**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **MARY LALIBERTE and MARIE MCKNIGHT, individually and as representatives of a class of similarly situated persons, on behalf of the QUANTA SERVICES, INC. 401(K) SAVINGS PLAN,** | § § § § § § § § | **Case No: 4:22-cv-03290** |
| **Plaintiffs,** | § § | |
| **v.** | § § | |
| **QUANTA SERVICES, INC.; THE BOARD OF TRUSTEES OF QUANTA SERVICES, INC.; THE QUANTA SERVICES, INC. 401(K) SAVINGS PLAN COMMITTEE; and DOES No. 1-20, Whose Names Are Currently Unknown,** | § § § § § § § | |
| **Defendants.** | § | |

## DEFENDANTS' MOTION TO DISMISS THE COMPLAINT AND MEMORANDUM OF LAW IN SUPPORT

Defendants Quanta Services, Inc. ("Quanta"), the Board of Trustees of Quanta Services, Inc., (the "Board") and the Quanta Services, Inc. 401(k) Savings Plan Committee (the "Committee"), by and through undersigned counsel, respectfully request that this Court, pursuant to Federal Rule of Civil Procedure 12(b)(6), dismiss with prejudice Plaintiffs' Complaint for the reasons set forth in the following memorandum of law.[1]

---

[1] Per this Court's November 30, 2022 Order, Dkt. 27, this motion to dismiss and the accompanying memorandum of law is no more than twenty-five pages (inclusive of the case style, any tables, and the signature block).

## <u>TABLE OF CONTENTS</u>

**Page**

I.     INTRODUCTION ................................................................................................ 3

II.    RELEVANT FACTUAL BACKGROUND....................................................... 5

     A.    Key Features of the Plan and Plaintiffs' Investments........................... 5

     B.    Target Date Funds................................................................................. 5

III.    PLAINTIFFS' CLAIMS .................................................................................. 7

IV.    ARGUMENT .................................................................................................... 8

     A.    Motion to Dismiss Standard.................................................................. 8

     B.    Plaintiffs Do Not Plausibly Allege That Quanta Breached Its Fiduciary
          Duties by Offering the Freedom Funds. ............................................... 9

          1.    Plaintiffs Cannot State a Viable Claim by Comparing the Actively
               Managed Freedom Funds to the Passively Managed Index Funds............ 9

          2.    Plaintiffs' Comparisons of the Freedom Funds to Other TDFs Do
               Not Permit an Inference of Imprudence................................................. 14

          3.    Plaintiffs' Critiques of the Performance of a Subset of the Freedom
               Funds' Underlying Investments Do Not Plausibly Suggest the
               Freedom Funds Were Imprudent Investments. ...................................... 20

          4.    "Outflows" from the Freedom Funds Do Not Suggest Imprudence........ 21

     C.    Plaintiffs Do Not Plausibly Allege It Was Imprudent to Offer the
          American Fund and the DFA Fund.................................................... 22

V.    CONCLUSION............................................................................................... 25

## I.    <u>INTRODUCTION</u>

Plaintiffs, two former participants in the Quanta 401(k) Services, Inc. Savings Plan ("Plan"), allege that Quanta breached its fiduciary duties of prudence and loyalty under the Employee Retirement Income Security Act ("ERISA"): (1) by offering the actively managed[2] Fidelity Freedom Funds ("Freedom Funds"), one of the most popular target-date funds ("TDFs") on the market, instead of the less-expensive passively managed Fidelity Index Funds ("Index Funds") or a few "better performing" TDF suites ("Alternative TDFs"); and (2) by offering the American Small Cap Value Fund ("American Fund") and the DFA International Small Cap Value Fund ("DFA Fund"). The premise of Plaintiffs' Complaint is that the Freedom Funds cost more than the Index Funds and had lower three-year and five-year returns than the cherry-picked Alternative TDFs as of a single date almost seven years ago. Plaintiffs also claim the American and DFA Funds underperformed their benchmark and a few other cherry-picked funds available in the market.

These claims fail as a matter of law for two primary reasons, as every Court of Appeals to have addressed these issues – in the context of these same TDFs – has held. *See Smith v. CommonSpirit Health*, 37 F.4th 1160, 1166 (6th Cir. 2022) (affirming Rule 12(b)(6) dismissal of imprudence claim challenging Freedom Funds); *Davis v. Salesforce.com, Inc.*, 2022 WL 1055557, at *2 n.1 (9th Cir. Apr. 8, 2022) (same as to JP Morgan TDFs); *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir. 2018) (same as to Wells Fargo and Vanguard TDFs).

First, as a matter of law, Plaintiffs must allege facts that their comparator funds are a meaningful benchmark for the challenged funds. The Complaint here does not. Most glaring, the

---

[2] Actively managed funds "try to find and buy underpriced securities while selling ones that the advisers think are overvalued." *Loomis v. Exelon*, 658 F.3d 667, 669-70 (7th Cir. 2011). Passively managed funds, also known as index funds, "simply track a designated portfolio." *Id.* at 670.

Complaint admits that the Freedom Funds invested in actively managed funds, but the Index Funds do not. And the Complaint has no facts about the glidepath, equity holdings, or bond holdings of any of the other Alternative Funds. These are the same sort of comparisons that the Sixth, Eighth and Ninth Circuits rejected. *See Smith*, 37 F.4th at 1166 (affirming Rule 12(b)(6) dismissal because Freedom Funds invest in actively managed funds and the Index Funds invest in passively managed funds); *Meiners*, 898 F.3d at 823 & n. 2 (same because "[a]s the district court noted, Wells Fargo [TDFs] have a higher allocation of bond[s] than Vanguard funds"); *Davis*, 2022 WL 1055557, at *2 n.1 (same as to claim comparing actively managed JP Morgan TDFs to JP Morgan TDFs that were partially active and partially passive). As the Eighth Circuit explained: "[c]omparing apples and oranges is not a way to show that one is better or worse than the other." *Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 485 (8th Cir. 2020); *Meiners*, 898 F.3d at 823 ("The fact that one fund with a different investment strategy ultimately performed better does not establish anything about whether the [challenged funds] were an imprudent choice at the outset"). Plaintiffs' comparisons to the American and DFA Funds suffer from the same shortfalls.

Second, even had Plaintiffs alleged meaningful benchmarks, "[n]o authority requires a fiduciary to pick the best performing [or cheapest] fund." *Meiners*, 898 F.3d at 823. That is why "[m]erely pointing to another investment that has performed better in a five-year snapshot of the lifespan of a fund that is supposed to grow for fifty years does not suffice to plausibly plead an imprudent decision." *Smith*, 37 F.4th at 1166. Yet that is all the Complaint does here.

For all these reasons, and those explained below, the Complaint should be dismissed.

4

## II.     RELEVANT FACTUAL BACKGROUND

### A.     Key Features of the Plan and Plaintiffs' Investments.

One of the ways Quanta helps its employees prepare for retirement is through the Plan, a "participant-directed 401(k) plan." Compl. ¶ 19. Each participant's retirement benefit depends on the amount they contribute and the performance of the investments they select. *Id*. Participants can choose from a diverse menu of investment options covering different asset classes, investment styles and risk-reward profiles. *Id*. ¶¶ 9, 24. Among others, the Plan offered the Freedom Funds, the American Fund, and the DFA Fund. *Id*. ¶¶ 25, 50, 55.

As relevant here, Plaintiff Laliberte alleges that she invested in the Fidelity Freedom 2055 Fund (*id*. ¶ 9), yet she alleges nothing about the fees or performance of that fund. Plaintiff McKnight alleges that she invested in fourteen different funds in the Plan, but she challenges just two of them: the American and DFA Funds. *Id*. ¶ 9.

### B.     Target Date Funds.

The Freedom Funds are the second-most widely-held TDF series in the market. *Id*. ¶ 25 (Fidelity "is the second largest TDF provider by total assets"); *see also* Blumenfeld Decl. Ex. A, Morningstar 2021 Target-Date Strategy Landscape ("2021 Morningstar Report")[3] at 8.[4] As the Complaint describes, the general idea of a TDF is to "offer[] an all-in-one retirement solution through a portfolio of underlying funds that gradually shifts to become more conservative as the assumed target retirement year approaches." Compl. ¶ 24. In other words, TDFs offer a one-stop investment strategy for participants and they hold a mix of underlying funds (in a "fund of funds"

---

[3] On a motion to dismiss, the Court can consider documents referenced in the Complaint. *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (citation omitted). Comp. ¶ 44; *Smith*, 37 F.4th at 1166 (considering Morningstar Report).

[4] A series (or "suite") of TDFs typically covers a range of potential retirement dates, spaced in five-year increments (i.e., 2020, 2025, and so on, up through 2060 or 2065).  Compl. ¶ 24.

structure) that invest in stocks, bonds, and other investments. *Id*. Importantly, TDFs are intended to be long-term investments, held until the date the investor retires (or later). *Id*. (TDFs provide "long-term growth"). For example, the Freedom 2055 Fund is designed for participants—such as Plaintiff Laliberte (*id*. ¶ 9)—who expect to retire thirty-two years from now, around the year 2055.

Different families of TDFs have meaningful differences. To start, as with other investments, TDFs can be characterized as either "actively managed" or "passively managed," depending on whether they invest in other funds that are passively managed or actively managed, or some combination of the two. The Complaint recognizes this important distinction. It alleges that actively managed TDFs "primarily feature[] funds with a manager deciding which securities to buy and sell, and in what quantities," whereas passively managed TDFs by contrast "invest[] only in index funds that track market indices." *Id*. ¶¶ 29-33. Further, over a TDFs' investment horizon, its managers will gradually rebalance the fund's asset allocation to become more conservative—shifting from riskier equity investments to lower-risk, non-equity investments—as the fund's target date approaches. *Id*. ¶ 24. This progression is known as the "glide path." *Id*.

Different TDF vintages offered by different companies will also hold different percentages of equities, bonds, and other assets. *Id*. ¶¶ 25, 37. For example, a suite managed by Fidelity might have a higher allocation to equities in its 2055 fund than other 2055 funds managed by T. Rowe Price or Vanguard because it reduces risk over time at a different rate than other TDF families, i.e. the glide paths differ.[5] The Complaint alleges the equity holdings of the Freedom Funds and Index Funds at different points in time, but does not allege any facts about the equity holdings of any of the other Alternative TDFs. *Id*. ¶ 36.

---

[5] *See* Blumenfeld Decl. Ex. B, Morningstar 2019 Target-Date Fund Landscape ("2019 Morningstar Report") at 22 (showing how the "sub-asset class glide path of the Fidelity Freedom series equity and bond exposures against the peer average").

Even more, significant variations exist within the equity or bond components of different target-date portfolios. As the Complaint explains, TDFs do not select individual securities; instead, they invest in a portfolio of "underlying funds." Compl. ¶¶ 27, 29, 34, 37. So even where two different TDFs of the same vintage might have the same overall percentage of assets allocated to "equities" or "bonds" generally, that says nothing about the specific types of equity funds or bond funds that are included, or the allocation among them. They vary. For instance, the Complaint admits that the Freedom Funds allocate "1.5% more of its assets to riskier international equities" and have a "higher exposure to riskier asset classes like emerging markets and high yield bonds." *Id.* ¶ 37. The Complaint alleges no facts comparing the Freedom Funds' holdings in international equities, emerging markets, or high yield bonds to any of the other Alternative TDFs. And the Complaint alleges no facts about the Alternative TDFs' allocations to any other types of bonds, or to small cap, mid-cap or large cap equities, or growth or value equities.

The DOL recognizes there are considerable differences among TDFs, even among those with the same target date, in terms of "how they invest and how they reallocate assets between equity and fixed income investments."[6] These "different investment strategies, glide paths, and investment-related fees," can "significantly affect the way a [TDF] performs." *Id.*[7]

## C.    Plaintiffs' Claims.

The Complaint asserts three claims: In Count I, Plaintiffs allege that Quanta breached its fiduciary duties of prudence and loyalty under ERISA, 29 U.S.C. § 1104(a)(1)(A), (B), and (D) by offering the Freedom Funds, the American Fund, and the DFA Fund in the Plan's investment

---

[6] *See U.S. Dep't of Labor and SEC Issue Guidance on Target Date Funds*, U.S. Dep't of Labor (DOL) (May 6, 2010), https://www.dol.gov/newsroom/releases/ebsa/ebsa20100506.

[7] *See Investor Bulletin: Target Date Retirement Funds*,  DOL, at 2-3 (May 6, 2010), https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/fact-sheets/investor-bulletin-target-date-retirement-funds.pdf.

lineup instead of the comparators they advocate. Compl. ¶¶ 78-82. In Count II, Plaintiffs allege that Quanta and its Administrative Committee failed to adequately monitor the fiduciaries. *Id.* ¶¶ 83-91. And in Count III, Plaintiffs allege that, to the extent any defendant is not an ERISA fiduciary, that defendant is liable as a non-fiduciary who participated in a knowing breach of trust. *Id.* ¶¶ 92-94.

## III.   ARGUMENT

### A.   Motion to Dismiss Standard.

To survive a motion to dismiss, a plaintiff must plead "sufficient factual matter" to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). To be "plausible," a plaintiff's allegations must raise "more than the mere possibility of misconduct." *Id.* at 679; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("speculative" allegations are insufficient). "When faced with two possible explanations for a defendant's conduct, only one of which results in liability, a plaintiff cannot offer allegations that are 'merely consistent with' their favored explanation but are also consistent with the alternative explanation." *JSW Steel (USA) Inc. v. Nucor Corp.*, 586 F. Supp. 3d 585, 595 (S.D. Tex. 2022) (quoting *Twombly*, 550 U.S. at 557)).

ERISA "does not give the federal courts a broad license to second-guess the investment decisions of retirement plans." *Smith*, 37 F.4th at 1162. Notwithstanding, fiduciaries often find themselves "between a rock and a hard place," facing litigation no matter what decision they make. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 424 (2014). A motion to dismiss is therefore an "important mechanism for weeding out meritless claims." *Id.* at 425. The Court must apply "careful, context-sensitive scrutiny" when evaluating ERISA claims at the pleadings stage. *Id.*

Because this is a "process-based inquiry," the question is not whether a plaintiff has alleged that a better performing investment existed in the marketplace; plaintiffs can do that in *every* case.

*Smith*, 37 F.4th at 1166; *see also Perkins v. United Surgical Partners Int'l Inc.*, 2022 WL 824839, at *5 (N.D. Tex. Mar. 18, 2022). Rather, Plaintiffs must allege facts that allow the inference that the fiduciary process must have been unlawful. *Smith*, 37 F.4th at 1166; *Meiners*, 898 F.3d at 823; *Albert v. Oshkosh Corp.*, 47 F.4th 570, 579 (7th Cir. 2022). In all events, recognizing that ERISA fiduciaries will often face "difficult tradeoffs," the Court "must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise," even in the Rule 12 context. *Hughes v. Nw. Univ.,* 142 S. Ct. 737, 742 (2022) (citation omitted).

**B.      Plaintiffs' Challenge To the Freedom Funds Does Not State A Claim.**

       1.     Plaintiffs Cannot State a Viable Claim by Comparing the Actively Managed Freedom Funds to the Passively Managed Index Funds.

Plaintiffs first claim Quanta breached its fiduciary duties by offering the actively managed Freedom Funds instead of the "less risky and less costly" Index Funds. Compl. ¶ 25. These allegations do not state an imprudence claim. To start, Plaintiffs here do not allege that the Freedom Funds were outliers in the marketplace, much less that they fell outside the "range of reasonable judgments" fiduciaries make. *Hughes*, 142 S. Ct. at 742. Nor do Plaintiffs allege that any fee difference harmed them by causing the Freedom Funds to underperform the Index Funds—whether net of fees or otherwise. *See generally* Compl. Indeed, although Plaintiff Laliberte alleges she invested in the Fidelity Freedom 2055 Fund, the Complaint contains no allegations about the fees or performance of that fund. These omissions are not surprising. Both the 2019 and 2021 Morningstar Target-Date Fund Landscape reports that Plaintiffs rely on in their Complaint (*id.* ¶ 44) confirm just the opposite. Ex. B, 2019 Morningstar Report, at 39 ("Despite an average fee advantage of 50 basis points, the Fidelity Freedom Index series *lagged* the Fidelity Freedom series by roughly 38 basis points annually, on average, since the former's 2009 inception through 2018."); Ex. A, 2021 Morningstar Report, at 7 ("Since Freedom Index launched in 2009, it has

underperformed the [] Freedom Funds . . .”); *see also Smith*, 37 F.4th at 1168 (“the Fidelity Freedom Funds [] outperformed the Fidelity Index Funds in the most recent set of performance data . . . .”). It is thus unsurprising the Freedom Funds “remained significantly more popular than the Index Suite as late of 2018 . . . .” *Id.*

Performance aside, the allegations in the Complaint regarding the Index Funds fail. *First*, Plaintiffs’ allegations merely reduce to a claim that fiduciaries must select the cheapest options available. That is not the law. “[N]othing in ERISA requires [a] fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems).” *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009).[8]

*Second*, that the actively managed Freedom Funds charge more than the passively managed Index Funds is insufficient to infer imprudence. The Sixth Circuit’s recent decision in *Smith* is instructive. There, Plaintiffs’ *same counsel* asserted nearly identical allegations, claiming that CommonSpirit Health should have jettisoned the Freedom Funds in favor of the Index Funds. *Compare* Compl. ¶ 29, *with Smith*, 37 F.4th at 1165 (“[Plaintiff] alleges that ‘investors should be very skeptical of an actively managed fund’s ability to consistently outperform its index” and that the Freedom Funds “chase[] returns by taking levels of risk that render [them] unsuitable for the average retirement investor”).[9] The Sixth Circuit rejected that claim, and affirmed dismissal.

---

[8] *See also Meiners*, 898 F.3d at 823–24 (“[T]he existence of a cheaper fund does not mean that a particular fund is too expensive in the market generally or that it is otherwise an imprudent choice”); *Albert*, 47 F.4th at 579 (affirming Rule 12 dismissal, explaining that “[t]his court has repeatedly emphasized that the cheapest investment option is not necessarily the one a prudent fiduciary would select”); *Forman v. TriHealth, Inc.*, 40 F.4th 443, 450 (6th Cir. 2022) (“Plan administrators [] have considerable discretion in choosing their offerings and do not have to pick the lowest-cost fund . . .”).

[9] Word-for-word, the Complaint mirrors the same allegations that the Sixth Circuit rejected in *Smith. Compare* Compl. ¶ 25, *with Smith v. CommonSpirit Health, et al.*, No. 2:20-cv-00095-DLB-EB (E.D. Ky. July 2, 2020), Dkt. 1, ¶ 21 (“*Smith* Compl.”) (“Among its target date offerings,

Recognizing that actively managed funds like the Freedom Funds "represent a common fixture of retirement plans," the Sixth Circuit noted that "there is nothing wrong with permitting employees to choose them in hopes of realizing above-average returns over the course of the long lifespan of a retirement account. . . . " *Smith*, 37 F.4th at 1165. Indeed, numerous circuit courts have aptly recognized that "denying employees the option of actively managed funds, especially for those eager to undertake more or less risk, would itself be imprudent." *Id.*; *Albert*, 47 F.4th at 581 (same). That actively managed funds, which "require considerable judgment and expertise, charge more than passively managed funds, which require little judgment and expertise," of course is no "surprise." *Smith*, 37 F.4th at 1163. To the contrary: the fee-differential between the two funds is to be expected. *Id.*; *see also Albert*, 47 F.4th at 581 ("the fact that actively managed funds charge higher fees than passively managed funds is…not enough to state a claim because such funds may also provide higher returns"); *Davis*, 960 F.3d at 486. In sum, "[o]ffering actively managed funds" like the Freedom Funds is a "reasonable response to customer behaviour," and is certainly within the "range of reasonable judgments" that fiduciaries make. *Smith*, 37 F.4th at 1165; *Forman*, 40 F.4th at 448; *Albert*, 47 F.4th at 581.

---

Fidelity offers the risker and more costly Freedom Funds [] and the less risky and less costly [] Index suite"); *compare* Compl. ¶ 29, *with Smith* Compl. ¶ 21 ("The Active suite is also dramatically more expensive than the Index suite, and riskier in both its underlying holdings and its asset-allocation strategy."); *compare* Compl. ¶ 41, *with Smith* Compl. ¶ 31 ("The fees charged by the Active suite are many multiples higher than the Index suite's industry-leading low fees" and citing identical chart titled "Cost Comparison for K Share Class"); *compare* Compl. ¶ 42, *with Smith* Compl. ¶ 33 ("Considering just the gap in expense ratios from the Plan's investment in the Active suite to the Institutional Premium share class of the Index suite, the Plan could have saved approximately [] in costs. . . .); *compare* Compl. ¶¶ 31-32, *with Smith* Compl. ¶ 26 ("Market research has indicated that investors should be very skeptical of an actively managed fund's ability to consistently outperform its index . . . Actively-managed funds tend to charge higher fees than index funds (which are passed on to the target date fund investor through higher expense ratios).").

*Third*, every circuit court in the country has held that to plausibly allege "a prudent fiduciary in like circumstances" would have selected a different TDF, Plaintiffs "must provide a sound basis for comparison—a meaningful benchmark." *Meiners*, 898 F.3d at 822.[10] This is a "challenging" standard and is not met "by alleging that cheaper alternative investments with some similarities exist in the marketplace." *Id.* at 822-23. It instead requires Plaintiffs to plead facts showing that their alternatives had similar investment strategies, asset allocations, and risk profiles to the challenged funds. *See id.*

Plaintiffs fail to meet this standard. Once again, *Smith* is instructive. Just like here, the plaintiffs in *Smith* alleged that "Fidelity Index Funds are appropriate comparators to the Freedom Funds because they are sponsored by the same company, managed by the same team, and use a similar allocation of investment types."[11] *Smith*, 37 F.4th at 1167. Not so. The district court in *Smith* explained that plaintiffs could not "'dodge the requirement for a meaningful benchmark'" simply because the Freedom Funds and Index Funds may have "some similarities." *Smith v. CommonSpirit Health*, 2021 WL 4097052, at *6 (E.D. Ky. Sept. 8, 2021), *aff'd*, 37 F.4th 1160 (citation omitted). Agreeing, the Sixth Circuit held that "each fund has distinct goals and distinct strategies, making them inapt comparators." *Smith*, 37 F.4th at 1167.

So too here. Plaintiffs' own allegations confirm the Index Funds are inapt benchmarks for the Freedom Funds, with markedly different investment strategies, holdings, and risk. For

---

[10] *See also Smith*, 37 F.4th at 1167 (same); *Davis*, 2022 WL 1055557, at *2 n.1.

[11] *Compare* Compl. ¶ 29 ("The Active suite and the Index suite are sponsored by the same investment management company and share a management team."), *with Smith* Compl. ¶ 22 ("The two fund families have nearly identical names and share a management team"); *compare* Compl. ¶ 36, *with Smith* Compl. ¶ 27 (the "Active and Index suites appear to follow essentially the same glide paths and strategy"); *compare* Compl. ¶ 36, *with Smith* Compl. ¶ 28 (showing identical "Equity Glide Path" chart).

example, Plaintiffs allege that the Freedom Funds "invest[] predominately in actively managed Fidelity mutual funds," while the "Index suite places no assets under active management," (Compl. ¶ 29); the Freedom Funds have more exposure to emerging markets, international equities, and high yield bonds, (*id*. ¶ 37); the Index Funds invest only in underlying index funds, while the Freedom Funds allow managers to decide which underlying funds to invest in and in what quantities, (*id*. ¶ 30); the Freedom Funds' goal is to "beat a benchmark," while the Index Funds invest only in funds that track segments of the market, (*id*. ¶ 37); and, the Freedom Funds can "deviate from the glide path allocations by ten percentage points in either direction," *id*. ¶ 38. These ***identical*** allegations compelled the district court and the Sixth Circuit in *Smith* to deem the Freedom Funds and the Index Funds unsuitable comparators.[12] *Smith*, 2021 WL 4097052, at *6 ("Plaintiff does not dispute the fundamental differences between the two funds, 'that is, the Active Suite's grant of discretion to select riskier assets and deviate from the glide path . . . .'"), *aff'd* 37 F.4th at 1167 (finding the Freedom Funds and Index Funds are "distinct funds [that] deal with different objectives for different investors"). This Court should reach the same result. *See also Forman*, 40 F.4th at 449 (affirming 12(b)(6) dismissal because "[e]ven comparator investments that are 'sponsored by the same company, managed by the same team, and use a similar allocation

---

[12] *Compare* Compl. ¶ 29, *with Smith* Compl. ¶ 21 ("But while the Active suite invests predominately in actively managed Fidelity mutual funds, the Index suite places no assets under active management and instead invests in Fidelity funds that simply track market indices."); *compare* Compl. ¶ 30, *with Smith* Compl. ¶ 25 ("The Active suite subjects its assets to significantly more risk than the Index suite []. At the underlying fund level, while the Index suite invests only in index funds that track segments of the market, the Active suite primarily features funds with a manager deciding which securities to buy and sell, and in what quantities"); *compare* Compl. ¶ 37, *with Smith* Compl. ¶ 28 ("Across the glide path, the Active suite allocates approximately 1.5% more of its assets to riskier international equities than the Index suite, and also has higher exposure to riskier asset classes like emerging markets and high yield bonds."); *compare* Compl. ¶ 38, *with Smith* Compl. ¶ 29 ("Since the Active suite series underwent a strategy overhaul in 2013 and 2014, its managers have had the discretion to deviate from the glide path allocations by ten percentage points in either direction.").

of investment types'" will be inapt when "'each fund has distinct goals and distinct strategies'")
(citation omitted); *Davis v. Salesforce.com, Inc.*, 2021 WL 1428259, at *5 (N.D. Cal. Apr. 15,
2021), *aff'd in relevant part*, 2022 WL 1055557 (9th Cir. Apr. 8, 2022) ("although the JPMorgan
target date blend funds and JPMorgan SmartRetirement funds may have some similarities, the
JPMorgan target date blend funds, which plaintiffs allege have 'some passive funds underlying
[them],' are not meaningful benchmarks for the actively managed JPMorgan SmartRetirement
funds"); *Coyer v. Univar Sols. USA Inc.,* 2022 WL 4534791, at *6 (N.D. Ill. Sept. 28, 2022)
(dismissing imprudence claim; Freedom Funds and Index Funds are inapt comparators).[13]

> 2. Comparisons of the Freedom Funds to Other TDFs Does Not Permit an Inference of Imprudence.

Plaintiffs' comparisons to the Alternative TDFs fare no better. They allege the Freedom
Funds underperformed the Alternative TDFs as of the second quarter of 2016 (or, June 2016).
Compl. ¶ 80. Based on this performance snapshot *almost seven years* ago, Plaintiffs ask the Court
to infer the Freedom Funds were imprudent. This claim fails.

As a matter of law, ERISA fiduciaries are not required to select the best performing fund.
*Meiners*, 898 F.3d at 823; *Smith*, 37 F.4th at 1165; *Forman,* 40 F.4th at 449; *Davis*, 960 F.3d at
485. The necessary corollary is that allegations that some other funds performed better do not state
a plausible fiduciary breach claim. *See, e.g.*, *Smith*, 37 F.4th at 1166 ("a showing of imprudence
[does not] come down to simply pointing to a fund with better performance"); *Forman,* 40 F.4th
at 449 (same); *Meiners*, 898 F.3d at 823 ("The fact that one fund with a different investment
strategy ultimately performed better does not establish anything about whether the Wells Fargo

---

[13] *See also, e.g., Parmer v. Land O'Lakes, Inc*., 518 F. Supp. 3d 1293, 1306–7 (D. Minn. 2021)
("A comparison between passively managed and actively managed funds is [therefore] not
meaningful . . . ."); *Rosenkranz v. Altru Health Sys.*, 2021 WL 5868960, at *10 (D.N.D. Dec. 10,
2021) (similar).

TDFs were an imprudent choice at the outset.").[14] This makes sense. After all, "[r]etirement investing" involves a "long-term horizon," *Kirschbaum v. Reliant Energy, Inc*., 526 F.3d 243, 253-54 (5th Cir. 2008), and short-term performance fluctuations are common. *See also White v. Chevron Corp*., 2017 WL 2352137, at *20 (N.D. Cal. May 31, 2017), *aff'd* 752 F.App'x. 453 (9th Cir. 2018) (noting fiduciaries often have "long-range investment strateg[ies]," which "plainly permit[]" the "common practice of retaining investments through periods of under-performance").[15] At best, short-term performance allegations merely show that the Alternative TDFs performed better at a snapshot in time, but that does not support a finding of imprudence because "[p]recipitously selling a well-constructed portfolio in response to disappointing short-term losses, as it happens, is one of the surest ways to frustrate the long-term growth of a retirement plan." *Smith*, 37 F.4th at 1166. This is particularly true when it comes to TDFs, which, by design, are intended for *long-term investing*. Compl. ¶ 29; *see supra* at 6. As the Sixth Circuit recently put it, "[m]erely pointing to another investment that has performed better in a five-year snapshot of the lifespan of a fund that is supposed to grow for fifty years does not suffice to plausibly plead an imprudent decision." *Smith*, 37 F.4th at 1166; *see also Forman*, 40 F.4th at 449 ("side-by-side comparisons 'of how two funds performed in a narrow window of time' . . . will not tell a fiduciary which is the more prudent long-term investment option").

---

[14] *See also DeBruyne v. Equitable Life Assur. Soc. of U.S.*, 920 F.2d 457, 465 (7th Cir. 1990) ("the ultimate outcome of an investment is not proof of imprudence"); *Pension Benefit Guar. Corp. ex rel. Saint Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718 (2d Cir. 2013) (allegations "that better investment opportunities were available at the time of the relevant decisions" does not plausibly state imprudent conduct).

[15] *Jenkins v. Yager*, 444 F.3d 916, 926 (7th Cir. 2006) (holding that a fiduciary may prudently select "funds with long-term growth potential and . . . stay with those . . . funds even during years of lower performance").

That principle holds here. Plaintiffs examine the Freedom Funds' returns as of a *single date* prior to the putative class period for a three- or five-year period.[16] That does not plausibly suggest imprudence. The Complaint says nothing about the performance as of any other quarter or year; indeed, taking the Complaint's allegations as true, one cannot tell whether the Freedom Funds performed worse than any of the comparator funds as of any other point in time, including the entire putative class period. Worse still, Plaintiffs' charts only provide performance data for a subset of the Freedom Funds' vintages, even omitting the 2055 fund in which Plaintiff Laliberte herself claims to have invested. Compl. ¶ 9. Regardless, the district court in *Coyer* rejected identical allegations comparing the Freedom Funds to Plaintiffs' same Alternative TDFs.[17] 2022 WL 4534791, at *6. It found that to infer imprudence based on the allegation that the Freedom Funds "ranked last against four of the five largest non-Fidelity managers" would run contrary to the well-accepted principle that fiduciaries need not jettison a fund "that fails to turn in best-in-class performance for any specific period." *Id.* (citing *Meiners*, 898 F.3d at 823)).  So too here.[18]

---

[16] *Wehner v. Genentech, Inc.*, 2021 WL 507599, at *9-10 (N.D. Cal. Feb. 9, 2021) ("There is nothing presumptively imprudent about a retirement retaining investments 'through periods of underperformance as part of a long-range investment strategy'"; rejecting five-year underperformance history) (citations omitted); *Gonzalez v. Northwell Health, Inc.*, 2022 WL 4639673, at *8 (E.D.N.Y. Sept. 30, 2022) (similar); *Dorman v. Charles Schwab Corp.*, 2019 WL 580785, at *6 (N.D. Cal. Feb. 8, 2019) (five years of underperformance history insufficient to support plaintiffs' allegation that funds "persistent[ly]" or "materially" underperformed).

[17] *Compare* Compl. ¶ 47, *with Coyer v. Univar Sols. USA Inc.*, No. 1:22-cv-00362 (N.D. Ill. Jan. 21, 2022) Dkt. 1, ¶ 81 (comparing Freedom Funds' performance to the American Funds, T. Rowe Price, Vanguard, and JP Morgan TDFs).

[18] As the *Coyer* Court aptly noted, Plaintiffs' comparator funds, too, "have been attacked as imprudent choices in other lawsuits for breach of fiduciary duty." 2022 WL 4534791, at *6. Courts have correctly rejected those allegations as implausible. *See, e.g.*, *Parmer*, 518 F. Supp. 3d at 1306 (granting Rule 12 motion as to fiduciary breach claims challenging T. Rowe Price TDFs because TDFs from Fidelity, Vanguard, and American Funds were not meaningful comparators); *Rosenkranz*, 2021 WL 5868960, at *10-11 (granting Rule 12 motion as to fiduciary breach claims challenging JP Morgan TDFs because Fidelity and American TDFs were not meaningful

Moreover, even if relative performance alone was enough to infer an imprudent process, Plaintiffs would at a minimum need to establish "a meaningful benchmark." *See supra* at 12. This requires Plaintiffs to allege facts showing that their alternatives had the same investment strategies, holdings, and risk profiles to the Freedom Funds. *Id.* After all, investments with different strategies, holdings, and fees are expected to perform differently. *See, e.g.*, *Meiners*, 898 F.3d at 823 ("The fact that one [TDF] with a different investment strategy ultimately performed better does not establish anything about whether the Wells Fargo TDFs were an imprudent choice"). In the Sixth Circuit's words, "[j]ust as comparison can be the thief of happiness in life, so it can be the thief of accuracy when it comes to two funds with separate goals and separate risk profiles," which is "why disappointing performance by itself does not conclusively point toward deficient decision-making, especially when we account for competing explanations and other common-sense aspects of long-term investments." *Smith*, 37 F.4th at 1167 (internal quotation marks omitted). Indeed, *every* circuit court to address similar challenges to TDFs—including the Sixth, Eighth, and Ninth Circuits—has affirmed dismissal because the proffered comparators do not satisfy this requirement. *See supra* at 12-14 (discussing *Smith*, 37 F.4th at 1167; *Meiners*, 898 F.3d at 823–24; *Davis*, 2022 WL 1055557, at *2 n.1).

Once again, the Complaint flunks this requirement. While Plaintiffs allege that the Alternative TDFs are "readily investable alternatives" to the Freedom Funds, Compl. ¶ 47, they fail to allege how the Alternative TDFs serve as a "sound basis of comparison—a meaningful benchmark" for the Freedom Funds. *Meiners*, 898 F.3d at 822. Nor could they. Plaintiffs admit that one of the Alternative TDFs (Vanguard) invests in passively managed index funds, Compl. ¶

comparators); *Matney v. Barrick Gold of N. Am., Inc.*, 2022 WL 1186532, at *10 (D. Utah Apr. 21, 2022) (similar).

17

47, and thus are "inapt" comparators to the active Freedom Funds, just as the Fidelity Index Funds are. *See Smith*, 37 F. 4th at 1167; *see also supra* at 12-14. Plaintiffs allege that the remaining comparators are all "actively managed" like the Freedom Funds, Compl. ¶ 47, but this alone is not sufficient to show they are meaningful benchmarks. TDFs employ different asset allocations (bonds v. equities v. other), risk profiles (aggressive v. conservative), different types of underlying funds, and various glide path strategies. TDFs also invest in domestic equities and international equities, small cap and large cap, growth and value. But Plaintiffs make no attempt to illustrate how the Alternative TDFs compare to the Freedom Funds in these ways. *See, e.g., Matousek v. MidAmerican Energy Co.*, 51 F. 4th 274, 281 (8th Cir. 2022) (affirming 12(b)(6) dismissal of imprudence claim; finding "[a]mong the missing details is whether they hold similar securities, have similar investment strategies, and reflect a similar risk profile"). Based on these precise pleading deficiencies, the district court in *Coyer* recently found Plaintiffs' bare allegation comparing the Freedom Funds to "suitable alternative TDFs" failed to satisfy their burden to plead a "meaningful benchmark." *Coyer*, 2022 WL 4534791, at *6 (holding "plaintiffs' complaint has not plausibly pleaded the active-management component of their comparison"). And just two weeks ago, the district court in *Tullgren v. Booz Allen Hamilton Inc.* and *Hall v. Capital One Financial Corp.* rejected the same Alternative TDFs (Fidelity Index, Vanguard, American Funds, and T. Rowe Price) that Plaintiffs try to use here in a challenge to a different TDF suite:

> Plaintiffs fail to allege facts that demonstrate BlackRock TDFs severely underperformed the comparable TDFs or *that, in fact, the comparable TDFs were appropriate, meaningful benchmark comparators*. The complaint lacks facts showing that the TDFs *shared the same investment strategy, investment style, risk profile, or asset allocation*. The Court accepts that the differences that have been identified between actively managed and passively managed, the time horizons of

"to retirement" versus "through retirement," *and the different allocations of bond and equity mixes is fatally defective* in plausibly stating a claim.[19]

Plaintiffs' allegations suffer from the same fatal flaws and should be dismissed. *See supra* at 13.[20]

Lastly, the Complaint's single-faceted performance attack on the Freedom Funds rests on comparisons to only a small segment of the TDF universe. The 2019 Morningstar Report, Ex. B at 53-54, identifies over 60 different TDF series, yet the Complaint merely alleges that four suites performed better than the Freedom Funds. There is no legal difference between alleging that four funds out of 60 performed better and saying that one fund out of 60 performed better. Both averments confirm only that the fund was not the best performing TDF during a particular period, nothing more. *Cf. Meiners*, 898 F.3d at 823-24 ("[T]he existence of a cheaper fund does not mean that a particular fund is too expensive in the market generally or that it is otherwise an imprudent choice."). That cannot state a claim because, as discussed, "no authority requires a fiduciary to pick the best performing [TDF]." *Id.* at 823; *see also supra* at 14. Otherwise, plaintiffs could state a fiduciary-breach claim against plans that offered the JP Morgan, Vanguard, and T. Rowe Price TDFs, too, because the American TDFs performed better than each of them as of the second quarter in 2016. *See* Compl. ¶ 47.

---

[19] *See* Blumenfeld Decl. Ex. C, Transcript of Motions Hearing, *Tullgren v. Booz Allen Hamilton Inc.*, No. 1:22-cv-00856 (E.D. Va. Dec. 1, 2022), at 36 (emphasis added); *see also Tullgren*, Dkt. 35; *Hall v. Capital One Fin. Corp.*, No 1:22-cv-00857 (E.D. Va. Dec. 1, 2022), Dkt. 47.

[20] *See also Anderson v. Intel Corp. Inv. Policy Comm.*, 579 F.Supp.3d 1133, 1149 (N.D. Cal. 2022) (rejecting argument that "comparing a given target date fund . . . to peer TDFs of the same vintage is standard and reasonable practice" because TDFs "can have differing 'investment strategies, glide paths, and investment-related fees'"; determining a suitable benchmark "[d]epends largely on the stated investment strategy and the actual investments of the fund"); *Matney*, 2022 WL 1186532, at *10 (dismissing claims where "the actively-managed American [TDFs] that Plaintiffs select for comparison have materially different investment strategies than the JPMorgan [TDFs]").

3.      Plaintiffs' Critiques of the Performance of a Subset of the Freedom Funds' Underlying Investments Do Not Plausibly Suggest the Freedom Funds Were Imprudent Investments.

Plaintiffs also ask the Court to infer an imprudent process because some of the investments *held by* the Freedom Funds underperformed their benchmarks, or had a short performance history. Compl. ¶¶ 33-35. But these investments were not offered as stand-alone funds in the Plan. Regardless, Plaintiffs say nothing about how the performance of the underlying investments impacted the performance of the *Freedom Funds themselves*, nor allege that the *Freedom Funds* had an insufficient performance history. Nor do Plaintiffs allege the Index Funds or the Alternative TDFs only had underlying funds with a five-year track record that outperformed their benchmarks.[21] Said another way, the Complaint alleges no facts that suggest that the Freedom Funds were any different from any other TDFs, let alone fall outside the "range of reasonable judgments" that fiduciaries make. *Hughes,* 142 S. Ct. at 742. Once again, Plaintiffs' same counsel made almost identical allegations in *Smith*, but the Court rejected them as insufficient.[22] 2021 WL 4097052, at *8. This Court should too.

---

[21] As it happens, the Fidelity Index Funds that Plaintiffs claim should have been offered instead of the Freedom Funds invest in component funds that were incepted in 2016, 2019, and 2021. *See, e.g.*, *Fidelity Freedom Index 2050 Fund Investor Class*, Fidelity, https://fundresearch.fidelity.com/mutual-funds/composition/315793869 (last visited Dec. 13, 2022) (listing component funds); *Fidelity Series Total Market Index Fund*, Fidelity, https://fundresearch.fidelity.com/mutual-funds/summary/315911537 (last visited Dec. 13, 2022) (inception date 4/26/2019); *Fidelity Series Bond Index Fund*, Fidelity, https://fundresearch.fidelity.com/mutual-funds/summary/31635T823 (last visited Dec. 13, 2022) (inception date 4/26/2019); *Fidelity Series Long-Term Treasury Bond Index Fund*, Fidelity, https://fundresearch.fidelity.com/mutual-funds/summary/31635V620 (last visited Dec. 13, 2022) (inception date 7/6/2016); *Fidelity Series International Developed Markets Bond Index Fund*, Fidelity, https://fundresearch.fidelity.com/mutual-funds/summary/31638R667 (last visited Dec. 13, 2022) (inception date 8/31/2021).

[22] *Compare* Compl. ¶ 33, *with Smith* Compl. ¶ 27 ("At all times across the glide path, the Active Suite's top four domestic equity positions were and are in Fidelity series funds, created for exclusive use in the Freedom Funds, [three] of which have dramatically trailed their respective

4.    "Outflows" from the Freedom Funds Do Not Suggest Imprudence.

Plaintiffs cite the 2019 Morningstar Report for the argument that Quanta should have realized the Freedom Funds were imprudent because some other investors withdrew assets from the Freedom Funds between 2016 and 2020. Compl. ¶ 44.[23] Plaintiffs ignore that even after the $35 billion in net "outflows," their own sources (Morningstar reports from 2019 and 2021) show that as of 2018 and 2020, the Freedom Funds were still three times *more* popular than the Index Funds with the Freedom Funds holding $212 billion in invested assets as opposed to the Index Funds' $70 billion in assets. *See e.g.*, Ex. A, 2021 Morningstar Report, at 8. According to Plaintiffs' Morningstar Reports, the Freedom Funds were the second-most popular TDF in the *entire* TDF market, and Morningstar gave both the Freedom Funds and the Index Funds identical "Silver" rankings. *See id.* at 8, 10*; see also Smith*, 2021 WL 4097052, at *8 (finding the Morningstar Report "undermines her allegations that a reasonable prudent fiduciary would have dropped the Fidelity Active Suite from its fund lineup"). These are the same sorts of facts relied upon by the Sixth Circuit when it affirmed dismissal of nearly identical challenges to the Freedom Funds in *Smith*.[24] 37 F. 4th at 1168 ("Morningstar gave the Freedom Funds and the Index Funds a

---

indices over their respective lifetimes" and alleging performance data of The Large Cap Stock Fund and the Intrinsic Opportunities Fund).

[23] Plaintiffs also complain about the Freedom Funds' managers' "discretion" to deviate from the funds' glide path when selecting investments. Compl. ¶¶ 32, 38. But this discretion "is merely a natural feature, not an unusual byproduct, of active management and well within the mainstream of industry practice," and does not suggest an imprudent process. *Smith*, 37 F.4th at 1167-68.

[24] *Compare* Compl. ¶ 44 ("Unsurprisingly, the Index suite has seen significant inflows, receiving an estimated $19.8 billion in net inflows in 2020. At the same time, investor confidence in the Active suite has deteriorated: from 2016-2020, while the Index suite gained approximately $40 billion in net inflows, the Active suite lost an estimated $35 billion in net outflows."), *with Smith* Compl. ¶ 34 (". . . the Index suite has seen significant inflows, receiving an estimated $4.9 billion in new funds in 2018 alone. At the same time, investor confidence in the Active suite has deteriorated; 2018 saw the series experience an estimated $5.4 billion in net outflows.").

'Silver' rating and rated the Freedom Funds' management team and process as 'above average' or better."). As the Sixth Circuit explained, "[n]othing in these reports suggest that the Freedom Funds' reputation was bad enough when viewed in the market as a whole that a prudent plan administrator should never have included them in the offerings or should have precipitously dumped them." *Id*. Said differently, this hindsight-based critique would not have caused alarm to a reasonably prudent fiduciary in real-time. *Id*.

This same takeaway applies here. Giving "due regard" to fiduciary discretion, the Court should not infer Quanta breached its duties by offering the Freedom Funds when those funds remained one of the most popular investments in the marketplace following the "outflows," and the Freedom Funds' holdings still dwarfed those of the Index Funds. *See Hughes*, 142 S. Ct. at 742; *Smith*, 2021 WL 4097052, at *8 ("[Freedom Funds] remained significantly more popular than the Index [Fund suite]" and were "the second-most popular [TDF] in the entire industry").

### C.     Plaintiffs Do Not Plausibly Allege It Was Imprudent to Offer the American Fund and the DFA Fund.

Plaintiffs also allege that it was imprudent for Quanta to retain two additional funds: the American Fund and the DFA International Fund. Compl. ¶¶ 50-58. Neither allegation suffices. Plaintiffs allege that the American and DFA Funds trailed the market indexes listed in their respective prospectus over the three- and five-year period. *Id*. ¶¶ 49, 55. That is insufficient to infer imprudence for at least two reasons.

*First*, as the Sixth and Eighth Circuits have aptly held, the market indexes listed in the funds' prospectuses are not "meaningful benchmarks" for actively managed funds, such as the American and DFA Funds. *Davis*, 960 F.3d at 485 n. 4 (rejecting comparison to Russell 3000 Index because it "tracks the 3,000 largest stocks in the [U.S.]" but "is not a fund, much less an actively-managed one. . . ."); *Smith*, 37 F.4th at 1168 (similar). The Sixth Circuit recently rejected

Plaintiffs' same counsel's challenge to an American fund for exactly this reason. *Smith*, 2021 WL 4097052, at *8 (the "Russell [] Value Index is an unsuitable comparator"), *aff'd* 37 F.4th at 1169 (allegations that the American fund "underperformed [the] benchmark index funds consistently" do not suffice).[25]

Plaintiffs' remaining comparators are equally insufficient. While Plaintiffs list several "readily investible alternatives" to the American and DFA Funds (Compl. ¶¶ 54, 58), they again fail to show how the comparators are "meaningful benchmarks" to the challenged funds. *See supra* at 12. Nor could they. For instance, the American Fund allocates assets (through different sub-advisors) that have "most or all" of numerous characteristics, such as above-average "earnings growth potential," and below-average price to earnings, price to book, and price to revenue ratios.[26] On the other hand, The MFS New Discovery Fund has a singular focus: it invests in assets of companies that are undervalued.[27] Based on precisely these differences, the Eighth Circuit recently found that two funds were "'just different.'" *Matousek*, 51 F.4th at 282 ("The American fund 'uses a balanced approach to invest in a broad range of securities,' including both growth and value stocks. The Oakmark fund, by contrast, 'uses a value investment philosophy' by buying stock in a 'relatively small number' of companies trading below their intrinsic value.") (citations omitted).

---

[25] *Smith* also rejected Plaintiffs' same argument that Quanta should have replaced the American Beacon Fund with a passively managed Vanguard Russell Index Fund, and this Court should too. *Smith*, 2021 WL 4097052, at *9.

[26] *See* Blumenfeld Decl. Ex. D, American Beacon Small Cap Value Fund Summary Prospectus, at 2. On a motion to dismiss, a court can consider documents like fund prospectuses that are "publicly filed with a government regulatory agency" (here, the SEC). *Cunningham v. Cornell Univ.*, 2017 WL 4358769, at *4 (S.D.N.Y. Sept. 29, 2017). In ERISA cases with fund performance allegations, courts frequently consider fund prospectuses at the pleadings stage. *See, e.g.*, *Hecker*, 556 F.3d at 585; *Kurtz v. Vail Corp.*, 511 F. Supp. 3d 1185, 1192 (D. Colo. 2021).

[27] *See* Blumenfeld Decl. Ex. E, MFS New Discovery Value Fund Summary Prospectus, at 2.

Likewise, the DFA Fund's strategy is to invest in "securities of small, non-U.S. companies in countries with developed markets," while its alleged comparator, the Yacktman Special Opportunities Fund, focuses its investments on "*domestic* and foreign equity securities, including *emerging market* securities.[28] *See Matousek*, 51 F.4th at 282 (finding "contrasting investment styles" rendered two funds insufficient comparators) (citation omitted). These "apples-to-oranges" comparisons do not suffice.

*Second*, even if Plaintiffs had identified an appropriate benchmark, they have failed to allege the sort of sustained and substantial underperformance that could nudge their claim from "possible" to "plausible." *Iqbal*, 556 U.S. at 678. Plaintiffs claim the American and DFA Funds underperformed in the three- and five-year periods during certain quarters over the class period, but courts consistently find that such a short period of alleged underperformance does not plausibly infer imprudence. *See, e.g.*, *Davis v. Salesforce.com, Inc.*, 2020 WL 5893405, at *4 (N.D.Cal. Oct. 5, 2020) ("five-year returns are not sufficiently long-term to state a plausible claim"); *see also supra* at 14-16. The Complaint demonstrates this principle: Plaintiffs' chart shows the American Fund started *outperforming* its benchmark as of the fourth quarter of 2021. Compl. ¶ 52. This is why "the duty of prudence does not compel ERISA fiduciaries to reflexively jettison investment options in favor of the prior year's top performers." *Patterson v. Morgan Stanley,* 2019 WL 4934834, at *11 (S.D.N.Y. Oct. 7, 2019). Even over these limited time periods, Plaintiffs' allegations of underperformance are modest. They allege the American Fund's underperformance ranged from .54% to 2.47% (three-year) and .60% to 1.80% (five-year), but that is not the sort of substantial underperformance that gives rise to a plausible inference that a prudent fiduciary would

---

[28] *Compare* Blumenfeld Decl. Ex. F, DFA International Small Cap Growth Fund Summary Prospectus, at 3, *with* Blumenfeld Decl. Ex. G, Yacktman Special Opportunities Fund Summary Prospectus, at 1 (emphasis added).

have removed these funds from the Plan.[29] These claims too fail.[30]

## IV.   CONCLUSION

This Court should dismiss Plaintiffs' Complaint with prejudice under Rule 12(b)(6).

Dated: December 13, 2022                    Respectfully submitted,

                                            **MORGAN, LEWIS & BOCKIUS LLP**

                                            /s/ *Jeremy P. Blumenfeld*
                                            Jeremy P. Blumenfeld, *Admitted Pro Hac Vice*
                                            Attorney-In-Charge
                                            Pennsylvania Bar No. 85955
                                            1701 Market Street
                                            Philadelphia, PA 19103
                                            Telephone: (215) 963-5000
                                            *jeremy.blumenfeld@morganlewis.com*

                                            David J. Levy
                                            Texas Bar No. 12264850
                                            S.D. Tex. No. 13725
                                            1000 Louisiana Street, Suite 4000
                                            Houston, Texas 77002
                                            Telephone: (713) 890-5000
                                            *david.levy@morganlewis.com*

---

[29] *Patterson*, 2019 WL 4934834, at *11 (five-year annualized underperformance of 1.14% "is relatively small and certainly not enough to support a claim for breach of the duty of prudence"), *Gonzalez,* 2022 WL 4639673, at *5 (finding that rolling three- and five-year underperformance ranging from 0.32% to 2.57% was "not the type of substantial underperformance over a lengthy period that gives rise to a plausible inference that a prudent fiduciary would have removed these funds from the plan's menu of options"); *Forman,* 563 F. Supp. 3d 753, 764 (S.D. Ohio 2021) (finding underperformance ranging from 1.00% to "just over" 2.00% was "simply too small to raise a plausible breach of the fiduciary duty claim"), *aff'd in relevant part*, 40 F.4th at 443.

[30] Plaintiffs' secondary claims fail too. *First*, because ERISA's duty of loyalty stands independent from the duty of prudence, a plaintiff "must do more than simply recast purported breaches of the duty of prudence as disloyal acts." *Smith*, 2021 WL 4097052, at *12, *aff'd*, 37 F.4th at 1160. They have not done so. *See generally* Compl. *Second*, Plaintiffs' failure-to-monitor claim is entirely predicated on their underlying claim for breach of the duty of prudence, which warrants dismissal. *See Perkins,* 2022 WL 824839, at *9. *Third*, Plaintiffs' "knowing participation theory" fails because they do not plead any underlying breach. *E.g.*, *Smith*, 2021 WL 4097052, at *13; *Coyer,* 2022 WL 4534791, at *7 (dismissing similar claim for failure to "plausibly plead[] allegations of knowledge" of any breach).

## **CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that a true and correct copy of the foregoing document was served via the Court's ECF/CM e-filing system to all counsel of record who are deemed to have consented to electronic service on this 13th day of December 2022.

*/s/ Jeremy P. Blumenfeld*
Jeremy P. Blumenfeld