# EXHIBIT A

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| MARY LALIBERTE and MARIE MCKNIGHT, individually and as representatives of a class of similarly situated persons, on behalf of the QUANTA SERVICES, INC. 401(K) SAVINGS PLAN,<br><br>Plaintiffs,<br><br>v.<br><br>QUANTA SERVICES, INC.; THE BOARD OF TRUSTEES OF QUANTA SERVICES, INC.; THE QUANTA SERVICES, INC. 401(K) SAVINGS PLAN COMMITTEE; and DOES No. 1-20, Whose Names Are Currently Unknown,<br><br>Defendants. | Case No. 4:22-cv-03290 |

## BRIEF OF AMICUS CURIAE THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA

OF COUNSEL:

Paul Lettow
Jordan L. Von Bokern
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062

Jordan Bock
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210

Jaime A. Santos (admitted *pro hac vice*)
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036
Telephone: (202) 346-4000
Facsimile: (202) 346-4444
jsantos@goodwinlaw.com

*Counsel for Amicus Curiae the Chamber of Commerce of the United States of America*

## TABLE OF CONTENTS

Page

INTEREST OF THE AMICUS CURIAE ................................................................................ 4

INTRODUCTION ..................................................................................................................... 4

ARGUMENT............................................................................................................................. 7

    I.       There is no ERISA exception to Rule 8(a)'s pleading standard. ........................... 7

           A.    These lawsuits often manufacture factual disputes that do not
                survive plausibility scrutiny. ...................................................................... 9

           B.    Fiduciaries have discretion to make a range of reasonable choices......... 10

    II.      These lawsuits will harm participants and beneficiaries..................................... 13

           A.    These lawsuits pressure plan sponsors away from exercising their
                discretion................................................................................................... 14

           B.    Changes in the liability-insurance market will harm participants. .......... 14

CONCLUSION........................................................................................................................ 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albert v. Oshkosh Corp.*,
   47 F.4th 570 (7th Cir. 2022) ...................................................................................................7

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .................................................................................................................6

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) .........................................................................................................6, 8, 9

*Brown v. Daikin Am., Inc.*,
   2021 WL 1758898 (S.D.N.Y. May 4, 2021) .........................................................................15

*Conkright v. Frommert*,
   559 U.S. 506 (2010) ...............................................................................................................15

*Evans v. Akers*,
   534 F.3d 65 (1st Cir. 2008) ....................................................................................................13

*Fifth Third Bancorp v. Dudenhoeffer*,
   573 U.S. 409 (2014) ..................................................................................................7, 9, 10, 11

*Hughes v. Northwestern University*,
   142 S. Ct. 737 (2022) ........................................................................................6, 7, 9, 10, 12, 14

*Matousek v. MidAmerican Energy Co.*,
   51 F.4th 274 (8th Cir. 2022) ...............................................................................................7, 11

*Meiners v. Wells Fargo & Co.*,
   898 F.3d 820 (8th Cir. 2018) .................................................................................................10

*Moreno v. Deutsche Bank Ams. Holding Corp.*,
   2016 WL 5957307 (S.D.N.Y. Oct. 13, 2016) .......................................................................13

*In re RadioShack Corp. ERISA Litig.*,
   547 F. Supp. 2d 606 (N.D. Tex. 2008) ..................................................................................12

*Sacerdote v. N.Y. Univ.*,
   9 F.4th 95 (2d Cir. 2021) .........................................................................................................8

*Smith v. CommonSpirit Health*,
   37 F.4th 1160 (6th Cir. 2022) .......................................................................................6, 9, 10

*Sweda v. Univ. of Pa.*,
   2017 WL 4179752 (E.D. Pa. Sept. 21, 2017) ........................................................................12
   923 F.3d 320 (3d Cir. 2019)....................................................................................................8

*Thompson v. Avondale Indus., Inc.*,
   2000 WL 310382 (E.D. La. Mar. 24, 2000) ..........................................................................12

**Other Authorities**

Daniel Aronowitz, *Exposing Excessive Fee Litigation Against America's Defined
   Contribution Plans*, Euclid Specialty (Dec. 2020), https://bit.ly/3hNXJaW ..................4, 14, 15

Daniel Aronowitz, *The State of the Fiduciary Liability Insurance Market and
   Excessive Fee Cases at the Half-Way Point of 2022* (July 13, 2022),
   https://bit.ly/3sgvaqq...............................................................................................................7

Jon Chambers, *ERISA Litigation in Defined Contribution Plans*, Sageview
   Advisory Grp. (Mar. 2021), https://bit.ly/2SHZuME ............................................................15

Charles Filips et al., *Options When Fiduciary Insurance Is Too Expensive*,
   PlanSponsor (Mar. 8, 2022), https://bit.ly/3q1vgRU ..............................................................15

Judy Greenwald, *Litigation Leads to Hardening Fiduciary Liability Market*,
   Business Insurance (Apr. 30, 2021), https://bit.ly/3ytoRBX ..................................................14

David McCann, *Passive Aggression*, CFO (June 22, 2016), https://bit.ly/2Sl55Yq .....................14

George S. Mellman and Geoffrey T. Sanzenbacher, *401(k) Lawsuits: What are
   the Causes and Consequences?*, Center for Retirement Research at Boston
   College (May 2018), https://bit.ly/3fUxDR1 ............................................................................7

Robert Steyer, *Sponsors Rocked by Fiduciary Insurance Hikes*,
   Pensions & Investments (Sept. 20, 2021), https://bit.ly/39W996Y ........................................14

U.S. Dep't of Labor, *A Look at 401(k) Plan Fees* (Sept. 2019),
   https://bit.ly/3fP8vuH.............................................................................................................13

*West Corp. Inks $875,000 Deal in Class Challenge to 401(k) Fees*,
   Bloomberg Law (June 29, 2022), https://bit.ly/3VsmOcy........................................................7

Jacklyn Wille, *Spike in 401(k) Lawsuits Scrambles Fiduciary Insurance Market*,
   Bloomberg Law (Oct. 18, 2021), https://bit.ly/307mOHg......................................................14

**INTEREST OF THE AMICUS CURIAE**

The Chamber of Commerce of the United States of America (Chamber) is the world's largest business federation, representing approximately 300,000 direct members and indirectly representing the interests of more than three million businesses and professional organizations of every size, in every industry sector, and from every region of the country.[1]  Given the importance of the laws governing fiduciary conduct to its members, many of which maintain or provide services to retirement plans, the Chamber regularly participates as amicus curiae in ERISA cases at all levels of the federal-court system, including those addressing the pleading standard for fiduciary-breach claims.  The Chamber submits this brief to provide context on retirement-plan management and how this case is situated in the broader litigation landscape challenging ERISA fiduciaries' investment decisions.

**INTRODUCTION**

This case is one of many in a recent surge of putative class actions challenging the management of employer-sponsored retirement plans.  This explosion in litigation is not "a warning that retirees' savings are in jeopardy."  Daniel Aronowitz, *Exposing Excessive Fee Litigation Against America's Defined Contribution Plans* 3, Euclid Specialty (Dec. 2020), https://bit.ly/3hNXJaW ("*Excessive Fee Litigation*").  To the contrary, "in nearly every case, the asset size of many of these plans being sued has increased—often by billions of dollars"—over the last decade.  *Id.*  Nevertheless, many of these suits cherry-pick particular data points, disregard bedrock principles of plan management and investment strategies, and ignore judicially noticeable information demonstrating the flawed nature of many plaintiffs' allegations in an effort to create

---

[1] No counsel for a party authored this brief in whole or in part.  No party, no counsel for a party, and no person other than Amicus, its members, or its counsel made a monetary contribution intended to fund the preparation or submission of this brief.

4

an illusion of mismanagement and imprudence.

The complaints typically follow a familiar playbook, often loaded with inferences unsupported by the plaintiffs' conclusory factual allegations. Using the benefit of hindsight, these lawsuits challenge plan fiduciaries' decisions about the investment options made available to retirement plan participants based on a few cherry-picked comparators and a cherry-picked window of time—even where, as here, that decision resulted in selection of one of the most popular target-date fund ("TDF") suites on the market. The complaints typically point to alternative investment options (among tens of thousands of investment options offered in the investment marketplace, and dozens within the same category of fund), and allege that plan fiduciaries *must have* had a flawed decision-making process because they did not choose one of those alternatives. They then lean heavily on ERISA's perceived complexity to open the door to costly and burdensome discovery, even where their allegations are belied by publicly available data. No plan, regardless of size or type, is immune from these challenges. It is *always* possible for plaintiffs to use the benefit of hindsight to identify, among the almost innumerable options available in the marketplace, a better-performing investment option than the ones plan fiduciaries chose. That is not sufficient under the pleading standard established in *Hughes v. Northwestern University*, 142 S. Ct. 737, 740 (2022), *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

This lawsuit provides the perfect example. While Plaintiffs allege that the plan would have fared better had Defendants invested in the "less risky and less costly" Fidelity Index Funds, rather than the actively managed Fidelity Freedom Funds, Compl. ¶ 25, the 2019 and 2021 Morningstar Target-Date Fund Landscape reports that Plaintiffs themselves cite in the Complaint show just the opposite: The actively managed Freedom Funds in fact outperformed the Index Funds between

5

2009, when Fidelity first launched the Index Funds, and year-end 2018 and 2020. *See* Compl. ¶ 44; *see also* Morningstar, 2021 Target-Date Strategy Landscape, at 7; Morningstar, 2019 Target-Date Fund Landscape: Simplifying the Complex, at 39. As the Sixth Circuit noted in rejecting a nearly identical set of allegations, "the Fidelity Freedom Funds … outperformed the Fidelity Index Funds in the most recent set of performance data, and the Freedom Fund suite 'remained significantly more popular than the Index Suite as late as 2018 and was the second-most popular target-date fund in the entire industry by market share.'" *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1168 (6th Cir. 2022) (citation omitted).

Nevertheless, Plaintiffs attempt to make out a claim of imprudence by limiting the universe to a short window of time and a narrow set of comparator funds—funds that are, in any event, plainly inapt comparators based on any fair reading of the caselaw, not to mention common-sense investment principles. If this case teaches us anything, it is that it is nearly impossible for plan fiduciaries to avoid being sued no matter how rigorous their process, no matter the high quality of the funds they choose, and no matter how carefully they monitor the market. Plan sponsors and fiduciaries today truly are, as the Supreme Court has observed, "between a rock and a hard place." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 424 (2014).

Against this backdrop, it is critical that courts do not shy away from the "context-specific inquiry" ERISA requires. *Hughes*, 142 S. Ct. at 740; *see also Fifth Third*, 573 U.S. at 425. As the Supreme Court recently made explicit, and as circuit courts have repeatedly emphasized since, ERISA cases are subject to the pleading standard articulated in *Twombly* and *Iqbal*. *See Hughes*, 142 S. Ct. at 742; *see also Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 278 (8th Cir. 2022); *Albert v. Oshkosh Corp.*, 47 F.4th 570, 577 (7th Cir. 2022); *Smith*, 37 F.4th at 1165. When a plaintiff does not present direct allegations of wrongdoing and relies on circumstantial allegations

6

that are "just as much in line with" plan fiduciaries' having acted through a prudent fiduciary process, dismissal is required. *See Twombly*, 550 U.S. at 554. And if these types of conclusory and speculative complaints are sustained, plan participants will be the ones who suffer. Fiduciaries will be pressured to limit investments to a narrow range of options at the expense of providing a diversity of choices with a range of fees, risk levels, and potential performance upsides, as ERISA expressly encourages and most participants want.

## ARGUMENT

**I.     There is no ERISA exception to Rule 8(a)'s pleading standard.**

The last 15 years have seen a surge of ERISA litigation challenging 401(k) plan fees and performance. *See, e.g.*, George S. Mellman and Geoffrey T. Sanzenbacher, *401(k) Lawsuits: What are the Causes and Consequences?*, Center for Retirement Research at Boston College (May 2018), https://bit.ly/3fUxDR1 (documenting the rise in 401(k) complaints from 2010 to 2017). What began as a trickle has become a flood, with at least 190 lawsuits filed since 2020. *See West Corp. Inks $875,000 Deal in Class Challenge to 401(k) Fees*, Bloomberg Law (June 29, 2022), https://bit.ly/3VsmOcy. This year alone, there were 42 excessive-fee cases filed in the first half of 2022—and the total is predicted to reach 75 to 100 by the end of the year. *See* Daniel Aronowitz, *The State of the Fiduciary Liability Insurance Market and Excessive Fee Cases at the Half-Way Point of 2022* (July 13, 2022), available at https://bit.ly/3sgvaqq. These lawsuits have been filed against employers in every industry, including those that have been hit the hardest by the pandemic. These cases generally do not develop organically based on plan-specific details, but rather are advanced as prepackaged, one-size-fits-all challenges. As a result, they typically rely on generalized allegations that do not reflect the context of the actual plan whose fiduciaries are being sued.

7

The Supreme Court has taken several recent opportunities to address the standard for pleading a fiduciary-breach claim under ERISA. Each time, it has stressed that ERISA suits are no different from any others: To survive a motion to dismiss, plaintiffs must satisfy the Rule 8 pleading standard articulated in *Twombly* and *Iqbal*. *Hughes*, 142 S. Ct. at 742.[2] Given the variety among ERISA plans, the wide discretion fiduciaries have when making decisions on behalf of tens of thousands of employees with different investment needs and risk tolerances, and the risk that any ERISA suit can be made to appear superficially complicated, applying Rule 8(a) to ERISA claims requires a close evaluation of "the circumstances … prevailing at the time the fiduciary acts" and a "careful, context-sensitive scrutiny of a complaint's allegations." *Fifth Third*, 573 U.S. at 425. "[C]ategorical rules" have no place in this analysis—particularly because "the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes*, 142 S. Ct. at 742. If anything, the discretion and flexibility ERISA affords should make pleading through hindsight-based circumstantial allegations *more* difficult, not less.

The allegations in many of the cases in this wave of litigation, including this one, fail this standard twice over. First, the complaints' circumstantial allegations are often equally (if not far more) consistent with lawful behavior, and therefore cannot "nudge[] the[] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Second, the allegations frequently ignore the discretion fiduciaries have in making decisions based on their experience and expertise, and in light of the context of their particular plan.

---

[2] The Court thus rejected some circuits' suggestion that a lower pleading standard applies in ERISA cases. *See Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 108 & n.47 (2d Cir. 2021); *Sweda v. Univ. of Pa.*, 923 F.3d 320, 326 (3d Cir. 2019).

8

### A. These lawsuits often manufacture factual disputes that do not survive plausibility scrutiny.

The shared problem with many of these lawsuits is exemplified by a feature that appears in most of the complaints. Plaintiffs typically create a chart (or many charts) purporting to compare some of the investment options in the plan under attack to a handful of other options available on the market that allegedly out-performed the plan's options during a cherry-picked time period. *See, e.g.*, Compl. p. 23. They then use the charts to try and barrel past dismissal, asking the Court to infer that plan fiduciaries must have been asleep at the wheel and requesting discovery to prove it. Inferring imprudence from this tactic ignores the realities of plan management, basic investment principles, and ERISA's statutory structure—important context the Supreme Court has instructed lower courts to consider. *See Hughes*, 142 S. Ct. at 740; *Fifth Third*, 573 U.S. at 425.

To start, plaintiffs' attorneys can easily cherry-pick historical data to make a fiduciary's choices look suboptimal given the near-infinite combination of comparator options and time periods. When plaintiffs' attorneys zero in on a single time period and a single metric for comparison—in these cases, performance—they will *always* be able to find a supposedly "better" fund among the options on the market. With the benefit of hindsight, one can always identify a better-performing fund during a cherry-picked time period, just as one could always identify a worse-performing fund. But with dozens of TDF suites on the market, it cannot be that a court can infer that fiduciaries were acting imprudently simply because—as Plaintiffs allege here—a particular suite was not amongst *the absolute top performers* at all times. "Any other rule would mean that every actively managed fund with below-average results over the most recent five-year period would create a plausible ERISA violation." *Smith*, 37 F.4th at 1166; *see also Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir. 2018) ("The fact that one fund with a different investment strategy ultimately performed better does not establish anything about whether the

9

[challenged funds] were an imprudent choice at the outset."). Indeed, "[p]reciptiously selling a well-constructed portfolio in response to disappointing short-term losses … is one of the surest ways to frustrate the long-term growth of a retirement plan." *Smith*, 37 F.4th at 1166.

Moreover, plaintiffs frequently compare apples and oranges: comparing the performance of Fund A with one investment style and performance benchmark to that of Fund B, with a different investment style and performance benchmark. That one fund ended up with higher investment returns than another fund over a particular time period does not mean that the former fund was prudent and the latter was imprudent—some funds aim to maximize upside performance, while others aim to minimize downside loss (even if that means some sacrifice of upside performance), among innumerable other distinct strategy choices made by asset managers. Indeed, the Sixth Circuit has already recognized as much with respect to the precise comparators at issue here. As the court explained in rejecting a comparison between the Fidelity Freedom Funds and the Fidelity Index Funds, "each fund has distinct goals and distinct strategies, making them inapt comparators." *Smith*, 37 F.4th at 1167; *see also Matousek*, 51 F.4th at 281 (plaintiffs failed to allege that comparators held "similar securities," had "similar investment strategies," or "reflect[ed] a similar risk profile"); *Coyer v. Univar Sols. USA, Inc.*, 2022 WL 4534791, at *6 (N.D. Ill. Sept. 28, 2022) (rejecting comparison between Fidelity Freedom Funds and Fidelity Index Funds). Plaintiffs' chosen comparators performed differently precisely because they had different features, different investment styles, and different investment strategies. While ERISA plaintiffs often ask courts to ignore these features on a motion to dismiss, the Supreme Court has said the opposite—that "context" *must* be considered at the 12(b)(6) stage. *Fifth Third*, 573 U.S. at 425.

**B. Fiduciaries have discretion to make a range of reasonable choices.**

The allegations in these complaints also often fail to grasp a fundamental tenet of ERISA—

namely, the "range of reasonable judgements a fiduciary may make" and the "difficult tradeoffs" inherent in fiduciary decision-making. *Hughes*, 142 S. Ct. at 742. That fiduciaries did not select what turned out to be the absolute best-performing option does not suggest that their process was imprudent. There is no one prudent fund, service provider, or fee level that renders everything else imprudent. Instead, there is a wide range of reasonable options, and Congress vested fiduciaries with flexibility and discretion to choose from among those options based on their informed assessment of the needs of their plan and its unique participant base.

The complaints themselves reflect a range of assessments, as one complaint's supposedly imprudent choice is often another complaint's prudent exemplar. Plaintiffs in many cases allege imprudence based on defendants' decision to offer actively managed funds. *See, e.g.*, Compl. ¶¶ 79-82, 93, 100, 109-116, *Baumeister v. Exelon Corp.*, No. 21-6505 (N.D. Ill.), ECF No. 1. But plaintiffs have also alleged the exact opposite—a breach of fiduciary duty based on a plan's decision to include passively managed funds rather than actively managed ones. *See* Compl. ¶¶ 79-83, *Ravarino v. Voya Financial, Inc.*, No. 21-1658 (D. Conn.), ECF No. 1. Indeed, while Plaintiffs here allege that offering Fidelity Freedom Funds suggests imprudence, plaintiffs in other cases have held out those same funds as models of prudent plan management. *See* Am. Compl. ¶ 160, *Anderson v. Intel Corp. Inv. Pol'y Comm.*, No. 19-4618 (N.D. Cal.), ECF No. 113. The same phenomenon plays out with respect to plan performance. General Electric was sued in 2017 for including the GE RSP U.S. Equity Fund, among others, in its 401(k) plan. *See* Compl. ¶ 1, *Haskins v. Gen. Elec. Co.*, No. 17-01960 (S.D. Cal.), ECF No. 1. But in a different case, plaintiffs held up *that exact fund* as a "superior performing alternative[]." *See* Compl. ¶ 122, *Harding v. Southcoast Hosps. Grp.*, No. 20-12216 (D. Mass.), ECF No. 1.

As these complaints demonstrate, ERISA fiduciaries making discretionary decisions are at

11

risk of being sued seemingly no matter what decisions they make. While most plaintiffs sue plans for charging allegedly excessive fees in the hopes of outperformance, a new wave of suits charge defendants with following the purportedly "in vogue" trend of "chas[ing]" low fees rather than focusing on funds' "ability to generate return." *See, e.g.*, Compl. ¶ 29, *Tullgren v. Booz Allen Hamilton Inc.*, No. 22-856 (E.D. Va.), ECF No. 1. Likewise, plaintiffs sue fiduciaries both for failing to divest from risky or dropping stock, and for failing to *hold onto* such stock because high risk can produce high reward. *Compare In re RadioShack Corp. ERISA Litig.*, 547 F. Supp. 2d 606, 611 (N.D. Tex. 2008), *with Thompson v. Avondale Indus., Inc.*, 2000 WL 310382, at *1 (E.D. La. Mar. 24, 2000) (plaintiff alleged that fiduciaries "prematurely" divested ESOP stock). Some plaintiffs allege that it is imprudent for a plan to offer more than one investment option in the same style, while others complain that including *only one option* in each investment style is imprudent. *Compare Sweda v. Univ. of Penn.*, 2017 WL 4179752, at *10 (E.D. Pa. Sept. 21, 2017), *rev'd in part*, 923 F.3d 320 (3d Cir. 2019), *with* Am. Compl. ¶ 52, *In re GE ERISA Litig.*, No. 17-cv-12123 (D. Mass.), ECF No. 35. In many cases, plaintiffs allege that fiduciaries were imprudent because they should have offered Vanguard mutual funds, but others complain that defendants were imprudent *because they offered* Vanguard mutual funds. *Compare Moreno v. Deutsche Bank Ams. Holding Corp.*, 2016 WL 5957307, at *6 (S.D.N.Y. Oct. 13, 2016), *with* Am. Compl. ¶ 108, *White v. Chevron Corp.*, No. 16-0793 (N.D. Cal.), ECF No. 41. And in some instances, fiduciaries have simultaneously defended against "diametrically opposed" liability theories, giving new meaning to the phrase "cursed-if-you-do, cursed-if-you-don't." *See Evans v. Akers*, 534 F.3d 65, 68 (1st Cir. 2008). This dynamic has made it incredibly difficult for fiduciaries to do their jobs—and, as this case reveals, it has made it virtually impossible for fiduciaries to avoid being sued, no matter how careful their process and how reasonable their decisions.

Accordingly, it is critical for courts to consider context—things like the DOL instruction that fees are only one of *several factors* that should be considered; publicly available information demonstrating that a complaint's supposed comparators are inapposite; publicly available industry data showing that services (and their pricing) vary widely; the performance ebbs and flows that are common characteristics of investment management; and the wide discretion granted to fiduciaries by Congress all bear on whether fiduciary-breach claims are plausible. *See* DOL, *A Look at 401(k) Plan Fees* 1 (Sept. 2019), https://bit.ly/3fP8vuH. Nevertheless, some courts have declined to consider context when evaluating plausibility, suggesting that doing so would require the court to resolve a purported dispute of fact. That approach cannot be squared with the Supreme Court's direction to "give due regard to the range of reasonable judgments a fiduciary may make," recognizing that a bare allegation that one fiduciary made a decision different from another fiduciary is insufficient to survive a motion to dismiss. *Hughes*, 142 S. Ct. at 742.

## II. These lawsuits will harm participants and beneficiaries.

This surge of litigation has significant negative consequences for plan participants and beneficiaries. These lawsuits impose pressure on plan fiduciaries to make decisions based on how to avoid litigation, rather than on their considered discretion as to what is best for their population of employees. In order to minimize risk, employers may be hesitant to make decisions that would otherwise redound to the benefit of their employees—such as instituting auto-enrollment and designating a permissible investment option to serve as the default fund for employees who do not affirmatively select any particular investment options. The changing litigation landscape also increases the cost of fiduciary liability insurance, leaving employers with less money to provide benefits for employees—such as matching contributions or paying for administrative expenses. And for smaller employers, retirement plans might become cost-prohibitive or simply not worth

the risk of litigation. The result will be fewer employers sponsoring plans, less generous benefits, and reduced choice for participants. This outcome is wholly at odds with a primary purpose of ERISA—to *encourage* employers to voluntarily offer retirement plans and a diverse set of options within those plans. *See Conkright v. Frommert*, 559 U.S. 506, 517 (2010).

### A. These lawsuits pressure plan sponsors away from exercising their discretion.

These suits threaten to undermine one of the most important aspects of ERISA: the value of innovation, diversification, and employee choice. An investment committee may, for example, feel pressured by the threat of litigation to chase investment performance, even though doing so is not in participants' best interests. *See supra*, pp. 6-7. Likewise, an investment committee may feel it needs to offer only "a diversified suite of passive investments," despite "actually think[ing] that a mix of active and passive investments is best." *See* David McCann, *Passive Aggression*, CFO (June 22, 2016), https://bit.ly/2Sl55Yq. In a purported effort to safeguard retirement funds, plaintiffs actually pressure fiduciaries *away from* exercising their "responsibility to weigh … competing interests and to decide on a (prudent) financial strategy." *Brown v. Daikin Am., Inc.*, 2021 WL 1758898, at *7 (S.D.N.Y. May 4, 2021).

### B. Changes in the liability-insurance market will harm participants.

The litigation surge has upended the insurance industry for retirement plans. Judy Greenwald, *Litigation Leads to Hardening Fiduciary Liability Market*, Business Insurance (Apr. 30, 2021), https://bit.ly/3ytoRBX. The risks of litigation have pushed fiduciary insurers "to raise insurance premiums, increase policyholder deductibles, and restrict exposure with reduced insurance limits." *Excessive Fee Litigation* 4; *see also* Jacklyn Wille, *Spike in 401(k) Lawsuits Scrambles Fiduciary Insurance Market*, Bloomberg Law (Oct. 18, 2021), https://bit.ly/307mOHg (discussing the "sea change" in the market for fiduciary insurance); Robert Steyer, *Sponsors*

*Rocked by Fiduciary Insurance Hikes*, Pensions & Investments (Sept. 20, 2021), https://bit.ly/39W996Y. Plans are now at risk of not being able to "find[] adequate and affordable fiduciary coverage because of the excessive fee litigation." *Excessive Fee Litigation* 4; *see also* Jon Chambers, *ERISA Litigation in Defined Contribution Plans* 1, Sageview Advisory Grp. (Mar. 2021), https://bit.ly/2SHZuME (fiduciary insurers may "increasingly move to reduce coverage limits, materially increase retention, or perhaps even cancel coverage"); Charles Filips et al., *Options When Fiduciary Insurance Is Too Expensive* 1, PlanSponsor (Mar. 8, 2022), https://bit.ly/3q1vgRU (responding to an inquiry from a plan sponsor that was no longer able to afford fiduciary insurance).

If employers need to absorb the cost of higher insurance premiums and higher deductibles, many employers will inevitably have to offer less generous plans—reducing their employer contributions, declining to cover administrative fees and costs when they otherwise would elect to do so, and reducing the services available to employees. And while large employers may have some capacity to absorb some of these costs, many smaller employers do not. If smaller plan sponsors "cannot purchase adequate fiduciary liability insurance to protect their plan fiduciaries, the next step is to stop offering retirement plans to their employees." *Excessive Fee Litigation* 4.[3] In short, these suits impose significant costs on plan sponsors—and, by extension, plan participants and beneficiaries—often without producing any concomitant benefit.

---

[3] Congress is in fact trying to do the opposite. The Setting Every Community Up for Retirement Enhancement Act of 2019 increases the tax incentives available for small employers that sponsor eligible employer plans and creates a structure for pooled employer plans, allowing unrelated employees to join together to participate in a single defined contribution plan. *See* Public L. 116-94, 133 Stat. 2534 (2019), §§ 101, 104-105. These lawsuits run counter to Congress's goal to expand—rather than shrink—the number of employees who are able to participate in retirement plans.

15

## CONCLUSION

For the foregoing reasons, adopting anything less than the "context-specific inquiry" of ERISA complaints prescribed by the Supreme Court in *Hughes* and *Fifth Third* would create precisely the types of negative consequences that Congress intended to avoid in crafting ERISA. *Amicus* urges the Court to adopt and apply that level of scrutiny to this case.

Dated: December 30, 2022

OF COUNSEL:

Paul Lettow
Jordan L. Von Bokern
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062

Jordan Bock
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210

Respectfully submitted,

/s/ *Jaime A. Santos*
Jaime A. Santos (admitted *pro hac vice*)
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036
Telephone: (202) 346-4000
Facsimile: (202) 346-4444
jsantos@goodwinlaw.com

*Counsel for Amicus Curiae the Chamber of Commerce of the United States of America*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Southern District of Texas by using the court's CM/ECF system on December 30, 2022.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the court's CM/ECF system.

Dated: December 30, 2022

/s/ *Jaime A. Santos*
Jaime A. Santos (admitted *pro hac vice*)
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, D.C. 20036
Telephone: (202) 346-4000
Facsimile: (202) 346-4444
jsantos@goodwinlaw.com

*Counsel for Amicus Curiae the Chamber of Commerce of the United States of America*