**IN THE UNITED STATES DISTRIT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| MARY LALIBERTE and MARIE MCKNIGHT, individually and as representatives of a class of similarly situated persons, on behalf of the QUANTA SERVICES, INC. 401(K) SAVINGS PLAN,<br><br>        Plaintiffs,<br><br>   v.<br><br>QUANTA SERVICES, INC.; THE BOARD OF TRUSTEES OF QUANTA SERVICES, INC.; THE QUANTA SERVICES INC. 401(K) SAVINGS PLAN COMMITTEE; and DOES No. 1-20, Whose Names are Currently Unknown,<br><br>        Defendants. | Case No. 4:22-cv-03290 |

---

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS PLAINTIFFS' COMPLAINT**

---

Plaintiffs Mary Laliberte and Marie McKnight ("Plaintiffs") submit their Opposition to the Motion to Dismiss (ECF No. 36 and accompanying Memorandum of Law, "Memorandum") filed by Defendants Quanta Services, Inc. ("Quanta"), the Board of Directors of Quanta Services, Inc. (the "Board"), and the Quanta Services, Inc. 401(k) Savings Plan Committee (the "Committee," and collectively, "Defendants"). For the reasons set forth below, the Court should deny Defendants' Motion in its entirety.

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................. 3

II.   BACKGROUND ................................................................................................. 4

      A.    Overview of the Plan ................................................................................. 4

      B.    Plaintiffs' Claims and Supporting Facts ................................................... 5

III.  ARGUMENT ...................................................................................................... 7

      A.    Standard of Review .................................................................................... 7

      B.    Plaintiffs Plausibly Allege that Quanta Breached Its Fiduciary Duties by Failing
            to Appropriately Monitor, and Retaining, the Freedom Funds ................. 8

            1.    Plaintiffs' Use of the Index Suite as a Comparator for the Active Suite Is
                  Appropriate ..................................................................................... 9

            2.    Plaintiffs' Comparison of the Active Suite to Other Similar TDFs .......... 13
                  Supports an Inference of a Fiduciary Breach ........................................... 13

            3.    Defendants' Arguments Regarding the Underperformance of the Active
                  Suites' Underlying Funds Lack Merit ........................................................ 19

            4.    Capital Flight Suggests Imprudence ......................................................... 19

      C.    Plaintiffs Plausibly Allege Defendants Acted Imprudently by Failing to
            Appropriately Monitor and Retaining the American Beacon and DFA Funds .... 21

      C.    Plaintiffs' Ancillary Claims Succeed .......................................................... 21

IV.   CONCLUSION ................................................................................................... 24

I.      **INTRODUCTION**

The Employee Retirement Income Security Act of 1974 ("ERISA") imposes strict fiduciary duties of loyalty and prudence upon retirement plan fiduciaries, which courts have recognized are "the highest known to the law." *Schweitzer v. Inv. Comm. of Phillips 66 Sav. Plan*, 960 F.3d 190, 194 (5th Cir. 2020).  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1), with an "eye single" to the interests of such participants and beneficiaries.  *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000).  Fiduciaries must also exercise appropriate "care, skill, prudence, and diligence[.]"  29 U.S.C. § 1104(a)(1)(B).  Here, Defendants breached their fiduciary duties to the Plan and its participants and beneficiaries by failing to appropriately monitor Plan investments and causing losses to the Plan as a result of the retention of imprudent investments.

Despite Defendants' mischaracterization of Plaintiffs' claims, the Complaint is a specific challenge to Defendants' investment monitoring process, which fell far below minimum standards and resulted in the retention of imprudent investments in the Plan.  The Fidelity Freedom Funds ("Freedom Funds" or "Active Suite") were among the first target date funds ("TDF(s)") available to investors, and, thus, benefitted significantly from the subsequent popularity of TDFs—in other words, they enjoyed an incumbency advantage untethered to their investment merits.  Nevertheless, as the Active Suite's excessive risk, cost, and consistent underperformance has become apparent in the past decade, retirement plans, and investors at large, have fled from the Active Suite, causing its market share to decline steadily and substantially.

Simply put, Plaintiffs allege that the retention of the Active Suite in the Plan could not have been deemed prudent by any competent fiduciaries fulfilling their duties.  Moreover, Defendants' deficient investment monitoring process permitted the imprudent retention of the

consistently underperforming American Beacon Small Cap Value Fund ("American Beacon Fund") and the DFA International Small Cap Value Fund ("DFA Fund").  District courts in every Circuit have denied similar motions to dismiss analogous claims when pled with the degree of detail and specificity in the Complaint (ECF No. 1).[1]  This case is no different and Defendants' arguments for dismissal are meritless.  The motion should be denied.

## II.   BACKGROUND

### A.   Overview of the Plan

Plaintiffs are former participants in the Plan, a defined contribution retirement plan. Compl. at ¶¶ 2, 9–10.  The Plan is one of the largest 401(k) plans in the United States, with assets totaling more than $1.21 billion by the end of 2020, and 16,317 participants.  *Id.* at ¶ 4. Quanta is a fiduciary charged with administering the Plan and appointing, overseeing, and removing members of the Committee.  *Id.* at ¶¶ 84–85.  Quanta also appointed Fidelity Management Trust Company as the Plan trustee and recordkeeper.  *Id.* at ¶¶ 22, 27.

---

[1] *See, e.g.*, *Blackmon v. Zachry Holdings, Inc.*, 2021 WL 2190907, at *7 (N.D. Tex. Apr. 22, 2021) (denying motion to dismiss analogous action challenging Freedom Funds); *In re Biogen, Inc. ERISA Litig.*, 2021 WL 3116331, at *3 (D. Mass. July 22, 2021); *Tracey, et al. v. MIT*, 2017 WL 4478239, at *2 (D. Mass. Oct. 4, 2017); *Velazquez v. Massachusetts Fin. Servs. Co.*, 320 F. Supp. 3d 252, 255 (D. Mass. 2018); *Falberg v. Goldman Sachs Group, Inc.,* 2020 WL 3893285, at *11 (S.D.N.Y. July 9, 2020); *Pinnell v. Teva Pharms. USA, Inc.*, 2020 WL 1531870, at *6 (E.D. Pa. Mar. 31, 2020); *Feinberg v. T. Rowe Price Group, Inc.*, 2018 WL 3970470, at *7 (D. Md. Aug. 20, 2018); *Main v. Am. Airlines*, 248 F. Supp. 3d 786, 794 (N.D. Tex. Mar. 31, 2017); *Cassell v. Vanderbilt*, 285 F. Supp. 3d 1056, 1061 (M.D. Tenn. 2018); *Bell v. Pension Comm. of ATH Holding Co., LLC*, 2017 WL 1091248, at *4 (S.D. Ind. Mar. 23, 2017); *Schultz v. Edward Jones*, 2018 WL 1508906, at *3 (E.D. Mo. Mar. 27, 2018); *Bouvy v. Analog Devices, Inc.*, 2020 WL 3448385, at *3 (S.D. Cal. June 24, 2020); *Johnson v. Providence Health & Servs., et al.*, 2018 WL 1427421, at *6 (W.D. Wash. Mar. 22, 2018); *Troudt v. Oracle Corp.*, 2017 WL 1100876, at *3 (D. Col. Mar. 22, 2017); *Henderson v. Emory Univ.*, 252 F. Supp. 3d 1344, 1349 (N.D. Ga. May 10, 2017).

B.        Plaintiffs' Claims and Supporting Facts

*The Active Suite.*  It is a basic principle of investment theory that the risks associated with an investment must be justified by its potential returns in order for that investment to be rational.  *Id*. at ¶ 49.  Yet Defendants' retention of the Active Suite, which held approximately 47% of the Plan's assets by December 2020 (largely because of its status as the Plan's Qualified Default Investment Alternative), does not satisfy that basic principle.  *Id.* at ¶¶ 27–28.

The Active Suite, a series of TDFs the Plan has offered since at least December 2009, is riskier and more expensive than its index fund counterpart, the Fidelity Freedom Index series ("Index Suite").  The Active Suite and Index Suite share material similarities, including the same investment management company, the same individual investment managers, and nearly identical glide paths (i.e., asset allocation).  *Id*. at ¶¶ 25, 29–36.  For these and other reasons, the Index Suite would have been well-known to prudent fiduciaries who had sufficiently investigated the Active Suite.  *See id.*  Defendants were responsible for crafting the Plan lineup and could have chosen any of the target date families offered by Fidelity or those of any other target date provider, including other TDFs with portfolios composed of actively managed sub-funds which, unlike the Active Suite, offer a reasonable expectation of increased returns to justify their increased costs and risk.  *Id.* at ¶ 25.

In 2013 and 2014, the Active Suite underwent a strategy overhaul, under which the investment managers were authorized to deviate from the glide path allocations by 10%, thereby increasing its exposure to market volatility.  *Id.* at ¶¶ 38–39.  Since the strategy overhaul and, in particular, as of the start of the Class Period, the Active Suite and most of its components have consistently underperformed several of the most popular, readily investable alternatives in the TDF marketplace.  *Id.* at ¶¶ 46–48 (embedding charts).  The strategy overhaul and subsequent

underperformance did not go unnoticed to the investing public, including other 401(k) plans—the Active Suite experienced $35 billion in net outflows from 2016 to 2020.  *Id.* at ¶ 44.  Indeed, in March 2018, Reuters, a news organization, published a scathing special report detailing the Active Suite's issues and commentary from financial analysts.  *Id.* at ¶ 38.

Plaintiffs allege that Defendants breached their fiduciary duties by failing to compare the Active Suite to the Index Suite and other available TDFs (including actively managed TDFs) that offer expected returns sufficient to justify their costs and risk.  Plaintiffs maintain that a simple weighing of the benefits of these other funds would have shown that the Active Suite was not a suitable and prudent investment alternative for the Plan.

***The American Beacon Small Cap Value Fund.***  The American Beacon Fund has consistently and significantly underperformed the benchmark chosen by its own manager, the Russell 2000 Value Index, on rolling three- and five-year annualized bases during the Class Period.  *Id.* at ¶ 50.  Defendants' failure to investigate the American Beacon fund's performance issues at their regular meetings during the Class Period, and unscrutinizing retention of the fund, represents a severe breach of fiduciary duty.  *See id*. at ¶ 53.  The American Beacon Fund's persistent inability to beat its benchmark over periods most closely approximating a market cycle should have raised concerns for any fiduciary engaging in a prudent investment monitoring process.  *Id.* at ¶¶ 50-52.  Despite having access to this returns data in real time, and despite the availability of several other prudent, superior actively managed alternatives that Defendants could have selected for the Plan, including the MFS New Discovery Value Fund and the Victory Sycamore Small Company Opportunity Fund, the Committees failed to replace the underperforming American Beacon Fund. *Id.* at ¶¶ 53-54.

***The DFA International Small Cap Value Fund***.  The DFA Fund (together, with the Active Suite and the American Beacon Fund, the "Challenged Investments") has also consistently and significantly underperformed its benchmark, the MSCI World Ex US Small Value Index and ranked in the bottom half of its peer group on rolling three- and five-year annualized bases during the Class Period.  *See id.* at ¶¶ 55-57.  DFA's obvious and persistent underperformance, data for which was available to Defendants in real time, should have compelled review and replacement of the fund with any of several other prudent, actively managed alternatives, including the AMG Yacktman Special Opportunities Fund and the Transamerica International Small Cap Value Fund.  *Id.* at ¶ 58.

## III.  ARGUMENT

### A.  Standard of Review

"To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'"  *Hernandez v. Metro. Life Ins. Co.*, 2019 WL 2563836, at *1 (W.D. Tex. Apr. 11, 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  When assessing whether Plaintiffs' claims survive a motion to dismiss under Rule 12(b)(6), the court "evaluates the pleadings by 'accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiff.'"  *Perkins v. United Surgical Partners Int'l Inc.*, 2022 WL 824839, at *3 (N.D. Tex. Mar. 18, 2022) (quoting *Stokes v. Gann*, 498 F.3d 483, 484 (5th Cir. 2020)).  Plaintiffs must allege enough facts that state a claim for relief that is plausible on its face and allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged.  *See id.* (citations omitted).

**B.    Plaintiffs Plausibly Allege that Quanta Breached Its Fiduciary Duties by Failing to Appropriately Monitor, and Retaining, the Freedom Funds**

Courts in the Fifth Circuit and around the country recognize that "ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences." *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.* ("*PBGC*"), 712 F.3d 705, 718 (2d Cir. 2013) (quotation omitted); *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) (same); *accord Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Ga.*, Inc., 892 F.3d 719, 728 (5th Cir. 2018) (citing cases). Thus, "[e]ven when the alleged facts do not 'directly address[] the process by which the Plan was managed,' a claim alleging a breach of fiduciary duty may still survive a motion to dismiss if the court, based on circumstantial factual allegations, may reasonably 'infer from what is alleged that the process was flawed.'" *PBGC*, 712 F.3d at 718 (citation omitted). Moreover, ERISA's "remedial scheme counsels careful and holistic evaluation of an ERISA complaint's factual allegations before concluding that they do not support a plausible inference that the plaintiff is entitled to relief." *Sweda v. Univ. of Penn.*, 923 F.3d 320, 331 (3d Cir. 2019) (citation omitted).

Fiduciaries have a continuing duty to monitor and conduct regular reviews of plan investments and remove those that have become unsuitable. *See Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 741 (2022) (citing *Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015)). The relevant inquiry at this stage is whether the Plan's fiduciaries engaged in a prudent monitoring process throughout the proposed Class Period to ensure the Challenged Investments remained appropriate for the Plan. *See In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996)) (a claim for breach of fiduciary duty must focus on "a fiduciary's conduct in arriving at an investment decision, . . . and ask[] whether a fiduciary employed the appropriate methods to

investigate and determine the merits of a particular investment.") (quoting *Marshall v. Northrop Grumman Corp.*, 2019 WL 4058583, at *10 (C.D. Cal. Aug. 14, 2019)) ("[a] trier of fact could reasonably view the [investment committee's] evaluations and discussions in [] meetings as insufficient to disprove a breach of Defendants' fiduciary duties because the Investment Committee failed to adequately weigh the costs and benefits of an active management strategy against a passive management strategy."); s*ee also Birse v. CenturyLink, Inc.*, 2019 WL 1292861, at *4 (D. Colo. Mar. 20, 2019) (finding plaintiff stated a claim by establishing "no reasonable fiduciary would have maintained the investment," that a defendant "would have acted differently had [it] engaged in proper monitoring" with appropriate consideration, "and that an alternative course of action could have prevented the plan's losses.") (citing *Kopp v. Klein*, 894 F.3d 214, 221 (5th Cir. 2018)).

Plaintiffs' allegations set forth unavoidable quantitative and qualitative indicia of the imprudence of retaining the Challenged Investments, which were or should have been apparent to Defendants in **real time**, as they made the relevant selection and retention decisions (or failed to act).  Since Defendants failed to adequately consider these warning signs and investigate alternatives, however, maintaining the Challenged Investments was "outside the range of reasonable judgments" a fiduciary would make for the Plan.  *Hughes*, 147 S. Ct. at 742 ("[i]f the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty.").

### 1.    Plaintiffs' Use of the Index Suite as a Comparator for the Active Suite Is Appropriate

As an initial matter, the "argument that [P]laintiffs used inappropriate benchmarks to assess the performance of the challenged options raises factual questions that are not properly addressed on a motion to dismiss."  *Cunningham*, 2017 WL 4358769, at *7; *see Kruger v.*

*Novant Health, Inc.*, 131 F. Supp. 3d 470, 478 (M.D.N.C. 2015) (noting that the defendants'

argument that the "comparison to Vanguard Fund fees is inapt . . . [but] these arguments are

better resolved at a later stage of the proceedings"); *accord Henderson v. Emory Univ.*, 252 F.

Supp. 3d 1344, 1352 (N.D. Ga. 2017) ("the proper benchmark can be more appropriately

determined on summary judgment"); *Schapker v. Waddell & Reed Fin., Inc.*, 2018 WL 1033277,

at *8 (D. Kan. Feb. 22, 2018) ("the question whether the funds Plaintiff presents are comparable

is a question of fact that the Court will not resolve in the context of ruling on a motion to

dismiss"); *Short v. Brown Univ.*, 320 F. Supp. 3d 363, 372 (D.R.I. 2018) ("To the extent Brown

suggests otherwise, or presents different benchmarks to measure the Plans' performance, it raises

factual issues that cannot be decided at the pleading stage").[2]

Nevertheless, Defendants attempt to miscast Plaintiffs' allegations relating to the

retention of the Active Suite as a claim that it was a breach of fiduciary duty to offer "the

actively managed Freedom Funds instead of the . . . Index Funds."  Memo., at 9.  This is a

blatant misrepresentation of the Complaint, which plainly alleges that the breach related to

Defendants' failure to compare the Active Suite with "any of the target date families offered by

Fidelity or those of any other target date provider, including other mutual fund families that have

portfolios composed of actively managed sub-funds."  Compl. at ¶25. (*See also,* "Defendants. . .

failed to compare the Active and Index suites, as well as other available TDFs, (including

---

[2] *Accord Leber v. Citigroup, Inc.*, 2010 WL 935442, at *13 (S.D.N.Y. Mar. 16, 2010) ("Of
course, defendants will be free to argue in subsequent proceedings, as they do in their moving
papers, that the higher fees were justified, that the Vanguard funds were not actually comparable,
or that investment decisions were ultimately in the best interests of the Plan.  But such arguments
are premature at this stage."); *Sacerdote v. N.Y. Univ.*, 2017 WL 3701482, at *10 (S.D.N.Y.
Aug. 25, 2017) ("Defendant's assertion that plaintiffs' 'use of a patently inappropriate
benchmarks over jury-rigged performance periods' raises factual questions that are not
appropriately addressed at this time.").

actively managed TDFs that offer expected returns sufficient to justify the associated costs and risk." *Id.*)  Defendants' arguments largely center on the active-passive distinction of this single element of Plaintiffs' Active Suite claim in an attempt to miscast the Complaint as a direct challenge to active management, despite language in the Complaint's directly addressing and refuting such a contention.[3]

Regardless, the Index Suite is a meaningful benchmark for the Active Suite.  Both are offered by the same investment management firm, share the same management team, and share an almost identical stated glide path.  *Id*. at ¶¶ 30, 36.  As a result, the Index Suite is an ideal comparator for the Active Suite—in a way, the Index Suite acts as the control, while the Active Suite, with its expanded discretion to the investment managers to select riskier assets and deviate from the glide path, is the variable.  *Id*. at ¶ 38.  Although Defendants make much about the fact that actively managed and passively managed funds have fundamental differences that make them incomparable; critically here, as a set of TDFs, the Active Suite is more appropriately measured against other TDF suites than against any index benchmark.  Indeed, the fundamental objective of all TDFs is to prepare investors for retirement by a particular date (i.e., the target date).  Compl. at ¶¶ 29–30.

The authorities cited by Defendants are distinguishable.  In both *Meiners v. Wells Fargo*, 898 F.3d 820 (8th Cir. 2018), and *Davis v. Salesforce.com Inc*., 2021 WL 1428259 (N.D. Cal. Apr. 15, 2021), *rev'd and remanded on other grounds*, 2022 WL 1055557 (9th Cir. Apr. 8, 2022), the courts focused on the fact that that the plaintiffs used passively managed comparators as benchmarks for the actively managed funds at issue without providing further rationale for the

---

[3] "This Complaint does not challenge the selection of TDFs that include actively managed investments and does not challenge active management specifically or in general." *Id.* at ¶ 24.

comparison.  The Complaint here contains both passive **and** active comparators, each of which were selected for their similarity and comparability to the Active Suite, as well as their status as leading offerings in the TDF market and, therefore, represent the most likely funds that a prudent fiduciary would have considered in weighing the performance of the Active Suite (or indeed replacing it)—a "sound basis" for comparison.  *Meiners*, 898 F.3d at 822.

Plaintiffs' position is not that ERISA requires the use of index funds or requires fiduciaries to "scour the market to find and offer the cheapest possible fund," but rather that ERISA requires the Plan's fiduciaries to engage in a prudent process to select and continually monitor cost-effective investment options.[4]  *See Biogen,* 2021 WL 3116331, at *5 (quoting *Falberg*, 2020 WL 3893285, at *8) ("A plaintiff may survive a motion to dismiss, even absent allegations of the defendant's knowledge or inadequate investigation, if the court can infer based on circumstantial factual allegations . . . that the process was flawed."); *Marshall*, 2019 WL 4058583, at *10 ("[a] trier of fact could reasonably view the [investment committee's] evaluations and discussions in [] meetings insufficient to disprove a breach of Defendants' fiduciary duties because the Investment Committee failed to adequately weigh the costs and benefits of an active management strategy against a passive management strategy.").

Defendants also attempt to minimize the totality of the allegations by myopically parsing them individually, arguing that the "fee-differential between [the Active and Index Suites]" is insufficient to infer imprudence.  Memo., at 10-11.  Yet Plaintiffs do not ground their fiduciary breach claims solely in the Active Suite's costs of the investments in the Plan, instead simply

---

[4] Accordingly, Plaintiffs' allegations are distinguishable from those in *Hecker v. Deere & Co*., 569 F.3d 708, 710–11 (7th Cir. 2009), as they do not suggest that Defendants should have selected only passive funds or the Index Suite, but, rather, that the retention of the Active Suite, and other actions or inactions, constitute circumstantial facts which reveal Defendants' deficient monitoring process.

alleging that Defendants, in failing to consider the combination of risk of the Active Suite, substantial capital flight, consistent underperformance, excessive fees, and myriad other red flags throughout the Class Period, ignored warning after warning that the Freedom Funds were not suitable for the Plan. *See Hughes*, 142 S. Ct. at 738 (noting "fiduciaries' continuing duty to monitor all plan investments and service arrangements and remove imprudent ones").  Contrary to Defendants' assertions, this is not a general attack on actively managed funds or their costs, and Defendants' retention of the Active Suite supports the inference that their process for monitoring investment options is deficient.  *See Disselkamp v. Norton Healthcare, Inc.*, 2019 WL 3536038, at *8 (W.D. Ky. Aug. 2, 2019) ("if a predictable investment continues to chronically underperform, one could draw a conclusion that the fiduciaries overseeing that fund have breached their duty").

### 2. Plaintiffs' Comparison of the Freedom Funds to Other Similar TDFs Supports an Inference of a Fiduciary Breach[5]

Defendants next take issue with the Complaint's allegations regarding the glaring underperformance of the Active Suite compared to alternative TDFs.[6]  Memo. at 14.  In a

---

[5] It bears noting that the gravamen of Defendants' argument that Plaintiffs' comparison of the Active Suite to the Index Suite is inappropriate is that actively managed funds and passively-managed funds cannot be compared.  Defendants' argument collapses onto itself when they immediately about-face and labor to distinguish Plaintiffs' allegations setting forth the very kind of comparisons they previously argued are necessary when attacking Plaintiffs' allegations referencing the Index Suite.  This tact is unsurprising (albeit unfortunate), as Defendants would have the Court place dispositive weight on *Smith* without acknowledging that the complaint in *Smith* did not include any allegations setting forth comparisons to actively managed TDFs.

[6] Defendants criticize Plaintiffs' inclusion of representative data regarding the poor performance of the Freedom Funds compared to suitable alternative TDFs, noting that the charts in the Complaint do not cover every vintage of the Freedom Funds and are limited to returns data as of the second quarter of 2016.  Memo. at 16.  The Complaint cites these returns as a representative example—particularly given the nature and structure of TDFs, which (as Plaintiffs explain) move along a glide path, such that the performance of any intermediate vintages is represented by the prior and subsequent vintages.  Should the Court instruct Plaintiffs to do so, they would be pleased to amend the Complaint to add the same comparative data for every vintage, but the data

deliberate attempt to misconstrue Plaintiffs' allegations, Defendants state that the allegations are based on a "performance snapshot *almost seven years* ago" and "a *single date* prior to the putative class period for a three- or five-year period." *Id.*, at 15-16. Defendants' feigned incredulity at this false proposition is undermined, however, by the Complaint's allegations that "the underperformance by the Active Suite relative to its peers ***persisted throughout the Class Period***." Compl. at ¶ 48 (emphasis added).

Unable or unwilling to address Plaintiffs' allegations as they appear in the Complaint, Defendants instead suggest that Plaintiffs fault Defendants for not chasing the best-performing fund at any given time and further argue that the underperformance alleged in the Complaint is too short-term to support an inference of imprudence. Memo. at 14–15. But Plaintiffs' use of three- and five-year annualized returns plausibly supports the inference that Defendants acted imprudently in retaining the Freedom Funds. Indeed, three- and five-year performance comparisons are widely regarded by investment professionals as the most important metrics for evaluating returns, as they most closely approximate a market cycle, allowing for observation of how a fund manager's strategy has performed in conditions both favorable and unfavorable. *See* Compl. ¶ 22 n.18; *see also Cunningham*, 2019 WL 4735876, at *13 (finding an advisor satisfied fiduciary duty when it regularly presented "three and five-year benchmarks" of investment options); *Bekker v. Neuberger Berman Inv. Comm.*, 2019 WL 2073953, at *2 (S.D.N.Y. May 9, 2019) ("The IPS also directed the Committee 'to review performance using three-year histories and remove underperforming funds.'"). Plaintiffs allege that Defendants had the necessary information ***at the time*** of their decisions to retain the Active Suite to know that it was

---

pled in the Complaint provide more than sufficient basis to find that the underperformance allegations support Plaintiffs' imprudence claims.

inappropriate to include it in the Plan.  In a recent case, the United States District Court for the District of Maryland focused on underperformance for three funds over a five-year period and explained that focusing upon "[t]he investments' long-term underperformance is categorically different than showing what a fiduciary should have done in hindsight."  *Moler v. Univ. of Md. Med. Sys.*, 2022 WL 2756290, at *4–5 (D. Md. July 13, 2022) (*citing Goodman v. Columbus Reg'l Healthcare Sys., Inc.*, 2022 WL 228764, at *2 (M.D. Ga. Jan. 25, 2022)) ("the Court is satisfied that Plaintiffs state a plausible claim that continuing to offer underperforming mutual funds with excessive expense ratios despite a consistent history of underperformance would violate ERISA's duty of prudence.").  As the *Moler* court explained, "Plaintiffs' allegation is not that Defendants should have acted differently in hindsight; but rather that Defendants were aware of the funds' underperformance at the time and chose to ignore it."  *Id.*, 2022 WL 228764, at *2 (citing *Garcia v. Alticor, Inc.*, 2021 WL 5537520, at *7 (rejecting a similar hindsight argument where "plaintiffs bring allegations that the committee failed for years to perform sufficient reviews or investigations into the Plan's performance[;] [t]hus, it is plausible that Defendants had access to performance data at various points throughout the relevant period, and Plaintiffs' allegation is that Defendants did not adequately consider that information; [and] [i]f this allegation is true, it is a breach of ERISA."));[7] *see also Moler*, 2022 WL 2756290, at *4 ("The investments' long-term underperformance is categorically different than showing what a fiduciary should have done in hindsight.").  Here, as in *Garcia*, "Plaintiffs' allegation is that

---

[7] The court in *Moler* also distinguished the Sixth Circuit's outlier decision in *Smith v. CommonSpirit Health*, 37 F.4th 1160 (6th Cir. 2022).  *See* 2022 WL 2756290, at *5.  The court explained that, as here, "Plaintiffs complain that the funds at issue underperformed, using other investments as a comparator, and that Defendants' continued inclusion of the underperforming funds amounts to imprudence in violation of Defendants' duties . . . . Plaintiffs' allegations are far more robust than those in *Smith*, where *Smith* essentially rested on a thin charge that there may have been better options out there."  *Id.* at * 5.

Defendants did not adequately consider that information" and "[i]f this allegation is true, it is a breach of ERISA." *Garcia*, 2021 WL 5537520, at * 7.[8]

Defendants also rely on an opinion from the Sixth Circuit to support their argument that the comparator TDFs are not meaningful benchmarks. *See* Memo. at 17–18 (citing *Smith*, 37 F.4th 1160). However, unlike in *Smith*, Plaintiffs specifically allege that the Freedom Funds underperformed **four** apt actively managed and passively managed comparators, as well as the returns of the Active Suite, rank "among all funds in the same Morningstar category" (Compl. at ¶ 47), and that this data, taken in combination with the myriad other red flags exhibited by the troubled Active Suite, should have led Defendants to consider alternative TDFs, based on conditions that were knowable to Defendants in real time during the Class Period. *See id.* at ¶¶ 29–48. In *Moler*, the court found that such allegations were sufficient to support an inference of imprudence, noting that "Plaintiffs' allegations go beyond reliance upon other investments that outperformed the selected funds. Plaintiffs complain that the funds at issue underperformed, using other investments as a comparator, and that Defendants' continued inclusion of the underperforming funds amounts to imprudence, in violation of Defendants' duties." 2022 WL 2756290, at *4; *see also Conlon v. The Northern Tr. Co.*, No. 21-cv-02940, ECF No. 51 (N.D. Ill.) (declining to follow the reasoning in *Smith* where plaintiffs pled "consistent, chronic underperformance" and supported the use of similar comparators).

Defendants contend that the comparators used by Plaintiffs are inapt because of purported differences in the investment strategies, asset allocations, and risk profiles between the

---

[8] The cases cited by Defendants are readily distinguishable on this basis. *See White v. Chevron Corp.*, 2017 WL 2352137, at *20 (N.D. Cal. May 31, 2017), *aff'd*, 752 F. App'x 453, 455 (9th Cir. 2018); *St. Vincent*, 712 F.3d at 718; *Meiners*, 898 F.3d at 823; *Patterson v. Morgan Stanley*, 2019 WL 4934834, at *17 (S.D.N.Y. Oct. 7, 2019); *Smith*, 37 F.4th at 1166.

comparators and the Freedom Funds.  *See* Memo. at 17.  But the appropriateness of Plaintiffs'

comparators is a question of fact not properly resolved on a motion to dismiss.  *See Dearing v.*

*IQVIA Inc*., 2021 WL 4291171, at *4 (M.D.N.C. Sept. 21, 2021) (denying motion to dismiss

analogous claims concerning Freedom Funds); *In re MedStar ERISA Litig*., 2021 WL 391701, at

*6; *Cunningham v. Cornell Univ.,* 2017 WL 4358769, at *7 (S.D.N.Y. Sept. 29, 2017) (same);

*Kruger*, 131 F. Supp. 3d at 478 (noting that defendants' argument that the "comparison to

Vanguard Fund fees is inapt . . . [but] these arguments are better resolved at a later stage of the

proceedings"); *accord Henderson v. Emory Univ.*, 252 F. Supp. 3d 1344, 1352 (N.D. Ga. 2017)

("the proper benchmark can be more appropriately determined on summary judgment");

*Schapker v. Waddell & Reed Fin., Inc.*, 2018 WL 1033277, at *8 (D. Kan. Feb. 22, 2018) ("the

question whether the funds Plaintiff presents are comparable is a question of fact that the Court

will not resolve in the context of ruling on a motion to dismiss"); *Short v. Brown Univ.*, 320 F.

Supp. 3d 363, 372 (D.R.I. 2018) ("To the extent Brown suggests otherwise, or presents different

benchmarks to measure the Plans' performance, it raises factual issues that cannot be decided at

the pleading stage").

     Defendants point to the unremarkable fact that various TDFs have certain differences in

asset allocations, risk profiles, and management styles (i.e., actively managed versus passively

managed).  *See* Memo. at 14, 17.  That certain of the off-the-shelf comparators are passively

managed strategies (while the Freedom Funds are actively managed) does not render them

inappropriate for comparison.  In fact, courts have recognized that there is no "blanket rule"

preventing comparison of active and passive funds, and, indeed, active and passive funds "might,

in some situations, serve as meaningful benchmarks" for one another.  *In re LinkedIn ERISA*

*Litig.*, 2021 WL 5331448, at *7 (N.D. Cal. Nov. 16, 2021) (finding comparison of Active Suite and Index Suite supporting claim of imprudence).

Moreover, and fundamentally, the TDF comparators cited in the Complaint all have the same objective as the Freedom Funds (i.e., preparing investors for retirement by a particular date).  It is unremarkable to suggest that different TDF providers pursue this goal differently.  Just as two managers of actively managed domestic large cap funds will both attempt to beat the United States large cap market by choosing different securities to buy and sell and in different quantities, TDF providers have their own unique approaches that incorporate different market assumptions and opinions.  These characteristics enable providers to market investment products that are distinct from others in the market; without them, investors would be left to choose from indistinguishable investment options.  In fact, if Defendants' arguments were taken seriously, there would apparently be no adequate benchmark for the Freedom Funds, or for any investment.

Defendants' argument that the alternatives presented in the Complaint represent a "small segment" of the TDF market is inaccurate.  Memo. at 19.  Plaintiffs state their underperformance allegations relative to the comparator TDFs because those four suites represent the primary offerings of several of the top managers in the TDF marketplace (and therefore were among those most likely to be selected were the Freedom Funds to be replaced).  Information about the performance of these alternative funds was readily available to Defendants throughout the Class Period.  Compl. at ¶¶ 46–48.  And, as Defendants conveniently ignore, the Complaint contains performance data showing each of the Active Suite's and the comparator TDFs' performance relative to the entire TDF universe.  *Id. at* ¶ 47.  Investment professionals and prudent fiduciaries evaluate an investment's ability to rank among the top half of its peers over longer

time horizons; Plaintiffs' performance allegations demonstrate the Active Suite's inability to achieve this objective.  *Id.*

### 3.     Defendants' Arguments Regarding the Underperformance of the Active Suites' Underlying Funds Lack Merit

Plaintiffs have provided detailed descriptions of the underperformance and/or insufficient track records of the Active Suite's underlying investments as of the start of the Class Period. Compl. at ¶¶ 33–35.  Defendants take issue with the inclusion of these facts, arguing that because they were not offered as stand-alone funds in the Plan there can be no inference of imprudence by Defendants for their failing to consider the consistent underperformance of the underlying investments.  But anyone with a passing familiarity of mutual funds (let alone the fiduciaries of a multibillion-dollar retirement plan) should have treated the underperformance and insufficient track records of the underlying funds as warnings of the shortcomings of the Freedom Funds. Indeed, the performance of the Active Suite itself depends entirely on the performance of the underlying funds.  Defendants also take issue with the fact that Plaintiffs do not allege that the Index Suite or the non-Fidelity TDFs **only** had underlying funds with a five-year track record that outperformed their benchmarks.  But this misses the point.  Taken together with the Freedom Funds' other quantitative and qualitive issues, these allegations amount to a real-time warning—a warning that Defendants ignored—that prudent fiduciaries should have investigated alternatives to the Active Suite.  *See In re Quest Diagnostics Inc. ERISA Litig.*, 2021 WL 1783274, at *3 n.5 (D.N.J. May 4, 2021)).

### 4.     Capital Flight Suggests Imprudence

Defendants essentially argue that the popularity of the Freedom Funds (due to its status as first-to-market) renders its hemorrhaging of assets unworthy of consideration by plan fiduciaries. Memo. At 21-22.  Indeed, Defendants point to the fact that, in 2020, the Active Suite had three

times the assets under management of the Index Suite, suggesting that the size of the Plan and continued popularity with other investors somehow made it appropriate for Defendants to turn a blind eye to the significant red flags with the Active Suite during the Class Period.  Memo. at 21. As the Complaint alleges, however, Fidelity is the second largest TDF provider by total assets (including both the Active and Index Suites, as well as four distinct other TDF offerings) in the country and the Active Suite enjoyed a significant incumbency advantage; thus, it is unsurprising that the Active Suite maintained considerable assets despite its significant underperformance. Compl. at ¶ 25.  In determining prudence under ERISA, courts focus on "a fiduciary's conduct in arriving at an investment decision, not on its results, and ask[] whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment."  *PBGC*, 712 F.3d at 716; *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996).  Defendants' failure to react to real-time warning signs, including significant net asset outflows, is more than sufficient to infer imprudence.  *Biogen*, 2021 WL 3116331, at *6 ("Here, Plaintiffs' allegations support a plausible claim that a prudent person who knew what Defendants knew would have stopped utilizing the Active suite in the aftermath of Fidelity's strategy overhaul in 2014. Plaintiffs assert that in 2018, the Active suite experienced an estimated $5.4 billion in net outflows with nearly $16 billion withdrawn from the fund family over the previous four years.").

Defendants' contention that Plaintiffs' allegations about the Freedom Funds fail because they are the "second-most popular TDF in the entire TDF market,"  Memo. at 21., is both no longer accurate and notably lacking any "legal authority to justify their 'everyone is doing it' defense."  *Essar Steel Algoma Inc. v. Nevada Holdings, Inc.*, 2020 WL 2539031, at *3 (S.D.N.Y. May 18, 2020).  Indeed, the standing of the Active Suite itself in the broader TDF marketplace has significantly diminished as investors have digested the negative popular and financial press

coverage of the issues plaguing the Freedom Funds: as of December 31, 2021, the Freedom

Funds had fallen to the fifth largest TDF suite by assets under management.[9]

Defendants also rely on the fact that the Freedom Funds received a "Silver" rating from

Morningstar.  Memo. At 21–22.  Yet these ratings are entirely subjective and based on the

judgment of a single analyst team; the Silver analyst rating assigned to the Freedom Funds is not

"based on their performance," but a forward-looking assessment of such qualitative factors as

"People," "Process," and "Parent" that judge a fund on the basis of non-quantitative factors that

are easily satisfied by any large, national asset manager like Fidelity[10]—whether they are

offering a prudent investment or not.[11]

### C.       Plaintiffs Plausibly Allege Defendants Acted Imprudently in Offering the American Beacon and DFA Funds

Defendants offer several arguments regarding the American Beacon and DFA funds,

which—like their arguments directed at the Freedom Funds—miss the mark.

First, Defendants contend that Plaintiffs do not use apt comparators in examining the

appropriateness of the American Beacon and DFA funds.  Memo. at 22–24.  But, as explained

above, determining whether funds are appropriate comparators "raises factual issues that cannot

be decided at the pleading stage." *Short*, 320 F. Supp. 3d at 372; *see also infra* III.B.1.

Defendants also contend that the performance of the American Beacon and DFA funds

cannot be compared to their own manager-selected benchmark indices, Memo. at 22-23, despite

such comparison being the minimum evaluation criteria universally recommended in defined

---

[9]  2022 Target-Date Strategy Landscape, Morningstar, at 12.

[10]  Morningstar Analyst Rating for Funds, Morningstar (Sept. 22, 2021), available at www.morningstar.com/investing-definitions/morningstar-analyst-rating-for-funds.

[11]  Indeed, each comparator in the Complaint is rated either Gold or Silver by Morningstar.

contribution plan investment policy statements and being provided in the disclosure materials provided to Plan participants, including Plaintiffs.  Many courts have held, however, that allegations that challenged funds have consistently failed to outperform their benchmarks suffice to state a breach of fiduciary duty claim.  *See, e.g.*, *Terraza v. Safeway, Inc.*, 241 F. Supp. 3d 1057, 1076 (N.D. Cal. 2017) (denying motion to dismiss complaint that alleged, *inter alia*, that investment options underperformed compared to their designated benchmarks); *Braden*, 588 F.3d at 596–97 (refusing to dismiss complaint where plaintiff alleged that defendants "did not change the options included in the Plan despite the fact that most of them underperformed the market indices they were designed to track"); *Sacerdote*, 2017 WL 3701482, at *10 ("allegations that [defendant] breached its fiduciary duty by offering actively managed funds that did not have a 'realistic expectation of higher returns' also plausibly support a prudence claim at this stage"). Plaintiffs do not compare the American Beacon and DFA funds directly to the index funds that track their respective benchmarks, but rather, evaluate those funds against their own *designated* benchmarks (and, in the case of the DFA Fund, against the universe of its peers, an element of Plaintiffs claims on which Defendants are conspicuously silent), and then simply offer one or two of *many* appropriate actively managed alternatives that regularly beat those same benchmarks, a course entirely appropriate at the pleading stage.  *See Moreno v. Deutsche Bank Ams. Holding Corp.*, 2016 WL 5957307, at *6 (S.D.N.Y. Oct. 13, 2016) (citing *PBGC*, 712 F.3d at 718) ("For instance, the complaint may allege facts sufficient to raise a plausible inference that . . . a superior alternative investment was readily apparent such that adequate investigation would have uncovered that alternative."); *see also Wildman v. Am. Century Servs., LLC*, 237 F. Supp. 3d 902, 914 (W.D. Mo. 2017) ("arguments that the fees are not excessive and the comparisons to the Vanguard funds are inappropriate raise factual issues that cannot be resolved in a motion to

dismiss"); *see also Miller v. Autozone, Inc.*, 2020 WL 6479564, at *4 (W.D. Tenn. Sept. 18, 2020) ("this Court declines to rule on the reasonableness of comparing actively[-]managed funds to passively-managed index funds").

Second, Defendants contend that the underperformance of the American Beacon and DFA funds is somehow too modest to support an inference of imprudence.  Memo. at 24.  But this position amounts to a remarkable admission of Defendants' flagrant dereliction of duty to act with the singular aim of managing Plan assets in the best interests of participants.  For example, while Defendants correctly note that America Beacon outperformed its benchmark as of the fourth quarter of 2021, they highlight this single cherry-picked datapoint and ignore that the funds' three- and five-year annualized returns trailed the benchmark return for the previous *twelve consecutive quarters*, with the three-year return having trailed for an additional six consecutive quarters.[12]  Compl. ¶¶ 52, 57.  Notably absent from Defendants' attempts to portray the American Beacon and DFA funds' underperformance as "modest" is any acknowledgement that the returns are *annualized*, not cumulative.  Memo. at 24.  That Fund A outperforms Fund B by 1% on a five-year annualized basis means that, for the previous five years, investors in Fund B earned an average return, compounded, of 1% less than Fund A each year, compounded.  Accordingly, Defendants understate the actual underperformance and resulting impact experienced by the Plan.

---

[12] Although Defendants refer to *Patterson v. Morgan Stanley* for their position that the differentials are minimal, as noted above, the *Patterson* court considered other factors of the challenged fund besides its alleged underperformance, including the defendants' timely removal of that fund.  2019 WL 4934834, at *11.

### D.      Plaintiffs' Ancillary Claims Succeed

Defendants also contend that Plaintiffs have not adequately pled their ancillary claims. Memo. at 25, n. 30.  First, Defendants contend that Plaintiffs have not adequately alleged that they breached ERISA's duty of loyalty.  *Id.*  But courts across the country have routinely declined to dismiss disloyalty claims where the factual allegations are, as here, tied to the prudence claims because discovery of the shared facts would resolve both claims.  *See*, *e.g.*, *Kruger*, 131 F. Supp. 3d at 474-80; *Morin v. Essentia Health*, 2017 WL 4876281, at *1 (D. Minn. Oct. 27, 2017) (citing *Tussey v. ABB, Inc.*, 746 F.3d 327, 335 (8th Cir. 2014)).  Further, Defendants challenge Plaintiffs' monitoring claim only by arguing that their primary causes of action are deficient.  *See* Memo. at 25, n. 30.  Since Plaintiffs state claims that certain fiduciaries breached their duties to the Plan, and Defendants were responsible for monitoring those fiduciaries, Plaintiffs plausibly allege that  Defendants failed to fulfill their monitoring duties. *See Howell v. Motorola, Inc*., 633 F.3d 552, 563 (7th Cir. 2011); *Troudt*, 2017 WL 1100876, at *2, n. 7.

## IV.     CONCLUSION

For these reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion in its entirety.[13]

---

[13] Plaintiffs respectfully request leave to amend to cure any deficiencies identified by the Court. Leave to amend should be "freely given when justice so requires" under Fed. R. Civ. P. 15(a); *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 872 (5th Cir. 2000) (citation omitted) ("Unless there is a "substantial reason to deny leave to amend, the discretion of the district court is not broad enough to permit denial."); *Blackmon*, 2021 WL 2190907, at *2 ("the plaintiff should generally be given at least one chance to amend the complaint under Rule 15(a) before dismissing the action with prejudice.").

Dated: January 12, 2023

Respectfully submitted,

*/s/ John S. Edwards, Jr.*
John S. "Jack" Edwards, Jr.
Texas Bar No. 24040851
S.D. Tex. No. 38095
Thomas R. Ajamie
Texas Bar No. 00952400
S.D. Tex. No. 6165
AJAMIE LLP
Pennzoil Place - South Tower
711 Louisiana, Suite 2150
Houston, TX 77002
Telephone: (713) 860-1600
Facsimile: (713) 860-1699
Email: jedwards@ajamie.com
          tajamie@ajamie.com

Mark K. Gyandoh
Of Counsel
Donald R. Reavey
CAPOZZI ADLER, P.C.
312 Old Lancaster Road
Merion Station, PA 19066
Telephone: (610) 890-0200
Facsimile: (717) 233-4103
Email: markg@capozziadler.com
          donr@capozziadler.com

James C. Shah
Alec J. Berin
John C. Roberts
MILLER SHAH LLP
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: jcshah@millershah.com
          ajberin@millershah.com
          jcroberts@millershah.com

James E. Miller
Attorney-In-Charge
Laurie Rubinow
MILLER SHAH LLP
65 Main Street
Chester, CT 06412
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: jemiller@millershah.com
          lrubinow@millershah.com

*Attorneys for Plaintiffs, the Plan,*
*and the Proposed Class*

## CERTIFICATE OF SERVICE

I certify that, on January 12, 2023, a true and correct copy of the foregoing document was served via the Court's ECF/CM e-filing system to all counsel of record who are deemed to have consented to electronic service.

 */s/ John S. Edwards, Jr.*
John S. "Jack" Edwards, Jr.