# EXHIBIT A

1
2
3
4
5
6
7
8            UNITED STATES DISTRICT COURT
9            EASTERN DISTRICT OF CALIFORNIA
10
11                                                  Master Case No.  1:20-cv-01007-JLT
      *In re Sutter Health ERISA Litigation*
12                                                  ORDER DENYING DEFENDANT'S
                                                    MOTION TO DISMISS AND GRANTING
13                                                  DEFENDANT'S MOTION TO STRIKE
14                                                  (Doc. 29)
15
16
           Plaintiffs Christina Bonicarlo, Nicole Garcia, Ronald Hudson, Adam Blackburn, Robert
17
   L. Hackett, Tabitha Hoglund, and Stephanie Chadwick (collectively, "Plaintiffs"),[1] bring this
18
   action individually and as participants of the Sutter Health 403(b) Savings Plan ("the Plan") on
19
   behalf of the Plan and a class of similarly situated participants and beneficiaries of the Plan.
20
   (Doc. 26.)  Plaintiffs allege that Defendants Sutter Health, the Retirement Benefits Investment
21
   Committee ("RBIC"), and Does No. 1–10 who are members of the RBIC or other fiduciaries of
22
   the plan, breached their fiduciary duties under the Employee Retirement Income Security Act
23
   ("ERISA").  *See* 29 U.S.C. §§ 1104, 1109.  Plaintiffs bring the action under 29 U.S.C. §§ 1109
24
   and 1132(a)(2), ERISA §§ 409 and 502.[2]
25
26
   [1] The Complaint also includes Obaleet Sargony as a Plaintiff, who has since passed away.  (Doc. 76.)
27
   [2] Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a), allows plan participants to bring an action under ERISA section
   409, 29 U.S.C. § 1109.  Section 409 provides that a plan fiduciary who breaches his or her duty shall be personally
28
   liable to "make good to such plan any losses to the plan resulting from each such breach ... and shall be subject to
   such other equitable or remedial relief as the court may deem appropriate." 29 U.S.C. § 1109(a).

Defendants move to dismiss the operative First Amended Complaint ("FAC"), (Doc. 29), on the grounds that Plaintiffs lack standing and otherwise have not sufficiently pled their claims. Defendants also request that Plaintiffs' jury demand be stricken. (Doc. 29 at 32.) Plaintiffs oppose the motion in full, (Doc. 32), and Defendants filed a reply. (Doc. 41.) The parties additionally filed several notices of supplemental authority and responses for the Court's consideration. (Docs. 55–59, 62–65, 70, 75, 79, 97.) For the reasons discussed below, Defendants' motion to dismiss is **DENIED**, and the motion to strike is **GRANTED**.

## BACKGROUND

### I.    The Plan

This case concerns Defendants' management of the Sutter Health 403(b) Savings Plan, a retirement plan for Sutter Health employees. Plaintiffs are former or current employees of Sutter Health who previously participated or currently participate in the Plan. (Doc. 26 at ¶¶ 9–18.) The Plan is a defined contribution plan, in which participants direct the investment of their contributions into investment options offered by the Plan. (Doc. 26 at ¶ 24.) As of December 31, 2018, the Plan had 73,408 active participants with account balances and assets totaling approximately $3.7 billion, which Plaintiffs allege place it in the top 0.1% of all defined contribution plans by plan size. (Doc. 26 at ¶ 4.) During the Class Period, from July 21, 2014 to the present, Plan assets were held in a trust by the Plan Trustee, Fidelity Management Trust Company ("Fidelity"). All investments and asset allocations were and continue to be performed through this trust instrument. (Doc. 26 at ¶ 27.)

### II.   Defendants

Defendants are Sutter Health, the Retirement Benefits Investment Committee ("RBIC"), and unnamed members of the RBIC. (Doc. 26 at ¶ 1.) The RBIC and its members are appointed by Sutter Health's Chief Executive Officer to administer the Plan on Sutter Health's behalf as the Plan Administrator, (Doc. 26 at ¶ 18), and Sutter Health is responsible for appointing, overseeing, and removing members of the RBIC. (Doc. 26 at ¶ 87.) The RBIC is responsible for establishing and revising the Plan's investment policy and establishing and monitoring the oversight committees that select and monitor the Plan's investment options. The RBIC and related

2

committee members are fiduciaries to the Plan.  Defendants maintain the Plan and are responsible for selecting, monitoring, and retaining the service provider(s) that provide investment, recordkeeping, and other administrative services.  (Doc. 26 at ¶ 5.)

### III.    Claims

Plaintiffs complain that Defendants violated their fiduciary duties of prudence and/or loyalty under ERISA by selecting, retaining, or otherwise ratifying "high-cost and poorly performing investments" for the Plan during the Class Period "instead of offering more prudent alternative investments when such prudent investments were readily available", and by allowing unreasonable expenses and fees to be charged to Plan participants for the Plan's administration. (Doc. 26 at 6, ¶ 28.)[3]  Plaintiffs allege that by choosing imprudent investment options to include and retain in the plan, including poorly performing options and options with high fees, the Plan "suffered millions of dollars in losses . . . and remains vulnerable to continuing harm" because Plaintiffs and other Plan participants "were deprived of the opportunity to invest in prudent options with reasonable fees".  (Doc. 26 at ¶ 23.)

Plaintiffs bring claims that Defendants (1) breached their fiduciary duties under ERISA § 404(a)(1)(A), (B), and (D), 29 U.S.C. § 1104(a)(1)(A), (B), and (D), by failing to discharge their duties solely in the interest of the Plan's participants and beneficiaries and failing to defray reasonable expenses of administering the Plan with the proper diligence ("Count One"); (2) failed to properly monitor the RBIC and related committees ("Count Two"); and, in the alternative—if any Defendants are not deemed a fiduciary or co-fiduciary of the Plan—(3) committed "knowing breach of trust" ("Count Three").  (Doc. 26 at 34–37.)

Plaintiffs seek a declaratory judgment holding that Defendants' actions violate ERISA; a permanent injunction prohibiting Defendants from engaging in the violative practices; equitable, legal or remedial relief "to return all losses to the Plan and/or for restitution and/or damages"; attorneys' fees; and any other relief that the Court deems appropriate.  (Doc. 26 at 3–4; 37–38.)

---

[3] The Complaint includes an allegation that Defendants "failed to fully disclose the expenses and risk of the Plan's investment options," (Doc. 26 at ¶ 6), but Plaintiffs' briefing indicates that this claim was included erroneously.  As such, the Court will not address the allegation.  (Doc. 32 at 11, n.4.)

**IV.    Supporting Facts**

The following facts are taken from the First Amended Complaint.  (Doc. 26.)   Plaintiffs complain that Defendants improperly retained several imprudent investment options within the Plan, despite warning signs that the options were inferior compared to other available alternatives during the Class Period.

The first allegedly imprudent investment includes a suite of thirteen "target date funds," which are portfolios of funds, which gradually shift to become more fiscally conservative as the target retirement year approaches.  (Doc. 26 at ¶ 29.)  The suite of target-date funds offered by the Plan from at least December 31, 2008 through December 31, 2018, was the "Fidelity Freedom" fund target-suite.  (Doc. 26 at ¶ 30.)  This suite, which Plaintiffs refer to as the "Active Suite," invests predominately in actively managed Fidelity mutual funds.  This contrasts with the "substantially less costly and less risky Freedom Index funds (the 'Index suite')," which places no assets under active management and instead invests in Fidelity funds that track market indices.  (Doc. 26 at ¶¶ 29–31.)  Plaintiffs allege that the Index suite "is and has been a far superior option" and "the more appropriate choice for the Plan."  (Doc. 26 at ¶ 30.)

The Complaint contrasts the performances of the Active and Index Suites over a number of years in which the Index Suite outperforms the Active Suite and provides data regarding the annual cost of the Active Suite to investors, which Plaintiffs claim is "over eight times higher than what shareholders of the corresponding fund pay."  (Doc. 26 at ¶ 40–42; 45–46.)  Because Plan expenses such as these are "paid by participants as a reduction on investment income," (Doc. 26 at ¶ 24), higher fees "reduce retirement account balances over time."  (Doc. 26 at ¶ 42.)  Furthermore, financial publications reported several concerns with the Active Suite's performance and management, particularly after the Active Suite underwent a strategy overhaul in 2014.  (*See* Doc. 26 at ¶ 38.)  The performance of the Active Suite is particularly important because it serves as the Plan's Qualified Default Investment Alternative ("QDIA"), where all participant contributions are automatically invested if the participant does not direct investments elsewhere.  (Doc. 26 at ¶ 32.)  By December 31, 2018, approximately 67% of the Plan's assets were invested in the Active Suite.  (Doc. 26 at ¶ 33.)

The Complaint describes three other funds, which Plaintiffs argue performed poorly and should not have been included or retained in the Plan during the Class Period.  The Complaint alleges that these funds had low returns, which did not justify their expense ratios, (Doc. 26 at ¶¶ 49, 51), and could have been replaced by other available index funds with better returns. (*See* Doc. 26 at ¶ 51.)   Plaintiffs also claim that they were charged unreasonable recordkeeping and administrative fees for the Plan, particularly considering how many participants and assets the Plan included at the time.  (Doc. 26 at ¶¶ 56–59.)  Each Plan participant during the Class Period paid $34 in these fees, which Plaintiffs allege should have been much lower if the Defendant's had utilized the Plan's size and negotiating power.  (Doc. 26 at ¶ 56.)

Finally, Plaintiffs raise concerns about the Plan's "total plan cost," which includes some of the aforementioned fees and the expense ratios in each fund.  As defined in the Complaint, the total plan cost is the sum of all fees and expenses associated with the operation of a retirement plan.  The Complaint notes that from 2014 to 2018, the Plan paid 0.49%-0.55% of its total assets in investment management fees alone, while "comparable plans" with more than $1 billion in assets paid an average of 0.28% for *all* plan costs.  (Doc. 26 at ¶ 60.)  Plaintiffs allege that the "fact that the investment management fees for the Plan alone have been nearly double the average [total plan cost] (inclusive of all fees) confirms the plain fact that Defendants failed to ensure that the Plan was paying reasonable fees" which constituted a "significant breach of their fiduciary duties".   (Doc. 26 at ¶ 60.)  The Plan's total plan cost during the Class Period allegedly ranged from 0.56% to 0.64% of net assets.  (Doc. 26 at ¶ 61.)

## JUDICIAL NOTICE

Defendants request that the Court take judicial notice of several documents, including governing Plan documents, publicly filed Forms 5500, participant disclosures, and documents cited in Plaintiffs' FAC, all of which are attached to Defendants' attorney declaration submitted with their motion to dismiss.  (*See* Doc. 29-1 and attached exhibits.)

"Generally, a court may not consider material beyond the complaint in ruling on a [Rule 12] motion."  *Intri-Plex Techs., Inc. v. Crest Grp., Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007). However, courts may "consider certain materials—documents attached to the complaint,

1   documents incorporated by reference in the complaint, or matters of judicial notice—without

2   converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*,

3   342 F.3d 903, 908 (9th Cir. 2003).  Under the "incorporation by reference" doctrine, courts may

4   take judicial notice of a document where "the plaintiff's claim depends on the contents of a

5   document, the defendant attaches the document to its motion to dismiss, and the parties do not

6   dispute the authenticity of the document, even though the plaintiff does not explicitly allege the

7   contents of that document in the complaint." *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir.

8   2005) (citing *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998)).

9       Defendants assert that the more than 600 pages of documents submitted with their Motion

10  are central to Plaintiffs' claims and relied upon in Plaintiffs' FAC.[4]  (Doc. 29 at 11, n.6.)  Indeed,

11  Defendants refer to these documents in their Motion almost exclusively to support their factual

12  arguments contesting Plaintiffs' claims, though as far as the Court can tell, none of the documents

13  clearly disprove Plaintiffs' factual allegations.  However, the defense fails to cite specifically to

14  any particular portion of the documents to show that the plaintiffs' allegations are untenable.  The

15  Court declines to cull through the 600 pages to find the factual nuggets that support the

16  defendant's motion.

17

18                              **LEGAL STANDARD**

19  **I.     Rule 12(b)(1)**

20       The district court is a court of limited jurisdiction and is empowered only to hear disputes

21  "authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S.

22  375, 377 (1994); *Exxon Mobil Corp v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005).  Federal

23  courts are "presumed to lack jurisdiction in a particular case, unless the contrary affirmatively

24  appears." *A-Z Int'l. v. Phillips*, 323 F.3d 1141, 1145 (9th Cir. 2003).  Thus, a plaintiff carries the

25  burden of demonstrating the Court has subject matter jurisdiction.  *Kokkonen*, 511 U.S. at 377

26

27  ───────────────────
    [4] Plaintiffs do not specifically object to any of these documents, though they assert that the
28  documents may not be used to prove the truth of the statements therein.  (Doc. 32 at 15.) The
    Court disagrees, but this disagreement is not determinative at this time.

                                    6

1   (citing *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 182-83 (1936)); *see also*

2   *Vacek v. United States Postal Serv.*, 447 F.3d 1248, 1250 (9th Cir. 2006).

3       Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, a party may challenge a

4   claim for relief for lack of subject matter jurisdiction. A motion to dismiss under Rule 12(b)(1)

5   "may either attack the allegations of the complaint or may . . . attack[] the existence of subject

6   matter jurisdiction in fact." *Thornhill Pub. Co., Inc. v. Gen. Tel. & Electronics Corp.*, 594 F.2d

7   730, 733 (9th Cir. 1979) (citing *Land v. Dollar*, 330 U.S. 731, 735 (1947)). Thus, "[a]

8   jurisdictional challenge under Rule 12(b)(1) may be made either on the face of the pleadings or

9   by presenting extrinsic evidence." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139

10  (9th Cir. 2003) (citing *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000)). The Ninth Circuit has

11  explained:

12          In a facial attack, the challenger asserts that the allegations contained
            in a complaint are insufficient on their face to invoke federal
13          jurisdiction. By contrast, in a factual attack, the challenger disputes
            the truth of the allegations that, by themselves, would otherwise
14          invoke federal jurisdiction.

15   *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1038 (9th Cir. 2004).

16  **II.    Rule 12(b)(6)**

17      A Rule 12(b)(6) motion "tests the legal sufficiency of a claim." *Navarro v. Block*, 250

18  F.3d 729, 732 (9th Cir. 2001). A claim should be dismissed under Rule 12(b)(6) when "the

19  complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory."

20  *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). Thus, under Rule

21  12(b)(6), "review is limited to the complaint alone." *Cervantes v. City of San Diego*, 5 F.3d 1273,

22  1276 (9th Cir. 1993).

23      "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

24  accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

25  U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The

26  Supreme Court explained,

27          A claim has facial plausibility when the plaintiff pleads factual
            content that allows the court to draw the reasonable inference that the
28          defendant is liable for the misconduct alleged. The plausibility

1
2
3

> standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

4   *Iqbal*, 556 U.S. at 678 (internal citations omitted).

5        On a Rule 12(b)(6) motion, all allegations of material fact are taken as true and construed

6   in the light most favorable to the nonmoving party.  *Fed'n of African Am. Contractors v. City of*

7   *Oakland*, 96 F.3d 1204, 1207 (9th Cir. 1996).  However, conclusory allegations of law,

8   unwarranted deductions of fact, and unreasonable inferences are insufficient to defeat a motion to

9   dismiss.  *Sprewell v Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001); *In re Syntex Corp.*

10  *Sec. Litig.*, 95 F.3d 922, 926 (9th Cir. 1996).  To the extent that pleading deficiencies can be

11  cured by the plaintiff alleging additional facts, leave to amend should be granted. *Cook, Perkiss &*

12  *Liehe, Inc. v. Northern Cal. Collection Serv.*, 911 F.2d 242, 247 (9th Cir. 1990) (citations

13  omitted).

14                                   **ANALYSIS**

15  **I.    Standing**

16        As a threshold matter, Defendants challenge Plaintiffs' standing to bring several of their

17  claims.  Defendants first argue that Plaintiffs lack constitutional standing to challenge the

18  inclusion of specific funds included in the Plan—such as the Active Suite and other allegedly

19  low-performing funds named in the Complaint—because Plaintiffs did not plead that they were

20  invested in those specific funds.  (Doc. 29 at 14.)  Plaintiffs counter that ERISA grants them

21  standing to challenge funds beyond their own investments on behalf of the entire Plan.  (Doc. 31

22  at 17.)  In such a facial challenge to jurisdiction, the Court must presume the truth of the

23  plaintiff's factual allegations "and draw all reasonable inferences in his favor."  *Doe v. Holy*, 557

24  F.3d 1066, 1073 (9th Cir. 2009).

25        As an initial matter, Plaintiffs are correct that ERISA authorizes them to bring claims that

26  sweep beyond their own injuries on behalf of the Plan and other plan participants.  (Doc. 31 at 17,

27  citing *Cassell v. Vanderbilt*, 2018 WL 5264640, at *2 (M.D. Tenn. Oct. 23, 2018)).  However,

28  ERISA's grant of statutory standing only applies once plaintiffs first demonstrate Article III

1   standing.  *See, e.g., Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.*, 465

2   F.3d 1123, 1124 (9th Cir. 2006).

3          To establish Article III standing, a plaintiff must demonstrate "(1) an injury-in-fact, (2)

4   [that is] fairly traceable to the challenged conduct of the defendant, and (3) [that is] likely to be

5   redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1543 (2016).

6   The injury-in-fact requirement calls for a Plaintiff to demonstrate that he or she suffered "an

7   invasion of a legally protected interest" that is "concrete and particularized" and "actual or

8   imminent, not conjectural or hypothetical."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–

9   61(1992).  In the context of ERISA claims regarding defined contribution plans, plaintiffs can

10  establish Article III standing by pleading injury to their own plan account.  *See In re LinkedIn*

11  *ERISA Litig.*, No. 5:20-CV-05704-EJD, 2021 WL 5331448, at *4 (N.D. Cal. Nov. 16, 2021)

12  (citing cases).

13         Though the Ninth Circuit has not addressed the issue directly, other courts have found that

14  plaintiffs bringing claims regarding underperforming funds can demonstrate the requisite injury

15  where they either (i) invested in *at least one* of the challenged funds or (ii) challenge a "plan-

16  wide" decision-making process that injures all plan participants.  *In re LinkedIn ERISA Litig.*,

17  2021 WL 5331448, at *4*; Boley v. Universal Health Servs.*, Inc., 498 F. Supp. 3d 715, 719–25

18  (E.D. Pa. 2020) (plaintiffs had standing because they challenged the plan's imprudent processes);

19  *Lange v. Infinity Healthcare Physicians, S.C.*, No. 20-cv-737-jdp, 2021 WL 3022117, at *1–4

20  (W.D. Wis. July 16, 2021) (conclusory allegations that imprudent investment options "impacted

21  all Plan participants" is, without more, insufficient to demonstrate Article III standing);

22  *McGowan v. Barnabas Health, Inc.*, No. 20-13119 (KM) (ESK), 2021 WL 1399870, at *3–5

23  (D.N.J. Apr. 13, 2021) (plaintiffs complaining of plan mismanagement allege "Plan-wide

24  injuries" for which plan participants may bring suit); *Santiago v. Univ. of Miami*, No. 1:20-cv-

25  21784-GAYLES/LOUIS, 2021 WL 1173164, at *6–8 (S.D. Fla. Mar. 1, 2021) (finding no

26  standing where plaintiffs asserted harm by the offering of underperforming investments but did

27  not explain how the offering of two funds in which they did not invest caused them concrete

28  injury).

In *Boley*, for example, plaintiffs challenged the inclusion of actively managed Fidelity Freedom target date funds in their retirement plan.  Three of the named plaintiffs in *Boley* demonstrated Article III standing because they invested in "at least one" of the allegedly imprudent Fidelity Freedom target date funds.  *Boley*, 498 F. Supp. 3d at 723.  Further, the *Boley* plaintiffs alleged that defendants lacked a "prudent investment evaluation process," which injured all plan participants by forcing participants to choose from an "expensive menu of investment options."  *Id*. at 723–24.  In *Urakhchin*, the court found standing where plaintiffs pled injury relating to the "defendants' management of the Plan *as a whole*," which rendered plaintiffs "unable to select low-cost options" when investing in the plan.  *Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*, No. SACV151614JLSJCGX, 2016 WL 4507117, at *4 (C.D. Cal. Aug. 5, 2016).  And in *McGowan*, the court found that plaintiffs' descriptions of poorly performing funds were merely "illustrative" of a larger claim that the fiduciary defendants "mismanaged the Plan" causing plan-wide injuries.  *McGowan*, 2021 WL 1399870, at *3–5.

Cases cited by Plaintiffs, including *Braden* and *Hay*, reach a similar result.  Though the decision in *Hay* does not state outright that the plaintiff was invested in some of the challenged funds in that case, the plaintiff did allege that she was subject to underperformance as a result of the poor investment options in the plan.  *Hay v. Gucci, Inc.*, No. 2:17-CV-07148, 2018 WL 4815558, at *4 (D.N.J. Oct. 3, 2018).  Further, the *Hay* plaintiff alleged mismanagement of her retirement plan because defendants failed to provide a "variety" of offered funds.  *Id*.  As such, the court found that the plaintiff alleged an injury rooted in the defendants' overall management of the funds as a group.  *Id*.  The *Braden* plaintiff similarly had Article III standing because the complaint focused on the defendants' *process* to adequately evaluate the investment options included in the plan.  *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 590 (8th Cir. 2009).

Plaintiffs have asserted two main theories of liability for breach of fiduciary duties as described in Count One: offering imprudent and underperforming investments such as the Active Suite, and imprudently offering overly expensive investment options with excessive and unreasonable management fees which contribute to the Plan's high total plan cost.  As to the first theory regarding underperforming investments, the FAC provides no information suggesting that

1    the named Plaintiffs invested in *any* of the challenged funds specifically described in the

2    Complaint.  In fact, the FAC contains no details as to the named Plaintiffs' specific investments.

3    Further, the FAC appears to complain about the performance of specific funds, not overall

4    mismanagement or imprudent processes when choosing funds to include in the Plan.  (*See* Doc.

5    26 at ¶ 31, "Defendants' decision to add the Active suite over the Index suite, and their failure to

6    replace the Active suite with the Index suite at any point during the Class Period, constitutes a

7    glaring breach of their fiduciary duties.")

8           However, Plaintiffs have demonstrated constitutional standing as to their Count One

9    claims related to excessive management fees and total plan cost.  For these claims, plaintiffs need

10   not plead their individual investment in any particular fund so long as the fees challenged were

11   charged to all Plan participants regardless of participants' specific investments.  *See Boley*, 498 F.

12   Supp. 3d at 720 ("The Employee may also satisfy this [standing] requirement by alleging an

13   injury to a plan's assets unrelated to specific funds, if plan participants are all assessed a portion

14   of the injury."); *Lange*, 2021 WL 3022117, at *3 (no standing regarding actively managed funds

15   in which plaintiff did not invest and where plaintiff did not allege "that these funds' management

16   fees were spread across all plan participants in any way").  The FAC sufficiently alleges that, at

17   the very least, all Plan participants including Plaintiffs were harmed by excessive recordkeeping

18   fees of $34 per participant, (Doc. 26 at ¶ 56–58), because "each [Plan] participant's account is

19   charged with . . . an allocation of administrative expenses" and "Plan participants bear" the

20   burden of excessive recordkeeping fees.  (Doc. 26 at ¶¶ 24, 58.)  Defendants agree that certain

21   administrative expenses, including recordkeeping fees, are paid using Plan assets.  (Doc. 29 at 13,

22   citing Doc. 29-1 at Ex. 1.)

23          Plaintiffs also demonstrate Article III standing as to Count Two by alleging specific

24   failures in Defendants' process of monitoring the RBIC and its members.  (*See* Doc. 26 at ¶ 56,

25   alleging that Defendants failed to "engage[] in any modestly prudent approach to ensur[e] that the

26   Plan recordkeeping fees were fair and reasonable," as demonstrated by their failure to negotiate

27   lower recordkeeping fees.)  And, as Defendants note, Counts Two and Three are derivative of

28   Plaintiffs' allegations in Count I.  Because Plaintiffs have Constitutional standing to bring their

1    claims, ERISA § 1132(a)(2) grants them statutory standing to seek relief that sweeps beyond their

2    individual injuries.  *See Braden*, 588 F.3d at 592.

3          Defendants incorrectly assert that named Plaintiffs who took full distribution of their

4    benefits during the Class Period do not have standing under ERISA to bring claims related to the

5    Plan.  (Doc. 29 at 15.)  This argument is contrary to the Ninth Circuit's holding in *Vaughn v. Bay*

6    *Env't Mgmt., Inc.*, which states that former participants of a defined contribution plan who have

7    received full distributions of their account balances still have standing under ERISA as plan

8    participants to recover losses occasioned by breaches of fiduciary duty that allegedly reduced the

9    amount of the plaintiffs' benefits.  567 F.3d 1021, 1030 (9th Cir. 2009).  The Ninth Circuit

10   confirmed this holding in *Harris*, clarifying that a plan participant had standing to seek relief

11   under ERISA § 502(a)(2), codified at 29 U.S.C. § 1132(a)(2), "despite having withdrawn all of

12   his assets from his plan."  *Harris v. Amgen*, 573 F.3d 728, 731 (9th Cir. 2009) (applying *Vaughn*).

13         Finally, Defendants contest the standing of former plan participants to seek injunctive

14   relief on behalf of the Plan.  (Doc. 29 at 15–16.)  Courts appear to differ as to whether former

15   plan participants may permissibly seek injunctive relief.  In *Cryer*, the court applied *Harris*'s

16   holding that "employees who cash out of a defined contribution ERISA plan are still

17   'participants' in that plan, as defined by 29 U.S.C. § 1002(7)," to find that former plan

18   participants can sue for "appropriate relief" including equitable remedies such as injunctions.

19   *Cryer v. Franklin Templeton Resources, Inc.*, No. C 16-4265 CW, 2017 WL 4023149, at *4 (N.D.

20   Cal. July 26, 2017) (citing *Harris*, 573 F.3d at 735).  In *Marks v. Trader Joe's Company*,

21   however, the court found that former plan participants do not have standing to seek prospective

22   injunctive relief because they are not "realistically threatened" by future breaches of duty.  No.

23   CV1910942PAJEMX, 2020 WL 2504333, at *9 (C.D. Cal. Apr. 24, 2020).

24         Notably, in *Marks*, all plaintiffs bringing suit were former plan participants.  Here,

25   however, Defendants do not contest that Garcia, Hudson, and Blackburn are current participants

26   in the Plan who undoubtedly have standing to sue for injunctive relief.  (Doc. 32 at 18, n.14.)

27   Because some Plaintiffs have standing to pursue injunctive relief, dismissal of that requested

28   relief for lack of standing is inappropriate at this time.

1   For the reasons discussed above, Defendants' motion to dismiss the FAC for lack of

2   standing is **DENIED**.  The Court notes, however, that whether the named Plaintiffs may

3   ultimately bring ERISA claims in a representative capacity on behalf of all Plan participants, is a

4   question of class certification—rather than standing—which is not before the Court at this time.[5]

5   *See Johnson v. Fujitsu Tech. & Bus. Of Am., Inc.*, 250 F.Supp.3d 460, 465 (N.D. Cal. 2017)

6   (citing *Melendres v. Arpaio*, 784 F.3d 1254, 1261–62 and declining to reach the class certification

7   question at the motion to dismiss stage where the named plaintiff demonstrated standing to bring

8   her individual claim).

9   **II.     Sufficiency of the Complaint**

10   Defendants next argue that Plaintiffs have failed to adequately plead their claims for (1)

11   breach of fiduciary duties, (2) failure to monitor, and (3) knowing breach of trust.  The Court

12   addresses each claim in turn.

13   **A.     Count One: Breach of Fiduciary Duties**

14   1.     Duty of Prudence

15   ERISA requires that fiduciaries act "with the care, skill, prudence, and diligence under the

16   circumstances then prevailing that a prudent ... [person] acting in a like capacity and familiar with

17   such matters would use in the conduct of an enterprise of a like character and with a like aim."  29

18   U.S.C. § 1104(a)(1)(B).  Plan fiduciaries must not only act prudently when selecting investments

19   but have a continuing duty to monitor and remove imprudent ones. *See Tibble v. Edison Int'l*, 575

20   U.S. 523, 530 (2015); *see also Hughes v. Northwestern Univ.*, 142 S.Ct. 737, 742 (2022) ("If []

21   fiduciaries fail to remove an imprudent investment from [a] plan within a reasonable time, they

22   breach their duty [of prudence].").

23   Section 409(a) of ERISA imposes liability for breach of fiduciary duty:

24   Any person who is a fiduciary with respect to a plan who breaches
     any of the responsibilities, obligations, or duties imposed upon
25   fiduciaries by this subchapter shall be personally liable to make good
     to such plan any losses to the plan resulting from each such breach,
26   and to restore to such plan any profits of such fiduciary which have

27   _____

28   [5]  Both Plaintiffs and Defendants, in briefing the Motion to Dismiss, refer the Court to cases involving the propriety
     of class certification in the ERISA context.  (*See e.g.*, Doc. 32 at 18, n.12.)  The Court has not considered these cases
     for the purposes of the Article III and statutory standing inquiry at hand.

13

> been made through use of assets of the plan by the fiduciary, and
> shall be subject to such other equitable or remedial relief as the court
> may deem appropriate, including removal of such fiduciary.

29 U.S.C. § 1109(a).

Accordingly, to establish that Defendants are liable for breach of fiduciary duty, the Plaintiffs must show that: (1) the Plan is governed by ERISA; (2) the Defendants were fiduciaries of the Plan; and (3) the Defendants breached their duties of prudence and/or loyalty under ERISA, resulting in losses to the participants of the Plan.  At this stage, Defendants do not contest that the Plan is governed by ERISA, nor that the Defendants are fiduciaries of the Plan. (*See* Doc. 29.)  They instead challenge the sufficiency of the FAC, arguing that the Plaintiffs have failed to plead any facts that could support a reasonable inference that the Defendants breached their fiduciary duties of prudence or loyalty. (Doc. 29 at 16–29.)

As previously described, Plaintiffs allege that Defendants breached their fiduciary duty of prudence under ERISA in three ways: (1) maintaining consistently underperforming investment options; (2) causing the Plan to pay excessive fees, including recordkeeping and administrative fees; and (3) causing the Plan to incur an unreasonable "total plan cost".  As to the alleged underperforming investments, Plaintiffs contend that Defendants breached their fiduciary duty of prudence by offering Fidelity's Active Suite in the Plan's investment lineup instead of alternatives such as the Index Suite.  Two thirds of the Active Suite's top three domestic equity positions were and are in Fidelity Series funds that have dramatically trailed their respective indices over their respective lifetimes.  (Doc. 26 at ¶ 36.)   The Active Suite also had a higher expense ratio than the Index Suite, despite consistently underperforming the Index Suite based on three-and five-year annualized returns. (Doc. 26 at ¶¶ 40–41, 45.)  The Active Suite further underwent a "strategy overhaul" in 2013 and 2014 that gave its managers discretion to deviate from glide path allocations (a key feature of TDFs) in order to time market shifts to locate underpriced securities. (Doc. 26 at ¶ 38.)

As a result of this "history of underperformance, frequent strategy changes and rising risk," investors began to lose confidence in the Active suite, as indicated by significant capital

1  outflow; in 2018, the series experienced approximately $5.4 billion in net outflows, and Plaintiffs

2  allege that nearly $16 billion has been withdrawn from the fund family over four years prior to

3  2018. (Doc. 26 at ¶¶ 38, 43.) Defendants nonetheless maintained the Active suite as its default

4  investment option (QDIA) for as long as it was an option in the Plan's investment menu. (Doc. 26

5  at ¶ 32.) Furthermore, Plaintiffs allege that the Active Suite's inherent risk was compounded by

6  "the suite's managers' approach to portfolio construction and asset allocation decisions" which

7  involved additional risk when compared to the Index Suite. (Doc. 26 at ¶ 37.)

8          Defendants argue that these allegations are insufficient to maintain the action because the

9  Complaint does not include any allegations about the *process* by which Plan fiduciaries selected

10 Plan's investment options. (Doc. 29 at 16.) As the Court analyzed in detail for its standing

11 analysis, the FAC lacks specific detail as to Defendants' allegedly improper processes. However,

12 "[t]o state a claim for breach of fiduciary duty [under ERISA], a complaint does not need to

13 contain factual allegations that refer directly to the fiduciary's knowledge, methods, or

14 investigations at the relevant times." *Terraza v. Safeway Inc.*, 241 F. Supp. 3d 1057, 1070 (N.D.

15 Cal. 2017) (*citing Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan

16 v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718 (2d Cir. 2013)). Because "'[t]hese facts

17 will frequently be in the exclusive possession of the breaching fiduciary,'" *Bouvy v. Analog

18 Devices, Inc.*, 2020 WL 3448385, at *3 (S.D. Cal. June 24, 2020) (citing *Concha v. London*, 62

19 F.3d 1493, 1503 (9th Cir. 1995)), "the court may be able to reasonably infer from the

20 circumstantial factual allegations that the fiduciary's decision-making process was flawed."

21 *Terraza*, 241 F. Supp. 3d at 1070; *see also Braden*, 588 F.3d at 596. In other words, the Court

22 may draw inferences regarding sufficiency that it could not draw for standing purposes.

23         Reading the allegations in the light most favorable to Plaintiffs, the above allegations are

24 sufficient to allege that Defendants failed to act "'with the care, skill, prudence and diligence' that

25 a prudent person 'acting in a like capacity and familiar with such matters' would use." *Tibble*,

26 575 U.S. at 528 (quoting 29 U.S.C. § 1104(a)(1)).

27         Defendants' arguments to the contrary largely misstate Plaintiffs' claims or delve into

28 factual disputes. For example, Defendants argue that Plaintiffs may not "simply claim[] that

15

other funds may be preferable based on their price" to state a fiduciary breach claim.  (Doc. 29 at

21.)  Plaintiffs' FAC does *not* merely point to the existence other, more preferable funds not

selected for the Plan as the basis for Plaintiffs' claims.  Unlike in *White v. Chevron Corp.*, No. 16-

CV-0793-PJH, 2016 WL 4502808 (N.D. Cal. Aug. 29, 2016), which Defendants cite in support

of their position that Plaintiffs' pleadings are insufficient, the FAC here provides ample support

for inferences of imprudence.

Plaintiffs were not the only parties raising the alarm about Defendants' choices with

regards to the Plan.  Among other things, financial experts are on record commenting that "it was

not clear . . . that [the managers of the Active Suite] knew what they were doing."  (Doc. 26 at

¶ 38.[6])  And, as described in a prior section, the Active suite suffered more than $20 billion in

capital outflows over an approximately five-year period.  (Doc. 26 at ¶¶ 38, 43.)  Corroboration

such as this raises Plaintiffs concerns above the bar of mere speculation.  Indeed, other courts

evaluating nearly identical claims regarding the Active Suite have denied motions to dismiss,

observing that:

> "Plaintiffs' claim for breach of fiduciary duty is not based merely on
> the allegation that the Active suite is [] more expensive, more risky,
> or poorer performing than the Index suite . . . the Active suite saw a
> substantial outflow of investment capital in the years leading up to
> its removal from the plan and received media scrutiny of its frequent
> strategy shifts, poor performance, and risk."

*In re: Prime Healthcare* No. 8:20-cv-01529-JLS-JDE, ECF No. 45 (C.D. Cal. July 16, 2021)

(citing *In re MedStar ERISA Litig.*, No. CV RDB-20-1984, 2021 WL 391701, at *6 (D. Md. Feb.

4, 2021)).

The Court therefore finds the allegations in the Complaint sufficient to allow a reasonable

inference of a flawed process.  Defendants' complaints regarding Plaintiffs' calculations and

benchmarks in the FAC, (*see* Doc. 29 at 22, 25, 28–29), are of no moment to the sufficiency

analysis, as disputes over these factors are inappropriate at the motion to dismiss stage.  *See*

*Cunningham v. Cornell Univ.*, No. 16-cv-6525 (PKC), 2017 WL 4358769, at *7 (S.D.N.Y. Sept.

---

[6] Citing Tim McLaughlin and Renee Dudley, *Special Report: Fidelity puts 6 million savers on risky path to retirement*, REUTERS (Mar. 5, 2018), https://www.reuters.com/article/us-fundsfidelity-retirement-special-rep/special-report-fidelity-puts-6-million-savers-on-risky-path-to-retirementidUSKBN1GH1SI

1  29, 2017) (noting that defendants' arguments that plaintiffs used "inappropriate benchmarks to

2  assess the performance of the challenged options" raised "factual questions that [were] not

3  properly addressed on a motion to dismiss".)

4        The Court further finds that the FAC plausibly alleges a breach of Defendants' duty of

5  prudence as to excessive recordkeeping fees and Total Plan Cost.  Plaintiffs cite the 401k

6  Averages Book (20th edition) for the proposition that plans much smaller than the Plan—of only

7  100 participants and $5 million in assets—were paying an average of $35 per participant for

8  "recordkeeping *and* administration" costs in 2017.  (Doc. 26 at ¶ 56.)  Participants of the Plan, in

9  contrast, were paying $34 for just recordkeeping.  (*Id*.)  Plaintiffs argue that given the Plan's

10 some 73,000 participants and $3.7 billion in assets, Defendants should have been able to negotiate

11 much lower fees.  Plaintiffs further cite the Brightscope/ICI study, published in June 2019, to

12 support their allegations that the investment management fees and Total Plan Cost paid by the

13 Plan were unacceptably higher than those of comparable plans.  (Doc. 26 at ¶ 60.)

14       Defendants complain that Plaintiffs failed to explain how they calculated the investment

15 management fees included in the Total Plan Cost and that the Brightscope study is outdated.

16 (Doc. 29 at 22.)  Defendants further complain, as to the investment management fees as well as

17 the recordkeeping fees, that Plaintiffs' examples of comparative plans are not "sufficient

18 benchmarks" for the Plan.  (Doc. 29 at 22, 27–28.)  Even still, this did not stop Defendants from

19 using the 401k Averages Book to argue that the Plan's recordkeeping fees were indeed

20 reasonable.  (Doc. 29 at 29.)  Defendants are correct that the 401k Averages Book is provides

21 imperfect comparisons, since the largest plans analyzed in the book appear to be those with only

22 100 participants and $5 million in assets.  (Doc. 29-1 at 657.)  However, the Book shows that

23 those plans averaged a recordkeeping fee of $40, which appears to support Plaintiffs' contentions;

24 if 100 participant plans with only $5 million in assets managed to negotiate a $40 recordkeeping

25 fee, it is unclear why the Plan, with more than 70,000 participants and billions in assets, could not

26 negotiate a much lower fee.

27       Nonetheless, the Court need not address these details at the motion to dismiss stage.

28 Though some courts at this stage have opted to analyze whether plaintiffs have offered a proper

1    "apples to apples" comparison for complaints of excessive fees, *see Wehner v. Genentech, Inc.*,

2    No. 20-CV-06894-WHO, 2021 WL 2417098 at *4 (N.D. Cal. June 14, 2021), it is not required in

3    the Ninth Circuit.[7]  It is sufficient at this stage that Plaintiffs allege specific facts supporting their

4    claims that the Plan's fees and Total Plan Cost were excessive for its size.  On these facts, the

5    Court can draw a plausible inference that Defendants failed to act prudently when negotiating

6    fees and costs for the Plan.  *Johnson*, 250 F.Supp.3d at 467; *see also See Ybarra v. Bd. of*

7    *Trustees of Supplemental Income Tr. Fund*, 2018 WL 9536641, at *4 (C.D. Cal. Nov. 5, 2018)

8    ("At this stage of the pleadings, the Court must take the Plaintiffs' factual allegations as true—

9    including Plaintiffs' claim that $40 would be a reasonable fee").

10        Because the Court finds that Plaintiffs have plausibly alleged a breach of fiduciary duty as

11    to the retainer of the Active Suite and excessive fees and Total Plan Cost within the Plan, the

12    Court declines to address whether the remaining allegations in Count One would independently

13    support a breach.

14                        2.        Duty of Loyalty

15        Plaintiffs' FAC refers specifically to Defendants' duty of loyalty in two places.  The first

16    alleges that Defendants have "severely breached their duties of prudence and/or loyalty to the

17    Plan." (Doc. 26 at ¶ 28.)  The second describes the fiduciary duties, including loyalty and

18    prudence, imposed by ERISA.  (Doc. 26 at ¶¶ 62–67, citing 29 U.S.C. 1104(a).)

19        Under ERISA, "a fiduciary shall discharge his duties with respect to a plan solely in the

20    interest of the participants and beneficiaries and ... for the exclusive purpose of ... providing

21    benefits to participants and their beneficiaries[ ] and defraying reasonable expenses of

22    administering the plan." 29 U.S.C. § 1104(a)(1)(A).  This duty of loyalty prohibits plan

23    fiduciaries from "engaging in transactions that involve self-dealing or that otherwise involve or

24    create a conflict between the trustee's fiduciary duties and personal interests." *Terraza*, 241

25    F.Supp.3d at 1069 (quoting Restatement (Third) of Trusts § 78 (2007) and citing *Tibble*, 575 U.S.

26

27    _____

      [7] *Wehner* relies on *White*, which cites to Second Circuit authority requiring plaintiffs alleging excessive fees to plead,
      at the motion to dismiss stage, that the fees are excessive "in relation to the *specific services* the recordkeeper
28    provided".  *See White*, 2016 WL 4502808 at *314 (citing *Young v. GM Inv. Mgmt. Corp.*, 325 Fed. Appx. 31, 33 (2nd
      Cir. 2009)).

1    at 528–29).  The Supreme Court has stated that the duty of loyalty requires fiduciaries to make

2    decisions "with an eye single toward beneficiaries' interests."  *Pegram v. Herdrich*, 530 U.S. 211,

3    235 (2000).

4          Defendants complain that Plaintiffs have not sufficiently pled a claim for breach of duty

5    of loyalty because Plaintiffs do not plead specific *facts* to support their loyalty claim, which

6    Defendants describe as "simply a repackaging of Plaintiffs' imprudence claims."  Defendants

7    assert that Plaintiffs "cannot adequately assert a breach of loyalty claim that hinges entirely on

8    one of their breach of prudence claims."  (Doc. 29 at 29–30.)  Plaintiffs counter that the FAC

9    alleges sufficient circumstantial facts to support their claim for breach of duty of loyalty because

10   the service provider (Fidelity) is directly affiliated with the Active Suite and other poorly-

11   performing investment options such as the retention of those funds in the Plan benefitted Fidelity

12   and may be "plausibly traced to disloyal conduct."  (Doc. 32 at 31.)  To support their position,

13   Plaintiffs cite to paragraphs 60 and 61 of the FAC, which do not specifically invoke the duty of

14   loyalty but describe the Total Plan Cost and allegedly unreasonable investment management fees

15   paid to Fidelity.  (Doc. 26 at ¶¶ 60–61.)  In their reply, Plaintiffs further direct the Court's

16   attention to a supplemental document filed by Defendants that the Court has judicially noticed.

17         This document, which is a Custodial Account Agreement between Sutter Health and

18   Fidelity regarding the Plan, appears to have been executed in 2008 and includes language

19   suggesting that the recordkeeping paid to Fidelity would be "reviewed" if certain Fidelity funds—

20   namely the "Freedom Blend K6" funds—were removed from the Plan.  (Doc. 29-1 at 156.)

21   Plaintiffs argue that the Custodial Agreement reflects a benefit to Fidelity for the retainer of

22   certain Fidelity funds in the Plan via the recordkeeping fees which "strongly suggests that the

23   Plan had similar arrangements with Fidelity regarding the Active Suite."  (Doc. 36.)  The Court

24   finds this suggestion questionable, as Plaintiffs do not plead the existence or provide evidence of

25   a similar arrangement either during the Class Period or involving any of the Fidelity funds at

26   issue in the FAC at any time.  Further, Plaintiffs' suggestion as to the impact of Custodial

27   Agreement appears nowhere in the Complaint itself.

28         However, the FAC clearly alleges, among other things, that the investment management

1   fees paid by the Plan to Fidelity from 2014–2018 were nearly double that of other plans with over

2   $1 billion in assets.  (Doc. 26 at ¶¶ 60–61.)  The FAC also makes clear that such investment

3   management fees are paid to Fidelity and may have contributed to Defendants' retention of

4   higher-cost imprudent investment options in the Plan.  (Doc. 26 at ¶ 42) ("Fidelity is highly

5   incentive to promote its own investment products, specifically those that charge the highest fees,

6   to each plan for which it recordkeeps, including the Plan.")  In other words, the Complaint

7   plausibly pleads that some of the Fidelity investment products offered, including the Active Suite,

8   could have benefitted Fidelity in the form of a higher expense ratio or higher fees at the cost of

9   Plan participants.  As such, the "inclusion and retention of various Fidelity investment products is

10  circumstantial evidence that Defendants did not act 'with a single eye toward beneficiaries'

11  interests'."  *Johnson*, 2018 WL 1427421 at *9.

12         The cases cited by Defendants are inapposite. In *White*, the plaintiffs unsuccessfully

13  argued that it was both a violation of the duty of prudence and the duty of loyalty "to cause the

14  Plan to incur only reasonable expenses."  *White*, 2016 WL 4502808, at *4–5.  The complaint

15  there, unlike here, pled no additional facts suggesting that defendants "took any of the actions

16  alleged for the purpose of benefitting themselves or a third-party entity . . . at the expense of the

17  Plan participants."  *Id*. at *5.  The complaint in *Romero*, also did not plead facts suggesting that

18  the defendants took actions to benefit a party other than the plan participants, and plaintiffs never

19  contested defendants' argument that the duty of loyalty claims were insufficiently pled.  *Romero*

20  *v. Nokia, Inc.*, No. C 12-6260 PJH, 2013 WL 5692324, at *5 (N.D. Cal. Oct. 15, 2013). In light of

21  the above, the Court **DENIES** Defendants' request to dismiss Plaintiffs' Count One claims

22  regarding the duties of prudence and loyalty.

23         **B.       Count Two: Failure to Monitor**

24         Plaintiffs' second claim alleges that Defendants also breached their fiduciary duties under

25  ERISA by failing to monitor the performance and processes of their co-fiduciaries. Specifically,

26  Plaintiffs assert that Defendant Sutter Health is responsible for "appointing, overseeing, and

27  removing members of the Administrative Committee" and had a "fiduciary responsibility to

28  monitor the performance of the Committee and its members."  Further, both Sutter Health and the

1    RBIC had a fiduciary responsibility to monitor the performance of the members of the

2    Committee." (Doc. 26 at ¶¶ 87–88.)

3         "A fiduciary 'has a continuing duty to monitor trust investments and remove imprudent

4    ones. This continuing duty exists separate and apart from the [fiduciary's] duty to exercise

5    prudence in selecting investments at the outset.'" *White*, 2016 WL 4502808, at *18 (quoting

6    *Tibble*, 575 U.S. at 528). "'A plaintiff may allege that a fiduciary breached the duty of prudence

7    by failing to properly monitor investments and remove imprudent ones.'" *Id*. Defendants first

8    argue that this claim is derivative of Plaintiffs' first claim and must be dismissed if Plaintiffs

9    cannot adequately plead an underlying breach of fiduciary duty. (Doc. 29 at 31.)  Because

10   Plaintiffs have adequately pleaded their first claim, the Court declines to dismiss the second claim

11   on this basis.

12        Defendants also argue that Plaintiffs fail to allege specific facts about Defendants'

13   monitoring process such that this claim should fail.  Plaintiffs, however, allege that Sutter Health

14   is responsible for "appointing, overseeing, and removing members of the Administrative

15   Committee" and had a "fiduciary responsibility to monitor the performance of the Committee and

16   its members" and that Defendants "[f]ail[ed] to monitor and evaluate the performance of their

17   appointees or have a system in place for doing so, standing idly by as the Plan suffered enormous

18   losses as a result of the appointees' imprudent actions and omissions with respect to the Plan"

19   where adequate monitoring "would have alerted a prudent fiduciary to the breaches of fiduciary

20   duties"  (Doc. 26 at ¶ 91.)  Plaintiffs further allege that Defendants failed to remove appointees

21   "whose performances were inadequate in that they continued to maintain imprudent, excessively

22   costly, and poorly performing investments within the Plan, all to the detriment of the Plan and its

23   participants' retirement savings."  (Doc. 26 at ¶ 91.)

24        Defendants point out that the district court in *White* dismissed similar allegations. (Doc.

25   29 at 31, citing *White*, 2016 WL 4502808, at *18).  In *White*, however, the court noted that "the

26   claim as pled is wholly dependent on the breaches of duty alleged in the first through fourth

27   causes of action," and the *White* plaintiffs had failed to adequately allege those underlying claims.

28   *White*, 2016 WL 4502808, at *18.  As discussed above, Plaintiffs have adequately pleaded a

1   breach of fiduciary duty, and the Court concludes that the allegations described above are

2   sufficient to plausibly allege a claim for failure to monitor.  *See Urakhchin*, 2016 WL 4507117, at

3   *7 (denying motion to dismiss claim for failure to monitor where the plaintiffs alleged that the

4   defendants breached by failing to "(a) monitor and evaluate the performance of their appointees,

5   *or failing to have a system in place for doing so*, and (b) failing to remove appointees who

6   maintained imprudent, excessively costly, and poorly performing investments within the Plan, all

7   to the detriment of the Plan and its participants").The Court therefore **DENIES** the motion as to

8   Plaintiffs' second claim.

9               **C.     Count Three: Knowing Breach of Trust**

10          Finally, Plaintiffs' third claim alleges that, "[i]n the alternative, to the extent that any of

11   the Defendants are not deemed a fiduciary or co-fiduciary under ERISA," Defendants are liable

12   for participating "in a knowing breach of trust."  (Doc. 26 at ¶ 96.)  Defendants briefly challenge

13   Count Three as derivative of Count One, which the Court has already determined was adequately

14   pled (Doc. 29 at 31); therefore, Defendants' motion to dismiss is **DENIED** as to Plaintiffs'

15   knowing breach of trust claims.

16   **III.    Jury Demand**

17          Lastly, Defendants request that Plaintiffs' jury demand be struck because there is no right

18   to a jury trial for ERISA claims.  Plaintiffs argue that jury trials are permitted in ERISA actions

19   "when such claims are legal rather than equitable in nature," and it is premature to strike the jury

20   demand before the Court makes a determination about the nature of Plaintiffs' claims.  (Doc. 32

21   at 33, citing *Healthcare Strategies, Inc. v. ING Life Ins. & Annuity Co.*, 2012 WL 162361, at *5

22   (D. Conn. Jan. 19, 2012).)

23          Federal Rule of Civil Procedure 12(f) provides that "[t]he court may strike from a

24   pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."

25   Fed. R. Civ. P. 12(f).  Following the Ninth Circuit's guidance in *Spinelli* regarding whether a

26   party has a right to a jury trial, the Court must (1) look at the nature of the right and (2) examine

27   the remedies provided to see whether they are legal or equitable in nature.  *Spinelli v. Gaughan*,

28   12 F.3d 853 (9th Cir. 1993) (stating that a suit by a beneficiary against a plan fiduciary "is the

1    kind of lawsuit that, before the merger of law and equity, respondents could have brought only in

2    a court of equity, not a court of law").

3           The nature of the action in this case, breach of fiduciary duty, was historically a matter

4    handled by courts of equity.  *CIGNA Corp. v. Amara*, 563 U.S. 421, 439 (2011).  As to the

5    remedies provided, the Ninth Circuit has found that "plan participants and beneficiaries are not

6    entitled to jury trials for claims brought under, or preempted by, section 502 of ERISA." *Thomas*

7    *v. Oregon Fruit Products Co.*, 228 F.3d 991, 996 (9th Cir. 2000).  That Plaintiffs potentially seek

8    "damages" above and beyond the return of all losses to the Plan is not determinative, as "[e]quity

9    courts possessed the power to provide relief in the form of monetary 'compensation' for a loss

10    resulting from a trustee's breach of duty, or to prevent the trustee's unjust enrichment." *Amara*

11    563 U.S. at 441 (citing Restatement (Third) of Trusts § 95, and Cmt. a (Tent. Draft No. 5, Mar. 2,

12    2009)).  Therefore, the Court **GRANTS** the motion to strike Plaintiffs' jury demand.

13                                            **CONCLUSION**

14           Accordingly, the Court **ORDERS**:

15        1.        Defendants' Motion to Dismiss (Doc. 29) is **DENIED**.

16        2.        Defendants' Motion to Strike under Rule 12(f) (Doc. 29) is **GRANTED**.

17        3.        Should Plaintiffs wish to further amend their Complaint for any reason, they may

18                seek leave to do so.

19

20    IT IS SO ORDERED.

21       Dated:  __**February 9, 2023**__

                                                            UNITED STATES DISTRICT JUDGE

22

23

24

25

26

27

28