# EXHIBIT A

2023 WL 2301962
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Kaity RUILOVA and Eileen Brannigan, Individually and
as representatives of a class of similarly situated persons,
on behalf of the Yale-New Haven Hospital and Tax
Exempt Affiliates Tax Sheltered Annuity Plan, Plaintiffs,
v.

YALE-NEW HAVEN HOSPITAL, INC.; the Board of
Trustees of Yale-New Haven Hospital, Inc.; the System
Investment Committee of Yale New Haven Health
Service Corp. and System Affiliates, the Retirement
Committee of Yale New Haven Health Services
Corp. and System Affilliates; and Does No. 1-20,
Whose Names Are Currently Unknown, Defendants.

No. 3:22-cv-00111-MPS
|
Signed March 1, 2023

**Attorneys and Law Firms**

Alec Berin, James C. Shah, Miller Shah LLP, Philadelphia,
PA, Gabrielle Kelerchian, Shook, Hardy & Bacon L.L.P.,
Philadelphia, PA, Anna K. D'Agostino, Miller Shah LLP, New
York, NY, Donald Reavey, Capozzi Adler, P.C., Harrisburg,
PA, James E. Miller, Laurie Rubinow, Miller Shah LLP,
Chester, CT, Kolin Tang, Miller Shah LLP, Irvine, CA, Mark
Gyandoh, Capozzi Adler, Merion Station, PA, for Plaintiffs.

Elizabeth L. Woods, William J. Delany, Michael J. Prame,
Groom Law Group, Chartered, Washington, DC, Jonathan B.
Orleans, Pullman & Comley, Bridgeport, CT, for Defendants
Yale-New Haven Hospital, Inc., Board of Directors of Yale-
New Haven Hospital, Inc.

William J. Delany, Groom Law Group, Chartered,
Washington, DC, for Defendants The System Investment
Committee of Yale New Haven Health Services Corp. and
System Affiliates, The Retirement Committee of Yale New
Haven Health Services Corp. and System Affiliates.

Jaime Santos, Goodwin Procter LLP, Washington, DC, for
Amici Chamber of Commerce of the United States of
America, American Hospital Association, Association of
American Medical Colleges.

**RULING ON MOTION TO DISMISS**

Michael P. Shea, United States District Judge

**\*1** Plaintiffs Kaity Ruilova and Eileen Brannigan
("Plaintiffs"), on their own behalf and on behalf of all
others similarly situated, bring this action against Yale-New
Haven Hospital, Inc., The Board of Trustees of Yale-New
Haven Hospital, Inc., The System Investment Committee of
Yale New Haven Health Service Corporation and System
Affiliates, The Retirement Committee of Yale New Haven
Health Services Corporation and System Affiliates, and Does
No. 1-20 ("Defendants"). Plaintiffs allege that Defendants
have breached their fiduciary duties under the Employee
Retirement Income Security Act ("ERISA"), 29 U.S.C.
§ 1001 *et seq.*, in their administration of the Yale-New
Haven Hospital and Tax Exempt Affiliates Tax Sheltered
Annuity Plan (the "Plan"), a 403(b) defined contribution
retirement plan. Specifically, Plaintiffs allege that Defendants
imprudently offered and retained certain investments in the
Plan, overpaid for the Plan's recordkeeping and administrative
fees, offered an overly expensive menu of investment options
to Plan participants, and violated their duty of loyalty to
the Plan. Plaintiffs also allege that certain Defendants failed
to monitor the fiduciary conduct of other Defendants or
were complicit in the fiduciary breaches of other Defendants.
Defendants have filed a motion to dismiss under Federal
Rules of Civil Procedure 12(b)(1) and 12(b)(6). For the
reasons set forth below, I grant Defendants' motion to dismiss
Plaintiffs' claims related to the Plan's investment lineup,
the Plan's total cost, and the duty of loyalty. I also dismiss
Count I against certain Defendants, some of the derivative
claims, and all of the alternative claims. I deny Defendants'
motion to dismiss as to the claim alleging that the Plan
incurred excessive recordkeeping and administrative fees and
the related failure-to-monitor claims. [1]

**I. FACTUAL AND PROCEDURAL BACKGROUND**
The following facts are drawn from Plaintiffs' amended
complaint and are accepted as true for the purpose of this
motion.

**A. Background**
Yale-New Haven Hospital ("Yale-NH Hospital") is a
Connecticut nonprofit corporation and a "flagship hospital"
that serves as "the largest acute-care provider in southern

Connecticut and one of the Northeast's major referral centers." ECF No. 56 ¶ 11. Yale-NH Hospital permits its employees to participate in the Plan. *Id.* ¶ 1. The Plan is "a participant-directed 403(b) plan," where "participants direct the investment of their contributions into various investment options offered by the Plan." ECF No. 56 ¶ 19. Each participant's account is "credited with the participant contributions, employer matching contributions, any discretionary contributions, and earnings or losses thereon." *Id.* ¶ 19. Plan participants could invest their account assets in mutual funds, a guaranteed investment contract, or a self-directed brokerage account. *Id.* ¶ 19. Mutual funds are "publicly traded investment vehicles consisting of a pool of monetary contributions collected from many investors for the purpose of investing in a portfolio of equities, bonds, and other securities." *Id.* ¶ 20. Guaranteed investment contracts are "insurance company contracts that guarantee a rate of return in exchange for keeping a deposit for a certain period of time." *Id.* ¶ 21. From January 21, 2016, through the date of judgment in this case (the "Class Period"), all Plan assets have been held in a trust by the Plan trustee, Fidelity Management Trust Company, and all investments and asset allocations were "performed through this trust instrument." *Id.* ¶ 22.

**\*2** The Plan pays its expenses from Plan assets, and the "majority of administrative expenses are paid by participants as a reduction of investment income." *Id.* ¶ 19. Each participant's account is "charged with the amount of distributions taken and an allocation of administrative expenses." *Id.* ¶ 19. As of December 31, 2020, the Plan is "in the top 0.1% of all defined contribution plans by plan size," having "26,416 participants with account balances and assets totaling approximately $1.66 billion." *Id.* ¶ 4. Because the Plan's assets are substantial, it has "significant bargaining power and the ability to demand low-cost administrative and investment management services" in the markets for these services. *Id.* ¶ 4. "The marketplace for defined contribution retirement plan services is well-established and can be competitive when fiduciaries of defined contribution retirement plans act in an informed and prudent fashion." *Id.*

Though Yale-NH Hospital established the Plan, the Board of Trustees of Yale-NH Hospital (the "Board") — named in this lawsuit as an organization with each member of the Board also sued in his or her individual capacity as Does No. 1-10 — appointed other "authorized representatives" to serve as the Plan's fiduciaries during the period at issue. *Id.* ¶ 12. The authorized representatives included the System Investment Committee of Yale New Haven Health

Services Corporation and System Affiliates; the Retirement Committee of Yale New Haven Health Services Corporation and System Affiliates (together "Committees"); and the members of these committees, who are sued individually as Does No. 11-20. *See id.* ¶¶ 12-14. During the Class Period, the Board and its members exercised "discretionary authority to appoint and/or monitor the Administrative Committees." *Id.* ¶ 12. In turn, the Committees were appointed to "administer the Plan on Yale-NH Hospital's behalf," *id.* ¶ 13, and so "had control over Plan management and/or authority or control over management or disposition of Plan assets," *id.* ¶ 12. Together, all Defendants maintain the Plan and are responsible for "selecting, monitoring, and retaining the service provider(s) that provide investment, recordkeeping, and other administrative services" for the Plan. *Id.* ¶ 5.

Plaintiffs are former employees of Yale-NH Hospital and "former participants" in the Plan. *Id.* ¶¶ 9-10. During the Class Period, Ruilova "maintained an investment through the Plan in the Fidelity Freedom 2050 Fund," *id.* at ¶ 9, whereas Brannigan invested in the "Fidelity Freedom 2020 Fund, Fidelity Advisor Freedom 2025 Fund, and the Fidelity Government Money Market Fund," *id.* at 10. Both Brannigan and Ruilova were subject to the Plan's recordkeeping and administrative costs, which they allege were excessive. *Id.* ¶¶ 9-10. Specifically, they allege that Defendants are all Plan fiduciaries who breached their duties of prudence and loyalty to the Plan by paying excessive recordkeeping costs to Fidelity. *Id.* ¶¶ 48-57. Ruilova and Brannigan also allege that the Plan offered imprudent investment options to participants. They seek to represent a class of Plan participants to pursue these claims.

During the Class Period, the Plan used Fidelity Management & Research Company ("Fidelity"), *id.* ¶¶ 49, 59, to provide "the essential recordkeeping and administrative ("RK & A") services" for it. [2] The Plan paid Fidelity for RK & A services "indirectly through asset-based revenue sharing," *id.* ¶ 49, which is where compensation is paid to the recordkeeper by third parties and "fees are taken from the investment options before the value of the investment option is provided to the participant." *Id.* ¶ 30.

**\*3** There are two types of essential recordkeeping services provided to the Plan. *Id.* ¶ 32. The first, bundled RK & A, includes transaction processing and many other kinds of basic administrative services. *Id.* ¶ 32. These services are offered by Fidelity and other "recordkeepers for one price," typically at a per participant rate. *Id.* ¶ 33. The specific services chosen

by a large plan for inclusion in its bundled RK & A package "do not affect the amount charged by recordkeepers" per participant because these are "basic and fungible services." *Id.* The second type of recordkeeping services are known as "a la carte RK & A" services and often "have separate, additional fees based on the conduct and use of individual participants." *Id.* ¶ 34. A la carte RK & A services include the fees associated with processing participant loans and other individualized services where the cost of providing the service can be directly associated with a participant's activity. *See id.*

All national recordkeepers can provide both kinds of RK & A services to large defined contribution plans. *Id.* ¶ 35. For "large plans with more than 5,000 participants, any minor variations in the way" the bundled and a la carte RK & A services are delivered "have no material impact on the fees charged by recordkeepers to deliver the services." *Id.* ¶ 36. This is because "RK & A services are essentially uniform in nature, and ... small differences in the services required by a large plan are immaterial to the cost of providing such services;" this means that "most recordkeepers only require a plan's participant count and asset level in order to provide a fee quote," which is typically provided on a cost "per-participant basis." *Id.* ¶ 44. There are significant "economies of scale inherent in the recordkeeping relationship," such that "a recordkeeper will accept a lower fee to provide RK & A as the number of participants in the plan increases." *Id.* ¶ 39. And "the average cost for a recordkeeper to provide services to a participant does not hinge on that participant's account balance." *Id.* ¶ 41.

### B. Recordkeeping Fees
Ruilova and Brannigan allege that Defendants' "failure to recognize that the Plan and its participants were grossly overcharged for RK & A services and their failure to take effective remedial actions amount[ ] to a shocking breach of their fiduciary duties to the Plan." *Id.* ¶ 57. The RK & A services Fidelity provided to the Plan "are and were the same standard services identified above, and are and were the same as those provided to comparable plans." *Id.* ¶ 49. "Fidelity provides no services to the Plan and its participants that are unusual or out of the ordinary." *Id.* The precise details of what services Fidelity provided the Plan "are immaterial to pricing considerations, the primary drivers of which are the number of participants and whether the plan fiduciaries employed a competitive process of soliciting bids to determine the reasonable market rate for the services required by the plan." *Id.*

Plaintiffs note that due to the "economies of scale inherent in the recordkeeping relationship ... the cost to the recordkeeper on a per-participant basis declines as the number of plan participants increases and, as a result, a recordkeeper will accept a lower fee to provide RK & A as the number of participants in the plan increases." *Id.* ¶ 39. Thus "the market for defined contribution plan RK & A services has become increasingly price competitive, particularly for larger plans, like the Plan, that have a considerable number of participants and significant assets." *Id.* ¶ 37. "Informed, prudent plan fiduciaries are aware of these cost structure dynamics and marketplace realities and will leverage the plan's participant count to obtain lower effective per-participant fees." *Id.* ¶ 42. Plan fiduciaries will regularly "ensure that a plan is paying fees commensurate with its size in the marketplace by soliciting competitive bids from recordkeepers other than the plan's current provider," which they then can use to obtain a lower fee. *Id.* ¶ 44.

**\*4** Defendants "allowed the Plan to be charged total amounts of RK & A fees that far exceeded the reasonable market rate" because the Plan paid an average fee per participant of $48 since the start of the Class Period and annual RK & A fees of: $63 in 2016, $45 in 2017, $37 in 2018, $51 in 2019, and $46 in 2020, *id.* ¶ 50, but "similarly sized defined contributions plans during the Class Period ... were paying much lower fees than the Plan," *id.* ¶ 52; *see also id.* ¶ 53. Plaintiffs provide a table containing nine similarly sized plans' per participant fee for 2020. *Id.* ¶ 53. The per participant fees from these other plans included "all the direct and indirect compensation paid to the recordkeeper disclosed on each plan's Form 5500," *id.* ¶ 54, and these comparable plans "received at least the same RK & A services received by the Plan," *id.* ¶ 55. Thus, the comparable plan fees are "apples-to-apples comparisons in that they include all the fees being charged by each recordkeeper to provide the same RK & A services" to plans like the Plan. *Id.* ¶ 55. In 2020, Fidelity charged the Plan $46 per participant in RK & A fees, whereas the nine plans examined by Plaintiffs with similar participant numbers all paid less than $35 per participant in RK & A fees. [3]

These much lower fees were paid "for materially identical services," showing that the "reasonable market rate [was] lower than what the Plan was paying" and that "comparable plans were able to negotiate lower fees for materially identical services." *Id.* ¶ 52. Because the fees the Plan paid to Fidelity are higher than those paid to comparable plans, defendants

"clearly engaged in virtually no examination, comparison, or benchmarking of the RK & A fees of the Plan to those of other similarly sized defined contribution plans, or they were complicit in paying grossly excessive fees." *Id.* ¶ 56.

### C. The Freedom Funds

The Plan offers "a suite of 14 target date funds ('TDF(s)')," which are "investment vehicle[s] that offer[ ] an all-in-one retirement solution through a portfolio of underlying funds that gradually shifts to become more conservative as the assumed target retirement year approaches." ECF No. 56 ¶ 58. Defendants were responsible for crafting the Plan lineup and could have chosen any of the target date families offered by Fidelity, or those of any other target date provider. *Id.* ¶ 59. Ruilova and Brannigan allege that defendants "failed to act in the sole interest of Plan participants and breached their fiduciary duty by imprudently selecting and retaining" in their TDF lineup the Fidelity Freedom funds (the "Active suite"). *Id.* ¶ 60.

All TDFs are actively managed by investment managers because managers must "make changes to the allocations to stocks, bonds, and cash over time." *Id.* ¶ 58. The allocation shifts "are referred to as a fund's glide path." *Id.* The Active suite "invests predominantly in actively managed Fidelity mutual funds," which makes it "dramatically more expensive ... and riskier in both its underlying holdings and its asset allocation strategy" than Fidelity's Freedom Index funds (the "Index suite"), a TDF that consists of "funds that simply track market indices." *Id.* ¶ 61. The Active suite "chases returns by taking levels of risk that render it unsuitable for the average retirement investor, including participants in the Plan." *Id.* ¶ 64. The managers of the Active suite chase returns by allocating suite assets "to primarily actively managed funds" that attempt "to beat a benchmark—usually a market index or combination of indices—by taking on additional risk." *Id.* ¶ 65.

Some of the funds included in the Active suite have underperformed relative to their benchmarks; "[t]he Intrinsic Opportunities Fund, which is currently allocated 7.97% of the total assets in the 2040-2065 Funds, has, over its lifetime, missed its benchmark, the Russell 3000 Index, by an incredible 185 basis points (1.85%) on an annualized basis." *Id.* ¶ 66. Similarly, "[t]he Large Cap Stock Fund, to which 6.95% of the total assets in the 2040-2065 Funds are allocated, has suffered even worse underperformance: Its annualized lifetime returns trail that of its benchmark, the S & P 500 Index, by 276 basis points (2.76%)." *Id.* The Active suite is

diversified "among 32 underlying investment vehicles," *id.*, 26 of which are "actively managed Fidelity Series Funds," *id.* ¶ 67. Of these 26 Fidelity Series Funds, "half similarly trail their respective benchmarks over their lifetimes," *id.* ¶ 67, 14 of them lack "a five-year performance track record" as of the start of the Class Period, *id.* ¶ 68, and only two of the funds with a five-year performance track record that are not short-term debt funds "had outperformed their prospectus benchmark over the previous three- and five-year period as of the start of the Class Period," *id.* ¶ 69.

**\*5** The Active suite is also subject to the "significant risks its managers take to boost returns." *Id.* ¶ 71. For example, the Active suite managers make risky decisions about the "sub-asset classes of the Active suite's portfolio." *Id.* ¶ 71. In total, the "Active suite allocates approximately 1.5% more of its assets to riskier international equities than the Index suite" and has "higher exposure to riskier classes like emerging markets and high yield bonds." *Id.* ¶ 71. The Active suite also allowed managers to "deviate from the glide path allocations by ten percentage points" as part of an "active asset allocation" strategy, "an attempt to time market shifts in order to locate underpriced securities." *Id.* ¶ 72. This investment strategy was criticized in a Reuters special report, by Morningstar, and by other industry experts. *Id.* Defendants failed to investigate the level of risk inherent in the Active suite portfolio and did not determine whether the risk level was suitable for Plan participants at any point during the Class Period. *Id.* ¶ 71. Nor did defendants initiate or undertake "any review or scrutiny of the Active suite's strategy changes" made as part of the active asset allocation strategy. *Id.* ¶ 72.

The Active suite also charged fees "many multiples higher than the Index suite's industry-leading low costs," offering shares with expense ratios ranging from 42 to 65 basis points when the Index suite offered institutional shares for 8 basis points. *Id.* ¶ 75. [4] "Even a minor increase in a fund's expense ratio can considerably reduce long-term retirement savings." *Id.* ¶ 75. For example, "[c]onsidering just the gap in expense ratios from the Plan's investment in the Active suite to the Institutional Premium share class of the Index suite, in 2020 alone, the Plan could have saved approximately $4.83 million in costs." *Id.* ¶ 76.

The Active suite also has "miserable performance when measured against any of the other most widely utilized TDF offerings." *Id.* ¶ 79. "Throughout the Class Period, there were many TDFs that consistently outperformed the Active suite, providing investors with substantially more capital

appreciation." *Id.* And "at the start of the Class Period, the Active suite ranked dead last when measured against the primary offerings of four of the five largest non-Fidelity managers in the TDF marketplace" based on a comparison of "the three- and five-year annualized returns" of these funds to those of the Active suite. *Id.* ¶ 80. [5] Given the continued presence of the Active suite in the Plan, Defendants "never heeded the numerous red flags ... and neglected to scrutinize the performance of the Active suite against any of the more appropriate alternatives in the TDF marketplace." *Id.* ¶ 79. Defendants failed "to undertake any analysis of the Active suite against appropriate peers using the above or other important performance metrics." *Id.* ¶ 81. [6]

Because of the rising risks and costs of the Active suite, investors have withdrawn their capital from the Active suite — "2018 alone saw an estimated $5.4 billion in net outflows" while the Index suite saw "an estimated $4.9 billion in new funds in 2018." *Id.* ¶ 78. Reuters reported that between 2014 and 2018 "nearly $16 billion has been withdrawn" from the Active suite. *Id.* In continuing to offer the Active suite in the plan, Defendants failed "to acknowledge or act upon investors' crumbling confidence in the Active suite, while ignoring the simultaneous and justified surge in preference for low-cost TDFs such as the Index suite." *Id.* ¶ 78.

**\*6** The Active suite was designated as the Plan's "Qualified Default Investment Alternative" during the Class Period, which means that "[i]f participants do not indicate where their assets should be invested, all contributions are automatically invested in ... [t]he Fidelity Freedom fund with the target year closest to a participant's assumed retirement age." *Id.* ¶ 62. Many "Plan participants are not sophisticated investors" and so they "concentrate their retirement assets in TDFs;" by "December 31, 2020, approximately 56% of the Plan's assets were invested in the Active suite." *Id.* ¶ 63.

### D. The Plan's Other Investments

The Plan also offers other investment options to participants besides the Active suite. Ruilova and Brannigan claim that Defendants' decision to include and retain five particular funds as Plan options was a breach of their fiduciary duties because these funds underperformed their benchmarks and had high fees for several consecutive quarters.

### 1. The Parnassus Core Equity Fund

The Parnassus Core Equity Fund ("Parnassus") "consistently and significantly underperformed its benchmark, the S & P 500 Index, on a rolling three- and five-year annualized basis," ECF No. 56 ¶ 83, despite having a "63-basis point (0.63%) expense ratio." *Id.* ¶ 87. But because "the Committees' [had] deficient investment review procedures, a general lack of understanding of how to evaluate investment returns, and/ or an attitude of neglect towards the plan, Defendants failed to appropriately scrutinize, and ultimately replace, this poor performing fund." *Id.* ¶ 83. Parnassus used as a benchmark the S & P 500 Index, *id.*, and the Plan contained an index fund that already tracked this benchmark, *id.* ¶ 86. Defendants had access to information about this fund and its performance relative to its benchmark during the Class Period, which when reviewed shows that Parnassus outperformed its benchmark once from the third quarter of 2016 until the second quarter of 2019 on its 3- and 5-year annualized returns and in its worst year had 3-year annualized returns that trailed the benchmark by 2.62%. *Id.* ¶ 83. The "Jensen Quality Growth Fund ("Jensen") or JPMorgan Equity Focus Fund ("JP Morgan")" are "actively managed U.S. large cap blend fund[s]" that performed better than Parnassus did during the Class Period. *Id.* ¶ 87. For example, "[b]y the end of the First Quarter of 2018, at which point the Parnassus Fund had trailed the S & P 500 Index on a 3- and 5-year annualized basis for four consecutive quarters and ranked in the 64th percentile" among its peer funds, "the Jensen Fund's 3- and 5-year returns exceeded the index and ranked in the 6th and 10th percentile, respectively, of that same peer group, and the JPMorgan Fund's 3- and 5-year returns also beat the index and both ranked in the 8th percentile." *Id.* ¶ 87. Both Jensen and JP Morgan "remained considerably better active domestic large cap funds than the Parnassus Fund throughout the Class Period." *Id.* ¶ 87.

### 2. The Invesco Diversified Dividend Fund

The Invesco Diversified Dividend Fund Class R6 ("Diversified Dividend") has also "consistently and significantly underperformed its benchmark, the Russell 1000 Value Index, on a rolling three- and five-year annualized basis," *id.* ¶ 88, despite having an expense ratio of 43 basis points (0.43%) when an exemplar index fund that simply tracks the benchmark had an expense ratio of 7 basis points (0.07%), *id.* ¶ 91. "At their regular meetings during the Class Period, Committee members had access to," *id.* ¶ 88, return data that, in summary, showed that from the fourth quarter of 2017 to the fourth quarter of 2021 Diversified Dividend had

always underperformed relative to its benchmark on its 3-year annualized returns and only outperformed its benchmark once on its 5-year annualized returns, *id.* ¶ 90. There were better "active domestic large cap value funds" that defendants could have chosen for the Plan, such as the Columbia Dividend Income Fund, which by the end of the third quarter of 2018 had "3- and 5-year returns [that] exceeded the index and ranked in the 10th and 5th percentile, respectively" among peer funds, or the Parnassus Endeavor Fund, which over the same periods had "3- and 5-year returns [that] also beat the index and ranked in the 3rd and 1st percentile, respectively." *Id.* ¶ 92. During this same period "the Diversified Dividend Fund's 3- and 5-year annualized returns had trailed the Russell 1000 Value Index for four consecutive quarters and ranked no higher than the 65th and 66th percentile, respectively." *Id.*

### 3. The AMG TimesSquare Mid Cap Growth Fund

**\*7** The AMG TimesSquare Mid Cap Growth Fund Class Z ("AMG") was added to the Plan "at some point prior to December 31, 2019" even though AMG had "consistently and significantly underperformed its benchmark, the Russell MidCap Growth Index, on a rolling three- and five-year annualized basis for at least the previous sixteen quarters." *Id.* ¶ 93. From the first quarter of 2015 until the third quarter of 2019, AMG's 3-year returns did not exceed its benchmark and its 5-year returns exceeded the benchmark only once. *Id.* Defendants were aware of these performance data. *Id.* In 2018 and 2019, AMG also regularly ranked in the bottom half of its peers when comparing 3- and 5-year returns. *Id.* ¶ 94. For this performance, AMG charged a "98 basis point (0.98%) expense ratio." *Id.* ¶ 95. The Plan could have chosen actively managed "domestic mid-cap growth" funds with better 3- and 5- year returns, such as the Champlain Mid Cap Fund with "3- and 5-year returns [that] exceeded the index and ranked in the 14th and 7th percentile, respectively" among peer funds in the First Quarter of 2019, or the ClearBridge Select Fund with "3- and 5-year returns [that] also beat the index and both ranked in the 1st percentile" during the same period among peer funds. *Id.* ¶ 95. During this same period, the first quarter of 2019, "the AMG Fund's 3- and 5-year annualized returns trailed the Russell Mid Cap Growth Index by 1.33% and 1.89%, respectively, and ranked in the 60th and 62nd percentile among U.S. mid cap growth funds." *Id.*

### 4. The Fidelity High Income Fund

The Fidelity High Income Fund ("High Income") has also underperformed relative to its benchmark, "the Intercontinental Exchange Bank of America Merrill Lynch U.S. High Yield/U.S. High Yield Constrained Blend Index." *Id.* ¶ 96. In the fourth quarter of each year from 2014 to 2020, High Income underperformed relative to its benchmark in its 5- and 10-year annualized performance. *Id.* ¶ 96. High Income also underperformed relative to its benchmark in annual returns, beating the benchmark only once from 2011-2021. *Id.* ¶ 97. Defendants had access to the 5-year, 10-year, and annual return performance data during the Class Period. *Id.* ¶ 96-97. High Income also had "three- and five-year performance that ranked in the 70th and 62nd percentile, respectively, among high yield bond funds." *Id.* ¶ 98. "[T]here is a BlackRock High Yield Fund that regularly beats both the High Income Fund and its benchmark, with an expense ratio of 51 basis points (0.51%) for the K share class," which is cheaper than the "69 basis points (0.69%)" charged by High Income. *Id.* ¶ 99. There were also other active high yield bond funds that defendants could have chosen for the Plan instead of High Income: at the start of the Class Period, "the Fidelity Advisor High Income Advantage Fund ... [had] 3- and 5-year returns [that] beat the benchmark and ranked in the 5th and 6th percentile, respectively, among that same peer group," and the "PGIM High Yield Fund ... [had] 3- and 5-year returns [that] also exceeded the benchmark and ranked in the 27th and 17th percentile, respectively." *Id.* ¶ 100. In comparison, at the start of the Class Period High Income "had failed to beat its benchmark by any trailing measure and had 3- and 5-year annualized returns that ranked in the 70th and 62nd percentile, respectively, among high yield bond funds." *Id.*

### 5. The Lazard Emerging Markets Equity Portfolio

The Lazard Emerging Markets Equity Portfolio Institutional Class ("Lazard") is another fund that Ruilova and Brannigan allege was imprudently selected before its removal "at some point after December 31, 2020." *Id.* ¶ 101. From the "first quarter-end prior to the start of the Class Period," *id.* ¶ 101, through to the "Fourth Quarter of 2021," *id.* ¶ 104, Lazard failed to perform better than its benchmark on its 3-year returns and in only 4 of 25 quarters did it outperform the benchmark on its 5-year returns. *Id.* ¶ 104. And Lazard charged "108 basis points (1.08%)," when a comparable index fund that tracked Lazard's benchmark charged only "7.6 basis points (0.076%)." *Id.* ¶ 105. There were several other emerging market funds that defendants could have included in the Plan instead of Lazard. For example, at the start of the

Class Period the American Funds New World Fund "3- and 5-year returns beat the benchmark and ranked in the 6th and 4th percentile, respectively, among that same peer group," and the Fidelity Emerging Markets Fund's '3- and 5-year returns also exceeded the benchmark and ranked in the 12th and 25th percentile, respectively." *Id.* ¶ 106. During this same period, Lazard's "3- and 5-year annualized returns trailed those of its benchmark by 2.36% and 0.77%, respectively, and ranked in the 88th and 70th percentile among emerging market funds," *Id.* ¶ 106.

### E. Total Plan Cost

**\*8** The defendants also "failed to monitor the average expense ratios charged by investment managers to similarly sized plans" and "the Plan was paying total fees that were up to 83% higher than the average total cost for comparable plans." *Id.* ¶ 107. From 2015 through 2020, "the Plan paid investment-related fees (some of which [were] allocated to the Plan's recordkeeper, Fidelity) of 0.53% of its total assets," which was much higher than the average total fee of "0.29% [of total assets] for plans with over $1 billion in assets" like the Plan. *Id.* "[A]t all times, the Plan's [total plan cost] was 16 to 24 basis points (0.16%–0.24%) higher than what Defendants should have reasonably accepted, causing the Plan to overpay approximately $15.9 million in fees from 2015 to 2020." *Id.* Plan participants bore the burden of paying these fees. *Id.*

### F. Class Allegations

Ruilova and Brannigan bring this action and allege the above facts on their behalf and on behalf of a proposed class of:

> All participants and beneficiaries in the Yale-New Haven Hospital and Tax Exempt Affiliates Tax Sheltered Annuity Plan at any time on or after January 21, 2016 and continuing to the date of judgment, or such earlier date that the Court determines is appropriate and just, including any beneficiary of a deceased person who was a participant in the Plan at any time during the Class Period.

ECF No. 56 ¶ 115 (and excluding any judicial officer to whom this case is assigned and Defendants).

## II. LEGAL STANDARD

### A. Rule 12(b)(1)

"Determining the existence of subject matter jurisdiction is a threshold inquiry and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2009) (quoting *Arar v. Ashcroft*, 532 F.3d 157, 168 (2d Cir. 2008)). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). I "must accept all factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to plaintiffs." *McGinty v. State*, 193 F.3d 64, 68 (2d Cir. 1999). [7]

### B. Rule 12(b)(6)

**\*9** In deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), I must determine whether the plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court accepts as true all of the complaint's factual allegations when evaluating a motion to dismiss, *id.*, and must "draw all reasonable inferences in favor of the non-moving party," *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008). However, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive a motion to dismiss. *Mastafa v. Chevron Corp.*, 770 F.3d 170, 177 (2d Cir. 2014) (citation omitted).

On a motion to dismiss under Rule 12(b)(6), I may consider only the allegations in the complaint, "documents appended to the complaint or incorporated in the complaint by reference," documents upon which "the complaint relies heavily," and "matters of which judicial notice may be taken." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (citations and internal quotation marks omitted). Judicial notice permits me to take account of the existence of publicly filed documents

but it does not permit me to consider statements made in such documents for their truth. *Staehr v. Hartford Fin. Services Group, Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) ("[I]t is proper to take judicial notice of the *fact* that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents").

## III. DISCUSSION

"Under ERISA, retirement-plan fiduciaries must adhere to the twin duties of loyalty and prudence." *Vellali v. Yale U.*, 308 F. Supp. 3d 673, 682 (D. Conn. 2018). "ERISA imposes a prudent man standard of care on fiduciaries entrusted with the administration" of employee benefits plans that requires fiduciaries to "act solely in the interest of the [plans'] participants and beneficiaries." *Pension Benefit Guaranty Corp. v. Morgan Stanley Investment Management Inc.*, 712 F.3d 705, 715 (2d Cir. 2013) (hereinafter "*PBGC*") (citation and internal quotation marks omitted); *see also* 29 U.S.C. § 1104(a)(1) (charging ERISA fiduciaries with "the exclusive purpose of ... providing benefits to participants and their beneficiaries" and acting with "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims").

The duty of prudence requires ERISA fiduciaries to "act in a prudent manner under the circumstances then prevailing" whenever they make decisions affecting their plans. *PBGC*, 712 F.3d at 716 (citation and internal quotation marks omitted). I thus must "judge a fiduciary's actions based upon information available to the fiduciary at the time of each investment decision and not from the vantage point of hindsight." *Id.* (citation and internal quotation marks omitted). In the context of a defined contribution plan, I cannot "rely, after the fact, on the magnitude of the decrease in [a fund's price]; rather, [I] must consider the extent to which plan fiduciaries at a given point in time reasonably could have predicted the outcome that followed" by focusing "on a fiduciary's conduct in arriving at an investment decision, not on its results, and ask[ing] whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment." *Id.* (citation and internal quotation marks omitted). An ERISA fiduciary's duty of prudence applies "not only in making [initial] investments but also in monitoring and reviewing investments, which is to be done in a manner that is reasonable and appropriate to the particular investments, courses of action, and strategies involved;" an ERISA fiduciary thus has "a continuing duty

of some kind to monitor investments and remove imprudent ones." *Tibble v. Edison Intern.*, 575 U.S. 523, 529-30 (2015) (internal quotation marks and citation omitted).

**\*10** Courts must conduct a "careful, context-sensitive scrutiny" of a complaint alleging a breach of the ERISA duty of prudence to "divide the plausible sheep from the meritless goats." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014). "At times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes v. N.W. U.*, 142 S. Ct. 737, 742 (2022).

Because most of the information about fiduciaries' conduct in arriving at an investment decision is necessarily private, the Second Circuit has recognized that "ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences." *PBGC*, 712 F.3d at 718 (internal quotation marks and citation omitted). Thus, claims of breach of fiduciary duty may survive at the motion to dismiss stage "if the complaint allege[s] facts that, if proved, would show that an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident." *Id.* (internal quotation marks and citation omitted, alteration in original). A complaint relying on circumstantial factual allegations to show a breach of fiduciary duty under ERISA generally must "allege facts, accepted as true, showing that a prudent fiduciary in like circumstances would have acted differently." *Sandoval v. Exela Enter. Sols., Inc.*, No. 3:17CV1573 (DJS), 2020 WL 9259108, at \*2 (D. Conn. Mar. 30, 2020) (citation omitted).

Ruilova and Brannigan claim that Defendants imprudently administered the Plan in several ways. Specifically, Plaintiffs claim in Count I that: (1) the Plan paid far more than other similarly sized plans for the same RK & A services, which shows that Defendants had an imprudent and ineffective process in place to monitor RK & A fees, ECF No. 56 ¶ 57; (2) Defendants imprudently retained in the Plan the Freedom Funds and five other investment options when the funds were performing poorly and were excessively costly, in violation of their duty to monitor investments and remove them if they become imprudent; *id.* ¶¶ 58-108; and (3) Defendants imprudently "failed to monitor" the average expense ratio of the Plan and compare it to similarly sized plans, resulting in Plan participants paying excessive fees, *id.* ¶ 107. Plaintiffs also claim that the same conduct breached the duty of loyalty.

*Id.* ¶ 47. In Count II, Plaintiffs claim that certain Defendants breached their prudential duty to monitor the performance of other fiduciaries or were involved in the breaches of other fiduciaries. *Id.* ¶¶ 133-41. And, to the extent that I find that any of the Defendants are not Plan fiduciaries, Plaintiffs allege in the alternative in Count III that these Defendants are still liable for knowing breach of trust. *Id.* ¶ 142-144.

Defendants move to dismiss all Counts, asserting that Plaintiffs have failed to state a claim. Defendants also argue that several Defendants are not Plan fiduciaries, ECF No. 37-1 at 42-45, and that Plaintiffs lack Article III standing to bring claims related to the performance and cost of Plan funds that the named Plaintiffs never invested in, *id.* at 45-46. I first address Defendants' standing argument before turning to the remaining claims.

**A. Standing**

Defendants challenge Ruilova and Brannigan's Article III standing to assert claims about Plan investment options in which they did not invest. ECF No. 37-1 at 45.[8] They argue that "[t]here is no ERISA exception to Article III," *Thole v. U. S. Bank N.A.*, 140 S.Ct. 1615, 1622 (2020), and that Ruilova and Brannigan lack standing because they have not, and cannot, "allege that their Plan accounts were negatively impacted by any underperformance or excessive fees associated with seventeen of the nineteen challenged investment options" because they never invested in them, ECF No. 37-1 at 46 (referring to the five funds designated in the Amended Complaint as underperforming and all the Fidelity Freedom funds from the Active suite in which Ruilova and Brannigan did not invest). I disagree and find that Ruilova and Brannigan have alleged enough facts to support Article III standing.

**\*11** Constitutional "standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "[T]he 'irreducible constitutional minimum' of standing consists of three elements ... [t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan*, 504 U.S. at 560-61). "If plaintiffs lack Article III standing, a court has no subject matter jurisdiction to hear their claim." *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005).

"[D]istrict courts in this Circuit have taken two divergent approaches to Article III standing in ERISA cases when plaintiffs allege injuries due to deficient management or performance of funds in defined-contribution plans." *Garthwait v. Eversource Energy Co.*, 3:20-CV-00902 (JCH), 2021 WL 4441939, at *5 (D. Conn. Sept. 28, 2021) (hereinafter "*Garthwait I*"). Defendants rely on one line of cases in arguing that Plaintiffs lack standing. These cases reason that "[l]osses incurred by funds in which [p]laintiffs did not invest cannot have impaired the value of [p]laintiffs' individual accounts" and so plaintiffs have not incurred an Article III injury in relation to those funds. *Patterson v. Morgan Stanley*, 16-CV-6568 (RJS), 2019 WL 4934834, at *5 (S.D.N.Y. Oct. 7, 2019); *accord In re Omnicom ERISA Litig.*, 20-CV-4141 (CM), 2021 WL 3292487, at *10 (S.D.N.Y. Aug. 2, 2021) ("plan participants ... can seek redress on behalf of their Plan only ... to the extent that their own accounts have suffered injury – which is to say, they cannot sue for generalized mismanagement, only for mismanagement that caused injury to them as individual participants"). Defendants argue that this line of cases is "better-reasoned," ECF No. 68 at 14, and in agreement with the Supreme Court's recent admonishment that "[t]here is no ERISA exception to Article III," *Thole*, 140 S. Ct. at 1622 (2020).

The other approach to standing in cases where plaintiffs allege injuries arising from deficient management of funds in defined-contribution plans holds that "plaintiffs have standing when they allege an injury to the Plan as a whole, notwithstanding their individual losses." *Garthwait v. Eversource Energy Co.*, 3:20-CV-00902(JCH), 2022 WL 1657469, at *6 (D. Conn. May 25, 2022) (hereinafter "*Garthwait II*") (referring to *Leber v. Citigroup 401(k) Plan Inv. Comm.*, 323 F.R.D. 145, 155 (S.D.N.Y. 2017)). These cases focus on the derivative nature of a suit brought under Section 502(a)(2) of ERISA and the impact of a footnote about ERISA derivative relief standing in the Second Circuit's opinion in *L.I. Head Start Child Dev. Services, Inc. v. Econ. Opportunity Commn. of Nassau County, Inc.*, 710 F.3d 57, 67 n.5 (2d Cir. 2013), a case that involved the different factual context of a defined *benefit* plan.

"[T]he Second Circuit has yet to definitively resolve, in the context of a defined contribution retirement plan, whether and to what extent a plaintiff must show individual harm to bring a derivative suit under Section 502(a)(2) of ERISA." *Garthwait II*, 2022 WL 1657469, at *7. I need not attempt

to resolve that issue today because this case is a class action. In the Second Circuit, a named plaintiff has class standing to assert class claims arising from conduct that did not injure him if he can allege "(1) that he personally has suffered some actual ... injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants." *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Company*, 693 F.3d 145, 162 (2d Cir. 2012) (hereinafter "*NECA*"). Here, Plaintiffs have sufficiently alleged injury to themselves from Defendants' conduct by virtue of their own investments in Plan funds. ECF No. 56 ¶¶ 9-10. Regardless of whether they would have standing on their own to assert claims about funds in which they did not invest, they may assert class claims regarding such funds on behalf of absent class members if the conduct that injured them implicates the same set of concerns as the conduct that injured the members of the proposed class.

 **\*12**  A named plaintiff's individual claim raises the same set of concerns as the claims of absent class members "when the proof the named plaintiff develops for his or her individual claims also tends to prove the class claims." *Curtis v. Aetna Life Ins. Co.*, 3:19-CV-01579-MPS, 2023 WL 34662, at \*6 (D. Conn. Jan. 4, 2023) (citing *Ret. Bd. of the Policemen's Annuity and Ben. Fund of the City of Chicago v. Bank of New York Mellon*, 775 F.3d 154, 161 (2d Cir. 2014)). Here, Ruilova and Brannigan allege in their individual claims that Defendants breached their fiduciary duties with respect to the Active suite TDFs Ruilova and Brannigan invested in by failing to prudently manage the Plan. For example, Plaintiffs assert that Defendants violated their fiduciary duties by: (1) imprudently selecting and retaining the Active suite by not investigating the level of risk inherent in the Active suite, not determining whether this risk level was suitable for Plan participants, and not undertaking "any review or scrutiny of the Active suite's strategy changes," ECF No. 56 ¶ 71-72; (2) "never heed[ing] the numerous red flags ... and neglect[ing] to scrutinize the performance of the Active suite against any of the more appropriate alternatives in the TDF marketplace," *id.* ¶ 7; and (3) failing "to undertake any analysis of the Active suite against appropriate peers using the above or other important performance metrics," *id.* ¶ 81.

In their individual claim, Ruilova and Brannigan thus challenge the management processes Defendants used to select and monitor the Active suite TDFs in which they invested during the Class Period. Proof that Defendants'

management processes were imprudent will tend to prove Plaintiffs' individual claims *and* the imprudence claims of absent class members who invested in other Active suite TDFs that were also managed using these processes. Similarly, proof that Defendants used imprudent processes to manage Plan funds like the Active suite TDFs will tend to prove that the five non-Active-suite funds were also imprudently managed. The evidence required for Plaintiffs' individual claims thus tends to prove class claims related to the funds in which Plaintiffs did not invest, and "[b]ecause the alleged harms are premised on the process Defendants used to manage the Plan, the claims involve similar inquiries and proof, and thus implicate the same set of concerns." *Moreno v. Deutsche Bank Americas Holding Corp.*, 15 CIV. 9936 (LGS), 2017 WL 3868803, at \*10 (S.D.N.Y. Sept. 5, 2017); *accord Brown v. Daikin Am., Inc.*, 18-CV-11091 (PAC), 2021 WL 1758898, at \*5 (S.D.N.Y. May 4, 2021) ("because the Plaintiffs and the absent class were both involved with the Plan at some point during the Class Period, both groups share the 'same set of concerns' regarding [Defendants'] management of the Plan"); *Cunningham v. Cornell U.*, 16-CV-6525 (PKC), 2019 WL 275827, at \*3-4 (S.D.N.Y. Jan. 22, 2019) (although named plaintiffs had not made a showing that they had invested in each of the challenged funds, they had class standing because they "allege that they and all other Plan participants were injured in the same manner due to defendants' failure to discharge their duties in the interests of Plan participants and beneficiaries, leading to unreasonable administrative fees, unreasonable investment options with high expenses and poor performance, and retention of appointees whose imprudent actions exacerbated the Plans' high costs and fees."). Requiring an ERISA plan participant bringing a class action to allege an individual injury from the poor performance or excessive fees associated with each fund would impose a more restrictive standing requirement than the one articulated in *NECA*. So I find that Plaintiffs have class standing to advance claims related to the funds in which they did not invest.

### B. Freedom Funds

In the Amended Complaint, Ruilova and Brannigan plead several circumstantial facts that they claim give rise to a reasonable inference that Defendants' retention of the Active suite throughout the Class Period was the result of an imprudent process. They allege that: (1) the Active suite was too risky because it invested in actively managed funds, and thus was unsuitable for retirement plan participants, ECF No. 56 ¶ 64-65; (2) the Active suite funds contained sub-asset classes that were too risky, *id.* ¶ 71; (3) the Active suite's

policy of allowing its portfolio managers to deviate from glide path allocations was excessively risky, *id.* ¶ 72; (4) certain mutuals funds within the Active suite TDFs performed poorly, *id.* ¶ 66-67, 69; (5) some of the mutual funds within the Active suite TDFs lacked the performance track record that a prudent fiduciary would have demanded to see before deciding to offer them in the Plan, *id.* ¶ 68; (6) the Active suite is more costly than the Index suite, *id.* ¶ 75; (7) the Active suite performed worse than "the primary offerings of four of the five largest non-Fidelity managers in the TDF marketplace" in its three- and five-year annualized returns according to data from the fourth quarter of 2015, *id.* ¶ 80; and (8) certain investors left the Active suite during the Class Period, *id.* ¶ 78. I agree with Defendants that these allegations are not indicative of imprudence even when I consider them together "in light of *all* the circumstances at the time the challenged decision was made." *Patterson*, 2019 WL 4934834, at *11 (emphasis in original).

 **\*13** Plaintiffs first allege that Defendants' decision to offer the Active suite as a Plan investment option, and particularly the Plan's default investment option for investors who do not select another investment option, indicates an imprudent decision-making process because "[t]he Active suite chases returns by taking levels of risk that render it unsuitable for the average retirement investor, including participants in the Plan." ECF No. 56 ¶ 64. Plaintiffs allege that actively managed funds are unsuitable for retirement investing, that offering them in the Plan indicates Defendants used an imprudent fund selection process, and that Defendants should have offered the Index suite instead. *Id.* ¶ 65. But "ERISA does not mandate passive management (with lower fees) over active management ... [and] [c]ourts have specifically rejected the theory that a plaintiff can establish a breach of the duty of prudence by comparing a passively-managed Vanguard index fund to an actively-managed fund." *Sacerdote v. New York U.*, 328 F. Supp. 3d 273, 313 n.114 (S.D.N.Y. 2018), *aff'd*, 9 F.4th 95 (2d Cir. 2021). This is because active and passive funds "have different aims, different risks, and different potential rewards that cater to different investors." *Davis v. Washington U. in St. Louis*, 960 F.3d 478, 485 (8th Cir. 2020).

I agree with Defendants that I cannot reasonably infer an imprudent decision-making process from the fact that the Active suite is actively managed and thus riskier. *See* ECF No. 37-1 at 23-24. As the Sixth Circuit recently stated, actively managed funds "represent a common fixture of retirement plans, and there is nothing wrong with permitting employees to choose them in hopes of realizing above-average returns

over the course of the long lifespan of a retirement account." *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1165 (6th Cir. 2022). Indeed, the Sixth Circuit knew "of no case that says a plan fiduciary violates its duty of prudence by offering actively managed funds to its employees as opposed to offering only passively managed funds. Several cases in truth suggest the opposite." *Id.*

Plaintiffs' second and third contentions, that the Active suite "has higher exposure to riskier [asset] classes," ECF No. 56 ¶ 71, and has a policy of allowing "its portfolio managers to participate in 'active asset allocation,' an attempt to time market shifts in order to locate underpriced securities," *id.* ¶ 72, do not indicate imprudence for similar reasons. The inclusion of riskier asset classes, which may generate higher returns, and "[t]he capacity of the Freedom Funds' managers to change the Funds' asset allocation and deviate slightly from the Funds' glide path is merely a natural feature, not an unusual byproduct, of active management and well within the mainstream of industry practice." *CommonSpirit Health*, 37 F.4th at 1167–68. These allegations are just more specific versions of Plaintiffs' general allegations that active management can indicate imprudence, which is a position unsupported by any authority.

Plaintiffs' fourth and fifth contentions concern the mutual funds selected for inclusion in each Active suite TDF. The Active suite consists of several TDFs, each of which aims to maximize returns by its target date for participants who plan to retire around that date. ECF No. 56 ¶ 59. Each TDF contains mutual funds. *Id.* ¶ 66-68. The composition of mutual funds in each TDF is adjusted over time as the TDF's retirement date nears. *Id.* ¶ 66. Plaintiffs allege that 2 of the 32 mutual funds contained in the Active suite TDFs —approximately 15% of the assets in the 2040 through 2065 TDFs — had annualized lifetime returns trailing their respective benchmarks. ECF No. 56 ¶ 66. Plaintiffs also allege that several of the mutual funds within each Active suite TDF lacked a five-year performance record, and that this indicates imprudent decision-making because a prudent fiduciary would not offer a TDF that contained mutual funds without a 5-year performance record. *Id.* ¶ 68. Plaintiffs argue that these allegations indicate imprudence because the "performance of the Freedom Funds is entirely dependent on that of the underlying funds" and a prudent fiduciary would not offer a TDF without considering this history. ECF No. 66 at 32-33.

**\*14**  I cannot, however, infer imprudent decision-making based on Plaintiffs' allegation about the performance of two mutual funds amounting to 15% of the assets in the 2040-2065 TDFs during the Class Period. The operative complaint does not allege that the Plan offered the mutual funds as standalone investment options. And it is not reasonable to infer from the performance of 15% of these TDF's assets during the Class Period that it was imprudent to offer each TDF. Nor can I infer imprudence from Plaintiffs' allegation that several mutual funds with the Active suite TDFs did not have a five-year investment track record. ECF No. 56 ¶ 68. Plaintiffs fail to respond to Defendants' argument that "plan fiduciaries have no duty under ERISA to monitor the underlying funds in a mutual fund product: underlying funds are not considered 'plan assets.' " ECF No. 37-1 at 29 (citing 29 C.F.R. § 2510.3-101(h)). Instead, Plaintiffs cite cases about a fiduciary's duty to monitor investments that are actually offered as options in the fiduciary's plan. *See, e.g.,* ECF No. 66 at 33 (citing *Cunningham,* 2019 WL 4735876, at *13, for the proposition that an advisor satisfied its fiduciary duty when it considered three and five-year fund data, but these funds were offered by the plan and were not components of the plan's funds). These authorities do not suggest it is imprudent to decline to monitor the performance of mutual funds in a Plan TDF with the same rigor as a fiduciary would monitor the TDF itself. And even if there was a duty for plan fiduciaries to monitor these constituent mutual funds, Plaintiffs allege that "half [of the 26 Fidelity Series mutual funds within the TDFs] ... trail their respective benchmarks over their lifetimes" without pleading specific facts about the performance of eleven of these thirteen trailing Fidelity Series mutual funds. *See* ECF No 56 ¶ 66-68. And Plaintiffs do not plead any performance data for the other thirteen Fidelity Series mutual funds in the TDFs and about whether, for example, strong performance in this other half of the funds eclipsed the weaker performance of the half mentioned in the complaint. *See id.* Nor do Plaintiffs explain what percentage of each Active suite fund consisted of these trailing constituent investments. *Id.* I cannot reasonably infer imprudence from these allegations.

Plaintiffs also suggest I can infer imprudence because the Active suite was more costly for Plan participants than the Index suite during the Class Period. *Id.* ¶ 75. These allegations fail as well because Plaintiffs have failed to plead any facts about the Active suite's performance during the Class Period and how it compared to the Index suite. *See* ECF No. 56 ¶¶ 58-81. Generally, expense ratios for active and passive funds "cannot be meaningfully compared." *Patterson,* 2019

WL 4934834, at *12. Even if I compare these costs, I cannot infer imprudence from the fact that the Active suite was more expensive than the Index suite without information about the relative performance of these two suites. Plaintiffs have not pled any facts about the Index suite's performance. It is not reasonable to infer imprudence merely because an actively managed investment cost more than a passively managed one. *See Sacerdote,* 328 F. Supp. 3d at 313 n.114 ("ERISA does not mandate passive management (with lower fees) over active management).

To buttress their circumstantial allegations about imprudence discussed above, Plaintiffs also plead that "[t]he most significant of the myriad issues with the Active suite is its miserable performance," ECF No. 56 ¶ 79, supporting this assertion with three- and five-year annualized returns for the Active suite as of the fourth quarter of 2015 compared to four other target date funds. *Id.* ¶ 80. [9] But these data do not support a reasonable inference that Defendants imprudently selected and retained the Active suite during the Class Period. Generally, "a prudent fiduciary may—and often does—retain investments through a period of underperformance as part of a long-range investment strategy." *Gonzalez v. Northwell Health, Inc.,* 20CV3256RPKRLM, 2022 WL 4639673, at *7 (E.D.N.Y. Sept. 30, 2022) (citation and internal quotation marks omitted). In this Circuit, "allegations of consistent, ten-year underperformance may support a duty of prudence claim, if the underperformance is substantial." *Id.* (citing *Patterson,* 2019 WL 4934834, at *10) (collecting cases). In contrast, "allegations based on five-year returns are not sufficiently long-term to state a plausible claim of imprudence." *Id.* (citation and internal quotation marks omitted).

Plaintiffs have pled facts only about the Active suites' short-term performance from before the Class Period, which is insufficient for an inference of imprudent retention during the Class Period. [10] Defendants note that "Plaintiffs make no allegations as to the Freedom Funds' trailing three-year or five-year performance at any point during the class period." ECF No. 68 at 10. Plaintiffs decline to address this statement in their brief, instead pointing to other alleged indicia of imprudence to compensate for the absence of allegations about the Active suite's performance during the Class Period. ECF No. 66 at 34-36. Imprudent retention claims based on performance "require evidence that an investment was imprudent from the moment the administrator selected it, that the investment became imprudent over time, or that the investment was otherwise clearly unsuitable for the goals of the fund based on ongoing performance."

*CommonSpirit Health*, 37 F.4th at 1166. Plaintiffs ask that I infer from the short-term performance of the Active suite in 2010-2015 that it was imprudent to retain the Active suite in the Plan from 2016 to 2023. But Courts in this Circuit considering imprudent retention claims generally rely on performance data from the Class Period when inferring imprudence. *See, e.g., Gonzalez*, 2022 WL 4639673, at *2-3 (considering allegations about the underperformance of several funds during the class period); *In re Omnicom ERISA Litig.*, 2021 WL 3292487, at *12 (considering performance comparison for the entire six-year class period); *Falberg v. Goldman Sachs Group, Inc.*, 19 CIV. 9910 (ER), 2020 WL 3893285, at *9 (S.D.N.Y. July 9, 2020) (considering returns data from 2013, 2015, and the entire prior 10-year period overlapping the class period when sustaining a claim for imprudent retention)*; Patterson*, 2019 WL 4934834, at *10 (considering "cumulative performance over the class period"). A fiduciary's actions are judged according to "information available ... at the time of each investment decision." *PBGC*, 712 F.3d at 716. Plaintiffs do not provide any information from the Class Period, and I cannot infer from short-term returns predating the Class Period that Defendants had an imprudent process that resulted in the retention of the Active Suite for the duration of the Class Period. [11]

**\*15** Plaintiffs' failure to plead facts about the Active suite's performance during the Class Period also blunts the impact of their allegations regarding investors leaving the Active suite during the Class Period. ECF No. 56 ¶ 78. Plaintiffs plead that billions of dollars left the Active suite for other funds during the Class Period, *id.*, and they argue that this is an adequate substitute for their failure to provide information about the Active suite's performance during the Class Period, ECF No. 66 at 34-35. The Sixth Circuit recently rejected a similar argument: "net outflows from [the Active suite] to other investments, and outside analysts' critical evaluations of the funds ... do not make a cognizable claim of imprudence" in combination with allegations very similar to those in this case. *CommonSpirit Health*, 37 F.4th at 1167; *see also In re Omnicom ERISA Litig.*, 2021 WL 3292487, at *12 (allowing imprudent retention claim to proceed when the large net outflows from the Active suite were pled together with performance data from the same period). Here, Plaintiffs allege outflows that overlap with the Class Period but, without other indicia of imprudence such as poor performance during the Class Period, I cannot reasonably infer from these outflows that Defendants breached their fiduciary duty by retaining the Active suite.

In sum, Plaintiffs' breach of duty claim regarding retention of the Active suite amounts to a challenge to active fund management combined with incomplete data about cost and performance. Even considering all of Plaintiffs' allegations in the light most favorable to them, and under the circumstances at the time of the investment decisions, I cannot reasonably infer that Defendants breached their fiduciary duties by retaining the Active suite during the Class Period.

### C. Other Investments

Ruilova and Brannigan also allege that Defendants offered five other imprudent investment options in the Plan: Parnassus, Diversified Dividend, AMG, High Income, and Lazard. Each option, they allege, was imprudent because it underperformed relative to its benchmark and other similar alternatives. I find that Plaintiffs have failed to plausibly allege that Defendants breached their duty of prudence by retaining each of these funds in the Plan.

As I discussed above, "[w]hile a plaintiff may allege a breach of fiduciary duty based on a fund's underperformance relative to a benchmark index, the comparative underperformance must generally be consistent and substantial to support an inference of imprudence." *Gonzalez*, 2022 WL 4639673, at *7 (citation and internal quotation marks omitted). "[A]llegations of consistent, ten-year underperformance may support a duty of prudence claim" but "the underperformance must be substantial." *Patterson*, 2019 WL 4934834, at *10 (citations omitted). And "allegations based on five-year returns are not sufficiently long-term to state a plausible claim of imprudence." *Gonzalez*, 2022 WL 4639673, at *7 (citation and internal quotation marks omitted) (collecting cases). For all of the challenged funds except for High Income, Plaintiffs allege 3- and 5-year trailing returns as compared to their benchmarks, i.e., periods covering fewer than ten years. *See* ECF No. 56 ¶¶ 83 (Parnassus), 90 (Diversified Dividend); 93 (AMG); 104 (Lazard). They thus have "not offered evidence of long-term underperformance relative to the benchmark indices," but have instead provided "calculations based only on three- and five-year trailing averages, without the ten-year data that is a traditional hallmark of viable claims based on underperformance relative to an index." *Gonzalez*, 2022 WL 4639673, at *8. Plaintiffs have thus failed to plead consistent underperformance as to these four funds. They have, however, alleged that High Income failed to consistently beat the benchmark based on ten-year returns. ECF No. 56 ¶ 96.

For High Income, though, Ruilova and Brannigan have not pled substantial underperformance. High Income's ten-year

trailing performance from 2013-2020 was less than 1% below the benchmark in all but one year, when it was 1.10% below the benchmark. *Id.* ¶ 96. Further, in seven of the ten years of annual return data in the Amended Complaint, High Income was within one percent of its benchmark. *See id.* ¶ 97. And in the other three years, it was 1.52%, 1.12%, and 3.63% below the benchmark. *Id.* This is not the kind of "substantial underperformance over a lengthy period that gives rise to a plausible inference that a prudent fiduciary would have removed these funds from the plan's menu of options." *Gonzalez*, 2022 WL 4639673, at *8 (finding that underperformance "by 2.33% on a rolling three-year trailing basis and 2.57% on a rolling five-year trailing basis" did not support claim of imprudence); *compare Jacobs v. Verizon Commun., Inc.*, 16 CIV. 1082 (PGG), 2017 WL 8809714, at *9 (S.D.N.Y. Sept. 28, 2017) (ten-year annualized underperformance of 8.63% sufficient to state fiduciary breach claim) *with Patterson*, 2019 WL 4934834, at *11 (five-year annualized underperformance of 1.14% "is relatively small and certainly not enough to support a claim for breach of the duty of prudence"); *Cho v. Prudential Ins. Co. of Am.*, No. 19-CV-19886 (JMV) (SCM), 2021 WL 4438186, at *9 (D.N.J. Sept. 27, 2021) (plaintiffs did not allege "sufficiently substantial" underperformance to state a claim as to fund for which "five-year trailing performance had underperformance percentages ranging from .07% to 3.71%," and "ten-year trailing performance reflected underperformance ranging from 1.19% to 2.86%"); *Bekker v. Neuberger Berman Group LLC*, 16 CV 6123-LTS-BCM, 2018 WL 4636841, at *2, *7 (S.D.N.Y. Sept. 27, 2018) (ten-year annualized underperformance of approximately 4.4% insufficient for breach of duty of prudence).

**\*16**  Plaintiffs fail to address the caselaw requiring consistent and substantial underperformance in their brief, instead citing inapposite caselaw. *See* ECF No. 66 at 36-38. For example, Plaintiffs cite a Third Circuit case for the proposition that I must infer fiduciary breach if Defendants retained expensive underperformers, but the Third Circuit found fiduciary breach in the cited case when the retention of underperforming fund options was accompanied by factual allegations that a plan provided "identically managed but higher cost retail class shares," that some plan investments "in the line-up had layers of unnecessary fees," that many of the offered funds were duplicative and confusing to participants, and that "60% of Plan options underperformed appropriate benchmarks." *Sweda v. U. of Pennsylvania*, 923 F.3d 320, 331 (3d Cir. 2019). Similar allegations are absent from Plaintiffs' Amended Complaint. And Plaintiffs cite one decision from

within this Circuit where a court found an adequately pled imprudence claim involving ten-year underperformance of more than 1.00%, but in that case there were other indicia of imprudence related to the fact that the funds implicated were proprietary funds offered by the employer authorizing the plan. *Falberg*, 2020 WL 3893285, at *9-10. Plaintiffs have not pled any other indicia of imprudence related to the five funds they challenge. [12]

Plaintiffs have not alleged any indicia of imprudence related to the five funds they challenge except for performance and cost data. These data do not demonstrate continual and substantial underperformance, and "the duty of prudence does not compel ERISA fiduciaries to reflexively jettison investment options in favor of the prior year's top performers." *Patterson*, 2019 WL 4934834, at *11. As Plaintiffs' allegations fail to move their claim of imprudence as to these funds from the possible to the plausible, they fail to state a fiduciary breach claim as to these funds.

### D. Recordkeeping Fees

Defendants next challenge the sufficiency of Plaintiffs' allegations about the RK & A fees paid by the Plan on three grounds: (1) Plaintiffs miscalculated the per participant recordkeeping fees in the Amended Complaint; (2) Plaintiffs' RK & A fees calculation is contradicted by Plan documents extraneous to the Amended Complaint, which Defendants provide in support of their motion to dismiss; and (3) Plaintiffs fail to sufficiently allege the scope of RK & A services provided to the Plan, making an assessment of the propriety of the fees impossible. At this stage, however, I find that Plaintiffs have plausibly alleged that Defendants allowed the Plan to pay excessive RK & A fees, and so I allow this claim to proceed.

To state a claim of fiduciary breach due to excessive RK & A fees, Plaintiffs must "allege that the fees were excessive relative to the services rendered" and should allege "facts concerning other factors relevant to determining whether a fee is excessive under the circumstances." *Young v. Gen. Motors Inv. Mgt. Corp.*, 325 Fed. Appx. 31, 33 (2d Cir. 2009) (unpublished) (citation and internal quotation marks omitted); *accord CommonSpirit Health*, 37 F.4th at 1169 (recordkeeping fees allegation inadequately pled where plaintiff had "not pleaded that the services that [defendants'] fee covers are equivalent to those provided by the plans" from which plaintiff derived comparison data). Courts "have denied motions to dismiss recordkeeping fees claims where …

plaintiffs allege that costs were excessive and the plan failed to use its size and presumed negotiating power to reduce costs." *Garthwait I*, 2021 WL 4441939, at *8 (citations and internal quotation marks omitted).

In the Amended Complaint, Plaintiffs allege that the market for defined contribution RK & A services is extremely competitive for large plans, that informed fiduciaries are aware of this and will leverage a large plan's participant count to obtain lower RK & A fees by regularly soliciting competitive bids from other recordkeepers, and that these bids can typically be obtained if a plan provides only its participant count and asset level. ECF No. 56 ¶¶ 37-44. Plaintiffs calculate the Plan's average RK & A fee during the Class Period to be $48 per participant and $46 per participant in 2020 based on the Plan's Form 5500 disclosures. *Id.* ¶ 50. Similarly sized plans receiving at least the same RK & A services as the Plan all paid less than $35 per participant in 2020 RK & A fees. *Id.* ¶ 53. From these calculations and comparisons, Plaintiffs infer that Defendants paid more than comparable plans for the same services because they failed to use a prudent process involving "examination, comparison, or benchmarking of the RK & A fees of the Plan to those of similarly sized defined contribution plans." *Id.* ¶ 55-56. Courts in this Circuit have consistently found that allegations of this kind are sufficient to state a claim. [13]

### 1. Fee Calculations

**\*17** Defendants argue that Plaintiffs have miscalculated the Plan's RK & A fees and that this failure is fatal to their RK & A allegations. The amounts disclosed on the Plan's Form 5500s, they assert, account for "*all* recordkeeping and administrative fees incurred by Plan participants, including participant-specific fees" (such as loan fees incurred at a participant's request) and that using these amounts to calculate the per-capita RK & A fees inflates the Plan's "base recordkeeping fee" per participant. ECF No. 37-1 at 16. They also argue that Plaintiffs' figures are contradicted by the Plan's agreement with Fidelity and other documents not incorporated by reference or otherwise relied on in the complaint and that Plaintiffs failed to account correctly for the Plan's revenue-sharing arrangement with Fidelity. *Id.* at 17-18. These challenges attack the accuracy of the Plaintiffs' factual allegations and rely on documents that are not publicly available, were filed with redactions by Defendants, and are not cited in the Amended Complaint. These arguments are thus not cognizable at the motion to dismiss stage, where I

must accept as true all factual allegations in the Amended Complaint.

Plaintiffs have pled the source of their data — the Plan's Form 5500 disclosures, which it must file annually — and have provided tables with the relevant information from the Form 5500s and the resulting calculated per participant RK & A fee. These allegations are sufficient at this stage. *See* ECF No. 56 ¶¶ 50-55. Defendants point to two district court decisions to argue that I should evaluate whether Plaintiffs have properly calculated revenue sharing amounts, but both cases provided less information about the fee calculation than Plaintiffs do here. *See Cunningham v. USI Ins. Services, LLC*, 21 CIV. 1819 (NSR), 2022 WL 889164, at *5 (S.D.N.Y. Mar. 25, 2022) (the court dismissed the recordkeeping fees claim because "nowhere in the Complaint does Plaintiff provide any figures, estimates, or formulas from which the Court could reasonably infer Plaintiff obtained such results"); *Wehner v. Genentech, Inc.*, 20-CV-06894-WHO, 2021 WL 507599, at *6 (N.D. Cal. Feb. 9, 2021) (claim failed because the complaint included no "indication of how [plaintiff] calculated the per-participant fees for recordkeeping and administrative cost").

### 2. Similar Plans

Defendants also contend that Plaintiffs' comparison of the Plan to similar large plans is not specific enough: "Plaintiffs must make allegations regarding the recordkeeping and administrative services actually offered to the plan at issue, as well as those offered to comparable plans, in order to state a plausible claim." ECF No. 37-1 at 19. It is true that Plaintiffs must plead facts showing that the fees charged to the Plan "were excessive relative to the services rendered." *Young*, 325 Fed. Appx. at 33 (unpublished) (citation and internal quotation marks omitted). And, as Defendants note, " 'at the very least,' a plaintiff must plausibly allege that other plans received the same 'basket of services' to state a viable claim." ECF No. 37-1 at 20 (citing *Cunningham*, 2022 WL 889164, at *4). Here, though, Plaintiffs have done so.

Plaintiffs allege that the Plan receives "the same standard services ... as those provided to comparable plans," receives no services "that are unusual or out of the ordinary," and that the precise details of the services it receives are "immaterial to pricing considerations, the primary drivers of which are the number of participants and whether the plan fiduciaries employed a competitive process of soliciting bids to determine the reasonable market rate for the services

required by the plan." ECF No. 56 ¶ 49. They state that RK & A services for large plans like the Plan are sold in a very competitive marketplace where services providers primarily compete on price. *Id.* ¶ 37. And they note that RK & A services for large plans "are essentially uniform in nature," such that a recordkeeper can provide an accurate RK & A fee quote based only on a large plan's participant count and asset level. *Id.* ¶ 44. Plaintiffs then provide information about nine similarly sized plans, all of which "received at least the same RK & A services" as the Plan yet paid a substantially lower per participant RK & A fee. *Id.* ¶ 55. I must accept these allegations as true, and when I do so I find that Plaintiffs have plausibly alleged a market structure in which RK & A fees for large plans like the Plan are determined by number of participants and asset value and that the Plan paid substantially more for RK & A services than plans with similar participant numbers and asset values receiving at least the same services. [14]

**\*18** At this stage, Plaintiffs' RK & A fee and service comparisons — when combined with other facts about the market for RK & A services and the RK & A fee bid process — are enough to support a reasonable inference that Defendants' choice to retain Fidelity as the RK & A service provider — or their failure to use their leverage to negotiate lower fees with Fidelity — was the result of an imprudent process and outside of the range of reasonable judgments a fiduciary may make. I thus decline to dismiss Plaintiffs' claim that Defendants breached their fiduciary duty by allowing the Plan to pay RK & A fees that were excessive in relation to the services Fidelity provided the Plan.

### E. Total Plan Cost

Ruilova and Brannigan also allege that the Plan's total plan cost ("TPC") — "the sum of all fees and expenses associated with the operation" of the Plan, including "recordkeeping fees, any other administrative fees, and investment management fees" — was excessively high. ECF No. 56 at 52 n. 28. Because this claim is at least partly duplicative of the recordkeeping fee claim and is otherwise inadequately supported, I dismiss this claim.

Plaintiffs allege that the Plan's TPC was too high because Defendants "failed to monitor the average expense ratios charged by investment managers to similarly sized plans" such that Plan participants "were offered an exceedingly expensive menu of investment options." *Id.* ¶ 107. They note that the Plan's TPC was 0.53% of its assets from 2015-2020,

while a recent study found that the average TPC for plans with over $1 billion in assets like the Plan was 0.29%. *Id.* This alleged failure to monitor the total plan cost and take action to reduce it was, Plaintiffs assert, a "profound breach of fiduciary duty." *Id.* In response to Defendants' motion to dismiss this claim, Plaintiffs argue that their statements that the Plan has a TPC "far greater than the average TPC" for similarly sized Plans is sufficient to state a claim for failure to monitor total plan costs. ECF No. 66 at 41. For several reasons, I disagree.

First, Plaintiffs have failed to plead enough facts to support their allegation that the TPC was excessively high due to the expense ratios of each of its funds. The TPC consists of the sum of "all fees and expenses associated with the operation" of the Plan, which includes the recordkeeping fees. *See id.* ¶ 107. Plaintiffs point to the Plan's TPC of 0.53% of total assets, which is higher than the 0.29% of assets paid by similarly sized plans, as showing that "Defendants ... failed to monitor the average expense ratios charged by investment managers to similarly sized plans." *Id.* Plaintiffs fail to distinguish the portion of the Plan's TPC attributable to fund expense ratios, however, from that attributable to the already-challenged recordkeeping fees. By providing only a single number representing the combined cost of both kinds of fees, and alleging nothing else about this claim except for conclusory statements about Defendants' conduct, Plaintiffs fail to plead any facts plausibly showing that expense ratios contributed to the Plan's higher-than-average TPC. In other words, Plaintiffs have not pled facts suggesting that the Plan's higher than average TPC is attributable to anything other than its higher than average recordkeeping fees — making this claim duplicative of the recordkeeping fee claim.

Second, even if Plaintiffs had adequately pled facts showing that the Plan's higher-than-average TPC was attributable to the expense ratios of the Plan's chosen funds, a higher-than-average TPC does not support an inference of fiduciary breach without additional factual allegations tending to show that Defendants failed to monitor the Plan's TPC. As noted above, ERISA plans may offer actively or passively managed funds. *Sacerdote*, 328 F. Supp. 3d at 314 ("ERISA does not mandate passive management (with lower fees) over active management."). "[A]ctively managed funds need to charge higher fees, because they must hire management teams to actively select investments to buy and sell, whereas index funds require less management and less upkeep." *CommonSpirit Health*, 37 F.4th at 1169 (holding that "[a]n average plan-wide management fee of 0.55% is merely

evidence that [defendant] offers a number of actively managed funds, and an imprudence claim based on this fee alone fails for the same reason that [plaintiff's] more general attack on active investments fails"). Apart from the RK & A problem discussed above, Plaintiffs have failed to plead any facts supporting their allegation that the Plan's TPC resulted from an imprudent process and is not just a consequence its investment in actively managed funds.

**\*19** A complaint about plan costs "cannot simply make a bare allegation that costs are too high ... [r]ather, it must provide a sound basis for comparison—a meaningful benchmark." *Albert v. Oshkosh Corp.*, 47 F.4th 570, 581 (7th Cir. 2022), *reh'g denied*, 2022 WL 4372363 (7th Cir. Sept. 21, 2022) (quoting *Davis*, 960 F.3d at 484). Plaintiffs have failed to plead any facts showing that the TPCs from the study they cite, *see* ECF No. 56 ¶ 107, come from plans that have fund compositions similar to the Plan. Instead, they simply assert that the TPC statistics come from similarly sized plans. I have no basis from which to infer that the study plans offer funds similar to those in the Plan; the study plans may offer different fund types that make them inapt comparators. For this reason, too, I dismiss the claim about the Plan's TPC.

### F. Duty of Loyalty

Ruilova and Brannigan have also failed to state a claim for violation of the duty of loyalty. In the Amended Complaint, they assert that "Defendants have severely breached their fiduciary duties of prudence and loyalty," ECF No. 56 ¶ 47, and that "ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan," *id.* ¶ 109. These are the only mentions of the duty of loyalty in the Amended Complaint, and they are unaccompanied by factual allegations suggesting Defendants acted disloyally.

An ERISA fiduciary must make decisions about the Plan with "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982). "Breaches of the unwavering duty of loyalty occur when a fiduciary deviates from that single-minded devotion, placing its interests or the interests of a third party above that of plan participants or beneficiaries." *Vellali*, 308 F. Supp. 3d at 688 (citations and internal quotation marks omitted). A plaintiff states a claim for a breach of loyalty when he or she alleges facts that permit a plausible inference that the defendant "engag[ed] in transactions involving self-dealing or otherwise involve or create a conflict between the trustee's fiduciary duties and personal interests." *Sacerdote v. New York U.*, 16-CV-6284 (KBF), 2017 WL 3701482, at \*5

(S.D.N.Y. Aug. 25, 2017) (internal quotation marks omitted, alteration in original), *rev'd on other grounds, Sacerdote v. New York Univ.*, 9 F.4th 95, 103 (2d Cir. 2021).

Here, Plaintiffs have failed to allege any facts from which I can infer self-dealing or a conflict between the trustee's fiduciary duties and personal interests. Plaintiffs' claims about excessive RK & A fees arise from allegations that Defendants failed "to recognize that the Plan and its participants were grossly overcharged for RK & A services" and that Defendants did not appropriately monitor "the compensation paid to Fidelity and ensure[ ] that participants were only charged reasonable RK & A fees." ECF No. 56 ¶ 57. Similarly, Plaintiffs attribute the Plan's retention of expensive and low-performing fund options to the Defendants' neglect and a failure to prudently monitor investment performance. *See, e.g., id.* ¶ 81 (alleging that the Active Suite was imprudently retained in the Plan because Defendants "neglected to undertake any analysis of the Active suite against appropriate peers using the above or other important performance metrics"); *id.* ¶ 108 (Defendants failed "to recognize that the Plan and its participants were paying higher investment-related fees than they should have been"). Plaintiffs "offer no plausible theory in any of the counts to suggest that the defendants' decisions favored themselves or a third party at the expense of the Plan participants. [They] have not alleged that the fiduciaries benefited directly or indirectly" from the Plan's arrangements with Fidelity. *Vellali*, 308 F. Supp. 3d at 688. Plaintiffs' theories of misconduct are predicated on neglect, not disloyalty.

**\*20** Faced with Defendants' arguments on this point, Plaintiffs advance two theories of disloyalty in their opposition brief: that Defendants acted "(1) to save [themselves] costs at the expense of Plan participants; or (2) to favor [their] recordkeepers over the Plan participants." ECF No. 66 at 42. But Plaintiffs may not amend their complaint through their motion to dismiss briefing, and the complaint is devoid of facts that would support either theory. Plaintiffs also argue that I should allow them to engage in discovery to support their duty of loyalty claims, as some facts may advance both prudence and loyalty claims, and that I should wait to decide whether they have stated a claim once there is "a more developed record." *Id.* This ignores my obligation to determine whether they have stated a breach-of-loyalty claim before allowing them to conduct discovery on it. *See Bell Atlantic Corp. v. Twombly*, 500 U.S. 544, 559 (2007) ("It is no answer to say that a claim just shy of a plausible entitlement can, if groundless, be weeded out early in the

discovery process ...") Because Plaintiffs seek to "repackage [their] breach of prudence claims under a different label," without alleging facts from which I can reasonably infer disloyalty, I dismiss the allegations that Defendants violated their duty of loyalty. *In re SunEdison, Inc. ERISA Litig.*, 331 F. Supp. 3d 101, 115 (S.D.N.Y. 2018), *aff'd sub nom. O'Day v. Chatila*, 774 Fed. Appx. 708 (2d Cir. 2019) (unpublished).

### G. Fiduciary Status of the Board, Individual Board Members, and Individual Committee Members

Defendants argue that Ruilova and Brannigan have failed to allege facts showing that the Board, individual Board Members, and individual Committee members are Plan fiduciaries with respect to the breach of fiduciary duty claim (Count I). I agree and dismiss Count I as to these defendants.

"[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets ... or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002. "[I]n every case charging breach of ERISA fiduciary duty ... the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint" *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000). "[A] person may be an ERISA fiduciary with respect to certain matters but not others, for he has that status only to the extent that he has or exercises the described authority or responsibility." *Harris Tr. and Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 302 F.3d 18, 28 (2d Cir. 2002) (citation and internal quotation marks omitted).

In Count I of the Complaint, Ruilova and Brannigan allege that "Defendants failed and continue to fail to discharge their duties with respect to the Plan" and that this failure is a breach of fiduciary duty. ECF No. 56 ¶ 129. The alleged failures resulted in the Plan's paying excessive RK & A costs, *id.* ¶¶48-57, incurring excessive total costs, *id.* ¶ 107, and offering expensive, poorly performing fund options to Plan participants, *id.* ¶¶ 58-108. These alleged failures concern how the Plan was managed by the entities that administer it.

Ruilova and Brannigan allege that "the Administrative Committees ... had control over Plan management and/or authority over management or disposition of Plan assets."

ECF No. 56 ¶ 12. By contrast, with regard to the Board itself, the Amended Complaint alleges only that the Board "appointed 'authorized representatives' of Yale-NH Hospital, including the Administrative Committees, as plan fiduciaries." ECF No. 56 ¶ 12. Ruilova and Brannigan argue that this is sufficient and that I should not dismiss Count I against the Board because they "plausibly allege that the Board appointed ... plan fiduciaries." ECF No. 66 at 45-46. But because Ruilova and Brannigan have alleged only that the Board could "appoint, retain, or remove members of the Committee[s]" for the Plan, "the Board's fiduciary obligations can extend only as to those acts." *Crowley ex rel. Corning, Inc., Inv. Plan v. Corning, Inc.*, 234 F. Supp. 2d 222, 229 (W.D.N.Y. 2002). They do not allege that the Board exercised any authority in selecting service providers for the Plan, and so the Board could not have breached a fiduciary duty in the selection of a RK & A provider that allegedly charged excessive fees. Similarly, Plaintiffs' claim "that the defendants imprudently continued to offer participants the ability to invest their plan funds [in poorly performing funds] fails as to the Board, as [it] is apparent from plaintiff's amended complaint[ ] [that] the Board did not control investment options." *Id.; see Hudson v. Natl. Football League Mgt. Council*, 18CV04483GHWRWL, 2019 WL 5722220, at *16 (S.D.N.Y. Sept. 5, 2019), *report and recommendation adopted as modified*, 1:18-CV-4483-GHW, 2019 WL 4784680 (S.D.N.Y. Sept. 30, 2019) (no breach of fiduciary duty where plaintiffs alleged only that a defendant could appoint or remove fiduciaries and failed to allege that a specific defendant " 'exercise[d] any discretionary authority or discretionary control respecting management' of the Plan, directed the 'disposition of assets' under the Plan ... or 'ha[d] any discretionary authority or discretionary responsibility' in administration of the Plan") (citation omitted, alteration in original). To be sure, "ERISA law imposes a duty to monitor appointees on fiduciaries with appointment power," *Vellali*, 308 F. Supp. 3d at 691, but that duty does not make the appointing fiduciary responsible for every substantive investment or management decision of the appointee. Plaintiffs charge that the Board violated the duty to monitor in Count II of the Amended Complaint, not Count I. Plaintiffs have failed to allege facts showing that the Board was involved in RK & A service provider and investment decisions and thus Count I is dismissed as to the Board.

**\*21** Ruilova and Brannigan also bring Count I against the individual Board members, alleging that "each exercised discretionary authority to appoint and/or monitor the Administrative Committees." ECF No. 56 ¶ 12. They argue in

their opposition brief that "Defendants point to no authority suggesting plaintiffs must plead that the Individual Board Members had authority to act on behalf of the Board." ECF No. 66 at 46. But the issue here is not whether individual Board members could act on behalf of the Board but instead whether individual Board members were involved in the Committees' decisions about RK & A service providers and Plan investment fund options. Ruilova and Brannigan must plead that each Board member was performing a fiduciary function when taking the action described in Count I. As I explained above, alleging that each Board member could appoint the Committees' members does not mean that each Board member breached a fiduciary duty in the selection of RK & A service provider and Plan investment options. As this is the conduct described as unlawful in Count I, Count I must be dismissed against the individual Board members.

Finally, Defendants argue that the Amended Complaint lacks factual allegations showing that individual Committee members are Plan fiduciaries. Plaintiffs allege in the Amended Complaint that "the members of the Administrative Committees" are "by virtue of their membership [in the Committee], fiduciaries of the Plan or otherwise are fiduciaries to the Plan." ECF No. 56 ¶ 14. And Plaintiffs argue that their "circumstantial allegations of the Individual Committee Members' conduct is sufficient at this stage" because they "do not have access to internal documents reflecting the Committees' governance practices or attendance that would illuminate the roles of the Individual Committee Members vis-à-vis the Plan." ECF No. 66 at 46. Defendants cite *Luense*, a case from the District of New Jersey, and claim that Plaintiffs' failure to plead any facts about individual Committee member conduct is fatal to their ability to bring Count I against these defendants. *See Luense v. Konica Minolta Bus. Sols. U.S.A., Inc.*, 541 F. Supp. 3d 496, 509 (D.N.J. 2021) (Complaint did not adequately plead that individual members of management Committee appointed by Board were fiduciaries when only relevant allegation was that "[t]he Committee and each of its members were fiduciaries of the Plan during the Class Period ... because each exercised discretionary authority over management or disposition of Plan assets").

But *Luense* does not set forth any reasoning, and at least at the pleadings stage, I cannot discern a "meaningful distinction between the Committee[s] as an entity and the committee['s] members in their individual capacity" because the complaint alleges that the Committees are made up of the individual members and "the Committee[s] exercised sole authority and

responsibility for the administration of the Plan." *Pedersen v. Kinder Morgan Inc.*, 4:21-CV-03590, 2022 WL 3643485, at *14 (S.D. Tex. Aug. 18, 2022) (finding committee members and committee could both be fiduciaries). Plaintiffs have adequately pled a breach of fiduciary duty by the Committees in the selection of an RK & A provider, and the Committees' decisions must be made by the Committees' members. At the pleadings stage, therefore, Plaintiffs have adequately alleged that the Committees' members were Plan fiduciaries.

### H. Derivative and Alternative Claims

Ruilova and Brannigan also bring derivative claims for failure to monitor and co-fiduciary breach related to the direct fiduciary breach allegations discussed above, and they state alternative claims for knowing breach of trust as to any defendants that I find are not fiduciaries. ECF No. 56 ¶¶ 133-44. All parties agree that Ruilova's and Brannigan's derivative claims for failure to monitor fiduciaries, co-fiduciary breach, and knowing breach of trust fail if there is no underlying fiduciary breach. *See* ECF No. 37-1 at 40-41 (Defendants noting that when "a plaintiff fails to plausibly allege an underlying claim for breach of fiduciary duty" any related derivative claims must be dismissed); ECF No. 66 at 43 (Plaintiffs acknowledging that "plausible underlying claims" for fiduciary breach are necessary components of derivative claims). Defendants move to dismiss Ruilova and Brannigan's derivative claims on the grounds that Plaintiffs failed to allege an underlying fiduciary breach. As I decided above that Ruilova and Brannigan have adequately pled a claim of fiduciary breach related to the RK & A fees, their derivative claims do not fail on this ground.

**\*22** Defendants also argue that Plaintiffs' derivative failure to monitor claims are "only conclusory allegations that are devoid of supporting facts." ECF No. 37-1 at 41. "ERISA law imposes a duty to monitor appointees on fiduciaries with appointment power." *In re Xerox Corp. ERISA Litig.*, 483 F.Supp.2d 206, 215 (D. Conn. 2007) (citation omitted); *Cunningham*, 2017 WL 4358769, at *11 ("The text of ERISA does not explicitly impose on plan fiduciaries a duty to monitor, however, several courts have held that there is a duty to monitor appointed fiduciaries under ERISA") (citation omitted). At the motion to dismiss stage, "an analysis of the precise contours of the defendants' duty to monitor ... is premature." *In re M & T Bank Corp. ERISA Litig.*, 16-CV-375 FPG, 2018 WL 4334807, at *11 (W.D.N.Y. Sept. 11, 2018). Instead, a plaintiff may plead "facts, including allegations of excessive fees paid by the Plan, that indirectly show[ ] unlawful behavior and thus give Defendants fair notice of

what the claim is and the grounds upon which it rests." *Id.* (citing *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)) (alteration in original, internal quotation marks omitted).

As noted above, Ruilova and Brannigan have adequately pled facts that indirectly show unlawful behavior and fiduciary breach. They have also adequately pled facts that Yale-NH Hospital and the Committees breached their fiduciary monitoring duties by failing to take certain monitoring actions. Yale-NH Hospital and the Committees "[f]ail[ed] to monitor and evaluat[e] the performance of their appointees or have a system in place for doing so, standing idly by as the Plan suffered enormous losses ... [and] [f]ail[ed] to monitor their appointees' fiduciary processes ... [and] [f]ail[ed] to remove appointees whose performances were inadequate" based on the factual allegations underlying their fiduciary breach claim. ECF No. 56 ¶ 138. These failure-to-monitor allegations, when paired with the factual allegations from the fiduciary breach claim, are sufficient to suggest unlawful behavior and give Defendants fair notice of the failure-to-monitor claim against them. *See Vellali*, 308 F. Supp. 3d at 691-92 (declining to dismiss failure-to-monitor count when plaintiffs adequately alleged fiduciary breach claim and identified two parties with responsibility to monitor allegedly breaching fiduciaries). Ruilova and Brannigan thus state a failure-to-monitor claim against Yale-NH Hospital and the Committees.

Plaintiffs' derivative co-fiduciary breach claim fails, however, because it does no more than recite the legal elements of co-fiduciary breach. *See* ECF No. 56 ¶ 141. "In order to find a breach of co-fiduciary duty, the Court must first find 'knowing participation' in other fiduciaries' breaches." *Rosen*, 2016 WL 7494320, at *16. "Knowing participation turns on a showing that defendants (1) knew of the primary violator's status as a fiduciary and (2) knew that the primary violator's conduct contravened a fiduciary duty." *Leber v. Citigroup, Inc.*, 07 Civ. 9329 (SHS), 2010 WL 935442 at *14 (S.D.N.Y. Mar. 16, 2010) (citing *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 282–83 (2d. Cir. 1992)). Ruilova and Brannigan state only that each defendant "knowingly participated in the breaches of the other Defendants, knowing that such acts constituted breaches; enabled the other Defendants to commit breaches ... [and] knew of the breaches by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breaches." ECF No. 56 ¶ 141. As discussed above, elsewhere in the Amended Complaint Plaintiffs have pled sufficient facts to sustain fiduciary breach

claims against the Committees in managing the Plan and against certain other Defendants in appointing and monitoring the Committees' members. Plaintiffs have not, however, alleged facts suggesting that any Defendants "knowingly" participated in fiduciary breaches by other Defendants and knew that such acts were breaches. Indeed, Plaintiffs' failure-to-monitor claim is premised on Yale-NH Hospital failing to adequately monitor the Committees and the Committees failing to monitor their appointees — a far cry from awareness of a breach by the Committees. The co-fiduciary breach portion of Count Two of the Amended Complaint against Yale-NH Hospital and the Committees is thus dismissed.

**\*23**  Ruilova and Brannigan have also pled, in the alternative, knowing breach of trust claims against any defendant who I determine is not a plan fiduciary. ECF No. 56 ¶¶ 142-144 (Count III). Defendants argue that these alternative claims, like the derivative claims, are "only conclusory allegations that are devoid of supporting facts." ECF No. 37-1 at 41. I agree. "[B]reach of trust is generally interchangeable with breach of fiduciary duty without any formal distinction between the two;" the "only difference is that a breach-of-trust claim can only be asserted against non-fiduciaries." *In re Omnicom ERISA Litig.*, 2021 WL 3292487, at *17. "Therefore, courts apply the same analysis when they consider fiduciary duty and breach-of-trust claims," *Garthwait v. Eversource Energy Co.*, 3:20-CV-00902 (JCH), 2021 WL 4441939, at *10 (D. Conn. Sept. 28, 2021), because "there is no formal distinction between such a claim and a claim for breach of fiduciary duty except that a breach-of-trust claim[ ] can only be brought against non-fiduciaries," *Gonzalez*, 2022 WL 4639673, at *12.

In their knowing breach of trust claim, Ruilova and Brannigan ask for "equitable relief" to prevent non-fiduciary defendants "from further participating in a knowing breach of trust", ECF No. 56 ¶ 143, because "all Defendants possessed the requisite knowledge and information to avoid the fiduciary breaches at issue here and knowingly participated in breaches of fiduciary duty." *Id.* ¶ 144. Plaintiffs' knowing breach of trust claim is thus pled as a knowing participation in a breach of fiduciary duty claim, except that it can be brought against a non-fiduciary. *Gonzalez*, 2022 WL 4639673, at *12 (treating a claim styled as knowing breach of trust as a "knowing-participation claim"). As I noted above, a knowing participation claim in the fiduciary duty context requires that the offending party "knew that the primary violator's conduct contravened a fiduciary duty," *Leber*, 2010 WL 935442 at *14. And courts from other circuits

discussing claims for knowing breach of trust recognize that "if such a cause of action were to exist, an essential element of such a claim would be the defendant's knowing participation in a breach by a fiduciary." *Jones v. Coca-Cola Consol., Inc.*, 320CV00654FDWDSC, 2021 WL 1226551, at *5 (W.D.N.C. Mar. 31, 2021) (citing *Gordon v. CIGNA Corp.*, 890 F.3d 463, 476 (4th Cir. 2018)) (internal quotation marks omitted). As with their co-fiduciary breach claim, however, Plaintiffs have failed to plead facts showing knowledge. The conclusory statements that each Defendant "possessed the requisite knowledge" and "knowingly participates in breaches of fiduciary duty," ECF No. 65 ¶ 144, are insufficient to state a claim, and there are no other factual allegations in the Amended Complaint from which I can reasonably infer knowledge. I thus dismiss Count III against all Defendants.

## IV. CONCLUSION

For the reasons above, I grant in part and deny in part the motion to dismiss (ECF No. 59). I grant Defendants' motion to dismiss Plaintiffs' claims related to Plan investments, to the Plan's total cost, and to the duty of loyalty. I also dismiss Count I against certain Defendants, some of the derivative claims, and all of the alternative claims. I deny Defendants' motion to dismiss as to the recordkeeping and administrative fees claim, as well as the related failure-to-monitor claims against the Committees and Yale-NH Hospital.

**All Citations**

Slip Copy, 2023 WL 2301962

## Footnotes

1    Defendants' incorporated by reference "their Original Brief, which lays out in detail the reasons why Plaintiffs' claims regarding the Plan's recordkeeping fees, the inclusion of the Freedom Funds in the Plan's investment lineup, the overall Plan costs, breach of loyalty, and co-fiduciary liability and failure to monitor fiduciaries are insufficient and should be dismissed." ECF No. 59-1 at 5-6. I thus cite Defendants' original brief, ECF No. 37, in addition to Defendant's operative motion to dismiss.

2    These services include "maintaining plan records, tracking participant account balances and investment elections, providing transaction processing, providing call center support and investment education and guidance, providing participant communications, and providing trust and custodial services." ECF No. 56 ¶ 26.

3    Plaintiffs include the average RK & A fee of $48 that the Plan paid in their comparison chart, but the more apt amount for 2020 from which a direct comparison can be made is stated on the previous page of their complaint. *See* ECF No. 56 ¶¶ 50, 53.

4    "A fund's expense ratio is the total annual cost to an investor, expressed as a percentage of assets." ECF No. 56 at 27 n.17

5    These annualized returns data were "available to Defendants at the start of the Class Period from the most recent quarter-end (the Fourth Quarter of 2015). Defendants could have sought these data from Fidelity or the Plan's other service providers, or easily obtained it themselves." ECF No. 56 ¶ 80.

6    "Investment professionals and investment policy statements for virtually all competently managed defined contribution retirement plans appropriately recognize that the three-year and five-year annualized returns are the most important metrics for evaluating whether investment options should be maintained in a retirement plan lineup." ECF No. 56 ¶ 81 n. 21.

7    The Second Circuit has not always been clear on the drawing of inferences in Rule 12(b)(1) motions, stating, at times, that on a Rule 12(b)(1) motion, the court should *not* draw inferences in the pleader's favor. *Compare McGinty*, 193 F.3d 64 at 68 (in reviewing dismissal under Rule 12(b)(1), "we must accept all factual allegations

in the complaint as true and draw inferences from those allegations in the light most favorable to plaintiffs") *with Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998) ("[W]hen the question to be considered is one involving the jurisdiction of a federal court, jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it.") and *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004) ("On appeal of the district court's order on the motion to dismiss [under Rule 12(b)(1)], we must accept as true all material factual allegations in the complaint, but we are not to draw inferences from the complaint favorable to plaintiffs."). *In Morrison v. Nat'l Australia Bank Ltd.,* 547 F.3d 167 (2d Cir. 2008), the court suggested that these different statements were reconcilable, although it did not explain how: "The court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff [on a Rule 12(b)(1) motion], 'but jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it.' " *Id.* at 170. In this ruling, I take as true the allegations in Plaintiffs' complaint and draw all reasonable inferences in their favor.

8   Defendants do not challenge Ruilova and Brannigan's standing to assert claims about the Fidelity Freedom funds in which they invested — the Fidelity Freedom 2050 and Fidelity Freedom 2020 funds. ECF No. 56 ¶¶ 9-10. Nor do defendants challenge Ruilova and Brannigan's standing to bring claims alleging that the Plan's recordkeeping fees were too high.

9   I do not address whether these funds are appropriate comparators to the Active suite because, even assuming that they are, Plaintiffs have failed to allege sufficient data to support an inference of imprudence from this comparison.

10   Plaintiffs' data are from the fourth quarter of 2015, so the 3-year trailing returns cover the period 2012-2015 and the 5-year trailing returns cover the period 2010-2015. *See* ECF No. 56 ¶ 79.

11   Plaintiffs seem to recognize the importance of providing returns data from the Class Period. For the other five funds they challenge as imprudent, Plaintiffs plead quarter-by-quarter returns data from the Class Period and ask the Court to infer imprudent retention from Defendants' failure to respond to these returns data. *See* ECF No. 56 ¶ 83-106.

12   Defendants also argue that the comparator funds Plaintiffs cite as better alternatives to each challenged fund are not adequately pled. ECF No. 59-1 at 9-11. Because Plaintiffs have failed to allege consistent and substantial underperformance, I do not analyze whether they have adequately pled appropriate comparators, especially given that "the overwhelming trend with district courts in this Circuit is to defer deciding the question of whether two funds are proper comparators until after discovery." *In re Omnicom ERISA Litig.*, 2021 WL 3292487, at *13.

13   See, e.g., *Garthwait I*, 2021 WL 4441939, at *8 (recordkeeping fees claim sufficient where complaint noted plan's sizeable assets and participant count, plan's ability to use this to bargain for lower fees, plan's fee being $10 higher than 2017 industry averages for smaller plans, and where complaint alleged fees were much higher than the value of the RK & A services); *In re Omnicom ERISA Litig.*, 2021 WL 3292487, at *15 (noting that courts have denied motions to dismiss ERISA excessive fee claims where "Plaintiffs allege that Defendants overpaid management fees, [and] the Plan failed to use its size and presumed negotiating power to reduce costs," and denying motion to dismiss recordkeeping fees claim where complaint alleged that plan was large, RK & A fee was higher than average paid by much smaller retirement plans, that fiduciaries did not negotiate or seek to obtain lower fees, and that same recordkeeper charges other plans lower fees) (citation omitted); *Vellali*, 308 F. Supp. 3d at 685 (recordkeeping fee allegations sufficient where plaintiffs alleged unreasonably high fees and "a decision-making process that was deficient in terms of monitoring, soliciting competitive bids, negotiating, and selecting a reasonably priced recordkeeper").

14    Defendants note that Plaintiffs' comparative table contains the average RK & A fee data for the Plan for most of the Class Period and compares it to the 2020 information for the comparator plans. ECF No. 37-1 at 21. While true, this does not defeat Plaintiffs' allegations because the 2020 information regarding the Plan is available in a table on the previous page. ECF No. 56 ¶ 50.

**End of Document**        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   23