## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **MARY LALIBERTE**, *et al.*, | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Case No: 4:22-cv-03290** |
| | § | |
| **QUANTA SERVICES, INC.**, *et al.*, | § | |
| | § | |
| **Defendants.** | § | |

### DEFENDANTS' ANSWER AND DEFENSES TO PLAINTIFFS' COMPLAINT

Quanta Services, Inc. ("Quanta"), the Board of Trustees of Quanta Services, Inc.

("Board"), and the Quanta Services, Inc. 401(k) Savings Plan Committee ("Administrative

Committee" or "Committee") (together, "Defendants") hereby answer Plaintiffs' Complaint

(ECF No. 1) and state their defenses and affirmative defenses, as follows:[1]

### I.      INTRODUCTION

1.      Plaintiffs Mary Laliberte ("Laliberte") and Marie McKnight ("McKnight")
(collectively, "Plaintiffs"), individually in their capacity as participants of the Quanta Services,
Inc. 401(k) Savings Plan ("Plan"), bring this action ("Action") under 29 U.S.C. § 1132, on behalf
of the Plan and a class of similarly situated participants and beneficiaries of the Plan, against
Defendants Quanta Services, Inc. ("Quanta"), the Board of Trustees of Quanta Services, Inc.
("Board"), the Quanta Services, Inc. 401(k) Savings Plan Committee ("Administrative
Committee" or "Committee"), and Does No. 1-20, who are members of the Administrative
Committee or the Board or other fiduciaries of the Plan and whose names are currently unknown
(collectively, "Defendants"), for breach of their fiduciary duties under the Employee Retirement
Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*., and related breaches of applicable

---

[1]  Defendants use headings from the Complaint for ease of reference, but Defendants do not
consider the headings to be substantive allegations that require a response. To the extent any
response is required, Defendants deny all allegations within the headings. Relatedly, Plaintiffs
included approximately twenty footnotes in the Complaint. Defendants likewise do not consider
the information set forth in footnotes to be substantive allegations that require a response. To the
extent any response is required, Defendants deny all allegations within the footnotes in the
Complaint (which Defendants do not reproduce herein).

law beginning six years prior to the date the Action is filed and continuing to the date of judgment, or such earlier date that the Court determines is appropriate and just ("Class Period").

**ANSWER**: Defendants admit that Plaintiffs purport to bring their claims as a class action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(2), on behalf of participants and beneficiaries in the Quanta Services, Inc. 401(k) Savings Plan ("Plan"), but deny that Plaintiffs' claims are appropriate for class treatment and deny that they committed any ERISA violations or engaged in any unlawful conduct, and that Plaintiffs, the Plan, or any putative class members are entitled to any relief. Except as expressly admitted, Defendants deny all remaining allegations in Paragraph 1.

2. Defined contribution plans (e.g., 401(k) plans) that are qualified as tax-deferred vehicles have become the primary form of retirement saving in the United States and, as a result, America's *de facto* retirement system. Unlike traditional defined benefit retirement plans, in which the employer typically promises a calculable benefit and assumes the risk with respect to high fees or underperformance of pension plan assets used to fund defined benefits, the participants in 401(k) plans bear the risk of high fees and investment underperformance.

**ANSWER**: Defendants lack sufficient information or knowledge to admit or deny the factual statements contained in Paragraph 2 and, on that basis, deny them.

3. The importance of defined contribution plans to the United States retirement system has become pronounced as employer-provided defined benefit plans are increasingly rare as an offered and meaningful employee benefit.

**ANSWER**: Defendants lack sufficient information or knowledge to admit or deny the factual statements contained in Paragraph 3 and, on that basis, deny them.

4. As of December 31, 2020, the Plan had 16,317 participants with account balances and assets totaling approximately $1.21 billion, placing it in the top 0.1% of all defined contribution plans by plan size. Defined contribution plans with substantial assets, like the Plan, have significant bargaining power and the ability to demand low-cost administrative and investment management services within the market for administration of defined contribution plans and the investment of defined contribution assets. The market for defined contribution retirement plan services is well-established and can be competitive when fiduciaries of defined contribution retirement plans act in an informed and prudent fashion.

**ANSWER**:  Defendants admit that the Plan's Form 5500 for the plan year ending

December 31, 2020, reported that the Plan had 16,317 participants with account balances and

$1,214,555,425 assets.  Defendants lack sufficient information or knowledge to admit or deny

the remaining factual statements contained in Paragraph 4 and, on that basis, deny them.

5.      Defendants maintain the Plan, and are responsible for selecting, monitoring, and retaining the service provider(s) that provide investment, recordkeeping, and other administrative services.  Defendants are fiduciaries under ERISA, and, as such, owe a series of duties to the Plan and its participants and beneficiaries, including obligations to act for the exclusive benefit of participants, ensure that the investment options offered through the Plan are prudent and diverse, and ensure that Plan expenses are fair and reasonable.

**ANSWER:** Paragraph 5 asserts legal conclusions that require no response.  To the extent

a response is required, Defendants deny the allegations in Paragraph 5.

6.      Defendants have breached their fiduciary duties to the Plan.  As detailed below, Defendants selected, retained, or otherwise ratified high-cost and poorly performing investments instead of offering more prudent alternative investments that were readily available at the time and during the Class Period.  Since Defendants have discretion to select the investments made available to participants, Defendants' breaches are the direct cause of the losses alleged herein.

**ANSWER:** Denied.

7.      To remedy these fiduciary breaches and other violations of ERISA, Plaintiffs bring this class action under Sections 404, 409, and 502 of ERISA, 29 U.S.C. §§ 1104, 1109, and 1132, to recover and obtain all losses resulting from each breach of fiduciary duty.  Plaintiffs also seek such other equitable or remedial relief for the Plan and the proposed class ("Class") as the Court may deem appropriate and just under the circumstances.

**ANSWER**:  Defendants admit that Plaintiffs purport to bring their claims to remedy

alleged breaches of fiduciary duty and alleged ERISA violations on behalf of the Plan and the

proposed class under Sections 404, 409, and 502 of ERISA, and seek losses and other equitable

and remedial relief.  Defendants deny that Plaintiffs have viable claims or that they, the Plan, or

the purported class are entitled to any relief. Except as expressly admitted, Defendants deny all

allegations in Paragraph 7.

8.      Plaintiffs specifically seek the following relief on behalf of the Plan and the Class:

a.    A declaratory judgment holding that the acts of Defendants described herein violate ERISA and applicable law;

b.    A permanent injunction against Defendants prohibiting the practices described herein and affirmatively requiring them to act in the best interests of the Plan and its participants;

c.    Equitable, legal, or remedial relief for all losses and/or compensatory damages;

d.    Attorneys' fees, costs, and other recoverable expenses of litigation; and

e.    Such other and additional legal or equitable relief that the Court deems appropriate and just under the circumstances.

**ANSWER**:  Defendants admit that Plaintiffs purport to seek losses and other equitable and remedial relief.  Defendants deny that Plaintiffs have viable claims or that they, the Plan, or the purported class are entitled to any relief, including the relief in subparagraphs (a)-(e). Except as expressly admitted, Defendants deny all allegations in Paragraph 8.

## II.    <u>THE PARTIES</u>

9.    Plaintiff Mary Laliberte is a former employee of Quanta and former participant in the Plan under 29 U.S.C. § 1002(7).  Laliberte is a resident of Pensacola, Florida.  During the Class Period, Laliberte maintained an investment through the Plan in the Fidelity Freedom 2055 Fund.

**ANSWER**:  Defendants admit only that Plaintiff Mary Laliberte is a former employee of Quanta and that, based on records available to Quanta, Ms. Laliberte formerly had an account in the Plan and during a portion of the purported class period, invested in the Fidelity Freedom 2055 Fund.  Whether Ms. Laliberte was a participant in the Plan under 29 U.S.C. § 1002(7) asserts a legal conclusion that requires no response.  To the extent a response is required, Defendants deny that allegation.  Defendants lack information or knowledge sufficient to form a belief as to the truth of the allegations regarding Ms. Laliberte's residence and therefore deny those allegations.  Except as expressly admitted, Defendants deny all remaining allegations of Paragraph 9.

10.     Plaintiff Marie McKnight is a former employee of Quanta and former participant in the Plan under 29 U.S.C. § 1002(7).  McKnight is a resident of League City, Texas.  During the Class Period, McKnight maintained an investment through the Plan in the American Beacon Small Cap Value Fund, American Funds Growth Fund of America, Dodge & Cox Stock Fund, DFA International Small Cap Value Fund, Fidelity Diversified International Fund, Fidelity 500 Index Fund, Fidelity Extended Market Index Fund, Fidelity Low Priced Stock Fund, Fidelity Managed Income Portfolio, Fidelity Small Cap Growth Fund, Fidelity Total Bond Fund, Vanguard GNMA Fund, Vanguard Growth Index Fund, and the Vanguard Value Index Fund.

**ANSWER**: Defendants admit only that Plaintiff Marie McKnight is a former employee

of Quanta and that, based on records available to Quanta, Ms. McKnight formerly had an

account in the Plan, and during a portion of the purported class period, invested in Plan

investment options that include, the American Beacon Small Cap Value Fund, American Funds

Growth Fund of America, Dodge & Cox Stock Fund, DFA International Small Cap Value Fund,

Fidelity Diversified International Fund, Fidelity 500 Index Fund, Fidelity Extended Market

Index Fund, Fidelity Low Priced Stock Fund, Fidelity Managed Income Portfolio, Fidelity Small

Cap Growth Fund, Fidelity Total Bond Fund, Vanguard GNMA Fund, Vanguard Growth Index

Fund, and the Vanguard Value Index Fund, among other Plan investment options.  Whether Ms.

McKnight was a participant in the Plan under 29 U.S.C. § 1002(7) asserts a legal conclusion that

requires no response.  To the extent a response is required, Defendants deny that allegation.

Defendants lack information or knowledge sufficient to form a belief as to the truth of the

allegations regarding Ms. McKnight's residence and therefore deny those allegations.  Except as

expressly admitted, Defendants deny all remaining allegations of Paragraph 10.

11.     Quanta is a public Delaware corporation headquartered in Houston, Texas. Quanta provides infrastructure services for the electric power, underground utility, and communications industries.

**ANSWER**: Defendants admit that Quanta is incorporated in Delaware and has its

headquarters in Houston, Texas, and that its stock is publicly traded on the New York Stock

Exchange.  Defendants admit further that Paragraph 11 describes certain of the services Quanta

provides.  Defendants deny any remaining allegations.

12.     The Board appointed "authorized representatives" of Quanta, including the
Administrative Committee, as plan fiduciaries.  Does No. 1-10 are members of the Board who
were/are fiduciaries of the Plan under ERISA under 29 U.S.C. §§ 1002(21)(A) because each
exercised discretionary authority to appoint and/or monitor the Administrative Committee, which
had control over Plan management and/or authority or control over management or disposition of
Plan assets.

**ANSWER:** Paragraph 12 asserts legal conclusions that require no response.  To the

extent a response is required, Defendants admit Quanta appointed certain individuals to the

Administrative Committee.  Defendants admit that Plaintiffs purport to refer to unnamed

members of the Quanta Board of Directors as "Does No. 1-10," but deny that it is proper to do

so.  Except as expressly admitted, Defendants deny any remaining allegations in Paragraph 12.

13.     The Administrative Committee is responsible for the general administration of the
Plan and is a fiduciary under ERISA under 29 U.S.C. §§ 1002 and 1102.  The Administrative
Committee maintains its address at Quanta's corporate headquarters in Houston, Texas.  The
Administrative Committee and its members are appointed by Quanta or its delegate to administer
the Plan on Quanta's behalf.

**ANSWER:** Paragraph 13 asserts legal conclusions that require no response.  To the

extent a response is required, Defendants admit that the Administrative Committee acts in an

administrative capacity with respect to certain aspects of the Plan.  Defendants admit that the

Administrative Committee was established by Quanta under the terms of the Plan, and that

appointments to the Administrative Committee are made by Quanta.  Expect as expressly

admitted, Defendants deny any remaining allegations in Paragraph 13.

14.     Does No. 11-20 are the members of the Administrative Committee and, by virtue
of their membership, fiduciaries of the Plan or otherwise are fiduciaries of the Plan.  Plaintiffs
are currently unable to determine the membership of the Administrative Committee or the
identities of the other fiduciaries of the Plan because, despite reasonable and diligent efforts, it
appears that the membership of the Administrative Committee and the identities of any other
fiduciaries are not publicly available.  As such, these Defendants are named Does as
placeholders.  As soon as their identities are discovered, Plaintiffs will move, under Federal Rule
of Civil Procedure 15, to amend this Complaint to name the members of the Administrative

Committee, the members of the Board, and other responsible individuals as defendants.

**ANSWER:** Defendants admit that Plaintiffs purport to refer to unnamed members of the

Committee as "Does No. 11-20," but deny that it is proper to do so.  Except as expressly

admitted, Defendants deny any remaining allegations in Paragraph 14.

### III.    JURISDICTION AND VENUE

15.    Plaintiffs seek relief on behalf of the Plan pursuant to ERISA's civil enforcement
remedies with respect to fiduciaries and other interested parties and, specifically, under 29
U.S.C. § 1109 and 29 U.S.C. § 1132.

**ANSWER:** Defendants admit that Plaintiffs purport seek relief on behalf of the Plan

under 29 U.S.C. § 1109 and 29 U.S.C. § 1132 but deny that Plaintiffs or the Plan are entitled to

any relief.  Except as expressly admitted, Defendants deny any remaining allegations in

Paragraph 15.

16.    This Court has subject matter jurisdiction over the Action pursuant to 28 U.S.C. §
1331 because the Action arises under the laws of the United States.

**ANSWER:** Paragraph 16 asserts legal conclusions that require no response.  To the

extent a response is required, Defendants admit that the Court has subject matter jurisdiction

over this action.  Except as expressly admitted, Defendants deny any remaining allegations in

Paragraph 16.

17.    Venue is proper in this District pursuant to Section 502(e) of ERISA, 29 U.S.C. §
1332(e), and 28 U.S.C. § 1391 because Quanta's principal place of business is in this District and
the Plan is administered in this judicial district.  Further, a substantial part of the acts and
omissions giving rise to the claims asserted herein occurred in this District.

**ANSWER:** Paragraph 17 asserts legal conclusions that require no response.  To the

extent a response is required, Defendants admit that venue is proper in this Court.  Except as

expressly admitted, Defendants deny any remaining allegations in Paragraph 17.

18.    Plaintiffs have standing to bring the Action because they maintained investments
in the Plan in several of the investment options challenged in the Action during the Class Period.
Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), authorizes any participant, fiduciary, or the

Secretary of Labor to bring suit as a representative of a plan, with any recovery necessarily flowing to a plan.  As explained herein, the Plan has suffered millions of dollars in losses due to Defendants' fiduciary breaches and remains vulnerable to continuing harm, all redressable by the Court.  And although standing under Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), is established by these Plan-wide injuries, Plaintiffs and all Plan participants also suffered financial harm as a result of the Plan's imprudent investment options and were deprived of the opportunity to invest in prudent options with reasonable fees, among other injuries.

**ANSWER:** Paragraph 18 asserts legal conclusions that require no response.  To the extent a response is required, Defendants deny the allegations in Paragraph 18.

## IV.    FACTUAL ALLEGATIONS

### A.    Background and Plan Structure

19.    The Plan is a participant-directed 401(k) plan, meaning participants direct the investment of their contributions into various investment options offered by the Plan.  Each participant's account is credited with their participant contributions, applicable employer matching contributions, any discretionary contributions, and earnings or losses thereon.  The Plan pays expenses from Plan assets, and the majority of administrative expenses are paid by participants as a reduction of investment income.  Each participant's account is charged with the amount of distributions taken and an allocation of administrative expenses.  The investment options made available to Plan participants include mutual funds and a collective trust fund.

**ANSWER:** Defendants admit that the Plan is a 401(k) plan in which participants direct their contributions to specific investments offered by the Plan, and Defendants admit that participants' accounts are credited with participant contributions, employer matching contributions, any discretionary contributions, and any investment earnings or losses on their investment selections. Defendants further admit that the Plan pays certain expenses from Plan assets and that participants pay certain administrative expenses, and that the Plan's investment options have varied, but have included mutual funds and a collective trust fund.  Defendants deny any remaining allegations of Paragraph 19.

20.    Mutual funds are publicly traded investment vehicles consisting of a pool of monetary contributions collected from many investors for the purpose of investing in a portfolio of equities, bonds, and other securities.  Mutual funds are operated by professional investment advisers, who, like the mutual funds, are registered with the U.S. Securities and Exchange Commission ("SEC").  Mutual funds are subject to SEC regulation and required to provide certain investment and financial disclosures and information in the form of a prospectus.

-8-

**ANSWER:** Admitted.

21.     Collective trusts are, in essence, mutual funds without the SEC regulation. Collective trusts fall under the regulatory purview of the Office of the Comptroller of the Currency or individual state banking departments. Collective trusts were first organized under state law in 1927 and were blamed for the market crash in 1929. As a result, collective trusts were severely restricted, giving rise to the more transparent and publicly traded mutual funds. Today, banks create collective trusts for only their trust clients and employee benefit plans, like the Plan. Despite their historic lack of transparency, modern collective trust sponsors provide sufficient information for investors to make informed decisions about the merits of investing in collective trusts. The main advantage of opting for a collective trust, rather than a mutual fund, is the negotiability of the fees, so that larger retirement plans should be able to leverage their size to negotiate lower fees.

**ANSWER:** Defendants admit that collective trusts are not regulated by the SEC.

Defendants further admit that banks or trust companies may administer collective trusts and that

collective trusts generally operate under the regulatory authority of the Office of the Comptroller

of the Currency. The remaining allegations of Paragraph 21 assert arguments that require no

response. To the extent a response is required, Defendants deny any remaining allegations of

Paragraph 21.

22.     During the Class Period, Plan assets were held in a trust by the Plan trustee, Fidelity Management Trust Company. All investments and asset allocations are performed through this trust instrument.

**ANSWER:** Admitted.

**B.      Defendants' Breaches of Fiduciary Duties**

23.     As discussed below, Defendants breached their fiduciary duties of prudence and loyalty to the Plan in several ways. Plaintiffs did not acquire actual knowledge about Defendants' breaches until shortly before this Complaint was filed.

**ANSWER:** Defendants deny that they breached their fiduciary duties of prudence and

loyalty. Defendants lack information or knowledge sufficient to form a belief as to the truth of

the allegations regarding whether Plaintiffs acquired actual knowledge about Defendants' alleged

breaches until shortly before this Complaint was filed, and therefore deny those allegations.

### 1.  The Plan's Investment in the Fidelity Freedom Funds

24.     Among other investments, the Plan lineup offers a suite of 14 target date funds ("TDF").  A TDF is an investment vehicle that offers an all-in-one retirement solution through a portfolio of underlying funds that gradually shifts to become more conservative as the assumed target retirement year approaches.  TDFs offer investors dynamic, easy asset allocation, while providing both long-term growth and capital preservation.  All TDFs are inherently actively managed, because managers make changes to the allocations to stocks, bonds, and cash over time.  These allocation shifts are referred to as a fund's glide path.  The underlying mutual funds that TDF managers choose to populate each asset class can be actively or passively managed.  This Complaint does not challenge the selection of TDFs that include actively managed investments and does not challenge active management specifically or in general.  As explained below, there is nothing inherently wrong with choosing actively managed funds, as long as the expected return of the fund justifies the increased expense and risk, as compared to other readily available investment options.  In other words, to justify choosing an actively managed investment, fiduciaries of a retirement plan must, at a minimum, engage in rational economic decision-making to justify the more expensive and inherently riskier investment.  Since the fiduciaries here employed a fundamentally irrational decision-making process (i.e., inconsistent with their duty of prudence), they breached their fiduciary duties under ERISA, which are the "highest known to law."  *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) (citing *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)).

**ANSWER:** Defendants admit that the Plan offers a suite of 14 target date funds ("TDF").

Defendants admit that a TDF is an investment vehicle that offers a portfolio of underlying funds

that gradually shifts to become more conservative as the assumed target retirement year

approaches, that TDFs provide both long-term growth and capital preservation, that a TDF's

manager makes changes to the asset allocations over time, that a TDF's asset allocation shifts are

called its glide path, and that the underlying mutual funds of a TDF can be actively or passively

managed.  The remaining allegations of Paragraph 24 assert legal arguments that require no

response; to the extent a response is required, Defendants deny any characterization contrary to

the referenced sources or ERISA.  Except as expressly admitted, Defendants deny all remaining

allegations in Paragraph 24.

25.     According to the Plan's Form 5500s, since at least December 31, 2009, the Plan offered the Fidelity Freedom funds target-date suite.  Fidelity Management & Research Company ("Fidelity") is the second largest TDF provider by total assets.  Among its target date offerings, Fidelity offers the riskier and more costly Freedom funds (the "Active suite") and the less risky and less costly Freedom Index funds (the "Index suite").  Defendants were responsible

for crafting the Plan lineup and could have chosen any of the target date families offered by Fidelity or those of any other target date provider, including other mutual fund families that have portfolios composed of actively managed sub-funds, which are readily available in the market and, unlike the Active suite, offer a reasonable expectation of increased returns to justify their increased costs and risk. Defendants should have considered the merits and features of all available TDF options, but they instead failed to compare the Active and Index suites, as well as other available TDFs, (including actively managed TDFs that offer expected returns sufficient to justify the associated costs and risk).

**ANSWER:** Defendants admit only that the Plan's Form 5500 for plan year ending December 31, 2009, reported that the Plan offered the Fidelity Freedom funds target date suite. Defendants admit that Fidelity offers the Freedom funds and another target date suite known as the Freedom Index funds. Defendants lack information or knowledge sufficient to form a belief as to the truth of the allegations regarding whether Fidelity is the second largest TDF provider by total assets and therefore deny those allegations. Defendants deny all remaining allegations in Paragraph 25.

26.     A simple weighing of the benefits of all other available TDFs at the beginning of the Class Period would have raised a significant red flag for prudent fiduciaries. An objective evaluation of the Active suite would have concluded that the Active suite was not a suitable and prudent option for the Plan and would have resulted in the selection of a more consistent, better performing, and more appropriate TDF than the Active suite. Had Defendants carried out their responsibilities in a single-minded manner with an eye focused solely on the interests of Plan participants, they would not have retained the Active suite. But Defendants failed to act in the interests of Plan participants and breached their fiduciary duties by imprudently selecting, retaining, and failing to appropriately monitor the Active suite.

**ANSWER:** Denied.

27.     Exacerbating Defendants' imprudent choice to offer the Active suite is its designation as the Plan's Qualified Default Investment Alternative ("QDIA"). Under DOL regulations, retirement plan fiduciaries can select one of the investment offerings in a plan's lineup as a QDIA to aid participants who lack the knowledge or confidence to make investment elections for their retirement assets. If participants do not indicate where their assets should be invested, their contributions are automatically invested in the QDIA. Thus, it is vital for fiduciaries to understand the relevant population of plan participants and ensure that the QDIA is a suitable and prudent option for them. Indeed, Plan fiduciaries are responsible for prudently selecting and continuously monitoring an appropriate QDIA. The Fidelity Freedom fund with the target year closest to a participant's assumed retirement age (i.e., age 65) serves as the Plan's QDIA. Because Defendants designated the Active suite as the Plan's QDIA, this is not a case where the fiduciaries of a plan made several suites of TDFs available to the Plan's participants so

that they could choose from (a) a TDF composed of riskier and more expensive actively managed sub-funds (along with appropriate disclosures), if such an investment met their individual investment objectives; or (b) another TDF suite that was either composed of passively managed underlying funds, better performing, less risky, cheaper, and/or all of the above. Instead, as with most defined contribution retirement plans, only one TDF suite was selected to be made available to *all* participants and the TDF is designated as the QDIA, thereby ensuring that funds from the Plan flow into the TDF (in this case, the Active suite) by default.  Indeed, by selecting the Active suite and designating it as the Plan's QDIA, Defendants ensured that Fidelity (which is also the recordkeeper for the Plan) would derive enormous profits.  In doing so, Defendants placed the interests of Fidelity ahead of the interests of the Plan participants.

**ANSWER:** Defendants admit only that the Active suite is the Plan's Qualified Default

Investment Alternative ("QDIA") and that DOL regulations permit retirement plan fiduciaries to

select one of the investment offerings in a plan's lineup as a QDIA.  Defendants admit that for

participants who do not select specific investments for the investment of their assets, their

contributions are automatically invested in the QDIA.  Defendants admit that Fidelity Freedom

fund with the target year closest to a participant's assumed retirement age (i.e., age 65) serves as

the Plan's QDIA.  Defendants deny all remaining allegations in Paragraph 27.

28.     Because the vast majority of Plan participants are not sophisticated investors, many concentrate their retirement assets in TDFs.  Thus, the impact of Defendants' imprudent selection of TDFs is magnified vis-à-vis other asset categories.  Indeed, by December 31, 2020, approximately 47% of the Plan's assets were invested in the Active suite.

**ANSWER:** Denied.

i.     The Active Suite is High-Risk and Unsuitable for Plan Participants

29.     The Active suite and the Index suite are sponsored by the same investment management company and share a management team.   But while the Active suite invests predominantly in actively managed Fidelity mutual funds, the Index suite places no assets under active management and instead invests in Fidelity funds that simply track market indices.  The Active suite is also dramatically more expensive than the Index suite, and riskier in both its underlying holdings and its asset-allocation strategy.  Defendants breached their fiduciary duties by choosing to add the Active suite over another prudent TDF suite, and failing to replace the Active suite at any point during the Class Period.

**ANSWER:** Defendants admit only that the Active suite and the Index suite are sponsored

by the same management company and that the Active suite invests in certain actively managed

funds and the Index suite invests in funds that track market indexes.  Defendants deny all

remaining allegations in Paragraph 29.

30.     The Active suite chases returns by taking levels of risk that render it unsuitable
for the average retirement investor, including Plan participants.  At first glance, the equity glide
paths of the Active suite and Index suite appear nearly identical, which would suggest both target
date options have a similar risk profile.  But the Active suite subjects its assets to significantly
more risk than the Index suite, through multiple avenues.  At the underlying fund level, where
the Index suite invests only in index funds that track market indices, the Active suite primarily
features funds with a manager deciding which securities to buy and sell, and in what quantities.

**ANSWER:** Denied.

31.     The goal of an active manager is to beat a benchmark—usually a market index or
a combination of indices—by taking more risk than the relevant index or indices.  Kilroy, *Is
Active Management a Good Idea for Your Portfolio* (SmartAsset Advisor, LLC) (December 11,
2019), https://smartasset.com/financial-advisor/active-management ("the goal of active
management is to outperform a specific market index or, in a market downturn, to book losses
that are less severe than a specific market index suffers"); *see also* Lehman and Modest, *Mutual
Fund Performance Evaluation: A Comparison of Benchmarks and Benchmark Comparisons*,
Journal of Finance, Vol. XLII, No. 2 (June, 1987) (evaluating the performance of benchmarks
using Capital Asset Pricing Model ("CAPM") and Arbitrage Pricing Theory ("APT") and
explaining that the entire purpose of actively managed mutual funds is to exceed the performance
of an index/benchmark); Baks, Metrick, & Wachter, *Should Investors avoid all actively managed
mutual funds?  A Study in Bayesian performance evaluation*, Journal of Finance, Vol. LVI, No. 1
(February, 2001) (observing that, since Jensen in 1968, "most studies have found that the
universe of mutual funds does not outperform its benchmarks after expenses" and "evidence
indicates that the average active mutual fund should be avoided"); Jensen, *The Performance of
Mutual Funds in the Period 1945-1964*, Vol. XXIII, No. 2 (May, 1968) (explaining that most
actively managed mutual funds do not outperform indexes and that only those that outperform
indexes can justify the risk and expense from an economic perspective).  Thus, any suggestion
that a comparison of actively managed funds to passively managed investments (as a proxy for
the specific market index that the actively managed investment attempts to beat) is somehow
inappropriate or an "apples to oranges" comparison betrays a fundamental misunderstanding of
basic investment theory and what fiduciaries actually do.  Indeed, a prudent fiduciary should
compare actively managed funds to passively managed funds or similar indices in order to
determine whether the Plan is getting the additional return to justify the increased expense and
risk of the active investment.  This, in addition to other metrics (such as peer relative
performance), is exactly what every minimally competent investment professional does to
evaluate an actively managed investment and arguments or suggestions to the contrary fall far
outside mainstream thought in terms of investment management, basic economics and minimum
standards of fiduciary care and prudence.  Indeed, in promulgating its Final Rule to Improve
Transparency of Fees and Expenses to Workers in 401(k)-Type Retirement Plans in February,
2012, the United States Department of Labor specifically required that plan sponsors identify
benchmarks in the form of an appropriate broad-based securities market index for each
investment offered in the plan, thus specifically recognizing that  actively managed investments

must be evaluated against indexes, for which passively managed index funds serve as an investable proxy.

**ANSWER:** The allegations of Paragraph 31 assert arguments that require no response; to the extent a response is required, Defendants deny any characterization contrary to the referenced sources or ERISA.

32.     Market research has indicated that investors should be skeptical of certain actively managed funds' ability to consistently outperform their indices, which is a significant concern for long-term investors saving for retirement, like Plan participants.  Actively managed funds typically charge higher fees than passively managed funds, which are passed on to the investors (including TDF investors) through higher expense ratios.  These extra costs present an additional hurdle active managers must clear in order to provide value and compensate investors for the added risk resulting from their decision-making.  Indeed, Morningstar has repeatedly concluded that "in general, actively managed funds have failed to survive and beat their benchmarks, especially over longer time horizons."   Although they may experience success over shorter periods, active fund managers are infrequently able to time their activity efficiently enough to outperform the market.  The Active suite's allocation to primarily actively managed funds thus subjected Plan participants to the decision-making skill and success, or lack thereof, of the underlying fund managers and the associated higher risk of these investments.

**ANSWER:** The allegations of Paragraph 32 assert arguments that require no response; to the extent a response is required, Defendants deny any characterization contrary to the referenced sources or ERISA.

33.     At all times across the glide path, the Active suite's top four domestic equity positions were and are in Fidelity Series funds, created for exclusive use in the Freedom funds, three of which have dramatically trailed their respective indices over their entire respective lifetimes.  The Large Cap Stock Fund, to which at least 7.55% of the total assets in the 2040-2065 Funds are allocated, has, over its lifetime, trailed its benchmark, the S&P 500 Index, by 181 basis points (1.81%) annualized.  The Stock Selector Large Cap Value Fund, which is currently allocated at least 5.84% of the total assets in the 2040-2065 Funds, has, over its lifetime, missed its benchmark, the Russell 1000 Value Index, by 28 basis points (0.28%) on an annualized basis.  The Intrinsic Opportunities Fund, which is currently allocated at least 5.81% of the total assets in the 2040-2065 Funds, has similarly lagged its benchmark, the Russell 3000 Index, over its lifetime by 54 basis points (0.54%) on an annualized basis.  While the portfolio of the Active suite is diversified among 32 underlying investment vehicles, the three aforementioned funds represent over 19% of the 2040 through 2065 vintages, meaning for at least 20 years (because those target date funds have an associated target retirement date of at least twenty years from now), over 19% of investor dollars are subject to the poor judgment exercised by just those three managers.

**ANSWER:** Denied.

34.    Poor performance of the underlying funds in the Active suite is not limited to the largest positions.  Of the 25 actively managed Fidelity Series Funds in the Active suite portfolio, 11 have failed to beat their respective benchmarks over their lifetimes.  Defendants apparently never reviewed the performance of the funds in the Active suite during the Class Period.

**ANSWER:** Denied.

35.    Moreover, as of the start of the Class Period, several of the underlying funds used within the Active suite portfolio lacked performance history sufficient to support a meaningful analysis.  Accordingly, no prudent fiduciary could have properly evaluated these funds.  Indeed, as illustrated in the table below, 13 of 24 funds failed to meet the basic criteria of at least a five-year performance history, meaning almost two-thirds of the funds in the Active suite portfolio would have failed one of the most basic fiduciary requirements.  Defendants undertook no such analysis at any point during the Class Period.

| Underlying Fund Name | Ticker | Inception Date | Less than 5-Years Performance |
|---|---|---|---|
| Fidelity Series 100 Index | FOHIX | 20070329 | |
| Fidelity Series 1000 Value Index | FSIOX | 20130711 | x |
| Fidelity Series All-Sector Equity | FSAEX | 20081017 | |
| Fidelity Series Blue Chip Growth | FSBDX | 20130711 | x |
| Fidelity Series Commodity Strategy | FCSSX | 20090110 | |
| Fidelity Series Emerging Markets Debt | FEDCX | 20110317 | |
| Fidelity Series Emerging Markets | FEMFX | 20080912 | |
| Fidelity Series Equity-Income | FRLLX | 20120612 | x |
| Fidelity Series Floating Rate Hi Inc | FFHCX | 20111020 | x |
| Fidelity Series Growth & Income | FTBTX | 20120612 | x |
| Fidelity Series Growth Company | FCGSX | 20130711 | x |
| Fidelity Series High Income | FSHNX | 20111003 | x |
| Fidelity Series Infl-Prtct Bd Idx | FSIPX | 20090929 | |
| Fidelity Series International Growth | FIGSX | 20090312 | |
| Fidelity Series International Sm Cap | FSTSX | 20090312 | |
| Fidelity Series International Value | FINVX | 20090312 | |
| Fidelity Series Intrinsic Opps | FDMLX | 20120612 | x |
| Fidelity Series Investment Grade Bond | FSIGX | 20080810 | |
| Fidelity Series Opportunistic Insights | FVWSX | 20120612 | x |
| Fidelity Series Real Estate Equity | FREDX | 20111020 | x |
| Fidelity Series Real Estate Income | FSREX | 20111020 | x |
| Fidelity Series Small Cap Discovery | FJACX | 20130711 | x |
| Fidelity Series Small Cap Opps | FSOPX | 20070322 | |
| Fidelity Series Stk Selec Lg Cp Val | FBLEX | 20120612 | x |

**ANSWER:** Denied.

36.    Compounding the high level of risk inherent in the Active suite's underlying holdings is the managers' approach to portfolio construction and asset allocation.  As discussed

above, the Active and Index suites appear to follow essentially the same glide paths and strategy. The chart below shows the percentage of assets devoted to equities in each vintage:

| Equity Glide Path | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Years to Target Retirement Year | | | | | | | | | | | | |
| Series | 40 | 35 | 30 | 25 | 20 | 15 | 10 | 5 | 0 | -5 | -10 | -15 | -20 |
| Fidelity Freedom | 90 | 90 | 90 | 90 | 89 | 78 | 65 | 58 | 53 | 43 | 35 | 24 | 24 |
| Fidelity Freedom Index | 90 | 90 | 90 | 90 | 90 | 80 | 65 | 59 | 52 | 43 | 34 | 24 | 24 |

**ANSWER:** Defendants admit only that Paragraph 36 purports to show the percentage of assets devoted to equities in each vintage of the Active and Index TDFs. Defendants deny that the numbers in the chart in Paragraph 36 are accurate. Defendants deny all remaining allegations in Paragraph 36.

37. This chart considers only the mix of stocks, bonds, and cash. A deeper examination of the sub-asset classes of the Active suite's portfolio, however, exposes the significant risks its managers take to boost returns. Across the glide path, the Active suite allocates approximately 1.5% more of its assets to riskier international equities than the Index suite, and also has higher exposure to riskier asset classes like emerging markets and high yield bonds. Defendants failed to investigate the level of risk inherent in the Active suite portfolio and did not determine whether that risk level was suitable for Plan participants at any point during the Class Period.

**ANSWER:** Denied.

38. Since the Active suite series underwent a strategy overhaul in 2013 and 2014, its managers have had the discretion to deviate from the glide path allocations by ten percentage points in either direction. Departing from the accepted wisdom that TDFs should maintain pre-set allocations, Fidelity encouraged its portfolio managers to participate in "active asset allocation," an attempt to time market shifts in order to locate underpriced securities. This strategy heaps further unnecessary risk on investors, such as Plan participants, in the Active suite. In fact, a March 2018 Reuters special report on the Fidelity Freedom funds (the "Reuters Report") details how many investors lost confidence in the Active suite "because of their history of underperformance, frequent strategy changes and rising risk." The report quotes a member of Longfellow Advisors, who told Reuters that, after the 2014 changes, "it was not clear to us that [the managers of the Active suite] knew what they were doing." While many TDF managers increase their exposure to riskier investments in an effort to improve returns, the president of research firm Target Date Solutions cautions that the Active suite has gone further down this path than its peers. Other industry experts have criticized the "chaotic glide paths" of the Active suite relative to peer target date providers. Morningstar noted in the past that active management hindered the Active suite's performance, criticizing a previous poor decision to heavily weight to commodities, and similarly characterized Fidelity's shifts in the stock allocation between 1996–2010 as "shocking" and "seemingly chaotic." Yet since 2014,

Defendants have given the Active suite—a fund family with a history of poor returns— "carte blanche" to take further risks, to the severe detriment of the Plan and its participants.  Defendants never initiated or undertook any review of the Active suite's strategy changes.

**ANSWER:** Defendants admit only that Paragraph 38 cites and purports to quote various industry articles, which speak for themselves.  Defendants deny any characterization contrary to the cited sources.  Defendants deny all remaining allegations in Paragraph 38.

39.     Far from being the "lifetime savings solution" Fidelity promotes, because its funds assume more risk, the Active suite exposes investors to significant losses in the event of market volatility like the downturn experienced during the COVID-19 pandemic.

**ANSWER:** Denied.

40.     Morningstar analyst Jeff Holt opines that the popularity of target date funds derives from investors' belief that the funds are designed to "not lose money."  Indeed, the average (unsophisticated) investor, such as the typical Plan participant, typically chooses the all-in-one savings solution a TDF offers.  For this reason, Plan participants should be shielded from the riskiest funds where active managers' decisions could amplify losses during market declines.

**ANSWER:** Denied.

ii.     <u>The Active Suite's Considerable Cost</u>

41.     Even a minor increase in a fund's expense ratio can considerably reduce long-term retirement savings.  The fees charged by the Active suite are many multiples higher than the Index suite's industry-leading low fees.  While the Institutional Premium share class for each target year of the Index suite charges a mere 8 basis points (0.08%), the K share class of the Active suite—which the Plan offers—has expense ratios ranging from 42 basis points (0.42%) to 65 basis points (0.65%).

| Cost Comparison | | | | | | |
|---|---|---|---|---|---|---|
| Freedom Suite | Ticker | Exp Rat | Freedom Index Suite | Ticker | Exp Rat | Difference |
| Income K | FNSHX | 0.42% | Income Inst Prem | FFGZX | 0.08% | -0.34% |
| 2005 K | FSNJX | 0.42% | 2005 Inst Prem | FFGFX | 0.08% | -0.34% |
| 2010 K | FSNKX | 0.46% | 2010 Inst Prem | FFWTX | 0.08% | -0.38% |
| 2015 K | FSNLX | 0.49% | 2015 Inst Prem | FIWFX | 0.08% | -0.41% |
| 2020 K | FSNOX | 0.53% | 2020 Inst Prem | FIWTX | 0.08% | -0.45% |
| 2025 K | FSNPX | 0.56% | 2025 Inst Prem | FFEDX | 0.08% | -0.48% |
| 2030 K | FSNQX | 0.60% | 2030 Inst Prem | FFEGX | 0.08% | -0.52% |
| 2035 K | FSNUX | 0.63% | 2035 Inst Prem | FFEZX | 0.08% | -0.55% |
| 2040 K | FSNVX | 0.65% | 2040 Inst Prem | FFIZX | 0.08% | -0.57% |
| 2045 K | FSNZX | 0.65% | 2045 Inst Prem | FFOLX | 0.08% | -0.57% |
| 2050 K | FNSBX | 0.65% | 2050 Inst Prem | FFOPX | 0.08% | -0.57% |
| 2055 K | FNSDX | 0.65% | 2055 Inst Prem | FFLDX | 0.08% | -0.57% |
| 2060 K | FNSFX | 0.65% | 2060 Inst Prem | FFLEX | 0.08% | -0.57% |
| 2065 K | FFSDX | 0.65% | 2065 Inst Prem | FFIKX | 0.08% | -0.57% |

**ANSWER:** Denied.

42.     Higher fees significantly reduce retirement account balances over time. Considering just the gap in expense ratios from the Plan's investment in the Active suite to the Institutional Premium share class of the Index suite, the Plan could have saved approximately $2.82 million in costs in 2020 alone.  This tremendous cost difference goes straight into Fidelity's pockets at the expense of Plan participants.  Likewise, as discussed below, there were readily available actively managed TDFs (offered by other mutual fund families) that performed better (and were less risky) than the Active suite that the Plan could have offered participants. Inexplicably, Defendants retained the Active suite in the Plan to the great detriment of the Plan and its participants.  Thus, Defendants placed the interests of Fidelity ahead of the interests of the Plan participants.

**ANSWER:** Denied.

43.     As the costs of recordkeeping services have dropped precipitously over the past decade, recordkeepers like Fidelity have been forced to chase profits elsewhere.  The management fees derived from a plan's use of a provider's investment offerings substantially trump any compensation for recordkeeping services.  Thus, Fidelity is heavily incentivized to promote its own investment products, specifically those that charge the highest fees, to each plan for which it also provides recordkeeping services, including the Plan.

**ANSWER:** Denied.

iii.     Investors Have Lost Faith in the Active Suite

44.     The flow of funds to or from target date families is one indicator of the preferences of investors at large.  According to Morningstar's report on the 2019 Target Date Fund Landscape, investor demand for low-cost TDF options has skyrocketed in recent years.

Unsurprisingly, the Index suite has seen significant inflows, receiving an estimated $19.8 billion in net inflows in 2020.   At the same time, investor confidence in the Active suite has deteriorated: from 2016-2020, while the Index suite gained approximately $40 billion in net inflows, the Active suite lost an estimated $35 billion in net outflows.  That undeniable response by the market as to the suitability of the Active suite should have been a clear signal that it was imprudent for Defendants to continue offering the Active suite as an investment in the Plan, as opposed to other TDFs (both active and passive) that were readily available and more suitable.



**ANSWER:** Defendants admit only that Paragraph 44 cites industry publications, which

speak for themselves.  Defendants deny any characterization contrary to the cited sources.

Defendants deny all remaining allegations in Paragraph 44.

45.     Defendants' conduct in offering and maintaining the Active suite in the Plan evidences their failure to acknowledge or act upon investors' crumbling confidence in the Active suite while ignoring the simultaneous and justified surge in preference for low-cost TDFs such as the Index suite.

**ANSWER:** Denied.

iv.     <u>The Active Suite's Inferior Returns</u>

46.     Exacerbating the myriad issues with the Active suite is its performance issues when compared to the other most widely used TDF offerings.  Prior to and throughout the Class Period, there were other TDFs that consistently outperformed the Active suite, providing investors with substantially more capital appreciation.  It is apparent, given the continued presence of the Active suite in the Plan's investment menu, that Defendants never heeded the numerous red flags detailed above and neglected to scrutinize the performance of the Active suite against any of the more appropriate alternative TDF options.

**ANSWER:** Denied.

47.     A prudent fiduciary evaluates TDF returns not only against an appropriate index or a group of peer TDFs, but also against specific, readily investable alternatives.  At the start of the Class Period, the Active suite ranked dead last when measured against the primary offerings of four of the five largest non-Fidelity TDF managers.  The performance tables below compare the three- and five-year annualized returns of several representative vintages of the Active suite to those of the same iterations of the Vanguard Target Retirement Funds, the T. Rowe Price Retirement Funds, the American Funds Target Date Funds, and the J.P. Morgan SmartRetirement Funds (which, with the exception of Vanguard, are all comprised of actively managed underlying funds), as well as the percentile rank of those returns among all funds of the same Morningstar category (e.g., Target Date 2020).   This information was available to Defendants from the start of the Class Period until the most recent quarter-end (the Second Quarter of 2016).  Defendants could have obtained this data from Fidelity, the Plan's other service providers, or through just a few clicks of a mouse.

| Three-Year Annualized Return as of 2Q16 | | | | | |
|---|---|---|---|---|---|
| | Retirement | 2020 | 2030 | 2040 | 2050 |
| American Funds | 6.47% | 7.57% | 8.62% | 8.61% | 8.65% |
| JPMorgan | 4.61% | 6.21% | 6.96% | 7.21% | 7.23% |
| T. Rowe Price | 5.79% | 6.91% | 7.68% | 7.92% | 7.92% |
| Vanguard | 4.93% | 6.76% | 7.27% | 7.54% | 7.52% |
| **Fidelity Freedom** | **3.68%** | **5.74%** | **6.46%** | **6.78%** | **6.89%** |

| Five-Year Annualized Return as of 2Q16 | | | | | |
|---|---|---|---|---|---|
| | Retirement | 2020 | 2030 | 2040 | 2050 |
| American Funds | 6.64% | 7.64% | 8.75% | 8.73% | 8.74% |
| JPMorgan | 4.66% | 6.29% | 6.97% | 7.32% | 7.35% |
| T. Rowe Price | 5.71% | 6.84% | 7.60% | 7.88% | 7.90% |
| Vanguard | 4.98% | 6.67% | 7.21% | 7.57% | 7.56% |
| **Fidelity Freedom** | **3.43%** | **5.30%** | **5.97%** | **6.25%** | **6.27%** |

*Neither American Funds nor T. Rowe Price offer a Retirement vintage.  Accordingly, the 2010 vintage is used as a proxy for participants already in retirement.

| Peer Rank of Three-Year Annualized Return as of 2Q16 | | | | | |
|---|---|---|---|---|---|
| | Retirement | 2020 | 2030 | 2040 | 2050 |
| American Funds | 1 | 1 | 1 | 1 | 1 |
| JPMorgan | 40 | 36 | 25 | 30 | 39 |
| T. Rowe Price | 20 | 10 | 8 | 7 | 10 |
| Vanguard | 26 | 16 | 15 | 16 | 24 |
| Fidelity Freedom | 66 | 63 | 49 | 56 | 54 |

| Peer Rank of Five-Year Annualized Return as of 2Q16 | | | | | |
|---|---|---|---|---|---|
| | Retirement | 2020 | 2030 | 2040 | 2050 |

| American Funds | 1 | 1 | 1 | 1 | 1 |
|---|---|---|---|---|---|
| JPMorgan | 33 | 38 | 30 | 34 | 33 |
| T. Rowe Price | 23 | 11 | 9 | 11 | 9 |
| Vanguard | 28 | 16 | 20 | 27 | 26 |
| Fidelity Freedom | 74 | 75 | 65 | 69 | 71 |

**ANSWER:** Defendants admit only that Paragraph 47 purports to compare three- and five-year annualized returns of several suites of TDFs. Defendants deny that the numbers contained in the charts in Paragraph 47 are accurate. Defendants deny all remaining allegations in Paragraph 47.

48.     Across the board, at all stages along the Active suite's glide path from aggressive to conservative, the Active suite's returns paled in comparison to those of the readily available alternatives. Defendants, however, neglected to undertake any analysis of the Active suite against appropriate peers. This underperformance by the Active suite relative to its peers persisted throughout the Class Period. If Defendants had complied with their fiduciary duties during the Class Period, they would have replaced the Active suite with a suitable alternative TDF. Their failure to do so caused Plan participants to miss out on substantial investment returns for their retirement savings.

**ANSWER:** Denied.

### 2.     The Plan's Objectively Imprudent Investment Options

49.     In addition to the Active suite, Defendants saddled participants with other objectively imprudent investment options. It is a basic principle of investment theory that the risks associated with an investment must be justified by its potential returns in order for that investment to be rational. This principle applies even before considering the purpose of the investment or the needs of an investor. The Capital Asset Pricing Model ("CAPM")—which is used to price securities and generate expected returns for assets given their risks and the cost of capital—provides the following mathematical formula for this principle:

$$ERi = Rf + \beta i(ERm - Rf), \text{ where:}$$

$ERi$ = the expected return of the investment

$Rf$ = the risk-free rate

$\beta i$ = the beta of the investment

$(ERm - Rf)$ = the market risk premium

Applied here, the beta—$\beta i$—is the risk associated with an actively managed mutual fund or collective trust, which can be justified only if the expected return—$ERi$—is, at the very least,

above that of its benchmark, *Rf*.   Otherwise, the model collapses, and it would be imprudent to assume the extra risk without achieving a higher return than the benchmark.

**ANSWER:** Defendants deny that there were other objectively imprudent investment options in the Plan.  The remaining allegations in Paragraph 49 assert argument to which no response is required.  To the extent a response is required, Defendants deny all remaining allegations in Paragraph 49.

### i.    The American Beacon Small Cap Value Fund

50.    The American Beacon Small Cap Value Fund Class R5 ("American Beacon") has consistently and significantly underperformed the benchmark chosen by its own manager, the Russell 2000 Value Index, on a rolling three- and five-year annualized basis.  Due to the Committee's deficient investment review procedures, however, a general lack of understanding of how to evaluate investment returns, and/or an attitude of neglect towards the plan, Defendants failed to appropriately scrutinize, and ultimately replace, this poor performing fund.  At their meetings during the Class Period, Committee members had access to the below returns data in real time, which would have been sufficient to convince a fiduciary following a prudent process that the American Beacon Fund should be removed:

- By the end of the Fourth Quarter of 2018, the American Beacon Fund's three- and five-year annualized returns trailed those of its benchmark by 2.23% and 0.67%, respectively.  While this was the first quarter-end at which the five-year return fell below the benchmark, the Fund's three-year returns had lagged the benchmark for the previous six consecutive quarters, beginning as of the end of the Second Quarter of 2017.

- As of the end of the First Quarter of 2019, the American Beacon Fund's three- and five-year annualized returns trailed those of its benchmark by 2.47% and 0.60%, respectively.

- As of the end of the Second Quarter of 2019, the American Beacon Fund's three- and five-year annualized returns trailed those of its benchmark by 1.20% and 0.62%, respectively.

- As of the end of the Third Quarter of 2019, the American Beacon Fund's three- and five-year annualized returns trailed those of its benchmark by 0.90% and 1.10%, respectively.

**ANSWER:** Denied.

51.    At this point, consistent with their regular monitoring duties, the Committee should have reviewed at least *four consecutive quarters* of the American Beacon Fund's underperformance (or ten consecutive quarters considering the three-year return alone).   This

troubling pattern was ignored, however, and Defendants allowed the Fund to linger even as its performance issues persisted:

- As of the end of the Fourth Quarter of 2019, the American Beacon Fund's three- and five-year annualized returns trailed those of its benchmark by 0.54% and 0.60%, respectively.

- As of the end of the First Quarter of 2020, the American Beacon Fund's three- and five-year annualized returns trailed those of its benchmark by 2.12% and 1.61%, respectively.

- As of the end of the Second Quarter of 2020, the American Beacon Fund's three- and five-year annualized returns trailed those of its benchmark by 1.03% and 1.32%, respectively.

- As of the end of the Third Quarter of 2020, the American Beacon Fund's three- and five-year annualized returns trailed those of its benchmark by 0.69% and 1.48%, respectively.

**ANSWER:** Denied.

52.     At this point, the Committee should have reviewed returns data demonstrating the American Beacon Fund's persistent inability to beat its benchmark over periods most closely approximating a market cycle for *eight consecutive quarters* (or 14 consecutive quarters considering just the three-year underperformance).  These issues have endured; the Fund has continued to underperform its benchmark through the filing of this Complaint:

- As of the end of the Fourth Quarter of 2020, the American Beacon Fund's three- and five-year annualized returns trailed those of its benchmark by 0.99% and 1.30%, respectively.

- As of the end of the First Quarter of 2021, the American Beacon Fund's three- and five-year annualized returns trailed those of its benchmark by 1.78% and 1.80%, respectively.

- As of the end of the Second Quarter of 2021, the American Beacon Fund's three- and five-year annualized returns trailed those of its benchmark by 1.87% and 1.57%, respectively.

- As of the end of the Third Quarter of 2021, the American Beacon Fund's three- and five-year annualized returns trailed those of its benchmark by 1.71% and 1.05%, respectively.

- While the American Beacon Fund's three-year returns for the Fourth Quarter of 2021 and First Quarter of 2022 exceeded the benchmark, its five-year returns for those same periods have still trailed the benchmark,

meaning to date the Fund's five-year returns have lagged the benchmark for 14 consecutive quarters.





**ANSWER:** Denied.

53.     All of the above returns data was available in real time to Defendants at the moments when they decided to retain the American Beacon Fund.  As discussed above, active managers face an uphill battle to provide value by consistently beating their benchmarks and compensating for fees higher than those funds that simply track the benchmark.  When an investment option's track record is so poor, as it is here, prudent fiduciaries should necessarily replace the fund with an alternative that has demonstrated the ability to consistently outperform the benchmark, or, at the very least, retain an alternative that tracks the benchmark.  For example, there is a Vanguard Russell 2000 Value Index Fund that simply tracks the Russell 2000

Value Index, with a very low expense ratio of eight basis points (0.08%) for the Institutional share class. While participants should have had the option to achieve the index's returns at minimal cost, Defendants' imprudence in retaining the American Beacon Fund instead forced participants in that fund to pay a much higher 83 basis points (0.83%)—just to consistently lag the index.

**ANSWER:** Denied.

54. There were also several other prudent available actively managed funds that Defendants could have chosen for the Plan instead of the American Beacon Fund, including the MFS New Discovery Value Fund ("MFS") or the Victory Sycamore Small Company Opportunity Fund ("Victory"). By the end of the Third Quarter of 2019, the American Beacon Fund's three- and five-year annualized returns had trailed the Russell 2000 Value Index for four consecutive quarters. Yet over the same periods, the MFS Fund's three- and five-year returns exceeded the index by at least 1.00% annualized each quarter-end, and the Victory Fund's three- and five-year returns beat the index by at least 1.08% annualized each quarter-end. As of the end of the Third Quarter of 2019, the MFS Fund's three- and five-year returns exceeded those of the benchmark by 4.83% and 3.41% annualized, respectively, while the Victory Fund's three- and five-year returns beat the benchmark by 5.07% and 4.34% annualized, respectively. Both the MFS and Victory Funds remained considerably better active domestic small cap value funds than the American Beacon Fund throughout the Class Period. Defendants' failure to replace the American Beacon Fund with these or other superior alternatives was a breach of fiduciary duty.

**ANSWER:** Denied.

ii.   The DFA International Small Cap Value Fund

55. The DFA International Small Cap Value Fund Class I ("DFA") has also consistently and significantly underperformed its benchmark, the MSCI World Ex US Small Value Index, on a rolling three- and five-year annualized basis. Again, the Committee neglected to follow a prudent investment evaluation process and ignored this negative trend. At their meetings during the Class Period, Committee members had access to the below returns data in real time, which would have been sufficient to convince a fiduciary following a prudent process that the DFA Fund should be removed:

- By the end of the Fourth Quarter of 2018, the DFA Fund's trailing returns fell below those of its benchmark and its performance ranked poorly compared to its peers (funds in the same Morningstar category) on both a three- and five-year basis. Specifically, as of the end of the Fourth Quarter of 2018, the DFA Fund's three- and five-year annualized returns trailed those of its benchmark by 2.61% and 0.97%, respectively, and ranked in the 78th and 55th percentile among its peers, respectively. While this was the first quarter-end at which the five-year return fell below the benchmark and into the bottom half of peers, the Fund's three-year returns had failed both performance measures for the previous two quarters, beginning as of the end of the Second Quarter of 2018.

- As of the end of the First Quarter of 2019, the DFA Fund's three- and five-year annualized returns trailed those of its benchmark by 2.16% and 1.49%, respectively, and ranked in the 84th and 70th percentile among its peers, respectively.

- As of the end of the Second Quarter of 2019, the DFA Fund's three- and five-year annualized returns trailed those of its benchmark by 2.00% and 1.36%, respectively, and ranked in the 77th and 66th percentile among its peers, respectively.

- As of the end of the Third Quarter of 2019, the DFA Fund's three- and five-year annualized returns trailed those of its benchmark by 2.78% and 1.60%, respectively, and ranked in the 74th and 55th percentile among its peers, respectively.

**ANSWER:** Denied.

56.     At this point, consistent with regular monitoring duties, the Committee should have reviewed at least *four consecutive quarters* of deplorable returns by the DFA Fund.  But these indicators were ignored, and the poor returns persisted, further harming participant retirement accounts:

- As of the end of the Fourth Quarter of 2019, the DFA Fund's three- and five-year annualized returns trailed those of its benchmark by 3.33% and 1.56%, respectively, and ranked in the 82nd and 65th percentile among its peers, respectively.

- As of the end of the First Quarter of 2020, the DFA Fund's three- and five-year annualized returns trailed those of its benchmark by 4.04% and 2.20%, respectively, and ranked in the 81st and 74th percentile among its peers, respectively.

- As of the end of the Second Quarter of 2020, the DFA Fund's three- and five-year annualized returns trailed those of its benchmark by 3.33% and 2.17%, respectively, and ranked in the 77thth and 78th percentile among its peers, respectively.

- As of the end of the Third Quarter of 2020, the DFA Fund's three- and five-year annualized returns trailed those of its benchmark by 3.80% and 2.34%, respectively, and ranked in the 82nd and 78th percentile among its peers, respectively.

**ANSWER:** Denied.

57.     At this point, the DFA Fund's three- and five-year returns had trailed the benchmark and ranked in the bottom half of its peers for *eight consecutive quarters*. Inexplicably, the Committee continued to ignore the DFA Fund's pitiful performance, and the

Fund has continued to underperform its benchmark and peer group through the filing of this Complaint:

- As of the end of the Fourth Quarter of 2020, the DFA Fund's three- and five-year annualized returns trailed those of its benchmark by 3.69% and 2.54%, respectively, and ranked in the 77th and 82nd percentile among its peers, respectively.

- As of the end of the First Quarter of 2021, the DFA Fund's three- and five-year annualized returns trailed those of its benchmark by 3.48% and 2.05%, respectively, and ranked in the 78th and 75th percentile among its peers, respectively.

- As of the end of the Second Quarter of 2021, the DFA Fund's three- and five-year annualized returns trailed those of its benchmark by 3.03% and 1.75%, respectively, and ranked in the 82nd and 70th percentile among its peers, respectively.

- As of the end of the Third Quarter of 2021, the DFA Fund's three- and five-year annualized returns trailed those of its benchmark by 2.63% and 1.97%, respectively, and ranked in the 75th and 73rd percentile among its peers, respectively.

- As of the end of the Fourth Quarter of 2021, the DFA Fund's three- and five-year annualized returns trailed those of its benchmark by 0.96% and 2.10%, respectively, and its five-year return ranked in the 77th percentile among its peers.

- As of the end of the First Quarter of 2022, the DFA Fund's three- and five-year annualized returns trailed those of its benchmark by 0.63% and 2.18%, respectively, and its five-year return ranked in the 72nd percentile among its peers.

- As of the end of the Second Quarter of 2022, the DFA Fund's five- year annualized return trailed that of its benchmark by 1.61% and ranked in the 63rd percentile among its peers.





**ANSWER:** Denied.

58.     All of the above returns data was available in real time to Defendants at the moments when they decided to retain the DFA Fund.  When an investment option's track record is so apparently poor, as it was here, prudent fiduciaries should necessarily replace the fund with an alternative that has demonstrated the ability to consistently outperform the benchmark, or, at the very least, retain an alternative that tracks the benchmark.  Although there were no readily available index funds that track the DFA Fund's benchmark, there were several other prudent available actively managed alternatives that Defendants could have selected for the Plan in place of the DFA Fund including, for example, the AMG Yacktman Special Opportunities Fund ("AMG") or the Transamerica International Small Cap Value Fund ("Transamerica").  By the end of the Third Quarter of 2019, the DFA Fund's three- and five-year annualized returns trailed those of its benchmark for four consecutive quarters and ranked no higher than the 74th and 55th

percentile, respectively, among foreign small/mid cap value funds. As of that same quarter-end, the AMG Fund's three- and five-year returns ranked in the 1st and 4th percentile, respectively, among that same peer group, and the Transamerica Fund's three- and five-year returns ranked in the 13th and 11th percentile, respectively. Throughout the Class Period, both the AMG and Transamerica Funds remained considerably better active foreign small cap value funds than the DFA Fund. Defendants' failure to replace the DFA Fund with better performing alternatives was a severe breach of fiduciary duty.

**ANSWER:** Denied.

## V.    ERISA'S FIDUCIARY STANDARDS

59.    ERISA imposes strict fiduciary duties of loyalty and prudence on the Defendants as fiduciaries of the Plan. Section 404(a) of ERISA, 29 U.S.C. § 1104(a), states, in relevant part, as follows:

> [A]    fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and -
>
> (A)    for the exclusive purpose of
>
> > (i)    providing benefits to participants and their beneficiaries; and
> >
> > (ii)    defraying reasonable expenses of administering the plan;
>
> [and]
>
> (B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

**ANSWER**: Paragraph 59 asserts legal conclusions that require no response. To the extent a response is required, Defendants admit that Paragraph 59 purports to characterize the terms of 29 U.S.C. § 1104(a) but deny any characterization contrary to the terms of the cited statute. Defendants deny any remaining allegations in Paragraph 59.

60.    Under 29 U.S.C. § 1103(c)(l), as relevant here, the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to plan participants and their beneficiaries and defraying reasonable expenses of administering the plan.

**ANSWER**: Paragraph 60 asserts legal conclusions that require no response. To the extent a response is required, Defendants admit that Paragraph 60 purports to characterize the

terms of 29 U.S.C. § 1103(c)(1) but deny any characterization contrary to the terms of the cited

statute.  Defendants deny any remaining allegations in Paragraph 60.

61.     Under ERISA, parties that exercise any authority or control over plan assets,
including the selection of plan investments and service providers, are fiduciaries and must act
prudently and solely in the interest of participants in a plan.

**ANSWER**: Paragraph 61 asserts legal conclusions that require no response.  To the

extent a response is required, Defendants admit that Paragraph 61 purports to characterize certain

fiduciary responsibilities under ERISA but deny any characterization contrary to the terms of the

statute.  Defendants deny any remaining allegations in Paragraph 61.

62.     ERISA's fiduciary duties are "the highest known to the law" and must be
performed "with an eye single" to the interests of participants.  *Donovan v. Bierwirth*, 680 F.2d
263, 271, 272 n.8 (2d Cir. 1982).

**ANSWER**: Paragraph 62 asserts legal conclusions that require no response.  To the

extent a response is required, Defendants admit that Paragraph 62 purports to quote from and

characterize judicial decisions, which speak for themselves.  To the extent a response is required,

Defendants deny any characterization contrary to the terms of those judicial decisions.

Defendants deny any remaining allegations in Paragraph 62.

63.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries.  Section
405(a) of ERISA, 29 U.S.C. § 1105(a), provides a cause of action against a fiduciary for
knowingly participating in a breach by another fiduciary and knowingly failing to cure any
breach of duty.  Specifically, Section 405(a) of ERISA states:

> In addition to any liability which he may have under any other provision of this
> part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary
> responsibility of another fiduciary with respect to the same plan in the following
> circumstances:
>
> (1)     if he participates knowingly in, or knowingly undertakes to conceal,
>         an act or omission of such other fiduciary, knowing such act or
>         omission is a breach; or
>
> (2)     if, by his failure to comply with section 404(a)(l) in the
>         administration of his specific responsibilities which give risk to his

status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

**ANSWER**: Paragraph 63 asserts legal conclusions that require no response.  To the extent a response is required, Defendants admit that Paragraph 63 purports to characterize the terms of 29 U.S.C. § 1105(a) but deny any characterization contrary to the terms of the cited statute. Defendants deny any remaining allegations in Paragraph 63.

64.    Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under Section 409, 29 U.S.C. § 1109.  Section 409(a) of ERISA states, in relevant part:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

**ANSWER**: Paragraph 64 asserts legal conclusions that require no response.  To the extent a response is required, Defendants admit that Paragraph 64 purports to characterize the terms of 29 U.S.C. § 1132(a)(2) and 29 U.S.C. § 1109 but deny any characterization contrary to the terms of the cited statute.  Defendants deny any remaining allegations in Paragraph 64.

## VI.    CLASS ALLEGATIONS

65.    This action is brought as a class action by Plaintiffs on behalf of themselves and the following proposed Class:

All participants and beneficiaries in the Quanta Services, Inc. 401(k) Savings Plan at any time on or after September 26, 2016, and continuing to the date of judgment, or such earlier date that the Court determines is appropriate and just, including any beneficiary of a

deceased person who was a participant in the Plan at any time during
the Class Period.

Excluded from the Class are Defendants and the Judge to whom this case is assigned or any other
judicial officer having responsibility for this case who is a beneficiary.

**ANSWER**: Defendants admit that Plaintiffs purport to sue on behalf of the proposed

class as defined in Paragraph 65 but deny that class treatment is appropriate.  Except as expressly

admitted, Defendants deny any remaining allegations of Paragraph 65.

66.     This action may be maintained as a class action under Rule 23 of the Federal
Rules of Civil Procedure.

**ANSWER**: Denied.

67.     **Numerosity**.  Plaintiffs are informed and believe that there are at least thousands
of Class members throughout the United States.  As a result, the members of the Class are so
numerous that their individual joinder in this action is impracticable.

**ANSWER**: Denied.

68.     **Commonality**.  There are numerous questions of fact and/or law that are common
to Plaintiffs and all the members of the Class, including the following:

(a)     Whether Defendants failed and continue to fail to discharge their duties with
respect to the Plan solely in the interest of the Plan's participants for the
exclusive purpose of providing benefits to participants and their
beneficiaries;

(b)     Whether Defendants breached their fiduciary duties under ERISA by failing
to defray the reasonable expenses of administering the Plan; and

(c)     Whether and what form of relief should be afforded to Plaintiffs and the
Class.

**ANSWER**: Denied.

69.     **Typicality**.  Plaintiffs, who are members of the Class, have claims that are typical
of all members of the Class.  Plaintiffs' claims and all Class members' claims arise out of the
same uniform course of conduct by Defendants and arise under the same legal theories
applicable to all Class members.  In addition, Plaintiffs seek relief for the Plan under the same
remedial theories that are applicable to all Class members.

**ANSWER**: Denied.

70.     **Adequacy of Representation**.  Plaintiffs will fairly and adequately represent the

interests of all Class members.  Plaintiffs have no conflicts of interest with other Class members and no interests that are different from any other Class other members.  Plaintiffs have retained competent counsel experienced in class action and other complex litigation, including ERISA class actions.

**ANSWER**: Denied.

71.    **Potential Risks and Effects of Separate Actions**.  The prosecution of separate actions by individual Class members would create a risk of: (A) inconsistent or varying adjudications for individual Class members that would establish incompatible standards of conduct for Defendants; or (B) adjudications for individual class members that, as a practical matter, would be dispositive of the interests of other Class members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

**ANSWER**: Denied.

72.    **Predominance**.  Common questions of law and fact predominate over questions affecting only individual Class members, and the Court and the parties will spend most of their time working to resolve these common issues.  Indeed, virtually the only individual issues of significance will be the exact amount of damages recovered by each Class member, the calculation of which will ultimately be a ministerial act and which does not bar Class certification.

**ANSWER**: Denied.

73.    **Superiority**.  A class action is superior to all other feasible alternatives for the resolution of this matter.  The vast majority of, if not all, Class members are unaware of Defendants' breaches of fiduciary duty and prohibited transactions such that they will never bring suit individually.  Further, even if they were aware of their claims against Defendants, the claims of virtually all Class members would be too small to economically justify in individual litigation.  Finally, individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the courts and the parties, and potentially could lead to inconsistent results that would be contrary to the interests of justice.

**ANSWER**: Denied.

74.    **Manageability**.  This case is well-suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a Class-wide basis, while the allocation and distribution of damages to Class members would be essentially a ministerial function.

**ANSWER**: Denied.

75.    Defendants have acted on grounds generally applicable to the Class by uniformly subjecting them to the breaches of fiduciary duty described above.  Thus, injunctive relief, as well as legal and/or equitable monetary relief (such as disgorgement and/or restitution), along with corresponding declaratory relief, are appropriate for the Class as a whole.

**ANSWER**: Denied.

76.     Plaintiffs' counsel will fairly and adequately represent the interests of the Class and are best able to represent the interests of the Class under Rule 23(g) of the Federal Rules of Civil Procedure.  Moreover, treating this case as a class action is superior to proceeding on an individual basis and there will be no difficulty in managing this case as a class action.

**ANSWER**: Denied.

77.     Therefore, this action should be certified as a class action under Rules 23(a), and 23(b)(1), or 23(b)(3) of the Federal Rules of Civil Procedure.

**ANSWER**: Denied.

## COUNT I
### (For Breach of Fiduciary Duty)

78.     Plaintiffs incorporate by reference the allegations in the previous paragraphs.

**ANSWER**:  Defendants restate and incorporate their answers to all prior allegations as

though fully set forth herein.

79.     Defendants' conduct, as set forth above, violates their fiduciary duties under Sections 404(a)(1)(A), (B), and (D) of ERISA, 29 U.S.C. § 1104(a)(1)(A), (B), and (D), in that Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries, and (ii) defraying reasonable expenses of administering the Plan with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (c) by failing to act in accordance with the documents and instruments governing the Plan. Defendants also violated their respective fiduciary duties under ERISA by failing to monitor other fiduciaries of the Plan in the performance of their duties.

**ANSWER**: Denied.

80.     To the extent any Defendant did not directly commit any breach of fiduciary duty, each such Defendant is liable under 29 U.S.C. § 1105(a) because he, she, they, or it was a co-fiduciary and knowingly participated in, or concealed, a breach of fiduciary duty by another fiduciary, enabled another fiduciary to commit breaches of fiduciary duty in the administration of his, her, their, or its specific responsibilities giving rise to his, her, their, or its fiduciary status, or knowingly failed to cure a breach of fiduciary duty by another fiduciary and failed to take reasonable efforts to remedy the breach.

**ANSWER**: Denied.

81.     As a direct result of Defendants' breaches of fiduciary duties, the Plan has suffered losses and damages.

**ANSWER**: Denied.

82.     Under Sections 409 and 502(a)(2) of ERISA, 29 U.S.C. §§ 1109 and 1132, Defendants are liable to restore to the Plan the losses that have been suffered as a direct result of Defendants' breaches of fiduciary duty and are liable for damages and any other available equitable or remedial relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs, and other recoverable expenses of litigation.

**ANSWER**: Denied.

## <u>COUNT II</u>
### (Failure to Monitor Fiduciaries and Co-Fiduciary Breaches)

83.     Plaintiffs incorporate by reference the allegations in the previous paragraphs.

**ANSWER**:  Defendants restate and incorporate their answers to all prior allegations as

though fully set forth herein.

84.     Quanta is responsible for appointing, overseeing, and removing members of the Administrative Committee, who, in turn, are responsible for appointing, overseeing, and removing members of the Committee.

**ANSWER**:  Paragraph 84 asserts legal conclusions that require no response.  To the

extent a response is required, Defendants admit that appointments to the Administrative

Committee are made by Quanta.  Defendants deny the remaining allegations in Paragraph 84.

85.     In light of its appointment and supervisory authority, Quanta had a fiduciary duty to monitor the performance of the Committee and its members.  Quanta and the Administrative Committee also had a fiduciary duty to monitor the performance of the members of the Committee.

**ANSWER**: Paragraph 85 asserts legal conclusions that require no response.  To the

extent a response is required, Defendants deny the allegations in Paragraph 85.

86.     A monitoring fiduciary must ensure that the monitored fiduciaries perform their fiduciary obligations, including those related to the investment and holding of Plan assets, and must take prompt and effective action to protect the Plan and its participants when the monitored fiduciaries do not perform their fiduciary obligations.

**ANSWER**: Paragraph 86 asserts legal conclusions that require no response.  To the extent a response is required, Defendants deny the allegations in Paragraph 86.

87.     To the extent that any fiduciary monitoring responsibilities of Quanta or the Committee were delegated, each Defendant's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

**ANSWER**:  Paragraph 87 asserts legal conclusions that require no response.  To the extent a response is required, Defendants deny the allegations in Paragraph 87.

88.     Quanta and the Committee breached their fiduciary monitoring duties by:

    (a)     Failing to monitor and evaluate the performance of their appointees or have a system in place for doing so, standing idly by as the Plan suffered enormous losses due to the appointees' imprudent actions and omissions related to the Plan;

    (b)     Failing to monitor their appointees' fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein, in violation of ERISA; and

    (c)     Failing to remove appointees whose performances were inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments in the Plan, all to the detriment of the Plan and its participants' retirement savings.

**ANSWER**:  Denied.

89.     Due to these breaches of fiduciary duty to monitor, the Plan suffered substantial losses.  Had Quanta and the Committee discharged their fiduciary monitoring duties prudently, the losses suffered by the Plan would have been avoided or minimized.  Therefore, as a direct result of the breaches of fiduciary duties alleged herein, the Plan and its participants lost millions of dollars of retirement savings.

**ANSWER**:  Denied.

90.     Quanta and the Committee are liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties, are liable to restore to the Plan any profits made through use of Plan assets, and are subject to other equitable or remedial relief as appropriate.

**ANSWER**:  Denied.

91.     Each Defendant also knowingly participated in the breaches of fiduciary duty by the other Defendants, knowing that such acts constituted breaches; enabled the other Defendants

to commit breaches of fiduciary duty by failing to lawfully discharge their own fiduciary duties; and knew of the breaches of fiduciary duty by the other Defendants and failed to make any reasonable effort under the circumstances to remedy those breaches.  Defendants are thus liable for the losses caused by the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

**ANSWER**:  Denied.

## COUNT III
### (In the Alternative, Liability for Knowing Breach of Trust)

92.     Plaintiffs incorporate by reference the allegations in the previous paragraphs.

**ANSWER**:  Defendants restate and incorporate their answers to all prior allegations as

though fully set forth herein.

93.     Alternatively, to the extent that any Defendant is not deemed to be a fiduciary or co-fiduciary under ERISA, each such Defendant should be enjoined or otherwise subject to equitable relief as a non-fiduciary from further participating in a knowing breach of trust.

**ANSWER**:  Denied.

94.     To the extent any Defendant is not deemed to be a fiduciary or is not deemed to be acting as a fiduciary, any such Defendant is liable for the conduct at issue here, since all Defendants possessed the requisite knowledge and information to avoid the fiduciary breaches at issue here and knowingly participated in these breaches of fiduciary duty by permitting the Plan to offer a menu of imprudent investment options and pay excessive recordkeeping and administrative fees, all of which was unjustifiable in light of the size and characteristics of the Plan.

**ANSWER**:  Denied.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves, the Class and the Plan, demand judgment against Defendants for the following relief:

(a)     Declaratory and injunctive relief under Section 502 of ERISA, 29 U.S.C. § 1132, as detailed above;

(b)     Equitable, legal, or remedial relief to return all losses to the Plan and/or for restitution and/or damages as stated above, plus all other equitable or remedial relief as the Court may deem appropriate under Sections 409 and 502 of ERISA, 29 U.S.C. §§ 1109 and 1132;

(c)     Pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity;

(d)     Attorneys' fees, costs, and other recoverable expenses of litigation; and

(e)     Such further and additional relief to which the Plan may be justly entitled and the Court deems appropriate and just under all of the circumstances.

**ANSWER**:  Defendants deny the allegations set forth in each and every paragraph of the Prayer for Relief, including subparts (a) through (e), and deny that Plaintiffs, the Plan, or any members of the putative class are entitled to the relief sought in each and every paragraph of the Prayer for Relief, including subparts (a) through (e), or any other relief whatsoever.

## <u>NOTICE PURSUANT TO ERISA § 502(h)</u>

To ensure compliance with the requirements of Section 502(h) of ERISA, 29 U.S.C. § 1132(h), the undersigned affirms that, on this date, a true and correct copy of this Complaint was served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, return receipt requested.

**ANSWER**:  Plaintiffs' "Notice" requires no response.  To the extent a response is required, Defendants lack sufficient information to admit or deny the allegations of Plaintiffs' "Notice," and on that basis, deny them.

*          *          *

For avoidance of doubt, Defendants deny any and all other allegations of the Complaint that were not previously admitted or otherwise responded to.

## DEFENSES AND AFFIRMATIVE DEFENSES

Without assuming the burden of proof on any matters that would otherwise rest with Plaintiffs, and while expressly denying any and all wrongdoing, Defendants assert the following defenses and affirmative defenses to the Complaint:

## FIRST DEFENSE

One or more of the Defendants are not, or were not acting as, fiduciaries within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), with respect to certain conduct alleged and challenged by Plaintiffs.

## SECOND DEFENSE

The claims of Plaintiffs and the members of the putative class against Defendants may be barred in whole or in part by the applicable statutes of repose or limitations, including but not limited to ERISA § 413, 29 U.S.C. § 1113.

## THIRD DEFENSE

The claims of Plaintiffs and/or other members of the putative class are barred, in whole or in part, by their lack of standing.

## FOURTH DEFENSE

The claims of Plaintiffs and/or other members of the putative class may be subject to arbitration.

## FIFTH DEFENSE

Defendants are relieved of any alleged liability based on the Plan participants' exercise of control over their individual accounts pursuant to ERISA § 404(c), 29 U.S.C. § 1104(c), and/or because neither the Plaintiffs, the Plan, nor anyone else suffered a loss as a result of the actions or inactions of Defendants under ERISA § 404(c).

## SIXTH DEFENSE

Any losses alleged by Plaintiffs were not caused by any alleged breach of fiduciary duty by Defendants, as set forth in ERISA § 409(a), 29 U.S.C. § 1109(a) and elsewhere, but resulted from economic causes and events not related to any alleged breaches of fiduciary duty and from matters over which Defendants had no control.

## SEVENTH DEFENSE

Defendants engaged in a prudent process to select and monitor the performance and costs of the Plan's investment options.

## EIGHTH DEFENSE

The Plans' investment options were substantively and objectively prudent.

## NINTH DEFENSE

The Plans' investment options were selected solely in the interest of the participants and beneficiaries and not to obtain a benefit for Defendants.

## TENTH DEFENSE

Plaintiffs are not entitled to certification of this action as a class action because they cannot satisfy the requirements of Federal Rule of Civil Procedure 23(a) or (b).

## ELEVENTH DEFENSE

The claims of Plaintiffs and/or any other members of the putative class who have executed a waiver or release of claims against any or all Defendants may be barred by that waiver or release of claims.

\*          \*          \*

Defendants presently have insufficient knowledge or information to form a belief as to whether there are additional defenses or affirmative defenses than those stated above and have

not knowingly or intentionally waived any applicable defenses or affirmative defenses. Defendants explicitly reserve the right to assert and rely upon such other defenses as additional information becomes available during discovery proceedings or otherwise. Defendants further reserve the right to amend this Answer and their defenses accordingly, as well as the right to remove defenses they determine are not applicable, as additional information becomes available during discovery proceedings or otherwise.

\*          \*          \*

WHEREFORE, having answered the Complaint in its entirety, Defendants pray for judgment as set forth below:

    a.  An order dismissing Plaintiffs' claims with prejudice;

    b.  An order awarding costs to Defendants; and

    c.  Any such other and further relief as this Court deems just and proper.

Dated: October 13, 2023        Respectfully submitted,

**MORGAN, LEWIS & BOCKIUS LLP**

_/s/ Jeremy P. Blumenfeld_____
Jeremy P. Blumenfeld, _Admitted Pro Hac Vice_
Attorney-In-Charge
Pennsylvania Bar No. 85955
1701 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-5000
_jeremy.blumenfeld@morganlewis.com_

David J. Levy
Texas Bar No. 12264850
S.D. Tex. No. 13725
1000 Louisiana Street, Suite 4000
Houston, Texas 77002
Telephone: (713) 890-5000
_david.levy@morganlewis.com_

## **CERTIFICATE OF SERVICE**

The undersigned counsel certifies that a true and correct copy of the foregoing document

was served via the Court's ECF/CM e-filing system to all counsel of record on October 13, 2023.

*/s/ Jeremy P. Blumenfeld*
Jeremy P. Blumenfeld