UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **MARY LALIBERTE and MARIE MCKNIGHT**, individually and as representatives of a class of similarly situated persons, on behalf of the **QUANTA SERVICES, INC. 401(K) SAVINGS PLAN**, | § § § § § § § § § § § § § § § | |
| **Plaintiffs,** | | Case No: 4:22-cv-03290 (AHB) |
| | | Oral Argument Requested |
| **v.** | | |
| **QUANTA SERVICES, INC.,** | | |
| **Defendant.** | | |

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT

Defendant Quanta Services, Inc. ("Quanta"),[1] by and through the undersigned counsel, submits this motion for summary judgment, and accompanying memorandum of law, on Plaintiffs' Class Action Complaint (Dkt. 1) ("Complaint" or "Compl.").

### PRELIMINARY STATEMENT

Plaintiffs accuse Quanta of breaching its fiduciary duties under the Employee Retirement Income Security Act ("ERISA") by offering three allegedly imprudent investment options (1) the actively managed Fidelity Freedom Funds ("Freedom Funds"), (2) the American Beacon Small Cap Value Fund R6 Class ("American Beacon Fund"), and (3) the DFA International Small Cap

---

[1] Quanta is the only remaining defendant in this matter. Dkt. 71 at 3 n.1; *see also* Dkt. 55.

1

Value I Fund ("DFA Fund") (collectively "the Challenged Investments") in the Quanta Services, Inc. 401(k) Savings Plan ("Plan"). "Plaintiffs contend that the Challenged Investments are 'objectively imprudent investment options.'" Order, Dkt. 53 at 2 (quoting Dkt. 40 at 5-7). As this Court explained in denying Quanta's motion to dismiss the Complaint, "[t]o allege a breach of fiduciary duty under ERISA, Plaintiffs must show that Defendants breached their duties of prudence and/or loyalty under ERISA, resulting in losses to the participants of the plan." *Id.* at 3 (citations and quotations omitted); *see also McDonald v. Provident Indem. Life Ins. Co.*, 60 F.3d 234, 237 (5th Cir. 1995). The record undisputedly establishes that Plaintiffs cannot carry their burden on either breach or loss. Summary judgment is appropriate for those two, different reasons.

*First*, it is undisputed that the Plan suffered no losses from any of the Challenged Investments. Plaintiffs proffered an expert report from Dr. Adam Werner ("Dr. Werner") in which he opined that the Plan suffered "no losses" from the American Beacon and DFA Funds, and his calculations show this is true both now *and* when Plaintiffs filed this lawsuit in September 2022.[2] At deposition, Dr. Werner conceded that the Plan actually experienced approximately $4 million in gains from those two funds as compared to the "prudent" funds Plaintiffs say a prudent fiduciary would have offered instead. *See infra* at IV.B, IV.C. No losses resulted from these two funds.

The same is true as to the Freedom Funds. Quanta acknowledges that with respect to the Freedom Funds—what the Complaint calls the "Active Suite"—Dr. Werner's Report states that the Plan experienced $20,139,166 in "losses" as of June 2024. Undisputedly, this conclusion is wrong. **At deposition, Dr. Werner admitted that he reached this conclusion because he did not**

---

[2] Quanta is filing a separate Rule 12(b)(1) motion to dismiss for lack of Article III standing on the grounds that Plaintiffs have suffered no injury-in-fact that would be redressable to them on their claims for damages, and that Plaintiffs, as former participants in the Plan, lack Article III standing to seek any prospective injunctive relief.

2

***know when he wrote his Report (or was deposed) that the Freedom Funds had been removed from the Plan in April 2021***. That oversight resulted in a critical miscalculation of so-called Plan "losses." As of April 2021 when the Freedom Funds were removed from the Plan, Dr. Werner's calculations show that the Plan experienced millions of dollars in gains—not losses—from the Freedom Funds. Dr. Werner further admitted in his deposition that "as an economics matter," the Plan's losses (or gains) from any Challenged Investment end as of the date that fund is removed from the Plan. Plaintiffs agree. In their motion for class certification, Plaintiffs asserted "[t]he Plan's losses can be determined by measuring the difference between the terminal balances in the Challenged Investments and the terminal balances that the Plan would have experienced if the Challenged Investments had been replaced by a suitable alternative investment." Dkt. 71 at 5. And so do courts. *Donovan. v. Bierwirth*, 754 F.2d 1049, 1057 (2d Cir. 1985) (measuring damages in ERISA breach of fiduciary duty case, holding "[h]erein, there was an actual sale of the [challenged] securities, and therefore the amount realized on the sale should be compared with the earnings, if any, that would have been realized through alternative investment *over the same period of time*") (emphasis added). Dr. Werner's subsequent loss calculations—the *entire* $20,139,166—flow from April 2021 through June 2024, and are based on the Plan's holdings and performance of an entirely different set of funds, the FIAM Blend Funds. There is no dispute that the FIAM Blend Funds are irrelevant here: Plaintiffs do not challenge the FIAM Blend Funds in their Complaint, Plaintiffs do not allege that they ever invested in the FIAM Blend Funds, and none of their experts criticize the FIAM Blend Funds. *See generally* Compl.

Dr. Werner's admissions are fatal to Plaintiffs' claims. It is undisputed that the Plan suffered no losses as a result of the actual Challenged Investments, even according to Plaintiffs' own expert. Their breach of fiduciary claim fails. *McDonald*, 60 F.3d at 237 (claim for breach of

fiduciary duty failed because plaintiffs did not prove a loss to the plan). For this reason alone, summary judgment is appropriate.

*Second*, although the Court need not even reach this issue, summary judgment is warranted as to Plaintiffs' challenge to the Freedom Funds for another, independent reason. In the Complaint, Plaintiffs alleged that the Freedom Funds were imprudent investments for a host of reasons, for example, because they were more expensive and riskier than the passively managed Fidelity Freedom Index TDFs[3] ("Index Suite"), were comprised of underlying funds that performed poorly or had an insufficient track record, had a "chaotic glide path[]," and lost investor confidence. Compl. ¶¶ 29-48. Plaintiffs have now abandoned these criticisms, and it is undisputed that none of their experts criticize the Freedom Funds on these grounds.

Instead, in discovery, Plaintiffs levy just a single criticism of the Freedom Funds—their experts opine that Quanta should have removed the Freedom Funds as of January 1, 2017, based on their performance as of the fourth quarter 2016. But Plaintiffs' new theory is notably absent from the Complaint, and this timing is important. Underperformance alone cannot form the basis of a fiduciary breach claim, and this Court relied on Plaintiffs' other criticisms (all now abandoned) of the Freedom Funds in denying the motion to dismiss. Moreover, the class period in this case *starts* on September 26, 2016, yet Plaintiffs do not identify any flawed *process* by Quanta between September 26, 2016, and January 1, 2017. Plaintiffs' process expert, Donald C. Stone ("Mr. Stone"), does not identify any information that Quanta should have considered in that twelve-week period but did not. Although Plaintiffs may disagree with the *outcome* of the fiduciary process— the decision to retain the Freedom Funds as of January 1, 2017—that itself does not create a triable fact as to a flawed *process*. The Supreme Court has instructed that "courts *must* give due regard to

---

[3] TDFs stands for "target date funds."

4

the range of reasonable judgments a fiduciary may make." *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022) (emphasis added). Courts routinely grant summary judgment in these circumstances, and this Court should do the same. *See, e.g.*, *In re Quest Diagnostics Inc. ERISA Litig.*, 2024 WL 4285163, at *18-19 (D.N.J. Sept. 25, 2024), *appeal docketed*, No. 24-2866 (3d Cir. Oct. 10, 2024) ("that the Freedom Funds [] fell short of their benchmarks does not indicate that a prudent fiduciary, even knowing of the underperformance, would have removed the funds sooner").

For these reasons, and those explained below, Quanta is entitled to summary judgment.

## UNDISPUTED MATERIAL FACTS

### I. PLAINTIFFS' CLAIMS

Plaintiffs assert three claims in their Complaint (1) that Quanta breached its fiduciary duties of prudence and loyalty by offering the Challenged Investments (Compl. ¶¶ 78-82); (2) that Quanta failed to adequately monitor the fiduciaries (*id.* ¶¶ 83-91); and (3) that Quanta is liable as a non-fiduciary who participated in a knowing breach of trust (*id.* ¶¶ 92-94). As alleged, the purported "class period" is six years pre-dating the Complaint—September 26, 2016—through the date of judgment. *Id*. ¶ 1.

Plaintiffs alleged in the Complaint that the Freedom Funds were imprudent investments because they (a) were more expensive than the passively managed Index Suite, (b) were riskier than the Index Suite, (c) were comprised of underlying funds that performed poorly or had an insufficient track record, (d) took "levels of risk that rendered [them] unsuitable for the average retirement investor," (e) engaged in "active asset allocation" and had a "chaotic glide path[]," (f) lost investor confidence; and (g) had poor performance in the first and second quarters of 2016. *Id*. ¶¶ 29-48. Plaintiffs also alleged that the American Beacon and DFA Funds were imprudent investment options in 2019. *Id*. ¶¶ 50, 55. From these alleged breaches of fiduciary duty, Plaintiffs contend in the Complaint that "the Plan suffered enormous losses." *Id*. ¶¶ 88-90.

In discovery, Plaintiffs have proffered three proposed experts in support of their claims.[4] Two of them—Dr. Werner and Mr. Stone—are relevant to this Motion. Dr. Werner purported to calculate the Plan's "losses" based on the following assumptions provided to him by Plaintiffs: (1) the Freedom Funds were "imprudent as of 4Q2016" and should have been replaced by the American Funds TDFs as of January 1, 2017; and (2) the American Beacon and DFA Funds were "imprudent as of 4Q2019" and should have been replaced by the Janus Henderson Small Cap Value N ("Janus Fund") and the Schwab Fundamental International Small Cap Equity Index Fund ("Schwab Fund"), respectively, as of January 1, 2020. Ex. A (Werner Report) ¶ 1; Ex. B (Werner Dep. Tr.) at 105:17-106:1, 118:9-14. At Plaintiffs' request, Dr. Werner ran his calculations through a "terminal date" of June 30, 2024. Ex. A ¶ 1; Ex. B at 30:4-31:12.

Mr. Stone, meanwhile, has purported to opine on whether Quanta's process in monitoring the Challenged Investments was "consistent" with the "standards of conduct applicable to plan fiduciaries in connection with the governance and monitoring of defined contribution plans." Ex. C (Stone Report) ¶ 1. Mr. Stone did not evaluate or opine on any of the allegations in the Complaint about the Freedom Funds' risk, fees, glidepath, etc., or compare the Freedom Funds to the Index Suite referenced throughout the Complaint. *Id*. Nor did Mr. Stone opine that Quanta's fiduciary process should have led to the removal of the Freedom Funds from the Plan by January 1, 2017, or any other date for that matter. Ex. D (Stone Dep. Tr.) at 171:3-21.

---

[4] Simultaneously with this Motion, Quanta is filing motions to exclude the Expert Reports of Mr. Richard Marin ("Mr. Marin") and Mr. Stone. Quanta is entitled to summary judgment, however, regardless of the outcome of those motions to exclude Mr. Marin's and Mr. Stone's expert opinions for the reasons described herein.

## II.  THE PLAN

The Plan is a participant-directed 401(k) plan. Compl. ¶ 19. Over the class period—from September 26, 2016, through the present—the Plan offered approximately 17 different funds covering a variety of asset classes, investment styles, and risk-reward profiles.[5] *E.g.*, Ex. E (2020 Form 5500) at QUANTA_001828. Among other investment options, the Plan offered the American Beacon and DFA Fund from the start of the class period through the present. The Plan offered the actively managed Fidelity Freedom Funds from the start of the class period through April 16, 2021. Ex. F (Letter Agreement re FIAM Blend Funds) at QUANTA_1016-1017. As of that date, the Plan replaced the Fidelity Freedom Funds with a different TDF suite—the Fidelity Institutional Asset Management Blend Target Date Funds ("FIAM Blend Funds"). *Id.*; Ex. G (Q3 2020 Minutes) at QUANTA_004627-28.

Plaintiffs do not challenge the FIAM Blend Funds. The Complaint makes no mention of the FIAM Blend Funds, nor do Plaintiffs' experts opine on the reasonableness of the FIAM Blend Funds or otherwise analyze the FIAM Blend Funds. The opposite is true. Mr. Stone purports to opine on the process that Quanta undertook when monitoring the Challenged Investments, but he limited his opinion to the time period during which Quanta offered the Freedom Funds. He testified: "When [Quanta] got out of the Freedom Funds and ***got into the other*** fidelity funds ***that is where my opinion ends***." Ex. D at 152:3-8 (emphasis added). Dr. Werner, likewise, confirmed that the "actively-managed" Freedom Funds were the only TDFs offered by the Plan that he intended to analyze in his Report, or that Plaintiffs asked him to analyze. Ex. B at 45:21-25 ("Q.

---

[5] For these purposes, Quanta is including the fourteen individual vintages of the Freedom Funds as one "fund."

7

Do you know whether the Plaintiffs are complaining about the Active Suite, the Index Suite, or something else? A. ….it's the Active Suite."); *id*. (Dr. Werner only "analyzed" the "Active Suite").

**III.  THE COMMITTEE ENGAGED IN A PRUDENT FIDUCIARY PROCESS**

The record establishes that Quanta engaged in a prudent fiduciary process during the entirety of the class period. *See generally* Ex. H (Expert Report of Lorie Latham). For purposes of this Motion, however, the Court need not wade through the evidence spanning the duration of that period. Indeed, Plaintiffs' whole case as relevant to the Freedom Funds is limited to about a twelve-week timeframe: September 26, 2016 (start of class period) to January 1, 2017 (when Plaintiffs say the Freedom Funds should have been removed from the Plan). Ex. A ¶ 1.

Yet Plaintiffs point to *no evidence* of an imprudent fiduciary *process* during this twelve-week period. More specifically, Mr. Stone did not identify any specific *procedural* missteps during this narrow timeframe. Nor did Mr. Stone opine that the Freedom Funds' performance mandated removal of the Freedom Funds as of the fourth quarter of 2016; rather he says the Freedom Funds should have merely been on "watch" status. Ex. D at 168:12-171:16.

If anything, Mr. Stone's deposition confirms that the Committee's process with respect to monitoring the Freedom Funds, including during this limited window, was prudent. He testified: (i) the Committee had discretion to determine whether it was appropriate to place a fund on "monitor alert status" (*id*. at 177:18-178:4), (ii) the Committee needed to (and did) consider a host of qualitative and quantitative factors—other than a single metric, performance against benchmark—when monitoring the Freedom Funds, (iii) the Investment Policy Statement ("IPS") did not mandate that the Freedom Funds be on "watch" status as a result of trailing their benchmark (*id*. at 182:19-184:5), and (iv) that the Freedom Funds were performing well relative to their peer groups during this time period (*id*. at 205:15-23).

## IV. PLAINTIFFS' OWN EXPERT CONFIRMS THE PLAN SUFFERED NO LOSSES BY OFFERING THE CHALLENGED INVESTMENTS

Plaintiffs' only "evidence" of purported "loss" to the Plan in connection with the Challenged Investments comes in the form of an opinion of their expert, Dr. Werner. But Dr. Werner's opinions and calculations show that the Plan suffered *no losses* from any of the Challenged Investments, and instead was better off by millions of dollars as compared to the alternative investments Plaintiffs advocate. These admissions doom Plaintiffs' claims.

### A. According to Plaintiffs' Expert, The Freedom Funds Outperformed Plaintiffs' Chosen Comparator Over The Time Period The Freedom Funds Were Offered In The Plan.

Dr. Werner opined in his Report that the Plan purportedly suffered "losses" of $20,139,166 between September 26, 2016, and June 30, 2024, by offering the actively managed Freedom Funds. Ex. A § III. In reaching this conclusion, Dr. Werner made the following assumptions based solely on instructions from counsel: (1) the Freedom Funds were "imprudent" as of the fourth quarter of 2016; (2) the Plan should have removed the Freedom Funds as of January 1, 2017; and (3) the Plan should have replaced the Freedom Funds with the American Funds TDFs. *Id*. ¶ 1. Dr. Werner also assumed, at counsel's instruction, that "the terminal date for all loss calculations for purposes of this Expert Report should be June 30, 2024." *Id*.; Ex. B at 30:4-31:8. Dr. Werner performed no analysis whatsoever beyond these specific instructions from counsel. Ex. B at 76:4-77:12. Indeed, Dr. Werner did not assess the reasonableness of a single one of these assumptions. *Id*. at 31:9-12 ("Q. Did you do anything to assess whether [the terminal date for loss calculations of June 30, 2024] was a reasonable assumption or not. A. I did not."); *see also id*. at 29:3-11, 31:5-12, 33:18-34:13, 36:23-37:1.

To perform the "loss" calculations for the Freedom Funds vis-à-vis the American Funds TDFs, Dr. Werner purported to use the "quarterly balances" and "quarterly return data" of each

9

vintage of the Freedom Funds in the Plan through the first quarter of 2024. Ex. A ¶¶ 9-10. And he then assumed that the second quarter 2024 "quarterly balance data" was the same as the first quarter. *Id.* ¶ 10. Dr. Werner explained that he obtained this data from Plaintiffs' counsel based on documents produced by Quanta:

> For data on the quarterly balances, I obtained from Counsel a set of documents produced by Defendants in this matter ***detailing the quarterly balances of the Plan's investments in each of the Fidelity Freedom TDF Vintages covering the quarters 4Q2015 through 1Q2024.*** Notably, these documents were missing data for 2Q2024. My understanding is that Defendants did not produce quarterly balance data for this quarter. To remediate this missing data, I assume for purposes of this analysis that the last available quarterly balance data in 1Q2024 remained unchanged in 2Q2024.
>
> ***I then obtained quarterly return data for each of the Fidelity Freedom TDF Vintages from the same set of documents from which I obtained quarterly balances.***

*Id*. ¶¶ 9-10 (emphasis added); *see also* Ex. B at 112:18-113:8. To then calculate what the Plan "would have earned" if the Plan had replaced the Freedom Funds with the American Funds TDFs, Dr. Werner compared the "computed cash inflows and outflows of the Fidelity Freedom TDFs from 1Q2017 through 2Q2024" with the quarterly return data for the American Funds TDFs over the same time period. Ex. A ¶ 13. The "losses" suffered by the Plan, according to Dr. Werner's Report, is the "difference in quarterly balances between the Fidelity Freedom TDFs and the American Funds TDFs as of June 30, 2024 (or 2Q 2024)." *Id*. ¶ 14.

Dr. Werner's Report contains a critical error, however. Dr. Werner testified that his calculation worksheets were intended to show the balances *in the Freedom Funds* and the returns *of the Freedom Funds*. Ex. B at 135:16-136:11. And the approximately $20.1 million in claimed "losses" assumes that the Plan offered the Freedom Funds ***through June 30, 2024***. Ex. A ¶ 1; Ex. B at 139:18-19, 94:15-18. But both that assumption and those calculations are wrong. It is undisputed that the Plan removed the Freedom Funds from the Plan *on April 16, 2021* (between

10

the quarter ending on March 31, 2021, and the quarter ending on June 30, 2021). *See supra* at Point II. That means all of Dr. Werner's calculations after that date are based on the returns of the FIAM Blend Funds and the Plan's quarterly balances in the FIAM Blend Funds, not the Freedom Funds. Ex. B at 142:13-20; Ex. J (Q2 2021 Investment Review) at QUANTA_005152. But at the time he submitted the Report, and at the time of his deposition, Dr. Werner was ***not aware*** of this undisputed fact:

> **Q:** ***Dr. Werner, did you know before today that the Fidelity Freedom Funds had been removed from the plan between March of 2021 and June of 2021?***
> **A:** Are you stipulating that that happened?
> **Q:** Did you know?
> **A:** I still don't know
> **Q:** I'm telling you it happened. Did you know that it happened?
> **A:** Not that – I'll take you at your word. ***I don't believe that I knew that.***

Ex. B at 142:21-143:5 (emphasis added).

Dr. Werner testified that he did not actually review the documents produced by Quanta that showed the Plan's quarterly balances and quarterly return data. *Id.* at 104:7-9, 130:23-131:7, 136:5-21. Perhaps that explains Dr. Werner's fatal error, and why Dr. Werner did not know that the quarterly balance data and quarterly return data he was using after April 2021 was ***not*** quarterly balance and quarterly return data for the Freedom Funds that are at issue in this case. Regardless, this mistake unravels the calculations and conclusions in Dr. Werner's Report. In fact, Dr. Werner admitted at deposition that if one of the "assumptions" in his Report is wrong, his purported "loss" calculations would also be wrong. *Id.* at 92:8-24 ("Q. If the court says that the assumptions that are contained in Paragraph 1A of your report are not correct, then the conclusions based on those assumptions would have to be changed; correct? A. I believe that is correct.").

That is precisely the case here, and Dr. Werner explained why at his deposition. As a general economics matter, the Plan's "losses" may fluctuate—including from positive (a showing of loss) to negative (a showing of no loss, e.g., a gain)—from quarter to quarter depending on the

11

performance of the challenged fund vis-à-vis its comparator over that quarter. *Id.* at 105:17-106:20; *see also id.* at 107:20-23 ("The reason that the losses then fluctuate is because the plan continued to be invested in the American Beacon fund and so you can continue to run the analysis? A. Correct."). From there, Dr. Werner admitted—repeatedly—that if the Plan *no longer* offered a fund as of a certain date, any "loss" calculation associated with such fund must, logically, terminate as of that date. Said differently, the Plan's "losses" (or gains) are those that are calculated as of the date the fund is removed from the Plan, not any other date.

An example is illustrative. Dr. Werner, for instance, calculated the "losses" on the American Beacon Fund as of March 31, 2020, to be $942,080 relative to the Janus Fund. *Id.* at 106:7-8. Dr. Werner was then asked at deposition: "[i]f on April 1 of 2020 [the next day], the American Beacon fund was removed from the plan, the plan would have suffered losses, under your methodology, of $942,080; correct?" He answered: "correct." *Id.* at 108:21-25. Dr. Werner also went on to testify:

> **Q:** Once the American fund *is removed from the plan, there wouldn't be any more losses* associated with the American Beacon after that; correct?
> **A:** That's correct.

*Id*. at 109:14-20 (emphasis added); *see also id*. at 110:6-111:11 (same, regarding DFA Fund). In other words, any underperformance (or overperformance) that occurs after a Challenged Investment is removed from the Plan "wouldn't be damages associated with" the Challenged Investment. *Id.*

These principles apply with equal force to the Fidelity Freedom Funds. As explained, the Freedom Funds were replaced with the FIAM Blend Funds on April 16, 2021, meaning any "loss" calculation vis-à-vis the Freedom Funds must end "as an economic matter" on that date. *Id.* at 121:25-124:7, 138:2-139:7. And there is no dispute that the Plan experienced gains—not losses—when comparing the performance of the Freedom Funds to the American Funds TDFs that

12

Plaintiffs claim should have replaced them. Dr. Werner admitted to this fact at deposition. He testified that—based on his own damages calculations—the Plan experienced gains between $4.2 and $7 million by offering the Freedom Funds rather than the American Funds TDFs over the time period the Plan actually held the Freedom Funds:

> **Q:** As of March 31st of 2021, your damages methodology yields damages of negative $4,233,995.89 [for the Fidelity Freedom Funds]; correct?
> **A:** As an economic matter, I believe that that calculation is correct.
> **Q:** And then as of June 30th, 2021, your calculation methodology yields damages of negative $7,062,855.17 [for the Fidelity Freedom Funds]?
> **A:** As an economic calculation, that does sum -- represent the sum of Line 25 or I guess what's labeled Row 19.

*Id.* at 138:22-139:7; *see also id*. at 140:4-10 (testifying that the formula correctly shows the Plan was better off in the Freedom Funds).

Dr. Werner explained at deposition how to account for this fact, as a mathematical matter, using his own spreadsheets and corresponding calculations submitted in the Report. Dr. Werner admitted that to reflect the removal of a fund in his "loss" calculations, the quarterly balances would need to be set to "zero" as of the date of any fund removal. *Id*. at 111:12-16 ("Q. And maybe one way you could show that economically [a fund replacement] is to go into the [fund] balances and change the numbers in [the funds] to zero as of [the removal date]. A. I believe that is correct."). Dr. Werner performed this calculation at his deposition: when the participant quarterly balances in the Freedom Funds were set to "zero" as of March 31, 2021, and June 30, 2021 (the two quarter-ends surrounding the April 16, 2021, removal of the Freedom Funds from the Plan)—the Plan's total "losses" are, respectively, negative $4.2 million and $7 million. *See* Ex. I (Werner Backup Materials)[6] at Tab Exhibit 3 (set participant balances to "zero" as of March 31, 2021, and

---

[6] Ex. I was produced by Dr. Werner as in two Excel spreadsheets. To enable the Court to assess the calculations that Dr. Werner performed at deposition, as described herein, Quanta will separately submit a copy of the Excel spreadsheets in connection with this Motion.

June 30, 2021, to reflect the fact that the Freedom Funds were no longer offered in the Plan) and Tab Exhibit 8 (showing corresponding negative loss calculations after setting participant balances of "zero"); Ex. B at 112:18-20 (Exhibit 3 to Werner Backup shows Fidelity Freedom participant balances); *Id.* at 113:18-114:1 (Exhibit 8 to Werner Backup shows Dr. Werner's "loss" calculations). Dr. Werner admitted at deposition that these calculations are correct under his methodology as reflected in his Report and that "[a]s an economic matter" it is accurate to say that his methodology yields negative damages as of those dates. Ex. B at 137:19-139:4.

What does all this mean? As Dr. Werner readily admitted at deposition, it means that the Plan was actually *better off*—by $4.2 million as of March 31, 2021, and $7 million as of June 30, 2021—as a result of offering the Freedom Funds rather than Plaintiffs' sole comparator, the American Funds TDFs. *Id*. at 137:8-140:10. There is no dispute. Not only did the Plan experience no "losses" as a result of offering the Freedom Funds instead of the American Funds TDFs, as Plaintiffs advocate—it experienced substantial gains. These undisputed facts are fatal to Plaintiffs' challenge to the Freedom Funds. Summary judgment is appropriate.

### B.  Plaintiffs' Expert Concluded That The Plan Experienced No Losses From The American Beacon Fund.

Dr. Werner also calculated the Plan's "losses" associated with the American Beacon Fund. For those calculations, Dr. Werner was asked by Plaintiffs to assume that (1) the American Beacon Fund was imprudent as of the fourth quarter of 2019; and (2) it should have been replaced by the Janus Fund as of January 1, 2020. Ex. A ¶ 1; Ex. B at 29:13-21, 93:21-25.

Dr. Werner concluded that the Plan suffered no losses from the American Beacon Fund and, in fact, was *better off* by about $3.1 million by offering the American Beacon Fund rather than the Janus Fund. *See* Ex. A ¶ 16 ("As of June 30, 2024, there were no losses attributable to Plan participants as a result of Quanta's failure to replace the American Beacon Fund [] with the

14

[Janus Fund]"); Ex. I at Tab Beacon_Losses (showing negative "damages" of $3,147,203); Ex. B at 97:5-10, 99:11-15, 99:25-100:4. Indeed, Dr. Werner testified:

> **Q:** . . . your conclusion that the plan would have been *better off* in the American Beacon fund that was in the plan as compared to the Janus Henderson fund by $3,147,203, correct?
> **A:** Economically, that's correct.

*Id.* at 103:15-21 (emphasis added); *see also id.* at 98:10-14.

### C. Plaintiffs' Expert Concluded That The Plan Experienced No Losses From The DFA Fund.

The same is true with respect to the DFA Fund. Again, Plaintiffs submitted the Report in which Dr. Werner assumed—based on Plaintiffs' instructions—that the DFA Fund should have been replaced with the Schwab Fund as of January 1, 2020. Ex. A ¶ 1; Ex. B at 94:1-6, 77:13-24 (did not conduct any evaluation of the Schwab Fund, aside from performance). Yet Dr. Werner, again, calculated that the Plan experienced *gains* of $834,969 as of June 30, 2024 from the DFA as compared to the Schwab Fund. Ex. I at Tab DFA_Losses (showing negative damages of $834,969); *see also* Ex. B at 101:2-5, 110:6-14 ("Q. As of June 30 of 2024, you calculated negative losses of $834,969; correct? A. Correct."). He testified:

> **Q:** Meaning had the plan made the change that plaintiffs asked you to assume it should have made, the plan would be *worse off* to the tune of $834,969?
> **A:** That's correct.

*Id.* at 101:6-9 (emphasis added).

## LEGAL STANDARD

To prevail on their breach of fiduciary duty claim (Count I), Plaintiffs have to present evidence that: "Defendants breached their duties of prudence and/or loyalty under ERISA, resulting in losses to the participants of the plan." Dkt. 53 at 3 (citations and quotations omitted). *See also McDonald*, 60 F.3d at 237; 29 U.S.C. § 1109(a). As the Fifth Circuit has explained, Plaintiffs must prove both that (1) Quanta "would have acted differently had they engaged in

15

proper monitoring" of the Challenged Investments and that (2) "an alternative course of action could have prevented the Plan's losses." *Kopp v. Klein*, 894 F.3d 214, 221 (5th Cir. 2018). Said differently, "a fiduciary is liable only for 'losses to the plan resulting from' a fiduciary breach." *Id.*; *see also McDonald*, 60 F.3d at 237. There is no triable issue of fact on either element here.

### A. Plaintiffs Offer No Evidence Of Loss To The Plan.

Plaintiffs offered a single piece of evidence to try to show loss to the Plan as a result of offering the Challenged Investments—Dr. Werner's Report. That Report creates no triable issue of fact as to any of the Challenged Investments.

Starting with the American Beacon and DFA Funds, Dr. Werner's Report concedes that the Plan suffered "no loss" as a result of offering those funds. Ex. A at § III ("The Plan suffered ***no losses*** as of June 30, 2024, as a result of Quanta's failure to replace the American Beacon Fund with the [Janus Fund] and Quanta's failure to replace the DFA Fund with the [Schwab Fund]."). That concession is dispositive. *See McDonald*, 60 F.3d at 234 (affirming summary judgment because plaintiffs failed to show loss to the plan); *Best Int'l, U.S.A. v. Tucker and Clark*, 2001 WL 406207, at *5 (N.D. Tex. Apr. 19, 2001) (granting summary judgment in favor of defendant where plaintiff offered no evidence of loss to the plan and therefore failed to raise "a genuine issue of material fact on an element for which it bears the burden of proof at trial").[7]

The same is true with respect to the Freedom Funds. Dr. Werner's deposition testimony confirms that the Plan experienced no losses from the Freedom Funds during the entire time period the Freedom Funds were offered in the Plan. *Supra* at IV.A. Instead, according to Dr. Werner, the

---

[7] Dr. Werner's calculations reflect that there also were no losses when Plaintiffs filed their Complaint or at any time since then. Ex. B at 103:7-21, 106:2-107:11; Ex. I at Beacon_Losses, DFA_Losses.

Plan was better off in the Freedom Funds than the American Funds TDFs from January 1, 2017, until the Freedom Funds were removed from the Plan in April 2021. Dr. Werner testified:

> **Q:** As of March 31st of 2021, your damages methodology [for the Freedom Funds] yields damages of negative $4,233,995.89; correct?
> **A:** As an economic matter, I believe that that calculation is correct.

Ex. B at 138:22-139:1. And Dr. Werner offered no economic analysis or justification as to why he continued his calculations after April 2021 based on the Plan's holdings and performance *of the FIAM Blend Funds*. Instead, he simply performed the calculations that way because Plaintiffs' counsel told him to assume a "terminal date" of June 30, 2024, and because Dr. Werner *did not know* that the Freedom Funds had been removed from the Plan in April 2021. *Supra* at IV.A

It is not surprising that Dr. Werner offers no *economic* justification for continuing his calculations for three years after the Freedom Funds were removed from the Plan. He admits that there is none. *See, e.g.,* Ex. B at 107:25-109:18. And there is no *legal* justification either. The Second Circuit addressed this precise circumstance in one of the leading cases about loss calculations for breach of fiduciary duty claims. In *Donovan*, the Second Circuit recognized that when calculating losses based on differences in investment performance, "the value of each portfolio is likely to vary every business day." 754 F.2d at 1057.

> The question then remains, as of what date should the portfolios be valued? Herein, there was an actual sale of the [challenged] securities, ***and therefore the amount realized on the sale should be compared with the earnings, if any, that would have been realized through alternative investment over the same period of time.***

*Id*. (emphasis added). Here, that means comparing the earnings of the Freedom Funds until those funds were sold (April 2021) against the earnings "that would have been realized through [the American Funds TDFs] *over the same time period*." *Id.* It is undisputed that there are no damages over that time period. *Supra* at IV.A. Absent any triable issue of fact on "loss," summary judgment is warranted in favor of Quanta for this lone reason.

### B.  Quanta Engaged In A Prudent Fiduciary Process.

A fiduciary has wide discretion to manage a plan in its participants' best interests, and Congress did not intend for courts to second-guess those decisions. Rather, the Court's role is to give "due regard" to the "range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes,* 142 S. Ct. at 742. It is the process rather than results that matter. *Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 253 (5th Cir. 2008) (ERISA's "test of prudence is one of conduct, not results").

Here, the evidence establishes that Quanta's process was prudent during the entirety of the class period. Indeed, Quanta's process expert, Lorie Latham, concluded that the Committee's monitoring of the Challenged Investments was reasonable and consistent with accepted fiduciary practices. *See generally* Ex. H. Courts regularly grant summary judgment in these circumstances, and this Court should too.[8]

But the Court need not even evaluate the record evidence regarding Quanta's process outside of the limited time period at issue here with respect to Plaintiffs' challenge to the Freedom Funds, September 26, 2016, to January 1, 2017. *See* Ex A. ¶ 1; *supra* at III. When narrowed to this twelve-week timeframe, Plaintiffs' only criticism is that Quanta should have placed the Freedom Funds on "watch" status. *Id.* At bottom, Plaintiffs' position boils down to the untenable conclusion

---

[8] *See In re Quest Diagnostics Inc. ERISA Litig.*, 2024 WL 4285163, at *8-9 (finding objectively prudent process where committee engaged an investment advisor, held quarterly meetings, and reviewed quarterly reports on fund performance); *Silva v. Evonik Corp.*, 2024 WL 3379067, at *5 (D.N.J. June 28, 2024) (finding objectively prudent process where investment committee engaged an investment advisor, received reports prior to quarterly meetings from advisor that contained various metrics about the plan's investments, and discussed reports at meetings); *Falberg v. Goldman Sachs Grp., Inc.,* 2022 WL 4280634, at *13 (S.D.N.Y. Sept. 14, 2022) (finding objectively prudent process because the committee "received a packet of information from [its investment advisor]" that included "information about each of the Plan's investment options," "reviewed those materials in preparation for the meetings," and discussed the plan's offerings with its investment advisor at its quarterly meetings).

that by not placing the Freedom Funds on "watch" status in the fourth quarter of 2016 based *solely* on performance—which Stone admits was not required by the IPS—establishes an imprudent monitoring *process*. But a mere discrepancy in benchmark performance is not a criticism of the fiduciary *process*; it's a result, not conduct. *Kirschbaum*, 526 F.3d at 253; *see also Jenkins v. Yager*, 444 F.3d 916, 926 (7th Cir. 2006) (citing *DeBruyne v. Equitable Life Assurance Soc'y. of the U.S.*, 920 F.2d 457, 465 (7th Cir. 1990)) ("[I]nvestment losses are not proof that an investor violated his duty of care."). And it does not align with the factual allegations in Plaintiffs' Complaint—which do not even mention the Freedom Funds' performance in the fourth quarter (or third quarter) of 2016 as a basis for imprudence, and instead criticize the Freedom Funds for reasons (now abandoned) having nothing to do with performance. *See supra* at III.

The recent decision in *In re Quest Diagnostics Inc. ERISA Litig.* is instructive. 2024 WL 4285163, at *9. There, the District of New Jersey faced materially identical circumstances when granting summary judgment in favor of defendant in a case brought by Plaintiffs' same counsel. It concluded:

> The Court rejects [p]laintiffs' argument that the Freedom Funds []benchmark performances present a triable issue of fact. . . [p]laintiffs' assertion that the Freedom Funds [] fell short of their benchmarks does not indicate that a prudent fiduciary, even knowing of the underperformance, would have removed the funds sooner.[9]

---

[9] *See also Silva*, 2024 WL 3379067, at *5 (investments trailed their "benchmark performance does not present a triable issue of fact" because "it does not indicate that a prudent fiduciary, even knowing of the funds' underperformance, would have removed the funds sooner"); *Cunningham v. Cornell*, 2019 WL 4735876, at *11 (S.D.N.Y. Sept. 27, 2019) (granting summary judgment because "[p]laintiffs offer no evidence, affidavits, or testimony beyond the conclusory assertion of their expert [] that the level of underperformance of the [] funds alone, as measured by the benchmark . . . would lead a prudent fiduciary to conclude the funds should be removed from the plans . . . ."); *White v. Chevron Corp.*, 2016 WL 4502808, at *17 (N.D. Cal. Aug. 29, 2016) ("Indeed, a fiduciary may–and often does–retain investments through a period of underperformance as part of a long-range investment strategy.").

*Id.* at *10. The court noted that "an after-the-fact performance gap" does not "by itself violate the process-driven duties imposed by ERISA fund managers." *Id.* at *9 (*citing Smith*, 37 F.4th at 1167). Plaintiffs offer nothing more. Summary judgment is warranted for this additional reason.[10]

## CONCLUSION

For all of these reasons, Quanta requests that the Court grant summary judgment.

Dated: December 20, 2024

Respectfully submitted,

**MORGAN, LEWIS & BOCKIUS LLP**

/s/ Jeremy P. Blumenfeld
Jeremy P. Blumenfeld, admitted *pro hac vice*
Attorney-In-Charge
Pennsylvania Bar No. 85955
1701 Market Street
Philadelphia, PA  19103
Telephone: (215) 963-5000
*jeremy.blumenfeld@morganlewis.com*

David J. Levy
Texas Bar No. 12264850
S.D. Tex. No. 13725
1000 Louisiana Street, Suite 4000
Houston, Texas  77002
Telephone: (713) 890-5000
*david.levy@morganlewis.com*
*Counsel for Defendant Quanta*

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that a true and correct copy of the foregoing document was served via the Court's ECF/CM e-filing system to all counsel of record on December 20, 2024.

/s/ Jeremy P. Blumenfeld
Jeremy P. Blumenfeld

---

[10] Counts II and III are derivative of Count I and fail for the same reasons. *See Singh v. RadioShack Corp.*, 882 F.3d 137, 150 (5th Cir. 2018) ("[D]uty-to-monitor claims recognized by other courts inherently require a breach of duty by the appointed fiduciary."); *Izzarelli v. Rexene Prods. Co.*, 24 F.3d 1506, 1525 n.34 (5th Cir. 1994) ("Because there was no breach of fiduciary duty on the part of the Rexene defendants, it goes without saying that the Bank cannot be liable as a co-fiduciary for the same conduct."); *accord Smith*, 2021 WL 4097052, at *13.