# Exhibit D

Page 1

1

2       UNITED STATES DISTRICT COURT

3       SOUTHERN DISTRICT OF TEXAS

4       Case No.: 4:22-cv-03290 (AHB)

5       -----------------------------------x

6       MARY LALIBERTE, et al.,

7                                   Plaintiffs,

8               -against-

9       QUANTA SERVICES, INC., et al.,

10                                  Defendants.

11      -----------------------------------x

12                                  November 1, 2024

                                    3:03 p.m.

13                                  Central European Time

14

15

16          Remote Virtual Zoom Deposition of

17      DONALD C. STONE  taken by Defendants, pursuant

        to Notice, with the Witness located in Costa

18      Bravo, Spain, before William Visconti, a

        Shorthand Reporter and Notary Public within and

19      for the State of New York.

20

21

22

23

24

25

Page 2

```
 1
 2      A P P E A R A N C E S:
             MILLER SHAH, LLP
 3           Attorneys for Plaintiffs
                   1845 Walnut Street, Suite 806
 4                 Philadelphia, PA 19103
 5           BY:    JOHN C. ROBERTS  ESQ.
                    jcroberts@millershah.com
 6
 7
             MORGAN LEWIS & BOCKIUS LL[
 8           Attorneys for Defendants
                   One Federal Street
 9                 Boston, MA 02110
10           BY:    KERI L. ENGELMAN, ESQ.
                    keri.engelman@morganlewis.com
11                  MARIA DE CASTRO, ESQ.
                    maria.decastro@morganlewis.com
12
13
14
       ALSO PRESENT:
15
             HOWARD BRODSKY, Videographer
16           CAROLYN CAMPBELL, In-house Quanta Services
17
18
19
20
21
22
23
24
25
```

Page 3

1

2              IT IS HEREBY STIPULATED AND AGREED

3       by and between the attorneys for the

4       respective parties herein that filing and

5       sealing be and the same are hereby waived.

6              IT IS FURTHER STIPULATED AND AGREED

7       that all objections, except as to the form

8       of the question, shall be reserved to the

9       time of the trial.

10             IT IS FURTHER STIPULATED AND AGREED

11      that the within deposition may be signed

12      and sworn to before any officer authorized

13      to administer an oath with the same force and

14      effect as if signed and sworn to before the

15      Court.

16

17

18

19

20

21

22

23

24

25

Page 4

1

2              THE VIDEOGRAPHER:   Good morning.

3       Here begins the video recorded virtual

4       remote testimony of Donald C. Stone

5       appearing from his location in Costa Bravo,

6       Spain.  This deposition is taken by the

7       Defendants in the matter of Mary Laliberte,

8       et al. Plaintiffs versus Quanta Services

9       Inc., et al, Defendants.  The case number

10      4:22-CV-03290 (AHB) in the United States

11      District Court Southern District of Texas.

12              Today is Friday, November 1st, 2024.

13      The time is approximately 3:03 p.m. central

14      European standard time.  My name is Howard

15      Brodsky and I'm the legal video specialist

16      today with Veritext Legal Solutions with

17      offices located in Philadelphia,

18      Pennsylvania.  The court reporter is

19      William Visconti in association with

20      Veritext.

21              Counsel have stipulated that the

22      court reporter shall enter all appearances

23      for this proceeding into the stenographic

24      court record and further stipulate and

25      agree that the court reporter may take the

Page 5

1

2          deponents oath remotely.

3                    Will you court reporter please swear

4          in the witness.

5

6                    D O N A L D    C.    S T O N E,

7          having been first duly sworn by the Notary Public,

8          was examined and testified as follows:

9                    MR. ROBERTS:  I'm ordering a copy of

10          the transcript.

11     EXAMINATION CONDUCTED BY MS. ENGELMAN:

12               Q.    Good afternoon, Mr. Stone.  How

13     are you today?

14               A.    I'm fine.  How about yourself?

15               Q.    Good, thank you.  My name is Keri

16     Engelman and I represent Quanta Services in

17     this matter.  And you understand today that

18     you're here to be deposed about the expert

19     report that you submitted in this matter.

20               A.    Correct.

21               Q.    We have heard on the record that

22     you are currently in Spain; is that correct?

23               A.    That is correct.

24               Q.    How long have you been in Spain?

25               A.    Six months.  We spend about 6

Page 6

1                  DONALD C. STONE
2       months in here and six months in Florida.
3              Q.    I understand that you have been
4       deposed before; is that correct?
5              A.    That's correct.
6              Q.    I won't spend a lot of time going
7       through some preliminaries since you have been
8       deposed, but I just want to be go through a
9       couple of basics.
10                  First of all, if you need a break
11      today, please let me know.  I'm happy to take
12      one, my only sort of instruction around that
13      would be if there is a question pending that
14      you answer the question and then we could take
15      that break.  That being said, we are in kind of
16      a good rhythm of taking a break every hour or
17      hour and a half to stretch our legs.  So that
18      should be fine.
19                  If you do not understand a
20      question, of course ask me to clarify.  If you
21      do answer the question I'm going to assume that
22      you understood it.  Is that fair?
23              A.    That's fair.
24              Q.    You understand that you just took
25      an oath and that means that you have an

Page 7

1                    DONALD C. STONE

2       obligation to the court to tell the truth just

3       as if you were before the judge in court.  Do

4       you understand that?

5               A.      I do.

6               Q.      Is there any reason today that you

7       would not be able to testify truthfully?

8               A.      No.

9               Q.      What did you do, Mr. Stone, to

10      prepare for today's deposition?

11              A.      Just in the last day or two or

12      since the beginning when I got involved in the

13      case?

14              Q.      I would like to take it step by

15      step.  But to the extent that you prepared for

16      today's deposition since being aware that you

17      would come in to be deposed, what do you do to

18      prepare for today?

19              A.      So I read through my report, of

20      course.  I read through some of the depositions

21      again.  I read the investment policy statement

22      again.  I looked at a few of the quarterly

23      reports, investment reports again.  Probably a

24      few other documents as well that have been

25      supplied by counsel.

Page 8

1            DONALD C. STONE

2        Q.    When you say deposition

3   transcripts, do you mean the entirety of the

4   transcripts?

5        A.    Well, I didn't look through the

6   entirety of all the transcripts again at this

7   point.  But I did look up Laurie Latham in

8   particular, I reread that one.

9        Q.    You read Laurie Latham's

10  deposition transcript?

11       A.    I read her rebuttal report.

12       Q.    When talking about deposition

13  transcripts, do you remember which deponents

14  the transcripts of which you read in preparation

15  for today's deposition?

16       A.    There were a bunch of names,

17  that's for sure.  There were several of the

18  committee members that I looked at.  I didn't

19  read all of those transcripts in preparation in

20  the last couple of days.  I looked at them

21  earlier.  I think there were three committee

22  members that I looked at.  One was the

23  associate legal counsel, one was the head of

24  the committee or at least presumed head of the

25  committee and the other would have been the

Page 9

```
               DONALD C. STONE
 1
 2      head of HR.
 3           Q.    Other than your counsel, did you
 4      speak to anyone in preparation for today's
 5      deposition?
 6           A.    No, I did not.
 7           Q.    Did you speak with counsel in
 8      preparation for today's deposition?
 9           A.    I did.
10           Q.    Who did you speak with?
11           A.    John Roberts and a couple of his
12      associates yesterday for probably three, four
13      hours.
14           Q.    Other than that conversation with
15      John and some associates yesterday, did you
16      speak with counsel in preparation for today's
17      deposition?
18           A.    That was -- well, I think two days
19      ago I spoke with him briefly and yesterday and
20      that was the part that I would count as
21      preparation for today.
22           Q.    You mentioned that you re-reviewed
23      Laurie Latham's report; is that right?
24           A.    Correct.
25           Q.    Did you review Laurie Latham's
```

Page 10

```
 1                    DONALD C. STONE
 2      report when she served it in this matter or
 3      shortly thereafter or did you just review it
 4      within this past week?
 5              A.      I think just in this past week.
 6              Q.      When were you provided the report?
 7              A.      It has been some time ago.  I
 8      don't remember the exact date.
 9              Q.      So you were provided it some time
10      ago and you read it this week for the first
11      time; is that right?
12              A.      I think that is correct, yes.
13              Q.      Have you read any other expert
14      reports that have been submitted in this
15      matter?
16              A.      I have and it has been a little
17      while since I have looked at those.
18              Q.      Do you know if those were
19      Plaintiffs' experts or Defendants' experts?
20              A.      Those would have been Defendants.
21              Q.      Are you aware if Plaintiffs have
22      submitted any other expert reports other than
23      your own in this matter?
24              A.      I am.
25              Q.      Do you know which experts or which
```

Page 11

1                    DONALD C. STONE

2    reports?

3           A.    I did not read those.  Since they

4    weren't part of my opinion I did not read them.

5           Q.    Do you know who the experts are?

6           A.    I don't remember the names off the

7    top of my head.  And I don't know them through

8    my industry contacts.

9           Q.    You said you recall reading

10   another of Defendants' expert reports other

11   than Laurie Latham; is that correct?

12          A.    Yes.

13          Q.    Do you know when you read that?

14          A.    No, I don't.

15          Q.    Do you have any documents with you

16   today in person, Mr. Stone?

17          A.    I have a freshly printed out copy

18   of my report, that's it.

19          Q.    Sounds good.  So when were you

20   retained in this case?

21          A.    I believe I want to say it was

22   either May or June of this year, I believe.

23   It's possible I was retained earlier, but we

24   didn't get around to looking at documents or

25   anything, so I don't have that -- I'd have to

Page 12

                        DONALD C. STONE

1

2      look up when the agreement was signed.  I don't

3      have that off the top of my head.

4              Q.    That's okay.  Do you recall --

5              A.    Can I -- I'm sorry interrupt you.

6      I have a really obnoxious fly that keeps

7      landing on my computer.  Can we go off the

8      record for two minutes and I'm gong to take of

9      this.

10                   MS. ENGELMAN:   Sure.  Let's go off

11             the record for 5 to make sure that you take

12             care of it.

13                   THE VIDEOGRAPHER:   Counsel, the

14             time is 3:12 p.m. and we are off the

15             record.

16             (Recess Taken.)

17                   THE VIDEOGRAPHER:   The time is 3:14

18             p.m. and we are on the record.

19      BY MS. ENGELMAN:

20             Q.    Mr. Stone, before the kind of fly

21      situation we were talking about when you were

22      retained in this case.  Do you recall if you

23      reviewed any documents before you were retained

24      in this case?

25             A.    I would have reviewed the

Page 13

1              DONALD C. STONE

2     complaint prior to being retained.

3          Q.    Anything else?

4          A.    Probably that's the only document

5     prior to being retained.

6          Q.    Did you have any conversations

7     with anyone in connection with prior to being

8     retained in this case?

9          A.    Yes, I had I think a couple of

10    conversations with counsel prior to the

11    retention.

12         Q.    With anyone else prior to the

13    retention?

14         A.    No.

15         Q.    Did anyone assist you in preparing

16    your report?

17         A.    I worked with legal counsel, but

18    other than that, no.

19         Q.    When you say legal counsel, you're

20    referring to Miller Shah?

21         A.    Yes, I am.

22         Q.    What particular attorneys are you

23    referring to?

24         A.    Well, John in particular and both

25    of his associates.

Page 14

1                    DONALD C. STONE

2          Q.     When you say you worked with legal

3     counsel, did you actually draft every portion

4     of your report?

5          A.     I wrote the report.  It's an

6     iterative process.  Counsel, as you probably

7     are aware, that you have conversations at the

8     beginning about kind of what the counsel's view

9     of the case is.  We go back and forth.  We talk

10    about particular salient areas where they have

11    an opinion and they are wondering if my opinion

12    kind of syncs up with theirs.  We go back and

13    forth on that.  Sometimes it does and sometimes

14    to doesn't.  Then the process begins.

15               At that point they fed me a

16    framework for the report itself and they also

17    ended up filling in, of course, at the end

18    putting all the cites and everything because

19    they have this ability.  I don't have that

20    capability here.

21         Q.     Of filling in the cites.  Okay, so

22    it is your testimony that you counsel provided

23    you with a draft of the report and you --

24         A.     We went back and forth creating

25    drafts.  They would have a, for lack of a

Page 15

```
 1                    DONALD C. STONE
 2      better work, a backbone of what they wanted to
 3      do and I would populate it within some cases
 4      depending on which section there was quite a
 5      bit of information back and forth and they
 6      would go and give me some additional
 7      information.  I would review that, I would edit
 8      it, I would send them an edited version back,
 9      back and forth.  At the end of the day.  It is
10      my report.  I stand by the words on it.  I
11      signed it.  So I think that's the situation.
12           Q.    Other than counsel at Miller Shah,
13      did anyone else assist you in any way in the
14      creation of the report?
15           A.    No.
16           Q.    To the best of your recollection,
17      when is it that you first received a, quote/unquote,
18      framework of the draft of the report from
19      counsel?
20           A.    Probably in June.
21           Q.    Do you have any recollection of
22      how many drafts you exchanged with counsel
23      before the report was finalized?
24           A.    I don't remember the exact number.
25      All of these cases work in a very similar
```

Page 16

1                  DONALD C. STONE

2      fashion.  Sometimes it goes with three or four

3      drafts, sometimes it goes up to six or seven

4      drafts.  It varies and I can't give you an

5      exact number on this one.  I have to go back

6      and recreate that.

7              Q.     Sitting here today do you think it

8      was more than 3 or less than 3?

9              A.     I would guess more.

10             Q.     When you signed the report and we

11     will take a look at it, let me just pull up the

12     exact date here.  July 31st of 2024, does that

13     ring a bell?

14             A.     Yeah.

15             Q.     Do you have a recollection of when

16     you actually finalized the report with counsel?

17             A.     That would have been about that

18     time.

19             Q.     So can you approximate for me

20     about how many hours you think you spent

21     preparing the report?

22             A.     You know, I really don't know.  I

23     submit monthly invoices, but I don't actually

24     total anything up on these cases until after

25     they are done.  It's typical that it could be

Page 17

1                          DONALD C. STONE

2          cases -- it depends on case, but they could be up

3          to -- between 50 and 150 to 180 hours depending

4          and, I don't know, how many hours in this case.

5                  Q.      When you say 50 to 100 hours,

6          you're talking about the preparation of the

7          report itself and not necessarily including

8          preparation for deposition or are you

9          combining?

10                 A.      I'm talking about the total.

11                 Q.      When you were exchanging drafts

12         with Plaintiffs' counsel, were you also having

13         conversations about those drafts via phone or

14         Teams or Zoom or what have you?

15                 A.      Yes, typically via phone we would

16         have a conversation.  I don't know that it was

17         every time, but there might be an e-mail

18         exchange going on, there might be phone

19         conversations, it just depended.  But there

20         would always be some kind of communication back

21         and forth as these were being exchanged.

22                 Q.      Do you have any estimation or

23         approximate of how much time you spent on the

24         phone with counsel in the iterative process of

25         preparing your report?

Page 18

1                     DONALD C. STONE

2          A.     I have no idea.  I mean it would

3     be purely a guess.  It is not something that I

4     track, so I could come up with a number but the

5     number would be as good as any fiction that is

6     out there.  I just don't know.

7          Q.     So you can't approximate whether

8     --

9          A.     I don't want to speculate on

10     something that I can't even come close on.

11          Q.     I don't want you speculate either.

12     Without speculation, can you say it was more

13     than 10 hours or less than 10 hours on the

14     phone with counsel in the process of creating

15     the report.

16          A.     Creating the report, it would have

17     been probably less than -- probably approaching

18     10  in the creation of the report, somewhere in

19     that neighborhood.  Again, that is a guess at

20     this point.

21          Q.     Okay.  So I understand that you

22     have served as an expert in prior cases; is

23     that correct?

24          A.     That's correct.

25          Q.     Approximately how many cases, I

Page 19

1                    DONALD C. STONE

2       know in your report you list the cases that you

3       served as an expert for the last four years and

4       we will cover those.

5                    Do you have an approximation of

6       how many case you have served as an expert in

7       the last 10 years?

8            A.     Let's see, the last ten years it

9       actually would be the same number.  There was a

10      period of time between say 2004 and 2007 I

11      served as an expert and then I did not serve as

12      an expert again until 2021.

13           Q.     Sorry, I missed the first date

14      that you provided there.

15           A.     2004 to 2007.

16           Q.     From 2004 to 2021 you did not

17      provide any expert --

18           A.     From 2007 to 2021.

19           Q.     Understood.  Did you provide

20      expert services prior to 2007?

21           A.     Yes, between 2004 and 2007.

22           Q.     All right, for some reason I had a

23      disconnect of the from 2004 to 2007 you

24      provided expert services?

25           A.     That's correct.

Page 20

1                    DONALD C. STONE

2          Q.     2007 to 2021 you did not and

3     resumed again in 2021?

4          A.     Correct.  I can explain that.

5          Q.     I was going to ask first how many

6     cases did you serve, if you can recall, as an

7     expert between 2004 and 2007?

8          A.     Either four or five.

9          Q.     Do you recall the issues on which

10    you opined in those cases?

11         A.     I do.

12         Q.     Can you just walk through the

13    names of the cases and the issues, if you

14    recall?

15         A.     Well, I can give you the names of

16    two of the cases.  There are a couple of them

17    which are -- I don't remember the names of the

18    cases, but they actually were the most

19    interesting of the group.  They were a bit

20    different.

21               Two of the cases were -- one was

22    Kraft and my partner and I were working on that

23    case for the Defendants.  And then General

24    Dynamics was the other one.

25         Q.     Do you remember the issue that

Page 21

DONALD C. STONE

1
2    was -- that you opined in Kraft?

3         A.    It had to do with recordkeeping

4    fees and I believe in General Dynamics it had

5    to do with recordkeeping fees, but also had to

6    do with a -- with investments, because they had

7    in-house -- they had an in-house investment

8    firm that was spun off at a certain point, but

9    it was -- it had been a captive internal

10   organization, if you will, so there was some

11   issues obviously around a fiduciary aspect of

12   that.

13        Q.    So for Kraft you said that you

14   were an expert for the Defendant; is that

15   correct?

16        A.    Yes, that's correct.  You actually

17   probably will see because I was -- I wrote a

18   big chunk of the report with my partner, which

19   you will see her name on it, Jennifer, at that

20   time it would have been Jennifer Marconi I

21   believe or it could have been Flodin, F-l-o-d-i-n,

22   which would have been her married name.

23        Q.    When you say partner, what do you

24   mean by that?

25        A.    She was my business partner in a

Page 22

```
 1                    DONALD C. STONE
 2     company that I founded in 2002.
 3              Q.     Were you opining on the prudence
 4     of the fiduciary process in that case?
 5              A.     I believe, I think that is
 6     probably a fair general broad explanation of
 7     it.  I don't remember all of issues and exactly
 8     the details of it at this point.  It has been
 9     quite a while.
10              Q.     For General Dynamics were you an
11     expert for the Plaintiffs or defense, if you
12     recall?
13              A.     For the defense.
14              Q.     The same question, were you
15     opining on the prudence of fiduciary process in
16     that case?
17              A.     Yes.
18              Q.     Then are those the only two cases
19     that you can recall providing an expert report
20     between 2004 and 2007?
21              A.     No.  There were two other cases
22     and they were -- they involved smaller plans
23     than the two that we just talked about.  One
24     involved theft from a 401-K and the other one
25     involved a defense of a -- there was a lack of
```

Page 23

1                    DONALD C. STONE

2        fiduciary process until I was asked to -- if

3        there was any reasonable defense in the case of

4        a profit sharing plan where somebody -- an

5        executive vice president of the firm had sued

6        saying that there was imprudence because of

7        lack of a fiduciary process and the investment

8        selection monitoring.

9             Q.    Do you recall what your opinion

10       was in that case?

11            A.    In the case of the, the last case

12       that we just talked about, yeah, basically what

13       I -- what we decided and legal counsel when

14       they approached me, this would have been toward

15       defense as well.  They said there was no

16       fiduciary process so we can't defend the case

17       on that.  Is there any other way that we can

18       defend it and the answer that I came up with

19       was how did the investments do.

20                  Basically one person chose all the

21       investments based on Money Magazine's

22       recommendations each month and she knocked it

23       out of the ballpark.  We went to the judge and

24       said no case, it would be a reasonable profit

25       sharing plan to use 60 percent S&P 500, 40

Page 24

1                    DONALD C. STONE

2       percent of the Ag on the bond side.  And if the

3       judge would accept that, which he did, then I

4       created, basically created a table showing the

5       performance.

6                    So there was no -- basically the

7       defense was there was no harm no foul.  Even

8       though there was no process, the guy who sued

9       was better off because of the selections that

10      she made.

11           Q.    So your position in that case was

12      essentially that these investments performed

13      well and as a result the defense should succeed

14      irrespective of no fiduciary process; is that

15      correct?

16           A.    Yeah, I didn't -- my report did

17      not say there was no fiduciary process.  That

18      was counsel that took that position.  My role

19      was to come up with the defense in terms of the --

20      was there a harm and the answer was there was

21      no harm.  That was my narrow role to look at

22      that.

23           Q.    And that was, just so I'm clear,

24      what is the name of that case?

25           A.    I don't remember.  It was a large --

Page 25

1                    DONALD C. STONE

2       it was -- I don't remember.  I don't even

3       remember what the company did at this point.

4       It was kind of a mid-size firm in the greater

5       Chicago region.  And besides that, I just don't

6       remember anything about it at this stage.  That

7       was back in probably 2005.

8              Q.    So any other cases that you

9       remember focusing on in the 2004 to 2007 time

10      period?

11             A.    I mentioned there was one where

12      there was theft from a 401-K.

13             Q.    Anything else?

14             A.    No, those are the only ones that I

15      remember.

16             Q.    From 2007 to 2021 you did not

17      provide any expert services; is that correct?

18             A.    That's correct.  We decided that

19      after the Kraft case we decided because of the

20      nature of these cases, they kind of come and go

21      and it's very difficult to run a business

22      despite the fact that, obviously legal firms do

23      it all the time, in terms of an investment

24      consulting firm, which my firm was, it created

25      more issues than it was worth going through to

Page 26

DONALD C. STONE

1   
2   try to staff for it and have the time and so on
3   to go through that kind of process.
4               So it was we just decided that we
5   wouldn't do any more cases and we didn't the
6   entire time that I was employed.
7       Q.      Then in 2021 as of that time you
8   were retired from the consulting service
9   business; is that correct?
10      A.      That's correct.
11      Q.      So at that time you started to
12  pick up cases, am I right?
13      A.      That's correct.  I was approached
14  about a case, I believe that would have been
15  Astellas which has since been settled and that
16  is listed in the report.  But I was approached
17  about that case in the fall of '21 to see
18  whether I would be interested in basically
19  working with the Plaintiffs in that case and I
20  think within about a month they also asked me
21  whether I would work on the Shell case.
22      Q.      When you say they, who are you
23  referring.
24      A.      This would have been Schlichter.
25      Q.      Schlichter was Plaintiffs' counsel

Page 27

DONALD C. STONE

1

2      in the Astellas and the Harmon versus Shell Oil

3      case; is that correct?

4              A.      Yes.

5              Q.      What was the issue in Astellas?

6              A.      Astellas -- let me think for a

7      moment.  So Astellas had to do with OCIO or

8      what is sometimes referred to as 338 services

9      that were being provided by Aon as a

10     proprietary product.  That was the primary

11     issue involved in that case.

12             Q.      What is it that you opined on

13     precisely?

14             A.      Basically I was saying that that

15     was -- that their role in recommending their

16     own funds was conflicted.

17             Q.      What was the issue in the Shell

18     Oil Company case?

19             A.      Shell had several issues and that

20     is still an ongoing case at this point.  One

21     was recordkeeping fees.  The second was the

22     tier of investments of approximately 300

23     investment choices which were not monitored by

24     the investment committee.  And then the third

25     issue was fees that were being generated by

Page 28

1                     DONALD C. STONE

2       managed accounts that -- and that tied into the

3       recordkeeping fee because it had to do with the

4       total revenue that was being received by the

5       record keeper at the end of the day.

6              Q.     Did you opine on the fiduciary

7       process as it related to all three of those

8       particular issues or something else?

9              A.     No, all three.

10             Q.     But was your report limited to the

11      fiduciary process issue?

12             A.     As oppose to -- well, I didn't --

13      so I dealt with the fee issues and the

14      fiduciary process issues.  I did not opine --

15      if I remember correctly, I don't think I opined

16      on the -- I'm not sure exactly about the

17      prudence of any particular -- there were 300

18      investments that nobody was monitoring and I

19      did make some commentary about some of those

20      funds being duplicative and being the same fund

21      was in the main menu and outside of the main

22      fund it was a more expensive version.  So I may

23      have opined about that.  I don't think I was --

24      I don't think I opined about the returns of any

25      particular fund or any particular groups of

Page 29

1                    DONALD C. STONE

2       funds.

3               Q.    We could introduce the exhibit,

4       but we will probably do it later.  Do you have

5       your report in front of you, I'm looking at

6       paragraph 15, which just has a list here of the

7       cases that you set forth as providing expert

8       testimony.  I'm just running through those.

9                    I'm looking, Mr. Stone, at

10      paragraph 15 of your report, just to refresh

11      your recollection of the other cases in which

12      you listed that you provided expert testimony.

13      So we talked about Astellas.  You listed that

14      as Wachala versus Astellas.  Do you know, was

15      it actually Miller versus Astellas?  Do you

16      have a recollection of that?

17              A.    I don't have a recollection that

18      it was Miller, no.

19              Q.    So then the next case listed is

20      Mills versus Molina Healthcare; is that right?

21              A.    Yes.

22              Q.    Did you provide testimony for

23      Plaintiffs or defense?

24              A.    For Plaintiffs.

25              Q.    Do you remember who counsel was?

Page 30

1              DONALD C. STONE

2          A.      That would have been Schlichter as

3     well.

4          Q.      What was the issue in that case?

5          A.      That had to do with proprietary

6     quasi custom target day funds.

7          Q.      What is the issue that you opined

8     on?

9          A.      Well, that I felt that there was a

10    conflict between -- well, that the advisor was

11    offering their own funds as opposed to having

12    an unconflicted view to go out and search for

13    other funds for their client.  And there were,

14    even though the overall -- the issue ended up

15    turning on whether in an NFP got -- if they

16    received extra benefit because people went into

17    their own funds.  Which basically are a Wrap or

18    Blackrock funds.  And the answer is they got

19    paid the same either way as a 338.  But some of

20    their staff actually got extra compensation

21    because of the recommendation to go into those

22    proprietary funds.

23         Q.      Am I correct that you provided

24    trial testimony in that case?

25         A.      That is correct.

Page 31

1              DONALD C. STONE

2         Q.    Is that the only case in which you

3    provided trial testimony to date?

4         A.    It is.

5         Q.    Snyder versus UnitedHealth Group

6    is the next case listed.  Did you provide an

7    expert opinion for the plaintiff or the

8    defense?

9         A.    For the Plaintiffs.

10        Q.    Who was counsel on that case?

11        A.    I'm trying to remember who counsel

12   was and I could look it up, but off the top of

13   my head it is not coming to me.

14        Q.    No problem.

15        A.    It is going to be the same as

16   Natixis, if I remember correctly.  No, I'm

17   sorry UnitedHealth is different.  I'm getting

18   two law firms mixed up.  So I don't remember

19   the law firm exactly, so I'm going to beg off

20   giving you the answer there unless you want me

21   to look it up.

22        Q.    That's okay, no.  Do you recall

23   the issue in that case?

24        A.    I do.  UnitedHealth, and this is

25   an ongoing case, UnitedHealth was utilizing

Page 32

1                    DONALD C. STONE
2      Wells Fargo's target date funds and had been
3      for many years.  They were a -- they did a lot
4      of business with Wells Fargo.  And the
5      contention by Plaintiffs was that the firm,
6      UnitedHealth, was conflicted and that they did
7      not act in participants' best interest in
8      choosing and retaining and not removing the
9      Wells Fargo funds.
10            Q.    Did you provide an opinion about
11      the fiduciary process or was it just an issue
12      of conflict?
13            A.    About fiduciary process because
14      they went through an RFP process and whatever.
15      I definitely opined on the process as well as
16      the conflict of interest.
17            Q.    Did you make any conclusions about
18      the fiduciary process in that case?
19            A.    I thought the fiduciary process
20      was flawed.
21            Q.    Do you remember why?
22            A.    I'm trying to think how much of
23      this is public at this particular point and how
24      much is privileged.  So I'm having a little bit
25      of heartburn over that.

Page 33

1              DONALD C. STONE

2       Q.      We could move on.

3       A.      Thank you.

4       Q.      The next case is Waldner versus --

5    I don't know if I'm going to mess this up.

6       A.      Natixis.

7       Q.      Natixis.  Do you recall if you

8    provided an expert opinion for Plaintiffs or

9    defense in that case?

10       A.      For Plaintiffs.

11       Q.      Do you remember who counsel was in

12    this case?

13       A.      No.  I don't keep all of these law

14    firms in my head.

15       Q.      That's okay.

16       A.      I'm supposed to be quasi retired.

17       Q.      It seems like you have been busy.

18    So do you remember what the issue was in the

19    Waldner case?

20       A.      Yes, Natixis is a very large

21    global investment management firm.  Basically

22    Natixis is a, for lack of a better term, is in

23    parlance within the business world would be,

24    it's a roll up of investment managers.  They

25    own a number of investment management firms

Page 34

1                     DONALD C. STONE

2        that operate under the original names, if you

3        will, when they were required.

4                     Natixis put almost all, not

5        totally, almost all Natixis funds into their

6        401-K.  So the issue had to do with fiduciary

7        process of the selection, monitoring and

8        retention of some of those funds, not all of

9        them, but some of those funds.

10            Q.    Okay, again, were you providing an

11       opinion on the fiduciary process in the

12       selection, monitoring and retention of those

13       funds?

14            A.    Yes.

15            Q.    Were you deposed in this case?

16            A.    I was deposed in that case, yes.

17            Q.    And then --

18            A.    That case is still open as well.

19            Q.    Okay.  The Williams versus

20       Centerra case on the next page of your report.

21       Did you provide an opinion for the Plaintiff or

22       the defense?

23            A.    That would have been the

24       Plaintiffs.

25            Q.    Do you recall who counsel was?

Page 35

```
 1                    DONALD C. STONE
 2          A.    I do.  In that case it was
 3     Schlichter.
 4          Q.    What was the issue in that case to
 5     the best of your recollection?
 6          A.    So the issue there had to do with,
 7     again, target date funds.
 8          Q.    Do you remember what the
 9     particular issue was around the target date
10     funds?
11          A.    I'm not remembering the details of
12     it at the moment.
13          Q.    Do you remember which target date
14     funds were at issue?
15          A.    I believe it was the NFP Funds
16     again, if I remember correctly.
17          Q.    NFP Funds?
18          A.    Yes, that's not the name.  The
19     funds themselves go under -- let me think a
20     second.  I believe they use Life Path which is
21     similar to Blackrock.  The names are similar to
22     what Blackrock uses for those.  I might confuse
23     those two.
24          Q.    Were you forming an opinion as to
25     the fiduciary process in retaining or selecting
```

Page 36

1                    DONALD C. STONE
2       or retaining and/or monitoring those funds or
3       something different?
4              A.     I believe so, yes.
5              Q.     Is that case still ongoing?
6              A.     That one has been settled.
7              Q.     Do you remember what your
8       opinion was in that case with respect to the
9       fiduciary process of selecting or changing the
10      target date funds?
11             A.     I don't recall the details at the
12      moment.  Sometimes these things start to become
13      a little bit of a blur.
14             Q.     Understood.  So the last one is
15      the Ahmed versus Liberty Mutual Group case.
16      Did you provide expert testimony for Plaintiff
17      or defense in this case?
18             A.     For Plaintiffs.
19             Q.     Do you remember who the counsel
20      was?
21             A.     It was the same as -- let's see,
22      Liberty Mutual is the same as Natixis, I
23      believe it was the same counsel.
24             Q.     Do you remember what the issue was
25      in that case?

Page 37

1                    DONALD C. STONE

2           A.    Again, it was a target date issue

3      and I'm not remembering the details of it at

4      the moment.

5           Q.    Do you remember what target date

6      funds were at issue in that case?

7           A.    Let me think.  I should remember

8      that.  No, I'm just not remembering at the

9      moment.

10          Q.    Do you remember if you provided an

11     opinion as to the fiduciary process with

12     respect to selecting and/or retaining the

13     target date funds at issue in that case or

14     something different?

15          A.    No, I think it would be the

16     fiduciary process.

17          Q.    So in any of these cases, do you

18     have a recollection that you worked with Miller

19     Shah?

20          A.    I did not work with Miller Shah on

21     any of those cases, no.

22          Q.    So how is it that you -- do you

23     know how it is that Miller Shah came to know

24     your name and contact you?

25          A.    I believe they -- I think they

1                      DONALD C. STONE
2      found me like some of the other found me which
3      is just on the internet.  There is a lot out
4      there under my name and everything.  Things
5      that I have written over the years.  Some of
6      cases, obviously the information is out there.
7      So I think that is the way that -- I believe
8      that's the way -- in fact I'm sure that is way
9      they found me.
10            Q.    So do you have any sense of how
11     much you've earned since 2021 in connection
12     where expert services?
13            A.    Well, I don't know the exact
14     number.  I don't necessarily want to get into
15     my total compensation, but certainly from the
16     cases that we have listed here, it's well north
17     of half a million dollars.
18            Q.    Do you have any other source of
19     income other than providing expert services at
20     this time or since 2021?
21            A.    Yeah, I do.
22            Q.    I don't want to know the income
23     but what are the sources of income?
24            A.    Well, at this point social
25     security.  So mine and my wife's and I also

Page 39

1                    DONALD C. STONE

2       have a number of investment accounts.  I have

3       also an IRA which is a rollover from a 401-K.

4       I have taken my required minimum distribution

5       every year.  RMD.  I have income off of bonds

6       and stocks and private equity investments as

7       well.

8              Q.     You have been retired since, is it

9       2019; is that right?

10             A.     It was actually May 19, 2019.

11             Q.     So let's --

12             MS. ENGELMAN:   Maria, can we mark

13             as Exhibit 1 Mr. Stone's report please.

14             (Exhibit 1 for identification,

15             Expert Report of Donald C. Stone.)

16             Q.     Do you have access, Mr. Stone, to

17      Exhibit Share?  Do you know how to work that?

18             A.     I do have Exhibit Share.  I'm

19      opening it as we speak.  Can I go off the hard

20      copy of my report when we talk about my report?

21             Q.     That is totally fine with me.  I

22      just want it marked for the record.

23             MS. ENGELMAN:   Let's mark it and

24             Mr. Stone and I will work off the hard copy

25             and proceed.

Page 40

1                    DONALD C. STONE

2          Q.      Mr. Stone if you turn to the back

3     end of your report which is Exhibit B,

4     materials considered.

5          A.      Yes, let me get to it.

6          Q.      The first two pages are various

7     articles, but I want to turn your attention to

8     the litigation documents.

9          A.      Okay.

10          Q.      First of all, does this report

11     contain the totality of your opinion in this

12     case?

13          A.      It does.

14          Q.      The litigation documents that are

15     listed here, are these all of the documents

16     that you relied on in forming your opinion in

17     this case?

18          A.      Yes.

19          Q.      Did you personally review every

20     single document that is listed in Exhibit B

21     here?

22          A.      I did.

23          Q.      Did you review them in their

24     totality?

25          A.      I would say virtually in their

Page 41

1                    DONALD C. STONE

2       totality.  For example, when we talk about

3       quarterly investment reports and they are 150,

4       200 pages long, I didn't review every single

5       page, every single quarter.  I think that is a

6       fair assumption.

7             Q.     Did counsel provide you documents

8       to review in order to create your opinion?

9             A.     Yes, they did.

10            Q.     Did you request certain documents

11      of counsel?

12            A.     Yes, we had conversations, I don't

13      recall specific requests that I made that they

14      didn't provide.  I know we had some back and

15      forth.  I had some questions and what have you,

16      so that may have led to certain documents being

17      included in the documents that they provided.

18      But I don't recall off the top of my head.

19                   As I said, it's a very iterative

20      process.  I had questions from the get-go and

21      that's kind of the normal way these things

22      work.

23            Q.     So I guess what I'm trying to get

24      at, the list on this page, is that all of the

25      documents that you received in connection with

Page 42

DONALD C. STONE

1
2    this litigation or is it a subset of what you
3    received and reviewed?
4         A.    Well, first of all, the litigation
5    documents go on for several pages.  I'm just
6    making sure that we are on the same thing.
7         Q.    Yes.
8         A.    So there is four pages here that
9    are not part of what I wrote and all of that
10   good stuff.  Yes, this is to the best of my
11   recollection this is all of the documents that
12   I looked at.
13        Q.    Did you type up these three pages
14   or did counsel?
15        A.    They would have typed this up.
16        Q.    Did you review it before it was
17   submitted to make sure it accurately reflected
18   the documents that you relied on in forming
19   your opinion?
20        A.    I reviewed -- I always do a spot
21   check, okay, when there is -- when you have a
22   like a Bates number or whatever that somebody
23   put down, I spot check those.  I don't go
24   through every single document and look at it
25   again.  But I do spot checks to make sure it is

Page 43

DONALD C. STONE

1
2    accurate, that I have seen it, that it is
3    something that I remember and I didn't find
4    anything unboard there.
5           Q.    Do you recall if you requested
6    certain categories of documents to review in
7    connection with this case?
8           A.    You know, again, that kind of goes
9    into the blur of the conversations that we had.
10   Obviously all categories that I wanted to see I
11   did see in this case and everything.  So I saw -- I
12   mean the things that I would expect counsel to
13   provide, like IPS, quarterly investment
14   reports, those kind of normal documents I would
15   expect to see those there.
16          So I don't know -- I don't recall
17   something that it was like, okay, I haven't
18   seen this, I haven't seen that, can you provide
19   this particular document.  But that would have
20   been part of that conversation that went on on
21   an ongoing basis.
22          Q.    Understood.  At the back end of
23   this, the last page is depositions of the
24   committee members as well as the consultant,
25   Rich Eagar, do you see that?

Page 44

1                    DONALD C. STONE
2          A.      I do.
3          Q.      We talked earlier about your
4    review of the transcripts in preparation for
5    the deposition.  But in connection with
6    preparing your report, did you personally
7    review each of those deposition transcripts in
8    their entirety?
9          A.      So I looked at all of them.  I
10   can't say that I read every word -- it is fair
11   to say that I read all of them, but I sometimes
12   speed read through things where it is areas
13   that I don't think are as relevant to the issue
14   at hand.  So sometimes some of the background
15   on somebody.  I don't necessarily spend a lot
16   of time looking at every single job that each
17   person has had.  I want to get to the kind of
18   meat of the issue.
19               I don't look -- I don't spend a
20   lot of time on the parts that you and I went
21   through a few minutes ago where you say if I
22   don't understand something I ask again.  All of
23   the preliminary stuff that shows up in the
24   depositions and everything.
25               I try to go to the meat of what

Page 45

DONALD C. STONE

1    I'm looking for in reading through all of

2

3    those.

4         Q.    Are there any other areas, I mean

5    you said earlier that is not relevant to your

6    opinion.  Any there other areas other than job

7    or background that you that you would have

8    support of sped read through?

9         A.    Not that I recall, no.

10        Q.    What do you consider the meat of

11   the issue?

12        A.    I want to say how they talk about --

13   how they viewed their role on the committee.

14   How they thought about how decisions were made

15   by the committee.  How they thought about the

16   advisor.  What they thought about the fiduciary

17   training.  Kind of all of the critical issues

18   that you would expect that each one of them

19   would have been asked about and would have had

20   a slightly different take on.

21              I want to see how they thought

22   about their role in the committee.  How they

23   understood the decision-making process.  Again,

24   what their comfort level was with investments.

25   There is a -- I come up with a very long

Page 46

DONALD C. STONE

1

2      laundry list, but these are the kind of things

3      that you start immediately trying to go to to

4      understand as opposed to I went to college at

5      XYZ.

6          Q.      Would you say that you read

7      these transcripts one time through in

8      preparation for your report or more than one?

9          A.      I spent time going back on a

10     couple of them more than I did others.  But so

11     I looked at Carolyn Campbell, I went back a

12     couple times to refresh myself on certain

13     things.  I did the same thing on Jensen and

14     Riddle.  Not so much on Rupp and Grindstaff.

15         Q.      Why is that?

16         A.      Because I didn't see anything

17     that -- I didn't see information that I felt

18     like I needed to go back and look at again.

19              I guess when I was looking through

20     my report and I was looking at the rebuttal

21     report, some of the information from those

22     particular people did not come up as much.  Now

23     Rich Eagar, that is different, he came up a

24     lot.  Of course he wasn't on the committee, he

25     was the advisor.

Page 47

1              DONALD C. STONE

2         Q.    We'll get to it, but there is a

3    fair number of transcripts or deposition cites

4    that are footnoted throughout your report; is

5    that correct?

6         A.    Correct.

7         Q.    Would you personally have chosen

8    which cites to include in your report?

9         A.    I would kind of reverse that.  It

10   was not me choosing the cite so much as the

11   reference point to quote.  Because I didn't

12   know exactly what the cite was in some cases.

13   But I had information that is a footnote and so

14   the information that is the footnote, that

15   would be what I would be focused on as opposed

16   to coming up with the legal information that

17   goes with the cite.

18        Q.    So okay, I guess maybe we are

19   talking about something -- maybe we are

20   miscommunicating here.

21             When I say citation I mean the

22   sort of information from the transcript, the

23   substantive information from the transcript.

24             Did you personally choose which

25   substantive information you wanted to include

Page 48

1                    DONALD C. STONE

2      from the transcripts for your report?

3           A.     Yes, I mean I read through all of

4      this.  Like I said, this was -- counsel might

5      bring up a particular topic or a particular --

6      what a particular individual said and we would

7      talk about it and sometimes it might be

8      something I would say that is kind of -- that

9      doesn't resonate, I don't know that that is

10     something that I find to be a problem or

11     whatever.  Or maybe I would say okay, well that

12     sounds very relevant and everything, so let's

13     talk about that a little bit.  It's a very

14     iterative process in that regard.

15                    I didn't go through a transcript

16     and pick out six different quotes I want to

17     use, for example, from Kip Rupp, okay.  I could

18     have done it that way because I read through it

19     and I did confirm all of those, but that is not

20     the way that these typically develop.

21          Q.     What do you mean you did confirm

22     all of those?

23          A.     I would go back and look up the

24     cites and make sure that they were correct.  I

25     would look at footnotes and make sure they were

Page 49

1                    DONALD C. STONE

2    correct.

3           Q.    You did do that for all the cites

4    prior to submitting your report?

5           A.    Yes.

6           Q.    Let's talk a little bit about your

7    background.  So I kind of want to start a

8    little bit in reverse order.  Prior to your

9    founding of Plan Sponsor Advisors in 2002,

10   prior to that, did you serve as a consultant in

11   any way to fiduciary committees in a 321 or 338

12   capacity?

13          A.    I was on a committee, but I was

14   the head of the trust company, so I can't say

15   that I was a 321.  I was running the trust

16   company.

17          Q.    So when you say you were on a

18   committee, you were a member of a fiduciary

19   committee for a 401-K plan for the trust?

20          A.    Yes, that's correct.  For Key

21   Bank.  Key Corp. would have been the holding

22   company.

23          Q.    Did you have a specific role on

24   the committee?

25          A.    Well, I ran the institutional

Page 50

1                    DONALD C. STONE

2      trust division.

3              Q.    You just went out for me.

4              A.    Can you hear me now.

5                    MS. ENGELMAN:   I'm not hearing you.

6              Can we go off the record.

7                    THE VIDEOGRAPHER:   Counsel, the

8              time is 4:04 p.m. and we are off the

9              record.

10                   (Recess taken.)

11                   THE VIDEOGRAPHER:   The time is 4:16

12             p.m. and we are on the record.

13     BY MS. ENGELMAN:

14             Q.    Hi, Mr. Stone, sorry we had a

15     technical hiccup.  I think before we went off

16     the record you were talking about the fact that

17     you served on a 401-K fiduciary committee at

18     Key Bank; is that right?

19             A.    That is correct.

20             Q.    Did you have a particular role on

21     that committee, Mr. Stone?

22             A.    I don't recall if I -- I was not

23     the chair of that committee.  So I don't recall

24     if I had a role other than being on the

25     committee.

Page 51

1                    DONALD C. STONE
2          Q.     Do you remember how many people
3    were on that committee?
4          A.     Not exactly, but I would say there
5    were probably five or six.
6          Q.     Did that committee offer
7    investment options?
8          A.     No, we were the ones who were --
9    that committee had the role of making options
10   available for the 401-K plan for key Corp. and
11   monitoring those and changing them out as
12   necessary.  Some other -- we had some other
13   responsibilities in regard to the overall
14   institution.
15         Q.     So you were responsible as a
16   fiduciary to make selections for investment
17   options; is that right?
18         A.     Yeah, that was among the roles,
19   yes.
20         Q.     The same for monitoring those
21   investment options that were selected?
22         A.     Yes.
23         Q.     Do you recall, did you consider
24   that to be a committee operating in a prudent
25   way?

1                    DONALD C. STONE

2            A.    Yeah, I thought it was a very

3      prudent committee.  It was a very -- it was

4      laid out well.  Everybody understood what their

5      role was.  Everybody was educated about what we

6      were supposed to be doing when we were there.

7      I thought it was a good prudent committee.

8            Q.    Was there an outside investment

9      consultant?

10           A.    No.

11           Q.    Do you know why that was the case?

12           A.    Well, keep in mind this is in the

13     mid-1990s, that would have been less prevalent.

14     And we were a rather sizable money manager and

15     so it just was not -- it was not something that

16     I think was felt that was necessary at that

17     particular time.

18           Q.    In terms of selecting investment

19     options, did that committee have any particular

20     process in place for the criteria it evaluated

21     when selecting investment options?

22           A.    I don't remember the details at

23     this point.  I mean, again, this is in the mid-1990s,

24     so a number of the options that were offered

25     were proprietary options, not all of them, but

Page 53

1                    DONALD C. STONE
2        a number of them were and that was very typical
3        at that time.  I don't recall the details of
4        the process.
5                 Q.    Do you recall any details about
6        what criteria the committee considered when
7        monitoring the performance of those options?
8                 A.    No, not at this point.
9                 Q.    So aside from that role at Key
10       Bank prior to PSA, did you otherwise serve on
11       any other 401-K or 403-B fiduciary committees
12       or serve as an investment consultant in a 321
13       or 338 committee?
14                A.    No.
15                Q.    Looking to 2002, you say in
16       paragraph 9 of your report that you founded
17       Plan Sponsors Advisors, which we'll call PSA.
18       Was that with the partner that you mentioned
19       earlier?
20                A.    Initially I did not have a
21       partner.  So she became part of that
22       organization officially in some time in 2004.
23                Q.    During the entirety of between
24       2002 and 2014 were you the president and
25       managing partner of PSA?

Page 54

                        DONALD C. STONE

1

2          A.     We changed titles a couple of

3     times.  I think I dropped the title of president at

4     some point.  At a certain point we went to

5     founding member and that kind of thing.  I

6     don't recall the details at the moment.

7          Q.     That firm provided consulting

8     services to fiduciary committees; is that

9     correct?

10          A.     That's correct.  I don't think it

11     is actually in my CV there but there was a -- I

12     also owned a second corporation that provided

13     similar services and I will explain the reason

14     behind that.

15               When I initially I had -- I picked

16     up some clients and I had them operating under

17     an entity called Third Coast Advisors.  At the

18     time that I brought my partner onboard she had

19     a separate business that was high net worth

20     individuals.  We couldn't agree on a valuation

21     between the two businesses, so we agreed to

22     carve them out separately and leave them as

23     independent as we built -- continued to build

24     Plan Sponsor Advisors.

25               So that ran in parallel the

Page 55

1                        DONALD C. STONE

2       entirety time until I sold both of those

3       corporations to Pavilion in 2014.

4              Q.     So just so I'm clear, was Third

5       Coast Advisors providing the services related

6       to high net worth individuals?

7              A.     No, it was not high net worth

8       individuals.  It was to 401-K plans as a 321

9       fiduciary.

10             Q.     So can you just explain the

11      difference between the services that PSA was

12      providing and the services that Third Coast

13      Advisors was providing?  I'm not sure that I'm

14      understanding the difference.

15             A.     There was no difference in the

16      services provided.  It had to do with the

17      ownership.  So Third Coast I owned 100 percent

18      of, my partner had the high net worth business,

19      we were going to roll those into Plan Sponsor

20      Advisor but we couldn't agree upon on a

21      valuation for those businesses, so we decided

22      to carve them out, keep them separate.

23                    So mine ran in parallel, Third

24      Coast ran in parallel.  I didn't add any new

25      clients to that.  It was kind of frozen at that

Page 56

DONALD C. STONE

1
2    point with the existing clients it had.  And it
3    ran until I sold that as well as Plan Sponsor
4    Advisors to Pavilion in 2014 and then her high
5    net business basically evaporated over time.
6         Q.    You owned 100 percent of Third
7    Coast Advisors.  Did you own a hundred percent
8    of PSA?
9         A.    I did not own hundred percent PSA
10   at that point.  There was a split that we had
11   and a complicated split, I don't want to go
12   into the legal aspect of that, but I was
13   majority owner.
14        Q.    That's fine.  So they were
15   essentially providing the same services to the
16   same clients or different clients?
17        A.    Different clients.
18        Q.    So let's start with PSA.  For both
19   Third Coast and PSA were you providing both 321
20   and 338 services?
21        A.    No, just 321.
22        Q.    Just 321 for both, okay.  During
23   the entirety of the time period between June,
24   2002 and June 2014 -- I'm sorry, between 2002
25   and 2014?

Page 57

1                DONALD C. STONE
2        A.      That's correct.
3        Q.      How many, approximately, how many
4    clients did Plan Sponsor Advisors serve?
5        A.      Probably over that timeframe,
6    around 60.
7        Q.      What about Third Coast Advisors?
8        A.      Third Coast was very small.  I
9    think I had four clients in that.
10       Q.      During the entirety of the 2002 to
11   2014 time period?
12       A.      Yes, because they were all signed
13   up in 2002 and so I didn't add anything to that
14   entity.  I just kept those clients all those
15   years.
16       Q.      Did Plan Sponsor Advisors have
17   employees or independent contractors or
18   consultants that worked there?
19       A.      We had employees.  We sometimes
20   had independent contractors who did work for us
21   as well.
22       Q.      How many employees or consultants
23   did Plan Sponsor Advisors have?
24       A.      Obviously it varied over time.  I
25   would say we were typically in the neighbor of

Page 58

DONALD C. STONE

1

2    12 employees.

3         Q.    Those employees were working as

4    321 advisors to clients of PSA?

5         A.    Not all of them.  Some of them

6    were in research.  We had one administrative it

7    person.  So there were several in the research

8    area exclusively.  There were a couple who were

9    servicing clients and also in research.  That

10   would have been 321s.

11        Q.    What about for Third Coast, were

12   there any employees or individuals --

13        A.    No, I was the sole employee.

14        Q.    For Third Coast you personally

15   served as the 321 advisor to those clients?

16        A.    Yes.

17        Q.    Do you know the names of those

18   clients?

19        A.    No, I don't remember them at this

20   point and they would be confidential.

21        Q.    For PSA did you personally serve

22   in a 321 capacity to any clients?

23        A.    I did.

24        Q.    Approximately how many clients?

25        A.    Well, I helped bring in all of

```
 1                    DONALD C. STONE
 2      those clients -- probably almost all of those
 3      clients.  So I would have been in a 321
 4      capacity for some period of time for probably
 5      all of those.  But what typically happened is
 6      that after going through the process of
 7      bringing -- onboarding the clients, at a
 8      certain point obviously I couldn't service them
 9      all, the same thing with my partner.  So we
10      would hand them off to someone else once we
11      onboarded them and got them kind of settled in
12      to our reporting process.
13               Q.    How is it that you went about
14      bringing in clients?  What was that process?
15               A.    Well, typically I would say for
16      Plan Sponsor Advisors it was almost totally
17      referral.
18               Q.    Referral by whom?
19               A.    Almost all by ERISA counsel.  Not
20      totally, but almost all by ERISA counsel.  And
21      sometimes there would be an RFP process
22      involved that counsel would say my client is
23      going to go through an RFP process and we would
24      like you to be in the mix.
25               Q.    Do you recall for any of those RFP
```

Page 60

1                  DONALD C. STONE

2      processes, do you recall whether or not you

3      were submitting an RFP to be the kind of first

4      consultant to provide services to a plan or to

5      replace an existing consultant?

6           A.    It could have been either one.

7           Q.    Do you have any specific

8      recollection of whether or not you submitted an

9      RFP in connection with replacing an existing

10     consultant?

11          A.    We did, yeah.  I don't remember

12     who the existing consultant was or who the

13     client was.  I mean that was not uncommon, I

14     guess is what I'm saying.

15          Q.    With respect to the individuals

16     who worked under you or worked for PSA as a 321

17     consultant, do you feel those were prudent

18     advisors?

19          A.    Yes.

20          Q.    Did you oversee their work to

21     ensure they were fulfilling their obligation as

22     321 consultants?

23          A.    Absolutely.

24          Q.    You say in paragraph 9 that during

25     your tenure you advised on over $65 billion in

Page 61

1                        DONALD C. STONE

2       retirement assets; is that right?

3              A.      That's correct.

4              Q.      Over what period are you talking

5       about there?

6              A.      That is during the 2002/2014

7       period.

8              Q.      In any given year do you know

9       approximately how many assets PSA provided

10      services for?

11             A.      That's a very difficult question.

12      Are you asking on a retainer basis?  That would

13      make this a little be easier.  We had clients

14      who were project clients in some cases.  That's

15      part of that 65 billion.  And then of course we

16      had retainer clients who we provided ongoing

17      services to and were in that 321 capacity that

18      entire time.

19             Q.      So on the project basis, those

20      were not -- those were specific projects, you

21      weren't the consistent 321 advisor to those

22      particular plans?

23             A.      We might be 321 -- depending on

24      what the project was, we might or might not be

25      a fiduciary to that particular client.

Page 62

1                    DONALD C. STONE

2                    So for ongoing retainer work when

3          we sold the business, we had a little over $23

4          billion at that point.

5               Q.     Do you know approximately how many

6          clients that covered?

7               A.     That was about 50 clients.

8               Q.     Do you know the range of the size

9          of clients that you provided 321 services to?

10         You said in your report both small and large?

11              A.     Yes.  So I would say at the time

12         that -- at the time that we sold the business

13         in 2014 the smallest client would have been

14         probably in the 5 million or so, 5, $6 million

15         range.  And that would have been one of the

16         kind, I will call them legacy clients.  One of

17         our first clients.  We had a very high

18         retention rate.

19                    I think the average client size

20         was, and this is going to be a guesstimate, I

21         did calculate it at one point.  But the average

22         client size was probably in the 4 to 500

23         million range and a number of the clients were

24         north of a billion.

25              Q.     How many clients would you say

Page 63

1                        DONALD C. STONE

2        were north of a billion?

3              A.      Probably of that 50, probably 10

4        of them.  Probably another 20, 25 would have

5        been north of a 100 million.

6              Q.      Would the asset size of the client

7        dictate the -- effect at all the quality of services that

8        you provided as a 321 consultant?

9              A.      No.  We looked to provide the same --

10       first of all, the same type of service and

11       there might be certain services that we didn't

12       provide to or would have actually -- I should

13       back up and say, would have provided as an

14       add-on service for certain clients because they

15       didn't necessarily need some of those service

16       or didn't need them all the time.

17                        In terms of the normal, you know,

18       create the IPS, arise the IPS, provide

19       investment selection, monitoring, removal,

20       basically we did the same thing for every

21       client.

22             Q.      For Third Coast Advisors, what was

23       the range of assets for those four plans, if

24       you recall?

25             A.      I don't recall exactly, but they

Page 64

1                    DONALD C. STONE

2    were small.  They would have been on the

3    smaller end.  So let's say 5 million or

4    whatever.  Because those were the first clients

5    I brought in the door when I started in 2002

6    and those were -- two of those were within the

7    first two months.  They were not the typical

8    client that we went after after that first

9    year.

10             Q.     Between 2002 and 2014 did

11   your -- as a 321 advisor at PSA and I guess

12   Third Coast, did your reporting capabilities

13   change in terms of the sort of metrics that you

14   can provide clients on their investments?

15             A.     I don't think the -- the basic

16   metrics did not change.  We had a pretty robust

17   reporting system early on that we invested in.

18   So the -- and the metrics -- I'll make a

19   distinction here because I think I understand

20   where you're going.

21                    The metrics that the industry

22   reports on have been around now for a good 20,

23   30 years or so.  And they are pretty much the

24   same metrics.  If you go to 50 different

25   companies you're going to get largely the same

Page 65

1                        DONALD C. STONE

2       metrics.

3                        What can be different is whether

4       or not, and some companies use a scoring system

5       and some of the scoring systems could get

6       rather complicated.  Some don't use a scoring

7       system.  So there is a -- I said that is where

8       the big difference is.

9                        Everybody is going to report on

10      the returns of the fund.  They are going to

11      report on the risk adjusted returns of the

12      funds, the expense ratios, the Sharpe ratio,

13      the upside/downside capture, so on and so

14      forth.  There is a whole range of things that

15      come into being well after ERISA, but that are

16      used by everybody to try to evaluate

17      investments these days.  And that is pretty

18      standardized.

19           Q.     Is it your view that it is

20      appropriate for committees to evaluate all of

21      those metrics that are recorded in their

22      fiduciary capacity?

23           A.     You know, I guess the keyword is

24      all.  I think there are metrics that are looked

25      at by consultants that are probably not well

Page 66

1                    DONALD C. STONE

2       understood by many clients.  And you don't show

3       every metric that you could possibly look at in

4       a report.  I mean it gets to be very, very

5       cluttered.

6                    So I would say typically you look

7       at the more salient ones that are going to --

8       that are used in your report.  Some people

9       prefer the Information Ratio versus the Sharpe

10      ratio, some people the Sharpe ratio versus the

11      Information Ratio.

12                   There are other ratios, the

13      Sortino ratio that is not used very much.  But

14      it is all out there and all available on the

15      same -- there are about three investment

16      platforms that exist out there that gather all

17      of this data that everybody uses to report on.

18           Q.     So I want to break down a couple

19      of things that you said.  The metrics that you

20      think committees would not understand, what are

21      those?

22           A.     There are metrics, probably that's

23      not the right word.  They might not be familiar

24      with them.  The Sortino ratio is one that I

25      can't remember how it is calculated at the

Page 67

1                       DONALD C. STONE

2      moment.  But there are a number of metrics

3      around the whole risk adjusted topic.  And

4      generally the Information Ratio and the Sharpe

5      ratio are the two that are most commonly used

6      by basically everybody in the industry that I

7      know of.  So those tell a very similar story

8      and everything.

9                  I don't think -- I guess what I'm

10     saying is, there are a lot of other things that

11     if you're a CFA you will be aware of 20

12     different ratios that aren't necessarily in

13     anybody's reporting, and if they would be, I'm

14     not sure why they would be because they don't

15     add necessarily a lot of additional value.

16          Q.     In terms of your view as to what

17     should be presented to a committee for its

18     review in terms of performance, what metrics do

19     you believe should be presented or did you

20     present to the committee in which you served as

21     a 321 advisor?

22          A.     I'm probably not going to remember

23     every single thing that we -- and we're talking

24     quantitative at the moment.  We will probably

25     get into qualitative as well.

Page 68

1                    DONALD C. STONE

2                    But the quantitative metrics, the

3       kind of things that we would report on on a

4       quarterly basis would be obviously raw

5       performance, performance against a benchmark,

6       perhaps against a couple of benchmarks

7       depending on the asset class, depending on

8       primarily the asset class and whatever we, you

9       know, whatever the investment manager used as

10      their preferred benchmark would show that.  We

11      would also use a best fit benchmark which might

12      be the same thing, might be something

13      different.

14                   We would do calculation of the

15      risk adjusted returns and we would use both

16      sharp and Information Ratio for that.  We would

17      report on actual assets in the product, in the

18      investment product.  We would report on the

19      tenure of the manager or managers.  We would

20      report typically on the upside/downside

21      capture.  It would be R squared, expense ratio

22      reports.

23                   THE COURT REPORTER:  Hold on a

24          second, he froze.

25                   THE VIDEOGRAPHER:   He froze.  Let's

Page 69

```
1              DONALD C. STONE
2        go off.  The time is 4:41 and we are off
3        the record.
4              (Recess Taken.)
5              THE VIDEOGRAPHER:   The time is 4:45
6        p.m. and we are on the record.
7              MS. ENGELMAN:   Bill can I call on
8        you to say the last thing that you got of
9        Mr. Stone's testimony.
10             (Requested portion of record read.)
11   BY MS. ENGELMAN:
12       Q.    Mr. Stone, you were talking about
13   the metrics that you would report on as a 321
14   advisor for clients.  Is there anything else?
15       A.    I'm sure there are a number of --
16   there are few other metrics, those are probably
17   the most salient ones that would, I think, be
18   of interest to clients or committees on a
19   quarterly basis.
20             There would be for -- obviously
21   when we're reporting on target date funds we
22   get into some other additional things that we
23   would report on periodically if certain things
24   changed or what have you.  But you know that --
25   maybe I didn't -- one thing that I may not have
```

Page 70

1                    DONALD C. STONE

2       captured is we would capture comparison to

3       peers.  I don't believe I said that one and

4       that is a very important one.

5                    Those are the principal ones that

6       are coming to mind at the moment.

7            Q.     You said with respect -- I didn't

8       mean to interrupt you.  Were you done?

9            A.     I was done, thank you.

10           Q.     With respect to target date funds,

11      you said there were some other metrics.  What

12      would those be?

13           A.     In target date they are obviously

14      going to look at the glide path, you're going

15      to look at any changes in the glide path over

16      time.  You're going to look at changes in the

17      asset make up of what makes up the target date

18      funds.  In other words the basic -- obviously

19      you have the glide path, quote/unquote, but

20      what makes that up in terms of the asset

21      allocation might change over time.  So that is

22      not the thing that we would report on every

23      quarter.  It is one of those things that comes

24      up as necessary.

25           Q.     Anything else with respect to

Page 71

1                    DONALD C. STONE

2      target date funds?

3           A.    Nothing that I'm remembering off

4      the top of my head right now.

5           Q.    I think you said that you would

6      periodically provide additional information

7      about target date funds to your client.  Did I

8      hear that correctly?

9           A.    Yes, something that we did and

10     obviously was done in this case and very

11     typical in the industry is to periodically do a

12     comparison or what some people call a deep dive

13     to compare to various metrics against other

14     target date series that are out there as part

15     of the ongoing education of client committees.

16          Q.    What metrics would typically be in

17     the presentations that you would provide to

18     your clients?

19          A.    Well what you'd be looking at, and

20     this was not specific to a client, it was for

21     all clients.  You would provide information on

22     assets, the asset -- maybe on the asset flows

23     both in and out, you would provide information

24     on the comparisons of the glide path,

25     comparisons of returns, comparisons of expense

Page 72

1                        DONALD C. STONE

2      ratios.  You would look at things like

3      comparison of whether there are to or through.

4      And I think most importantly you'd look at

5      their -- for this part you would look at what

6      is their equity mix at retirement date.

7      Assumed retirement date of 65.  I do would look

8      at -- you know, you just look at a number --

9      provide all of that information probably --

10     again, I'm not going to remember it all off the

11     top of my head.

12                    You're basically looking to

13     provide a grounding for the committee on a

14     comparison of various products that are out

15     there which might lead to a conversation as to

16     whether a further evaluation of the existing

17     product was wanted or not.

18          Q.     How often would you provide these

19     types of reports to your clients?

20          A.     Typically annually.

21          Q.     Is there any client that you can

22     think of that offered a target date fund that

23     you did not provide this to at least annually?

24          A.     I can't think of one or a reason

25     why I wouldn't do that.

Page 73

1                      DONALD C. STONE
2           Q.      What was the purpose of providing
3      these to your clients annually?
4           A.      Well, again, typically for most
5      clients the target date funds over a period of
6      time became the -- because they were typically
7      the QDIA, they would become the largest asset
8      within the plan.  So I think additional scrutiny
9      was certainly warranted.  And again, that was
10     part of the general education of the committee
11     that we would provide on an ongoing basis.
12                  On a quarterly basis you wouldn't
13     provide what I just said because nothing would
14     change on a quarterly basis.  It wouldn't make
15     a lot of sense to do that.
16                  Obviously if there was a selection
17     of a target date, then there would be additional
18     elements that you would look at that would be
19     specific to that particular plan in looking at
20     making -- in choosing a target date fund.  And
21     sometimes you would go back and rerun that
22     information specific to that plan on a periodic
23     basis.  Not necessarily annually, but from time
24     to time as appropriate.
25          Q.      I want to unpack just a few things

Page 74

1                    DONALD C. STONE

2     that said.  You went through the quantitative

3     criteria, generally speaking, that you would

4     provide to your client on a quarterly basis; is

5     that right?

6            A.    Yes.

7            Q.    And is it that you provided that

8     information so that the committee would review

9     and consider all of that information in making

10    its decision with respect to the investment

11    options offered in the plan?

12           A.    Yes.

13                 MR. ROBERTS:   Objection to the

14           form.

15           Q.    Is it your experience that the

16    committee in which you served as a 321

17    consultant actually considered those metrics in

18    making decisions with respect to the investment

19    options offered in the plan?

20                 MR. ROBERTS:   Objection to the form.

21           A.    Yeah, they did do that because we

22    spent a lot of time educating them about the

23    purpose of each of those and obviously some of

24    them were kind of self-explanatory.  But a

25    number of them were things that a typical

Page 75

1                    DONALD C. STONE

2      person that comes on to a committee may or may

3      not be familiar with.  We would spend time as

4      part of that fiduciary education process

5      educating them about the various economic terms

6      and economic metrics and educating them about

7      the context of what was going on in the world

8      as their investments, what was going on with

9      them and what was going on in the world that

10     might be having an impact on them.

11                    So the key was to get an educated

12     group that could actually be conversant.  I

13     think there is real concern in the industry in

14     terms of people throw all of these metrics out

15     and come in with fancy reports that got an

16     awful lot of night colors and everything and my

17     experience is, unless you really work hard at

18     it, half the people on these committees don't

19     have a clue as to what you're talking about.

20                    So it is very, very important,

21     because they don't have the background in

22     investments, so you really need to educate

23     them, otherwise you're showing them a lot of

24     pretty charts and saying you should do this and

25     do that.  And it is difficult for them to

Page 76

1                    DONALD C. STONE

2     deliberate about that.

3                    We spent a lot time on that

4     education process and it's a never ending kind

5     of process, but it is really critical to good

6     decision-making by a committee.

7          Q.    It is critical and you spent the

8     time educating your committees on these various

9     metrics that you mentioned, the quantitative

10    metrics, because it was your expectation that

11    they considered each of them?

12         A.    They did need to consider each of

13    them, absolutely, and to be able to be

14    conversant in them and ask questions about

15    them.  There would be sometimes very lively

16    conversations that would go on with these

17    clients and everything because they did take it

18    seriously.

19         Q.    With respect to the target date

20    annual reports that you provided, you mentioned

21    that you provided those to all of your clients

22    that offer target date funds; is that right?

23         A.    Yes.

24         Q.    Would you tailor those reports to

25    any specific plan?

Page 77

1                          DONALD C. STONE
2          A.     No, as I mentioned, there was a
3    standardized report that all of them received.
4    The only thing that was tailored to them,
5    obviously it covered -- made sure that it
6    covered the target date fund that they offered
7    and a range of other target date funds that
8    were out there.  So typically it would be the
9    same report that would go to all clients.
10                      There were things that were
11   customized to a particular client relative to
12   the target date that I alluded to that were
13   critical to the selection process.  And would
14   be important to the monitoring process if there
15   were in fact questions about whether the fund
16   that they had, the target date series they had
17   was the appropriate one.  But that is not
18   something that you would run all the time.
19         Q.     That's helpful, thank you.
20                      So you said you mentioned the
21   selection of a target date fund and some
22   metrics that would be important to that
23   process; is that right?
24         A.     Absolutely, yes.
25         Q.     So in your view what are the

Page 78

                    DONALD C. STONE

1

2      important aspect of a committee's selection of

3      a target date fund?

4            A.      Well, I think what is critical in

5      the selection of a target date fund is you're

6      going to talk about the objectives that the

7      committee has, what their expectations are for

8      that target date fund.  You're going to spend

9      time talking about any particular philosophy or

10     opinions that the committee already has formed

11     and has as you go into that process to

12     understand where they are coming from.  And

13     those could sometimes bring up issues that you

14     want to address in that selection process.

15                  You're also going to look at plan

16     demographics or what some people refer to as a

17     fit analysis.  The plan demographics are

18     critical to the selection process.

19           Q.      Why is that?

20           A.      Well, because there is not one

21     target date series that is the choice for

22     everybody out there.  Plans have, as I referred

23     to a moment ago, sometimes they may have

24     different objectives or different philosophies,

25     but most critically all plans have different

Page 79

1                    DONALD C. STONE

2        demographic information and the success or

3        failure of a particular target date series

4        really rests on those particular elements of

5        that plan.

6                        So what may work very well

7        and be the right choice for plan A may not be

8        the right choice for plan B and could in fact

9        be imprudent.  So it is not just a, let's go

10       out and find a well known target date series or

11       whatever.  There are really critical elements

12       to look at.  I will give you an example.

13                        Things you want to look at are

14       average balances, average age of participants,

15       you want to look at the contribution rates of

16       participants, you want to look at the contribution

17       rates of the company, you want to look at are

18       there supplemental plans.  There are a handful

19       of those -- those are some of most important.

20       There are others.  I'm not going to try to list

21       every demographic element at the moment.

22                        All of those go into play because

23       what you then want to do is to make a selection

24       is to project out what is the probability of

25       this particular -- of any particular target

Page 80

DONALD C. STONE

1

2      date series working for that plan.  By working,

3      I would say getting the largest percentage of

4      participants to a successful retirement.

5                    In the industry, generally

6      speaking, there is general agreement that

7      somewhere between 80, roughly 80 percent, some

8      people are a little less than that and some

9      people a little bit more than that, but let's

10     say 80 percent is probably the vast majority

11     would agree is the income percentage that

12     you're looking to replace through the plan,

13     through other assets somebody may have and

14     through social security.

15                    So what ends up happening is the

16     average participants, you're probably talking

17     about somewhere between in the neighborhood of

18     40 to 50 percent has to come from the 401-K

19     plan.  You project that out using Monte Carlo

20     simulations.

21                    I would say certainly I'm sure the

22     top 100, 150 consultants out there and maybe

23     more have this capability to project that out

24     and say, okay, this is what it is going to look

25     like in all likelihood, because you run

Page 81

1                    DONALD C. STONE

2      thousands of simulations and you have an idea

3      of whether or not it is going to get somebody

4      across the finish line.

5                    What you find sometimes is that a

6      target date series which might be well designed,

7      good named investment company but for this

8      particular plan doesn't work because people

9      aren't saving enough, people don't have average

10     balances big enough, they can't get there, they

11     are going to fail.  The whole plan will fail if

12     they choose that target date series so you

13     don't want to do that.

14                   For another plan it might be a

15     very valid and reasonable choice.  So it takes

16     a lot of -- I think it takes a lot of work to

17     in a really prudent way to make these choices.

18     And then this has developed over a period of

19     the last 50 years.  I mean we are literally 50

20     years away from ERISA coming into play.

21                   All the things that we have been

22     talking about, almost none of them existed when

23     ERISA was founded.  In fact ERISA assumed

24     everybody would be in a defined benefit plan

25     for the most part.

Page 82

1                    DONALD C. STONE

2          Q.    I hear you.  I just know we just

3     celebrated the 50th anniversary.  We had some

4     parties here at our firm to commemorate that.

5          A.    That's okay, yes.

6          Q.    So a couple of follow up questions

7     there.  What you just walked through in terms

8     of the things that a committee in a prudent way

9     would consider in selecting a target date fund,

10    would those considerations come into play when

11    monitoring the prudence of a selected target

12    date fund in terms of retaining it for the

13    plan?

14         A.    Yeah, it's not something that you

15    would report on quarterly because you're not

16    going to rerun what I just described, the Monte

17    Carlo simulation, you're not going to rerun

18    that quarterly.

19                If something were under

20    consideration for -- let's say it was on a

21    watch list, I will use that is a broad general

22    term because I know in this particular case

23    they used several different terms, and if you

24    go look at 20 plans they may use a couple of

25    different terms for that.  But in general

Page 83

                    DONALD C. STONE

1

2       something that needs more scrutiny, we call

3       that a watch list.  Then you might go back and

4       rerun this at that point and say is this thing

5       working the way it is supposed to.  Is there

6       something that has changed in its composition

7       that requires more scrutiny.

8                       I think you take a much deeper, I

9       will use the term deep dive, but in this case

10      it is very specific to the target date series

11      that you have to figure out what is going on

12      with it and how is it working with that plan.

13                      You're going visit with the

14      manager, you're going to spend time with them

15      and you're going to look at -- you're going to

16      spend a lot of time looking at their operational

17      processes, you're going to look at their --

18      some of the qualitative things that we haven't

19      talked about and everything.

20                      I guess the point is, you might

21      rerun that type of information at that point

22      when you've gotten to a stage where you're

23      considering making a change.  You may or may

24      not ultimately make that change, but when

25      you're on watch, then that to me is you have

Page 84

1                    DONALD C. STONE

2      heightened scrutiny.  It is not just saying,

3      watch and walking away from it.  You actually

4      need to do some additional work to look at it.

5                    I would expect a committee to be

6      saying to their consultant or their advisor, we

7      need you to go back and come back to us with

8      what is going on with this thing.  Why, you

9      know, great it's underperforming, but why is it

10     underperforming.  What is actually going on

11     under the covers that is making this happen.

12     And it may turn out that, well, you know, it's

13     a blip, it may turn out that there are reasons

14     because of changes in the firm, there may be

15     reasons that that particular approach is out of

16     favor.

17                   There certainly can be

18     explanations and then the committee has to be

19     thoughtful to consider, you know, are we still

20     comfortable whether those explanations are

21     satisfactory or perhaps we need to consider

22     making a change.  Again, just because it goes

23     on watch doesn't mean you change it, but it

24     certainly does mean that you give it additional

25     scrutiny.

Page 85

                    DONALD C. STONE

1

2          Q.     So there would be circumstances in

3      your experience where there is underperformance

4      of a fund, but it is still appropriate to continue to

5      offer that fund in the planned?

6          A.     Yes, as long as you continue to do

7      the additional scrutiny while it is under watch

8      and then if the committee gets comfortable with

9      that, that's obviously a choice, that is part

10     of what they are supposed to do is make a

11     choice as to whether they think it is

12     appropriate or not.

13         Q.     You mentioned the Monte Carlo

14     simulation; is that right?

15         A.     Yes.

16         Q.     I'm not familiar with what that

17     is.  Can you explain what that is?

18         A.     Yes.  In a simple way, because I

19     haven't run these in a while, so Monte Carlo

20     simulations basically are -- and you see this

21     -- I mean for example, when you look at --

22     maybe the easiest thing to think about is, we

23     are in hurricane season and when you go out

24     there and you got a hurricane coming towards

25     Florida and they show you the cone of

Page 86

1                    DONALD C. STONE

2      uncertainty as they call it, which shows all

3      the possible routes that hurricane can take.

4      They've run thousands of simulations to create

5      that cone of uncertainty or whatever as to

6      where it is going to go.  All the inputs that

7      go in.

8                    So in the case of Monte Carlo

9      simulation for a target date fund, you're going

10     to think about all the different possible

11     permutations.  You're not going to think about

12     it, you're going to have the system run it,

13     that could happen.

14                    For example, you have immediately

15     you start having bad returns and you have bad

16     returns for five years in a row, or you

17     immediately have incredibly good returns or

18     it's level returns over the entire 35, 40 year

19     period, the career of a person.

20                    So the mathematics are running all

21     of those different kind of permutations of what

22     might -- what those returns might look like.

23     And literally -- we would typically run I think

24     at 10,000 we figured out that we had all we

25     needed.  And what happens you begin to see --

Page 87

DONALD C. STONE

1
2      then you start to kind of -- for purposes of
3      looking at the, what we were talking about,
4      about who is going to get across the finish
5      line, you look then at kind of the median of
6      all of those.  You wouldn't take the outliers,
7      whether they are positive or negative, you're
8      going to look towards the median of that.
9                    So that's probably the most
10     likely outcome that you're going to see.  And
11     how does that work if we said that a particular
12     participant -- and we will just break it down
13     as a participant.  A particular participant
14     needed $1,500,000 at retirement to meet this 80
15     percent goal including social security, does
16     this simulation do that, okay.  If it comes up
17     and says well, no, the most likely case is
18     they're going to be at 1 million 3, that is not
19     very good.  If it says they're going to be at 1
20     million 6, we are kind of happy about that.
21                    There may be three or four
22     or five target date series that are successful
23     that way for the largest number of participants.
24     So then you have to do -- then you start doing
25     additional analysis to figure out which might

Page 88

1                    DONALD C. STONE
2      be the right choice for that entity.  You're
3      going to look at how smooth the ride is.  How
4      comfortable the ups and down that go on along
5      way.
6                    I'm not how much more detail you
7      want on that.  But that's kind of how you do
8      that.  It's a mathematical simulation that
9      projects out what possible returns could be and
10     the sequence of those returns over a broad
11     number of years.
12          Q.    So I want to make sure I'm clear
13     and I don't want to get into the total minutia
14     of this.  But you're essentially suggesting
15     there is a program where you would input the
16     demographic fits or objectives of your plan for
17     which you're solving for?
18          A.    Yes.
19          Q.    And attempt to create over the
20     long-term, so for the average retiree a certain
21     level of returns and the system would look at
22     all target date funds in the market or is it a
23     subset?
24          A.    It is not looking at target date
25     funds.  It's looking at returns at that point.

Page 89

DONALD C. STONE

1
2       So what you plug in -- let's say we have
3       participant Bob, okay.  So Bob is currently
4       deferring -- I'm just using an individual --
5       but you use averages obviously.  You could run
6       it for every participant.  You could make it --
7       you can individualize it for everybody but then
8       that could get incredibly expensive.
9               So would you typically do is
10      you run it for the plan which means you look at
11      the average deferral rate, you look at average
12      contribution by the company, you look at
13      average balance and so on and so forth or you
14      look at the median or you run it for both of
15      those.
16              So let's say that the average
17      participant is contributing 6 percent and the
18      average participant has a balance of the
19      $90,000.  The average participant is, let's say
20      it's a company that has a fairly old workforce
21      that the average participant is 20 years from
22      retirement.  You plug that in and then you plug
23      those numbers in and so you have that $90,000
24      balance and you're now going to run that out
25      with that 6 percent contribution rate and

Page 90

1                     DONALD C. STONE
2        you're probably going to look at other things
3        like does the plan have other escalations.
4                     So is Bob going to be or the
5        average participant, are they going to be
6        putting in 7 percent the next year and 8
7        percent the year after.  So you can build that
8        in as well.
9                     Then given those numbers, then
10       you run the simulation with returns for a mix.
11       So you can run that mix against a particular
12       asset allocation which let's say would be the
13       T. Rowe Price Funds or it could be the Fidelity
14       or it could be Van Guard, it could be whatever.
15       And you run those for each one of those against
16       their allocation because their allocation is
17       going to have, depending on how conservative --
18       you're going to run those for each allocation
19       against those average balances and the way
20       those balances are going to grow and everything
21       over time.
22                     That is how you get at the end
23       analysis that at 65 the probability is that
24       this person will have a balance of X.  This
25       average participant or median participant

```
1                    DONALD C. STONE
2        depending on how you run it.
3             Q.    How is it -- --
4             A.    That is very common.  It is run by
5        all of the different advisors in consulting
6        firms that I used to work with and interact
7        with and over time and everything.  It is not
8        an unusual program.  This has been around for a
9        long time.
10            Q.    Is it something that you used as a
11       consultant?
12            A.    We used it for every single client
13       for a target date fund.  That is how the selection --
14       that was a big part of the selection process
15       because we might come up with three choices.
16       There is 42 different -- as of I think as of
17       last year there were 42 different target date
18       series, not counting any custom things that are
19       out there that are available in the marketplace.
20       Some have gone out of business over the years
21       others have come into the business in the last few
22       years, there is around 42 of them out there.
23            The only way that you're going to narrow
24       this down is to tie that from a prudence
25       perspective, is this going to make sense for our
```

Page 92

1                    DONALD C. STONE

2       client.  The real basic level is this is why you

3       want diversification in the first place and so on

4       and so forth.

5                    If we go back to what the Department Of

6       Labor has said, you're supposed to have at least

7       three asset classes, well, everybody has a lot

8       more than that.  Everything is based off of

9       building on that.  So it is available to most of

10      the firms out there that I'm aware of and has been

11      for a long time.

12                   Q.    So how is it that -- one piece

13      that I think I'm struggling to understand, how

14      is it that you decide as a consultant or as the

15      common industry decide which target date funds

16      to run in the program?  You said you could, for

17      example, use T. Rowe Price.  How would you

18      whittle it down from 42 to however many you're

19      going to run in the program?

20                   A.    We typically -- we wouldn't run 42

21      different runs probably.  Most firms don't

22      actually track all 42 or whatever the number

23      happens to be today.  But there is a large

24      subset that they probably are watching.

25                        So certainly if it is on your --

Page 93

DONALD C. STONE

1

2    if you have a buy list or a recommended list or

3    preferred list of managers, because those are

4    the ones that you have the highest conviction

5    in, you'd run it against all of those and there

6    might be five, six different managers.  But you

7    probably have run it internally against a much

8    larger subset over time to determine is this

9    somebody that we should be looking at for our

10   clients that we should be considering.

11            We would've run it against

12   probably 20 different products that were out

13   there as a part of our process.  Not for a

14   particular client, but for the firm in order to

15   be able to recommend things to our clients.

16            Q.    Okay, but if you're looking at a

17   particular client and they are looking to make

18   a target date fund selection, you mentioned a

19   preferred list.  What is that?

20            A.    So every -- I won't say every.

21   The vast majority of investment consultants

22   have a buy list or whatever they call it,

23   whether it's a buy list or preferred list or a

24   high conviction list or whatever, but it's a

25   group of -- you had your investment team

Page 94

1               DONALD C. STONE

2       analyzing -- going out and looking at managers

3       all the time.  This is true of every asset

4       class.

5               So you go out and you say, okay,

6       these are the five managers, there is 600 large

7       value managers, but out of that we really have

8       a high conviction because we have been to see

9       them in their office, we've seen their operational

10      processes, we've looked at their stability of

11      the organization and we've looked at their

12      returns, the construction methodology, we

13      looked at -- it goes on and on.  And we have a

14      really high conviction of this manager and this

15      manager and this manager.

16              You typically might have five

17      different target date managers that you have a

18      high conviction and five or six large growth

19      managers or large value or whatever and in all

20      the asset classes you would do that.  That is

21      very typical.  Those would be the ones that you

22      would start with certainly on the target date.

23              Now, if none of those, I can't

24      imagine, but if none of those worked out, you

25      could go on and look at others as well.  But

Page 95

DONALD C. STONE

1

2    you've already whittled it down to some extent

3    because these were ones that you have -- you've

4    seen what they have done, you have a lot of

5    history on them and we have a lot of history at

6    this point for target date.

7                    And these are the ones that you --

8    somebody said through -- if your grandmother

9    said what should I buy, this is one of ones

10   that you would recommend to your grandmother

11   because you're comfortable with it for any of a

12   number of reasons which you would articulate in

13   the internal notes that you keep on fund

14   managers.

15   Q.    At your time at PSA and Pavilion,

16   I'm going assume that your testimony here

17   relates to your capacity as an investment

18   advisor at Pavilion as well, which I know that

19   we haven't talk about yet.  Is that generally

20   fair?

21   A.    That's fair, yes.

22   Q.    Can you name the target date funds

23   that you had a highest conviction rate with?

24   A.    Yeah, the highest conviction

25   managers might have changed a little bit over

Page 96

DONALD C. STONE

1

2       time, because we're talking about a number of

3       years, but the highest -- in general the

4       highest conviction managers would have been T.

5       Rowe Price as an active manager, JP Morgan as

6       an active manager, but also as a blend manager

7       which is to say they use some passive, some

8       active.  Blackrock as a passive manager.  Van

9       Guard as a passive manager.  State Street as a

10      passive manager.  And then American Funds as an

11      active manager.

12              Those would have been probably

13      been the recurring -- the ones that would have

14      recurred most often.

15          Q.    Did you ever have a conviction

16      rate with the Fidelity Freedom Funds to your

17      recollection?

18          A.    We used the Freedom Funds -- we

19      used Fidelity -- I don't know about the -- Fidelity has

20      several different versions.  So I don't recall

21      that the Fidelity funds -- Freedom Funds were

22      on our high conviction list.

23              We did have some clients at some

24      point in time and I'm thinking this was

25      actually way prior to the class period that we

Page 97

```
 1                    DONALD C. STONE
 2       are talking about who did use the Freedom
 3       Funds, but I believe those clients moved out of
 4       those, the Freedom Funds, at some point and
 5       probably this would have been 2008, 2010
 6       period.  But that's very hazy in my mind.  So
 7       that is just a general.
 8            Q.    No problem.  So just a couple of
 9       other things on this simulation exercise.
10                  Once you ran the exercise and you
11       whittled it down to from maybe six target date
12       funds and then a handful of those would work,
13       quote/unquote, work for your clients.  Then
14       what are the other factors that you would
15       consider as a consultant in providing advice as
16       to which to select?
17            A.    So let's say that three of the
18       funds all passed those screens that you just
19       mentioned.  As I mentioned a couple minutes
20       ago, one of the things that we look at next is,
21       okay, if all three of these get across the
22       finish line, so to speak, which one is probably
23       going to be the most comfortable ride for
24       participants.  Which is to say going to have
25       the lease volatility over that period of time.
```

Page 98

1                          DONALD C. STONE

2                    So one fund might be just really

3          fabulous, it knocks the lights out ultimately,

4          but the ride was like being on a roller coaster

5          all the time, that is probably not the one that

6          you are going to recommend.  You're going to

7          look for something -- if there are three of

8          them that past those screens, you're going to

9          look for something less volatile.

10                   All things being equal, one that's

11         less volatile would be one that you'd probably

12         recommend to the client as opposed to a more

13         volatile choice.

14             Q.    Any other factors that you would

15         consider at that point in time?

16             A.    Well, you're going to look at

17         things like when do people -- at that point you

18         may look at the to versus through idea which is

19         if I went to a client and they said, like most

20         clients would, well, most of our participants

21         take their money out within one year of

22         retirement.  Then it doesn't matter which one

23         you choose because the to or the through are

24         both going to be fine because people are going

25         to take their money out right after the

```
1              DONALD C. STONE
2     retirement.
3              If somebody said our participants
4     they really trust us, they are likely to keep
5     their money in the plan and we would like them
6     to keep their money in the plan because we
7     think they get the fiduciary oversight, they
8     get better pricing blah, blah, blah.  Then in
9     that instance maybe one of the decision factors
10    would be of these three is one of those a
11    through choice as opposed to to.
12             So it's a conversation with the
13    committee they will all work for you, but let's
14    find something that seems to be the best
15    choice, all things being equal.  Those are --
16    there are probably some other factors, but
17    those are the big ones.
18        Q.    When you talk about volatility,
19    just help me understand.  What factors would be
20    driving volatility or what you would be looking
21    at to determine the volatility of a certain
22    fund?
23        A.    Well, keep in mind we projected
24    out the returns based on all the factors that
25    we talked about, and then when -- you're going
```

Page 100

                    DONALD C. STONE
 1
 2      to have a lot of lines on a graph, if you can
 3      picture it, sometimes those lines are going to
 4      be smoother for some target date series then
 5      for others, which means they have fewer ups and
 6      downs in the market.  Maybe they do a little
 7      better job of protecting on the downside when
 8      the market isn't -- as a bear market or a down
 9      market even if doesn't go to a full bear
10      market.
11                    Others are going to be we are
12      pedal to the metal and we are going to generate
13      great returns, but when the market goes down we
14      are just going to get hammered at least for a
15      period of time.
16                    So you're going to have that line
17      that is going to be very jagged.  It is going
18      to look more like a lightening bolt as opposed
19      to smoother line.  That is the visualization of
20      that volatility.
21              Q.    You talked about the to versus
22      through, are you referencing a glide path
23      there?
24              A.    I am.
25              Q.    And is that an important

Page 101

```
 1                        DONALD C. STONE
 2       consideration when determining whether or not
 3       to pick a certain target date fund?
 4            A.     Well, as I mentioned, you have to
 5       versus through.  I think it is only -- it is important in
 6       two ways.  One is if a committee says our
 7       participants keep their money in the plan so
 8       they need something that is going to continue
 9       to adjust over time, then a through would make
10       sense in that instance.  Most plans that is not
11       the case.  Despite the fact that a lot of
12       people would like people to keep money in the
13       plan, there are a lot of committees that would
14       like people to keep money in the plan,
15       typically they don't.  They roll it into an IRA
16       or do whatever they are going to do.
17                        But the other factor that people
18       are going to look at is at retirement age, so
19       at 65, that arbitrary age we all kind of focus
20       on, what is the equity exposure at that point.
21       The range is going to be -- in the industry is
22       going to be from about 20ish percent to about
23       55, 57 percent.  Okay.  So it's a pretty good
24       range.  So that is going to be the other
25       factor.
```

Page 102

1                       DONALD C. STONE

2                       Some committees may say, well, I

3       don't want to have that kind of volatility or potential

4       volatility with a 55 percent exposure to

5       equities at 65.  I want my participants to have

6       less than that and so of the three that you're

7       bringing to me, one of them has 55, one of them

8       has 45, and the other has 42, they probably

9       want to focus on talking about the 42 and 45

10      and in trying to decide between those two.

11           Q.    So would you look -- well, let's

12      say this differently.

13                  Are all glide paths the same?

14           A.    No, glide paths can be -- they all

15      start in a pretty close proximity to each

16      other.  But after that, there is a broad range

17      of, one, where they end up ultimately.  And

18      two, there is a broad range when they decide to

19      begin to lower the equity exposure.

20                  So that changes, there's a broad

21      range of choices there.  There are ones that

22      are 35, 40 years to retire and they are already

23      starting to diminish equity exposure.  There

24      are ones that wait to more like 20 years before

25      retirement before they do it.

Page 103

1           DONALD C. STONE

2                So there is a lot of variety of

3      how these are created and keep in mind the

4      asset allocations under -- that make up the

5      glide path.  We are thinking about it as

6      equity, fixed income and cash, well, it is

7      really, you know, equities could be

8      international equities, it could be emerging

9      markets, it could even be frontier markets,

10     probably not, but could be.  It's going to be

11     domestic markets, it's going to be the exposure

12     of large cap versus small cap.

13                So all of these go into when you

14     look at a glide path you're just getting the

15     first snapshot of how these are created.  And

16     it's a -- again, this is why I think it's a process.

17     Everything about ERISA is a process.  It's a

18     process to educate committees, but they need to

19     understand how these work because it might look

20     very simple on the surface that, you know, I

21     don't want a lot of equity exposure at

22     retirement and then you show them, yeah, but

23     your participants are unlikely to be

24     successful.

25                One plan I looked at a lot a while

Page 104

1                        DONALD C. STONE

2       back, to give you an example, the average

3       balance was $5200.  There is no way that those

4       folks are going to get a successful requirement.

5       Most of them aren't going to get to having the

6       balance no matter what when the average balance

7       is 5200.  They obviously need to be encouraged

8       to save a lot more.  But they also need to have

9       an equity exposure to have any chance of having

10      a reasonable balance at retirement.

11                        Now that is an extreme on one end,

12      but that's a -- actually that's a billion dollar plus

13      plan.  You can look at the other end and say

14      you got a defined benefit plan, heck, you don't

15      need to save that much.

16                        So the answers can be quite

17      different for each plan.  It's just a very

18      thoughtful process to go through.

19              Q.        That's helpful, thank you.

20                        Turning back to I want to go back

21      to we talked about the qualitative -- quantitative

22      factors that you would present to your -- to

23      the committees which you served as consultant.

24                        What about the qualitative factors

25      that would be presented to a committee for

Page 105

1              DONALD C. STONE

2      consideration of monitoring its investment

3      options?

4              A.    Okay.  You want me to just

5      enumerate them.

6              Q.    Yes, if you can.

7              A.    So I think I've spoken to a couple

8      of these before, but you're going to look at

9      the manager tenure, the depth of the team,

10     stability of the organization overall and you

11     can see some of these are related to each

12     other, but they are different.

13             You're going to look at the

14     operational processes which actually means

15     looking at how does their trading desk work.

16     How good are they at trade execution which can

17     make a real difference over time.  How well do

18     they control risk internally.  How do they

19     diversify so that they don't find themselves --

20     you know, how do they track that they are not

21     getting too heavy into a particular, let's say

22     into tech or too heavy into consumer durables

23     or whatever the heck it may be.

24             You want to look at how they put

25     this thing together.  And you want to look at

Page 106

1                    DONALD C. STONE

2      reputational risk as well.

3                     So there a number of factors that

4      come into play in that regard.  Because they

5      are qualitative they are a little bit more --

6      you're not going to -- you're not reporting on

7      hard metrics as much.  There is some of that

8      which is the how long has the manager been in

9      place, is it a single manager, is it a team.

10     So on and so forth.

11                    Some of the metrics are a little

12     bit harder to report as just a metric.

13          Q.     Understood.  So was it your

14     experience that the committees or was it your

15     expectation that the committees considered

16     these metrics each time you provided them in

17     monitoring investments offered in the plan?

18          A.     You do want them to consider them.

19     You want them to understand the qualitative why

20     it is important if there is something that

21     you're telling them about that is qualitative

22     metrics or a measure, you want to make sure

23     that they understand where does that play into

24     the equation and everything.

25                    It is one of -- quite often it is

```
                        DONALD C. STONE
 1
 2      not one thing that makes you choose a
 3      particular manager or makes you decide to not
 4      choose a manager or to remove a manager,
 5      whatever.  It is usually a combination of
 6      factors that come into play.
 7                      So and you're not going to report
 8      on the qualitative -- you know, there are
 9      certain things maybe it will just be in the
10      book, but it is not something that you're going
11      to spend time talking about.  The manager has
12      another quarter of experience this quarter,
13      you're not going to go into that.  As long as
14      it is the same manager you're not going to
15      worry about that.
16              Q.      When you talked about the
17      quantitative metrics you mentioned, I think,
18      comparison to peer group and I think I'm
19      quoting you accurately, you said that was very
20      important.
21              A.      Yes.
22              Q.      Why is that very important?
23              A.      Well those are the -- and I think
24      that is -- I mean you're looking at two different
25      things.  You're looking at, they're related but
```

Page 108

1              DONALD C. STONE

2     they are different.  You're looking at how a

3     fund is doing versus its benchmark.  You're

4     also looking how it is doing versus peers.

5                  Peers are the -- you can't invest

6     in the benchmark, but you can invest with the

7     peers.  So if you're -- you would not want to

8     choose, I don't think, somebody who is lagging

9     their peers substantially.  It is just another

10    snapshot of that -- of how well are they doing.

11    How is that performance.  It is another element

12    of that.

13                  I think in target date funds it is

14    very relevant to see how are they doing versus

15    other funds that are similar to them.

16                  Sometimes you do an analysis

17    of -- if you have a to fund, I don't think this

18    is important myself, they may say we want to

19    see what other to funds are doing and you

20    compare this against maybe five other to funds

21    as opposed to through funds.  So there are

22    different ways that you slice it.

23                  The peers is actually what real

24    managers are doing in realtime out in the real

25    world versus what your particular manager of

Page 109

                        DONALD C. STONE

 1
 2      your investment product is doing.
 3              Q.     So is there specific for the
 4      reporting metrics that you would provide to
 5      your client, is there a specific time period of
 6      performance versus benchmark and performance
 7      versus peer group that you would typically
 8      provide or expect to see?
 9              A.     So I think this goes to -- the
10      answer is yes.  And in a vacuum you want to
11      look at as many different things as you can.
12      So quarter, year to date, one year, three year,
13      five year, 10 year if it exists.  I probably
14      wouldn't look much past that unless it was the
15      rare case where the same manager had been in
16      place for 15, 20 years.  That does exist but it
17      is not as common.
18                     But I would also -- all of this
19      needs to get tied very specifically to the
20      investment policy statement.  So the investment
21      policy statement, you have to make sure that
22      where your focus is is making sure that you're
23      compliant with the investment policy statement.
24      Not necessarily some set of metrics that you,
25      as a consultant, think people ought to be

Page 110

1                   DONALD C. STONE

2      looking at.

3                        It is great that you have that,

4      but your focus has to be on what does the

5      investment policy say.  Because that is a --

6      that's part of the plan documents and it is

7      part of what the plan committee is going to use

8      to evaluate.  So it has to tie to that

9      investment policy statement.

10                       The investment policy statement,

11     for example, says we wouldn't focus on three

12     year, five year numbers, which would be

13     reasonable.  You may report on the 10 year, but

14     you're not going to go put something on watch,

15     for example, because the 10 year number is not

16     attractive.  Because that doesn't tie to the

17     IPS.  Now the IPS, of course, you can go out

18     and you can rewrite the IPS.  You can have a

19     conversation on that but those things are

20     reporting and the IPS really need to tie

21     together.

22                       And then a lot --

23          Q.     Okay.

24          A.     A lot of times you run into

25     problems with that because of the way people

Page 111

1                    DONALD C. STONE
2      create the reporting system.
3              Q.    So let me just ask you this.  Is
4      it your testimony that if there is a reporting
5      metric that is provided to the committee that
6      the committee finds to be concerning and wants
7      to put an investment option on watch, because
8      of that your testimony is that they could not
9      do that if the investment policy statement
10     doesn't specifically require that?
11             A.    No, no, no.  Sorry, that is not my
12     testimony.  Keep in mind the committee has
13     flexibility to -- it's a guiding document.  The
14     IPS is a guiding document and depending on how
15     it is written, if it says you will do something
16     then I think this a clear you're going to have
17     to do that.  But quite often it says you may do
18     something.  So you have to look at the language
19     of it.
20                    They can put it on watch even
21     though the IPS doesn't reference it, but I
22     think that raises an issue at that point of,
23     okay, what is going on with our IPS.  You want
24     to take a look and say, why is it important
25     that we put it on watch, but it is not covered

Page 112

1                    DONALD C. STONE
2        in the IPS.  That would seem -- it would raise
3        other questions, I think, as opposed to --
4                Q.      Got it.
5                        You mentioned earlier -- I'm going
6        to backtrack a quick second to this program
7        that simulated the target date fund and you
8        were talking about volatility in those
9        simulations.  Do you recall that?
10               A.      I do.
11               Q.      You're talking about -- when
12       you're talking about volatility, you're talking
13       about performance volatility?
14               A.      That would be performance
15       volatility, yes.
16               Q.      Is the program being run or is it
17       reflecting performance compared to a certain
18       benchmark and peer groups or one or the other?
19               A.      No.  The simulation -- you're
20       talking about the Monte Carlo.
21               Q.      Yes.
22               A.      The Monte Carlo is taking the
23       demographic information that we talked about
24       and it is then going and running that against
25       all possible combinations or at least thousands

Page 113

DONALD C. STONE

1
2      of possible combinations of return sequences
3      that could happen.  It is not worried -- it is
4      not looking at a benchmark or peer group, it is
5      looking at actual returns.
6                   So let's say, for example, it's
7      going to look at returns for bonds using -- and
8      you're going to have probably -- probably used
9      a broad index for the Barclays Ag, for example,
10     for bonds as the proxy.  It's going to look at,
11     you might use the Russell 1000 as the proxy for
12     domestic equities.  You might use something
13     else for -- you could break it down as much as
14     you want.
15                   You can put in as many inputs, if
16     you want to get down and have short-term bonds,
17     but it is actually looking at projecting against those
18     indexes what you're -- and running what you're
19     balance might be.  It is running against another fund.
20     It is not running against any particular peer group or
21     whatever.  It is running against what those
22     indexes might generate in returns going on a go
23     forward basis.
24            Q.    I see.  I got it.
25            A.    You got it, okay.  Is that okay?

Page 114

1                    DONALD C. STONE

2          Q.    Yes.  I'm okay, thank you.

3     Generally speaking, when it comes to investment

4     funds, do you agree with me that there are time

5     periods where there are fluctuations in

6     performance over time?

7               A.    Absolutely.

8                    MS. ENGELMAN:   It's 12:45 eastern,

9               can we take 20 minutes now and do a quick

10              lunch?  Does that work?  I know it is

11              probably dinnertime to you, Mr. Stone.

12              Let's go off the record

13                   THE VIDEOGRAPHER:   The time is 5:44

14              p.m. and we are off the record.

15                   (Lunch recess taken at 5:44 p.m.

16              European standard time)

17

18

19

20

21

22

23

24

25

Page 115

1                    DONALD C. STONE

2            A F T E R N O O N   S E S S I O N

3                        6:14 p.m.

4            D O N A L D   C.   S T O N E,

5        resumed, having been previously duly sworn,

6        was examined and testified further as

7        follows:

8                    THE VIDEOGRAPHER:   The time is 6:14

9        p.m. and we are on the record.

10   BY MS. ENGELMAN:

11        Q.    Hi, Mr. Stone.  We just had a

12   short lunch break here on the east coast maybe

13   dinner break for you.  Welcome back.

14                Did you speak to your counsel

15   during the break?

16        A.    I did not.

17        Q.    I have a hypothetical for you.  So

18   we are going to switch gears a little bit.

19                So suppose an investment fund

20   underperformed its benchmark on a three and

21   five-year basis for a single quarter.  Would

22   that in your experience require placement on

23   the watch list?

24        A.    It is usual it would be on for

25   just one quarter.  I think you have to go back

Page 116

1                    DONALD C. STONE

2       and look at the IPS and see what it -- how it

3       would direct you, if you will.  So if something

4       was -- I don't know how you could be on a watch

5       list for a five-year period and had it happen

6       just the one quarter.  I mean the numbers are

7       not adding up for me.

8              Q.    The first quarter that there is a

9       detection of underperformance against benchmark

10      on the three year and five-year period.

11             A.    Okay.

12             Q.    Have you ever had a situation

13      where a committee placed a fund on a watch list

14      based on one quarter of underperformance,

15      irrespective of any other factor?

16             A.    I can't recall a specific instance

17      where that fact pattern existed and so I just

18      can't speak to that in terms of actual

19      experience.  As far as that is concerned.

20                   I think that would be a obviously --

21             Q.    Do you personally believe that a

22      fund should go on a watch list if there was a

23      three year and five year underperformance for a

24      single quarter?

25             A.    I think -- are you assuming --

Page 117

1                    DONALD C. STONE

2       first of all, you don't know if it is going to

3       be a single quarter, if I understand your

4       hypothetical correctly.  It is under for one

5       quarter, you don't know what the next quarter

6       is going to look like at this point, correct?

7              Q.      Correct.

8              A.      I think it's a conversation that

9       you have with the committee.  You certainly

10      don't ignore it.  Suddenly this thing is on

11      watch for a three year and five year -- not

12      watch.  It's underperforming for a three year

13      and five year, I think that becomes a

14      conversation with the committee and it is

15      possible it could go on watch because -- and

16      particularly, again, looking at the IPS, you

17      have to look at that and say, well, if there is

18      criteria for the IPS.

19                    There is nothing wrong with

20      putting something on watch and saying this

21      needs closer scrutiny, that is what watch

22      means.  So I don't think there is problem doing

23      that.  I think, but again, I would defer to the

24      IPS and I would have a conversation with the

25      committee and say they could make a

Page 118

1              DONALD C. STONE

2     determination that we are not going to put it

3     on watch list, we will wait until next quarter.

4              But I think that would be one of

5     those things that you look at and say, if it is

6     on for one quarter it's probably really likely

7     it is going to be on the next quarter too

8     particularly for three and five year numbers.

9     It is hard to see those rolling off.

10             So I think it would be reasonable

11    to consider putting it on watch.  I don't think

12    you have to put it on watch, but it certainly

13    ought to be discussed.

14        Q.    How would your answer be impacted

15    if the underperformance on the three year, five

16    year comparison to benchmark was one basis

17    point.

18        A.    Well, again, I think you're still

19    going to have a conversation and that's a

20    conversation that you're having with the

21    committee.  It is only one basis point.  I

22    think it's a fair and honest conversation to

23    have with the committee to say, you know, it is

24    barely there, but here is where we're at.

25             I think you can also look at --

Page 119

```
                           DONALD C. STONE
 1
 2      one of the things that would happen in this
 3      case in your hypothetical, I would think that
 4      the advisor would go and say what number is
 5      going to drop off next quarter.  Because you're
 6      always adding a number and subtracting a
 7      number, okay, for the three year and five year.
 8               So something is going to go off
 9      and something is going to come on.  You don't
10      know what the number that is going to come on
11      at the hypothetical point that you're talking
12      about right now.  But what you do know is what
13      number is going to drop off.
14               What the advisor would be able to
15      say is, yeah, it's one basis point now, but it
16      is probably going to be back in compliance next
17      quarter or it is going to be much worse off
18      based on the number that is dropping off.
19               So I think you look at that.  It's
20      a conversation -- like I said, you don't have
21      to put it on watch, but I think that raises the
22      question that you want to have a conversation
23      with the committee and have the committee make
24      a decision as to whether they want to just
25      watch and wait and see or whether they want to
```

                                          Page 120

                              DONALD C. STONE

 1

 2      put it officially on watch.  They have that

 3      option.

 4          Q.     In your experience would the

 5      committee also want to look at, not just the

 6      three and five-year performance against

 7      benchmark, but also look at performance against

 8      the peer group?

 9          A.     Absolutely.  I think at that point

10      you probably step back and, again, if I was on

11      the committee I would be saying, okay, so first

12      of all is this going to be on watch next

13      quarter and the advisor ought to be able to

14      tell you right then a there.  And then two, by

15      how much, depending on what number is dropping

16      off and is it going to have a magnitude.

17      What's the magnitude of the impact.  And then

18      let's look at the other number.

19                 It's a conversation that the

20      committee is going to have to say, okay, there

21      is issue here, let's take a look at it.  It doesn't

22      mean the house is on fire.  It may turn out to

23      be on fire, but at this point you don't know

24      that.  It is just we have an issue we ought to

25      look at, we ought to be thoughtful about it and

Page 121

1                    DONALD C. STONE

2     take a look and see what else is going on to

3     you point and look at the peer group and any

4     other metrics that seem appropriate at the

5     time.

6          Q.     So similar hypothetical for you.

7     Suppose a fund underperformed its benchmark

8     again on the three and five-year basis for five

9     quarters, irrespective of any other metric,

10    would that automatically require, in your view,

11    removal of the fund?

12         A.     Well, again, I think you go back

13    to what a particular hypothetical, what's the

14    hypothetical IPS say.  You go back to your IPS

15    and it's reasonable that you two companies or

16    two 401-K plans could have different IPSs that

17    have different metrics, that's possible.  They

18    may be -- I would hope they would be similar

19    but they wouldn't necessarily be the same.

20                    The first thing is go back and

21    look at the IPS and see what it says.  See if

22    it says will or whether it says shall or

23    whether it say may.  I mean this is a process

24    and so ERISA is all about process, it is not

25    about outcomes.  So I think at that point

Page 122

1                    DONALD C. STONE

2       you're going to -- five quarters, how far under

3       is it, you have to look at the whole thing.  I

4       think you have to step back and look at the

5       whole thing.  The first thing is look at the

6       IPS and follow the IPS.  You don't look at

7       anything else.

8            Q.    So irrespective of an IPS, in your

9       view, objectively, if a fund underperforms in a

10      three year and five year compared to its

11      benchmark only, irrespective to any other

12      metric, should that fund automatically be

13      removed from the plan lineup?

14                 MR. ROBERTS:   Objection to the

15            form.

16            A.    The answer is, I can't give you

17      answer to that because you do look at a lot of

18      other metrics.  Certainly it would be on watch,

19      but whether you're going to remove it that

20      depends.

21            Q.    When you are evaluating or

22      monitoring the performance of a target date

23      fund and a target date fund is obviously made

24      up of many different vintages, right, correct?

25            A.    Correct.

Page 123

1                    DONALD C. STONE

2           Q.    And those different vintages

3     perform differently; correct?

4           A.    They do, yes.

5           Q.    So in your experience, when you

6     are helping committees to evaluate the performance,

7     for example, on a three year and five-year

8     period of target date funds, how is it that you

9     look at the target date fund as a whole in

10    order to encompass the performance of the

11    various vintages?

12          A.    Well, I think you're going to look

13    at, with the target date you're going to look

14    at potentially three different things.  You're

15    going to look at the overall target date level

16    and that would include all the vintages and

17    what the -- how that performance is.  And

18    depending on how you're reporting on it,

19    do you have a point system or not, whatever

20    mechanism you use for that.

21                Two, you're going to look

22    at each individual vintage and you're going to

23    certainly rank them as to whether they are

24    compliant or not in terms of peer group, in

25    terms of absolute performance.  And I think

Page 124

1                    DONALD C. STONE

2       that in some cases depending on what is going

3       on on any given quarter you're not necessarily

4       going to do this, but if you have a problem,

5       you have an issue with a fund, then I think

6       you're going to want to go and look at the

7       funds that comprise each vintage and see what

8       is happening with them.  Because one or more of

9       those funds is probably or is definitely

10      driving that underperformance.

11                    Usually there is a couple that are

12      having the problem and you want to understand

13      is this something that is kind of something

14      that we might see from time to time or is there

15      a bigger problem.

16                    So I think you're going to look at

17      all of those as a part of that discussion which

18      you will have with the client.

19           Q.    Did you ever have a scenario where

20      you average the performance of the various

21      vintages to look at the average performance of

22      the underlying fund on a three year and

23      five-year basis?

24           A.    I've seen that done.  I think that --

25      I have some concerns about that because I think

Page 125

1                    DONALD C. STONE

2      it can hide issues.  I think as opposed to -- I

3      think it is done to kind of clarify things.  At

4      least that was the original idea.  We could

5      rate this fund a 6, we could rate it a 5, we

6      would rate it a 10, whatever the scoring would

7      be in that case.  And that keeps it simple in a

8      sense, but it also completely I think hides --

9      you don't really know what is going on or

10     what's driving that issue.

11                    So I'm skeptical of kind of

12     rolling that up in an average or, for example,

13     if I'm going to take an average, why wouldn't I

14     take a median and say that you could get into

15     this kind of go down a rabbit hole and I'm not

16     sure that is helpful to a committee.  Could

17     they use that, they can, if this is what they

18     choose to do.  If this is what their IPS says.

19                    Let me go back.  I think

20     committees operate differently and there is no

21     one perfect IPS and I'm not suggesting there

22     are.  I think there are elements that obviously

23     have to be in any IPS and committees can make

24     different decisions based on -- may make

25     different decisions based on similar facts in

Page 126

1                   DONALD C. STONE

2       some cases.  But, again, it comes back to it is

3       not about the outcome, it is about process with

4       ERISA.

5                   Q.    Kind of along those same

6       questions with regard to evaluating the

7       performance of a target date suite.  In your

8       experience would you say that if in your

9       experience, Mr. Stone, in evaluating the

10      performance of a target date fund suite, would

11      you say that if more than 50 percent of the

12      underlying vintages were underperforming, that

13      that meant that the target date suite was

14      underperforming?  Did you reach that conclusion

15      in your experience?

16                  A.    Yes.

17                  Q.    Was that always the case?

18                  A.    I would say, just again on that

19      hypothetical, I would say if 50 percent or more

20      are underperforming, then I think -- then

21      obviously I think there is an issue that needs

22      to be looked at with that particular target

23      date suite.

24                  Q.    Could a committee look at the

25      performance and the level of performance or

Page 127

DONALD C. STONE

1
2    level of underperformance and reach a different
3    conclusion?
4            A.    You kind of went to the heart of
5    what I said a few minutes ago.  You need to
6    evaluate it.  You can't just let it go.  You
7    need to spend the time to go an evaluate what
8    is the underperformance.  What is causing that
9    underperformance.  And then you may make a
10   decision that right now we think it is okay
11   still.  Okay.  I don't think that is possible
12   without doing the evaluation.
13               In other words, the whole point
14   is what the -- the hypotheticals you're bringing up
15   trigger a needed response by the committee and
16   the response is not absolute, every single time
17   no matter what you have to do A and it is not
18   that you have to throw out the fund.  It's that
19   you have to evaluate it and make a
20   determination as to what the appropriate action
21   is.
22           Q.    One more hypothetical along these
23   lines and then we will move on.
24               So say there was a target date
25   suite that underperformed its benchmark on a

Page 128

1                    DONALD C. STONE

2        three and five-year period, but that benchmark

3        outperformed 90 percent of the other assets in

4        it's class, would that inform how the committee

5        evaluated the underperformance?

6                    MR. ROBERTS:    Objection to the

7              form.

8              A.    Can you repeat that, please?

9              Q.    Yes.

10                   MS. ENGELMAN:    Can you read it

11             back, Bill, because I'm not sure I can say

12             it.  If he doesn't understand it I can

13             rephrase it, but I don't know that I could

14             repeat it exactly as I said it.

15                   (Requested portion of record read.)

16             A.    What you're saying is the

17       benchmark measuring the target date fund

18       outperformed 90 percent of all of the other

19       target date funds?

20             Q.    Correct.

21             A.    So all the target date funds, 90

22       percent of them underperformed for some

23       hypothetical reason, and that's at least

24       theoretically possible.  Again, I think what

25       that would say to me, I, as a committee member,

Page 129

1                      DONALD C. STONE

2       I would say, wow, that is interesting

3       information.  So again, and that would probably

4       give me some degree of comfort in the

5       short-term in looking at this, but I would

6       still say, we need to understand why are we in

7       that 90 percent.  What are we doing or what is

8       our fund doing.  We just need to understand it

9       better.

10                      I think all of this triggers a

11      need for additional looking and scrutiny to the

12      situation.  It doesn't necessarily right off

13      top of the bat dictate an absolute answer.  It

14      dictates additional scrutiny.

15              Q.      So I was going down your

16      biography, Mr. Stone, and we went on a whole

17      detour.  So I'm going to reroute back to your

18      sort of your background.

19                      I understand doing the PSA time

20      period you served entirely as a 321 consultant

21      and then 2014, am I correct, that you sold PSA

22      to Pavilion?

23              A.      Correct, in June of 2014.

24              Q.      And you became an employee of

25      Pavilion at that time?

```
                                        Page 130

 1                 DONALD C. STONE
 2        A.      That's correct.  I was an employee
 3   and shareholder.
 4        Q.      What was your role at Pavilion
 5   from 2014 until you retired in 2019?
 6        A.      I was -- my title was executive
 7   director and I was responsible for a number of
 8   relationships that I was -- had been -- was
 9   personally working with at the time we sold the
10   company to maintain those relationships, to
11   make sure they stayed with Pavilion and to
12   ultimately transition them to other people, but
13   not in that initial three year -- the first
14   three years.
15                Then I was also responsible for
16   being one of the spokespeople for the firm.  So
17   I did a lot of public speaking.  A lot of
18   conferences.  I did some writing.  I also
19   continued my being on the executive committee
20   of DCIIA, that's D-C-I-I-A, which you will see
21   in my CV or in the bio I should say.
22                So I continued that role as well,
23   which was obviously promoting better outcomes
24   for participants.  But that gave visibility to
25   Pavilion.
```

Page 131

1              DONALD C. STONE

2              I also did due diligence on

3      managed account products and probably a couple

4      of other things along the way.  I did some

5      training of some of staff at Pavilion.

6         Q.    So did you -- in your role at

7      Pavilion, did you serve as a 338 advisor to any

8      clients?

9         A.    I did.  In 2017 I served as a --

10     began serving as a 338 for a defined benefit

11     plan of one my clients.  I want to say 1.2

12     billion or so.

13        Q.    Okay, do you remember which client

14     that is?

15        A.    Yes, it was I think in the record,

16     Packaging Corp of America.  In 2018 I became a

17     338 for the defined contribution plan as well.

18        Q.    Is that the only plan -- for

19     Packaging Corporation of America, is that the

20     only plan that you served as a 338 advisor?

21        A.    That's correct.

22        Q.    So the record is clear, what is

23     the difference between a 321 and a 338 advisor?

24        A.    So a 321 advises, provides advice

25     to clients that has no discretion.   The

Page 132

1                        DONALD C. STONE

2      ultimate decisionmaking responsibility lies

3      with the committee.  338 has discretion to act

4      on the investments within the mandate that they

5      have been given.

6                     So you could have a -- you

7      could be a 338 for one investment choice in a

8      plan, for example, or for the whole plan.  And

9      the committee still maintains some monitoring

10     responsibility of that 338, but it does shift a

11     lot of the liability for actual decisions to

12     buy fund A or fund B to the 338.

13           Q.    When did the 338 relationship,

14     your 338 relationship end with Packing

15     Corporation, is that when you left Pavilion?

16           A.    When I left Pavilion.

17           Q.    When did it start?

18           A.    So the defined benefit started in

19     2017, the defined contribution in 2018.

20           Q.    With respect to the 321

21     relationships, did you continue the relationships

22     you had from PSA into your time at Pavilion?

23           A.    I did.  And I was responsible for

24     transitioning those relationships into Pavilion

25     and helping ensure that they were happy and

Page 133

1                    DONALD C. STONE
2    would remain clients.  And then I was
3    responsible, ultimately, this would have been
4    in 2017, some time in 2017, maybe late 2017
5    early 2018, to begin transitioning those
6    relationships to other advisors within the firm
7    since I knew I was going to be retiring at -- I
8    didn't have an actual date at that point, but I
9    knew some time in the future I would be and it
10   wasn't that far off.
11            Q.     Just to take this step by step.
12   From 2014 to 2017, early 2017, how many clients
13   would you say that you were personally
14   providing 321 services for?
15            A.     Probably 15.
16            Q.     15?
17            A.     Yes.
18            Q.     Do you have an approximation of
19   the range of the plan size from small to big?
20            A.     Yes.  Probably the, probably from
21   the small end would be probably 30, 40 million.
22   With probably half of those relationships maybe
23   slightly more being just under or well over a
24   billion.
25            Q.     I missed that last part?

Page 134

1                    DONALD C. STONE

2          A.     Just under or well over a billion.

3          Q.     That is a large range.  How many

4    plans would you say were $100 million and less?

5          A.     I'm guessing at this point, but I

6    would say probably no more than three or four.

7          Q.     How many would you say were over a

8    billion?

9          A.     I said just under to over a

10   billion I think it was probably in the

11   neighborhood of 10 or so of the 15.  So there

12   is a couple that would have been in let's say

13   half a billion dollar range.

14         Q.     Did the quality of the services

15   that you provided as a 321 consultant vary

16   depending on whether it was a small client or

17   large client?

18         A.     No.  You asked me that earlier

19   today.  Even at Pavilion it was the same.  We

20   provided the same service.

21         Q.     Did you have -- for these 15

22   clients in this time period, did you have other

23   individuals working alongside you as a

24   consultant or was it just you?

25         A.     No, it was -- I had a team to help

Page 135

1                    DONALD C. STONE

2      me.  For example, quarterly reports, we had at

3      that point we had probably 50 people doing

4      research in reporting.  I would have people who

5      would prepare reports for my review.  I would

6      have investment analysts who would do

7      additional information if there was a need for

8      some kind of a deep dive on a particular

9      manager or not, I would be directing someone to

10     get that information for me.  I might be

11     involved in that process as well, but I would

12     have somebody else who is kind of driving it in

13     that regard.

14                   And I would usually have a, at

15     least, some other, I don't want to say junior

16     consultant, but somebody who was less

17     experienced than I was, let's just say it that

18     way, who would also go with me to meetings.  So

19     I would always have at least two people at a

20     meeting, sometimes three, depending on what the

21     topics were.

22          Q.    From 2017 on you said you started

23     to transition clients to people who were less

24     experienced; is that correct?

25          A.    Well, not necessarily people -- to

Page 136

```
 1                    DONALD C. STONE
 2     people who were not as close to retirement,
 3     let's put it that way.
 4          Q.    Did you have any role with respect
 5     to those clients from 2017 on?
 6          A.    It was an iterative process where
 7     I was involved with some of them all the way
 8     probably halfway through 2018, maybe a little
 9     longer.
10          Q.    I'm going to ask a similar
11     question of PSA.  Do you feel that you
12     personally fulfilled your fiduciary duties with
13     being a 321 consultant with respect to each
14     plan that you worked with?
15          A.    Are you talking with Pavilion or
16     PSA?
17          Q.    Well, at both.
18          A.    Yes, I think I fulfilled my
19     responsibility, yes.
20          Q.    For the people -- for whom the
21     people that work under you and work with you,
22     do you have the same feeling with respect to
23     both PSA and Pavilion?
24          A.    Absolutely.  I trained a lot of
25     them, so it was a -- I trained a lot of them
```

1                    DONALD C. STONE

2       and there was a particular way that we wanted

3       to -- if you want to think about it, it's a

4       process and we wanted to be very careful to

5       take care of our clients.  That is my personal

6       philosophy about how I approach things.

7                    So if you have a client -- you

8       have a responsibility to take care of them and

9       treat them the way that any other client would

10      be treated for that particular service that

11      you're providing.

12           Q.    With the committees with whom

13      you worked, do you feel as though they were

14      good and prudent committees?

15           A.    I do feel that.  Obviously there

16      was a range of skill sets.  There was a range

17      of size of committees, sophistication, so on

18      and so forth.  But this is where, you know, we

19      would not -- we actually refused to take on a

20      couple of assignments at some time in the past

21      I remember because I did not think they were

22      going to take it seriously and I thought it was

23      going to be a problem and I didn't want any

24      part of it.

25                   So the key is is that every single

Page 138

1                     DONALD C. STONE

2       committee we drove the process to say you have

3       to get -- we are going to provide fiduciary

4       education and somebody joins the committee,

5       there is a process that they go through.  They

6       get removed from the committee we want to make

7       sure that they actually have been removed from

8       the committee and documented in writing.  It's

9       a very clear process frankly to avoid problems,

10      but also most importantly to make sure, to the

11      extent that you possibly can, you're acting in

12      the best interest of the participants.

13              Q.     You mentioned a range skill sets.

14      What do you mean by that?

15              A.     People come on to a committee,

16      there are people you go in and the committee is

17      already in existence, the plan is already in

18      existence and you get to know people and you

19      realize -- not to pick on HR, but quite often

20      HR is not as investment savvy as the finance

21      people.  And then sometimes the finance people

22      think they are more savvy than they actually

23      are in terms of fiduciary issues or whatever.

24                     So committees from a large

25      corporation tend to have a bigger talent pool

                                          Page 139

 1                        DONALD C. STONE
 2       to pick from to be on the committee.  Sometimes
 3       they have already got established more robust
 4       processes before we come in.  Sometimes not.
 5                    And at smaller clients quite often
 6       we go in and here is what we would like to do,
 7       which is one of the reasons that we got hired.
 8       This is what we -- the process that we want to
 9       go through to get you tuned up to where you
10       need to be to make sure you're overseeing the
11       plan appropriately, to make sure that we are
12       doing the best job, you're doing the best job
13       that you can for the people in the plan.
14            Q.    Was it generally common in your
15       experience for HR folks to be part of the
16       committee?
17            A.    Yes.
18            Q.    Is that because the committee does
19       more than simply do financial analysis and
20       monitor investment performance?
21                    MR. ROBERTS:   Objection to the
22            form.
23            A.    Yes, typically -- sometimes there
24       was a separate administrative committee, so
25       that's not unusual at some large corporations.

1                    DONALD C. STONE

2       But generally it is one committee and the -- so

3       there are issues that you deal with in terms of

4       plan design.  There are issues that you deal

5       with in terms of, did you payroll right.  Did

6       you not include -- there are a lot of issues

7       that happen with these plans and everything and

8       so all of those issues would typically come to

9       a committee at least to report out what is

10      being done.

11                    In some cases those administrative

12      issues would be handled outside the investment

13      committee room, but they would report back in

14      as to what the follow up was.  There was a lot

15      of issues in terms of revenue sharing, in terms

16      of how we are going to account for, we have a

17      para account which is an account that could be

18      set up to pay expenses of the plan and to

19      actually reimburse companies for people who are

20      working, spending most of their time working on

21      issues around the plan and there are

22      complicated rules around that.

23                    So there is a lot of things that

24      an administrative person does versus an HR

25      person.  Certainly the whole plan design issue

Page 141

1                    DONALD C. STONE
2       is a big issue for that side of the house.
3             Q.    Generally speaking at Pavilion,
4       are you aware of any consultants who worked
5       there who you do not think fulfilled their
6       obligations as a 321 consultant or otherwise
7       worked with imprudent or disengaged committees?
8             A.    I can't speak to whether -- to
9       what the committees were like for somebody that
10      I never met.  So I can't really speak to that.
11                  I would say the staff, all of the
12      consultants at Pavilion, I think I met all of
13      them because we had multiple offices, but all
14      the ones that I knew I think were serious and
15      dedicated about the work they did.  And we had
16      a common process about how we went about --
17      what we presented to clients and how that --
18      how those decisions got made at to what to show
19      them.
20                  To go back to what we talked
21      about earlier today.  The process for picking a
22      target date fund would have been the same if it
23      was me, if it was a colleague of mine who came
24      over from PSA or if it was somebody who had
25      been at Pavilion for ten years before we sold

Page 142

1                DONALD C. STONE

2       the firm to Pavilion.

3            Q.     Got it, okay.  And that would be

4       the same for not just selecting a target date

5       fund, but retaining a target date fund or

6       monitoring a target date fund?

7            A.     That's correct.  All of that would

8       be the same and in fact the research person who

9       was primarily responsible for spearheading the

10      target date efforts and to track them and to

11      investigate all the products that were out

12      there was one of my staff from PSA that came

13      over.

14           Q.     And she did all of that work for

15      Pavilion?

16           A.     He did.

17           Q.     He did, sorry.  When you sold the

18      business from PSA to Pavilion, did the

19      reporting capabilities change?  We talked

20      earlier about reporting capabilities and how

21      those can change over time.  Did that happen?

22           A.     So the defined contribution

23      reporting essentially stayed the same.

24           Q.     Okay.

25           A.     The defined benefit reporting was

```
 1                    DONALD C. STONE

 2       enhanced because Pavilion had been primarily

 3       focused on endowments, foundations and defined

 4       benefit plans and one of the reasons why they

 5       wanted to acquire our firm is because of their

 6       expertise in defined contribution was more

 7       limited.  So we had more resources, I will say,

 8       but the systems that we used, the actual

 9       reporting systems that we used I don't believe

10       changed at all.

11            Q.    You talked earlier, sort generally

12       speaking in the industry how reporting systems

13       can change.  Do you recall that testimony?

14            A.     Are you talking about scoring

15       systems or are you talking about reporting --

16       like there are three or so major reporting

17       systems that everybody basically goes out and

18       buys.  I'm not sure what you're saying.

19            Q.     What are those reporting systems?

20            A.     One of them was produced by

21       Morning Star.  One of them is produce by

22       Markoff Systems and the third is -- the third -- I'm

23       not remembering the name right at the moment.

24                   Quite often it is not unusual for

25       a shop to have two of those in-house and use
```

Page 144

                    DONALD C. STONE

1

2    them in different ways.

3        Q.    Those reporting systems may have

4    different metrics embedded into them and spit

5    out different metrics in different formats?

6        A.    They all have the same metrics

7    available.  You can select which metrics you

8    want to see.  If you're printing out something,

9    you can go in and customize those pages to

10   include only the -- you can suppress some data

11   and include other data, depending on what as a

12   firm you decided what you want to show a

13   client.  All the metrics are available on all

14   of these systems.

15                Generally speaking, if you go

16   and look at -- I looked at probably the vast

17   majority -- I've looked at all major firms out

18   there for sure, they are all pretty much

19   reporting the same stuff.  It may look maybe

20   formatted a little differently, but there is

21   nobody out there who is, that I know of, who is

22   not reporting or peer groups.  There is a

23   nobody out there who's not reporting absolute

24   performance.  There is nobody out there that's

25   not doing risk adjusted performance and so on

Page 145

                    DONALD C. STONE

1
2      and so forth.  So everybody is providing that
3      same data pretty much.
4           Q.    So you did mention scoring systems
5      earlier.  How many of your clients at PSA or
6      Pavilion utilized a score system of some sort?
7           A.    I don't think we used a scoring
8      system at the client level at all.  In fact I
9      know we didn't.  We never did that.  A lot of
10     our -- okay, some of our colleagues did and
11     some of our colleagues didn't, but we never did
12     use that.
13          Q.    Do you have an opinion about
14     whether or not just as a general matter a
15     scoring system is appropriate or inappropriate
16     in evaluating investment options?
17          A.    I guess I will ask you what do you
18     mean by appropriate or inappropriate in the
19     context of what we are talking about here?
20          Q.    Do you think it's a prudent way to
21     monitor investment options as a general matter
22     or an imprudent way as a general matter?
23          A.    I don't think it is necessarily
24     imprudent.  I'm not a huge fan of scoring
25     systems, but I don't think by definition they

Page 146

1                    DONALD C. STONE

2       are imprudent, no.

3              Q.      Mr. Stone, in your report you

4       make several references to the relevant time

5       period.  What time period are you speaking

6       about?

7              A.      Can you show me a particular

8       place in my report where that -- I'm not going

9       to do a memory test tonight.

10             Q.      Sure.  Give me a second.

11      Paragraph 60 as an example.

12             A.      6-0?

13             Q.      Yes.

14             A.      Let me get to that.  I'm on 60.

15      You want me to read through that?

16             Q.      In the second sentence you say,

17      "The committee generally met quarterly during

18      the relevant time period."

19                     What is the relevant time period

20      that you're referring to there?

21             A.      Well, I would be referring to the

22      class period is I guess what I'm saying.

23             Q.      Okay.  What is the class period?

24             A.      I believe it began in the end of

25      2014 and runs to the present.

Page 147

```
 1              DONALD C. STONE
 2        Q.    You believe it began in 2014?
 3        A.    I think at the end of 2014 is when
 4   it began.
 5        Q.    So if we turn to the conclusions
 6   in your report which are on page 66 paragraph
 7   148.
 8        A.    66 paragraph 148.  Okay, I'm
 9   there.
10        Q.    It says, "The conclusion is the
11   committee failed to established and apply a
12   reasonable process to monitor the challenged
13   investments."  Do you see that?
14        A.    I do.
15        Q.    So what are the challenged
16   investments that you're referring to there?
17        A.    I think we are referring to the
18   Freedom Funds.
19        Q.    Anything else?
20        A.    I think that's the focus.
21        Q.    So when you say the committee
22   failed to establish and apply a reasonable
23   process, do you have a time period associated
24   with that?
25        A.    It is over the entire period that
```

Page 148

```
 1                    DONALD C. STONE
 2      is covered within my report which talks --
 3      which focuses obviously starting in 2014 and
 4      goes into probably 2020 at least.
 5             Q.     Do you have a sense of when the
 6      class period runs through?
 7             A.     Well, the class period as I
 8      understand it, that we are still in the class
 9      period.
10             Q.     You said your report ran from 2014
11      to 2020; is that correct?
12             A.     2020 is about where it I stopped
13      commenting on things, yes.
14                    MS. ENGELMAN:   Can we go off the
15             record, I'm having issues with him freezing
16             and I don't know if it's just me.
17                    THE VIDEOGRAPHER:   The time is 7
18             p.m. and we are off the record.
19                    (Recess Taken.)
20                    THE VIDEOGRAPHER:   The time is 7:05
21             and we are on the record.
22                    MS. ENGELMAN:   Bill, would you mind
23             reading back the last thing that you have.
24                    (Requested portion of record read.)
25      BY MS. ENGELMAN:
```

Page 149

1                    DONALD C. STONE

2          Q.     Why is it that you stopped

3     commenting around 2020?

4          A.     Basically the period that I was

5     focused on has to do with the behavior that

6     took place in 2015, 2016, 2017, 2018, 2019.

7     2020 they put in a new IPS and I think there

8     was, also at that point there was some

9     additional training that was being offered from

10    a fiduciary perspective.

11              So I didn't think there's was a

12    lot else to comment on that point.  In talking

13    with counsel that was the period they wanted to

14    focus on I guess is the best way to put that.

15         Q.     So is it your opinion that -- did

16    you review all of the materials relating from

17    2020 forward or you didn't review the materials

18    at all?

19         A.     No, I did.  I reviewed all the

20    documents that I said I reviewed.  I looked at

21    all of them.  If you notice there is nothing in

22    my report that goes into that further period.

23         Q.     So when we look at the litigation

24    documents that are cited in Appendix B, that

25    goes through 2024, the first quarter of 2024

Page 150

1                    DONALD C. STONE
2      and you reviewed all the materials through
3      2024; is that correct?
4              A.    What was the last document in
5      2024?
6              Q.    It looks like you reviewed the
7      meeting -- everything up to Q1, 2024.
8              A.    That sounds right, yes.
9              Q.    Do you know when in 2020 your
10     recorder of what month your opinion essentially
11     stopped?
12             A.    I'd have to look at my report to
13     figure that out at this point.
14             Q.    Sitting here today without looking
15     at your report you don't know when in 2020 you
16     stopped defining?
17             A.    No, I can't tell you what month,
18     no
19             Q.    But it was some time in 2020?
20             A.    That's the last thing that I
21     actually wrote about, yes.
22             Q.    Is it your opinion then from 2020
23     to 2024 that the process was prudent?
24             A.    I did not reach a judgment as to
25     whether it was prudent or not during that

Page 151

DONALD C. STONE

1

2      period.

3              Q.      So when we say -- when we look

4      at your conclusions on paragraph 148 when it

5      says, "The committee failed to establish and

6      apply reasonable processes to monitor the

7      challenged investments."  You're talking about

8      a period that is from 2014 to some time in

9      2020; is that correct?

10             A.      Yes, that be would correct.

11             Q.      So from 2020 on it is not your

12     conclusion that the committee failed to establish

13     a reasonable process to monitor the challenged

14     investments; is that correct?

15             A.      Well, again, I have no comment on

16     it.  There is commentary in my report.

17             Q.      What I'm trying to understand is

18     if you independently made a determination as to

19     the reasonableness of the process during that

20     time period or whether counsel told you that

21     you should not focus on that time period?

22             A.      Counsel did not tell me not to

23     focus on it, but we did not focus on that time

24     period.

25             Q.      Who is we in that sentence?

Page 152

1                    DONALD C. STONE

2          A.      Well, I didn't spend my time

3    looking at documentation on that.  So I think

4    it has to do with when the -- the Freedom Funds

5    changed over was what, 2019, so that's a

6    significant change.  When they got out of the

7    Freedom Funds and got into the other fidelity

8    funds that is where my opinion ends.

9          Q.      You think that happened in 2019,

10   is that your testimony?

11         A.      I think they switched, again, I

12   don't want this to be a memory test, we could

13   look at my report.  I think they switched out

14   of the Freedom Funds in 2019.  I don't remember

15   what month.

16         Q.      So focusing I guess on the -- do

17   you know what month your review in 2014

18   started?

19         A.      I looked at all of 2014, because I

20   looked at -- actually I looked at all of 2014.

21   I was looking at meeting minutes so I would

22   call it the entire year of 2014.

23         Q.      So from January 1st, 2014 to some

24   time in 2020 was the focus of your review?

25         A.      That's what my report covers, yes.

Page 153

1                    DONALD C. STONE

2            Q.    When you say that the committee

3    failed to establish an apply a reasonable

4    process to monitor the challenged investments,

5    is there anything specific in 2014 that was

6    unreasonable in your view?

7            A.    Well, I think one of the things is

8    we don't know how the Freedom Funds got into

9    the mix in the first place.  They were selected

10   prior to -- I believe prior to Ascende being

11   the advisor, if I remember correctly.  So when

12   you look at the minutes, again, the minutes to

13   me and the IPS is from 2015.  So -- I don't

14   think it was -- I don't recall an IPS prior to

15   that.  So the IPS was 2015 I guess is the

16   relevant document.

17           Q.    So I appreciate that.  My question

18   is a little different which is, can you identify

19   anything specific into 2014 that the committee

20   did that was unreasonable with respect to

21   monitoring the Freedom Funds?

22           A.    I don't think they had a process

23   in place to monitor them that tied to the IPS.

24   What the advisor was providing, I don't know

25   that it tied to an IPS.

Page 154

1                      DONALD C. STONE

2           Q.      In 2015 is there anything specific

3     other than what you just mentioned that you

4     identified as unreasonable with respect to

5     monitoring the Freedom Funds?

6           A.      Well, again, I think in 2015 the

7     funds should have been -- they were on -- they

8     were on watch and they were on watch -- one of

9     interesting things, they weren't on watch for

10    underperformance and yet the funds were

11    underperforming.  And that ties into the IPS.

12    But what they were actually on watch for, at

13    least the way they came off of watch later on,

14    they are were on watch because of the lack of a

15    three year performance number at all for some

16    of the underlying funds.

17                      I think that raises a question

18    about how they got selected in the first place.

19    If you don't have a track record you can look

20    at how do you make a selection in that

21    particular instance.  That's the first thing.

22                      The second thing is, if they

23    actually are underperforming overall, each

24    underlying fund, why wasn't it on watch for

25    that purpose at that particular time.

Page 155

DONALD C. STONE

1

2          Q.      Mr. Stone, are you offering an

3     opinion on the committee's selection of the

4     Freedom Funds?

5          A.      No, that is prior to the class

6     period.  So I don't have an opinion on that.  I

7     think -- I have questions in my mind about it.

8     I have no idea how it got in there.  I guess

9     I'm saying Ascende doesn't seem to have asked

10    how it got in there as well and didn't seem to

11    do any due diligence, from what I see in the

12    record on how they got in there as well.

13              Again, it is prior to the class

14    period, so that's kind of not an issue.  I'm

15    not volunteering any opinion.

16         Q.      So it has nothing to do with your

17    report; is that right?

18         A.      I think --

19              MR. ROBERTS:   Objection to the

20         form.

21         A.      I think the selection process -- I

22    have questions -- it carries forward.  Okay so

23    in the period when they were chosen in a sense

24    is not relevant because it is before the class

25    period.  But the same behavior, unless it is

1                    DONALD C. STONE

2      corrected, carries forward into the class

3      period in which case nobody looked at why they

4      got selected.  Nobody went back and why did we

5      select these things, why are they here.

6                    There was is an opportunity to do

7      that when they were on watch for not having

8      three year numbers in some of the funds.  That

9      would have been an opportunity for the

10     committee and advisor to suggest that they go

11     and take a deeper look and understand how did

12     they choose these and are there -- do we want

13     to consider other alternatives.

14          Q.     Was is it your opinion that when

15     Ascende became the advisor in 2015 it should

16     have evaluated whether or not the Freedom Funds

17     were an appropriate investment option?

18          A.     I would think they would have done

19     that for all the investment options that were

20     in the plan.  That would be a normal part of

21     the process.

22          Q.     Is it your opinion if at any time

23     that Ascende became the investment advisor

24     there was any underperformance as compared to

25     benchmark or peer groups, that that fund would

Page 157

1                    DONALD C. STONE
2      be removed at that time?
3              A.    Again, I can go back and look and
4      say what does the IPS say and the answer I'm
5      going to give is the same one I gave awhile
6      back which is, it doesn't instantaneously mean
7      that you're going to remove it.  It means it
8      needs to be reviewed and you need to understand
9      more of the reasons for the underperformance.
10     And there may be a reason that you would keep
11     it and there may be a reason why you would
12     remove it.
13             Q.    Got it.
14                   Moving forward, I want to make
15     sure it is clear that your opinion is that anything
16     prior to the class period is irrelevant, correct?
17                   MR. ROBERTS:   Objection to the
18            form, misstates testimony.
19             A.    What I said was is that the
20     behavior carries forward and is current during
21     the class period because they didn't change
22     anything.  They had an opportunity to look at
23     it and see whether it was appropriate or not,
24     but they didn't do that.
25                   So obviously I could have an

1              DONALD C. STONE

2    opinion about 2009, that wouldn't make any

3    difference either.  That is irrelevant.  But

4    what is relevant is that if a behavior carries

5    forward into the class period, it is relevant

6    to that case.  And that behavior did carry

7    forward because nothing changed.  They didn't

8    do a look at that and determine whether or not

9    it was still an appropriate choice to have in

10   the plan.

11          Q.    In 2016 did you identify any

12   particular deficiencies or parts of the process

13   that were unreasonable in 2016?

14          A.    Well there is things in my report

15   and -- I don't -- well I could go through the

16   report, there are comments about 2016.  But I

17   have to look through the report.  I'm not going

18   off my memory to try to remember specific dates

19   or things in 2016.  If you want to show me

20   something in my report I'm happy to comment on

21   it.

22          Q.    Well get through it.  I'm

23   wondering sitting here today whether or not you

24   have an opinion on whether or not you know

25   there was something in 2016 that you deemed to

Page 159

1                    DONALD C. STONE

2       be unreasonable in the process?

3            A.    I think the -- again, without

4       looking at my report, which is what I would ask

5       to do, but having said that, the behavior in

6       2016, nothing changed, okay, in terms of trying

7       to comply with the IPS.  There were a couple of

8       funds that I believe -- I think it was 2016,

9       but again I would like to look at my report to

10      confirm it, where the way it was reported by

11      Ascende is different than the way the IPS

12      reads.  The two didn't sync up.

13                    The committee didn't pick up on

14      this, they were getting reporting that was

15      showing compliance in one way when the IPS

16      called for compliance in a different way.  And

17      that happened a couple of different times over

18      different time periods.

19            Q.    The same question for 2017, just

20      do you have any sitting here today do you have

21      any opinion as to whether there was something

22      inspect in 2017 that was unreasonable with

23      respect to monitoring the Freedom Funds?

24            A.    There is certainly -- in 2017 is

25      when there was a draft of the IPS that was -- a

Page 160

1                    DONALD C. STONE

2       new IPS was drafted, but it was not adopted.

3       But Eagar, I guess that's his last name, Eagar,

4       specifically said that the reporting that they

5       provided to the committee was based on that

6       2017 IPS which was never adopted.  So the

7       committee was getting information that really --

8       they weren't able to -- they weren't getting

9       the appropriate information as to compliance

10      on -- I don't know how many different funds

11      were affected, but definitely some were

12      affected in that regard.  And they didn't ask

13      about it.  And I think they were kind of

14      getting, just assuming that the investment

15      advisor was tying about back to the IPS or not,

16      but they weren't.  And they didn't ask about it

17      and that's their responsibility.

18             Q.    Other than what you just

19      mentioned, anything in 2017 that you deemed to

20      be unreasonable with respect to monitoring the

21      Freedom Funds?

22             A.    Again, I would want to look at my

23      report.  I don't want to try to go off my

24      memory particularly it is getting late here.

25      I'm happy to go look at any page that you like

Page 161

                        DONALD C. STONE

1          and comment on it.

2              Q.     We will do that, I want to get

3          through these questions.

4                     2018, anything that you can recall

5          that you identified specifically for that

6          reason that was unreasonable in terms of

7          Quanta's process for evaluating the Freedom

8          Funds?

9              A.     Well I don't think anything change

10         in 2018, so I guess the same thing would apply

11         in 2018 in terms of the performance reporting

12         being based on an IPS that had not been

13         adopted.  So that is problem.  Nobody asked

14         anything else about it.  There may have been

15         other things, but again, I would refer to my

16         report.

17             Q.     What about 2019?

18             A.     Another draft IPS which was

19         ultimately adopted in 2020.  And actually one

20         thing that I would want to comment on going

21         back over this period that you were just asking

22         about, as a part of this in the noncompliance,

23         there were three different systems over that,

24         call it 4 1/2 year period.  Three different

Page 162

1                    DONALD C. STONE

2    scoring systems that were being used by

3    Ascende and its successors that don't tie to an

4    IPS.  Don't tie to the IPS that Quanta had

5    specifically.

6                    So they had three different ways

7    they were getting reporting.  So they were not

8    getting the information they needed and they

9    were making decisions based on information that

10   in some cases was not accurate as to how they

11   would expect to see compliance.  So some things

12   may have been showing as compliant when they

13   weren't and vice versa and what have you,

14   because they weren't operating off the existing

15   IPS.  And it kept changing the system that they

16   operated off of.

17                    And at one point and this one I

18   don't understand at all.  I believe this was in

19   2019, basically the committee said stop showing

20   us these scores on each of the funds.  They

21   just wanted to see whether it was pass or fail.

22   Then one of the committee members, I think it

23   was Campbell said that she didn't want to see

24   the word fail.  She wanted to use a different

25   word.

Page 163

1                    DONALD C. STONE

2                    But bottom line they didn't -- so

3         there was additional information, I would think

4         any committee would want to know what the score

5         was.   If you're using a scorecard, even it's

6         the wrong one in this case, if you're getting

7         reporting on it, you'd want to know what the

8         score was because, to your point earlier, what

9         if you're just one basis point off, well that

10        is a different circumstance than if you're a

11        hundred basis points off.  They didn't want the

12        score.  So the score got dropped on that.  I

13        have no idea why that happened.  I don't find

14        that to be a good system to be followed.

15             Q.    Mr. Stone, isn't it exactly the

16        opposite, that if you don't get the score but

17        you just look at the underlying criteria, you're

18        actually looking at the level of performance as

19        opposed to what the scores tells you?

20                   MR. ROBERTS:   Objection to the

21             form.

22             A.    So it depends on what they

23        received.  But, yes, if you get the underlying

24        information, that's great.  But if the -- but

25        the score is what is driving whether or not it

```
 1                    DONALD C. STONE
 2     was compliant or not.  That's where the
 3     disconnect is on that.  You can have the
 4     information and the information could be saying
 5     whatever about the fund which could be good,
 6     not good, whatever, but the -- what made it
 7     compliant or not was the score that it got.
 8     They didn't want to see the score.  You can
 9     have a fund that was actually okay, but if it
10     had a bad score then it would be showing as not
11     okay.
12                    So I think the process is --
13          Q.    Okay.  Do you take issue with the
14     fact that the committee wanted to evaluate the
15     underlying quantitative metrics independently
16     on their own as opposed to looking at a score
17     irrespective of the IPS just as general matter?
18     Do you take issue with that?
19          A.    I don't have an issue with them
20     wanting to look at the information, the underlying
21     information about each of the funds.  That is
22     not an issue.  But I would expect them to look
23     at it in relationship to the IPS.  To not have
24     the IPS as part of that conversation I think is
25     a problem.
```

Page 165

1                    DONALD C. STONE

2          Q.    We will come back to that later.

3    I want to focus on 2020.  Do you have any

4    specific issues with the process that the

5    committee undertook with respect to evaluating

6    the Freedom Funds?

7          A.    Again, I would say I would like to

8    look at my report and --

9          Q.    Sir, you can look at your report

10   any time you like.

11         A.    I'm sorry?

12         Q.    You can look at your report any

13   time you like.

14         A.    I understand that.  If I'm having

15   to search for where something is, it could take

16   some time to find some of those things as

17   opposed to you have some very specific things

18   in mind and I think it will serve the purpose

19   of everybody better if you'd direct me where

20   you'd like me to look and comment.  I'm happy

21   to do that.

22         Q.    I understand, I will.  I'm just

23   trying to understand based on your knowledge

24   sitting here today whether or not you know

25   there is anything in 2020 specific.

                                        Page 166

1                    DONALD C. STONE
2                    You mentioned in 2020 a new IPS
3       was adopted, isn't that correct?
4           A.    That's correct.
5           Q.    Do you have any recollection of
6       whether or not that IPS had any sort of scoring
7       system attached to it?
8           A.    I believe it did, but again, I
9       would like to look at my report.
10          Q.    If it did, did you look to see
11      whether or not the committee from 2020 forward
12      received information that was consistent with
13      the scoring system in the 2020 IPS?
14          A.    No, I don't think so.
15          Q.    Why not?
16          A.    Well, again, at that point the
17      Freedom Funds were not in the mix.
18          Q.    Okay.  So it is your opinion that
19      as of 2020 the Freedom Funds were not in the
20      mix and therefore you did not need to review
21      the committee's fiduciary process from 2020
22      forward?
23                    MR. ROBERTS:   Objection to the
24          form, misstates testimony.
25          A.    I was not asked to review from

                                        Page 167

1                    DONALD C. STONE

2       that point forward for to '24 to have an

3       opinion about that because the funds that were

4       at issue were not in the plan.

5            Q.    If the funds were in the plan past

6       2020, would there be a reason that you wouldn't

7       look to see if the scoring system matched with

8       the criteria that the fiduciary committee was

9       evaluating?

10           A.    No.

11           Q.    So you would agree that you should

12      have done that if the Freedom Funds were still

13      in the plan as of 2020?

14           A.    Yes.

15           Q.    Do you know if there are any other

16      challenged investments in this case?

17           A.    The only ones that I'm aware of

18      were the Freedom Funds at this point.

19           Q.    So Mr. Stone, do you have an

20      opinion, based on your review of the materials

21      in your report, that there should have been

22      action with respect to the Freedom Funds by the

23      committee?

24           A.    Yes.  I think that as of the end

25      of -- as of the fourth quarter 2015 they would

1                     DONALD C. STONE

2        have been on -- they could have been a watch

3        for four quarters at least at that point.  In

4        fact I think that would have been a fifth

5        quarter at that point.  I think, again, there

6        should have been a process where the committee

7        took a very hard look at whether those funds

8        should have been removed or should have stayed

9        in the plan and there should have been

10       documentation either way on what conclusion

11       they reached and why.

12            Q.    Do you have an opinion that they

13       should have removed the Freedom Funds as of a

14       certain date?

15            A.    Again, I think they needed to do

16       the analysis to determine -- so my remit here

17       was to talk about fiduciary process.  I didn't

18       do a deep dive and your question is assuming

19       that I went out and did independent analysis of

20       the Freedom Funds during that particular period

21       and ran all the analytics and everything and I

22       did not do that.  I was not asked to do that.

23            Q.    I understand --

24            A.    So it goes back again to the point

25       I was -- my role as an expert is to talk about

Page 169

1              DONALD C. STONE

2     fiduciary process, not necessarily to provide

3     in-depth information about any particular

4     investment at that time.

5              Q.    But you mentioned the fourth

6     quarter of 2015, you made a specific very

7     specific reference to that and underperformance.

8     So what I'm asking you is, do you have an

9     opinion as to the fiduciary process, whether or

10    not the process should have -- my question is,

11    you mentioned fourth quarter of 2015?

12             A.    Yes.

13             Q.    So what is the issue with the

14    fourth quarter of 2015 that you were referring

15    to?

16             A.    The number of quarters that the

17    fund could have potentially been on watch for

18    underperformance.

19             Q.    So is it your opinion that it

20    should have been on watch or that it could have

21    potentially been on watch?

22             A.    I think it should have been on

23    watch and I think the committee should have

24    determined that, but they did not put it on

25    watch or performance.  In fact they -- it gets

Page 170

1                    DONALD C. STONE

2       worse, because they took it off of watch, it

3       had been on watch for the fact that some of

4       funds, underlying funds did not have a three

5       year history.  And when those funds got a three

6       year history, irrespective of the fact that the

7       funds were underperforming relative to the

8       benchmark, they took it off of watch at that

9       point which I think is -- sends a very strange

10      signal and is something that I can't recall

11      seeing in my past and everything that you would

12      take a fund, even if it is on watch for a

13      different reason, at the time that you start --

14      you want to remove it from being on watch in

15      this case for some of the underlying funds not

16      having a performance history.

17                    I cannot recall seeing a fund come

18      off of watch that in fact has a long period of

19      underperformance at that point.  I think that

20      just speaks to me that they weren't looking at

21      the underperformance at all and it could get

22      kind of crazy if the next quarter they decide

23      to look at it and say oh, this underperformance

24      is really a problem we need to put it on watch

25      again.  I think that process is -- that's a bit

Page 171

                      DONALD C. STONE

1

2    of a mess.

3         Q.    So we will get to some of those

4    details.  I'm just trying to hone in on whether

5    or not you have an opinion that the committee

6    should have removed the Freedom Funds from the

7    plan lineup at a certain period of time?

8         A.    I think they should have done -- I

9    keep coming back to this.  I haven't done -- I

10   don't have all of that analytic data in front

11   of me.  I know the number of quarters that it

12   was underperforming and I know by how much

13   because that is in the report here.  But what I

14   don't have, I don't have the information to

15   make the determination that you're asking me to

16   just blithely say it should have been removed.

17              What I can say, it should have

18   been subject to substantially more analytical

19   analysis which might have resulted in it being

20   removed, but I can't say at this point because

21   the work wasn't done.

22              MS. ENGELMAN:  So let's pull up the

23         IPS, the 2015 IPS Maria.

24              (Exhibit 2 for identification, 2015

25         IPS.)

Page 172

1                 DONALD C. STONE

2        A.    I assume it is still loading.

3        Q.    It usually takes a minute.  I'll

4    get to that in a second.  I'm going to turn

5    your attention to --

6                 MR. ROBERTS:   It looks like it is

7             up now.

8        Q.    One question for you, Mr. Stone.

9    You mentioned some draft IPSs.  Is it your view

10   that those were operative or inoperative?

11       A.    They were not operative in my view

12   and I think a couple of committee members

13   specifically said they, in their deposition,

14   they did not think it was operative.  And I

15   would say it was not operative because it was

16   never signed.

17       Q.    You make some references to the

18   draft IPSs in your report.  Why is it did you

19   do so if they are not operative in your view?

20       A.    Because I think they were used by

21   the advisor to generate their reporting.

22       Q.    Do you see it Mr. Stone?

23       A.    The IPS?

24       Q.    Yes.

25       A.    I have it open.

Page 173

```
 1                    DONALD C. STONE
 2          Q.      This is the 2015 IPS; correct?
 3          A.      Yes.
 4          Q.      And in your view this was in
 5      operation until the 2020 version went into
 6      effect; is that right?
 7          A.      That would be correct.
 8          Q.      And you had an opportunity to
 9      review this IPS as part of drafting your
10      report?
11          A.      I did.
12          Q.      Generally speaking, is it a pretty
13      typical IPS in your experience?
14          A.      For the most part, yeah, I would
15      say, yeah, they all vary a little bit, but for
16      the most part it is fairly typical, yes.
17          Q.      Is there anything that you can
18      identify that is not typical, in your experience?
19          A.      No, I was just thinking about
20      that.  I don't mean to say there is something
21      atypical.  I think the -- as we go through it,
22      I can't think of anything that is a major
23      problem or issue with the 2015 IPS, no.
24          Q.      So you opine -- let's just take a
25      step back here.  If we turn to page 2 of the
```

Page 174

1              DONALD C. STONE

2    IPS.

3          A.    Okay.

4          Q.    That last paragraph where it says

5    "The purpose of the IPS is to provide the plan

6    and fiduciaries with guidelines which will

7    establish the plan's investment objectives and

8    the process for promoting these objectives."

9    Do you see that?

10         A.    I do.

11         Q.    I think you testified earlier that

12   you agree that the IPS is a guideline for the

13   committee?

14         A.    Yes, I think I testified that in

15   general it's a guidepost that the committee

16   uses to have a consistent process.  But there

17   are parts of it that are obligatory and parts

18   that are not obligatory and subject to the

19   discretion of the committee members.

20              Again, this gets back to the

21   language that we talked about earlier.  If it

22   says will, then I think they have to follow it.

23   That is what will means.   If it says may, then

24   that obviously applies discretion on the part

25   of the committee.

Page 175

1               DONALD C. STONE

2          Q.    So if you can turn to page 12 of

3     the IPS.  Are you there?

4          A.    The Bates number seems to be right

5     on top of it, so I'm just -- tell me what it

6     says at the top of the page and I will be sure

7     that I'm on the right one.

8          Q.    I'm looking at "Investment

9     Objectives Criteria for Review and Review

10    Processes".

11         A.    Okay, that is what I'm on.

12         Q.    "Performance Evaluation Criteria."

13    Are you with me?

14         A.    I am.

15         Q.    The second sentence says, "To

16    address this the committee will monitor the

17    plan's investment performance on at least an

18    annual basis and evaluate each of the

19    investment opportunities pursuant to the

20    guidelines detailed herein."  Do you see that?

21         A.    I do.

22         Q.    Do you agree with me that the

23    committee monitored the plan's investment

24    options more than on an annual basis?

25         A.    Yes.

Page 176

1                    DONALD C. STONE

2          Q.    Then it says, "Performance

3    evaluation will include, but not be limited to,

4    comparisons to appropriate benchmark, indexes

5    and peer group comparisons."  Do you see that?

6          A.    I do.

7          Q.    Do you agree with me that the

8    committee evaluated performance and the IPS

9    mandated that performance be evaluated not just

10   on benchmark, but on peer group comparisons and

11   other factors?

12         A.    Yes.

13         Q.    Do you see the next sentence where

14   it says, "Performance will be measured by

15   comparing rates of return to appropriate market

16   indexes and peer groups for the most recent

17   quarter, year to date, one year and three year

18   periods and longer periods where available."

19   Do you see that?

20         A.    But that is not the next sentence,

21   that was the next -- that was another paragraph

22   down.

23              MS. ENGELMAN:    It is saying my

24         internet connection is unstable, can we

25         take five.

Page 177

1                    DONALD C. STONE

2                    THE VIDEOGRAPHER:    The time is 7:47

3          and we are off the record.

4                    (Recess taken.)

5                    THE VIDEOGRAPHER:    The time is 8:01

6          and we are on the record.

7                    MS. ENGELMAN:    Bill, can you tell

8          me the last thing that you got.

9                    (Requested portion of record read.)

10     BY MS. ENGELMAN:

11          Q.    You see it in the IPS, is that

12     correct, on the page?

13          A.    I do.

14          Q.    So then we look at -- if we go to

15     the next page, Mr. Stone, is the investment

16     watch list page.

17          A.    I'm there.

18          Q.    The first sentence says, "The

19     committee may place an investment option on

20     monitor alert status and conduct a thorough

21     review analysis of the investment options."  Do

22     you see that?

23          A.    I do.

24          Q.    Do you agree that the committee

25     has discretion as to whether or not to place an

Page 178

1                    DONALD C. STONE
2       investment option on monitor alert status?
3              A.     That's their job is to evaluate
4       that.
5              Q.     Then is --
6              A.     But here is where the IPS gets a
7       little funky.  If you go back to the previous
8       page.  In the second paragraph it says, "When a
9       fund fails to achieve its stated objective, the
10      reasons for the failure will be evaluated and
11      the committee shall determine whether the
12      option shall remain, be frozen or replaced."
13             So that doesn't quite sync up with
14      the other page.  That gets back to kind of what
15      I've been saying all along which is they
16      actually need to go and determine the reasons
17      for the failure needs to be evaluated.
18             That is not quite the same as
19      saying you don't have to do anything with it,
20      as I think you were alluding to on the
21      subsequent page.
22             Q.     What does the stated objectives
23      mean to you?
24             A.     The stated objectives of the fund?
25             Q.     Correct.

Page 179

1                    DONALD C. STONE

2         A.      Not of the committee or whatever?

3         Q.      Well, it says "When a fund fails

4    to achieve its stated objectives."  That is the

5    sentence that you just quoted; is that correct?

6         A.      Yes.

7         Q.      Do you know what the stated

8    objectives of the target date funds are, the

9    Fidelity Freedom target date funds are?

10        A.      Well I don't know that it's

11   necessarily the stated objectives of what, in

12   this case, what Fidelity would say, but I think

13   it probably refers to the stated objectives

14   that the committee has for the plan.

15               So that goes back to where

16   does it rank, its having a competitive return

17   and blah, blah, blah, blah, okay.

18        Q.      That's not what this sentence

19   says.  This sentence says, "When a fund fails

20   to achieve its stated objectives."

21        A.      Well, its stated objectives may --

22   I read that to refer to its, for example, its

23   performance relative to the IPS standards.

24        Q.      Is that what that says there?

25        A.      That's what I'm reading it to

Page 180

1                    DONALD C. STONE

2      mean, okay.

3             Q.    But you agree with me it says when

4      a fund fails to achieve its stated objectives,

5      correct?

6             A.    Correct, you're having a different

7      definition of what its stated objectives are.

8      We are disagreeing about that.

9             Q.    So we have a grammatical

10     disagreement about how to read a sentence?

11                  MR. ROBERTS:   Objection to the

12             form.

13            A.    I'm say it is not very clear

14     because you think it refers to what Fidelity

15     says about the fund and I'm saying I think this

16     is all in language within the IPS itself.  I

17     don't think -- if they had referred to what the

18     investment manager's stated objective is, that

19     would have been probably a different

20     conversation.  But I'm reading -- I guess that

21     is what we get with indefinite pronouns like

22     its.

23                  I read it as being a reference

24     back to the IPS and the objectives that the

25     committee has for the funds in the plan and not

Page 181

```
              1                    DONALD C. STONE
              2    anything that Fidelity may have as an
              3    objective.
              4         Q.    Would you agree with me that
              5    the objectives of a target date funds are to
              6    meet the needs of retirement for individuals
              7    invested in the target date fund?
              8         A.    Yes, I mean there is nothing --
              9    it's a rather anodyne statement.  You can't
             10    argue with that.
             11         Q.    If we turn back to the watch list
             12    page, Mr. Stone.
             13         A.    Yes.
             14         Q.    The second sentence says, 'The
             15    committee may consider the following criteria
             16    when placing a fund on monitor or alert status?
             17    Do you agree with that?
             18         A.    Again, this goes back to why we
             19    went to the previous page.  I'm not sure this
             20    language syncs up with what the previous page
             21    says.
             22         Q.    Okay, just to be clear, what is it
             23    exactly -- what exactly in this previous page
             24    do you think does not sync up with that page?
             25         A.    So it says, "Thus, when a fund
```

Page 182

```
1                      DONALD C. STONE
2      fails to achieve its stated objectives, the
3      reasons for the failure will be evaluated and
4      the committee shall determine whether the
5      options shall remain, be frozen or replaced."
6                  That contradicts what it says on
7      the subsequent page which is the committee may
8      do any of these following things.
9                  So I don't think those two sync
10     up.  I don't think the IPS is written very
11     tightly in that regard.  Those two shouldn't be
12     out of alignment with each other.
13           Q.    Do you agree with me that the
14     sentence that says "When a fund fails to
15     achieve its it stated objectives the reasons
16     for failure will be evaluated."?
17           A.    Yes.
18           Q.    Strike that.
19                 If you move to the second, the
20     page that I was on in the investment watch list
21     criteria page.
22           A.    Okay.
23           Q.    You see the list of options or
24     list of criteria that the committee may
25     consider, do you see that?
```

Page 183

1                    DONALD C. STONE

2          A.      Yes.

3          Q.      Do you see anywhere in here where

4    it says that a consideration is the three and

5    five-year performance against benchmark?

6                    (Witness reviewing document.)

7          A.      I think that is another strange

8    thing about it.  It is talking about -- so this

9    is where -- this is another thing that is in my

10   report.  The IPS does not mention performance

11   at all in these particular criteria, which is

12   extremely strange that in a watch list criteria

13   you would not mention performance versus a

14   benchmark.

15         Q.      You're incorrect that it doesn't

16   mention performance at all.  The first three

17   bullets are performance criteria; correct?

18         A.      It talks about against a peer

19   group, which is fine, okay.  Risk adjusted

20   return and they talk about the Information

21   Ratio.  All of which is fine.  Okay, I'm just

22   saying I've never seen an IPS that doesn't go

23   and have as potential monitoring -- potential

24   watch issues the performance of the fund

25   against the benchmark.  I've never seen that in

Page 184

1                    DONALD C. STONE

2      my 40 years.

3              Q.    So you agree with me that it is

4      not listed here in this criteria?

5              A.    It is not listed, no.  And it was

6      later on added in I think the draft of the 2017

7      IPS which was not adopted, but I think they

8      realized they left it out.

9              Q.    Do you know whether it is included

10     in the 2020 IPS?

11             A.    Not off the top of my head.  I

12     have to look at it.

13             Q.    When you were preparing your

14     report, did you look to make that determination?

15             A.    I looked at the '15, I look at the

16     '17, I look at '19, which was eventually adopted

17     and I looked at the signed 2020 as well.  But

18     I'm not going to remember everything off the

19     top of my head at this particular point.

20             Q.    My question is, do you remember

21     looking particularly for the issue of whether

22     or not the inclusion of the benchmark was

23     included in 2020 adopted IPS?

24             A.    I think I looked for whether it

25     was included in later versions of the IPS.  I'm

Page 185

1                    DONALD C. STONE
2    sure I did.
3           Q.    When we go back to the earlier
4    page 12 which is the performance evaluation
5    criteria, is it your view that the plan objectives
6    were for the Freedom Funds to outperform its
7    benchmark on the three and five-year period?
8    Does it state that somewhere in the IPS?
9           A.    Where are you looking?
10          Q.    You were focused on this second
11   sentence.  In the second paragraph in the
12   performance evaluation criteria when it says,
13   "When a fund fails to achieve its stated
14   objectives" and your testimony is that that
15   relates to the plan's objectives for a fund; is
16   that correct?
17          A.    Correct.
18          Q.    Is it your belief that the plan's
19   objectives for the Freedom Funds were for it to
20   outperform its benchmark on a three and
21   five-year basis?
22          A.    No, I don't think it said that.
23          Q.    Okay.  If we turn back to the
24   investment watch list process.
25          A.    Okay.

Page 186

1                    DONALD C. STONE

2          Q.      The bottom paragraph it says,

3     "Once an investment option has been assigned a

4     status of monitor, it should remain with the

5     status for up to four consecutive quarters.

6     Without documented approving on the underlying

7     criteria, it will be advanced to a status of

8     alert no later than the fifth consecutive

9     quarter of underperformance."  Do you see that?

10         A.      I do.

11         Q.      Do you agree if there is an

12    improvement of the underlying criteria, the IPS

13    does not mandate an advancement to alert status

14    in the fifth consecutive quarter?

15         A.      Let me read that again.

16              (Witness reviewing document.)

17         A.      So I think what that is saying

18    is -- what I read it as saying is that if it

19    doesn't improve, then it is going to go to the

20    alert status no later than the fifth consecutive

21    quarter which to me would also say it could go

22    to an alert status earlier.  And I'm not sure

23    that it -- it doesn't really speak to the issue

24    of not having gone on the watch list at that

25    point or in the monitor.

Page 187

1                    DONALD C. STONE

2          Q.     But you agree with me if there is

3    improvement, the IPS does not mandate it be

4    advanced alert status; correct?

5          A.     That would be correct.

6          Q.     The second to last sentence says,

7    "The committee at its discretion may change an

8    investment status outside of these standards as

9    each fund is separately evaluated."  Do you see

10   that?

11         A.     I do.

12         Q.     Is that pretty typical for the IPS

13   to allow discretion of that nature?

14         A.     Well, again, as long as it is

15   consistent with other parts of the IPS, yes.

16         Q.     You can put that document down for

17   now.

18                I want to turn back to your

19   report.  Give me a second to find the paragraph.

20   So paragraph 34 of your report, Mr. Stone, if

21   you could turn to that, please?

22         A.     Okay, I'm on that page.

23         Q.     So you state in paragraph 34,

24   "On at least a quarterly basis, fiduciaries

25   should review and analyze the impact of

Page 188

1                        DONALD C. STONE
2        economic developments on the plan, the
3        performance of each plan investment across all
4        relevant metrics, and the qualitative and
5        quantitative factors relevant to the
6        fiduciary's decision to retain or replace any
7        investments on a watch list."  Do you see that?
8                A.     I do.
9                Q.     So it's your testimony that not a
10       single metric is informative necessarily of a
11       fiduciary's decision, but they must consider
12       all of the qualitative and quantitative
13       factors?
14               A.     Well, I think that is misreading
15       what I wrote there.  Obviously what we are
16       saying -- what I'm saying, the fiduciaries want
17       to look at all of it.  But that doesn't speak
18       to whether one of them should be called out and
19       one of them might be enough to trigger taking a
20       look at everything.
21                      It says that the fiduciaries
22       should be looking at all of these things.  This
23       is, you know, to retain or replace something on
24       the watch list.  It says you should look at all
25       of them, which is correct, okay.

Page 189

1                    DONALD C. STONE

2          Q.     Okay, got it.  So the last

3     sentence it says, "Consistent underperformance

4     over longer periods is usually grounds for

5     removal."  Do you see that?

6          A.     I do.

7          Q.     What do you mean by consistent

8     underperformance?

9          A.     This is a generalized statement

10    which could be somewhat different from one plan

11    versus another, depending on what their IPS

12    says.  But generally speaking, consistent

13    underperformance means over an extended period

14    of time to be defined by, again, each committee

15    may define it slightly differently.

16              I will tell you that generally in

17    the industry more often than not it is

18    somewhere between four and six quarters,

19    although that is not a hard rule, because it's

20    this is a -- because it is a -- it's not a

21    cookie cutter decision as to how you do this.

22    You're looking at all factors.

23              You brought up before, you're one

24    basis point under.  Well, that's a very

25    different fact pattern than if you're a hundred

Page 190

```
 1                    DONALD C. STONE
 2      basis points under.  So you're not going to
 3      necessarily make the same decision based on
 4      that.
 5                    So consistent underperformance
 6      means over an extended period of time.  Let's
 7      say somewhere between four and six quarters
 8      typically in the industry.  I think that will
 9      generally be agreed upon.  And that's usually
10      grounds for removal.  Again "usually" key word
11      there.  There are circumstances when that might
12      not be the case.  There are circumstances where
13      it definitely would be the case.  So committees
14      have to use their judgment.  It's not a check
15      the box approach.
16             Q.    When you're talking about
17      underperformance there, are you talking about
18      as compared to a specific metric?
19             A.    I'm talking about underperformance
20      may be compared to -- it could be across any of
21      those metrics if it is underperforming.
22             Q.    Let's turn to page 35 of your
23      report.
24             A.    Okay.
25             Q.    You have given an opinion,
```

Page 191

DONALD C. STONE

1         Mr. Stone, that the committee meeting minutes

2    by this committee were, I'm using your words,

3    "woefully inadequate and cursory."  Is that

4    correct?

5         A.      Correct.

6         Q.      Did you review in full the

7    entirety of the meeting minutes between 2014

8    and 2024?

9         A.      I think I reviewed all of those,

10   yes.

11        Q.      Is it your opinion that every

12   single one of those meeting minutes is woefully

13   inadequate and cursory?

14        A.      No, that is not my opinion.  I

15   didn't single out -- any particular one my

16   might be fine.  This is a general observation.

17        Q.      I'm trying to understand how you

18   reached the conclusion that there is a general

19   observation if all of them are not cursory and

20   woefully inadequate, how many are?

21        A.      You can't have -- you doesn't

22   necessary have to be every single one as

23   woefully inadequate.  Some of those meeting

24   minutes are rather brief and they seem

Page 192

1                    DONALD C. STONE
2      perfectly fine.
3                        Part of the issue here is the
4      minutes were taken by the advisor, they weren't
5      taken by someone on the committee.  So that is
6      not unusual.  I'm not faulting that per se.
7                        What the committee meetings are is
8      they're the voice of the advisor filtering what
9      the committee talked about or said as opposed
10     to -- so there are some of the substantive
11     decisions that are not -- it is not clear how
12     they made some of those decisions.  So when I
13     say this is a general comment, you don't have
14     to have every one be wrong for it to be an
15     issue in general.  That's not -- that was not
16     my claim that every single minute was wrong and
17     should have been redone or whatever.
18                        I think there is a generalized
19     problem that they seem to be -- it's not clear
20     when read through them exactly what the
21     rationalization is for some of the decisions
22     that are made.  They are pretty anodyne.  They
23     are pretty vanilla.  They don't really give me
24     a sense of how did this decision get made.
25     What were the issues that were concerned.

Page 193

DONALD C. STONE

1

2          Q.    As a 321 consultant, did you ever

3    take the minutes for any of the committees with

4    which you worked?

5          A.    I did.  And as I said, that is not

6    unusual in the industry.  It is not -- it doesn't always

7    happen that way, but it is certainly not unusual.

8          Q.    How many clients with which you

9    worked did you take the minutes approximately?

10         A.    Probably a third, maybe it might

11   have been slightly more than a third.  At least

12   a third.

13         Q.    Do you have an understanding in

14   this case that the committee members reviewed

15   and commented on the minutes and revised them

16   as appropriate?

17         A.    I do.  I do recognize that, yes.

18         Q.    You testified earlier that some of

19   the committee minutes were brief but otherwise

20   fine.  Do you remember that testimony?

21         A.    Yeah, I said that just a minute

22   ago, yes.

23         Q.    What does that mean?

24         A.    So it depends on -- that was just

25   an offhand comment.  But it depends on if there

Page 194

1                    DONALD C. STONE

2    were any significant issues to be discussed and

3    whatever, if there weren't and it was a short

4    meeting or if it was an administrative meeting

5    that didn't deal with the investments, that may

6    have been fine.  I'm not referring to a

7    particular set of minutes in this particular

8    case.

9                    What I'm saying, when there were

10   investment decisions that needed to be made, it

11   wasn't always clear what the rationale was and

12   it wasn't very clear what other discussions may

13   have gone on and whether there were any

14   concerns by any of the committee members that

15   weren't captured.

16         Q.    For each of those minutes which

17   you identified a problem, did you include those

18   in your report?

19         A.    I didn't single out particular

20   series of minutes, no.

21         Q.    Why not?

22         A.    It never crossed my mind.  In

23   general the minutes were taken the same way

24   each time.  So in general I felt they were

25   deficient for the reasons that I gave.

Page 195

1                    DONALD C. STONE

2          Q.      Well, you testified earlier they

3     were only deficient in so far as the -- you

4     didn't believe the rationale was adequately

5     captured, correct?

6          A.      That happens in a lot of cases

7     when something is being monitored.  There is

8     always something going on.  In most of the

9     minutes there is something going on.

10         Q.      Do you have an approximation of

11    how many -- first of all, do you know how many

12    minutes you reviewed?

13         A.      I don't have the exact number, no.

14    There was a lot of minutes, but I don't remember the

15    exact number.

16         Q.      I'm going to represent to you that

17    according to your report in the litigation

18    documents you reviewed 37 minutes.

19         A.      Okay.

20         Q.      Do you have any sense of how many

21    of those 37 you took issue with?

22         A.      No.

23         Q.      So do you agree with me that you

24    provided one example in your report of a

25    deficient meeting minute?

Page 196

1                    DONALD C. STONE

2          A.    I'd have to look at that, but that

3    sounds correct.

4          Q.    Do you have any -- did you decide

5    which example would be included in your report?

6          A.    It was part of the conversation

7    that I had with counsel.  I don't know exactly

8    whether I brought it up, they brought it up, I

9    don't know.

10         Q.    So it's your testimony it could

11   have been counsel deciding which example would

12   be in your report?

13         A.    No, they didn't decide which

14   example.  You're misspeaking what I said.  It

15   is my report at the end of the day.  I either

16   agreed with it or I didn't.  I don't know how a

17   particular conversation went that would have

18   taken place weeks ago at this point.  That's

19   not realistic.

20         Q.    But you don't know if you took

21   issue with half of the minutes, a third of the

22   minutes, two of the minutes, you don't know?

23         A.    Now we could go through them all

24   right now and I will tell you as we go.  We'll

25   will go through all 37.  We could do that.

Page 197

1                    DONALD C. STONE

2          Q.      You testified that you reviewed

3     every single one of the minutes in preparation

4     for your report.  Your report contains one

5     example of a so-called deficient meeting and

6     I'm asking what other meeting minutes are

7     deficient in your view.  You reviewed them.

8          A.      Okay, but I don't remember which

9     particular quarter here, there or the other.

10    If we looked through them I could give you that

11    answer.

12         Q.      If the majority of the meeting

13    minutes are deficient, why didn't you include

14    more examples of those deficiencies?

15         A.      I didn't include every single

16    example of everything in the report.  I can't

17    recall ever seeing one of these reports where

18    every single possible thing is capture because

19    it is way too long.

20                  If the bottom line is I didn't, I

21    think as a general process as I read through

22    the reports and, again, in a lot of cases it

23    just strikes me there is stuff that is missing.

24    When I read through it there are things that

25    simply aren't there.

Page 198

1                    DONALD C. STONE

2          Q.    Can you identify any of those

3     things today?

4          A.    If I read through the minutes I

5     can.

6          Q.    Did you read through the minutes

7     in advance of your deposition today?

8          A.    I did not read through them in the

9     last -- I read through some of them yesterday,

10    but I didn't read through them this morning.

11         Q.    So based on your review yesterday,

12    do have any recollection of other things that

13    are missing from the minutes that you did not

14    include in your report?

15         A.    As I read through the minutes,

16    what comes across is it's very -- it's, as I

17    said before, it's anodyne, it doesn't tell me

18    the rationale behind a lot of decisionmaking.

19         Q.    What decision, you look at them

20    yesterday, what ones?

21              MR. ROBERTS:    Are you asking about

22         a particular document or are you asking in

23         the aggregate of 37?  If you want to show

24         him a document you can do that.

25              MS. ENGELMAN:    I'm asking what he

Page 199

1              DONALD C. STONE
2         remembers from his review of the minutes
3         yesterday.
4         A.     At this hour in the evening,
5    frankly I don't remember any specific minute,
6    period.  I can look through them and I'm happy
7    to do that.  For me to say I have a memory, I
8    remember the meeting minutes from June of 2017,
9    no, I'm not going to say that, that wouldn't be
10   accurate.
11        Q.     Is it your opinion that the
12   meeting minutes from 2020 forward were
13   compliant with the IPS?
14        A.     I think it is the same issue that
15   goes forward.  Okay.
16        Q.     You note in your report that the
17   IPS was amended to reflect what needed to be
18   included in the minutes.  Do you recall that?
19        A.     I do.
20        Q.     Do you take issue with that
21   decision?  Is that uncommon in the industry to
22   make a change to the IPS in terms of what needs
23   to be reflected in the minutes?
24        A.     You asked two different questions.
25   That's a compound question.  It is not uncommon

Page 200

                    DONALD C. STONE

1
2        for an IPS to be modified over time.  In fact
3        it is fairly common.
4                Q.      Okay, let's turn to paragraph 86
5        of your report.
6                A.      86, okay.
7                Q.      So you say here, "This is a
8        glaring example of deficiency of the meeting
9        minutes."  Right?  And this is the fact that
10       the Freedom Funds were on monitor status in
11       February, 2016?
12               A.      Correct.
13               Q.      Do you see that?
14               A.      Yes.
15               Q.      You say here "As of the fourth
16       quarter 2015 meeting, the Freedom Funds had
17       been on monitor status for four consecutive
18       quarters."  Do you see that?
19               A.      Yes.
20               Q.      Then you say, "The quarterly
21       investment review presented at the meeting also
22       detailed that the Freedom Funds were
23       underperforming their benchmarks for a three and
24       five-year period."  Do you see that?
25               A.      I do.

1                   DONALD C. STONE

2          Q.     Then it says, "In accordance with

3     the criteria of the 2015 IPS, if an investment

4     on monitor status for four consecutive quarters

5     shows no signs of improvement in the underlying

6     criteria, it is to be advanced to alert status

7     absent a documented decision by the committee

8     to change an investment status."  Do you see

9     that?

10         A.     I do.

11         Q.     We looked at the 2015 IPS earlier

12    and you agreed with me that the performance

13    against benchmark for the three and five-year

14    period is not included as a monitoring criteria

15    in the 2015 IPS; correct?

16         A.     Correct.

17         Q.     Then it says, "The minutes of the

18    fourth quarter 2015 committee meeting held on

19    February 15th, 2015 reflected a number of

20    investments were discussed in-depth to

21    determine monitor status."  Then it goes on to

22    say what the minutes reported.  Right?

23         A.     Yes.

24         Q.     I'm going to the middle of the

25    paragraph, paragraph 88.  "Given that the

Page 202

1                    DONALD C. STONE

2      Freedom Funds continue to underperform their

3      benchmark and that the advisor and the

4      committee noted that no significant changes to

5      the suite had occurred during 2015, it is

6      entirely unclear how the committee arrived at

7      its decision to remove the Freedom Funds from

8      monitor status at this time."  Do you see that?

9            A.     I do.

10           Q.     I believe you testified earlier

11     that the reason that you're aware that the

12     reason that the Freedom Funds were on monitor

13     status as of this time was the lack of

14     performance data for some of underlying funds;

15     is that right?

16           A.     That was the reason that they

17     gave, yes.

18           Q.     Were you aware of that at the time

19     that you wrote this report?

20           A.     Yes.

21           Q.     So when you say that given the

22     Freedom Funds continued to underperform their

23     benchmark and that the advisor committee noted

24     no significant changes to the fund suite

25     occurred in 2015, were you aware at that point

Page 203

1                      DONALD C. STONE
2        that you wrote the report that the Freedom
3        Funds were not on monitor status for
4        performance?
5                A.      They should have been.
6                Q.      But they weren't; is that correct?
7                A.      Well, and that's a flaw by the
8        committee, that they were not on watch status
9        at that point.  That was -- and to take them
10       off monitor in general.
11                      When you go on monitor, to come
12       off monitor says that all the issues are
13       resolved.  That is typically the way that you
14       think of that.  When they came off monitor all
15       the issues weren't resolved.  They still had
16       significant underperformance issues despite the
17       fact that the IPS left that language out.
18                      So my point is, I think the
19       committee, regardless of whether -- because the
20       committee has the flexibility to put it on
21       monitor for any reason they want, and it's
22       incomprehensible to me that they come and take
23       it off of monitor when it is still underperforming.
24                      They could have gone and said,
25       okay, we are taking it off of watch for the

Page 204

1                    DONALD C. STONE

2      three year number, but at the same time it would

3      have made sense they we are going to keep it on

4      watch because it is still underperforming.  We

5      are looking at it in a different lens at this

6      point.

7                    I think the committee -- I don't

8      know if they just weren't paying attention or

9      exactly what happened that they would take

10     something off monitor when it's underperforming.

11     Regardless whether it is specifically a bullet

12     point in that 2015 IPS or not.

13          Q.    So I guess that's my question.

14     What is the basis for your opinion that it

15     should have been on monitor as of -- for the

16     poor performance, what is basis of your

17     opinion?

18          A.    Because I think the committee has

19     a duty of loyalty to the plan to look after the

20     best interest of the participants.  And I don't

21     think they were making a good judgment in that

22     affect.  Okay.  It is incomprehensible to me.

23          Q.    Do you know what the

24     underperformance was at this time period

25     relative to benchmark?

Page 205

1                    DONALD C. STONE

2          A.     There is a list that gives the

3     underperformance fund vintage by vintage.  I

4     don't have it right in front of me.  I looked at it

5     earlier today, but I don't have it in front of

6     me at the moment.  It varied from being just

7     slightly underperforming to being fairly

8     substantially underperforming.  So it varied

9     depending on the vintage.

10         Q.     So was this underperformance

11    compared to index or compared to benchmark or

12    compare to something else?

13         A.     I believe that was compared to the

14    index.

15         Q.     Do you know how the target date

16    funds were comparing as to peer group during

17    the time period?

18         A.     They were showing up a little

19    differently.  You're talking about the liber

20    list?

21         Q.     I'm asking you if you know.

22         A.     The peer group performance looked

23    better than against the benchmark.

24         Q.     So is it plausible that the

25    committee looked at the peer group performance

Page 206

1                    DONALD C. STONE

2      and decided that it didn't need to be on monitor

3      status because the performance against peer

4      group?

5              A.    But they didn't say that.  This

6      goes back to the minutes not talking about the

7      rationale employed.

8              Q.    Do you have any sense of whether

9      or not the performance improved during the time

10     they were stated on monitor until the time they

11     went off monitor?

12             A.    I think it varied depending on the

13     vantage.

14             Q.    Do you know one way or another?

15             A.    And depending on the quarter.

16     There was some improvement during I think part

17     of that period of time, but by the same token

18     they were still underperforming.  So they never

19     got above the waterline.

20             Q.    You talk about in your report that

21     the Freedom Funds were the plan QDIA; is that

22     correct?

23             A.    Yes.

24             Q.    And that there should be some sort

25     of heightened scrutiny around the plan's QDIA;

Page 207

1                    DONALD C. STONE

2       is that correct

3              A.      Correct.

4              Q.      What do you mean by heightened

5       scrutiny?

6              A.      Well, by heightened scrutiny I

7       mean, usually QDIA holds a large percentage, if

8       not the majority percentage, of all the assets

9       in the plan.  So I think that the -- so just by

10      share looking at raw numbers and number of

11      participants typically involved as well that --

12      this is not a minor thing.  It is not like it's

13      a fund that is held -- some kind of select fund

14      that is held by three individuals who happen to

15      be in a C suite.  It's a very different thing.

16                     They are people who quite often

17      have been defaulted, they tend to be

18      unsophisticated people, they tend to be

19      unengaged, their money is going into a suite of

20      funds that they don't actually know much about

21      and they are relying upon the plan fiduciaries

22      to look after their interest.  So I think that

23      is why I say a heightened level of scrutiny is

24      reasonable.

25             Q.      My question was a little

Page 208

1                      DONALD C. STONE
2       different.  What is the heightened level of
3       scrutiny?  What does that entail?
4              A.      The heightened level of scrutiny,
5       it looks at it more carefully to be sensitive
6       to the fact that you don't go and -- in this
7       case you don't go and remove it because it
8       doesn't happen to show up in the 2015 IPS to
9       look against benchmark.  You don't remove it
10      from a watch list because it is still
11      underperforming.  You try to understand what's
12      driving that underperformance and I don't see
13      that anywhere they spent time doing that.
14             Q.      Did you always do that in your
15      role as a 321 investment advisor?
16             A.      Of course.
17             Q.      Mr. Stone, you opine in your
18      report that the committee failed to review the
19      services provided by Ascende and QPA; is that
20      correct?
21             A.      That's correct.
22             Q.      Is it your opinion that the
23      committee was under obligation to do an RFP for
24      services by another investment consultant?
25             A.      I don't think it was necessarily,

Page 209

1                    DONALD C. STONE

2       although that would be the better way to go.

3       An RFP per se, like I said, I think that would

4       be the preferred way to go, but they weren't

5       under a, quote, obligation to do just an RFP.

6       They could have done an RFI, they could have

7       had a -- they could have hired somebody to a

8       benchmarking study of advisors.  An RFP would

9       certainly be the preferred way because you get

10      so much more information, much richer.

11                    The Department of Labor

12      specifically does call out -- they don't call

13      out an RFP, of course, but they do call out

14      that you have to have a process for reviewing

15      your service providers.  And that would

16      certainly include your investment advisor.

17           Q.    But you agree that the Department

18      of Labor doesn't require any specific manner in

19      which to review your investment advisor; is

20      that correct?

21           A.    The Department of Labor doesn't

22      require almost any of the things that we have

23      been talking about, including an IPS, a

24      charter, they don't require having a committee

25      of multiple people.  You could have an

Page 210

1                    DONALD C. STONE
2       individual, it is not a good process, but you
3       could do that.
4                    Most of the things -- they don't
5       require looking at peer groups.  They don't
6       require looking at risk adjusted returns.  None
7       of this is anywhere in ERISA because it is 50
8       years old and this has been an accretive
9       process of what has been standard practice in
10      the industry over a period literally of decades.
11                   So none of this stuff is -- and
12      the Department of Labor, I think, doesn't want
13      to get involved in some of the level of detail
14      in everything.  I'm not sure the skill set is
15      there.
16           Q.     When you were a 321 investment
17      advisor from 2002 to 2019, did you recommend to
18      your clients that they conduct an RFP or a RFI
19      for other investment consultants?
20           A.     I had many of them go exactly
21      through that.  I never said don't do that at
22      all.
23           Q.     Did every single one of them do
24      that annually?
25           A.     First of all, you wouldn't do it

Page 211

1           DONALD C. STONE

2     annually.   You wouldn't do an RFP annually.

3     But not every single one of them, as I recall,

4     actually did it.  But those were conversations

5     that we had as part of the fiduciary training

6     that your service providers, and that would

7     have included us sitting in the room, you ought

8     to be out periodically going through a formal

9     process to determine if you have the

10    appropriate choice.

11          Q.    So tell me what specific steps you

12    made sure they were going through -- every

13    single one of your clients was going through a

14    formal process to determine --

15          A.    As I said some of them --

16          Q.    Let me finish my question.   -- to

17    determine whether or not to continue to have

18    their services provided by the PSA or Pavilion?

19          A.    As I said a minute ago, not all of

20    them chose to go through that.  As a 321 I

21    could make recommendations, I couldn't go and

22    act for them.  So not everyone of them went

23    through a formal process.  Many of them did.

24          Q.    How many did?

25          A.    I don't know exactly the number,

Page 212

1                    DONALD C. STONE
2      but it certainly would have been well over half
3      of our clients.
4            Q.    For the other half you testified
5      earlier that you believe all the committees
6      that which you worked with were prudent engaged
7      in good committees.  Does your answer change
8      given that they didn't go out and do a formal
9      RFP and RFI?
10                   MR. ROBERTS:   Objection to form.
11           A.    The thing to realize is, I don't
12     even know if they did an RFP separate.
13     Sometimes they don't tell you what they're
14     doing.  They don't include you in that process.
15     If they do an RFI they don't include you
16     necessarily.  So there would be ones that I
17     don't know what they did.  I'm not included in
18     some of those conversations or wasn't, I should
19     say, included in some of those conversations
20     depending on how the committee decided it
21     wanted to act.
22           Q.    But sitting here today you're
23     aware of some of the committees in which you
24     worked where you don't know whether or not they
25     underwent any formal process for evaluating the

Page 213

1                  DONALD C. STONE
2       services that you were providing?  You have no
3       idea one way of the other?
4            A.    I don't know what process they
5       went through.  I won't say they didn't go
6       through a process, but I don't know what
7       process they went through because typically the
8       existing advisor is not included in that process
9       unless it's a full blown RFP.
10           Q.    If you don't know what process
11      they went through, how do you know they went
12      through a process at all?
13           A.    This is really a gotcha game and
14      it is really rather childish at this hour of
15      the day.
16                 My clients went through rigorous
17      training on what they should do.  At the end of
18      day they needed to take the action to go
19      through a process to evaluate us.  Sometimes
20      they went through a process of evaluating us
21      that we found out about after the fact.
22                 Sometimes they went through a
23      process that it was quite formal with an RFP
24      which we knew about upfront.  Sometimes they
25      did it through talking to their peers.  There

Page 214

1                    DONALD C. STONE

2      were multiple ways they decided to go about

3      that.  I did not have access to all of that

4      data.

5                    So I can't, for example, respond

6      to their level of prudency on that particular

7      element because I wasn't involvement in that

8      process and I was there to provide advice not

9      to dictate what they did.

10           Q.     Let's turn to training.  You talk

11     about training for individuals who were

12     onboarded on to the committee during the

13     relevant period.  Do you recall that line?

14           A.     I do.

15           Q.     Do you know whether any

16     committee members were onboarded during the

17     relevant time period in that case?

18           A.     They talk about an informal

19     process of onboarding that seems to come back

20     to the conversation of being included in the

21     quarterly investment reviews where there was

22     some degree of fiduciary information provided.

23     And there were I think a couple of years where

24     there was a one-pager that I saw that bullet

25     pointed various fiduciary things that people

Page 215

                    DONALD C. STONE

1    should be aware of which I would not consider

2    anywhere near adequate fiduciary training nor

3    would anyone else that I know of consider that.

4              So I don't think -- I think a

5    couple of the numbers specifically refer to the

6    fact that they did not get specific onboarding

7    training.

8         Q.    My question was a little

9    different.  Do you know whether or not any

10   committee members were onboarded during the

11   relevant period in this case?

12        A.    I thought I answered that.  I said

13   some of them said they received -- that their

14   onboarding was getting quarterly information as

15   they were in the meetings.

16        Q.    You're misunderstanding my

17   question.  I'm talking about the timeframe.  Do

18   you know whether or not anyone was actually

19   onboarded during the relevant time period in

20   this case?

21        A.    You mean a new person entered the

22   committee?

23        Q.    Yes.

24        A.    Okay, I didn't understand that.

Page 216

1                     DONALD C. STONE

2                     I'm trying to think who went --

3        there was a -- there was a change over of a

4        couple of members of the committee, I don't

5        remember the exact date, but the 2015 IPS I

6        believe was signed by a couple of people that

7        were not on the committee later.

8              Q.    So you testified or paragraph 93

9        of your report, I will direct you there.

10             A.    Okay, I'm there.

11             Q.    You say, "Other than brief updates

12       in quarterly investment review materials

13       provided by the plan's investment advisor, no

14       formal fiduciary education materials were

15       presented to the committee prior to May 24th,

16       2021."  Do you see that?

17             A.    I do.

18             Q.    What do you consider to be formal

19       fiduciary education?

20             A.    Well, I think it's a very -- it's --

21       probably a good example would be what was

22       actually presented on May 24, 2021.  It is like

23       a 22-page document that walked through a number

24       of issues.  It's a question of how much you

25       want to include.

Page 217

1                    DONALD C. STONE

2                    But the reality was that it talked

3        about a lot of different aspects, what it means

4        to be a fiduciary, how you monitor the

5        investments.  It talked about appointment to

6        the committee.  It talked about all the

7        different processes that you look at and how

8        you should also think about being a fiduciary.

9        So it was a pretty detailed document.

10                   I don't think it was -- I probably

11       would tweak it a little bit if I were doing it

12       myself, but that is neither here nor there I

13       suppose.

14                   I think it was a pretty rich and

15       robust document overall as compared to what we

16       saw prior to that period when for I think two

17       years there it was a one-page bullet pointed

18       document that I have no idea how much was --

19       what was spoken to from that and how that was

20       presented.  And otherwise it was just different

21       updates during quarterly meetings which there

22       is nothing wrong with updates during quarterly

23       meetings, but it is not sufficient.

24           Q.     So when you're talking about a

25       one-pager, are you talking about the fiduciary

Page 218

1            DONALD C. STONE
2     essentials document, do you know?
3           A.     That sounds correct.
4           Q.     Do you know when that was
5     presented to the committee?
6           A.     It was presented on two different
7     occasions as I recall and I don't remember the
8     exact dates.
9           Q.     Was it prior to 2021?
10          A.     Yes, it was.
11          Q.     Your position is that is just not
12    a formal training in your view?
13          A.     I think it's -- a one page bullet
14    point is not formal training in any sense of
15    the word in my mind.  I think it is -- it's a
16    complicated issue and people need help in
17    understanding what they're supposed to do and
18    it's certainly not an onboarding of anybody.
19               No, I don't think it is formal
20    training at all.  It didn't get into a lot of
21    different issues that I would have gone into.
22    And I don't know how much was spoken.
23               I want to add, even with the
24    bullet points, I don't know what was spoken to
25    those bullet points or not spoken to them in

Page 219

1                    DONALD C. STONE

2      terms of the amount of relevant detail that

3      would have been provided in terms of talking

4      about fiduciary responsibility, investment

5      monitoring and selection, you know, acting in

6      the interest of the participants as opposed to

7      the interest of the company or yourself,

8      conflicts of interest.  These are pretty meaty

9      topics that require more than a single bullet

10     point on a sheet of paper.

11            Q.    Understood.  You don't have any

12     knowledge sitting here one way or another what

13     was actually delivered in the fiduciary

14     essentials presentation to the committee,

15     you're just going off what is included in the

16     one-pager?

17            A.    That is the piece of paper that

18     apparently was given to them.

19            Q.    You don't have any knowledge or

20     testimony or record of any sort regarding what

21     was actually delivered, it could have been much

22     meatier than what the one-pager suggests?

23                    MR. ROBERTS:   Objection.

24            A.    I have no idea what was delivered.

25     I cannot imagine that you can deliver -- based

Page 220

DONALD C. STONE

1
2      on those bullet points, it certainly would not
3      have been sufficient regardless of what was
4      delivered in person.  No, I don't know what was
5      delivered verbally, let's say, to those bullet
6      points.
7              Q.    Do you have a recollection that
8      the bullet points did cover at least at a high
9      level investment monitoring?
10             A.    They did.
11             Q.    So you mentioned earlier,
12     Mr. Stone, that the DOL does not require a
13     charter; is that correct?
14             A.    They don't require a lot of things
15     in explicit terms, no.
16             Q.    You agree with me that ERISA does
17     not require a charter of any kind?
18             A.    I missed the last part of that.
19             Q.    Do you agree that ERISA doesn't
20     require a charter of any kind?
21             A.    A what?
22             Q.    A charter of any kind.
23             A.    What did you say before that?
24             Q.    ERISA does not require.
25             A.    That's what I missed, sorry.  No

Page 221

DONALD C. STONE

1     ERISA is not -- is not that explicit about a

2     lot of things as I said a minute ago.  It

3     doesn't require a committee.

4          Q.    Did every single one of the

5     clients with which you worked at both PSA and

6     Pavilion have a charter in place?

7          A.    They did.  I wouldn't allow them

8     not to.

9          Q.    When you say charter, do you mean

10    charter or other equivalent document?  I think

11    you use that in your report.

12         A.    It could be an equivalent

13    document.  Again, it depends on what it says in

14    the equivalent document.  The IPS typically

15    reiterates some pieces of it, but there is a

16    lot of things that an IPS would not include and

17    the IPSs in this case do not include that would

18    be essential to have in a charter.  It could be

19    covered in the plan document.  Sometimes that

20    happens.  And that's fine.  My preference would

21    be for a charter, but you don't have to have a

22    charter as long as the information is conveyed

23    that needs to be conveyed.

24         Q.    So let's go back to the 2015 IPS.


Page 222

1                    DONALD C. STONE

2          A.    Let me bring that up.

3          Q.    Can you identify what is missing

4     from the IPS that you would like to see in a

5     charter document?

6          A.     Well there are several things that

7     are -- that jump out right from the get-go.  So

8     I don't know that IPS is going to help because

9     it doesn't have anything in there about this.

10    So a charter first of all should clearly

11    delegate authority to either an individual or

12    to a committee and by that it is going to be

13    clear who the authority is that it's coming

14    from.  It could be the board, it could be from

15    the CEO, it could be handled several different

16    ways.  It is going to also detail what

17    authority that committee has.  It is not just a

18    matter of you can monitor the investments and

19    this, that and the other.

20              Part of it is what authority don't

21    you have.  Where does your committee get

22    circumscribed.  In some cases a committee can

23    make decisions about certain things and that is

24    very clear.  Again, that is the purpose of a

25    charter.  It is very clear that this is something that

Page 223

1                    DONALD C. STONE

2       we can make a decision about.  Here is

3       something that over here if it happens we need

4       to go and raise it to -- elevate it to another

5       level.

6                    So that's not covered in the

7       investment policy statement.

8            Q.    I don't want to interrupt you

9       there, but if you're done with that particular

10      thought I would like to jump in with a question

11      whenever you done with that particular thought.

12           A.    The point is, I think there is a

13      number of areas that are not covered in the IPS

14      that a charter should cover that makes the

15      authority very, very clear.  And I think that

16      is a very important point.

17           Q.    So I want to turn your attention

18      to paragraph 28 of your report.

19           A.    Paragraph 28?

20           Q.    We are going to look at paragraph

21      28 of your report and look at the 2015 IPS.

22           A.    All right, I have paragraph 28.

23           Q.    You say, "The responsibilities of

24      such a committee are customarily set forth in

25      plan documents such as a committee charter and

Page 224

1                      DONALD C. STONE
2       may include, among other things, 'establishing,
3       interpreting and following investment policy
4       statement'."  Do you see that?
5                A.    I do.
6                Q.    Let's turn to page 4 of the IPS.
7                A.    Okay.
8                Q.    Do you see here that it sets forth
9       the roles and responsibilities of the 401-K
10      committee.  And it sets forth exactly what the
11      401-K committee is going to do and that
12      includes preparing and maintaining the IPS?
13               A.    Yes, I see that.
14               Q.    And then you see here in bullet
15      point two you say, "Selecting investment
16      options for the plan including the QPA."
17               A.    Yes.
18               Q.    Do you see here where it says,
19      "Determine guidelines for selecting investment
20      options and then provide sufficient asset
21      classes with different and distinct risk return
22      profiles so each participant may prudently
23      diversify his or her accounts."  Do you see
24      that?
25               A.    Hold on, I got my pages turned up

Page 225

1                    DONALD C. STONE

2       here.  Where are you again now?

3             Q.    I'm on page 4 of the IPS, bullets

4       number 3 and 4.

5             A.    Determine guideline and provide

6       sufficient asset classes, okay.

7             Q.    Do you see subsection 3 on page 28

8       of your report says "Monitoring the performance

9       of each of investment options"?

10            A.    Yes.

11            Q.    Then do you see two bullets down

12      it says here "Establish procedures for continuing

13      monitoring and evaluating the investment

14      options."?

15            A.    Yes.

16            Q.    Then do you see bullet point four

17      where it says, "Appointing service providers

18      for the plan including investment advisors?

19            A.    Yes.

20            Q.    Do you see the last sentence of

21      this page it says "The committee also has the

22      authority to obtain the services of any third

23      providers as it deems necessary."?

24            A.    Yes.

25            Q.    Mr. Stone, you also state in your

Page 226

1                    DONALD C. STONE

2       report at what I'll say that you seem to have

3       taken issue with the fact that the committee

4       operated by consensus voting; is that correct?

5            A.     Yeah, it is not -- I think it can

6       be confusing.  It's not that you can't do

7       consensus voting, but sometimes in the not

8       clear and particularly in this record it is not

9       clear if they actually took a vote or what the

10      results of the vote were in some cases.  And

11      what happens to somebody if you don't have a

12      consensus.

13            That to me strikes me as a

14      particularly potentially dangerous area to get

15      into that you can't reach a consensus.  So it

16      is not -- I'm not saying that you can't use

17      consensus voting, but I'm raising that I don't

18      think it is the best approach to -- it is not

19      the approach that makes sense to me to use

20      given the fact that you might not have

21      consensus, given the fact that in this

22      particular case -- again, it is not clear that

23      they took a vote on many of these cases.  It

24      just seems to -- something happened and it is

25      not -- we took a vote, here is what we vote to

Page 227

                          DONALD C. STONE

1

2        do, even if it was by consensus.

3              Q.     Well is it required by ERISA, the

4        DOL or anyone else that committee members take

5        a vote on every decision?

6              A.     Again, almost nothing that we're

7        talking about is, quote/unquote, required.

8                     This comes back to the prudent

9        practice and what is the common and accepted

10       practice in the industry today or during the

11       time period that we are talking about.  What

12       are the things that make -- what would make

13       this a group process.  That is what I'm talking

14       about.

15                    And no, I'm not going to say

16       they got to list of all of these 42 different

17       things you should be doing because none of

18       these existed -- most of them didn't exist at

19       the time that ERISA was passed.  So the

20       Department of Labor hadn't come out with a list

21       like that.

22             Q.     So is it your testimony that the

23       only prudent way to operate a committee is to

24       have an formal vote on every decision?

25                    MR. ROBERTS:   Objection to the

Page 228

1                    DONALD C. STONE
2          form.
3          A.    I don't think you have to have a,
4    quote, formal vote on every decision.  But I
5    think that that is a practice that is generally
6    accepted in the industry as a prudent way to
7    operate because it does demonstrate that
8    decisions were made and how they were made and
9    who made them.
10         Q.    Okay, did you identify any
11   particular circumstances here where you
12   couldn't determine whether or not a decision
13   was made?
14         A.    I don't see any record of votes in
15   most of these cases.
16         Q.    That wasn't my question.
17         A.    I can't determine that if there
18   was no vote.  I can't determine what they
19   decided.
20         Q.    If the committee talked about an
21   issue and together made a decision without a
22   formal yes/no vote, but came together and made
23   a decision and then the meeting minutes reflect
24   that the committee made a certain decision, is
25   that an unreasonable process in your view?

Page 229

1                    DONALD C. STONE

2          A.      How could say they made a decision

3     if we don't know what they made a decision

4     about.

5          Q.      I'm representing to you that the

6     meeting minutes state that the committee as a

7     whole made a decision.

8          A.      Okay, if they say that the

9     committee made a decision, that is -- I don't

10    think -- certainly it is not a way that I would

11    prefer.  It is not an imprudent thing in and of

12    itself, no.

13         Q.      Would it be your -- is it your

14    testimony that the meeting minutes should

15    reflect the individual votes of every committee

16    member?

17         A.      No, it doesn't necessarily have to

18    reflect the individual members' votes.  It

19    could simply be the committee voted and

20    everyone was in agreement or a majority agreed

21    to remove this fund from watch or put it on

22    watch or what have you.  That would be, I

23    think, sufficient.

24         Q.      So I want to make sure that the

25    record is clear.

Page 230

DONALD C. STONE

1
2              Your testimony is not that a vote
3       is required by each committee member in order
4       to reach a decision.  Your testimony is that
5       the record needs to reflect that a decision was
6       made, whether by consensus or otherwise?
7              A.    It needs to reflect that a
8       decision was made and I think the clarification
9       would be the best way to do that is through an
10      actual vote.
11             Q.    But it is not the only way; isn't
12      that correct?
13             A.    It is not the only way.
14             MR. ROBERTS:   Keri, we have been
15             going for over an hour, would now be a good
16             time to take a break?
17             MS. ENGELMAN:   Yes, let's take ten
18             minutes.
19             THE VIDEOGRAPHER:   The time is 9:09
20             and we are off the record.
21             (Recess Taken.)
22             THE VIDEOGRAPHER:   The time is 9:26
23             and we are on the record.
24      BY MS. ENGELMAN:
25             A.    Can I interject something before

Page 231

1                    DONALD C. STONE

2     you ask me a question?

3              Q.    Sure.

4              A.    So I want to -- I had a chance to

5     over this break to go through and look at a

6     couple of the times that you asked me about

7     earlier.  And I misspoke earlier talking about,

8     for example, the changeover was, because that

9     was in my head the changeover was to the new

10    FIA funds of Fidelity.  That was actually 2022.

11              So the timeframe that I should

12    have been working with was 2016.  It began in

13    2016 through 2022 when they changed over to the

14    FIAM version of the Fidelity funds.  That would

15    be consistent with what is in my report and I

16    reference part of that on page 40, for example.

17              Q.    So is it your testimony that your

18    report does not go out beyond 2020; is that

19    correct?

20              A.    No, it goes through to the change

21    over to FIAM in 2022.

22              Q.    Sorry, I meant 2022.

23              A.    Yes.

24              Q.    It doesn't go beyond 2022; is that

25    right?

Page 232

```
 1                    DONALD C. STONE
 2         A.     That's correct.
 3         Q.     It is your testimony that the
 4    change from the Freedom Funds to the FIAM funds
 5    happened in 2022?
 6         A.     Yes.
 7         Q.     What is the basis of your change
 8    in testimony regarding the 2016 time period?
 9         A.     I went back and looked through the
10    report.
11         Q.     Did you speak with counsel during
12    this break?
13         A.     I did not speak with him, no.
14         Q.     If you turn to page 97 of your
15    report.
16         A.     Page 97?
17         Q.     I'm sorry, paragraph 97.
18         A.     I was going to say, page 97, I'm
19    going to run out of pages.  Paragraph 97 page
20    41, okay.
21         Q.     You say that, "The committee
22    relies solely on the plan's investment advisor
23    to identify investments that became
24    noncompliant with the plan's IPS that might
25    otherwise be unsuitable for the plan."  Do you
```

Page 233

1                    DONALD C. STONE

2      see that?

3           A.     I do.

4           Q.     In that paragraph are you

5      referring to specific instances that investments

6      became noncompliant with the IPS or otherwise

7      became unsuitable for the plan?

8           A.     There were a couple of instances

9      that were referenced and it's a question of

10     finding the pages and everything where -- this

11     is on page 43.  If you look at 104 we start

12     getting into that in terms of what -- this was

13     where the whole thing where the -- Ascende was

14     using or QPA was using a version their scoring

15     system that was not in sync with the IPS and so

16     I think the committee did not -- they didn't

17     look on their own and they didn't get any other

18     information and they were I think not getting

19     good information, consistent information as to

20     what should have been or would have been on

21     watch and not on watch.

22          Q.     So when you talk about that

23     paragraph, you're referring to the three

24     instances that you identify in I think

25     paragraph 104 of the report?

Page 234

1                    DONALD C. STONE

2         A.    Page 104 --

3         Q.    Paragraph 104?

4         A.    Paragraph 104, you're right.  And

5    so the American Beacon Fund and DFA Fund and

6    then the Freedom Funds as well.  So those are

7    the three that I call out in that particular

8    instance, yes.

9         Q.    Did you identify, in preparing

10   your report, any other instances that you did

11   not include in your report?

12        A.    None are coming to mind at the

13   moment.

14        Q.    When you're talking about the QPA

15   or Ascende at the time was using a scoring

16   system, that in your view was inconsistent with

17   the 2015 IPS; is that correct?

18        A.    Correct.

19        Q.    Is it your understanding that the

20   scoring system was implemented sometime around

21   2017; is that correct?

22        A.    So, yeah, there were three

23   iterations of scoring systems.  One was in

24   place during the 2015 IPS and the next one was

25   2017 and then there was another change in 2019.

Page 235

1                    DONALD C. STONE
2                    What happened is, QPA was changing
3       their systems to -- I think they upgraded or
4       they changed the -- it sounds like they changed
5       some of the software they were using.  So they
6       started using a different reporting standard
7       than had been used in the past.  I think this
8       pretty much left -- unfortunately left the
9       committee unaware of -- they didn't go back and
10      say what about under this scoring system would
11      this thing have been compliant before or not.
12      You'd have to go through and look at every fund
13      over multiple periods of time, which I did not
14      do.
15                   Theoretically you can go back and
16      say maybe these were compliant under this
17      system but they weren't under that system.  But
18      the changeover in the systems was I think a
19      significant concern.
20           Q.     Is it your understanding that
21      there was a scoring system prior to 2017 in the
22      IPS?
23           A.     I believe there -- I'm trying to
24      see -- I have to go back and look through my
25      report, but I recall there was one standard --

Page 236

1                    DONALD C. STONE

2       I don't know that they -- there was one

3       standard that was being used in 2015 and then

4       switched over to the pass/fail and then they

5       went to this other point count system

6       ultimately and that's when they got them to

7       delay the score.  So that's three in my mind.

8           Q.     I want the record to be clear

9       here.  If you need to consult your report

10      please do so.  But if you look at the 2015 IPS

11      there is no scoring system.

12          A.     I guess the question is not the

13      IPS, but what is being reported by QPA or

14      Ascende in terms of how they came up with

15      whether something was potentially on watch or

16      not.

17               So not necessarily the scoring

18      system in the 2015 IPS, because I don't think

19      that was there, but I'm not sure that they --

20      you know, I guess that, to -- well, the 2015

21      maybe that is where it is.  They didn't have

22      Appendix B or there was something about an

23      Appendix B missing and that is probably where

24      the scoring was.

25          Q.     Let's turn to page 47 of your

Page 237

```
                              DONALD C. STONE
 1                                DONALD C. STONE
 2      report.
 3              A.      47?
 4              Q.      The bottom of page 47.
 5              A.      Okay.
 6              Q.      It says "The scoring system
 7      implemented after 2017 conflicted with the
 8      monitoring standards established in the IPS."
 9                      Do you see that?
10              A.      No, where are you reading?
11              Q.      Does that refresh your
12      recollection that your opinion is that the
13      scoring system was implemented in 2017?
14              A.      Where were you reading?
15              Q.      The bottom of page 47.
16              A.      Okay.  The scoring system
17      implemented -- you're talking about 3-I?
18              Q.      Yes.
19              A.      Okay, yes, the inconsistencies --
20      yes.
21              Q.      So to make the record clear.  Is
22      your recollection refreshed that the scoring
23      system was implemented in 2017 and not prior to
24      that.  So when we turn back to paragraph 97 of
25      your report and the examples, the scoring
```

Page 238

                        DONALD C. STONE

1

2      system that you're talking about was the ones

3      in place in 2017 and after that time period; is

4      that correct?

5              A.      That's correct.  But we don't know

6      what attachment B was to the 2015 IPS.

7              Q.      Do you have any knowledge of

8      testimony otherwise that says there was a

9      scoring system in Appendix B?

10             A.      No, I just know there is an

11     Appendix B that is referenced in the scoring --

12     excuse me in the -- in there.  We don't know

13     what it says.  But I reference there were a

14     number of analytics that they were referencing

15     in the document.

16             Q.      Did you review the quarterly

17     investment reports prior to 2017?

18             A.      Yes, I looked at investment

19     reports prior to 2017, yes.

20             Q.      Did those reflect a scoring system

21     of any kind?

22             A.      I don't recall and I'm not looking

23     at one in front of me.  Even if they had an

24     internal scoring system, it wouldn't

25     necessarily be reflected in that report.

Page 239

1                DONALD C. STONE

2          Q.    Do you have any knowledge about

3     whether or not there was an internal scoring

4     system?

5          A.    I don't know what was in the

6     appendix.  I don't know what I don't know

7     there.  I'm just raising that as a question.

8          Q.    Let's turn back to page --

9     paragraph 104 of your report, page 43.

10         A.    Okay, I'm there.

11         Q.    So you say, "Plan investments

12    frequently ran afoul of the standards adopted

13    in the IPS for assigning monitor and alert

14    status, but escaped mention or scrutiny because

15    the binary pass or fail hegemony of the scoring

16    system was the sole monitoring approach

17    undertaken by the committee."  Do you see that?

18         A.    I do.

19         Q.    And that pass/fail system was

20    implemented in 2017 to your knowledge?

21         A.    I think so, yes.

22         Q.    Then you testified earlier that

23    these are the examples that you could come up

24    with where there was an inconsistency between

25    the scoring system and the 2015 IPS; is that

Page 240

1                        DONALD C. STONE

2       right?

3               A.      That's correct.

4               Q.      If we look at the 2015 IPS.

5               A.      Okay, I have it up

6               Q.      You say, "The deference to the

7       scoring system permitted the DFA Funds below

8       peer median three-year Alpha and negative

9       three-year Alpha Information Ratio to go

10      undetected --

11              A.      Where are you?  What paragraph are

12      you?

13              Q.      I'm still on paragraph 104.

14              A.      Okay.

15              Q.      It says "The committee's

16      indifference to the IPS investment watch list

17      process and deference to the scoring system

18      permitted the DFA Fund below peer median

19      three-year Alpha and negative three-year Alpha

20      information to go undetected in Q3, 2018."  Do

21      you see that?

22              A.      Yes.

23              Q.      So let's turn to in the IPS, the

24      2015 IPS.  Let's turn to the investment watch

25      list process page.

Page 241

1                    DONALD C. STONE

2            A.      Remind me again which page that

3       is.

4            Q.      Page 13.

5            A.      I'm there.

6            Q.      You're there, okay.  Can you point

7       me to where in this document it says that a

8       below peer median three-year Alpha and negative

9       three-year Alpha Information Ratio requires a

10      monitor status?

11           A.      The second bullet point I think

12      speaks to I think what you're asking about

13      which is the peer group median risk adjusted

14      return is in the second bullet point.

15           Q.      You agree with me that is one

16      consideration that the committee may consider?

17           A.      Yes.

18           Q.      But does not have to consider?

19           A.      It says may consider in the IPS.

20           Q.      Then if we look at --

21                   MS. ENGELMAN:   Maria, can we pull

22              up I believe it is the Q4, 2018 minutes.

23                   (Exhibit 3 for identification, Q4,

24              2018 meeting minutes.)

25           A.      Okay, let me open that.

Page 242

1                      DONALD C. STONE
2           Q.    So this is the quarter after the
3      quarter that you referred in your report where
4      you said this information was undetected; is
5      that right?
6           A.    Yes.
7           Q.    Do you see here where it says "The
8      DAF was place on monitor status as of Q4, 2018."?
9           A.    Which page are you on?
10          Q.    I'm on page, I guess this is page 3.
11          A.    The DAF International Small/Mid
12     Cap Value.
13                (Witness reviewing document.)
14          A.    Okay.
15          Q.    So you agree that the committee
16     detected performance issues with this fund in
17     Q4 2018?
18          A.    Q4 they did, they are talking
19     about short-term decline.
20          Q.    Did you reference that document
21     prior to forming your opinion?
22          A.    I read this document, yes.
23          Q.    You didn't include it in your
24     report?
25          A.    I don't know if there is a bullet

Page 243

1                    DONALD C. STONE

2     point or if there is a footnote on it, I don't

3     think there is, but I don't recall that at this

4     point.

5           Q.    Do you recall whether or not the

6     American Beacon Funds were ever placed on

7     monitor status?

8           A.    I do not recall if they were

9     placed on monitor status.  They don't appear to

10    have been placed on monitor status during this

11    quarter?

12          Q.    Right, okay.  Stick with paragraph

13    104, the second to last sentence you say, "The

14    Freedom Funds' negative information ratios over

15    both three and five-year period were ignored in

16    Q4, 2015."  Do you see that?

17          A.    I do.

18          Q.    So again, you testified earlier

19    that when you're talking about the scoring

20    system in these paragraphs you're talking about

21    the one that was implemented in 2017?

22          A.    Well, this is referring back to

23    2015.

24          Q.    Okay.  But you testified earlier

25    that the inconsistency with the IPS that you

1        DONALD C. STONE

2    were speaking about in this paragraph relates

3    to the 2017 scoring system.  Do you recall that

4    testimony?

5        A.    I do, but I think that misspoke

6    the fact that I also had an example from an

7    earlier period.

8        Q.    Okay, tell me -- point me to where

9    in the 2015 IPS it requires a monitoring status

10   for a negative Information Ratio on a three and

11   five-year period?

12       A.    Again I don't think it has that

13   specifically to a -- it is one of the monitoring factors

14   that you can look at and the committee did not

15   seem to address it.

16       Q.    When you came back from the break

17   you clarified that the relevant period was from

18   2016 forward.  Do you recall that?

19       A.    I do.

20       Q.    Do you know what month in 2016?

21       A.    That would have been the beginning

22   of 2016, so that would have included the Q4

23   report that was in February or so.

24       Q.    February of 2016?

25       A.    Correct.

Page 245

```
 1                    DONALD C. STONE

 2          Q.     So you believe the relevant time

 3     period cover January, 2016 forward?

 4          A.     It covers the period of that --

 5     yes, from January of 2016 forward.

 6          Q.     So can you explain to me why

 7     you're providing an example in 2015?

 8          A.     Because it wasn't reported on

 9     until 2016.  The committee would not have had

10     the information until 2016 and that's the time

11     when it would have been triggered.

12          Q.     So if we turn to paragraph 117 of

13     your report.

14          A.     Okay.

15          Q.     So if you turn to page 47, I want

16     to go back to this.  We are under a bullet 3-1?

17          A.     Hold on?

18          Q.     We looked at it earlier.

19          A.     Okay.

20          Q.     So we are talking about the

21     scoring system implemented after 2017

22     conflicted with the monitoring standards

23     established by the IPS.  That is the bullet

24     under which this section is created; correct?

25          A.     Yes, 3-I.
```

Page 246

1                      DONALD C. STONE
2          Q.     Can we agree that the information
3    in this section relates only to the time period
4    of 2017 forward?
5          A.     I don't know why we are would do
6    that.
7          Q.     Is that not what it says?
8          A.     So that's what the -- I understand
9    what you're saying.  It's a grammatical issue
10   about where it is placed in here as opposed to
11   a substantive issue.
12         Q.     It's not a grammatical issue.  The
13   heading is "The scoring implemented after 2017
14   conflicted with the monitoring standards
15   established by the IPS."
16              My question is, the paragraphs
17   that follow under that heading, will you agree
18   with me these relate to the time period of 2017
19   forward when the scoring system was
20   implemented?  That is not grammatical, that is
21   your text.
22         A.     I understand what you're saying.
23   Okay.
24         Q.     So you agree?
25         A.     I agree that's what the heading

Page 247

1                      DONALD C. STONE

2      says, yes.

3              Q.      That wasn't my question.  Do you

4      agree that the paragraphs that follow until we

5      get to the second subbullet on page 50 relate

6      only to the time period after 2017 when the

7      scoring system was implemented, which I will

8      represent to you is Q3 2017, if you don't know

9      that?

10             A.      Okay.

11             Q.      So the first bullet point, it says

12     "The IPS dictates that performance will be

13     measured by comparing rates of return to

14     appropriate market indexes and peer groups for

15     me recent quarter, year to date, one year and

16     three-year period."  Do you see that?

17             A.      I do see that.

18             Q.      You saying that is what the 2015

19     IPS requires; is that correct?

20             A.      That would be the 2015, yes.

21             Q.      Then you say, "The scoring system

22     evaluates performance against benchmark indexes

23     for three year and five-year period and again

24     peers for one, three and five-year periods."

25     Do you see that?

1              DONALD C. STONE

2         A.    I do.

3         Q.    And you have highlighted and

4    bolded -- I'm sorry italicized and bolded the

5    five-year period.  Do you see that?

6         A.    I do.

7         Q.    So your point here is that these

8    scoring systems evaluated five-year performance

9    against benchmark and peer groups, but the IPS

10   did not call for five-year performance against

11   benchmark and peer groups; is that correct?

12        A.    Correct.

13        Q.    Then you say, "In addition to

14   incorporating an assessment of funds

15   performance for a longer timeframe than the

16   IPS".  So again, you're criticizing the

17   committee for looking at a longer time period

18   than the IPS contemplated; is that correct?

19        A.    Yes, I'm just saying it is

20   inconsistent, yes.

21        Q.    Is it your opinion that it is

22   inappropriate for the committee to evaluate

23   five-year performance against benchmark and

24   peer groups?

25        A.    No, I'm saying it is inconsistent

Page 249

1                    DONALD C. STONE

2      with the two don't tie together.  And that is

3      one of the things that I'm saying is there are

4      places where these two don't tie together and I

5      think that could present confusing information

6      to the committee.

7                         There is nothing wrong with a

8      five-year number per se, but that is not a part

9      of the IPS.  So if you go and get a scoring

10     based on a five-year number, you might come up

11     with a different answer then what the IPS would

12     necessarily dictate.

13          Q.    Okay.  So let's look at the IPS.

14     Go back to the 2015 IPS.  And what you're

15     referring to is on page 12 of the IPS.  Do you

16     see that?

17          A.    Let me get to page 12.  Okay, yes

18     performance evaluation, right.

19          Q.    So the middle of the page it says,

20     where I think you got your quote from.

21     "Performance hopefully measured by comparing

22     rates of return to the appropriate market

23     indexes and peer groups for the most recent

24     quarter, year to date, one-year and three-year

25     period and longer periods where available."  Do

Page 250

1                    DONALD C. STONE

2      you see that?

3              A.    I do.

4              Q.    And that would include five-year

5      period?

6              A.    Yes, it would.

7              Q.    So that is not inconsistent with

8      the IPS at all, is it?

9              A.    No, it would seem to be

10     consistent.

11             Q.    Why did you state in your report

12     that it was inconsistent with the IPS?

13             A.    I probably misread it.

14             Q.    Okay.

15                   Would you agree with me that the

16     quarter data would be captured by the one year

17     data?

18             A.    No, the quarter data is data -- I

19     mean it would be subsumed under it, but

20     reporting on the quarter is a separate

21     reporting element.

22             Q.    But it would be subsumed in the

23     one year data, correct?

24             A.    But you wouldn't know what part of

25     it was, that's why you call it out separately.

Page 251

1                    DONALD C. STONE

2          Q.      Aside from the scoring system, do

3    you know one way or the other whether or not

4    the committee was receiving in the quarterly

5    reports all of this information?

6          A.      They were getting quite a bit of

7    information in the quarterly reports.

8          Q.      So did you review, aside from the

9    scoring system, did you review all of the

10   metrics that the committee was receiving in the

11   quarterly reports?

12         A.      I did look at the metrics they

13   were receiving, yes.

14         Q.      Did you form an opinion as to

15   whether or not all of the metrics they were

16   receiving were inconsistent with the IPS?

17         A.      The metrics seemed fine.

18         Q.      If we go to the second bullet it

19   says, "The IPS investment watch list process

20   identified performance below the peer median

21   over three, five or ten years as a criterion to

22   consider in placing an investment on monitor or

23   alert status despite the ten-year returns not

24   appearing anywhere in the scoring system."  Do

25   you see that?

Page 252

1              DONALD C. STONE

2         A.     I do.

3         Q.     Was the ten-year returns provided

4    in the quarterly investment reports outside the

5    scoring system?

6         A.     I have to look at the quarterly

7    report to confirm that.  They probably were,

8    but I have to look at the report to confirm it.

9         Q.     So if we turn to the next page.

10   It says, "The scoring system requires an

11   investment manager to have at least a

12   three-year tenure to receive a passing score

13   for that component, but IPS cautions that any

14   change to an investment manager could be

15   sufficient reason to assign a fund to monitor

16   or alert status."  Do you see that?

17        A.     I do.

18        Q.     So wouldn't a three-year tenure

19   encompass any change to an investment manager?

20        A.     To get a passing score you have to

21   have -- let me read it.

22              (Witness reviewing document.)

23        A.     I'm trying to understand what

24   you're asking me.

25        Q.     So you say, "The IPS cautions that

Page 253

1                    DONALD C. STONE

2      any change to an investment manager could be

3      sufficient reason to assign a fund to monitor

4      or alert status."  Right?

5              A.     Correct.

6              Q.     And the scoring system requires

7      that a manager have at least a three-year tenure;

8      is that right?

9              A.     Yes, it does.

10             Q.     If there is a change --

11             A.     That is not the same as any

12     change.  That could be -- again, the language

13     is not clear.  That could be something else.

14             Q.     What is it in your view?  How are

15     these inconsistent?

16             A.     You could have had a team of

17     people and one of them left, that wouldn't

18     change the fact that you still have a

19     three-year tenure.  But it could be if that was

20     a person -- that that person left might be a

21     reason that you'd want to consider monitor or

22     alert status.

23             Q.     Do you know whether or not the

24     committee was receiving information about

25     whether or not there was any change to the

Page 254

1                    DONALD C. STONE

2      investment manager in the QIRs?

3           A.     They were receiving that.

4           Q.     So that is not inconsistent with

5      the IPS; correct?

6           A.     No.

7           Q.     I want to turn your attention to

8      some of qualitative criteria.  Turn to paragraph 131

9      of your report.

10          A.     Let me get there.

11          Q.     Here you're talking about a March,

12     2018 report, a special report regarding the

13     Fidelity Freedom Funds.

14          A.     Yes, the Reuters report.

15          Q.     This Reuters report dealt with

16     withdrawals from the Fidelity Freedom Funds

17     over the preceding four years; is that right?

18          A.     Correct.

19          Q.     Is it your -- did you review that

20     report in connection with preparing your

21     report?

22          A.     Yes.

23          Q.     Are you aware that -- am I correct

24     that that report was dealing with essentially

25     an overhaul of the Fidelity Freedom Funds that

Page 255

DONALD C. STONE

1

2    happened if 2014 that resulted in some riskier

3    investments; is that correct?

4        A.    Well, it was -- they changed their

5    glide path and probably some of the underlying

6    funds in 2014, so between 2014 and 2018 there

7    was a substantial runoff of assets by people

8    who got concerned about what the risk might be.

9    There was an increase in equity depending on

10   vintage between 1 and 20 percent and there were

11   a few other, I think there are probably a few

12   other tweaks that I don't remember off the top

13   of me head.

14            In any event, Fidelity was

15   undergoing substantial run off of assets that I

16   think about 15 billion during that period of

17   time.  And other target dates series were

18   gaining assets.  So it was actually a rather

19   fraught period at Fidelity, they were losing

20   market share overall.

21       Q.    You say in here towards the

22   bottom of this paragraph, "The committee never

23   reviewed or discussed these concerns much less

24   deliberated their impact on the Freedom Funds

25   standing in the plan whether as a result of the

Page 256

1                    DONALD C. STONE
2      plan's investment advisor bringing this report
3      to the committee's attention or to the
4      committee independently identifying significant
5      negative reporting concerning the plan's most
6      important investments."  Do you see that?
7           A.     I do.
8           Q.     So did you review all of the
9      minutes to determine whether or not the
10     committee had ever discussed this report or
11     otherwise discussed the underlying overhaul of
12     the Fidelity Freedom Funds.
13          A.     I did not see anything specific to
14     the special report.
15          Q.     What about the overhaul of the
16     Fidelity Freedom Funds?
17          A.     I don't recall at the moment.  I
18     wouldn't be surprised if they did have some
19     conversation around that.
20          Q.     Why wouldn't you be surprised
21     about that?
22          A.     Well, I would expect -- I would
23     hope they would.  I just wouldn't be surprised.
24     It's a big event at the time.
25          Q.     Why is it that you believe that

Page 257

                        DONALD C. STONE

1
2       the special report should have been considered
3       if in fact the actual -- if the committee was
4       actually monitoring the overhaul itself and the
5       impact on the plan?
6              A.    Well, I would like -- again, I'm
7       saying it ought to be in there, but I'm not
8       looking at the particular minutes.  I don't
9       recall which minutes might have them in there.
10      I would have to look at that.
11                  MS. ENGELMAN:    Maria, can you pull
12             up Q1 2015 committee meeting minutes
13             please.
14                  (Exhibit 4 for identification, Q1
15             2015 committee meeting minutes.)
16             A.    That was a Q4 '18?
17             Q.    It should be Q1, 2015.
18             A.    Q1, 2015, I got that.  Okay.
19             Q.    Do you see here where it says that
20      "The Fidelity Freedom Funds were on monitor
21      status in part due to the underlying -- the
22      performance history of the underlying fund but
23      also --
24             A.    Where are you in this?
25             Q.    Page 4.

Page 258

1                    DONALD C. STONE
2           A.      Page 4, okay.  Fidelity Freedom
3      Funds, okay.
4                   (Witness reviewing document.)
5           A.      So that's an addition to reason
6      for monitoring added for that quarter.
7           Q.      So do you agree that they were on
8      monitor status and the committee was monitoring
9      the enhanced guide path that changed in the
10     latter part of 2013 which increased overall
11     equity exposure between 10 percent and 20
12     percent across the various vintages?
13          A.      But they waited nearly two years
14     to do that.
15          Q.      Well, I'm showing one set of
16     minutes here.  I'm asking if you agree that
17     during this time period they were monitoring
18     that?
19          A.      They were monitoring the glide
20     path change at this point, yes.
21          Q.      Do you have any reason to believe
22     sitting here they weren't monitoring during
23     other time periods?
24          A.      I don't recall seeing it on watch
25     for other time periods and they said -- so it

Page 259

1                      DONALD C. STONE
2       was added at this point due to do the enhanced
3       glide path and maybe because it just want into
4       effect -- I don't know if it shows up in prior
5       minutes or not.
6             Q.    If you were a -- let me ask you
7       this.  Are you suggesting in this report that
8       the 2018 special report should have resulted in
9       any particular action with respect to the
10      Freedom Funds?
11            A.    Again, I would go back to what I
12      said before.  I would think that it would first
13      lead to an in-depth analysis as to what was
14      going on with them.  It would not simply be
15      business as usual.
16                  I think that would be to me the
17      kind of thing that would raise the issue that
18      to put them back on watch if they weren't on
19      watch and to do a deep analysis of, in this
20      case, going back to find out how much assets
21      they were losing, what the impact of that was,
22      what the -- why the concern about the putting
23      6 million participants at risk is kind of a hot
24      headline to say the least.
25                  I would think that they would

Page 260

                        DONALD C. STONE

1
2      want to go do a deeper analysis and that would
3      show up in let's say the next quarter's
4      reports.
5              Q.      But other than that, any
6      particular outcome that you were opining should
7      have resulted as a result of --
8              A.      It depends on what they found when
9      they did that as to whether they would replace
10     them or not.
11             Q.      Turn to paragraph 135 of your
12     report.
13             A.      Okay.
14             Q.      Actually, you know what, we are
15     going to go somewhere else first and then to
16     that.
17                     So Mr. Stone, you're familiar with
18     the target date deep dives that were presented
19     to the committee?
20             A.      Yes.
21             Q.      It's your opinion they were
22     presented annually from 2014 to 2024 other than
23     2017 that is in paragraph 137 of your report?
24             A.      Correct.
25             Q.      You say that the committee did not

Page 261

1                    DONALD C. STONE
2      ask for those deep dives in your report.  Do
3      you see that?
4              A.      Where are you?
5              Q.      On paragraph 137 toward the end
6      of the paragraph you say "Committee members did
7      not recall requesting additional information or
8      taking any action as a result of the target
9      date deep dives."
10             A.      Yeah, that was the Riddle
11     deposition.
12             Q.      Then the last sentence says,
13     "These documents were not prepared at the
14     request of the committee or tailored to the
15     Quanta plan, but instead were distributed to
16     each of Ascende's clients." Do you see that?
17             A.      Yes.
18             Q.      You were relying on Mr. Eagar's
19     testimony that the committee did not request
20     these deep dives?
21             A.      Correct.
22             Q.      Why does it matter whether or not
23     the committee requested the deep dives or not
24     if they saw them and considered them?
25             A.      Well, I think it has had do with

Page 262

```
 1                    DONALD C. STONE
 2      their being kind of what they're asking for
 3      that they are in charge, they are the ones
 4      making the decision as opposed to something
 5      just being fed to them which was a document
 6      that was sent to every client.  I think there
 7      is a difference.
 8                    There is obviously a difference if
 9      the committee says, you know, we would really
10      like to see a deeper dive of the Fidelity
11      Freedom Funds relative to a broad array of
12      other target date funds.  That's a very
13      different fact pattern than if Ascende just
14      simply says, we've created this, we thought
15      we'd go over this and we thought you'd find
16      this interesting.
17           Q.    If the committee is receiving the
18      information and considering the information in
19      its analysis, why does it matter who requested
20      it in the first place?
21           A.    Because it's a motivational issue.
22      They didn't seem to have any interest in
23      finding out how others were doing.  That was
24      the point.
25           Q.    You testified earlier that you
```

Page 263

1                         DONALD C. STONE

2       provided similar reports to your clients; is

3       that correct?

4              A.     We did.

5              Q.     Did every committee which you

6       worked with ask for that information or did you

7       just provide it?

8              A.     One of them -- there is a myriad

9       number of things that we provide as part of our

10      service.

11             Q.     You testified that you didn't

12      tailor those specific documents to the specific

13      plans; is that correct?

14             A.     No, like I had said, this was just

15      an add-on that we provided.  But the point

16      would be that if a client asked for specific

17      information, that's different than if we just simply

18      send them information or in this case if QPA

19      sends them information.

20             Q.     Did you draw a conclusion that the

21      committees with which you were working were

22      operating imprudently if they hadn't asked for

23      this type of information?

24             A.     That isn't what I said.  It's a

25      different circumstance in terms of, if you ask

Page 264

1                      DONALD C. STONE

2      for something you're showing more, obviously,

3      more interest in being proactive about things.

4      And all I'm saying in this particular case is

5      the committee did not proactively ask for this

6      information.  Not everybody that I worked with

7      asked for it either.  Some did, some didn't.

8      But I'm just saying that is a different fact

9      pattern.

10                     MS. ENGELMAN:  Can you pull up

11             minutes, Maria, please.

12                     (Exhibit 5 for identification, Q1

13             2016 Meeting Minutes.)

14             A.     Which meeting minutes is that?

15             Q.     It should be the latest document

16      in Exhibit Share, Q1 2016.

17             A.     Which document?

18             Q.     Q1.

19             A.     Q1, 2016, I got it.

20             Q.     If you turn to the bottom of the

21      page.

22             A.     Which page?

23             Q.     Target date fund and it says, "As

24      the meeting concluded, AWAI" which is Ascende

25      at that point in time "and the committee

Page 265

1                    DONALD C. STONE

2      discussed an overview of the Fidelity Freedom

3      Funds.  The committee expressed interest in

4      conducting a due diligence project to review

5      the Freedom Funds versus some industry

6      competitors."

7                    Does that refresh your

8      recollection that the committee actually

9      requested these types of analysis?

10          A.    It sounds like they did request

11     some additional information.

12                 MS. ENGELMAN:   Maria, can you pull

13          up 2016 deep dives.

14                 (Exhibit 6 for identification, 2016

15          Deep Dives.)

16          Q.    Mr. Stone, I point your attention

17     paragraph 39 of your report.

18          A.    39, okay.

19          Q.    Here you talk about what

20     responsible plan fiduciaries should do when

21     assessing target date funds.  Do you see that?

22          A.    Yes.

23          Q.    And in the middle of the paragraph

24     you say, "The fiduciaries gather and evaluate

25     essential information about the available

Page 266

1                    DONALD C. STONE
2      options such as historical returns and risk
3      adjusted returns, fees, expenses, and
4      differences in their glide path, asset classes
5      and underlying investments."  Do you see that?
6            A.    Yes.
7            Q.    So if you pull up the target date
8      funds that should be in Exhibit Share which are
9      the 2016 deep dives.
10           A.    Yes.
11           Q.    And I represent to you that was
12     presented at the Q4 2016 meeting.  If you turn
13     to page 5 of that document.  Do you agree that
14     that shows the various asset classes?
15           A.    This is the glide path.
16           Q.    The glide path, okay.
17           A.    Not the various asset classes.
18           Q.    Okay, sorry I'm looking at the
19     wrong thing.
20                 Do you see it shows the various
21     glide paths of various target date funds?
22           A.    Maybe I'm looking at the wrong
23     one.  I'm looking at Freedom Funds glide path
24     on page 5.
25           Q.    Okay, hold on one second.

Page 267

1                    DONALD C. STONE

2          A.      You're looking at the glide path

3     comparison all?

4          Q.      I'm looking at equity fund split

5     of target date funds on page 5 of the Freedom

6     Funds.  Do you see that?

7          A.      Yes.  "The Freedom Funds, The

8     International Equity Exposure, US Equity

9     Exposure, Bond Exposure."

10         Q.      If we go to page 6, it looks at

11    the glide path of the Fidelity Freedom Funds as

12    compared to all the comparators in this report?

13         A.      Yes.

14         Q.      And then the next page looks at

15    glide path to only and the page after that

16    looks at glide path comparison through only.

17         A.      Correct.

18         Q.      The next page looks at the

19    composition percentage breakdown of the various

20    vintages of the Fidelity Freedom Funds.

21         A.      Yes, it's a high level asset

22    allocation, yes.

23         Q.      Then if we look at the next page,

24    it looks at the Freedom Funds returns on three

25    years.

Page 268

1                    DONALD C. STONE

2          A.      Correct.

3          Q.      Then if we look at next page it

4    looks at one-year returns compared to the

5    various comparators.

6          A.      Correct.

7          Q.      Then if we look at the next page

8    it looks at three-year returns compared to the

9    various comparators.

10         A.      Yes, it does.

11         Q.      Then the next page looks at the

12   five-year returns compared to the various

13   comparators.

14         A.      Yes, it does.

15         Q.      Then the next page looks at the

16   growth of the Fidelity Freedom Funds, certain

17   vintages.

18         A.      Yes.

19         Q.      The next couple of pages looks

20   like that and then we get to page 16 and does

21   this look at the risk adjusted returns?

22         A.      Let me get to that.

23         Q.      On a three year and five-year

24   basis compared to the comparators?

25         A.      Yes.

Page 269

1                DONALD C. STONE

2          Q.      So does page 17 and so does page

3    18.

4          A.      Okay.

5          Q.      And page 19 looks at the

6    allocation of the underlying funds for the

7    various vintages.

8          A.      Yes.

9          Q.      And page 20 looks at the

10   three-year comparison compared to best

11   benchmark.

12         A.      Yes.

13         Q.      And the next page looks at

14   five-year comparison compared to best

15   benchmark.

16         A.      Correct.

17         Q.      And the next page looks to be --

18   the next couple of pages looks at expense

19   ratios.

20         A.      Yes, it looks at returns.

21         Q.      You're correct.

22                 It has a summary of returns

23   compared to benchmark and annualized and net

24   expense ratios.  So it's a summary of the

25   various vintages?

Page 270

DONALD C. STONE

1

2          A.    These is all the various sub funds

3     within the vintage, yes.

4          Q.    Would you agree with me that this

5     deep dive is consistent with type of information

6     that you would expect the committee to have in

7     conjunction with paragraph 39 of your report?

8          A.    I think it is good information for

9     them to have, absolutely.

10         Q.    So if we look at --

11              MS. ENGELMAN:   Maria, can you pull

12         up fourth quarter 2016.  I'm not sure, I

13         think it is Exhibit 5, Mr. Stone.

14         A.    You want me to go to Exhibit 5.

15         Q.    Hold on a second.  Let me make

16    sure this is right.   Fourth quarter -- it

17    should be the May 10, 2017 meeting minutes

18    Maria..

19              (Exhibit 7 for identification, May 10,

20         2017 meeting minutes.)

21         Q.    While you wait for that to come

22    up.  So in paragraph 138 you opine in the first

23    sentence, "It's unclear if and how the

24    committee actually considered the data

25    presented in the TDF deep dives."  Do you see

Page 271

1                    DONALD C. STONE

2      that?

3            A.    Yes.

4            Q.    If you look at these meeting

5      minutes and you go to the end of them -- do you

6      have them in front of you?

7            A.    No they haven't come up.

8            Q.    May 1st, 2017.

9            A.    Okay, now let me open it, okay.

10           Q.    At the bottom of the page, the

11     bottom of the document.

12           A.    Okay.

13           Q.    It says, "The committee reviewed a

14     target date fund comparison which analyzed the

15     current Fidelity Freedom Funds versus leading

16     industry competitors.  Discussion covered the

17     glide path construction and philosophy,

18     terminal allocation point of the glide path

19     fees and diversification.  The committee

20     considered like styled active managers, index

21     managers as well as blended managers using

22     active and passive underlying investments in

23     their target date strategies.  Upon their

24     review the committee remained pleased with the

25     Fidelity Freedom Funds.  It did not note

Page 272

```
 1                    DONALD C. STONE
 2    sufficient reasoning to change target date
 3    providers at the time."  Do you see that?
 4          A.     I do.
 5          Q.     So do you agree with me that in
 6    these meeting minutes it is clear that the
 7    committee considered the data present in this
 8    target date deep dive?
 9          A.     They considered the information
10    in the target date deep dive, but it is kind of
11    a -- it actually doesn't get to the issue of
12    whether these particular funds are appropriate
13    for their participants.  And this is the kind
14    of thing that we talked about earlier about the
15    minutes, you read this and I have no idea
16    whether they know or have any idea whether
17    these target date series does or does not work
18    for the participants.
19                 It is just a laundry of list of
20    fees, glide path, diversification, which is all
21    stuff that you have to look at but that doesn't
22    answer that question at all.  It doesn't seem
23    to go what a participant -- are participants
24    generating the kind of wealth they need which
25    would be what I would hope to see in addition
```

Page 273

1                    DONALD C. STONE

2      to the information that is here.  It is just

3      not there.

4           Q.    So what you would expect to

5      see is information about how the Fidelity

6      Freedom Funds are generating wealth for the

7      plan participants?

8           A.    How it is working for the

9      participants.  In other words, this could have

10     been for any of the 5,000 different plans out

11     there.  This is what I'm saying, it could be

12     rather anodyne.  This doesn't tell me, is this

13     the appropriate choice for their plan and if

14     so, why do they think it is the right choice

15     for their plan.

16               They are just saying it's --

17     that they looked at the fees, they looked at

18     diversification, they looked at the allocation,

19     the construction, all of which is good stuff.

20     All of which they should definitely be doing.

21     But nowhere does it tell me that they have tied

22     that to their own plan and how that works.

23          Q.    So it doesn't tell you in the

24     minutes they tied it to their own plans, but

25     the minutes reflect that they reached a

Page 274

1                      DONALD C. STONE

2         conclusion after looking at all of the

3         available information that it was sufficient

4         for their plan; is that correct?

5              A.    Well, no, that is not quite what I

6         said.  It tells me they probably didn't consider

7         whether it works for their participants.  That

8         is what I take away from that.

9                   It tells me they looked at all of

10        this information, they looked at a lot of data

11        and a lot of analytics, which is good, but the

12        point of looking at all of that information is

13        to tie it back and realize is this working for

14        our plan.  It this working for our participants.

15        That's not here and that's, I don't think that

16        is ever in any of these things that I've seen.

17                   That is -- people are -- they're

18        ticking all the boxes as opposed to kind of

19        actually -- they are kind of missing what the

20        punch line is here which is, is the plan

21        working well for our participants and that

22        answer is not here.

23             Q.    And that answer can change

24        depending on the plan and the plan's objectives;

25        is that right?

Page 275

1                    DONALD C. STONE

2            A.    It could, it could depend on the

3     plan's objectives, it could depend on the

4     plan's demographics.  But like said, in this

5     case they are looking at all the stuff that

6     everybody gets excited about, which is all the

7     nice color charts and graphs and everything,

8     but what do you do with that information.  All

9     of that stuff is for a purpose and that purpose

10    is to help you determine is this appropriate

11    for our plan.  Is this working for our

12    participants.  Are they getting to where they

13    want.

14             If the objective of the plan,

15    which one of the objectives is to have people

16    be able to save the appropriate amount of money

17    for retirement.  This doesn't answer that

18    question.  This just tells me they looked at a

19    bunch analytics.

20            Q.    Okay.  Going back to the meeting

21    minutes.  Did you review any of the materials

22    that were appended to or attached to the

23    meeting minutes?

24            A.    I did.  I don't recall exactly

25    what I looked at at the moment, but yes, I did.

Page 276

1                    DONALD C. STONE
2          Q.    Do you consider the materials
3     presented at the meeting such as the quarterly
4     investment reports to be part of the meeting
5     minutes record?
6          A.    Yes.
7          Q.    Let's go paragraph 135 of your
8     report.
9          A.    Okay, 135.
10         Q.    So you say here that "The
11    committee failed to recognize and appropriately
12    scrutinize the persistent failure of the Freedom
13    Funds to outperform its benchmark."  Do you see
14    that?
15         A.    I do.
16         Q.    It says, "Appendix A to the 2015
17    IPS identifies S&P target date indexes as the
18    appropriate benchmark for evaluating TDF
19    performance."  Do you see that?
20         A.    I do.
21         Q.    Then it goes on about, "There is
22    quarters bracketing the start of the class
23    period from Q4 2015 through Q1 2017, the
24    majority of the Freedom Funds vintages failed
25    to generate returns that exceeded the

Page 277

1                    DONALD C. STONE
2        corresponding S&P target date index on a
3        five-year basis while all but Q1 2017 the
4        Freedom Funds similarly failed that standard on
5        a three-year basis."  Do you see that?
6                A.      I do.
7                Q.      So then you go to the next page,
8        there is a table one in your report.
9                A.      There is, yes.
10               Q.      Did you prepare that table?
11               A.      No, I asked counsel to prepare
12       that report.
13               Q.      Did you check to make sure it was
14       accurate in terms of the underperform versus
15       outperform on three year and five-year
16       performance relative to benchmark?
17               A.      I went and spot checked it.  I
18       didn't check every single vintage against every
19       single period.
20               Q.      How did you spot check it?  What
21       materials did you consult?
22               A.      Go back to Morning Star and I also
23       get -- there was a couple of others too, I
24       think.
25               Q.      We already talked about the fact

Page 278

1                       DONALD C. STONE

2          that the IPS asks for -- looks at performance

3          on a comparison to benchmark but also

4          comparison to peer group; is that correct?

5                  A.     Correct.

6                  Q.     You didn't include comparison to

7          peer group here, why is that?

8                  A.     Because it is -- I think this

9          demonstrates one element of underperformance.

10         There is probably an infinite number of things

11         that you could do on those things.  So this is

12         one example.  It is not a matter of

13         intentionally -- well, it was intentionally

14         leaving it out, but it was not because it

15         somehow or another told a different story.

16                 Q.     What was end of that, I didn't

17         catch it?

18                 A.     I said it was not left out because

19         it told a different story.  I think this tells the story

20         as I wanted to tell it.  It underperformed its

21         benchmark, period.  I thought that was enough

22         for purposes of what I was trying to say here.

23                 Q.     So what is it that you're trying

24         to say here?

25                 A.     That they consistently

Page 279

1                    DONALD C. STONE

2      underperformed their benchmark over a three

3      year and five-year period through the timeframe

4      that we are looking at here which is Q4 of 2015

5      into where they actually started to outperform

6      which is Q1 2017.

7            Q.    So did you look at performance

8      compared to benchmark after Q1 2017 of the

9      Fidelity Freedom Funds?

10           A.    I had look at some of it, yes, and

11     the performance was better.

12           Q.    Do you know over what time period

13     the performance was better?

14           A.    I can't say off the top of my head

15     right now, no.

16           Q.    Is it not -- is it common for

17     investment funds to have fluctuating performance

18     during different time periods?

19           A.    It is and we talked about that,

20     but we also talked about that that doesn't mean

21     that you don't take a very deep look at

22     underperformance and determine whether or not

23     it is still an appropriate choice for you.

24                 Because we don't know -- we are

25     ex post here, we know that the funds performed

Page 280

1                    DONALD C. STONE

2       better, but that's great.  After the fact is

3       great.  At the time that they were looking at

4       this we have underperform, underperform,

5       underperform pretty much across the board for

6       an extended period which goes back to the

7       conversation I know we had several times which

8       is why weren't they taking a much deeper look

9       at this at that particular time not knowing

10      what the future would hold.  Okay, nobody knows

11      that.

12          Q.    In this table here you don't state

13      the level of underperformance compared to

14      benchmark, do you?

15          A.    Not in this table, no.

16          Q.    But you agree with me that that is

17      an important factor that the committee needs to

18      consider when evaluating whether something is

19      actually underperforming or not?

20          A.    It was underperforming.  The

21      question is the percentage underperforming is

22      certainly something that you could take a look

23      at and I would expect they would take a look at

24      that.

25          Q.    And they would also take a look at

Page 281

                        DONALD C. STONE

1
2     whether or not the performance was improving
3     during tis time period?
4           A.    You would take a look at all of
5     this, yes.
6                 MS. ENGELMAN:   Can we take a ten
7           minute break and hopefully come back and
8           wrap up.
9                 MR. ROBERTS:   Okay.
10                THE VIDEOGRAPHER:   The time is
11          10:40 and we are off the record.
12                (Recess taken.)
13                THE VIDEOGRAPHER:   The time is
14          10:50 and we are on the record.
15    BY MS. ENGELMAN:
16          Q.    Mr. Stone, do you recall or do you
17    know GlassBridge Enterprises was a client of
18    Pavilion?
19          A.    I'm sorry, who was?
20          Q.    GlassBridge Enterprises?
21          A.    Glass, G-l-a-s-s?
22          Q.    Yes.
23          A.    I've never heard of them.
24                MS. ENGELMAN:   Maria, can we pull
25          up the 5500 for GlassBridge, the 2017.

Page 282

1                    DONALD C. STONE

2                    (Exhibit 8 for identification,

3            GlassBridge 2017 Form 5500.)

4            A.      I'm opening it now.

5            Q.      Can you go to Schedule C which is

6       on page 6 of the document?

7            A.      Okay.

8            Q.      First, actually let me start at

9       the top of the document.  This is a 5500 for

10      the GlassBridge Retirement Investment Plan, do

11      you see that?

12           A.      Yes, I do.

13           Q.      It is the period January, 2017 to

14      December 31st, 2017, do you see that?

15           A.      I do.

16           Q.      If we go to page 6 of the

17      document.

18           A.      Yes.

19           Q.      It says Pavilion Advisory Group

20      and under there it says relationship,

21      investment advisory.

22           A.      Yes, so on the following page

23      after that what you see is Jeffrey Slocum &

24      Associates which was a firm that we bought

25      based out of Minneapolis.  So that is why I

Page 283

1                    DONALD C. STONE

2     didn't recognize that name because that was a

3     Slocum client and 2017 sounds like the time

4     that we actually close that deal and taken them

5     over as a client.

6          Q.     So when you took them over as a

7     client, did some of their investment advisors

8     come over to Pavilion as well?

9          A.     Yes, most of them did.

10         Q.     Did you interact with those folks?

11         A.     I did interact with them.  Mostly --

12    occasionally I saw a few of them, but I never

13    went to the Minneapolis office, so I didn't

14    meet all the people that worked there.

15         Q.     Were you an executive director of

16    Pavilion at this time?

17         A.     I was.

18         Q.     So you feel that the investment

19    advisors who were serving in the 321 capacity

20    were fulfilling their fiduciary obligation?

21    Any reason not to believe that?

22         A.     I'm sorry, repeat that I

23    couldn't --

24         Q.     Do you believe that the 321

25    investment advisors that were employed by

Page 284

DONALD C. STONE

1    Pavilion at this time were fulfilling their

2    fiduciary obligation?

3         A.    The ones that I knew were

4    certainly.  I can't speak to people that I

5    didn't know and I think I kind of carved that

6    out earlier.  But to the extent that I knew

7    people, I was absolutely certain they were

8    doing the correct thing.

9              I didn't have a -- I mean some

10    of these -- I don't know who -- I don't know

11    who was responsible for this relationship.  So

12    while I would like to think they certainly were

13    doing exactly what they should be doing, I

14    don't know what they were doing because I

15    wasn't -- I don't even know it we integrated

16    them into our reporting system at this

17    particular time, because you have part of the

18    fee went to Jeffrey Slocum & Associates, so

19    that would have been probably just earlier in

20    the year and then the rest of it would have

21    been Pavilion later in the year.  So I would

22    guess that we may not have even switched over

23    the reporting system at that point.

24         Q.    So would it have been your

25

Page 285

1                    DONALD C. STONE

2      expectation that when Pavilion essentially, I

3      guess, acquired this business, that it ensured

4      that the individuals who were working on the

5      clients that were now Pavilion were fulfilling

6      their fiduciary obligations?

7            A.    Yes, I would expect that they

8      would do that.  How that was validated, I'm not

9      sure.

10           Q.    If we turn Schedule H of this

11     document which I will tell you the PDF number

12     in a second.

13           A.    I'm there.

14           Q.    You see here as of December 31,

15     2017 this plan offers the Fidelity Freedom

16     Funds K Class?

17           A.    I'm on Schedule H.  Isn't H the

18     one that you want to be in?

19           Q.    Page 41 of the document, Schedule

20     H line 4-I.

21           A.    4-I, okay.  I'm missing it

22     somewhere.  I'm not sure where you're looking.

23           Q.    On page 41 of 43.

24           A.    41 of 43.  Okay way down there.

25     Hold on.  Almost there.  Okay, I'm on page 41

Page 286

1                    DONALD C. STONE
2        of 43.
3                Q.    Do you see where it says the
4        Fidelity Freedom Funds and the various vintages
5        K Class was offered in this plan?
6                A.    I do.
7                Q.    As of December 31st, 2017?
8                A.    Yes.
9                Q.    Do you see that?
10               A.    Yes.
11               Q.    Do you agree with me that the
12       Pavilion advisors would have had the same
13       performance information that you identified in
14       table 1 paragraph 135 of your report?
15               A.    I would assume so, yes.
16               Q.    You agree with me that this plan
17       committee did not elect to remove the Fidelity
18       Freedom Funds as of that time period?
19               A.    As of that time, that is correct.
20               Q.    You have no reason to believe that
21       Pavilion as a 321 advisor was acting imprudently or
22       not fulfilling its fiduciary obligations?
23               A.    I would not think that the firm
24       was acting imprudently.  I don't know who the
25       advisor was.  As I said, this was as we were

Page 287

1            DONALD C. STONE

2    transitioning people over.  I can't speak to

3    what they did or do not do.  But I would assume

4    because the firm had a sterling reputation and

5    everything, that they were doing what they

6    should be doing.  And I also don't know

7    demographics of this plan, so I don't know how

8    that would have fit in this particular case

9    because I didn't recognize the firm's name at

10   all.

11        Q.    So would you agree with me

12   based on the information in table 1 of your

13   report, that that information does not

14   necessitate a removal of the Fidelity Freedom

15   Funds from a plan?

16        A.    I said what it necessitated was

17   taking additional action to understand the

18   reasons for the underperformance.  That might

19   or not have led to the removal of the funds

20   depending on what was discovered.

21        Q.    You agree with me that at least

22   this plan did not discover anything that

23   warranted removal as of December 31st, 2017?

24             MR. ROBERTS:  Objection.

25        A.    I can't speak to what they knew

```
                                          Page 288
                            DONALD C. STONE
 1
 2      or didn't know, because I don't know these
 3      people.  So I'm not going to put myself in
 4      their place.  They chose to keep the funds as
 5      of this point, that's the only information that
 6      I know of at this stage.
 7                    MS. ENGELMAN:   Maria, can we look
 8              at 2019 GlassBridge.
 9                    (Exhibit 9 for identification,
10              GlassBridge 2019 Form 5500.)
11           A.     Okay, I'm bringing it up.
12           Q.     So this is for the year -- let me
13      know when you have it.
14           A.     Okay, I'm on the first page.
15           Q.     This is for year January, 2019 to
16      December 31st, 2019.  Do you see that?
17           A.     Yes.
18           Q.     If you go to page 3 of the PDF it
19      shows that Pavilion Advisory Group is the
20      investment advisor?
21           A.     On page 3?
22           Q.     Sorry, it's page 6.  Page 6 of the
23      PDF.  Schedule C.
24           A.     Yes, Pavilion Advisory Group, yes.
25           Q.     If we go back down to Schedule H
```

Page 289

1                    DONALD C. STONE

2      which is page 37 of 38 all the way toward the

3      end.

4            A.      37 of 38.  Okay, I'm on this.

5            Q.      You see as of this time period

6      this plan is still offering the Fidelity Freedom

7      Funds Class K.  Do you see that?

8            A.      Yes, I do.

9            Q.      Those are the same funds that are

10     offered in this plan; is that right?

11           A.      That's correct.

12           Q.      Through May of 2019 you were an

13     executive director at Pavilion; is that right?

14           A.      Yes, actually it had switched over

15     to Mercer.

16           Q.      What time period?

17           A.      Well Mercer acquired Pavilion on

18     November 30th, 2018.

19           Q.      Got it.  But you were still there

20     in an executive director role until May of 2019

21     I thought you said?

22           A.      No, I had no client relationship,

23     I had no responsibilities and I was living in

24     Spain, but I was still on the payroll, yes.

25           Q.      During this time period, this 2019

Page 290

1                    DONALD C. STONE

2       time period where this plan is still offering

3       the Fidelity Freedom Funds, that is after the

4       March, 2018 special report that you highlighted

5       in your expert report; is that correct?

6              A.     That's correct.

7              Q.     Mr. Stone I would like to --

8                     MS. ENGELMAN:   Maria, can we look

9              at the 2016 Holland & Knight.

10                    (Exhibit 10 for identification,

11             Holland & Knight 2016 Form 5500.)

12             Q.     Mr. Stone, were you an investment

13      advisor for Holland & Knight?

14             A.     I was not.

15             Q.     Do you know if Pavilion was?

16             A.     That sounds familiar.

17             Q.     Do you know who the investment

18      consultant, the 321 investment consultant was

19      for Holland & Knight?

20             A.     I do not.

21             Q.     Do you have any reason to believe

22      sitting here today that the investment consultant

23      from Pavilion working on the Holland & Knight plan

24      did not fulfill the fiduciary obligation of a

25      321 advisor?

```
                                            Page 291

 1                    DONALD C. STONE
 2                    MR. ROBERTS:    Objection.
 3           A.      I don't have any reason to think
 4      that, no.
 5           Q.      Do you have any reason to think
 6      that the Holland & Knight committee was acting
 7      imprudently in any way?
 8           A.      I don't know anything about that,
 9      so I can't speak to them.
10           Q.      Do you have the 2016 Holland &
11      Knight 5500 in your Exhibit Share?
12           A.      Let me see if it is loaded.  Yes,
13      it is there.  Let me open it.
14           Q.      So this is for the period
15      January 1st, 2016 to December 31st, 2016.  Do
16      you see that?
17           A.      Yes.
18           Q.      If we look at page 36 of the PDF.
19           A.      36 of the PDF, okay.
20           Q.      Schedule C.
21           A.      Yes, okay.  I'm on page 36 of
22      Schedule C.
23           Q.      Do you see there that the Pavilion
24      Advisory Group is the Holland & Knight plan's
25      investment advisor?
```

Page 292

1                    DONALD C. STONE
2              A.     I don't.  On 36 that is not --
3         hold on.  Yes, okay, the previous page, I see
4         it.
5              Q.     Then if we go to page 88 of 89.
6              A.     I'm there.
7              Q.     Do you see that this plan offered
8         the Fidelity Freedom Funds K target date funds
9         with is the same funds that were offered in
10        this plan?
11             A.     I do.
12                    MS. ENGELMAN:   Can we go to 2017,
13             Maria.
14                    (Exhibit 11 for identification,
15             Holland & Knight 2017 Form 5500.)
16             A.     I'm loading it.  Okay, I think it
17        is open.
18             Q.     So this is the 5500 for the
19        Holland & Knight Profit Sharing Plan and Trust.
20        This is for the January 1st, 2017 to
21        December 31st, 2017 time period.  Do you see
22        that?
23             A.     I do.
24             Q.     Then if we go to, again, to page
25        36 of my PDF where it shows that Pavilion

Page 293

                    DONALD C. STONE
1       Advisory Group is the investment advisor.
2
3              A.    Give me a moment.  Okay, yes, one
4       of several consultants apparently.
5              Q.    Then if we go to Schedule H --
6              A.    If I could just stop you there for
7       a moment.  I have an a question.
8              Q.    Sure.
9              A.    So I mean there is four different
10      consultants listed here, no five.  Five -- six
11      different consultants listed here and so I'm
12      not sure what Pavilion's role was here as the
13      investment advisor.  They were getting only
14      $15,000, so that is not a typical advisory fee.
15      So I'm not sure if they just take -- they had
16      the relationship before.  I'm not sure what the
17      role was for Pavilion at that particular time.
18                    I wanted to make a note of that
19      because somebody else -- there a couple of
20      somebody else's that were making considerably
21      more money as consultants on this plan at this
22      particular time.  And there is enough advisors,
23      strategic advisors on this plan at the same
24      time.
25             Q.    If we go to Schedule H.

                                        Page 294

1                        DONALD C. STONE

2          A.      Okay, I'm on Schedule H.

3          Q.      It is my page 81 of 83.

4          A.      81 of 83.  Okay.

5          Q.      Do you see here that the Fidelity

6    Freedom Fund K Funds were offered in this plan?

7          A.      I do.

8          Q.      And that Pavilion would have had

9    access to the same performance information in

10   table one of your report?

11         A.      Yes, but I'm not sure who was the --

12   who was actually driving the ship in this

13   particular case because there are like five

14   consultants and at least two investment

15   advisors as they're broken out on Schedule C.

16                 I don't know that -- I don't know

17   what they were providing.  But for $15,000 they

18   were not providing quarterly reporting.  So I

19   think it was one of the other -- I'm not saying

20   these guys didn't have the K Funds and all of

21   that, I get it.  I don't think Pavilion has

22   probably much of anything to say on whatever

23   was going on with that plan in this particular

24   year because it looks like other people were

25   providing advice to the plan.

Page 295

1                    DONALD C. STONE

2          Q.    Do you know one way or the other

3     sitting here today what role Pavilion played?

4          A.    No, but for $15,000, they weren't

5     the investment advisor.  I could tell you that.

6          Q.    Mr. Stone, you testified earlier

7     that you were the 338 investment advisor to

8     Packaging Corporation of America; is that

9     correct?

10         A.    That's correct.

11         Q.    What was the timeline that you

12     were the 338 advisor?

13         A.    We are talking about the 401-K or

14     the define benefit?

15         Q.    The 401-K.

16         A.    401-K would have begun sometime

17     during 2018 and I'm going to -- I'm not sure of

18     the exact timeframe.  It was probably during

19     the second quarter that they began to convert

20     over and I actually handed that relationship

21     off to one of my colleagues at the point that

22     they finalized the decision and signed the

23     agreement to have us being a 338.

24         Q.    Prior to that were you personally

25     the 321 advisor?

Page 296

         1              DONALD C. STONE
         2        A.      321, yes.
         3        Q.      So during what time period were
         4    you the 321 advisor?
         5        A.      So I had worked with Packaging
         6    Corporation of America beginning in 2005, if I
         7    remember correctly, but I don't think we took
         8    over the main plan until 2007.  I did a couple
         9    of projects for them back in like 2005, 2006.
        10    And I think that -- and worked with a subsidiary
        11    and took over the main 401-K plan as advisor I
        12    think in 2007.
        13        Q.      Do you recall what target date
        14    funds the Packaging Corporation of America
        15    offered?
        16        A.      I do not.
        17        Q.      Would it refresh your recollection
        18    if they offered the State Street Fund?
        19        A.      That sounds like that could be
        20    correct, yes.  That sounds correct.
        21        Q.      Do you recall if they were the
        22    plan QDIA?
        23        A.      I believe they were.
        24        Q.      Does that mean that you would have
        25    provided heightened scrutiny, as you used that

Page 297

                    DONALD C. STONE
1
2    term, with respect to the State Street Fund?
3           A.    Yes.
4           Q.    Would you have recommended their
5    removal -- in a 321 capacity would you have
6    recommended the committee remove those funds if
7    you deemed them to be imprudent?
8           A.    Of course.
9           Q.    As a 338 advisor it would have
10   been your fiduciary obligation to remove those
11   funds if they were imprudent in your view?
12          A.    Correct.
13          Q.    Do you have a recollection of when
14   the plan offered the State Street target date
15   funds?
16          A.    I believe they offered them for a
17   number of years, but I can't speak to when they
18   went into the plan and I'm not sure what
19   happened after Pavilion became the 338 and I
20   handed the relationship off to one of my
21   colleagues as part of my kind of exit strategy.
22                So I don't recall if any --
23   because that was actually at the time, as you
24   said, it was after we had signed the agreement
25   and we were in the process of evaluating

Page 298

1                      DONALD C. STONE

2      whether any fund changes were going to be made

3      by us as a 338.  But I was not involved

4      ultimately in whatever changes did or did not

5      take place.

6             Q.     Sorry, just remind me, when was

7      the time period when you handed off the

8      relationship?

9             A.     I believe it was the second

10     quarter of 2018.  I'm not a hundred percent

11     sure, but that is pretty close.

12            Q.     Do you recall what the benchmark

13     was for the State Street funds?

14            A.     I do not off the top of my head,

15     no.

16            Q.     Would it refresh your recollection

17     that the State Street Fund offered or have the

18     chosen benchmark as the S&P 500?

19            A.     It would be the S&P target date

20     index fund, right?

21            Q.     Correct.

22            A.     Not the S&P 500.

23            Q.     The target date Intex fund;

24     correct.

25            A.     That is a typical index that's

Page 299

```
 1                    DONALD C. STONE
 2     used pretty much across the board.
 3                    MS. ENGELMAN:  Maria, can we pull up
 4             the next document.
 5                    (Exhibit 12 for identification,
 6             Document titled State Street Fund versus
 7             S&P.)
 8             Q.     Let me know when you have it,
 9     Mr. Stone.
10             A.     What is the document?
11             Q.     This document is one that we put
12     together and I will explain it to you.
13             A.     The last thing I'm showing is
14     still the Holland & Knight.  Okay State Street
15     Fund versus S&P PDF.
16             Q.     We went and looked at the
17     performance of the State Street Fund as
18     compared to the benchmark over the time period
19     that you served in both a 321 capacity and also
20     a 338 capacity.  Although I know post 2018,
21     second quarter 2018 that is not necessarily the
22     case.
23                    I understand that you don't have
24     the underlying metric, but assuming this
25     analysis is correct, will you agree with me
```

Page 300

1                     DONALD C. STONE
2       that starting in Q3 2016 the State Street funds
3       are underperforming the index on a three year
4       and five-year basis?
5               A.      Q3 in 2016, right?
6               Q.      Correct.
7               A.      Okay, so there were a couple of
8       vintages that appear not to have been, but
9       there are several that -- most of them were
10      underperforming at that particular time, yes.
11              Q.      The same is true for Q4 2016?
12              A.      That would be correct.
13              Q.      The same is true for Q1 2017?
14              A.      I have to go to the next page.
15      Three year basis, yes.
16              Q.      And on a five-year basis as well?
17              A.      Yes.
18              Q.      For Q2 2017 would you agree they
19      are underperforming the benchmark on a three
20      year and five-year basis?
21              A.      I would.
22              Q.      And for Q3 2017, would you agree
23      the State Street funds are underperforming the
24      benchmark on a three year and five-year basis?
25              A.      I would.  These are index funds,

```
 1                    DONALD C. STONE
 2      so you would expect them to be underperforming
 3      by definition.
 4              Q.      For Q4 2017?
 5              A.      Again, most of them are
 6      underperforming at that particular point.
 7              Q.      Q1 2018?
 8              A.      Okay, most of them are
 9      underperforming at that point.  And again, my
10      point still stands which is they are index
11      funds so you would expect them to be
12      underperforming this benchmark.
13              Q.      For Q2 2018 the same?
14              A.      Same thing.
15              Q.      And Q3 2018 same thing?
16              A.      Yes.
17              Q.      And during this time period, so
18      that is, I'm going to count, nine quarters of
19      underperformance on the three year and
20      five-year basis as compared to index.  Do you
21      agree with me?
22              A.      As compared to the S&P target date
23      index, that's correct.  These are passively
24      managed funds.  Again, it is not exactly a
25      surprise that they're underperforming a little
```

Page 302

1                  DONALD C. STONE

2    bit.

3          Q.     But you agree with me these funds

4    were not removed from the plan?

5          A.     They are going to be evaluated

6    differently as a passive fund.  They are going

7    to be evaluated differently.  No, they weren't

8    removed from the fund.  But I'm saying the

9    evaluation would also be different as well.

10         Q.     Tell me about that.  Why would the

11   evaluation be different for a passive fund?

12         A.     They are passive, they are not

13   actively managed.  All they are doing is

14   tracking a benchmark and the only difference

15   here is the benchmark.  The S&P target date

16   index and I don't have that information in

17   front of me, but I'm making a good educated

18   guess, is the allocation in the target date

19   index that they are being measure against, the

20   allocations could be slightly different than

21   the actual State Street target date allocations

22   themselves.

23                Also State Street might have

24   been using a different -- the funds that they

25   were using, the asset allocation itself might

Page 303

1                    DONALD C. STONE

2      have included or not included all the different

3      asset categories that are in the S&P target

4      date series.

5                    In addition to that, you have

6      transaction costs in the State Street.  So you

7      have several things that create a little bit of

8      noise in the data when you look at that because

9      they are passive funds.  All they are doing is

10     mimicking an index and they did a very good job

11     of mimicking that index.

12                   When we did the analysis, we would

13     go back and look at, you know, what are they

14     doing anything that says they are not tracking

15     their index.  If that they are -- that they are

16     not doing what they should be doing.  And the

17     funds were inexpensive so I think the

18     evaluation is, not to say that you wouldn't

19     have the conversation with the committee about

20     these versus this benchmark, I think you would.

21     But it is very different than how the way that

22     you evaluate actively managed funds.  Totally

23     different.

24          Q.     Do you have a specific

25     recollection of having conversations with the

Page 304

1                    DONALD C. STONE

2       committee in a 321 capacity regarding this

3       performance?

4            A.    I don't recall specific

5       conversations I would have had years ago with

6       this -- in regard to any quarterly performance

7       or whatever with this particular client.  No, I

8       don't remember that.

9            Q.    In a 338 capacity do you recall

10      specifically you tracking down sort of

11      understanding what the noise was and

12      understanding what was driving this

13      underperformance?

14           A.    This would have been up to my

15      colleague who replaced me.  He was heavily

16      involved in the evaluation process as to

17      whether they were going to continue with the

18      State Street target date funds or not and I

19      have no idea what the outcome of that was.

20           Q.    You were a 338 advisor prior to

21      Q2 2018; correct?

22           A.    In '17 I was a 338 for the defined

23      benefit.  In 2018 I was briefly the 338 for the

24      401-K because I handed it off during -- as we

25      got the agreement signed.  So I would have --

Page 305

DONALD C. STONE

1

2    technically it was probably a 30-day period

3    that I was actually the 338 since we were

4    handing it off.

5         Q.    Your partner, you don't know what

6    happened -- you don't know what analysis they

7    did exactly?

8         A.    First of all, it wouldn't have

9    just been him.  It would have been an entire

10   staff of people that would have been looking at

11   whether or not State Street was in our high

12   conviction list.  If State Street was in our

13   high conviction list, if they were in our high

14   conviction list, we are probably would have

15   kept it.

16             It's a passive choice.  It is

17   generally -- it has been very good doing what

18   it does.  And the allocation of the State

19   Street target date funds is -- for example,

20   passive funds can be a little tricky.  State

21   Street, their target date funds look a little

22   bit different than Blackrock which looks a

23   little different than Vanguards.  They are all

24   passive, they all track index, but they are

25   tracking in some case the same index and in

Page 306

1                    DONALD C. STONE

2     some case different indexes.

3                    And they also may be making

4     other decision under the covers.  For example,

5     Vanguard does not go and invest in small and

6     mid cap international funds because they said

7     it dries up transaction costs.  Well, State

8     Street does as far as I know and I'm pretty

9     sure Blackrock does as well.

10                    There is some noise in those

11    numbers and I don't think -- you can not

12    reasonably compare a passive index fund to an

13    actively managed portfolio in target date or

14    for that matter any other category and say

15    well, gee, the index fund is underperforming.

16                    If it is doing what it is supposed

17    to be doing which is tracking its index, then

18    it is doing exactly what it is supposed to be

19    doing and you don't need to do anything else.

20                    MS. ENGELMAN:  If I could have five

21            minutes, I likely can wrap up, I just need

22            to look at my notes.

23                    THE VIDEOGRAPHER:  The time is

24            11:26 and we are off the record.

25                    (Recess taken.)

Page 307

1                    DONALD C. STONE

2                    THE VIDEOGRAPHER:    The time is

3            11:41 and we are on the record.

4    BY MS. ENGELMAN:

5            Q.    Mr. Stone, just a couple of other

6    things and then we will wrap up.

7                    Are you aware that Packaging

8    Corporation of America and the investment

9    committee of the Packaging Corporation of

10   America was sued in connection with the choices

11   of the fiduciary committee?

12           A.    No, I was not the aware of that.

13   Can you tell me what date that was?

14           Q.    I can.   The complaint was filed in

15   June of 2022.

16           A.    Okay.

17                    MS. ENGELMAN:   Maria, can we pull

18           up the Amended Complaint, please.

19                    (Exhibit 12 for identification,

20           Amended Complaint filed in June of 2022.)

21           Q.    Do you have that, Mr. Stone?   Let

22   me know when you do?

23           A.    No, it hasn't loaded yet.   Oh

24   okay, it just came across.

25           Q.    So this was filed in -- this is

Page 308

                          DONALD C. STONE

1

2      the Amended Complaint.  This was filed in June

3      of 2022.  I think the class period goes back to

4      at least 2016.  So that is the time period when

5      you were serving as the 321 consultant; is that

6      right?

7              A.      That would be correct.

8              Q.      We don't have to review the whole

9      thing, but I will represent to you that it

10     challenges breach of fiduciary duty claims

11     based on the recordkeeping fees that were paid

12     to the record keeper, the managed account

13     services as well as the prudence of three

14     different investment options.

15             A.      Okay.

16             Q.      So the investment options are,

17     they are listed throughout the complaint, but

18     if you go to page, I guess paragraph 151 there

19     it is a chart and the Invesco Diversified

20     Dividend  Fund, The Metropolitan West Total

21     Return Bond Fund and the Victory-Integrity

22     Small Cap Value Fund.

23             A.      Okay.

24             Q.      Do you have any thoughts on

25     whether or not these three investment options

Page 309

                    DONALD C. STONE

1

2      were actually prudent options available to plan

3      participants?

4            A.    I have not look at those

5      investment options in a long time, so I really

6      have no thought one way or the other at this

7      particular point.

8            Q.    Do you have any thoughts about

9      whether or not the recordkeeping fees paid to

10     the record keeper by this plan may have been

11     too high?

12           A.    I would very surprised.  Again, I

13     haven't looked at the specifics of the complaint,

14     but we negotiated lower fees for every single

15     client that we ever had except one over -- as

16     PSA, so over that 12-year period, only one

17     client were we not able to reduce fees for.

18                 That was something that we

19     spent a lot of time doing.  So I would be very

20     surprised, but I don't know, like I said, I

21     don't know anything about the complaint.

22           Q.    You weren't involved and you

23     weren't deposes in this matter or otherwise

24     involved in any way?

25           A.    I have not been contacted by

Page 310

1                    DONALD C. STONE

2      anybody.

3              Q.    But you understand that on the

4      date of this complaint essentially you're

5      advice to the committee was at issue in this

6      lawsuit?

7              A.    Yeah, I understand that, yes.

8                    MS. ENGELMAN:   I don't have any

9            further questions for Mr. Stone.

10                   MR. ROBERTS:   Nothing from me

11           either.  Thank you, Mr. Stone.

12                   THE WITNESS:   Okay.

13                   (CONTINUED ON NEXT PAGE.)

14

15

16

17

18

19

20

21

22

23

24

25

Page 311

1                    DONALD C. STONE

2                    THE VIDEOGRAPHER:   If there are no

3          other stipulations I will conclude the

4          video recorded for this proceeding.

5                    So here ends media unit number 6,

6          this concludes the video recorded virtual

7          remote deposition of Donald C. Stone taken

8          by the Defendants on Friday, November 1st,

9          2024.  The time is 11:47 p.m. central

10         European time and we are going off the

11         record.

12                   (TIME NOTED:  11:47 P.M. CENTRAL

13         EUROPEAN TIME.)

14

15                              _____

16                              DONALD C. STONE

17

18         Subscribed and sworn to before me

19         this _____ day of _____, 2024

20

21         _____

22

23

24

25

Page 312

1                         ERRATA SHEET

                    VERITEXT LEGAL SOLUTIONS

2                     330 OLD COUNTRY ROAD

                    MINEOLA, NEW YORK 11501

3                              516-608-2400

4      NAME OF CASE:

       DATE OF DEPOSITION:

5      NAME OF DEPONENT:

6      PAGE   LINE(S)      CHANGE              REASON

7      ____|_____|_____|_____

8      ____|_____|_____|_____

9      ____|_____|_____|_____

10     ____|_____|_____|_____

11     ____|_____|_____|_____

12     ____|_____|_____|_____

13     ____|_____|_____|_____

14     ____|_____|_____|_____

15     ____|_____|_____|_____

16     ____|_____|_____|_____

17     ____|_____|_____|_____

18     ____|_____|_____|_____

19     ____|_____|_____|_____

20     ____|_____|_____|_____

21     ____|_____|_____|_____

22     ____|_____|_____|_____

23     SUBSCRIBED AND SWORN TO BEFORE ME

       THIS____DAY OF _____, 20___.

24

       _____    _____

25     (NOTARY PUBLIC)              MY COMMISSION EXPIRES:

Page 313

```
 1              C E R T I F I C A T E

 2   STATE OF NEW YORK      )

 3                          : ss.

 4   COUNTY OF NEW YORK  )

 5       I, WILLIAM VISCONTI, a Shorthand Reporter and

 6   Notary Public within and for the State of New York,

 7   do hereby certify:

 8       That prior to being examined, the witness named in

 9   the foregoing deposition was duly sworn to testify the truth,

10   the whole truth, and nothing but the truth;

11       That said deposition was taken down by me in

12   shorthand at the time and place therein named and

13   thereafter reduced by me to typewritten form and that the

14   same is a true, correct, and complete transcript of said

15   proceedings.

16       Before completion of the deposition, review of the

17   transcript [ X ] was [   ] was not requested.  If requested,

18   any changes made by the deponent (and provided to the

19   reporter) during the period allowed are appended hereto.

20       I further certify that I am not interested in the

21   outcome of the action.

22       Witness my hand this 11th day of 2024.

23

24   _____

25                         WILLIAM VISCONTI
```

Page 314

```
 1
 2              E X H I B I T S
 3     DESCRIPTION                      PAGE
 4      Exhibit 1 for identification,   39
 5      Expert Report of Donald C.
 6      Stone.
 7      Exhibit 2 for identification,   171
 8      2015 IPS.
 9      Exhibit 3 for identification,   241
10      Q4, 2018 meeting minutes.
11      Exhibit 4 for identification,   257
12      Q1 2015 committee meeting
13      minutes.
14      Exhibit 5 for identification,   264
15      Q1 2016 Meeting Minutes.
16      Exhibit 6 for identification,   265
17      2016 Deep Dives.
18      Exhibit 7 for identification,   270
19      May 10, 2017 meeting minutes.
20      Exhibit 8 for identification,   282
21      GlassBridge 2017 Form 5500.
22      Exhibit 9 for identification,   288
23      GlassBridge 2019 Form 5500.
24      Exhibit 10 for identification,  290
25      Holland & Knight 2016 Form 5500
```

Page 315

```
 1
 2                    E X H I B I T S
 3     DESCRIPTION                         PAGE.)
 4     Exhibit 11 for identification,   292
 5     Holland & Knight 2017 Form
 6     5500.
 7     Exhibit 12 for identification,   299
 8     document titled State Street
 9     Fund versus S&P.
10     Exhibit 12 for identification,   307
11     Amended Complaint filed in June
12     of 2022.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 316

1    John Roberts, Esquire

2    jcroberts@millershah.com

3                        November 11, 2024

4    RE:    Laliberte, Mary Et Al v. Quanta Services Inc Et Al

5        11/1/2024, Donald C. Stone (#6983699)

6        The above-referenced transcript is available for

7    review.

8        Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-midatlantic@veritext.com.

16    Return completed errata within 30 days from

17   receipt of testimony.

18     If the witness fails to do so within the time

19   allotted, the transcript may be used as if signed.

20

21

22               Yours,

23               Veritext Legal Solutions

24

25

Page 317

1    Laliberte, Mary Et Al v. Quanta Services Inc Et Al

2    Donald C. Stone (#6983699)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Donald C. Stone, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11    _____    _____

12    Donald C. Stone                        Date

13    *If notary is required

14                        SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                        _____ DAY OF _____, 20____.

16

17

18                        _____

19                        NOTARY PUBLIC

20

21

22

23

24

25

**[& - 2015]**                                                                                     Page 1

## &

**&**   2:7 282:23
284:19 290:9
290:11,13,19
290:23 291:6
291:10,24
292:15,19
299:14 314:25
315:5

## 0

**02110**   2:9
**03290**   1:4 4:10

## 1

**1**   1:12 39:13,14
87:18,19
255:10 286:14
287:12 314:4
**1,500,000**   87:14
**1.2**   131:11
**1/2**   161:25
**10**   18:13,13,18
19:7 63:3
109:13 110:13
110:15 125:6
134:11 258:11
270:17,19
290:10 314:19
314:24
**10,000**   86:24
**100**   17:5 55:17
56:6 63:5
80:22 134:4
**1000**   113:11

**104**   233:11,25
234:2,3,4
239:9 240:13
243:13
**10:40**   281:11
**10:50**   281:14
**11**   292:14
315:4 316:3
**11/1/2024**
316:5
**11501**   312:2
**117**   245:12
**11:26**   306:24
**11:41**   307:3
**11:47**   311:9,12
**11th**   313:22
**12**   58:2 175:2
185:4 249:15
249:17 299:5
307:19 309:16
315:7,10
**12:45**   114:8
**13**   241:4
**131**   254:8
**135**   260:11
276:7,9 286:14
**137**   260:23
261:5
**138**   270:22
**148**   147:7,8
151:4
**15**   29:6,10
109:16 133:15
133:16 134:11
134:21 184:15

255:16
**15,000**   293:14
294:17 295:4
**150**   17:3 41:3
80:22
**151**   308:18
**15th**   201:19
**16**   268:20
**17**   184:16
269:2 304:22
**171**   314:7
**18**   257:16
269:3
**180**   17:3
**1845**   2:3
**19**   39:10
184:16 269:5
**19103**   2:4
**1990s**   52:13,23
**1st**   4:12 152:23
271:8 291:15
292:20 311:8

## 2

**2**   171:24
173:25 314:7
**20**   63:4 64:22
67:11 82:24
89:21 93:12
102:24 109:16
114:9 255:10
258:11 269:9
312:23 317:15
**200**   41:4
**2002**   22:2 49:9
53:15,24 56:24

56:24 57:10,13
64:5,10 210:17
**2002/2014**   61:6
**2004**   19:10,15
19:16,21,23
20:7 22:20
25:9 53:22
**2005**   25:7
296:6,9
**2006**   296:9
**2007**   19:10,15
19:18,20,21,23
20:2,7 22:20
25:9,16 296:8
296:12
**2008**   97:5
**2009**   158:2
**2010**   97:5
**2013**   258:10
**2014**   53:24
55:3 56:4,24
56:25 57:11
62:13 64:10
129:21,23
130:5 133:12
146:25 147:2,3
148:3,10 151:8
152:17,19,20
152:22,23
153:5,19 191:8
255:2,6,6
260:22
**2015**   149:6
153:13,15
154:2,6 156:15

**[2015 - 299]**                                                          Page 2

167:25 169:6
169:11,14
171:23,24
173:2,23
200:16 201:3
201:11,15,18
201:19 202:5
202:25 204:12
208:8 216:5
221:25 223:21
234:17,24
236:3,10,18,20
238:6 239:25
240:4,24
243:16,23
244:9 245:7
247:18,20
249:14 257:12
257:15,17,18
276:16,23
279:4 314:8,12
**2016**  149:6
158:11,13,16
158:19,25
159:6,8 200:11
231:12,13
232:8 244:18
244:20,22,24
245:3,5,9,10
264:13,16,19
265:13,14
266:9,12
270:12 290:9
290:11 291:10
291:15,15

300:2,5,11
308:4 314:15
314:17,25
**2017**  131:9
132:19 133:4,4
133:4,12,12
135:22 136:5
149:6 159:19
159:22,24
160:6,19 184:6
199:8 234:21
234:25 235:21
237:7,13,23
238:3,17,19
239:20 243:21
244:3 245:21
246:4,13,18
247:6,8 260:23
270:17,20
271:8 276:23
277:3 279:6,8
281:25 282:3
282:13,14
283:3 285:15
286:7 287:23
292:12,15,20
292:21 300:13
300:18,22
301:4 314:19
314:21 315:5
**2018**  131:16
132:19 133:5
136:8 149:6
161:5,11,12
240:20 241:22

241:24 242:8
242:17 254:12
255:6 259:8
289:18 290:4
295:17 298:10
299:20,21
301:7,13,15
304:21,23
314:10
**2019**  39:9,10
130:5 149:6
152:5,9,14
161:18 162:19
210:17 234:25
288:8,10,15,16
289:12,20,25
314:23
**2020**  148:4,11
148:12 149:3,7
149:17 150:9
150:15,19,22
151:9,11
152:24 161:20
165:3,25 166:2
166:11,13,19
166:21 167:6
167:13 173:5
184:10,17,23
199:12 231:18
**2021**  19:12,16
19:18 20:2,3
25:16 26:7
38:11,20
216:16,22
218:9

**2022**  231:10,13
231:21,22,24
232:5 307:15
307:20 308:3
315:12
**2024**  1:12 4:12
16:12 149:25
149:25 150:3,5
150:7,23 191:9
260:22 311:9
311:19 313:22
316:3
**20567**  313:23
**20ish**  101:22
**21**  26:17
**22**  216:23
**23**  62:3
**24**  167:2
216:22
**241**  314:9
**24th**  216:15
**25**  63:4
**257**  314:11
**264**  314:14
**265**  314:16
**270**  314:18
**28**  223:18,19,21
223:22 225:7
**282**  314:20
**288**  314:22
**290**  314:24
**292**  315:4
**299**  315:7

**[3 - 6]**

| 3 |
|---|

**3** 16:8,8 87:18
225:4,7 237:17
241:23 242:10
245:25 288:18
288:21 314:9
**3-1** 245:16
**30** 64:23
133:21 305:2
316:16
**300** 27:22
28:17
**307** 315:10
**30th** 289:18
**31** 285:14
**31st** 16:12
282:14 286:7
287:23 288:16
291:15 292:21
**321** 49:11,15
53:12 55:8
56:19,21,22
58:4,15,22
59:3 60:16,22
61:17,21,23
62:9 63:8
64:11 67:21
69:13 74:16
129:20 131:23
131:24 132:20
133:14 134:15
136:13 141:6
193:2 208:15
210:16 211:20
283:19,24

286:21 290:18
290:25 295:25
296:2,4 297:5
299:19 304:2
308:5
**321s** 58:10
**330** 312:2
**338** 27:8 30:19
49:11 53:13
56:20 131:7,10
131:17,20,23
132:3,7,10,12
132:13,14
295:7,12,23
297:9,19 298:3
299:20 304:9
304:20,22,23
305:3
**34** 187:20,23
**35** 86:18
102:22 190:22
**36** 291:18,19,21
292:2,25
**37** 195:18,21
196:25 198:23
289:2,4
**38** 289:2,4
**39** 265:17,18
270:7 314:4
**3:03** 1:12 4:13
**3:12** 12:14

| 4 |
|---|

**4** 62:22 161:25
224:6 225:3,4
257:14,25

258:2 285:20
285:21 314:11
**40** 23:25 80:18
86:18 102:22
133:21 184:2
231:16
**401** 22:24
25:12 34:6
39:3 49:19
50:17 51:10
53:11 55:8
80:18 121:16
224:9,11
295:13,15,16
296:11 304:24
**403** 53:11
**41** 232:20
285:19,23,24
285:25
**42** 91:16,17,22
92:18,20,22
102:8,9 227:16
**43** 233:11
239:9 285:23
285:24 286:2
**45** 102:8,9
**47** 236:25
237:3,4,15
245:15
**4:04** 50:8
**4:22** 1:4 4:10
**4:41** 69:2

| 5 |
|---|

**5** 12:11 62:14
62:14 64:3
125:5 264:12
266:13,24
267:5 270:13
270:14 314:14
**5,000** 273:10
**50** 17:3,5 62:7
63:3 64:24
80:18 81:19,19
126:11,19
135:3 210:7
247:5
**500** 23:25
62:22 298:18
298:22
**50th** 82:3
**516-608-2400**
312:3
**5200** 104:3,7
**55** 101:23
102:4,7
**5500** 281:25
282:3,9 288:10
290:11 291:11
292:15,18
314:21,23,25
315:6
**57** 101:23

| 6 |
|---|

**6** 5:25 62:14
87:20 89:17,25
125:5 259:23
265:14 267:10

**[6 - add]**

282:6,16
288:22,22
311:5 314:16
**6-0** 146:12
**60** 23:25 57:6
146:11,14
**600** 94:6
**65** 60:25 61:15
72:7 90:23
101:19 102:5
**66** 147:6,8
**6983699** 316:5
317:2

**7**

**7** 90:6 148:17
270:19 314:18

**8**

**8** 90:6 282:2
314:20
**80** 80:7,7,10
87:14
**806** 2:3
**81** 294:3,4
**83** 294:3,4
**86** 200:4,6
**88** 201:25
292:5
**89** 292:5

**9**

**9** 53:16 60:24
288:9 314:22
**90** 128:3,18,21
129:7

**90,000** 89:19,23
**93** 216:8
**97** 232:14,16,17
232:18,19
237:24

**a**

**ability** 14:19
**able** 7:7 76:13
93:15 119:14
120:13 160:8
275:16 309:17
**above** 206:19
316:6 317:7
**absent** 201:7
**absolute**
123:25 127:16
129:13 144:23
**absolutely**
60:23 76:13
77:24 114:7
120:9 136:24
270:9 284:8
**accept** 24:3
**accepted** 227:9
228:6
**access** 39:16
214:3 294:9
**accordance**
201:2
**account** 131:3
140:16,17,17
308:12
**accounts** 28:2
39:2 224:23

**accretive** 210:8
**accuracy** 316:9
**accurate** 43:2
162:10 199:10
277:14
**accurately**
42:17 107:19
**achieve** 178:9
179:4,20 180:4
182:2,15
185:13
**acknowledge...**
317:3
**acknowledg...**
316:12
**acquire** 143:5
**acquired** 285:3
289:17
**act** 32:7 132:3
211:22 212:21
**acting** 138:11
219:5 286:21
286:24 291:6
**action** 127:20
167:22 213:18
259:9 261:8
287:17 313:21
**active** 96:5,6,8
96:11 271:20
271:22
**actively** 302:13
303:22 306:13
**actual** 68:17
113:5 116:18
132:11 133:8

143:8 230:10
257:3 302:21
**actually** 14:3
16:16,23 19:9
20:18 21:16
29:15 30:20
39:10 54:11
63:12 74:17
75:12 84:3,10
92:22 96:25
104:12 105:14
108:23 113:17
137:19 138:7
138:22 140:19
150:21 152:20
154:12,23
161:20 163:18
164:9 178:16
207:20 211:4
215:19 216:22
219:13,21
226:9 231:10
255:18 257:4
260:14 265:8
270:24 272:11
274:19 279:5
280:19 282:8
283:4 289:14
294:12 295:20
297:23 305:3
309:2
**add** 55:24
57:13 63:14
67:15 218:23
263:15

**[added - ahb]**                                                                 Page 5

| | | | |
|---|---|---|---|
| **added** 184:6 | **adopted** 160:2 | 290:13,25 | 127:5 193:22 |
| 258:6 259:2 | 160:6 161:14 | 291:25 293:2 | 196:18 211:19 |
| **adding** 116:7 | 161:20 166:3 | 293:13 295:5,7 | 221:3 304:5 |
| 119:6 | 184:7,16,23 | 295:12,25 | **agree** 4:25 |
| **addition** | 239:12 | 296:4,11 297:9 | 54:20 55:20 |
| 248:13 258:5 | **advance** 198:7 | 304:20 | 80:11 114:4 |
| 272:25 303:5 | **advanced** | **advisors** 49:9 | 167:11 174:12 |
| **additional** 15:6 | 186:7 187:4 | 53:17 54:17,24 | 175:22 176:7 |
| 67:15 69:22 | 201:6 | 55:5,13 56:4,7 | 177:24 180:3 |
| 71:6 73:8,17 | **advancement** | 57:4,7,16,23 | 181:4,17 |
| 84:4,24 85:7 | 186:13 | 58:4 59:16 | 182:13 184:3 |
| 87:25 129:11 | **advice** 97:15 | 60:18 63:22 | 186:11 187:2 |
| 129:14 135:7 | 131:24 214:8 | 91:5 133:6 | 195:23 209:17 |
| 149:9 163:3 | 294:25 310:5 | 209:8 225:18 | 220:16,19 |
| 261:7 265:11 | **advised** 60:25 | 283:7,19,25 | 241:15 242:15 |
| 287:17 | **advises** 131:24 | 286:12 293:22 | 246:2,17,24,25 |
| **additions** 317:6 | **advisor** 30:10 | 293:23 294:15 | 247:4 250:15 |
| **address** 78:14 | 45:16 46:25 | **advisory** | 258:7,16 |
| 175:16 244:15 | 55:20 58:15 | 282:19,21 | 266:13 270:4 |
| **adequate** 215:3 | 61:21 64:11 | 288:19,24 | 272:5 280:16 |
| **adequately** | 67:21 69:14 | 291:24 293:2 | 286:11,16 |
| 195:4 | 84:6 95:18 | 293:14 | 287:11,21 |
| **adjust** 101:9 | 119:4,14 | **affect** 204:22 | 299:25 300:18 |
| **adjusted** 65:11 | 120:13 131:7 | **affected** 160:11 | 300:22 301:21 |
| 67:3 68:15 | 131:20,23 | 160:12 | 302:3 |
| 144:25 183:19 | 153:11,24 | **afoul** 239:12 | **agreed** 3:2,6,10 |
| 210:6 241:13 | 156:10,15,23 | **afternoon** 5:12 | 54:21 190:9 |
| 266:3 268:21 | 160:15 172:21 | **ag** 24:2 113:9 | 196:16 201:12 |
| **administer** | 192:4,8 202:3 | **age** 79:14 | 229:20 |
| 3:13 | 202:23 208:15 | 101:18,19 | **agreement** 12:2 |
| **administrative** | 209:16,19 | **aggregate** | 80:6 229:20 |
| 58:6 139:24 | 210:17 213:8 | 198:23 | 295:23 297:24 |
| 140:11,24 | 216:13 232:22 | **ago** 9:19 10:7 | 304:25 |
| 194:4 | 256:2 286:21 | 10:10 44:21 | **ahb** 1:4 4:10 |
| | 286:25 288:20 | 78:23 97:20 | |

**ahmed**  36:15
**al**  1:6,9 4:8,9
   316:4,4 317:1
   317:1
**alert**  177:20
   178:2 181:16
   186:8,13,20,22
   187:4 201:6
   239:13 251:23
   252:16 253:4
   253:22
**alignment**
   182:12
**allocation**
   70:21 90:12,16
   90:16,18
   267:22 269:6
   271:18 273:18
   302:18,25
   305:18
**allocations**
   103:4 302:20
   302:21
**allotted**  316:19
**allow**  187:13
   221:8
**allowed**  313:19
**alluded**  77:12
**alluding**  178:20
**alongside**
   134:23
**alpha**  240:8,9
   240:19,19
   241:8,9

**alternatives**
   156:13
**amended**
   199:17 307:18
   307:20 308:2
   315:11
**america**  131:16
   131:19 295:8
   296:6,14 307:8
   307:10
**american**  96:10
   234:5 243:6
**amount**  219:2
   275:16
**analysis**  78:17
   87:25 90:23
   108:16 139:19
   168:16,19
   171:19 177:21
   259:13,19
   260:2 262:19
   265:9 299:25
   303:12 305:6
**analysts**  135:6
**analytic**  171:10
**analytical**
   171:18
**analytics**
   168:21 238:14
   274:11 275:19
**analyze**  187:25
**analyzed**
   271:14
**analyzing**  94:2

**anniversary**
   82:3
**annual**  76:20
   175:18,24
**annualized**
   269:23
**annually**  72:20
   72:23 73:3,23
   210:24 211:2,2
   260:22
**anodyne**  181:9
   192:22 198:17
   273:12
**answer**  6:14,21
   23:18 24:20
   30:18 31:20
   109:10 118:14
   122:16,17
   129:13 157:4
   197:11 212:7
   249:11 272:22
   274:22,23
   275:17
**answered**
   215:13
**answers**  104:16
**anybody**
   218:18 310:2
**anybody's**
   67:13
**aon**  27:9
**apparently**
   219:18 293:4
**appear**  243:9
   300:8

**appearances**
   4:22
**appearing**  4:5
   251:24
**appended**
   275:22 313:19
   317:7
**appendix**
   149:24 236:22
   236:23 238:9
   238:11 239:6
   276:16
**applicable**
   316:8
**applies**  174:24
**apply**  147:11
   147:22 151:6
   153:3 161:11
**appointing**
   225:17
**appointment**
   217:5
**appreciate**
   153:17
**approach**
   84:15 137:6
   190:15 226:18
   226:19 239:16
**approached**
   23:14 26:13,16
**approaching**
   18:17
**appropriate**
   65:20 73:24
   77:17 85:4,12

121:4 127:20
145:15,18
156:17 157:23
158:9 160:9
176:4,15
193:16 211:10
247:14 249:22
272:12 273:13
275:10,16
276:18 279:23
**appropriately**
139:11 276:11
**approving**
186:6
**approximate**
16:19 17:23
18:7
**approximately**
4:13 18:25
27:22 57:3
58:24 61:9
62:5 193:9
**approximation**
19:5 133:18
195:10
**arbitrary**
101:19
**area** 58:8
226:14
**areas** 14:10
44:12 45:4,6
223:13
**argue** 181:10
**array** 262:11

**arrived** 202:6
**articles** 40:7
**articulate**
95:12
**ascende** 153:10
155:9 156:15
156:23 159:11
162:3 208:19
233:13 234:15
236:14 262:13
264:24
**ascende's**
261:16
**aside** 53:9
251:2,8
**asked** 23:2
26:20 45:19
134:18 155:9
161:14 166:25
168:22 199:24
231:6 263:16
263:22 264:7
277:11
**asking** 61:12
161:22 169:8
171:15 197:6
198:21,22,25
205:21 241:12
252:24 258:16
262:2
**asks** 278:2
**aspect** 21:11
56:12 78:2
**aspects** 217:3

**assessing**
265:21
**assessment**
248:14
**asset** 63:6 68:7
68:8 70:17,20
71:22,22 73:7
90:12 92:7
94:3,20 103:4
224:20 225:6
266:4,14,17
267:21 302:25
303:3
**assets** 61:2,9
63:23 68:17
71:22 80:13
128:3 207:8
255:7,15,18
259:20
**assign** 252:15
253:3
**assigned** 186:3
**assigning**
239:13
**assignments**
137:20
**assist** 13:15
15:13
**associate** 8:23
**associated**
147:23
**associates** 9:12
9:15 13:25
282:24 284:19

**association**
4:19
**assume** 6:21
95:16 172:2
286:15 287:3
**assumed** 72:7
81:23
**assuming**
116:25 160:14
168:18 299:24
**assumption**
41:6
**astellas** 26:15
27:2,5,6,7
29:13,14,15
**attached** 166:7
275:22 316:11
**attachment**
238:6
**attempt** 88:19
**attention** 40:7
172:5 204:8
223:17 254:7
256:3 265:16
**attorney**
316:13
**attorneys** 2:3,8
3:3 13:22
**attractive**
110:16
**atypical** 173:21
**authority**
222:11,13,17
222:20 223:15
225:22

**authorized**
  3:12
**automatically**
  121:10 122:12
**available**  51:10
  66:14 91:19
  92:9 144:7,13
  176:18 249:25
  265:25 274:3
  309:2 316:6
**average**  62:19
  62:21 79:14,14
  80:16 81:9
  88:20 89:11,11
  89:13,16,18,19
  89:21 90:5,19
  90:25 104:2,6
  124:20,21
  125:12,13
**averages**  89:5
**avoid**  138:9
**awai**  264:24
**aware**  7:16
  10:21 14:7
  67:11 92:10
  141:4 167:17
  202:11,18,25
  212:23 215:2
  254:23 307:7
  307:12
**awful**  75:16
**awhile**  157:5

**b**

**b**  40:3,20 53:11
  79:8 132:12
  149:24 236:22
  236:23 238:6,9
  238:11 314:2
  315:2
**back**  14:9,12
  14:24 15:5,8,9
  16:5 17:20
  25:7 40:2
  41:14 43:22
  46:9,11,18
  48:23 63:13
  73:21 83:3
  84:7,7 92:5
  104:2,20,20
  115:13,25
  119:16 120:10
  121:12,14,20
  122:4 125:19
  126:2 128:11
  129:17 140:13
  141:20 148:23
  156:4 157:3,6
  160:15 161:22
  165:2 168:24
  171:9 173:25
  174:20 178:7
  178:14 179:15
  180:24 181:11
  181:18 185:3
  185:23 187:18
  206:6 214:19
  221:25 227:8

  232:9 235:9,15
  235:24 237:24
  239:8 243:22
  244:16 245:16
  249:14 259:11
  259:18,20
  274:13 275:20
  277:22 280:6
  281:7 288:25
  296:9 303:13
  308:3
**backbone**  15:2
**background**
  44:14 45:7
  49:7 75:21
  129:18
**backtrack**
  112:6
**bad**  86:15,15
  164:10
**balance**  89:13
  89:18,24 90:24
  104:3,6,6,10
  113:19
**balances**  79:14
  81:10 90:19,20
**ballpark**  23:23
**bank**  49:21
  50:18 53:10
**barclays**  113:9
**barely**  118:24
**based**  23:21
  92:8 99:24
  116:14 119:18
  125:24,25

  160:5 161:13
  162:9 165:23
  167:20 190:3
  198:11 219:25
  249:10 282:25
  287:12 308:11
**basic**  64:15
  70:18 92:2
**basically**  23:12
  23:20 24:4,6
  26:18 27:14
  30:17 33:21
  56:5 63:20
  67:6 72:12
  85:20 143:17
  149:4 162:19
**basics**  6:9
**basis**  43:21
  61:12,19 68:4
  69:19 73:11,12
  73:14,23 74:4
  113:23 115:21
  118:16,21
  119:15 121:8
  124:23 163:9
  163:11 175:18
  175:24 185:21
  187:24 189:24
  190:2 204:14
  204:16 232:7
  268:24 277:3,5
  300:4,15,16,20
  300:24 301:20
**bat**  129:13

[bates - bolded]                                                        Page 9

**bates** 42:22
  175:4
**beacon** 234:5
  243:6
**bear** 100:8,9
**beg** 31:19
**began** 131:10
  146:24 147:2,4
  231:12 295:19
**beginning** 7:12
  14:8 244:21
  296:6
**begins** 4:3
  14:14
**begun** 295:16
**behavior** 149:5
  155:25 157:20
  158:4,6 159:5
**belief** 185:18
**believe** 11:21
  11:22 21:4,21
  22:5 26:14
  35:15,20 36:4
  36:23 37:25
  38:7 67:19
  70:3 97:3
  116:21 143:9
  146:24 147:2
  153:10 159:8
  162:18 166:8
  195:4 202:10
  205:13 212:5
  216:6 235:23
  241:22 245:2
  256:25 258:21

283:21,24
286:20 290:21
296:23 297:16
298:9
**bell** 16:13
**benchmark**
  68:5,10,11
  108:3,6 109:6
  112:18 113:4
  115:20 116:9
  118:16 120:7
  121:7 122:11
  127:25 128:2
  128:17 156:25
  170:8 176:4,10
  183:5,14,25
  184:22 185:7
  185:20 201:13
  202:3,23
  204:25 205:11
  205:23 208:9
  247:22 248:9
  248:11,23
  269:11,15,23
  276:13,18
  277:16 278:3
  278:21 279:2,8
  280:14 298:12
  298:18 299:18
  300:19,24
  301:12 302:14
  302:15 303:20
**benchmarking**
  209:8

**benchmarks**
  68:6 200:23
**benefit** 30:16
  81:24 104:14
  131:10 132:18
  142:25 143:4
  295:14 304:23
**best** 15:16 32:7
  35:5 42:10
  68:11 99:14
  138:12 139:12
  139:12 149:14
  204:20 226:18
  230:9 269:10
  269:14
**better** 15:2
  24:9 33:22
  99:8 100:7
  129:9 130:23
  165:19 205:23
  209:2 279:11
  279:13 280:2
**beyond** 231:18
  231:24
**big** 21:18 65:8
  81:10 91:14
  99:17 133:19
  141:2 256:24
**bigger** 124:15
  138:25
**bill** 69:7 128:11
  148:22 177:7
**billion** 60:25
  61:15 62:4,24
  63:2 104:12

131:12 133:24
  134:2,8,10,13
  255:16
**binary** 239:15
**bio** 130:21
**biography**
  129:16
**bit** 15:5 20:19
  32:24 36:13
  48:13 49:6,8
  80:9 95:25
  106:5,12
  115:18 170:25
  173:15 217:11
  251:6 302:2
  303:7 305:22
**blackrock**
  30:18 35:21,22
  96:8 305:22
  306:9
**blah** 99:8,8,8
  179:17,17,17
  179:17
**blend** 96:6
**blended** 271:21
**blip** 84:13
**blithely** 171:16
**blown** 213:9
**blur** 36:13 43:9
**board** 222:14
  280:5 299:2
**bob** 89:3,3 90:4
**bockius** 2:7
**bolded** 248:4,4

**bolt** 100:18
**bond** 24:2
  267:9 308:21
**bonds** 39:5
  113:7,10,16
**book** 107:10
**boston** 2:9
**bottom** 163:2
  186:2 197:20
  237:4,15
  255:22 264:20
  271:10,11
**bought** 282:24
**box** 190:15
**boxes** 274:18
**bracketing**
  276:22
**bravo** 1:18 4:5
**breach** 308:10
**break** 6:10,15
  6:16 66:18
  87:12 113:13
  115:12,13,15
  230:16 231:5
  232:12 244:16
  281:7
**breakdown**
  267:19
**brief** 191:25
  193:19 216:11
**briefly** 9:19
  304:23
**bring** 48:5
  58:25 78:13
  222:2

**bringing** 59:7
  59:14 102:7
  127:14 256:2
  288:11
**broad** 22:6
  82:21 88:10
  102:16,18,20
  113:9 262:11
**brodsky** 2:15
  4:15
**broken** 294:15
**brought** 54:18
  64:5 189:23
  196:8,8
**build** 54:23
  90:7
**building** 92:9
**built** 54:23
**bullet** 204:11
  214:24 217:17
  218:13,24,25
  219:9 220:2,5
  220:8 224:14
  225:16 241:11
  241:14 242:25
  245:16,23
  247:11 251:18
**bullets** 183:17
  225:3,11
**bunch** 8:16
  275:19
**business** 21:25
  25:21 26:9
  32:4 33:23
  54:19 55:18

  56:5 62:3,12
  91:20,21
  142:18 259:15
  285:3
**businesses**
  54:21 55:21
**busy** 33:17
**buy** 93:2,22,23
  95:9 132:12
**buys** 143:18

## c

**c** 1:17 2:2,5 4:4
  5:6 6:1 7:1 8:1
  9:1 10:1 11:1
  12:1 13:1 14:1
  15:1 16:1 17:1
  18:1 19:1 20:1
  21:1 22:1 23:1
  24:1 25:1 26:1
  27:1 28:1 29:1
  30:1 31:1 32:1
  33:1 34:1 35:1
  36:1 37:1 38:1
  39:1,15 40:1
  41:1 42:1 43:1
  44:1 45:1 46:1
  47:1 48:1 49:1
  50:1 51:1 52:1
  53:1 54:1 55:1
  56:1 57:1 58:1
  59:1 60:1 61:1
  62:1 63:1 64:1
  65:1 66:1 67:1
  68:1 69:1 70:1
  71:1 72:1 73:1

  74:1 75:1 76:1
  77:1 78:1 79:1
  80:1 81:1 82:1
  83:1 84:1 85:1
  86:1 87:1 88:1
  89:1 90:1 91:1
  92:1 93:1 94:1
  95:1 96:1 97:1
  98:1 99:1
  100:1 101:1
  102:1 103:1
  104:1 105:1
  106:1 107:1
  108:1 109:1
  110:1 111:1
  112:1 113:1
  114:1 115:1,4
  116:1 117:1
  118:1 119:1
  120:1 121:1
  122:1 123:1
  124:1 125:1
  126:1 127:1
  128:1 129:1
  130:1,20 131:1
  132:1 133:1
  134:1 135:1
  136:1 137:1
  138:1 139:1
  140:1 141:1
  142:1 143:1
  144:1 145:1
  146:1 147:1
  148:1 149:1
  150:1 151:1

| | | | |
|---|---|---|---|
| 152:1 153:1 | 222:1 223:1 | 291:22 292:1 | **capabilities** |
| 154:1 155:1 | 224:1 225:1 | 293:1 294:1,15 | 64:12 142:19 |
| 156:1 157:1 | 226:1 227:1 | 295:1 296:1 | 142:20 |
| 158:1 159:1 | 228:1 229:1 | 297:1 298:1 | **capability** |
| 160:1 161:1 | 230:1 231:1 | 299:1 300:1 | 14:20 80:23 |
| 162:1 163:1 | 232:1 233:1 | 301:1 302:1 | **capacity**  49:12 |
| 164:1 165:1 | 234:1 235:1 | 303:1 304:1 | 58:22 59:4 |
| 166:1 167:1 | 236:1 237:1 | 305:1 306:1 | 61:17 65:22 |
| 168:1 169:1 | 238:1 239:1 | 307:1 308:1 | 95:17 283:19 |
| 170:1 171:1 | 240:1 241:1 | 309:1 310:1 | 297:5 299:19 |
| 172:1 173:1 | 242:1 243:1 | 311:1,7,16 | 299:20 304:2,9 |
| 174:1 175:1 | 244:1 245:1 | 313:1,1 314:5 | **captive**  21:9 |
| 176:1 177:1 | 246:1 247:1 | 316:5 317:2,4 | **capture**  65:13 |
| 178:1 179:1 | 248:1 249:1 | 317:12 | 68:21 70:2 |
| 180:1 181:1 | 250:1 251:1 | **calculate**  62:21 | 197:18 |
| 182:1 183:1 | 252:1 253:1 | **calculated** | **captured**  70:2 |
| 184:1 185:1 | 254:1 255:1 | 66:25 | 194:15 195:5 |
| 186:1 187:1 | 256:1 257:1 | **calculation** | 250:16 |
| 188:1 189:1 | 258:1 259:1 | 68:14 | **care**  12:12 |
| 190:1 191:1 | 260:1 261:1 | **call**  53:17 | 137:5,8 |
| 192:1 193:1 | 262:1 263:1 | 62:16 69:7 | **career**  86:19 |
| 194:1 195:1 | 264:1 265:1 | 71:12 83:2 | **careful**  137:4 |
| 196:1 197:1 | 266:1 267:1 | 86:2 93:22 | **carefully**  208:5 |
| 198:1 199:1 | 268:1 269:1 | 152:22 161:25 | **carlo**  80:19 |
| 200:1 201:1 | 270:1 271:1 | 209:12,12,13 | 82:17 85:13,19 |
| 202:1 203:1 | 272:1 273:1 | 234:7 248:10 | 86:8 112:20,22 |
| 204:1 205:1 | 274:1 275:1 | 250:25 | **carolyn**  2:16 |
| 206:1 207:1,15 | 276:1 277:1 | **called**  54:17 | 46:11 |
| 208:1 209:1 | 278:1 279:1 | 159:16 188:18 | **carries**  155:22 |
| 210:1 211:1 | 280:1 281:1 | 197:5 | 156:2 157:20 |
| 212:1 213:1 | 282:1,5 283:1 | **campbell**  2:16 | 158:4 |
| 214:1 215:1 | 284:1 285:1 | 46:11 162:23 | **carry**  158:6 |
| 216:1 217:1 | 286:1 287:1 | **cap**  103:12,12 | **carve**  54:22 |
| 218:1 219:1 | 288:1,23 289:1 | 242:12 306:6 | 55:22 |
| 220:1 221:1 | 290:1 291:1,20 | 308:22 | |

[carved - chart]

| | | | |
|---|---|---|---|
| **carved**  284:6 | 263:18 264:4 | **ceo**  222:15 | 73:14 83:23,24 |
| **case**  1:4 4:9 | 275:5 287:8 | **certain**  21:8 | 84:22,23 |
| 7:13 11:20 | 294:13 299:22 | 41:10,16 43:6 | 142:19,21 |
| 12:22,24 13:8 | 305:25 306:2 | 46:12 54:4 | 143:13 152:6 |
| 14:9 17:2,4 | 312:4 | 59:8 63:11,14 | 157:21 161:10 |
| 19:6 20:23 | **cases**  15:3,25 | 69:23 88:20 | 187:7 199:22 |
| 22:4,16 23:3 | 16:24 17:2 | 99:21 101:3 | 201:8 212:7 |
| 23:10,11,11,16 | 18:22,25 19:2 | 107:9 112:17 | 216:3 231:20 |
| 23:24 24:11,24 | 20:6,10,13,16 | 168:14 171:7 | 232:4,7 234:25 |
| 25:19 26:14,17 | 20:18,21 22:18 | 222:23 228:24 | 252:14,19 |
| 26:19,21 27:3 | 22:21 25:8,20 | 268:16 284:8 | 253:2,10,12,18 |
| 27:11,18,20 | 26:5,12 29:7 | **certainly**  38:15 | 253:25 258:20 |
| 29:19 30:4,24 | 29:11 37:17,21 | 73:9 80:21 | 272:2 274:23 |
| 31:2,6,10,23,25 | 38:6,16 47:12 | 84:17,24 92:25 | 312:6 |
| 32:18 33:4,9 | 61:14 124:2 | 94:22 117:9 | **changed**  54:2 |
| 33:12,19 34:15 | 126:2 140:11 | 118:12 122:18 | 69:24 83:6 |
| 34:16,18,20 | 162:10 195:6 | 123:23 140:25 | 95:25 143:10 |
| 35:2,4 36:5,8 | 197:22 222:22 | 159:24 193:7 | 152:5 158:7 |
| 36:15,17,25 | 226:10,23 | 209:9,16 212:2 | 159:6 231:13 |
| 37:6,13 40:12 | 228:15 | 218:18 220:2 | 235:4,4 255:4 |
| 40:17 43:7,11 | **cash**  103:6 | 229:10 280:22 | 258:9 |
| 52:11 71:10 | **castro**  2:11 | 284:5,13 | **changeover** |
| 82:22 83:9 | **catch**  278:17 | **certify**  313:7,20 | 231:8,9 235:18 |
| 86:8 87:17 | **categories**  43:6 | **cfa**  67:11 | **changes**  70:15 |
| 101:11 109:15 | 43:10 303:3 | **chair**  50:23 | 70:16 84:14 |
| 119:3 125:7 | **category** | **challenged** | 102:20 202:4 |
| 126:17 156:3 | 306:14 | 147:12,15 | 202:24 298:2,4 |
| 158:6 163:6 | **causing**  127:8 | 151:7,13 153:4 | 313:18 316:10 |
| 167:16 170:15 | **cautions** | 167:16 | 317:6 |
| 179:12 190:12 | 252:13,25 | **challenges** | **changing**  36:9 |
| 190:13 193:14 | **celebrated**  82:3 | 308:10 | 51:11 162:15 |
| 194:8 208:7 | **centerra**  34:20 | **chance**  104:9 | 235:2 |
| 214:17 215:12 | **central**  1:13 | 231:4 | **charge**  262:3 |
| 215:21 221:18 | 4:13 311:9,12 | **change**  64:13 | **chart**  308:19 |
| 226:22 259:20 | | 64:16 70:21 | |

[charter - coast]                                                    Page 13

**charter** 209:24
220:13,17,20
220:22 221:7
221:10,11,19
221:22,23
222:5,10,25
223:14,25
**charts** 75:24
275:7
**check** 42:21,23
190:14 277:13
277:18,20
**checked** 277:17
**checks** 42:25
**chicago** 25:5
**childish** 213:14
**choice** 78:21
79:7,8 81:15
85:9,11 88:2
98:13 99:11,15
132:7 158:9
211:10 273:13
273:14 279:23
305:16
**choices** 27:23
81:17 91:15
102:21 307:10
**choose** 47:24
81:12 98:23
107:2,4 108:8
125:18 156:12
**choosing** 32:8
47:10 73:20
**chose** 23:20
211:20 288:4

**chosen** 47:7
155:23 298:18
**chunk** 21:18
**circumscribed**
222:22
**circumstance**
163:10 263:25
**circumstances**
85:2 190:11,12
228:11
**citation** 47:21
**cite** 47:10,12,17
**cited** 149:24
**cites** 14:18,21
47:3,8 48:24
49:3
**claim** 192:16
**claims** 308:10
**clarification**
230:8
**clarified**
244:17
**clarify** 6:20
125:3
**class** 68:7,8
94:4 96:25
128:4 146:22
146:23 148:6,7
148:8 155:5,13
155:24 156:2
157:16,21
158:5 276:22
285:16 286:5
289:7 308:3

**classes** 92:7
94:20 224:21
225:6 266:4,14
266:17
**clear** 24:23
55:4 88:12
111:16 131:22
138:9 157:15
180:13 181:22
192:11,19
194:11,12
222:13,24,25
223:15 226:8,9
226:22 229:25
236:8 237:21
253:13 272:6
**clearly** 222:10
**client** 30:13
59:22 60:13
61:25 62:13,19
62:22 63:6,21
64:8 71:7,15
71:20 72:21
74:4 77:11
91:12 92:2
93:14,17 98:12
98:19 109:5
124:18 131:13
134:16,17
137:7,9 144:13
145:8 262:6
263:16 281:17
283:3,5,7
289:22 304:7
309:15,17

**clients** 54:16
55:25 56:2,16
56:16,17 57:4
57:9,14 58:4,9
58:15,18,22,24
59:2,3,7,14
61:13,14,16
62:6,7,9,16,17
62:23,25 63:14
64:4,14 66:2
69:14,18 71:18
71:21 72:19
73:3,5 76:17
76:21 77:9
93:10,15 96:23
97:3,13 98:20
131:8,11,25
133:2,12
134:22 135:23
136:5 137:5
139:5 141:17
145:5 193:8
210:18 211:13
212:3 213:16
221:6 261:16
263:2 285:5
**close** 18:10
102:15 136:2
283:4 298:11
**closer** 117:21
**clue** 75:19
**cluttered** 66:5
**coast** 54:17
55:5,12,17,24
56:7,19 57:7,8

| | | | |
|---|---|---|---|
| 58:11,14 63:22 | 198:16 227:8 | 50:21,23,25 | 175:16,23 |
| 64:12 115:12 | **comfort** 45:24 | 51:3,6,9,24 | 176:8 177:19 |
| **coaster** 98:4 | 129:4 | 52:3,7,19 53:6 | 177:24 178:11 |
| **colleague** | **comfortable** | 53:13 67:17,20 | 179:2,14 |
| 141:23 304:15 | 84:20 85:8 | 72:13 73:10 | 180:25 181:15 |
| **colleagues** | 88:4 95:11 | 74:8,16 75:2 | 182:4,7,24 |
| 145:10,11 | 97:23 | 76:6 78:7,10 | 187:7 189:14 |
| 295:21 297:21 | **coming** 31:13 | 82:8 84:5,18 | 191:2,3 192:5 |
| **college** 46:4 | 47:16 70:6 | 85:8 99:13 | 192:7,9 193:14 |
| **color** 275:7 | 78:12 81:20 | 101:6 104:25 | 193:19 194:14 |
| **colors** 75:16 | 85:24 171:9 | 110:7 111:5,6 | 201:7,18 202:4 |
| **combination** | 222:13 234:12 | 111:12 116:13 | 202:6,23 203:8 |
| 107:5 | **commemorate** | 117:9,14,25 | 203:19,20 |
| **combinations** | 82:4 | 118:21,23 | 204:7,18 |
| 112:25 113:2 | **comment** | 119:23,23 | 205:25 208:18 |
| **combining** 17:9 | 149:12 151:15 | 120:5,11,20 | 208:23 209:24 |
| **come** 7:17 18:4 | 158:20 161:2 | 125:16 126:24 | 212:20 214:12 |
| 18:10 24:19 | 161:21 165:20 | 127:15 128:4 | 214:16 215:11 |
| 25:20 45:25 | 192:13 193:25 | 128:25 130:19 | 215:23 216:4,7 |
| 46:22 65:15 | **commentary** | 132:3,9 138:2 | 216:15 217:6 |
| 75:15 80:18 | 28:19 151:16 | 138:4,6,8,15,16 | 218:5 219:14 |
| 82:10 84:7 | **commented** | 139:2,16,18,24 | 221:4 222:12 |
| 91:15,21 106:4 | 193:15 | 140:2,9,13 | 222:17,21,22 |
| 107:6 119:9,10 | **commenting** | 146:17 147:11 | 223:24,25 |
| 138:15 139:4 | 148:13 149:3 | 147:21 151:5 | 224:10,11 |
| 140:8 165:2 | **comments** | 151:12 153:2 | 225:21 226:3 |
| 170:17 203:11 | 158:16 | 153:19 156:10 | 227:4,23 |
| 203:22 214:19 | **commission** | 159:13 160:5,7 | 228:20,24 |
| 227:20 239:23 | 312:25 | 162:19,22 | 229:6,9,15,19 |
| 249:10 270:21 | **committee** 8:18 | 163:4 164:14 | 230:3 232:21 |
| 271:7 281:7 | 8:21,24,25 | 165:5 166:11 | 233:16 235:9 |
| 283:8 | 27:24 43:24 | 167:8,23 168:6 | 239:17 241:16 |
| **comes** 70:23 | 45:13,15,22 | 169:23 171:5 | 242:15 244:14 |
| 75:2 87:16 | 46:24 49:13,18 | 172:12 174:13 | 245:9 248:17 |
| 114:3 126:2 | 49:19,24 50:17 | 174:15,19,25 | 248:22 249:6 |

**[committee - conclusion]** Page 15

251:4,10
253:24 255:22
256:4,10 257:3
257:12,15
258:8 260:19
260:25 261:6
261:14,19,23
262:9,17 263:5
264:5,25 265:3
265:8 270:6,24
271:13,19,24
272:7 276:11
280:17 286:17
291:6 297:6
303:19 304:2
307:9,11 310:5
314:12
**committee's**
78:2 155:3
166:21 240:15
256:3
**committees**
49:11 53:11
54:8 65:20
66:20 69:18
71:15 75:18
76:8 101:13
102:2 103:18
104:23 106:14
106:15 123:6
125:20,23
137:12,14,17
138:24 141:7,9
190:13 193:3
212:5,7,23

263:21
**common** 91:4
92:15 109:17
139:14 141:16
200:3 227:9
279:16
**commonly** 67:5
**communication**
17:20
**companies**
64:25 65:4
121:15 140:19
**company** 22:2
25:3 27:18
49:14,16,22
79:17 81:7
89:12,20
130:10 219:7
**comparators**
267:12 268:5,9
268:13,24
**compare** 71:13
108:20 205:12
306:12
**compared**
112:17 122:10
156:24 190:18
190:20 205:11
205:11,13
217:15 267:12
268:4,8,12,24
269:10,14,23
279:8 280:13
299:18 301:20
301:22

**comparing**
176:15 205:16
247:13 249:21
**comparison**
70:2 71:12
72:3,14 107:18
118:16 267:3
267:16 269:10
269:14 271:14
278:3,4,6
**comparisons**
71:24,25,25
176:4,5,10
**compensation**
30:20 38:15
**competitive**
179:16
**competitors**
265:6 271:16
**complaint** 13:2
307:14,18,20
308:2,17
309:13,21
310:4 315:11
**complete**
313:14 317:8
**completed**
316:16
**completely**
125:8
**completion**
313:16
**compliance**
119:16 159:15
159:16 160:9

162:11
**compliant**
109:23 123:24
162:12 164:2,7
199:13 235:11
235:16
**complicated**
56:11 65:6
140:22 218:16
**comply** 159:7
**component**
252:13
**composition**
83:6 267:19
**compound**
199:25
**comprise** 124:7
**computer** 12:7
**concern** 75:13
235:19 259:22
**concerned**
116:19 192:25
255:8
**concerning**
111:6 256:5
**concerns**
124:25 194:14
255:23
**conclude** 311:3
**concluded**
264:24
**concludes**
311:6
**conclusion**
126:14 127:3

147:10 151:12
168:10 191:19
263:20 274:2
**conclusions**
32:17 147:5
151:4
**conduct** 177:20
210:18
**conducted** 5:11
**conducting**
265:4
**cone** 85:25 86:5
**conferences**
130:18
**confidential**
58:20
**confirm** 48:19
48:21 159:10
252:7,8
**conflict** 30:10
32:12,16
**conflicted**
27:16 32:6
237:7 245:22
246:14
**conflicts** 219:8
**confuse** 35:22
**confusing**
226:6 249:5
**conjunction**
270:7
**connection**
13:7 38:11
41:25 43:7
44:5 60:9

176:24 254:20
307:10
**consecutive**
186:5,8,14,20
200:17 201:4
**consensus**
226:4,7,12,15
226:17,21
227:2 230:6
**conservative**
90:17
**consider** 45:10
51:23 74:9
76:12 82:9
84:19,21 97:15
98:15 106:18
118:11 156:13
181:15 182:25
188:11 215:2,4
216:18 241:16
241:18,19
251:22 253:21
274:6 276:2
280:18
**considerably**
293:20
**consideration**
82:20 101:2
105:2 183:4
241:16
**considerations**
82:10
**considered**
40:4 53:6
74:17 76:11

106:15 257:2
261:24 270:24
271:20 272:7,9
**considering**
83:23 93:10
262:18
**consistent**
61:21 166:12
174:16 187:15
189:3,7,12
190:5 231:15
233:19 250:10
270:5
**consistently**
278:25
**construction**
94:12 271:17
273:19
**consult** 236:9
277:21
**consultant**
43:24 49:10
52:9 53:12
60:4,5,10,12,17
63:8 74:17
84:6 91:11
92:14 97:15
104:23 109:25
129:20 134:15
134:24 135:16
136:13 141:6
193:2 208:24
290:18,18,22
308:5

**consultants**
57:18,22 60:22
65:25 80:22
93:21 141:4,12
210:19 293:4
293:10,11,21
294:14
**consulting**
25:24 26:8
54:7 91:5
**consumer**
105:22
**contact** 37:24
**contacted**
309:25
**contacts** 11:8
**contain** 40:11
**contains** 197:4
**contemplated**
248:18
**contention** 32:5
**context** 75:7
145:19
**continue** 85:4,6
101:8 132:21
202:2 211:17
304:17
**continued**
54:23 130:19
130:22 202:22
310:13
**continuing**
225:12
**contractors**
57:17,20

[contradicts - counsel]                                              Page 17

**contradicts**
  182:6
**contributing**
  89:17
**contribution**
  79:15,16 89:12
  89:25 131:17
  132:19 142:22
  143:6
**control** 105:18
**conversant**
  75:12 76:14
**conversation**
  9:14 17:16
  43:20 72:15
  99:12 110:19
  117:8,14,24
  118:19,20,22
  119:20,22
  120:19 164:24
  180:20 196:6
  196:17 214:20
  256:19 280:7
  303:19
**conversations**
  13:6,10 14:7
  17:13,19 41:12
  43:9 76:16
  211:4 212:18
  212:19 303:25
  304:5
**convert** 295:19
**conveyed**
  221:23,24

**conviction** 93:4
  93:24 94:8,14
  94:18 95:23,24
  96:4,15,22
  305:12,13,14
**cookie** 189:21
**copies** 316:14
**copy** 5:9 11:17
  39:20,24
**corp** 49:21
  51:10 131:16
**corporation**
  54:12 131:19
  132:15 138:25
  295:8 296:6,14
  307:8,9
**corporations**
  55:3 139:25
**correct** 5:20,22
  5:23 6:4,5 9:24
  10:12 11:11
  18:23,24 19:25
  20:4 21:15,16
  24:15 25:17,18
  26:9,10,13
  27:3 30:23,25
  47:5,6 48:24
  49:2,20 50:19
  54:9,10 57:2
  61:3 117:6,7
  122:24,25
  123:3 128:20
  129:21,23
  130:2 131:21
  135:24 142:7

148:11 150:3
151:9,10,14
157:16 166:3,4
173:2,7 177:12
178:25 179:5
180:5,6 183:17
185:16,17
187:4,5 188:25
191:5,6 195:5
196:3 200:12
201:15,16
203:6 206:22
207:2,3 208:20
208:21 209:20
218:3 220:13
226:4 230:12
231:19 232:2
234:17,18,21
238:4,5 240:3
244:25 245:24
247:19 248:11
248:12,18
250:23 253:5
254:5,18,23
255:3 260:24
261:21 263:3
263:13 267:17
268:2,6 269:16
269:21 274:4
278:4,5 284:9
286:19 289:11
290:5,6 295:9
295:10 296:20
296:20 297:12
298:21,24

299:25 300:6
300:12 301:23
304:21 308:7
313:14 317:8
**corrected** 156:2
**corrections**
  317:6
**correctly** 28:15
  31:16 35:16
  71:8 117:4
  153:11 296:7
**corresponding**
  277:2
**costa** 1:17 4:5
**costs** 303:6
  306:7
**counsel** 4:21
  7:25 8:23 9:3,7
  9:16 12:13
  13:10,17,19
  14:3,6,22
  15:12,19,22
  16:16 17:12,24
  18:14 23:13
  24:18 26:25
  29:25 31:10,11
  33:11 34:25
  36:19,23 41:7
  41:11 42:14
  43:12 48:4
  50:7 59:19,20
  59:22 115:14
  149:13 151:20
  151:22 196:7
  196:11 232:11

[counsel - date]                                          Page 18

277:11 316:14
**counsel's** 14:8
**count** 9:20
  236:5 301:18
**counting** 91:18
**country** 312:2
**county** 313:4
**couple** 6:9 8:20
  9:11 13:9
  20:16 46:10,12
  54:2 58:8
  66:18 68:6
  82:6,24 97:8
  97:19 105:7
  124:11 131:3
  134:12 137:20
  159:7,17
  172:12 214:23
  215:6 216:4,6
  231:6 233:8
  268:19 269:18
  277:23 293:19
  296:8 300:7
  307:5
**course** 6:20
  7:20 14:17
  46:24 61:15
  110:17 208:16
  209:13 297:8
**court** 1:2 3:15
  4:11,18,22,24
  4:25 5:3 7:2,3
  68:23
**cover** 19:4
  220:8 223:14

245:3
**covered** 62:6
  77:5,6 111:25
  148:2 221:20
  223:6,13
  271:16
**covers** 84:11
  152:25 245:4
  306:4
**crazy** 170:22
**create** 41:8
  63:18 86:4
  88:19 111:2
  303:7
**created** 24:4,4
  25:24 103:3,15
  245:24 262:14
**creating** 14:24
  18:14,16
**creation** 15:14
  18:18
**criteria** 52:20
  53:6 74:3
  117:18 163:17
  167:8 175:9,12
  181:15 182:21
  182:24 183:11
  183:12,17
  184:4 185:5,12
  186:7,12 201:3
  201:6,14 254:8
**criterion**
  251:21
**critical** 45:17
  76:5,7 77:13

78:4,18 79:11
**critically** 78:25
**criticizing**
  248:16
**crossed** 194:22
**cs** 316:15
**current** 157:20
  271:15
**currently** 5:22
  89:3
**cursory** 191:4
  191:14,20
**custom** 30:6
  91:18
**customarily**
  223:24
**customize**
  144:9
**customized**
  77:11
**cutter** 189:21
**cv** 1:4 4:10
  54:11 130:21

**d**

**d** 5:6,6 21:21
  115:4,4 130:20
**daf** 242:8,11
**dangerous**
  226:14
**data** 66:17
  144:10,11
  145:3 171:10
  202:14 214:4
  250:16,17,18
  250:18,23

270:24 272:7
  274:10 303:8
**date** 10:8 16:12
  19:13 31:3
  32:2 35:7,9,13
  36:10 37:2,5
  37:13 69:21
  70:10,13,17
  71:2,7,14 72:6
  72:7,22 73:5
  73:17,20 76:19
  76:22 77:6,7
  77:12,16,21
  78:3,5,8,21
  79:3,10 80:2
  81:6,12 82:9
  82:12 83:10
  86:9 87:22
  88:22,24 91:13
  91:17 92:15
  93:18 94:17,22
  95:6,22 97:11
  100:4 101:3
  108:13 109:12
  112:7 122:22
  122:23 123:8,9
  123:13,15
  126:7,10,13,23
  127:24 128:17
  128:19,21
  133:8 141:22
  142:4,5,6,10
  168:14 176:17
  179:8,9 181:5
  181:7 205:15

216:5 247:15
249:24 260:18
261:9 262:12
264:23 265:21
266:7,21 267:5
271:14,23
272:2,8,10,17
276:17 277:2
292:8 296:13
297:14 298:19
298:23 301:22
302:15,18,21
303:4 304:18
305:19,21
306:13 307:13
310:4 312:4
317:12
**dates** 158:18
218:8 255:17
**day** 7:11 15:9
28:5 30:6
196:15 213:15
213:18 305:2
311:19 312:23
313:22 317:15
**days** 8:20 9:18
65:17 316:16
**dciia** 130:20
**de** 2:11
**deal** 140:3,4
194:5 283:4
**dealing** 254:24
**dealt** 28:13
254:15

**decades** 210:10
**december**
282:14 285:14
286:7 287:23
288:16 291:15
292:21
**decide** 92:14,15
102:10,18
107:3 170:22
196:4,13
**decided** 23:13
25:18,19 26:4
55:21 144:12
206:2 212:20
214:2 228:19
**deciding**
196:11
**decision** 45:23
74:10 76:6
99:9 119:24
127:10 188:6
188:11 189:21
190:3 192:24
198:19 199:21
201:7 202:7
223:2 227:5,24
228:4,12,21,23
228:24 229:2,3
229:7,9 230:4
230:5,8 262:4
295:22 306:4
**decisionmaki...**
132:2 198:18
**decisions** 45:14
74:18 125:24

125:25 132:11
141:18 162:9
192:11,12,21
194:10 222:23
228:8
**declare** 317:4
**decline** 242:19
**dedicated**
141:15
**deemed** 158:25
160:19 297:7
317:6
**deems** 225:23
**deep** 71:12 83:9
135:8 168:18
259:19 260:18
261:2,9,20,23
265:13,15
266:9 270:5,25
272:8,10
279:21 314:17
**deeper** 83:8
156:11 260:2
262:10 280:8
**defaulted**
207:17
**defend** 23:16
23:18
**defendant**
21:14
**defendants**
1:10,17 2:8 4:7
4:9 10:19,20
11:10 20:23
311:8

**defense** 22:11
22:13,25 23:3
23:15 24:7,13
24:19 29:23
31:8 33:9
34:22 36:17
**defer** 117:23
**deference**
240:6,17
**deferral** 89:11
**deferring** 89:4
**deficiencies**
158:12 197:14
**deficiency**
200:8
**deficient**
194:25 195:3
195:25 197:5,7
197:13
**define** 189:15
295:14
**defined** 81:24
104:14 131:10
131:17 132:18
132:19 142:22
142:25 143:3,6
189:14 304:22
**defining** 150:16
**definitely** 32:15
124:9 160:11
190:13 273:20
**definition**
145:25 180:7
301:3

degree   129:4
  214:22
delay   236:7
delegate   222:11
deliberate   76:2
deliberated
  255:24
deliver   219:25
delivered
  219:13,21,24
  220:4,5
demographic
  79:2,21 88:16
  112:23
demographics
  78:16,17 275:4
  287:7
demonstrate
  228:7
demonstrates
  278:9
department
  92:5 209:11,17
  209:21 210:12
  227:20
depend   275:2,3
depended
  17:19
depending   15:4
  17:3 61:23
  68:7,7 90:17
  91:2 111:14
  120:15 123:18
  124:2 134:16
  135:20 144:11

189:11 205:9
  206:12,15
  212:20 255:9
  274:24 287:20
depends   17:2
  122:20 163:22
  193:24,25
  221:14 260:8
deponent   312:5
  313:18 316:13
  317:3
deponents   5:2
  8:13
deposed   5:18
  6:4,8 7:17
  34:15,16
deposes   309:23
deposing
  316:13
deposition   1:16
  3:11 4:6 7:10
  7:16 8:2,10,12
  8:15 9:5,8,17
  17:8 44:5,7
  47:3 172:13
  198:7 261:11
  311:7 312:4
  313:9,11,16
depositions
  7:20 43:23
  44:24
depth   105:9
  169:3 201:20
  259:13

described
  82:16
description
  314:3 315:3
design   140:4,25
designed   81:6
desk   105:15
despite   25:22
  101:11 203:16
  251:23
detail   88:6
  210:13 219:2
  222:16
detailed   175:20
  200:22 217:9
details   22:8
  35:11 36:11
  37:3 52:22
  53:3,5 54:6
  171:4
detected
  242:16
detection   116:9
determination
  118:2 127:20
  151:18 171:15
  184:14
determine   93:8
  99:21 158:8
  168:16 178:11
  178:16 182:4
  201:21 211:9
  211:14,17
  224:19 225:5
  228:12,17,18

256:9 275:10
  279:22
determined
  169:24
determining
  101:2
detour   129:17
develop   48:20
developed
  81:18
developments
  188:2
dfa   234:5 240:7
  240:18
dictate   63:7
  129:13 214:9
  249:12
dictates   129:14
  247:12
difference
  55:11,14,15
  65:8 105:17
  131:23 158:3
  262:7,8 302:14
differences
  266:4
different   20:20
  31:17 36:3
  37:14 45:20
  46:23 48:16
  56:16,17 64:24
  78:25 82:23,25
  86:10,21 91:5

91:16,17 92:21
93:6,12 94:17
96:20 104:17
105:12 107:24
108:2,22
109:11 121:16
121:17 122:24
123:2,14
125:24,25
127:2 144:2,4
144:5,5 153:18
159:11,16,17
159:18 160:10
161:24,25
162:6,24
163:10 170:13
180:6,19
189:10,25
199:24 204:5
207:15 208:2
215:10 217:3,7
217:20 218:6
218:21 222:15
224:21 227:16
235:6 249:11
262:13 263:17
263:25 264:8
273:10 278:15
278:19 279:18
293:9,11 302:9
302:11,20,24
303:2,21,23
305:22,23
306:2 308:14

**differently**
102:12 123:3
125:20 144:20
189:15 205:19
302:6,7
**difficult** 25:21
61:11 75:25
**diligence** 131:2
155:11 265:4
**diminish**
102:23
**dinner** 115:13
**dinnertime**
114:11
**direct** 116:3
165:19 216:9
**directing** 135:9
**director** 130:7
283:15 289:13
289:20
**disagreeing**
180:8
**disagreement**
180:10
**disconnect**
19:23 164:3
**discover**
287:22
**discovered**
287:20
**discretion**
131:25 132:3
174:19,24
177:25 187:7
187:13

**discussed**
118:13 194:2
201:20 255:23
256:10,11
265:2
**discussion**
124:17 271:16
**discussions**
194:12
**disengaged**
141:7
**distinct** 224:21
**distinction**
64:19
**distributed**
261:15
**distribution**
39:4
**district** 1:2,3
4:11,11
**dive** 71:12 83:9
135:8 168:18
262:10 270:5
272:8,10
**diversification**
92:3 271:19
272:20 273:18
**diversified**
308:19
**diversify**
105:19 224:23
**dives** 260:18
261:2,9,20,23
265:13,15
266:9 270:25

314:17
**dividend**
308:20
**division** 50:2
**document** 13:4
40:20 42:24
43:19 111:13
111:14 150:4
153:16 183:6
186:16 187:16
198:22,24
216:23 217:9
217:15,18
218:2 221:11
221:14,15,20
222:5 238:15
241:7 242:13
242:20,22
252:22 258:4
262:5 264:15
264:17 266:13
271:11 282:6,9
282:17 285:11
285:19 299:4,6
299:10,11
315:8
**documentation**
152:3 168:10
**documented**
138:8 186:6
201:7
**documents**
7:24 11:15,24
12:23 40:8,14
40:15 41:7,10

[documents - donald]                                                    Page 22

| | | | |
|---|---|---|---|
| 41:16,17,25 | 19:1 20:1 21:1 | 114:1 115:1 | 184:1 185:1 |
| 42:5,11,18 | 22:1 23:1 24:1 | 116:1 117:1 | 186:1 187:1 |
| 43:6,14 110:6 | 25:1 26:1 27:1 | 118:1 119:1 | 188:1 189:1 |
| 149:20,24 | 28:1 29:1 30:1 | 120:1 121:1 | 190:1 191:1 |
| 195:18 223:25 | 31:1 32:1 33:1 | 122:1 123:1 | 192:1 193:1 |
| 261:13 263:12 | 34:1 35:1 36:1 | 124:1 125:1 | 194:1 195:1 |
| **doing**   52:6 | 37:1 38:1 39:1 | 126:1 127:1 | 196:1 197:1 |
| 87:24 108:3,4 | 39:15 40:1 | 128:1 129:1 | 198:1 199:1 |
| 108:10,14,19 | 41:1 42:1 43:1 | 130:1 131:1 | 200:1 201:1 |
| 108:24 109:2 | 44:1 45:1 46:1 | 132:1 133:1 | 202:1 203:1 |
| 117:22 127:12 | 47:1 48:1 49:1 | 134:1 135:1 | 204:1 205:1 |
| 129:7,8,19 | 50:1 51:1 52:1 | 136:1 137:1 | 206:1 207:1 |
| 135:3 139:12 | 53:1 54:1 55:1 | 138:1 139:1 | 208:1 209:1 |
| 139:12 144:25 | 56:1 57:1 58:1 | 140:1 141:1 | 210:1 211:1 |
| 208:13 212:14 | 59:1 60:1 61:1 | 142:1 143:1 | 212:1 213:1 |
| 217:11 227:17 | 62:1 63:1 64:1 | 144:1 145:1 | 214:1 215:1 |
| 262:23 273:20 | 65:1 66:1 67:1 | 146:1 147:1 | 216:1 217:1 |
| 284:9,14,14,15 | 68:1 69:1 70:1 | 148:1 149:1 | 218:1 219:1 |
| 287:5,6 302:13 | 71:1 72:1 73:1 | 150:1 151:1 | 220:1 221:1 |
| 303:9,14,16,16 | 74:1 75:1 76:1 | 152:1 153:1 | 222:1 223:1 |
| 305:17 306:16 | 77:1 78:1 79:1 | 154:1 155:1 | 224:1 225:1 |
| 306:17,18,19 | 80:1 81:1 82:1 | 156:1 157:1 | 226:1 227:1 |
| 309:19 | 83:1 84:1 85:1 | 158:1 159:1 | 228:1 229:1 |
| **dol**   220:12 | 86:1 87:1 88:1 | 160:1 161:1 | 230:1 231:1 |
| 227:4 | 89:1 90:1 91:1 | 162:1 163:1 | 232:1 233:1 |
| **dollar**   104:12 | 92:1 93:1 94:1 | 164:1 165:1 | 234:1 235:1 |
| 134:13 | 95:1 96:1 97:1 | 166:1 167:1 | 236:1 237:1 |
| **dollars**   38:17 | 98:1 99:1 | 168:1 169:1 | 238:1 239:1 |
| **domestic** | 100:1 101:1 | 170:1 171:1 | 240:1 241:1 |
| 103:11 113:12 | 102:1 103:1 | 172:1 173:1 | 242:1 243:1 |
| **donald**   1:17 4:4 | 104:1 105:1 | 174:1 175:1 | 244:1 245:1 |
| 6:1 7:1 8:1 9:1 | 106:1 107:1 | 176:1 177:1 | 246:1 247:1 |
| 10:1 11:1 12:1 | 108:1 109:1 | 178:1 179:1 | 248:1 249:1 |
| 13:1 14:1 15:1 | 110:1 111:1 | 180:1 181:1 | 250:1 251:1 |
| 16:1 17:1 18:1 | 112:1 113:1 | 182:1 183:1 | 252:1 253:1 |

254:1 255:1
256:1 257:1
258:1 259:1
260:1 261:1
262:1 263:1
264:1 265:1
266:1 267:1
268:1 269:1
270:1 271:1
272:1 273:1
274:1 275:1
276:1 277:1
278:1 279:1
280:1 281:1
282:1 283:1
284:1 285:1
286:1 287:1
288:1 289:1
290:1 291:1
292:1 293:1
294:1 295:1
296:1 297:1
298:1 299:1
300:1 301:1
302:1 303:1
304:1 305:1
306:1 307:1
308:1 309:1
310:1 311:1,7
311:16 314:5
316:5 317:2,4
317:12
**door** 64:5
**downs** 100:6

**downside** 65:13
68:20 100:7
**draft** 14:3,23
15:18 159:25
161:19 172:9
172:18 184:6
**drafted** 160:2
**drafting** 173:9
**drafts** 14:25
15:22 16:3,4
17:11,13
**draw** 263:20
**dries** 306:7
**driving** 99:20
124:10 125:10
135:12 163:25
208:12 294:12
304:12
**drop** 119:5,13
**dropped** 54:3
163:12
**dropping**
119:18 120:15
**drove** 138:2
**due** 131:2
155:11 257:21
259:2 265:4
**duly** 5:7 115:5
313:9
**duplicative**
28:20
**durables**
105:22
**duties** 136:12

**duty** 204:19
308:10
**dynamics**
20:24 21:4
22:10

**e**

**e** 2:2,2 5:6
17:17 115:2,2
115:4 313:1,1
314:2 315:2
**eagar** 43:25
46:23 160:3,3
**eagar's** 261:18
**earlier** 8:21
11:23 44:3
45:5 53:19
112:5 134:18
141:21 142:20
143:11 145:5
163:8 174:11
174:21 185:3
186:22 193:18
195:2 201:11
202:10 205:5
212:5 220:11
231:7,7 239:22
243:18,24
244:7 245:18
262:25 272:14
284:7,20 295:6
**early** 64:17
133:5,12
**earned** 38:11
**easier** 61:13

**easiest** 85:22
**east** 115:12
**eastern** 114:8
**economic** 75:5
75:6 188:2
**edit** 15:7
**edited** 15:8
**educate** 75:22
103:18
**educated** 52:5
75:11 302:17
**educating**
74:22 75:5,6
76:8
**education**
71:15 73:10
75:4 76:4
138:4 216:14
216:19
**effect** 3:14 63:7
173:6 259:4
**efforts** 142:10
**either** 11:22
18:11 20:8
30:19 60:6
158:3 168:10
196:15 222:11
264:7 310:11
**elect** 286:17
**element** 79:21
108:11 214:7
250:21 278:9
**elements** 73:18
79:4,11 125:22

| | | | |
|---|---|---|---|
| **elevate** 223:4 | 265:12 270:11 | **equities** 102:5 | 151:12 153:3 |
| **else's** 293:20 | 281:6,15,24 | 103:7,8 113:12 | 174:7 225:12 |
| **embedded** | 288:7 290:8 | **equity** 39:6 | **established** |
| 144:4 | 292:12 299:3 | 72:6 101:20 | 139:3 147:11 |
| **emerging** 103:8 | 306:20 307:4 | 102:19,23 | 237:8 245:23 |
| **employed** 26:6 | 307:17 310:8 | 103:6,21 104:9 | 246:15 |
| 206:7 283:25 | **enhanced** | 255:9 258:11 | **establishing** |
| **employee** 58:13 | 143:2 258:9 | 267:4,8,8 | 224:2 |
| 129:24 130:2 | 259:2 | **equivalent** | **estimation** |
| **employees** | **ensure** 60:21 | 221:11,13,15 | 17:22 |
| 57:17,19,22 | 132:25 | **erisa** 59:19,20 | **et** 1:6,9 4:8,9 |
| 58:2,3,12 | **ensured** 285:3 | 65:15 81:20,23 | 316:4,4 317:1 |
| **encompass** | **entail** 208:3 | 81:23 103:17 | 317:1 |
| 123:10 252:19 | **enter** 4:22 | 121:24 126:4 | **european** 1:13 |
| **encouraged** | **entered** 215:22 | 210:7 220:16 | 4:14 114:16 |
| 104:7 | **enterprises** | 220:19,24 | 311:10,13 |
| **ended** 14:17 | 281:17,20 | 221:2 227:3,19 | **evaluate** 65:16 |
| 30:14 | **entire** 26:6 | **errata** 312:1 | 65:20 110:8 |
| **endowments** | 61:18 86:18 | 316:11,13,16 | 123:6 127:6,7 |
| 143:3 | 147:25 152:22 | **escalations** | 127:19 164:14 |
| **ends** 80:15 | 305:9 | 90:3 | 175:18 178:3 |
| 152:8 311:5 | **entirely** 129:20 | **escaped** 239:14 | 213:19 248:22 |
| **engaged** 212:6 | 202:6 | **esq** 2:5,10,11 | 265:24 303:22 |
| **engelman** 2:10 | **entirety** 8:3,6 | **esquire** 316:1 | **evaluated** |
| 5:11,16 12:10 | 44:8 53:23 | **essential** | 52:20 128:5 |
| 12:19 39:12,23 | 55:2 56:23 | 221:19 265:25 | 156:16 176:8,9 |
| 50:5,13 69:7 | 57:10 191:8 | **essentially** | 178:10,17 |
| 69:11 114:8 | **entity** 54:17 | 24:12 56:15 | 182:3,16 187:9 |
| 115:10 128:10 | 57:14 88:2 | 88:14 142:23 | 248:8 302:5,7 |
| 148:14,22,25 | **enumerate** | 150:10 254:24 | **evaluates** |
| 171:22 176:23 | 105:5 | 285:2 310:4 | 247:22 |
| 177:7,10 | **equal** 98:10 | **essentials** 218:2 | **evaluating** |
| 198:25 230:17 | 99:15 | 219:14 | 122:21 126:6,9 |
| 230:24 241:21 | **equation** | **establish** | 145:16 161:8 |
| 257:11 264:10 | 106:24 | 147:22 151:5 | 165:5 167:9 |

**[evaluating - experience]**                                    Page 25

212:25 213:20
225:13 276:18
280:18 297:25
**evaluation**
72:16 127:12
175:12 176:3
185:4,12
249:18 302:9
302:11 303:18
304:16
**evaporated**
56:5
**evening**  199:4
**event**  255:14
256:24
**eventually**
184:16
**everybody**  52:4
52:5 65:9,16
66:17 67:6
78:22 81:24
89:7 92:7
143:17 145:2
165:19 264:6
275:6
**ex**  279:25
**exact**  10:8
15:24 16:5,12
38:13 195:13
195:15 216:5
218:8 295:18
**exactly**  22:7
28:16 31:19
47:12 51:4
63:25 128:14

163:15 181:23
181:23 192:20
196:7 204:9
210:20 211:25
224:10 275:24
284:14 301:24
305:7 306:18
**examination**
5:11
**examined**  5:8
115:6 313:8
**example**  41:2
48:17 79:12
85:21 86:14
92:17 104:2
110:11,15
113:6,9 123:7
125:12 132:8
135:2 146:11
179:22 195:24
196:5,11,14
197:5,16 200:8
214:5 216:21
231:8,16 244:6
245:7 278:12
305:19 306:4
**examples**
197:14 237:25
239:23
**exceeded**
276:25
**except**  3:7
309:15
**exchange**  17:18

**exchanged**
15:22 17:21
**exchanging**
17:11
**excited**  275:6
**exclusively**
58:8
**excuse**  238:12
**execution**
105:16
**executive**  23:5
130:6,19
283:15 289:13
289:20
**exercise**  97:9
97:10
**exhibit**  29:3
39:13,14,17,18
40:3,20 171:24
241:23 257:14
264:12,16
265:14 266:8
270:13,14,19
282:2 288:9
290:10 291:11
292:14 299:5
307:19 314:4,7
314:9,11,14,16
314:18,20,22
314:24 315:4,7
315:10
**exist**  66:16
109:16 227:18
**existed**  81:22
116:17 227:18

**existence**
138:17,18
**existing**  56:2
60:5,9,12
72:16 162:14
213:8
**exists**  109:13
**exit**  297:21
**expect**  43:12,15
45:18 84:5
109:8 162:11
164:22 256:22
270:6 273:4
280:23 285:7
301:2,11
**expectation**
76:10 106:15
285:2
**expectations**
78:7
**expense**  65:12
68:21 71:25
269:18,24
**expenses**
140:18 266:3
**expensive**
28:22 89:8
**experience**
74:15 75:17
85:3 106:14
107:12 115:22
116:19 120:4
123:5 126:8,9
126:15 139:15
173:13,18

**experienced**
135:17,24
**expert** 5:18
10:13,22 11:10
18:22 19:3,6
19:11,12,17,20
19:24 20:7
21:14 22:11,19
25:17 29:7,12
31:7 33:8
36:16 38:12,19
39:15 168:25
290:5 314:5
**expertise** 143:6
**experts** 10:19
10:19,25 11:5
**expires** 312:25
**explain** 20:4
54:13 55:10
85:17 245:6
299:12
**explanation**
22:6
**explanations**
84:18,20
**explanatory**
74:24
**explicit** 220:15
221:2
**exposure**
101:20 102:4
102:19,23
103:11,21
104:9 258:11
267:8,9,9

**expressed**
265:3
**extended**
189:13 190:6
280:6
**extent** 7:15
95:2 138:11
284:7
**extra** 30:16,20
**extreme** 104:11
**extremely**
183:12

**f**

**f** 21:21 115:2
313:1
**fabulous** 98:3
**fact** 25:22 38:8
50:16 77:15
79:8 81:23
101:11 116:17
142:8 145:8
164:14 168:4
169:25 170:3,6
170:18 189:25
200:2,9 203:17
208:6 213:21
215:7 226:3,20
226:21 244:6
253:18 257:3
262:13 264:8
277:25 280:2
**factor** 101:17
101:25 116:15
280:17

**factors** 97:14
98:14 99:9,16
99:19,24
104:22,24
106:3 107:6
176:11 188:5
188:13 189:22
244:13
**facts** 125:25
**fail** 81:11,11
162:21,24
236:4 239:15
239:19
**failed** 147:11
147:22 151:5
151:12 153:3
208:18 276:11
276:24 277:4
**fails** 178:9
179:3,19 180:4
182:2,14
185:13 316:18
**failure** 79:3
178:10,17
182:3,16
276:12
**fair** 6:22,23
22:6 41:6
44:10 47:3
95:20,21
118:22
**fairly** 89:20
173:16 200:3
205:7

**fall** 26:17
**familiar** 66:23
75:3 85:16
260:17 290:16
**fan** 145:24
**fancy** 75:15
**far** 116:19
122:2 133:10
195:3 306:8
**fargo** 32:4,9
**fargo's** 32:2
**fashion** 16:2
**faulting** 192:6
**favor** 84:16
**february**
200:11 201:19
244:23,24
**fed** 14:15 262:5
**federal** 2:8
**fee** 28:3,13
284:19 293:14
**feel** 60:17
136:11 137:13
137:15 283:18
**feeling** 136:22
**fees** 21:4,5
27:21,25 266:3
271:19 272:20
273:17 308:11
309:9,14,17
**felt** 30:9 46:17
52:16 194:24
**fewer** 100:5
**fia** 231:10

**fiam** 231:14,21
   232:4
**fiction** 18:5
**fidelity** 90:13
   96:16,19,19,21
   152:7 179:9,12
   180:14 181:2
   231:10,14
   254:13,16,25
   255:14,19
   256:12,16
   257:20 258:2
   262:10 265:2
   267:11,20
   268:16 271:15
   271:25 273:5
   279:9 285:15
   286:4,17
   287:14 289:6
   290:3 292:8
   294:5
**fiduciaries**
   174:6 187:24
   188:16,21
   207:21 265:20
   265:24
**fiduciary** 21:11
   22:4,15 23:2,7
   23:16 24:14,17
   28:6,11,14
   32:11,13,18,19
   34:6,11 35:25
   36:9 37:11,16
   45:16 49:11,18
   50:17 51:16

53:11 54:8
55:9 61:25
65:22 75:4
99:7 136:12
138:3,23
149:10 166:21
167:8 168:17
169:2,9 211:5
214:22,25
215:3 216:14
216:19 217:4,8
217:25 219:4
219:13 283:20
284:3 285:6
286:22 290:24
297:10 307:11
308:10
**fiduciary's**
   188:6,11
**fifth** 168:4
   186:8,14,20
**figure** 83:11
   87:25 150:13
**figured** 86:24
**filed** 307:14,20
   307:25 308:2
   315:11
**filing** 3:4
**filling** 14:17,21
**filtering** 192:8
**finalized** 15:23
   16:16 295:22
**finance** 138:20
   138:21

**financial**
   139:19
**find** 43:3 48:10
   79:10 81:5
   99:14 105:19
   163:13 165:16
   187:19 259:20
   262:15
**finding** 233:10
   262:23
**finds** 111:6
**fine** 5:14 6:18
   39:21 56:14
   98:24 183:19
   183:21 191:17
   192:2 193:20
   194:6 221:21
   251:17
**finish** 81:4 87:4
   97:22 211:16
**fire** 120:22,23
**firm** 21:8 23:5
   25:4,24,24
   31:19 32:5
   33:21 54:7
   82:4 84:14
   93:14 130:16
   133:6 142:2
   143:5 144:12
   282:24 286:23
   287:4
**firm's** 287:9
**firms** 25:22
   31:18 33:14,25
   91:6 92:10,21

144:17
**first** 5:7 6:10
   10:10 15:17
   19:13 20:5
   40:6,10 42:4
   60:3 62:17
   63:10 64:4,7,8
   92:3 103:15
   116:8 117:2
   120:11 121:20
   122:5 130:13
   149:25 153:9
   154:18,21
   177:18 183:16
   195:11 210:25
   222:10 247:11
   259:12 260:15
   262:20 270:22
   282:8 288:14
   305:8
**fit** 68:11 78:17
   287:8
**fits** 88:16
**five** 20:8 51:5
   86:16 87:22
   93:6 94:6,16
   94:18 108:20
   109:13 110:12
   115:21 116:5
   116:10,23
   117:11,13
   118:8,15 119:7
   120:6 121:8,8
   122:2,10 123:7
   124:23 128:2

176:25 183:5
185:7,21
200:24 201:13
243:15 244:11
247:23,24
248:5,8,10,23
249:8,10 250:4
251:21 268:12
268:23 269:14
277:3,15 279:3
293:10,10
294:13 300:4
300:16,20,24
301:20 306:20
**fixed** 103:6
**flaw** 203:7
**flawed** 32:20
**flexibility**
111:13 203:20
**flodin** 21:21
**florida** 6:2
85:25
**flows** 71:22
**fluctuating**
279:17
**fluctuations**
114:5
**fly** 12:6,20
**focus** 101:19
102:9 109:22
110:4,11
147:20 149:14
151:21,23,23
152:24 165:3

**focused** 47:15
143:3 149:5
185:10
**focuses** 148:3
**focusing** 25:9
152:16
**folks** 104:4
139:15 283:10
**follow** 82:6
122:6 140:14
174:22 246:17
247:4
**followed**
163:14
**following**
181:15 182:8
224:3 282:22
**follows** 5:8
115:7
**footnote** 47:13
47:14 243:2
**footnoted** 47:4
**footnotes** 48:25
**force** 3:13
**foregoing**
313:9 317:5
**form** 3:7 74:14
74:20 122:15
128:7 139:22
155:20 157:18
163:21 166:24
180:12 212:10
228:2 251:14
282:3 288:10
290:11 292:15

313:13 314:21
314:23,25
315:5
**formal** 211:8
211:14,23
212:8,25
213:23 216:14
216:18 218:12
218:14,19
227:24 228:4
228:22
**formats** 144:5
**formatted**
144:20
**formed** 78:10
**forming** 35:24
40:16 42:18
242:21
**forth** 14:9,13
14:24 15:5,9
17:21 29:7
41:15 65:14
89:13 92:4
106:10 137:18
145:2 223:24
224:8,10
**forward** 113:23
149:17 155:22
156:2 157:14
157:20 158:5,7
166:11,22
167:2 199:12
199:15 244:18
245:3,5 246:4
246:19

**foul** 24:7
**found** 38:2,2,9
213:21 260:8
**foundations**
143:3
**founded** 22:2
53:16 81:23
**founding** 49:9
54:5
**four** 9:12 16:2
19:3 20:8 42:8
57:9 63:23
87:21 134:6
168:3 186:5
189:18 190:7
200:17 201:4
225:16 254:17
293:9
**fourth** 167:25
169:5,11,14
200:15 201:18
270:12,16
**framework**
14:16 15:18
**frankly** 138:9
199:5
**fraught** 255:19
**freedom** 96:16
96:18,21 97:2
97:4 147:18
152:4,7,14
153:8,21 154:5
155:4 156:16
159:23 160:21
161:8 165:6

**[freedom - funds]**

166:17,19
167:12,18,22
168:13,20
171:6 179:9
185:6,19
200:10,16,22
202:2,7,12,22
203:2 206:21
232:4 234:6
243:14 254:13
254:16,25
255:24 256:12
256:16 257:20
258:2 259:10
262:11 265:2,5
266:23 267:5,7
267:11,20,24
268:16 271:15
271:25 273:6
276:12,24
277:4 279:9
285:15 286:4
286:18 287:14
289:6 290:3
292:8 294:6
**freezing** 148:15
**frequently**
239:12
**freshly** 11:17
**friday** 4:12
311:8
**front** 29:5
171:10 205:4,5
238:23 271:6
302:17

**frontier** 103:9
**froze** 68:24,25
**frozen** 55:25
178:12 182:5
**fulfill** 290:24
**fulfilled** 136:12
136:18 141:5
**fulfilling** 60:21
283:20 284:2
285:5 286:22
**full** 100:9 191:7
213:9
**fund** 28:20,22
28:25 65:10
72:22 73:20
77:6,15,21
78:3,5,8 82:9
82:12 85:4,5
86:9 91:13
93:18 95:13
98:2 99:22
101:3 108:3,17
112:7 113:19
115:19 116:13
116:22 121:7
121:11 122:9
122:12,23,23
123:9 124:5,22
125:5 126:10
127:18 128:17
129:8 132:12
132:12 141:22
142:5,5,6
154:24 156:25
164:5,9 169:17

170:12,17
178:9,24 179:3
179:19 180:4
180:15 181:7
181:16,25
182:14 183:24
185:13,15
187:9 202:24
205:3 207:13
207:13 229:21
234:5,5 235:12
240:18 242:16
252:15 253:3
257:22 264:23
267:4 271:14
294:6 296:18
297:2 298:2,17
298:20,23
299:6,15,17
302:6,8,11
306:12,15
308:20,21,22
315:9
**funds** 27:16
28:20 29:2
30:6,11,13,17
30:18,22 32:2
32:9 34:5,8,9
34:13 35:7,10
35:14,15,17,19
36:2,10 37:6
37:13 65:12
69:21 70:10,18
71:2,7 73:5
76:22 77:7

88:22,25 90:13
92:15 95:22
96:10,16,18,21
96:21 97:3,4
97:12,18
108:13,15,19
108:20,21
114:4 123:8
124:7,9 128:19
128:21 147:18
152:4,7,8,14
153:8,21 154:5
154:7,10,16
155:4 156:8,16
159:8,23
160:10,21
161:9 162:20
164:21 165:6
166:17,19
167:3,5,12,18
167:22 168:7
168:13,20
170:4,4,5,7,15
171:6 179:8,9
180:25 181:5
185:6,19
200:10,16,22
202:2,7,12,14
202:22 203:3
205:16 206:21
207:20 231:10
231:14 232:4,4
234:6 240:7
243:6,14
248:14 254:13

254:16,25
255:6,24
256:12,16
257:20 258:3
259:10 262:11
262:12 265:3,5
265:21 266:8
266:21,23
267:5,6,7,11,20
267:24 268:16
269:6 270:2
271:15,25
272:12 273:6
276:13,24
277:4 279:9,17
279:25 285:16
286:4,18
287:15,19
288:4 289:7,9
290:3 292:8,8
292:9 294:6,20
296:14 297:6
297:11,15
298:13 300:2
300:23,25
301:11,24
302:3,24 303:9
303:17,22
304:18 305:19
305:20,21
306:6
**funky** 178:7
**further** 3:6,10
4:24 72:16
115:6 149:22

310:9 313:20
**future** 133:9
280:10

**g**

**g** 281:21
**gaining** 255:18
**game** 213:13
**gather** 66:16
265:24
**gears** 115:18
**gee** 306:15
**general** 20:23
21:4 22:6,10
73:10 80:6
82:21,25 96:3
97:7 145:14,21
145:22 164:17
174:15 191:17
191:19 192:13
192:15 194:23
194:24 197:21
203:10
**generalized**
189:9 192:18
**generally** 67:4
74:3 80:5
95:19 114:3
139:14 140:2
141:3 143:11
144:15 146:17
173:12 189:12
189:16 190:9
228:5 305:17
**generate**
100:12 113:22

172:21 276:25
**generated**
27:25
**generating**
272:24 273:6
**getting** 31:17
80:3 103:14
105:21 159:14
160:7,8,14,24
162:7,8 163:6
215:15 233:12
233:18 251:6
275:12 293:13
**give** 15:6 16:4
20:15 79:12
84:24 104:2
122:16 129:4
146:10 157:5
187:19 192:23
197:10 293:3
**given** 61:8 90:9
124:3 132:5
190:25 201:25
202:21 212:8
219:18 226:20
226:21 317:9
**gives** 205:2
**giving** 31:20
**glaring** 200:8
**glass** 281:21
**glassbridge**
281:17,20,25
282:3,10 288:8
288:10 314:21
314:23

**glide** 70:14,15
70:19 71:24
100:22 102:13
102:14 103:5
103:14 255:5
258:19 259:3
266:4,15,16,21
266:23 267:2
267:11,15,16
271:17,18
272:20
**global** 33:21
**go** 6:8 12:7,10
14:9,12 15:6
16:5 25:20
26:3 30:12,21
35:19 39:19
41:20 42:5,23
44:25 46:3,18
48:15,23 50:6
56:11 59:23
64:24 69:2
73:21 76:16
77:9 78:11
79:9,22 82:24
83:3 84:7
85:23 86:6,7
88:4 92:5 94:5
94:25 100:9
103:13 104:18
104:20 107:13
110:14,17
113:22 114:12
115:25 116:22
117:15 119:4,8

| | | | |
|---|---|---|---|
| 121:12,14,20 | 300:14 303:13 | 95:16 97:23,24 | 204:3 207:19 |
| 124:6 125:15 | 306:5 308:18 | 98:6,6,8,16,24 | 211:8,12,13 |
| 125:19 127:6,7 | **goal** 87:15 | 98:24 99:25 | 219:15 222:8 |
| 135:18 138:5 | **goes** 16:2,3 | 100:3,11,12,14 | 222:12,16 |
| 138:16 139:6,9 | 43:8 47:17 | 100:16,17,17 | 223:20 224:11 |
| 141:20 144:9 | 84:22 94:13 | 101:8,16,18,21 | 227:15 230:15 |
| 144:15 148:14 | 100:13 109:9 | 101:22,24 | 232:18,19 |
| 156:10 157:3 | 143:17 148:4 | 103:10,11 | 259:14,20 |
| 158:15 160:23 | 149:22,25 | 104:4,5 105:8 | 260:15 275:20 |
| 160:25 173:21 | 168:24 179:15 | 105:13 106:6 | 288:3 294:23 |
| 177:14 178:7 | 181:18 199:15 | 107:7,10,13,14 | 295:17 298:2 |
| 178:16 183:22 | 201:21 206:6 | 110:7,14 | 301:18 302:5,6 |
| 185:3 186:19 | 231:20 276:21 | 111:16,23 | 304:17 311:10 |
| 186:21 196:23 | 280:6 308:3 | 112:5,24 113:7 | **gong** 12:8 |
| 196:24,25 | **going** 6:6,21 | 113:8,10,22 | **good** 4:2 5:12 |
| 203:11 208:6,7 | 17:18 20:5 | 115:18 117:2,6 | 5:15 6:16 |
| 209:2,4 210:20 | 25:25 31:15,19 | 118:2,7,19 | 11:19 18:5 |
| 211:20,21 | 33:5 46:9 | 119:5,8,9,10,13 | 42:10 52:7 |
| 212:8 213:5,18 | 55:19 59:6,23 | 119:16,17 | 64:22 76:5 |
| 214:2 221:25 | 62:20 64:20,25 | 120:12,16,20 | 81:7 86:17 |
| 222:7 223:4 | 65:9,10 66:7 | 121:2 122:2,19 | 87:19 101:23 |
| 231:5,18,24 | 67:22 70:14,14 | 123:12,13,15 | 105:16 137:14 |
| 235:9,12,15,24 | 70:16 72:10 | 123:21,22 | 163:14 164:5,6 |
| 240:9,20 | 75:7,8,9 78:6,8 | 124:2,4,6,16 | 204:21 210:2 |
| 245:16 249:9 | 78:15 79:20 | 125:9,13 | 212:7 216:21 |
| 249:14 251:18 | 80:24 81:3,11 | 129:15,17 | 230:15 233:19 |
| 259:11 260:2 | 82:16,17 83:11 | 133:7 136:10 | 270:8 273:19 |
| 260:15 262:15 | 83:13,14,15,15 | 137:22,23 | 274:11 302:17 |
| 267:10 270:14 | 83:17 84:8,10 | 138:3 140:16 | 303:10 305:17 |
| 271:5 272:23 | 86:6,9,11,12 | 146:8 157:5,7 | **gotcha** 213:13 |
| 276:7 277:7,22 | 87:4,8,10,18,19 | 158:17 161:21 | **gotten** 83:22 |
| 282:5,16 | 88:3 89:24 | 172:4 184:18 | **grammatical** |
| 288:18,25 | 90:2,4,5,17,18 | 186:19 190:2 | 180:9 246:9,12 |
| 292:5,12,24 | 90:20 91:23,25 | 195:8,9,16 | 246:20 |
| 293:5,25 | 92:19 94:2 | 199:9 201:24 | |

**grandmother**
95:8,10
**graph** 100:2
**graphs** 275:7
**great** 84:9
100:13 110:3
163:24 280:2,3
**greater** 25:4
**grindstaff**
46:14
**grounding**
72:13
**grounds** 189:4
190:10
**group** 20:19
31:5 36:15
75:12 93:25
107:18 109:7
113:4,20 120:8
121:3 123:24
176:5,10
183:19 205:16
205:22,25
206:4 227:13
241:13 278:4,7
282:19 288:19
288:24 291:24
293:2
**groups** 28:25
112:18 144:22
156:25 176:16
210:5 247:14
248:9,11,24
249:23

**grow** 90:20
**growth** 94:18
268:16
**guard** 90:14
96:9
**guess** 16:9 18:3
18:19 41:23
46:19 47:18
60:14 64:11
65:23 67:9
83:20 145:17
146:22 149:14
152:16 153:15
155:8 160:3
161:11 180:20
204:13 236:12
236:20 242:10
284:23 285:3
302:18 308:18
**guessing** 134:5
**guesstimate**
62:20
**guide** 258:9
**guideline**
174:12 225:5
**guidelines**
174:6 175:20
224:19
**guidepost**
174:15
**guiding** 111:13
111:14
**guy** 24:8
**guys** 294:20

**h**

**h** 285:10,17,17
285:20 288:25
293:5,25 294:2
314:2 315:2
**half** 6:17 38:17
75:18 133:22
134:13 196:21
212:2,4
**halfway** 136:8
**hammered**
100:14
**hand** 44:14
59:10 313:22
**handed** 295:20
297:20 298:7
304:24
**handful** 79:18
97:12
**handing** 305:4
**handled** 140:12
222:15
**happen** 84:11
86:13 113:3
116:5 119:2
140:7 142:21
193:7 207:14
208:8
**happened** 59:5
152:9 159:17
163:13 204:9
226:24 232:5
235:2 255:2
297:19 305:6

**happening**
80:15 124:8
**happens** 86:25
92:23 195:6
221:21 223:3
226:11
**happy** 6:11
87:20 132:25
158:20 160:25
165:20 199:6
**hard** 39:19,24
75:17 106:7
118:9 168:7
189:19
**harder** 106:12
**harm** 24:7,20
24:21
**harmon** 27:2
**hazy** 97:6
**head** 8:23,24
9:2 11:7 12:3
31:13 33:14
41:18 49:14
71:4 72:11
184:11,19
231:9 255:13
279:14 298:14
**heading** 246:13
246:17,25
**headline**
259:24
**healthcare**
29:20
**hear** 50:4 71:8
82:2

**heard** 5:21 281:23

**hearing** 50:5

**heart** 127:4

**heartburn** 32:25

**heavily** 304:15

**heavy** 105:21 105:22

**heck** 104:14 105:23

**hegemony** 239:15

**heightened** 84:2 206:25 207:4,6,23 208:2,4 296:25

**held** 201:18 207:13,14

**help** 99:19 134:25 218:16 222:8 275:10

**helped** 58:25

**helpful** 77:19 104:19 125:16

**helping** 123:6 132:25

**hereto** 313:19 317:7

**hi** 50:14 115:11

**hiccup** 50:15

**hide** 125:2

**hides** 125:8

**high** 54:19 55:6 55:7,18 56:4

62:17 93:24 94:8,14,18 96:22 220:8 267:21 305:11 305:13,13 309:11

**highest** 93:4 95:23,24 96:3 96:4

**highlighted** 248:3 290:4

**hired** 139:7 209:7

**historical** 266:2

**history** 95:5,5 170:5,6,16 257:22

**hold** 68:23 224:25 245:17 266:25 270:15 280:10 285:25 292:3

**holding** 49:21

**holds** 207:7

**hole** 125:15

**holland** 290:9 290:11,13,19 290:23 291:6 291:10,24 292:15,19 299:14 314:25 315:5

**hone** 171:4

**honest** 118:22

**hope** 121:18 256:23 272:25

**hopefully** 249:21 281:7

**hot** 259:23

**hour** 6:16,17 199:4 213:14 230:15

**hours** 9:13 16:20 17:3,4,5 18:13,13

**house** 2:16 21:7 21:7 120:22 141:2 143:25

**howard** 2:15 4:14

**hr** 9:2 138:19 138:20 139:15 140:24

**huge** 145:24

**hundred** 56:7,9 163:11 189:25 298:10

**hurricane** 85:23,24 86:3

**hypothetical** 115:17 117:4 119:3,11 121:6 121:13,14 126:19 127:22 128:23

**hypotheticals** 127:14

**i**

**idea** 18:2 81:2 98:18 125:4 155:8 163:13 213:3 217:18 219:24 272:15 272:16 304:19

**identification** 39:14 171:24 241:23 257:14 264:12 265:14 270:19 282:2 288:9 290:10 292:14 299:5 307:19 314:4,7 314:9,11,14,16 314:18,20,22 314:24 315:4,7 315:10

**identified** 154:4 161:6 194:17 251:20 286:13

**identifies** 276:17

**identify** 153:18 158:11 173:18 198:2 222:3 228:10 232:23 233:24 234:9

**identifying** 256:4

**ignore** 117:10

**ignored** 243:15

imagine 94:24
  219:25
immediately
  46:3 86:14,17
impact 75:10
  120:17 187:25
  255:24 257:5
  259:21
impacted
  118:14
implemented
  234:20 237:7
  237:13,17,23
  239:20 243:21
  245:21 246:13
  246:20 247:7
important 70:4
  75:20 77:14,22
  78:2 79:19
  100:25 101:5
  106:20 107:20
  107:22 108:18
  111:24 223:16
  256:6 280:17
importantly
  72:4 138:10
improve
  186:19
improved
  206:9
improvement
  186:12 187:3
  201:5 206:16
improving
  281:2

imprudence
  23:6
imprudent
  79:9 141:7
  145:22,24
  146:2 229:11
  297:7,11
imprudently
  263:22 286:21
  286:24 291:7
inadequate
  191:4,14,21,24
inappropriate
  145:15,18
  248:22
include 47:8,25
  123:16 140:6
  144:10,11
  176:3 194:17
  197:13,15
  198:14 209:16
  212:14,15
  216:25 221:17
  221:18 224:2
  234:11 242:23
  250:4 278:6
included 41:17
  184:9,23,25
  196:5 199:18
  201:14 211:7
  212:17,19
  213:8 214:20
  219:15 244:22
  303:2,2

includes 224:12
including 17:7
  87:15 209:23
  224:16 225:18
inclusion
  184:22
income 38:19
  38:22,23 39:5
  80:11 103:6
incomprehen...
  203:22 204:22
inconsistencies
  237:19
inconsistency
  239:24 243:25
inconsistent
  234:16 248:20
  248:25 250:7
  250:12 251:16
  253:15 254:4
incorporating
  248:14
incorrect
  183:15
increase 255:9
increased
  258:10
incredibly
  86:17 89:8
indefinite
  180:21
independent
  54:23 57:17,20
  168:19

independently
  151:18 164:15
  256:4
index 113:9
  205:11,14
  271:20 277:2
  298:20,25
  300:3,25
  301:10,20,23
  302:16,19
  303:10,11,15
  305:24,25
  306:12,15,17
indexes 113:18
  113:22 176:4
  176:16 247:14
  247:22 249:23
  276:17 306:2
indifference
  240:16
individual 48:6
  89:4 123:22
  210:2 222:11
  229:15,18
individualize
  89:7
individuals
  54:20 55:6,8
  58:12 60:15
  134:23 181:6
  207:14 214:11
  285:4
industry 11:8
  64:21 67:6
  71:11 75:13

80:5 92:15
101:21 143:12
189:17 190:8
193:6 199:21
210:10 227:10
228:6 265:5
271:16
**inexpensive**
303:17
**infinite**   278:10
**inform**   128:4
**informal**
214:18
**information**
15:5,7 38:6
46:17,21 47:13
47:14,16,22,23
47:25 66:9,11
67:4 68:16
71:6,21,23
72:9 73:22
74:8,9 79:2
83:21 112:23
129:3 135:7,10
160:7,9 162:8
162:9 163:3,24
164:4,4,20,21
166:12 169:3
171:14 183:20
209:10 214:22
215:15 221:23
233:18,19,19
240:9,20 241:9
242:4 243:14
244:10 245:10

246:2 249:5
251:5,7 253:24
261:7 262:18
262:18 263:6
263:17,18,19
263:23 264:6
265:11,25
270:5,8 272:9
273:2,5 274:3
274:10,12
275:8 286:13
287:12,13
288:5 294:9
302:16
**informative**
188:10
**initial**   130:13
**initially**   53:20
54:15
**inoperative**
172:10
**input**   88:15
**inputs**   86:6
113:15
**inspect**   159:22
**instance**   99:9
101:10 116:16
154:21 234:8
**instances**   233:5
233:8,24
234:10
**instantaneous...**
157:6
**institution**
51:14

**institutional**
49:25
**instruction**
6:12
**integrated**
284:16
**integrity**
308:21
**intentionally**
278:13,13
**interact**   91:6
283:10,11
**interest**   32:7,16
69:18 138:12
204:20 207:22
219:6,7,8
262:22 264:3
265:3
**interested**
26:18 313:20
**interesting**
20:19 129:2
154:9 262:16
**interject**
230:25
**internal**   21:9
95:13 238:24
239:3
**internally**   93:7
105:18
**international**
103:8 242:11
267:8 306:6
**internet**   38:3
176:24

**interpreting**
224:3
**interrupt**   12:5
70:8 223:8
**intex**   298:23
**introduce**   29:3
**invesco**   308:19
**invest**   108:5,6
306:5
**invested**   64:17
181:7
**investigate**
142:11
**investment**
7:21,23 21:7
23:7 25:23
27:23,24 33:21
33:24,25 39:2
41:3 43:13
51:7,16,21
52:8,18,21
53:12 63:19
66:15 68:9,18
74:10,18 81:7
93:21,25 95:17
105:2 109:2,20
109:20,23
110:5,9,10
111:7,9 114:3
115:19 132:7
135:6 138:20
139:20 140:12
145:16,21
156:17,19,23
160:14 169:4

174:7 175:8,17
175:19,23
177:15,19,21
178:2 180:18
182:20 185:24
186:3 187:8
188:3 194:10
200:21 201:3,8
208:15,24
209:16,19
210:16,19
214:21 216:12
216:13 219:4
220:9 223:7
224:3,15,19
225:9,13,18
232:22 238:17
238:18 240:16
240:24 251:19
251:22 252:4
252:11,14,19
253:2 254:2
256:2 276:4
279:17 282:10
282:21 283:7
283:18,25
288:20 290:12
290:17,18,22
291:25 293:2
293:13 294:14
295:5,7 307:8
308:14,16,25
309:5
**investments**
21:6 23:19,21

24:12 27:22
28:18 39:6
45:24 64:14
65:17 75:8,22
106:17 132:4
147:13,16
151:7,14 153:4
167:16 188:7
194:5 201:20
217:5 222:18
232:23 233:5
239:11 255:3
256:6 266:5
271:22
**invoices**   16:23
**involved**   7:12
22:22,24,25
27:11 59:22
135:11 136:7
207:11 210:13
298:3 304:16
309:22,24
**involvement**
214:7
**ips**   43:13 63:18
63:18 110:17
110:17,18,20
111:14,21,23
112:2 116:2
117:16,18,24
121:14,14,21
122:6,6,8
125:18,21,23
149:7 153:13
153:14,15,23

153:25 154:11
157:4 159:7,11
159:15,25
160:2,6,15
161:13,19
162:4,4,15
164:17,23,24
166:2,6,13
171:23,23,25
172:23 173:2,9
173:13,23
174:2,5,12
175:3 176:8
177:11 178:6
179:23 180:16
180:24 182:10
183:10,22
184:7,10,23,25
185:8 186:12
187:3,12,15
189:11 199:13
199:17,22
200:2 201:3,11
201:15 203:17
204:12 208:8
209:23 216:5
221:15,17,25
222:4,8 223:13
223:21 224:6
224:12 225:3
232:24 233:6
233:15 234:17
234:24 235:22
236:10,13,18
237:8 238:6

239:13,25
240:4,16,23,24
241:19 243:25
244:9 245:23
246:15 247:12
247:19 248:9
248:16,18
249:9,11,13,14
249:15 250:8
250:12 251:16
251:19 252:13
252:25 254:5
276:17 278:2
314:8
**ipss**   121:16
172:9,18
221:18
**ira**   39:3 101:15
**irrelevant**
157:16 158:3
**irrespective**
24:14 116:15
121:9 122:8,11
164:17 170:6
**issue**   20:25
27:5,11,17,25
28:11 30:4,7
30:14 31:23
32:11 33:18
34:6 35:4,6,9
35:14 36:24
37:2,6,13
44:13,18 45:11
111:22 120:21
120:24 124:5

125:10 126:21
140:25 141:2
155:14 164:13
164:18,19,22
167:4 169:13
173:23 184:21
186:23 192:3
192:15 195:21
196:21 199:14
199:20 218:16
226:3 228:21
246:9,11,12
259:17 262:21
272:11 310:5
**issues**   20:9,13
21:11 22:7
25:25 27:19
28:8,13,14
45:17 78:13
125:2 138:23
140:3,4,6,8,12
140:15,21
148:15 165:4
183:24 192:25
194:2 203:12
203:15,16
216:24 218:21
242:16
**italicized**   248:4
**iterations**
234:23
**iterative**   14:6
17:24 41:19
48:14 136:6

**j**

**jagged**   100:17
**january**   152:23
245:3,5 282:13
288:15 291:15
292:20
**jcroberts**   2:5
316:2
**jeffrey**   282:23
284:19
**jennifer**   21:19
21:20
**jensen**   46:13
**job**   44:16 45:6
100:7 139:12
139:12 178:3
303:10
**john**   2:5 9:11
9:15 13:24
316:1
**joins**   138:4
**jp**   96:5
**judge**   7:3 23:23
24:3
**judgment**
150:24 190:14
204:21
**july**   16:12
**jump**   222:7
223:10
**june**   11:22
15:20 56:23,24
129:23 199:8
307:15,20
308:2 315:11

**junior**   135:15

**k**

**k**   22:24 25:12
34:6 39:3
49:19 50:17
51:10 53:11
55:8 80:18
121:16 224:9
224:11 285:16
286:5 289:7
292:8 294:6,20
295:13,15,16
296:11 304:24
**keep**   33:13
52:12 55:22
95:13 99:4,6
99:23 101:7,12
101:14 103:3
111:12 157:10
171:9 204:3
288:4
**keeper**   28:5
308:12 309:10
**keeps**   12:6
125:7
**kept**   57:14
162:15 305:15
**keri**   2:10 5:15
230:14
**keri.engelman**
2:10
**key**   49:20,21
50:18 51:10
53:9 75:11
137:25 190:10

**keyword**   65:23
**kind**   6:15 12:20
14:8,12 17:20
25:4,20 26:3
41:21 43:8,14
44:17 45:17
46:2 47:9 48:8
49:7 54:5
55:25 59:11
60:3 62:16
68:3 74:24
76:4 86:21
87:2,5,20 88:7
101:19 102:3
124:13 125:3
125:11,15
126:5 127:4
135:8,12
155:14 160:13
170:22 178:14
207:13 220:17
220:20,22
238:21 259:17
259:23 262:2
272:10,13,24
274:18,19
284:6 297:21
**kip**   48:17
**knew**   133:7,9
141:14 213:24
284:4,7 287:25
**knight**   290:9,11
290:13,19,23
291:6,11,24
292:15,19

**[knight - legacy]**

299:14 314:25
315:5
**knocked**  23:22
**knocks**  98:3
**know**  6:11
  10:18,25 11:5
  11:7,13 16:22
  16:22 17:4,16
  18:6 19:2
  29:14 33:5
  37:23,23 38:13
  38:22 39:17
  41:14 43:8,16
  47:12 48:9
  52:11 58:17
  61:8 62:5,8
  63:17 65:23
  67:7 68:9
  69:24 72:8
  82:2,22 84:9
  84:12,19 95:18
  96:19 103:7,20
  105:20 107:8
  114:10 116:4
  117:2,5 118:23
  119:10,12
  120:23 125:9
  128:13 137:18
  138:18 144:21
  145:9 148:16
  150:9,15
  152:17 153:8
  153:24 158:24
  160:10 163:4,7
  165:24 167:15

171:11,12
179:7,10 184:9
188:23 195:11
196:7,9,16,20
196:22 204:8
204:23 205:15
205:21 206:14
207:20 211:25
212:12,17,24
213:4,6,10,11
214:15 215:4
215:10,19
218:2,4,22,24
219:5 220:4
222:8 229:3
236:2,20 238:5
238:10,12
239:5,6,6
242:25 244:20
246:5 247:8
250:24 251:3
253:23 259:4
260:14 262:9
272:16 279:12
279:24,25
280:7 281:17
284:6,11,11,15
284:16 286:24
287:6,7 288:2
288:2,6,13
290:15,17
291:8 294:16
294:16 295:2
299:8,20
303:13 305:5,6

306:8 307:22
309:20,21
**knowing**  280:9
**knowledge**
  165:23 219:12
  219:19 238:7
  239:2,20
**known**  79:10
**knows**  280:10
**kraft**  20:22
  21:2,13 25:19

**l**

**l**  2:10 5:6 21:21
  115:4 281:21
**labor**  92:6
  209:11,18,21
  210:12 227:20
**lack**  14:25
  22:25 23:7
  33:22 154:14
  202:13
**lagging**  108:8
**laid**  52:4
**laliberte**  1:6
  4:7 316:4
  317:1
**landing**  12:7
**language**
  111:18 174:21
  180:16 181:20
  203:17 253:12
**large**  24:25
  33:20 62:10
  92:23 94:6,18
  94:19 103:12

134:3,17
138:24 139:25
207:7
**largely**  64:25
**larger**  93:8
**largest**  73:7
  80:3 87:23
**late**  133:4
  160:24
**latest**  264:15
**latham**  8:7
  11:11
**latham's**  8:9
  9:23,25
**laundry**  46:2
  272:19
**laurie**  8:7,9
  9:23,25 11:11
**law**  31:18,19
  33:13
**lawsuit**  310:6
**lead**  72:15
  259:13
**leading**  271:15
**lease**  97:25
**leave**  54:22
**leaving**  278:14
**led**  41:16
  287:19
**left**  132:15,16
  184:8 203:17
  235:8,8 253:17
  253:20 278:18
**legacy**  62:16

**[legal - look]**

**legal**  4:15,16
  8:23 13:17,19
  14:2 23:13
  25:22 47:16
  56:12 312:1
  316:23
**legs**  6:17
**lens**  204:5
**level**  45:24
  86:18 88:21
  92:2 123:15
  126:25 127:2
  145:8 163:18
  207:23 208:2,4
  210:13 214:6
  220:9 223:5
  267:21 280:13
**lewis**  2:7
**liability**  132:11
**liber**  205:19
**liberty**  36:15
  36:22
**lies**  132:2
**life**  35:20
**lightening**
  100:18
**lights**  98:3
**likelihood**
  80:25
**likely**  87:10,17
  99:4 118:6
  306:21
**limited**  28:10
  143:7 176:3

**line**  81:4 87:5
  97:22 100:16
  100:19 163:2
  197:20 214:13
  274:20 285:20
  312:6
**lines**  100:2,3
  127:23
**lineup**  122:13
  171:7
**list**  19:2 29:6
  41:24 46:2
  79:20 82:21
  83:3 93:2,2,3
  93:19,22,23,23
  93:24 96:22
  115:23 116:5
  116:13,22
  118:3 177:16
  181:11 182:20
  182:23,24
  183:12 185:24
  186:24 188:7
  188:24 205:2
  205:20 208:10
  227:16,20
  240:16,25
  251:19 272:19
  305:12,13,14
**listed**  26:16
  29:12,13,19
  31:6 38:16
  40:15,20 184:4
  184:5 293:10
  293:11 308:17

**literally**  81:19
  86:23 210:10
**litigation**  40:8
  40:14 42:2,4
  149:23 195:17
**little**  10:16
  32:24 36:13
  48:13 49:6,8
  61:13 62:3
  80:8,9 95:25
  100:6 106:5,11
  115:18 136:8
  144:20 153:18
  173:15 178:7
  205:18 207:25
  215:9 217:11
  301:25 303:7
  305:20,21,23
**lively**  76:15
**living**  289:23
**llp**  2:2
**loaded**  291:12
  307:23
**loading**  172:2
  292:16
**located**  1:17
  4:17
**location**  4:5
**long**  5:24 41:4
  45:25 85:6
  88:20 91:9
  92:11 106:8
  107:13 170:18
  187:14 197:19
  221:23 309:5

**longer**  136:9
  176:18 189:4
  248:15,17
  249:25
**look**  8:5,7 12:2
  16:11 24:21
  31:12,21 42:24
  44:19 46:18
  48:23,25 66:3
  66:6 70:14,15
  70:16 72:2,4,5
  72:7,8 73:18
  78:15 79:12,13
  79:15,16,17
  80:24 82:24
  83:15,17 84:4
  85:21 86:22
  87:5,8 88:3,21
  89:10,11,12,14
  90:2 94:25
  97:20 98:7,9
  98:16,18
  100:18 101:18
  102:11 103:14
  103:19 104:13
  105:8,13,24,25
  109:11,14
  111:18,24
  113:7,10 116:2
  117:6,17 118:5
  118:25 119:19
  120:5,7,18,21
  120:25 121:2,3
  121:21 122:3,4
  122:5,6,17

**[look - made]**                                                    Page 40

| | | | |
|---|---|---|---|
| 123:9,12,13,15 | 281:4 288:7 | 107:25 108:2,4 | 92:7 95:4,5 |
| 123:21 124:6 | 290:8 291:18 | 110:2 113:4,5 | 100:2 101:11 |
| 124:16,21 | 303:8,13 | 113:17 117:16 | 101:13 103:2 |
| 126:24 144:16 | 305:21 306:22 | 129:5,11 | 103:21,25 |
| 144:19 149:23 | 309:4 | 150:14 152:3 | 104:8 110:22 |
| 150:12 151:3 | **looked** 7:22 | 152:21 159:4 | 110:24 122:17 |
| 152:13 153:12 | 8:18,20,22 | 163:18 164:16 | 130:17,17 |
| 154:19 156:11 | 10:17 42:12 | 170:20 175:8 | 132:11 136:24 |
| 157:3,22 158:8 | 44:9 46:11 | 184:21 185:9 | 136:25 140:6 |
| 158:17 159:9 | 63:9 65:24 | 188:22 189:22 | 140:14,23 |
| 160:22,25 | 94:10,11,13 | 204:5 207:10 | 145:9 149:12 |
| 163:17 164:20 | 103:25 126:22 | 210:5,6 238:22 | 195:6,14 |
| 164:22 165:8,9 | 144:16,17 | 248:17 257:8 | 197:22 198:18 |
| 165:12,20 | 149:20 152:19 | 266:18,22,23 | 217:3 218:20 |
| 166:9,10 167:7 | 152:20,20 | 267:2,4 274:2 | 220:14 221:3 |
| 168:7 170:23 | 156:3 184:15 | 274:12 275:5 | 221:17 274:10 |
| 177:14 184:12 | 184:17,24 | 279:4 280:3 | 274:11 309:19 |
| 184:14,15,16 | 197:10 201:11 | 285:22 305:10 | **lower** 102:19 |
| 188:17,20,24 | 205:4,22,25 | **looks** 150:6 | 309:14 |
| 196:2 198:19 | 232:9 238:18 | 172:6 208:5 | **loyalty** 204:19 |
| 199:6 204:19 | 245:18 273:17 | 267:10,14,16 | **lunch** 114:10 |
| 207:22 208:9 | 273:17,18 | 267:18,24 | 114:15 115:12 |
| 217:7 223:20 | 274:9,10 | 268:4,8,11,15 | |
| 223:21 231:5 | 275:18,25 | 268:19 269:5,9 | **m** |
| 233:11,17 | 299:16 309:13 | 269:13,17,18 | **ma** 2:9 |
| 235:12,24 | **looking** 11:24 | 269:20 278:2 | **made** 24:10 |
| 236:10 240:4 | 29:5,9 44:16 | 294:24 305:22 | 41:13 45:14 |
| 241:20 244:14 | 45:2 46:19,20 | **losing** 255:19 | 77:5 122:23 |
| 249:13 251:12 | 53:15 71:19 | 259:21 | 141:18 151:18 |
| 252:6,8 257:10 | 72:12 73:19 | **lot** 6:6 32:3 | 164:6 169:6 |
| 267:23 268:3,7 | 80:12 83:16 | 38:3 44:15,20 | 192:12,22,24 |
| 268:21 270:10 | 87:3 88:24,25 | 46:24 67:10,15 | 194:10 204:3 |
| 271:4 272:21 | 93:9,16,17 | 73:15 74:22 | 211:12 228:8,8 |
| 279:7,10,21 | 94:2 99:20 | 75:16,23 76:3 | 228:9,13,21,22 |
| 280:8,22,23,25 | 105:15 107:24 | 81:16,16 83:16 | 228:24 229:2,3 |
| | | | 229:7,9 230:6 |

[made - matter]                                                    Page 41

230:8 298:2
313:18 317:5
**magazine's**
23:21
**magnitude**
120:16,17
**mail** 17:17
**main** 28:21,21
296:8,11
**maintain**
130:10
**maintaining**
224:12
**maintains**
132:9
**major** 143:16
144:17 173:22
**majority** 56:13
80:10 93:21
144:17 197:12
207:8 229:20
276:24
**make** 12:11
28:19 32:17
42:17,25 48:24
48:25 51:16
61:13 64:18
70:17 73:14
79:23 81:17
83:24 85:10
88:12 89:6
91:25 93:17
101:9 103:4
105:17 106:22
109:21 117:25

119:23 125:23
125:24 127:9
127:19 130:11
138:6,10
139:10,11
146:4 154:20
157:14 158:2
171:15 172:17
184:14 190:3
199:22 211:21
222:23 223:2
227:12,12
229:24 237:21
270:15 277:13
293:18
**makes** 70:17,20
107:2,3 223:14
226:19
**making** 42:6
45:23 51:9
73:20 74:9,18
76:6 83:23
84:11,22
109:22 162:9
204:21 262:4
293:20 302:17
306:3
**managed** 28:2
131:3 301:24
302:13 303:22
306:13 308:12
**management**
33:21,25
**manager** 52:14
68:9,19 83:14

94:14,15,15
96:5,6,6,8,9,10
96:11 105:9
106:8,9 107:3
107:4,4,11,14
108:25 109:15
135:9 252:11
252:14,19
253:2,7 254:2
**manager's**
180:18
**managers**
33:24 68:19
93:3,6 94:2,6,7
94:17,19 95:14
95:25 96:4
108:24 271:20
271:21,21
**managing**
53:25
**mandate** 132:4
186:13 187:3
**mandated**
176:9
**manner** 209:18
**march** 254:11
290:4
**marconi** 21:20
**maria** 2:11
39:12 171:23
241:21 257:11
264:11 265:12
270:11,18
281:24 288:7
290:8 292:13

299:3 307:17
**maria.decastro**
2:11
**mark** 39:12,23
**marked** 39:22
**market** 88:22
100:6,8,8,9,10
100:13 176:15
247:14 249:22
255:20
**marketplace**
91:19
**markets** 103:9
103:9,11
**markoff** 143:22
**married** 21:22
**mary** 1:6 4:7
316:4 317:1
**matched** 167:7
**materials** 40:4
149:16,17
150:2 167:20
216:12,14
275:21 276:2
277:21
**mathematical**
88:8
**mathematics**
86:20
**matter** 4:7 5:17
5:19 10:2,15
10:23 98:22
104:6 127:17
145:14,21,22
164:17 222:18

[matter - mid]                                                    Page 42

261:22 262:19
278:12 306:14
309:23
**mean** 8:3 18:2
21:24 43:12
45:4 47:21
48:3,21 52:23
60:13 66:4
70:8 81:19
84:23,24 85:21
107:24 116:6
120:22 121:23
138:14 145:18
157:6 173:20
178:23 180:2
181:8 189:7
193:23 207:4,7
215:22 221:10
250:19 279:20
284:10 293:9
296:24
**means** 6:25
89:10 100:5
105:14 117:22
157:7 174:23
189:13 190:6
217:3
**meant** 126:13
231:22
**measure**
106:22 302:19
**measured**
176:14 247:13
249:21

**measuring**
128:17
**meat** 44:18,25
45:10
**meatier** 219:22
**meaty** 219:8
**mechanism**
123:20
**media** 311:5
**median** 87:5,8
89:14 90:25
125:14 240:8
240:18 241:8
241:13 251:20
**meet** 87:14
181:6 283:14
**meeting** 135:20
150:7 152:21
191:2,8,13,24
194:4,4 195:25
197:5,6,12
199:8,12 200:8
200:16,21
201:18 228:23
229:6,14
241:24 257:12
257:15 264:13
264:14,24
266:12 270:17
270:20 271:4
272:6 275:20
275:23 276:3,4
314:10,12,15
314:19

**meetings**
135:18 192:7
215:16 217:21
217:23
**member** 49:18
54:5 128:25
229:16 230:3
**members** 8:18
8:22 43:24
162:22 172:12
174:19 193:14
194:14 214:16
215:11 216:4
227:4 229:18
261:6
**memory** 146:9
152:12 158:18
160:24 199:7
**mention** 145:4
183:10,13,16
239:14
**mentioned** 9:22
25:11 53:18
76:9,20 77:2
77:20 85:13
93:18 97:19,19
101:4 107:17
112:5 138:13
154:3 160:19
166:2 169:5,11
172:9 220:11
**menu** 28:21
**mercer** 289:15
289:17

**mess** 33:5
171:2
**met** 141:10,12
146:17
**metal** 100:12
**methodology**
94:12
**metric** 66:3
106:12 111:5
121:9 122:12
188:10 190:18
299:24
**metrics** 64:13
64:16,18,21,24
65:2,21,24
66:19,22 67:2
67:18 68:2
69:13,16 70:11
71:13,16 74:17
75:6,14 76:9
76:10 77:22
106:7,11,16,22
107:17 109:4
109:24 121:4
121:17 122:18
144:4,5,6,7,13
164:15 188:4
190:21 251:10
251:12,15,17
**metropolitan**
308:20
**mid** 25:4 52:13
52:23 242:11
306:6

midatlantic
316:15
middle 201:24
249:19 265:23
miller 2:2
13:20 15:12
29:15,18 37:18
37:20,23
millershah.com
2:5 316:2
million 38:17
62:14,14,23
63:5 64:3
87:18,20
133:21 134:4
259:23
mills 29:20
mimicking
303:10,11
mind 52:12
70:6 97:6
99:23 103:3
111:12 148:22
155:7 165:18
194:22 218:15
234:12 236:7
mine 38:25
55:23 141:23
mineola 312:2
minimum 39:4
minneapolis
282:25 283:13
minor 207:12
minute 172:3
192:16 193:21

195:25 199:5
211:19 221:3
281:7
minutes 12:8
44:21 97:19
114:9 127:5
152:21 153:12
153:12 191:2,8
191:13,25
192:4 193:3,9
193:15,19
194:7,16,20,23
195:9,12,14,18
196:21,22,22
197:3,6,13
198:4,6,13,15
199:2,8,12,18
199:23 200:9
201:17,22
206:6 228:23
229:6,14
230:18 241:22
241:24 256:9
257:8,9,12,15
258:16 259:5
264:11,13,14
270:17,20
271:5 272:6,15
273:24,25
275:21,23
276:5 306:21
314:10,13,15
314:19
minutia 88:13

miscommuni...
47:20
misread 250:13
misreading
188:14
missed 19:13
133:25 220:18
220:25
missing 197:23
198:13 222:3
236:23 274:19
285:21
misspeaking
196:14
misspoke 231:7
244:5
misstates
157:18 166:24
misunderstan...
215:17
mix 59:24 72:6
90:10,11 153:9
166:17,20
mixed 31:18
modified 200:2
molina 29:20
moment 27:7
35:12 36:12
37:4,9 54:6
67:2,24 70:6
78:23 79:21
143:23 205:6
234:13 256:17
275:25 293:3,7

money 23:21
52:14 98:21,25
99:5,6 101:7
101:12,14
207:19 275:16
293:21
monitor 139:20
145:21 147:12
151:6,13 153:4
153:23 175:16
177:20 178:2
181:16 186:4
186:25 200:10
200:17 201:4
201:21 202:8
202:12 203:3
203:10,11,12
203:14,21,23
204:10,15
206:2,10,11
217:4 222:18
239:13 241:10
242:8 243:7,9
243:10 251:22
252:15 253:3
253:21 257:20
258:8
monitored
27:23 175:23
195:7
monitoring
23:8 28:18
34:7,12 36:2
51:11,20 53:7
63:19 77:14

**[monitoring - new]**

82:11 105:2
106:17 122:22
132:9 142:6
153:21 154:5
159:23 160:20
183:23 201:14
219:5 220:9
225:8,13 237:8
239:16 244:9
244:13 245:22
246:14 257:4
258:6,8,17,19
258:22
**monte**  80:19
82:16 85:13,19
86:8 112:20,22
**month**  23:22
26:20 150:10
150:17 152:15
152:17 244:20
**monthly**  16:23
**months**  5:25
6:2,2 64:7
**morgan**  2:7
96:5
**morganlewis....**
2:10,11
**morning**  4:2
143:21 198:10
277:22
**motivational**
262:21
**move**  33:2
127:23 182:19

**moved**  97:3
**moving**  157:14
**multiple**
141:13 209:25
214:2 235:13
**mutual**  36:15
36:22
**myriad**  263:8

**n**

**n**  2:2 5:6,6
21:21 115:2,2
115:2,4,4
**name**  4:14 5:15
21:19,22 24:24
35:18 37:24
38:4 95:22
143:23 160:3
283:2 287:9
312:4,5
**named**  81:7
313:8,12
**names**  8:16
11:6 20:13,15
20:17 34:2
35:21 58:17
**narrow**  24:21
91:23
**natixis**  31:16
33:6,7,20,22
34:4,5 36:22
**nature**  25:20
187:13
**near**  215:3
**nearly**  258:13

**necessarily**
17:7 38:14
44:15 63:15
67:12,15 73:23
109:24 121:19
124:3 129:12
135:25 145:23
169:2 179:11
188:10 190:3
208:25 212:16
229:17 236:17
238:25 249:12
299:21
**necessary**
51:12 52:16
70:24 191:23
225:23 317:6
**necessitate**
287:14
**necessitated**
287:16
**need**  6:10 63:15
63:16 75:22
76:12 84:4,7
84:21 101:8
103:18 104:7,8
104:15 110:20
127:5,7 129:6
129:8,11 135:7
139:10 157:8
166:20 170:24
178:16 206:2
218:16 223:3
236:9 272:24
306:19,21

**needed**  46:18
86:25 87:14
127:15 162:8
168:15 194:10
199:17 213:18
**needs**  83:2
109:19 117:21
126:21 157:8
178:17 181:6
199:22 221:24
230:5,7 280:17
**negative**  87:7
240:8,19 241:8
243:14 244:10
256:5
**negotiated**
309:14
**neighbor**  57:25
**neighborhood**
18:19 80:17
134:11
**neither**  217:12
**net**  54:19 55:6
55:7,18 56:5
269:23
**never**  76:4
141:10 145:9
145:11 160:6
172:16 183:22
183:25 194:22
206:18 210:21
255:22 281:23
283:12
**new**  1:19 55:24
149:7 160:2

**[new - offered]**                                                    Page 45

166:2 215:22
231:9 312:2
313:2,4,6
**nfp**  30:15 35:15
35:17
**nice**  275:7
**night**  75:16
**nine**  301:18
**noise**  303:8
304:11 306:10
**noncompliance**
161:23
**noncompliant**
232:24 233:6
**normal**  41:21
43:14 63:17
156:20
**north**  38:16
62:24 63:2,5
**notary**  1:18 5:7
312:25 313:6
317:13,19
**note**  199:16
271:25 293:18
316:10
**noted**  202:4,23
311:12 317:7
**notes**  95:13
306:22
**notice**  1:17
149:21
**november**  1:12
4:12 289:18
311:8 316:3

**number**  4:9
15:24 16:5
18:4,5 19:9
33:25 38:14
39:2 42:22
47:3 52:24
53:2 62:23
67:2 69:15
72:8 74:25
87:23 88:11
92:22 95:12
96:2 106:3
110:15 119:4,6
119:7,10,13,18
120:15,18
130:7 154:15
169:16 171:11
175:4 195:13
195:15 201:19
204:2 207:10
211:25 216:23
223:13 225:4
238:14 249:8
249:10 263:9
278:10 285:11
297:17 311:5
**numbers**  89:23
90:9 110:12
116:6 118:8
156:8 207:10
215:6 306:11

**o**

**o**  5:6,6 21:21
115:2,2,2,4,4

**oath**  3:13 5:2
6:25
**objection**  74:13
74:20 122:14
128:6 139:21
155:19 157:17
163:20 166:23
180:11 212:10
219:23 227:25
287:24 291:2
**objections**  3:7
**objective**  178:9
180:18 181:3
275:14
**objectively**
122:9
**objectives**  78:6
78:24 88:16
174:7,8 175:9
178:22,24
179:4,8,11,13
179:20,21
180:4,7,24
181:5 182:2,15
185:5,14,15,19
274:24 275:3
275:15
**obligation**  7:2
60:21 208:23
209:5 283:20
284:3 290:24
297:10
**obligations**
141:6 285:6
286:22

**obligatory**
174:17,18
**obnoxious**  12:6
**observation**
191:17,20
**obtain**  225:22
**obviously**
21:11 25:22
38:6 43:10
57:24 59:8
68:4 69:20
70:13,18 71:10
73:16 74:23
77:5 85:9 89:5
104:7 116:20
122:23 125:22
126:21 130:23
137:15 148:3
157:25 174:24
188:15 262:8
264:2
**occasionally**
283:12
**occasions**  218:7
**occurred**  202:5
202:25
**ocio**  27:7
**offer**  51:6
76:22 85:5
**offered**  52:24
72:22 74:11,19
77:6 106:17
149:9 286:5
289:10 292:7,9
294:6 296:15

296:18 297:14
297:16 298:17
**offering** 30:11
155:2 289:6
290:2
**offers** 285:15
**offhand** 193:25
**office** 94:9
283:13
**officer** 3:12
**offices** 4:17
141:13
**officially** 53:22
120:2
**oh** 170:23
307:23
**oil** 27:2,18
**okay** 12:4
14:21 18:21
31:22 33:15
34:10,19 40:9
42:21 43:17
47:18 48:11,17
56:22 80:24
82:5 87:16
89:3 93:16
94:5 97:21
101:23 105:4
110:23 111:23
113:25,25
114:2 116:11
119:7 120:11
120:20 127:10
127:11 131:13
142:3,24

145:10 146:23
147:8 155:22
159:6 164:9,11
164:13 166:18
174:3 175:11
179:17 180:2
181:22 182:22
183:19,21
185:23,25
187:22 188:25
189:2 190:24
195:19 197:8
199:15 200:4,6
203:25 204:22
215:25 216:10
224:7 225:6
228:10 229:8
232:20 237:5
237:16,19
239:10 240:5
240:14 241:6
241:25 242:14
243:12,24
244:8 245:14
245:19 246:23
247:10 249:13
249:17 250:14
257:18 258:2,3
260:13 265:18
266:16,18,25
269:4 271:9,9
271:12 275:20
276:9 280:10
281:9 282:7
285:21,24,25

288:11,14
289:4 291:19
291:21 292:3
292:16 293:3
294:2,4 299:14
300:7 301:8
307:16,24
308:15,23
310:12
**old** 89:20 210:8
312:2
**onboard** 54:18
**onboarded**
59:11 214:12
214:16 215:11
215:20
**onboarding**
59:7 214:19
215:7,15
218:18
**once** 59:10
97:10 186:3
**ones** 25:14 51:8
66:7 69:17
70:5 93:4
94:21 95:3,7,9
96:13 99:17
102:21,24
141:14 167:17
198:20 212:16
238:2 262:3
284:4
**ongoing** 27:20
31:25 36:5
43:21 61:16

62:2 71:15
73:11
**open** 34:18
172:25 241:25
271:9 291:13
292:17
**opening** 39:19
282:4
**operate** 34:2
125:20 227:23
228:7
**operated**
162:16 226:4
**operating**
51:24 54:16
162:14 263:22
**operation**
173:5
**operational**
83:16 94:9
105:14
**operative**
172:10,11,14
172:15,19
**opine** 28:6,14
173:24 208:17
270:22
**opined** 20:10
21:2 27:12
28:15,23,24
30:7 32:15
**opining** 22:3,15
260:6
**opinion** 11:4
14:11,11 23:9

[opinion - page]                                                    Page 47

31:7 32:10
33:8 34:11,21
35:24 36:8
37:11 40:11,16
41:8 42:19
45:6 145:13
149:15 150:10
150:22 152:8
155:3,6,15
156:14,22
157:15 158:2
158:24 159:21
166:18 167:3
167:20 168:12
169:9,19 171:5
190:25 191:12
191:15 199:11
204:14,17
208:22 237:12
242:21 248:21
251:14 260:21
**opinions**  78:10
**opportunities**
175:19
**opportunity**
156:6,9 157:22
173:8
**oppose**  28:12
**opposed**  30:11
46:4 47:15
98:12 99:11
100:18 108:21
112:3 125:2
163:19 164:16
165:17 192:9

219:6 246:10
262:4 274:18
**opposite**
163:16
**option**  111:7
120:3 156:17
177:19 178:2
178:12 186:3
**options**  51:7,9
51:17,21 52:19
52:21,24,25
53:7 74:11,19
105:3 145:16
145:21 156:19
175:24 177:21
182:5,23
224:16,20
225:9,14 266:2
308:14,16,25
309:2,5
**order**  41:8 49:8
93:14 123:10
230:3
**ordering**  5:9
**organization**
21:10 53:22
94:11 105:10
**original**  34:2
125:4
**ought**  109:25
118:13 120:13
120:24,25
211:7 257:7
**outcome**  87:10
126:3 260:6

304:19 313:21
**outcomes**
121:25 130:23
**outliers**  87:6
**outperform**
185:6,20
276:13 277:15
279:5
**outperformed**
128:3,18
**outside**  28:21
52:8 140:12
187:8 252:4
**overall**  30:14
51:13 105:10
123:15 154:23
217:15 255:20
258:10
**overhaul**
254:25 256:11
256:15 257:4
**oversee**  60:20
**overseeing**
139:10
**oversight**  99:7
**overview**  265:2
**own**  10:23
27:16 30:11,17
33:25 56:7,9
164:16 233:17
273:22,24
**owned**  54:12
55:17 56:6
**owner**  56:13

**ownership**
55:17

**p**

**p**  2:2,2
**p.m.**  1:12 4:13
12:14,18 50:8
50:12 69:6
114:14,15
115:3,9 148:18
311:9,12
**pa**  2:4
**packaging**
131:16,19
295:8 296:5,14
307:7,9
**packing**  132:14
**page**  34:20
41:5,24 43:23
147:6 160:25
173:25 175:2,6
177:12,15,16
178:8,14,21
181:12,19,20
181:23,24
182:7,20,21
185:4 187:22
190:22 216:23
217:17 218:13
224:6 225:3,7
225:21 231:16
232:14,16,18
232:19 233:11
234:2 236:25
237:4,15 239:8
239:9 240:25

[page - particular]                                              Page 48

| | | | |
|---|---|---|---|
| 241:2,4 242:9 | **paper**  219:10 | 53:21 61:15 | 274:14,21 |
| 242:10,10 | 219:17 | 71:14 72:5 | 275:12 309:3 |
| 245:15 247:5 | **para**  140:17 | 73:10 75:4 | **particular**  8:8 |
| 249:15,17,19 | **paragraph** | 81:25 85:9 | 13:22,24 14:10 |
| 252:9 257:25 | 29:6,10 53:16 | 91:14 93:13 | 28:8,17,25,25 |
| 258:2 264:21 | 60:24 146:11 | 110:6,7 124:17 | 32:23 35:9 |
| 264:22 266:13 | 147:6,8 151:4 | 133:25 137:24 | 43:19 46:22 |
| 266:24 267:5 | 174:4 176:21 | 139:15 156:20 | 48:5,5,6 50:20 |
| 267:10,14,15 | 178:8 185:11 | 161:23 164:24 | 52:17,19 61:22 |
| 267:18,23 | 186:2 187:19 | 173:9,14,16 | 61:25 73:19 |
| 268:3,7,11,15 | 187:20,23 | 174:24 192:3 | 77:11 78:9 |
| 268:20 269:2,2 | 200:4 201:25 | 196:6 206:16 | 79:3,4,25,25 |
| 269:5,9,13,17 | 201:25 216:8 | 211:5 220:18 | 81:8 82:22 |
| 271:10 277:7 | 223:18,19,20 | 222:20 231:16 | 84:15 87:11,13 |
| 282:6,16,22 | 223:22 232:17 | 249:8 250:24 | 90:11 93:14,17 |
| 285:19,23,25 | 232:19 233:4 | 257:21 258:10 | 105:21 107:3 |
| 288:14,18,21 | 233:23,25 | 263:9 276:4 | 108:25 113:20 |
| 288:22,22 | 234:3,4 237:24 | 284:18 297:21 | 121:13 126:22 |
| 289:2 291:18 | 239:9 240:11 | **participant** | 135:8 137:2,10 |
| 291:21 292:3,5 | 240:13 243:12 | 87:12,13,13 | 146:7 154:21 |
| 292:24 294:3 | 244:2 245:12 | 89:3,6,17,18,19 | 154:25 158:12 |
| 300:14 308:18 | 254:8 255:22 | 89:21 90:5,25 | 168:20 169:3 |
| 310:13 312:6 | 260:11,23 | 90:25 224:22 | 183:11 184:19 |
| 314:3 315:3 | 261:5,6 265:17 | 272:23 | 191:16 194:7,7 |
| **pager**  214:24 | 265:23 270:7 | **participants** | 194:19 196:17 |
| 217:25 219:16 | 270:22 276:7 | 32:7 79:14,16 | 197:9 198:22 |
| 219:22 | 286:14 308:18 | 80:4,16 87:23 | 214:6 223:9,11 |
| **pages**  40:6 41:4 | **paragraphs** | 97:24 98:20 | 226:22 228:11 |
| 42:5,8,13 | 243:20 246:16 | 99:3 101:7 | 234:7 257:8 |
| 144:9 224:25 | 247:4 | 102:5 103:23 | 259:9 260:6 |
| 232:19 233:10 | **parallel**  54:25 | 130:24 138:12 | 264:4 272:12 |
| 268:19 269:18 | 55:23,24 | 204:20 207:11 | 280:9 284:18 |
| **paid**  30:19 | **parlance**  33:23 | 219:6 259:23 | 287:8 293:17 |
| 308:11 309:9 | **part**  9:20 11:4 | 272:13,18,23 | 293:22 294:13 |
| | 42:9 43:20 | 273:7,9 274:7 | 294:23 300:10 |

| | | | |
|---|---|---|---|
| 301:6 304:7 | **path** 35:20 | 294:21 295:3 | 66:8,10 71:12 |
| 309:7 | 70:14,15,19 | 297:19 | 75:14,18 78:16 |
| **particularly** | 71:24 100:22 | **pavilion's** | 80:8,9 81:8,9 |
| 117:16 118:8 | 103:5,14 255:5 | 293:12 | 98:17,24 |
| 160:24 184:21 | 258:9,20 259:3 | **pay** 140:18 | 101:12,12,14 |
| 226:8,14 | 266:4,15,16,23 | **paying** 204:8 | 101:17 109:25 |
| **parties** 3:4 82:4 | 267:2,11,15,16 | **payroll** 140:5 | 110:25 130:12 |
| **partner** 20:22 | 271:17,18 | 289:24 | 135:3,4,19,23 |
| 21:18,23,25 | 272:20 | **pdf** 285:11 | 135:25 136:2 |
| 53:18,21,25 | **paths** 102:13 | 288:18,23 | 136:20,21 |
| 54:18 55:18 | 102:14 266:21 | 291:18,19 | 138:15,16,18 |
| 59:9 305:5 | **pattern** 116:17 | 292:25 299:15 | 138:21,21 |
| **parts** 44:20 | 189:25 262:13 | **pedal** 100:12 | 139:13 140:19 |
| 158:12 174:17 | 264:9 | **peer** 107:18 | 207:16,18 |
| 174:17 187:15 | **pavilion** 55:3 | 109:7 112:18 | 209:25 214:25 |
| **pass** 162:21 | 56:4 95:15,18 | 113:4,20 120:8 | 216:6 218:16 |
| 236:4 239:15 | 129:22,25 | 121:3 123:24 | 253:17 255:7 |
| 239:19 | 130:4,11,25 | 144:22 156:25 | 274:17 275:15 |
| **passed** 97:18 | 131:5,7 132:15 | 176:5,10,16 | 283:14 284:5,8 |
| 227:19 | 132:16,22,24 | 183:18 205:16 | 287:2 288:3 |
| **passing** 252:12 | 134:19 136:15 | 205:22,25 | 294:24 305:10 |
| 252:20 | 136:23 141:3 | 206:3 210:5 | **percent** 23:25 |
| **passive** 96:7,8 | 141:12,25 | 240:8,18 241:8 | 24:2 55:17 |
| 96:9,10 271:22 | 142:2,15,18 | 241:13 247:14 | 56:6,7,9 80:7 |
| 302:6,11,12 | 143:2 145:6 | 248:9,11,24 | 80:10,18 87:15 |
| 303:9 305:16 | 211:18 221:7 | 249:23 251:20 | 89:17,25 90:6 |
| 305:20,24 | 281:18 282:19 | 278:4,7 | 90:7 101:22,23 |
| 306:12 | 283:8,16 284:2 | **peers** 70:3 | 102:4 126:11 |
| **passively** | 284:22 285:2,5 | 108:4,5,7,9,23 | 126:19 128:3 |
| 301:23 | 286:12,21 | 213:25 247:24 | 128:18,22 |
| **past** 10:4,5 | 288:19,24 | **pending** 6:13 | 129:7 255:10 |
| 98:8 109:14 | 289:13,17 | **pennsylvania** | 258:11,12 |
| 137:20 167:5 | 290:15,23 | 4:18 | 298:10 |
| 170:11 235:7 | 291:23 292:25 | **people** 30:16 | **percentage** |
| | 293:17 294:8 | 46:22 51:2 | 80:3,11 207:7 |

[percentage - pick]                                    Page 50

| | | | |
|---|---|---|---|
| 207:8 267:19 | 278:2 279:7,11 | 215:20 217:16 | **permutations** |
| 280:21 | 279:13,17 | 227:11 232:8 | 86:11,21 |
| **perfect**  125:21 | 281:2 286:13 | 238:3 243:15 | **persistent** |
| **perfectly**  192:2 | 294:9 299:17 | 244:7,11,17 | 276:12 |
| **perform**  123:3 | 304:3,6 | 245:3,4 246:3 | **person**  11:16 |
| **performance** | **performed** | 246:18 247:6 | 23:20 44:17 |
| 24:5 53:7 | 24:12 279:25 | 247:16,23 | 58:7 75:2 |
| 67:18 68:5,5 | **period**  19:10 | 248:5,17 | 86:19 90:24 |
| 108:11 109:6,6 | 25:10 56:23 | 249:25 250:5 | 140:24,25 |
| 112:13,14,17 | 57:11 59:4 | 255:16,19 | 142:8 215:22 |
| 114:6 120:6,7 | 61:4,7 73:5 | 258:17 276:23 | 220:4 253:20 |
| 122:22 123:6 | 81:18 86:19 | 277:19 278:21 | 253:20 |
| 123:10,17,25 | 96:25 97:6,25 | 279:3,12 280:6 | **personal**  137:5 |
| 124:20,21 | 100:15 109:5 | 281:3 282:13 | **personally** |
| 126:7,10,25,25 | 116:5,10 123:8 | 286:18 289:5 | 40:19 44:6 |
| 139:20 144:24 | 128:2 129:20 | 289:16,25 | 47:7,24 58:14 |
| 144:25 154:15 | 134:22 146:5,5 | 290:2 291:14 | 58:21 116:21 |
| 161:12 163:18 | 146:18,19,22 | 292:21 296:3 | 130:9 133:13 |
| 169:25 170:16 | 146:23 147:23 | 298:7 299:18 | 136:12 295:24 |
| 175:12,17 | 147:25 148:6,7 | 301:17 305:2 | **perspective** |
| 176:2,8,9,14 | 148:9 149:4,13 | 308:3,4 309:16 | 91:25 149:10 |
| 179:23 183:5 | 149:22 151:2,8 | 313:19 | **philadelphia** |
| 183:10,13,16 | 151:20,21,24 | **periodic**  73:22 | 2:4 4:17 |
| 183:17,24 | 155:6,14,23,25 | **periodically** | **philosophies** |
| 185:4,12 188:3 | 156:3 157:16 | 69:23 71:6,11 | 78:24 |
| 201:12 202:14 | 157:21 158:5 | 211:8 | **philosophy** |
| 203:4 204:16 | 161:22,25 | **periods**  114:5 | 78:9 137:6 |
| 205:22,25 | 168:20 170:18 | 159:18 176:18 | 271:17 |
| 206:3,9 225:8 | 171:7 185:7 | 176:18 189:4 | **phone**  17:13,15 |
| 242:16 247:12 | 189:13 190:6 | 235:13 247:24 | 17:18,24 18:14 |
| 247:22 248:8 | 199:6 200:24 | 249:25 258:23 | **pick**  26:12 |
| 248:10,15,23 | 201:14 204:24 | 258:25 279:18 | 48:16 101:3 |
| 249:18,21 | 205:17 206:17 | **permitted** | 138:19 139:2 |
| 251:20 257:22 | 210:10 214:13 | 240:7,18 | 159:13 |
| 276:19 277:16 | 214:17 215:12 | | |

**picked** 54:15
**picking** 141:21
**picture** 100:3
**piece** 92:12
  219:17
**pieces** 221:16
**place** 52:20
  92:3 106:9
  109:16 146:8
  149:6 153:9,23
  154:18 177:19
  177:25 196:18
  221:7 234:24
  238:3 242:8
  262:20 288:4
  298:5 313:12
**placed** 116:13
  243:6,9,10
  246:10
**placement**
  115:22
**places** 249:4
**placing** 181:16
  251:22
**plaintiff** 31:7
  34:21 36:16
**plaintiffs** 1:7
  2:3 4:8 10:19
  10:21 17:12
  22:11 26:19,25
  29:23,24 31:9
  32:5 33:8,10
  34:24 36:18
**plan** 23:4,25
  49:9,19 51:10

53:17 54:24
55:19 56:3
57:4,16,23
59:16 60:4
73:8,19,22
74:11,19 76:25
78:15,17 79:5
79:7,8 80:2,12
80:19 81:8,11
81:14,24 82:13
83:12 88:16
89:10 90:3
99:5,6 101:7
101:13,14
103:25 104:13
104:14,17
106:17 110:6,7
122:13 131:11
131:17,18,20
132:8,8 133:19
136:14 138:17
139:11,13
140:4,18,21,25
156:20 158:10
167:4,5,13
168:9 171:7
174:5 179:14
180:25 185:5
188:2,3 189:10
204:19 206:21
207:9,21
221:20 223:25
224:16 225:18
232:25 233:7
239:11 255:25

257:5 261:15
265:20 273:7
273:13,15,22
274:4,14,20,24
275:11,14
282:10 285:15
286:5,16 287:7
287:15,22
289:6,10 290:2
290:23 292:7
292:10,19
293:21,23
294:6,23,25
296:8,11,22
297:14,18
302:4 309:2,10
**plan's** 174:7
  175:17,23
  185:15,18
  206:25 216:13
  232:22,24
  256:2,5 274:24
  275:3,4 291:24
**planned** 85:5
**plans** 22:22
  55:8 61:22
  63:23 78:22,25
  79:18 82:24
  101:10 121:16
  134:4 140:7
  143:4 263:13
  273:10,24
**platforms**
  66:16

**plausible**
  205:24
**play** 79:22
  81:20 82:10
  106:4,23 107:6
**played** 295:3
**please** 5:3 6:11
  39:13 128:8
  187:21 236:10
  257:13 264:11
  307:18
**pleased** 271:24
**plug** 89:2,22,22
**plus** 104:12
**point** 8:7 14:15
  18:20 21:8
  22:8 25:3
  27:20 32:23
  38:24 47:11
  52:23 53:8
  54:4,4 56:2,10
  58:20 59:8
  62:4,21 83:4
  83:20,21 88:25
  95:6 96:24
  97:4 98:15,17
  101:20 111:22
  117:6 118:17
  118:21 119:11
  119:15 120:9
  120:23 121:3
  121:25 123:19
  127:13 133:8
  134:5 135:3
  149:8,12

150:13 162:17
163:8,9 166:16
167:2,18 168:3
168:5,24 170:9
170:19 171:20
184:19 186:25
189:24 196:18
202:25 203:9
203:18 204:6
204:12 218:14
219:10 223:12
223:16 224:15
225:16 236:5
241:6,11,14
243:2,4 244:8
247:11 248:7
258:20 259:2
262:24 263:15
264:25 265:16
271:18 274:12
284:24 288:5
295:21 301:6,9
301:10 309:7
**pointed**   214:25
217:17
**points**   163:11
190:2 218:24
218:25 220:2,6
220:8
**policy**   7:21
109:20,21,23
110:5,9,10
111:9 223:7
224:3

**pool**   138:25
**poor**   204:16
**populate**   15:3
**portfolio**
306:13
**portion**   14:3
69:10 128:15
148:24 177:9
**position**   24:11
24:18 218:11
**positive**   87:7
**possible**   11:23
86:3,10 88:9
112:25 113:2
117:15 121:17
127:11 128:24
197:18
**possibly**   66:3
138:11
**post**   279:25
299:20
**potential**   102:3
183:23,23
**potentially**
123:14 169:17
169:21 226:14
236:15
**practice**   210:9
227:9,10 228:5
**preceding**
254:17
**precisely**   27:13
**prefer**   66:9
229:11

**preference**
221:21
**preferred**
68:10 93:3,19
93:23 209:4,9
**preliminaries**
6:7
**preliminary**
44:23
**preparation**
8:14,19 9:4,8
9:16,21 17:6,8
44:4 46:8
197:3
**prepare**   7:10
7:18 135:5
277:10,11
**prepared**   7:15
261:13
**preparing**
13:15 16:21
17:25 44:6
184:13 224:12
234:9 254:20
**present**   2:14
67:20 104:22
146:25 249:5
272:7
**presentation**
219:14
**presentations**
71:17
**presented**
67:17,19
104:25 141:17

**preference**
200:21 216:15
216:22 217:20
218:5,6 260:18
260:22 266:12
270:25 276:3
**president**   23:5
53:24 54:3
**presumed**   8:24
**pretty**   64:16,23
65:17 75:24
101:23 102:15
144:18 145:3
173:12 187:12
192:22,23
217:9,14 219:8
235:8 280:5
298:11 299:2
306:8
**prevalent**
52:13
**previous**   178:7
181:19,20,23
292:3
**previously**
115:5
**price**   90:13
92:17 96:5
**pricing**   99:8
**primarily**   68:8
142:9 143:2
**primary**   27:10
**principal**   70:5
**printed**   11:17
**printing**   144:8

**prior** 13:2,5,7
  13:10,12 18:22
  19:20 49:4,8
  49:10 53:10
  96:25 153:10
  153:10,14
  155:5,13
  157:16 216:15
  217:16 218:9
  235:21 237:23
  238:17,19
  242:21 259:4
  295:24 304:20
  313:8
**private** 39:6
**privileged**
  32:24
**proactive** 264:3
**proactively**
  264:5
**probability**
  79:24 90:23
**probably** 7:23
  9:12 13:4 14:6
  15:20 18:17,17
  21:17 22:6
  25:7 29:4 51:5
  57:5 59:2,4
  62:14,22 63:3
  63:3,4 65:25
  66:22 67:22,24
  69:16 72:9
  80:10,16 87:9
  90:2 92:21,24
  93:7,12 96:12

97:5,22 98:5
98:11 99:16
102:8 103:10
109:13 113:8,8
114:11 118:6
119:16 120:10
124:9 129:3
131:3 133:15
133:20,20,21
133:22 134:6
134:10 135:3
136:8 144:16
148:4 179:13
180:19 193:10
216:21 217:10
236:23 250:13
252:7 255:5,11
274:6 278:10
284:20 294:22
295:18 305:2
305:14
**problem** 31:14
  48:10 97:8
  117:22 124:4
  124:12,15
  137:23 161:14
  164:25 170:24
  173:23 192:19
  194:17
**problems**
  110:25 138:9
**procedures**
  225:12
**proceed** 39:25

**proceeding**
  4:23 311:4
**proceedings**
  313:15
**process** 14:6,14
  17:24 18:14
  22:4,15 23:2,7
  23:16 24:8,14
  24:17 26:3
  28:7,11,14
  32:11,13,14,15
  32:18,19 34:7
  34:11 35:25
  36:9 37:11,16
  41:20 45:23
  48:14 52:20
  53:4 59:6,12
  59:14,21,23
  75:4 76:4,5
  77:13,14,23
  78:11,14,18
  91:14 93:13
  103:16,17,18
  104:18 121:23
  121:24 126:3
  135:11 136:6
  137:4 138:2,5
  138:9 139:8
  141:16,21
  147:12,23
  150:23 151:13
  151:19 153:4
  153:22 155:21
  156:21 158:12
  159:2 161:8

164:12 165:4
166:21 168:6
168:17 169:2,9
169:10 170:25
174:8,16
185:24 197:21
209:14 210:2,9
211:9,14,23
212:14,25
213:4,6,7,8,10
213:12,19,20
213:23 214:8
214:19 227:13
228:25 240:17
240:25 251:19
297:25 304:16
**processes** 60:2
  83:17 94:10
  105:14 139:4
  151:6 175:10
  217:7
**produce** 143:21
**produced**
  143:20
**product** 27:10
  68:17,18 72:17
  109:2
**products** 72:14
  93:12 131:3
  142:11
**profiles** 224:22
**profit** 23:4,24
  292:19
**program** 88:15
  91:8 92:16,19

112:6,16

**project** 61:14
61:19,24 79:24
80:19,23 265:4

**projected**
99:23

**projecting**
113:17

**projects** 61:20
88:9 296:9

**promoting**
130:23 174:8

**pronouns**
180:21

**proprietary**
27:10 30:5,22
52:25

**protecting**
100:7

**provide** 19:17
19:19 25:17
29:22 31:6
32:10 34:21
36:16 41:7,14
43:13,18 60:4
63:9,12,18
64:14 71:6,17
71:21,23 72:9
72:13,18,23
73:11,13 74:4
109:4,8 138:3
169:2 174:5
214:8 224:20
225:5 263:7,9

**provided** 10:6
10:9 14:22
19:14,24 27:9
29:12 30:23
31:3 33:8
37:10 41:17
54:7,12 55:16
61:9,16 62:9
63:8,13 74:7
76:20,21
106:16 111:5
134:15,20
160:5 195:24
208:19 211:18
214:22 216:13
219:3 252:3
263:2,15
296:25 313:18

**providers**
209:15 211:6
225:17,23
272:3

**provides**
131:24

**providing**
22:19 29:7
34:10 38:19
55:5,12,13
56:15,19 73:2
97:15 133:14
137:11 145:2
153:24 213:2
245:7 294:17
294:18,25

**proximity**
102:15

**proxy** 113:10
113:11

**prudence** 22:3
22:15 28:17
82:11 91:24
308:13

**prudency**
214:6

**prudent** 51:24
52:3,7 60:17
81:17 82:8
137:14 145:20
150:23,25
212:6 227:8,23
228:6 309:2

**prudently**
224:22

**psa** 53:10,17,25
55:11 56:8,9
56:18,19 58:4
58:21 60:16
61:9 64:11
95:15 129:19
129:21 132:22
136:11,16,23
141:24 142:12
142:18 145:5
211:18 221:6
309:16

**public** 1:18 5:7
32:23 130:17
312:25 313:6
317:19

**pull** 16:11
171:22 241:21
257:11 264:10
265:12 266:7
270:11 281:24
299:3 307:17

**punch** 274:20

**purely** 18:3

**purpose** 73:2
74:23 154:25
165:18 174:5
222:24 275:9,9

**purposes** 87:2
278:22

**pursuant** 1:17
175:19

**put** 34:4 42:23
105:24 110:14
111:7,20,25
113:15 118:2
118:12 119:21
120:2 136:3
149:7,14
169:24 170:24
187:16 203:20
229:21 259:18
288:3 299:11

**putting** 14:18
90:6 117:20
118:11 259:22

| q |
|---|

**q1** 150:7
257:12,14,17
257:18 264:12
264:16,18,19

276:23 277:3
279:6,8 300:13
301:7 314:12
314:15
**q2** 300:18
301:13 304:21
**q3** 240:20
247:8 300:2,5
300:22 301:15
**q4** 241:22,23
242:8,17,18
243:16 244:22
257:16 266:12
276:23 279:4
300:11 301:4
314:10
**qdia** 73:7
206:21,25
207:7 296:22
**qirs** 254:2
**qpa** 208:19
224:16 233:14
234:14 235:2
236:13 263:18
**qualitative**
67:25 83:18
104:21,24
106:5,19,21
107:8 188:4,12
254:8
**quality** 63:7
134:14
**quanta** 1:9
2:16 4:8 5:16
162:4 261:15

316:4 317:1
**quanta's** 161:8
**quantitative**
67:24 68:2
74:2 76:9
104:21 107:17
164:15 188:5
188:12
**quarter** 41:5
70:23 107:12
107:12 109:12
115:21,25
116:6,8,14,24
117:3,5,5
118:3,6,7
119:5,17
120:13 124:3
149:25 167:25
168:5 169:6,11
169:14 170:22
176:17 186:9
186:14,21
197:9 200:16
201:18 206:15
242:2,3 243:11
247:15 249:24
250:16,18,20
258:6 270:12
270:16 295:19
298:10 299:21
**quarter's** 260:3
**quarterly** 7:22
41:3 43:13
68:4 69:19
73:12,14 74:4

82:15,18 135:2
146:17 187:24
200:20 214:21
215:15 216:12
217:21,22
238:16 251:4,7
251:11 252:4,6
276:3 294:18
304:6
**quarters** 121:9
122:2 168:3
169:16 171:11
186:5 189:18
190:7 200:18
201:4 276:22
301:18
**quasi** 30:6
33:16
**question** 3:8
6:13,14,20,21
22:14 61:11
119:22 136:11
153:17 154:17
159:19 168:18
169:10 172:8
184:20 199:25
204:13 207:25
211:16 215:9
215:18 216:24
223:10 228:16
231:2 233:9
236:12 239:7
246:16 247:3
272:22 275:18
280:21 293:7

**questions** 41:15
41:20 76:14
77:15 82:6
112:3 126:6
155:7,22 161:4
199:24 310:9
**quick** 112:6
114:9
**quite** 15:4 22:9
104:16 106:25
111:17 138:19
139:5 143:24
178:13,18
207:16 213:23
251:6 274:5
**quote** 15:17
47:11 70:19
97:13 209:5
227:7 228:4
249:20
**quoted** 179:5
**quotes** 48:16
**quoting** 107:19

**r**

**r** 2:2 68:21
115:2 313:1
**rabbit** 125:15
**raise** 112:2
223:4 259:17
**raises** 111:22
119:21 154:17
**raising** 226:17
239:7
**ran** 49:25
54:25 55:23,24

**[ran - recall]**                                                    Page 56

56:3 97:10
148:10 168:21
239:12
**range**  62:8,15
62:23 63:23
65:14 77:7
101:21,24
102:16,18,21
133:19 134:3
134:13 137:16
137:16 138:13
**rank**  123:23
179:16
**rare**  109:15
**rate**  62:18
89:11,25 95:23
96:16 125:5,5
125:6
**rates**  79:15,17
176:15 247:13
249:22
**rather**  52:14
65:6 181:9
191:25 213:14
255:18 273:12
**ratio**  65:12
66:9,10,10,11
66:13,24 67:4
67:5 68:16,21
183:21 240:9
241:9 244:10
**rationale**
194:11 195:4
198:18 206:7

**rationalization**
192:21
**ratios**  65:12
66:12 67:12
72:2 243:14
269:19,24
**raw**  68:4
207:10
**reach**  126:14
127:2 150:24
226:15 230:4
**reached**  168:11
191:19 273:25
**read**  7:19,20,21
8:9,11,14,19
10:10,13 11:3
11:4,13 44:10
44:11,12 45:8
46:6 48:3,18
69:10 128:10
128:15 146:15
148:24 177:9
179:22 180:10
180:23 186:15
186:18 192:20
197:21,24
198:4,6,8,9,10
198:15 242:22
252:21 272:15
316:9 317:5
**reading**  11:9
45:2 148:23
179:25 180:20
237:10,14

**reads**  159:12
**real**  75:13 92:2
105:17 108:23
108:24
**realistic**  196:19
**reality**  217:2
**realize**  138:19
212:11 274:13
**realized**  184:8
**really**  12:6
16:22 75:17,22
76:5 79:4,11
81:17 94:7,14
98:2 99:4
103:7 110:20
118:6 125:9
141:10 160:7
170:24 186:23
192:23 213:13
213:14 262:9
309:5
**realtime**  108:24
**reason**  7:6
19:22 54:13
72:24 128:23
157:10,11
161:7 167:6
170:13 202:11
202:12,16
203:21 252:15
253:3,21 258:5
258:21 283:21
286:20 290:21
291:3,5 312:6
316:11

**reasonable**
23:3,24 81:15
104:10 110:13
118:10 121:15
147:12,22
151:6,13 153:3
207:24
**reasonableness**
151:19
**reasonably**
306:12
**reasoning**
272:2
**reasons**  84:13
84:15 95:12
139:7 143:4
157:9 178:10
178:16 182:3
182:15 194:25
287:18
**rebuttal**  8:11
46:20
**recall**  11:9 12:4
12:22 20:6,9
20:14 22:12,19
23:9 31:22
33:7 34:25
36:11 41:13,18
43:5,16 45:9
50:22,23 51:23
53:3,5 54:6
59:25 60:2
63:24,25 96:20
112:9 116:16
143:13 153:14

161:5 170:10
170:17 197:17
199:18 211:3
214:13 218:7
235:25 238:22
243:3,5,8
244:3,18
256:17 257:9
258:24 261:7
275:24 281:16
296:13,21
297:22 298:12
304:4,9
**receipt** 316:17
**receive** 252:12
**received** 15:17
28:4 30:16
41:25 42:3
77:3 163:23
166:12 215:14
**receiving** 251:4
251:10,13,16
253:24 254:3
262:17
**recent** 176:16
247:15 249:23
**recess** 12:16
50:10 69:4
114:15 148:19
177:4 230:21
281:12 306:25
**recognize**
193:17 276:11
283:2 287:9

**recollection**
15:16,21 16:15
29:11,16,17
35:5 37:18
42:11 60:8
96:17 166:5
198:12 220:7
237:12,22
265:8 296:17
297:13 298:16
303:25
**recommend**
93:15 95:10
98:6,12 210:17
**recommendat...**
30:21
**recommendat...**
23:22 211:21
**recommended**
93:2 297:4,6
**recommending**
27:15
**record** 4:24
5:21 12:8,11
12:15,18 28:5
39:22 50:6,9
50:12,16 69:3
69:6,10 114:12
114:14 115:9
128:15 131:15
131:22 148:15
148:18,21,24
154:19 155:12
177:3,6,9
219:20 226:8

228:14 229:25
230:5,20,23
236:8 237:21
276:5 281:11
281:14 306:24
307:3 308:12
309:10 311:11
**recorded** 4:3
65:21 311:4,6
**recorder**
150:10
**recordkeeping**
21:3,5 27:21
28:3 308:11
309:9
**recreate** 16:6
**recurred** 96:14
**recurring**
96:13
**redone** 192:17
**reduce** 309:17
**reduced** 313:13
**refer** 78:16
161:16 179:22
215:6
**reference** 47:11
111:21 169:7
180:23 231:16
238:13 242:20
**referenced**
233:9 238:11
316:6
**references**
146:4 172:17

**referencing**
100:22 238:14
**referral** 59:17
59:18
**referred** 27:8
78:22 180:17
242:3
**referring** 13:20
13:23 26:23
146:20,21
147:16,17
169:14 194:6
233:5,23
243:22 249:15
**refers** 179:13
180:14
**reflect** 199:17
228:23 229:15
229:18 230:5,7
238:20 273:25
**reflected** 42:17
199:23 201:19
238:25
**reflecting**
112:17
**refresh** 29:10
46:12 237:11
265:7 296:17
298:16
**refreshed**
237:22
**refused** 137:19
**regard** 48:14
51:13 106:4
126:6 135:13

160:12 182:11
304:6
**regarding**
219:20 232:8
254:12 304:2
**regardless**
203:19 204:11
220:3
**region**  25:5
**reimburse**
140:19
**reiterates**
221:16
**relate**  246:18
247:5
**related**  28:7
55:5 105:11
107:25
**relates**  95:17
185:15 244:2
246:3
**relating**  149:16
**relationship**
132:13,14
164:23 282:20
284:12 289:22
293:16 295:20
297:20 298:8
**relationships**
130:8,10
132:21,21,24
133:6,22
**relative**  77:11
170:7 179:23
204:25 262:11

277:16
**relevant**  44:13
45:5 48:12
108:14 146:4
146:18,19
153:16 155:24
158:4,5 188:4
188:5 214:13
214:17 215:12
215:20 219:2
244:17 245:2
**relied**  40:16
42:18
**relies**  232:22
**relying**  207:21
261:18
**remain**  133:2
178:12 182:5
186:4
**remained**
271:24
**remember**  8:13
10:8 11:6
15:24 20:17,25
22:7 24:25
25:2,3,6,9,15
28:15 29:25
31:11,16,18
32:21 33:11,18
35:8,13,16
36:7,19,24
37:5,7,10 43:3
51:2 52:22
58:19 60:11
66:25 67:22

72:10 131:13
137:21 152:14
153:11 158:18
184:18,20
193:20 195:14
197:8 199:5,8
216:5 218:7
255:12 296:7
304:8
**remembering**
35:11 37:3,8
71:3 143:23
**remembers**
199:2
**remind**  241:2
298:6
**remit**  168:16
**remote**  1:16 4:4
311:7
**remotely**  5:2
**removal**  63:19
121:11 189:5
190:10 287:14
287:19,23
297:5
**remove**  107:4
122:19 157:7
157:12 170:14
202:7 208:7,9
229:21 286:17
297:6,10
**removed**
122:13 138:6,7
157:2 168:8,13
171:6,16,20

302:4,8
**removing**  32:8
**repeat**  128:8,14
283:22
**rephrase**
128:13
**replace**  60:5
80:12 188:6,23
260:9
**replaced**
178:12 182:5
304:15
**replacing**  60:9
**report**  5:19
7:19 8:11 9:23
10:2,6 11:18
13:16 14:4,5
14:16,23 15:10
15:14,18,23
16:10,16,21
17:7,25 18:15
18:16,18 19:2
21:18 22:19
24:16 26:16
28:10 29:5,10
34:20 39:13,15
39:20,20 40:3
40:10 44:6
46:8,20,21
47:4,8 48:2
49:4 53:16
62:10 65:9,11
66:4,8,17 68:3
68:17,18,20
69:13,23 70:22

| | | | |
|---|---|---|---|
| 77:3,9 82:15 | 244:23 245:13 | 250:21 256:5 | **requests** 41:13 |
| 106:12 107:7 | 250:11 252:7,8 | 284:17,24 | **require** 111:10 |
| 110:13 140:9 | 254:9,12,12,14 | 294:18 | 115:22 121:10 |
| 140:13 146:3,8 | 254:15,20,21 | **reports** 7:23,23 | 209:18,22,24 |
| 147:6 148:2,10 | 254:24 256:2 | 10:14,22 11:2 | 210:5,6 219:9 |
| 149:22 150:12 | 256:10,14 | 11:10 41:3 | 220:12,14,17 |
| 150:15 151:16 | 257:2 259:7,8 | 43:14 64:22 | 220:20,24 |
| 152:13,25 | 260:12,23 | 68:22 72:19 | 221:4 |
| 155:17 158:14 | 261:2 265:17 | 75:15 76:20,24 | **required** 34:3 |
| 158:16,17,20 | 267:12 270:7 | 135:2,5 197:17 | 39:4 227:3,7 |
| 159:4,9 160:23 | 276:8 277:8,12 | 197:22 238:17 | 230:3 317:13 |
| 161:17 165:8,9 | 286:14 287:13 | 238:19 251:5,7 | **requirement** |
| 165:12 166:9 | 290:4,5 294:10 | 251:11 252:4 | 104:4 |
| 167:21 171:13 | 314:5 | 260:4 263:2 | **requires** 83:7 |
| 172:18 173:10 | **reported** | 276:4 | 241:9 244:9 |
| 183:10 184:14 | 159:10 201:22 | **represent** 5:16 | 247:19 252:10 |
| 187:19,20 | 236:13 245:8 | 195:16 247:8 | 253:6 |
| 190:23 194:18 | **reporter** 1:18 | 266:11 308:9 | **reread** 8:8 |
| 195:17,24 | 4:18,22,25 5:3 | **representing** | **reroute** 129:17 |
| 196:5,12,15 | 68:23 313:5,19 | 229:5 | **rerun** 73:21 |
| 197:4,4,16 | **reporting** | **reputation** | 82:16,17 83:4 |
| 198:14 199:16 | 59:12 64:12,17 | 287:4 | 83:21 |
| 200:5 202:19 | 67:13 69:21 | **reputational** | **research** 58:6,7 |
| 203:2 206:20 | 106:6 109:4 | 106:2 | 58:9 135:4 |
| 208:18 216:9 | 110:20 111:2,4 | **request** 41:10 | 142:8 |
| 221:12 223:18 | 123:18 135:4 | 261:14,19 | **reserved** 3:8 |
| 223:21 225:8 | 142:19,20,23 | 265:10 | **resolved** |
| 226:2 231:15 | 142:25 143:9 | **requested** 43:5 | 203:13,15 |
| 231:18 232:10 | 143:12,15,16 | 69:10 128:15 | **resonate** 48:9 |
| 232:15 233:25 | 143:19 144:3 | 148:24 177:9 | **resources** |
| 234:10,11 | 144:19,22,23 | 261:23 262:19 | 143:7 |
| 235:25 236:9 | 159:14 160:4 | 265:9 313:17 | **respect** 36:8 |
| 237:2,25 | 161:12 162:7 | 313:17 | 37:12 60:15 |
| 238:25 239:9 | 163:7 172:21 | **requesting** | 70:7,10,25 |
| 242:3,24 | 235:6 250:20 | 261:7 | 74:10,18 76:19 |

132:20 136:4
136:13,22
153:20 154:4
159:23 160:20
165:5 167:22
259:9 297:2
**respective** 3:4
**respond** 214:5
**response**
127:15,16
**responsibilities**
51:13 223:23
224:9 289:23
**responsibility**
132:2,10
136:19 137:8
160:17 219:4
**responsible**
51:15 130:7,15
132:23 133:3
142:9 265:20
284:12
**rest** 284:21
**rests** 79:4
**result** 24:13
255:25 260:7
261:8
**resulted** 171:19
255:2 259:8
260:7
**results** 226:10
**resumed** 20:3
115:5
**retain** 188:6,23

**retained** 11:20
11:23 12:22,23
13:2,5,8
**retainer** 61:12
61:16 62:2
**retaining** 32:8
35:25 36:2
37:12 82:12
142:5
**retention** 13:11
13:13 34:8,12
62:18
**retire** 102:22
**retired** 26:8
33:16 39:8
130:5
**retiree** 88:20
**retirement** 61:2
72:6,7 80:4
87:14 89:22
98:22 99:2
101:18 102:25
103:22 104:10
136:2 181:6
275:17 282:10
**retiring** 133:7
**return** 113:2
176:15 179:16
183:20 224:21
241:14 247:13
249:22 308:21
316:13,16
**returns** 28:24
65:10,11 68:15
71:25 86:15,16

86:17,18,22
88:9,10,21,25
90:10 94:12
99:24 100:13
113:5,7,22
210:6 251:23
252:3 266:2,3
267:24 268:4,8
268:12,21
269:20,22
276:25
**reuters** 254:14
254:15
**revenue** 28:4
140:15
**reverse** 47:9
49:8
**review** 9:25
10:3 15:7
40:19,23 41:4
41:8 42:16
43:6 44:4,7
67:18 74:8
135:5 149:16
149:17 152:17
152:24 166:20
166:25 167:20
173:9 175:9,9
177:21 187:25
191:7 198:11
199:2 200:21
208:18 209:19
216:12 238:16
251:8,9 254:19
256:8 265:4

271:24 275:21
308:8 313:16
316:7
**reviewed** 9:22
12:23,25 42:3
42:20 149:19
149:20 150:2,6
157:8 191:10
193:14 195:12
195:18 197:2,7
255:23 271:13
**reviewing**
183:6 186:16
209:14 242:13
252:22 258:4
**reviews** 214:21
**revised** 193:15
**rewrite** 110:18
**rfi** 209:6
210:18 212:9
212:15
**rfp** 32:14 59:21
59:23,25 60:3
60:9 208:23
209:3,5,8,13
210:18 211:2
212:9,12 213:9
213:23
**rhythm** 6:16
**rich** 43:25
46:23 217:14
**richer** 209:10
**riddle** 46:14
261:10

**[ride - saying]**

**ride** 88:3 97:23
  98:4
**right** 9:23
  10:11 19:22
  26:12 29:20
  39:9 50:18
  51:17 61:2
  66:23 71:4
  74:5 76:22
  77:23 79:7,8
  85:14 88:2
  98:25 119:12
  120:14 122:24
  127:10 129:12
  140:5 143:23
  150:8 155:17
  173:6 175:4,7
  196:24 200:9
  201:22 202:15
  205:4 222:7
  223:22 231:25
  234:4 240:2
  242:5 243:12
  249:18 253:4,8
  254:17 270:16
  273:14 274:25
  279:15 289:10
  289:13 298:20
  300:5 308:6
**rigorous**
  213:16
**ring** 16:13
**risk** 65:11 67:3
  68:15 105:18
  106:2 144:25

  183:19 210:6
  224:21 241:13
  255:8 259:23
  266:2 268:21
**riskier** 255:2
**rmd** 39:5
**road** 312:2
**roberts** 2:5 5:9
  9:11 74:13,20
  122:14 128:6
  139:21 155:19
  157:17 163:20
  166:23 172:6
  180:11 198:21
  212:10 219:23
  227:25 230:14
  281:9 287:24
  291:2 310:10
  316:1
**robust** 64:16
  139:3 217:15
**role** 24:18,21
  27:15 45:13,22
  49:23 50:20,24
  51:9 52:5 53:9
  130:4,22 131:6
  136:4 168:25
  208:15 289:20
  293:12,17
  295:3
**roles** 51:18
  224:9
**roll** 33:24
  55:19 101:15

**roller** 98:4
**rolling** 118:9
  125:12
**rollover** 39:3
**room** 140:13
  211:7
**roughly** 80:7
**routes** 86:3
**row** 86:16
**rowe** 90:13
  92:17 96:5
**rule** 189:19
**rules** 140:22
**run** 25:21
  77:18 80:25
  85:19 86:4,12
  86:23 89:5,10
  89:14,24 90:10
  90:11,15,18
  91:2,4 92:16
  92:19,20 93:5
  93:7,11 110:24
  112:16 232:19
  255:15
**running** 29:8
  49:15 86:20
  112:24 113:18
  113:19,20,21
**runoff** 255:7
**runs** 92:21
  146:25 148:6
**rupp** 46:14
  48:17
**russell** 113:11

**s**

**s** 2:2 5:6 115:2
  115:2,2,4
  281:21,21
  312:6 314:2
  315:2
**s&p** 23:25
  276:17 277:2
  298:18,19,22
  299:7,15
  301:22 302:15
  303:3 315:9
**salient** 14:10
  66:7 69:17
**satisfactory**
  84:21
**save** 104:8,15
  275:16
**saving** 81:9
**savvy** 138:20
  138:22
**saw** 43:11
  214:24 217:16
  261:24 283:12
**saying** 23:6
  27:14 60:14
  67:10 75:24
  84:2,6 117:20
  120:11 128:16
  143:18 146:22
  155:9 164:4
  176:23 178:15
  178:19 180:15
  183:22 186:17
  186:18 188:16

**[saying - see]**                                                      Page 62

| | | | |
|---|---|---|---|
| 188:16 194:9 | 261:12 262:9 | 237:6,13,16,22 | 181:14 182:19 |
| 226:16 246:9 | 262:14 264:23 | 237:25 238:9 | 185:10,11 |
| 246:22 247:18 | 271:13 276:16 | 238:11,20,24 | 187:6,19 |
| 248:19,25 | 282:19,20 | 239:3,15,25 | 241:11,14 |
| 249:3 257:7 | 286:3 303:14 | 240:7,17 | 243:13 247:5 |
| 264:4,8 273:11 | **scenario** | 243:19 244:3 | 251:18 266:25 |
| 273:16 294:19 | 124:19 | 245:21 246:13 | 270:15 285:12 |
| 302:8 | **schedule**  282:5 | 246:19 247:7 | 295:19 298:9 |
| **says**  87:17,19 | 285:10,17,19 | 247:21 248:8 | 299:21 |
| 101:6 110:11 | 288:23,25 | 249:9 251:2,9 | **section**  15:4 |
| 111:15,17 | 291:20,22 | 251:24 252:5 | 245:24 246:3 |
| 121:21,22,22 | 293:5,25 294:2 | 252:10 253:6 | **security**  38:25 |
| 125:18 147:10 | 294:15 | **screens**  97:18 | 80:14 87:15 |
| 151:5 174:4,22 | **schlichter** | 98:8 | **see**  19:8 21:17 |
| 174:23 175:6 | 26:24,25 30:2 | **scrutinize** | 21:19 26:17 |
| 175:15 176:2 | 35:3 | 276:12 | 36:21 43:10,11 |
| 176:14 177:18 | **score**  145:6 | **scrutiny**  73:8 | 43:15,25 45:21 |
| 178:8 179:3,19 | 163:4,8,12,12 | 83:2,7 84:2,25 | 46:16,17 85:20 |
| 179:19,24 | 163:16,25 | 85:7 117:21 | 86:25 87:10 |
| 180:3,15 | 164:7,8,10,16 | 129:11,14 | 94:8 105:11 |
| 181:14,21,25 | 236:7 252:12 | 206:25 207:5,6 | 108:14,19 |
| 182:6,14 183:4 | 252:20 | 207:23 208:3,4 | 109:8 113:24 |
| 185:12 186:2 | **scorecard** | 239:14 296:25 | 116:2 118:9 |
| 187:6 188:21 | 163:5 | **se**  192:6 209:3 | 119:25 121:2 |
| 188:24 189:3 | **scores**  162:20 | 249:8 | 121:21,21 |
| 189:12 201:2 | 163:19 | **sealing**  3:5 | 124:7,14 |
| 201:17 203:12 | **scoring**  65:4,5 | **search**  30:12 | 130:20 144:8 |
| 221:14 224:18 | 65:6 125:6 | 165:15 | 147:13 155:11 |
| 225:8,12,17,21 | 143:14 145:4,7 | **season**  85:23 | 157:23 162:11 |
| 237:6 238:8,13 | 145:15,24 | **second**  27:21 | 162:21,23 |
| 240:15 241:7 | 162:2 166:6,13 | 35:20 54:12 | 164:8 166:10 |
| 241:19 242:7 | 167:7 233:14 | 68:24 112:6 | 167:7 172:22 |
| 246:7 247:2,11 | 234:15,20,23 | 146:10,16 | 174:9 175:20 |
| 249:19 251:19 | 235:10,21 | 154:22 172:4 | 176:5,13,19 |
| 252:10 257:19 | 236:11,17,24 | 175:15 178:8 | 177:11,22 |

182:23,25
183:3 186:9
187:9 188:7
189:5 200:13
200:18,24
201:8 202:8
208:12 216:16
222:4 224:4,8
224:13,14,18
224:23 225:7
225:11,16,20
228:14 233:2
235:24 237:9
239:17 240:21
242:7 243:16
247:16,17,25
248:5 249:16
250:2 251:25
252:16 256:6
256:13 257:19
261:3,16
262:10 265:21
266:5,20 267:6
270:25 272:3
272:25 273:5
276:13,19
277:5 282:11
282:14,23
285:14 286:3,9
288:16 289:5,7
291:12,16,23
292:3,7,21
294:5
**seeing** 170:11
170:17 197:17

258:24
**seem** 112:2
121:4 155:9,10
191:25 192:19
226:2 244:15
250:9 262:22
272:22
**seemed** 251:17
**seems** 33:17
99:14 175:4
214:19 226:24
**seen** 43:2,18,18
94:9 95:4
124:24 183:22
183:25 274:16
**select** 97:16
144:7 156:5
207:13
**selected** 51:21
82:11 153:9
154:18 156:4
**selecting** 35:25
36:9 37:12
52:18,21 82:9
142:4 224:15
224:19
**selection** 23:8
34:7,12 63:19
73:16 77:13,21
78:2,5,14,18
79:23 91:13,14
93:18 154:20
155:3,21 219:5
**selections** 24:9
51:16

**self** 74:24
**send** 15:8
263:18
**sends** 170:9
263:19
**sense** 38:10
73:15 91:25
101:10 125:8
148:5 155:23
192:24 195:20
204:3 206:8
218:14 226:19
**sensitive** 208:5
**sent** 262:6
316:14
**sentence**
146:16 151:25
175:15 176:13
176:20 177:18
179:5,18,19
180:10 181:14
182:14 185:11
187:6 189:3
225:20 243:13
261:12 270:23
**separate** 54:19
55:22 139:24
212:12 250:20
**separately**
54:22 187:9
250:25
**sequence** 88:10
**sequences**
113:2

**series** 71:14
77:16 78:21
79:3,10 80:2
81:6,12 83:10
87:22 91:18
100:4 194:20
255:17 272:17
303:4
**serious** 141:14
**seriously** 76:18
137:22
**serve** 19:11
20:6 49:10
53:10,12 57:4
58:21 131:7
165:18
**served** 10:2
18:22 19:3,6
19:11 50:17
58:15 67:20
74:16 104:23
129:20 131:9
131:20 299:19
**service** 26:8
59:8 63:10,14
63:15 134:20
137:10 209:15
211:6 225:17
263:10
**services** 1:9
2:16 4:8 5:16
19:20,24 25:17
27:8 38:12,19
54:8,13 55:5
55:11,12,16

[services - six]                                                    Page 64

56:15,20 60:4
61:10,17 62:9
63:7,11 133:14
134:14 208:19
208:24 211:18
213:2 225:22
308:13 316:4
317:1
**servicing** 58:9
**serving** 131:10
283:19 308:5
**set** 29:7 109:24
140:18 194:7
210:14 223:24
258:15
**sets** 137:16
138:13 224:8
224:10
**settled** 26:15
36:6 59:11
**seven** 16:3
**several** 8:17
27:19 42:5
58:7 82:23
96:20 146:4
222:6,15 280:7
293:4 300:9
303:7
**shah** 2:2 13:20
15:12 37:19,20
37:23
**share** 39:17,18
207:10 255:20
264:16 266:8
291:11

**shareholder**
130:3
**sharing** 23:4,25
140:15 292:19
**sharp** 68:16
**sharpe** 65:12
66:9,10 67:4
**sheet** 219:10
312:1 316:11
**shell** 26:21 27:2
27:17,19
**shift** 132:10
**ship** 294:12
**shop** 143:25
**short** 113:16
115:12 129:5
194:3 242:19
**shorthand** 1:18
313:5,12
**shortly** 10:3
**show** 66:2
68:10 85:25
103:22 141:18
144:12 146:7
158:19 198:23
208:8 260:3
**showing** 24:4
75:23 159:15
162:12,19
164:10 205:18
258:15 264:2
299:13
**shows** 44:23
86:2 201:5
259:4 266:14

266:20 288:19
292:25
**side** 24:2 141:2
**sign** 316:12
**signal** 170:10
**signature**
313:23
**signed** 3:11,14
12:2 15:11
16:10 57:12
172:16 184:17
216:6 295:22
297:24 304:25
316:19
**significant**
152:6 194:2
202:4,24
203:16 235:19
256:4
**signs** 201:5
**similar** 15:25
35:21,21 54:13
67:7 108:15
121:6,18
125:25 136:10
263:2
**similarly** 277:4
**simple** 85:18
103:20 125:7
**simply** 139:19
197:25 229:19
259:14 262:14
263:17
**simulated**
112:7

**simulation**
82:17 85:14
86:9 87:16
88:8 90:10
97:9 112:19
**simulations**
80:20 81:2
85:20 86:4
112:9
**single** 40:20
41:4,5 42:24
44:16 67:23
91:12 106:9
115:21 116:24
117:3 127:16
137:25 188:10
191:13,16,23
192:16 194:19
197:3,15,18
210:23 211:3
211:13 219:9
221:5 277:18
277:19 309:14
**sir** 165:9
**sitting** 16:7
150:14 158:23
159:20 165:24
211:7 212:22
219:12 258:22
290:22 295:3
**situation** 12:21
15:11 116:12
129:12
**six** 5:25 6:2
16:3 48:16

**[six - speculate]**

51:5 93:6
94:18 97:11
189:18 190:7
293:10
**sizable** 52:14
**size** 25:4 62:8
62:19,22 63:6
133:19 137:17
**skeptical**
125:11
**skill** 137:16
138:13 210:14
**slice** 108:22
**slightly** 45:20
133:23 189:15
193:11 205:7
302:20
**slocum** 282:23
283:3 284:19
**small** 57:8
62:10 64:2
103:12 133:19
133:21 134:16
242:11 306:5
308:22
**smaller** 22:22
64:3 139:5
**smallest** 62:13
**smooth** 88:3
**smoother** 100:4
100:19
**snapshot**
103:15 108:10
**snyder** 31:5

**social** 38:24
80:14 87:15
**software** 235:5
**sold** 55:2 56:3
62:3,12 129:21
130:9 141:25
142:17
**sole** 58:13
239:16
**solely** 232:22
**solutions** 4:16
312:1 316:23
**solving** 88:17
**somebody** 23:4
42:22 44:15
80:13 81:3
93:9 95:8 99:3
108:8 135:12
135:16 138:4
141:9,24 209:7
226:11 293:19
293:20
**somewhat**
189:10
**sophistication**
137:17
**sorry** 12:5
19:13 31:17
50:14 56:24
111:11 142:17
165:11 220:25
231:22 232:17
248:4 266:18
281:19 283:22
288:22 298:6

**sort** 6:12 47:22
64:13 129:18
143:11 145:6
166:6 206:24
219:20 304:10
**sortino** 66:13
66:24
**sounds** 11:19
48:12 150:8
196:3 218:3
235:4 265:10
283:3 290:16
296:19,20
**source** 38:18
**sources** 38:23
**southern** 1:3
4:11
**spain** 1:18 4:6
5:22,24 289:24
**speak** 9:4,7,10
9:16 39:19
97:22 115:14
116:18 141:8
141:10 186:23
188:17 232:11
232:13 284:5
287:2,25 291:9
297:17
**speaking** 74:3
80:6 114:3
130:17 141:3
143:12 144:15
146:5 173:12
189:12 244:2

**speaks** 170:20
241:12
**spearheading**
142:9
**special** 254:12
256:14 257:2
259:8 290:4
**specialist** 4:15
**specific** 41:13
49:23 60:7
61:20 71:20
73:19,22 76:25
83:10 109:3,5
116:16 153:5
153:19 154:2
158:18 165:4
165:17,25
169:6,7 190:18
199:5 209:18
211:11 215:7
233:5 256:13
263:12,12,16
303:24 304:4
**specifically**
109:19 111:10
160:4 161:6
162:5 172:13
204:11 209:12
215:6 244:13
304:10
**specifics**
309:13
**speculate** 18:9
18:11

**speculation**
  18:12
**sped**  45:8
**speed**  44:12
**spend**  5:25 6:6
  44:15,19 75:3
  78:8 83:14,16
  107:11 127:7
  152:2
**spending**
  140:20
**spent**  16:20
  17:23 46:9
  74:22 76:3,7
  208:13 309:19
**spit**  144:4
**split**  56:10,11
  267:4
**spoke**  9:19
**spoken**  105:7
  217:19 218:22
  218:24,25
**spokespeople**
  130:16
**sponsor**  49:9
  54:24 55:19
  56:3 57:4,16
  57:23 59:16
**sponsors**  53:17
**spot**  42:20,23
  42:25 277:17
  277:20
**spun**  21:8
**squared**  68:21

**ss**  313:3
**stability**  94:10
  105:10
**staff**  26:2 30:20
  131:5 141:11
  142:12 305:10
**stage**  25:6
  83:22 288:6
**stand**  15:10
**standard**  4:14
  114:16 210:9
  235:6,25 236:3
  277:4
**standardized**
  65:18 77:3
**standards**
  179:23 187:8
  237:8 239:12
  245:22 246:14
**standing**
  255:25
**stands**  301:10
**star**  143:21
  277:22
**start**  36:12
  46:3 49:7
  56:18 86:15
  87:2,24 94:22
  102:15 132:17
  170:13 233:11
  276:22 282:8
**started**  26:11
  64:5 132:18
  135:22 152:18
  235:6 279:5

**starting**  102:23
  148:3 300:2
**state**  1:19 96:9
  185:8 187:23
  225:25 229:6
  250:11 280:12
  296:18 297:2
  297:14 298:13
  298:17 299:6
  299:14,17
  300:2,23
  302:21,23
  303:6 304:18
  305:11,12,18
  305:20 306:7
  313:2,6 315:8
**stated**  178:9,22
  178:24 179:4,7
  179:11,13,20
  179:21 180:4,7
  180:18 182:2
  182:15 185:13
  206:10
**statement**  7:21
  109:20,21,23
  110:9,10 111:9
  181:9 189:9
  223:7 224:4
**states**  1:2 4:10
**status**  177:20
  178:2 181:16
  186:4,5,7,13,20
  186:22 187:4,8
  200:10,17
  201:4,6,8,21

**202:8,13 203:3**
  203:8 206:3
  239:14 241:10
  242:8 243:7,9
  243:10 244:9
  251:23 252:16
  253:4,22
  257:21 258:8
**stayed**  130:11
  142:23 168:8
**stenographic**
  4:23
**step**  7:14,15
  120:10 122:4
  133:11,11
  173:25
**steps**  211:11
**sterling**  287:4
**stick**  243:12
**stipulate**  4:24
**stipulated**  3:2,6
  3:10 4:21
**stipulations**
  311:3
**stocks**  39:6
**stone**  1:17 4:4
  5:12 6:1 7:1,9
  8:1 9:1 10:1
  11:1,16 12:1
  12:20 13:1
  14:1 15:1 16:1
  17:1 18:1 19:1
  20:1 21:1 22:1
  23:1 24:1 25:1
  26:1 27:1 28:1

| | | | |
|---|---|---|---|
| 29:1,9 30:1 | 115:11 116:1 | 184:1 185:1 | 254:1 255:1 |
| 31:1 32:1 33:1 | 117:1 118:1 | 186:1 187:1,20 | 256:1 257:1 |
| 34:1 35:1 36:1 | 119:1 120:1 | 188:1 189:1 | 258:1 259:1 |
| 37:1 38:1 39:1 | 121:1 122:1 | 190:1 191:1,2 | 260:1,17 261:1 |
| 39:15,16,24 | 123:1 124:1 | 192:1 193:1 | 262:1 263:1 |
| 40:1,2 41:1 | 125:1 126:1,9 | 194:1 195:1 | 264:1 265:1,16 |
| 42:1 43:1 44:1 | 127:1 128:1 | 196:1 197:1 | 266:1 267:1 |
| 45:1 46:1 47:1 | 129:1,16 130:1 | 198:1 199:1 | 268:1 269:1 |
| 48:1 49:1 50:1 | 131:1 132:1 | 200:1 201:1 | 270:1,13 271:1 |
| 50:14,21 51:1 | 133:1 134:1 | 202:1 203:1 | 272:1 273:1 |
| 52:1 53:1 54:1 | 135:1 136:1 | 204:1 205:1 | 274:1 275:1 |
| 55:1 56:1 57:1 | 137:1 138:1 | 206:1 207:1 | 276:1 277:1 |
| 58:1 59:1 60:1 | 139:1 140:1 | 208:1,17 209:1 | 278:1 279:1 |
| 61:1 62:1 63:1 | 141:1 142:1 | 210:1 211:1 | 280:1 281:1,16 |
| 64:1 65:1 66:1 | 143:1 144:1 | 212:1 213:1 | 282:1 283:1 |
| 67:1 68:1 69:1 | 145:1 146:1,3 | 214:1 215:1 | 284:1 285:1 |
| 69:12 70:1 | 147:1 148:1 | 216:1 217:1 | 286:1 287:1 |
| 71:1 72:1 73:1 | 149:1 150:1 | 218:1 219:1 | 288:1 289:1 |
| 74:1 75:1 76:1 | 151:1 152:1 | 220:1,12 221:1 | 290:1,7,12 |
| 77:1 78:1 79:1 | 153:1 154:1 | 222:1 223:1 | 291:1 292:1 |
| 80:1 81:1 82:1 | 155:1,2 156:1 | 224:1 225:1,25 | 293:1 294:1 |
| 83:1 84:1 85:1 | 157:1 158:1 | 226:1 227:1 | 295:1,6 296:1 |
| 86:1 87:1 88:1 | 159:1 160:1 | 228:1 229:1 | 297:1 298:1 |
| 89:1 90:1 91:1 | 161:1 162:1 | 230:1 231:1 | 299:1,9 300:1 |
| 92:1 93:1 94:1 | 163:1,15 164:1 | 232:1 233:1 | 301:1 302:1 |
| 95:1 96:1 97:1 | 165:1 166:1 | 234:1 235:1 | 303:1 304:1 |
| 98:1 99:1 | 167:1,19 168:1 | 236:1 237:1 | 305:1 306:1 |
| 100:1 101:1 | 169:1 170:1 | 238:1 239:1 | 307:1,5,21 |
| 102:1 103:1 | 171:1 172:1,8 | 240:1 241:1 | 308:1 309:1 |
| 104:1 105:1 | 172:22 173:1 | 242:1 243:1 | 310:1,9,11 |
| 106:1 107:1 | 174:1 175:1 | 244:1 245:1 | 311:1,7,16 |
| 108:1 109:1 | 176:1 177:1,15 | 246:1 247:1 | 314:6 316:5 |
| 110:1 111:1 | 178:1 179:1 | 248:1 249:1 | 317:2,4,12 |
| 112:1 113:1 | 180:1 181:1,12 | 250:1 251:1 | **stone's** 39:13 |
| 114:1,11 115:1 | 182:1 183:1 | 252:1 253:1 | 69:9 |

**[stop - sure]**                                                      Page 68

stop  162:19
  293:6
stopped  148:12
  149:2 150:11
  150:16
story  67:7
  278:15,19,19
strange  170:9
  183:7,12
strategic
  293:23
strategies
  271:23
strategy  297:21
street  2:3,8
  96:9 296:18
  297:2,14
  298:13,17
  299:6,14,17
  300:2,23
  302:21,23
  303:6 304:18
  305:11,12,19
  305:21 306:8
  315:8
stretch  6:17
strike  182:18
strikes  197:23
  226:13
struggling
  92:13
study  209:8
stuff  42:10
  44:23 144:19
  197:23 210:11

272:21 273:19
  275:5,9
styled  271:20
sub  270:2
subbullet  247:5
subject  171:18
  174:18
submit  16:23
submitted  5:19
  10:14,22 42:17
  60:8
submitting
  49:4 60:3
subscribed
  311:18 312:23
  317:14
subsection
  225:7
subsequent
  178:21 182:7
subset  42:2
  88:23 92:24
  93:8
subsidiary
  296:10
substantial
  255:7,15
substantially
  108:9 171:18
  205:8
substantive
  47:23,25
  192:10 246:11
subsumed
  250:19,22

subtracting
  119:6
succeed  24:13
success  79:2
successful  80:4
  87:22 103:24
  104:4
successors
  162:3
suddenly
  117:10
sued  23:5 24:8
  307:10
sufficient
  217:23 220:3
  224:20 225:6
  229:23 252:15
  253:3 272:2
  274:3
suggest  156:10
suggesting
  88:14 125:21
  259:7
suggests  219:22
suite  2:3 126:7
  126:10,13,23
  127:25 202:5
  202:24 207:15
  207:19
summary
  269:22,24
supplemental
  79:18
supplied  7:25

support  45:8
suppose  115:19
  121:7 217:13
supposed  33:16
  52:6 83:5
  85:10 92:6
  218:17 306:16
  306:18
suppress
  144:10
sure  8:17 12:10
  12:11 28:16
  38:8 42:6,17
  42:25 48:24,25
  55:13 67:14
  69:15 77:5
  80:21 88:12
  106:22 109:21
  109:22 125:16
  128:11 130:11
  138:7,10
  139:10,11
  143:18 144:18
  146:10 157:15
  175:6 181:19
  185:2 186:22
  210:14 211:12
  229:24 231:3
  236:19 270:12
  270:16 277:13
  285:9,22 293:8
  293:12,15,16
  294:11 295:17
  297:18 298:11
  306:9

**surface**  103:20
**surprise**  301:25
**surprised**
  256:18,20,23
  309:12,20
**swear**  5:3
**switch**  115:18
**switched**
  152:11,13
  236:4 284:23
  289:14
**sworn**  3:12,14
  5:7 115:5
  311:18 312:23
  313:9 317:14
**sync**  159:12
  178:13 181:24
  182:9 233:15
**syncs**  14:12
  181:20
**system**  64:17
  65:4,7 86:12
  88:21 111:2
  123:19 145:6,8
  145:15 162:15
  163:14 166:7
  166:13 167:7
  233:15 234:16
  234:20 235:10
  235:17,17,21
  236:5,11,18
  237:6,13,16,23
  238:2,9,20,24
  239:4,16,19,25
  240:7,17

243:20 244:3
245:21 246:19
247:7,21 251:2
251:9,24 252:5
252:10 253:6
284:17,24
**systems**  65:5
  143:8,9,12,15
  143:17,19,22
  144:3,14 145:4
  145:25 161:24
  162:2 234:23
  235:3,18 248:8

**t**

**t**  5:6 90:13
  92:17 96:4
  115:2,4 313:1
  313:1 314:2
  315:2
**table**  24:4
  277:8,10
  280:12,15
  286:14 287:12
  294:10
**tailor**  76:24
  263:12
**tailored**  77:4
  261:14
**take**  4:25 6:11
  6:14 7:14 12:8
  12:11 16:11
  45:20 76:17
  83:8 86:3 87:6
  98:21,25
  111:24 114:9

120:21 121:2
125:13,14
133:11 137:5,8
137:19,22
156:11 164:13
164:18 165:15
170:12 173:24
176:25 193:3,9
199:20 203:9
203:22 204:9
213:18 227:4
230:16,17
274:8 279:21
280:22,23,25
281:4,6 293:15
298:5
**taken**  1:17 4:6
  12:16 39:4
  50:10 69:4
  114:15 148:19
  177:4 192:4,5
  194:23 196:18
  226:3 230:21
  281:12 283:4
  306:25 311:7
  313:11
**takes**  81:15,16
  172:3
**talent**  138:25
**talk**  14:9 39:20
  41:2 45:12
  48:7,13 49:6
  78:6 95:19
  99:18 168:17
  168:25 183:20

206:20 214:10
214:18 233:22
265:19
**talked**  22:23
  23:12 29:13
  44:3 83:19
  99:25 100:21
  104:21 107:16
  112:23 141:20
  142:19 143:11
  174:21 192:9
  217:2,5,6
  228:20 272:14
  277:25 279:19
  279:20
**talking**  8:12
  12:21 17:6,10
  47:19 50:16
  61:4 67:23
  69:12 75:19
  78:9 80:16
  81:22 87:3
  96:2 97:2
  102:9 107:11
  112:8,11,12,12
  112:20 119:11
  136:15 143:14
  143:15 145:19
  149:12 151:7
  183:8 190:16
  190:17,19
  205:19 206:6
  209:23 213:25
  215:18 217:24
  217:25 219:3

**[talking - thank]**                                                Page 70

227:7,11,13
231:7 234:14
237:17 238:2
242:18 243:19
243:20 245:20
254:11 295:13
**talks** 148:2
  183:18
**target** 30:6
  32:2 35:7,9,13
  36:10 37:2,5
  37:13 69:21
  70:10,13,17
  71:2,7,14
  72:22 73:5,17
  73:20 76:19,22
  77:6,7,12,16,21
  78:3,5,8,21
  79:3,10,25
  81:6,12 82:9
  82:11 83:10
  86:9 87:22
  88:22,24 91:13
  91:17 92:15
  93:18 94:17,22
  95:6,22 97:11
  100:4 101:3
  108:13 112:7
  122:22,23
  123:8,9,13,15
  126:7,10,13,22
  127:24 128:17
  128:19,21
  141:22 142:4,5
  142:6,10 179:8

179:9 181:5,7
205:15 255:17
260:18 261:8
262:12 264:23
265:21 266:7
266:21 267:5
271:14,23
272:2,8,10,17
276:17 277:2
292:8 296:13
297:14 298:19
298:23 301:22
302:15,18,21
303:3 304:18
305:19,21
306:13
**tdf** 270:25
  276:18
**team** 93:25
  105:9 106:9
  134:25 253:16
**teams** 17:14
**tech** 105:22
**technical** 50:15
**technically**
  305:2
**tell** 7:2 67:7
  120:14 150:17
  151:22 175:5
  177:7 189:16
  196:24 198:17
  211:11 212:13
  244:8 273:12
  273:21,23
  278:20 285:11

295:5 302:10
307:13
**telling** 106:21
**tells** 163:19
  274:6,9 275:18
  278:19
**ten** 19:8 141:25
  230:17 251:21
  251:23 252:3
  281:6
**tend** 138:25
  207:17,18
**tenure** 60:25
  68:19 105:9
  252:12,18
  253:7,19
**term** 33:22
  82:22 83:9
  88:20 113:16
  129:5 242:19
  297:2
**terminal**
  271:18
**terms** 24:19
  25:23 52:18
  63:17 64:13
  67:16,18 70:20
  75:5,14 82:7
  82:12,23,25
  116:18 123:24
  123:25 138:23
  140:3,5,15,15
  159:6 161:7,12
  199:22 219:2,3
  220:15 233:12

236:14 263:25
277:14
**test** 146:9
  152:12
**testified** 5:8
  115:6 174:11
  174:14 193:18
  195:2 197:2
  202:10 212:4
  216:8 239:22
  243:18,24
  262:25 263:11
  295:6
**testify** 7:7
  313:9
**testimony** 4:4
  14:22 29:8,12
  29:22 30:24
  31:3 36:16
  69:9 95:16
  111:4,8,12
  143:13 152:10
  157:18 166:24
  185:14 188:9
  193:20 196:10
  219:20 227:22
  229:14 230:2,4
  231:17 232:3,8
  238:8 244:4
  261:19 316:9
  316:17 317:8
**texas** 1:3 4:11
**text** 246:21
**thank** 5:15 33:3
  70:9 77:19

| | | | |
|---|---|---|---|
| 104:19 114:2 | 73:25 74:25 | 35:19 37:7,15 | 131:15 134:10 |
| 310:11 | 77:10 79:13 | 37:25 38:7 | 136:18 137:3 |
| **theft**  22:24 | 81:21 82:8 | 41:5 44:13 | 137:21 138:22 |
| 25:12 | 83:18 90:2 | 50:15 52:16 | 141:5,12,14 |
| **theirs**  14:12 | 91:18 93:15 | 54:3,10 57:9 | 145:7,20,23,25 |
| **theoretically** | 97:9,20 98:10 | 62:19 64:15,19 | 147:3,17,20 |
| 128:24 235:15 | 98:17 99:15 | 65:24 66:20 | 149:7,11 152:3 |
| **thing**  42:6 | 107:9,25 | 67:9 69:17 | 152:9,11,13 |
| 46:13 54:5 | 109:11 110:19 | 71:5 72:4,22 | 153:7,14,22 |
| 59:9 63:20 | 118:5 119:2 | 72:24 73:8 | 154:6,17 155:7 |
| 67:23 68:12 | 123:14 125:3 | 75:13 78:4 | 155:18,21 |
| 69:8,25 70:22 | 131:4 137:6 | 81:16 83:8 | 156:18 159:3,8 |
| 77:4 83:4 84:8 | 140:23 148:13 | 85:11,22 86:10 | 160:13 161:10 |
| 85:22 105:25 | 153:7 154:9 | 86:11,23 91:16 | 162:22 163:3 |
| 107:2 117:10 | 156:5 158:14 | 92:13 99:7 | 164:12,24 |
| 121:20 122:3,5 | 158:19 161:16 | 101:5 103:16 | 165:18 166:14 |
| 122:5 148:23 | 162:11 165:16 | 105:7 107:17 | 167:24 168:4,5 |
| 150:20 154:21 | 165:17 182:8 | 107:18,23 | 168:15 169:22 |
| 154:22 161:11 | 188:22 197:24 | 108:8,13,17 | 169:23 170:9 |
| 161:21 177:8 | 198:3,12 | 109:9,25 | 170:19,25 |
| 183:8,9 197:18 | 209:22 210:4 | 111:16,22 | 171:8 172:12 |
| 207:12,15 | 214:25 220:14 | 112:3 115:25 | 172:14,20 |
| 212:11 229:11 | 221:3,17 222:6 | 116:20,25 | 173:21,22 |
| 233:13 235:11 | 222:23 224:2 | 117:8,13,22,23 | 174:11,14,22 |
| 259:17 266:19 | 227:12,17 | 118:4,10,11,18 | 178:20 179:12 |
| 272:14 284:9 | 249:3 263:9 | 118:22,25 | 180:14,15,17 |
| 299:13 301:14 | 264:3 274:16 | 119:3,19,21 | 181:24 182:9 |
| 301:15 308:9 | 278:10,11 | 120:9 121:12 | 182:10 183:7 |
| **things**  36:12 | 303:7 307:6 | 121:25 122:4 | 184:6,7,24 |
| 38:4 41:21 | **think**  8:21 9:18 | 123:12,25 | 185:22 186:17 |
| 43:12 44:12 | 10:5,12 13:9 | 124:5,16,24,25 | 188:14 190:8 |
| 46:2,13 65:14 | 15:11 16:7,20 | 125:2,3,8,19,22 | 191:10 192:18 |
| 66:19 67:10 | 22:5 26:20 | 126:20,21 | 197:21 199:14 |
| 68:3 69:22,23 | 27:6 28:15,23 | 127:10,11 | 203:14,18 |
| 70:23 72:2 | 28:24 32:22 | 128:24 129:10 | 204:7,18,21 |

206:12,16
207:9,22
208:25 209:3
210:12 214:23
215:5,5 216:2
216:20 217:8
217:10,14,16
218:13,15,19
221:11 223:12
223:15 226:5
226:18 228:3,5
229:10,23
230:8 233:16
233:18,24
235:3,7,18
236:18 239:21
241:11,12
243:3 244:5,12
249:5,20
255:11,16
259:12,16,25
261:25 262:6
270:8,13
273:14 274:15
277:24 278:8
278:19 284:6
284:13 286:23
291:3,5 292:16
294:19,21
296:7,10,12
303:17,20
306:11 308:3
**thinking**   96:24
103:5 173:19

**third**   27:24
54:17 55:4,12
55:17,23 56:6
56:19 57:7,8
58:11,14 63:22
64:12 143:22
143:22 193:10
193:11,12
196:21 225:22
**thorough**
177:20
**thought**   32:19
45:14,15,16,21
52:2,7 137:22
215:13 223:10
223:11 262:14
262:15 278:21
289:21 309:6
**thoughtful**
84:19 104:18
120:25
**thoughts**
308:24 309:8
**thousands**   81:2
86:4 112:25
**three**   8:21 9:12
16:2 28:7,9
42:13 66:15
87:21 91:15
92:7 97:17,21
98:7 99:10
102:6 109:12
110:11 115:20
116:10,23
117:11,12

118:8,15 119:7
120:6 121:8
122:10 123:7
123:14 124:22
128:2 130:13
130:14 134:6
135:20 143:16
154:15 156:8
161:24,25
162:6 170:4,5
176:17 183:4
183:16 185:7
185:20 200:23
201:13 204:2
207:14 233:23
234:7,22 236:7
240:8,9,19,19
241:8,9 243:15
244:10 247:16
247:23,24
249:24 251:21
252:12,18
253:7,19
267:24 268:8
268:23 269:10
277:5,15 279:2
300:3,15,19,24
301:19 308:13
308:25
**throw**   75:14
127:18
**ticking**   274:18
**tie**   91:24 110:8
110:16,20
162:3,4 249:2

249:4 274:13
**tied**   28:2
109:19 153:23
153:25 273:21
273:24
**tier**   27:22
**ties**   154:11
**tightly**   182:11
**time**   1:13 3:9
4:13,14 6:6
10:7,9,11
12:14,17 16:18
17:17,23 19:10
21:20 25:9,23
26:2,6,7,11
38:20 44:16,20
46:7,9 50:8,11
52:17 53:3,22
54:18 55:2
56:5,23 57:11
57:24 59:4
61:18 62:11,12
63:16 69:2,5
70:16,21 73:6
73:23,24 74:22
75:3 76:3,8
77:18 78:9
83:14,16 90:21
91:7,9 92:11
93:8 94:3
95:15 96:2,24
97:25 98:5,15
100:15 101:9
105:17 106:16
107:11 109:5

[time - transcript]                                    Page 73

| | | | |
|---|---|---|---|
| 114:4,6,13,16 | 258:23,25 | 11:16 16:7 | **total**  16:24 |
| 115:8 121:5 | 264:25 272:3 | 92:23 134:19 | 17:10 28:4 |
| 124:14,14 | 279:12,18 | 141:21 150:14 | 38:15 88:13 |
| 127:7,16 | 280:3,9 281:3 | 158:23 159:20 | 308:20 |
| 129:19,25 | 281:10,13 | 165:24 198:3,7 | **totality**  40:11 |
| 130:9 132:22 | 283:3,16 284:2 | 205:5 212:22 | 40:24 41:2 |
| 133:4,9 134:22 | 284:18 286:18 | 227:10 290:22 | **totally**  34:5 |
| 137:20 140:20 | 286:19 289:5 | 295:3 | 39:21 59:16,20 |
| 142:21 146:4,5 | 289:16,25 | **today's**  7:10,16 | 303:22 |
| 146:18,19 | 290:2 292:21 | 8:15 9:4,8,16 | **toward**  23:14 |
| 147:23 148:17 | 293:17,22,24 | **together** | 261:5 289:2 |
| 148:20 150:19 | 296:3 297:23 | 105:25 110:21 | **towards**  85:24 |
| 151:8,20,21,23 | 298:7 299:18 | 228:21,22 | 87:8 255:21 |
| 152:2,24 | 300:10 301:17 | 249:2,4 299:12 | **track**  18:4 |
| 154:25 156:22 | 306:23 307:2 | **token**  206:17 | 92:22 105:20 |
| 157:2 159:18 | 308:4 309:5,19 | **told**  151:20 | 142:10 154:19 |
| 165:10,13,16 | 311:9,10,12,13 | 278:15,19 | 305:24 |
| 169:4 170:13 | 313:12 316:18 | **tonight**  146:9 | **tracking** |
| 171:7 177:2,5 | **timeframe**  57:5 | **took**  6:24 24:18 | 302:14 303:14 |
| 189:14 190:6 | 215:18 231:11 | 149:6 168:7 | 304:10 305:25 |
| 194:24 200:2 | 248:15 279:3 | 170:2,8 195:21 | 306:17 |
| 202:8,13,18 | 295:18 316:8 | 196:20 226:9 | **trade**  105:16 |
| 204:2,24 | **timeline**  295:11 | 226:23,25 | **trading**  105:15 |
| 205:17 206:9 | **times**  46:12 | 283:6 296:7,11 | **trained**  136:24 |
| 206:10,17 | 54:3 110:24 | **top**  11:7 12:3 | 136:25 |
| 208:13 214:17 | 159:17 231:6 | 31:12 41:18 | **training**  45:17 |
| 215:20 227:11 | 280:7 | 71:4 72:11 | 131:5 149:9 |
| 227:19 230:16 | **tis**  281:3 | 80:22 129:13 | 211:5 213:17 |
| 230:19,22 | **title**  54:3 130:6 | 175:5,6 184:11 | 214:10,11 |
| 232:8 234:15 | **titled**  299:6 | 184:19 255:12 | 215:3,8 218:12 |
| 235:13 238:3 | 315:8 | 279:14 282:9 | 218:14,20 |
| 245:2,10 246:3 | **titles**  54:2 | 298:14 | **transaction** |
| 246:18 247:6 | **today**  4:12,16 | **topic**  48:5 67:3 | 303:6 306:7 |
| 248:17 255:17 | 5:13,17 6:11 | **topics**  135:21 | **transcript**  5:10 |
| 256:24 258:17 | 7:6,18 9:21 | 219:9 | 8:10 47:22,23 |

48:15 313:14
313:17 316:6
316:19 317:5,8
**transcripts**  8:3
8:4,6,13,14,19
44:4,7 46:7
47:3 48:2
**transition**
130:12 135:23
**transitioning**
132:24 133:5
287:2
**treat**  137:9
**treated**  137:10
**trial**  3:9 30:24
31:3
**tricky**  305:20
**trigger**  127:15
188:19
**triggered**
245:11
**triggers**  129:10
**true**  94:3
300:11,13
313:14 317:8
**trust**  49:14,15
49:19 50:2
99:4 292:19
**truth**  7:2 313:9
313:10,10
**truthfully**  7:7
**try**  26:2 44:25
65:16 79:20
158:18 160:23
208:11

**trying**  31:11
32:22 41:23
46:3 102:10
151:17 159:6
165:23 171:4
191:18 216:2
235:23 252:23
278:22,23
**tuned**  139:9
**turn**  40:2,7
84:12,13
120:22 147:5
172:4 173:25
175:2 181:11
185:23 187:18
187:21 190:22
200:4 214:10
223:17 224:6
232:14 236:25
237:24 239:8
240:23,24
245:12,15
252:9 254:7,8
260:11 264:20
266:12 285:10
**turned**  224:25
**turning**  30:15
104:20
**tweak**  217:11
**tweaks**  255:12
**two**  7:11 9:18
12:8 20:16,21
22:18,21,23
31:18 35:23
40:6 54:21

64:6,7 67:5
101:6 102:10
102:18 107:24
120:14 121:15
121:16 123:21
135:19 143:25
159:12 182:9
182:11 196:22
199:24 217:16
218:6 224:15
225:11 249:2,4
258:13 294:14
**tying**  160:15
**type**  42:13
63:10 83:21
263:23 270:5
**typed**  42:15
**types**  72:19
265:9
**typewritten**
313:13
**typical**  16:25
53:2 64:7
71:11 74:25
94:21 173:13
173:16,18
187:12 293:14
298:25
**typically**  17:15
48:20 57:25
59:5,15 66:6
68:20 71:16
72:20 73:4,6
77:8 86:23
89:9 92:20

94:16 101:15
109:7 139:23
140:8 190:8
203:13 207:11
213:7 221:15

**u**

**ultimate**  132:2
**ultimately**
83:24 98:3
102:17 130:12
133:3 161:20
236:6 298:4
**unaware**  235:9
**unboard**  43:4
**uncertainty**
86:2,5
**unclear**  202:6
270:23
**uncommon**
60:13 199:21
199:25
**unconflicted**
30:12
**under**  34:2
35:19 38:4
54:16 60:16
82:19 84:11
85:7 103:4
117:4 122:2
133:23 134:2,9
136:21 189:24
190:2 208:23
209:5 235:10
235:16,17
245:16,24

246:17 250:19
282:20 306:4
**undergoing**
255:15
**underlying**
124:22 126:12
154:16,24
163:17,23
164:15,20
170:4,15 186:6
186:12 201:5
202:14 255:5
256:11 257:21
257:22 266:5
269:6 271:22
299:24
**underperform**
202:2,22
277:14 280:4,4
280:5
**underperfor...**
85:3 116:9,14
116:23 118:15
124:10 127:2,8
127:9 128:5
154:10 156:24
157:9 169:7,18
170:19,21,23
186:9 189:3,8
189:13 190:5
190:17,19
203:16 204:24
205:3,10
208:12 278:9
279:22 280:13

287:18 301:19
304:13
**underperfor...**
115:20 121:7
127:25 128:22
278:20 279:2
**underperfor...**
84:9,10 117:12
126:12,14,20
154:11,23
170:7 171:12
190:21 200:23
203:23 204:4
204:10 205:7,8
206:18 208:11
280:19,20,21
300:3,10,19,23
301:2,6,9,12,25
306:15
**underperforms**
122:9
**understand**
5:17 6:3,19,24
7:4 18:21
44:22 46:4
64:19 66:20
78:12 92:13
99:19 103:19
106:19,23
117:3 124:12
128:12 129:6,8
129:19 148:8
151:17 156:11
157:8 162:18
165:14,22,23

168:23 191:18
208:11 215:25
246:8,22
252:23 287:17
299:23 310:3,7
**understanding**
55:14 193:13
218:17 234:19
235:20 304:11
304:12
**understood**
6:22 19:19
36:14 43:22
45:23 52:4
66:2 106:13
219:11
**undertaken**
239:17
**undertook**
165:5
**underwent**
212:25
**undetected**
240:10,20
242:4
**unengaged**
207:19
**unfortunately**
235:8
**unit**  311:5
**united**  1:2 4:10
**unitedhealth**
31:5,17,24,25
32:6

**unpack**  73:25
**unquote**  15:17
70:19 97:13
227:7
**unreasonable**
153:6,20 154:4
158:13 159:2
159:22 160:20
161:7 228:25
**unsophisticat...**
207:18
**unstable**
176:24
**unsuitable**
232:25 233:7
**unusual**  91:8
139:25 143:24
192:6 193:6,7
**updates**  216:11
217:21,22
**upfront**  213:24
**upgraded**
235:3
**ups**  88:4 100:5
**upside**  65:13
68:20
**use**  23:25 35:20
48:17 65:4,6
68:11,15 82:21
82:24 83:9
89:5 92:17
96:7 97:2
110:7 113:11
113:12 123:20
125:17 143:25

145:12 162:24
190:14 221:12
226:16,19
**used** 65:16 66:8
66:13 67:5
68:9 82:23
91:6,10,12
96:18,19 113:8
143:8,9 145:7
162:2 172:20
235:7 236:3
296:25 299:2
316:19
**uses** 35:22
66:17 174:16
**using** 80:19
89:4 113:7
163:5 191:3
233:14,14
234:15 235:5,6
271:21 302:24
302:25
**usual** 115:24
259:15
**usually** 107:5
124:11 135:14
172:3 189:4
190:9,10 207:7
**utilized** 145:6
**utilizing** 31:25

**v**

**v** 316:4 317:1
**vacuum** 109:10
**valid** 81:15

**validated** 285:8
**valuation** 54:20
55:21
**value** 67:15
94:7,19 242:12
308:22
**van** 90:14 96:8
**vanguard**
306:5
**vanguards**
305:23
**vanilla** 192:23
**vantage** 206:13
**varied** 57:24
205:6,8 206:12
**varies** 16:4
**variety** 103:2
**various** 40:6
71:13 72:14
75:5 76:8
123:11 124:20
214:25 258:12
266:14,17,20
266:21 267:19
268:5,9,12
269:7,25 270:2
286:4
**vary** 134:15
173:15
**vast** 80:10
93:21 144:16
**verbally** 220:5
**verify** 316:9
**veritext** 4:16,20
312:1 316:14

316:23
**veritext.com.**
316:15
**versa** 162:13
**version** 15:8
28:22 173:5
231:14 233:14
**versions** 96:20
184:25
**versus** 4:8 27:2
29:14,15,20
31:5 33:4
34:19 36:15
66:9,10 98:18
100:21 101:5
103:12 108:3,4
108:14,25
109:6,7 140:24
183:13 189:11
265:5 271:15
277:14 299:6
299:15 303:20
315:9
**vice** 23:5
162:13
**victory** 308:21
**video** 4:3,15
311:4,6
**videographer**
2:15 4:2 12:13
12:17 50:7,11
68:25 69:5
114:13 115:8
148:17,20
177:2,5 230:19

230:22 281:10
281:13 306:23
307:2 311:2
**view** 14:8 30:12
65:19 67:16
77:25 121:10
122:9 153:6
172:9,11,19
173:4 185:5
197:7 218:12
228:25 234:16
253:14 297:11
**viewed** 45:13
**vintage** 123:22
124:7 205:3,3
205:9 255:10
270:3 277:18
**vintages** 122:24
123:2,11,16
124:21 126:12
258:12 267:20
268:17 269:7
269:25 276:24
286:4 300:8
**virtual** 1:16 4:3
311:6
**virtually** 40:25
**visconti** 1:18
4:19 313:5,25
**visibility**
130:24
**visit** 83:13
**visualization**
100:19

| | | | |
|---|---|---|---|
| **voice** 192:8 | 38:14,22 39:22 | 253:21 254:7 | 181:11 182:20 |
| **volatile** 98:9,11 | 40:7 44:17 | 259:3 260:2 | 183:12,24 |
| 98:13 | 45:12,21 48:16 | 270:14 275:13 | 185:24 186:24 |
| **volatility** 97:25 | 49:7 56:11 | 285:18 | 188:7,24 203:8 |
| 99:18,20,21 | 66:18 73:25 | **wanted** 15:2 | 203:25 204:4 |
| 100:20 102:3,4 | 78:14 79:13,15 | 43:10 47:25 | 208:10 229:21 |
| 112:8,12,13,15 | 79:16,17,23 | 72:17 137:2,4 | 229:22 233:21 |
| **volunteering** | 81:13 88:7,12 | 143:5 149:13 | 233:21 236:15 |
| 155:15 | 88:13 92:3 | 162:21,24 | 240:16,24 |
| **vote** 226:9,10 | 102:3,5,9 | 164:14 212:21 | 251:19 258:24 |
| 226:23,25,25 | 103:21 104:20 | 278:20 293:18 | 259:18,19 |
| 227:5,24 228:4 | 105:4,24,25 | **wanting** 164:20 | **watching** 92:24 |
| 228:18,22 | 106:18,19,22 | **wants** 111:6 | **waterline** |
| 230:2,10 | 108:7,18 | **warranted** 73:9 | 206:19 |
| **voted** 229:19 | 109:10 111:23 | 287:23 | **way** 15:13 |
| **votes** 228:14 | 113:14,16 | **watch** 82:21 | 23:17 30:19 |
| 229:15,18 | 119:22,24,25 | 83:3,25 84:3 | 38:7,8,8 41:21 |
| **voting** 226:4,7 | 120:5 124:6,12 | 84:23 85:7 | 48:18,20 49:11 |
| 226:17 | 131:11 135:15 | 110:14 111:7 | 51:25 81:17 |
| | 137:3,23 138:6 | 111:20,25 | 82:8 83:5 |
| **w** | 139:8 144:8,12 | 115:23 116:4 | 85:18 87:23 |
| **wachala** 29:14 | 146:15 152:12 | 116:13,22 | 88:5 90:19 |
| **wait** 102:24 | 156:12 157:14 | 117:11,12,15 | 91:23 96:25 |
| 118:3 119:25 | 158:19 160:22 | 117:20,21 | 104:3 110:25 |
| 270:21 | 160:23 161:3 | 118:3,11,12 | 131:4 135:18 |
| **waited** 258:13 | 161:21 162:23 | 119:21,25 | 136:3,7 137:2 |
| **waived** 3:5 | 163:4,7,11 | 120:2,12 | 137:9 145:20 |
| **waldner** 33:4 | 164:8 165:3 | 122:18 154:8,8 | 145:22 149:14 |
| 33:19 | 170:14 187:18 | 154:9,12,13,14 | 154:13 159:10 |
| **walk** 20:12 | 188:16 198:23 | 154:24 156:7 | 159:11,15,16 |
| **walked** 82:7 | 203:21 210:12 | 168:2 169:17 | 168:10 193:7 |
| 216:23 | 216:25 218:23 | 169:20,21,23 | 194:23 197:19 |
| **walking** 84:3 | 223:8,17 | 169:25 170:2,3 | 203:13 206:14 |
| **walnut** 2:3 | 229:24 231:4 | 170:8,12,14,18 | 209:2,4,9 |
| **want** 6:8 11:21 | 236:8 245:15 | 170:24 177:16 | 213:3 219:12 |
| 18:9,11 31:20 | | | |

**[way - yeah]**                                              Page 78

227:23 228:6
229:10 230:9
230:11,13
251:3 285:24
289:2 291:7
295:2 303:21
309:6,24
**ways** 101:6
108:22 144:2
162:6 214:2
222:16
**we've** 94:9,10
94:11 262:14
**wealth** 272:24
273:6
**week** 10:4,5,10
**weeks** 196:18
**welcome**
115:13
**wells** 32:2,4,9
**went** 14:24
23:23 30:16
32:14 43:20
44:20 46:4,11
50:3,15 54:4
59:13 64:8
74:2 98:19
127:4 129:16
141:16 156:4
168:19 173:5
181:19 196:17
206:11 211:22
213:5,7,11,11
213:16,20,22
216:2 232:9

236:5 277:17
283:13 284:19
297:18 299:16
**west** 308:20
**whittle** 92:18
**whittled** 95:2
97:11
**wife's** 38:25
**william** 1:18
4:19 313:5,25
**williams** 34:19
**withdrawals**
254:16
**witness** 1:17
5:4 183:6
186:16 242:13
252:22 258:4
310:12 313:8
313:22 316:8
316:10,12,18
**woefully** 191:4
191:13,21,24
**wondering**
14:11 158:23
**word** 44:10
66:23 162:24
162:25 190:10
218:15
**words** 15:10
70:18 127:13
191:3 273:9
**work** 15:2,25
26:21 37:20
39:17,24 41:22
57:20 60:20

62:2 75:17
79:6 81:8,16
84:4 87:11
91:6 97:12,13
99:13 103:19
105:15 114:10
136:21,21
141:15 142:14
171:21 272:17
**worked** 13:17
14:2 37:18
57:18 60:16,16
94:24 136:14
137:13 141:4,7
193:4,9 212:6
212:24 221:6
263:6 264:6
283:14 296:5
296:10
**workforce**
89:20
**working** 20:22
26:19 58:3
80:2,2 83:5,12
130:9 134:23
140:20,20
231:12 263:21
273:8 274:13
274:14,21
275:11 285:4
290:23
**works** 273:22
274:7
**world** 33:23
75:7,9 108:25

**worried** 113:3
**worry** 107:15
**worse** 119:17
170:2
**worth** 25:25
54:19 55:6,7
55:18
**would've** 93:11
**wow** 129:2
**wrap** 30:17
281:8 306:21
307:6
**writing** 130:18
138:8
**written** 38:5
111:15 182:10
**wrong** 117:19
163:6 192:14
192:16 217:22
249:7 266:19
266:22
**wrote** 14:5
21:17 42:9
150:21 188:15
202:19 203:2

|  |
|---|
| **x** |

**x** 1:5,11 90:24
313:17 314:2
315:2
**xyz** 46:5

|  |
|---|
| **y** |

**yeah** 16:14
23:12 24:16
38:21 51:18

[yeah - zoom]                                          Page 79

| | | |
|---|---|---|
| 52:2 60:11 | 247:23,24 | 199:3 |
| 74:21 82:14 | 248:5,8,10,23 | **york**  1:19 312:2 |
| 95:24 103:22 | 249:8,10,24,24 | 313:2,4,6 |
| 119:15 173:14 | 249:24 250:4 | |
| 173:15 193:21 | 250:16,23 | **z** |
| 226:5 234:22 | 251:23 252:3 | |
| 261:10 310:7 | 252:12,18 | **zoom**  1:16 |
| **year**  11:22 39:5 | 253:7,19 268:4 | 17:14 |
| 61:8 64:9 | 268:8,12,23,23 | |
| 86:18 90:6,7 | 269:10,14 | |
| 91:17 98:21 | 277:3,5,15,15 | |
| 109:12,12,12 | 279:3,3 284:21 | |
| 109:13,13 | 284:22 288:12 | |
| 110:12,12,13 | 288:15 294:24 | |
| 110:15 115:21 | 300:3,4,15,16 | |
| 116:5,10,10,23 | 300:20,20,24 | |
| 116:23 117:11 | 300:24 301:19 | |
| 117:11,12,13 | 301:20 309:16 | |
| 118:8,15,16 | **years**  19:3,7,8 | |
| 119:7,7 120:6 | 32:3 38:5 | |
| 121:8 122:10 | 57:15 64:23 | |
| 122:10 123:7,7 | 81:19,20 86:16 | |
| 124:22,23 | 88:11 89:21 | |
| 128:2 130:13 | 91:20,22 96:3 | |
| 152:22 154:15 | 102:22,24 | |
| 156:8 161:25 | 109:16 130:14 | |
| 170:5,6 176:17 | 141:25 184:2 | |
| 176:17,17 | 210:8 214:23 | |
| 183:5 185:7,21 | 217:17 251:21 | |
| 200:24 201:13 | 254:17 258:13 | |
| 204:2 240:8,9 | 267:25 297:17 | |
| 240:19,19 | 304:5 | |
| 241:8,9 243:15 | **yesterday**  9:12 | |
| 244:11 247:15 | 9:15,19 198:9 | |
| 247:15,16,23 | 198:11,20 | |

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.