# Exhibit H

*Laliberte et al v. Quanta Services, Inc. et al*

Expert Report of Lorie L. Latham

September 17, 2024

HIGHLY CONFIDENTIAL

# Table of Contents

I.    Qualifications ................................................................................................ 1

II.   Assignment .................................................................................................... 4

III.  Summary of Opinions .................................................................................. 5

IV.   Background ................................................................................................... 9

      A.    Overview of Defined Contribution Plans .......................................... 9

      B.    Defined Contribution Plan Governance Practices .......................... 10

            1.    Plan Documents and Committees ......................................... 10

            2.    Investment Advisors to Retirement Plans ............................ 12

      C.    Fiduciary Considerations in the Evaluation and Monitoring of Plan Investment
      Options ............................................................................................. 13

      D.    Overview of Target Date Funds ....................................................... 16

      E.    Overview of the Quanta Services, Inc. 401(k) Savings Plan ........... 19

V.    The Plan's Governance Structure and Monitoring Process Were Reasonable and
      Consistent with Accepted Fiduciary Practices ........................................... 20

      A.    The Committee, Its Roles and Responsibilities, Composition, and Oversight....
            ......................................................................................................... 21

      B.    The Investment Advisor's Role in the Plan's Fiduciary Process .................... 25

      C.    The Plan's Use of an Investment Policy Statement ......................... 31

      D.    The Committee Monitored Plan Investment Options, Including the Challenged
      Funds, in Accordance with Sound Fiduciary Practices ............................... 35

            1.    The Committee Met Regularly, Received and Reviewed
            Comprehensive Materials and Worked in Collaboration with Its Investment
            Advisor to Evaluate the Plan's Investment Options ........................ 35

            2.    The Committee's Monitoring Process and Use of Watch List Was
            Thorough, Detailed, and Consistent with Sound Fiduciary Practice .............. 38

            3.    The Committee's Monitoring of the Fidelity Freedom Funds Was
            Thorough and In-Line with Sound Fiduciary Practices ................................... 39

VI.   Mr. Stone's Criticisms of the Plan's Fiduciary Process Are Without Merit .............. 43

      A.    Mr. Stone's Opinion Regarding the Committee's Lack of a Charter Fails to
      Recognize the Committee's Active Decision to Operate Without a Charter .............. 43

      B.    Mr. Stone's Opinions Regarding the Committee's Leadership and Voting
      Processes are Inconsistent with Standard Approaches of Fiduciaries ........................ 45

      C.    Mr. Stone Fails to Recognize the Ongoing Fiduciary Training Received by the
      Committee .................................................................................................. 46

D.     The Plan's Investment Advisor Was Qualified, Engaged, and Provided Comprehensive Information on the Funds to the Committee, and the Committee Appropriately and Reasonably Relied on the Advisor's Advice ................................49

E.     Mr. Stone's Opinions Regarding the Level of Detail of the Committee's Meeting Minutes Are Incorrect...................................................................................52

F.     Mr. Stone's Opinions Regarding the Committee's Adherence to the IPS Are Faulty ...........................................................................................................................55

G.    Mr. Stone Mischaracterizes the Performance of the Freedom Funds at the Start of the Class Period .........................................................................................................57

H.    Mr. Stone's Criticisms of the Target Date Deep Dives Are Dismissive and Unfounded.....................................................................................................................61

I.     Mr. Stone Mischaracterizes the Strength of the Fidelity Target Date Fund Platform.........................................................................................................................64

VII.   Mr. Marin's Conclusions that the Committee Should Have Removed and Replaced Certain Funds During the Class Period Are Based on a Flawed Methodology...........67

## I.    Qualifications

1.    I am the Founder and President of L. Latham Consulting, LLC, an independent consultancy where I have written articles for a variety of organizations in the retirement plan industry and through which I am performing my engagement in this matter.  Prior to founding L. Latham Consulting in 2022, I spent multiple decades as a senior executive delivering defined contribution, retirement, fiduciary, and investment strategy expertise.  I have worked with several of the most well-known financial services companies in the country.  I hold dual Bachelor of Science degrees in Financial Services and Marketing from Wright State University (1995) and have been a Chartered Financial Analyst (CFA) Charterholder since 2004.

2.    I was the Vice President of Group and a Senior Defined Contribution Strategist at T. Rowe Price from 2016 to 2022.  T. Rowe Price is a global investment management firm, with $1.54 trillion in assets under management as of March 31, 2024, that offers a variety of services for individuals and institutional investors, financial intermediaries, and retirement plans.[1]  It continually ranks in the top three target date fund providers based on assets under management with over $300 billion at year-end 2022.[2]

3.    In this position, I worked directly with retirement plan sponsors, their constituent boards of directors and fiduciary committees, and their 3(21) investment advisors and/or 3(38) investment managers.[3]  My role was to inform my clients' investment decision making processes by providing them with research and recommendations with respect to retirement industry trends and market insights.  During my tenure, I designed, launched, and chaired T. Rowe Price's Defined Contribution Council, which was the group responsible for influencing T. Rowe Price's Defined Contribution ("DC") strategy; the DC strategy was the product of the research and study of retirement market trends that T. Rowe Price provided to clients.

---

[1] *See* "About Us," *T. Rowe Price*, available at https://www.troweprice.com/en/us/about-us.
[2] Jack Caporal, "The Largest Target Date Funds: Vanguard, T. Rowe Price, and BlackRock manage the most assets in target date funds," *The Motley Fool*, June 30, 2023, available at https://www.fool.com/research/largest-target-date-funds/.
[3] In a 3(21) investment advisory arrangement, the investment advisor provides recommendations and advice to aid the retirement plan committee's decision making process and has a fiduciary duty to the plan to provide prudent and loyal advice, but the committee retains the fiduciary responsibility for selecting, retaining, and removing investment options.  In contrast, in a 3(38) delegated management arrangement, the service provider assumes full fiduciary responsibility for certain or all (depending on the terms of the arrangement) of the plan's investment options themselves.  *See* Kimberly Shaw Elliott, "3(21) Versus 3(38) ERISA Investment Fiduciaries – Decoding the Numbers," *National Institute of Pension Administrators*, September 3, 2013, available at https://www.nipa.org/blogpost/1011572/169845/3-21-Versus-3-38-ERISA-Investment-Fiduciaries--Decoding-the-Numbers.

The Council was also responsible for developing and executing strategies supporting T. Rowe Price's retirement business activities, including engagement with boards and committees in retirement plan oversight and investment strategy and product evolution in target date and retirement income.

4.      I was also Co-Chair of T. Rowe Price America's Client Advisory Board (consisting of representatives from the firm's top 25 Defined Contribution Investment Only clients—not recordkeeping clients).  In this role, I led interactive discussions on DC plan trends and practices including, among other things, plan oversight and inputs to decision making, investment structure, target date, and retirement income trends with committee members representing multi-billion dollar DC plans.  I also served as a member of T. Rowe Price's Retirement Leadership Council for a term of two years.  In this role, I provided market insight and helped set strategy for T. Rowe Price's overall retirement practices.  In my various roles at T. Rowe Price, I had a range of interactions related to retirement plan oversight, research, and investment trends with both 3(21) investment advisors and 3(38) investment managers, as well as the committees who hired them, and I observed the committees' roles in both types of engagements.

5.      From 2006 to 2016, I worked with Willis Towers Watson ("TWIS," formerly Towers Watson and Watson Wyatt) as a Senior Investment Consultant and Director and Head of Defined Contribution Strategy.  TWIS is a multi-discipline global professional services firm with multiple lines of business, such as risk management, investment consulting services, and human resources consulting.  At TWIS, I worked closely with fiduciary committees for which TWIS was both the 3(21) investment advisor and the 3(38) investment manager to the plan to develop, implement, and monitor their plan investment menus.  Examples of my work include meeting with fiduciary committees overseeing DC plans, assisting fiduciary committees with assessing their governance capabilities and the level and type of consulting support they needed (e.g., 3(21) versus 3(38) services), helping to establish meeting agendas for fiduciary committee meetings, performing DC investment structure reviews, providing recommendations, developing and monitoring Investment Policy Statements ("IPS"), conducting investment manager reviews and searches (including extensive work analyzing, selecting, and monitoring Qualified Default Investment Alternatives ("QDIA")), and helping fiduciary committees meet their plans' investment objectives.  As a Director and Head of Defined Contribution Strategy, I was responsible for developing the firm's defined contribution strategy in working with clients, as well as for guiding the scope of

responsibilities and services offered for 3(21) and 3(38) solutions.  I also launched and chaired TWIS's Defined Contribution Steering Committee, the group responsible for developing and maintaining a centralized framework outlining TWIS's position on all matters related to DC investment management for client use, including its evolving views on DC investment management trends.

6.      From July 2004 to April 2006, I served as Vice President of Investment Management Services and a Senior Portfolio Manager at Ibbotson Associates (acquired by Morningstar in 2006).  Ibbotson Associates provided consulting and sub-advisory services to financial institutions.  As a Member of Ibbotson's Investment Policy, Compliance, and Alternative Investments Strategic Steering Committees, I helped steer Ibbotson's asset allocation policies and investment methodologies.  My role included leading and managing the team responsible for delivering 3(38) Plan Sponsor Consulting Services to defined contribution plans.  This included bringing to market one of the initial 3(38) fully outsourced plan lineup products designed for the defined contribution marketplace.

7.      Before joining Ibbotson, I was a Senior Portfolio Manager at J.P. Morgan (Bank One) from February 1998 to July 2004 and a Portfolio Analyst for Nuveen/Flagship Financial from February 1996 to February 1998.

8.      Through my work in retirement investment management, I have spent the better part of my thirty-year career partnering with boards and committees who serve as fiduciaries for billions of dollars in retirement plan assets.  In my work for a decade as a Senior Investment Consultant and DC Strategist with TWIS, my work included routinely sharing fiduciary responsibility as a 3(21) investment advisor and assuming fiduciary responsibility as a 3(38) investment manager.  At T. Rowe Price I worked with fiduciary committees as well as 3(21) investment advisors and 3(38) delegated managers and observed the interactions amongst them.  My emphasis throughout my career has been on: (1) establishing reasonable and appropriate governance practices for defined contribution plans; (2) developing reasonable and appropriate asset allocation and portfolio construction strategies for defined contribution plans; (3) building effective processes for defined contribution retirement plan fiduciaries to implement changes to their investment portfolios; and (4) facilitating defined contribution retirement plans' boards and committees' relationships with 3(38) investment managers and 3(21) advisors.

9.      I have provided interviews and written articles for various media outlets (including Bloomberg, CNBC, Institutional Investor, PLANSPONSOR, and Pensions & Investments)

and engaged in public speaking activities on retirement and defined contribution matters. I am periodically engaged in key retirement industry organizations as a member and contributor to their initiatives in the retirement benefits space. I most recently served as a Plan Design Committee member for the Defined Contribution Institutional Investment Association ("DCIIA"), a non-profit association dedicated to enhancing the retirement security of America's workers. I also contributed to a writing project for the Employee Benefit Research Institute ("EBRI"), a nonpartisan organization created to develop sound employee benefit programs and public policy through independent, objective, fact-based research and education.

10.     My work partnering with defined contribution plan committees led to extensive work in the target date fund ("TDF") space. TDFs are the primary qualified default investment alternative (QDIA) used in defined contribution plans and the vast majority of my clients used TDFs as their default offering. At Towers Watson, I worked with clients to evaluate, select, and monitor TDFs. This work included deep dive analyses of all of the relevant components (glide path, asset allocation, investment management, fee assessment, etc.) of the various TDF products in the marketplace including custom TDFs. At T. Rowe Price, I partnered closely with T. Rowe's TDF multi-asset research and portfolio management teams to conduct extensive work on a range of initiatives related to TDFs, including research pertaining to the risk literacy of committees in the selection process of TDFs, and the impact of varying asset class exposures and their influence on plan sponsor views of TDFs, among other bodies of work. My role was market facing with plan sponsor committees to understand their defined contribution plan goals and objectives and providing insight and expertise to support their TDF selection and monitoring process.

11.     I am being compensated at my standard billing rate of $775 per hour. I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction. My compensation in this matter is not in any way contingent or based on the content of my opinion or the outcome of this or any other matter.

12.     My CV, which includes a list of my publications in the last ten years and a list of cases in which I have testified in the past four years, is attached as **Appendix A**.

## II.     Assignment

13.     I have been retained by Morgan, Lewis & Bockius LLP, counsel for Defendants Quanta Services, Inc. ("Quanta"), the Board of Trustees of Quanta Services, Inc. ("Board"),

and the Quanta Services, Inc. 401(k) Savings Plan Committee ("Committee") (collectively, "Defendants"), in connection with the matter *Laliberte et al v. Quanta Services, Inc. et al.*[4] Plaintiffs allege that the Defendants breached their fiduciary duties with respect to the Quanta Services, Inc. 401(k) Savings Plan (the "Plan") because they "selected, retained, or otherwise ratified high-cost and poorly performing investments instead of offering more prudent alternative investments that were readily available at the time and during the Class Period."[5]

14.    Plaintiffs' expert, Donald C. Stone, filed an expert report on August 1, 2024 concluding primarily that (1) "[t]he Committee failed to establish and apply reasonable processes to monitor the Challenged Investments" and (2) "Quanta did not establish or apply a reasonable process to appoint qualified Committee members and monitor the Committee's performance."[6]  In light of Plaintiffs' and Mr. Stone's claims, Counsel has asked me to evaluate and offer opinions on the process undertaken by the Committee to monitor the Plan's investment options and the Committee's overall process during the period from September 26, 2016 to the present ("class period").[7]  Counsel has also asked me to review and respond to opinions set forth in Mr. Stone's report regarding the Committee's monitoring process.  Counsel has also asked me to address certain opinions in the August 1, 2024 report filed by Plaintiffs' expert Richard Marin.[8]

15.    A complete list of materials I have considered in preparing this report is attached as **Appendix B**.  My opinions in this matter are ongoing, and I reserve the right to modify, amend, or supplement my analysis as additional information becomes available.

## III.    Summary of Opinions

16.    As a result of my review and analysis of materials produced in this matter, which involved among other things applying my professional experience and industry knowledge, I have reached the following conclusions:

a.    Throughout the class period, the Committee, serving as the Plan's named fiduciary, provided oversight and management of the Plan.  Mr. Stone's report

---

[4] Class Action Complaint, *Laliberte, et al. v. Quanta Services, Inc., et al.*, United States District Court for the Southern District of Texas, Houston Division, Civil Action No. 4:22-cv-03290, September 26, 2022 ("Complaint").

[5] Complaint, ¶ 6.

[6] Expert Report of Donald C. Stone, August 1, 2024 ("Stone Report").

[7] Note that Mr. Stone's report focuses, in part, on the period prior to September 26, 2016.  Despite this being prior to the start of the class period, I respond to these pre-class period arguments.

[8] Expert Report of Richard A. Marin, August 1, 2024 ("Marin Report").

largely ignores or disregards the totality of the Committee's governance structure and thorough monitoring process, which were reasonable and consistent with sound fiduciary practices.

b. The Committee carefully and diligently monitored the Plan's investment options in accordance with sound fiduciary practices throughout the class period.  As part of its monitoring process, the Committee met regularly, received, reviewed, and discussed comprehensive materials, and worked in collaboration with its investment advisor to evaluate the Plan's investment options.

c. Mr. Stone's opinion regarding the Committee's lack of a charter fails to recognize the Committee's active and documented decision to operate without a charter.  In addition, his opinion fails to acknowledge that charters are not required under ERISA and that the IPS in effect during the class period provided the relevant guidance for the Committee.

d. The Committee's investment fund monitoring process was reasonable and consistent with accepted monitoring processes of plan fiduciary committees. Also consistent with common fiduciary practices, the Committee utilized a "Watch List" in evaluating fund performance, which was informed by both qualitative and quantitative metrics.

e. The Committee's monitoring of the Fidelity Freedom Funds ("Freedom Funds") is consistent with my experience and is in line with sound fiduciary practices.  Detailed information regarding the Freedom Funds' performance and other metrics were included in each Quarterly Plan Investment Review. In addition to the information included in the Quarterly Plan Investment Review, the annual Target Date Deep Dives included details regarding asset allocation, glide path, and other features specific to target date funds.

f. Mr. Stone's opinions regarding the Committee's leadership and voting processes are inconsistent with the fact that there is not a single, standard approach used by fiduciaries and are further inconsistent with my experience. Based on my experience, it is not unusual and is reasonable for committees to reach decisions using consensus rather than another voting structure.  Based on my review of the Plan materials and deposition testimony, I conclude that the Committee made well-reasoned and thorough decisions using a consensus

approach.  I also conclude that this Committee was high functioning, maintained a diverse set of opinions to inform their comprehensive work, and relied on sound practices to carry out their fiduciary responsibilities.

g.  Mr. Stone's approach to fiduciary training suggests there is only one track to accomplish fiduciary training, which is inconsistent with my experience, inconsistent with the deposition testimony of Committee members and the investment advisor, and overlooks the Committee's ongoing fiduciary education and engagement as well as formal training materials they received.

h.  In contrast to Mr. Stone's opinions, based on my review, Quanta's process to appoint Committee members is consistent with industry norms and demonstrated a thoughtful approach.  Quanta and the Committee, like most plan sponsors and retirement plan committees I have worked with, focused on having Committee members with a wide range of backgrounds and expertise. By design, the Committee was composed of members with diversified skills and expertise in a variety of fields, including finance and human resources, among other fields.

i.  In contrast to Mr. Stone's opinions, the Plan's investment advisor was qualified, engaged, and provided comprehensive information on the funds to the Committee, and the Committee appropriately and reasonably relied on the advisor's advice.  The quality of the materials produced by Quality Plan Advisors ("QPA") (and its predecessors) is on par with what is typical in the industry.  Mr. Stone's opinion also overlooks the continuity of the Committee/investment advisor relationship.  Despite the transition from AWAI to Epic to QPA, the Committee had the same investment advisor team (led by Rich Eagar) throughout the class period and valued its relationship with the advisor team.

j.  In contrast to Mr. Stone's opinion, based on my review of the Committee meeting minutes, I conclude that they were robust and had an appropriate amount of detail.  Meeting minutes are not intended to be a transcript to recreate specific data that is captured in meeting materials.  In fact, in my experience, meeting materials in full are considered "book of record," accessible to be reviewed, referenced, and discussed before, during, and after meetings.

k.  Mr. Stone's opinions regarding the Committee's adherence to the IPS are
faulty.  In reaching his conclusions, Mr. Stone fails to consider several critical
factors, including the discretion and latitude built into the Plan's IPSs and that
the Committee consistently received appropriate information and data to
support its decision-making process.

l.  Mr. Stone mischaracterizes the performance of the Freedom Funds at the start
of the class period.  In reaching this conclusion, Mr. Stone fails to consider (1)
the modest extent of the underperformance versus the S&P Target Date Index,
(2) the consistently improving performance versus the S&P Target Date Index,
(3) the consistently strong performance versus peers, (4) the Morningstar star
ratings (which are based on risk-adjusted returns), and perhaps most
fundamentally, (5) that broadly, all TDFs are designed with the long-term
objective of helping investors save for retirement as opposed to beating a
specific universe benchmark or competing fund.  Once these additional data
points are considered, it is apparent that the Committee's decision to not place
the Freedom Funds on the Watch List was reasonable.

m.  Mr. Stone's criticisms of the Target Date Deep Dive reports are unfounded
and fail to consider the additional detail that the reports provided to the
Committee.  Although ERISA does not require any "heightened scrutiny" or
"separate, more rigorous" procedures for monitoring a plan's QDIA, my
review of the documentary evidence, nonetheless, revealed extensive work
related to target date fund evaluation conducted by the Committee.  The
Committee requesting and reviewing an additional annual analysis to provide
more detail regarding the Plan's QDIA is consistent with the actions of a
thorough and engaged committee.  Further, at the conclusion of these reviews,
it allowed the Committee to continue to affirm the suitability of Fidelity as
their target date provider.

n.  Mr. Stone fails to consider the strength, reputation, and wide industry use of
the Fidelity platform and the overall assets in the Fidelity Freedom Fund
strategies.  Mr. Stone incorrectly implies that the Freedom Funds were failing
or that the Committee needed to act because of the outflows from the Freedom
Funds.  In fact, the Fidelity target date fund platform was extremely strong and
stable.

o. Mr. Marin's conclusions that the Committee should have removed and replaced certain funds during the class period are based on a flawed methodology. Mr. Marin's removal approach is predicated on performance-based metrics, ignores other decision-making factors and metrics—both quantitative and qualitative—detailed in the IPS, does not consider the Committee's preferences and Plan objectives, and completely disregards the broad discretion that exists in the IPS. Moreover, Mr. Marin's removal approach will almost certainly result in performance chasing, which is the opposite of what plan sponsors should be doing when monitoring plan investment options for retirement plans.

## IV.    Background

### A.    Overview of Defined Contribution Plans

17.    A 401(k) plan (also referred to as a defined contribution plan or DC plan) is an employee savings plan offered by many U.S. employers as a retirement benefit, and which offers tax advantages to the saver. All 401(k) plans are subject to the Employee Retirement Income Security Act ("ERISA") which is a "federal law that sets minimum standards for retirement plans in private industry."[9]

18.    A DC plan does not guarantee a specific amount of retirement benefits but rather relies on regular contributions by the employee and/or the employer to an investment account under the plan, typically at a set percentage of the employees' annual earnings.[10] Upon retirement, a DC plan participant then receives the balance in his or her investment account,

---

[9] "FAQs about Retirement Plans and ERISA," *U.S. Department of Labor*, *Employee Benefits Security Administration*, available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/faqs/retirement-plans-and-erisa-for-workers.pdf, p. 1. *See also* "2427. Employee Retirement Income Security Act Of 1974 (ERISA) -- 29 U.S.C. 1001 Et Seq.," *U.S. Department of Justice*, available at https://www.justice.gov/archives/jm/criminal-resource-manual-2427-employee-retirement-income-security-act-1974-erisa-29-usc-1001-et.

[10] A 401(k) plan is "a defined contribution plan that is a cash or deferred arrangement" that allows eligible employees (*i.e.*, employees eligible to participate in the plan) to make pre-tax elective deferrals through payroll deductions. Employers that establish a 401(k) retirement plan for their employees also have the option of making contributions on behalf of all participants, making matching contributions based on employees' elective deferrals, or both. *See* "Types of Retirement Plans," *U.S. Department of Labor*, available at https://www.dol.gov/general/topic/retirement/typesofplans.

HIGHLY CONFIDENTIAL

plus or minus any gains or losses to the investment account's underlying investments over time.[11]

## B.     Defined Contribution Plan Governance Practices

### 1.     Plan Documents and Committees

19.     DC Plan governance, which refers to the oversight and management of DC plans, is assigned to person(s) referred to as "plan fiduciaries."  Among many large DC plans, plan fiduciaries are often organized into internal retirement plan committees.[12]  Having a fiduciary committee is not required by ERISA, but in my experience, it is a common practice.  These retirement plan committee members often include representatives from various departments within the plan sponsor, including for example, finance, treasury, human resources and/or operations.[13]  These individuals work collectively, often in conjunction with a variety of service providers as well as staff from the plan sponsor, to design the plan and its investment menu, make ongoing decisions about plan investment options, and to conduct or coordinate plan administration.[14]  The composition of retirement plan committees typically provides broad representation from various groups within the organization.  This approach to Committee make-up helps ensure that the interests of Plan participants across the various divisions are represented and it supports the scope of work required in plan oversight, including employee benefit matters, participant communications, recordkeeping and plan administration, and investment oversight.  A diverse committee make-up with differing skillsets and backgrounds ensures the ability to comprehensively address the complexity of plan oversight.

20.     Plan governance is not a one-size-fits-all endeavor.  It is common, in my experience, that plan governance structures vary, depending upon a variety of factors including the size

---

[11] "Types of Retirement Plans," *U.S. Department of Labor*, available at https://www.dol.gov/general/topic/retirement/typesofplans.

[12] "Meeting Your Fiduciary Responsibilities," *U.S. Department of Labor*, *Employee Benefits Security Administration*, September 2021, available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf; "FiduciarySource Guide: Helping plan sponsors understand their fiduciary duties," *T. Rowe Price*, December 2021, available at https://www.troweprice.com/content/dam/retirement-plan-services/pdfs/advisor-resources/client-loyalty/FiduciarySource_Guide.pdf, p. 4.

[13] Rebecca Moore, "Establishing a Retirement Plan Committee," *PLANSPONSOR*, December 15, 2020, available at https://www.plansponsor.com/in-depth/establishing-retirement-plan-committee/.

[14] Rebecca Moore, "Establishing a Retirement Plan Committee," *PLANSPONSOR*, December 15, 2020, available at https://www.plansponsor.com/in-depth/establishing-retirement-plan-committee/.

and culture of the plan sponsor, the type of plan, complexity of investment line-up, and the approach to use of a consultant or advisor. Governance practices also evolve over time depending on, among other things, changes in regulation, the needs and objectives of plan fiduciaries, and the marketplace for investment products and services that support plan governance. Although there are some common governance practices among retirement plan committees, there is not a universal set of governance practices that all plan fiduciaries are required to follow.

21.     Although my understanding is that it is not required by ERISA's provisions, many retirement plan committees choose to adopt an IPS to document their plan's goals, objectives and procedures, and the retirement plan committee's role in overseeing them. An IPS may describe the plan's investment structure and guidelines for selecting, monitoring, and replacing investment options in the plan.[15]

22.     Similarly, it is my understanding that ERISA's provisions do not require a retirement plan committee to have a separate committee charter. In my experience, not all committees opt to incorporate a separate committee charter and instead look to other governing documents such as the IPS or Plan Documents to address committee roles and responsibilities.

23.     Retirement plan committees generally meet periodically, typically between two to four times per year, although I am not aware of any requirement to meet a minimum number of times per year. Depending on the plan, these meetings may also be attended by human resources staff, in-house and outside counsel, plan recordkeepers, consultants (3(21) investment advisors or 3(38) delegated managers), and other service providers. Significant changes to retirement plans' provisions, operations, administrative structures, consultants, and investment options may be reviewed and discussed at these meetings. It is common practice for minutes to be taken at these meetings. The level of detail reflected in the meeting minutes is within the discretion of the plan committee and varies from plan to plan. In my experience, committee minutes often memorialize high-level topics covered as well as the ultimate decisions made by the retirement plan committee.[16] Materials that are provided to

---

[15] "FiduciarySource Guide: Helping plan sponsors understand their fiduciary duties," *T. Rowe Price*, December 2021, available at https://www.troweprice.com/content/dam/retirement-plan-services/pdfs/advisor-resources/client-loyalty/FiduciarySource_Guide.pdf, p. 21.

[16] *See, e.g.*, "FiduciarySource Guide: Helping plan sponsors understand their fiduciary duties," *T. Rowe Price*, December 2021, available at https://www.troweprice.com/content/dam/retirement-plan-services/pdfs/advisor-resources/client-loyalty/FiduciarySource_Guide.pdf, p. 21 ("A good fiduciary process in overseeing a plan's investments may include [ ] [m]eeting regularly to discuss and review the plan's investments and keeping notes

committee members before or at the meetings by the plan sponsor's staff or the plan's service providers (e.g., investment advisors) may provide additional details regarding the retirement plan committee's process, decision making, and/or information/data considered by the committee in reaching its decisions.   In my experience, meeting minutes are not transcripts of committee meetings.  Instead, meeting minutes tend to be streamlined to document only high-level decisions and/or key action items with reliance on the accompanying meeting materials (e.g., quarterly reports, manager presentations, etc.) to represent the specific details that informed the retirement plan committee's decision making and to serve as record.[17]

### 2.     Investment Advisors to Retirement Plans

24.     Many retirement plan committees engage third parties to provide services relating to the plan's investment options and assist in plan oversight and management.  Under ERISA, one option available for a defined contribution plan when choosing an investment service provider is a 3(21) investment advisor.[18]

25.     In a 3(21) investment advisory arrangement, the investment consultant (referred to as an "investment advisor") provides recommendations and advice to aid the retirement plan committee's decision making process and has a fiduciary duty to the plan to provide prudent and loyal advice, but the committee retains the fiduciary responsibility for selecting, retaining, and removing investment options.  3(21) consultants typically analyze data and metrics with respect to the plan's participants and the plan's various investment options, and at committee meetings they communicate relevant data and information about the plan's investment options, their views on the appropriateness of the plans' funds, and their recommendations on any options they believe should be removed or replaced to the committee.  The plan sponsor's investment committee generally considers this advice, but they are not obligated to follow it.  In a 3(21) arrangement, a plan sponsor committee can

---

or minutes of such meetings. [ ] A good decision-making process will be thorough, consistently applied and well-documented (i.e., documentation should make clear what information was considered and what decisions were made), and will utilize experts when needed.").

[17] *See, e.g.*, True Tamplin, "Plan Committee Meeting Minutes," *Finance Strategists*, September 7, 2023, available at https://www.financestrategists.com/retirement-planning/plan-compliance/plan-committee-meeting-minutes/ ("Minutes should strike a balance between brevity and detail. Too much detail can make the minutes confusing and difficult to use, while too little detail can fail to provide a complete picture of the meeting.").

[18] "FiduciarySource Guide: Helping plan sponsors understand their fiduciary duties," *T. Rowe Price*, December 2021, available at https://www.troweprice.com/content/dam/retirement-plan-services/pdfs/advisor-resources/client-loyalty/FiduciarySource_Guide.pdf, p. 28 ("One option is to engage an investment advisor to act in a consulting capacity. … Investment advisors hired pursuant to ERISA 3(21) owe fiduciary duties of prudence and loyalty when they provide investment advice.").

make any changes to their plan's investment lineups that they deem appropriate, whether or not those changes were recommended by the 3(21) consultant.

### C. Fiduciary Considerations in the Evaluation and Monitoring of Plan Investment Options

26.     The monitoring processes that plan fiduciaries undertake to ensure that the selections for the plan investment lineup remain appropriate for their plan encompass a spectrum of activities.  Broadly, there is general tracking of plan investment options to ensure they are performing as expected in light of long-term investment horizons, are aligned to their initial investment mandate, and otherwise remain appropriate.  This tracking process entails gathering and reviewing a fund's overall performance (e.g., returns, risk, fees, etc.), and checking to see if there have been any developments or changes to its investment management team and investment strategy, among other factors.  Investment advisors are typically relied upon to collect and synthesize this information and report it to plan committees.  Generally, if no changes or developments have occurred and the reported information reflects that the funds remain appropriate for the plan, plan committees do not engage in in-depth discussion of funds that remain in-line with expectations.  Instead, plan committees will continue to track the funds through monitoring reports, and only discuss those funds in need of review.  To the extent any notable issues are identified as part of this ongoing tracking process, which is a determination made based on judgment, plan committees may choose to initiate further investigation into those issues.

27.     Fund investigation may entail more in-depth analysis of how notable changes might affect a fund's investment strategy and long-term performance, or to understand the drivers of a fund's returns and overall performance.  Again, plan committees often direct investment advisors to conduct this analysis, summarize their findings, and provide recommendations.  Finally, if the findings of an investigation indicate that a fund replacement may be necessary, plan committees may initiate a manager search to find a replacement.  All of this is only a broad description of monitoring activities—in practice, monitoring processes may not rigidly follow these succinct steps and in this order.

28.     Importantly, plan committees, with assistance from their investment advisors, evaluate and monitor funds in light of their plans' unique objectives and circumstances, typically taking a holistic approach rather than relying on any one factor to trigger a fund investigation or replacement.  Not all fund developments (e.g., performance metric changes,

portfolio management team shifts, etc.) warrant investigation, and not all investigations warrant fund replacement. Further, mechanically reacting to fund developments or changes by launching investigations and fund replacements is costly and inefficient and ignores the complexity and long-term nature of investing (particularly for target date funds). This can lead plan fiduciaries to make decisions that are not in the best interests of plan participants.

29.    To inform their monitoring decisions, plan fiduciaries evaluate funds for selection and retention based on various qualitative and quantitative factors. This information is typically considered collectively in order to make well-informed investment decisions. Qualitative factors include information on how a fund was rated by third-party research institutions (e.g., Morningstar), as well as investment managers' investment process, tenure, and experience with the fund's stated investment strategy. Quantitative factors typically include comparisons of the fund's fees and historical returns to the fees and historical returns of relevant benchmarks and/or peer groups over multiple periods. Importantly, again, there is no one-size-fits all approach to how plan fiduciaries weigh these various qualitative and quantitative factors—evaluation of a given fund depends on a wide range of considerations including the nature of the fund and its alignment to the objective of the plan, as well as the circumstances at hand.

30.    Evaluating fund returns, which is just one of the many quantitative factors plan fiduciaries typically consider, can be a complex process. Funds, even those within the same asset class, may differ in terms of how they execute their investment strategy, and an evaluation of fund returns should be conducted in light of a fund's specific investment strategy. For example, not all funds place the same emphasis on maximizing future returns. Rather, funds vary with respect to relative emphasis on maximizing returns versus limiting risk as well as what types of risk are prioritized. Still other funds are created to track the returns of an established index.

31.    Another complexity to evaluating fund returns is determining whether and when to prioritize long-term versus short-term return measures. "Performance chasing" (i.e., making fund selection and removal decisions based solely on short-term performance measures) or being overly reactive to short-term returns is generally inconsistent with accepted retirement plan fiduciary practices.[19] It is widely understood by plan fiduciaries that fund returns

---

[19] *See, e.g.*, "Retirement Plan Fiduciary Mistake – Focusing Solely on Past Investment Performance," *Conrad Siegel*, available at https://conradsiegel.com/focusing-solely-on-past-investment-performance/. For example, a Vanguard team "simulates a performance-chasing strategy among U.S. equity mutual funds for the ten years

relative to benchmarks can fluctuate due to varying market conditions and even minor differences in investment strategies. Evaluating a fund based on return measures over a limited time period may distort an assessment of the quality of the fund's investment management and how the fund is expected to perform over the long-term.[20] Since retirement accounts are typically held by participants over long time horizons, plan fiduciaries focus their evaluation on how funds are expected to perform over "full market cycles," or periods of prolonged rising and falling prices, respectively referred to by investment professionals as "bull" and "bear" markets.[21] Because different fund strategies and styles operate differently in different markets, the appropriate period over which to evaluate a fund may vary from fund to fund.

32.     Because evaluating fund returns is a complex process, in my experience, plan fiduciaries take time to observe fund returns in light of relevant market conditions and to deliberate about a fund before making the decision to replace it on a plan investment lineup, particularly if the fund is meeting its established objectives. The length of this observation period can vary depending on the facts and circumstances at hand. Observing and evaluating funds over long periods relative to target objectives prevents plan fiduciaries from making knee-jerk plan lineup changes based on short-term market trends and enables them to focus on evaluating funds based on their long-term suitability for the plan. It is also worth noting that frequent changes to plan investment lineups are disruptive and potentially costly to plan participants. Because DC plans are designed for long-term retirement savings, frequent changes in investment strategy may disrupt and hinder the compounding growth of the investments. For example, replacing a fund when its value is low due to prevailing market conditions would prevent participants from recovering those losses when market conditions, which are cyclical in nature, shift.[22] In addition, changing plan investment options carries

---

ended December 31, 2013; [they] then compare the results with a buy-and-hold strategy over the same period. [Their] analysis shows clearly that buy-and-hold has been the superior approach [than performance-chasing]." *See* Brian R. Wimmer, et al., "Quantifying the impact of chasing fund performance," *Vanguard*, July 2014, available at https://www.vanguard.ca/documents/quantifying-the-impact-en.pdf.

[20] Maciej Kowara and Paul Kaplan, "How Long Can a Good Fund Underperform?" *Morningstar*, August 17, 2018, available at https://www.morningstar.com/financial-advisors/how-long-can-good-fund-underperform ("[p]erformance is just not a reliable guide to assessing managers unless one extends the time frame to decades.").

[21] A "bull" market is characterized by strong growth in stock prices and confidence in financial markets. A "bear" market is characterized by a substantial decline in stock prices (at least a 20% decline from a recent high), a general lack of confidence in financial markets, and negative economic indicators and/or accompanied recession. *See* Kat Tretina, "Bear Market Vs. Bull Market: What's The Difference?" *Forbes Advisor*, June 12, 2023, available at https://www.forbes.com/advisor/investing/bear-market-vs-bull-market/.

[22] John Manganaro, "Lasting Volatility Faces Retirement Investors," *PLANSPONSOR*, March 10, 2020, available at https://www.plansponsor.com/lasting-volatility-faces-retirement-investors/.

transition costs associated with moving assets from one investment option to another (*i.e.* custodial costs, etc.) and typically results in unnecessary confusion for plan participants. Frequent changes to plan investment options force plan participants to incur transaction costs to sell out of their existing holdings and move to other investment options offered by the plan. By being deliberate about decisions to replace existing plan offerings, retirement plan committees shield plan participants from incurring these unnecessary costs.

### D.     Overview of Target Date Funds

33.     Target date funds ("TDFs") were first introduced in the 1990s, specifically for the DC plan market, and have become increasingly common among DC plans.[23] TDFs aim to provide investors with a professionally diversified portfolio that automatically adjusts its asset allocation over time to become more conservative as the target retirement date approaches.

34.     A TDF series consists of a set of "vintages," each of which implements an investment strategy designed to correspond to an expected target retirement date. TDFs are generally organized as a fund-of-funds, meaning that each TDF vintage is composed of a set of underlying funds. To provide investors with a diversified portfolio, TDFs invest in a variety of underlying funds across multiple asset classes—including equity (i.e., stocks), fixed income (i.e., bonds), and, sometimes, others such as real estate and commodities.

35.     As its target retirement date approaches, each TDF vintage adjusts its asset allocation to become more conservative by reducing exposure to higher-risk (and higher expected

---

[23] *See, e.g.*, "Industry's First Target-Date Fund Celebrates 15 Years Since Groundbreaking Launch," November 7, 2008, *InsuranceNewsNet*, available at https://insurancenewsnet.com/oarticle/Industrys-First-Target-Date-Fund-Celebrates-15-Years-Since-Groundbreaking-Launc-a-100322. According to annual surveys of DC plans conducted by Deloitte between 2008 and 2019, the share of retirement plans that included TDFs in their investment lineup ranged from 57 percent to 89 percent. The Deloitte surveys also report that, between 2008 and 2015, the share of retirement plans using TDFs as the QDIA rose from 63 to 85 percent. *See* "401(k) Benchmarking Survey: Looking beyond the horizon – Employers addressing strategic challenges by enhancing and fine-tuning their 401(k) plans," *Deloitte*, 2008; "Annual 401(k) Benchmarking Survey: Plan sponsors and providers work at closing the retirement readiness gap while getting ready for new fee disclosure regulations," *Deloitte*, 2011; "Annual Defined Contribution Benchmarking Survey: Stronger economy provides the building blocks for positive trends in DC plans," *Deloitte*, 2014; "Annual Defined Contribution Benchmarking Survey: Ease of Use Drives Engagement in Saving for Retirement," *Deloitte*, 2015; "Defined Contribution Benchmarking Survey: From Oversight to Participant Experience – Plan Sponsors are Taking Their Fiduciary Role up a Notch," *Deloitte*, 2017; "2019 Defined Contribution Benchmarking Survey Report: The retirement landscape has changed—are plan sponsors ready?" *Deloitte*, 2019. *See also* "2016 Target-Date Fund Landscape: Morningstar's Best Practices in Target-Date Evaluation," *Morningstar*, April 12, 2016, p. 5; "2020 Target-Date Strategy Landscape: How target-date shareholders fared in the coronavirus bear market and the trends shaping the future of investing for retirement," *Morningstar*, May 2020; "2021 Target-Date Strategy Landscape: Rising markets make up for fizzling contributions and push target-date assets to an all-time high," *Morningstar*, March 2021.

return) assets such as equity funds, and increasing exposure to lower-risk (and lower expected return) assets such as fixed income funds.  This approach helps protect participant savings from potential investment losses as they prepare to or start making withdrawals in retirement. Asset allocations within each TDF vintage can vary widely across TDFs and many TDF investment managers can dynamically adjust the target and rebalance their retirement savings over time.  TDFs' diversification across asset classes and their automatic rebalancing make these funds popular options for DC plans.[24]  Broadly, all TDFs are designed with the long-term objective of helping investors save for retirement; however, the asset allocation within each TDF vintage adjusts in response to evolving market conditions.  The overall asset allocation adjustments that all vintages of a TDF series follow over the investment time horizon is referred to as a "glide path." A TDF's asset allocation ultimately reaches a terminal point, after which the asset allocation is held constant.

36.    TDF glide paths are generally categorized as either "to-retirement" or "through-retirement."  "To-retirement" glide path TDFs reach their terminal asset allocation *at* the target retirement date, after which the glide path asset allocation is held constant. "Through-retirement" glide path TDFs continue to evolve their asset allocation into retirement and reach their terminal asset allocation at some point *after* (and sometimes well after) the target retirement date.[25]  The glide paths of "to-retirement" and "through-retirement" TDFs generally differ in their investment philosophies and risk-return profiles (*See* **Figure 1** below).  For example, "to-retirement" TDFs are designed to reduce the impact of a large market downturn just before retirement through a more conservative asset allocation strategy (i.e., lower allocation to higher-risk assets such as equities) in the years leading up retirement. In contrast, "through-retirement" TDFs continue to evolve the fund's asset allocation after the retirement date to address the potential need for income growth during the post-retirement years.  Accordingly, at certain points along the glide path (e.g., 20 years before retirement), "to-retirement" TDFs have, generally, lower allocations to potentially higher-risk and higher expected return investments than their counterpart "through-retirement" TDFs.  By design, TDFs with a lower allocation to higher-risk assets are likely to generate lower returns relative

---

[24] *See, e.g.*, "Target Date Retirement Funds - Tips for ERISA Plan Fiduciaries," *U.S. Department of Labor, Employee Benefits Security Administration*, February 2013, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/target-date-retirement-funds.pdf.
[25] *See, e.g.*, "Target-Date Series Research Paper: 2010 Industry Survey," *Morningstar*, March 15, 2010, p. 16; *See also* "2014 Target-Date Series Research Paper," *Morningstar*, July 1, 2014, p. 8.

to TDFs that pursue a higher allocation to higher-risk assets when market conditions favor higher-risk assets.

**Figure 1 – TDF Glide Paths**



Source: "2013 Target-Date Series Research Paper," *Morningstar*, June 27, 2013, p. 15.

37.     Aside from following different glide paths and having different asset-allocation risk-return profiles, TDFs can differ in whether they invest in passively-managed (i.e., index) underlying funds, actively-managed underlying funds, or a combination of both (i.e., blend).[26]  Passively-managed funds aim to closely track the performance of their defined benchmark.  Actively-managed funds typically aim to outperform their defined benchmark by investing in research and/or investment manager's expertise.  As a result, as a general matter, relative to actively-managed funds, passively-managed funds tend to be associated with lower fees.[27]  Whether a TDF uses passively-managed funds, actively-managed funds, or a combination of both as underlying funds should be considered when evaluating and interpreting performance relative to a benchmark.  A survey conducted by Callan, a leading investment consulting firm, shows that in 2016, 36.6 percent of plan sponsors used TDFs consisting solely of passively-managed underlying funds, 26.8 percent of plan sponsors used TDFs consisting of a mix of passively-managed and actively-managed underlying funds, and 36.6 percent of plan sponsors used TDFs consisting solely of actively-managed underlying funds.[28]  A subsequent 2021 Callan survey reported an increased use of passively-managed

---

[26] For example, the Freedom Funds invest largely in actively-managed underlying funds.  *See* "Fidelity Freedom Target-Date Fund Series Report," *Morningstar*, March 31, 2017.

[27] *See, e.g.*, Kat Tretina, "Index Funds vs. Mutual Funds," *Forbes Advisor*, March 22, 2023, available at https://www.forbes.com/advisor/investing/index-funds-vs-mutual-funds/.

[28] *See* "2017 Defined Contribution Trends: 10th Anniversary Edition," *Callan*, December 23, 2016, p. 25.

and blend TDFs during the class period.  The survey from 2021 reported that 44 percent of plan sponsors utilized passively-managed underlying funds, 37 percent utilized a mix of passively-managed and actively-managed underlying funds, and 19 percent utilized actively-managed underlying funds.[29]

38.    Although the overall objective of all TDFs is to provide a diversified portfolio that adjusts its asset allocation based on an expected target retirement date, TDFs vary significantly in terms of the investment strategies used to achieve this objective.[30] Importantly, a fulsome evaluation of a TDF series and its appropriateness for a plan lineup requires a keen understanding of the TDF series' specific investment strategy.

### E.    Overview of the Quanta Services, Inc. 401(k) Savings Plan

39.    The Plan is a defined contribution plan sponsored by Quanta with the purpose of "enabl[ing] eligible Employees to save for retirement."[31]  The Plan was established on January 1, 1999.[32]  Quanta employees above the age of 21 are eligible to participate in the Plan and can contribute between 1% and 75% of eligible compensation to the Plan on a pre-tax basis, subject to Internal Revenue Code limitations (e.g., $18,000 in 2016).[33]  Quanta matches Plan participant contributions "equal to 100% of the first 3% of [the Plan participant's] eligible compensation contributed to the Plan and 50% of the next 3% of the participant's eligible compensation contributed to the Plan."[34]

40.    From year-end 2016 through year-end 2022, the Plan grew from $560 million to $1.4 billion in net assets and from 7,600 to 23,000 Plan Participants.[35]  Throughout the class

---

[29] See "2022 Defined Contribution Trends Survey," *Callan*, 2022, p. 17.

[30] Other features that differ across TDFs include but are not limited to, underlying asset classes, whether the underlying funds are mutual funds, collective investment trusts, or a combination of both, etc.

[31] "Summary Plan Description: Quanta Services, Inc. 401(k) Savings Plan," *Quanta Services, Inc.*, July 15, 2016, QUANTA_000037–056 at 039; "Summary Plan Description: Quanta Services, Inc. 401(k) Savings Plan," *Quanta Services, Inc.*, May 3, 2021, QUANTA_000146–165 at 148.

[32] *See, e.g.*, Quanta Services, Inc. 401(k) Savings Plan, Form 5500, 2016.

[33] Quanta Services, Inc. 401(k) Savings Plan, Form 5500, 2016, QUANTA_001422–526 at 517.  Employees are not eligible if they are "a resident of Puerto Rico; covered by a collective bargaining agreement, unless the agreement requires the employees to be included under the Plan; a nonresident alien with no income from a U.S. source; Guam-based Employees performing services under prevailing wage statutes." *See* "Summary Plan Description: Quanta Services, Inc. 401(k) Savings Plan," *Quanta Services, Inc.*, July 15, 2016, QUANTA_000037–056 at 042; "Summary Plan Description: Quanta Services, Inc. 401(k) Savings Plan," *Quanta Services Inc.*, May 3, 2021, QUANTA_000146–165 at 151.

[34] Quanta Services, Inc. 401(k) Savings Plan, Form 5500, 2016, QUANTA_001422–526 at 517.

[35] Quanta Services, Inc. 401(k) Savings Plan, Form 5500, 2016, QUANTA_001422–526 at 423, 436; Quanta Services, Inc. 401(k) Savings Plan, Form 5500, 2022, QUANTA_001914–993 at 915, 927.  During the class period, the Contractors Retirement Plan merged into the Plan on June 1, 2017, the Stronghold Ltd. 401(k) Plan merged into the Plan effective December 31, 2017, the NLC 401(k) Savings Plan merged into the Plan on December 31, 2018, and the Blattner Holding Company Employee Retirement Savings Plan merged into the

period, the Plan offered a variety of investments including a money market fund, a range of mutual funds, and a TDF series.[36]  From the start of the class period until April 15, 2021, the Plan's QDIA was the Freedom Funds.  Effective April 15, 2021, the Committee replaced the Freedom Funds with the FIAM Blend funds and designated the FIAM Blend funds as the Plan's new QDIA.[37]

41.    During the class period, the Plan was administered by the Committee, which was composed of five or six Quanta employees with senior management positions.[38]  The Committee retained a third-party investment advisor, QPA (and its predecessors), that served as an ERISA 3(21) fiduciary to the Plan.[39]  Additionally, the Plan was recordkept by Fidelity Investments Institutional.[40]

## V.    The Plan's Governance Structure and Monitoring Process Were Reasonable and Consistent with Accepted Fiduciary Practices

42.    Throughout the class period, the Committee, serving as the Plan's named fiduciary, provided oversight and management of the Plan.  Mr. Stone's report largely ignores or disregards the totality of the Committee's governance structure and thorough monitoring process, which I review and analyze throughout the class period below.  Relatedly, Plaintiffs' expert, Mr. Marin argues that the Freedom Funds should have been removed and replaced pursuant to the Plan's IPS "no later than the First Quarter of 2017" and that the American Beacon Small Cap Value Fund and DFA International Small Cap Value Fund should have

---

Plan on October 3, 2022.  *See* Quanta Services, Inc. 401(k) Savings Plan, Form 5500, 2017, QUANTA_001527–604 at 554; Quanta Services, Inc. 401(k) Savings Plan, Form 5500, 2019, QUANTA_001680–754 at 707; Quanta Services, Inc. 401(k) Savings Plan, Form 5500, 2022, QUANTA_001914–993 at 961.

[36] Quanta Services, Inc. 401(k) Savings Plan, Form 5500, 2016, QUANTA_001422–526 at 458; Quanta Services, Inc. 401(k) Savings Plan, Form 5500, 2022, QUANTA_001914–993 at 952.

[37] Quanta Services, Inc. 401(k) Savings Plan, Form 5500, 2016, QUANTA_001422–526 at 449; "Re: Changes to the Investment Options with respect to the Plan(s) specified below (the 'Plan(s)')," *Fidelity Investments*, February 16, 2021, QUANTA_001013–019 at 015.

[38] "Investment Policy Statement for Quanta Services, Inc. 401(k) Savings Plan," *Quanta Services, Inc.*, October 2015, QUANTA_001404–421 ("2015 Investment Policy Statement") at 408; "Investment Policy Statement for Quanta Services, Inc. 401(k) Savings Plan," *Quanta Services, Inc.*, May 2020, QUANTA_000909–930 ("2020 Investment Policy Statement") at 912.  *See* Section V.A.

[39] *See* Section V.B; Retirement Plan Advisory Services Agreement between Ascende Wealth Advisers, Inc. and Quanta Services, Inc., February 3, 2015, QUANTA_001381–402 at 385.

[40] Quanta Services, Inc. 401(k) Savings Plan, Form 5500, 2015; Quanta Services, Inc. 401(k) Savings Plan, Form 5500, 2016, QUANTA_001422–526 at 428; Quanta Services, Inc. 401(k) Savings Plan, Form 5500, 2017, QUANTA_001527–604 at 533; Quanta Services, Inc. 401(k) Savings Plan, Form 5500, 2018, QUANTA_001605–679 at 611; Quanta Services, Inc. 401(k) Savings Plan, Form 5500, 2021, QUANTA_001830–913 at 835.

been removed and replaced "no later than the First Quarter of 2020."[41]  Given the timing of his analysis, Mr. Marin's analysis focuses on the Plan's 2015 IPS.[42]

### A.   The Committee, Its Roles and Responsibilities, Composition, and Oversight

43.     The roles and fiduciary responsibilities of the Committee are described in the Plan's IPS and remained generally consistent across updates to the IPS made during the class period. According to the Plan IPSs effective during the class period, the Committee's responsibilities include the following: (1) defining the Plan's investment objectives; (2) preparing and maintaining the IPS; (3) determining guidelines for selecting investment options; (4) providing a menu of investment options within the Plan that includes a range of asset classes with different and distinct risk/return profiles to allow for prudent diversification opportunities; (5) controlling and accounting for all investment, recordkeeping and administrative expenses associated with the Plan; (6) establishing procedures for monitoring and evaluating investment options; (7) establishing criteria used to determine when to retain, add, eliminate, etc. investment options; (8) avoiding prohibited transactions and conflicts of interest; and (9) amending the IPS at such times and in such manner as the Committee determines necessary to meet the Plan's overall objectives.[43]  The IPS also states that the Committee shall create and maintain written records of all decisions relating to the choice and ongoing monitoring of the investment options under the Plan and that minutes shall be taken of all meetings, noting pertinent information that was discussed.[44]  As is common practice, the Plan's IPS states explicitly that the fiduciaries are not bound by the literal terms of the IPS, but will instead use considered judgement in making their decisions.[45]

44.     During the class period, the Committee typically had either five or six members at any given time.[46]  Consistent with industry norms, many of the Committee members held senior

---

[41] Marin Report, ¶ 24.

[42] Marin Report, footnote 3.  "I understand that the Committee adopted updates to the IPS in 2020 and 2023; however, since the Freedom Funds, American Beacon Small Cap Value Fund, and DFA International Small Cap Value Fund would have been removed pursuant to the analysis set forth herein before the IPS updates were adopted, any changes or updates to the IPS made in 2020 and 2023 do not impact my analysis or opinions."

[43] See, e.g., 2015 Investment Policy Statement at 408.

[44] 2015 Investment Policy Statement at 410.

[45] 2015 Investment Policy Statement at 408.

[46] Consistent with my experience, there has been some turnover in the makeup of the Committee since the start of the class period in 2016.  This can be caused by individuals departing the company or by individuals rolling off of the Committee.  See Deposition of Carolyn Campbell, June 27, 2024 ("Campbell Deposition"), pp. 216:3–220:9.

management positions at Quanta, including Senior Vice President of Finance; VP, Finance and Treasurer; Deputy General Counsel; VP, Human Resources; and VP, Investor Relations.[47]  In my experience, Committees typically include senior management and middle management professionals from the legal, finance, and human resources departments and this Committee was no different.  The backgrounds and skillsets of these Committee members were diverse, which in my experience lends itself to well-functioning committees.  More generally, the Committee's members' diverse professional roles within Quanta were useful in helping ensure that the interests of Plan participants from Quanta's various divisions were represented in the Committee.  The table below summarizes the education, work experience, and roles of several of the Committee members during the class period.[48]

**Table 1 – Backgrounds of Selected Committee Members**

| Name | Position(s) at Quanta | Education | Experience |
|---|---|---|---|
| Kip Rupp[49] | Vice President, Investor Relations | Business degree with concentration in investments; CFA designation | Investment management; equity research; investor relations consulting |
| Nicholas Grindstaff[50] | VP, Finance and Treasurer | Undergraduate degree in finance; master's in accounting degree | Finance group at Quanta. Series of roles (assistant treasurer, treasurer, VP of finance and treasurer) |
| Derrick Jensen[51] | CFO; Executive Vice President – Business Operations | Bachelor's degree in accounting. | Auditor; series of finance positions at Quanta (VP, Controller; Chief Accounting Officer; Senior Vice President, Finance; Chief Financial Officer) |
| Carolyn Campbell[52] | Deputy general counsel and corporate secretary | Bachelor's degree in accounting; JD law degree | Law firm experience at multiple firms; in-house attorney at several companies |

[47] *See* Deposition of Kim Riddle, July 16, 2024 ("Riddle Deposition"), p. 16:5–10; Deposition of Nicholas Grindstaff, July 26, 2024 ("Grindstaff Deposition"), p. 16:14–15; Deposition of Christopher August Rupp, June 28, 2024 ("Rupp Deposition"), p. 10:1–3; Campbell Deposition, p. 23:13–14; Deposition of Derrick Jensen, June 19, 2024 ("Jensen Deposition"), p. 17:10–11.
[48] Other Committee members (and their positions at Quanta) during the class period included Jayshree Desai (Chief Financial Officer); Randall Wisenbaker (Executive Vice President); Redgie Probst (Chief Operating Officer); Steve Wilhelm (Executive Vice President); and Paul Noble (Chief Accounting Officer).  Campbell Deposition, pp. 217:24–223:14.
[49] Rupp Deposition, pp. 9:21–25, 15:22–21:2.
[50] Grindstaff Deposition, pp. 13:15–17:4.
[51] Jensen Deposition, pp. 11:25–15:6; "Quanta Services Announces Planned Executive Transitions," *Quanta Services, Inc.*, May 5, 2022, available at https://quantaservices.com/stories/quanta-services-announces-planned-executive-transitions.
[52] Campbell Deposition, pp. 24:10–27:4.

HIGHLY CONFIDENTIAL                    Page 22

| Name | Position(s) at Quanta | Education | Experience |
|---|---|---|---|
| Kim Riddle[53] | Vice President, Human Resources | Bachelor's degree in journalism | Experience in a range of HR roles at several companies; previous 401(k) plan experience at her prior employer, Hercules Offshore Drilling. |

In my opinion, the composition of the Committee is consistent with the composition of other defined contribution plan committees I have observed in my experience.

45.     The Committee met regularly throughout the class period.  The cadence of meetings was quarterly (four times a year) in all but two years over the class period, as shown in **Exhibit 1**.  In each year, the meetings provided comprehensive coverage of every quarter over the class period (2017 combined 4Q 2016 and 1Q 2017 and 2018 combined 1Q 2018 and 2Q 2018).[54]  From 2015 through 2023, the Committee met 36 times, which is an average of 4 meetings per year.[55]  In my experience, this frequency is consistent with sound fiduciary practices.  These meetings provided comprehensive and ongoing coverage including, but not limited to: (1) review and approval of prior meeting minutes, (2) capital markets updates, (3) regulatory reviews, and (4) investment performance reviews.  Consistent with my experience, the Plan's investment advisor prepared and circulated these materials and the Committee

---

[53] Riddle Deposition, pp. 16:5–23:4.

[54] 2016 Meetings occurred on February 15, 2016 (QUANTA_104297–299); May 12, 2016 (QUANTA_114144–146); August 15, 2016 (QUANTA_109620–622); and November 18, 2016 (QUANTA_110280–282).
2017 Meetings occurred on May 10, 2017 (QUANTA_002215–218); August 14, 2017 (QUANTA_002287–289); and November 9, 2017 (QUANTA_002427–429).
2018 Meetings occurred on March 5, 2018 (QUANTA_002555–558); July 25, 2018 (QUANTA_002806–809); and October 23, 2018 (QUANTA_002946–949).
2019 Meetings occurred on January 15, 2019 (QUANTA_003310–311); February 28, 2019 (QUANTA_003080–083); June 18, 2019 (QUANTA_003363–366); September 4, 2019 (QUANTA_003581–584); and November 18, 2019 (QUANTA_003722–724).
2020 Meetings occurred on February 13, 2020 (QUANTA_003956–959); May 20, 2020 (QUANTA_004149–152); September 1, 2020 (QUANTA_004416–419); and November 19, 2020 (QUANTA_004626–630).
2021 Meetings occurred on March 8, 2021 (QUANTA_004822–826); May 24, 2021 (QUANTA_128166); June 9, 2021 (QUANTA_004998–5001); August 17, 2021 (QUANTA_005130–133); and November 17, 2021 (QUANTA_005275–278).
2022 Meetings occurred on March 1, 2022 (QUANTA_005405–408); June 16, 2022 (QUANTA_005566–569); September 13, 2022 (QUANTA_005738–742); and December 16, 2022 (QUANTA_005955–958).
2023 Meetings occurred on March 22, 2023 (QUANTA_006119–123); June 8, 2023 (QUANTA_006292–295); September 19, 2023 (QUANTA_006447–450); and December 14, 2023 (QUANTA_129099–103).

[55] See **Exhibit 1**.  Two of these meetings were not standard quarterly meetings. *See* Fidelity Diversified International Supplemental Discussion Minutes, January 15, 2019, QUANTA_003310–311; Quanta Services New Committee Member Meeting Agenda, May 24, 2021, QUANTA_128166.

received and reviewed these materials in advance of each meeting.[56]  In addition, the Committee received reports from Fidelity, the Plan's recordkeeper.  These reports included information on plan statistics and utilization, as well as Fidelity Investment Reviews and other topics, such as personalized planning and advice review.[57]

46.     In addition to these regular topics, as part of the meetings, the Committee reviewed and discussed numerous other items such as: (1) an annual "Target Date Deep Dive" report that provided a detailed review of the target date fund market, (2) periodic updates of the IPS, (3) fiduciary education reports, and (4) periodic analysis of multiple investment options that cycled on and off of the Watch List depending on performance and market cycles over the class period, including engagement with the several asset managers.

47.     Documentation of each of the meetings through meeting minutes was thorough, comprehensive, and reflective of an engaged and active Committee in the oversight, monitoring, and decision-making of the Plan.  My review of documentary evidence revealed a very engaged Committee who thoroughly prepared in advance for each Committee meeting and came prepared with specific questions and/or issues to discuss.[58]  Committee members regularly reviewed the performance of the Plan's investment options at each meeting.  The Committee also routinely requested information related to funds that were underperforming certain expected objectives, including placing funds on watch, requesting follow-up actions pertaining to investment updates and analytics, and suggesting alternatives for underperforming funds.  For example, at the May 2017 meeting, the Committee "reviewed four alternative small cap growth options to compare with the current Oak Ridge [Small Cap Growth Fund] investment."  The Committee decided to replace Oak Ridge with Fidelity

---

[56] *See, e.g.*, Jensen Deposition, p. 112:18–24 ("We would receive the materials prior to the meeting and each committee member would go through and review the information for the purpose of identifying any issues, concerns, questions or comments associated with material."); Campbell Deposition, pp. 37:5–38:11; Riddle Deposition, pp. 40:12–41:22.

[57] *See, e.g.*, "Your Plan Review: Quanta Services, Inc. 401(k) Savings Plan," *Fidelity Investments*, February 28, 2019, QUANTA_003198–229.  *See also* November 2016 Committee meeting minutes, which note that there was a Fidelity Plan Review.  The minutes noted that "Ted Albright led the conversation with a Fidelity plan review of Quanta's plan. He noted that total assets were at $532 million and participant count went from 5,800 to 7,500 in the last 12 months.  He also included discussion on industry trends that Fidelity has seen as well as updates regarding regulatory and legal landscape of retirement plans and employee participation and utilization statistics."  3rd Quarter 2016 Investment Committee Meeting Minutes, November 18, 2016, QUANTA_110280–282 at 281.

[58] For example, Ms. Campbell stated that "I can tell you that the Committee views its investment review obligation duty on this Committee as one of its most important jobs, so I -- I think the Committee makes a big effort to spend all the time that the Committee needs. And that includes the preparation that we do before we come into the meeting, the discussions we have in and outside and around the meeting as well, so I would presume that we spent a good amount of time on discussing the investment review."  Campbell Deposition, pp. 200:20–201:9.  *See also* Riddle Deposition, p. 40:12–20; Grindstaff Deposition, pp. 38:14–39:12.

Advisor Small Cap Growth.[59]  As another example, at the February 2019 meeting, the Committee placed the DFA International Small Cap Value Fund on "Watch status" based on short-term performance.[60]  In their September 2019 meeting, Committee members requested more information and talking points pertaining to target date fund changes.[61]  Similarly, in their May 2020 meeting, Committee members, working with QPA, planned an off-cycle update call with an asset manager for an investment option that was underperforming.[62] These activities reflect a highly engaged Committee in monitoring activities to assist in their Plan oversight.[63]

### B.    The Investment Advisor's Role in the Plan's Fiduciary Process

48.    Qualified Plan Advisers (QPA) (and its predecessors) served as the Plan's investment advisor for the entire class period.[64]  During this time, QPA's responsibilities as the Plan's investment advisor and ERISA 3(21) fiduciary involved providing advice and recommendations to the Committee regarding the Plan and its investments and providing fiduciary updates, education, and training to the Committee, but did not encompass making or implementing fiduciary decisions regarding the Plan.[65]  The Committee clearly understood

---

[59] The minutes report that the Oak Ridge fund "has underperformed its best benchmark for all performance periods. The fund is a small cap growth fund and is rated 2 Stars by Morningstar. As the 1 year performance of the fund trailed the index by 866 basis points."  4th Quarter 2016 and 1st Quarter 2017 Investment Committee Meeting Minutes, May 10, 2017, QUANTA_002215–218 at 217.

[60] 4th Quarter 2018 Investment Committee Meeting Minutes, February 28, 2019, QUANTA_003080–083 at 082.

[61] 2nd Quarter 2019 Investment Committee Meeting Minutes, September 4, 2019, QUANTA_003581–584 at 582.

[62] 1st Quarter 2020 Investment Committee Meeting Minutes, May 20, 2020, QUANTA_004149–152 at 152 ("On June 8, 2020, the Quanta Committee and QPA participated in a video conference call with American Funds and the investment manager for American Funds Growth Fund of America.").

[63] In his deposition testimony, Mr. Jensen notes that the materials distributed to the Committee in advance of the meetings included "multiple pages of analysis associated with each of the individual funds" and that the Committee materials "would review [the] information in detail" in advance of the meeting.  Jensen Deposition, pp. 112:18–113:17.

[64] The same investment advisors have worked with the Committee throughout the class period under several different firm names.  Initially, the advisory firm was named Ascende Wealth Advisors (or AWAI).  EPIC then acquired Ascende.  Finally, the advisor transitioned from Ascende to Qualified Plan Advisors (or QPA) at the end of 2018.  *See* Deposition of Rich Eagar, July 19, 2024 ("Eagar Deposition"), p. 56:1–13.  *See also* 4th Quarter 2017 Investment Committee Meeting Minutes, March 5, 2018, QUANTA_002555–558 at 556.  These minutes include details regarding the purchase of Ascende Wealth Advisers, Inc. (AWAI) by Qualified Plan Advisors (QPA) on January 1, 2018.

[65] *See, for example*, Retirement Plan Advisory Services Agreement between Ascende Wealth Advisers, Inc. and Quanta Services, Inc., February 3, 2015, QUANTA_001381–402.

QPA's role and, based on my review of the Plan's materials, utilized QPA in a manner consistent with good fiduciary process.[66]

49.    The Plan's IPS outlined that the Committee "may retain an objective, third-party advisor to assist the Committee in managing the overall investment process."[67]  The advisor's responsibilities included guiding the Committee through a disciplined and rigorous investment process to enable the Committee to meet the fiduciary responsibilities outlined for the Committee.[68]  The Plan's IPS also stated that the advisor "agreed to prepare written quarterly reports for the Committee to assist it in both the selection and monitoring of the investment options offered under the Plan including specific investment option recommendations for consideration by the Committee."[69]  The advisor's role and approach in assisting the Committee in monitoring the Plan's investment options is common in the industry and indicative of good fiduciary practice.

50.    An important part of QPA's communication with the Committee came via QPA's Quarterly Plan Investment Review Reports ("QIRs") (later called Fiduciary Investment Analysis).[70]  QPA provided the Committee with detailed QIRs that included both quantitative and qualitative information about the broader economy, financial markets, and Plan investments.  These reports specifically included an assessment of macroeconomic conditions, performance and fundamentals of different asset classes and performance, risk, and portfolio characteristics of the Plan and the different funds included in the Plan.[71]

---

[66] For example, Carolyn Campbell's deposition testimony noted that "The advisor is a facilitator for the meeting, helps guide the Committee through a rigorous process. The advisor assembles a compilation of materials to provide the Committee in advance of the meeting. And we go through those materials before we get to the meeting and come to the meeting prepared to discuss the questions that we have, specific things we want more information on, or -- or have questions about."  Campbell Deposition, pp. 50:18–51:4.  *See also* Grindstaff Deposition, p. 35:3–18 ("Q. Do you recall any instances in which the committee did not follow a recommendation by the advisor?  A. I can't recall a specific example of when we did not follow a recommendation. But I can tell you this: The committee made the decisions. The decisions were not made by the advisor. The advisor, you know, certainly would make recommendations. But, you know, they didn't make recommendations in the material that you reviewed before the meeting. Those, you know, at the end of the day, they had their input just like every other committee member did during the meeting, and the committee came to consensus on the status of the investments.").

[67] 2015 Investment Policy Statement at 409.  "The Committee may retain an objective, third-party Adviser to assist the Committee in managing the overall investment process. The Adviser will be responsible for guiding the Committee through a disciplined and rigorous investment process to enable the Committee to meet the fiduciary responsibilities outlined above."

[68] The Committee's process is summarized in the "Investment Objectives, Criteria for Review, and Review Processes" section of the 2015 Investment Policy Statement at 411–417.

[69] 2020 Investment Policy Statement at 914.

[70] *See, for example*, "Quanta Services, Inc.: 1st Quarter 2017 401(k) Investment Review," *Ascende, Inc.*, May 10, 2017, QUANTA_002219–286.  Throughout, I refer to these quarterly reports as QIR.

[71] The reports also included a one-page or two-page fact sheet for each Plan investment option.  *See, for example*, "Quanta Services, Inc.: 1st Quarter 2017 401(k) Investment Review," *Ascende, Inc.*, May 10, 2017, QUANTA_002219–286 at 255, which is a one-page fact sheet for the Fidelity Balanced K Fund.  This fact sheet

Additionally, as consistently reflected in the Committee meeting notes, (1) QPA provided an update on the current market environment, (2) QPA presented an analysis of the Plan for the relevant quarter, including, a detailed review and discussion of the current fund line up covering diversification, investment performance, benchmark analysis, investment fees and expenses, asset allocation, recommendations for diversification and/or replacement (if warranted), and ongoing monitoring, (3) QPA provided key findings including the Plan's average weighted expense ratio compared with the Morningstar benchmark category average, analysis showing the aggregate investment portfolio's relative performance to a blended benchmark over various periods with relevant commentary of how the Plan investments are doing, composition of Plan assets in target date and other large holdings, and (4) QPA provided a thorough summary of investment options that were discussed in depth.[72]  QPA discussed in detail those funds with performance in need of review and those funds which underwent significant changes, such as changes in portfolio management, during the relevant review period.[73]  Assessments of fund performance and changes to fund management included recommendations by QPA about the continued long-term suitability of these funds within the Plan, including recommendations to place or remove funds on watch and whether to remove, replace, or maintain funds in the Plan.  Finally, QPA also provided information about when the Plan was eligible for lower cost share class offerings of investments in the Plan and changes in the fees charged by the funds in the Plan and benchmarked these fees against the respective peer-group category averages.[74]  QPA's partnership with the Committee provided thorough review and monitoring of the Plan investment options.

51.    In addition to providing regular quantitative and qualitative information about Plan performance, documentary evidence showed that QPA also provided the Committee with one-off investment analyses either proactively or at the request of the Committee.  These

---

includes information and data on fund operations, asset allocation, Morningstar ratings, sector weightings, and performance and risk.

[72] *See, for example*, 3rd Quarter 2018 Investment Committee Meeting Minutes, October 23, 2018, QUANTA_002946–949.  The minutes from this meeting reflect a Plan Administration Update, Review of Prior Meeting Minutes, Fidelity Plan Review, 3rd Quarter 2018 Investment Results, and Non-Qualified Deferred Compensation Review.

[73] The minutes include detail on each of the funds that were discussed in detail.  For example, at the May 2020 meeting, the minutes state that "As of 1st quarter 2020 results, the following investment options were discussed in depth to determine monitor status. The Committee will continue to specifically review the performance of these options on a quarterly basis to monitor their status."  The funds discussed included Dodge & Cox Stock, American Funds Growth Fund of America, and DFA International Small Cap Value.  1st Quarter 2020 Investment Committee Meeting Minutes, May 20, 2020, QUANTA_004149–152 at 151.

[74] *See, for example*, "Fiduciary Investment Analysis: Quanta Services, Inc. 401(k) Savings Plan," *Qualified Plan Advisors*, December 31, 2019, QUANTA_003960–4057.

analyses focused on certain investment options that cycled on and off of the watch list depending on performance, market cycles, and other factors over the class period. These analyses included topics such as a review of other funds in comparison to existing funds, detailed review of existing funds, and fund searches. For example, during the February 2019 Committee meeting, Committee members recapped a supplemental meeting that was held in January 2019 where they took an in-depth review and comparison of an existing fund offering (Fidelity Diversified International Fund) with other funds in the same peer group.[75] The investment information and analysis QPA provided to the Committee through these reports is consistent with the quality of materials other investment advisors typically provide to similarly-situated plan fiduciaries.

52.     QPA played a key role in keeping the Committee abreast of important Plan performance drivers. QPA representatives made recommendations about adding funds to the watch list and adding and removing funds from the Plan, when appropriate. Committee meeting notes routinely document investment decisions made by the Committee. For example, at the May 2016 Committee meeting, the Committee with QPA's guidance placed Dodge & Cox Stock Fund on Monitor status,[76] at the August 2016 Committee meeting, the Committee with QPA's guidance placed Fidelity Low Priced Stock Fund on Monitor status,[77] and at the May 2017 Committee meeting, the Committee with QPA's guidance placed the Oak Ridge Small Cap Growth Fund on Alert status.[78] Later in the class period, at the November 2019 Committee meeting, the Committee with QPA's guidance placed Growth Fund of America on Watch to be monitored.[79] At the November 2020 Committee meeting, the Committee with QPA's guidance placed the Vanguard GNMA Fund on Watch to be monitored due to underperformance.[80] Similarly, in the March 2023 Committee meeting, QPA recommended placing the Fidelity Balanced fund on Watch status to monitor the fund's

---

[75] 4th Quarter 2018 Investment Committee Meeting Minutes, February 28, 2019, QUANTA_003080–083 at 081–082. "During the meeting alternate options were reviewed from Dimensional Fund Advisors and T. Rowe Price. After thorough discussion it was decided to retain the Fidelity option, though keep on a Watch status."

[76] 1st Quarter 2016 Investment Committee Meeting Minutes, May 12, 2016, QUANTA_114144–146 at 145.

[77] 2nd Quarter 2016 Investment Committee Meeting Minutes, August 15, 2016, QUANTA_109620–622 at 622.

[78] 4th Quarter 2016 & 1st Quarter 2017 Investment Committee Meeting Minutes, May 10, 2017, QUANTA_002215–218 at 217.

[79] 3rd Quarter 2019 Investment Committee Meeting Minutes, November 18, 2019, QUANTA_003722–724 at 724.

[80] 3rd Quarter 2020 Investment Committee Meeting Minutes, November 19, 2020, QUANTA_004626–630 at 630.

short-term returns.[81]  The investments discussed by the Committee for potential watch list inclusion during the class period are shown in **Exhibit 2**.

53.    In addition, QPA provided the Committee with an annual Target Date Deep Dive report and analysis.[82]  These Deep Dive reports provided a comprehensive review of (1) DOL guidance for monitoring and selecting TDFs, (2) a review of target date fund families and aggregation of various data and analytics as to each of those families, (3) a glide path comparison of both to- and through- strategies, (4) a target-date fund performance review (e.g., one-year, three-year, and five-year return comparisons), and (5) a variety of risk analytics (e.g., standard deviation and sharp ratios).

54.    As part of their responsibilities, Committee members consistently participated in fiduciary training.  Consistent with common fiduciary practices, QPA (and its predecessors) provided periodic fiduciary training to the Committee.  For example, in March 2015, AWAI provided a fiduciary education presentation titled "Fiduciary Roles & Responsibilities" that "included a background on ERISA, an overview on who is considered a fiduciary to the plan, the responsibilities of those fiduciaries, settlor versus non-settlor functions and guidelines for managing fiduciary responsibility effectively."[83]  Upon completion of the presentation, the Committee signed an acknowledgement form indicating that they had been updated on fiduciary roles and responsibilities.  In July 2018, the Committee received a "Fiduciary Essentials" summary from QPA which covered fiduciary roles and responsibilities and investment processes and procedures.[84]  As another example, in 2021, Committee members received an overview of fiduciary education, including who were the relevant parties that worked with the plan, and received training about what it means to be a fiduciary to a qualified retirement plan, including the importance of acting solely in the best interest of

---

[81] 4th Quarter 2022 Investment Committee Meeting Minutes, March 22, 2023, QUANTA_006119–123 at 122.

[82] *See, for example*, "Fidelity Freedom Funds 2016 Target Date Deep Dive," *Ascende, Inc.*, 2017, QUANTA_106738–761.  Mr. Jensen's deposition testimony indicates that the Committee "took the action of recognizing the uniqueness of [the TDFs] and asked for the outside consultants to prepare a specific set of deep dive analysis…."  Jensen Deposition, p. 139:10–14.

[83] 4th Quarter 2014 Performance Meeting Minutes, March 23, 2015, QUANTA_104283–286 at 283.

[84] "401(k) Investment Committee: Fiduciary Essentials," *Qualified Plan Advisors*, QUANTA_002944.  *See* Email from Eric Ferguson to Steven Wilhelm, et al., "401(k) Committee Review," July 9, 2018, QUANTA_121339.  *See also* Email from Rich Eagar to Kim Riddle and Eric Ferguson, "[EXTERNAL] Materials for Call Today," July 9, 2018, QUANTA_121202.  "Attached is the 1Q 2018 investment review report, last meeting minutes, as well as the one-pager that I referred regarding fiduciary basics.  We will review the one page document mostly, and then I will provide an overview on the investment review."  The Committee also received a second "Fiduciary Essentials" one-pager later in the class period.  *See* Email from Libby Apolstol to Carolyn Campbell, et al., "Quanta Services First Quarter 2021 Committee Meeting," June 4, 2021, QUANTA_126156.

HIGHLY CONFIDENTIAL

participants and their beneficiaries, following the terms of the governing plan documents, monitoring the diversified investment menu, and benchmarking the plan fees.[85]

55.    Additionally, throughout the class period, the Plan's investment advisor provided the Committee with QIRs which consistently included a section that provided fiduciary and regulatory updates.[86]  This section of the QIRs routinely provided updates and insight to ensure that the Committee was knowledgeable of, among other things, its fiduciary duties as well as regulatory developments.  These regulatory updates and changes included pending regulation and Congressional updates.  This encompassed topics such as the SECURE Act and RESA, automating participant disclosures, and guidance regarding the CARES Act and COVID-19.[87]  In my view, the activities undertaken by QPA show that QPA's participation at Committee meetings was appropriate, and, based on my experience with other plans, consistent with how other investment advisors interact with retirement plan committees.  My review of deposition testimony also revealed that the Committee members understood their fiduciary obligations and how seriously the Committee took their fiduciary role.[88]

56.    Importantly, in my experience, it is common for fiduciary training to be incorporated into ongoing engagement with retirement plan committees and service providers, as it was here.  The fact that the full retirement Committee was receiving this education and training before and throughout the class period from their investment advisor is further evidence that the Committee was attentive to their fiduciary duties and updating their knowledge on an ongoing basis.

---

[85] 1st Quarter 2021 Investment Committee Meeting Minutes, June 9, 2021, QUANTA_004998–5001 at 4999.

[86] *See, for example,* "Plan Investment Review: Quanta Services, Inc. 401(k) Savings Plan, October 1 - December 31, 2018," *Qualified Plan Advisors,* QUANTA_003084–197 at 092–093.  In this quarter, the Fiduciary Insights and Regulatory Update included information on two retirement plan litigations, IRS 2019 Annual Limits, a discussion regarding "Definition of Compensation Lawsuit," information on HSA Benefits, and information regarding a third-party advisor embezzling from retirement plans.

[87] *See, for example,* "Plan Investment Review: Quanta Services, Inc. 401(k) Savings Plan, April 1 - June 30, 2019," *Qualified Plan Advisors,* QUANTA_003585–695 at 594; "Fiduciary Investment Analysis: Quanta Services, Inc. 401(k) Savings Plan," *Qualified Plan Advisors,* December 31, 2019, QUANTA_003960–4057 at 974; "Fiduciary Investment Analysis: Quanta Services, Inc. 401(k) Savings Plan," *Qualified Plan Advisors,* September 30, 2020, QUANTA_004631–721 at 642–643.

[88] *See, e.g.,* Grindstaff Deposition, pp. 21:18–22:5 ("So I'm not – I'm not sure, you know, what the definition of formal is, but I can tell you that throughout my time on the committee, through third-party advisors as well as, you know, committee discussions, we were all very well aware and took very serious our fiduciary responsibility.  And we all knew very much what that meant and that, you know, we were to act in the sole interest of the participants.").

C.      The Plan's Use of an Investment Policy Statement

57.     In my experience, the purpose of an IPS is to provide guidance on how plan
fiduciaries should manage their plans and investment options.  An IPS often sets the plan's
overall objectives, which in turn informs how plan fiduciaries should approach their decision-
making and ongoing monitoring processes.  As noted in Section IV.B, an IPS is not a
required document under ERISA.  Rather, an IPS is typically an optional document often
used by plan fiduciaries of large defined contribution plans as a supplemental tool to support
and guide decision making.  Importantly, an IPS is also not typically intended to be
prescriptive—that is, an IPS is not required to include language that dictates when or why
plan fiduciaries should select, monitor, or remove investment options.  As described in more
detail in Section VI.F, an IPS is designed to provide guidance as opposed to forcing rigidity
in decision making given the complexities of long-term investing and plan oversight.
Regardless of the language used in an IPS, plan fiduciaries are expected to and do apply
discretion and judgment when carrying out their fiduciary duties in the best interest of
participants.  Deposition testimony by Investment Committee members reflect that they
understood this accepted fiduciary practice.[89]

58.     In my opinion, the Plan IPS provided the Committee with sufficient guidance to carry
out their fiduciary duties, gave the Committee the direction it needed, and was consistent with
common retirement plan fiduciary practices.  The ratified 2015 Plan IPS, which was amended
during the class period,[90] set the Plan's overall objective, which did not change and stated:
"The primary purpose of the Plan is to provide an opportunity for participants to accumulate
funds for their retirement needs on a regular and long-term basis and secondarily to meet
their other financial goals."[91]  It also defined the purpose of the IPS, which likewise remained
fundamentally unchanged and stated: "The purpose of the Investment Policy Statement (the
'IPS') is to provide the Plan and its fiduciaries with *guidelines* which will establish the Plan's
investment objectives and the process for promoting those objectives."[92]  The IPS also
provided guidance regarding Section 404(c) compliance, outlined the roles and

---

[89] *See, for example*, Campbell Deposition, pp. 64:10–65:5, 77:16–25, 102:4–7; Rupp Deposition, p. 92:12–17;
Grindstaff Deposition, pp. 59:18–60:9.

[90] The Plan had two ratified IPSs in effect during the class period.  The first was dated October 2015 ("2015
Investment Policy Statement") and the second was dated May 2020 ("2020 Investment Policy Statement").  In
addition, the Plan had two sets of interim edits to the IPS between 2015 and 2020.  In my opinion, these edits,
which were not ratified, were not operative.

[91] 2015 Investment Policy Statement at 406.

[92] 2015 Investment Policy Statement at 406 (emphasis added).

responsibilities of the 401(k) Committee, the investment advisor, the recordkeeping administrator, the trustee/custodian, and the Plan participants.[93] The Plan's IPS also included a section covering "Investment Objectives, Criteria for Review, and Review Processes." This section encompassed guidance for the Committee related to the Plan's (a) investment objectives, (b) investment criteria, (c) allowable asset classes, (d) selection of investment options (including both quantitative and qualitative factors), (e) performance evaluation criteria, and (f) the investment watch list process.[94] The guidance in this section of the IPS is in line with what is typical and standard in IPS documents. And, while the next modified and ratified IPS was in 2020, my review of the October 2015 and the May 2020 IPS side by side, as shown in **Exhibit 3**, found that the modifications were primarily what I would categorize as refinements versus substantive edits – revisiting language and terms, reorganizing language and moving subsections around, and fine-tuning the watch list process.

59.     The 2015 IPS outlined four broad "Investment Criteria" that the Committee should consider. These included "Long-term Horizon," "Performance," "Flexibility," and "Suitability."[95]

## Investment Policy Statement

### INVESTMENT OBJECTIVES, CRITERIA FOR REVIEW, AND REVIEW PROCESSES

#### Investment Criteria

The selection of each investment option will take into account the risk, return and other financial characteristics of the other investment options, so that individual participants may select among investment options that are materially different from one another. In addition, the Plan's overall investment program and individual investment options provided to the participants will seek to achieve the following objectives:

- **Long-term Horizon**. Objectives and strategies appropriate to the goals of the long-term investor.
- **Performance**. Long-term competitive rate of return on investments, net of expenses.
- **Flexibility**. Adequate flexibility to meet the varying needs of participants and their varying risk tolerances. Provide the ability to construct a portfolio that is diversified among different asset classes.
- **Suitability**. Investment options suitable for a 401(k) retirement plan that is valued everyday the New York Stock Exchange is open. For example, an investment holding one or more Limited Partnerships may be illiquid, subject to Unrelated Business Taxable Income (UBTI), cannot be valued each day, and therefore may not be a suitable investment for the Plan.

60.     These "Investment Criteria" are typical objectives that are considered by plan committees. While the 2015 IPS contained a range of factors the Committee may consider in its ongoing monitoring and evaluation of Plan investment options, it provided the Committee

---

[93] 2015 Investment Policy Statement at 407–410.
[94] 2015 Investment Policy Statement at 411–417.
[95] 2015 Investment Policy Statement at 412.

appropriate leeway to use its judgment to, among other things, monitor funds relative to their respective objectives and determine the period over which fund performance should be evaluated to retain or remove funds.  For example, the Performance Evaluation Section includes the following:[96]

> The Committee recognizes that styles of investments go through cycles and that there will be periods of time in which the investment options may fail to meet their performance targets compared to indexes.  Thus, when a fund fails to achieve its stated objectives, the reasons for failure will be evaluated, and *the Committee shall determine* whether the option shall remain, be frozen, or be replaced.

Elsewhere, the 2015 IPS stated that "the Committee *may* place an investment option on a 'Monitor' or 'Alert' status and conduct a thorough review and analysis of the investment option.  The Committee *may* consider the following criteria when placing a fund on 'Monitor' or 'Alert' status."[97]  This sort of language allowing the Committee to exercise judgment and discretion is extremely prevalent in plan IPS documents, and for good reason as explained in Section VI.F.

61.　　The 2015 IPS "Performance Evaluation Criteria" section references an Appendix B.  Specifically, the section states that "All performance evaluation categories and criteria are outlined in Appendix B."[98]  Plaintiffs' expert, Mr. Stone, notes in his report that this Appendix was not produced in the litigation.[99]  Even if the Appendix was not formally appended to the IPS, based on my review of the materials, the Committee and the investment advisor understood the factors that were to be considered—i.e., those factors identified and analyzed in the QIRs prepared by QPA—and the Committee received adequate information to make an informed decision regarding the Plan's investment options.[100]  Consistent with this, Mr. Eagar testified that Appendix B would have basically recapped the criteria already outlined in the IPS.[101]

---

[96] 2015 Investment Policy Statement at 416 (emphasis added).
[97] 2015 Investment Policy Statement at 417 (emphasis added).
[98] 2015 Investment Policy Statement at 416.
[99] Stone Report, ¶ 65.
[100] *See, e.g.*, Jensen Deposition, pp. 121:3–122:3.
[101] Eagar Deposition, p. 98:6–14 ("Q. Was there ever an -- an Appendix B that was attached or affixed to the 2015 October IPS?  A. There certainly were evaluation -- the evaluation criteria in that Appendix B are all contained within the IPS. I don't recall or know why it skipped out on being attached in -- in the version of the IPS we've got here."). *See also* Eagar Deposition, p. 100:10–25.

62.     The 2015 IPS does not provide specific requirements regarding the Committee adding or removing a fund from Watch List.  Instead, the 2015 IPS lists a set of criteria that the Committee may consider.  This includes a relatively standard set of qualitative and quantitative items including performance versus peer funds, a change in the fund's portfolio management, and an indication of fund style or strategy drift.[102]  The 2015 IPS also details the Watch List process.  Even here, the Committee is provided with considerable discretion.  After detailing the Watch List process, the 2015 IPS states that "However, the Committee at its discretion may change an investment's status outside of these standards as each fund is separately evaluated."[103]  The 2015 IPS also states that the change in status will be documented in the meeting minutes.[104]

63.     As shown in **Exhibit 3**, the changes to the Plan's IPS during the class period were relatively minor.  Based on my experience, IPS language changes such as these are common and are often made to reflect preferences of the Committee and the management of the Plan over time.

64.     The 2020 IPS covers the same general set of topics as the 2015 IPS.  Consistent with the 2015 IPS, the 2020 IPS includes considerable leeway and defers to the judgement of the Committee.  For example, in the "Investment Objectives, Criteria for Review, and Review Processes" section, the Committee again is given considerable discretion:[105]

>    The Committee may, from time to time, determine that a more thorough review and analysis of an investment option should be performed. Any one or more of the conditions listed below may indicate that further review and analysis of an investment option is warranted and may be considered by the Committee in its evaluation of an investment option's ongoing suitability for or status within the Plan…

Similarly, the investment option removal discussion states that "there are no absolute rules for removal of an investment option from the Plan."[106]

65.     Finally, I note that while the Plan IPSs throughout the class period provide general guidance on the circumstances that may lead the Committee to consider removing or replacing an existing investment, it enables the Investment Committee to exercise judgement

---

[102] 2015 Investment Policy Statement at 117.
[103] 2015 Investment Policy Statement at 117.
[104] 2015 Investment Policy Statement at 117.
[105] 2020 Investment Policy Statement at 921.
[106] 2020 Investment Policy Statement at 923.

and discretion when making such decisions.  Based on my review of documentary evidence, this was well understood by Committee members.[107]  The flexibility afforded in the Plan IPS is appropriate to allow the Investment Committee to make decisions in the interest of Plan participants.  In my opinion, because investments, investment strategies, investment managers, investment trends, and overall market conditions evolve over time, the Plan IPS's provisions were and continue to be reasonable and appropriate to enable the Investment Committee to respond to such changes.

### D.  The Committee Monitored Plan Investment Options, Including the Challenged Funds, in Accordance with Sound Fiduciary Practices

66.   Based on my review of the materials, I conclude that the Committee carefully and diligently monitored the Plan's investment options in accordance with sound fiduciary practices throughout the class period.

### 1.  The Committee Met Regularly, Received and Reviewed Comprehensive Materials and Worked in Collaboration with Its Investment Advisor to Evaluate the Plan's Investment Options

67.   As summarized in **Exhibit 1**, the Committee met at least three times per year throughout the class period.  These meetings were more frequent than outlined in the 2015 IPS, which states that "this Committee shall evaluate the performance of the investments against the targeted benchmarks on a periodic basis, but in no event less than annually."[108] At each of these meetings, the Committee, with the assistance of QPA, reviewed the Plan's investment options, including both their performance and cost.  This meeting frequency is in-line with industry standards and enabled the Committee to regularly evaluate and monitor the Plan's investment options.

68.   Each quarter during the class period, the Committee received and reviewed a QIR that provided detailed information on each of the Plan's investment options.  These reports included detailed information regarding fund assets, performance, and fees, among other information.  The performance evaluation typically included return data over multiple time

---

[107] *See, e.g.*, Grindstaff Deposition, pp. 54:10–21, 59:21–60:9 ("…[T]his investment policy statement was always considered a guideline. Even though it had the word policy in it, it was always viewed as guidelines. And somewhere in this document I feel certain that it speaks to the committee's discretion because of -- you know, we were looking at a variety and numerous qualitative and quantitative factors to assess. And so these were not absolutes by any stretch. It was just merely guidelines to guide us. But, you know, it was -- these were not hard and fast rules that the committee was bound to.").
[108] 2015 Investment Policy Statement at 408.

horizons, performance comparisons versus peer groups and benchmarks, Morningstar ratings, and additional risk/return statistics (i.e., Sharpe ratio, information ratio, etc.).  This provided the Committee with considerable data and context to evaluate fund performance and the documentary evidence shows that the Committee members reviewed that data closely in advance of the meetings as well as at the meeting itself.[109]  Based on my review and experience, the information contained within these reports provided the Committee with relevant information to inform its monitoring and investment decision making and was consistent with the quality of information other retirement plan fiduciary committees review when monitoring plan investments.

69.    Also, consistent with accepted fiduciary practices, representatives of the Plan's investment advisor participated in each Committee meeting and presented results based on the information contained in the QIRs.[110]  While retirement plan committees must ensure that they appropriately and independently monitor the ongoing appropriateness of plan investment options, it is common and reasonable to rely on the overall information and recommendations of qualified investment advisors to inform their assessment.  Based on my experience, the Plan investment advisor's assistance in preparing standardized investment review materials, presenting those materials, and opining on the appropriateness of Plan's investment options is consistent with how external investment advisors assist other retirement plan committees.  Importantly, and consistent with common practice, the ultimate decisions were made by the Committee.  The case materials indicate that the Committee was thorough and engaged, pushed back, asked questions, and reached their own conclusions regarding the Plan's investment options.[111]

70.    In addition to the QIRs, roughly once per year during the class period, the Committee received a Target Date Deep Dive report from their investment advisor.[112]  These supplemental reports were intended to provide the Committee with even more information regarding the Plan's target date option — the Freedom Funds — and the other leading target

---

[109] *See* Grindstaff Deposition, p. 23:2–12; Jensen Deposition, pp. 30:21–31:17.

[110] *See, for example*, 4th Quarter 2017 Investment Committee Meeting Minutes, March 5, 2018, QUANTA_002555–558 at 556.  The minutes in the section titled "4th Quarter 2017 Investment Results" note that "Rich presented an analysis of the Quanta Services 401(k) Plan (the 'Plan') including a detailed review and discussion of the current fund line up covering diversification, investment performance, benchmark analysis, investment fees and expenses, asset allocation, recommendations for diversification and/ or replacement (if warranted), and ongoing monitoring."

[111] *See, for example*, Eagar Deposition, pp. 93:13–21, 102:5–10; Campbell Deposition, pp. 125:9–127:7.

[112] *See, for example*, "Fidelity Freedom Funds 2016 Target Date Deep Dive," *Ascende, Inc.*, 2017, QUANTA_106738–761.  The Committee received these Deep Dives in almost every year during the class period.

date funds in the market so that the Committee could conduct even further analyses, in addition to their regular committee meetings, as to whether the Freedom Funds were prudent investment options for the Plan.[113]  These reports included a wealth of information including details on target date fund strategies, glide paths, asset allocations, and performance.  Given the importance of the Plan's target date funds — these funds accounted for approximately 38% of Plan assets as of September 30, 2016 and were the Plan's QDIA — receiving and reviewing annual reports that focus exclusively on target date funds enhances the fund monitoring process, as the Committee recognized in requesting this annual analysis in the first instance.[114]  In fact, in my experience, many Committees are content to receive the standard quarterly reports and may only receive supplemental target-date fund focused reports on a non-routine and ad hoc basis.  Based on my review of these reports, they would have provided the Committee with valuable information and data to help assess the relative merits of the Freedom Funds beyond the information provided in the QIRs.  These reports are indicative of the robust fiduciary process that the Committee undertook with respect to the evaluation and ongoing suitability of the Plan's target date funds.

71.     Committee member deposition testimony demonstrates that they received and reviewed both the QIRs and the Target Date Deep Dives materials, as well as any other pre-reading materials, in advance of the Committee meetings.  For example, Mr. Jensen testified that "there were numerous materials that were circulated" in advance of meetings.[115]  This included "reports from outside consultants… reports from Fidelity… [and] separate analyses performed by our HR team."[116]  Mr. Jensen testified that the Committee "put a level of expectation that materials to be discussed needed to be distributed prior to so they could be reviewed by the Committee prior to the meeting."[117]  And the depositions of Committee members show that they indeed did regularly review these materials in detail prior to the regular meetings and came to the meetings prepared with questions and/or issues that they'd

---

[113] Jensen Deposition, p. 139:7–22 ("It was the Committee who asked for and created the deep dive. It was the Committee who took the action of recognizing the uniqueness of it and asked for the outside consultants to prepare a specific set of deep dive analysis allowing us to see more -- more clearly a comparison of the Freedom funds to a competitive environment, to a broader set of competitive type dynamics and comparisons and indices, et cetera, that would allow us to go through and -- and conclude as to the appropriateness of -- of the fund selection."). *See also* Grindstaff Deposition, p. 70:4–22.

[114] **Exhibit 4** details the assets by fund per quarter during the class period.  At year-end 2022, target-date fund assets accounted for approximately 45 percent of plan assets.

[115] Jensen Deposition, p. 63:3–4.

[116] Jensen Deposition, p. 63:7–11.

[117] Jensen Deposition, p. 65:2–6.

like to discuss amongst the Committee and with QPA.[118]  For example, Carolyn Campbell testified that she "spent hours reviewing the materials so that [she] could come in and have [her] comments sort of highlighted or circled."[119]  In my view, providing Committee members with pre-read materials in advance of meetings is a common and sound fiduciary process.

72.      Based on my experience, the information provided to Committee members in these reports was high quality and consistent with the information typically provided to defined contribution plan committees.  In my opinion, this material enabled the Committee to be well informed regarding the Plan's investment options.

73.      The Committee's ongoing monitoring process included a thorough and diligent review of the Plan's investment options throughout the class period.  This included a review of materials prepared by the investment advisor, requests made to the investment advisor, and an appropriate and holistic approach to fund evaluation.

### 2.      The Committee's Monitoring Process and Use of Watch List Was Thorough, Detailed, and Consistent with Sound Fiduciary Practice

74.      Based on my review and experience, the Committee's monitoring process was reasonable and consistent with accepted monitoring processes of plan fiduciary committees. Also consistent with common fiduciary practices, the Committee utilized a "Watch List" informed by both qualitative and quantitative metrics.[120]  The Committee, together with the investment advisor, determined whether certain funds should be placed on watch or more closely monitored.  There was no formulaic mechanism by which funds were added to the Watch List, as noted in the operative IPSs.  *See* Section V.C.  Instead, the Committee, along with the Plan's investment advisor, would consider the quantitative and qualitative factors established in the Plan IPS when deciding whether to add a fund to the Watch List.[121]

75.      While all of Plan's investment options are reviewed in each meeting, the bulk of committee discussion and scrutiny is focused on those investment options with either poor

---

[118] Jensen Deposition, pp. 30:21–31:17.

[119] Campbell Deposition, pp. 64:2–9, 60:13–17 ("Our practice was to review materials before we went into the meeting and that was the expectation of the Committee, that the materials had been reviewed so we were able to come in prepared.").

[120] Funds on the Watch List are typically detailed in the Committee meeting minutes and the QIRs.  *See, for example,* 1st Quarter 2016 Investment Committee Meeting Minutes, May 12, 2016, QUANTA_114144–146 at 145–146; "Quanta Services, Inc.: 1st Quarter 2017 401(k) Investment Review," *Ascende, Inc.*, May 10, 2017, QUANTA_002219–286 at 250.

[121] Campbell Deposition, pp. 99:18–102:19.

performance or other qualitative areas that warrant further discussion.   For example, at the May 12, 2016 meeting, the minutes indicate that "the following investment options were discussed in depth to determine monitor status."[122]   At this particular meeting, these funds included Dodge & Cox Stock Fund and Oak Ridge Small Cap Growth.   Based on a review of the minutes and other meeting materials, it is apparent that each fund is evaluated on its own merits and the Committee decisions are specific to the facts and circumstances surrounding the given fund.[123]   In this instance, the Committee placed the Dodge & Cox Stock Fund on "Monitor" status and left Oak Ridge Small Cap Growth on "Monitor" status.[124]

76.     Consistent with this approach, at a later meeting in 2017, the Committee left the Dodge & Cox Stock Fund on "No Alert," placed the Fidelity Low Priced Stock Fund on "Alert" status, left Fidelity Diversified International on "Monitor" status, and decided to replace Oak Ridge Small Cap Growth with Fidelity Advisor Small Cap Growth.[125]   These meetings are broadly representative of the other meetings during the class period and demonstrate the fiduciary care exercised by the Committee in monitoring the Plan's investment options.   **Exhibit 2** summarizes the investments discussed at each Committee meeting for potential watch list inclusion during the class period.

### 3.     The Committee's Monitoring of the Fidelity Freedom Funds Was Thorough and In-Line with Sound Fiduciary Practices

77.     The Committee's monitoring of the Freedom Funds is consistent with my experience and is in line with sound fiduciary practices.   Detailed information regarding the Freedom Funds' performance and other metrics were included in each QIR.[126]   In addition to the QIR, the annual Target Date Deep Dives included details regarding asset allocation, glide path, and other features specific to target date funds.   Prior to the start of the class period, the Freedom

---

[122] 1st Quarter 2016 Investment Committee Meeting Minutes, May 12, 2016, QUANTA_114144–146 at 145.
[123] Campbell Deposition, pp. 99:18–102:19.
[124] 1st Quarter 2016 Investment Committee Meeting Minutes, May 12, 2016, QUANTA_114144–146 at 145–146.
[125] 4th Quarter 2016 & 1st Quarter 2017 Investment Committee Meeting Minutes, May 10, 2017, QUANTA_002215–218 at 216–217.
[126] For example, the QIR with data as of December 31, 2019 included the following information regarding the Freedom Funds: (1) assets in the Plan, (2) performance versus benchmark and peer group over a variety of time periods ranging from last quarter to 10 years, (3) fees and category rank of fees, (4) risk/return metrics, such as the three-year and five-year Sharpe Ratios, and (5) a two-page detailed fund fact report for each vintage that includes a wealth of data.  "Fiduciary Investment Analysis: Quanta Services, Inc. 401(k) Savings Plan," *Qualified Plan Advisors*, December 31, 2019, QUANTA_003960–4057.

Funds were on "Monitor" status.[127]  Based on the meeting minutes available from this period, as part of the 2014 Target Date Deep Dive discussion, it was noted that "While the funds continue to perform well, they remain on 'Monitor' as many of the underlying investment options do not yet have 3 years of return history.  The investment suite remains an appropriate investment option for participants seeking a one-fund diversified investment option with an acceptable glide path, management, cost structure, and set of underlying funds and asset classes."[128]

78.    In subsequent meetings prior to the start of the class period, the funds continued to remain on Monitor status based on factors that the Committee could consider in its judgment. The minutes to the 1st Quarter 2015 Investment Committee Meeting note that:[129]

> Ascende [subsequently QPA] has kept the Fidelity Freedom Funds on "Monitor" status this quarter due to lack of return history for several underlying funds and the change to an "enhanced glidepath" in the later part of 2013 which increased overall equity exposure between 1% and 20% across the various vintages.  The changes that Fidelity has made appear to be paying off as absolute returns of the funds continue to improve.

The minutes including additional detail regarding Watch List funds is consistent with sound fiduciary practice.[130]  It is also apparent that the Committee was closely monitoring the Freedom Funds—including their underlying funds and strategy changes.  These monitoring activities are at odds with Plaintiffs' allegations, which incorrectly allege that "Defendants never initiated or undertook any review of the [Freedom Funds'] strategy changes."[131]

79.    At the February 15, 2016 Committee meeting, which pre-dates the class period, the Freedom Funds were removed from Monitor status.[132]  The minutes indicate that a Target Date Deep Dive Report was reviewed at that meeting and that "AWAI [subsequently QPA] and the Committee discussed various aspects of the target date suite including management, glide path, asset allocation, fees and underlying fund composition."  In addition, "the AWAI

---

[127] 4th Quarter 2014 Performance Meeting Minutes, March 23, 2015, QUANTA_104283–286 at 286.  Note that these are the earliest meeting minutes available.

[128] 4th Quarter 2014 Performance Meeting Minutes, March 23, 2015, QUANTA_104283–286 at 286.

[129] 1st Quarter 2015 Performance Meeting Minutes, June 24, 2015, QUANTA_104287–290 at 290.

[130] These meeting minutes include specific detail for six investment options that were either on Watch List or being considered for addition to Watch List.  1st Quarter 2015 Performance Meeting Minutes, June 24, 2015, QUANTA_104287–290 at 289–290.

[131] Complaint, ¶ 38.

[132] 4th Quarter 2015 Investment Committee Meeting Minutes, February 15, 2016, QUANTA_104297–299 at 299.

[subsequently QPA] team also indicated that there were not significant changes to the fund suite during 2015."[133]  Given that the Freedom Funds had been on Monitor status due to the lack of a three-year track record of several underlying funds and the desire to track the impact of a change to its glide path, it was reasonable to remove the Freedom Funds considering that the underlying funds now had longer performance histories and there was a longer track record of success of the strategy changes.  As such, the Freedom Funds no longer warranted Monitor status as of that time.  At the time the Freedom Funds were removed from Monitor as of February 2016 (prior to the start of the class period), the Committee noted the strong recent performance of the funds.

80.    Throughout the class period, the Committee continued to prudently monitor the Freedom Funds.  In addition to receiving detailed information in the QIRs and investment advisor commentary at the regular Committee meetings, roughly once a year the Committee received a Target Date Deep Dive report, which was discussed at the meetings.  For example, the 4th Quarter 2018 Minutes include the following summary on the Freedom Funds:[134]

> The target date deep dive report illustrated Fidelity's position relative to other target date fund managers in the marketplace. After the changes to the glide path and underlying investment options a number of years back, performance has improved. Fidelity continues to manage the target date suite as a "through retirement" strategy, with a glide path that ends at age 80. The Committee reviewed the portfolio glidepath, compared it to 11 other target date managers of varying strategies, reviewed the portfolio returns on a 1, 3 and 5-year basis and then evaluated the risk adjusted returns of the portfolio. The Committee remains confident in Fidelity's approach and the portfolio suite as a whole.

This level of fund evaluation and detail in the minutes involving a non-watch list fund is illustrative of an engaged Committee that is carefully monitoring investment options.

81.    Given the strong relative performance of the Freedom Funds from the start of the class period through their removal in 2021, I would not expect the funds to be placed on watch list status during the class period.  For example, the three-year and five-year percentile ranks of the Freedom Funds as of December 31, 2019, are summarized in Table 2 below.  These percentile ranks are consistent with a strong performing investment option during the class period.  These results, along with the materials reviewed clearly demonstrate that the

---

[133] 4th Quarter 2015 Investment Committee Meeting Minutes, February 15, 2016, QUANTA_104297–299 at 299.
[134] 4th Quarter 2018 Investment Committee Meeting Minutes, February 28, 2019, QUANTA_003080–083 at 082.

Freedom Funds were among the top performing target date suites in the market during the class period.

**TABLE 2:  Freedom Funds – Three-Year and Five-Year Morningstar Percentile Ranks, 12/31/19**[135]

| Fund | Morningstar Percentile Rank[136] | |
|---|---|---|
|  | **Three-Year** | **Five-Year** |
| Freedom Income | 63 | 47 |
| Freedom 2005 | 61 | 53 |
| Freedom 2010 | 13 | 9 |
| Freedom 2015 | 11 | 8 |
| Freedom 2020 | 7 | 5 |
| Freedom 2025 | 11 | 6 |
| Freedom 2030 | 9 | 6 |
| Freedom 2035 | 10 | 9 |
| Freedom 2040 | 16 | 11 |
| Freedom 2045 | 25 | 16 |
| Freedom 2050 | 27 | 17 |
| Freedom 2055 | 27 | 19 |
| Freedom 2060 | 37 | 39 |

82.    In 2021, the Committee, following extensive discussions with QPA, decided to replace the Freedom Funds with a different Fidelity-managed target date suite — the FIAM Blend target date funds.[137]

> As was requested at the prior meeting, Rich and the Fidelity team provided an overview of the FIAM Blend target date options. This target date suite from Fidelity maintains a part actively managed, part passively managed approach to lower costs while keeping the same glidepath as the actively managed Fidelity target date funds. Two share classes were reviewed: The X share class that has an expense ratio of 0.36% per fund (contains 10bps of revenue sharing), and the S share class that has an expense ratio of 0.26% (contains 0 revenue sharing). The Committee discussed these two options and Rich and the Fidelity team answered questions on performance, fees, glidepath, and comparisons to other target date suites.

---

[135] *See,* "Fiduciary Investment Analysis: Quanta Services, Inc. 401(k) Savings Plan," *Qualified Plan Advisors*, December 31, 2019, QUANTA_003960–4057.

[136] Morningstar percentile rank ranges from 1 to 100.  A rank of 1 is best performing versus funds in the same Morningstar category.  A rank of 100 is worst performing versus funds in the same Morningstar category.  *See*, "Percentile Rank in Category," *Morningstar*, available at https://awgmain.morningstar.com/webhelp/glossary_definitions/mutual_fund/Percentile_Rank_in_Category.htm .

[137] 3rd Quarter 2020 Investment Committee Meeting Minutes, November 19, 2020, QUANTA_004626–630 at 627.

The FIAM Blend is a different product than the Freedom Funds, with lower fees, differences in underlying funds, and a mix of active and passive investing.[138]  Based on my review of the Complaint and Plaintiffs' expert reports, Plaintiffs do not appear to challenge the reasonableness of the Committee's decision to transition from the Freedom Funds to the FIAM Blend suite.  Nevertheless, based on my review of the relevant materials, I conclude that the Committee's process associated with the decision was sound.  Moreover, based on my review of the Plan materials, the Committee continued to carefully monitor the FIAM Blend suite following its introduction.

## VI.    Mr. Stone's Criticisms of the Plan's Fiduciary Process Are Without Merit

83.    Mr. Stone's two primary conclusions are that "[t]he Committee failed to establish and apply reasonable processes to monitor the Challenged Investments" and that "Quanta did not establish or apply a reasonable process to appoint qualified Committee members and monitor the Committee's performance."[139]  To reach these conclusions, he quibbles with the Committee's process, documentation, and the fiduciary training and selection of Committee members.  These conclusions are without merit and fail to appropriately assess the sound fiduciary processes of the Committee.

### A.    Mr. Stone's Opinion Regarding the Committee's Lack of a Charter Fails to Recognize the Committee's Active Decision to Operate Without a Charter

84.    Mr. Stone claims that "[t]hroughout the entire relevant period, the Committee operated without a charter or other formal governance document…"[140]  Mr. Stone asserts that the existence of a charter results in committee members "understand[ing] the force and effect of such provisions" that govern the Plan.[141]  He further assets that the lack of charter

---

[138] *See* 3rd Quarter 2020 Investment Committee Meeting Meetings, November 19, 2020, QUANTA_004626–630 at 627.  *See also* "Quanta Services Investment Fee Discussion," *Morningstar*, QUANTA_016005–009 at 005, 009; "Fidelity Freedom Target-Date Fund Series Report," *Morningstar*, September 30, 2022, pp. 1, 5; "Fidelity Freedom Blend Target-Date Fund Series Report," *Morningstar*, September 30, 2022, pp. 1, 5.

[139] Stone Report, ¶¶ 148–149.

[140] Mr. Stone states that such a document would "[outline] the Committee's responsibilities, the roles of respective Committee members, the Committee's voting procedures, requirements for Committee action, and guidance concerning Committee records, among other subjects typically discussed in an investment committee charter."  Stone Report, ¶ 81.

[141] Stone Report, ¶ 81.

contributes to "unreasonable" fiduciary governance procedures by the Committee.[142]  His opinions fail to take into account the requirements of ERISA and the realities of the Plan's governance structure.

85.    First, it is important to establish that a committee charter document is not required under ERISA, as also noted by their investment advisor.[143]  Second, as allowed by ERISA, the Committee made an active decision not to adopt a separate committee charter.  In the March 23, 2015 Committee meeting, the meeting notes specified that "AWAI also presented a draft Committee Charter.  However, as the current custom plan document incorporates the charter, there is no need to adopt a separate charter at this time."[144]  In my experience, similar to this Committee, not all committees opt to incorporate a separate committee charter and instead look to other governing documents such as the IPS or Plan Documents to address committee roles and responsibilities.  Consistent with this, the Plan's IPS contained a section outlining the roles and responsibilities of the Committee.[145]  Based on my review of the documentary evidence, it is clear that the Committee understood its roles and responsibilities, maintained a consistent and thorough monitoring process as described in Section V.D and was supported by the Plan Document, and separately, the IPS.

---

[142] Stone Report, ¶ 80.

[143] Eagar Deposition, p. 49:20–25 ("I would also note that the process by which the committee evaluated and made determinations was consistent across the relevant time period, and the committee charter is a non-required document.").

[144] 4th Quarter 2014 Performance Meeting Minutes, March 23, 2015, QUANTA_104283–286 at 284.

[145] 2015 Investment Policy Statement at 408.
"Accordingly, the Committee shall:
- Define the Plan's investment objectives;
- Prepare and maintain the IPS;
- Determine guidelines for selecting investment options;
- Provide sufficient asset classes with different and distinct risk/return profiles so each participant may prudently diversify his or her account;
- Control and account for all investment, record keeping and administrative expenses associated with the Plan;
- Establish procedures for continued monitoring and evaluating of investment options;
- Establish criteria used to determine when to retain; add, eliminate, etc. investment options;
- Avoid prohibited transactions and conflict of interest; and
- Amend this Policy at such times and in such manner as this Committee determines necessary to meet the Plan's overall objectives."

### B. Mr. Stone's Opinions Regarding the Committee's Leadership and Voting Processes are Inconsistent with Standard Approaches of Fiduciaries

86.     Relatedly, Mr. Stone asserts that "[t]he Committee lacked any clear structure or guidelines for its decision making in carrying out its fiduciary monitoring responsibilities"[146] and that "Committee members had inconsistent understandings of the role of Chairman."[147] These opinions are inconsistent with my experience.  First, based on my experience, it is common and reasonable for a committee to reach decisions using consensus rather than another voting structure.  Despite Mr. Stone's belief that majority voting is superior to consensus voting, there is no requirement that an ERISA committee has a majority voting structure.  Based on my review of the Plan materials and deposition testimony, I conclude that the Committee made well-reasoned and thorough decisions using a consensus approach. Further, neither the minutes nor deposition testimony reflect any issue with the Committee reaching decisions through consensus.  Nor did I see any evidence that the Committee would have reached a different conclusion had there been a majority voting approach instead of consensus voting.  In my opinion, this is an example of Mr. Stone nit-picking details that have no impact on the outcome of the process.

87.     Moreover, there is no requirement under ERISA to have a formal Committee chairperson.[148]  For much of the class period, Mr. Jensen provided leadership to the Committee akin to being a chair.  In his deposition testimony, he noted that "from my role within the Company [as CFO] and the actions, I would say that I was likely looked at as being the default Chair of the Committee."[149]  This is consistent with the testimony of other Committee members.[150]  Based on my review of the deposition testimony, Mr. Jensen was a highly engaged Committee member who carried out his role with expertise.  There is no indication that Mr. Jensen having a formal title would have enhanced or altered the Committee's process.  Nor is there any indication that whether the other Committee members viewed Mr. Jensen as the *de facto* Chairman would have impacted the operations and decision making of the Committee.  In my experience, it was not uncommon to have a

---

[146] Mr. Stone specifically focuses on the voting process, claiming that "the Committee lacked any process contemplating a scenario where the Committee was unable to reach a consensus."  Stone Report, ¶ 82.

[147] Stone Report, ¶ 83.

[148] In my experience, the role of the committee chairperson typically involves areas such as agenda planning with the advisor, ensuring the distribution of meeting materials, calling the meeting to order, and adjourning the meeting.

[149] Jensen Deposition, p. 20:2–5.  Mr. Jensen departed the Committee in 2022.

[150] *See, for example*, Riddle Deposition, p. 37:3–4; Rupp Deposition, p. 28:9–11.

chairperson, but I have also worked with several committees who maintain a lead person not officially nominated as the chair, but who carried out those activities seamlessly as is the case with Mr. Jensen.  Regardless, I maintain that from my review of documentary evidence, this Committee was high functioning, maintained a diverse set of opinions to inform their comprehensive work, and relied on sound fiduciary practices to carry out their fiduciary responsibilities.

### C.   Mr. Stone Fails to Recognize the Ongoing Fiduciary Training Received by the Committee

88.    Mr. Stone criticizes the Committee's fiduciary training, arguing that it was "informal and cursory at best."[151]  He also states that "Committee members clearly would have benefitted from further or better training, as they lacked an understanding of which individuals and service providers had a fiduciary responsibility to the Plan."[152]  Mr. Stone's approach to fiduciary training seems to indicate there is only one track to accomplish fiduciary training, which is inconsistent with my experience, inconsistent with the deposition testimony of Committee members and the investment advisor, and overlooks ongoing fiduciary education and engagement as well as formal training materials.

89.    First, Mr. Stone's approach to fiduciary education is rigid and prescriptive.  There is no requirement under ERISA that extensive training should occur before joining the Committee and no prescribed type of required training.  Despite this, Mr. Stone outlines a very specific onboarding training process that he believes is prudent: "Onboarding training should include review of all plan governance documents, investment and fee guidance, and records of any prior decision-making of plan fiduciaries."[153]  Mr. Stone's opinion is not rooted in ERISA's mandates and overlooks the testimony of both Mr. Eagar and Mr. Jensen.  Both testified that, although it was not a formal written process, there was an onboarding process for new Committee members that included an emphasis on the fiduciary

---

[151] Stone Report, ¶ 92.
[152] Stone Report, ¶ 95.  Mr. Stone focuses on his belief that Ms. Riddle "demonstrated a glaring lack of knowledge regarding basic investment concepts."
[153] Stone Report, ¶ 32.

responsibility of members.[154]  In addition, many of the Committee members had prior fiduciary experience and a familiarity with their fiduciary duties.[155]

90.     Second, in my experience, a large portion of fiduciary training occurs during the Committee meetings.  This Committee was no different.  Based on my review of the record, the advisor regularly provided education to the Committee members on a range of fiduciary and investment topics as part of the quarterly meetings.  This can be an explicit agenda item, such as the Fiduciary Education Essentials, or the Fiduciary Insights and Regulatory Update, or fiduciary education that occurs in the normal course of a meeting.[156]  Consistent with this, Mr. Eagar testified that "fiduciary education is certainly something that we would discuss on an ongoing basis, be it formalized or ongoing."[157]  Similarly, Mr. Jensen testified that informal fiduciary training occurred as part of every Committee meeting.[158]  Other Committee members also testified that training was ongoing as part of the Committee meetings.[159]  Despite this, Mr. Stone unjustifiably dismisses the importance of this frequent, informal intra-meeting training that is a key aspect of fiduciary training.

91.     Finally, Mr. Stone overlooks several of the formal fiduciary training presentations received by the Committee.  Some examples include, in March 2015, AWAI provided a fiduciary education presentation titled "Fiduciary Roles & Responsibilities" that included, at a minimum, "a background on ERISA, an overview on who is considered a fiduciary to the plan, the responsibilities of those fiduciaries, settlor vs. non-settlor functions and guidelines for managing fiduciary responsibility effectively."[160]  In July 2018, the Committee received a "Fiduciary Essentials" summary from QPA which covered fiduciary roles and responsibilities

---

[154] For example, Mr. Eagar testified that "We would have conversations either in person or virtual with new committee members to give them an overview and update with respect to fiduciary responsibility, what it means to be a member of a committee of a qualified retirement plan. We would provide an overview, excuse me, of the investment report materials, what they would be looking at. We would provide copies of prior minutes so that they could review those and understand the conversations that we would be -- would be having. We did that on a few different occasions." Eagar Deposition, pp. 161:15–162:2.  *See also* Jensen Deposition, p. 27:10–23.

[155] *See, for example*, Rupp Deposition, p. 51:7–11 ("Obviously with my prior, you know, background from a professional standpoint, as we discussed, you know, the roles of being a fiduciary and how to execute that was familiar to me.").

[156] *See, for example*, "401(k) Investment Committee: Fiduciary Essentials," *Qualified Plan Advisors*, QUANTA_002944; "Plan Investment Review: Quanta Services, Inc. 401(k) Savings Plan, October 1 - December 31, 2017," *EPIC*, QUANTA_002559–672 at 571–573.

[157] Eagar Deposition, p. 158:18–20.

[158] Jensen Deposition, pp. 24:18–25:3 ("…[I]t was a -- an informal discussion that would have occurred, really, as -- as part of every meeting.").

[159] *See, for example*, Riddle Deposition, pp. 38:24–39:7.  When asked if "since joining the Committee at Quanta, have you received fiduciary training," she testified "Yes.  In the meetings.  We go through it every meeting, there's some type…and it changes all the time if there's changes in landscape, regulatory…."

[160] 4th Quarter 2014 Performance Meeting Minutes, March 23, 2015, QUANTA_104283–286 at 283.

and investment processes and procedures.[161]  Similarly, in May 2021, the Committee received a "Retirement Plan Fiduciary Education" presentation from QPA.  This presentation focused on "who is a fiduciary," the responsibility of a fiduciary, and how best to maintain a prudent process.[162]  Despite Mr. Stone's claims to the contrary, in my experience, the Committee's overall level of fiduciary training was reasonable and the Committee members clearly understood their role as fiduciaries.

92.     Mr. Stone also criticizes the Committee's investment knowledge and asserts that "Without sufficient fiduciary education, those responsible for selecting and monitoring investments lack the essential knowledge needed to implement a consistent and prudent fiduciary process and, crucially, to recognize and remedy an erratic process or a deficiency of investment data."[163]  He specifically criticizes the investment knowledge of one Committee member, Ms. Riddle.[164]

93.     In contrast to Mr. Stone's opinions, based on my review, Quanta's process to appoint Committee members is consistent with industry norms and demonstrated a thoughtful approach.  Quanta and the Committee, like most plan sponsors and retirement plan committees I have worked with, focused on having Committee members with a wide range of backgrounds and expertise.[165]  The Committee was intentionally composed of members with diversified skills and expertise in a variety of related fields, including finance and human resources, among other fields.[166]  Given this approach, and consistent with my experience working with retirement plan committees, I would not expect all Committee members to have expertise in investments—the Committee does far more than simply monitoring the Plan's investments, such as addressing employee benefit matters, participant communications,

---

[161] "401(k) Investment Committee: Fiduciary Essentials," *Qualified Plan Advisors*, QUANTA_002944.  *See* Email from Eric Ferguson to Steven Wilhelm, et al., "401(k) Committee Review," July 9, 2018, QUANTA_121339.  *See also* Email from Rich Eagar to Kim Riddle and Eric Ferguson, "[EXTERNAL] Materials for Call Today," July 9, 2018, QUANTA_121202.  "Attached is the 1Q 2018 investment review report, last meeting minutes, as well as the one-pager that I referenced regarding fiduciary basics.  We will review the one page document mostly, and then I will provide an overview on the investment review."  The Committee also received a second "Fiduciary Essentials" one-pager later in the class period.  *See* Email from Libby Apolstol to Carolyn Campbell, et al., "Quanta Services First Quarter 2021 Committee Meeting," June 4, 2021, QUANTA_126156.

[162] "Retirement Plan Fiduciary Education," *Qualified Plan Advisors*, May 24, 2021, QUANTA_004975–996.

[163] Stone Report, ¶ 94.

[164] Specifically, Mr. Stone criticizes Ms. Riddle's investment knowledge.  *See* Stone Report ¶ 95.  Ms. Riddle's background is in human resources and she was the most knowledgeable Committee member regarding administrative topics and oversight.

[165] *See, for example*, Jensen Deposition, pp. 35:13–36:5.

[166] *See* Riddle Deposition, p. 16:5–10; Grindstaff Deposition, pp. 16:8–17:4; Rupp Deposition, pp. 9:21–10:6; Campbell Deposition, p. 23:5–16; Jensen Deposition, p. 17:9–11.  *See also* Table 1.

recordkeeping and plan administration.  Ms. Riddle's background and experience in human resources is well-suited for these non-investment areas, which are critical to a well-functioning plan.  In fact, in my experience, I cannot think of a time when a retirement committee did not have a senior member from the human resources team involved.  And, based on my review of documentary evidence, I found that the deposition testimony of all Committee members revealed a solid and informed understanding of key investment elements.[167]  In addition, based on my review of the materials, the Committee included many members with a very strong knowledge of investment concepts.[168]

> **D.    The Plan's Investment Advisor Was Qualified, Engaged, and Provided Comprehensive Information on the Funds to the Committee, and the Committee Appropriately and Reasonably Relied on the Advisor's Advice**

94.    Mr. Stone criticizes the Plan's investment advisor and asserts that "the Plan was the largest plan that Ascende serviced in terms of AUM and Ascende's average client was far smaller."[169]  Mr. Stone criticizes the quality of the information that the investment advisor provided to the Committee.[170]  He also criticizes the Committee's "reliance" on the investment advisor.[171]  Finally, he asserts that the Committee did not "establish and follow a formal process to periodically review the performance of all plan service providers" including the advisor.[172]

95.    Mr. Stone's criticism of QPA (and its predecessors) due to the size of its average plan client falls flat.  First, the quality of the materials produced by QPA (and its predecessors) is on par with what is typical in the industry.  Throughout the class period, the Committee received industry-standard information regarding economic and market commentary, fund performance and fees, including investment performance over various time periods, relative

---

[167] *See, e.g.*, Campbell Deposition, pp. 194:24–198:12; Riddle Deposition, pp. 58:5–59:25.

[168] Mr. Jensen, Mr. Grindstaff, Ms. Campbell, and Mr. Rupp all had business, accounting, or finance degrees. Mr. Rupp is a CFA charterholder and had prior experience as a portfolio manager and a sell-side equity analyst. Mr. Grindstaff and Mr. Jensen both had extensive finance experience.  *See also* Jensen Deposition, pp. 189:4–191:18; Rupp Deposition, pp. 94:19–97:16; Grindstaff Deposition, pp. 13:11–16:15; Campbell Deposition, p. 24:7–24.

[169] Stone Report, ¶ 109.

[170] Stone Report, ¶ 110 ("It was only after Ascende was acquired by EPIC, and gradually gained access to more sophisticated reporting systems, that it began providing more detailed metrics and analysis to the Committee. It is clear, however, that the additional information presented to the Committee was: (1) not the product of any tested and accepted means for evaluating the performance of investment options; (2) not consistent with the criteria in the IPS; and (3) not clearly communicated to the Committee.").

[171] Stone Report, ¶¶ 97, 106.

[172] Stone Report, ¶¶ 52–53.

performance versus peers, relative performance versus benchmarks, fund fees, and detailed reports on each fund that included a range of performance and risk indicators, rankings by leading industry groups, and other metrics.[173]   In my experience, the information contained in the QIRs covered all of the necessary elements for the Committee to thoroughly evaluate and monitor the Plan's investment options.   The materials were comprehensive and complete regardless of the size of the plan.   Mr. Stone's assertion jumps to a false conclusion with no actual support.

96.     Second, the size of the advisor's client base does not impact the quality of the advice provided by the advisor.   This is because fund evaluation is dependent on the details of the fund and not the size of the client and advisors are typically monitoring a given fund for more than one client.[174]   Best practices in fund monitoring and evaluation will not vary based on plan size because performance metrics for a given fund/share class combination are not dependent on plan size (i.e., the fees and returns of the K share class of the Freedom 2040 Fund are identical for every investor).   Given this, the size of the investment advisor's client base does not impact its ability to provide thoughtful and detailed data and advice as part of the fund evaluation and monitoring process.

97.     Mr. Stone's criticism of the Committee's "reliance" on its investment advisor fails to understand the typical Committee/advisor relationship.   Mr. Stone asserts that "the Committee relied solely on the Plan's investment advisor to identify investments that became non-compliant with the Plan's IPS or might otherwise be unsuitable for the Plan."[175]   Based on my review of the materials, the Committee exercised its own judgment in determining the appropriate decisions regarding the Plan investment options.   For example, the Committee

---

[173] During the class period, the QIRs had multiple formats.   The first format was under the Ascende name.   *See, for example*, "Quanta Services, Inc.: 1st Quarter 2017 401(k) Investment Review," *Ascende, Inc.*, May 10, 2017, QUANTA_002219–286.   These reports included "Investment Fund Performance Tables" that included performance versus a benchmark index, Lipper performance ranking 36 months, Morningstar star ranking, expense ratio, and plan assets information.   Both Lipper and Morningstar are peer-based metrics.   In addition, these reports included "Investment Fund Data Tables" that included a wealth of fund-specific data and information including data related to operations, asset allocation, and performance data and statistics.   The reports also included a glossary that defined relevant investment terms and data sources.   The second format was under the QPA name.   *See, for example*, "Plan Investment Review: Quanta Services, Inc. 401(k) Savings Plan, January 1 - March 31, 2019," *Qualified Plan Advisors*, QUANTA_003367–478.   These reports included a "Performance Summary" that included performance over various periods versus a Morningstar category peer group and a benchmark index.   Other relevant data included calendar year performance versus Morningstar category, a "Risk Return Analysis" that included metrics such as alpha and Sharpe Ratio, and an expense ratio market comparison.   Consistent with the prior format, the reports included fund-specific reports with operations, asset allocation, and performance data and statistics.
[174] For example, Mr. Eagar testified that his firm has "other clients that have utilized the Fidelity Freedom Funds [as their QDIA]."   Eagar Deposition, p. 139:15–23.
[175] Stone Report, ¶ 97.

specifically asked the investment advisor to remove the fund "score" from the Committee materials.[176]  The Committee did not want to be overly swayed by one summary datapoint and preferred to reach its *own* conclusions based on the totality of the data.[177]  This decision is consistent with an independent and engaged Committee that wanted to reach its own conclusions regarding the Plan's investment options.  Part of that process involved the recommendations provided by the investment advisor.  Also, in my experience, it is not uncommon for a committee to agree with an advisor's recommendations.  What is most important is that the committee considers the recommendation, evaluates the information provided, and reaches a decision on their own, as this Committee did.  Of note, if there is consistent disagreement between a committee and an advisor, there would be a high probability this would lead to the committee replacing the advisor.

98.      In contrast to Mr. Stone's opinion, committees are not required to have a formal process to periodically review the performance of service providers.  This formal review is not a requirement under ERISA and, in my experience, many committees do not have a formal review process and instead opt to rely on the frequent ongoing engagements with service providers as more informative.  Given the level of frequent interaction with the investment advisor, the Committee had sufficient information to evaluate the performance of the advisor and did so on ongoing basis at every meeting.  As noted by Kip Rupp when asked whether the Committee ever evaluated the advisor, "Yeah, in a way on an ongoing basis. You know, every quarter we have an interaction with QPA… so I would say we're ongoing [in] evaluating QPA."[178]  Additionally, when asked if she recalls any process the Committee engaged in evaluating performance of the advisor, Ms. Riddle testified, "that's kind of an ongoing thing… they're engaged, and they're responsive."[179]  Similarly, Carolyn Campbell testified that[180]

> I believe the Committee regularly considers whether we're happy with QPA, or whether we -- we think there is a better alternative or might be a better

---

[176] *See, for example*, Eagar Deposition, pp. 224:7–20, 226:11–22; Campbell Deposition, pp. 125:16–127:7.  Ms. Campbell testified that "In fact, we asked QPA to remove its scoring conclusions from our report, and because the Committee wanted to make individual assessments on our own, bring those perspectives into the meeting and use our judgment and discretion and care and prudence in reaching a conclusion."

[177] Rupp Deposition, p. 126:7–16 ("…[T]he committee felt like having a score, you know, could influence, you know, proper deliberation and evaluation of, you know, more than just one metric as far as evaluating the funds and the options within the plan.").

[178] Rupp Deposition, pp. 69:22–70:2.  *See also* Campbell Deposition, p. 57:3–10.

[179] Riddle Deposition, p. 92:2–7.

[180] Campbell Deposition, pp. 54:18–55:3.

alternative, and to this point, we've been very pleased with the service that we receive from QPA. We believe it's comprehensive.  We believe it is responsive.  And we believe they have expertise that is valuable to us….

99.     Through these interactions, it is also important to acknowledge that QPA was continuing to evolve and grow through mergers and acquisitions, resulting in continued enhanced reporting, expansion of tools, resources, and advanced databases.  This growth and evolution also allowed the Committee to see first-hand the advancements that were deployed.[181]

100.    Mr. Stone's opinion also overlooks the continuity of the Committee/investment advisor relationship.  Despite the transition from AWAI to Epic to QPA, the Committee had the same investment advisor team (led by Rich Eagar) throughout the class period and valued its relationship with the advisor team.[182]  Institutional memory and understanding of the history of plan specifications is valuable and can enhance plan oversight.  As a result, it is common in the industry, and in my experience, for committees to continue to retain the same investment advisor team even if that team changes firms or works for a firm that is acquired or merges with another firm.  This Committee was no different.

###     E.    Mr. Stone's Opinions Regarding the Level of Detail of the Committee's Meeting Minutes Are Incorrect

101.    Mr. Stone asserts that the Committee's meeting minutes were "cursory and failed to support objective and consistent decision making."[183]  While Mr. Stone concedes that the Committee maintained meeting minutes, he claims that the "minutes were woefully inadequate, and do not reflect the decision-making process of the Committee at the time of the meeting."[184]  In reaching this conclusion, Mr. Stone appears to rely solely on Committee meeting minutes to understand what the Committee considered in their evaluation, and ignores relevant meeting materials—such as the QIRs prepared by the advisor—which per the IPS are also considered part of the written records of the Plan.[185]  In contrast to Mr.

---

[181] For example, Mr. Eagar discusses the additional capabilities that were available when his team moved from Ascende to QPA.  *See* Eagar Deposition, p. 142:12–23.
[182] *See, for example*, Campbell Deposition, pp. 52:11–55:3; Rupp Deposition, p. 72:18–25.
[183] Stone Report, ¶ 84.
[184] Stone Report, ¶ 85.
[185] 2015 Investment Policy Statement at 410.  The IPS section entitled "Written Records" which discusses the meeting minutes also includes the following: "The investment adviser has agreed to prepare written quarterly reports for the Committee to assist it in both the selection and monitoring of the investment options offered under the Plan including specific investment option recommendations for consideration by the Committee."

Stone's opinion, based on my review of the materials, I conclude that the Committee meeting minutes were robust and had an appropriate amount of detail. Meeting minutes are not intended to be a transcript to recreate specific data that is captured in meeting materials. In fact, in my experience, meeting materials in full are considered "book of record," accessible to be reviewed, referenced, and discussed before, during, and after meetings.[186]

102.   Mr. Stone characterizes the removal of the Freedom Funds from "Monitor" status in February 2016 as "[a] glaring example of the deficiency of the meeting minutes."[187] Despite Mr. Stone's claim to the contrary, the documentary evidence in this matter reflect that the Committee's work was thorough and complete. In fact, Mr. Stone highlights that the Committee minutes report that:[188]

> AWAI and the Committee discussed various aspects of the target date suite involving management, glide path, asset allocation, fees and underlying fund composition. The AWAI team also indicated that there were not significant changes to the fund suite during 2015. As a result, AWAI and the Committee agreed to move the funds from Monitor to No Alert status.[189]

In this specific example, had Mr. Stone more carefully reviewed the documentary evidence available, he would have seen that the Freedom Funds were on "Monitor" status prior to this Committee meeting simply due to the fact that some of the underlying funds to the Freedom Funds suite did not have a three-year track record. In the 4th Quarter 2014 Committee meeting minutes dated March 23, 2015, the minutes state that "While the [Freedom Funds] continue to perform well they remain on 'Monitor' as many of the underlying investment options do not yet have 3 years of return history."[190] The meeting notes go on to affirm that "[t]he investment suite remains an appropriate investment option for participants seeking a one-fund diversified investment option with an acceptable glide path, management, cost structure, and set of underlying funds and asset classes."[191] This is a notable example of the meeting minutes being fulsome, countering Mr. Stone's assertion otherwise. These minutes

---

[186] *See* 2015 Investment Policy Statement at 410.

[187] Stone Report, ¶ 86. Note that this example provided by Mr. Stone predates the class period, which begins in August 2016.

[188] Stone Report, ¶ 87, citing "The minutes of the Fourth Quarter 2015 Committee meeting held on February 15, 2016."

[189] 4th Quarter 2015 Performance Meeting Minutes, February 15, 2016, QUANTA_104297–299 at 299.

[190] 4th Quarter 2014 Performance Meeting Minutes, March 23, 2015, QUANTA_104283–286 at 286.

[191] 4th Quarter 2014 Performance Meeting Minutes, March 23, 2015, QUANTA_104283–286 at 286.

also offer clarity that the Committee reviewed the Freedom Funds' underlying fund composition and strategy.

103.     In my opinion, the approach that Ascende [subsequently QPA] and the Committee took was an extra monitoring step that is thoughtful and precautionary—the opposite of how Mr. Stone portrays the Committee's monitoring activities.  In fact, for target date funds (like the Freedom Funds), the track record that is relevant is the track record of the overall suite offering (as opposed to the underlying funds of the Freedom Funds).[192]  Reasonable retirement plan committees, when properly evaluating a suite of target date funds for track record purposes, will evaluate those funds at the fund suite level and focus on factors like the overall portfolio manager's experience and philosophy, the investment glide path, and the overall fund performance.  Based on my review of the materials, the Committee clearly did this, but also went above that standard, employing an extra level of monitoring until the underlying funds reached a three-year performance history threshold.

104.     My review of the documentary evidence indicates that the Committee's approach, in partnership with their investment advisor, was diligent and complete.  The meeting notes succinctly recognize the review of this information as the rationale for removing the Freedom Funds from "Monitor" status.  Based on my experience, this level of summation given the reason the funds were on "Monitor" to begin with is what I would expect the meeting notes to capture.  As an additional aside, the funds were not on "Alert" – rather simply "Monitor," which based on my review of the documentary evidence is exactly what the Committee's work accomplished (i.e., monitoring one or more specific aspects of the funds).[193]  Last, as mentioned in Section IV.B, meeting notes are not intended to be a transcript to recreate specific data that is captured in meeting materials.

---

[192] For example, as of March 31, 2017, the Freedom Funds had 27 underlying funds.  *See* "Fidelity Freedom Target-Date Fund Series Report," *Morningstar*, March 31, 2017, p. 3.

[193] Per the 2015 IPS, "Once an investment option has been assigned a status of 'Monitor', if it should remain with this status for up to four consecutive quarters, without documented improvement in the underlying criteria, it will be advanced to a status of 'Alert' no later than the fifth consecutive quarter of underperformance.  After two consecutive quarters on 'Alert' status, the Committee shall consider alternative investment options and discuss the merits of replacing or continuing the investment.  However, the Committee at its discretion may change an investment's status outside of these standards as each fund is separately evaluated.  Any such change in investment status will be documented in the meeting minutes."  2015 Investment Policy Statement at 417.

**F.    Mr. Stone's Opinions Regarding the Committee's Adherence to the IPS Are Faulty**

105.    Mr. Stone asserts that the Committee "failed to consistently apply the Investment Policy Statement and scoring system."[194]  He also claims that "[i]nconsistencies between the ratified 2015 IPS and the scoring system introduced in the 2017 [QIR] materials compounded the disconnect regarding the operative IPS between the Committee and the Plan's investment consultant."[195]  In reaching these conclusions, Mr. Stone fails to consider several critical factors including:  the discretion and latitude built into the IPSs and that the Committee consistently received appropriate information and data to support its decision-making process.

106.    As discussed in detail, an IPS is a guideline document to be referenced as a tool to support the Committee's decision-making.  This baseline fact was well understood by Committee members based on extensive deposition testimony.[196]  As covered in Section V.C, judgment, discretion, and latitude were built into the IPS for this Committee.[197]

107.    In addition, foundationally, the spirit of an IPS in whole and monitoring criteria specifically is meant to be a guide and support to Committees in plan oversight.  An IPS should not force actions that when circumstances are considered may not be suitable.  In fact, I agree with Mr. Eagar's view shared in his deposition testimony that "it's not a binary or pure quantitative process" and "it's not a quantitatively driven document that says, this is what has to be done, this is a data point that must be looked at. It provides the realm of information and data that the committee can consider in making a determination on an investment option."[198]  The purpose of an IPS is to provide *guidance* on how plan fiduciaries should manage their plans and investment options, not to provide hard line rules which trigger absolute or required actions.  It would run contrary to the judgment and discretion required of plan fiduciaries to be rigidly constrained in their decision-making by a static written document that cannot anticipate all of the considerations of complex plan oversight and investment decisions.  Regardless of the language used in an IPS, plan fiduciaries are

---

[194] Stone Report, ¶ 122.

[195] Stone Report, ¶ 116.

[196] *See, for example*, Campbell Deposition, pp. 236:21–238:8; Jensen Deposition, pp. 78:11–79:18.

[197] Eagar Deposition, p. 129:7–17.  Mr. Eagar notes that the scoring system, which was added to the QIRs in mid-2017 was not automatic – just prompts discussion.

[198] Eagar Deposition, pp. 68:9–10, 77:15–22.

Case 4:22-cv-03290     Document 88-10     Filed on 12/20/24 in TXSD     Page 60 of 99

expected to and do apply discretion and judgment when carrying out their fiduciary duties in the best interest of participants.

108.    Based on my review of documentary evidence, the Committee had an IPS throughout the class period that was ratified at all times and that they abided by (2015 and 2020).  Both the 2015 and the 2020 IPSs were thorough and complete.  The Committee was receiving all the right information which allowed them to conduct proper monitoring.  The monitoring criteria across the 2015 and 2020 IPSs remained generally consistent.  And, the information the Committee received to discuss, review, and evaluate the funds was thorough and complete to support appropriate decision making about the plan's investments.  The updates in 2017 and 2019 provided extra information—which actually shows an engaged Committee—and neither presented any information that was problematic.  The Committee had latitude, discretion, and was reviewing and formally monitoring the QIRs thoroughly and remained comfortable with the Plan's investments.

109.    My review of documentary evidence and deposition testimony revealed that the primary changes in the IPS were driven by organizational shifts, upgraded systems and reporting capabilities, and refinement of monitoring and scoring approaches by the investment advisor.  Also, consistent with Mr. Eagar's testimony, in my experience, updates to an IPS are not robotic and the timing varies depending on a number of factors.[199] Committees often take time to deliberate, discuss, and consider modifications, influenced by a host of factors, including consultant reporting capabilities and changes, organizational and committee shifts and changes, and time constraints and considerations relative to calendaring and meetings.

110.    Mr. Stone also asserts that the "Committee failed to recognize that its advisors were not identifying IPS non-compliance."[200]  He states that "Plan investments frequently ran afoul of the standards adopted in the IPS for assigning 'Monitor' and 'Alert' status but escaped mention or scrutiny because the binary pass or fail hegemony of the scoring system was the sole monitoring approach undertaken by the Committee."[201]  This conclusion is faulty.

111.    First, Mr. Stone again overlooks the fact that the IPS was a guideline document.  As discussed earlier, the IPS intentionally provides discretion: "the Committee *may* place an investment option on a 'Monitor' or 'Alert' status and conduct a thorough review and

---

[199] Eagar Deposition, pp. 135:19–136:20.
[200] Stone Report, ¶ 102.
[201] Stone Report, ¶ 104.

HIGHLY CONFIDENTIAL                                          Page 56

analysis of the investment option. The Committee *may* consider the following criteria when placing a fund on 'Monitor' or 'Alert' status."[202] And as explained above, at all times, the Committee *did* consider those criteria when evaluating investment options as part of the QIRs. Critically, none of the language in the IPS is intended to be prescriptive or indicative of absolute "non-compliance" as Mr. Stone infers.

112.    Second, Mr. Stone mischaracterizes Mr. Eagar's testimony. Mr. Stone states, "Mr. Eagar himself testified, failure of any one of the evaluative criteria set forth in the IPS could have been sufficient to place an investment on 'Monitor' or 'Alert' status."[203] In reality, Mr. Eagar testified that the list of criteria were items that the Committee can consider.[204]

113.    Contrary to Mr. Stone's continued assertions that that the Committee was blindly reliant on their investment advisor or nonchalant and disengaged, as has been covered extensively in Sections VI.A–E, this Committee was fully engaged, deploying independent judgment, and working in partnership with their consultant. As it pertains to Mr. Stone's accusations about the Freedom Funds, there is also extensive evidence revealing the Committee's understanding of the Freedom Funds as a suitable TDF for the Plan based on its glide path and investment strategy, among other factors. One data point on a long list of optional criteria does not equate to a failure to place the Freedom Funds on the Watch List. Further, as has also been demonstrated, Mr. Stone's assertion reveals a rudimentary understanding of complexity of TDFs as an investment and the overall objective of a TDF in a plan line-up.

### G.    Mr. Stone Mischaracterizes the Performance of the Freedom Funds at the Start of the Class Period

114.    Mr. Stone states that "the Committee failed to recognize and appropriately scrutinize the persistent failure of the Freedom Funds to outperform its benchmark."[205] To support this conclusion, he cites Table 1 of his report, which summarizes whether the Freedom Funds "Underperform" or "Outperform" the S&P Target Date Index over a three-year and five-year period at each quarter end from Q4 2015 through Q1 2017.[206] In reaching this conclusion, Mr. Stone fails to consider (1) the modest extent of the underperformance versus the S&P

---

[202] 2015 Investment Policy Statement at 417 (emphasis added).
[203] Stone Report, ¶ 102.
[204] Eagar Deposition, p. 90:12–20.
[205] Stone Report, ¶ 135.
[206] This table is based on information in the Plan's QIRs. *See* Stone Report, footnote 243.

Target Date Index, (2) the consistently improving performance versus the S&P Target Date Index, (3) the consistently strong performance versus peers, (4) the Morningstar star ratings (which are based on risk-adjusted returns), and perhaps most fundamentally, (5) as described in Section IV.D, that broadly, all TDFs are designed with the long-term objective of helping investors save for retirement *as opposed* to beating a specific universe benchmark or competing fund.  Once these additional data points are considered, it is apparent that the Committee's decision to not place the Freedom Funds on the Watch List was reasonable.

115.     As shown in Table 3 and Table 4 below, the difference between the performance of the Freedom Funds and the S&P Target Date Index was modest and narrowed over time.[207] For example, on three-year trailing basis, the only fund that trailed the benchmark by more than 1.00% during this six-quarter time period was the Freedom Income Fund.  On a five-year trailing basis, no fund trailed the benchmark by more than 1.50% during this six-quarter time period.  This is consistent with a fund that is performing better in more recent periods compared to more distant periods.  It is common and reasonable for a committee to consider whether long-term performance versus a benchmark is improving or worsening.  In this instance, the Freedom Fund performance was improving and the performance was competitive with the S&P Target Date Index.[208]

**TABLE 3:  Freedom Funds – Three-Year Performance Versus S&P Target Date Index (%) – Q4 2015 through Q1 2017**

| Fund | Q4 2015 | Q1 2016 | Q2 2016 | Q3 2016 | Q4 2016 | Q1 2017 |
|------|---------|---------|---------|---------|---------|---------|
| Freedom Income | -1.15 | -1.03 | -1.03 | -0.71 | -0.54 | -0.38 |
| Freedom 2005 | 0.25 | -0.12 | -0.19 | 0.04 | -0.05 | 0.33 |
| Freedom 2010 | 0.25 | -0.13 | -0.08 | 0.09 | -0.06 | 0.35 |
| Freedom 2015 | -0.42 | -0.58 | -0.41 | -0.07 | -0.19 | 0.32 |
| Freedom 2020 | -0.77 | -0.87 | -0.62 | -0.20 | -0.27 | 0.19 |
| Freedom 2025 | -0.29 | -0.51 | -0.31 | -0.01 | -0.24 | 0.23 |

---

[207] *See* "Quanta Services, Inc.: 4th Quarter 2015 401(k) Investment Review," *Ascende, Inc.*, February 15, 2016, QUANTA_100812–878 at 839; "Quanta Services, Inc.: 1st Quarter 2016 401(k) Investment Review," *Ascende, Inc.*, May 12, 2016, QUANTA_120726–793 at 754; "Quanta Services, Inc.: 2nd Quarter 2016 401(k) Investment Review," *Ascende, Inc.*, August 15, 2016, QUANTA_120799–866 at 827; "Quanta Services, Inc.: 3rd Quarter 2016 401(k) Investment Review," *Ascende, Inc.*, November 18, 2016, QUANTA_120867–934 at 895; "Quanta Services, Inc.: 4th Quarter 2016 401(k) Investment Review," *Ascende, Inc.*, March 31, 2017, QUANTA_120935–1002 at 963; "Quanta Services, Inc.: 1st Quarter 2017 401(k) Investment Review," *Ascende, Inc.*, May 10, 2017, QUANTA_002219–286 at 247.

[208] The S&P Target Date Indices are constructed using asset class benchmark indices that are each weighted based on the "average" allocation to those asset classes by TDFs in the marketplace. That is, across each target date vintage peer group, the mean value of each underlying asset class is calculated and proportionally adjusted to ensure that the weights of the asset classes sum to 100 percent. The calculated weight of each asset class is applied to an asset class benchmark index to construct each of the S&P Target Date Index vintages. See "S&P Target Date Index Series Methodology," *S&P Dow Jones Indices*, April 2024, available at https://www.spglobal.com/spdji/en/documents/methodologies/methodology-sp-target-date.pdf, p. 5.

| Fund | Q4 2015 | Q1 2016 | Q2 2016 | Q3 2016 | Q4 2016 | Q1 2017 |
|---|---|---|---|---|---|---|
| Freedom 2030 | -0.42 | -0.68 | -0.47 | 0.09 | -0.16 | 0.50 |
| Freedom 2035 | -0.12 | -0.62 | -0.49 | -0.03 | -0.16 | 0.60 |
| Freedom 2040 | -0.36 | -0.7 | -0.62 | -0.13 | -0.27 | 0.40 |
| Freedom 2045 | -0.46 | -0.76 | -0.66 | -0.20 | -0.32 | 0.26 |
| Freedom 2050 | -0.37 | -0.74 | -0.62 | -0.18 | -0.38 | 0.10 |
| Freedom 2055 | -0.14 | -0.57 | -0.49 | -0.13 | -0.37 | 0.02 |
| Freedom 2060 | - | - | - | - | - | - |

**TABLE 4:  Freedom Funds – Five-Year Performance Versus S&P Target Date Index (%) – Q4 2015 through Q1 2017**

| Fund | Q4 2015 | Q1 2016 | Q2 2016 | Q3 2016 | Q4 2016 | Q1 2017 |
|---|---|---|---|---|---|---|
| Freedom Income | -1.40 | -1.50 | -1.35 | -1.31 | -0.99 | -0.82 |
| Freedom 2005 | -0.45 | -0.84 | -0.59 | 0.42 | 0.48 | 0.34 |
| Freedom 2010 | -0.23 | -0.56 | -0.35 | 0.42 | 0.51 | 0.42 |
| Freedom 2015 | -0.66 | -0.91 | -0.74 | -0.43 | -0.16 | 0.01 |
| Freedom 2020 | -0.88 | -1.15 | -0.97 | -0.72 | -0.47 | -0.28 |
| Freedom 2025 | -0.62 | -0.89 | -0.70 | -0.37 | -0.18 | -0.07 |
| Freedom 2030 | -0.73 | -1.06 | -0.90 | -0.63 | -0.34 | -0.03 |
| Freedom 2035 | -0.72 | -1.12 | -0.92 | -0.39 | -0.12 | 0.12 |
| Freedom 2040 | -0.89 | -1.23 | -1.06 | -0.69 | -0.45 | -0.17 |
| Freedom 2045 | -0.95 | -1.30 | -1.10 | -0.79 | -0.57 | -0.35 |
| Freedom 2050 | -0.97 | -1.37 | -1.14 | -0.64 | -0.78 | -0.64 |
| Freedom 2055 | - | - | -1.03 | -0.43 | -0.81 | -0.74 |
| Freedom 2060 | - | - | - | - | - | - |

116.    In reaching his conclusion regarding the performance of the Freedom Funds in late-2015 and 2016, Mr. Stone fails to consider the funds' performance versus peers.  In fact, the 2015 IPS stated that "performance evaluation will include, but not be limited to, comparisons to appropriate market indexes and *peer group comparisons*."[209]  The QIRs included the Freedom Funds' performance versus Lipper peers over the trailing three-year period.[210]  As shown in Table 5 below, from Q4 2015 through Q2 2016, the vast majority of the Freedom Fund vintages ranked in the 2nd quintile and from Q3 2016 through Q1 2017, the vast majority of the Freedom Fund vintages ranked in the 1st quintile.[211]  This indicates that Freedom Funds outperformed the majority of peer funds during these time periods.  In

---

[209] 2015 Investment Policy Statement at 416 (emphasis added).

[210] Lipper is a leading market data company that provides performance, fee, and other data for mutual funds. "LSEG Lipper," *LSEG Data & Analytics*, available at https://www.lseg.com/en/data-analytics/asset-management-solutions/lipper-fund-performance.

[211] Each quintile represents 1/5 or 20% of the peer funds.  The 1st Quintile represents the best 20% performing funds during the 36-month period.

addition, the Committee had access to the funds' Morningstar star ratings.[212]  As summarized in Table 6 below, throughout the period, the Freedom Funds consistently were rated three stars.

**TABLE 5:  Freedom Funds – Lipper Performance Quintile Ranking (36 Months) – Q4 2015 through Q1 2017**

| Fund | Q4 2015 | Q1 2016 | Q2 2016 | Q3 2016 | Q4 2016 | Q1 2017 |
|---|---|---|---|---|---|---|
| Freedom Income | 2nd | 3rd | 3rd | 3rd | 2nd | 2nd |
| Freedom 2005 | 3rd | 3rd | 3rd | 3rd | 2nd | 2nd |
| Freedom 2010 | 2nd | 2nd | 2nd | 1st | 1st | 1st |
| Freedom 2015 | 2nd | 2nd | 2nd | 1st | 1st | 1st |
| Freedom 2020 | 2nd | 2nd | 2nd | 1st | 1st | 1st |
| Freedom 2025 | 2nd | 2nd | 2nd | 1st | 1st | 1st |
| Freedom 2030 | 2nd | 2nd | 2nd | 1st | 1st | 1st |
| Freedom 2035 | 2nd | 2nd | 2nd | 1st | 1st | 1st |
| Freedom 2040 | 2nd | 2nd | 2nd | 1st | 1st | 1st |
| Freedom 2045 | 2nd | 2nd | 2nd | 1st | 1st | 1st |
| Freedom 2050 | 2nd | 2nd | 2nd | 1st | 1st | 1st |
| Freedom 2055 | 2nd | 2nd | 2nd | 2nd | 1st | 1st |

**TABLE 6:  Freedom Funds – Morningstar Rating (1 to 5 Stars) – Q4 2015 through Q1 2017**

| Fund | Q4 2015 | Q1 2016 | Q2 2016 | Q3 2016 | Q4 2016 | Q1 2017 |
|---|---|---|---|---|---|---|
| Freedom Income | 3 Stars | 3 Stars | 3 Stars | 3 Stars | 3 Stars | 3 Stars |
| Freedom 2005 | 3 Stars | 3 Stars | 3 Stars | 2 Stars | 3 Stars | 3 Stars |
| Freedom 2010 | 3 Stars | 3 Stars | 3 Stars | 4 Stars | 4 Stars | 4 Stars |
| Freedom 2015 | 3 Stars | 3 Stars | 3 Stars | 3 Stars | 3 Stars | 4 Stars |
| Freedom 2020 | 3 Stars | 3 Stars | 3 Stars | 3 Stars | 4 Stars | 4 Stars |
| Freedom 2025 | 3 Stars | 3 Stars | 3 Stars | 4 Stars | 4 Stars | 4 Stars |
| Freedom 2030 | 3 Stars | 3 Stars | 3 Stars | 3 Stars | 3 Stars | 4 Stars |
| Freedom 2035 | 3 Stars | 3 Stars | 3 Stars | 3 Stars | 3 Stars | 4 Stars |
| Freedom 2040 | 3 Stars | 3 Stars | 3 Stars | 3 Stars | 3 Stars | 4 Stars |
| Freedom 2045 | 3 Stars | 3 Stars | 3 Stars | 3 Stars | 3 Stars | 4 Stars |
| Freedom 2050 | 3 Stars | 3 Stars | 3 Stars | 3 Stars | 3 Stars | 4 Stars |
| Freedom 2055 | 4 Stars | 3 Stars | 3 Stars | 3 Stars | 3 Stars | 4 Stars |

117.    Whereas Mr. Stone focuses on a single metric—performance versus a universe benchmark—the Committee's monitoring process included a wide range of quantitative and qualitative data.  The monitoring approach suggested by Mr. Stone is purely formulaic and is based solely on comparisons of returns, ignores other relevant monitoring criteria that the Freedom Funds were consistently meeting, and is inconsistent with sound fiduciary practices

---

[212] The Morningstar star rating is a measure of a fund's risk-adjusted return, relative to funds in the same Morningstar category.  Funds are rated from one star to five stars, with the best performers receiving five stars and the worst performers receiving one star.  Five stars are the top 10%, four stars are the next 22.5%, three stars are the middle 35%, two stars are the next 22.5%, and one star is the bottom 10%.  "Morningstar Rating (Star Rating) - Funds," *Morningstar*, available at https://awgmain.morningstar.com/webhelp/glossary_ definitions/mutual_fund/mfglossary_MorningstarRating.html.

in target date oversight.  As explained in Section IV.D and supported by testimony from their investment advisor, TDFs are complex investment vehicles and need to be reviewed in that context, which the Committee accomplished by looking *beyond* single, short-term performance relative to a universal benchmark.[213]  Based on my review of the information available to the Committee, its conclusion that the Freedom Funds should not be on Watch List or removed at that time was reasonable.

### H.    Mr. Stone's Criticisms of the Target Date Deep Dives Are Dismissive and Unfounded

118.    Mr. Stone downplays the relevance and importance of the Target Date Deep Dive reports that were prepared by the investment advisor and reviewed by the Committee.[214]  He also asserts that the "Committee applied no heightened scrutiny or established any separate, more rigorous procedures to monitor the Plan's QDIA."[215]  Although ERISA does not require any "heightened scrutiny" or "separate, more rigorous" procedures for monitoring a plan's QDIA, my review of the documentary evidence, nonetheless, revealed extensive work related to target date fund evaluation conducted by the Committee.

119.    As an initial baseline, the Committee requested a competitive target date fund report. As noted in the 1Q 2016 meeting notes: "As the meeting concluded, AWAI [subsequently QPA] and the Committee discussed an overview of the Fidelity Freedom Funds.  The Committee expressed interest in conducting a due diligence project to review the Freedom Funds versus some industry competitors."[216]  The request by the Committee to review and compare Freedom Funds to some industry competitors is another example of an engaged Committee.  This request shows they were not insular in their thinking nor were they anchored to Fidelity.  Rather, they were willing to (and did) review extensive detail of multiple providers in the marketplace to ensure they were tracking comparators and trends.

---

[213] Eagar Deposition, pp. 146:4–9, 216:2–22 ("As mentioned, the discussion on Target Date Funds is a complicated one when you need to include quantitative and qualitative performance metrics.  And, again, the Fidelity performance objectives and their asset allocation in a 2030 may be different moderately or significantly from an S&P Target Date Fund or Target Date Index or what they consider appropriate for that particular allocation.  So these numbers and these data points are -- were certainly reviewed and discussed and considered, as would the -- the Lipper rankings of first quarter and three- and four-star Morningstar rankings, as well as how the investments, you know, short, medium, long term in comparison with peers through the deep dive analysis that -- that would have been done, if this would have been in the first quarter of '17 meeting, I believe, if I'm recalling correctly.").
[214] Stone Report, ¶ 137.
[215] Stone Report, ¶ 134.
[216] 1st Quarter 2016 Investment Committee Meeting Minutes, May 12, 2016, QUANTA_114144–146 at 146.

During the Class Period, Target Date Deep Dive reports were provided to the Committee nearly every year between 2016 and 2024.[217]  Consistent with this, in his deposition testimony, Mr. Jensen noted that the complexity of target date funds, "…necessitate a bit of a separate and incremental piece of analysis to ensure fulsomeness in its review" and that "it was the Committee who asked for and created the deep dive."[218]  Specifically requesting an additional annual analysis to provide more detail regarding the Plan's QDIA is consistent with the actions of a thorough and engaged committee.  Further, at the conclusion of these reviews, it allowed the Committee to continue to affirm the suitability of Fidelity as their target date provider.

120.    Based upon my experience and my review of documentary evidence, this level of consistent competitive analysis conducted on nearly an annual basis reveals a high level of attentiveness and effort put forth by the Committee.  In fact, in my experience, an annual target date fund competitive landscape analysis is not something typically provided to committees.  The Target Date Fund Deep Dive reports included, among other topics: (1) DOL guidance for monitoring and selecting TDFs, (2) review of TDF alternatives, including competing target date fund organizations (including five of the potential alternative TDFs proffered by Mr. Marin) and aggregation of various data and analytics, (3) glide path comparison of both to- and through- strategies, (4) performance review (e.g., one-, three-, and five-year return comparisons), (5) risk analytics (e.g., standard deviation and sharp ratios) and (6) fee analysis.[219]

121.    Contrary to Mr. Stone's assertions, this work helped the Committee remain informed of the broader competitive landscape and the wide variation of alternative TDFs, in addition to providing a consistent opportunity to review Fidelity as their provider relative to the broader landscape.  Considering this ongoing study and consideration of the marketplace offerings coupled with my review of documentary evidence, nothing substantive seemed to

---

[217] *See* "Fidelity Freedom Funds 2016 Target Date Deep Dive," *Ascende, Inc.*, 2017, QUANTA_106738–761; "Fidelity Target Date Suite: 2018 Target Date Deep Dive," *Qualified Plan Advisors*, QUANTA_003295–309; "2019 Target Date Deep Dive," *Qualified Plan Advisors*, QUANTA_004058–070; "2020 Target Date Deep Dive," *Qualified Plan Advisors*, QUANTA_004861–874; "2022 Target Date Deep Dive," *Qualified Plan Advisors*, QUANTA_005448–463; "2023 Target Date Deep Dive," *Qualified Plan Advisors*, QUANTA_006169–184; "2024 Target Date Deep Dive," *Qualified Plan Advisors*, QUANTA_129075–092.
[218] Jensen Deposition, pp. 138:14–139:9.
[219] In 2020, the TDF alternatives listed are American Century, American Funds, BlackRock Index, Freedom Funds, Fidelity Freedom Index, JPMorgan, JPMorgan Blend, PIMCO Blend, Putnam, T. Rowe Price, TIAA-CREF, and Vanguard.  *See* "2020 Target Date Deep Dive," *Qualified Plan Advisors*, QUANTA_004861–874 at 865.  Mr. Marin, in his report, argues that the Plan should have replaced the Freedom Funds with the American Funds TDF.  *See* Marin Report, ¶ 47.  This TDF was included as one of the competing target date funds in the Target Date Fund Deep Dive reports reviewed by the Committee.

have changed for the Plan based on the Committee's objectives, plan needs, or other rationale which would have prompted the Committee to pursue a different glide path or fund family. The Committee, through engagement with their investment advisor and with support from Fidelity, continued to monitor the competitive landscape. The underpinning of Mr. Stone's assertions broadly dismiss the thorough analysis conducted by the Committee and instead homes in on single short-term metrics, wholly missing the bigger picture and long-term nature of the target date fund in the Plan. Mr. Stone's criticism of the steps and stages of the Committee have an eye toward "gotcha" nit picking, elevates form over function, and ignores strategic and long-term relevant insight.

122.    There is no requirement for the Committee to have considered any other alternative TDFs merely because alternative TDFs are available in the marketplace or because of short-term lower returns relative to a benchmark. When evaluating TDF suites as the Plan QDIA, retirement plan committees would consider a more expanded set of considerations such as the Plan's objective, the glide path design, the underlying investment management approach (active, passive, blend, etc.), the risk/return trade-offs connected to the strategy, and fees. This is consistent with the approach the Committee applied when considering the ongoing suitability of the Freedom Funds. One example is connected to the Plan's objective as stated in the IPS. The 2015 IPS and 2020 IPS both maintained "The primary purpose of the Plan is to provide an opportunity for participants to ***accumulate funds for their retirement needs on a regular and long-term basis*** and secondarily to meet their other financial goals."[220] A retirement plan with a set purpose emphasizing meeting retirement needs on a long-term basis further supports why the Committee chose a "through" glide path and continued to affirm this choice with Fidelity over time. In addition, deposition testimony by several Committee members, as well as their investment advisor, showed detailed affirmation of their desire for a "through" glide path strategy, evaluation and consideration of the investment approach (active versus blend), and continued overall satisfaction with Fidelity's strategy and approach.[221]

123.    Consistent with these common considerations, my review of the documentary evidence, including the QIRs alongside the annual Target Date Fund Deep Dives—all referred to throughout the meeting minutes and considered book of record—reveal this work

---

[220] 2015 Investment Policy Statement at 406; 2020 Investment Policy Statement at 910 (emphasis added).
[221] *See, for example*, Rupp Deposition, pp. 142:7–143:9, 151:5–152:5, 160:13–24.

was being conducted routinely.  The Committee, with assistance from its investment advisor (and recordkeeper), consistently evaluated the performance, fees, benchmark, and universe data as well as the Morningstar ratings of the Freedom Funds in the QIRs.  Fidelity also routinely provided reporting which included the Freedom Fund composite benchmark—a benchmark designed specifically for the Freedom Funds—and shows that, over the same time periods, they were performing in-line with the composite benchmark and as expected.

124.    A retirement plan committee is not required to investigate every alternative in the marketplace, nor is it required to scour the market for the lowest cost funds or the highest performing funds.  Importantly, a fiduciary should focus on the process by which investments are selected and monitored for the plan, and <u>not on investment outcomes</u>.[222]  From a practical perspective, conducting such an extensive investigation to replace a fund that the retirement plan committee has already deemed reasonable creates unnecessary churn and occupies resources that could be better spent on other matters that require attention.

## I.    Mr. Stone Mischaracterizes the Strength of the Fidelity Target Date Fund Platform

125.    Mr. Stone claims that the Committee "regularly failed to consider information addressing [qualitative and non-performance] criteria with respect to the Plan's investments, including the Freedom Funds."[223]  In making this assertion, Mr. Stone observes that "Fidelity's TDFs had experienced $16 billion in net capital outflows from 2014 to 2018 and, from 2008 to 2018, the Freedom Funds' market share had decreased over 50%, from 43% market share to 21% market share."[224]  He goes on to conclude that "… the Committee did not discuss the Freedom Funds' substantial asset shedding during the relevant period.  Moreover, the Committee did not receive, nor did it seek out, sufficient information concerning the net asset flows to the Freedom Funds."[225]  This opinion fails to consider the strength of the Fidelity platform and the overall assets in the Freedom Fund strategies.  Mr. Stone incorrectly implies that the Freedom Funds were failing or that the Committee needed

---

[222] *See, for example*, Alison V. Douglass and Christina Hennecken, "Selecting, Evaluating, and Monitoring Investments in DC Plans: A Legal Perspective," *T. Rowe Price*, August 2023, available at https://www.troweprice.com/institutional/us/en/insights/articles/2021/q1/selecting-evaluating-monitoring-investments-dc-plans-legal-perspective-na.html.
[223] Stone Report, ¶ 130.
[224] Stone Report, ¶ 132.
[225] Stone Report, ¶ 132.

to act because of the flows out of the Freedom Funds.  In fact, the Fidelity TDF platform was extremely strong and stable.

126.    In addition, the broader target date landscape continued to evolve and become more competitive with new entrants with various investment strategies (e.g., glide path, asset allocation, asset class), implementation techniques (e.g., passive, blend, active), and investment vehicles (e.g., mutual funds, commingled trusts, etc.).[226]  Thus, it is unsurprising that assets were moving around in an evolving and growing industry.  As was detailed in Section VI.H, the Committee was abreast of the competitive landscape through their annual Target Date Deep Dive reports and continued to affirm the appropriateness of Fidelity as their target date provider in whole and the Freedom Funds specifically, until the Plan transitioned to the FIAM Blend Funds in 2021.

127.    Based in my experience, outflows alone are not a trigger for formal review or fund replacement.  Asset flows are a single input that may or may not result in the need for attention.  More importantly, in this case, despite its outflows, Fidelity remained one of the top three target date providers, reflecting that investors did not generally view the outflows as a cause of concern in Fidelity's ability to execute on their target date suite's investment strategies.  Fidelity was not hindered in their investing prowess and ability to execute on target date strategies, which is a far more relevant point of consideration.  In fact, from 2014 through 2023, according to the Morningstar Target Date Landscape Reports, Fidelity was, and remained, the second largest target date provider by asset share.[227]

128.    Furthermore, as described in Section VI.E, the Committee had investigated the Freedom Funds carefully, and had decided that their characteristics fit the Plan well.  That is what matters for Plan participants.  Mr. Stone's claim is thus myopic and fails to provide a complete picture of the fact that retirement plan committees evaluate funds holistically.  It is

---

[226] *See, for example*, "2018 Target-Date Fund Landscape: Sizing Up the Trillion-Dollar, Increasingly Passive Giant," *Morningstar*, May 7, 2018, pp. 1, 13.

[227] "2015 Target-Date Fund Landscape," *Morningstar*, April 7, 2015, p. 10; "2016 Target-Date Fund Landscape: Morningstar's Best Practices in Target-Date Evaluation," *Morningstar*, April 12, 2016, p. 9; "2017 Target-Date Fund Landscape: Answers to Frequently Asked Questions," *Morningstar*, April 20, 2017, p. 11; "2018 Target-Date Fund Landscape: Sizing Up the Trillion-Dollar, Increasingly Passive Giant," *Morningstar*, May 7, 2018, p. 8; "2019 Target-Date Fund Landscape: Simplifying the Complex," *Morningstar*, May 9, 2019, p.10; "2020 Target-Date Strategy Landscape: How target-date shareholders fared in the coronavirus bear market and the trends shaping the future of investing for retirement," *Morningstar*, May 2020, p.11; "2021 Target-Date Strategy Landscape: Rising markets make up for fizzling contributions and push target-date assets to an all-time high," *Morningstar*, March 2021, p. 8; "2022 Target-Date Strategy Landscape," *Morningstar*, March 23, 2022, p.12; "Target-Date Strategy Landscape: 2023," *Morningstar*, March 28, 2023, p. 9; "2024 Target-Date Strategy Landscape: Target-date strategies remained popular with investors, and mutual funds held the majority of assets," *Morningstar*, March 2024, p. 14.

reasonable for retirement plan committees to retain a fund that is experiencing outflows if the fund is still appropriate for its plan and is able to execute on the investment strategy.

129.     In addition, Mr. Stone's argument that outflows from 2014 to 2018 were an issue further loses credence when one examines the trend in Freedom Funds' assets over the period from 2014 through 2021.  Over that period, assets in Freedom Funds increased from $158 billion to $221 billion.[228]  As shown in **Exhibit 5**, Freedom Fund assets consistently exceeded $150 billion throughout this period.  That is clearly not consistent with investors having lost faith in the Freedom Funds, and is the type of situation in which retirement plan committees should examine data over longer periods in order to better understand trends in the marketplace before acting too quickly.

130.     Finally, in reaching his conclusions, Mr. Stone glaringly mischaracterizes Mr. Eagar's testimony related to fund outflows and monitoring target date funds.  Mr. Stone states that "Indeed, Mr. Eagar himself acknowledged that capital outflows from Plan investments should be a factor considered in investment monitoring, including with respect to TDFs."[229] However, in deposition, when Mr. Eagar was asked the question "Under the IPS would capital outflow from a particular investment be something that the committee should take into account in connection with its performance monitoring duties?", Mr. Eagar's answer was "It certainly *can be one data point of several* that are considered in the ongoing monitoring of a Target Date Suite."[230]  His testimony is a very different tone and approach than Mr. Stone represents.  In my experience, I agree with Mr. Eagar.  Asset outflows, depending on the circumstances of an investment strategy, organization, and fund, can be one factor considered in monitoring.  However, if the investment strategy is not disrupted, the organizational stability remains intact, and the funds' liquidity is not hindered, as was the case with the Freedom Funds, it would not be a factor that requires attention.

---

[228] Plan Sponsor reports year-end 2014 AUM of $66 billion and $92 billion for the Freedom Funds and the Freedom K Funds, respectively, for a total sum of $158 billion.  Morningstar reports year-end 2021 AUM of $221 billion for Freedom collectively.  *See* "2015 TDF Buyer's Guide: Fidelity Freedom Funds," *PLANSPONSOR*, September 10, 2015 available at https://www.plansponsor.com/research/2015-plansponsor-tdf-buyers-guide/; "2015 TDF Buyer's Guide: Fidelity Freedom K Funds," *PLANSPONSOR*, September 10, 2015, available at https://www.plansponsor.com/surveys/2015-plansponsor-tdf-buyers-guide/?pagesec=5&type=date&pname=Fidelity&pid=18#TDF Providers; "2022 Target-Date Strategy Landscape," *Morningstar*, March 23, 2022, p. 12.

[229] Stone Report, ¶ 132.

[230] Eagar Deposition, p. 190:12–19 (emphasis added).

**VII.    Mr. Marin's Conclusions that the Committee Should Have Removed and Replaced Certain Funds During the Class Period Are Based on a Flawed Methodology**

131.    Mr. Marin utilizes a performance-focused methodology that ignores all other quantitative and qualitative factors to conclude that the Freedom Funds should have been removed and replaced "no later than the First Quarter of 2017" and that the American Beacon Small Cap Value Fund and DFA International Small Cap Value Fund should have been removed and replaced "no later than the First Quarter of 2020."[231]  Mr. Marin's core methodology for determining whether a fund must be removed from the Plan involves comparing a fund's three-year and five-year returns against a benchmark index for a five-quarter period.[232]  He also provides two supplementary performance-focused analyses that cover the same five-quarter period: (1) whether the funds had positive information ratios and (2) a comparison of the funds' returns and/or alphas to a "peer group."[233]  Mr. Marin's conclusions are flawed for several reasons.

132.    Mr. Marin's removal approach is predicated on performance-based metrics and ignores the other decision-making factors and metrics—both quantitative and qualitative—detailed in the IPS, does not consider the Committee's preferences and Plan objectives, and completely disregards the broad discretion that exists in the IPS.  For example, Mr. Marin overlooks that the IPS includes leeway for the Committee to apply discretion regarding fund retention and replacement decisions.[234]  In addition, the Investment Watch List Process provides the Committee with discretion regarding Watch List and fund removal decisions.[235]  In contrast to this clear discretion afforded to the Committee, Mr. Marin's prescriptive approach does not distinguish between 10 basis points of underperformance versus 1,000 basis points of underperformance.  Similarly, Mr. Marin's approach does not distinguish between a fund with strong recent performance and a fund with weaker recent performance.  These differences can reasonably result in different committee decisions.

---

[231] Marin Report, ¶ 24.

[232] Marin Report, ¶¶ 31–32.

[233] Mathematically, the information ratio analysis is essentially equivalent to the performance versus benchmark analysis.  Marin Report, ¶ 31.

[234] 2015 Investment Policy Statement at 416 ("Thus, when a fund fails to achieve its stated objectives, the reasons for the failure will be evaluated, and the Committee shall determine whether the option shall remain, be frozen, or be replaced.").

[235] 2015 Investment Policy Statement at 417.

133.    Moreover, Mr. Marin's removal approach will almost certainly result in performance chasing, which is the opposite of what plan sponsors should be doing when selecting plan investment options.  If plan sponsors are concerned that they will face a lawsuit for periods when a fund is not a top performer or have to apply performance-based tests with no flexibility, it will likely lead to the inappropriate removal and replacement of funds based on short-term performance (i.e., performance chasing).  There is substantial empirical evidence regarding the pitfalls of performance chasing and that performance chasing results in lower long-term returns.[236]

Executed this 17th of September, 2024

_____

Lorie L. Latham

---

[236] Maciej Kowara and Paul Kaplan, "How Long Can a Good Fund Underperform?" *Morningstar*, August 17, 2018, available at https://www.morningstar.com/financial-advisors/how-long-can-good-fund-underperform ("[p]erformance is just not a reliable guide to assessing managers unless one extends the time frame to decades.").

HIGHLY CONFIDENTIAL

**APPENDIX A**

**Lorie L. Latham, CFA**

**Summary**

---

**Professional History**

- L. Latham Consulting, LLC, Founder and President, an independent consultancy (2022 to present)
- T. Rowe Price, Vice President of Group and Senior Defined Contribution Strategist (2016 – 2022)
- Willis Towers Watson (formerly Towers Watson and Watson Wyatt), Director, Head of Defined Contribution Strategy, Leadership Team (2006-2016)
- Ibbotson Associates, Vice President, Investment Management Services and Senior Portfolio Manager (2004 – 2006)
- JP Morgan (Bank One), Senior Portfolio Manager, Business Development Lead Manager, Analyst (1998 – 2004)
- Nuveen/Flagship Financial, Portfolio Analyst, (1996 - 1998)
- Fifth Third Bank Trust & Investment, Bank Associate Program, (1995 – 1996) (400 candidates, one of four hired into program)
- James Investment, Research Associate (1990 – 1995) -- Full-time student working 25+ hours a week

**Education and Professional Affiliations**

- Dual Bachelor of Science degrees in Financial Services and Marketing, Wright State University (1995)
- Chartered Financial Analyst (CFA) Charterholder (2004)
- Formerly held Series 63, 65, 6, and 7 licenses in the early 2000's

**Key Committee and Organizational Engagements**

- Founder and President, L. Latham Consulting, LLC (current)
- Expert Witness in 401k retirement plan litigation (current)
- Defined Contribution Institutional Investment Association (DCIIA), Plan Design Committee member (2022-2023)
- Employee Benefit Research Institute (EBRI), Moderator of key research partner round table pertaining to workforce changes and impact on retirement savings and outcomes culminating in a white paper (2022)
- Designed, launched and chaired T. Rowe Price's Defined Contribution Council, which served as the firm's cross-business unit group driving go-to-market strategy across retirement activities (2016- 2021) Baltimore, MD (chaired 2016-2019)
- Co-chair of the T. Rowe Price America's Client Advisory Board (consisting of top 25 institutional DCIO clients) (2016-2021)
- Member Retirement Leadership Council T. Rowe Price Baltimore, MD (2016-2019)

1

**APPENDIX A**

- Member of T. Rowe Price America's Lead Team Baltimore, MD (2016-2020)
- Designed, launched, and chaired Towers Watson's Defined Contribution (DC) Steering Committee, responsible for developing and executing on DC strategy for the firm Chicago, IL (2011 – 2016)
- Member of Tower's Watson's Investment Leadership Team Chicago, IL (2011 - 2016)
- Multi-year Chairman's fellowship senior mentor responsible for coaching fellows in design of new venture pursuits on behalf of new venture team and CEO, Chicago, IL (2014-2016)
- Member of Ibbotson's Investment Policy Committee (IPC), responsible for steering strategic and dynamic asset allocation policies and investment methodologies Chicago, IL (2004-2006)
- Member Ibbotson's Alternative Investments Strategic Steering Committee Chicago, IL (2004-2006)
- Member of Ibbotson's Compliance Committee Chicago, IL (2004 – 2006)

**Publications**

- *Jeff DeVack, Lorie Latham, Wyatt Lee & Terry Moore, Defined Contribution – The Future of Fixed Income in DC Plans: A Way Forward, T. Rowe Price's Price Perspective (Sept. 2017)*
- Lorie Latham, *Advancing the Way We Think About Perceptions of Risk and Achieving Outcomes*, T. Rowe Price's Price Perspective (July 2018)
- Lorie Latham, *What DC Plan Sponsors Prefer Retiring Participants Do and Why It Matters*, T. Rowe Price Insights on Retirement (Feb. 2019)
- Lorie Latham, *Three questions today – an improved DC plan tomorrow*, T. Rowe Price Insights on Retirement (Apr. 2019)
- Lorie Latham, *It's Time to Get Serious About Retirement Income Solutions*, T. Rowe Price Insights on Retirement (June 2019)
- Kim DeDominicis & Lorie L. Latham, *Evolution With Purpose*, T. Rowe Price Insights on Retirement (July 2019)
- Lorie Latham, Antonio L. Luna & Robert A. Madore, *Viewing Stable Value With 2020 Vision*, T. Rowe Price Insights on Stable Value (Feb. 2020)
- Lorie Latham, *Bridging the Gap Between Accumulation and Decumulation for Participants*, T. Rowe Price Insights on Retirement (Mar. 2020)
- Contributor, *Defined Contribution Consultant Study*, T. Rowe Price (Sept. 2020)
- Lorie Latham, *New Outlook on Income*, T. Rowe Price Insights on Retirement (Apr. 2021)
- Lorie Latham, *Three Tips for Evaluating Target Date Solutions*, T. Rowe Price Insights on Defined Contribution Plans (Nov. 2021).
- Kathryn Farrell, Lorie Latham & Zachary Rayfield, *Beyond Averages: A More Robust Approach to Glide-Path Design*, T. Rowe Price Insights on Defined Contribution Plans (Jan. 2022)
- Lorie Latham, *Five Ideas to Get your Committee Organized for the Year Ahead*, Massena Associates, LLC. (Feb. 2022)
- Contributor, *A View from EBRI's Retirement Research Center: Real World Insight About the Great Resignation's Impact on Work, Benefits, and Retirement Trends* (Sep. 2022)

**LinkedIn Articles**

- Lorie L. Latham, *Three Things Plan Sponsors Need to Know About Stable Value*, LinkedIn (March 17, 2020)
- Lorie L. Latham, *Participant Exchange Behavior May Be Less Concerning Than You Think...*, LinkedIn (June 1, 2020)

**APPENDIX A**

- Lorie L. Latham, *2020 Retirement Environment Insights Series – Part One: Evolution and Turbulence*, LinkedIn (Sept. 15, 2020)
- Lorie L. Latham, *2020 Retirement Environment Insights Series – Part Two: Outcomes Matter*, LinkedIn (Sept. 22, 2020)
- Lorie L. Latham, *2020 Retirement Environment Insights Series – Part Three: Outcomes Matter— Retirement Income Edition*, LinkedIn (Oct. 6, 2020)
- Lorie L. Latham, *2020 Retirement Environment Insights Series – Part Four: Revisiting the Core Lineup: Capital Preservation*, LinkedIn (Oct. 21, 2020)
- Jeff DeVack, Lorie Latham, Wyatt Lee & Terry Moore, *Defined Contribution – The Future of Fixed Income in DC Plans: A Way Forward*, T. Rowe Price's Price Perspective (Sept. 2017)
- Lorie L. Latham, *2020 Retirement Environment Insights Series – Part Five: Beyond Conventional DC*, LinkedIn (Jan. 14, 2021)
- Lorie L. Latham, *Evaluating DC Investments: Client Insights Drive Next Level Results – Part One: Evaluating Target Date Solutions*, LinkedIn (Mar. 30, 2021)
- Lorie L. Latham, *Evaluating DC Investments: Client Insights Drive Next Level Results –Part Two: Evaluating Stable Value*, LinkedIn (Apr. 15, 2021)
- Lorie L. Latham, *Untangling Fiduciary Misperceptions*, LinkedIn (June 25, 2021)

**Prior Expert Testimony**

- Wendy Berry, *et al. v.* FirstGroup America, Inc., *et al.* United States District Court Southern District of Ohio, Case No. 1:18-cv-00326-MWM, deposition date of September 8, 2022.
- *Johnson, et al. v. Quest Diagnostics Incorporated, et al. United States District Court District of New Jersey, Case No. 2:20-cv-07936-SDW-LDW, deposition date May 24, 2023.*
- *Peter Trauernicht, et al. v. Genworth Financial, Inc., et al. United States Eastern District of Virginia, Case No. 3:22-cv-532, deposition date February 7, 2024.*

**APPENDIX B**

# Documents Considered

**Depositions**

- Deposition of Derrick Jensen, June 19, 2024, and Exhibits
- Deposition of Carolyn Campbell, June 27, 2024, and Exhibits
- Deposition of Christopher August Rupp, June 28, 2024, and Exhibits
- Deposition of Kim Riddle, July 16, 2024, and Exhibits
- Deposition of Rich Eagar, July 19, 2024, and Exhibits
- Deposition of Nicholas Grindstaff, July 26, 2024, and Exhibits

**Expert Reports**

- Expert Report of Donald C. Stone, August 1, 2024
- Expert Report of Dr. Adam Werner, August 1, 2024
- Expert Report of Richard A. Marin, August 1, 2024

**Form 5500s**

- Quanta Services, Inc. 401(k) Savings Plan, Form 5500, 2015–2022

**Industry Reports**

- "2013 Target-Date Series Research Paper," *Morningstar*, June 27, 2013
- "2014 Target-Date Series Research Paper," *Morningstar*, July 1, 2014
- "2015 Target-Date Fund Landscape," *Morningstar*, April 7, 2015
- "2016 Target-Date Fund Landscape: Morningstar's Best Practices in Target-Date Evaluation," *Morningstar*, April 12, 2016
- "2017 Defined Contribution Trends: 10th Anniversary Edition," *Callan*, December 23, 2016
- "2017 Target-Date Fund Landscape: Answers to Frequently Asked Questions," *Morningstar*, April 20, 2017
- "2018 Target-Date Fund Landscape: Sizing Up the Trillion-Dollar, Increasingly Passive Giant," *Morningstar*, May 7, 2018
- "2019 Defined Contribution Benchmarking Survey Report: The retirement landscape has changed—are plan sponsors ready?" *Deloitte*, 2019
- "2019 Target-Date Fund Landscape: Simplifying the Complex," *Morningstar*, May 9, 2019
- "2020 Target-Date Strategy Landscape: How target-date shareholders fared in the coronavirus bear market and the trends shaping the future of investing for retirement," *Morningstar*, May 2020

**APPENDIX B**

- "2021 Target-Date Strategy Landscape: Rising markets make up for fizzling contributions and push target-date assets to an all-time high," *Morningstar*, March 2021
- "2022 Defined Contribution Trends Survey," *Callan*, 2022
- "2022 Target-Date Strategy Landscape," *Morningstar*, March 23, 2022
- "2024 Target-Date Strategy Landscape: Target-date strategies remained popular with investors, and mutual funds held the majority of assets," *Morningstar*, March 2024
- "401(k) Benchmarking Survey: Looking beyond the horizon – Employers addressing strategic challenges by enhancing and fine-tuning their 401(k) plans," *Deloitte*, 2008
- "Annual 401(k) Benchmarking Survey: Plan sponsors and providers work at closing the retirement readiness gap while getting ready for new fee disclosure regulations," *Deloitte*, 2011
- "Annual Defined Contribution Benchmarking Survey: Stronger economy provides the building blocks for positive trends in DC plans," *Deloitte*, 2014
- "Annual Defined Contribution Benchmarking Survey: Ease of Use Drives Engagement in Saving for Retirement," *Deloitte*, 2015
- "Defined Contribution Benchmarking Survey: From Oversight to Participant Experience – Plan Sponsors are Taking Their Fiduciary Role up a Notch," *Deloitte*, 2017
- "Fidelity Freedom Blend Target-Date Fund Series Report," *Morningstar*, September 30, 2022
- "Fidelity Freedom Target-Date Fund Series Report," *Morningstar*, March 31, 2017
- "Fidelity Freedom Target-Date Fund Series Report," *Morningstar*, September 30, 2022
- "Target-Date Series Research Paper: 2010 Industry Survey," *Morningstar*, March 15, 2010
- "Target-Date Series Research Paper: 2013 Survey," *Morningstar*, 2013
- "Target-Date Strategy Landscape: 2023," *Morningstar*, March 28, 2023

**Legal Documents**

- Class Action Complaint, *Laliberte, et al. v. Quanta Services, Inc., et al.*, United States District Court for the Southern District of Texas, Houston Division, Civil Action No. 4:22-cv-03290, September 26, 2022

**Websites**

- "2015 TDF Buyer's Guide: Fidelity Freedom Funds," *PLANSPONSOR*, September 10, 2015, available at https://www.plansponsor.com/research/2015-plansponsor-tdf-buyers-guide/
- "2015 TDF Buyer's Guide: Fidelity Freedom K Funds," *PLANSPONSOR*, September 10, 2015, available at https://www.plansponsor.com/surveys/2015-plansponsor-tdf-buyers-guide/?pagesec=5&type=date&pname=Fidelity&pid=18#TDF Providers
- "2427. Employee Retirement Income Security Act Of 1974 (ERISA) -- 29 U.S.C. 1001 Et Seq.," *U.S. Department of Justice*, available at https://www.justice.gov/archives/jm/criminal-resource-manual-2427-employee-retirement-income-security-act-1974-erisa-29-usc-1001-et
- "About Us," *T. Rowe Price*, available at https://www.troweprice.com/en/us/about-us

- "FAQs about Retirement Plans and ERISA," *U.S. Department of Labor*, *Employee Benefits Security Administration*, available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/faqs/retirement-plans-and-erisa-for-workers.pdf

- "FiduciarySource Guide: Helping plan sponsors understand their fiduciary duties," *T. Rowe Price*, December 2021, available at https://www.troweprice.com/content/dam/retirement-plan-services/pdfs/advisor-resources/client-loyalty/FiduciarySource_Guide.pdf

- "Industry's First Target-Date Fund Celebrates 15 Years Since Groundbreaking Launch," November 7, 2008, *InsuranceNewsNet*, available at https://insurancenewsnet.com/oarticle/Industrys-First-Target-Date-Fund-Celebrates-15-Years-Since-Groundbreaking-Launc-a-100322

- "LSEG Lipper," *LSEG Data & Analytics*, available at https://www.lseg.com/en/data-analytics/asset-management-solutions/lipper-fund-performance

- "Meeting Your Fiduciary Responsibilities," *U.S. Department of Labor*, *Employee Benefits Security Administration*, September 2021, available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf

- "Morningstar Rating (Star Rating) - Funds," *Morningstar*, available at https://awgmain.morningstar.com/webhelp/glossary_definitions/mutual_fund/mfglossary_MorningstarRating.html

- "Percentile Rank in Category," *Morningstar*, available at https://awgmain.morningstar.com/webhelp/glossary_definitions/mutual_fund/Percentile_Rank_in_Category.htm

- "Quanta Services Announces Planned Executive Transitions," *Quanta Services, Inc.*, May 5, 2022, available at https://quantaservices.com/stories/quanta-services-announces-planned-executive-transitions

- "Retirement Plan Fiduciary Mistake – Focusing Solely on Past Investment Performance," *Conrad Siegel*, available at https://conradsiegel.com/focusing-solely-on-past-investment-performance/

- "S&P Target Date Index Series Methodology," *S&P Dow Jones Indices*, April 2024, available at https://www.spglobal.com/spdji/en/documents/methodologies/methodology-sp-target-date.pdf

- "Target Date Retirement Funds - Tips for ERISA Plan Fiduciaries," *U.S. Department of Labor, Employee Benefits Security Administration*, February 2013, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/target-date-retirement-funds.pdf

- "Types of Retirement Plans," *U.S. Department of Labor*, available at https://www.dol.gov/general/topic/retirement/typesofplans

- Alison V. Douglass and Christina Hennecken, "Selecting, Evaluating, and Monitoring Investments in DC Plans: A Legal Perspective," *T. Rowe Price*, August 2023, available at https://www.troweprice.com/institutional/us/en/insights/articles/2021/q1/selecting-evaluating-monitoring-investments-dc-plans-legal-perspective-na.html

**APPENDIX B**

- Brian R. Wimmer, et al., "Quantifying the impact of chasing fund performance," *Vanguard*, July 2014, available at https://www.vanguard.ca/documents/quantifying-the-impact-en.pdf
- Jack Caporal, "The Largest Target Date Funds: Vanguard, T. Rowe Price, and BlackRock manage the most assets in target date funds," *The Motley Fool*, June 30, 2023, available at https://www.fool.com/research/largest-target-date-funds/
- John Manganaro, "Lasting Volatility Faces Retirement Investors," *PLANSPONSOR*, March 10, 2020, available at https://www.plansponsor.com/lasting-volatility-faces-retirement-investors/
- Kat Tretina, "Bear Market Vs. Bull Market: What's The Difference?" *Forbes Advisor*, June 12, 2023, available at https://www.forbes.com/advisor/investing/bear-market-vs-bull-market/
- Kat Tretina, "Index Funds vs. Mutual Funds," *Forbes Advisor*, March 22, 2023, available at https://www.forbes.com/advisor/investing/index-funds-vs-mutual-funds/
- Kimberly Shaw Elliott, "3(21) Versus 3(38) ERISA Investment Fiduciaries – Decoding the Numbers," *National Institute of Pension Administrators*, September 3, 2013, available at https://www.nipa.org/blogpost/1011572/169845/3-21-Versus-3-38-ERISA-Investment-Fiduciaries--Decoding-the-Numbers
- Maciej Kowara and Paul Kaplan, "How Long Can a Good Fund Underperform?" *Morningstar*, August 17, 2018, available at https://www.morningstar.com/financial-advisors/how-long-can-good-fund-underperform
- Rebecca Moore, "Establishing a Retirement Plan Committee," *PLANSPONSOR*, December 15, 2020, available at https://www.plansponsor.com/in-depth/establishing-retirement-plan-committee/
- True Tamplin, "Plan Committee Meeting Minutes," *Finance Strategists*, September 7, 2023, available at https://www.financestrategists.com/retirement-planning/plan-compliance/plan-committee-meeting-minutes/

**Produced Documents**

- QUANTA_000001–036
- QUANTA_000037–056
- QUANTA_000057–059
- QUANTA_000060–061
- QUANTA_000062–081
- QUANTA_000082–088
- QUANTA_000089–100
- QUANTA_000101–105
- QUANTA_000106–110
- QUANTA_000111–131
- QUANTA_000132–139
- QUANTA_000140–145
- QUANTA_000146–165
- QUANTA_000166–215
- QUANTA_000216–218
- QUANTA_000219–292
- QUANTA_000293–297
- QUANTA_000298–301
- QUANTA_000302–351
- QUANTA_000352–358
- QUANTA_000359–391
- QUANTA_000392–399
- QUANTA_000400–406
- QUANTA_000407–419
- QUANTA_000420–426
- QUANTA_000427
- QUANTA_000428
- QUANTA_000429–430
- QUANTA_000431–453
- QUANTA_000454–459
- QUANTA_000460–471
- QUANTA_000472
- QUANTA_000473
- QUANTA_000474–519
- QUANTA_000676–683
- QUANTA_000684–691

**APPENDIX B**

- QUANTA_000692–699
- QUANTA_000700–707
- QUANTA_000708–715
- QUANTA_000716–723
- QUANTA_000724–731
- QUANTA_000732–739
- QUANTA_000740–747
- QUANTA_000748–755
- QUANTA_000756–763
- QUANTA_000764–771
- QUANTA_000772–779
- QUANTA_000780–787
- QUANTA_000788–795
- QUANTA_000796–803
- QUANTA_000804–811
- QUANTA_000812–819
- QUANTA_000820–827
- QUANTA_000828–835
- QUANTA_000836–843
- QUANTA_000844–851
- QUANTA_000852–859
- QUANTA_000860–867
- QUANTA_000868–875
- QUANTA_000876–883
- QUANTA_000884–891
- QUANTA_000892–900
- QUANTA_000901–908
- QUANTA_000909–930
- QUANTA_000931–936
- QUANTA_000937–992
- QUANTA_000993–994
- QUANTA_000995–996
- QUANTA_000997–1001
- QUANTA_001002–004

- QUANTA_001005–007
- QUANTA_001008–012
- QUANTA_001013–019
- QUANTA_001020–026
- QUANTA_001027–042
- QUANTA_001043–084
- QUANTA_001085–114
- QUANTA_001274
- QUANTA_001275–340
- QUANTA_001341–372
- QUANTA_001373–374
- QUANTA_001375–380
- QUANTA_001381–402
- QUANTA_001403
- QUANTA_001404–421
- QUANTA_001422–526
- QUANTA_001527–604
- QUANTA_001605–679
- QUANTA_001680–754
- QUANTA_001755–829
- QUANTA_001830–913
- QUANTA_001914–993
- QUANTA_002004
- QUANTA_002005–010
- QUANTA_002011–016
- QUANTA_002017
- QUANTA_002018
- QUANTA_002019–021
- QUANTA_002022
- QUANTA_002023–038
- QUANTA_002029–030
- QUANTA_002031–058
- QUANTA_002059–067
- QUANTA_002068–070

- QUANTA_002071–214
- QUANTA_002215–218
- QUANTA_002219–286
- QUANTA_002287–289
- QUANTA_002290–358
- QUANTA_002359–425
- QUANTA_002426
- QUANTA_002427–429
- QUANTA_002430–553
- QUANTA_002554
- QUANTA_002555–558
- QUANTA_002559–672
- QUANTA_002673
- QUANTA_002674–804
- QUANTA_002805
- QUANTA_002806–809
- QUANTA_002810–943
- QUANTA_002944
- QUANTA_002945
- QUANTA_002946–949
- QUANTA_002950–3071
- QUANTA_003072–075
- QUANTA_003076–078
- QUANTA_003079
- QUANTA_003080–083
- QUANTA_003084–197
- QUANTA_003198–229
- QUANTA_003230–294
- QUANTA_003295–309
- QUANTA_003310–311
- QUANTA_003312–315
- QUANTA_003316–329
- QUANTA_003330–333
- QUANTA_003334–347

**APPENDIX B**

- QUANTA_003348–361
- QUANTA_003362
- QUANTA_003363–366
- QUANTA_003367–478
- QUANTA_003479–512
- QUANTA_003513–579
- QUANTA_003580
- QUANTA_003581–584
- QUANTA_003585–695
- QUANTA_003696–720
- QUANTA_003721
- QUANTA_003722–724
- QUANTA_003725–819
- QUANTA_003820–863
- QUANTA_003864–937
- QUANTA_003938–951
- QUANTA_003952–954
- QUANTA_003955
- QUANTA_003956–959
- QUANTA_003960–4057
- QUANTA_004058–070
- QUANTA_004071–147
- QUANTA_004148
- QUANTA_004149–152
- QUANTA_004153–242
- QUANTA_004243–256
- QUANTA_004257–303
- QUANTA_004304–355
- QUANTA_004356–377
- QUANTA_004378–411
- QUANTA_004412–413
- QUANTA_004414
- QUANTA_004415
- QUANTA_004416–419

- QUANTA_004420–509
- QUANTA_004510–555
- QUANTA_004556–607
- QUANTA_004608–619
- QUANTA_004620–624
- QUANTA_004625
- QUANTA_004626–630
- QUANTA_004631–721
- QUANTA_004722–763
- QUANTA_004764–805
- QUANTA_004806–808
- QUANTA_004809–820
- QUANTA_004821
- QUANTA_004822–826
- QUANTA_004827–860
- QUANTA_004861–874
- QUANTA_004875–924
- QUANTA_004925–973
- QUANTA_004974
- QUANTA_004975–996
- QUANTA_004997
- QUANTA_004998–5001
- QUANTA_005002–041
- QUANTA_005042
- QUANTA_005043–044
- QUANTA_005045–089
- QUANTA_005090–128
- QUANTA_005129
- QUANTA_005130–133
- QUANTA_005134–173
- QUANTA_005174–231
- QUANTA_005232–273
- QUANTA_005274
- QUANTA_005275–278

- QUANTA_005279–317
- QUANTA_005318–358
- QUANTA_005359–403
- QUANTA_005404
- QUANTA_005405–408
- QUANTA_005409–447
- QUANTA_005448–463
- QUANTA_005464–518
- QUANTA_005519–564
- QUANTA_005565
- QUANTA_005566–569
- QUANTA_005570–591
- QUANTA_005592–631
- QUANTA_005632–678
- QUANTA_005679–736
- QUANTA_005737
- QUANTA_005738–742
- QUANTA_005743–787
- QUANTA_005788–829
- QUANTA_005830–886
- QUANTA_005887–908
- QUANTA_005909–930
- QUANTA_005931–935
- QUANTA_005936–937
- QUANTA_005938–940
- QUANTA_005941–942
- QUANTA_005943–946
- QUANTA_005947–949
- QUANTA_005950–952
- QUANTA_005953–954
- QUANTA_005955–958
- QUANTA_005959
- QUANTA_005960–6002
- QUANTA_006003–058

**APPENDIX B**

- QUANTA_006059–118
- QUANTA_006119–123
- QUANTA_006124
- QUANTA_006125–168
- QUANTA_006169–184
- QUANTA_006185
- QUANTA_006186–234
- QUANTA_006235–291
- QUANTA_006292–295
- QUANTA_006296
- QUANTA_006297–337
- QUANTA_006338–379
- QUANTA_006380–446
- QUANTA_006447–450
- QUANTA_006451
- QUANTA_006452–493
- QUANTA_006494–537
- QUANTA_006538–604
- QUANTA_006605
- QUANTA_006606–648
- QUANTA_006649–703
- QUANTA_006704–768
- QUANTA_006769–778
- QUANTA_006982–987
- QUANTA_006988–994
- QUANTA_006995–7001
- QUANTA_011500–521
- QUANTA_013611–692
- QUANTA_014750–751
- QUANTA_014844–845
- QUANTA_016003–004
- QUANTA_016005–009
- QUANTA_046513–535
- QUANTA_100812–878

- QUANTA_100884
- QUANTA_102214
- QUANTA_103070
- QUANTA_104037–038
- QUANTA_104039–115
- QUANTA_104121–197
- QUANTA_104202–278
- QUANTA_104279–280
- QUANTA_104283–286
- QUANTA_104287–290
- QUANTA_104295–296
- QUANTA_104297–299
- QUANTA_104300–302
- QUANTA_104350–355
- QUANTA_104356–378
- QUANTA_104566–642
- QUANTA_104643–719
- QUANTA_104802–878
- QUANTA_105350–377
- QUANTA_105451–557
- QUANTA_105941–944
- QUANTA_105995–6018
- QUANTA_106738–761
- QUANTA_109620–622
- QUANTA_109908
- QUANTA_110280–282
- QUANTA_110365
- QUANTA_110462–466
- QUANTA_112693–711
- QUANTA_112842–860
- QUANTA_114144–146
- QUANTA_116160–200
- QUANTA_116202–223
- QUANTA_116224–264

- QUANTA_117788
- QUANTA_118778–799
- QUANTA_120538–559
- QUANTA_120726–793
- QUANTA_120799–866
- QUANTA_120867–934
- QUANTA_120935–1002
- QUANTA_121202
- QUANTA_121339
- QUANTA_123238
- QUANTA_124130–140
- QUANTA_126156
- QUANTA_127718
- QUANTA_127719–724
- QUANTA_127725
- QUANTA_127726–727
- QUANTA_127728
- QUANTA_127729–734
- QUANTA_127735
- QUANTA_127736–739
- QUANTA_127740
- QUANTA_127741
- QUANTA_127742–816
- QUANTA_127817–819
- QUANTA_127820–821
- QUANTA_127822–823
- QUANTA_127824–828
- QUANTA_127829
- QUANTA_127830–843
- QUANTA_127844–851
- QUANTA_127852–854
- QUANTA_127855–934
- QUANTA_127935–936
- QUANTA_127937–944

**APPENDIX B**

- QUANTA_127945
- QUANTA_127946
- QUANTA_127947–951
- QUANTA_127952
- QUANTA_127953
- QUANTA_127954–957
- QUANTA_127958
- QUANTA_127959
- QUANTA_127960–980
- QUANTA_127981–988
- QUANTA_127989–991
- QUANTA_127992–993
- QUANTA_127994–8137
- QUANTA_128138–139
- QUANTA_128140–147
- QUANTA_128148–152
- QUANTA_128153
- QUANTA_128154–165
- QUANTA_128166
- QUANTA_128167
- QUANTA_128168–242
- QUANTA_128243–253
- QUANTA_128254–337

- QUANTA_128338–412
- QUANTA_128413–415
- QUANTA_128416
- QUANTA_128417–441
- QUANTA_128442–444
- QUANTA_128445
- QUANTA_128446–473
- QUANTA_128474–476
- QUANTA_128477–495
- QUANTA_128496–573
- QUANTA_128574
- QUANTA_128575–577
- QUANTA_128578–682
- QUANTA_128683–690
- QUANTA_128691–694
- QUANTA_128695
- QUANTA_128696–697
- QUANTA_128698–716
- QUANTA_128717–718
- QUANTA_128719–722
- QUANTA_128723–736
- QUANTA_128737–750
- QUANTA_128751–764

- QUANTA_128765–768
- QUANTA_128769–770
- QUANTA_128771–774
- QUANTA_128775–788
- QUANTA_128789–802
- QUANTA_128803–816
- QUANTA_128817–820
- QUANTA_128821–871
- QUANTA_128872
- QUANTA_128873–945
- QUANTA_128946–9012
- QUANTA_129013–014
- QUANTA_129015
- QUANTA_129016–067
- QUANTA_129068–074
- QUANTA_129075–092
- QUANTA_129093–098
- QUANTA_129099–103
- QUANTA_129104–125
- QUANTA_129126–222
- QUANTA_129223–316

**In addition to the documents on this list, I considered all documents cited in my report and my exhibits to form my opinions.**

# Quanta Services, Inc. 401(k) Savings Plan
## Quarterly Committee Meetings
### 2015 – 2023

|    | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|----|------|------|------|------|------|------|------|------|------|
| 1. | Mar 23 | Feb 15 | May 10 | Mar 5 | Feb 28 | Feb 13 | Mar 8 | Mar 1 | Mar 22 |
| 2. | Jun 24 | May 12 | Aug 14 | Jul 25 | Jun 18 | May 20 | Jun 9 | Jun 16 | Jun 8 |
| 3. | Sep 24 | Aug 15 | Nov 9 | Oct 23 | Sep 4 | Sep 1 | Aug 17 | Sep 13 | Sep 19 |
| 4. | Oct 19 | Nov 18 | - | - | Nov 18 | Nov 19 | Nov 17 | Dec 16 | Dec 14 |

Source: QUANTA_104283–286; QUANTA_104287–290; QUANTA_104300–302; QUANTA_104295–296; QUANTA_104297–299; QUANTA_114144–146; QUANTA_109620–622; QUANTA_110280–282 QUANTA_002215–218; QUANTA_002287–289; QUANTA_002427–429; QUANTA_002555–558; QUANTA_002806–809; QUANTA_002946–949; QUANTA_003080–083; QUANTA_003363–366; QUANTA_003581–584; QUANTA_003722–724; QUANTA_003956–959; QUANTA_004149–152; QUANTA_004416–419; QUANTA_004626–630; QUANTA_004822–826; QUANTA_004998–5001; QUANTA_005130–133; QUANTA_005275–278; QUANTA_005405–408; QUANTA_005566–569; QUANTA_005738–742; QUANTA_005955–958; QUANTA_006119–123; QUANTA_006292–295; QUANTA_006447–450; QUANTA_129099–103.

Note: A "-" indicates that no meeting occured and the meeting was combined with the subsequent quarter.  In addition to the above, the Committee held a "Fidelity Diversified International Supplemental Discussion" on January 15, 2019, and a "New Committee Member Meeting" on May 24, 2021.  *See* QUANTA_003310–311 and QUANTA_128166.

# Quanta Services, Inc. 401(k) Savings Plan
# Committee Meeting Watch List Discussion History
## September 30, 2016 – December 31, 2023

| Quarter | Funds Discussed for Potential Watch List Inclusion | | | |
|---|---|---|---|---|
| Q3 2016 | Oak Ridge Small Cap Growth | Fidelity Low Priced Stock Fund | Dodge & Cox Stock Fund | American Beacon Small Cap Value | - |
| Q4 2016[1] | Oak Ridge Small Cap Growth | Fidelity Low Priced Stock Fund | Dodge & Cox Stock Fund | Fidelity Diversified International | - |
| Q1 2017[1] | Oak Ridge Small Cap Growth | Fidelity Low Priced Stock Fund | Dodge & Cox Stock Fund | Fidelity Diversified International | - |
| Q2 2017 | Oak Ridge Small Cap Growth | Fidelity Low Priced Stock Fund | Fidelity Diversified International | - | - |
| Q3 2017 | Oak Ridge Small Cap Growth | Fidelity Low Priced Stock Fund | Fidelity Diversified International | Fidelity Managed Income Portfolio | Fidelity Government Money Market |
| Q4 2017 | Fidelity Low Priced Stock Fund | Fidelity Diversified International | Fidelity Managed Income Portfolio | Fidelity Government Money Market | - |
| Q1 2018[2] | Fidelity Low Priced Stock Fund | Fidelity Diversified International | Fidelity Managed Income Portfolio | Fidelity Government Money Market | - |
| Q2 2018[2] | Fidelity Low Priced Stock Fund | Fidelity Diversified International | Fidelity Managed Income Portfolio | Fidelity Government Money Market | - |
| Q3 2018 | Fidelity Low Priced Stock Fund | Fidelity Diversified International | Fidelity Managed Income Portfolio | Fidelity Government Money Market | - |
| Q4 2018 | Fidelity Diversified International | DFA International Small/Mid Cap Value | - | - | - |
| Q1 2019 | Fidelity Diversified International | DFA International Small/Mid Cap Value | Fidelity Freedom Funds Target Date Funds | - | - |
| Q2 2019 | Fidelity Diversified International | DFA International Small/Mid Cap Value | American Funds Growth Fund of America | - | - |

# Quanta Services, Inc. 401(k) Savings Plan
# Committee Meeting Watch List Discussion History
## September 30, 2016 – December 31, 2023

| Quarter | Funds Discussed for Potential Watch List Inclusion | | | |
|---|---|---|---|---|
| Q3 2019 | Fidelity Diversified International | DFA International Small/Mid Cap Value | American Funds Growth Fund of America | - | - |
| Q4 2019 | DFA International Small/Mid Cap Value | American Funds Growth Fund of America | - | - | - |
| Q1 2020 | DFA International Small/Mid Cap Value | American Funds Growth Fund of America | Dodge & Cox Stock Fund | - | - |
| Q2 2020 | DFA International Small/Mid Cap Value | American Funds Growth Fund of America | Dodge & Cox Stock Fund | - | - |
| Q3 2020 | DFA International Small/Mid Cap Value | Dodge & Cox Stock Fund | Vanguard GNMA | - | - |
| Q4 2020 | DFA International Small/Mid Cap Value | Dodge & Cox Stock Fund | Vanguard GNMA | - | - |
| Q1 2021 | DFA International Small/Mid Cap Value | Vanguard GNMA | - | - | - |
| Q2 2021 | DFA International Small/Mid Cap Value | American Beacon Small Cap Value | American Funds Growth Fund of America | - | - |
| Q3 2021 | DFA International Small/Mid Cap Value | American Beacon Small Cap Value | - | - | - |
| Q4 2021 | DFA International Small/Mid Cap Value | American Beacon Small Cap Value | - | - | - |

HIGHLY CONFIDENTIAL

**EXHIBIT 2**

# Quanta Services, Inc. 401(k) Savings Plan
# Committee Meeting Watch List Discussion History
September 30, 2016 – December 31, 2023

| Quarter | Funds Discussed for Potential Watch List Inclusion | | | |
|---|---|---|---|---|
| Q1 2022 | DFA International Small/Mid Cap Value | American Beacon Small Cap Value | FIAM Blend Target Date Funds | - | - |
| Q2 2022 | American Funds Growth Fund of America | FIAM Blend Target Date Funds | Dodge & Cox Stock Fund | - | - |
| Q3 2022 | FIAM Blend Target Date Funds | - | - | - | - |
| Q4 2022 | FIAM Blend Target Date Funds | Fidelity Managed Income Portfolio | Fidelity Balanced | - | - |
| Q1 2023 | FIAM Blend Target Date Funds | Fidelity Managed Income Portfolio | Fidelity Balanced | - | - |
| Q2 2023 | FIAM Blend Target Date Funds | Fidelity Managed Income Portfolio | DFA International Small Cap Value I | Fidelity Low Priced Stock | - |
| Q3 2023 | FIAM Blend Target Date Funds | Fidelity Managed Income Portfolio | DFA International Small Cap Value I | Fidelity Extended Market Index | - |
| Q4 2023 | Fidelity Managed Income Portfolio | DFA International Small Cap Value I | - | - | - |

Source: QUANTA_110280–282; QUANTA_002215–218; QUANTA_002287–289; QUANTA_002427–429; QUANTA_002555–558;
QUANTA_002806–809; QUANTA_002946–949; QUANTA_003080–083; QUANTA_003363–366; QUANTA_003581–584;
QUANTA_003722–724; QUANTA_003956–959; QUANTA_004149–152; QUANTA_004416–419; QUANTA_004626–630;
QUANTA_004822–826; QUANTA_004998–001; QUANTA_005130–133; QUANTA_005275–278; QUANTA_005405–408;
QUANTA_005566–569; QUANTA_005738–742; QUANTA_005955–958; QUANTA_006119–123; QUANTA_006292–295;
QUANTA_006447–450; QUANTA_129099–103; QUANTA_129093–098


Note:
[1] The Committee consolidated its meetings for Q4 2016 and Q1 2017, holding a single meeting on May 10, 2017.
[2] The Committee consolidated its meetings for Q1 2018 and Q2 2018, holding a single meeting on July 25, 2018.

HIGHLY CONFIDENTIAL

EXHIBIT 3

# Quanta Services, Inc. 401(k) Savings Plan
## Investment Policy Statement Changes
2015 vs 2020

| Topic[1] | 2015 IPS | 2020 IPS |
|---|---|---|
| **Plan's Purpose[2]** | "The primary purpose of the Plan is to provide an opportunity for participants to accumulate funds for their retirement needs on a regular and long-term basis and secondarily to meet their other financial goals." | – |
| **401(k) Investment Committee[3]** | "This Committee shall evaluate the performance of the investments against the targeted benchmarks on a periodic basis, but in no event less than annually. The Committee is responsible for the implementation of and compliance with this Policy. Accordingly, the Committee shall:<br>• Define the Plan's investment objectives;<br>• Prepare and maintain the IPS;<br>• Determine guidelines for selecting investment options;<br>• Provide sufficient asset classes with different and distinct risk/return profiles so each participant may prudently diversify his or her account;<br>• Control and account for all investment, record keeping and administrative expenses associated with the Plan;<br>• Establish procedures for continued monitoring and evaluating of investment options;<br>• Establish criteria used to determine when to retain, add, eliminate, etc. investment options;<br>• Avoid prohibited transactions and conflicts of interest; and<br>• Amend this Policy at such times and in such manner as the Committee determines necessary to meet the Plan's overall objectives." | "This Committee shall evaluate the performance of the investment options against the targeted benchmarks on a periodic basis, but in no event less than annually. The Committee is responsible for the review of this IPS to ensure it contains the necessary information to provide sufficient oversight of the investments within the Plan. Accordingly, the Committee shall:<br>• Define the Plan's investment objectives;<br>• Prepare and maintain the IPS;<br>• Determine guidelines for selecting investment options;<br>• Provide a menu of investment options within the Plan that includes a range of asset classes with different and distinct risk/return profiles to allow for prudent diversification opportunities;<br>• Control and account for all investment, record keeping and administrative expenses associated with the Plan;<br>• Establish procedures for continued monitoring and evaluating of investment options;<br>• Establish criteria used to determine when to retain, add, eliminate, etc. investment options;<br>• Avoid prohibited transactions and conflicts of interest; and<br>• Amend this Policy at such times and in such manner as the Committee determines necessary to meet the Plan's overall objectives." |
| **Meeting Minutes[4]** | "Minutes shall be taken of all meetings, noting time and place, attendees, matters discussed, and decisions reached. The minutes shall document investigation, facts, and the reasoning that went into the making of such decisions." | "Minutes shall be taken of all meetings, noting pertinent information that was discussed." |
| **Investment Adviser[5]** | "The Committee may retain an objective, third-party Adviser to assist the Committee in managing the overall investment process. The Adviser will be responsible for guiding the Committee through a disciplined and rigorous investment process to enable the Committee to meet the fiduciary responsibilities outlined above." | – |

HIGHLY CONFIDENTIAL

**EXHIBIT 3**

## Quanta Services, Inc. 401(k) Savings Plan
## Investment Policy Statement Changes
2015 vs 2020

| Topic[1] | 2015 IPS | 2020 IPS |
|---|---|---|
| **Investment Objectives[6]** | "The Plan is intended to provide participants and their beneficiaries with income during retirement. As a qualified plan, the Plan provides an opportunity for employees to save toward their retirement on a tax-deferred basis. The Plan also offers a company match feature to help employees accumulate for retirement.<br><br>Modern Portfolio Theory indicates that the asset allocation decision among a broad range of investment alternatives is the most critical determinant of a portfolio's long-term success or failure. Investment options offered should represent a broad range of different asset classes, with different risk and return characteristics to minimize the risk of large losses.<br><br>Both passive and actively managed alternatives may be offered by the Plan. Passively managed investments, which typically track an established index, are generally the least expensive way of achieving the unique risk and return characteristics of a given asset class. Actively managed investments generally charge higher investment expenses for the goal of offering either better performance or lower risk, or a combination thereof, than a given market index." | "The Committee will evaluate, select and implement an investment menu that it deems to be in the best interest of its participants and their beneficiaries. Investment options offered should represent a broad range of different asset classes, with different risk and return characteristics to minimize the risk of large losses.<br><br>Both passive and actively managed alternatives will be evaluated and may be offered by the Plan. Passively managed investments, which typically track an established index, are generally the least expensive way of achieving the unique risk and return characteristics of a given asset class. Actively managed investments generally charge higher investment expenses for the goal of offering either better performance or lower risk, or a combination thereof, than a given market index." |

**EXHIBIT 3**

## Quanta Services, Inc. 401(k) Savings Plan
## Investment Policy Statement Changes
### 2015 vs 2020

| Topic[1] | 2015 IPS | 2020 IPS |
|---|---|---|
| **Selection and Monitoring of Investment Options: Quantitative Factors[7]** | "**• Long Term Performance, Volatility and Relative Risk as Measured by Alpha, Beta, R-squared, Sharpe Ratio and Standard Deviation Statistics.** Long-term will be defined as at least three years. When long-term data is not available, this factor should be considered in evaluating the investment.<br>**• Competitive and Consistent Performance Measured Against an Appropriate Benchmark.** Based on the investment's objective, investment style (growth vs. value) and market capitalization (large market vs. small market), an appropriate benchmark should be used for relative investment performance evaluation. A list of the benchmarks to be used for comparison to the Plan's investment options may be found in Appendix A.<br>**• Manager Performance Measured Against the Relative Peer Group.** Each investment should be evaluated against the peer group's median manager return for the annualized 1, 3, and 5 year periods ending on the most recent calendar quarter prior to the Committee's quarterly review meeting.<br>**• Consistency of Investment Objective and Investment Approach.** The fund manager should consistently manage the fund by the investment objectives stated in the prospectus or trust agreement.<br>**• Expense Ratios/Fees.** Investment options should have fees that are reasonable and competitive with similar investments offering similar ranges of services. If revenue sharing is used to offset administrative expenses, full disclosure should be made to the Plan fiduciaries." | "**• Long Term Performance, Volatility and Relative Risk as Measured by Alpha, Beta, R-squared, Sharpe Ratio, Information Ratio and Standard Deviation Statistics.** Long-term will be defined as at least three years. When long-term data is not available, this factor should be considered in evaluating the investment.<br>**• Competitive and Consistent Performance Measured Against an Appropriate Benchmark.** Based on the investment's objective, investment style (growth vs. value) and market capitalization (large market vs. small market), an appropriate benchmark should be used for relative investment performance evaluation.<br>**• Manager Performance Measured Against the Relative Peer Group.** Each investment should be evaluated against the peer group's median manager return for the annualized 1, 3, and 5 year periods ending with the most recent calendar quarter prior to the Committee's quarterly review meeting.<br>**• Expense Ratios/Fees.** Investment options should have fees that are reasonable and competitive with similar investments offering similar ranges of services. If revenue sharing is used to offset administrative expenses, full disclosure should be made to the Plan fiduciaries." |

**EXHIBIT 3**

## Quanta Services, Inc. 401(k) Savings Plan
## Investment Policy Statement Changes
2015 vs 2020

| Topic[1] | 2015 IPS | 2020 IPS |
|---|---|---|
| **Selection and Monitoring of Investment Options: Qualitative Factors[8]** | "• **Regulatory Oversight.** Each investment option should be managed by:<br>- A bank;<br>- An insurance company;<br>- A registered investment company; or,<br>- Registered investment adviser.<br>• **Diversification.** Each fund's underlying securities should be comprised of a diverse group of securities.<br>• **Fund Reputation and Management.** The fund family, investment adviser(s), or both when appropriate, should have a reputation of reliability and sound financial backgrounds. The management of the investment adviser should demonstrate stability and quality and subscribe to a business strategy that is consistent with the prudence required of an ERISA governed plan. Generally, three years is the minimum time period against which a fund manager should be evaluated.<br>• **Assets Under Management.** Funds should have sufficient assets so that the portfolio manager can properly trade and maintain liquidity of the fund.<br>• **Participant Usefulness.** The funds and number of investment options should support and promote participant understanding and decision-making." | "• **Diversification.** Each investment option's underlying securities should be comprised of a diverse group of securities.<br>• **Investment Option Reputation and Management.** The fund family, investment adviser(s), or both when appropriate, should have a reputation of reliability and sound financial backgrounds. The management of the investment adviser should demonstrate stability and quality and subscribe to a business strategy that is consistent with the prudence required of an ERISA governed plan.<br>• **Liquidity.** Investment option should have sufficient assets so that the portfolio manager can properly trade and maintain liquidity of the investment.<br>• **Participant Usefulness.** The funds and number of investment options should support and promote participant understanding and decision-making.<br>• **Consistency of Investment Objective and Investment Approach.** The investment manager should consistently manage the fund by the investment objectives stated in the prospectus or trust agreement." |

# Quanta Services, Inc. 401(k) Savings Plan
## Investment Policy Statement Changes
### 2015 vs 2020

| Topic[1] | 2015 IPS | 2020 IPS |
|---|---|---|
| **Performance Evaluation Criteria[9]** | "The Committee recognizes that ongoing review and analysis of the investment options is just as important as the due diligence implemented in the manager selection process. To address this, the Committee will monitor the Plan's investment performance on at least an annual basis and evaluate each investment option pursuant to the guidelines detailed herein. Performance evaluation will include, but not be limited to, comparisons to appropriate market indexes and peer group comparisons.<br><br>The Committee recognizes that styles of investments go through cycles and that there will be periods of time in which the investment options may fail to meet their performance targets compared to indexes. Thus, when a fund fails to achieve its stated objectives, the reasons for the failure will be evaluated, and the Committee shall determine whether the option shall remain, be frozen, or be replaced.<br><br>Performance will be measured by comparing rates of return to appropriate market indexes and peer groups for the most recent quarter, year to date, one year and three year periods; and longer periods where available. Risk will be measured over a similar time frame as measured by volatility compared to the level of risk taken by the performance benchmarks.<br><br>Although performance will be evaluated utilizing performance net of fees, fees will also be evaluated by comparing costs to similar funds.<br><br>Material changes in the investment option's organization, investment philosophy, personnel or any legal or regulatory proceedings will also be monitored.<br>All performance evaluation categories and criteria are outlined in Appendix B." | "The Committee recognizes the importance of ongoing review and analysis of the investment options and will monitor the Plan's investment performance on at least an annual basis and evaluate each investment option pursuant to the guidelines detailed herein. Performance evaluation will include, but not be limited to, comparisons to appropriate market indexes, peer group comparisons and assessment of other quantitative and qualitative factors referenced in this IPS.<br><br>The Committee recognizes that styles of investments go through cycles and that there will be periods of time in which the investment options may fail to meet their performance targets compared to indexes. Thus, when a fund fails to achieve its stated objectives, the reasons for the failure will be evaluated, and the Committee shall determine whether the option shall remain, be frozen, or be replaced.<br><br>Although performance will be evaluated utilizing performance net of fees, fees will also be evaluated by comparing costs to similar funds.<br><br>Material changes to an investment option's organization, investment philosophy, personnel or any legal or regulatory proceedings will also be monitored." |
| **Watch List:**<br>**Process[10]** | "The Committee may place an investment option on a 'Monitor' or 'Alert' status and conduct a thorough review and analysis of the investment option. The Committee may consider the following criteria when placing a fund on "Monitor" or "Alert" status:" | "The Committee may, from time to time, determine that a more thorough review and analysis of an investment option should be performed. Any one or more of the conditions listed below may indicate that further review and analysis of an investment option is warranted and may be considered by the Committee in its evaluation of an investment option's ongoing suitability for or status within the Plan:" |
| **Watch List:**<br>**Performance Consideration[11]** | "The investment option's net performance falls below the median of its peer group's 3-, 5- or 10-year cumulative returns" | "The investment option's net performance falls below the median of its peer group's 1-, 3-, or 5 year cumulative returns without justifiable rationale" |

**EXHIBIT 3**

## Quanta Services, Inc. 401(k) Savings Plan
## Investment Policy Statement Changes
2015 vs 2020

| Topic[1] | 2015 IPS | 2020 IPS |
|---|---|---|
| **Watch List:**<br>**All Other Considerations[12]** | "• An investment option's risk-adjusted return (Alpha) falls below that of the peer group's median risk-adjusted return;<br>• The consistency of performance as measured by the fund's information ratio is negative as measured on a 3-, 5- or 10-year basis;<br>• There is a change in the professionals managing the portfolio;<br>• There is a significant decrease in the investment option's assets or the investment option does not have at least $75 million under management;<br>• There is an indication that the investment manager of the fund is deviating from that manager's stated style and/or strategy;<br>• There is a significant increase in expense ratio/fees of the investment option and the expense ratio falls into the bottom half (most expensive) of the peer group;<br>• An extraordinary event occurs that may interfere with the investment option's ability to fulfill its role in the future; or<br>• There is instability of the organization managing the investment option." | • An investment option's risk-adjusted return (Alpha) falls below that of the peer group's median risk-adjusted return;<br>• The consistency of performance as measured by the fund's information ratio is negative as measured on a 3-, 5- or 10-year basis;<br>• There is a change in the professionals managing the portfolio;<br>• There is a significant decrease in the investment option's assets or the investment option does not have at least $75 million under management;<br>• There is an indication that the investment manager of the fund is deviating from that manager's stated style and/or strategy;<br>• There is a significant increase in expense ratio/fees of the investment option and the expense ratio falls into the bottom half (most expensive) of the peer group;<br>• An extraordinary event occurs that may interfere with the investment option's ability to fulfill its role in the future;<br>• There is instability of the organization managing the investment option; or,<br>• The Committee deems the investment option no longer suitable for participants." |
| **Watch List:**<br>**Duration[13]** | "Once an investment option has been assigned a status of 'Monitor', if it should remain with this status for up to four consecutive quarters, without documented improvement in the underlying criteria, it will be advanced to a status of 'Alert' no later than the fifth consecutive quarter of underperformance. After two consecutive quarters on 'Alert' status, the Committee shall consider alternative investment options and discuss the merits of replacing or continuing the investment. However, the Committee at its discretion may change an investment's status outside of these standards as each fund is separately evaluated." | "If an investment option remains on 'Watch' status for consecutive quarters with no documented sign of improvement, the investment option will be placed on 'Review' status no later than the fifth consecutive quarter. At any time, but no later than the second consecutive quarter on 'Review' status, the Committee may consider alternative investment options and discuss the merits of replacing or continuing the investment option. The Committee shall have the discretion to apply alternative escalation and review standards in evaluating and determining the status of any investment option, as unique circumstances associated with each fund may be separately evaluated." |

**EXHIBIT 3**

## Quanta Services, Inc. 401(k) Savings Plan
## Investment Policy Statement Changes
2015 vs 2020

| Topic[1] | 2015 IPS | 2020 IPS |
|---|---|---|
| **Investment Termination[14]** | N.A. | "There are no absolute rules for removal of an investment option from the Plan. However, unsatisfactory performance over a reasonable period and/or failure to meet one or more of the stated criteria listed in this IPS is a basis for removal of an investment option from the Plan.<br><br>Should an investment option be removed by the Committee from the Plan, the Committee may utilize one of the following approaches:<br>• Remove and replace the investment option; map assets to a new alternative investment option selected by the Committee.<br>• Continue the investment option, but add a competing investment option selected by the Committee.<br>• Remove the investment option without providing a replacement investment option; map assets to alternative fund held within the Plan." |

Source: Stone Report; QUANTA_001404–421; QUANTA_000909–930

Note:
[1] The topics shown in the Exhibit correspond to select discussion of the IPS in the Stone Report. A "–" indicates no changes were made from the previous IPS. Green text highlights new or changed language from the previous IPS. An "N.A." represents that the indicated version of the IPS did not provide a comparable discussion.
[2] Stone Report, ¶¶ 61
[3] Stone Report, ¶ 62
[4] Stone Report, ¶¶ 63, 85–90
[5] Stone Report, ¶¶ 96–108, 113–115
[6] Stone Report, ¶ 67
[7] Stone Report, ¶¶ 64, 129
[8] Stone Report, ¶¶ 64, 130.  The 2020 IPS moved the "Consistency of Investment Objective and Investment Approach" metric from quantitative factors to qualitative factors.
[9] Stone Report, ¶ 65
[10] Stone Report, ¶ 104
[11] Stone Report, ¶ 117
[12] Stone Report, ¶ 132
[13] Stone Report, ¶¶ 66–68
[14] Stone Report, ¶ 67

**EXHIBIT 4**

## Quanta Services, Inc. 401(k) Savings Plan
## Plan Asset Balance by Quarter
June 30, 2016 – March 31, 2023

*(millions)*

| Investment | Q2 2016 | Q3 2016 | Q4 2016 | Q1 2017 | Q2 2017 | Q3 2017 | Q4 2017 | Q1 2018 | Q2 2018 | Q3 2018 | Q4 2018 | Q1 2019 | Q2 2019 | Q3 2019 | Q4 2019 | Q1 2020 | Q2 2020 | Q3 2020 | Q4 2020 | Q1 2021 | Q2 2021 | Q3 2021 | Q4 2021 | Q1 2022 | Q2 2022 | Q3 2022 | Q4 2022 | Q1 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Mutual Funds** | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| American Funds The Growth Fund of America | $67.1 | $69.7 | $68.4 | $73.9 | $77.5 | $80.2 | $82.6 | $88.7 | $97.2 | $102.0 | $87.5 | $96.6 | $95.4 | $91.9 | $100.9 | $82.7 | $103.7 | $111.1 | $123.7 | $128.2 | $137.3 | $129.7 | $138.5 | $121.7 | $93.3 | $90.6 | $107.5 | - |
| American Beacon Small Cap Value Fund | $10.9 | $10.7 | $13.2 | $12.7 | $13.2 | $13.6 | $13.2 | $13.1 | $13.7 | $14.2 | $10.9 | $12.6 | $12.9 | $12.2 | $16.1 | $9.1 | $10.1 | $9.8 | $12.5 | $17.2 | $18.0 | $17.4 | $18.2 | $18.0 | $18.1 | $17.5 | $29.6 | $30.7 |
| Dodge & Cox Stock Fund | $42.6 | $45.5 | $52.9 | $56.9 | $59.5 | $58.1 | $58.5 | $57.0 | $57.8 | $65.0 | $53.0 | $55.1 | $54.8 | $54.5 | $59.2 | $41.4 | $53.0 | $56.9 | $65.9 | $75.3 | $81.2 | $84.5 | $103.5 | $96.5 | $69.3 | $63.8 | $84.1 | $84.1 |
| Fidelity 500 Index Fund | $36.0 | $38.6 | $40.5 | $41.8 | $44.4 | $46.2 | $49.8 | $50.7 | $50.7 | $52.6 | $47.5 | $58.5 | $61.2 | $63.6 | $73.7 | $61.5 | $72.1 | $77.4 | $81.9 | $77.7 | $84.7 | $84.5 | $93.6 | $107.9 | $94.8 | $89.8 | $104.0 | $109.8 |
| Fidelity Balanced Fund | $5.7 | $6.2 | $5.7 | $6.1 | $6.4 | $6.1 | $6.6 | $6.7 | $6.9 | $7.3 | $6.6 | $7.5 | $8.6 | $9.7 | $10.4 | $8.0 | $10.7 | $11.5 | $14.3 | $18.3 | $19.3 | $16.7 | $16.8 | $15.7 | $12.6 | $11.8 | $12.6 | $14.1 |
| Fidelity Diversified International Fund | $25.5 | $26.6 | $25.1 | $28.4 | $31.6 | $34.2 | $36.4 | $37.4 | $37.6 | $38.2 | $33.6 | $38.5 | $40.6 | $39.5 | $44.9 | $36.1 | $44.4 | $46.9 | $53.4 | $54.6 | $58.9 | $61.1 | $64.4 | $59.1 | $49.2 | $45.9 | $70.5 | $75.1 |
| Fidelity Extended Market Index Fund | $7.1 | $8.6 | $9.8 | $12.0 | $11.2 | $13.0 | $14.0 | $15.3 | $14.2 | $15.7 | $12.7 | $19.5 | $19.8 | $18.2 | $15.9 | $11.4 | $17.5 | $21.8 | $25.4 | $28.7 | $30.8 | $30.2 | $24.6 | $22.7 | $18.2 | $17.6 | $24.9 | $25.7 |
| Fidelity Low Priced Stock Fund | $22.6 | $21.8 | $21.7 | $21.4 | $23.7 | $26.3 | $27.9 | $28.0 | $28.4 | $26.8 | $22.4 | $23.3 | $22.6 | $21.4 | $25.7 | $24.5 | $27.7 | $21.2 | $22.5 | $36.2 | $41.2 | $40.7 | $28.8 | $27.5 | $24.9 | $23.9 | $31.7 | $37.9 |
| Fidelity Total Bond Fund | $33.7 | $34.6 | $33.8 | $34.4 | $36.3 | $36.7 | $39.3 | $43.2 | $41.6 | $38.4 | $39.0 | $39.9 | $41.4 | $45.1 | $46.5 | $46.2 | $49.6 | $52.2 | $53.5 | $50.4 | $54.1 | $56.1 | $58.3 | $55.9 | $47.7 | $45.2 | $60.9 | $64.7 |
| International Small Cap Value Fund | $0.9 | $0.4 | $0.6 | $1.0 | $1.2 | $1.6 | $2.0 | $2.2 | $2.5 | $2.6 | $2.2 | $2.2 | $2.3 | $2.2 | $2.5 | $1.9 | $2.0 | $2.2 | $2.6 | $4.2 | $4.4 | $4.5 | $4.7 | $4.6 | $4.1 | $3.8 | $4.7 | $5.2 |
| Oak Ridge Small Cap Growth Fund | $15.8 | $16.5 | $14.7 | $14.8 | $15.5 | $16.1 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| T. Rowe Price High Yield Fund | $0.0 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Vanguard GNMA Fund | $4.3 | $4.2 | $4.2 | $4.1 | $3.6 | $4.2 | $4.7 | $5.1 | $5.6 | $8.3 | $8.9 | $10.5 | $13.0 | $13.3 | $10.9 | $14.1 | $14.9 | $14.5 | $15.7 | $15.4 | $12.9 | $13.2 | $11.2 | $7.7 | $12.1 | $11.5 | $17.5 | $20.4 |
| Vanguard Growth Index Fund | $2.1 | $3.1 | $4.1 | $4.1 | $5.2 | $6.0 | $6.7 | $8.5 | $9.4 | $10.0 | $9.0 | $12.6 | $18.5 | $23.0 | $28.7 | $23.3 | $34.5 | $43.5 | $54.9 | $55.7 | $60.6 | $69.2 | $79.2 | $63.8 | $50.3 | $49.2 | $50.4 | $64.2 |
| Vanguard Value Index Fund | $4.6 | $5.7 | $5.0 | $6.2 | $5.4 | $8.2 | $12.6 | $13.4 | $14.2 | $12.3 | $12.2 | $18.2 | $21.7 | $21.4 | $19.2 | $12.7 | $13.9 | $14.6 | $19.3 | $17.1 | $19.3 | $15.7 | $16.4 | $18.1 | $27.4 | $26.8 | $32.6 | $34.2 |
| Fidelity Small Cap Growth Fund | - | - | - | - | - | - | $18.4 | $20.5 | $23.8 | $27.1 | $21.7 | $25.1 | $27.7 | $27.2 | $30.8 | $22.5 | $25.0 | $27.0 | $33.6 | $35.2 | $37.8 | $36.3 | $40.5 | $39.5 | $31.5 | $32.1 | $34.9 | $35.8 |
| **Total Mutual Funds** | $278.8 | $292.2 | $299.6 | $317.8 | $334.6 | $350.6 | $372.6 | $387.9 | $403.7 | $420.3 | $367.3 | $420.2 | $440.7 | $443.1 | $485.4 | $397.3 | $479.0 | $510.4 | $579.2 | $614.3 | $660.5 | $659.9 | $698.5 | $658.7 | $553.6 | $529.3 | $665.8 | $601.9 |

**EXHIBIT 4**

## Quanta Services, Inc. 401(k) Savings Plan
## Plan Asset Balance by Quarter
June 30, 2016 – March 31, 2023

*(millions)*

| Investment | | | | | | | | | | | | | | | | Quarter-End | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q2 2016 | Q3 2016 | Q4 2016 | Q1 2017 | Q2 2017 | Q3 2017 | Q4 2017 | Q1 2018 | Q2 2018 | Q3 2018 | Q4 2018 | Q1 2019 | Q2 2019 | Q3 2019 | Q4 2019 | Q1 2020 | Q2 2020 | Q3 2020 | Q4 2020 | Q1 2021 | Q2 2021 | Q3 2021 | Q4 2021 | Q1 2022 | Q2 2022 | Q3 2022 | Q4 2022 | Q1 2023 |
| **Money Market Funds** | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Fidelity Money Market Trust Retirement Government Money Market Portfolio | $0.3 | $0.3 | $0.1 | $0.1 | $0.2 | $23.7 | $22.9 | $22.1 | $21.7 | $20.3 | $22.3 | $22.8 | $22.6 | $23.2 | $23.3 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Fidelity Money Market Trust Retirement Government Money Market II Portfolio | $20.7 | $21.2 | $23.9 | $22.3 | $23.5 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Fidelity Investments Money Market Government Portfolio Fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | $29.4 | $30.4 | $34.3 | $36.6 | $35.9 | $31.8 | $31.6 | $29.0 | $28.6 | $30.2 | $30.5 | $32.2 | $32.1 |
| **Total Money Market Funds** | **$20.9** | **$21.4** | **$24.0** | **$22.4** | **$23.7** | **$23.7** | **$22.9** | **$22.1** | **$21.7** | **$20.3** | **$22.3** | **$22.8** | **$22.6** | **$23.2** | **$23.3** | **$29.4** | **$30.4** | **$34.3** | **$36.6** | **$35.9** | **$31.8** | **$31.6** | **$29.0** | **$28.6** | **$30.2** | **$30.5** | **$32.2** | **$32.1** |
| **Managed Income Fund** | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Fidelity Managed Income Portfolio Fund | $17.3 | $17.0 | $17.3 | $16.9 | $15.3 | $14.9 | $15.2 | $16.5 | $17.2 | $17.1 | $18.9 | $19.1 | $19.1 | $18.9 | $19.7 | $21.9 | $21.5 | $24.9 | $27.3 | $26.6 | $26.0 | $26.7 | $26.4 | $28.3 | $30.1 | $29.7 | $52.6 | $52.9 |

**EXHIBIT 4**

## Quanta Services, Inc. 401(k) Savings Plan
### Plan Asset Balance by Quarter
June 30, 2016 – March 31, 2023

*(millions)*

| Investment | Q2 2016 | Q3 2016 | Q4 2016 | Q1 2017 | Q2 2017 | Q3 2017 | Q4 2017 | Q1 2018 | Q2 2018 | Q3 2018 | Q4 2018 | Q1 2019 | Q2 2019 | Q3 2019 | Q4 2019 | Q1 2020 | Q2 2020 | Q3 2020 | Q4 2020 | Q1 2021 | Q2 2021 | Q3 2021 | Q4 2021 | Q1 2022 | Q2 2022 | Q3 2022 | Q4 2022 | Q1 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Target Date Funds** | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Freedom Income Fund | $3.2 | $3.5 | $3.3 | $3.4 | $3.7 | $3.9 | $4.0 | $4.1 | $3.9 | $3.9 | $3.9 | $4.1 | $4.0 | $4.7 | $5.0 | $4.7 | $5.3 | $4.3 | $4.4 | $4.3 | - | - | - | - | - | - | - | - |
| Freedom 2005 Fund | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.2 | $0.2 | $0.2 | $1.0 | $1.0 | $1.4 | $1.8 | $1.0 | $1.1 | $0.6 | $0.6 | $0.8 | $0.9 | $0.9 | - | - | - | - | - | - | - | - |
| Freedom 2010 Fund | $18.7 | $19.1 | $18.7 | $19.2 | $19.0 | $19.2 | $17.7 | $16.3 | $15.6 | $15.9 | $15.0 | $15.1 | $15.0 | $14.9 | $15.2 | $13.4 | $14.2 | $14.5 | $14.0 | $14.6 | - | - | - | - | - | - | - | - |
| Freedom 2015 Fund | $0.3 | $0.5 | $0.5 | $0.6 | $0.8 | $1.6 | $1.8 | $2.8 | $2.8 | $2.0 | $2.1 | $2.4 | $2.7 | $2.9 | $3.3 | $3.0 | $3.2 | $3.4 | $3.7 | $3.4 | - | - | - | - | - | - | - | - |
| Freedom 2020 Fund | $57.6 | $62.6 | $62.1 | $65.7 | $68.9 | $69.9 | $71.3 | $69.4 | $69.9 | $70.5 | $63.8 | $70.3 | $72.2 | $70.4 | $75.1 | $63.5 | $71.2 | $73.0 | $76.4 | $75.7 | - | - | - | - | - | - | - | - |
| Freedom 2025 Fund | $1.9 | $2.6 | $3.5 | $5.9 | $6.6 | $7.1 | $7.8 | $11.2 | $12.3 | $12.6 | $13.2 | $16.8 | $20.0 | $21.5 | $24.2 | $22.9 | $26.2 | $29.3 | $35.4 | $38.0 | - | - | - | - | - | - | - | - |
| Freedom 2030 Fund | $43.4 | $46.9 | $49.1 | $53.5 | $57.9 | $61.4 | $65.3 | $68.4 | $70.2 | $72.7 | $66.1 | $75.2 | $78.8 | $79.3 | $86.2 | $73.6 | $84.9 | $91.3 | $104.8 | $108.2 | - | - | - | - | - | - | - | - |
| Freedom 2035 Fund | $0.6 | $1.2 | $1.6 | $2.4 | $3.1 | $3.9 | $5.7 | $10.3 | $11.2 | $12.8 | $12.1 | $15.8 | $18.1 | $19.2 | $27.6 | $24.1 | $27.9 | $31.3 | $36.9 | $42.7 | - | - | - | - | - | - | - | - |
| Freedom 2040 Fund | $38.5 | $42.3 | $43.7 | $48.0 | $51.9 | $54.9 | $59.1 | $63.6 | $65.5 | $67.6 | $59.8 | $69.9 | $73.3 | $73.8 | $82.9 | $67.1 | $80.6 | $87.4 | $102.6 | $109.8 | - | - | - | - | - | - | - | - |
| Freedom 2045 Fund | $0.8 | $1.5 | $2.0 | $2.5 | $3.2 | $4.8 | $5.9 | $10.1 | $11.2 | $12.5 | $11.6 | $15.4 | $17.4 | $19.0 | $22.8 | $19.2 | $23.5 | $26.4 | $32.6 | $36.5 | - | - | - | - | - | - | - | - |
| Freedom 2050 Fund | $18.6 | $20.9 | $22.7 | $25.7 | $28.6 | $31.3 | $34.6 | $37.6 | $39.1 | $41.7 | $37.8 | $44.4 | $48.2 | $50.2 | $57.5 | $47.1 | $56.3 | $61.6 | $73.6 | $79.8 | - | - | - | - | - | - | - | - |
| Freedom 2055 Fund | $0.3 | $0.6 | $1.0 | $1.5 | $2.2 | $3.0 | $3.8 | $5.5 | $6.7 | $7.9 | $8.4 | $10.8 | $12.9 | $14.5 | $17.8 | $15.8 | $19.4 | $21.6 | $27.1 | $31.0 | - | - | - | - | - | - | - | - |
| Freedom 2060 Fund | $0.1 | $0.3 | $0.4 | $0.6 | $0.9 | $1.3 | $1.7 | $2.3 | $2.9 | $4.0 | $4.5 | $6.2 | $7.9 | $9.3 | $11.9 | $10.8 | $14.1 | $16.7 | $21.2 | $24.0 | - | - | - | - | - | - | - | - |
| Freedom 2065 Fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - | $0.1 | $0.2 | $0.7 | $1.2 | $1.7 | $2.4 | - | - | - | - | - | - | - | - |

HIGHLY CONFIDENTIAL

**EXHIBIT 4**

## Quanta Services, Inc. 401(k) Savings Plan
## Plan Asset Balance by Quarter
### June 30, 2016 – March 31, 2023
*(millions)*

| Investment | Q2 2016 | Q3 2016 | Q4 2016 | Q1 2017 | Q2 2017 | Q3 2017 | Q4 2017 | Q1 2018 | Q2 2018 | Q3 2018 | Q4 2018 | Q1 2019 | Q2 2019 | Q3 2019 | Q4 2019 | Q1 2020 | Q2 2020 | Q3 2020 | Q4 2020 | Q1 2021 | Q2 2021 | Q3 2021 | Q4 2021 | Q1 2022 | Q2 2022 | Q3 2022 | Q4 2022 | Q1 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FIAM Blend Income | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | $4.1 | $4.2 | $4.2 | $4.3 | $4.0 | $3.9 | $4.0 | $3.9 |
| FIAM Blend 2005 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | $0.8 | $1.2 | $1.7 | $1.7 | $1.8 | $1.7 | $1.8 | $1.2 |
| FIAM Blend 2010 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | $14.6 | $14.2 | $14.4 | $13.3 | $11.6 | $10.8 | $11.2 | $11.7 |
| FIAM Blend 2015 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | $3.6 | $3.4 | $3.5 | $2.9 | $2.7 | $2.6 | $2.6 | $2.9 |
| FIAM Blend 2020 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | $77.7 | $76.1 | $76.1 | $67.7 | $58.4 | $53.5 | $54.8 | $56.1 |
| FIAM Blend 2025 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | $41.8 | $42.1 | $42.9 | $40.1 | $36.4 | $34.0 | $38.0 | $42.6 |
| FIAM Blend 2030 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | $116.6 | $116.8 | $118.3 | $112.9 | $100.0 | $95.6 | $105.1 | $114.6 |
| FIAM Blend 2035 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | $47.8 | $48.8 | $51.9 | $52.5 | $47.5 | $46.8 | $54.0 | $60.1 |
| FIAM Blend 2040 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | $118.8 | $117.5 | $127.0 | $119.7 | $103.7 | $97.2 | $111.2 | $123.6 |
| FIAM Blend 2045 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | $40.9 | $42.2 | $45.8 | $44.8 | $40.5 | $39.7 | $48.4 | $56.6 |
| FIAM Blend 2050 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | $88.9 | $89.5 | $97.1 | $93.2 | $80.8 | $77.5 | $89.3 | $98.7 |
| FIAM Blend 2055 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | $35.8 | $37.1 | $41.3 | $40.5 | $37.1 | $36.4 | $44.4 | $51.2 |
| FIAM Blend 2060 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | $28.0 | $29.2 | $32.0 | $31.6 | $29.2 | $29.3 | $36.8 | $42.3 |
| FIAM Blend 2065 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | $3.2 | $4.0 | $5.0 | $6.4 | $7.0 | $7.6 | $10.8 | $13.2 |
| **Total Target Date Funds** | $184.0 | $202.0 | $208.6 | $229.0 | $246.9 | $262.3 | $278.9 | $301.8 | $311.6 | $325.1 | $299.2 | $347.8 | $372.3 | $380.7 | $430.6 | $366.0 | $428.1 | $462.6 | $535.3 | $571.3 | $622.4 | $626.2 | $661.0 | $631.6 | $560.7 | $536.5 | $612.3 | $678.7 |
| **Total Plan Investments** | $501 | $533 | $550 | $586 | $621 | $651 | $690 | $728 | $754 | $783 | $708 | $810 | $855 | $866 | $959 | $815 | $959 | $1,032 | $1,178 | $1,248 | $1,341 | $1,344 | $1,415 | $1,347 | $1,175 | $1,126 | $1,363 | $1,366 |

Source: QUANTA_000684–908

# Fidelity Freedom Funds
# Assets Under Management
## 2014 – 2023
*(billions)*

| Year | Assets Under Management |
|------|------------------------|
| 2014 | $157.6 |
| 2015 | $150.6 |
| 2016 | $158.7 |
| 2017 | $185.0 |
| 2018 | $167.0 |
| 2019 | $193.7 |
| 2020 | $209.0 |
| 2021 | $221.0 |
| 2022 | $174.0 |
| 2023 | $193.0 |

Source:  2018–2024 Morningstar Target Date Fund Landscape Report; Plan Sponsor Target Date Survey 2015, 2017, 2019, and 2021

Note: Freedom Fund assets under management displayed are sourced from the Plan Sponsor Target Date Surveys for 2014 to 2020 and from Morningstar Target Date Fund Landscape Reports from 2021 to 2023. Assets under management displayed are for the Freedom Fund mutual fund.