# Exhibit B

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2       FOR THE SOUTHERN DISTRICT OF DISTRICT OF TEXAS

3    _____

4    MARY LALIBERTE, et al.,

5              Plaintiffs,

6       v.                               Case No.

7    QUANTA SERVICES, INC., et al.,      4:22-cv-03290

8              Defendants.               (AHB)

9    _____

10                 VIDEOTAPED DEPOSITION OF

11                     MARIE MCKNIGHT

12   DATE:           Thursday, September 5, 2024

13   TIME:           9:25 a.m.

14   LOCATION:       Morgan Lewis & Bockius LLP

15                   1000 Louisiana Street #4000

16                   Houston, TX 77002

17   OFFICIATED BY: Cynthia P. Smith

18   JOB NO.:        6881123

19

20   PAGE 8 IS CONFIDENTIAL

21

22

23

24

25

Page 2

1                    A P P E A R A N C E S

2      ON BEHALF OF PLAINTIFFS MARY LALIBERTE AND MARIE

3      MCKNIGHT:

4              JOHN ROBERTS, ESQUIRE

5              Miller Shah LLP

6              1845 Walnut Street, Suite 806

7              Philadelphia, PA 19103

8              jcroberts@millershah.com

9              (610) 900-6068

10

11     ON BEHALF OF DEFENDANT QUANTA SERVICES, INC.:

12             SAMUEL BLOCK, ESQUIRE

13             Morgan Lewis and Bockius LLP

14             110 North Wacker Drive

15             Chicago, IL 60606

16             samuel.block@morganlewis.com

17             (312) 324-1715

18

19     ALSO PRESENT:

20             Ray Burchette, Videographer

21             Carolyn Campbell, In-House Counsel for Quanta

22             Services

23

24

25

```
                                                    Page 3
1                        I N D E X
2      EXAMINATION:                                  PAGE
3          By Mr. Block                                 6
4
5                      E X H I B I T S
6      NO.              DESCRIPTION                   PAGE
7      Exhibit 1        LinkedIn Profile               20
8      Exhibit 2        Willis Group 2017 Form 5500    37
9      Exhibit 3        Personnel Action Notice &
10                      Severance Agreement            46
11     Exhibit 4        KBR 2022 Form 5500             69
12     Exhibit 5        Quanta Services 401(k)         81
13     Exhibit 6        Class Action Complaint         82
14     Exhibit 7        Expert Report of Richard Marin 93
15     Exhibit 8        Expert Report of Dr. Adam Werner 97
16     Exhibit 9        Summary Plan Description       108
17     Exhibit 10       Required Fee Disclosure        110
18     Exhibit 11       Fidelity Account Summary       122
19     Exhibit 12       Fidelity Investment Report     125
20     Exhibit 13       Interrogatories               131
21     Exhibit 14       Miller Shah Blog Post          154
22
23
24
25
```

Page 4

1                    P R O C E E D I N G S

2                    THE VIDEOGRAPHER:  Good morning.  We're

3        going on record at 9:25.  Today's date is September 5,

4        2024.  I'll now turn it over to Cynthia Smith for her

5        read-on.

6                    THE OFFICER:  Good morning.  My name is

7        Cynthia Smith; I'm the reporter assigned by Veritext

8        to take the record of this proceeding.

9                    This is the deposition of Marie

10       McKnight taken in the matter of Mary Laliberte, et

11       al., vs. Quanta Services, Inc., et al., on

12       Wednesday [sic], September 5, 2024.

13                   I'm a notary authorized to take

14       acknowledgments and administer oaths in Texas.

15                   Additionally, absent an objection on

16       the record before the witness is sworn, all parties

17       and the witness understand and agree that any

18       certified transcript produced from the recordings of

19       this proceeding:

20                        - is intended for all uses permitted

21                          under applicable procedural and

22                          evidentiary rules and laws in the

23                          same manner as a deposition recorded

24                          by stenographic means; and

25                        - shall constitute written stipulation

Page 5

1              of such.

2              This proceeding will be recorded via

3    video technology by Ray Burchette.

4              At this time will everyone in

5    attendance please introduce yourselves for the record.

6              MR. BLOCK:  Good morning, everyone.

7    I'm Sam Block, counsel for Morgan Lewis representing

8    Quanta, and alongside me is Carolyn Campbell, in-house

9    attorney at Quanta.

10              MR. ROBERTS:  Good morning.  This is

11    John Roberts from Miller Shah on behalf of the

12    witness.

13              THE OFFICER:  Okay.  Ms. McKnight, will

14    you please raise your right hand.

15    WHEREUPON,

16                   MARIE MCKNIGHT,

17    called as a witness and having been first duly sworn

18    to tell the truth, the whole truth, and nothing but

19    the truth, was examined and testified as follows:

20              THE OFFICER:  All right.  Is anybody on

21    Zoom?

22              THE VIDEOGRAPHER:  No.

23              THE OFFICER:  Okay.  Counsel, you may

24    proceed.  I just wanted to make sure.

25              MR. BLOCK:  Thank you very much.

Page 6

1              And thanks, everyone, for your

2     flexibility on rescheduling this.  It would not have

3     been a fun deposition for me a couple weeks ago,

4     although it would have been quick because I would have

5     had very little voice.  Okay.

6                          EXAMINATION

7     BY MR. BLOCK:

8         Q    So can you please state and spell your full

9     name for the record.

10        A    It's Marie McKnight, M-A-R-I-E

11    M-C-K-N-I-G-H-T.

12        Q    And have you ever gone by any other names?

13        A    When I was married.

14        Q    And what was your last name then?

15        A    Marie McKnight-Benton.

16        Q    And B-E-N-T-O-N?

17        A    Mm-hmm.

18        Q    Have you ever been deposed before?

19        A    Years ago.

20        Q    What was that case or matter?

21        A    It's personal, and I don't think it's

22    relevant.

23        Q    So we'll go over some of the ground rules

24    today.  That's sort of what this is leading to.  But

25    as far as answering questions, if I ask a question,

Page 7

1    unless your attorney instructs you not to answer the

2    question, you have to answer the question.  So I'll go

3    back to the question I just asked, then.  Can you tell

4    me what that matter was?

5                    THE WITNESS:  I have --

6                    MR. ROBERTS:  You do have to answer it.

7    I think he's asking generally what it was about.

8                    THE WITNESS:  I really don't -- not a

9    good way to start this.

10                   (Nonconfidential portion of transcript

11                   ends.)

12   //

13   //

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

```
                                              Page 9
 1                    (Nonconfidential portion of transcript
 2                    begins.)
 3       BY MR. BLOCK:
 4           Q     Okay.  Have you been deposed in any other
 5       proceeding?
 6           A     No.
 7           Q     Okay.  And have you ever testified at any
 8       matter outside of that matter we were just discussing?
 9           A     No.
10           Q     Okay.  So I'm going to operate under the
11       assumption that depositions -- we'll give you sort of
12       Deposition 101.  So as we just discussed -- and I'll
13       try to stay away from questions that are privileged.
14       If I get there, your lawyer will tell you not to
15       answer those questions.
16               And I will try to keep them relevant, but
17       sometimes I don't know what I don't know until I ask.
18       So I think important rules to understand are you're
19       under oath.  And, you know, there's the penalty of
20       perjury if you're under oath, and it's the same as
21       testifying before a judge or a jury.  Does that make
22       sense?
23           A     Mm-hmm.
24               THE OFFICER:  You have to use verbal
25       responses, please.
```

1          THE WITNESS:  Okay.

2          THE OFFICER:  I was just telling her --

3          MR. BLOCK:  Yeah, yeah, please.  Okay.

4     That's a good rule too.  Yeah.  So you beat me to rule

5     number 5, which is answer audibly.

6     BY MR. BLOCK:

7          Q    So even though it would be natural in a

8     conversation sometimes to shake your head or go

9     "Mm-hmm," we'll try to stick to yeses or nos, or of

10    course any other words you want to say in response to

11    a question.  Does that make sense?

12         A    Yes.

13         Q    Okay.  If you answer a question, we're going

14    to assume that you understand the question.  So feel

15    free, if you don't understand the question, to ask me

16    to rephrase it.  Or you can point out the part that

17    doesn't make sense to you or anything else to make

18    sure you understand the question.  Does that make

19    sense?

20         A    Yes.  Could I have just a minute to regroup?

21         MR. BLOCK:  Oh, sure.  Do you want to

22    take a few-minute break?

23         MR. ROBERTS:  Yeah, sure --

24         THE VIDEOGRAPHER:  Off the record at

25    9:30.

1            (Off the record.)

2            THE VIDEOGRAPHER:  Back on record at

3      9:34 --

4            MR. ROBERTS:  Sam, before you get

5      started, I think we're just going to seek to have that

6      portion of the transcript designated as confidential.

7            MR. BLOCK:  There will be no

8      objections.

9            MR. ROBERTS:  Okay.

10            MR. BLOCK:  Yeah.  Okay.

11      BY MR. BLOCK:

12         Q    And this actually segues well into the next

13      Deposition 101 rule, which -- breaks are okay.  You

14      just have to ask, like you just did.  And as long as

15      there's not a question pending, we can take a break.

16         A    Okay.

17         Q    And your lawyers may -- your lawyer,

18      singular, sorry -- may make objections.  And as we

19      discussed, unless he instructs you not to answer, you

20      can sort of essentially disregard the objections and

21      just answer the question.  Does that make sense?

22         A    Yes.

23         Q    Okay.  So some questions that we ask at

24      every deposition -- have you taken any medication that

25      would impact your ability to recall past events?

Page 12

1          A      No.

2          Q      Okay.  So nothing that you can think of that

3     would impact your ability to testify truthfully today?

4          A      No.

5          Q      Okay.  What did you do to prepare for

6     today's deposition?

7          A      Met with my attorney.

8          Q      Just once?

9          A      Well, over the last couple of years, I've

10    met with him on and off, mostly by telephone.

11         Q      Okay.  And all these questions, I'm not

12    going to ask for the substance of any of the

13    conversations with your attorney.  So you talked about

14    having a couple of telephone calls.  How many of those

15    calls were specifically to prepare for the deposition?

16         A      One.

17         Q      And roughly when was that call?

18         A      Yesterday.

19         Q      For how long?

20         A      About an hour.

21         Q      Did anyone participate in that call other

22    than you and your attorney?

23         A      No.

24         Q      Have you reviewed any documents in

25    preparation for today's deposition?

Page 13

```
 1        A    I have.

 2        Q    Do you recall what those documents or

 3   document was?

 4        A    It was the -- the questions that I was

 5   asked.  What -- what is that document called?

 6        Q    So the interrogatories?

 7        A    Yes, that's it.

 8        Q    And was there anything else?

 9        A    I just reviewed some of my statements.

10        Q    In the interrogatories or in something else?

11        A    No, it was a different document.

12        Q    I think I know the answer to this, but do

13   you have any of those documents with you today?

14        A    No.

15        Q    And did you review those yesterday?

16        A    Yes.

17        Q    Do you have any notes with you today?

18        A    No.

19        Q    And I also think I know the answer to this,

20   but did you give any documents to your lawyers to

21   produce today?  And "to produce" means like to share

22   with us, the opposing counsel -- Quanta.

23        A    I think they probably shared everything

24   already.

25                 MR. ROBERTS:  And separate from what
```

Page 14

1    you've produced previously in the lawsuit, did you

2    bring anything to give today specifically --

3                    THE WITNESS:  Oh, no.

4                    MR. ROBERTS:  -- for today's

5    deposition?

6                    THE WITNESS:  No.

7    BY MR. BLOCK:

8        Q    All right.  Other than --

9        A    This isn't big enough for that.

10       Q    Other than your attorney and your spouse,

11   have you discussed today's deposition with anyone?

12       A    I don't have a spouse.  And I spoke with a

13   girlfriend about it a couple of days ago.

14       Q    What was the name of that girlfriend?

15       A    Brandy Wilbanks.

16       Q    Can you spell the last name?

17       A    W-I-L-B-A-N-K-S.

18       Q    You said she's your girlfriend; right?

19       A    Yes, she's just a friend.

20       Q    She's just a friend?

21       A    Yeah.

22       Q    What is her, if she has one, day job?

23       A    She works for KBR.

24       Q    And what does she do for them?

25       A    She is in subcontracts.  Subcontract

Page 15

1   manager.

2        Q    And what did you talk about specifically

3   with her?

4        A    Just that I had this deposition coming up.

5        Q    And what was her reaction?

6        A    She just kind of talked me through sort of

7   that first question you asked, 'cause I thought that

8   might come up.

9        Q    Anything else?

10       A    No.

11       Q    Did she ask you what the case was about?

12       A    She didn't ask, but I offered.

13       Q    And what did you say?

14       A    That it had to do with the investments that

15   Quanta made on our behalf -- on my behalf -- while I

16   was working there.

17       Q    And did you say anything else, you know,

18   anything about the investments in particular?

19       A    No.

20       Q    What did you tell her -- based on your last

21   response, it didn't sound like you said Quanta did

22   anything wrong.  Did you tell her what the allegations

23   are that Quanta did wrong?

24       A    I just said that the -- the company

25   mismanaged the investment funds.  That's it.

Page 16

1        Q    And what did she say in response to that?

2        A    Nothing, really.  We focused more on the

3    other piece of the conversation.

4        Q    You said "Nothing, really."  Did you say

5    anything whatsoever?

6        A    Not that I recall.

7        Q    And outside of this conversation with Brandy

8    Wilbanks, can you recall talking about this case with

9    anyone else other than your attorneys?

10        A    No.

11        Q    Okay.  So let's go over some more background

12    information.  How old are you?

13        A    63.

14        Q    And what is your current residential

15    address?

16        A    318 Sorrelwood Drive in League City.

17        Q    Texas?

18        A    Yeah, Texas.  77573.

19        Q    How long have you lived there?

20        A    Five years, four and a half years, something

21    like that.

22        Q    And I'm not interested in getting into too

23    much detail about this.  Purely from a 401(k) angle.

24    I may or may not ask follow-up questions, but you

25    mentioned you previously had a spouse.  When was your

Page 17

1    divorce?

2          A    Well, I've been married twice.

3          Q    Oh, twice.  Okay.

4          A    The first divorce was in the --

5          Q    I'm just interested in the recent one.

6          A    -- yeah -- in the mid-'90s, and the last

7    divorce was in 2007.

8          Q    Okay.  Do you have any children?

9          A    I do.

10         Q    How many?

11         A    Two biological and one stepdaughter that

12   I've -- I've helped raise all her life.

13         Q    And what are their ages?

14         A    Ooh.

15         Q    Roughly, if you know.

16         A    Sheena is -- so Jeffrey was born in '88.

17   Sheena is a couple years older than him, so she would

18   have been born in '85, '86.  And then Ange [ph], my

19   youngest, is -- was born in '92.  They're all in their

20   30s somewhere.

21         Q    I was asking because I didn't want to ask

22   you about their employment, and then you tell me

23   they're 16 or something.

24         A    No.

25         Q    Okay.  So what is the name of your oldest,

1    did you say?

2         A    My stepdaughter?  Sheena --

3         Q    Sheena, okay.

4         A    -- Wall.

5         Q    And is she employed?

6         A    Not any longer.  She's a stay-at-home mom.

7         Q    All right.  And then your next oldest's

8    name?

9         A    Jeffrey McKnight, Jr.

10        Q    Okay.  And is he employed?

11        A    Yes.

12        Q    And where does he work?

13        A    He is a VP of operations at Emily Summers'

14   design firm.

15        Q    And do you know if he has a retirement

16   account with that firm?

17        A    I'm sure he does.

18        Q    But have you ever talked to him about saving

19   for retirement?

20        A    When he was much younger.

21        Q    And what wisdom did you impart?  And I don't

22   mean that sarcastically.  Like, what did you tell him?

23        A    Yeah.  The earlier you -- you start saving,

24   the -- the better off you'll be.

25        Q    Anything else?

Page 19

```
1          A     That's about it.
2          Q     Okay.  And then your youngest's name again?
3          A     Angela Vigen.
4          Q     And is she employed?
5          A     Yes.
6          Q     And where --
7          A     She is a teacher, and it's in Mansfield
8    School District.
9          Q     Is that a public school district?
10         A     Yes.
11         Q     Do you know if she has a retirement account
12   through that public school district?
13         A     I don't know.
14         Q     Have you ever talked to her about saving or
15   investing for retirement?
16         A     No.  I mean, you can try with her but --
17   yeah.
18         Q     Okay.  I hope this isn't going to where we
19   went before.  And if it is, let me know.  But have you
20   ever filed a lawsuit?
21         A     Yes.
22         Q     Okay.  And it was the one we've already
23   discussed?
24         A     Yes.  But, again, that was 30 years ago or
25   longer.
```

Page 20

1      Q     Have you ever had a lawsuit filed against

2    you?

3      A     No.

4      Q     Again, questions that we ask every

5    witness -- have you ever been arrested?

6      A     No.

7      Q     Have you ever been convicted of a crime?

8      A     No.

9      Q     Have you ever declared bankruptcy?

10     A     Yes.

11     Q     And, roughly, do you recall when that was?

12     A     2011, 2012, some -- somewhere in there.

13     Q     So I'll introduce the first exhibit to try

14   to make this less of a memory test -- so I marked as

15   Exhibit 1 a printout of your LinkedIn profile.

16                    (Exhibit 1 was marked for

17                    identification.)

18             Take a minute, as long as you need, to flip

19   through the document.  And when you're ready, let me

20   know if you recognize the document.

21     A     Yes.

22     Q     So I'll direct your -- oh.  Well, I've sort

23   of said it, what it is already, but I'll give you a

24   chance to articulate it.  Can you tell me what this

25   document is?

Page 21

1        A     A version of my resume.

2        Q     And did you write this document?  Or is the

3     material here stuff that you wrote?

4        A     Yes.

5        Q     And in doing so, did you try to be truthful

6     and accurate?

7        A     Yes.

8        Q     So when it says "top skills" -- you see that

9     on the blue left-hand side?

10       A     Yes.

11       Q     The third one says finance and accounting.

12    When you wrote "finance" as a top skill, what does

13    that mean?

14       A     It means I worked in the finance and

15    accounting group for KBR.

16       Q     You know, if you were asked in an interview,

17    "Talk to me about your finance and accounting skills,"

18    what would you say?

19       A     Accounts payable, accounts receivable,

20    journal entries, P&Ls, that sort of thing.

21       Q     So I knew most of those terms.  What is

22    journal entries?

23       A     It's when -- let's say, for example, that

24    something was coded to the wrong GL code or to the

25    wrong project.  And then you have to go into your

Page 22

1    system, whether it be SAP or Oracle or whatever, you

2    know, application that you're using at the time.  Then

3    you make an entry in there, take it out of the place

4    it doesn't belong, and put it where it does belong.

5        Q    And I think you said in the list P&Ls;

6    right?

7        A    Profit and loss.

8        Q    Yeah.  So it was part of your skill set

9    determining when there's been a profit or a gain and

10   when there's been a loss?

11       A    That was -- that was mostly applied when I

12   owned my store.  I didn't -- I didn't deal with a lot

13   of P&Ls in the corporate world.

14       Q    So when you owned your --

15       A    Corporate finance, yeah.

16       Q    Sorry, I did not mean to cut you off there.

17   Talk to me about when -- you said it applied when you

18   owned your store.  So how did it apply when you owned

19   your store?

20       A    Well, I needed to know if I was making a

21   profit or a loss.

22       Q    And when you write "finance and accounting"

23   as that top skill, does that in a way include or have

24   anything to do with investment or investment

25   performance?

Page 23

1        A    No.

2        Q    All right.  Let's skip to the end, page 5.

3    So we'll work through this chronologically.  So it

4    says you attended college at Stillwell Technical

5    College; is that right?

6        A    Yes.

7        Q    And you had a -- well, it says associate's

8    degree, business administration and accounting.

9        A    Right.

10       Q    I was going to call it a focus, but is

11   that -- I don't know.  What's the right term for

12   business administration and accounting?

13       A    Well, it was back in the '70s.  So it was

14   just a -- a general overall office administration.

15   You know, we learned typing skills, accounting skills,

16   you know, how to use the different machines that were

17   relevant at the time, like a mimeograph machine, you

18   know, before copiers came out.  So it was just an

19   overall, you know, business school.

20       Q    And did you take any courses in investment

21   or relating to investments?

22       A    No.

23       Q    And then it looks like in 1996 you got a

24   certification in the management development program

25   from Rice University.  Can you talk to me about, what

Page 24

1    did that entail?

2        A    Yes.  It was -- KBR -- or actually, they

3    were Brown & Root then -- sent me to that.  And it was

4    like a three-month program that we would go on the

5    weekends and just discuss overall, you know,

6    business -- not really business strategies.

7            But we looked at different cases and -- and

8    just discussed, you know, how it worked out and -- and

9    what sort of logic was applied to it and, you know,

10   how they figured out lessons learned and things like

11   that.

12       Q    And did that course cover in any way

13   investments or investment performance?

14       A    No, not that -- not that I recall.

15       Q    So outside of Stillwell Technical College

16   and Rice University, is there any other post-high

17   school education of note?

18       A    I took some college classes at Lamar years

19   ago, didn't finish it.  And then I -- when I was

20   living in Florida, I took some college classes there.

21       Q    And starting with Lamar, what were the

22   college classes?

23       A    Basic, you know, English and accounting and

24   that sort of thing.

25       Q    And what about in Florida?

Page 25

1          A     Florida, I was trying to figure out who I

2     wanted to be when I grew up, so it was like graphic

3     design classes.  And again, English, and you still had

4     to take the other classes as well.

5          Q     And did any of those classes involve

6     investments or investment performance?

7          A     No.

8          Q     Have you received any vocational training?

9          A     Such as?

10          Q     Well, let me try asking the question a

11     different way.  What about professional

12     certifications?

13          A     No.

14          Q     Have you attended any financial or

15     investment seminars?

16          A     No.

17          Q     Any retirement planning seminars or

18     presentations?

19          A     No.

20          Q     Okay.  So we'll continue to go through this

21     chronologically.  The first employer listed here is

22     KBR.  And it says, if you look at page 5, that third

23     line, it says, "with a specific focus on customer

24     billings."

25          A     Mm-hmm.

Page 26

1        Q    Do you see that?

2        A    Where at?

3        Q    It's the third line on page 5 up at the top.

4        A    Yes.

5        Q    So what were some of the common billing

6    issues you encountered?

7        A    So we were doing an SAP implementation then.

8    And I was brought in to be part of the team as a

9    functional expert because of accounts payable,

10   accounts receivable, dealing with procurement coming

11   through, you know, making sure you had your three-way

12   match, and that sort of stuff.

13           But it wasn't -- that -- yeah, that was

14   really it.  We were doing design and configuration of

15   the system.  And then we would test it out to make

16   sure that it was functioning properly.

17       Q    So I'm not sure what the answer is to this.

18   Was part of that work involved in making sure nothing

19   was double-billed?

20       A    I'm guessing it -- it would have been.  But

21   I don't -- I don't really recall that.

22       Q    And to ask maybe an obvious question -- I'll

23   not ask it in a leading way -- is there anything wrong

24   with double-billing?  And if so, what's wrong with

25   double-billing?

Page 27

1      A    Well, that's -- I mean, that should be -- be

2    illegal.  Why would you want to do that?

3      Q    And it's a really obvious question.  Why is

4    it?  Why is it bad?  What's, you know --

5      A    Because it's not your money.  You can't keep

6    what's not yours.

7      Q    It says you were also a global training

8    instructor.

9      A    I was.

10     Q    Who were you training?

11     A    KBR employees around the world.

12     Q    And what did training look like?  You know,

13   what was sort of the topic of the training?

14     A    It had a lot to do with the generating

15   invoices out of SAP, teaching them how to use the

16   new -- 'cause we were switching from our legacy system

17   to SAP.  So it was teaching them how to use this new

18   application in their job and what kind of issues they

19   might come up against and how to resolve those.

20     Q    All right.  So moving to the next line in

21   your employment, in your LinkedIn profile, is it

22   Rindecella's?

23     A    Rindecella's, yes.

24     Q    Okay.  Rindecella's Unique Gifts &

25   Treasures.  So tell me the story there about -- you

Page 28

1    know, you're the owner of this shop, it says.  You

2    know, why did you start it?

3         A    Because I wanted to try something new.

4         Q    And did you have any employees?

5         A    I did.  One part-time.

6         Q    One part-time?

7         A    Mm-hmm.

8         Q    And so for the six years and eight months

9    you were there, it was you and, at most, that one

10   other part-time person?

11        A    I don't know that she was there the whole

12   time.  I didn't actually start it in -- in June of

13   2000.

14        Q    When did you start it?

15        A    Maybe around 2004 or 2005.

16        Q    Okay.  Then if we just take a step back, so

17   KBR, it says 1998 to 2000.  Are those years right?

18        A    No.  Actually I worked for KBR from 1988.

19   But if I put all my experience on here, my resume

20   would be, you know, 20 pages long.

21        Q    Yeah, and I just wanted to understand if

22   there was a gap.

23        A    Right.

24        Q    Between 2000 and 2005, what were you, you

25   know, doing at the time?

Page 29

1        A    I worked for my ex-husband's company.

2        Q    In what role?

3        A    Paying the bills, that sort of thing.

4        Q    Did that company have a retirement plan that

5    offered its employees?

6        A    I don't -- I don't think they did.  If they

7    did, that would have been handled by the CPA or by a

8    separate company.

9        Q    And what was the name of that company?

10       A    B&B Ice.

11       Q    B&B Ice?

12       A    Mm-hmm.

13       Q    And what did that company do?

14       A    Distributed ice.

15       Q    And how many employees did it have, roughly?

16       A    I don't -- I don't know.

17       Q    Going back to Rindecella's, so the part-time

18    employee, did you hire this person?

19       A    Yes.

20       Q    Tell me about the hiring process.

21       A    She was a friend -- friend of my

22    stepdaughter's, and she was going through school.  She

23    just needed a little part-time job.

24       Q    Was she in high school at the time or

25    college or --

Page 30

1          A    I think maybe she had just started college.

2          Q    Did you ever evaluate her performance,

3     informally or formally?

4          A    No.

5          Q    How did you determine then if she was doing

6     a good job and should remain employed?

7          A    I didn't go through any sort of formal

8     evaluation.  If she was getting her work done, you

9     know, and did what she was asked and showed

10    motivation, then I was good.

11         Q    So, if I understand what you're saying

12    right, you didn't think a formal evaluation was

13    necessary because you were interacting with her

14    frequently and she was meeting your standards?

15         A    That's correct.

16         Q    And you think that's a reasonable way to

17    evaluate someone's performance?

18         A    It was --

19                   MR. ROBERTS:  Object to form.

20                   THE WITNESS:  Oh, sorry.

21    BY MR. BLOCK:

22         Q    You can answer.

23         A    Oh.  It was a small little boutique gift

24    shop.  They're just -- not a lot to that.

25         Q    All right.  And then continuing on with your

Page 31

1    history, you returned to -- well, let me make sure

2    that's right.

3         A    Returned to KBR?

4         Q    Yeah.  Just wanted to make sure I was

5    looking at right.  Oh, there, I see.  Okay.  It's

6    because it's tucked into the bottom of page 3.  Okay.

7    So why did you return to KBR?

8         A    Because I got a divorce and moved back to

9    Texas.

10        Q    Was this lead accountant role sort of a

11   promotion or a step up in responsibility from your

12   previous role, or is it just sort of a different kind

13   of role?

14        A    Really just a lateral.

15        Q    All right.  You say that you -- and it's the

16   fourth line -- managed a $9 million budget annually

17   for capital projects and fixed assets globally.  What

18   does it mean that you managed that, a $9 million

19   budget?

20        A    It means that I, you know, that I applied,

21   you know, that it was -- like, KBR is a big company,

22   so they -- they buy things all the time, right?

23   Equipment, you know -- at one point when we were on

24   Clinton Drive, we had, you know, a -- a fitness room,

25   you know.

Page 32

1          So they would buy exercise equipment and

2     just all sorts of things.  So I tracked it an SAP

3     and -- and watched for when it was fully depreciated

4     and that sort of thing.

5          Q    All right.  And then your next role within

6     KBR was senior specialist, information management.

7     Was that a lateral move, or was that a step up in

8     responsibility?

9          A    Again, that was similar to when we were

10    doing the SAP implementation.  I -- you know, at that

11    point, our license had expired with SAP, and we were

12    going to move to Oracle.  So I was brought over to --

13    to that team to -- to help with that project.

14         Q    And the first sentence says, "Team lead for

15    the resource management and opportunity management

16    modules."

17         A    Mm-hmm.

18         Q    I didn't know what that meant, so would you

19    mind telling me what that means?

20         A    So resource management is, you know,

21    managing your resources, your employees sort of thing.

22    And along with Oracle, we were implementing a -- an

23    application we called -- called EcoSys.

24              And that -- EcoSys is a Hexagon company

25    that's used globally for, like, project controls work,

Page 33

1    you know, looking at forecasts and that sort of thing.

2    And so resource management -- so within EcoSys, they

3    have different modules.

4              So we were, you know, learning EcoSys and

5    understanding how we wanted to set it up to -- to

6    manage, you know, the hiring of people and be able to

7    better track people so that when, you know, if -- if

8    we knew employee X was assigned to, let's say, Exxon

9    for two years and, let's say, you know, they're going

10   to be released or that project will be done in 2026,

11   we -- we wanted to be -- to be able to have an eye on

12   it to know, when you get near that date, okay, let's

13   start looking for, you know, another project for them

14   to go to.

15        Q    And on an unrelated note to that answer,

16   when you were at KBR, did you participate in their

17   401(k) plan?

18        A    I did.

19        Q    Do you recall having any issues with that

20   401(k) plan?

21        A    No.

22        Q    Do you recall what you were invested in?

23        A    No.

24        Q    How did you make a decision about what to

25   invest in?

Page 34

1          A    The -- pretty much the same way I do with

2    any 401(k) program.  What -- whatever, you know,

3    that -- that team recommends for me and at that

4    particular -- particular age, that's what I go with.

5          Q    So you said whatever the team recommends.

6    What are you referring to when you say "team"?

7          A    Well, it -- when I say "team," I mean, like,

8    with Quanta, it was Fidelity.  I'm -- at Worley now,

9    it's Principal.  At KBR, it was Vanguard.  So those --

10   those retirement management companies that manage the

11   funds.

12         Q    And we'll probably get into this later and

13   in different ways.  But why are you -- you know, it

14   sounds like you're choosing to rely on what you refer

15   to as those teams or management --

16         A    Right.

17         Q    -- companies; is that right?  Why are you

18   doing that instead of just choosing, you know,

19   yourself or some other alternative?

20         A    Because I'm not knowledgeable in that area.

21   That's it.

22         Q    I think you mentioned Fidelity, Principal,

23   and there was one more.

24         A    Vanguard.

25         Q    Vanguard.  Have you had any issues with any

Page 35

1    of them?

2         A     No.

3         Q     Have you found them to be reasonable judges

4    of what's a good investment?

5                    MR. ROBERTS:  Object to form.

6                    You can answer.

7                    THE WITNESS:  Answer?

8                    MR. ROBERTS:  Mm-hmm.

9                    THE WITNESS:  Ask me the question

10   again.

11   BY MR. BLOCK:

12        Q     So you said you've relied on them, so I was

13   asking if you found them to be good judges of what are

14   reasonable investments.

15                   MR. ROBERTS:  Same objection.

16        A     Until it's brought to my attention

17   otherwise.

18        Q     And what do you do, if anything, to have

19   people bring, you know, to bring other opinions to

20   bear on whether these investments are reasonable or

21   not?

22        A     I don't do anything.

23        Q     Well, you told us until it's brought to your

24   attention.  So it sounds like at some point, something

25   was brought to your attention that made you think some

Page 36

 1    investments you were in were not reasonable; is that

 2    correct?

 3        A    That's correct.

 4        Q    So if that happened once -- well, how many

 5    times has that happened?

 6        A    To my knowledge, just the one time.

 7        Q    And I think we'll also get into this later,

 8    but if it happened once, how come you don't do

 9    anything to double-check any of your other

10    investments?

11        A    Again, I'm -- I'm not knowledgeable in that

12    area.  That's not, you know, that's not where my

13    expertise is.  And it takes a lot of time, you know,

14    to get through that, so --

15        Q    So I think we'll get back to that topic

16    later, too, in other ways.  Moving on to page 3, it

17    says your next employment was with Willis Group.

18        A    Right.

19        Q    So what attracted you to the opportunity at

20    Willis Group?

21        A    Well, when we were working on that last

22    implementation at KBR with the Oracle and EcoSys, I

23    really enjoyed working with EcoSys in the design and

24    configuration.  And they were doing an implementation

25    at Spectra Energy, and so I wanted to be part of that

Page 37

1    team.

2         Q    And what did your job responsibilities at

3    the Willis Group entail?

4         A    Design and configuration of EcoSys, writing

5    UAT test scripts, training employees.

6         Q    Did you participate in a 401(k) plan at

7    Willis Group?

8         A    I'm sure I did.

9         Q    Do you recall having any issues with any of

10   the investments offered in that 401(k) plan?

11        A    No.

12        Q    Let me introduce -- and this may be fairly

13   quick -- Exhibit 2.

14                   (Exhibit 2 was marked for

15                   identification.)

16             I'll pass it around to everyone, which is

17   the Form 5500 for the Willis Group 401(k) plan.  Feel

18   free to look through it, but I'm just going to ask a

19   question or two about the very end of it where it

20   lists the various investments in the plan.

21             So whenever you're ready, flip to the last

22   page.  That's the only thing I'm going to ask about.

23   Are you on that last page --

24        A    Mm-hmm.

25        Q    -- it should say "schedule of assets."  I

Page 38

1    think it's on the page here.

2         A    Oh, behind it?

3         Q    Yeah, there you go.  So you see it lists a

4    bunch of different investment options.

5         A    Yes.

6         Q    So recognizing that this was a number of

7    years ago, I just wanted to see if looking at this

8    list helped you recall what you were invested in when

9    you participated in the Willis Group LLC 401(k) plan.

10        A    Not really.

11        Q    And we talked about this a little bit.  So

12   when you are confronted with these options -- this is,

13   I should say, the 2017 Form 5500.  So it covers, you

14   know, the period of time in which you were at Willis.

15   Talk to me a little bit about the process you go

16   through to identify which investment or investments to

17   invest in.

18        A    Again, I just go with what's recommended.

19        Q    And do you know if sort of the service

20   you're describing was something you paid for?  Like,

21   were you paying someone to recommend different

22   investments to choose --

23        A    I don't think so.

24        Q    Let's go back to your -- you can put that

25   aside, wherever's convenient.  Highly unlikely to

Page 39

1    return to it.  Okay.  So back to your form 55 -- or

2    sorry.  Back to your LinkedIn.  So after the Willis

3    Group, you went to Quanta next; is that right?

4         A    That's correct.

5         Q    What attracted you about the opportunity at

6    Quanta?

7         A    Well, with Willis Group, I was a contract

8    employee with Spectra -- or for Spectra.  But then

9    Quanta reached out to me and went through the

10   interview process, and it was a permanent full-time

11   employee.

12        Q    And you said they reached out to you.  Do

13   you recall how they did that?

14        A    I got a call from the manager at the time.

15   His name was Matt Trawick, Trawick, something like

16   that.

17        Q    Tell me if this is right.  You were saying

18   one thing that attracted you about Quanta is it was

19   going to be a full-time employee.

20        A    Right.  I was full-time before, but I was as

21   a contract employee.

22        Q    What did you know about Quanta, if anything,

23   before they reached out to you?

24        A    Not much at all.

25        Q    And what did you learn about Quanta through

Page 40

1    the, you know, when you were just deciding whether to

2    pursue or take the opportunity?

3         A    Do you mean what did I learn as far as what

4    they did?

5         Q    Anything.  I'm keeping it very broad.

6         A    Oh.  Well, they were doing EcoSys

7    implementations.  And like I said, I really enjoyed

8    working with EcoSys and interviewed with the manager,

9    and went through a series of interviews.  And I liked

10   everybody that was part of the team.

11        Q    And what did you learn about Quanta's

12   reputation as a company?

13        A    Do you mean how other businesses looked at

14   them or how they were rated?  Or what are you asking?

15        Q    So let me try it this way.  Did you learn

16   anything about their reputation as an employer?  You

17   know, were they -- and I don't want to put words in

18   your mouth, there could be all sorts of -- right?  A

19   company could be known as like, very tough

20   environment, or they're very friendly and give --

21        A    Oh, no, I enjoyed working at Quanta.

22        Q    And why was that?

23        A    I enjoyed the team I was on.  They seemed

24   like they were a -- they -- they seemed to value their

25   employees.

Page 41

1          Q    And you say the team you were on, or the
2     company?
3          A    The company overall.
4          Q    Were you satisfied with your salary?
5          A    I was.
6          Q    Were you satisfied with the benefits they
7     offered?
8          A    I was.
9          Q    What did your job at Quanta entail?
10         A    Design and configuration of EcoSys and
11    supporting our end users, writing test scripts.  Same
12    thing.
13         Q    Okay.  So it says in the second line, when
14    you're an applications analyst from March 2017 to May
15    2019, that you identified deficiencies in business
16    systems.  What does that mean?
17         A    It means you're -- you're
18    constantly -- when -- when you're doing design and
19    configuration of an application, not all applications
20    are, you know, out of the box.
21              You -- you can't just -- you can't just go
22    pick a product off a shelf and think it's going to
23    work for the entire way the company does business.  So
24    it takes some customization.
25              So our team did part of that customization.

Page 42

1    And during the process, through testing it out and

2    changes that were made, that's when you identify

3    deficiencies.

4        Q    Who did you report to while at Quanta?

5        A    Matt Trawick.

6        Q    That's a different name that you said before

7    about who reached out to you?

8        A    It -- I think it's Trawick.  It's -- it came

9    to me now 'cause at first I was like, "Trawick,

10   something" -- I was close.

11       Q    Got it.  Understood.

12       A    I -- I reported to him initially.  And then,

13   not long before I was let go, he left the company and

14   a new manager took over.  And they just decided to

15   change things up.

16       Q    So I'm going to read a list of names.  I

17   wasn't able to grab a good org chart.  Are you

18   familiar with Randall Wisenbaker?

19       A    Huh-uh.

20       Q    What about Steve Kemps?

21       A    No.

22       Q    Traci McReady?

23       A    No.

24       Q    Kim Milton?

25       A    No.

Page 43

1         Q     Nick Grindstaff?

2         A     That one sounds kind of familiar.  But you

3    have to understand that IT group, you know, they were

4    in -- or -- or most of the company was in Williams

5    Tower.

6               And the IT group was in an office that was

7    part of the Galleria.  So you -- you know, I didn't

8    always see those people on a regular basis or hear

9    about them or anything like that.

10        Q     That's helpful context.  So you said Nick

11   Grindstaff, the name was somewhat familiar?

12        A     It may -- it sounds familiar, but that

13   doesn't mean that I knew him or anything like that.

14        Q     Do you know anything about his reputation?

15        A     No.

16        Q     Derrick Jensen?

17        A     I -- I do remember Derek.  We would have --

18   I don't remember if it was monthly or quarterly, like

19   little town hall meetings over at the Tower.  And he

20   would often get up and speak.

21        Q     What was your impression of him?

22        A     Seemed like a nice guy to me.  I didn't know

23   him personally but, you know, seemed like a nice guy.

24        Q     And what about competency as far as his job?

25        A     He was -- I mean, again, I didn't work with

Page 44

1    him.  I, you know, I didn't work closely with him.  Or

2    I didn't work with him at all.  So it's not something

3    I could judge.

4         Q    Based on his presentations, did he seem

5    intelligent?

6         A    Seemed to be.

7         Q    Trustworthy?

8         A    I didn't know him.

9         Q    Are you aware of anything about his

10   reputation?

11        A    Not really.

12        Q    What about Kip Rupp?

13        A    Who?

14        Q    Kip Rupp.

15        A    No.

16        Q    Redgie Probst?

17        A    No.

18        Q    Steven Wilhelm?

19        A    No.

20        Q    Bo Cassidy?

21        A    No.

22        Q    Jayshree Desai?

23        A    No.

24        Q    Paul Nobel?

25        A    No.

Page 45

1          Q     Carolyn Campbell?

2          A     I think I've heard of her name, but I didn't

3     know her.

4          Q     I wasn't sure what to do with that one

5     because she's also right here.

6          A     Oh.  That's why I've heard of the name.  I'm

7     sorry.

8          Q     Okay.  When you were at Quanta, did you

9     participate in a 401(k) plan?

10         A     I did.

11         Q     How did it compare to previous 401(k) plans

12    that you participated in?

13         A     I mean, about the same, you know?  Like

14    I've -- I've said, I didn't get real involved in the

15    details.

16         Q     At the time you were at Quanta, do you

17    recall having any issues with the investments offered

18    in Quanta's 401(k) plan?

19         A     Did I have any issues with -- no.

20         Q     When you were hired, did you attend an

21    orientation?

22         A     I'm trying to think.  I don't recall.

23         Q     Well, okay.  So you don't recall.  Do you

24    recall at any point learning anything about the --

25    well, let me ask it this way.  What do you recall, if

Page 46

1    anything, about learning about the 401(k) plan?

2    Because presumably, at some point, you learned it

3    existed and --

4         A    Well, it's -- it's all part of the HR

5    process, right?  You know, you -- you get hired, you

6    sign the paperwork, you select your -- the insurance

7    benefits you want, you choose whether or not you're

8    going to participate in a 401(k).

9         Q    And you worked at Quanta for -- your

10   LinkedIn says it's two years and three months; does

11   that sound about right?

12        A    Yeah, a couple years.

13        Q    And why did your employment with Quanta end

14   in May 2019?

15        A    We got a new -- a new manager replaced Matt

16   when he left, and he decided to let me go.

17        Q    All right.  Let me introduce Exhibit 3.

18                  (Exhibit 3 was marked for

19                  identification.)

20             Take a second, you know, as much time as you

21   need to look over it.  And once you've had a chance,

22   you know, let me know if you recognize the document.

23                  MR. ROBERTS:  Thanks.

24                  THE WITNESS:  I do.

25   //

Page 47

1    BY MR. BLOCK:

2          Q    And what is this document?

3          A    The termination papers.  And it lists out

4    the severance package that I was given.

5          Q    And have you seen this document before?

6          A    I have.

7          Q    When was the last time you saw the document?

8    The most recent time?

9          A    I reviewed it yesterday with my attorney.

10         Q    And when you -- well, let's look at the last

11   page.  Do you see your signature there?

12         A    Yes.

13         Q    When you reviewed this document for the

14   first time, did you do so with an attorney?  Did you

15   consult any --

16         A    No.

17         Q    I'm interested in section 8, the paragraph

18   a, which is on page 3 of the severance agreement.  Do

19   you see that?  It starts with -- yeah -- "Employee

20   further represents that employee"?

21         A    Want to put that in English for me?

22         Q    Yeah, we'll walk through it.  But I guess

23   that brings me to a question.  So before bringing this

24   lawsuit, did you look at the severance agreement --

25   let me ask a more precise question.  In between the

Page 48

1    time period in which you signed this document -- which

2    says June 7, 2019 -- to when this lawsuit was filed,

3    did you ever look at this severance agreement?

4        A    At -- at the time that they had me sign it,

5    but it's not like -- I wasn't given a copy that I

6    could hold on to and think about or even go consult

7    with an attorney.

8        Q    So to make sure I understand your testimony,

9    you're saying you were not given a copy of this?

10       A    No, I was provided a copy of it.  Just -- at

11   the time when they said, "It's time for you to go."

12       Q    Okay.  So I think, to make sure I'm

13   understanding your testimony, so after you signed this

14   and before you brought this lawsuit, you didn't look

15   again at the severance agreement to decide if you were

16   violating it or not by bringing a lawsuit?

17       A    No.

18       Q    Okay.  So let's translate 8a.  It says,

19   "Employee" -- do you understand that to be yourself?

20       A    Yes.

21       Q    Okay -- "represents that employee has never

22   commenced or filed" -- I don't care so much about

23   that -- "and agrees not to commence, file, voluntarily

24   aid, or in any way prosecute for cause to be commenced

25   or prosecuted against the Released Parties any action,

Page 49

1    charge, complaint, or other proceeding subject to the

2    provisions of paragraph 8c."  So did I read that

3    right?

4        A    Well, you read it word for word, but not

5    necessarily in English.

6        Q    Yeah.  So we'll go through it in English.  I

7    just wanted to get it all there for the record.  Okay.

8    Because now I'm going to just hone in on specific

9    parts to try to make it --

10       A    Okay.

11       Q    -- translate better, but I don't want it to

12   seem like I'm cherry picking or anything like that.

13   Okay.  So "Release Parties" is a capitalized word.  Do

14   you see that?  That "Release Parties," they're both

15   capitalized?

16       A    Yes.

17       Q    It's a defined term.  Okay.  So if you look

18   at the other page across the way, section 7, do you

19   see "Released Parties" is underlined and capitalized

20   sort of in the middle of paragraph 7?

21       A    Yes.

22       Q    Okay.  So there's a bunch of entities that

23   are considered Released Parties, but I think just to

24   make it simple, I just want to focus on -- it says in

25   the fourth line, it says "the Company," in capital C,

Page 50

1    "the Company" is listed as one of the Released

2    Parties?  We're in paragraph 7.

3         A    Yes.

4         Q    Okay.  And then do you understand "the

5    Company" to be Quanta services?

6         A    Yes.

7         Q    Okay.  So now let's go back to 8 and try to

8    translate it.  Okay.  So it says, "Employee further

9    represents" -- actually, let's make it a little

10   different.

11        A    Well, let -- let me --

12        Q    Please.

13        A    -- let me just answer this for you.  I mean,

14   I'm not ignorant.  I, you know, I kind of get the gist

15   of what they're saying here.  But in my mind, that

16   would apply to, like, the termination itself.

17             You know, it's -- it's saying if -- to me,

18   this is saying, "Okay.  We gave you this money.

19   You've been terminated.  Here's this document.  Sign

20   it saying that you're not going to go to an attorney

21   about -- or you're -- you're not going to seek a -- a

22   legal case about your termination and the reason for

23   the termination."

24             In my mind, that's what that represents.

25   That doesn't have anything to do with what we're here

Page 51

1    for today.

2         Q    Okay.  And what, you know, where does that

3    understanding come from?  Is that just from this

4    paragraph 8a, or is that from somewhere else?

5         A    Well, it's -- it's -- that was just my

6    interpretation of it.

7         Q    And have you ever, outside of -- I don't

8    care about -- I do care about, but I'm not going to

9    ask about conversations with your lawyer.  So outside

10   of conversations with your lawyers, have you ever

11   vetted that interpretation with anyone?

12        A    No.

13        Q    Why not?

14        A    Why?

15        Q    Right.  That's my question:  Why not?

16   You're going to say "Why"?

17        A    Yeah, that is why.  Why would I?

18        Q    Okay.  Okay.  So we'll go back to that;

19   right?  But I guess, let me point you to on -- what's

20   the easiest spot to point you to?  All right.  Well,

21   let me just represent to you -- and we can go through

22   this too; right?  Well, let me ask this question this

23   way.

24             I guess one reason why you might want to

25   look at it is to understand if you're going to be in

1      breach of the agreement.  Does that make sense?

2           A     It never occurred to me.

3           Q     Okay.  So let's go back to 8a and try to

4      see, reading it now, see what you think, you know,

5      what's your understanding now of what it means.  Okay?

6      So it says, "Employee represents that they agree not

7      to commence, file," and it goes on.

8           A     I still interpret it the same way.

9           Q     Right.  Right.  So I guess -- okay.  So it

10     says, "agrees not to file any action, charge,

11     complaint, or other proceeding."  So I guess what

12     about the phrase --

13          A     In my mind, "any action" --

14          Q     Let me finish.  Let me finish.  And then

15     you'll get a chance.  Okay.  So it says, "any action,

16     charge, complaint, or other proceeding."  So my

17     question is:  What about that makes you think that the

18     only action it relates to is related to -- what did

19     you say?  Sorry.  Actually now I'm forgetting what you

20     thought it just limited to.  You thought it was

21     limited to just --

22          A     Just to the termination itself.

23          Q     So let me make sure I understand.  So you

24     thought the only thing it applied to, you couldn't sue

25     them was for, like, wrongful termination?

Page 53

1          A    Right.

2          Q    All right.  So what about the language, "any

3    action, charge, complaint, or other proceeding" makes

4    you think the only action it could be about was

5    wrongful termination?

6          A    Because it was my termination papers.

7          Q    So sitting here now, do you still read it

8    that way --

9          A    I do.

10         Q    -- when we walk through it?  And why is

11   that?

12         A    Because it's my termination package.  It

13   doesn't say anything at all about how our money was

14   invested and mishandled.

15         Q    All right.  So your interpretation of this

16   paragraph is that you could sue Quanta for any action

17   so long as it wasn't about wrongful termination?

18         A    Correct.

19         Q    So let me ask you this:  Sitting here today,

20   do you think you're violating the severance agreement

21   by suing Quanta in this action?

22         A    No.

23         Q    Are you concerned about your interpretation?

24         A    No.

25         Q    And why are you not concerned about your

Page 54

1    interpretation?

2         A    I -- I've already explained it.

3         Q    So let me read the next sentence.  It says,

4    in b, "In the event an employee files any civil

5    complaint or commences any litigation of any kind that

6    is covered by this release in this agreement" -- does

7    that give you any concern about your interpretation?

8         A    No.

9         Q    So what do you think is meant by that

10   sentence?

11        A    I think it's all related to the termination

12   package.

13        Q    And just to be clear, is there any language

14   you can point me to that supports that interpretation?

15        A    On page -- on the second page -- it's not

16   numbered, but it's Termination of Employee.  Why would

17   I interpret it any differently?  It's a termination

18   package.

19        Q    So is it your, you know, understanding or

20   opinion that any termination package can only limit

21   that person being terminated from suing about that

22   termination?  There's no way to draft a termination

23   package that would limit them from suing about

24   something else?

25              MR. ROBERT:  Object to form.

Page 55

1      A    I'm -- that's my interpretation of it.  It

2    just is what it is.

3      Q    So as part of this termination package, you

4    received $11,425.27.  Do you see that?

5      A    Yes.

6      Q    Did you receive that payment?

7      A    I did.

8      Q    Okay.  And in paragraph 7A, it says -- it's

9    a long paragraph.  I agree.  But it says, if you look

10   at the first sentence, it says, "In consideration of

11   the severance benefits," so that includes the $11,000

12   we just talked about; right?

13     A    Mm-hmm.

14          THE OFFICER:  Excuse me.  Could you

15   repeat that for me, please?

16          THE WITNESS:  Yes.

17          THE OFFICER:  Thank you.

18   BY MR. BLOCK:

19     Q    "The employee" -- so that's you; right?

20     A    Right.

21     Q    And then it goes on to say, "hereby releases

22   and discharges the company" -- so that's Quanta;

23   right?

24     A    Right.

25     Q    And then it goes on, just after Released

Page 56

1    Parties to say, "from any and all claims, cause of

2    action, suits, debts, controversies, judgments,

3    decrees, damages, liabilities, covenants, contracts,

4    and agreements, whether known or unknown, in law or

5    equity, whether statutory or common law," so on and so

6    forth.  It goes on; right?  It says all that?

7        A    Yes.

8        Q    And then it says, "or any claims relating to

9    or arising out of any aspect of an employee's

10   employment with the company or termination of such

11   employment"?

12            So "arising out of any aspect of an

13   employee's employment with the company or the

14   termination of such employment."  And it's your

15   interpretation that all that means, the only claim

16   you're releasing is about wrongful termination?

17       A    That's my interpretation.

18       Q    So what do you think is meant by, "from any

19   and all claims, causes of action, suits, debts,

20   controversies" --

21       A    Well, it mentions age discrimination and

22   Older Workers Benefit Protection Act and all of that

23   stuff.  It's related to the termination package.

24       Q    All right.  So what do you think the words

25   "arising out of any aspect of an employee's employment

Page 57

1      with the company" means?

2          A     Which sentence?

3          Q     So it says -- right -- just second to last

4      line of paragraph 7, it says you've released all these

5      various things, "including but not limited to any

6      claims relating to or arising out of any aspect of an

7      employee's employment with the company."

8                So I'm asking, what do you think "arising

9      out of any aspect of an employee's employment with the

10     company" means?

11         A     That -- that it's -- it's related to -- to

12     my employment with the company.

13         Q     Right.  So --

14         A     In -- in my opinion, this is a termination

15     package.  And we can present it in any way we want

16     and -- and re-dissect it.  But my interpretation is my

17     interpretation.

18         Q     Yeah, I'm just trying to understand if,

19     going through it, that would help, if you'd be willing

20     to reconsider what the words mean.  But it sounds like

21     you're not; is that right?

22         A     No.

23         Q     Okay.  And then it goes on to say, among the

24     claims you're releasing -- you talked about the Age

25     Discrimination Act.  Do you see in that list, sort of

Page 58

1    roughly in the middle, right after "of 1991," it says

2    the "Employee Retirement Income Security Act of 1974."

3    Do you see that?

4         A    I do.

5         Q    Okay.  And do you understand that to mean

6    that you released claims related to the Employee

7    Retirement Income Security Act of 1974?

8         A    I don't interpret it as having anything to

9    do with my investments.

10        Q    Let me ask a different way.  So you've said

11   this agreement only applies related to your

12   termination.  So do you understand this to mean that

13   you're releasing claims under the Employee Retirement

14   Income Security Act of 1974 that are related to your

15   termination?

16        A    It's related to my termination, but not my

17   investments and how the committee chose to select

18   those investments.

19        Q    Let me try asking you this.  So it says

20   you're releasing claims under the Employee Retirement

21   Income Security Act of 1974.  What could that cover if

22   that's related to your -- you said not your

23   investments.  So I'm wondering what could that cover?

24   Is it your --

25        A    I have no idea.  I've never read that act.

Page 59

1        Q    Well, before filing this lawsuit, did you

2    ask anyone whether you might be in violation of this

3    agreement by suing Quanta?

4        A    No.

5        Q    At what point did you become aware that the

6    severance agreement -- I know you disagree -- but you

7    arguably violated by suing Quanta?

8        A    Well, you keep saying it.  That's the point.

9    But I -- that's not how I interpret it.  So I don't

10    agree.

11        Q    Okay.  So going back to the right-hand side

12    above "No claims," there's a paragraph that starts

13    with, "To the extent any claim is not releasable,

14    employee acknowledges that the payments and

15    consideration received hereunder more than offset

16    any" -- actually, I'll scratch that question.

17            So if you go back to the other page, page 2,

18    it says, the last sentence, it says, "Any violation,"

19    it goes on to say, "the employee will immediately

20    tender back to the company any severance benefits

21    received under the agreement as a result of such

22    breach."

23            Are you aware that there's an argument that,

24    if you're in violation of this severance agreement,

25    you would have to return the $11,425.27?

Page 60

1          A    But I'm not in violation of the severance
2     agreement --
3          Q    Yeah, that wasn't my question.  Are you
4     aware that there's an argument that you might have to
5     give that money back?  Or is that news to you?
6          A    That's news to me.
7          Q    Are you concerned by that news?  Again, you
8     might not agree with it, but is that concerning?
9          A    I'm not sure.
10         Q    Outside of talking to your lawyer, are you
11    going to do anything to determine whether this is
12    something you should be concerned about?
13         A    I doubt it.
14         Q    And why not?
15         A    Because it's not my interpretation of it.
16         Q    I'm not trying to be cute or anything.  So
17    you're that confident that your interpretation is
18    correct?
19         A    I'm fairly confident.
20         Q    If we look at paragraph 18, it starts with
21    acknowledgement -- or that's the caption,
22    "Acknowledgement."  So I'll give you a chance to read
23    this paragraph.
24              And my question is:  Do you understand that
25    this means, when you signed the agreement, you were

Page 61

1    representing that you understood and agreed to the

2    waiver we just discussed?

3         A    To be honest with you, you know, it was --

4    it was an upsetting day.  And when they show up at

5    your desk to escort you out, and they hand you this

6    package, it all happens in less than 15 minutes.  You

7    don't have time to sit and read through this document

8    word for word.

9                   MR. BLOCK:  I actually don't have a

10   clock on me.  I feel like we've been going for a

11   while.

12                  MR. ROBERTS:  It's 10:45.

13                  MR. BLOCK:  You want to take a ten-,

14   15-minute break?  What's best for you all?

15                  MR. ROBERTS:  Ten sounds good.

16                  MR. BLOCK:  Okay.

17                  THE WITNESS:  Sure.

18                  THE VIDEOGRAPHER:  Off the record at

19   10:45.

20                  (Off the record.)

21                  THE VIDEOGRAPHER:  Back on record at

22   10:57.  Please proceed.

23   BY MR. BLOCK:

24        Q    All right.  Ms. McKnight, just before the

25   break, I think you testified that you only had 15

Page 62

1    minutes to sign this or something along those lines.

2    Am I recalling that correctly?

3        A    That's what I recall.

4        Q    All right.  And you see the date you signed

5    the document?  It's that last page we looked at

6    before.  June 7, 2019?

7        A    Yes.

8        Q    And then do you see, back on the Termination

9    of Employment that we looked at before, it says your

10   employment will end on May 21, 2019 -- sorry, May 21,

11   2019 -- make sure I said that right.

12       A    Mm-hmm.

13       Q    Okay.  Does that help with your recollection

14   that you did not sign this 15 minutes after receiving

15   it but, in fact, more like three weeks?

16       A    I don't know when I would have signed it.

17       Q    Well, what about --

18       A    I mean, I -- I thought it was at -- at the

19   time that I was being escorted out, so --

20       Q    Well, you dated it, and that's your

21   signature -- page 7.

22       A    Yeah, that is.  That is.  I agree to that.

23       Q    Do you have any reason to doubt that that

24   date is correct?

25       A    No.

Page 63

1          Q     All right.  So does that help your

2     recollection that you did not sign this 15 minutes

3     after receiving it?

4          A     Well, I don't know when I received it.  I

5     mean, I obviously received it on June 7th.

6          Q     But what about if we look -- well, let's ask

7     this a couple of different ways.  So you think it's

8     possible that you received this document for the first

9     time three weeks after you were working at Quanta?

10         A     That's what it looks like.

11         Q     Like, potentially in the mail?

12         A     I don't think it would have come in the

13    mail.  Yeah, I couldn't have signed it then.

14         Q     Right.  And if we look at the page before,

15    it says "Quanta Service HR Termination Checklist,"

16    that's dated 5/21/19.  Do you see that?

17         A     Yes.

18         Q     Does that help you remember that this was a

19    document you received on 5/21/19?

20         A     That -- this document was 5/21/19?

21         Q     Yeah.  It's a checklist of the various

22    things that are going to happen on the last date of

23    employment?

24         A     Right.

25         Q     So I'm asking if that helps you recall that

Page 64

1   you received the severance agreement on 5/21/19.

2        A    No, that doesn't help me recall.

3        Q    So to the best of your recollection, how do

4   you recall receiving this document?  In person?  Some

5   other way?

6        A    I really have no idea.  I -- I was thinking

7   it all happened at the same time.

8        Q    We can move on then.  Okay.  Let's go back

9   to your LinkedIn profile to the extent it's helpful

10  for you to remember dates and such.  So after Quanta,

11  you returned to QBRE.  Is that --

12       A    KBR.

13       Q    KBR, sorry.  Is that correct?

14       A    Yes.

15       Q    Do you recall what you invested when you

16  were in the KBR retirement plan?

17       A    No.

18       Q    Do you recall if you rolled over -- well, do

19  you understand what the term "rollover" means?

20       A    I do.

21       Q    Do you recall if you rolled over money from

22  your Quanta 401(k) plan into the KBR plan when your

23  employment with Quanta ended?

24       A    I think I probably did.

25       Q    And do you have any recollection of why you

Page 65

1    did so, if you did?

2         A    Just to have all the money in the same

3    place.

4         Q    All right.  And then after returning to KBR,

5    then you worked and are still working at Worley; is

6    that correct?

7         A    Yes.

8         Q    What attracted you about the opportunity at

9    Worley?

10        A    Oh, I need to update that.  KBR, Inc., says

11   November to present, and Worley says October to

12   present.  So I need to update that.

13        Q    It should say just for clarity, I guess, the

14   record, it should say --

15        A    October of '22, yeah.

16        Q    For KBR.

17        A    Yes.  Yeah.  So KBR was a project -- on this

18   particular assignment, KBR was a project building a

19   Methanex unit in Geismar, Louisiana.  And I was hired

20   to be a senior accountant and was asked then to do

21   this track implementation, which is a time and

22   attendance type thing where people swipe in and out of

23   the gate and collect their hours.

24             And then -- so I spent a year in Louisiana,

25   and that's when Worley reached out to me and asked me

Page 66

1    if I wanted to come on board with them.  A lot of the

2    employees that are currently at Worley and that have

3    been there the last several years, I worked from --

4    with them at Brown & Root, KBR, for years.

5         Q    And do you participate in Worley's 401(k)

6    plan?

7         A    I do.

8         Q    Do you have any issues with the investments

9    offered in its 401(k) plan?

10        A    Not at this time.

11        Q    Not at this time.  What would cause you to

12   change your opinion?

13        A    I would have to learn that something was

14   being mishandled.

15        Q    Are you interested in finding out if that's

16   the case?

17        A    I would look into it.

18        Q    And what would you do to look into it?

19        A    Look at my documents.  I mean, again, this

20   is not my field of expertise.  I'm not knowledgeable

21   about it.  I leave it up to the experts, you know,

22   to -- to recommend what I should be doing.

23             So I'm, you know, I'm not married.  I depend

24   on the experts to -- to provide me that information.

25   No different if -- than if I go to the doctor.  I

Page 67

1    don't go into a doctor's office and tell them what's

2    wrong with me; I let them tell me what's wrong with

3    me.

4         Q    Right.  I think that's a good and

5    interesting metaphor; right?  Tell me if it's true;

6    right?  You go to a doctor on a recurring basis?

7         A    Do I?

8         Q    Right, like you go in for checkups or

9    whatnot.

10        A    Yeah, yeah.

11        Q    So, right, because you need the experts help

12   to understand what's going on and it's important to

13   you, your health?

14        A    Right.

15        Q    So I guess my question is -- right --

16   someone has told you something is wrong with the

17   Quanta 401(k) plan, and you sued.  Now you're in this

18   Worley 401(k) plan.

19             How come you haven't gone to an expert to

20   find out if something's wrong with that?  Is it

21   because the 401(k) plan is not important?  Is there,

22   you know, some other reason?

23             MR. ROBERTS:  Object to form.

24        A    401(k) plan is very important.

25        Q    So why haven't you gone to an expert to

Page 68

```
 1    understand if Worley is mismanaging its 401(k) plan in
 2    any way?
 3         A    I haven't had reason to.
 4         Q    What would give you reason to?
 5         A    It would have to come to my attention that
 6    it's been mismanaged.
 7         Q    So your testimony is, unless someone reaches
 8    out to you and tells you it's mismanaged, you're not
 9    going to be concerned about it?
10         A    That's not what I said.
11         Q    So please rephrase.
12         A    As -- again, it would have to come to my
13    attention that it's being mismanaged.
14         Q    And I'll move on soon.  I guess I'm just
15    struggling -- why isn't it an important enough issue
16    for you to proactively seek out advice to find out if
17    it's being mismanaged or not?
18                   MR. ROBERTS:  Object to form.
19         A    I think that's a personal decision.
20         Q    Let's look at one of your documents.  And
21    while I do that, I guess -- because it'll take a
22    minute -- what do you mean by "It's a personal
23    decision"?
24         A    It's -- it's my decision as to when, where,
25    and how I choose to look into it.
```

Page 69

1          Q    I'm going to introduce Exhibit 4, which is

2      another Form 5500.

3                     (Exhibit 4 was marked for

4                     identification.)

5               This is the 2022 one for Worley -- and,

6      again, take your time to look through it.  But I'm

7      just going to be interested in that page -- in this

8      case, it's in the back.  But it's not the exact same

9      spot as the other one.  I'll direct you because this

10     chart looks like -- okay.

11              So it's -- oh, there it is -- page 12, but

12     towards the back.  So if you go all the way to the

13     back and then you, like, go back a couple pages,

14     you'll see a page that looks something like this.

15     Okay.  First of all, I guess, do any of these

16     investments look familiar to you?

17         A    I mean, I'm familiar with some of the names.

18     But --

19         Q    Do you recall what you're currently invested

20     in?

21         A    Whichever plan was recommended to me.

22         Q    And I'm asking if you recall what that is.

23         A    No.

24         Q    Okay.  So in column B, there's a bunch of

25     investment manager names.  Do you see that?  There's

Page 70

1      Principal Life Company, Vanguard Group, PIMCO, Loomis

2      Sales.  Do you see those names?

3          A    Yes.

4          Q    Okay.  Sitting here today, do you have any

5      concerns about any of those investment managers?

6          A    I can't answer that because I'm not familiar

7      enough with them.

8          Q    So is that to say you have no concerns?

9          A    Well, I -- I don't -- several of these, I

10     don't even recognize the names.  So at this time, I

11     don't have any concerns.

12         Q    Which are the names that you recognize?  If

13     you could just list them off.

14         A    I mean, I recognize the name Principal.  I

15     recognize the name Vanguard.  But then when you look

16     in column C, I don't know what the Principal Lifetime

17     2010 fund is, 2015 fund.  I don't -- I don't know the

18     details of those individual investment descriptions.

19         Q    And I'm just asking in column B which names

20     you recognize.  And it sounds like your answer is

21     Principal and Vanguard.  Is there any other names?

22         A    Well, I only -- I recognize Principal

23     because that who -- that's who is is managing.  And

24     then I see Fidelity up there.  But that's really it.

25         Q    And as you pointed to the Principal Lifetime

1    2010, 2015 funds, et cetera, do you know whether those

2    are target date funds or not?

3         A    No.

4         Q    Do you know what a target date fund is?

5         A    No.

6         Q    Are you suing related to a target date fund?

7         A    I don't know.

8         Q    Okay.  In column B, one of the advisors is

9    Dimensional Fund Advisors.  They offer a fund called

10   DFA International Sustainability Corps in this plan.

11   Have you ever heard of Dimensional Fund Advisors

12   before?

13        A    Not that I recall.

14        Q    Are you suing related to any funds offered

15   by Dimensional Fund Advisors?

16        A    I can't answer that.

17        Q    Why can you not answer that?

18        A    Because I don't know the details off the top

19   of my head.

20        Q    Okay.  So you're not sure if you're you are

21   or are not suing related to a fund offered by

22   Dimensional Fund Advisors?

23        A    That's correct.

24        Q    All right.  Well, in your word then, what is

25   this lawsuit about?  This lawsuit we're sitting here

Page 72

1    today, just to be clear which one I'm talking about.

2        A    That -- that the investment accounts that I

3    participated in were not necessarily the -- the best

4    accounts for me.  There were other accounts that I

5    could have been invested in had the committee been

6    properly doing their job where I would have had a

7    better ROI.

8        Q    So there's a couple of pieces that I want to

9    follow up on.  What do you mean by "investment

10   account"?

11       A    The -- the different investment accounts

12   that you're part of.

13       Q    Is it fair to describe them as like funds,

14   investment funds?

15       A    Funds, sure.

16       Q    Okay.  Just want to make sure we're on the

17   same page for some basic terminology.  And then you

18   said at the end that you would have got a better ROI

19   if they had selected better funds.  Am I summarizing

20   what you said correctly?

21       A    Yes.

22       Q    All right.  So is that -- well, let me ask

23   it this way, I guess.  So what's your understanding of

24   how the plan or its participants, including you, were

25   harmed by this alleged mismanagement?

Page 73

1      A    Because there was an opportunity there that

2    we could have gotten a better return on our investment

3    than what we were given.

4      Q    So that relates to this next question:  What

5    remedies are you seeking in this lawsuit?

6      A    Ultimately, it's up to the court to decide.

7      Q    But what are you seeking?

8      A    I'm -- I'm asking the courts to -- to take a

9    look at this case and look at how things were handled

10    for everybody that was invested in it and ensure that

11    it was done correctly.

12      Q    Well, I'll try to help you out.  Right?  So

13    based on your last answer about you think the funds

14    should have had better ROI, so you're seeking money

15    damages; right?

16      A    Again, that's up to the courts to decide.

17      Q    All right.  But what are you seeking?  If

18    the court finds in your favor, what would you like the

19    court to award you for your loss?

20      A    I think the -- I think the -- the funds

21    would have to be -- you know, I think there is more

22    investigation required.  I -- I don't have a number.

23      Q    Oh, I'm not asking for a number.  I just

24    want to make sure what you're seeking is more money.

25    You're not seeking, I don't know, to terminate the

Page 74

1    plan or some, you know, to throw out an example,

2    right?  Like what you're seeking is --

3         A    Well, what I -- I would seek also is that

4    they put something into place to ensure that this

5    doesn't ever happen again.

6         Q    And how would that impact you as a former

7    participant?

8         A    It wouldn't, but it would protect those that

9    are -- that are still there.

10        Q    Okay.  Let's go back to the second -- I

11   think you've talked about this in different ways, but

12   we'll just run through it.  Okay.  Do you consider

13   yourself a knowledgeable investor?

14        A    No.

15        Q    Why not?

16        A    Because it's not my area of expertise.

17        Q    Okay.  During the time you participated in

18   the plan, what factors did you consider when making

19   decisions about a particular investment?

20        A    I -- I really just went with whatever was

21   recommended to me.

22        Q    All right.  So instead of going line by

23   line, I'll just list out a bunch of things and just

24   confirm these were not things you considered.  Or if

25   they were, let me know.

Page 75

1            So performance history, asset style, asset
2    class, cost, management style, fees, risk.  Do you
3    consider any of those things when selecting
4    investments?
5            A    Not really.
6            Q    So are any of those factors more important
7    to you than others?
8            A    Well, obviously at my age, I wouldn't want
9    to be in one that's, you know, at a very high risk.
10           Q    All right.  So can you repeat that?  I want
11   to make sure I heard that right.  You said you would
12   want to be in a fund that is high risk or not high
13   risk?
14           A    Not high risk.
15           Q    Okay.  Yeah, so that answers one of my
16   questions.  So the importance of risk may have changed
17   for you over time as you get older.  It's more
18   important to you to be in something that's less risky;
19   is that correct?
20           A    That's correct.  Well, it's really -- it's
21   a -- it's a good mix, right?  You know, you -- you
22   want to have -- you -- you just want to get the most,
23   you know -- you know, the most out of it that you can
24   without, you know, I don't know, stock markets
25   crashing tomorrow and you losing it all.

Page 76

1          Q    So I think that also, actually, you're

2     anticipating some of these questions.  So do you

3     understand that, when investing, there's a trade-off

4     between risk and return?

5          A    Yes.

6          Q    And that not all investors have the same --

7          A    But that's in life too, though.  It's not

8     just --

9          Q    Sure.  I agree.  I agree with that.  Do you

10    understand that not all investors have the same

11    investment philosophy?  Some want more risks, some

12    want less risks, some might value active management,

13    some might value passive management, so on and so

14    forth?

15         A    I'm not really aware of that.

16         Q    Do you think all investors have the same

17    investment philosophy?

18         A    I don't really give it -- I -- I mean, I'm

19    inclined to say no, they don't, because you look at

20    people like -- what was that -- Bernie Madoff and, you

21    know, all those scams all the time.  So I'm sure

22    everybody's, you know, philosophy is -- is different.

23         Q    Sure.  And putting aside, I guess,

24    fraudulent scammers, I guess I'm just simply asking,

25    right, a younger investor might be willing to take on

Page 77

1    more risks than an older investor, for example.

2        A    I think that would depend on who his client

3    is.

4        Q    So within -- let's just use the Quanta

5    401(k) plan as an example.  Do you have any idea of,

6    roughly, how many participants are in the 401(k) plan?

7        A    I do not.

8        Q    Do you have any idea, roughly, how many

9    people are in the class you're seeking to represent?

10        A    I do not.

11        Q    Well, within a plan as large as Quanta -- we

12    don't know, I guess, how many people it is -- but

13    would you agree that different participants have

14    different investment philosophies and value

15    different -- let's stop there and make a simple

16    question.

17            Would you agree, in a plan as large as

18    Quanta, that different investors have different

19    investment philosophies?

20        A    Potentially.  I guess they could.

21        Q    I mentioned before active and passive

22    management.  Do you know what those terms mean?

23        A    In general, yes.

24        Q    Okay.  Tell me what your general

25    understanding is.

Page 78

1          A     Ask the question again.  What's the

2     difference between active and passive management?

3          Q     Yes.

4          A     In -- as related to managing these funds?

5          Q     Try answering it that way, and I'll ask

6     another question if that's not what I was going for.

7          A     Well, what -- what were you going for?

8          Q     Well, yeah, I think we're on the same page,

9     but I'm not sure until you answer.  So just try it.

10    Give it a go and if --

11         A     I'm really confused.

12         Q     Okay.  Sure.  So a given fund could be

13    actively managed or passively managed, and I'm asking

14    if you know what that means.  What would be the

15    difference between that actively managed fund and that

16    passively managed fund?

17         A     An actively managed fund would be, I guess,

18    where somebody's more involved and, you know, looking

19    at it and staying on top, and passive would be just

20    the opposite.

21         Q     Do you have an understanding of if one of

22    those styles tends to be more expensive than the

23    other?  Is active or passive more expensive than the

24    other?

25         A     I have no idea.

Page 79

1      Q    What publications and materials did you rely
2    on or do you rely on when making investment decisions,
3    if any?
4      A    I don't.  I just go with what's recommended.
5      Q    So no newspapers, TV, magazine, internet
6    sources, blogs, books, family members, friends?
7      A    No.
8      Q    Have you ever done any financial or
9    retirement planning?
10     A    No.  Other than my 401(k)s, no.
11     Q    Well, have you ever worked with an
12   investment advisor?
13     A    No.
14     Q    Okay.  And I know we have some documents you
15   produced related to this.  So do you have an
16   understanding today where your investments are, not
17   what funds they're in, just like where they sit?  So
18   in the Worley plan would be one place; right?
19     A    Right.
20     Q    Are they anywhere else?
21     A    I still have some in Vanguard.  And I still
22   have -- think I still have the rollover at Fidelity.
23     Q    And with Vanguard, is that money in a 401(k)
24   plan, or is that like a IRA?  Or do you know?
25     A    It's in a 401(k) plan.  It's just not

Page 80

1      active.  I need to move it to Worley.

2          Q    And what employer is it from?  Or what

3      employer's 401(k) plan is it in?

4          A    For which one?

5          Q    You said your Vanguard money --

6          A    Oh, that's KBR.

7          Q    Okay.  Do you know if you're invested in any

8      individual stocks?

9          A    I -- I don't think so.

10         Q    I won't go too much in this.  But is your

11     spouse, was he formerly employed at Quanta?

12         A    No.  My spouse was almost 20 years ago,

13     so --

14         Q    I could be mixing up named plaintiffs too,

15     it's possible.  I think it's funny; right?  Marie and

16     Mary?

17         A    Yeah.

18         Q    Okay.  Have you ever talked to her about

19     that?

20         A    I've never spoken to her.

21         Q    Well, I guess that could be a good lens to

22     get at my previous question.  Do you know if you and

23     her have the same investment philosophy or not?

24         A    I do not.

25         Q    Possible that it differs?

Page 81

1          A      It could; we're two different people.

2          Q      And because people have different investment

3     philosophies, you think it's a good idea to offer a

4     range of investments that may cater to people's

5     different, you know, interests?

6          A      I would agree with that.

7          Q      This is the big document.

8                 (Exhibit 5 was marked for

9                 identification.)

10                We're not going to go over anything close to

11    all of it.  But take a peek at it just enough to be

12    able to answer the question:  What is this document?

13         A      So it's just a statement.

14         Q      Yeah.  Whose statement is it?

15         A      From Quanta, for retirement and savings.

16         Q      And whose retirement savings?  If you look

17    on the first page, for instance, in the upper left,

18    that'll tip you off.

19         A      You mean, myself?

20         Q      Yeah.

21         A      Oh.

22         Q      Yeah.  That's all I was going for.  We just

23    have to lay the foundation about what the document is.

24    So I'm asking you sometimes some questions I

25    definitely know the answer to.  Okay.  Do you know, of

1    the funds challenged in the complaint, which ones you

2    are invested in?

3         A    No.

4         Q    Okay.  Let's then introduce one more

5    exhibit.  So we'll keep this one -- we're not done

6    with it.  But I'm also going to introduce Exhibit 6,

7    which is the class action complaint that you filed on

8    September 22, 2022.

9                   (Exhibit 6 was marked for

10                   identification.)

11                   MR. BLOCK:  I know you have it

12   memorized, John, but just in case, there you go.

13   BY MR. BLOCK:

14        Q    Do you recognize this document?

15        A    I do.

16        Q    Have you ever seen it before?

17        A    I have.

18        Q    The first time you saw it, was it before or

19   after it was filed?

20        A    That, I don't recall.

21        Q    Okay.  So I just wanted to use this to help

22   point you to the funds that are being challenged in

23   your complaint so you don't have to take my word for

24   it.

25                   So -- the cleanest way to do this is.  Okay.

Page 83

1    So you see maybe on page 8, it says -- there's a

2    heading that says "The Plan's Investment in the

3    Fidelity Freedom Funds."

4         A    Mm-hmm.

5         Q    And then if you look on page 11, it says

6    "The Active Suite is High-Risk and Unsuitable for Plan

7    Participants."  Do you see that heading?

8         A    Mm-hmm.

9         Q    Okay.  So does that help refresh your

10   recollection about what was one of the investments

11   that you're challenging in your lawsuit?

12        A    Not really -- I mean, it's part of the

13   Fidelity Freedom Funds, right?

14        Q    Right.  Yeah, I could have just done this

15   and said, "Here's what you're challenging" and

16   stipulate to it or whatever.  But I thought this would

17   be better.  But maybe that was wrong.

18             But, right, yeah, one of the funds is the

19   Fidelity Freedom Funds, or the active suite, which you

20   can see on page 9 is defined as "Fidelity offers

21   riskier and more costly Freedom funds and the less

22   risky and less costly Freedom Index funds, the index

23   suite."

24             So that's where those terms come from.

25   Okay.  And then if you look on page 25, it says the

Page 84

1    American Beacon Small Cap Value Fund.  You see that?

2         A    Mm-hmm.

3         Q    Okay.  That's one of the funds your

4    complaint is challenging.  And DFA International Small

5    Cap Value Fund on page 29, that's the third fund that

6    you're challenging.  Do you see that?

7         A    Yes.

8         Q    Okay.  Having looked at those three funds,

9    does that help you recall which, if any of these funds

10   you were invested in?

11        A    No.

12        Q    Do you think it's important as the named

13   plaintiff to understand what are the funds you're

14   challenging in the lawsuit and which ones you're

15   invested in?

16             MR. ROBERTS:  Object to form.

17        A    I think, I mean, I guess it -- it is

18   important, but that's what I have an attorney for.

19        Q    Let's go back to your account statements,

20   and I'll just try to make this less like a root canal

21   or something like that.

22        A    Thank you.

23        Q    Okay.  We can go to, at the bottom right,

24   you see there's these things called Bates labels.

25   They're Quanta, and then they have an underscore and

Page 85

1    some numbers?

2         A    Yes.

3         Q    Okay.  So let's flip to Quanta underscore

4    002090.  Okay.  You see it says "Stock investments,"

5    and it has lists of different investments that you're

6    invested in?

7         A    Yes.

8         Q    Okay.  And the first one listed is ABF Small

9    Cap Value R5.  Do you see that?

10        A    Mm-hmm.

11        Q    Okay.  So I'll --

12        A    Yes.  Sorry.

13        Q    -- tell you that's the -- no problem.  I'll

14   tell you that's the American Beacon Small Cap Value

15   Fund.

16        A    Okay.

17        Q    So that's one of the ones you're invested in

18   that you're challenging.  Does that make sense?

19        A    Yes.

20        Q    Okay.  And if you look at the market value

21   as of 9/30/2017, you have $108.47 in it.  Do you see

22   that?

23        A    Yes.

24        Q    And then as of 12/31/2017, you have $0 in

25   it.

Page 86

1          A    Yes.

2          Q    Well, let me ask the first question.  Do you

3     know if, at any point after 12/31/2017, you had any

4     money invested in the American Beacon Small Cap Value

5     Fund?

6          A    I don't know.

7          Q    If I tell you that you didn't, would you

8     believe that?  We could also go through this, but --

9          A    Sure.  I believe you.

10          Q    Yeah.  Okay.  Okay.  Now let's flip to

11     underscore 002145.  All right.  So now we see the same

12     list of funds before.  Do you see in that list the

13     ABF -- the American Beacon Fund -- is not there?  Do

14     you see that and agree?

15          A    I agree.

16          Q    Okay.  But on that list is DFA Intl

17     International Small Cap Value.  Do you see that?

18          A    Yes.

19          Q    Okay.  So that's one of the other funds that

20     the complaint -- that you're invested in.

21          A    Okay.

22          Q    Okay.  And it says, as of 12/31/2018, you

23     had $79.78 in it.  Do you see that?

24          A    12/31?

25          Q    Yeah.  As of 12/31/2018, it says you have

Page 87

1    $79.78.

2         A    Where are you seeing the 12/31 at?

3         Q    I'm still on 002145.  Looks like maybe on a

4    different page.  What's the Bates number at the

5    bottom?

6         A    2115.

7         Q    So you're looking for 02145.

8         A    Oh, 4-5.  No wonder I couldn't find it.

9    There we go.

10        Q    Okay.  So if you look at DFA Intl Small Cap

11   Value, and you keep going to the right, you'll see

12   $79.78 as of 12/31/2018.  Let me know if you see that.

13        A    What was the amount again?

14        Q    $79.78.

15        A    Oh, I see it.

16        Q    Okay.  And then as of 03/31/2019 or March

17   31, 2019, you had $0 in it.  Do you see that?

18        A    I do.

19        Q    Do you remember if you had any money

20   invested in the DFA International Small Cap Value Fund

21   at any point after this?

22        A    I don't recall.

23        Q    And we can go through your top statements.

24   But do you believe me if I tell you after this point

25   you didn't have any money invested in this fund?

Page 88

1       A    If -- if you say so.

2       Q    Okay.  If your lawsuit alleges that these

3    two funds that we talked about -- the American Beacon

4    Fund and the DFA International Fund -- should have

5    been removed in the first quarter of 2020, how would

6    you have been harmed by that if you were in neither of

7    those funds at that point?

8       A    I would have to go back and do some research

9    on this before I could answer that.

10      Q    What would you need to look into?

11      A    Into all the documents and really do some

12   research.

13      Q    What would you be looking for?

14      A    To see if I was ever invested in that fund

15   again.

16      Q    Okay.  And I'm happy to go through that now,

17   but like we just said before, assume with me that you

18   were not invested in those funds at any point.  So

19   let's take that as a given.  And we can go through and

20   also prove it out.

21           My same question from before:  How would you

22   be harmed if you were not invested in these funds

23   prior to 2020?  Sorry, let me say that again.  I

24   butchered the question.

25           So we're going to take it as a given that

Page 89

1    what we've just said is true, that as of March 31,

2    2019, you were not invested in either the DFA

3    International Small Cap Value Fund or the American

4    Beacon Fund.

5              So my question is:  If the allegation is

6    those funds should have been removed in the first

7    quarter of 2020, how would you have been harmed by

8    that if you had no money in either of those funds?

9    A    You said March 31, 2019, but I did have

10   money in there.  I'm confused with your dates you're

11   throwing out.

12   Q    So in March 31, 2019, you see you had $0 in

13   the DFA International Small Cap Value Fund?

14   A    Oh, that's the price.  Yes.

15   Q    All right.  So that's my question.  So if

16   you had zero dollars in that fund, the DFA

17   International Small Cap Value Fund, and $0 in the

18   American Beacon Fund as of 2019, and your complaint

19   alleges that those funds should have been removed in

20   the first quarter of 2020, my question is:  How could

21   you have been harmed by that if you had no money in

22   either of those funds at the time that Plaintiffs said

23   they should have been removed?

24   A    I would have to go back and look through

25   everything.

Page 90

1        Q    I'm not trying to be difficult.  Like, we're

2    taking it as a given you have no money in it, so I

3    don't understand what it would be that you need to

4    look, through.  It sounds like you're saying "I need

5    to look through to see if I have money in it"; is that

6    right?

7        A    Well, it's -- yeah.  I mean, at some point,

8    I would -- I would just have to go back and -- and

9    look through it all and determine, you know, whether

10   or not I had funds in there in 2020.

11       Q    All right.  So let me ask a different way.

12   I think we've gone through this.  You would agree with

13   me that, if you had no money in those funds as of

14   2020, you wouldn't have been harmed by the allegation

15   that those funds should have been removed in 2020?

16       A    No, I wouldn't agree because I would have to

17   understand why I was no longer investing in those

18   funds.

19       Q    We can try this a different way.  Okay?  So

20   if you had $0 in both of those funds in 2020, and

21   those funds were removed in 2020 and put in a better

22   performing fund, would you have made any more money?

23       A    It depends on -- you would have to compare

24   the two different -- both funds at the same time.

25       Q    Right.  But if you had no money in them, you

Page 91

1    wouldn't have made more or less money because you have

2    no money in them; right?

3         A    I don't believe that to be correct.

4         Q    Tell me, in what way is it incorrect?

5         A    Well, again, if -- if, you know, when was --

6    when was the decision made to move the money out of

7    there, and what fund did they move it to?

8         Q    All right.  Let me try this one more way.

9    And I'm going to try this a bunch of different ways

10   until we get there.  Okay?  Have you heard of the

11   stock NVIDIA?

12        A    No.

13        Q    Okay.  Have you heard of the stock Apple?

14        A    Oh, the stock.

15        Q    Yeah.

16        A    Apple stock.

17        Q    Yeah.

18        A    Yes.

19        Q    Okay.  Do you know if you have any money in

20   Apple stock?

21        A    I do not.

22        Q    You have no money in it; right?

23        A    No.

24        Q    Okay.  So if Apple stock does really well,

25   does it make a difference to you as far as how much

Page 92

1    money you have?

2          A    No.

3          Q    Right.

4          A    Because I don't have any money in it.

5          Q    Right.  So that's exactly my question here.

6    If you have no money in the DFA International Small

7    Cap Fund and the American Beacon Small Cap Fund, then

8    it doesn't make a difference to you how those funds

9    do; right --

10         A    Well, it -- it does make a difference to me

11   because I would need to understand why I was no longer

12   participating in this fund and why it was moved and

13   where -- where it was moved to.

14         Q    Help me understand.  So why does it matter

15   how many dollars you have based on where it was moved

16   to?

17         A    Because I wasn't the one making the decision

18   on where to move money from one fund to another.

19         Q    All right.  We're going to try this a couple

20   different ways.  Are you aware that, in this lawsuit

21   that you're a named plaintiff of, you've issued expert

22   reports?

23         A    That -- issued expert reports?

24         Q    Yeah.  Are you aware that the named

25   plaintiffs, you and Ms. Laliberte, you have issued

Page 93

1    expert reports in this case?

2          A     My attorneys are aware of it.

3          Q     So are you aware of it?

4          A     Not particularly.

5          Q     Have you ever seen any expert reports in

6    this case?

7          A     No, not that I recall.

8          Q     So I'm going to introduce to you one of the

9    expert reports in this case if I can figure out how to

10   use this stapler.  And I'll mark it as Exhibit 7.

11                    (Exhibit 7 was marked for

12                    identification.)

13                This is the expert report of Richard A.

14   Marin dated August 1, 2024.  And I didn't include some

15   of the stuff in the back because I'm not going to ask

16   about it.  But I can give it to you if you want.

17                    MR. BLOCK:  John, do you have your

18   laptop with you --

19                    MR. ROBERTS:  We'll get it.  That's

20   fine.

21                    MR. BLOCK:  -- the exhibit?

22                    MR. ROBERTS:  Yeah.

23                    MR. BLOCK:  Okay.  Yeah.  I appreciate

24   it.  Thanks, John.  I appreciate it --

25   BY MR. BLOCK:

Page 94

1          Q     Okay.  And I want to turn your attention to

2     paragraph 69 of this.  Let me know when you're there.

3     It's on page 37.

4          A     Okay.

5          Q     Okay.  Do you understand that this is a

6     report issued by one of your experts?

7          A     I do.

8          Q     Okay.  And it says, "An application of an

9     objective investment monitoring and removal framework

10    consistent with the plan's IPS would have resulted in

11    the removal and replacement of both the American

12    Beacon Fund and DFA Fund in a plan no later than the

13    first quarter of 2020."  Do you see that?

14         A     Yes.

15         Q     Okay.  So that's saying, according to your

16    expert, these two funds should have been removed in

17    the first quarter of 2020.

18         A     But it says first quarter of 2017.

19         Q     Where do you see that?  Are you looking at

20    paragraph 69?

21         A     Oh.  No, I was looking at 66.

22         Q     Yeah, that's about the Freedom Funds.  We're

23    on paragraph 69.  You weren't investing in the Freedom

24    Funds; do you agree with that?  We didn't see that on

25    any of your --

Page 95

1          A    Right.

2          Q    -- statements?  It's just the first sentence

3    on paragraph 20 -- sorry -- paragraph 69.

4          A    Okay.

5          Q    All right.  So do you understand that your

6    expert is saying the American Beacon Fund and DFA Fund

7    should have been removed from Quanta's 401(k) plan in

8    the first quarter of 2020?

9          A    That's what it says, yes.

10         Q    Okay.  So can you articulate to me how, if

11   that was done, as Plaintiff's expert said it should be

12   done, you would have made any more money?

13         A    Well, it says no later than the first

14   quarter of 2020.  And I thought the documents we

15   looked at before said as of, what was it, 2019?

16         Q    Right.  So if they're saying it should have

17   been removed in the first quarter of 2020 --

18         A    They're saying no later than the first

19   quarter of 2020.

20         Q    And we can go through this.  I'm trying to

21   cut through it; right?  Like, if they wanted to say

22   the first quarter of 2019, they could have said that;

23   right?

24              So just assume with me -- you can disagree

25   with it -- that this means they should have been

Page 96

1    removed in the first quarter of 2020.  My question is:

2    How would you have made a penny more if that happened

3    in the first quarter of 2020?

4         A    But it says no later than the first quarter

5    of 2020, which means, you know, even though I -- based

6    on what you've shown me so far, I wasn't a participant

7    in the first quarter of 2020.  You know, leading up to

8    that, I was a participant --

9              MR. ROBERTS:  Yeah, and I'm going to

10   help, because I see where you're going.  And I think

11   I'm just trying to bridge the gap here.

12             He's saying, setting aside the language

13   that, you know, says "no later," and setting aside

14   that maybe in your view it could have been a separate

15   date, if the replacement was made on 2020, and you

16   weren't invested as of 2020, what additional money

17   would you have gotten if you weren't actually invested

18   as of 2020, if they changed funds?

19             THE WITNESS:  Yeah.  I -- I probably

20   wouldn't -- I wouldn't have gotten anything.  But this

21   suit isn't about just me.

22   BY MR. BLOCK:

23        Q    No.  Yeah, and I understand that.  That's

24   all I was looking for, is that saying you would not

25   have got anything more.  Other people might have, but

Page 97

1    you would not have gotten any more.

2         A    Right.  Right.

3         Q    So we agree about that?

4         A    Yes.

5         Q    Okay.  So for other people -- actually, no,

6    let's leave it there for now.  Okay.  Okay.  Let's

7    look at one more expert report.  You can put that one

8    aside.  Oh, there we go.  Okay.  So I'm introducing

9    Exhibit 8, the expert report of Adam Werner.

10                  (Exhibit 8 was marked for

11                  identification.)

12                  MR. ROBERTS:  Thanks.

13   BY MR. BLOCK:

14        Q    And actually, we can look more at it in a

15   second.  I have a few questions, I guess, before.  So

16   this -- well, did you know that you had an expert who

17   calculates damages in this case?

18        A    Not in particular.  But, you know, I don't

19   really expect to know all the details.

20        Q    Would it surprise --

21        A    It makes sense.

22        Q    Yeah.  Would it be surprising to you if, for

23   the two funds you invested in -- the DFA International

24   and the American Beacon Fund -- that your expert

25   calculated there were $0 in damages for those two

Page 98

1      funds?

2          A     Where's he saying that at?

3          Q     Yeah.  You don't have to look at it yet.

4      I'm just asking if that would surprise you.

5          A     Yes.

6          Q     And why would it surprise you?

7          A     Because if he was saying that there's no

8      damages from it, why are we at this point now?

9          Q     So said differently, too, if there were $0

10     in damages for it, even if you were in the funds when

11     they're being challenged, you wouldn't be making a

12     penny more if there were $0 in damages?

13         A     Didn't we just go through that?

14         Q     Yeah, but I'm putting aside the timing

15     issue.  Now, I'm asking a separate issue.  If your

16     expert calculates there's $0 in damages, then isn't

17     that another way in which you wouldn't have any

18     financial stake in the outcome?

19                 MR. ROBERTS:  Object to form.

20         A     Yeah, I think that -- I mean, just because

21     you go with expert witnesses -- and then I can't say

22     that that's what he said in here because I haven't

23     read it.

24                 But just because, you know, each side

25     provides expert witnesses, it doesn't mean that, you

Page 99

1    know, the jury or the judge or whoever is, you know --

2    one's going to outweigh the other one in what they

3    say.

4        Q    So let's go to paragraph 16, which is on

5    page 6.  He says, "As of June 30, 2024, there was no

6    losses attributable to the plan participants as a

7    result of Quanta's failures to replace the American

8    Beacon Fund and the DFA Fund with the Janus Henderson

9    Small Cap Value N and Schwab Fundamental International

10   Small Cap Equity, respectively, by Q1 2020."  Do you

11   see that?

12       A    I'm reading it.  I see that.

13       Q    All right.  What does that mean to you?

14   Specifically that there were no losses attributable to

15   plan participants?

16       A    Where do you see it saying "no losses"?  Are

17   you on section 14?

18       Q    No, I'm in paragraph 16, that second

19   sentence.  It says "there were no losses attributable

20   to plan participants as a result of Quanta's failures

21   to replace the American Beacon Fund and DFA Fund."

22       A    And what's the question?

23       Q    What does that mean to you?

24       A    What he's saying is there were no -- no

25   losses in -- in those two funds, right?

Page 100

1          Q    So based on our conversation today,

2     including looking at your experts' reports, do you

3     believe that you suffered any financial injury as a

4     result of something Quanta did or didn't do?

5          A    I think there was potential that I did and

6     many others as well.

7          Q    Do you think that in actuality there was?

8          A    Again, that -- that would be up to the court

9     to decide.  That's why we each have legal sides and

10    they go argue the case in front of the court.  That's

11    not for me to decide.

12         Q    All right.  So sitting here right now, can

13    you identify any damages that you suffered based on

14    your investment in the American Beacon and DFA Fund?

15         A    I can't identify anything at this point in

16    time, but I can't say that there -- there wasn't

17    potential to be.

18         Q    And did your expert identify any damages?

19         A    Well, you're saying he says, you know, he

20    didn't.  But I haven't read the whole document.  So

21    it's kind of hard to take one little paragraph or a

22    couple of sentences and -- if you don't understand the

23    entire context of what you're reading.

24         Q    Okay.  Well, feel free to read the whole

25    thing.  That's the only paragraph related to the

Page 101

1    American Beacon and DFA Fund.  You can see the heading

2    right above it.  It's just one paragraph.

3        A    Mm-hmm.

4        Q    All right.  So maybe there's something --

5        A    Yes.

6        Q    -- else out there.  But let's just say it's

7    true that your expert has calculated no damages for

8    those two funds --

9        A    Based on the document he provided, that's

10   what he is saying, yes.

11       Q    Okay.  And I think you earlier used the

12   expression, "Well, what would we be doing here if

13   there were no damages?"  So I guess my question is:

14   What do you think Quanta did wrong?

15       A    I don't think that they managed the funds as

16   best that -- that they could have.

17       Q    And you think that even though your own

18   expert calculates no damages?

19       A    Yes.

20       Q    And why is that?

21       A    Because it's been proven.

22       Q    How has it been proven?

23       A    They could have managed the funds

24   differently.

25       Q    And how has that been proven?

Page 102

1      A    Well, it's stated in this suit.

2      Q    Okay.  Aside from this lawsuit, did you ever

3  complain about any of the investments in Quanta's

4  401(k) plan?

5      A    No, I never complained about it.

6      Q    Did you ever lodge any formal complaints at

7  Quanta about anything at all?  And that doesn't have

8  to be related to the 401(k) plan.

9      A    Only, you know, in relation to my

10 termination.  I don't know that it was a formal

11 complaint, but I discussed it with HR.

12     Q    Have you ever heard of a legal concept

13 called "standing"?

14     A    No.

15     Q    So there's a concept in the law called

16 "standing" that says, to be able to bring a lawsuit,

17 you have to have been harmed in some way.  Does that

18 sort of make sense as a general --

19     A    Sure.

20     Q    -- proposition?  Okay.  So based on that

21 general proposition, can you articulate to me how you

22 have standing to bring this lawsuit?

23     A    Because there's potential that we were

24 harmed.

25     Q    So would you agree with me that, if that

Page 103

1    potential was never realized, and you were not harmed

2    and there were $0 in damages for two funds that you

3    would never invested in in the period of time that

4    Plaintiffs said they should have been removed, that

5    you would not have standing?

6        A    If the potential wasn't realized, we

7    wouldn't be here because I wouldn't be aware.

8        Q    So I think you were agreeing with me; right?

9    You're saying you wouldn't have standing if the

10   funds --

11       A    I didn't say I wouldn't have standing; I

12   said I wouldn't be aware.  It doesn't mean that I do

13   or I don't have standing.  But if it was never brought

14   to my attention, then I'm not aware of it.

15       Q    All right.  Well, I will try this one other

16   way too; right?  We talked about before Apple stock;

17   right?

18       A    Sure.

19       Q    And you wouldn't have standing when you

20   agreed to sue Apple for the stock underperforming

21   because you weren't invested in Apple; would you agree

22   with that?

23       A    I wouldn't have standing because I've never

24   been invested in Apple.

25       Q    Okay.  But if the allegation was Apple stock

Page 104

1    underperformed from 2020 to 2024, and you were

2    invested in Apple stock in 2019, and you were not

3    invested in it in 2020 through 2024, would you agree

4    with me you wouldn't have standing to sue Apple about

5    the performance of that stock?

6                    MR. ROBERTS:  Object to form.

7         A    I wouldn't -- you know, if -- if I was -- if

8    Apple stock was part of a plan, whether or not, you

9    know, I was participating at that particular point in

10   time, it's -- and then it was brought to my attention

11   that the funds weren't managed correctly, then yes, I

12   would have standing.

13        Q    Let me ask this another way too.

14        A    Because I'm not just suing for myself.  It's

15   for -- for all of the plan participants that were

16   potentially harmed.

17                    MR. ROBERTS:  Sam, we've been going a

18   bit over an hour --

19                    MR. BLOCK:  Yeah.  I think I'm about to

20   say I have no questions.  But I'll --

21                    MR. ROBERTS:  Yeah, sure.  Yeah.

22                    MR. BLOCK:  Okay.  Yeah, we can take a

23   break.

24                    THE VIDEOGRAPHER:  Off the record,

25   12:01.

Page 105

1           (Off the record.)

2           THE VIDEOGRAPHER:  Back on the record,

3    12:43.  Please proceed.

4    BY MR. BLOCK:

5      Q    Okay.  We'll hope you had a nice lunch

6    break.  We'll try to move diligently through the rest

7    of this.  Okay.  Do you think that the plan offered

8    expensive investment options?

9      A    Expensive?

10     Q    Correct.

11     A    I -- I really can't answer that question

12   because I never looked into it at that level.  You

13   know, I went with what was recommended, so I don't

14   know what was expensive.

15     Q    Do you know whether your lawsuit says

16   anything about whether any of the investments in the

17   plans are unduly expensive?

18     A    Not particularly, no.

19     Q    Do you know whether your lawsuit says any of

20   the investments in the plan were poor performers?

21     A    Nothing stands out to me.

22     Q    How often, you know, if at all, did you

23   review investments in the plan?  And I should say, I

24   think we've been talking today about "the plan" and

25   have had an understanding, but the plan means the

Page 106

1    Quanta 401(k) plan.  Does that make sense?

2         A    Is it applied to me?  To -- to my plan?

3         Q    So I say "the plan" as a whole.  But this

4    question was:  How often did you review your

5    investments in the Quanta 401(k) plan?

6         A    Probably every couple of months or something

7    like that.

8         Q    And what information did you review?

9         A    I just looked at what my balance was.

10         Q    Was it, like, the account statements mailed

11    to your house, or did you go on a website or something

12    else?

13         A    It was probably a combination of both.

14         Q    Do you recall ever changing your investments

15    in the plan?

16         A    No.

17         Q    Well, did you ever visit the plan's website?

18         A    Yes.

19         Q    And maybe similar to what we talked about

20    before, but how often?

21         A    Once every couple of months or so.

22         Q    And what were you looking for when you went

23    on the website?

24         A    My balance.

25         Q    Did the website have other information

Page 107

1    beyond your account balance?

2         A    I'm sure it did.

3         Q    But you didn't seek that out?

4         A    No.

5         Q    Have you ever heard of a document called a

6    Summary Plan Description?

7         A    Sounds familiar.

8         Q    Do you know if there were any fee

9    disclosures available to you, either through the

10   website or mailed to you or through some other means?

11        A    I'm sure there were on the website, but I --

12   I don't recall looking at it.

13        Q    And the website also provided access to

14   articles and videos that provided financial planning

15   information.  Did you ever access any of that

16   information?

17        A    No.

18              MR. BLOCK:  Pardon me -- I should have

19   said this before -- can I have more stickers?

20              THE OFFICER:  Yes.  What exhibit did we

21   stop on?

22              MR. BLOCK:  8.  Yeah.

23              THE OFFICER:  Sorry.

24              MR. BLOCK:  -- give this to you first.

25   BY MR. BLOCK:

Page 108

1      Q    And now introducing what is Exhibit Number

2   9, this is the Summary Plan Description you were just

3   talking about.

4                    (Exhibit 9 was marked for

5                    identification.)

6            So take a look at it and let me know if it

7   looks familiar to you.

8      A    It looks somewhat familiar.

9      Q    Do you recall if you've ever received this

10  before?

11     A    No, I don't recall.

12     Q    I'm guessing if you didn't recall receiving

13  it, you're not sure if you read it.  But do you recall

14  reading parts of this?

15     A    I don't recall.

16     Q    So let's look at the Bates numbers again,

17  and let's go to 68.  So at the bottom of it, it says

18  "Safe harbor matching contributions"?

19     A    Yes.

20     Q    It says "Your employer elected to make

21  matching contributions to all eligible participants in

22  the amount equal to 100 percent of the first 3 percent

23  of your eligible compensation, 50 percent of the next

24  3 percent of your eligible compensation."  Can you

25  explain to me just at a high, basic level what that's

Page 109

1    saying?

2         A    That the company was going to match whatever

3    you put in.

4         Q    And did you consider this to be a generous

5    match?

6         A    It seems to be.

7         Q    So you were happy with it?

8         A    Yeah.

9         Q    Do you know how it compares to any of your

10   other employers?

11        A    No.

12        Q    Okay.  On the next page, page 7 or Quanta

13   70, there's a section called Investments, and under A,

14   there's a lengthy paragraph that starts with "The

15   Employee Retirement Income Security Act of 1974,

16   ERISA, imposes certain duties," and it goes on for a

17   little bit.  Do you see that?

18        A    Mm-hmm.

19        Q    Can you read that first couple of sentences

20   until you get to the point that says "Resulting from

21   your investment instructions"?

22        A    Where did you want me to read to?  Where it

23   said "responsible"?

24        Q    Until it says "your investment

25   instructions."  There's sort of a little gap there,

Page 110

1     and then it says, "To assist you in making informed,"

2     but you don't need to read that part.

3          A     Right.

4          Q     Okay.  Could you, to the best of your

5     ability, summarize what you just read?  What do you

6     think it means?

7          A     So it's basically that there's, you know,

8     there was a -- a group there to manage the plan to

9     recommend things to you or that you can make your own

10    choices.  But, you know, you're -- you're responsible

11    for those own choices.

12         Q     I'm now going to introduce Exhibit 10.

13                    (Exhibit 10 was marked for

14                    identification.)

15               Take a peek at it and let me know if you

16    recognize the documents.

17         A     I don't recognize these particular

18    documents, but it's everything we've been discussing

19    today.

20         Q     So this is a Participant Fee Disclosure.  Do

21    you recall ever receiving a document, either this

22    document or a document like this?

23         A     No.

24         Q     If you did receive a document like this,

25    would you have looked at it?

Page 111

1        A    I probably would have glanced at it.

2        Q    Let's glance at page 10.  Well, that's the

3    PDF number.  It says B7 and B8.  I think it's Quanta

4    0565, but my three-hole puncher is right through the

5    page number.  Yeah, 565.  You see a chart?  And at the

6    top of the chart is American Beacon Small Cap Fund

7    Class Institutional?  Let me know if you see that.

8        A    On this one?

9        Q    Yeah, on the left-hand side.

10       A    Oh, got you.

11       Q    So do you see where it says American Beacon

12   Small Cap --

13       A    Mm-hmm.

14       Q    And we've talked today, right, that's one of

15   the funds you're invested in?

16       A    Right.

17       Q    Or at least at some point in time.  And this

18   shows the one-year performance, five-year performance,

19   and ten-year performance.  First, the benchmark.  Do

20   you see that information?

21       A    Mm-hmm.

22       Q    Sorry.  Could you give a verbal yes?

23            THE OFFICER:  -- thank you.

24            THE WITNESS:  Oh, yes.  I'm sorry.

25   BY MR. BLOCK:

Page 112

1          Q    How did the fund do compared to the

2     benchmark?

3          A    Where's the benchmark?

4          Q    Good question.  So below --

5          A    Oh.

6          Q    -- it says "Russell 2000 Value" in italics.

7          A    Mm-hmm.

8          Q    That would be the benchmark.  And the

9     numbers aligning with that are the benchmark

10     performance numbers.

11          A    It looks like it performed a little better

12     than expected.

13          Q    And does that surprise you based on what

14     we've talked about today?

15          A    It -- it's not something I've really thought

16     about.

17          Q    You said it performed a little better.  What

18     would it take for you to say it performed a lot

19     better?

20          A    I don't know.  I'm not -- I'm not familiar

21     with -- with things like this.  So I don't know what

22     makes it a little better and a lot better.  You know,

23     is it more than 1 percent?  Is it more than 5 percent?

24     I -- I don't know.

25          Q    And then the column sort of breaks and

Page 113

1     there's another chart.

2          A    Mm-hmm.

3          Q    And it says "Annual gross expense ratio."

4     So information on the plan investments' fees was

5     available to you; correct?

6          A    I'm sure it was.

7          Q    And then if you skip down a little bit,

8     there's the DFA International Small Cap Portfolio

9     Institutional Class Fund.  Do you see that?

10         A    Yes.

11         Q    So similar to the American Beacon Fund,

12    information about the performance of the DFA fund over

13    a variety of reporting periods as compared to the

14    benchmark was available to you; right?

15         A    I'm sure it was.

16         Q    Do you still have in that pile of your

17    account statement?  It's the biggest one with the big

18    paper clip.  It was previously marked as Exhibit

19    Number 5.

20         A    Yes.

21         Q    Okay.  Do you remember how you received

22    those statements?  Was it mail, email, something else?

23         A    Didn't we already go over this?

24         Q    Well, I think we went over some of the

25    numbers.  Maybe I asked this already, but I don't know

Page 114

1    if I asked, like, that basic question.  So --

2         A    Well, my response was it was probably a

3    combination of both.

4         Q    Okay.  And we were asking about plan

5    disclosures generally.  But specifically for account

6    statements, can you tell me if you recall reviewing

7    them?

8         A    Plan disclosures?

9         Q    So I'm saying for these kind of account

10   statements.  When you received something like this,

11   did you, you know, review the document?

12        A    I looked at it and checked the balance,

13   checked to see if it was going up or down.

14        Q    That was my question.  Okay.  So let's look

15   at some pages for a different purpose than before.  So

16   let's go to 2174.  This is your statement as of the

17   fourth quarter of 2019.  Do you see that?  In the

18   upper right is where the date is.

19        A    Mm-hmm.

20        Q    Is that a yes?

21        A    Yes.  Yes.

22        Q    Okay.  So when you say if your account was

23   going up, so you would look at where it says beginning

24   balance and ending balance?  That's the information

25   you'd --

Page 115

1          A    That's correct.

2          Q    -- primarily focus on?  Okay.  And if you

3     look a little bit below, it says "Your personal rate

4     of return."  And it says "this period" and "year to

5     date."  Do you see that?

6          A    Yes.

7          Q    And your year to date rate of return at this

8     point was 21.1 percent.  Do you see that?

9          A    Yes.

10         Q    Were you happy with that rate of return?

11         A    I didn't have any feelings one way or

12    another toward it.

13         Q    So sitting here today, there's no sort of

14    rate of return number that you can identify as, like,

15    "Well, it's over X percent, I'd be happy with it"?

16         A    No.

17         Q    Okay.  And just to clarify something, did

18    Quanta choose the specific investments you're invested

19    in?

20         A    Yes.

21         Q    So is it your opinion that -- well, let's

22    look at what you're invested in at the time.  Okay?

23    Let's see.  So you were invested in the, for instance,

24    if you look at the next page, the Fidelity 500 Index.

25    And below that, it says Fidelity Total Bond.  Do you

Page 116

1    see that?

2         A    Mm-hmm.

3         Q    So just to make sure I understand your

4    testimony, is it your belief --

5         A    Yes.  I'm sorry.

6         Q    Is it your belief that Quanta chose for you

7    to be invested in those funds?  And I'm trying to

8    distinguish it from Quanta choosing what funds to

9    offer in the plan.  So did Quanta choose what specific

10   funds you were invested in?

11                  (Off-the-record discussion.)

12                  THE WITNESS:  My investments were based

13   on the recommendations from Fidelity.

14   BY MR. BLOCK:

15        Q    From Fidelity.  Okay.  Let's go to 2211,

16   which is, I think, towards the back.  Okay.  So if we

17   look, this is December 2020, fourth quarter of 2020,

18   and your total balance at the end of this is $0.  Do

19   you see that, where it says "Total balance," $0?  It's

20   on the top.

21        A    Mm-hmm.  Did you say -- yes.  I'm sorry.

22   But did you say 2020 or 2022?

23        Q    Oh, sorry.  You're right.  Thank you.  I was

24   looking at the wrong thing.  Well, actually, that's a

25   good question because it says "as of 2022" --

Page 117

1      A    Right.

2      Q    -- but I'm pretty sure.

3      A    Oh, that -- that would be right because the

4  statement period is 10/1/2020 to 12/31/2020.  But

5  "your elections as of 10/3/2022."  Okay.

6      Q    I don't know why it says "2022," to be

7  candid with you, but because you left Quanta -- all

8  right.  Now I'm going by memory, 2020 or 2019?

9      A    2019.

10     Q    2019.  Okay.  All right.  So you were no

11 longer an employee at Quanta as of 2020?

12     A    Correct.

13     Q    Okay.  So I just tried to pick this one

14 because I think it summarizes your sort of history of

15 your account at Quanta before you rolled out of it.

16     A    Mm-hmm.  Yes.

17     Q    So you contributed a little over $17,000,

18 and Quanta contributed about $13,000; is that right?

19     A    That's correct.

20     Q    Okay.  And as we said before, that's a

21 pretty generous contribution, almost half of what you

22 put in yourself --

23     A    That's correct.

24     Q    Okay.  And so that adds up -- and I'm just

25 going to try to help tie these numbers together.  So

Page 118

1    if you look at your account activity, it's in the

2    second -- there's two different things.  In your

3    account activity, the second one says total

4    $35,475.73.  Do you see where it says a little over

5    $35,000?

6         A    Yes.

7         Q    Okay.  And we'll look at a document too, but

8    do you remember that you ultimately withdrew around

9    that amount of money out of the plan and put it into a

10   IRA?

11        A    That sounds about right, but I don't recall

12   the actual numbers.

13        Q    And more importantly is why did you -- well,

14   is it right that you testified earlier you withdrew

15   your money so you could have it in one place, or was

16   there some other reason?

17        A    No, I just wanted it in one place.

18        Q    Do you recall how, for lack of a better

19   term, the money ended up in this Fidelity IRA?  You

20   know, it could have gone to other places.  How did it

21   end up there?

22        A    I don't recall.

23        Q    Is $35,000, or was it at the time, a

24   meaningful amount of money to you?

25        A    I think $35,000 would be a meaningful amount

Page 119

1      of money to anyone.

2           Q    I agree.  I just didn't want to -- yeah, I

3      wanted to establish that it was, you know, a serious

4      amount of money, yeah, without asking a leading

5      question.  So, yeah, I agree.

6                So talk to me about what you recall, if

7      anything, about how that money -- so that money went

8      over to a Fidelity IRA.  And do you remember anything

9      about how it got allocated?  You know, like what --

10     let's start there.  Do you remember anything about how

11     it got allocated?

12          A    I don't recall.

13          Q    Do you recall if you made the decision about

14     what to invest it in?

15          A    I don't recall, but I seriously doubt it.

16          Q    Do you remember if you were presented with

17     options about what you could invest it in?

18          A    I may have been, but I -- I likely, most

19     likely, went with what they recommended.

20          Q    And "they" being Fidelity?

21          A    Yes.

22          Q    And do you trust Fidelity's recommendations?

23          A    I did at one time.

24          Q    And does that imply that you no longer trust

25     Fidelity's recommendations?

Page 120

1          A    I'm not invested with them right now.

2          Q    So that may have answered the question, but

3     I'll ask it again.  Is that that you no longer trust

4     Fidelity?

5          A    As I said, I'm not invested.  My money -- I

6     might have money sitting there, but I'm not invested.

7     So they can't do anything with my money right now.

8          Q    I'm just trying to understand that answer.

9          A    I don't have a reason to trust or not trust

10    them.

11         Q    Okay.  Because you're saying you don't have

12    any money with them.

13         A    It's very little, and it's not being

14    invested in anything.

15         Q    So we talked about how the $35,000 was a

16    meaningful amount of money.  Do you recall, after it

17    got allocated, did you review what it was put into?

18         A    I don't recall.

19         Q    Sitting here today, do you think you would

20    have seen where your $35,000 ended up?

21         A    I don't recall, but I would guess that I

22    went with whatever was recommended.

23         Q    Right.  I understand you don't recall what

24    was recommended now.  But based on your practices, it

25    being a lot of money, you probably looked at where it

Page 121

1    ended up; right?

2        A    I don't recall.

3        Q    So sitting here today, you think it's

4    possible that you rolled $35,000 into an account but

5    don't know what it was invested in and didn't know?

6        A    I'm sure I didn't know the details.

7        Q    But at a general level, you probably would

8    have looked at, "Oh, it was invested in fund X"?

9        A    It would have been something I might have

10   glanced at, but not anything I looked at with any real

11   depth.

12       Q    Would you have done anything to assess

13   whether it was invested in, you know, something you

14   were comfortable in?

15       A    No.

16       Q    So, you know, just to use an example, so if

17   they put it in -- I don't know.  I'm not trying to,

18   again, be, like, cute.  I'm just trying to get at your

19   thinking.

20       A    So is there some company you really dislike?

21       Q    Not really.

22       A    Okay.  I'm trying to think of something

23   like -- I don't know.  If they put it in some super

24   obscure fund from China, would you have done any, you

25   know, vetting of, like, "Well, that seems odd"?

1    Q    If -- if I was made aware that it was

2    invested in something in China, then yes, I would have

3    looked further into that.

4    A    Okay.

5    Q    All right.  Let's look at one more exhibit,

6    which I'll mark as Exhibit 11.

7                    (Exhibit 11 was marked for

8                    identification.)

9            And I'll represent to you this is a document

10    Plaintiffs produced in this case.  Take a look at it

11    and let me know if you recognize it.

12    A    It looks familiar.

13    Q    Okay.  Is this an account summary of the

14    Fidelity IRA we were just discussing?

15    A    I suppose so.

16    Q    And if you look on the page that has 078 on

17    it and you look at the last column, you see October

18    2020?

19    A    Yes.

20    Q    And you see there's a 35,000-plus dollar

21    number?

22    A    Yes.

23    Q    And that's in the deposits.  So does this

24    show we're just talking about, that you rolled

25    $35,000-plus into a fidelity IRA in October 2020?

Page 123

1          A    That's what it looks like.

2          Q    And the chart on the other -- I shouldn't

3    say "chart."  The graph on the other page shows, you

4    know, that account going down at various points.  And

5    if you look at the Withdrawals column on the second

6    page, you'll see that various points, there were

7    several withdrawals made: 2,000, 3,000, 10,000,

8    15,000.  Do you see those withdrawals?

9          A    Yes.

10         Q    Where did that money go?  Like, where did

11   you put that money?

12         A    I don't recall.

13         Q    Is that money invested somewhere else?

14         A    I don't recall.

15         Q    Do you recall if, like, you just took that

16   money out and used it to pay bills or whatever outside

17   of reinvesting it?

18         A    I don't recall.

19         Q    All right.  Well, since --

20         A    That doesn't sound like something I would

21   typically do, though.

22         Q    Okay.  Yeah.  And I don't know the answer to

23   these questions.  Like, sitting here today, are you

24   invested outside of 401(k) plans?  Are you invested in

25   any other IRAs?

Page 124

1        A    Other than this one?

2        Q    Right.  Because according to this, you

3    withdrew about $33,000.  So I'm wondering if that went

4    to like a Vanguard brokerage or somewhere else.  You

5    know, you know, it's a significant amount of money.

6    So I'm curious if it was --

7        A    Yeah, it may have.  But I don't recall the

8    specifics.

9        Q    And we'll keep going through this.  And if

10    you remember, that would be great.  And if not, you

11    produced a good number of documents.  But we'd be

12    interested -- you know, one of the things we requested

13    was your IRAs, and you produced this Fidelity one.

14            And if the $33,000 was invested in another

15    IRA, we'd ask that you produce that as being

16    responsive to our request for production.

17                  MR. BLOCK:  So I know there's an

18    outstanding request with the other plaintiffs.  We can

19    talked about it via email, but --

20                  MR. ROBERTS:  Mm-hmm.

21                  MR. BLOCK:  -- just putting it in the

22    record.

23    BY MR. BLOCK:

24        Q    And again, like, just to kind of make it

25    easier when we end up searching for documents, you

Page 125

1    don't have any recollection of where this -- if you

2    have currently 30,000-plus dollars in some investment

3    account outside of Fidelity?

4        A    I do.  But I don't know if it's this

5    $33,000.

6        Q    Okay.  So what is that account?

7        A    My Principal account.

8        Q    And is that with your current employer's

9    401(k), or is that --

10        A    That's correct.

11        Q    Okay.  So that's your current Worley 401(k)

12    plan account?

13        A    Yes.

14        Q    All right.  So you don't know for sure, but

15    it's possible that you rolled money out of this and

16    into the Worley 401(k) plan?

17        A    It's possible.

18        Q    All right.  If that's the answer, then I

19    think we might have that information, and then you

20    won't need to search for documents.  So that's why I

21    was asking.  Okay.  Let me introduce another document

22    to you.  So this would be Exhibit 12, and please take

23    a look at it and let me know if you recognize what

24    this is.

25                    (Exhibit 12 was marked for

Page 126

1              identification.)
2              So do you recognize what this document is?
3      A    It's an investment report.
4      Q    So this is an investment report from June
5      2019 for your Fidelity IRA; is that right?
6      A    That's correct.
7      Q    Well, was this a document that you had
8      accessed online?  Did you get something mailed to you
9      with these kind of statements, if you recall?
10     A    Probably a combination of both.
11     Q    And did you review these Fidelity IRA
12     documents?
13     A    Most likely.
14     Q    And on page 10, or it's Bates number 10 --
15     so it's page 3 of 12, but it's also Plaintiff McKnight
16     00010.  It says, "Top holdings"?
17     A    Yes.
18     Q    All right.  Did you see that it says 81
19     percent of your holdings were in the Fidelity Freedom
20     2030 Fund as of June 2019?
21     A    Yes.
22     Q    How did you decide to invest in the 2030
23     Fidelity Freedom Fund?
24     A    Because that's what was recommended.
25     Q    Do you have any understanding of why it was

Page 127

1    recommended?

2         A    No.

3         Q    When it was recommended, did you have any

4    issue with the recommendation?

5         A    I did not.

6         Q    You did not have any issue with the

7    recommendation?

8         A    I did not.

9         Q    When you saw that your IRA was 81 percent

10   invested in the Fidelity Freedom Fund, did you think

11   that was a reasonable investment option?

12        A    I didn't think one way or another about it.

13        Q    Were you happy with its performance?

14        A    I don't recall.

15        Q    Were you happy with the level of risk that

16   it had?

17        A    I don't recall.

18        Q    So put both those questions differently, do

19   you recall ever being unhappy with the performance of

20   the Freedom Funds?

21        A    Not that I remember.

22        Q    And do you recall ever being unhappy with

23   the risk profile of the Freedom Funds?

24        A    Not that I recall.

25        Q    And if you look on the page above, you are

Page 128

1     also -- oh, no.  Sorry, sorry, sorry.  Just the line

2     below, I apologize.  You were 19 percent invested in

3     Quanta Services Com, which I'll just tell you is the

4     Quanta Services Company stock.  Do you recall how your

5     money got allocated into that investment?

6          A    I don't recall.

7          Q    Do you have any -- well, let's ask it this

8     way first.  Do you recall any feeling at the time, you

9     know, positively or negatively about being invested in

10    a company stock, a single company stock?

11         A    No feeling positive or negative.

12         Q    Sitting here today, do you have any view

13    about whether it's a good idea to have your retirement

14    dollars invested in a single company stock?

15         A    I would think it would depend on, you know,

16    what percentage of your value is invested in that one

17    stock.

18         Q    When you brought this lawsuit, were you

19    aware that you had personally invested in the Fidelity

20    Freedom Funds?

21         A    Yes.

22         Q    And did your personal investment in those

23    funds give you any concern that actually these funds

24    may be reasonable investment options?  Let me try

25    asking that question.

Page 129

1           Did your personal investment in the Fidelity

2     Freedom Funds give you any hesitation about bringing a

3     lawsuit challenging the Fidelity Freedom Funds?

4        A     Can you ask that again?

5        Q     Sure.  So I'm trying to -- I could see a

6     variety of answers to a question like this; right?

7     But, like, if I was going to go out and sue, you know,

8     some retirement plan for some fund, and I was in that

9     fund myself outside of the retirement plan, you know,

10    I could see like, "Oh, well, that gives me some pause.

11    Like this fund doesn't seem that bad.  I'm investing

12    in it myself."

13           Or maybe like, I don't know, you have some

14    other thought.  So I'm wondering if the fact that you

15    happen to be invested in this fund yourself gave you

16    any hesitation about bringing a lawsuit challenging

17    this fund.

18              MR. ROBERTS:  Object to form.

19        A     Not really.

20        Q     And why is that?

21        A     Because at the time that I was invested in

22    this fund, I wasn't aware.

23        Q     And what are you aware of now that makes you

24    think differently about the fund?

25        A     I don't -- I don't know that it's this

```
                                              Page 130
 1     particular fund.  I -- I think it's, you know,
 2     multiple funds and the way they were invested, which
 3     could have been done differently.
 4          Q    Sitting here now, if someone at Worley, you
 5     said Principal, right, is the --
 6          A    Yes.
 7          Q    So if someone at Principal recommended that
 8     you invest your Worley 401(k) assets in the Fidelity
 9     Freedom Funds, would you do so?
10          A    It's highly unlikely.  And if that
11     particular Freedom Fund came highly recommended, I
12     would probably seek outside help on making that
13     decision.
14          Q    And what kind of outside help would that be?
15          A    I would -- I would need to go talk with
16     somebody.
17          Q    Like an investment advisor or some other
18     category of person?
19          A    Something similar to that.
20          Q    Are you invested -- oh, sorry.  Did you have
21     more to say?
22          A    No.
23          Q    Are you invested in any cryptocurrency?
24          A    God, no.
25          Q    Same -- okay.  I'm going to go out of order
```

Page 131

1    for a second because I have this printed twice, but

2    okay.  So I'm going to introduce to you what is

3    Exhibit 13, and these are your interrogatory responses

4    that you produced to us.

5                    (Exhibit 13 was marked for

6                    identification.)

7              And I think you mentioned earlier today that

8    you looked at the documents to prepare for this

9    deposition.  Let me know if that all checks out and is

10   correct.

11        A    Is there a question on the table?

12        Q    Yeah, just do you recognize this document?

13        A    Yes.

14        Q    Okay.  Did you -- well, let's look at the

15   very end or towards the very end, page 20.  Do you see

16   your digital signature?

17        A    Yes.

18        Q    Did you review this document before signing

19   it?

20        A    I did.

21        Q    And you understand that, as you see above,

22   that you declare that what's in this document is true

23   and correct under penalty of perjury?

24        A    Yes.

25        Q    So let's go to page 7 through 8.  Skip some

Page 132

1    of the legalese at the beginning and go to

2    interrogatory number 2.  And it says that, sort of

3    skipping to the answer, that you have not spoken to

4    anyone other than the attorneys about the plan.

5    Because it says, "Plaintiff has no information

6    responsive to this interrogatory."

7              This document is from -- find the exact

8    date -- February 18, 2024.  So we talked way at the

9    beginning today that you had a conversation with

10   Brandy Wilbanks.  Roughly when was that conversation?

11        A    Night before last.

12        Q    All right.  So recently?

13        A    Yes.

14        Q    Okay.  So just to clarify, outside of that

15   conversation, have you -- even if it's not very

16   substantive -- had any conversations with anyone

17   outside of your attorneys about this lawsuit?

18        A    Not that I recall.

19        Q    Do you think it's possible you did but

20   you're just not remembering or you're fairly confident

21   you haven't?

22        A    It's highly unlikely.

23        Q    All right.  Ao interrogatory number 3 asks,

24   "Are there any communications that influenced your

25   decision to participate in the plan?"  And your

Page 133

1    response was that you have no information responsive
2    to this interrogatory.  So sitting here today, can you
3    recall any communications that influenced your
4    decision to participate in the plan?
5        A    Ask that again?
6        Q    Do you recall if there were any
7    communications that influenced your decision to
8    participate in the plan?  I don't know, do you receive
9    any?  In the packets, the Quanta 401(k) plan.
10       A    Oh, like any brochures or, you know --
11       Q    Exactly.
12       A    -- "here, go with this, and this is why"?
13   No.
14       Q    Interrogatory number 6 asks, and it's on
15   page 10, if you "contend that any defendants" --
16   sorry -- "that defendants or any of their officers or
17   agents have made any admissions or declaration against
18   interest concerning the subject matter of this action,
19   identify each person that allegedly made that such
20   statement and describe in detail each alleged
21   admission of declaration."
22            So this document was from, you know, several
23   months ago at this point.  So just to confirm, sitting
24   here today, can you identify any admission or
25   declaration against interest concerning the subject

Page 134

1    matter of your lawsuit made by any representative of

2    Quanta?

3         A    No.

4         Q    Okay.  So interrogatory number 10 asks

5    whether you've invested in a target date fund outside

6    of the plan, whether -- oh, sorry.  I'll just leave

7    that; it's the only part I care about.  Asks whether

8    you've invested in a target date fund outside of the

9    plan.

10             And your answer says, which is on page 15,

11   is that you invested in the Vanguard Target Retirement

12   2030 Trust when you were in KBR and the Vanguard

13   Target 2025 Trust in Worley Group's 401(k) plan.  But

14   that's not right; isn't that true?  We just went over

15   how you also invested in the Fidelity Freedom Fund in

16   your Fidelity IRA; right?

17        A    I'm not sure.  What are -- what are you

18   saying is not true?

19        Q    Well, I'm saying that the Fidelity Freedom

20   Fund should have been listed as a target date fund

21   that you invested in outside of the plan; right?

22        A    If you say so.  But like I said, there's --

23   there's not much money in that -- what's -- what's

24   there in that little IRA account.  So I probably just

25   didn't even consider it.

Page 135

1      Q    All right.  So that gets to the question I

2    wanted to ask, was:  Why didn't you identify the

3    Fidelity Freedom 2030 Fund in this interrogatory

4    response?

5      A    I just answered.

6      Q    Because you thought that the, whatever it

7    was, I'm forgetting offhand, $17,000, $18,000 wasn't,

8    you know, a lot of money?

9            MR. ROBERTS:  Object to form.

10     A    Maybe I just understood the question to be,

11   have you invested in any other?  And I listed those

12   others but not -- I failed to mention that.

13     Q    Sitting here today, can you think of any

14   other investments, specifically target date funds,

15   that you failed to include on this list?

16     A    Not that I'm aware of.

17     Q    Okay.  Let's talk a little bit about your

18   RFP responses.  We'll see if we can get through these

19   questions without the actual document.  If not, I'll

20   take a brief break to print them out.  But do you

21   recall that you were requested to try to locate

22   certain documents?

23     A    Yes.

24     Q    What did you do to search for documents?

25     A    Searched files, searched online.

Page 136

1        Q    Did you search for hard copies?  Like,
2    that's what you meant by "files"?
3        A    Yes.
4        Q    Yeah.  Okay.  You say in the RFP response
5    that you no longer have access to your account, your
6    plan account with Quanta, or any Quanta plan-related
7    documents that you might have received during the
8    class period.  Is that an accurate statement?
9        A    I -- I believe I still have access to
10    that -- that one little IRA account.
11        Q    All right.  And just for the record, that is
12    with Fidelity?  So that's not with Quanta?
13        A    Right.  That's correct.
14        Q    So do you still have access to, like, the
15    Quanta --
16        A    No.
17        Q    Yeah.  You don't have any money in it
18    anymore.
19        A    Right.
20        Q    Yeah.  When you received communications
21    related to the plan -- so it was like your account
22    statements or fee disclosures or anything like that --
23    in a hard copy, would you store those hard copies
24    somewhere?  Or do you read them and toss them?
25        A    I would just put them in the filing cabinet

Page 137

1    in case they were needed at another time.

2        Q    So do you have a filing cabinet at home that

3    maybe among other things has various documents you've

4    received from 401(k) plans?

5        A    Current 401(k) -- 401(k) plans.

6        Q    So you're saying that the only documents

7    that would be in this filing drawer today are

8    documents from your Worley plan?

9        A    Most likely.  Most everything is electronic

10   now.

11       Q    Okay.  So you said "most likely," but you're

12   not certain whether you have hard copies from previous

13   plans in this filing drawer?

14       A    Not 100 percent.  I would have to look.

15       Q    All right.  So we talked earlier today about

16   policies.  I don't want to go into that one.  But did

17   you also file a civil lawsuit against Farmers

18   Insurance related to a car accident?

19       A    Oh, that was that wreck -- that --

20       Q    In 2009, if I didn't say the year.

21       A    I think that was that wreck my daughter got

22   in.

23       Q    So you might have filed a lawsuit on behalf

24   of your daughter?  I don't have actually a lot of

25   details on that.

```
                                            Page 138
```

1          A     Possibly.  Yeah, I don't -- I mean, I kind

2     of vaguely remember that now that you mentioned it.

3     But I believe it had something to do with the car

4     wreck she was in.

5          Q     Do you remember the outcome?

6          A     Not really.

7                    MR. BLOCK:  Can we take like a five-

8     minute break?  I need to use the restroom and then I

9     don't have a --

10                   THE VIDEOGRAPHER:  Off the record,

11    13:37.

12                   (Off the record.)

13                   THE VIDEOGRAPHER:  Back on the record,

14    13:42.  Please proceed.

15    BY MR. BLOCK:

16         Q     Ms. McKnight, what do you understand your

17    duties to be as a class representative?

18         A     Well, that would -- and I don't mean this

19    literally when I say it, but to sort of be the face,

20    you know, to represent -- to -- the face for the other

21    claimants that would represent them in court.

22         Q     Anything else?

23         A     No.

24         Q     Can you describe the class you seek to

25    represent?

Page 139

1          A     The class?

2          Q     Yes.  Can you describe the class that you

3    seek to represent?

4          A     The other employees of Quanta that was part

5    of this plan.

6          Q     Do you understand if you seek to represent

7    participants who were not invested in any of the three

8    challenged funds?

9          A     Are you asking me if I'm representing those

10   people that weren't involved?

11         Q     Do you have an understanding of if the class

12   does or does not include plan participants who are not

13   invested in any of the three challenged funds?

14         A     I don't have an understanding of that.

15         Q     Do you think it does or doesn't?  Do you

16   have an expectation?

17         A     No.

18         Q     Do you understand the court must find you to

19   be an adequate representative of the class?

20         A     I do.

21         Q     And what do you think the court -- strike

22   that.

23               What time period does this class cover?

24         A     The exact dates?

25         Q     Even the rough dates would be --

Page 140

1      A    Let's see.  Somewhere from 2017 to maybe --

2    I -- I have no idea.

3      Q    Do you have an understanding of how long a

4    trial in this case might last, if this case goes to

5    trial?

6      A    I don't have a clue.

7      Q    If I told you that it might be ten days,

8    would you be willing to attend the entire ten days?

9      A    Absolutely.

10     Q    Okay.  So ask it differently.  Whatever the

11   length of the trial is, you'd be willing to attend the

12   entire trial?

13     A    Of course.

14     Q    Have you reviewed every filing in this case?

15     A    Not every filing.

16     Q    Why not?

17     A    That's what the attorneys are for.

18     Q    Without getting into the substance in any

19   way, have you ever disagreed with any of the

20   recommendations by your attorney?

21     A    No.

22     Q    And do you think that means you're not doing

23   an adequate job vetting the quality and decisions of

24   your attorney, if you're agreeing with everything

25   they're saying?

1        A     That's not what I think at all.

2        Q     What is it that you think?  Like, do you

3    think it's reasonable to rely on your attorneys

4    because they're the experts?

5                    MR. ROBERTS:  Object to form.

6        A     I don't rely solely on my -- on the

7    attorneys.  I do have a mind of my own.  If I felt

8    like they were doing something out of line or

9    inappropriate, I would definitely be having a

10   conversation with them about that.

11       Q     You'd ask questions?

12       A     Of course.

13       Q     But whether or not you've ever disagreed

14   with them doesn't have any bearing or doesn't tell you

15   anything about if you're doing a good job or not of

16   vetting your attorneys; right?

17                   MR. ROBERTS:  Object to form.

18       A     Are you trying to say that I selected the

19   wrong attorneys?

20       Q     Not at all.  I'm trying to ask if you agree

21   that, you know, if you're relying on your experts,

22   your attorneys in this case, and you, you know,

23   haven't had any instances where you disagree with

24   them, that doesn't mean you're doing a bad job.  That

25   could just mean your experts are doing a fine job?

Page 142

1      A    It could.

2      Q    Okay.  How did you choose your attorneys?

3      A    They reached out to me.

4      Q    Was it an advertisement?

5      A    No, I don't think so.  I think it was an

6   email.

7      Q    Do you have any understanding of how they

8   got your email address?

9      A    I'm sure I asked in the beginning, but I

10  don't recall now.

11     Q    Do you think it's possible you're saying you

12  initiated the outreach?  Is it a recollection that you

13  initiated the outreach or they initiated the outreach?

14     A    I -- it's my recollection that they

15  initiated the outreach because that's when I became

16  aware of the situation.

17     Q    And if you still have your interrogatory

18  responses in front of you, we'll see that in number

19  13, which spills into the last page, that you first

20  communicated with counsel on December 9, 2021, and you

21  retained counsel on December 22, 2021.  Do you see

22  that?

23     A    Yes.  Wait.  Yes.

24     Q    So that's roughly a two-week gap between

25  when you first communicated and then when you retained

Page 143

1    counsel, 13 days to be precise?

2         A    Sure.

3         Q    Do you recall what you were thinking about

4    during that time period?  Why did it take 13 days?

5    It's, you know, sort of another way to ask the same

6    question.

7         A    Given that it was December, I was probably

8    thinking about Christmas and shopping and decorating

9    my house.

10        Q    When it came time to return your, you know,

11   effort and energy back to the decision about whether

12   to hire them, do you recall, you know, your thought

13   process?

14        A    I thought about whether or not I wanted to

15   get involved.  That's about all I remember.

16        Q    Did you consult with any other attorneys --

17        A    No.

18        Q    Okay.  So that answered one question.  But a

19   different question too:  Did you consult with any

20   other attorneys to -- or anyone, I should -- strike --

21            Did you consult with anyone to learn more

22   information about the Miller Shah and Capozzi Adler

23   firms?

24        A    No.

25        Q    So you didn't conduct an RFP?  You know, you

Page 144

1    didn't reach out to other lawyers and say, "How you go

2    about handling this case?"

3        A    No.

4        Q    And similarly, you didn't do some sort of

5    request for information from other lawyers?

6        A    No, not with attorneys.

7        Q    Did you do any, like, Googling?

8        A    Most likely.

9        Q    And why did you feel that it was not

10   necessary to contact other attorneys to see, you know,

11   if they'd be interested in the lawsuit?

12       A    I didn't think about it.

13       Q    Have you heard about this lawsuit prior to

14   joining it as a named plaintiff?

15       A    No.

16       Q    I think we've covered this, but I'll just

17   quickly go over it again.  Before you heard about this

18   lawsuit, did you believe that you had been harmed by

19   investing in the Quanta 401(k) plan?

20       A    No, because I didn't learn of what had

21   happened until I talked to the attorneys.

22       Q    Yeah.  So saying it differently, before you

23   talked to your attorneys, you didn't have any concerns

24   about the Quanta 401(k) plan; correct?

25       A    Correct.

Page 145

1      Q    Did you negotiate what fees your lawyers

2    could collect in a settlement?  Well, let me even take

3    a step back.  Do you understand that one possible

4    outcome of this case is that it could settle?

5      A    Yes.

6      Q    And do you have an understanding of who

7    receives money in a settlement?

8      A    I do.

9      Q    All right.  And what is that understanding?

10     A    The attorneys will receive a portion, and

11   the plaintiff -- everybody else will receive a portion

12   as well.

13     Q    And do you have an understanding about

14   whether you receive additional compensation as a named

15   plaintiff?

16     A    It's my understanding that, A, that's the

17   court's decision and, B, it does happen at -- at

18   times.

19     Q    And when it does happen, do you have an

20   understanding of what's a typical amount of money that

21   a named plaintiff receives in a settlement?

22     A    I have no idea.

23     Q    So you wouldn't know if it was a hundred

24   dollars, a thousand, ten thousand?

25     A    Not a clue.

Page 146

1        Q    Do you have a sense of what percentage your
2    lawyers would receive from a settlement?
3        A    We discussed it early on, but I don't recall
4    what it was at this point.
5        Q    And you don't have to get in any substance.
6    Probably a yes-or-no question: Did you negotiate what
7    fees your lawyers could collect in a settlement?
8        A    No.
9        Q    Could you have?
10       A    You always have the opportunity to -- to
11   negotiate.
12       Q    If you didn't talk to any other lawyers to
13   learn how they'd handled the case or what they charge,
14   how do you know that you're getting, you know, the
15   best legal services for the dollar?
16       A    You don't.
17       Q    In your view, is it important to always
18   select the lawyer the lowest-cost fees?
19       A    In my view?  Do I think that it's always
20   best to select the lowest cost -- lowest attorney
21   fees?
22       Q    Yeah.  That was the question.
23       A    Absolutely not.
24       Q    And why not?
25       A    I wouldn't do it for a doctor, either.

Page 147

1       Q    I agree the question is pretty obvious, but
2    if you just put a little more meat on the bones and
3    tell me why you don't always want to go with the
4    cheapest service provider.
5       A    Because cheaper is not always better.  Quite
6    often, it's not always better.
7       Q    Would you object if your attorneys sought 33
8    percent of a settlement?
9       A    No, that seems about average.
10      Q    And what's your basis for saying it's about
11   average?
12      A    Just hearing people talk, casual
13   conversations.  Not in regards to this case, so you
14   don't have to ask that again.
15      Q    So you mentioned way at the beginning, when
16   we're talking about preparing for this deposition,
17   that you've spoken with your lawyers a couple of times
18   over the course of the lawsuit.  Do you have a
19   ballpark estimate of how many times you've spoken to
20   your lawyers over the course of the lawsuit?
21      A    Not really.
22      Q    More than ten?
23      A    Possibly.  Every few months, you know, they
24   would reach out and we would talk, or they would send
25   an email just giving me an update and that sort of

Page 148

1    thing.

2        Q    And roughly when you were talking -- not the

3    emails, but the conversations -- roughly how long were

4    those in length?

5        A    I don't recall.

6        Q    An hour?  Or five minutes?

7        A    I don't recall.

8        Q    You don't recall which end of the spectrum

9    it was?  Closer to an hour?  Closer to five minutes?

10       A    I don't recall.

11       Q    As a class representative, do you have a

12   responsibility to oversee your lawyers and how they're

13   handling the case?

14       A    You do.

15       Q    And what steps have you taken to oversee if

16   your lawyers are doing a sufficient job?

17       A    Ensuring that I'm, you know, updated on a

18   regular basis, understanding what they're doing.

19       Q    Have you conducted any formal evaluation

20   about how your lawyers are doing?

21       A    No, I have not.

22       Q    Do you think it's necessary to conduct a

23   formal evaluation to assess how they're doing?

24       A    Not at this time.

25       Q    And why not?

Page 149

1      A    I just don't think it's necessary at this
2   time.
3      Q    Is it like what we were talking about
4   earlier when you were the owner of the business and
5   you had a part-time employer [sic] that your regular
6   interactions with them give you an adequate basis to
7   assess if they're doing a good job or not?
8      A    I don't -- I don't think that's comparing
9   apples to apples.
10     Q    Tell me why not.
11     A    Tell you what?
12     Q    Why is it not an apples to apples
13  comparison?
14     A    Because it -- that was a little boutique.  A
15  little, you know, a little boutique gift shop with one
16  employee.  You know, we weren't representing a large
17  number of people when their funds had been mishandled.
18  So, yes, I would -- I don't look at it the same way.
19     Q    So are you saying you think you need to do
20  more vetting for this than you did with your shop?
21     A    I didn't say that at all.
22     Q    Well, then I didn't understand the
23  implication of this.  You know, you're saying it
24  involves more people, so what kind of difference does
25  that make to the vetting you need to do?

Page 150

1      A    I -- I -- at this time, I don't think I need

2   to do any vetting.

3      Q    So is it your testimony that you've not done

4   any, you know, informal or formal assessments, but

5   mostly informal assessments of if you think that your

6   attorneys are doing an adequate job prosecuting this

7   lawsuit?

8      A    I've done informal assessments, and I've

9   already explained how and what that means.

10     Q    And you think that's sufficient, those

11  informal --

12     A    At this time, I do.

13     Q    At what time would it call for a formal

14  assessment?

15     A    I can't answer that.

16     Q    Is it your opinion that at some point it

17  will call for a formal assessment, or is it possible

18  informal assessments will be sufficient?

19     A    I -- I really can't answer that.  I will

20  just have to wait and see.

21     Q    As a class representative with

22  responsibility for overseeing the developments of this

23  case, do you think you need to hire another lawyer to

24  determine if your lawyers are doing a good job?

25     A    Not at this time.

Page 151

1          Q    Maybe this is the same question as before,
2     but why not?
3          A    I -- I don't see a cause for it.
4          Q    Based on your day-to-day assessment of how
5     the case is going, you're saying you don't think you
6     need, you know, a legal expert to assess how your
7     lawyers are doing?
8          A    Not at this time.
9          Q    And what would cause you to think that you
10    need to get an independent third party to assess?
11    Would something need to go way off track?
12         A    I couldn't even venture to guess.
13         Q    But if the time came and I felt the need for
14    it, then I may do so.  As a class representative with
15    responsibility for overseeing the class, do you have
16    any criteria, formally or informally, to assess
17    whether your lawyers are doing a sufficient job?
18         A    I believe I've already answered this
19    question multiple times.
20         Q    I don't think I asked about criteria, so is
21    that a yes or a no?
22         A    Ask the question again?
23         Q    Yeah.  As a class representative with
24    responsibility for overseeing your lawyers, do you
25    have any criteria in place to determine if your

Page 152

1    lawyers are doing a good job?

2        A    Nothing formal.

3        Q    Do you expect to receive any compensation

4    for serving as a class representative separate and

5    apart from any money you might recover as a class

6    member?

7        A    It's up to the courts.

8        Q    Do you have any expectation, though?

9        A    Not necessarily.  But again, it's up to the

10   courts.

11       Q    Yeah.  I fully recognize it's up to the

12   courts, but do you expect that the courts will award

13   you compensation for serving as a class

14   representative?

15       A    I don't have any expectations.

16       Q    Would you be a class representative of this

17   case even if there was no additional compensation for

18   doing so?

19       A    Yes.

20       Q    Would you turn down any compensation awarded

21   to you if the court awards you compensation for being

22   a class representative?

23       A    I doubt that, not if the court felt like I

24   was owed it.

25       Q    If the court decides this case cannot

Page 153

1    proceed as a class action, would you pursue this case
2    as an individual lawsuit?
3         A    That's not something I've given any thought
4    to at this time.
5         Q    Do you know anything about the process
6    Quanta uses to administer the plan?
7         A    No, I don't.
8         Q    Do you know anything about Quanta's process
9    to select the investments offered in the plan?
10        A    No, I don't.
11        Q    Do you know anything about their process to
12   monitor the investments after they've been selected?
13        A    No, I don't.
14        Q    As you sit here today, can you identify
15   anything about Quanta's process to select investments
16   that you believe was improper?
17        A    No.
18        Q    As you sit here today, can you identify
19   anything about Quanta's process to monitor investments
20   that you believe was improper?
21        A    No.
22        Q    One final exhibit.  That's my exhibit, which
23   is perfect because there's one more number written.
24   I'm going to introduce you to a document that is going
25   to be introduced as Exhibit 14.

Page 154

1              (Exhibit 14 was marked for

2              identification.)

3         It's a blog post that your attorneys wrote.

4    So I'll give you a chance to look at that.  There you

5    go.  So if you look at the last page, you can see the

6    legal team at Miller Shah LLP, and it lists some

7    attorney names.  Does that help confirm that this is a

8    blog post that your attorney's firm wrote?  Posted?

9         A    I don't have a clue.

10        Q    Do you have any reason to doubt that this is

11   a blog post that Miller Shah posted?

12        A    Well, it did come off the internet, so you

13   know --

14        Q    Yeah, I'm not trying to be tricky.  Like, I

15   know you haven't seen this document before.

16        A    Oh.

17        Q    But I'm just, you know, asking you to make

18   sure you agree with me that it appears to be a blog

19   post that --

20        A    It appears to be.

21        Q    All right.  And it says, "Please contact

22   Alec Berin" is one of the attorneys that's an attorney

23   on this case.  I don't know if you've ever had a

24   chance to interact with him.

25        A    I don't think I have.

Page 155

1      Q    All right.  Okay.  Well, if we look on the

2   second page, the -- one, two, three -- fourth

3   paragraph, the second to last sentence says,

4   "Specifically, plaintiffs assert Defendants were

5   imprudent in offering the Fidelity Freedom Target Date

6   Series, the Parnassus Core Equity Fund, the Dodge &

7   Cox Stock Fund, and the Lazard Emerging Markets Equity

8   Fund."  Do you see that?

9      A    Mm-hmm.

10     Q    So it looks like among the funds, your

11  attorneys -- different case, but your attorneys, the

12  Miller Shah firm is challenging here includes the

13  Dodge & stock -- sorry -- the Dodge & Cox Stock Fund.

14  Do you see that?

15     A    Mm-hmm.  Yes.  Sorry.

16     Q    Okay.  So let's go back.  And I know you've

17  got a big stack of paper, so it's a little hard, but

18  to the Worley 2022 Form 5500, which will be one of the

19  first couple of documents from this case.

20     A    Which -- which one is it?  I don't even know

21  anymore.

22     Q    Yeah, I don't have the exhibit numbers on

23  mine.  I might --

24               MR. ROBERTS:  I think it's Exhibit 4.

25               MR. BLOCK:  Exhibit 4.  Thank you,

Page 156

1    John.

2                    And if it's hard, I can just hand you

3    the one piece of paper I was going to ask you about

4    it, Because I want you to flip back to that --

5                    MR. ROBERTS:  It's on page 12.

6                    MR. BLOCK:  -- yeah, that chart, all

7    the funds in the plan.

8    BY MR. BLOCK:

9         Q    And you see among the -- well, let's just

10    take a step back.  So this is the 401(k) plan you're

11    currently invested in; right?  The Worley plan?

12         A    I believe so.

13         Q    Okay.  And one of the investments they offer

14    is the Dodge & Cox stock fund.  Do you see that?

15         A    I do.

16         Q    So considering that your lawyers in this

17    case are challenging another plan for imprudently

18    offering the Dodge & Cox stock fund, and your current

19    plan offers the Dodge & Cox stock fund, are you going

20    to do anything to investigate whether Worley is

21    mismanaging its 401(k) plan?

22         A    I'm not sure at this time.

23         Q    All right.  What makes you unsure?  What

24    information would you need to become more sure?

25    Strike that.  Those are two different questions.  So

Page 157

1    first question, what makes you unsure?

2         A    I'm not sure.  That's the reason I'm unsure.

3         Q    So then the second question:  What

4    information would you want to see that would help you

5    make a decision?

6         A    I'm not sure.

7         Q    So sitting here today, based on everything

8    we've discussed, do you have any concern about the

9    management of your current retirement plan?

10        A    From what I've seen so far, nothing has

11   given me reason to be concerned.  But I will likely

12   maybe at some point do a little research into the

13   Dodge & Cox funds.

14        Q    And you see they also offer a DFA fund, and

15   that's one of the funds you're -- not that fund, but

16   that advisor or fund manager is one of the managers

17   you're challenging here; right?

18        A    Yes.

19        Q    So, you know, if you one day do this

20   research, what information would you look for to help

21   you assess whether something's gone awry here?

22        A    I have no idea.

23        Q    I guess to ask the closing question -- and I

24   ask this because I'm genuinely curious.  Like, so you

25   said you had no concern about the Quanta 401(k) plan

Page 158

1      until you talked to your attorneys.  I'm pointing out

2      here that your same attorneys have identified at least

3      one fund in this plan as being an imprudent fund.  So

4      what convinced you that something might be going wrong

5      with the Quanta plan?

6          A    When I learned that the funds had been

7      mismanaged or the investments weren't handled

8      correctly.

9          Q    Let's give an example of that.  What's

10     something that would make you think that a fund was

11     mismanaged?

12         A    By it being brought to your attention by

13     someone, some -- some form of media, some person, some

14     something.

15         Q    Yeah, but I guess my question was a little

16     different.  Like, what actions or lack of actions

17     would make you think that it was being mismanaged?

18     Like, is there something they're not doing that they

19     should be doing or --

20         A    With Quanta?

21         Q    Yeah.

22         A    Well, I mean, you don't know what you don't

23     know.

24         Q    Okay.  Last question, then I think -- well,

25     what would make you want to find out?  Like, I guess

Page 159

1    I'm curious -- you didn't know what you didn't know

2    about Quanta.  But you became interested enough to use

3    your time; right?

4              Clearly you're dedicating time to this to be

5    a named plaintiff.  So what would motivate you to want

6    to dedicate a similar amount of time to finding out if

7    your current plan is being managed properly?

8         A    Well, you know, I think you pointing out

9    about this blog and those two other funds, that might,

10   you know, concern me enough to start doing some

11   research and looking around.  It's -- it's been

12   brought to my attention at this point.

13              MR. BLOCK:  Well, I thank you for your

14   time today, and I have no further questions.

15              MR. ROBERTS:  No questions here.  Thank

16   you.

17              THE WITNESS:  Thanks.

18              THE OFFICER:  Mr. Roberts, would you

19   like to read and sign, sir?

20              MR. ROBERTS:  Yeah.

21              THE OFFICER:  And would you like a

22   copy?

23              MR. ROBERTS:  Yes, please.

24              THE OFFICER:  Thank you.

25              THE VIDEOGRAPHER:  That concludes

Page 160

1      today's deposition.  Off the record at 14:14.

2                      (Signature reserved.)

3                      (Whereupon, at 2:14 p.m., the

4                      proceeding was concluded.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 161

1          CERTIFICATE OF DEPOSITION OFFICER

2              I, CYNTHIA P. SMITH, the officer before whom

3     the foregoing proceedings were taken, do hereby

4     certify that any witness(es) in the foregoing

5     proceedings, prior to testifying, were duly sworn;

6     that the proceedings were recorded by me and

7     thereafter reduced to typewriting by a qualified

8     transcriptionist; that said digital audio recording of

9     said proceedings are a true and accurate record to the

10    best of my knowledge, skills, and ability; that I am

11    neither counsel for, related to, nor employed by any

12    of the parties to the action in which this was taken;

13    and, further, that I am not a relative or employee of

14    any counsel or attorney employed by the parties

15    hereto, nor financially or otherwise interested in the

16    outcome of this action.

17                              CYNTHIA P. SMITH

18                              Notary Public in and for the

19                              State of Texas

20

21    [X] Review of the transcript was requested.

22

23

24    Dated: September 20, 2024

25

Page 162

CERTIFICATE OF TRANSCRIBER

1

2          I, SARAH COSTA, do hereby certify that this

3    transcript was prepared from the digital audio

4    recording of the foregoing proceeding, that said

5    transcript is a true and accurate record of the

6    proceedings to the best of my knowledge, skills, and

7    ability; that I am neither counsel for, related to,

8    nor employed by any of the parties to the action in

9    which this was taken; and, further, that I am not a

10   relative or employee of any counsel or attorney

11   employed by the parties hereto, nor financially or

12   otherwise interested in the outcome of this action.

13

14

15                                          SARAH COSTA

16

17

18

19

20

21

22

23

24   Dated: September 20, 2024

25

Page 163

1    Marie McKnight

2    mcknight.marie@gmail.com

3                       September 20, 2024

4    RE: Laliberte, Mary v. Quanta

5        9/5/2024, Marie McKnight (#6881123)

6        The above-referenced transcript is available for

7    review.

8        Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to

15   Erratas-CS@veritext.com.

16    Return completed errata within 30 days from

17   receipt of testimony.

18     If the witness fails to do so within the time

19   allotted, the transcript may be used as if signed.

20

21

22                   Yours,

23                   Veritext Legal Solutions

24

25

```
                                            Page 164

 1    Laliberte, Mary v. Quanta

 2    Marie McKnight (#6881123)

 3                   E R R A T A   S H E E T

 4    PAGE_____ LINE_____ CHANGE_____

 5    _____

 6    REASON_____

 7    PAGE_____ LINE_____ CHANGE_____

 8    _____

 9    REASON_____

10    PAGE_____ LINE_____ CHANGE_____

11    _____

12    REASON_____

13    PAGE_____ LINE_____ CHANGE_____

14    _____

15    REASON_____

16    PAGE_____ LINE_____ CHANGE_____

17    _____

18    REASON_____

19    PAGE_____ LINE_____ CHANGE_____

20    _____

21    REASON_____

22

23    _____    _____

24    Marie McKnight                              Date

25
```

Page 165

1    Laliberte, Mary v. Quanta

2    Marie McKnight (#6881123)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Marie McKnight, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11    _____    _____

12    Marie McKnight                       Date

13    *If notary is required

14                      SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                      _____ DAY OF _____, 20____.

16

17

18                      _____

19                      NOTARY PUBLIC

20

21

22

23

24

25

**[& - 2021]**

| & |
|---|
| **&** 1:14 3:9 24:3 27:24 66:4 155:6,13,13 156:14,18,19 157:13 |

| 0 |
|---|
| **0** 85:24 87:17 89:12,17 90:20 97:25 98:9,12 98:16 103:2 116:18,19 |
| **00010** 126:16 |
| **002090** 85:4 |
| **002145** 86:11 87:3 |
| **02145** 87:7 |
| **03/31/2019** 87:16 |
| **03290** 1:7 |
| **0565** 111:4 |
| **078** 122:16 |

| 1 |
|---|
| **1** 3:7 20:15,16 93:14 112:23 |
| **10** 3:17 110:12 110:13 111:2 126:14,14 133:15 134:4 |
| **10,000** 123:7 |
| **10/1/2020** 117:4 |
| **10/3/2022** 117:5 |

**100** 108:22 137:14
**1000** 1:15
**101** 9:12 11:13
**108** 3:16
**108.47** 85:21
**10:45** 61:12,19
**10:57** 61:22
**11** 3:18 83:5 122:6,7
**11,000** 55:11
**11,425.27** 59:25
**11,425.27.** 55:4
**110** 2:14 3:17
**12** 3:19 69:11 125:22,25 126:15 156:5
**12/31** 86:24 87:2
**12/31/2017** 85:24 86:3
**12/31/2018** 86:22,25 87:12
**12/31/2020** 117:4
**122** 3:18
**125** 3:19
**12:01** 104:25
**12:43** 105:3
**13** 3:20 131:3,5 142:19 143:1,4
**13,000** 117:18
**131** 3:20
**13:37** 138:11

**13:42** 138:14
**14** 3:21 99:17 153:25 154:1
**14:14** 160:1
**15** 61:6,14,25 62:14 63:2 134:10
**15,000** 123:8
**154** 3:21
**16** 17:23 99:4 99:18
**17,000** 117:17 135:7
**18** 60:20 132:8
**18,000** 135:7
**1845** 2:6
**19** 128:2
**19103** 2:7
**1974** 58:2,7,14 58:21 109:15
**1988** 28:18
**1991** 58:1
**1996** 23:23
**1998** 28:17

| 2 |
|---|
| **2** 3:8 37:13,14 59:17 132:2 |
| **2,000** 123:7 |
| **20** 3:7 28:20 80:12 95:3 131:15 161:24 162:24 163:3 165:15 |
| **2000** 28:13,17 28:24 112:6 |

**2004** 28:15
**2005** 28:15,24
**2007** 17:7
**2009** 137:20
**2010** 70:17 71:1
**2011** 20:12
**2012** 20:12
**2015** 70:17 71:1
**2017** 3:8 38:13 41:14 94:18 140:1
**2019** 41:15 46:14 48:2 62:6,10,11 87:17 89:2,9 89:12,18 95:15 95:22 104:2 114:17 117:8,9 117:10 126:5 126:20
**2020** 88:5,23 89:7,20 90:10 90:14,15,20,21 94:13,17 95:8 95:14,17,19 96:1,3,5,7,15 96:16,18 99:10 104:1,3 116:17 116:17,22 117:8,11 122:18,25
**2021** 142:20,21

**[2022 - 9]**                                                                    Page 2

**2022**  3:11 69:5
  82:8 116:22,25
  117:6 155:18
**2024**  1:12 4:4
  4:12 93:14
  99:5 104:1,3
  132:8 161:24
  162:24 163:3
**2025**  134:13
**2026**  33:10
**2030**  126:20,22
  134:12 135:3
**21**  62:10,10
**21.1**  115:8
**2115**  87:6
**2174**  114:16
**22**  65:15 82:8
  142:21
**2211**  116:15
**25**  83:25
**25554**  161:16
**28760**  162:14
**29**  84:5
**2:14**  160:3

**3**

**3**  3:9 31:6
  36:16 46:17,18
  47:18 108:22
  108:24 126:15
  132:23
**3,000**  123:7
**30**  19:24 99:5
  163:16
**30,000**  125:2

**30s**  17:20
**31**  87:17 89:1,9
  89:12
**312**  2:17
**318**  16:16
**324-1715**  2:17
**33**  147:7
**33,000**  124:3,14
  125:5
**35,000**  118:5,23
  118:25 120:15
  120:20 121:4
  122:20,25
**35,475.73.**
  118:4
**37**  3:8 94:3

**4**

**4**  3:11 69:1,3
  155:24,25
**4-5**  87:8
**4000**  1:15
**401**  3:12 16:23
  33:17,20 34:2
  37:6,10,17
  38:9 45:9,11
  45:18 46:1,8
  64:22 66:5,9
  67:17,18,21,24
  68:1 77:5,6
  79:10,23,25
  80:3 95:7
  102:4,8 106:1
  106:5 123:24
  125:9,11,16
  130:8 133:9

  134:13 137:4,5
  137:5 144:19
  144:24 156:10
  156:21 157:25
**46**  3:10
**4:22**  1:7

**5**

**5**  1:12 3:12 4:3
  4:12 10:5 23:2
  25:22 26:3
  81:8 112:23
  113:19
**5/21/19**  63:16
  63:19,20 64:1
**50**  108:23
**500**  115:24
**55**  39:1
**5500**  3:8,11
  37:17 38:13
  69:2 155:18
**565**  111:5

**6**

**6**  3:3,13 82:6,9
  99:5 133:14
**60606**  2:15
**610**  2:9
**63**  16:13
**66**  94:21
**68**  108:17
**6881123**  1:18
  163:5 164:2
  165:2
**69**  3:11 94:2,20
  94:23 95:3

**7**

**7**  3:14 48:2
  49:18,20 50:2
  57:4 62:6,21
  93:10,11
  109:12 131:25
**70**  109:13
**70s**  23:13
**77002**  1:16
**77573**  16:18
**79.78**  86:23
  87:12
**79.78.**  87:1,14
**7a**  55:8
**7th**  63:5

**8**

**8**  1:20 3:15
  47:17 50:7
  83:1 97:9,10
  107:22 131:25
**806**  2:6
**81**  3:12 126:18
  127:9
**82**  3:13
**85**  17:18
**86**  17:18
**88**  17:16
**8a**  48:18 51:4
  52:3
**8c**  49:2

**9**

**9**  3:16 31:16,18
  83:20 108:2,4
  142:20

**[9/30/2017 - agree]**

**9/30/2017**
85:21
**9/5/2024**  163:5
**900-6068**  2:9
**90s**  17:6
**92**  17:19
**93**  3:14
**97**  3:15
**9:25**  1:13 4:3
**9:30**  10:25
**9:34**  11:3

**a**

**a.m.**  1:13
**abf**  85:8 86:13
**ability**  11:25
12:3 110:5
161:10 162:7
**able**  33:6,11
42:17 81:12
102:16
**above**  59:12
101:2 127:25
131:21 163:6
165:7
**absent**  4:15
**absolutely**
140:9 146:23
**abused**  8:6
**access**  107:13
107:15 136:5,9
136:14
**accessed**  126:8
**accident**
137:18

**account**  3:18
18:16 19:11
72:10 84:19
106:10 107:1
113:17 114:5,9
114:22 117:15
118:1,3 121:4
122:13 123:4
125:3,6,7,12
134:24 136:5,6
136:10,21
**accountant**
31:10 65:20
**accounting**
21:11,15,17
22:22 23:8,12
23:15 24:23
**accounts**  21:19
21:19 26:9,10
72:2,4,4,11
**accuracy**  163:9
**accurate**  21:6
136:8 161:9
162:5
**acknowledge...**
60:21,22 165:3
**acknowledges**
59:14
**acknowledg...**
163:12
**acknowledg...**
4:14
**act**  56:22 57:25
58:2,7,14,21,25
109:15

**action**  3:9,13
48:25 52:10,13
52:15,18 53:3
53:4,16,21
56:2,19 82:7
133:18 153:1
161:12,16
162:8,12
**actions**  158:16
158:16
**active**  76:12
77:21 78:2,23
80:1 83:6,19
**actively**  78:13
78:15,17
**activity**  118:1,3
**actual**  118:12
135:19
**actuality**  100:7
**actually**  11:12
24:2 28:12,18
50:9 52:19
59:16 61:9
76:1 96:17
97:5,14 116:24
128:23 137:24
**adam**  3:15 97:9
**additional**
96:16 145:14
152:17
**additionally**
4:15
**additions**  165:6
**address**  16:15
142:8

**adds**  117:24
**adequate**
139:19 140:23
149:6 150:6
**adler**  143:22
**administer**
4:14 153:6
**administration**
23:8,12,14
**admission**
133:21,24
**admissions**
133:17
**advertisement**
142:4
**advice**  68:16
**advisor**  79:12
130:17 157:16
**advisors**  71:8,9
71:11,15,22
**age**  34:4 56:21
57:24 75:8
**agents**  133:17
**ages**  17:13
**ago**  6:3,19 8:10
14:13 19:24
24:19 38:7
80:12 133:23
**agree**  4:17 52:6
55:9 59:10
60:8 62:22
76:9,9 77:13
77:17 81:6
86:14,15 90:12
90:16 94:24

97:3 102:25 103:21 104:3 119:2,5 141:20 147:1 154:18

**agreed** 61:1 103:20

**agreeing** 103:8 140:24

**agreement** 3:10 47:18,24 48:3 48:15 52:1 53:20 54:6 58:11 59:3,6 59:21,24 60:2 60:25 64:1

**agreements** 56:4

**agrees** 48:23 52:10

**ahb** 1:8

**aid** 48:24

**al** 1:4,7 4:11,11

**alec** 154:22

**aligning** 112:9

**allegation** 89:5 90:14 103:25

**allegations** 15:22

**alleged** 72:25 133:20

**allegedly** 133:19

**alleges** 88:2 89:19

**allocated** 119:9 119:11 120:17 128:5

**allotted** 163:19

**alongside** 5:8

**alternative** 34:19

**american** 84:1 85:14 86:4,13 88:3 89:3,18 92:7 94:11 95:6 97:24 99:7,21 100:14 101:1 111:6,11 113:11

**amount** 87:13 108:22 118:9 118:24,25 119:4 120:16 124:5 145:20 159:6

**analyst** 41:14

**ange** 17:18

**angela** 19:3

**angle** 16:23

**annual** 113:3

**annually** 31:16

**answer** 7:1,2,6 9:15 10:5,13 11:19,21 13:12 13:19 26:17 30:22 33:15 35:6,7 50:13 70:6,20 71:16 71:17 73:13

78:9 81:12,25 88:9 105:11 120:8 123:22 125:18 132:3 134:10 150:15 150:19

**answered** 120:2 135:5 143:18 151:18

**answering** 6:25 78:5

**answers** 75:15 129:6

**anticipating** 76:2

**anybody** 5:20

**anymore** 136:18 155:21

**ao** 132:23

**apart** 152:5

**apologize** 128:2

**appears** 154:18 154:20

**appended** 165:7

**apple** 91:13,16 91:20,24 103:16,20,21 103:24,25 104:2,4,8

**apples** 149:9,9 149:12,12

**applicable** 4:21 163:8

**application** 22:2 27:18 32:23 41:19 94:8

**applications** 41:14,19

**applied** 22:11 22:17 24:9 31:20 52:24 106:2

**applies** 58:11

**apply** 22:18 50:16

**appreciate** 93:23,24

**area** 34:20 36:12 74:16

**arguably** 59:7

**argue** 100:10

**argument** 59:23 60:4

**arising** 56:9,12 56:25 57:6,8

**arrested** 20:5

**articles** 107:14

**articulate** 20:24 95:10 102:21

**aside** 38:25 76:23 96:12,13 97:8 98:14 102:2

**asked** 7:3 13:5 15:7 21:16 30:9 65:20,25

**[asked - ballpark]**                                    Page 5

| | | | b |
|---|---|---|---|
| 113:25 114:1 | **assist** 110:1 | 143:20 144:6 | **b** 3:5 6:16 |
| 142:9 151:20 | **associate's** 23:7 | 144:10,21,23 | 14:17 54:4 |
| **asking** 7:7 | **assume** 10:14 | 145:10 147:7 | 69:24 70:19 |
| 17:21 25:10 | 88:17 95:24 | 150:6 154:3,22 | 71:8 145:17 |
| 35:13 40:14 | **assumption** | 155:11,11 | **b&b** 29:10,11 |
| 57:8 58:19 | 9:11 | 158:1,2 | **b7** 111:3 |
| 63:25 69:22 | **attached** | **attracted** 36:19 | **b8** 111:3 |
| 70:19 73:8,23 | 163:11 | 39:5,18 65:8 | **back** 7:3 11:2 |
| 76:24 78:13 | **attend** 45:20 | **attributable** | 23:13 28:16 |
| 81:24 98:4,15 | 140:8,11 | 99:6,14,19 | 29:17 31:8 |
| 114:4 119:4 | **attendance** 5:5 | **audibly** 10:5 | 36:15 38:24 |
| 125:21 128:25 | 65:22 | **audio** 161:8 | 39:1,2 50:7 |
| 139:9 154:17 | **attended** 23:4 | 162:3 | 51:18 52:3 |
| **asks** 132:23 | 25:14 | **august** 93:14 | 59:11,17,20 |
| 133:14 134:4,7 | **attention** 35:16 | **authorized** | 60:5 61:21 |
| **aspect** 56:9,12 | 35:24,25 68:5 | 4:13 | 62:8 64:8 69:8 |
| 56:25 57:6,9 | 68:13 94:1 | **available** 107:9 | 69:12,13,13 |
| **assert** 155:4 | 103:14 104:10 | 113:5,14 163:6 | 74:10 84:19 |
| **assess** 121:12 | 158:12 159:12 | **average** 147:9 | 88:8 89:24 |
| 148:23 149:7 | **attorney** 5:9 | 147:11 | 90:8 93:15 |
| 151:6,10,16 | 7:1 12:7,13,22 | **award** 73:19 | 105:2 116:16 |
| 157:21 | 14:10 47:9,14 | 152:12 | 138:13 143:11 |
| **assessment** | 48:7 50:20 | **awarded** | 145:3 155:16 |
| 150:14,17 | 84:18 140:20 | 152:20 | 156:4,10 |
| 151:4 | 140:24 146:20 | **awards** 152:21 | **background** |
| **assessments** | 154:7,22 | **aware** 44:9 | 16:11 |
| 150:4,5,8,18 | 161:14 162:10 | 59:5,23 60:4 | **bad** 27:4 |
| **asset** 75:1,1 | 163:13 | 76:15 92:20,24 | 129:11 141:24 |
| **assets** 31:17 | **attorney's** | 93:2,3 103:7 | **balance** 106:9 |
| 37:25 130:8 | 154:8 | 103:12,14 | 106:24 107:1 |
| **assigned** 4:7 | **attorneys** 16:9 | 122:1 128:19 | 114:12,24,24 |
| 33:8 | 93:2 132:4,17 | 129:22,23 | 116:18,19 |
| **assignment** | 140:17 141:3,7 | 135:16 142:16 | **ballpark** |
| 65:18 | 141:16,19,22 | **awry** 157:21 | 147:19 |
| | 142:2 143:16 | | |

**[bankruptcy - bring]**

**bankruptcy**
20:9
**based** 15:20
44:4 73:13
92:15 96:5
100:1,13 101:9
102:20 112:13
116:12 120:24
151:4 157:7
**basic** 24:23
72:17 108:25
114:1
**basically** 110:7
**basis** 43:8 67:6
147:10 148:18
149:6
**bates** 84:24
87:4 108:16
126:14
**beacon** 84:1
85:14 86:4,13
88:3 89:4,18
92:7 94:12
95:6 97:24
99:8,21 100:14
101:1 111:6,11
113:11
**bear** 35:20
**bearing** 141:14
**beat** 10:4
**beginning**
114:23 132:1,9
142:9 147:15
**begins** 8:2 9:2

**behalf** 2:2,11
5:11 15:15,15
137:23
**belief** 116:4,6
**believe** 86:8,9
87:24 91:3
100:3 136:9
138:3 144:18
151:18 153:16
153:20 156:12
**belong** 22:4,4
**benchmark**
111:19 112:2,3
112:8,9 113:14
**benefit** 56:22
**benefits** 41:6
46:7 55:11
59:20
**benton** 6:15
**berin** 154:22
**bernie** 76:20
**best** 61:14 64:3
72:3 101:16
110:4 146:15
146:20 161:10
162:6
**better** 18:24
33:7 49:11
72:7,18,19
73:2,14 83:17
90:21 112:11
112:17,19,22
112:22 118:18
147:5,6

**beyond** 107:1
**big** 14:9 31:21
81:7 113:17
155:17
**biggest** 113:17
**billed** 26:19
**billing** 26:5,24
26:25
**billings** 25:24
**bills** 29:3
123:16
**biological**
17:11
**bit** 38:11,15
104:18 109:17
113:7 115:3
135:17
**block** 2:12 3:3
5:6,7,25 6:7
8:3 9:3 10:3,6
10:21 11:7,10
11:11 14:7
30:21 35:11
47:1 55:18
61:9,13,16,23
82:11,13 93:17
93:21,23,25
96:22 97:13
104:19,22
105:4 107:18
107:22,24,25
111:25 116:14
124:17,21,23
138:7,15
155:25 156:6,8

159:13
**blog** 3:21 154:3
154:8,11,18
159:9
**blogs** 79:6
**blue** 21:9
**bo** 44:20
**board** 66:1
**bockius** 1:14
2:13
**bond** 115:25
**bones** 147:2
**books** 79:6
**born** 17:16,18
17:19
**bottom** 31:6
84:23 87:5
108:17
**boutique** 30:23
149:14,15
**box** 41:20
**brandy** 14:15
16:7 132:10
**breach** 52:1
59:22
**break** 10:22
11:15 61:14,25
104:23 105:6
135:20 138:8
**breaks** 11:13
112:25
**bridge** 96:11
**brief** 135:20
**bring** 14:2
35:19,19

|  | c |  |  |
|---|---|---|---|
| 102:16,22 | | **caption** 60:21 | **certain** 109:16 |
| **bringing** 47:23 | **c** 2:1 4:1 6:11 | **car** 137:18 | 135:22 137:12 |
| 48:16 129:2,16 | 49:25 70:16 | 138:3 | **certificate** |
| **brings** 47:23 | **cabinet** 136:25 | **care** 48:22 51:8 | 161:1 162:1 |
| **broad** 40:5 | 137:2 | 51:8 134:7 | **certification** |
| **brochures** | **calculated** | **carolyn** 2:21 | 23:24 |
| 133:10 | 97:25 101:7 | 5:8 45:1 | **certifications** |
| **brokerage** | **calculates** | **case** 1:6 6:20 | 25:12 |
| 124:4 | 97:17 98:16 | 8:9 15:11 16:8 | **certified** 4:18 |
| **brought** 26:8 | 101:18 | 50:22 66:16 | **certify** 161:4 |
| 32:12 35:16,23 | **call** 12:17,21 | 69:8 73:9 | 162:2 |
| 35:25 48:14 | 23:10 39:14 | 82:12 93:1,6,9 | **cetera** 71:1 |
| 103:13 104:10 | 150:13,17 | 97:17 100:10 | **challenged** |
| 128:18 158:12 | **called** 5:17 13:5 | 122:10 137:1 | 82:1,22 98:11 |
| 159:12 | 32:23,23 71:9 | 140:4,4,14 | 139:8,13 |
| **brown** 24:3 | 84:24 102:13 | 141:22 144:2 | **challenging** |
| 66:4 | 102:15 107:5 | 145:4 146:13 | 83:11,15 84:4 |
| **budget** 31:16 | 109:13 | 147:13 148:13 | 84:6,14 85:18 |
| 31:19 | **calls** 12:14,15 | 150:23 151:5 | 129:3,16 |
| **building** 65:18 | **campbell** 2:21 | 152:17,25 | 155:12 156:17 |
| **bunch** 38:4 | 5:8 45:1 | 153:1 154:23 | 157:17 |
| 49:22 69:24 | **canal** 84:20 | 155:11,19 | **chance** 20:24 |
| 74:23 91:9 | **candid** 117:7 | 156:17 | 46:21 52:15 |
| **burchette** 2:20 | **cap** 84:1,5 85:9 | **cases** 24:7 | 60:22 154:4,24 |
| 5:3 | 85:14 86:4,17 | **cassidy** 44:20 | **change** 42:15 |
| **business** 23:8 | 87:10,20 89:3 | **casual** 147:12 | 66:12 164:4,7 |
| 23:12,19 24:6 | 89:13,17 92:7 | **category** | 164:10,13,16 |
| 24:6 41:15,23 | 92:7 99:9,10 | 130:18 | 164:19 |
| 149:4 | 111:6,12 113:8 | **cater** 81:4 | **changed** 75:16 |
| **businesses** | **capital** 31:17 | **cause** 15:7 | 96:18 |
| 40:13 | 49:25 | 27:16 42:9 | **changes** 42:2 |
| **butchered** | **capitalized** | 48:24 56:1 | 163:10 165:6 |
| 88:24 | 49:13,15,19 | 66:11 151:3,9 | **changing** |
| **buy** 31:22 32:1 | **capozzi** 143:22 | **causes** 56:19 | 106:14 |

[charge - compares]                                                                Page 8

charge  49:1
  52:10,16 53:3
  146:13
chart  42:17
  69:10 111:5,6
  113:1 123:2,3
  156:6
cheaper  147:5
cheapest  147:4
check  36:9
checked  114:12
  114:13
checklist  63:15
  63:21
checks  131:9
checkups  67:8
cherry  49:12
chicago  2:15
child  8:6,9
children  17:8
china  121:24
  122:2
choices  110:10
  110:11
choose  38:22
  46:7 68:25
  115:18 116:9
  142:2
choosing  34:14
  34:18 116:8
chose  58:17
  116:6
christmas
  143:8

chronologica...
  23:3 25:21
city  16:16
civil  54:4
  137:17
claim  56:15
  59:13
claimants
  138:21
claims  56:1,8
  56:19 57:6,24
  58:6,13,20
  59:12
clarify  115:17
  132:14
clarity  65:13
class  3:13 75:2
  77:9 82:7
  111:7 113:9
  136:8 138:17
  138:24 139:1,2
  139:11,19,23
  148:11 150:21
  151:14,15,23
  152:4,5,13,16
  152:22 153:1
classes  24:18
  24:20,22 25:3
  25:4,5
cleanest  82:25
clear  54:13
  72:1
clearly  159:4
client  77:2

clinton  31:24
clip  113:18
clock  61:10
close  42:10
  81:10
closely  44:1
closer  148:9,9
closing  157:23
clue  140:6
  145:25 154:9
code  21:24
coded  21:24
collect  65:23
  145:2 146:7
college  23:4,5
  24:15,18,20,22
  29:25 30:1
column  69:24
  70:16,19 71:8
  112:25 122:17
  123:5
com  128:3
combination
  106:13 114:3
  126:10
come  15:8
  27:19 36:8
  51:3 63:12
  66:1 67:19
  68:5,12 83:24
  154:12
comfortable
  121:14
coming  15:4
  26:10

commence
  48:23 52:7
commenced
  48:22,24
commences
  54:5
committee
  58:17 72:5
common  26:5
  56:5
communicated
  142:20,25
communicati...
  132:24 133:3,7
  136:20
companies
  34:10,17
company  15:24
  29:1,4,8,9,13
  31:21 32:24
  40:12,19 41:2
  41:3,23 42:13
  43:4 49:25
  50:1,5 55:22
  56:10,13 57:1
  57:7,10,12
  59:20 70:1
  109:2 121:20
  128:4,10,10,14
compare  45:11
  90:23
compared
  112:1 113:13
compares
  109:9

**comparing**
149:8
**comparison**
149:13
**compensation**
108:23,24
145:14 152:3
152:13,17,20
152:21
**competency**
43:24
**complain** 102:3
**complained**
102:5
**complaint** 3:13
49:1 52:11,16
53:3 54:5 82:1
82:7,23 84:4
86:20 89:18
102:11
**complaints**
102:6
**complete** 165:8
**completed**
163:16
**concept** 102:12
102:15
**concern** 54:7
128:23 157:8
157:25 159:10
**concerned**
53:23,25 60:7
60:12 68:9
157:11

**concerning**
60:8 133:18,25
**concerns** 70:5,8
70:11 144:23
**concluded**
160:4
**concludes**
159:25
**conduct** 143:25
148:22
**conducted**
148:19
**confident** 60:17
60:19 132:20
**confidential**
1:20 8:1,12
11:6
**configuration**
26:14 36:24
37:4 41:10,19
**confirm** 74:24
133:23 154:7
**confronted**
38:12
**confused** 78:11
89:10
**consider** 74:12
74:18 75:3
109:4 134:25
**consideration**
55:10 59:15
**considered**
49:23 74:24
**considering**
156:16

**consistent**
94:10
**constantly**
41:18
**constitute** 4:25
**consult** 47:15
48:6 143:16,19
143:21
**contact** 144:10
154:21
**contend** 133:15
**context** 43:10
100:23
**continue** 25:20
**continuing**
30:25
**contract** 39:7
39:21
**contracts** 56:3
**contributed**
117:17,18
**contribution**
117:21
**contributions**
108:18,21
**controls** 32:25
**controversies**
56:2,20
**convenient**
38:25
**conversation**
10:8 16:3,7
100:1 132:9,10
132:15 141:10

**conversations**
12:13 51:9,10
132:16 147:13
148:3
**convicted** 20:7
**convinced**
158:4
**copiers** 23:18
**copies** 136:1,23
137:12 163:14
**copy** 48:5,9,10
136:23 159:22
**core** 155:6
**corporate**
22:13,15
**corps** 71:10
**correct** 30:15
36:2,3 39:4
53:18 60:18
62:24 64:13
65:6 71:23
75:19,20 91:3
105:10 113:5
115:1 117:12
117:19,23
125:10 126:6
131:10,23
136:13 144:24
144:25 165:8
**corrections**
165:6
**correctly** 62:2
72:20 73:11
104:11 158:8

[cost - deficiencies]

**cost** 75:2 146:18,20
**costa** 162:2,15
**costly** 83:21,22
**counsel** 2:21 5:7,23 13:22 142:20,21 143:1 161:11 161:14 162:7 162:10 163:14
**couple** 6:3 12:9 12:14 14:13 17:17 46:12 63:7 69:13 72:8 92:19 100:22 106:6 106:21 109:19 147:17 155:19
**course** 10:10 24:12 140:13 141:12 147:18 147:20
**courses** 23:20
**court** 1:1 73:6 73:18,19 100:8 100:10 138:21 139:18,21 152:21,23,25
**court's** 145:17
**courts** 73:8,16 152:7,10,12,12
**covenants** 56:3
**cover** 24:12 58:21,23 139:23

**covered** 54:6 144:16
**covers** 38:13
**cox** 155:7,13 156:14,18,19 157:13
**cpa** 29:7
**crashing** 75:25
**crime** 20:7
**criteria** 151:16 151:20,25
**cryptocurrency** 130:23
**cs** 163:15
**curious** 124:6 157:24 159:1
**current** 16:14 125:8,11 137:5 156:18 157:9 159:7
**currently** 66:2 69:19 125:2 156:11
**customer** 25:23
**customization** 41:24,25
**cut** 22:16 95:21
**cute** 60:16 121:18
**cv** 1:7
**cynthia** 1:17 4:4,7 161:2,17

**d**

**d** 3:1 4:1
**damages** 56:3 73:15 97:17,25 98:8,10,12,16 100:13,18 101:7,13,18 103:2
**date** 1:12 4:3 33:12 62:4,24 63:22 71:2,4,6 96:15 114:18 115:5,7 132:8 134:5,8,20 135:14 155:5 164:24 165:12
**dated** 62:20 63:16 93:14 161:24 162:24
**dates** 64:10 89:10 139:24 139:25
**daughter** 137:21,24
**day** 14:22 61:4 151:4,4 157:19 165:15
**days** 14:13 140:7,8 143:1 143:4 163:16
**deal** 22:12
**dealing** 26:10
**debts** 56:2,19
**december** 116:17 142:20

142:21 143:7
**decide** 48:15 73:6,16 100:9 100:11 126:22
**decided** 42:14 46:16
**decides** 152:25
**deciding** 40:1
**decision** 33:24 68:19,23,24 91:6 92:17 119:13 130:13 132:25 133:4,7 143:11 145:17 157:5
**decisions** 74:19 79:2 140:23
**declaration** 133:17,21,25
**declare** 131:22 165:4
**declared** 20:9
**decorating** 143:8
**decrees** 56:3
**dedicate** 159:6
**dedicating** 159:4
**deemed** 165:6
**defendant** 2:11
**defendants** 1:8 133:15,16 155:4
**deficiencies** 41:15 42:3

**defined** 49:17
83:20
**definitely** 81:25
141:9
**degree** 23:8
**depend** 66:23
77:2 128:15
**depends** 90:23
**deponent**
163:13 165:3
**deposed** 6:18
8:9 9:4
**deposing**
163:13
**deposition** 1:10
4:9,23 6:3 9:12
11:13,24 12:6
12:15,25 14:5
14:11 15:4
131:9 147:16
160:1 161:1
**depositions**
9:11
**deposits** 122:23
**depreciated**
32:3
**depth** 121:11
**derek** 43:17
**derrick** 43:16
**desai** 44:22
**describe** 72:13
133:20 138:24
139:2
**describing**
38:20

**description** 3:6
3:16 107:6
108:2
**descriptions**
70:18
**design** 18:14
25:3 26:14
36:23 37:4
41:10,18
**designated**
11:6
**desk** 61:5
**detail** 16:23
133:20
**details** 8:4,8
45:15 70:18
71:18 97:19
121:6 137:25
**determine** 30:5
60:11 90:9
150:24 151:25
**determining**
22:9
**development**
23:24
**developments**
150:22
**dfa** 71:10 84:4
86:16 87:10,20
88:4 89:2,13
89:16 92:6
94:12 95:6
97:23 99:8,21
100:14 101:1
113:8,12

157:14
**difference** 78:2
78:15 91:25
92:8,10 149:24
**different** 13:11
23:16 24:7
25:11 31:12
33:3 34:13
38:4,21 42:6
50:10 58:10
63:7 66:25
72:11 74:11
76:22 77:13,14
77:15,18,18
81:1,2,5 85:5
87:4 90:11,19
90:24 91:9
92:20 114:15
118:2 143:19
155:11 156:25
158:16
**differently**
54:17 98:9
101:24 127:18
129:24 130:3
140:10 144:22
**differs** 80:25
**difficult** 90:1
**digital** 131:16
161:8 162:3
**diligently** 105:6
**dimensional**
71:9,11,15,22
**direct** 20:22
69:9

**disagree** 59:6
95:24 141:23
**disagreed**
140:19 141:13
**discharges**
55:22
**disclosure** 3:17
110:20
**disclosures**
107:9 114:5,8
136:22
**discrimination**
56:21 57:25
**discuss** 24:5
**discussed** 9:12
11:19 14:11
19:23 24:8
61:2 102:11
146:3 157:8
**discussing** 9:8
110:18 122:14
**discussion**
116:11
**dislike** 121:20
**disregard**
11:20
**dissect** 57:16
**distinguish**
116:8
**distributed**
29:14
**district** 1:1,2,2
19:8,9,12
**divorce** 17:1,4
17:7 31:8

[doctor - employers]                                              Page 12

| | | | |
|---|---|---|---|
| **doctor** 66:25 | **dodge** 155:6,13 | **duly** 5:17 161:5 | **emails** 148:3 |
| 67:6 146:25 | 155:13 156:14 | **duties** 109:16 | **emerging** 155:7 |
| **doctor's** 67:1 | 156:18,19 | 138:17 | **emily** 18:13 |
| **document** 13:3 | 157:13 | | **employed** 18:5 |
| 13:5,11 20:19 | **doing** 21:5 26:7 | **e** | 18:10 19:4 |
| 20:20,25 21:2 | 26:14 28:25 | **e** 2:1,1 3:1,5 4:1 | 30:6 80:11 |
| 46:22 47:2,5,7 | 30:5 32:10 | 4:1 6:10,16 | 161:11,14 |
| 47:13 48:1 | 34:18 36:24 | 164:3,3,3 | 162:8,11 |
| 50:19 61:7 | 40:6 41:18 | **earlier** 18:23 | **employee** 29:18 |
| 62:5 63:8,19 | 66:22 72:6 | 101:11 118:14 | 33:8 39:8,11 |
| 63:20 64:4 | 101:12 140:22 | 131:7 137:15 | 39:19,21 47:19 |
| 81:7,12,23 | 141:8,15,24,25 | 149:4 | 47:20 48:19,21 |
| 82:14 100:20 | 148:16,18,20 | **early** 146:3 | 50:8 52:6 54:4 |
| 101:9 107:5 | 148:23 149:7 | **easier** 124:25 | 54:16 55:19 |
| 110:21,22,22 | 150:6,24 151:7 | **easiest** 51:20 | 58:2,6,13,20 |
| 110:24 114:11 | 151:17 152:1 | **ecosys** 32:23,24 | 59:14,19 |
| 118:7 122:9 | 152:18 158:18 | 33:2,4 36:22 | 109:15 117:11 |
| 125:21 126:2,7 | 158:19 159:10 | 36:23 37:4 | 149:16 161:13 |
| 131:12,18,22 | **dollar** 122:20 | 40:6,8 41:10 | 162:10 |
| 132:7 133:22 | 146:15 | **education** | **employee's** |
| 135:19 153:24 | **dollars** 89:16 | 24:17 | 56:9,13,25 |
| 154:15 | 92:15 125:2 | **effort** 143:11 | 57:7,9 |
| **documents** | 128:14 145:24 | **eight** 28:8 | **employees** |
| 12:24 13:2,13 | **double** 26:19 | **either** 89:2,8,22 | 27:11 28:4 |
| 13:20 66:19 | 26:24,25 36:9 | 107:9 110:21 | 29:5,15 32:21 |
| 68:20 79:14 | **doubt** 60:13 | 146:25 | 37:5 40:25 |
| 88:11 95:14 | 62:23 119:15 | **elected** 108:20 | 66:2 139:4 |
| 110:16,18 | 152:23 154:10 | **elections** 117:5 | **employer** 25:21 |
| 124:11,25 | **dr** 3:15 | **electronic** | 40:16 80:2 |
| 125:20 126:12 | **draft** 54:22 | 137:9 | 108:20 149:5 |
| 131:8 135:22 | **drawer** 137:7 | **eligible** 108:21 | **employer's** |
| 135:24 136:7 | 137:13 | 108:23,24 | 80:3 125:8 |
| 137:3,6,8 | **drive** 2:14 | **email** 113:22 | **employers** |
| 155:19 | 16:16 31:24 | 124:19 142:6,8 | 109:10 |
| | | 147:25 | |

**employment**
  17:22 27:21
  36:17 46:13
  56:10,11,13,14
  56:25 57:7,9
  57:12 62:9,10
  63:23 64:23
**encountered**
  26:6
**ended** 64:23
  118:19 120:20
  121:1
**ends** 7:11 8:13
**energy** 36:25
  143:11
**english** 24:23
  25:3 47:21
  49:5,6
**enjoyed** 36:23
  40:7,21,23
**ensure** 73:10
  74:4
**ensuring**
  148:17
**entail** 24:1 37:3
  41:9
**entire** 41:23
  100:23 140:8
  140:12
**entities** 49:22
**entries** 21:20
  21:22
**entry** 22:3
**environment**
  40:20

**equal** 108:22
**equipment**
  31:23 32:1
**equity** 56:5
  99:10 155:6,7
**erisa** 109:16
**errata** 163:11
  163:13,16
**erratas** 163:15
**es** 161:4
**escort** 61:5
**escorted** 62:19
**esquire** 2:4,12
**essentially**
  11:20
**establish** 119:3
**estimate**
  147:19
**et** 1:4,7 4:10,11
  71:1
**evaluate** 30:2
  30:17
**evaluation** 30:8
  30:12 148:19
  148:23
**event** 54:4
**events** 11:25
**everybody**
  40:10 73:10
  145:11
**everybody's**
  76:22
**evidentiary**
  4:22

**ex** 29:1
**exact** 69:8
  132:7 139:24
**exactly** 92:5
  133:11
**examination**
  3:2 6:6
**examined** 5:19
**example** 21:23
  74:1 77:1,5
  121:16 158:9
**excuse** 55:14
**exercise** 32:1
**exhibit** 3:7,8,9
  3:11,12,13,14
  3:15,16,17,18
  3:19,20,21
  20:13,15,16
  37:13,14 46:17
  46:18 69:1,3
  81:8 82:5,6,9
  93:10,11,21
  97:9,10 107:20
  108:1,4 110:12
  110:13 113:18
  122:5,6,7
  125:22,25
  131:3,5 153:22
  153:22,25
  154:1 155:22
  155:24,25
**existed** 46:3
**expect** 97:19
  152:3,12

**expectation**
  139:16 152:8
**expectations**
  152:15
**expected**
  112:12
**expense** 113:3
**expensive**
  78:22,23 105:8
  105:9,14,17
**experience**
  28:19
**expert** 3:14,15
  26:9 67:19,25
  92:21,23 93:1
  93:5,9,13
  94:16 95:6,11
  97:7,9,16,24
  98:16,21,25
  100:18 101:7
  101:18 151:6
**expertise** 36:13
  66:20 74:16
**experts** 66:21
  66:24 67:11
  94:6 100:2
  141:4,21,25
**expired** 32:11
**explain** 108:25
**explained** 54:2
  150:9
**expression**
  101:12
**extent** 59:13
  64:9

**exxon** 33:8
**eye** 33:11

**f**

**face** 138:19,20
**fact** 62:15
 129:14
**factors** 74:18
 75:6
**failed** 135:12
 135:15
**fails** 163:18
**failures** 99:7,20
**fair** 72:13
**fairly** 37:12
 60:19 132:20
**familiar** 42:18
 43:2,11,12
 69:16,17 70:6
 107:7 108:7,8
 112:20 122:12
**family** 79:6
**far** 6:25 40:3
 43:24 91:25
 96:6 157:10
**farmers** 137:17
**favor** 73:18
**february** 132:8
**fee** 3:17 107:8
 110:20 136:22
**feel** 10:14 37:17
 61:10 100:24
 144:9
**feeling** 128:8
 128:11

**feelings** 115:11
**fees** 75:2 113:4
 145:1 146:7,18
 146:21
**felt** 141:7
 151:13 152:23
**fidelity** 3:18,19
 34:8,22 70:24
 79:22 83:3,13
 83:19,20
 115:24,25
 116:13,15
 118:19 119:8
 119:20 120:4
 122:14,25
 124:13 125:3
 126:5,11,19,23
 127:10 128:19
 129:1,3 130:8
 134:15,16,19
 135:3 136:12
 155:5
**fidelity's**
 119:22,25
**field** 66:20
**figure** 25:1
 93:9
**figured** 24:10
**file** 48:23 52:7
 52:10 137:17
**filed** 19:20 20:1
 48:2,22 82:7
 82:19 137:23
**files** 54:4
 135:25 136:2

**filing** 59:1
 136:25 137:2,7
 137:13 140:14
 140:15
**final** 153:22
**finance** 21:11
 21:12,14,17
 22:15,22
**financial** 25:14
 79:8 98:18
 100:3 107:14
**financially**
 161:15 162:11
**find** 67:20
 68:16 87:8
 132:7 139:18
 158:25
**finding** 66:15
 159:6
**finds** 73:18
**fine** 93:20
 141:25
**finish** 24:19
 52:14,14
**firm** 18:14,16
 154:8 155:12
**firms** 143:23
**first** 5:17 15:7
 17:4 20:13
 25:21 32:14
 42:9 47:14
 55:10 63:8
 69:15 81:17
 82:18 85:8
 86:2 88:5 89:6

89:20 94:13,17
 94:18 95:2,8
 95:13,17,18,22
 96:1,3,4,7
 107:24 108:22
 109:19 111:19
 128:8 142:19
 142:25 155:19
 157:1
**fitness** 31:24
**five** 16:20
 111:18 138:7
 148:6,9
**fixed** 31:17
**flexibility** 6:2
**flip** 20:18 37:21
 85:3 86:10
 156:4
**florida** 24:20
 24:25 25:1
**focus** 23:10
 25:23 49:24
 115:2
**focused** 16:2
**follow** 16:24
 72:9
**follows** 5:19
**forecasts** 33:1
**foregoing**
 161:3,4 162:4
 165:5
**forgetting**
 52:19 135:7
**form** 3:8,11
 30:19 35:5

37:17 38:13
39:1 54:25
67:23 68:18
69:2 84:16
98:19 104:6
129:18 135:9
141:5,17
155:18 158:13
**formal** 30:7,12
102:6,10
148:19,23
150:4,13,17
152:2
**formally** 30:3
151:16
**former** 74:6
**formerly** 80:11
**forth** 56:6
76:14
**found** 35:3,13
**foundation**
81:23
**four** 16:20
**fourth** 31:16
49:25 114:17
116:17 155:2
**framework**
94:9
**fraudulent**
76:24
**free** 10:15
37:18 100:24
**freedom** 83:3
83:13,19,21,22
94:22,23

126:19,23
127:10,20,23
128:20 129:2,3
130:9,11
134:15,19
135:3 155:5
**frequently**
30:14
**friend** 14:19,20
29:21,21
**friendly** 40:20
**friends** 79:6
**front** 100:10
142:18
**full** 6:8 39:10
39:19,20
**fully** 32:3
152:11
**fun** 6:3
**functional** 26:9
**functioning**
26:16
**fund** 70:17,17
71:4,6,9,9,11
71:15,21,22
75:12 78:12,15
78:16,17 84:1
84:5,5 85:15
86:5,13 87:20
87:25 88:4,4
88:14 89:3,4
89:13,16,17,18
90:22 91:7
92:7,7,12,18
94:12,12 95:6

95:6 97:24
99:8,8,21,21
100:14 101:1
111:6 112:1
113:9,11,12
121:8,24
126:20,23
127:10 129:8,9
129:11,15,17
129:22,24
130:1,11 134:5
134:8,15,20,20
135:3 155:6,7
155:8,13
156:14,18,19
157:14,15,16
158:3,3,10
**fundamental**
99:9
**funds** 15:25
34:11 71:1,2
71:14 72:13,14
72:15,19 73:13
73:20 78:4
79:17 82:1,22
83:3,13,18,19
83:21,22 84:3
84:8,9,13
86:12,19 88:3
88:7,18,22
89:6,8,19,22
90:10,13,15,18
90:20,21,24
92:8 94:16,22
94:24 96:18

97:23 98:1,10
99:25 101:8,15
101:23 103:2
103:10 104:11
111:15 116:7,8
116:10 127:20
127:23 128:20
128:23,23
129:2,3 130:2
130:9 135:14
139:8,13
149:17 155:10
156:7 157:13
157:15 158:6
159:9
**funny** 80:15
**further** 47:20
50:8 122:3
159:14 161:13
162:9

**g**

**g** 4:1 6:11
**gain** 22:9
**galleria** 43:7
**gap** 28:22
96:11 109:25
142:24
**gate** 65:23
**geismar** 65:19
**general** 23:14
77:23,24
102:18,21
121:7
**generally** 7:7
8:5 114:5

generating
27:14
generous  109:4
117:21
genuinely
157:24
getting  16:22
30:8 140:18
146:14
gift  30:23
149:15
gifts  27:24
girlfriend
14:13,14,18
gist  50:14
give  9:11 13:20
14:2 20:23
40:20 54:7
60:5,22 68:4
76:18 78:10
93:16 107:24
111:22 128:23
129:2 149:6
154:4 158:9
given  47:4 48:5
48:9 73:3
78:12 88:19,25
90:2 143:7
153:3 157:11
165:9
gives  129:10
giving  147:25
gl  21:24
glance  111:2

glanced  111:1
121:10
global  27:7
globally  31:17
32:25
gmail.com
163:2
go  6:23 7:2
10:8 16:11
21:25 24:4
25:20 30:7
33:14 34:4
38:3,15,18,24
41:21 42:13
46:16 48:6,11
49:6 50:7,20
51:18,21 52:3
59:17 64:8
66:25 67:1,6,8
69:12,13 74:10
78:10 79:4
80:10 81:10
82:12 84:19,23
86:8 87:9,23
88:8,16,19
89:24 90:8
95:20 97:8
98:13,21 99:4
100:10 106:11
108:17 113:23
114:16 116:15
123:10 129:7
130:15,25
131:25 132:1
133:12 137:16

144:1,17 147:3
151:11 154:5
155:16
god  130:24
goes  52:7 55:21
55:25 56:6
57:23 59:19
109:16 140:4
going  4:3 8:8
9:10 10:13
11:5 12:12
19:18 23:10
29:17,22 32:12
33:9 37:18,22
39:19 41:22
42:16 46:8
49:8 50:20,21
51:8,16,25
57:19 59:11
60:11 61:10
63:22 67:12
68:9 69:1,7
74:22 78:6,7
81:10,22 82:6
87:11 88:25
91:9 92:19
93:8,15 96:9
96:10 99:2
104:17 109:2
110:12 114:13
114:23 117:8
117:25 123:4
124:9 129:7
130:25 131:2
151:5 153:24

153:24 156:3
156:19 158:4
good  4:2,6 5:6
5:10 7:9 10:4
30:6,10 35:4
35:13 42:17
61:15 67:4
75:21 80:21
81:3 112:4
116:25 124:11
128:13 141:15
149:7 150:24
152:1
googling  144:7
gotten  73:2
96:17,20 97:1
grab  42:17
graph  123:3
graphic  25:2
great  124:10
grew  25:2
grindstaff  43:1
43:11
gross  113:3
ground  6:23
group  3:8
21:15 36:17,20
37:3,7,17 38:9
39:3,7 43:3,6
70:1 110:8
group's  134:13
guess  47:22
51:19,24 52:9
52:11 65:13
67:15 68:14,21

**[guess - idea]** Page 17

69:15 72:23
76:23,24 77:12
77:20 78:17
80:21 84:17
97:15 101:13
120:21 151:12
157:23 158:15
158:25
**guessing** 26:20
108:12
**guy** 43:22,23

**h**

**h** 3:5 6:11
164:3
**half** 16:20
117:21
**hall** 43:19
**hand** 5:14 21:9
59:11 61:5
111:9 156:2
**handled** 29:7
73:9 146:13
158:7
**handling** 144:2
148:13
**happen** 63:22
74:5 129:15
145:17,19
**happened** 36:4
36:5,8 64:7
96:2 144:21
**happens** 61:6
**happy** 88:16
109:7 115:10
115:15 127:13

127:15
**harbor** 108:18
**hard** 100:21
136:1,23,23
137:12 155:17
156:2
**harmed** 72:25
88:6,22 89:7
89:21 90:14
102:17,24
103:1 104:16
144:18
**head** 10:8
71:19
**heading** 83:2,7
101:1
**health** 67:13
**hear** 43:8
**heard** 45:2,6
71:11 75:11
91:10,13
102:12 107:5
144:13,17
**hearing** 147:12
**help** 32:13
57:19 62:13
63:1,18 64:2
67:11 73:12
82:21 83:9
84:9 92:14
96:10 117:25
130:12,14
154:7 157:4,20
**helped** 17:12
38:8

**helpful** 43:10
64:9
**helps** 63:25
**henderson** 99:8
**hereto** 161:15
162:11 165:7
**hereunder**
59:15
**hesitation**
129:2,16
**hexagon** 32:24
**high** 24:16
29:24 75:9,12
75:12,14 83:6
108:25
**highly** 38:25
130:10,11
132:22
**hire** 29:18
143:12 150:23
**hired** 45:20
46:5 65:19
**hiring** 29:20
33:6
**history** 31:1
75:1 117:14
**hmm** 6:17 9:23
10:9 25:25
28:7 29:12
32:17 35:8
37:24 55:13
62:12 83:4,8
84:2 85:10
101:3 109:18
111:13,21

112:7 113:2
114:19 116:2
116:21 117:16
124:20 155:9
155:15
**hold** 48:6
**holdings**
126:16,19
**hole** 111:4
**home** 18:6
137:2
**hone** 49:8
**honest** 61:3
**hope** 19:18
105:5
**hour** 12:20
104:18 148:6,9
**hours** 65:23
**house** 2:21 5:8
106:11 143:9
**houston** 1:16
**hr** 46:4 63:15
102:11
**huh** 42:19
**hundred**
145:23
**husband's** 29:1

**i**

**ice** 29:10,11,14
**idea** 58:25 64:6
77:5,8 78:25
81:3 128:13
140:2 145:22
157:22

**identification**
20:17 37:15
46:19 69:4
81:9 82:10
93:12 97:11
108:5 110:14
122:8 126:1
131:6 154:2
**identified**
41:15 158:2
**identify** 38:16
42:2 100:13,15
100:18 115:14
133:19,24
135:2 153:14
153:18
**ignorant** 50:14
**il** 2:15
**illegal** 27:2
**immediately**
59:19
**impact** 11:25
12:3 74:6
**impart** 18:21
**implementati...**
26:7 32:10
36:22,24 65:21
**implementati...**
40:7
**implementing**
32:22
**implication**
149:23
**imply** 119:24

**importance**
75:16
**important** 9:18
67:12,21,24
68:15 75:6,18
84:12,18
146:17
**importantly**
118:13
**imposes** 109:16
**impression**
43:21
**improper**
153:16,20
**imprudent**
155:5 158:3
**imprudently**
156:17
**inappropriate**
141:9
**inclined** 76:19
**include** 22:23
93:14 135:15
139:12
**includes** 55:11
155:12
**including** 57:5
72:24 100:2
**income** 58:2,7
58:14,21
109:15
**incorrect** 91:4
**independent**
151:10

**index** 83:22,22
115:24
**individual**
70:18 80:8
153:2
**influenced**
132:24 133:3,7
**informal** 150:4
150:5,8,11,18
**informally** 30:3
151:16
**information**
16:12 32:6
66:24 106:8,25
107:15,16
111:20 113:4
113:12 114:24
125:19 132:5
133:1 143:22
144:5 156:24
157:4,20
**informed** 110:1
**initially** 42:12
**initiated**
142:12,13,13
142:15
**injury** 100:3
**instance** 81:17
115:23
**instances**
141:23
**institutional**
111:7 113:9
**instructions**
109:21,25

**instructor** 27:8
**instructs** 7:1
11:19
**insurance** 46:6
137:18
**intelligent** 44:5
**intended** 4:20
**interact** 154:24
**interacting**
30:13
**interactions**
149:6
**interest** 133:18
133:25
**interested**
16:22 17:5
47:17 66:15
69:7 124:12
144:11 159:2
161:15 162:12
**interesting**
67:5
**interests** 81:5
**international**
71:10 84:4
86:17 87:20
88:4 89:3,13
89:17 92:6
97:23 99:9
113:8
**internet** 79:5
154:12
**interpret** 52:8
54:17 58:8
59:9

**[interpretation - jayshree]**                                              Page 19

**interpretation**
  51:6,11 53:15
  53:23 54:1,7
  54:14 55:1
  56:15,17 57:16
  57:17 60:15,17
**interrogatories**
  3:20 13:6,10
**interrogatory**
  131:3 132:2,6
  132:23 133:2
  133:14 134:4
  135:3 142:17
**interview**  21:16
  39:10
**interviewed**
  40:8
**interviews**  40:9
**intl**  86:16 87:10
**introduce**  5:5
  20:13 37:12
  46:17 69:1
  82:4,6 93:8
  110:12 125:21
  131:2 153:24
**introduced**
  153:25
**introducing**
  97:8 108:1
**invest**  33:25
  38:17 119:14
  119:17 126:22
  130:8
**invested**  33:22
  38:8 53:14

  64:15 69:19
  72:5 73:10
  80:7 82:2
  84:10,15 85:6
  85:17 86:4,20
  87:20,25 88:14
  88:18,22 89:2
  96:16,17 97:23
  103:3,21,24
  104:2,3 111:15
  115:18,22,23
  116:7,10 120:1
  120:5,6,14
  121:5,8,13
  122:2 123:13
  123:24,24
  124:14 127:10
  128:2,9,14,16
  128:19 129:15
  129:21 130:2
  130:20,23
  134:5,8,11,15
  134:21 135:11
  139:7,13
  156:11
**investigate**
  156:20
**investigation**
  73:22
**investing**  19:15
  76:3 90:17
  94:23 129:11
  144:19
**investment**
  3:19 15:25

  22:24,24 23:20
  24:13 25:6,15
  35:4 38:4,16
  69:25 70:5,18
  72:2,9,11,14
  73:2 74:19
  76:11,17 77:14
  77:19 79:2,12
  80:23 81:2
  83:2 94:9
  100:14 105:8
  109:21,24
  125:2 126:3,4
  127:11 128:5
  128:22,24
  129:1 130:17
**investments**
  15:14,18 23:21
  24:13 25:6
  35:14,20 36:1
  36:10 37:10,20
  38:16,22 45:17
  58:9,17,18,23
  66:8 69:16
  75:4 79:16
  81:4 83:10
  85:4,5 102:3
  105:16,20,23
  106:5,14
  109:13 113:4
  115:18 116:12
  135:14 153:9
  153:12,15,19
  156:13 158:7

**investor**  74:13
  76:25 77:1
**investors**  76:6
  76:10,16 77:18
**invoices**  27:15
**involve**  25:5
**involved**  26:18
  45:14 78:18
  139:10 143:15
**involves**  149:24
**ips**  94:10
**ira**  79:24
  118:10,19
  119:8 122:14
  122:25 124:15
  126:5,11 127:9
  134:16,24
  136:10
**iras**  123:25
  124:13
**issue**  68:15
  98:15,15 127:4
  127:6
**issued**  92:21,23
  92:25 94:6
**issues**  26:6
  27:18 33:19
  34:25 37:9
  45:17,19 66:8
**it'll**  68:21
**italics**  112:6

| j |
|---|

**janus**  99:8
**jayshree**  44:22

| | | | |
|---|---|---|---|
| **jcroberts**  2:8 | 64:22 66:5,9 | 130:14 138:1 | 73:21,25 74:1 |
| **jeffrey**  17:16 | 67:17,18,21,24 | 149:24 | 74:25 75:9,21 |
| 18:9 | 68:1 77:5,6 | **kip**  44:12,14 | 75:23,23,24,24 |
| **jensen**  43:16 | 79:10,23,25 | **knew**  21:21 | 76:21,22 77:12 |
| **job**  1:18 14:22 | 80:3 95:7 | 33:8 43:13 | 77:22 78:14,18 |
| 27:18 29:23 | 102:4,8 106:1 | **know**  8:5 9:17 | 79:14,24 80:7 |
| 30:6 37:2 41:9 | 106:5 123:24 | 9:17,19 13:12 | 80:22 81:5,25 |
| 43:24 72:6 | 125:9,11,16 | 13:19 15:17 | 81:25 82:11 |
| 140:23 141:15 | 130:8 133:9 | 17:15 18:15 | 86:3,6 87:12 |
| 141:24,25 | 134:13 137:4,5 | 19:11,13,19 | 90:9 91:5,19 |
| 148:16 149:7 | 137:5 144:19 | 20:20 21:16 | 94:2 96:5,7,13 |
| 150:6,24 | 144:24 156:10 | 22:2,20 23:11 | 97:16,18,19 |
| 151:17 152:1 | 156:21 157:25 | 23:15,16,18,19 | 98:24 99:1,1 |
| **john**  2:4 5:11 | **kbr**  3:11 14:23 | 24:5,8,9,23 | 100:19 102:9 |
| 82:12 93:17,24 | 21:15 24:2 | 26:11 27:4,12 | 102:10 104:7,9 |
| 156:1 | 25:22 27:11 | 28:1,2,11,20,25 | 105:13,14,15 |
| **joining**  144:14 | 28:17,18 31:3 | 29:16 30:9 | 105:19,22 |
| **journal**  21:20 | 31:7,21 32:6 | 31:20,21,23,24 | 107:8 108:6 |
| 21:22 | 33:16 34:9 | 31:25 32:10,18 | 109:9 110:7,10 |
| **jr**  18:9 | 36:22 64:12,13 | 32:20 33:1,4,6 | 110:15 111:7 |
| **judge**  9:21 44:3 | 64:16,22 65:4 | 33:7,9,12,13 | 112:20,21,22 |
| 99:1 | 65:10,16,17,18 | 34:2,13,18 | 112:24 113:25 |
| **judges**  35:3,13 | 66:4 80:6 | 35:19 36:12,13 | 114:11 117:6 |
| **judgments**  56:2 | 134:12 | 38:14,19 39:22 | 118:20 119:3,9 |
| **june**  28:12 48:2 | **keep**  9:16 27:5 | 40:1,17 41:20 | 121:5,5,6,13,16 |
| 62:6 63:5 99:5 | 59:8 82:5 | 43:3,7,14,22,23 | 121:17,23,25 |
| 126:4,20 | 87:11 124:9 | 44:1,8 45:3,13 | 122:11 123:4 |
| **jury**  9:21 99:1 | **keeping**  40:5 | 46:5,20,22,22 | 123:22 124:5,5 |
| **k** | **kemps**  42:20 | 50:14,17 51:2 | 124:12,17 |
| **k**  3:12 6:11 | **kim**  42:24 | 52:4 54:19 | 125:4,14,23 |
| 14:17 16:23 | **kind**  15:6 27:18 | 59:6 61:3 | 128:9,15 129:7 |
| 33:17,20 34:2 | 31:12 43:2 | 62:16 63:4 | 129:9,13,25 |
| 37:6,10,17 | 50:14 54:5 | 66:21,23 67:22 | 130:1 131:9 |
| 38:9 45:9,11 | 100:21 114:9 | 70:16,17 71:1 | 133:8,10,22 |
| 45:18 46:1,8 | 124:24 126:9 | 71:4,7,18 | 135:8 138:20 |

**[know - list]**

141:21,22
143:5,10,12,25
144:10 145:23
146:14,14
147:23 148:17
149:15,16,23
150:4 151:6
153:5,8,11
154:13,15,17
154:23 155:16
155:20 157:19
158:22,23
159:1,1,8,10
**knowledge**
36:6 161:10
162:6
**knowledgeable**
34:20 36:11
66:20 74:13
**known** 40:19
56:4

**l**

**l** 14:17
**labels** 84:24
**lack** 118:18
158:16
**laliberte** 1:4
2:2 4:10 92:25
163:4 164:1
165:1
**lamar** 24:18,21
**language** 53:2
54:13 96:12
**laptop** 93:18

**large** 77:11,17
149:16
**lateral** 31:14
32:7
**law** 56:4,5
102:15
**laws** 4:22
**lawsuit** 14:1
19:20 20:1
47:24 48:2,14
48:16 59:1
71:25,25 73:5
83:11 84:14
88:2 92:20
102:2,16,22
105:15,19
128:18 129:3
129:16 132:17
134:1 137:17
137:23 144:11
144:13,18
147:18,20
150:7 153:2
**lawyer** 9:14
11:17 51:9
60:10 146:18
150:23
**lawyers** 11:17
13:20 51:10
144:1,5 145:1
146:2,7,12
147:17,20
148:12,16,20
150:24 151:7
151:17,24

152:1 156:16
**lay** 81:23
**lazard** 155:7
**lead** 31:10
32:14
**leading** 6:24
26:23 96:7
119:4
**league** 16:16
**learn** 39:25
40:3,11,15
66:13 143:21
144:20 146:13
**learned** 23:15
24:10 46:2
158:6
**learning** 33:4
45:24 46:1
**leave** 8:6 66:21
97:6 134:6
**left** 21:9 42:13
46:16 81:17
111:9 117:7
**legacy** 27:16
**legal** 50:22
100:9 102:12
146:15 151:6
154:6 163:23
**legalese** 132:1
**length** 140:11
148:4
**lengthy** 109:14
**lens** 80:21
**lessons** 24:10

**level** 105:12
108:25 121:7
127:15
**lewis** 1:14 2:13
5:7
**liabilities** 56:3
**license** 32:11
**life** 17:12 70:1
76:7
**lifetime** 70:16
70:25
**liked** 40:9
**likely** 119:18
119:19 126:13
137:9,11 144:8
157:11
**limit** 54:20,23
**limited** 52:20
52:21 57:5
**line** 25:23 26:3
27:20 31:16
41:13 49:25
57:4 74:22,23
128:1 141:8
164:4,7,10,13
164:16,19
**lines** 62:1
**linkedin** 3:7
20:15 27:21
39:2 46:10
64:9
**list** 22:5 38:8
42:16 57:25
70:13 74:23
86:12,12,16

**[list - make]**

Page 22

135:15
**listed** 25:21
50:1 85:8
134:20 135:11
**lists** 37:20 38:3
47:3 85:5
154:6
**literally** 138:19
**litigation** 54:5
**little** 6:5 29:23
30:23 38:11,15
43:19 50:9
100:21 109:17
109:25 112:11
112:17,22
113:7 115:3
117:17 118:4
120:13 134:24
135:17 136:10
147:2 149:14
149:15,15
155:17 157:12
158:15
**lived** 16:19
**living** 24:20
**llc** 38:9
**llp** 1:14 2:5,13
154:6
**locate** 135:21
**location** 1:14
**lodge** 102:6
**logic** 24:9
**long** 8:10 11:14
12:19 16:19
20:18 28:20

42:13 53:17
55:9 140:3
148:3
**longer** 18:6
19:25 90:17
92:11 117:11
119:24 120:3
136:5
**look** 25:22
27:12 37:18
46:21 47:10,24
48:3,14 49:17
51:25 55:9
60:20 63:6,14
66:17,18,19
68:20,25 69:6
69:16 70:15
73:9,9 76:19
81:16 83:5,25
85:20 87:10
88:10 89:24
90:4,5,9 97:7
97:14 98:3
108:6,16
114:14,23
115:3,22,24
116:17 118:1,7
122:5,10,16,17
123:5 125:23
127:25 131:14
137:14 149:18
154:4,5 155:1
157:20
**looked** 24:7
40:13 62:5,9

84:8 95:15
105:12 106:9
110:25 114:12
120:25 121:8
121:10 122:3
131:8
**looking** 31:5
33:1,13 38:7
78:18 87:7
88:13 94:19,21
96:24 100:2
106:22 107:12
116:24 159:11
**looks** 23:23
63:10 69:10,14
87:3 108:7,8
112:11 122:12
123:1 155:10
**loomis** 70:1
**losing** 75:25
**loss** 22:7,10,21
73:19
**losses** 99:6,14
99:16,19,25
**lot** 22:12 27:14
30:24 36:13
66:1 112:18,22
120:25 135:8
137:24
**louisiana** 1:15
65:19,24
**lowest** 146:18
146:20,20
**lunch** 105:5

**m**

**m** 6:10,11
**machine** 23:17
**machines** 23:16
**made** 15:15
35:25 42:2
90:22 91:1,6
95:12 96:2,15
119:13 122:1
123:7 133:17
133:19 134:1
165:5
**madoff** 76:20
**magazine** 79:5
**mail** 63:11,13
113:22
**mailed** 106:10
107:10 126:8
**make** 5:24 9:21
10:11,17,17,18
11:18,21 20:14
22:3 26:15
31:1,4 33:24
48:8,12 49:9
49:24 50:9
52:1,23 62:11
72:16 73:24
75:11 77:15
84:20 85:18
91:25 92:8,10
102:18 106:1
108:20 110:9
116:3 124:24
149:25 154:17
157:5 158:10

**[make - mentioned]**                                                          Page 23

158:17,25
**makes** 52:17
53:3 97:21
112:22 129:23
156:23 157:1
**making** 22:20
26:11,18 74:18
79:2 92:17
98:11 110:1
130:12
**manage** 33:6
34:10 110:8
**managed** 31:16
31:18 78:13,13
78:15,16,17
101:15,23
104:11 159:7
**management**
23:24 32:6,15
32:15,20 33:2
34:10,15 75:2
76:12,13 77:22
78:2 157:9
**manager** 15:1
39:14 40:8
42:14 46:15
69:25 157:16
**managers** 70:5
157:16
**managing**
32:21 70:23
78:4
**manner** 4:23
**mansfield** 19:7

**march** 41:14
87:16 89:1,9
89:12
**marie** 1:11 2:2
4:9 5:16 6:10
6:15 80:15
163:1,5 164:2
164:24 165:2,4
165:12
**marin** 3:14
93:14
**mark** 93:10
122:6
**marked** 20:14
20:16 37:14
46:18 69:3
81:8 82:9
93:11 97:10
108:4 110:13
113:18 122:7
125:25 131:5
154:1
**market** 85:20
**markets** 75:24
155:7
**married** 6:13
17:2 66:23
**mary** 1:4 2:2
4:10 80:16
163:4 164:1
165:1
**match** 26:12
109:2,5
**matching**
108:18,21

**material** 21:3
**materials** 79:1
**matt** 39:15 42:5
46:15
**matter** 4:10
6:20 7:4 9:8,8
92:14 133:18
134:1
**mcknight** 1:11
2:3 4:10 5:13
5:16 6:10,15
18:9 61:24
126:15 138:16
163:1,5 164:2
164:24 165:2,4
165:12
**mcknight.ma...**
163:2
**mcready** 42:22
**mean** 18:22
19:16 21:13
22:16 27:1
31:18 34:7
40:3,13 41:16
43:13,25 45:13
50:13 57:20
58:5,12 62:18
63:5 66:19
68:22 69:17
70:14 72:9
76:18 77:22
81:19 83:12
84:17 90:7
98:20,25 99:13
99:23 103:12

138:1,18
141:24,25
158:22
**meaningful**
118:24,25
120:16
**means** 4:24
13:21 21:14
31:20 32:19
41:17 52:5
56:15 57:1,10
60:25 64:19
78:14 95:25
96:5 105:25
107:10 110:6
140:22 150:9
**meant** 32:18
54:9 56:18
136:2
**meat** 147:2
**media** 158:13
**medication**
11:24
**meeting** 30:14
**meetings** 43:19
**member** 152:6
**members** 79:6
**memorized**
82:12
**memory** 20:14
117:8
**mention** 135:12
**mentioned**
16:25 34:22
77:21 131:7

138:2 147:15
**mentions** 56:21
**met** 12:7,10
**metaphor** 67:5
**methanex**
65:19
**mid** 17:6
**middle** 49:20
58:1
**miller** 2:5 3:21
5:11 143:22
154:6,11
155:12
**millershah.com**
2:8
**million** 31:16
31:18
**milton** 42:24
**mimeograph**
23:17
**mind** 32:19
50:15,24 52:13
141:7
**mine** 155:23
**minute** 10:20
10:22 20:18
61:14 68:22
138:8
**minutes** 61:6
62:1,14 63:2
148:6,9
**mishandled**
53:14 66:14
149:17

**mismanaged**
15:25 68:6,8
68:13,17 158:7
158:11,17
**mismanagem...**
72:25
**mismanaging**
68:1 156:21
**mix** 75:21
**mixing** 80:14
**mm** 6:17 9:23
10:9 25:25
28:7 29:12
32:17 35:8
37:24 55:13
62:12 83:4,8
84:2 85:10
101:3 109:18
111:13,21
112:7 113:2
114:19 116:2
116:21 117:16
124:20 155:9
155:15
**modules** 32:16
33:3
**mom** 18:6
**money** 27:5
50:18 53:13
60:5 64:21
65:2 73:14,24
79:23 80:5
86:4 87:19,25
89:8,10,21
90:2,5,13,22,25

91:1,2,6,19,22
92:1,4,6,18
95:12 96:16
118:9,15,19,24
119:1,4,7,7
120:5,6,7,12,16
120:25 123:10
123:11,13,16
124:5 125:15
128:5 134:23
135:8 136:17
145:7,20 152:5
**monitor** 153:12
153:19
**monitoring**
94:9
**month** 24:4
**monthly** 43:18
**months** 28:8
46:10 106:6,21
133:23 147:23
**morgan** 1:14
2:13 5:7
**morganlewis....**
2:16
**morning** 4:2,6
5:6,10
**motivate** 159:5
**motivation**
30:10
**mouth** 40:18
**move** 32:7,12
64:8 68:14
80:1 91:6,7
92:18 105:6

**moved** 31:8
92:12,13,15
**moving** 27:20
36:16
**multiple** 130:2
151:19

**n**

**n** 2:1 3:1 4:1
6:11,16,16
14:17 99:9
**name** 4:6 6:9
6:14 14:14,16
17:25 18:8
19:2 29:9
39:15 42:6
43:11 45:2,6
70:14,15
**named** 80:14
84:12 92:21,24
144:14 145:14
145:21 159:5
**names** 6:12
42:16 69:17,25
70:2,10,12,19
70:21 154:7
**natural** 10:7
**near** 33:12
**necessarily**
49:5 72:3
152:9
**necessary**
30:13 144:10
148:22 149:1
165:6

**[need - okay]**

**need** 20:18 46:21 65:10,12 67:11 80:1 88:10 90:3,4 92:11 110:2 125:20 130:15 138:8 149:19 149:25 150:1 150:23 151:6 151:10,11,13 156:24
**needed** 22:20 29:23 137:1
**negative** 128:11
**negatively** 128:9
**negotiate** 145:1 146:6,11
**neither** 88:6 161:11 162:7
**never** 48:21 52:2 58:25 80:20 102:5 103:1,3,13,23 105:12
**new** 27:16,17 28:3 42:14 46:15,15
**news** 60:5,6,7
**newspapers** 79:5
**nice** 43:22,23 105:5

**nick** 43:1,10
**night** 132:11
**nobel** 44:24
**nonconfident...** 7:10 9:1
**north** 2:14
**nos** 10:9
**notary** 4:13 161:18 165:13 165:19
**note** 24:17 33:15 163:10
**noted** 165:7
**notes** 13:17
**notice** 3:9
**november** 65:11
**number** 10:5 38:6 73:22,23 87:4 108:1 111:3,5 113:19 115:14 122:21 124:11 126:14 132:2,23 133:14 134:4 142:18 149:17 153:23
**numbered** 54:16
**numbers** 85:1 108:16 112:9 112:10 113:25 117:25 118:12 155:22

**nvidia** 91:11

**o**

**o** 4:1 6:16
**oath** 9:19,20
**oaths** 4:14
**object** 30:19 35:5 54:25 67:23 68:18 84:16 98:19 104:6 129:18 135:9 141:5,17 147:7
**objection** 4:15 35:15
**objections** 11:8 11:18,20
**objective** 94:9
**obscure** 121:24
**obvious** 26:22 27:3 147:1
**obviously** 63:5 75:8
**occurred** 52:2
**october** 65:11 65:15 122:17 122:25
**odd** 121:25
**offer** 71:9 81:3 116:9 156:13 157:14
**offered** 15:12 29:5 37:10 41:7 45:17 66:9 71:14,21 105:7 153:9

**offering** 155:5 156:18
**offers** 83:20 156:19
**offhand** 135:7
**office** 23:14 43:6 67:1
**officer** 4:6 5:13 5:20,23 9:24 10:2 55:14,17 107:20,23 111:23 159:18 159:21,24 161:1,2
**officers** 133:16
**officiated** 1:17
**offset** 59:15
**oh** 10:21 14:3 17:3 20:22 30:20,23 31:5 38:2 40:6,21 45:6 65:10 69:11 73:23 80:6 81:21 87:8,15 89:14 91:14 94:21 97:8 111:10,24 112:5 116:23 117:3 121:8 128:1 129:10 130:20 133:10 134:6 137:19 154:16
**okay** 5:13,23 6:5 9:4,7,10

**[okay - package]**

| | | | |
|---|---|---|---|
| 10:1,3,13 11:9 | 95:4,10 97:5,6 | **ones** 82:1 84:14 | **outside** 9:8 |
| 11:10,13,16,23 | 97:6,8 100:24 | 85:17 | 16:7 24:15 |
| 12:2,5,11 | 101:11 102:2 | **online** 126:8 | 51:7,9 60:10 |
| 16:11 17:3,8 | 102:20 103:25 | 135:25 | 123:16,24 |
| 17:25 18:3,10 | 104:22 105:5,7 | **ooh** 17:14 | 125:3 129:9 |
| 19:2,18,22 | 109:12 110:4 | **operate** 9:10 | 130:12,14 |
| 25:20 27:24 | 113:21 114:4 | **operations** | 132:14,17 |
| 28:16 31:5,6 | 114:14,22 | 18:13 | 134:5,8,21 |
| 33:12 39:1 | 115:2,17,22 | **opinion** 54:20 | **outstanding** |
| 41:13 45:8,23 | 116:15,16 | 57:14 66:12 | 124:18 |
| 48:12,18,21 | 117:5,10,13,20 | 115:21 150:16 | **outweigh** 99:2 |
| 49:7,10,13,17 | 117:24 118:7 | **opinions** 35:19 | **overall** 23:14 |
| 49:22 50:4,7,8 | 120:11 121:22 | **opportunity** | 23:19 24:5 |
| 50:18 51:2,18 | 122:4,13 | 32:15 36:19 | 41:3 |
| 51:18 52:3,5,9 | 123:22 125:6 | 39:5 40:2 65:8 | **oversee** 148:12 |
| 52:15 55:8 | 125:11,21 | 73:1 146:10 | 148:15 |
| 57:23 58:5 | 130:25 131:2 | **opposing** 13:22 | **overseeing** |
| 59:11 61:16 | 131:14 132:14 | **opposite** 78:20 | 150:22 151:15 |
| 62:13 64:8 | 134:4 135:17 | **option** 127:11 | 151:24 |
| 69:10,15,24 | 136:4 137:11 | **options** 38:4,12 | **owed** 152:24 |
| 70:4 71:8,20 | 140:10 142:2 | 105:8 119:17 | **own** 101:17 |
| 72:16 74:10,12 | 143:18 155:1 | 128:24 | 110:9,11 141:7 |
| 74:17 75:15 | 155:16 156:13 | **oracle** 22:1 | **owned** 22:12 |
| 77:24 78:12 | 158:24 | 32:12,22 36:22 | 22:14,18,18 |
| 79:14 80:7,18 | **old** 16:12 | **order** 130:25 | **owner** 28:1 |
| 81:25 82:4,21 | **older** 8:11 | **org** 42:17 | 149:4 |
| 82:25 83:9,25 | 17:17 56:22 | **orientation** | |
| 84:3,8,23 85:3 | 75:17 77:1 | 45:21 | **p** |
| 85:4,8,11,16,20 | **oldest** 17:25 | **outcome** 98:18 | **p** 1:17 2:1,1 4:1 |
| 86:10,10,16,19 | **oldest's** 18:7 | 138:5 145:4 | 161:2,17 |
| 86:21,22 87:10 | **once** 12:8 36:4 | 161:16 162:12 | **p&ls** 21:20 |
| 87:16 88:2,16 | 36:8 46:21 | **outreach** | 22:5,13 |
| 90:19 91:10,13 | 106:21 | 142:12,13,13 | **p.m.** 160:3 |
| 91:19,24 93:23 | **one's** 99:2 | 142:15 | **pa** 2:7 |
| 94:1,4,5,8,15 | | | **package** 47:4 |
| | | | 53:12 54:12,18 |

[package - percentage]                                    Page 27

54:20,23 55:3
56:23 57:15
61:6
**packets** 133:9
**page** 1:20 3:2,6
23:2 25:22
26:3 31:6
36:16 37:22,23
38:1 47:11,18
49:18 54:15,15
59:17,17 62:5
62:21 63:14
69:7,11,14
72:17 78:8
81:17 83:1,5
83:20,25 84:5
87:4 94:3 99:5
109:12,12
111:2,5 115:24
122:16 123:3,6
126:14,15
127:25 131:15
131:25 133:15
134:10 142:19
154:5 155:2
156:5 164:4,7
164:10,13,16
164:19
**pages** 28:20
69:13 114:15
**paid** 38:20
**paper** 113:18
155:17 156:3
**papers** 47:3
53:6

**paperwork**
46:6
**paragraph**
47:17 49:2,20
50:2 51:4
53:16 55:8,9
57:4 59:12
60:20,23 94:2
94:20,23 95:3
95:3 99:4,18
100:21,25
101:2 109:14
155:3
**pardon** 107:18
**parnassus**
155:6
**part** 10:16 22:8
26:8,18 28:5,6
28:10 29:17,23
36:25 40:10
41:25 43:7
46:4 55:3
72:12 83:12
104:8 110:2
134:7 139:4
149:5
**participant**
74:7 96:6,8
110:20
**participants**
72:24 77:6,13
83:7 99:6,15
99:20 104:15
108:21 139:7
139:12

**participate**
12:21 33:16
37:6 45:9 46:8
66:5 132:25
133:4,8
**participated**
38:9 45:12
72:3 74:17
**participating**
92:12 104:9
**particular**
15:18 34:4,4
65:18 74:19
97:18 104:9
110:17 130:1
130:11
**particularly**
93:4 105:18
**parties** 4:16
48:25 49:13,14
49:19,23 50:2
56:1 161:12,14
162:8,11
**parts** 49:9
108:14
**party** 151:10
**pass** 37:16
**passive** 76:13
77:21 78:2,19
78:23
**passively** 78:13
78:16
**past** 11:25
**paul** 44:24

**pause** 129:10
**pay** 123:16
**payable** 21:19
26:9
**paying** 29:3
38:21
**payment** 55:6
**payments**
59:14
**pdf** 111:3
**peek** 81:11
110:15
**penalty** 9:19
131:23
**pending** 11:15
**penny** 96:2
98:12
**people** 33:6,7
35:19 43:8
65:22 76:20
77:9,12 81:1,2
96:25 97:5
139:10 147:12
149:17,24
**people's** 81:4
**percent** 108:22
108:22,23,24
112:23,23
115:8,15
126:19 127:9
128:2 137:14
147:8
**percentage**
128:16 146:1

**perfect** 153:23
**performance**
22:25 24:13
25:6 30:2,17
75:1 104:5
111:18,18,19
112:10 113:12
127:13,19
**performed**
112:11,17,18
**performers**
105:20
**performing**
90:22
**period** 38:14
48:1 103:3
115:4 117:4
136:8 139:23
143:4
**periods** 113:13
**perjury** 9:20
131:23
**permanent**
39:10
**permitted** 4:20
**person** 28:10
29:18 54:21
64:4 130:18
133:19 158:13
**personal** 6:21
68:19,22 115:3
128:22 129:1
**personally**
43:23 128:19

**personnel** 3:9
**ph** 17:18
**philadelphia**
2:7
**philosophies**
77:14,19 81:3
**philosophy**
76:11,17,22
80:23
**phrase** 52:12
**pick** 41:22
117:13
**picking** 49:12
**piece** 16:3
156:3
**pieces** 72:8
**pile** 113:16
**pimco** 70:1
**place** 22:3 65:3
74:4 79:18
118:15,17
151:25
**places** 118:20
**plaintiff** 84:13
92:21 126:15
132:5 144:14
145:11,15,21
159:5
**plaintiff's**
95:11
**plaintiffs** 1:5
2:2 80:14
89:22 92:25
103:4 122:10
124:18 155:4

**plan** 3:16 29:4
33:17,20 37:6
37:10,17,20
38:9 45:9,18
46:1 64:16,22
64:22 66:6,9
67:17,18,21,24
68:1 69:21
71:10 72:24
74:1,18 77:5,6
77:11,17 79:18
79:24,25 80:3
83:6 94:12
95:7 99:6,15
99:20 102:4,8
104:8,15 105:7
105:20,23,24
105:25 106:1,2
106:3,5,15
107:6 108:2
110:8 113:4
114:4,8 116:9
118:9 125:12
125:16 129:8,9
132:4,25 133:4
133:8,9 134:6
134:9,13,21
136:6,6,21
137:8 139:5,12
144:19,24
153:6,9 156:7
156:10,11,17
156:19,21
157:9,25 158:3
158:5 159:7

**plan's** 83:2
94:10 106:17
**planning** 25:17
79:9 107:14
**plans** 45:11
105:17 123:24
137:4,5,13
**please** 5:5,14
6:8 9:25 10:3
50:12 55:15
61:22 68:11
105:3 125:22
138:14 154:21
159:23
**plus** 122:20,25
125:2
**point** 10:16
31:23 32:11
35:24 45:24
46:2 51:19,20
54:14 59:5,8
82:22 86:3
87:21,24 88:7
88:18 90:7
98:8 100:15
104:9 109:20
111:17 115:8
133:23 146:4
150:16 157:12
159:12
**pointed** 70:25
**pointing** 158:1
159:8
**points** 123:4,6

policies  137:16
poor  105:20
portfolio  113:8
portion  7:10
  8:1,12 9:1 11:6
  145:10,11
positive  128:11
positively
  128:9
possible  63:8
  80:15,25 121:4
  125:15,17
  132:19 142:11
  145:3 150:17
possibly  138:1
  147:23
post  3:21 24:16
  154:3,8,11,19
posted  154:8
  154:11
potential  100:5
  100:17 102:23
  103:1,6
potentially
  63:11 77:20
  104:16
practices
  120:24
precise  47:25
  143:1
preparation
  12:25
prepare  12:5
  12:15 131:8

prepared  162:3
preparing
  147:16
present  2:19
  57:15 65:11,12
presentations
  25:18 44:4
presented
  119:16
presumably
  46:2
pretty  34:1
  117:2,21 147:1
previous  31:12
  45:11 80:22
  137:12
previously  14:1
  16:25 113:18
price  89:14
primarily
  115:2
principal  34:9
  34:22 70:1,14
  70:16,21,22,25
  125:7 130:5,7
print  135:20
printed  131:1
printout  20:15
prior  88:23
  144:13 161:5
privileged  9:13
proactively
  68:16
probably  13:23
  34:12 64:24

96:19 106:6,13
111:1 114:2
120:25 121:7
126:10 130:12
134:24 143:7
146:6
problem  85:13
probst  44:16
procedural
  4:21
proceed  5:24
  61:22 105:3
  138:14 153:1
proceeding  4:8
  4:19 5:2 9:5
  49:1 52:11,16
  53:3 160:4
  162:4
proceedings
  161:3,5,6,9
  162:6
process  29:20
  38:15 39:10
  42:1 46:5
  143:13 153:5,8
  153:11,15,19
procurement
  26:10
produce  13:21
  13:21 124:15
produced  4:18
  14:1 79:15
  122:10 124:11
  124:13 131:4

product  41:22
production
  124:16
professional
  25:11
profile  3:7
  20:15 27:21
  64:9 127:23
profit  22:7,9,21
program  23:24
  24:4 34:2
project  21:25
  32:13,25 33:10
  33:13 65:17,18
projects  31:17
promotion
  31:11
properly  26:16
  72:6 159:7
proposition
  102:20,21
prosecute
  48:24
prosecuted
  48:25
prosecuting
  150:6
protect  74:8
protection
  56:22
prove  88:20
proven  101:21
  101:22,25
provide  66:24

**[provided - read]**

**provided** 48:10
101:9 107:13
107:14
**provider** 147:4
**provides** 98:25
**provisions** 49:2
**prying** 8:4
**public** 19:9,12
161:18 165:19
**publications**
79:1
**puncher** 111:4
**purely** 16:23
**purpose** 114:15
**pursue** 40:2
153:1
**put** 22:4 28:19
38:24 40:17
47:21 74:4
90:21 97:7
109:3 117:22
118:9 120:17
121:17,23
123:11 127:18
136:25 147:2
**putting** 76:23
98:14 124:21

**q**

**q1** 99:10
**qbre** 64:11
**qualified** 161:7
**quality** 140:23
**quanta** 1:7
2:11,21 3:12
4:11 5:8,9

13:22 15:15,21
15:23 34:8
39:3,6,9,18,22
39:25 40:21
41:9 42:4 45:8
45:16 46:9,13
50:5 53:16,21
55:22 59:3,7
63:9,15 64:10
64:22,23 67:17
77:4,11,18
80:11 81:15
84:25 85:3
100:4 101:14
102:7 106:1,5
109:12 111:3
115:18 116:6,8
116:9 117:7,11
117:15,18
128:3,4 133:9
134:2 136:6,6
136:12,15
139:4 144:19
144:24 153:6
157:25 158:5
158:20 159:2
163:4 164:1
165:1
**quanta's** 40:11
45:18 95:7
99:7,20 102:3
153:8,15,19
**quarter** 88:5
89:7,20 94:13
94:17,18 95:8

95:14,17,19,22
96:1,3,4,7
114:17 116:17
**quarterly**
43:18
**question** 6:25
7:2,2,3 10:11
10:13,14,15,18
11:15,21 15:7
25:10 26:22
27:3 35:9
37:19 47:23,25
51:15,22 52:17
59:16 60:3,24
67:15 73:4
77:16 78:1,6
80:22 81:12
86:2 88:21,24
89:5,15,20
92:5 96:1
99:22 101:13
105:11 106:4
112:4 114:1,14
116:25 119:5
120:2 128:25
129:6 131:11
135:1,10 143:6
143:18,19
146:6,22 147:1
151:1,19,22
157:1,3,23
158:15,24
**questions** 6:25
9:13,15 11:23
12:11 13:4

16:24 20:4
75:16 76:2
81:24 97:15
104:20 123:23
127:18 135:19
141:11 156:25
159:14,15
**quick** 6:4 37:13
**quickly** 144:17
**quite** 147:5

**r**

**r** 2:1 4:1 6:10
164:3,3
**r5** 85:9
**raise** 5:14
17:12
**randall** 42:18
**range** 81:4
**rate** 115:3,7,10
115:14
**rated** 40:14
**ratio** 113:3
**ray** 2:20 5:3
**reach** 144:1
147:24
**reached** 39:9
39:12,23 42:7
65:25 142:3
**reaches** 68:7
**reaction** 15:5
**read** 4:5 42:16
49:2,4 53:7
54:3 58:25
60:22 61:7
98:23 100:20

100:24 108:13
109:19,22
110:2,5 136:24
159:19 163:9
165:5
**reading** 52:4
99:12 100:23
108:14
**ready** 20:19
37:21
**real** 45:14
121:10
**realized** 103:1
103:6
**really** 7:8 16:2
16:4 24:6
26:14,21 27:3
31:14 36:23
38:10 40:7
44:11 64:6
70:24 74:20
75:5,20 76:15
76:18 78:11
83:12 88:11
91:24 97:19
105:11 112:15
121:20,21
129:19 138:6
147:21 150:19
**reason** 50:22
51:24 62:23
67:22 68:3,4
118:16 120:9
154:10 157:2
157:11 163:11

164:6,9,12,15
164:18,21
**reasonable**
30:16 35:3,14
35:20 36:1
127:11 128:24
141:3
**recall** 11:25
13:2 16:6,8
20:11 24:14
26:21 33:19,22
37:9 38:8
39:13 45:17,22
45:23,24,25
62:3 63:25
64:2,4,15,18,21
69:19,22 71:13
82:20 84:9
87:22 93:7
106:14 107:12
108:9,11,12,13
108:15 110:21
114:6 118:11
118:18,22
119:6,12,13,15
120:16,18,21
120:23 121:2
123:12,14,15
123:18 124:7
126:9 127:14
127:17,19,22
127:24 128:4,6
128:8 132:18
133:3,6 135:21
142:10 143:3

143:12 146:3
148:5,7,8,10
**recalling** 62:2
**receipt** 163:17
**receivable**
21:19 26:10
**receive** 55:6
110:24 133:8
145:10,11,14
146:2 152:3
**received** 25:8
55:4 59:15,21
63:4,5,8,19
64:1 108:9
113:21 114:10
136:7,20 137:4
**receives** 145:7
145:21
**receiving** 62:14
63:3 64:4
108:12 110:21
**recent** 17:5
47:8
**recently** 132:12
**recognize**
20:20 46:22
70:10,12,14,15
70:20,22 82:14
110:16,17
122:11 125:23
126:2 131:12
152:11
**recognizing**
38:6

**recollection**
62:13 63:2
64:3,25 83:10
125:1 142:12
142:14
**recommend**
38:21 66:22
110:9
**recommendat...**
127:4,7
**recommendat...**
116:13 119:22
119:25 140:20
**recommended**
38:18 69:21
74:21 79:4
105:13 119:19
120:22,24
126:24 127:1,3
130:7,11
**recommends**
34:3,5
**reconsider**
57:20
**record** 4:3,8,16
5:5 6:9 10:24
11:1,2 49:7
61:18,20,21
65:14 104:24
105:1,2 116:11
124:22 136:11
138:10,12,13
160:1 161:9
162:5

**recorded** 4:23
5:2 161:6
**recording**
161:8 162:4
**recordings**
4:18
**recover** 152:5
**recurring** 67:6
**redgie** 44:16
**reduced** 161:7
**refer** 34:14
**referenced**
163:6
**referring** 34:6
**refresh** 83:9
**regards** 147:13
**regroup** 10:20
**regular** 43:8
148:18 149:5
**reinvesting**
123:17
**related** 52:18
54:11 56:23
57:11 58:6,11
58:14,16,22
71:6,14,21
78:4 79:15
100:25 102:8
136:6,21
137:18 161:11
162:7
**relates** 52:18
73:4
**relating** 23:21
56:8 57:6

**relation** 102:9
**relative** 161:13
162:10
**releasable**
59:13
**release** 49:13
49:14 54:6
**released** 33:10
48:25 49:19,23
50:1 55:25
57:4 58:6
**releases** 55:21
**releasing** 56:16
57:24 58:13,20
**relevant** 6:22
9:16 23:17
**relied** 35:12
**rely** 34:14 79:1
79:2 141:3,6
**relying** 141:21
**remain** 30:6
**remedies** 73:5
**remember**
43:17,18 63:18
64:10 87:19
113:21 118:8
119:8,10,16
124:10 127:21
138:2,5 143:15
**remembering**
132:20
**removal** 94:9
94:11
**removed** 88:5
89:6,19,23

90:15,21 94:16
95:7,17 96:1
103:4
**repeat** 55:15
75:10
**rephrase** 10:16
68:11
**replace** 99:7,21
**replaced** 46:15
**replacement**
94:11 96:15
**report** 3:14,15
3:19 42:4
93:13 94:6
97:7,9 126:3,4
**reported** 42:12
**reporter** 4:7
**reporting**
113:13
**reports** 92:22
92:23 93:1,5,9
100:2
**represent**
51:21 77:9
122:9 138:20
138:21,25
139:3,6
**representative**
134:1 138:17
139:19 148:11
150:21 151:14
151:23 152:4
152:14,16,22
**representing**
5:7 61:1 139:9

149:16
**represents**
47:20 48:21
50:9,24 52:6
**reputation**
40:12,16 43:14
44:10
**request** 124:16
124:18 144:5
**requested**
124:12 135:21
161:21
**required** 3:17
73:22 165:13
**rescheduling**
6:2
**research** 88:8
88:12 157:12
157:20 159:11
**reserved** 160:2
**residential**
16:14
**resolve** 27:19
**resource** 32:15
32:20 33:2
**resources**
32:21
**respectively**
99:10
**response** 10:10
15:21 16:1
114:2 133:1
135:4 136:4
**responses** 9:25
131:3 135:18

142:18
**responsibilities**
  37:2
**responsibility**
  31:11 32:8
  148:12 150:22
  151:15,24
**responsible**
  109:23 110:10
**responsive**
  124:16 132:6
  133:1
**rest**  105:6
**restroom**  138:8
**result**  59:21
  99:7,20 100:4
**resulted**  94:10
**resulting**
  109:20
**resume**  21:1
  28:19
**retained**
  142:21,25
**retirement**
  18:15,19 19:11
  19:15 25:17
  29:4 34:10
  58:2,7,13,20
  64:16 79:9
  81:15,16
  109:15 128:13
  129:8,9 134:11
  157:9
**return**  31:7
  39:1 59:25

73:2 76:4
115:4,7,10,14
143:10 163:13
163:16
**returned**  31:1,3
  64:11
**returning**  65:4
**review**  13:15
  105:23 106:4,8
  114:11 120:17
  126:11 131:18
  161:21 163:7
**reviewed**  12:24
  13:9 47:9,13
  140:14
**reviewing**
  114:6
**rfp**  135:18
  136:4 143:25
**rice**  23:25
  24:16
**richard**  3:14
  93:13
**right**  5:14,20
  14:8,18 18:7
  22:6 23:2,5,9
  23:11 27:20
  28:17,23 30:12
  30:25 31:2,5
  31:15,22 32:5
  34:16,17 36:18
  39:3,17,20
  40:18 45:5
  46:5,11,17
  49:3 51:15,19

51:20,22 52:9
52:9 53:1,2,15
55:12,19,20,23
55:24 56:6,24
57:3,13,21
58:1 59:11
61:24 62:4,11
63:1,14,24
65:4 67:4,5,6,8
67:11,14,15
71:24 72:22
73:12,15,17
74:2,22 75:10
75:11,21 76:25
79:18,19 80:15
83:13,14,18
84:23 86:11
87:11 89:15
90:6,11,25
91:2,8,22 92:3
92:5,9,19 95:1
95:5,16,21,23
97:2,2 99:13
99:25 100:12
100:12 101:2,4
103:8,15,16,17
110:3 111:4,14
111:16 113:14
114:18 116:23
117:1,3,8,10,18
118:11,14
120:1,7,23
121:1 122:5
123:19 124:2
125:14,18

126:5,18 129:6
130:5 132:12
132:23 134:14
134:16,21
135:1 136:11
136:13,19
137:15 141:16
145:9 154:21
155:1 156:11
156:23 157:17
159:3
**rindecella's**
  27:22,23,24
  29:17
**risk**  75:2,9,12
  75:13,14,16
  76:4 83:6
  127:15,23
**riskier**  83:21
**risks**  76:11,12
  77:1
**risky**  75:18
  83:22
**robert**  54:25
**roberts**  2:4
  5:10,11 7:6
  10:23 11:4,9
  13:25 14:4
  30:19 35:5,8
  35:15 46:23
  61:12,15 67:23
  68:18 84:16
  93:19,22 96:9
  97:12 98:19
  104:6,17,21

124:20 129:18
135:9 141:5,17
155:24 156:5
159:15,18,20
159:23
**roi** 72:7,18
73:14
**role** 29:2 31:10
31:12,13 32:5
**rolled** 64:18,21
117:15 121:4
122:24 125:15
**rollover** 64:19
79:22
**room** 31:24
**root** 24:3 66:4
84:20
**rough** 139:25
**roughly** 12:17
17:15 20:11
29:15 58:1
77:6,8 132:10
142:24 148:2,3
**rule** 10:4,4
11:13
**rules** 4:22 6:23
9:18
**run** 74:12
**rupp** 44:12,14
**russell** 112:6

**s**

**s** 2:1 3:5 4:1
14:17 79:10
164:3

**safe** 108:18
**salary** 41:4
**sales** 70:2
**sam** 5:7 11:4
104:17
**samuel** 2:12
**samuel.block**
2:16
**sap** 22:1 26:7
27:15,17 32:2
32:10,11
**sarah** 162:2,15
**sarcastically**
18:22
**satisfied** 41:4,6
**saving** 18:18,23
19:14
**savings** 81:15
81:16
**saw** 47:7 82:18
127:9
**saying** 30:11
39:17 48:9
50:15,17,18,20
59:8 90:4
94:15 95:6,16
95:18 96:12,24
98:2,7 99:16
99:24 100:19
101:10 103:9
109:1 114:9
120:11 134:18
134:19 137:6
140:25 142:11
144:22 147:10

149:19,23
151:5
**says** 21:8,11
23:4,7 25:22
25:23 27:7
28:1,17 32:14
36:17 41:13
46:10 48:2,18
49:24,25 50:8
52:6,10,15
54:3 55:8,9,10
56:6,8 57:3,4
58:1,19 59:18
59:18 62:9
63:15 65:10,11
83:1,2,5,25
85:4 86:22,25
94:8,18 95:9
95:13 96:4,13
99:5,19 100:19
102:16 105:15
105:19 108:17
108:20 109:20
109:24 110:1
111:3,11 112:6
113:3 114:23
115:3,4,25
116:19,25
117:6 118:3,4
126:16,18
132:2,5 134:10
154:21 155:3
**scammers**
76:24

**scams** 76:21
**schedule** 37:25
**school** 19:8,9
19:12 23:19
24:17 29:22,24
**schwab** 99:9
**scratch** 59:16
**scripts** 37:5
41:11
**search** 125:20
135:24 136:1
**searched**
135:25,25
**searching**
124:25
**second** 41:13
46:20 54:15
57:3 74:10
97:15 99:18
118:2,3 123:5
131:1 155:2,3
157:3
**section** 47:17
49:18 99:17
109:13
**security** 58:2,7
58:14,21
109:15
**see** 21:8 26:1
31:5 38:3,7
43:8 47:11,19
49:14,19 52:4
52:4 55:4
57:25 58:3
62:4,8 63:16

69:14,25 70:2
70:24 83:1,7
83:20 84:1,6
84:24 85:4,9
85:21 86:11,12
86:14,17,23
87:11,12,15,17
88:14 89:12
90:5 94:13,19
94:24 96:10
99:11,12,16
101:1 109:17
111:5,7,11,20
113:9 114:13
114:17 115:5,8
115:23 116:1
116:19 118:4
122:17,20
123:6,8 126:18
129:5,10
131:15,21
135:18 140:1
142:18,21
144:10 150:20
151:3 154:5
155:8,14 156:9
156:14 157:4
157:14
**seeing** 87:2
**seek** 11:5 50:21
68:16 74:3
107:3 130:12
138:24 139:3,6
**seeking** 73:5,7
73:14,17,24,25

74:2 77:9
**seem** 44:4
49:12 129:11
**seemed** 40:23
40:24 43:22,23
44:6
**seems** 109:6
121:25 147:9
**seen** 47:5 82:16
93:5 120:20
154:15 157:10
**segues** 11:12
**select** 46:6
58:17 146:18
146:20 153:9
153:15
**selected** 72:19
141:18 153:12
**selecting** 75:3
**seminars** 25:15
25:17
**send** 147:24
**senior** 32:6
65:20
**sense** 9:22
10:11,17,19
11:21 52:1
85:18 97:21
102:18 106:1
146:1
**sent** 24:3
163:14
**sentence** 32:14
54:3,10 55:10
57:2 59:18

95:2 99:19
155:3
**sentences**
100:22 109:19
**separate** 13:25
29:8 96:14
98:15 152:4
**september** 1:12
4:3,12 82:8
161:24 162:24
163:3
**series** 40:9
155:6
**serious** 119:3
**seriously**
119:15
**service** 38:19
63:15 147:4
**services** 1:7
2:11,22 3:12
4:11 50:5
128:3,4 146:15
**serving** 152:4
152:13
**set** 22:8 33:5
**setting** 96:12
96:13
**settle** 145:4
**settlement**
145:2,7,21
146:2,7 147:8
**several** 66:3
70:9 123:7
133:22

**severance** 3:10
47:4,18,24
48:3,15 53:20
55:11 59:6,20
59:24 60:1
64:1
**shah** 2:5 3:21
5:11 143:22
154:6,11
155:12
**shake** 10:8
**share** 13:21
**shared** 13:23
**sheena** 17:16
17:17 18:2,3
**sheet** 163:11
**shelf** 41:22
**shop** 28:1
30:24 149:15
149:20
**shopping** 143:8
**show** 61:4
122:24
**showed** 30:9
**shown** 96:6
**shows** 111:18
123:3
**sic** 4:12 149:5
**side** 21:9 59:11
98:24 111:9
**sides** 100:9
**sign** 46:6 48:4
50:19 62:1,14
63:2 159:19
163:12

**signature** 47:11
62:21 131:16
160:2 161:16
162:14
**signed** 48:1,13
60:25 62:4,16
63:13 163:19
**significant**
124:5
**signing** 131:18
**similar** 32:9
106:19 113:11
130:19 159:6
**similarly** 144:4
**simple** 49:24
77:15
**simply** 76:24
**single** 128:10
128:14
**singular** 11:18
**sir** 159:19
**sit** 61:7 79:17
153:14,18
**sitting** 53:7,19
70:4 71:25
100:12 115:13
120:6,19 121:3
123:23 128:12
130:4 133:2,23
135:13 157:7
**situation**
142:16
**six** 28:8
**skill** 21:12 22:8
22:23

**skills** 21:8,17
23:15,15
161:10 162:6
**skip** 23:2 113:7
131:25
**skipping** 132:3
**small** 30:23
84:1,4 85:8,14
86:4,17 87:10
87:20 89:3,13
89:17 92:6,7
99:9,10 111:6
111:12 113:8
**smith** 1:17 4:4
4:7 161:2,17
**solely** 141:6
**solutions**
163:23
**somebody**
130:16
**somebody's**
78:18
**someone's**
30:17
**something's**
67:20 157:21
**somewhat**
43:11 108:8
**soon** 68:14
**sorrelwood**
16:16
**sorry** 11:18
22:16 30:20
39:2 45:7
52:19 62:10

64:13 85:12
88:23 95:3
107:23 111:22
111:24 116:5
116:21,23
128:1,1,1
130:20 133:16
134:6 155:13
155:15
**sort** 6:24 9:11
11:20 15:6
20:22 21:20
24:9,24 26:12
27:13 29:3
30:7 31:10,12
32:4,21 33:1
38:19 49:20
57:25 102:18
109:25 112:25
115:13 117:14
132:2 138:19
143:5 144:4
147:25
**sorts** 32:2
40:18
**sought** 147:7
**sound** 15:21
46:11 123:20
**sounds** 34:14
35:24 43:2,12
57:20 61:15
70:20 90:4
107:7 118:11
**sources** 79:6

**southern** 1:2
**speak** 43:20
**specialist** 32:6
**specific** 25:23
49:8 115:18
116:9
**specifically**
12:15 14:2
15:2 99:14
114:5 135:14
155:4
**specifics** 124:8
**spectra** 36:25
39:8,8
**spectrum** 148:8
**spell** 6:8 14:16
**spent** 65:24
**spills** 142:19
**spoke** 14:12
**spoken** 80:20
132:3 147:17
147:19
**spot** 51:20 69:9
**spouse** 14:10
14:12 16:25
80:11,12
**stack** 155:17
**stake** 98:18
**standards**
30:14
**standing**
102:13,16,22
103:5,9,11,13
103:19,23
104:4,12

| | | | |
|---|---|---|---|
| **stands** 105:21 | 145:3 156:10 | **struggling** | **suite** 2:6 83:6 |
| **stapler** 93:10 | **stepdaughter** | 68:15 | 83:19,23 |
| **start** 7:9 18:23 | 17:11 18:2 | **stuff** 21:3 26:12 | **suits** 56:2,19 |
| 28:2,12,14 | **stepdaughter's** | 56:23 93:15 | **summarize** |
| 33:13 119:10 | 29:22 | **style** 75:1,2 | 110:5 |
| 159:10 | **steps** 148:15 | **styles** 78:22 | **summarizes** |
| **started** 11:5 | **steve** 42:20 | **subcontract** | 117:14 |
| 30:1 | **steven** 44:18 | 14:25 | **summarizing** |
| **starting** 24:21 | **stick** 10:9 | **subcontracts** | 72:19 |
| **starts** 47:19 | **stickers** 107:19 | 14:25 | **summary** 3:16 |
| 59:12 60:20 | **stillwell** 23:4 | **subject** 49:1 | 3:18 107:6 |
| 109:14 | 24:15 | 133:18,25 | 108:2 122:13 |
| **state** 6:8 | **stipulate** 83:16 | **subscribed** | **summers** 18:13 |
| 161:19 | **stipulation** | 165:14 | **super** 121:23 |
| **stated** 102:1 | 4:25 | **substance** | **supporting** |
| **statement** | **stock** 75:24 | 12:12 140:18 | 41:11 |
| 81:13,14 | 85:4 91:11,13 | 146:5 | **supports** 54:14 |
| 113:17 114:16 | 91:14,16,20,24 | **substantive** | **suppose** 122:15 |
| 117:4 133:20 | 103:16,20,25 | 132:16 | **sure** 5:24 10:18 |
| 136:8 | 104:2,5,8 | **sue** 52:24 53:16 | 10:21,23 18:17 |
| **statements** | 128:4,10,10,14 | 103:20 104:4 | 26:11,16,17,18 |
| 13:9 84:19 | 128:17 155:7 | 129:7 | 31:1,4 37:8 |
| 87:23 95:2 | 155:13,13 | **sued** 67:17 | 45:4 48:8,12 |
| 106:10 113:22 | 156:14,18,19 | **suffered** 100:3 | 52:23 60:9 |
| 114:6,10 126:9 | **stocks** 80:8 | 100:13 | 61:17 62:11 |
| 136:22 | **stop** 77:15 | **sufficient** | 71:20 72:15,16 |
| **states** 1:1 | 107:21 | 148:16 150:10 | 73:24 75:11 |
| **statutory** 56:5 | **store** 22:12,18 | 150:18 151:17 | 76:9,21,23 |
| **stay** 8:4 9:13 | 22:19 136:23 | **suing** 53:21 | 78:9,12 86:9 |
| 18:6 | **story** 27:25 | 54:21,23 59:3 | 102:19 103:18 |
| **staying** 78:19 | **strategies** 24:6 | 59:7 71:6,14 | 104:21 107:2 |
| **stenographic** | **street** 1:15 2:6 | 71:21 104:14 | 107:11 108:13 |
| 4:24 | **strike** 139:21 | **suit** 96:21 | 113:6,15 116:3 |
| **step** 28:16 | 143:20 156:25 | 102:1 | 117:2 121:6 |
| 31:11 32:7 | | | 125:14 129:5 |

134:17 142:9
143:2 154:18
156:22,24
157:2,6
**surprise** 97:20
98:4,6 112:13
**surprising**
97:22
**sustainability**
71:10
**swipe** 65:22
**switching**
27:16
**sworn** 4:16
5:17 161:5
165:14
**system** 22:1
26:15 27:16
**systems** 41:16

**t**

**t** 3:5 6:11,16
164:3,3
**table** 131:11
**take** 4:8,13
10:22 11:15
20:18 22:3
23:20 25:4
28:16 40:2
46:20 61:13
68:21 69:6
73:8 76:25
81:11 82:23
88:19,25
100:21 104:22
108:6 110:15

112:18 122:10
125:22 135:20
138:7 143:4
145:2 156:10
**taken** 4:10
11:24 148:15
161:3,12 162:9
**takes** 36:13
41:24
**talk** 15:2 21:17
22:17 23:25
38:15 119:6
130:15 135:17
146:12 147:12
147:24
**talked** 12:13
15:6 18:18
19:14 38:11
55:12 57:24
74:11 80:18
88:3 103:16
106:19 111:14
112:14 120:15
124:19 132:8
137:15 144:21
144:23 158:1
**talking** 16:8
60:10 72:1
105:24 108:3
122:24 147:16
148:2 149:3
**target** 71:2,4,6
134:5,8,11,13
134:20 135:14
155:5

**teacher** 19:7
**teaching** 27:15
27:17
**team** 26:8
32:13,14 34:3
34:5,6,7 37:1
40:10,23 41:1
41:25 154:6
**teams** 34:15
**technical** 23:4
24:15
**technology** 5:3
**telephone**
12:10,14
**tell** 5:18 7:3
9:14 15:20,22
17:22 18:22
20:24 27:25
29:20 39:17
67:1,2,5 77:24
85:13,14 86:7
87:24 91:4
114:6 128:3
141:14 147:3
149:10,11
**telling** 10:2
32:19
**tells** 68:8
**ten** 61:13,15
111:19 140:7,8
145:24 147:22
**tender** 59:20
**tends** 78:22
**term** 23:11
49:17 64:19

118:19
**terminate**
73:25
**terminated**
50:19 54:21
**termination**
47:3 50:16,22
50:23 52:22,25
53:5,6,12,17
54:11,16,17,20
54:22,22 55:3
56:10,14,16,23
57:14 58:12,15
58:16 62:8
63:15 102:10
**terminology**
72:17
**terms** 21:21
77:22 83:24
**test** 20:14
26:15 37:5
41:11
**testified** 5:19
9:7 61:25
118:14
**testify** 12:3
**testifying** 9:21
161:5
**testimony** 48:8
48:13 68:7
116:4 150:3
163:9,17 165:8
**testing** 42:1
**texas** 1:2 4:14
16:17,18 31:9

| | | | |
|---|---|---|---|
| 161:19 | 56:18,24 57:8 | **thinking** 64:6 | 66:10,11 69:6 |
| **thank** 5:25 | 61:25 63:7,12 | 121:19 143:3,8 | 70:10 74:17 |
| 55:17 84:22 | 64:24 67:4 | **third** 21:11 | 75:17 76:21 |
| 111:23 116:23 | 68:19 73:13,20 | 25:22 26:3 | 82:18 89:22 |
| 155:25 159:13 | 73:20,21 74:11 | 84:5 151:10 | 90:24 100:16 |
| 159:15,24 | 76:1,16 77:2 | **thought** 15:7 | 103:3 104:10 |
| **thanks** 6:1 | 78:8 79:22 | 52:20,20,24 | 111:17 115:22 |
| 46:23 93:24 | 80:9,15 81:3 | 62:18 83:16 | 118:23 119:23 |
| 97:12 159:17 | 84:12,17 90:12 | 95:14 112:15 | 128:8 129:21 |
| **thing** 21:20 | 96:10 98:20 | 129:14 135:6 | 137:1 139:23 |
| 24:24 29:3 | 100:5,7 101:11 | 143:12,14 | 143:4,10 |
| 32:4,21 33:1 | 101:14,15,17 | 153:3 | 148:24 149:2,5 |
| 37:22 39:18 | 103:8 104:19 | **thousand** | 150:1,12,13,25 |
| 41:12 52:24 | 105:7,24 110:6 | 145:24,24 | 151:8,13 153:4 |
| 65:22 100:25 | 111:3 113:24 | **three** 24:4 | 156:22 159:3,4 |
| 116:24 148:1 | 116:16 117:14 | 26:11 46:10 | 159:6,14 |
| **things** 24:10 | 118:25 120:19 | 62:15 63:9 | 163:18 |
| 31:22 32:2 | 121:3,22 | 84:8 111:4 | **timeframe** |
| 42:15 57:5 | 125:19 127:10 | 139:7,13 155:2 | 163:8 |
| 63:22 73:9 | 127:12 128:15 | **throw** 74:1 | **times** 36:5 |
| 74:23,24 75:3 | 129:24 130:1 | **throwing** 89:11 | 145:18 147:17 |
| 84:24 110:9 | 131:7 132:19 | **thursday** 1:12 | 147:19 151:19 |
| 112:21 118:2 | 135:13 137:21 | **tie** 117:25 | **timing** 98:14 |
| 124:12 137:3 | 139:15,21 | **time** 1:13 5:4 | **tip** 81:18 |
| **think** 6:21 7:7 | 140:22 141:1,2 | 22:2 23:17 | **today** 6:24 12:3 |
| 9:18 11:5 12:2 | 141:3 142:5,5 | 28:5,6,10,12,25 | 13:13,17,21 |
| 13:12,19,23 | 142:11 144:12 | 29:17,23,24 | 14:2 51:1 |
| 22:5 29:6 30:1 | 144:16 146:19 | 31:22 36:6,13 | 53:19 70:4 |
| 30:12,16 34:22 | 148:22 149:1,8 | 38:14 39:10,14 | 72:1 79:16 |
| 35:25 36:7,15 | 149:19 150:1,5 | 39:19,20 45:16 | 100:1 105:24 |
| 38:1,23 41:22 | 150:10,23 | 46:20 47:7,8 | 110:19 111:14 |
| 42:8 45:2,22 | 151:5,9,20 | 47:14 48:1,4 | 112:14 115:13 |
| 48:6,12 49:23 | 154:25 155:24 | 48:11,11 61:7 | 120:19 121:3 |
| 52:4,17 53:4 | 158:10,17,24 | 62:19 63:9 | 123:23 128:12 |
| 53:20 54:9,11 | 159:8 | 64:7 65:21 | 131:7 132:9 |

133:2,24
135:13 137:7
137:15 153:14
153:18 157:7
159:14
**today's** 4:3
12:6,25 14:4
14:11 160:1
**together**
117:25
**told** 35:23
67:16 140:7
**tomorrow**
75:25
**took** 24:18,20
42:14 123:15
**top** 21:8,12
22:23 26:3
71:18 78:19
87:23 111:6
116:20 126:16
**topic** 27:13
36:15
**toss** 136:24
**total** 115:25
116:18,19
118:3
**tough** 40:19
**toward** 115:12
**towards** 69:12
116:16 131:15
**tower** 43:5,19
**town** 43:19
**traci** 42:22

**track** 33:7
65:21 151:11
**tracked** 32:2
**trade** 76:3
**training** 25:8
27:7,10,12,13
37:5
**transcriber**
162:1
**transcript** 4:18
7:10 8:1,12 9:1
11:6 161:21
162:3,5 163:6
163:19 165:5,8
**transcriptionist**
161:8
**translate** 48:18
49:11 50:8
**trawick** 39:15
39:15 42:5,8,9
**treasures** 27:25
**trial** 140:4,5,11
140:12
**tricky** 154:14
**tried** 117:13
**true** 67:5 89:1
101:7 131:22
134:14,18
161:9 162:5
165:8
**trust** 119:22,24
120:3,9,9
134:12,13
**trustworthy**
44:7

**truth** 5:18,18
5:19
**truthful** 21:5
**truthfully** 12:3
**try** 9:13,16
10:9 19:16
20:13 21:5
25:10 28:3
40:15 49:9
50:7 52:3
58:19 73:12
78:5,9 84:20
90:19 91:8,9
92:19 103:15
105:6 117:25
128:24 135:21
**trying** 25:1
45:22 57:18
60:16 90:1
95:20 96:11
116:7 120:8
121:17,18,22
129:5 141:18
141:20 154:14
**tucked** 31:6
**turn** 4:4 94:1
152:20
**tv** 79:5
**twice** 17:2,3
131:1
**two** 17:11 33:9
37:19 46:10
81:1 88:3
90:24 94:16
97:23,25 99:25

101:8 103:2
118:2 142:24
155:2 156:25
159:9
**tx** 1:16
**type** 65:22
**typewriting**
161:7
**typical** 145:20
**typically**
123:21
**typing** 23:15

**u**

**uat** 37:5
**uh** 42:19
**ultimately** 73:6
118:8
**under** 4:21
9:10,19,20
58:13,20 59:21
109:13 131:23
**underlined**
49:19
**underperfor...**
104:1
**underperfor...**
103:20
**underscore**
84:25 85:3
86:11
**understand**
4:17 9:18
10:14,15,18
28:21 30:11
43:3 48:8,19

**[understand - want]**                                        Page 41

50:4 51:25
52:23 57:18
58:5,12 60:24
64:19 67:12
68:1 76:3,10
84:13 90:3,17
92:11,14 94:5
95:5 96:23
100:22 116:3
120:8,23
131:21 138:16
139:6,18 145:3
149:22
**understanding**
33:5 48:13
51:3 52:5
54:19 72:23
77:25 78:21
79:16 105:25
126:25 139:11
139:14 140:3
142:7 145:6,9
145:13,16,20
148:18
**understood**
42:11 61:1
135:10
**unduly** 105:17
**unhappy**
127:19,22
**unique** 27:24
**unit** 65:19
**united** 1:1
**university**
23:25 24:16

**unknown** 56:4
**unrelated**
33:15
**unsuitable** 83:6
**unsure** 156:23
157:1,2
**update** 65:10
65:12 147:25
**updated** 148:17
**upper** 81:17
114:18
**upsetting** 61:4
**use** 9:24 23:16
27:15,17 77:4
82:21 93:10
121:16 138:8
159:2
**used** 32:25
101:11 123:16
163:19
**users** 41:11
**uses** 4:20 153:6
**using** 22:2

**v**

**v** 1:6 163:4
164:1 165:1
**vaguely** 138:2
**value** 40:24
76:12,13 77:14
84:1,5 85:9,14
85:20 86:4,17
87:11,20 89:3
89:13,17 99:9
112:6 128:16

**vanguard** 34:9
34:24,25 70:1
70:15,21 79:21
79:23 80:5
124:4 134:11
134:12
**variety** 113:13
129:6
**various** 37:20
57:5 63:21
123:4,6 137:3
**venture** 151:12
**verbal** 9:24
111:22
**verify** 163:9
**veritext** 4:7
163:23
**veritext.com.**
163:15
**version** 21:1
**vetted** 51:11
**vetting** 121:25
140:23 141:16
149:20,25
150:2
**video** 5:3
**videographer**
2:20 4:2 5:22
10:24 11:2
61:18,21
104:24 105:2
138:10,13
159:25
**videos** 107:14

**videotaped**
1:10
**view** 96:14
128:12 146:17
146:19
**vigen** 19:3
**violated** 59:7
**violating** 48:16
53:20
**violation** 59:2
59:18,24 60:1
**visit** 106:17
**vocational** 25:8
**voice** 6:5
**voluntarily**
48:23
**vp** 18:13
**vs** 4:11

**w**

**w** 14:17
**wacker** 2:14
**wait** 142:23
150:20
**waiver** 61:2
**walk** 47:22
53:10
**wall** 18:4
**walnut** 2:6
**want** 10:10,21
17:21 27:2
40:17 46:7
47:21 49:11,24
51:24 57:15
61:13 72:8,16
73:24 75:8,10

75:12,22,22
76:11,12 93:16
94:1 109:22
119:2 137:16
147:3 156:4
157:4 158:25
159:5
**wanted**  5:24
  25:2 28:3,21
  31:4 33:5,11
  36:25 38:7
  49:7 66:1
  82:21 95:21
  118:17 119:3
  135:2 143:14
**watched**  32:3
**way**  7:9 22:23
  24:12 25:11
  26:11,23 30:16
  34:1 40:15
  41:23 45:25
  48:24 49:18
  51:23 52:8
  53:8 54:22
  57:15 58:10
  64:5 68:2
  69:12 72:23
  78:5 82:25
  90:11,19 91:4
  91:8 98:17
  102:17 103:16
  104:13 115:11
  127:12 128:8
  130:2 132:8
  140:19 143:5

147:15 149:18
  151:11
**ways**  34:13
  36:16 63:7
  74:11 91:9
  92:20
**we've**  19:22
  61:10 89:1
  90:12 104:17
  105:24 110:18
  111:14 112:14
  144:16 157:8
**website**  106:11
  106:17,23,25
  107:10,11,13
**wednesday**
  4:12
**week**  142:24
**weekends**  24:5
**weeks**  6:3
  62:15 63:9
**went**  19:19
  39:3,9 40:9
  74:20 105:13
  106:22 113:24
  119:7,19
  120:22 124:3
  134:14
**werner**  3:15
  97:9
**whatnot**  67:9
**whatsoever**
  16:5
**wherever's**
  38:25

**whichever**
  69:21
**wilbanks**  14:15
  16:8 132:10
**wilhelm**  44:18
**williams**  43:4
**willing**  57:19
  76:25 140:8,11
**willis**  3:8 36:17
  36:20 37:3,7
  37:17 38:9,14
  39:2,7
**wisdom**  18:21
**wisenbaker**
  42:18
**withdrawals**
  123:5,7,8
**withdrew**
  118:8,14 124:3
**witness**  4:16,17
  5:12,17 7:5,8
  10:1 14:3,6
  20:5 30:20
  35:7,9 46:24
  55:16 61:17
  96:19 111:24
  116:12 159:17
  161:4 163:8,10
  163:12,18
**witnesses**  98:21
  98:25
**wonder**  87:8
**wondering**
  58:23 124:3
  129:14

**word**  49:4,4,13
  61:8,8 71:24
  82:23
**words**  10:10
  40:17 56:24
  57:20
**work**  18:12
  23:3 26:18
  30:8 32:25
  41:23 43:25
  44:1,2
**worked**  21:14
  24:8 28:18
  29:1 46:9 65:5
  66:3 79:11
**workers**  56:22
**working**  15:16
  36:21,23 40:8
  40:21 63:9
  65:5
**works**  14:23
**world**  22:13
  27:11
**worley**  34:8
  65:5,9,11,25
  66:2 67:18
  68:1 69:5
  79:18 80:1
  125:11,16
  130:4,8 134:13
  137:8 155:18
  156:11,20
**worley's**  66:5
**wreck**  137:19
  137:21 138:4

[write - zoom]                                                    Page 43

| | | |
|---|---|---|
| **write**  21:2 | 78:8 80:17 | **younger**   18:20 |
| 22:22 | 81:14,20,22 | 76:25 |
| **writing**   37:4 | 83:14,18 86:10 | **youngest**   17:19 |
| 41:11 | 86:25 90:7 | **youngest's**   19:2 |
| **written**   4:25 | 91:15,17 92:24 | **z** |
| 153:23 | 93:22,23 94:22 | |
| **wrong**  15:22,23 | 96:9,19,23 | **zero**   89:16 |
| 21:24,25 26:23 | 97:22 98:3,14 | **zoom**   5:21 |
| 26:24 67:2,2 | 98:20 104:19 | |
| 67:16,20 83:17 | 104:21,21,22 | |
| 101:14 116:24 | 107:22 109:8 | |
| 141:19 158:4 | 111:5,9 119:2 | |
| **wrongful**   52:25 | 119:4,5 123:22 | |
| 53:5,17 56:16 | 124:7 131:12 | |
| **wrote**   21:3,12 | 136:4,17,20 | |
| 154:3,8 | 138:1 144:22 | |
| **x** | 146:22 151:23 | |
| | 152:11 154:14 | |
| **x**   3:1,5 33:8 | 155:22 156:6 | |
| 115:15 121:8 | 158:15,21 | |
| 161:21 | 159:20 | |
| **y** | **year**   65:24 | |
| | 111:18,18,19 | |
| **yeah**   10:3,3,4 | 115:4,7 137:20 | |
| 10:23 11:10 | **years**   6:19 12:9 | |
| 14:21 16:18 | 16:20,20 17:17 | |
| 17:6 18:23 | 19:24 24:18 | |
| 19:17 22:8,15 | 28:8,17 33:9 | |
| 26:13 28:21 | 38:7 46:10,12 | |
| 31:4 38:3 | 66:3,4 80:12 | |
| 46:12 47:19,22 | **yeses**   10:9 | |
| 49:6 51:17 | **yesterday** | |
| 57:18 60:3 | 12:18 13:15 | |
| 62:22 63:13,21 | 47:9 | |
| 65:15,17 67:10 | | |
| 67:10 75:15 | | |

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.