# Exhibit C

Page 1

```
 1                     UNITED DISTRICT COURT
                    SOUTHERN DISTRICT OF TEXAS
 2                       HOUSTON DIVISION

 3

 4
       MARY LALIBERTE and MARIE          Case No:
 5     MCKNIGHT, individually and as      4:22-cv-03290
       representatives of a class of
 6     similarly situated persons, on
 7     behalf of the Quanta SERVICES,     CLASS ACTION COMPLAINT
       INC. 401(K)SAVINGS PLAN,
 8              Plaintiffs,
 9     v.
10     Quanta SERVICES, INC.;THE BOARD
       OF TRUSTEES OF Quanta SERVICES,
11     INC.;THE Quanta SERVICES,INC.
       401(K)SAVINGS PLAN COMMITTEE;
12     and DOES No.1-20,Whose Names Are
       Currently Unknown,
13
                Defendants.
14
       _____/
15
16
17
       DEPONENT:          MARY LALIBERTE
18
       DATE:             AUGUST 27TH, 2024
19
       TIME:             9:00 AM TO 11:44 AM
20
       LOCATION:         Pensacola Beach Resort
21                       165 Fort Pickens Road
                         Pensacola, FL 32561
22
23     REPORTED BY:      Christopher Tisa
                         Notary Commission Florida/HH 308731
24                       Commission Expires: Oct. 22nd, 2026
25     Job No. CS6863203
```

Page 2

1                          APPEARANCES
2
3      On behalf of the Plaintiffs:
4
                        JOHN C. ROBERTS, ESQ.
5                       MILLER SHAH, LLP.
                        1845 Walnut Street, Suite 806
6                       Philadelphia, PA 19103
                        866-540-5505
7                       jcroberts@millereshah.com
8
9      On behalf of the Defendants:
10
                        MATHEW J. MCKENNA, ESQ.
11                      MORGAN LEWIS & BOCKIUS, LLP.
                        1111 Pennsylvania Avenue, NW
12                      Washington, DC 20004
                        202-739-5412
13                      mathew.mckenna@morganlewis.com
14
15                      CAROLYN M. CAMPBELL, ESQ.
                        QUANTA SERVICES
16                      2727 North Loop West
                        Houston, TX 77008
17                      713-985-6488
18
19
20
21
22
23
24
25

Page 3

1                        I N D E X

2     TESTIMONY OF MARY LALIBERTE

3     Direct Examination by MR. MCKENNA                      4

4

5     JURAT/ERRATA FOR MARY LALIBERTE                      103

6     CERTIFICATE OF DIGITAL REPORTER                     105

7     CERTIFICATE OF TRANSCRIPTIONIST                     106

8

9

10

11

12                        E X H I B I T S

13    No.            Description                         Page

      Exhibit 1      Offer Letter                         12

14    Exhibit 2      Severance Agreement                  26

      Exhibit 3      Retirement Savings Statement         33

15    Exhibit 4      Required Disclosure Information       60

      Exhibit 5      Summary Plan Description              65

16    Exhibit 6      Plaintiff Responses to Def. RFP       70

      Exhibit 7      Plaintiff Responses to Def. ROG       73

17

18

19

20

21

22

23

              Proceedings recorded by digital sound recording;

24

              Transcript produced by transcriptionist.

25

Veritext Legal Solutions

Page 4

1                       P R O C E E D I N G

2              (On the record at 9:00 am)

3              THE REPORTER:  Okay.  Good morning.  We

4       are now on the record at 9:00 am, on August 27th,

5       2024.  This is the deposition of Mary Laliberte.  My

6       name is Christopher Tisa, notary public and digital

7       reporter on behalf of Veritext in the State of

8       Florida.  I will be capturing the verbatim record of

9       today's proceeding using electronic audio equipment,

10      a computer, and specialized recording software which

11      is not a form of stenography.

12              The witness is currently located in

13      Pensacola, Florida, and has positively identified

14      themselves to me by way of driver's license.  Absent

15      any objections at this time, counsel and the witness

16      agree to my remote administration of the oath and

17      the final transcript may be used for all purposes

18      allowed by the local rules of civil procedure.  Will

19      you please raise your right hand?

20                       MARY LALIBERTE

21              a witness, after first being duly

22                  sworn, testified as follows:

23              THE REPORTER:  You may I proceed?

24                  DIRECT EXAMINATION

25      BY MR. MCKENNA:

Page 5

1     Q     Morning, Ms. Laliberte.  I know I introduced

2  myself briefly off the record, or, actually, I'm not

3  positive that I did, but.  I'm Matthew McKenna.  I'm an

4  attorney for Morgan Lewis Bockius, representing Quanta

5  and the defendants in this lawsuit.  Can you please state

6  and spell your full name for the record?

7     A     Mary Laliberte, spelled M-A-R-Y L-A-L-I-B-E-R-

8  T-E

9     Q     Thank you.  Have you ever gone by any other

10  names?

11     A     Maiden name is Blankenship.  B-L-A-N-K-E-N-S-

12  H-I-P

13     Q     Have you been deposed before?

14     A     I have not.

15     Q     Okay, so I'm just gonna go over some ground

16  rules just to sort of help level -- and make sure that

17  today runs as smoothly as possible.  So, obviously, we're

18  here for your deposition.  I'm going to ask you questions

19  about the claims that you're asserting in this lawsuit.

20  And I'm just asking that you provide full and complete

21  answers.  Do you understand that?

22     A     Yes.

23     Q     And I know some of these events might have

24  happened several years ago, so your recollection may be a

25  little bit foggy.  I'm just asking you to sort of give

1    your best recollection as you remember it.

2        A    Okay.

3        Q    So I know we already covered.  We're here

4    under oath under penalty of perjury.  You understand

5    that's the same as if you're testifying in front of a

6    judge in the courtroom?

7        A    Yes.

8        Q    Throughout the day, I'm going to be asking a

9    lot of questions.  It's always possible that I ask a bad

10   question or that you don't hear me or something like

11   that.  If I do I just ask that you ask me to repeat or

12   rephrase the question, because if you answer a question,

13   I'm going to assume that you understood it.

14       A    Okay.

15       Q    Does that make sense?

16       A    Yes.

17       Q    So we have a court reporter here sort of

18   recording the whole transcript just to make things as

19   clear as possible for the transcript.  We just need to do

20   our best not to talk over each other.  I know.  Sort of

21   normal, everyday conversation.  You might predict where

22   I'm going with a question and try to jump in and answer

23   it before I finish.  I just ask that you let me finish my

24   questions, and I'll try to do the same with your answers.

25   Okay?

Page 7

1      A     Okay.

2      Q     And then also along the lines of the court

3   reporter being here, we want verbal responses, so no

4   nodding your head or shaking your head.  It'll be a yes

5   or a no.

6      A     Okay.

7      Q     Breaks are perfectly fine throughout the day.

8   I'll probably try to take breaks about once every hour.

9   If you need a break sooner than that, just let me know.

10  The only time when I might say no to a break is if I have

11  a question pending.  Or maybe if, you know, we're looking

12  at a document and I just have a couple questions left, I

13  might ask to wrap up that document before we take a

14  break.

15     A     Okay.

16     Q     Throughout the day, your attorney might make

17  some objections.  Unless he directs you not to answer,

18  you still have to answer my question.  Those objections

19  are just for the record, to preserve them for later so

20  that the judge can rule on them if he needs to.

21     A     Okay.

22     Q     Have you taken any medication that would

23  impact your ability to recall past events?

24     A     I have not.

25     Q     Other than the passage of time, can you think

Page 8

```
1     of anything that would affect your ability to recall past

2     events today?

3          A     No.

4          Q     Can you think of anything that would affect

5     your ability to testify truthfully?

6          A     No.

7          Q     What did you do to prepare for your deposition

8     today?

9          A     I had a prep meeting with my attorney.

10         Q     Just one meeting?

11         A     Correct.

12         Q     About how long was that meeting?

13         A     Roughly an hour.

14         Q     Was anybody else present?

15         A     Yes.

16         Q     Who?

17         A     A second attorney.

18         Q     Any non attorneys?

19         A     No.

20         Q     Did you review any documents to prepare for

21    your deposition today?

22         A     Yes.

23         Q     Do you recall what documents there were?

24         A     The filings and the proceedings.

25         Q     Anything other than the filings?
```

Page 9

```
 1      A     Exhibits.

 2      Q     Exhibits to the filings?

 3      A     Correct.

 4      Q     Do you recall specifically which exhibits?

 5      A     They were the documents that I provided.

 6      Q     So the documents that you produced in this

 7   lawsuit?

 8      A     Correct.

 9      Q     Anything else?

10      A     No.

11      Q     Do you have any of those documents with you?

12      A     I do not.

13      Q     Do you have any other documents or notes with

14   you today?

15      A     No.

16      Q     Have you provided your attorney with any

17   documents to produce today?

18      A     No.

19      Q     Other than your attorneys and your spouse,

20   have you discussed today's deposition with anybody?

21      A     No.

22      Q     More broadly speaking, have you discussed this

23   case with anybody other than your attorneys or your

24   spouse?

25      A     No.
```

```
                                                Page 10
 1        Q     You haven't discussed it with the other named
 2   plaintiff?
 3        A     No.
 4        Q     No current or former coworkers?
 5        A     No.
 6        Q     How old are you?
 7        A     35.
 8        Q     And can you just give your current address,
 9   please?
10        A     6903 Esther street, Unit A.  That's Pensacola,
11   Florida, 32506.
12        Q     And are you married?
13        A     Yes.
14        Q     Is your husband employed?
15        A     Yes.
16        Q     Where is he employed?
17        A     I'm not sure.  We are separated.
18        Q     Before you filed this lawsuit, have you ever
19   filed any other lawsuit?
20        A     No.
21        Q     Have you ever had a lawsuit filed against you?
22        A     No.
23        Q     Have you ever been arrested?
24        A     No.
25        Q     Have you ever declared bankruptcy?
```

Page 11

1    A    No.

2    Q    So now I want to talk a little bit about your

3    employment history and education just to get a better

4    sense of your background.  Can you just describe briefly

5    your educational background after high school?

6    A    Some college.

7    Q    How much is some?

8    A    Approximately two years, no degree.

9    Q    And where did you attend college?

10    A    Pensacola State.

11    Q    And what was your major?

12    A    Paralegal studies.

13    Q    Why did you decide not to finish?

14    A    Different career path.

15    Q    While you were in college, did you ever take

16    any finance classes?

17    A    I did not.

18    Q    What about economics?

19    A    No.

20    Q    Any classes that would involve sort of basic

21    investment principles?

22    A    No.

23    Q    And do you have any other education other than

24    Pensacola state?

25    A    No.

Page 12

1          Q      Any professional certifications?

2          A      No, not at this time.

3          Q      Any sort of like on the job training or

4     vocational training?

5          A      No.

6          Q      Have you ever attended a financial or

7     investment seminar?

8          A      No.

9          Q      Any retirement planning seminar?

10         A      No.

11         Q      Presentation.  I'm gonna introduce Exhibit 1.

12    Be a copy of your offer letter with Quanta.

13                    MR. ROBERTS:  Thank you.

14                    THE REPORTER:  Thank you.

15         Q      Do you recognize this document?

16         A      I do.

17             (Exhibit 1 is marked for identification)

18         Q      Do you recall receiving it on or around July

19    31st, 2018?

20         A      Yes.

21         Q      Were you hired in the Pensacola, Florida field

22    office?

23         A      I was.

24         Q      So, in this offer letter under, your total

25    offer includes, do you see three bullet points?

Page 13

1       A      I do.

2       Q      Can you just read the second bullet point

3    that starts with retirement savings plan.

4       A      Retirement savings plan, 401K with a company

5    match 100% on the first 3% of your contribution and 50%

6    of the next 3% contributed, employee contributes 6%.  The

7    company matches 4.5%.

8       Q      So at the time you were hired, did you

9    consider that to be a generous benefit?

10      A      I believe it to be an acceptable benefit.

11      Q      And why do you say it was acceptable?

12      A      It seemed to match what other companies were

13   offering at that time.

14      Q      And how do you know what other companies were

15   offering?

16      A      I had other previous job offers.

17      Q      And that was consistent with the other job

18   offers that you received?

19      A      Correct.

20      Q      When you were hired with Quanta, do you recall

21   attending orientation?

22      A      I do not.

23      Q      No.  Okay.  Did you ever discuss your benefits

24   with somebody at Quanta?

25      A      I don't believe so.

Page 14

1      Q      Did you ask the person who delivered your

2   offer letter about your benefits?

3      A      I did not.

4      Q      Why not?

5      A      I didn't feel like I had a reason to.

6      Q      And did you ever discuss the Quanta Services

7   401K savings plan with anybody at Quanta when you were

8   employed there?

9      A      I did not.

10     Q      And just sort of for ease of reference

11  throughout the day, if I just refer to it as the plan,

12  will you understand that I'm talking about the Quanta

13  401K plan that's at issue in the lawsuit?

14     A      Yes.

15     Q      Okay.  So the position you were offered at

16  Quanta was for permit coordinator, correct?

17     A      Correct.

18     Q      And what were your job duties as a permit

19  coordinator?

20     A      I filed right of way permits as well as

21  ecological permits for placing fiber optic cable.

22     Q      And did your job duties change at all during

23  your time with Quanta?

24     A      They did not.

25     Q      Who did you report to?

Page 15

1      A      I do not recall.

2      Q      Do you recall if it was the same person for

3   your entire time at Quanta or if it changed?

4      A      It changed a few different times.

5      Q      Are you familiar with any of the committee

6   members during the time you were employed at Quanta from

7   2018 to 2020?

8      A      I am not.

9      Q      Do you recognize the name Nick Grindstaff?

10     A      I do not.

11     Q      Derek Jensen?

12     A      No.

13     Q      Carolyn Campbell?

14     A      No.

15     Q      Kim Riddle?

16     A      Nope.

17     Q      Kip Rupp?

18     A      No.

19     Q      Reggie Probst?

20     A      No.

21     Q      Stephen Wilhelm?

22     A      No.

23     Q      Do you understand since filing this lawsuit

24   that those were all members of the committee at Quanta

25   responsible for managing the 401 plan?

Page 16

1      A     I do understand that.

2      Q     And you understand that your lawsuit asserts

3   that those individuals were somehow deficient in their

4   monitoring process?

5      A     Yes.

6      Q     What's your understanding of how they were

7   deficient in monitoring the 401K plan?

8      A     They did not monitor it in the best interest

9   of myself or the other party in this case.

10      Q     How so?

11      A     I feel like there was a loss of monies.

12      Q     Did you personally lose money in the 401 plan?

13      A     I would assume so.

14      Q     And what's that assumption based off of?

15      A     I'm not sure.

16      Q     Did you ever review your plan account

17   statements while you were a participant?

18      A     I did.

19      Q     You did.  And those plan account statements

20   would have reflected whether your account gained or lost

21   money, correct?

22      A     Correct.

23      Q     And so if those plan account statements show

24   that your account gained money over the time of your

25   participation, then how -- then what do you base your

```
1    conclusion that you lost money on?

2                MR. ROBERTS:  Object to form.  Sorry, you

3         can answer it.

4         A    Did not build as much as it should have.

5         Q    And what's that based on?  As much as it

6    should have.

7         A    Based on personal opinion.

8         Q    Can you give me any specifics about what

9    informs that personal opinion?

10        A    I cannot.

11        Q    Okay, so it's just a feeling?

12                MR. ROBERTS:  Object to form, you can

13        answer.

14        A    I don't have an answer for that question.  Can

15   you repeat the question?

16        Q    Yeah.  So I'm just trying to understand, sort

17   of the basis for you concluding that you lost money or

18   sorry, your account didn't grow as much as you believe it

19   should have?  I'm trying to understand.  How much do you

20   believe it should have grown?

21        A    Based on the money that I was contributing and

22   based on what the employer was contributing, it felt like

23   it didn't grow at all.

24        Q    So if your plan account statement showed a 20%

25   growth over a quarter, you would still contend that your
```

Page 18

1     money didn't grow at all?

2                    MR. ROBERTS:   Object to form.

3         A     Correct.

4         Q     Where did you work before you joined Quanta?

5         A     I worked for Boyles and Boyles PLLC.

6         Q     And what were your job duties there?

7         A     I started out as a secretary and started doing

8     paralegal work for them.

9         Q     And how long were you there?

10        A     Approximately two years.

11        Q     Why did you leave?

12        A     I had my second child.

13        Q     And you couldn't work there with two children?

14        A     No.

15        Q     Why not?

16        A     I chose to be a stay at home mother.

17        Q     And how long between when you left Boyles and

18    Boyles and you started at Quanta?

19        A     Approximately two years.

20        Q     While you were at Boyles and Boyles, did you

21    participate in a 401K plan?

22        A     I did not.

23        Q     Any other retirement plan?

24        A     No.

25        Q     Was any retirement plan available to you?

Page 19

1      A      No.

2      Q      So you left Quanta effective May 1st, 2020.

3      Does that sound right?

4      A      Yes.

5      Q      Can you just walk me through your employment

6      history since leaving Quanta?

7      A      Since leaving Quanta, I worked for another

8      engineering firm.  From there, I worked for some

9      subcontracting firms, same line of work.  And I am

10     currently with utility engineering firm.

11     Q      Okay.  Do you recall the names of any of those

12     firms?

13     A      I worked for Team Fishel.

14     Q      Is that F-I-S-C-H-E-L?

15     A      I-S-H-E-L.

16     Q      And then where did you work after?

17     A      A couple of different subcontracting

18     companies.

19     Q      You don't remember their names?

20     A      I don't.

21     Q      And where do you work currently?

22     A      I currently work for Engineering Associates .

23     Q      And what's your job title?

24     A      I'm a permit manager.

25     Q      And what are your job duties as a permit

```
                                                  Page 20
 1    manager?
 2         A     I manage a team of approximately 24 members
 3    and oversee day to day tasks.
 4         Q     What types of day to day tasks do you oversee?
 5         A     The permitting of towns, cities within the
 6    state of North Carolina, meeting with clients and
 7    scheduling.
 8         Q     I think we might have covered this earlier,
 9    off the record, but is that a fully remote position?
10         A     Correct.
11         Q     Do you participate in a 401K plan with
12    Engineering Associates ?
13         A     I do.
14         Q     When did you start participating in that plan?
15         A     December of 2023.
16         Q     What investments are offered in that plan?  To
17    the best of your recollection?
18         A     I am not entirely sure.
19         Q     Do you know what investments your money is
20    invested in?
21         A     I do not.
22         Q     Why not?
23         A     I trust the board members to handle that for
24    me.  That's the option I selected.
25         Q     Are you familiar with the term QDIA or a
```

Page 21

```
 1    qualified default investment option or alternative?
 2    Sorry.
 3          A    I am not.
 4          Q    Do you know if the investment that you are
 5    invested in with Engineering Associates  is the QDIA for
 6    the plan?
 7          A    I do not.
 8          Q    Do you know how your investments in the
 9    Engineering Associates  401K plan have performed since
10    December 2023?
11          A    I do not.
12          Q    Do you know if those investments have grown as
13    much as you think they should have?
14          A    To my knowledge, I believe so.
15          Q    And what's that based on?
16          A    Personal opinion.
17          Q    But I think you just said you don't know how
18    they performed, right?
19          A    Correct.  But they have shown more growth than
20    what the investment with Quanta did.
21          Q    And how do you know that?
22          A    Based on the numbers that I've seen compared
23    to what the numbers were with the Quanta 401K.
24          Q    And that's based on your plan account
25    statements or something else?
```

Page 22

1        A      Correct.

2        Q      Have you produced those plan account

3    statements in this litigation?

4        A      I have not.

5        Q      You understand that they were requested?

6        A      For the 401K that I currently have?

7        Q      Yes.

8        A      No.  I believe that whenever this was

9    originally filed, I did not have the 401K.

10        Q      Okay.  You understand that under the federal

11    rules of civil procedure, you have a duty to update your

12    discovery responses as new information becomes relevant?

13        A      Oh, well, I am now.

14        Q      Well, connect with John off the record, but I

15    think we're going to want those plan account statements.

16        A      Sure.

17        Q      Thank you.  I just want to confirm you don't

18    know what investment options you're invested in, correct?

19        A      That's correct.

20        Q      Do you have any other retirement savings?

21        A      No.

22        Q      Were you invested in a 401K plan with Team

23    Fishel or any of the other subcontracting firms?

24        A      No.

25        Q      Any other retirement savings with those

Page 23

1    companies?

2        A       No.

3        Q       And so I think with the Engineering Associates

4    plan, do you believe that plan is prudently managed?

5                    MR. ROBERTS:  Object to form.

6        A       Unsure.

7        Q       And if that plan weren't prudently managed,

8    would you sue them as well?

9        A       Can you repeat the question?

10       Q       Sure.  So -- and you just said you were unsure

11   if the Engineering Associates  plan would prudently

12   manage or not.

13       A       Mm-hmm.

14       Q       I'm just asking, if you discovered or you

15   believed that it was not prudently managed, would you

16   also file a lawsuit against them?

17       A       Yes.  If it was mismanaged.  Yes.

18       Q       And how would you figure out whether or not it

19   was mismanaged?

20       A       I think that would be up to legal counsel.

21       Q       You wouldn't take any steps on your own to

22   probe whether it was mismanaged or not?

23                    MR. ROBERTS:  Object to form.  You can

24       answer.

25       A       Yes, I would.

Page 24

```
1        Q      Okay.

2        A      What steps would you take?

3        A      Seeking legal advice.

4        Q      And have you done so, with respect to the

5   Engineering Associates plan?

6        A      No.

7        Q      Do you have an understanding of what the

8   Engineering Associates plans fiduciary process consists

9   of?

10       A      I do not.

11       Q      Do you have an understanding of what the

12  Engineering Associates 401K plan does differently than

13  the Quanta 401K plan?

14       A      I don't.

15       Q      And if it turned out that they did things

16  similarly to how the Quanta 401K plan operated, you would

17  sue them.

18              MR. ROBERTS:  Object to form.

19       A      I'm unsure.

20       Q      Have you ever thought about seeking legal

21  advice about the Engineering Associates 401K plan?

22       A      No.

23       Q      Why not?

24       A      I believe that it's being invested correctly.

25       Q      And that's just based on the growth in your
```

Page 25

1    plan account statements?

2          A      Correct.

3          Q      So if that growth was similar to the growth of

4    your account in the Quanta plan, would your conclusion

5    about Quanta change?

6                      MR. ROBERTS:   Object to form.

7          A      It's undetermined.

8          Q      And why is it undetermined?

9          A      I'm not sure.  Can you repeat the question,

10   please?

11         Q      Sure.  So the question was.

12                     MR. MCKENNA:   Sorry, can you read back the

13         question, actually, so I don't butcher it.

14                 (Question clarified by Reporter)

15         Q      The question was, if the growth in your -- I

16   keep forgetting your current employer's name.

17                     MR. ROBERTS:   Engineering associates.

18         Q      If the growth in your Engineering Associates

19   plan was similar to the growth in the Quanta plan that

20   you experienced, would that change your conclusion that

21   the Engineering Associates plan was prudently managed?

22         A      No.

23         Q      Why not?

24         A      I feel like that's kind of speculation at this

25   point.  I don't think that that would have anything to do

Page 26

1    with what Quanta has invested in and how they mismanaged.

2         Q    So you don't think that the growth in plan

3    assets has anything to do with mismanagement of the plan.

4                   MR. ROBERTS:  Object to form.  Misstates

5         the testimony.  You can answer.

6         A    No.

7         Q    And sitting here today, you don't know any of

8    the investments that are offered in your current 401K

9    plan?

10        A    No.

11        Q    Do you know if you're -- do you know if the

12   funds you're invested in are Target-Date Funds?

13        A    I do not.

14        Q    Okay, I'm gonna introduce Exhibit 2.  This is

15   a copy of the -- sorry about that.  Here's Exhibit 2.  Do

16   you recognize this document?

17        A    I do.

18             (Exhibit 2 is marked for identification)

19        Q    If you turn to the last page of this document,

20   do you see a signature and a date there?

21        A    I do.

22        Q    Is that your signature?

23        A    It is.

24        Q    And it's dated May 5th, 2020, right?

25        A    Yes.

Page 27

1        Q      Can you read paragraph two on the first page

2    for me?

3        A      The severance benefits?

4        Q      Yes, please.

5        A      Subject to the terms of this agreement, the

6    company will pay employee $2,843 less acceptable taxes.

7    The severance benefits.  Employee acknowledges and agrees

8    that the severance benefits are being provided in

9    consideration for employees execution of this agreement.

10        Q      And did you receive that payment?

11        A      I did.

12        Q      Do you recall when you received it?

13    Approximately?

14        A      Was sometime in June of 2020.

15        Q      Can you turn to the second page of this

16    agreement and can you just read through paragraph seven

17    and subpart A to yourself?  You don't need to read that

18    into the record.

19        A      Yes.

20        Q      What do you understand that paragraph?

21    Paragraph seven and subpart A to mean?

22        A      It looks like it's basically a release of any

23    kind of suit against Quanta.

24        Q      And does that include suits under ERISA?

25        A      I do not see where it states that.

Page 28

1       Q     Can you look so in subpart A about five lines

2  down, do you see where it says but Employee Retirement

3  Income Security act of 1974?

4       A     Yes.

5       Q     Do you understand that that's ERISA?

6       A     Yes.

7       Q     So you understand that by signing this

8  severance agreement, you agreed to release Quanta from

9  any and all claims arising under ERISA, correct?

10                   MR. ROBERTS:   Objective to form.

11      A     I do.  But I don't think that this qualifies

12  for the misinvestment of the 401K plan.

13      Q     And why don't you think that qualifies?

14      A     It doesn't state anything regarding that.

15      Q     But it does say any claims relating to or

16  arising out of any aspect of employees employment with

17  the company or the termination of such employment,

18  including, without limitation, Dot, Dot, dot, the

19  Employee Retirement Income Security act of 1974.  You see

20  that?

21      A     I do, but I think this more -- I think the

22  case is more a fact that it was misinvested.

23      Q     So you don't think that this case falls within

24  the scope of this release?

25      A     I do not.

Page 29

1          Q     And without telling me -- without telling me

2    any of the details of the conversation, have you

3    discussed that with your attorneys?

4          A     I have.

5          Q     So in exchange for this release, you received

6    a payment of $2,843 less taxes, right?

7          A     Correct.

8          Q     And you don't believe that the lawsuit that

9    we're here talking about today falls within the scope of

10   this release?

11         A     I do not.

12         Q     And that's just based on the information

13   shared by your attorneys?

14         A     That and personal belief.

15         Q     And what informs your personal belief?

16         A     I believe that myself and the other party

17   involved in this case just didn't get what we were meant

18   to receive.

19         Q     In what way?

20         A     In means of financial.

21         Q     Sorry, can you say that again?

22         A     Just in the way of financial.

23         Q     Financial what?

24         A     As far as the 401K, what it should have paid

25   out, it didn't cover what it should have.

1     Q     And that's just based on your belief that it

2   should have done better?

3     A     Correct.

4     Q     Can you turn to the next page?  Page three.

5   And the first paragraph just below subpart D.  Can you

6   just read that first sentence for me?

7     A     To the extent any claim is not releasable.

8   Employee acknowledges that the payments and consideration

9   received hereunder more than offset any monetary sums

10  owing to employee from any non-releasable claim.

11    Q     Okay.  What do you understand that sentence to

12  mean?

13    A     Can I reread it?

14    Q     Sure.

15    A     So basically, they're saying that they're not

16  going to pay anything more than what was released.

17    Q     And so you believe that this lawsuit is a non-

18  releasable claim, correct?

19    A     I'm unsure.

20    Q     But you don't think that this lawsuit falls

21  within the scope of the released claims that we're

22  discussing a moment ago in paragraph seven, correct?

23    A     Correct.

24    Q     And so if your claim in this lawsuit is a non-

25  releasable claim, then according to this sentence, you

Page 31

1    acknowledged that the payments you received under the

2    terms of the severance agreement offset any sums owing to

3    you for that claim.  Correct?

4              MR. ROBERTS:  Objective to form.

5        A    I'm unsure.

6        Q    Do you understand that the $2,843 severance

7    payment you received exceeds the entire value of your

8    plan account?

9        A    I'm aware.

10       Q    And this sentence we're just looking at now

11   says that that severance payment offsets any amount you

12   might be owed in the lawsuit, correct?

13       A    Correct.

14       Q    So what exactly are you seeking to recover in

15   the lawsuit?

16       A    I'm unsure at this time.

17       Q    When did you file this lawsuit?

18       A    Approximately three years ago.  I'm not sure

19   when the first document was filed.

20       Q    And so roughly three years in, you're still

21   unsure what you're looking to recover in the lawsuit?

22       A    I'm looking to recover some sort of financial

23   means.

24       Q    But if the amount that you are looking to

25   recover is below the severance payment that you received

Page 32

1    here, then you won't get anything, right?

2              MR. ROBERTS:   Object to form.

3         A    Can you repeat that, please?

4         Q    Sure.   So if the amount that you're seeking to

5    recover in the lawsuit is less than the severance payment

6    that you received, then according to this sentence here,

7    that severance payment was an offset for the amount

8    you're seeking?

9         A    I don't agree with that.

10        Q    And why not?

11        A    That doesn't -- I just don't agree with it.

12   Personal opinion.

13        Q    Okay, so it's just your personal opinion,

14   reading the severance agreement.

15        A    Mm-hmm.

16        Q    You don't think that's correct?

17        A    No.

18        Q    Do you think that your alleged damages in this

19   lawsuit exceed $2,843?

20        A    Yes.

21        Q    And what's the basis for that?

22        A    Just the simple fact of I expected my 401K to

23   gain.   It did not, and it put me out money that I

24   possibly could have had now to build a retirement plan.

25        Q    How long were you a participant in the Quanta

```
                                                    Page 33

 1    401K plan?

 2         A     I'm not sure.  To be honest, I don't remember.

 3         Q     Do you recall approximately how much you

 4    invested in the Quanta 401K plan?

 5         A     I do not.

 6         Q     Introduce the next exhibit.  Not going to

 7    stand up this time because that wreaks havoc on the mics.

 8    So this is Exhibit 3.  Do you recognize this document?

 9         A     I do.

10               (Exhibit 3 is marked for identification)

11         Q     And what is it?

12         A     It's the retirement savings statement.

13         Q     And this is your plan account statement?

14         A     Yes.

15         Q     Give me just one sec.  How did you receive

16    these plan account statements?

17         A     Via email.

18         Q     Did you ever receive hard copies?

19         A     I don't believe so.

20         Q     And were these also available to you on the

21    plan website?

22         A     Yes.

23         Q     What did you do with your account statements

24    when you received them?

25         A     I saved them in an email.
```

Page 34

1      Q     And I'm going to refer to what are called

2  Bates numbers.  It's basically just the number that we

3  stamp on documents that are produced in litigation for

4  internal tracking purposes.  So if you look on the bottom

5  right hand of the page, do you see where it says Quanta

6  underscore and then six digits?

7      A     Yes.

8      Q     Okay, so that's the Bates number.  So can you

9  please turn to Bates number 2037?  Do you understand that

10 this is your account statement for quarter 2, 2020?

11     A     Yes.

12     Q     And do you see under your account summary

13 where it says your personal rate of return?

14     A     Yes.

15     Q     And do you see for this period for quarter 2,

16 2020 where it says 19.9%?

17     A     Yes.

18     Q     So you understand that your account grew by

19 19.9% during that quarter?

20     A     Yes.

21     Q     Were you happy with that return?

22     A     No.

23     Q     Why not?

24     A     Seems like it should have been more.

25     Q     And what's the basis for saying it seems like

Page 35

1     it should have been more?

2          A     Based on personal opinion.

3          Q     Can you identify any specific investment that

4     should have returned more or that would have returned

5     more?

6          A     I cannot.

7          Q     So it's just your thinking, your feeling?

8          A     Yeah.

9          Q     Do you know how the stock market did during

10    that same period?

11         A     I do not.

12         Q     Do you understand that this period would have

13    overlapped at the beginning of the Covid-19 pandemic?

14         A     I do.

15         Q     And you understand that was a volatile period

16    for the market?

17         A     I do.

18               MR. ROBERTS:  Object the form.  Sorry, go

19         ahead.

20         Q     So under market value of your account, on the

21    same page, do you see where it shows you're invested in

22    the Fidelity Freedom 2055K fund?

23         A     Yes.

24         Q     Just turn to the next page for me.  Do you see

25    under your contribution elections as of 10/03/2022?  It's

Page 36

```
 1    around the middle of the page.

 2         A    Which am I looking at.  I apologize.

 3         Q    Sorry.  So it's the section, the header is

 4    your contribution elections as of 10/3/2022 --

 5         A    Yes.  Got it.

 6         Q    Okay.  And do you see underneath

 7    contributions, it shows inception to date?  Do you see

 8    that line?

 9         A    Yes.

10         Q    And what were your individual salary deferral

11    contributions from the time you joined the plan through

12    June 30th 2020?

13         A    $631.24.

14         Q    What was Quanta's employer match during that

15    same time?

16         A    $473.43.

17         Q    And do you see underneath your account

18    activity?

19         A    Yes.

20         Q    Where it says withdrawals?

21         A    Yes.

22         Q    And how much did you withdraw from the plan at

23    that time?

24         A    $1,284.56.

25         Q    So, understanding that you withdrew $1,284.56
```

Page 37

1    from the plan.  Earlier I believe you said that you, the

2    401K plan, didn't get you the return that you think it

3    should have.  Is that correct?

4         A    Yes.

5         Q    Okay.  And you think that your return should

6    have exceeded your severance payment of $2,843, correct.

7                   MR. ROBERTS:  Object the form.

8         A    Correct.

9         Q    So you think that the value of your account

10   should have more than doubled?

11        A    Correct.

12                  MR. ROBERTS:  Object to form.

13        Q    And what's that based on?

14        A    Personal opinion.

15        Q    Do you have any understanding whether there

16   was any investment available on the market that would

17   have more than doubled your money, more than doubled your

18   return during that time?

19                  MR. ROBERTS:  Object to form.

20        A    I do not.

21        Q    You understand that your counsel has engaged

22   experts to assist in the litigation of this matter,

23   right?

24        A    Yes.

25        Q    Have you read any of those expert reports?

Page 38

```
1       A       Some.

2       Q       Do you recall which ones?

3       A       I do not.

4       Q       Have you ever spoken with any of the experts?

5       A       No.

6       Q       Do you know whether any of your experts opine

7   that there was an investment available during this time

8   period that would have more than doubled your rate of

9   return?

10                      MR. ROBERTS:  Object to form.

11      A       No.

12      Q       And if your experts haven't identified any

13  such investment, then how would that change your

14  conclusion that you think your damage is exceeded -- your

15  personal damages exceeded $2,843.

16                      MR. ROBERTS:  Object to form.

17      A       I'm unsure.

18      Q       So if there was no such investment available,

19  would you still think that your damages exceeded $2,843?

20                      MR. ROBERTS:  Object to form.

21      A       Yes.

22      Q       Why?

23      A       It's just based on the fact that I trusted my

24  money with the representatives of Quanta, and it was

25  mismanaged.
```

```
                                                    Page 39

 1        Q      So even if there was no available investment

 2   on the market, that would have more than doubled your

 3   money during that timeframe, you still think that the

 4   plan was managed imprudently?

 5        A      Correct.

 6        Q      Just based on your personal belief that you

 7   should have gotten more money?

 8        A      Correct.

 9        Q      And you understand that the $1,284.56 that you

10   withdrew was more than double your personal salary?

11   Deferral investments.  Correct?

12        A      I'm aware.

13        Q      And you still don't think that that's enough?

14        A      No.

15        Q      Looking at the next page, base number 2039.

16   Do you see the header that says a message from Quanta

17   Services?

18        A      I do.

19        Q      Can you just read that sentence for me?

20        A      To make changes to your account or for

21   questions about the statement, call the customer service

22   number.

23        Q      Did you ever call that customer service

24   number?

25        A      I did not.
```

```
                                                    Page 40

 1          Q     Why not?

 2          A     I didn't believe I had a reason to.

 3          Q     But you said you were reviewing your plan

 4    account statements when you received them, correct?

 5          A     Yes.

 6          Q     And so you saw the gains on your account at

 7    that time?

 8          A     Yes.

 9          Q     So at the time you received this plan account

10    statement, did you believe that that was a reasonable

11    gain?

12          A     At that time.  Yes.

13          Q     What changed?

14          A     When I was contacted by legal counsel.

15          Q     Okay, so you only don't believe that that was

16    a fair game because your legal counsel told you it

17    wasn't?

18                MR. ROBERTS:  Object to form.

19          A     Correct.

20          Q     Just going back to Exhibit 2 briefly, the

21    severance agreement.  Can you turn to -- it's going to be

22    Bates stamped 2026.  Can you just read paragraph ten?

23          A     Knowing an involuntary waiver.  Not

24    withstanding any other provisions of this agreement to

25    the contrary, employee agrees that the agreement
```

Page 41

1    constitutes a knowing involuntary waiver of all rights to

2    claim -- claims employee may have against the released

3    parties.  The company hereby advises employee to consult

4    with an attorney prior to executing this agreement.

5         Q    Did you consult with an attorney prior to

6    executing the agreement?

7         A    I did not.

8         Q    Why not?

9         A    I didn't believe that I needed to.

10         Q    Even though you were advised to do so in this

11    paragraph?

12         A    Correct.  I trusted Quanta.

13         Q    And if you consult an employee, or, sorry.  If

14    you consulted an attorney and they told you that this

15    lawsuit fell within the scope of the released claims,

16    would you have still filed this lawsuit?

17         Object to form calls for hypothetical.

18         A    I would.

19         Q    Even if it was a released claim?

20              MR. ROBERTS:  Object to form.

21         A    Yes.

22         Q    Can you turn to -- it's going to be 2028 is

23    the bates number.  And can you just read paragraph 18 for

24    me?

25         A    Acknowledgment.  Employee expressly

Page 42

1    acknowledges and agrees that employee has carefully read

2    this agreement, that employee fully understands the

3    terms, conditions and significance of this agreement,

4    that the company has advised employee of employees right

5    to consult with an attorney concerning this agreement and

6    that employee has executed this agreement voluntarily,

7    knowing and with such advice of an attorney as employee

8    has deemed appropriate.

9         Q    Did you carefully read the agreement before

10   you executed it?

11        A    I did.

12        Q    And you fully understood the terms, conditions

13   and significance of the agreement at that time?

14        A    Yes.

15        Q    How did you first learn that you were eligible

16   to participate in the plan.

17        A    It was offered.  I believe HR may have reached

18   out.

19        Q    Do you recall who had at HR reached out?

20        A    I do not.

21        Q    Do you recall when they reached out?

22        A    I do not.

23        Q    Would it have been shortly after you joined

24   Quanta?

25        A    Yes.

Page 43

1        Q      You joined Quanta in 2018, correct?

2        A      Correct.

3        Q      And you didn't begin participating in the plan

4    until 2020, right?

5        A      Correct.

6        Q      Why did you wait until 2020 to begin

7    participating?

8        A      I just didn't have the means to contribute

9    until that time.

10        Q      And what changed in 2020, that meant you did

11    have the means?  Did you receive a pay increase or

12    anything?

13        A      I did.

14        Q      And so once you had the pay increase, then you

15    felt you had the means to participate?

16        A      Correct.

17        Q      Do you recall how you made your investment

18    choices in the plan?

19        A      I believe I selected the option of where they

20    handled everything.

21        Q      Do you remember what that option said?

22        A      I do not.

23        Q      Do you recall, sort of, I guess, logistically,

24    how you made your investment elections.  Was it a paper

25    form, online, over the phone?

Page 44

1        A       It was definitely electronically.

2        Q       Do you think it was through the plan website?

3        A       I'm unsure.

4        Q       Did you ever make any changes to your

5    investments during the time you were a participant in the

6    plan?

7        A       No.

8        Q       How come?

9        A       I didn't feel like there was a need to.

10       Q       Because at the time, you believed that you

11   were getting a reasonable return?

12                    MR. ROBERTS:  Object to form.

13       A       Correct.

14       Q       Did you ever look at the performance of any

15   other investments available in the plan?

16       A       I did not.

17       Q       So you don't know whether there were any other

18   investments in the plan that outperformed your

19   investment?

20       A       I do not.

21                    MR. MCKENNA:  Been going about 50 minutes,

22           I think, before I jump into the next line of

23           questioning, this might be a good point for a quick

24           break.  In 5, 10 minutes.

25                    THE REPORTER:  We're going off the record

Page 45

1      at 9:51 am.

2                     (Recess taken)

3                     THE REPORTER:  We're going back to the

4      record at 10:00 am.

5                     FURTHER DIRECT EXAMINATION

6   BY MR. MCKENNA:

7      Q     So just stepping back a little bit, can you

8   just give me, in your own words, what this lawsuit's

9   about?

10     A     So basically, Quanta representatives did not

11  file the 401K investments or monitor the investments

12  appropriately for not only myself, but everyone.

13     Q     Okay.  And what specifically do you contend

14  that Quanta did wrong in monitoring the 401K?

15     A     Feel like they mismanaged and mis-monitored.

16     Q     How?

17     A     Felt like if they had a better kept track of

18  it, there would have been more gains.

19     Q     What do you mean by if they had kept better

20  track of it.

21     A     As far as making sure the investments were

22  appropriate.

23     Q     And what could they have done better?

24     A     They could have put the funds different

25  places, I feel.

Page 46

1    Q    Do you understand which investments your

2    lawsuit's challenging?

3    A    Specifically?  No.

4    Q    But you understand that you're not challenging

5    all of the investments offered in the plan, right?

6    A    Correct.

7    Q    Do you understand that your lawsuit's

8    challenging the Fidelity Freedom Funds?

9    A    I feel like it's what they put into the

10   Fidelity Freedom Funds.

11   Q    What do you mean by that?

12   A    Not necessarily suing Fidelity, but Quanta.

13   Q    So suing Quanta for offering the Fidelity

14   Freedom Funds in the plan?  Is that what you mean?

15   A    Yes.

16   Q    Do you know which other investments you're

17   challenging?

18   A    I do not.

19   Q    Are you familiar with the American Beacon

20   Small Cap Value Fund?

21   A    I am not.

22   Q    And so you don't know whether your lawsuit is

23   challenging that fund?

24   A    I do not.

25   Q    Are you familiar with the DFA International

Page 47

1    Small Cap Value Fund?

2        A      No.

3        Q      So you don't know if your lawsuit's

4    challenging that fund?

5        A      No.

6        Q      In what way were the Fidelity Freedom Funds a

7    bad investment for the plan?

8        A      I just feel like they weren't managed

9    appropriately as far as what the investments were in.

10       Q      I think you said that a couple of times what

11   the investments were in.  And what do you mean by that?

12       A      I feel like if there were other options, or

13   maybe if they had looked to see what was gaining, they

14   could have placed the funds in different areas.

15       Q      Do you understand that it's Fidelity who

16   decides how to invest the money in the Freedom Funds?

17       A      Yes.

18       Q      But you're not suing Fidelity, correct?

19       A      Correct.

20       Q      So what is it that Quanta, in your opinion,

21   did wrong?

22       A      I feel like they should have monitored what

23   Fidelity was investing in.

24       Q      Do you know that they weren't doing that?

25       A      Not specifically.

Page 48

1        Q     Do you know what steps Quanta took to monitor

2    the Fidelity Freedom Funds?

3        A     I do not.

4        Q     Can you tell me what they should have done

5    better?

6        A     I cannot.

7        Q     Why not?

8        A     I'm not sure what the proper steps they should

9    have been taking were.

10        Q     So how do you know that they weren't taking

11    the proper steps?

12        A     I don't.

13        Q     Okay, so you filed a lawsuit alleging that

14    Quanta and the committee were improperly monitoring the

15    Freedom Funds, but you don't know that they weren't.

16              MR. ROBERTS:  Object to form.

17        A     Correct.

18        Q     And sitting here today, can you identify

19    anything in particular that Quanta didn't do?

20        A     Nothing in particular.

21        Q     And can you identify anything in particular

22    that Quanta should have done?

23        A     I cannot.

24        Q     How did Quanta's actions affect you

25    personally?

Page 49

```
 1        A     It's not getting the benefits that I feel like

 2   I was entitled to.

 3        Q     I think we discussed earlier that's just based

 4   on your opinion, your feeling?

 5        A     Correct.

 6        Q     Outside of this lawsuit, did you ever complain

 7   to anybody else about the Freedom Funds?

 8        A     I did not.

 9        Q     Why not?

10        A     Didn't feel like I had a reason to.

11        Q     And is that because -- I think we discussed

12   earlier, before you spoke to your attorneys, you thought

13   that to Fidelity Freedom Funds for returning a reasonable

14   rate of return.

15        A     Correct.  And I don't discuss my monetary

16   issues with anyone else.

17        Q     Not even people in the benefits department at

18   work?

19        A     I just didn't feel like there was a need to

20   discuss with them.

21        Q     I think we looked earlier in your plan account

22   statements.  There was a number that you could have

23   called to speak with somebody at Fidelity?

24        A     Correct.

25        Q     You never felt like you needed to speak with
```

Page 50

```
 1    Fidelity about the performance of the Freedom Funds,
 2    correct?
 3         A     No.  At the time, I felt like everything was
 4    Kosher.
 5         Q     And the only thing that's changed between then
 6    and now is that you spoke to your attorneys?
 7         A     Correct.
 8         Q     But if you did ever have concerns about fund
 9    performance while you were a participant in the Quanta
10    plan, you understand that there were avenues that you
11    could have reached out to?
12         A     Yes.
13         Q     You could have reached out to somebody in
14    benefits at a Quanta?
15         A     Yes.
16         Q     You could have reached out to Fidelity?
17         A     Yes.
18         Q     You could have reached out and asked to be put
19    in touch directly with the committee?
20         A     Yes.
21         Q     But you didn't do any of that?
22         A     I didn't feel the need to.  I trusted them.
23         Q     So I think we've been talking a lot about the
24    rate of return.  Do you think that any of the investments
25    options in the plan were too expensive?
```

Page 51

1        A     I'm not sure.

2        Q     Do you have any understanding of what a

3    reasonable investment cost would be?

4        A     I do not.

5        Q     So you have no basis one way or the other, to

6    say whether a plan investment too expensive or not?

7                    MR. ROBERTS:  Object to form.

8        A     I do not.

9        Q     Do you know what your lawsuit says about

10   investment costs?

11       A     I do not.

12       Q     Have you read the complaint in this lawsuit?

13       A     I have.

14       Q     All of it.

15       A     The majority.

16       Q     Do you recall any parts that you specifically

17   didn't read?

18       A     No.

19       Q     When did you read it?

20       A     It's been a couple of months.

21       Q     Did you read it before the lawsuit was filed?

22       A     Yes.

23       Q     And you reviewed it sometime in the last

24   couple months?

25       A     Yes.

Page 52

1        Q       Do you recall why you reviewed it?

2        A       I just wanted to make sure I was fresh on the

3   case.

4        Q       Was that spurred by anything in particular?

5        A       No.

6        Q       Did you review it to prepare for your

7   deposition today?

8        A       I did.

9        Q       And was that a few months ago or more

10  recently?

11       A       More recently.  It was more just a Cliff notes

12  version.

13       Q       You say a Cliff notes version.  Was that an

14  actual summary that was prepared of the complaint?

15       A       No.

16       Q       Or you just skimmed the complaint?

17       A       Just skimmed.

18       Q       Do you understand the difference between an

19  actively managed fund and a passively managed fund?

20       A       I do not.

21       Q       Do you have an understanding of what your

22  lawsuit says about active versus passive management?

23       A       I do not.

24       Q       So you have no opinion of which one is better?

25       A       I don't.

```
                                                        Page 53
 1         Q      I think earlier we looked at your plan account
 2    statements, and it showed the Fidelity Freedom 2055 fund.
 3    Do you remember that?
 4         A      Yes.
 5         Q      Did you ever invest in any other fund while
 6    you were a participant in the plan?
 7         A      Not to my knowledge.
 8         Q      Do you consider yourself to be a knowledgeable
 9    investor?
10         A      I do not.
11         Q      Why not?
12         A      It's not really in my wheelhouse.
13         Q      So while you were a participant in the plan,
14    when you were looking at your plan account statements,
15    what were you looking for?  Was it just performance or
16    anything else?
17         A      I would say just performance.
18         Q      And was that just the current quarter's
19    performance, or were you looking at historical
20    performance?
21         A      I didn't look at historical performance.
22         Q      Did you ever consider the risk of your
23    assessment of your investments?
24         A      I did not.
25         Q      Did you ever consider asset style?
```

Page 54

```
1        A     I'm unsure what that is.

2        Q     What about asset class?

3        A     I'm unsure what that is as well.

4        Q     I think we covered this.  But you didn't look

5   at fees?

6        A     No.

7        Q     And you didn't look at management style,

8   active versus passive?

9        A     No.

10       Q     How come you didn't look at any of those

11  factors?

12       A     I'm not sure what they are.

13       Q     Do you have any understanding of the

14  relationship between risk and returns?

15       A     I do not.

16       Q     Do you understand that different investors

17  might value different factors when they're choosing an

18  investment option?

19       A     That would make sense.

20       Q     So some might want to take on more risk than

21  others.  Do you have an understanding of the other

22  investment options that were offered in the plan other

23  than the Freedom Funds?

24       A     I do not.  I trusted Quanta to figure all that

25  out for me.  That was the option that I selected strictly
```

Page 55

1   for the fact that I do not have a very wide understanding

2   of investments.

3       Q       Okay.  So you don't have any basis to say

4   whether the other investment options in the plan were

5   appropriate or not?

6       A       Correct.

7       Q       You can only speak to the Fidelity Freedom

8   Funds?

9                   MR. ROBERTS:  Object to form.

10      A       Correct.

11      Q       I think we covered this earlier, but I just

12  want to confirm you think the Fidelity Freedom Funds were

13  an inappropriate plan investment option because they

14  didn't give you as high of a rate of return as you

15  thought they should have?

16      A       Correct.

17      Q       And the basis for that opinion is just your

18  feeling?

19                  MR. ROBERTS:  Object to form, misstates

20      testimony.

21      A       Correct.

22      Q       Do you rely on any publications or other

23  materials when you make investment decisions?

24      A       I do not.

25      Q       What about with your current 401K plan?  What

Page 56

1    did you consider before you chose your investments there?

2        A    I did not use any material before

3    consideration.

4        Q    You understand that there's publicly available

5    information you can look at regarding different

6    investment options?  Pros and cons.

7        A    I do.

8        Q    Have you ever done any financial or retirement

9    planning?

10       A    No.

11       Q    Outside of your current 401K plan, do you have

12   any other savings or retirement?

13       A    I have stock.

14       Q    Stock in what company?

15       A    Dycom.

16       Q    Sorry, can you say that again?

17       A    Dycom.

18       Q    Can you spell that for me?

19       A    D-Y-C-O-M.

20       Q    How'd you get that stock?

21       A    I purchased it through my employer.

22       Q    Is that through the employer's 401K plan or

23   separate?

24       A    It's separate.

25       Q    And what made you choose to purchase that

Page 57

```
 1   stock?
 2        A     It looked like a good option.
 3        Q     Based on what?
 4        A     Based on the amount of money that that company
 5   makes per year.
 6        Q     And did you look at anything else before you
 7   made that purchase?
 8        A     I looked at the numbers.
 9        Q     What numbers did you look at?
10        A     Information provided by my company.
11        Q     And was that just on the numbers?  Were they
12   on company performance or the stock's performance or
13   something else?
14        A     Stock performance.
15        Q     Historical performance?
16        A     Historical and current.
17        Q     I think we were talking a moment ago when it
18   came to the plans investments.  You didn't look at
19   historical performance, correct?
20        A     For the 401k?
21        Q     Yep.
22        A     No, I did not.
23        Q     How come you treat these differently when
24   you're considering whether to invest?
25        A     I feel like I gained more knowledge since I
```

Page 58

1    purchased the stock, so hence the research.

2        Q     Have you gone back to look at your current

3    401K investments to look at historical performance?

4        A     I have not.

5        Q     Do you think you're gonna?

6        A     Yes.

7        Q     And I don't think we've received any documents

8    about your investment in Dycom stocks.  I think we'll

9    probably also request those.  I think those are

10   responsive to one of the RFP's, but we can get to that

11   later.  Okay.  So other than your 401K plan and the Dycom

12   stock, do you have any other savings or investments?

13       A     No.

14       Q     And when did you purchase that stock?

15       A     December 2023.

16       Q     And have you done anything with it since then?

17       A     No.

18       Q     Okay.  So you're just holding.  Have you

19   purchased any more or considered purchasing?  Purchasing

20   anymore?

21       A     Considered.

22       Q     But you haven't pulled the trigger yet?

23       A     No.

24       Q     So when you were a participant in the Quanta

25   plan, how often did you review your plan investments?

Page 59

1      A      Every couple months.

2      Q      And what would you do to review your plan

3    investments?

4      A      I think I misunderstood the question.  I was

5    thinking that you were saying statements.  As far as the

6    actual investments, I don't think that I reviewed those.

7      Q      Okay, so you just reviewed the quarterly

8    statements?

9      A      Yes.

10     Q      Would you review those, sort of when they came

11   in, once every quarter?

12     A      Yes.

13     Q      Did you do anything in between the quarterly

14   statements?

15     A      No.

16     Q      Did you ever visit the plan's website?

17     A      I did.

18     Q      How often?

19     A      Probably just a couple of times.

20     Q      And what was the purpose of your -- a couple

21   of visits to the plan website?

22     A      I think for the initial login, to set up the

23   information in there, and then for the withdrawal.

24     Q      Do you understand that the plan's website had

25   information on your account balance?

Page 60

1      A      I'm aware.

2      Q      And you understand that it had information on

3  the various investment options available in the plan?

4      A      Yes.

5      Q      But you didn't review any of that information

6  when you accessed the website?

7      A      No.

8      Q      How come?

9      A      I didn't feel a need to.

10      Q      Are you familiar with the plan's fee

11  disclosures?

12      A      I'm not.

13      Q      Have you ever heard the term 404(a)(5)

14  disclosure?

15      A      I have not.

16      Q      Do you recall ever receiving any sort of fee

17  disclosure?

18      A      I don't recall.

19      Q      Introduce Exhibit 4.  Do you recognize this

20  document?

21      A      No.

22          (Exhibit 4 is marked for identification)

23      Q      Do you see on the first page it says required

24  disclosure information Quanta Services, Inc.  401K

25  Savings plan?

```
                                                        Page 61

 1        A     I do.

 2        Q     And do you see on the bottom that it's dated

 3   September 9th, 2019?

 4        A     Yes.

 5        Q     Do you recall whether you received a this

 6   disclosure or any other similar disclosure?

 7        A     I don't recall.

 8        Q     Do you understand that this disclosure was

 9   available on the plan website?  If you wanted to look at

10   it?

11        A      Imagine that it was.  I don't recall that

12   information.

13        Q     Do you have any reason to dispute that it was

14   available to you?

15        A     I do not.

16        Q     But you never read it?

17        A     No.

18        Q      If you turn to the Bates number is going to be

19   577 and under qualified default investment alternative

20   notice.  Can you just read that first paragraph to

21   yourself?  Do you understand this to mean that if you

22   didn't make any affirmative decision on which investment

23   option to invest in, you would be defaulted into the

24   Freedom Funds?

25        A     Yes.
```

Page 62

1    Q    Do you understand whether that's what happened

2    with your account or not where you defaulted into the

3    Freedom Funds?

4    A    It appears to be so.

5    Q    The third paragraph in this section provides

6    you with a website link and a phone number that you can

7    call to speak about your investment decisions.  Do you

8    see that?

9    A    I do.

10    Q    And so if you didn't want to be invested in

11    the Freedom Funds, this is telling you that you could

12    have made that change.  You just needed to take action

13    yourself, right?

14    A    I do you see that.

15    Q    And you chose not to do so?

16    A    Correct.

17    Q    And why didn't you make any affirmative

18    election?

19    A    I figured that this was the best option.  I

20    don't have knowledge of how to invest, so I figured going

21    this route would be the most beneficial to me.

22    Q    Can you turn to -- it's going to be Bates

23    number 581 and you can just read this section to yourself

24    under helping you manage your plan account and accessing

25    your plan account statements, and just let me know when

Page 63

1   you're done.  So I think it's the second bullet.  Do you

2   see where it says please check your account information

3   for and promptly review correspondence, account

4   statements and confirmations as they are made available

5   to you.  Do you see that?

6        A     Yes.

7        Q     Did you do that?

8        A     No, I checked the account statements.  That's

9   pretty much it.

10       Q     Can you turn to -- it's going to be page 582

11  on the left side of the page.  Under investment options,

12  do you see where it says the plan offers a choice of

13  investment options that allow you to create a diversified

14  portfolio to help you meet your individual needs?

15       A     Yes.

16       Q     Do you have any basis to dispute that

17  statement?

18       A     I do not.

19       Q     Can you turn to 584?  Can you just read the

20  paragraph under variable return investments.

21       A     You want that out loud?

22       Q     Yeah, please.  Just up until that URL, about

23  halfway down.

24       A     The chart below list the plan's investment

25  options that do not have a fixed or stated rate of

Page 64

1    return, and underneath each investment option is an

2    applicable benchmark for that option.  A benchmark is

3    standard against which the performance of a security,

4    mutual fund or investment manager can be measured.  This

5    notice requires that a broad based market index be listed

6    on the chart for each investment option.  Additional

7    benchmarks for investment option may be available.

8         Q    Did you ever visit that website to review

9    additional benchmarks for the Freedom Funds?

10        A    I did not.

11        Q    And you understand that the chart on the next

12   several pages shows the performance and fees associated

13   with all of the investment options in the plan?

14        A    It appears to be so.

15        Q    And you never reviewed this information,

16   correct?

17        A    Even if -- I did not.  But even if I did, I

18   would have no understanding of it.

19        Q    In your view, was there anything about the

20   plan's investment performance that was not sufficiently

21   disclosed to you?

22        A    Not to my knowledge.

23        Q    Anything about the plan's fees that was not

24   sufficiently disclosed to you?

25        A    Not to my knowledge.

Page 65

1      Q      And so, as far as you know, Quanta provided

2    you with all the information you needed?

3      A      As far as I know.

4      Q      Do you understand that the plan website had

5    access to financial planning and education modules?

6      A      I did not.

7      Q      And you never reviewed any of that

8    information?

9      A      No.

10      Q      Okay, I'm going to introduce Exhibit 5.

11          (Exhibit 5 is marked for identification)

12      A      The battery on that computer is dying.

13      Q      Do you recognize this document?

14      A      I do not.

15      Q      Do you have any reason to doubt that it was

16    provided to you?

17      A      I don't.

18            MR. ROBERTS:  Can we go off the record

19        real quick?

20            MR. MCKENNA:  Sure.

21            MR. ROBERTS:  Can we go off the record

22        real quick?

23            THE REPORTER:  We're going off the record

24        at 10:33 a.m.

25                (Recess taken)

Page 66

1              THE REPORTER:  We're going back on the

2        record at 10:34 a.m.

3                   FURTHER DIRECT EXAMINATION

4    BY MR. MCKENNA:

5        Q      Okay, so before we went off the record, we

6    were just starting to look at Exhibit 5, which is titled

7    Summary Plan Description Quanta Services, Inc. 401K

8    savings plan.  I believe you said you don't have any

9    reason to doubt that this was provided to you, correct?

10       A      Correct.

11       Q      But you never read this document?

12       A      No.

13       Q      Do you understand what a summary plan

14   description is?

15       A      I do not.

16       Q      Can you turn to the Bates number is going to

17   be 64.  And it's the -- can you just read out loud for me

18   the third and fourth paragraphs there.  Starting at.

19   This booklet is called.

20       A       This booklet is called a summary plan

21   description.  SPD.  Contains a summary and understandable

22   language of your rights and benefits under the plan.  The

23   SPD is a brief description of the principal features of

24   the plan document and trust agreement and is not meant to

25   interpret, extend, or change these provisions in any way.

1   The plan document and trust agreement shall govern if

2   there is a discrepancy between the SPD and the actual

3   provisions of the plan.

4        Q    And so based on that, do you understand now

5   the SPD is sort of a summary or overview of the plan

6   document that's meant for participants to be able to

7   understand better?

8        A    Yes.

9        Q    Do you agree that this would have been a

10  helpful document to review as a participant in the plan?

11       A    I do.

12       Q    Have you ever reviewed an SPD for your current

13  401 plan?

14       A    I have not.

15       Q    Could you turn to -- the Bates number is going

16  to be 70.  And can you just read the paragraph under a

17  investments to yourself and let me know when you're done

18  with that?  What do you understand this paragraph to

19  mean?

20       A    It's basically letting me know that this

21  document's about making informed sound investment

22  decisions and the duties of what should be provided to

23  me.

24       Q    And you understand that you have the ability

25  to exercise control over the assets in your plan account?

Page 68

1    A    Corr --

2    Q    Sorry.

3    A    Correct.

4    Q    And you understand that you could choose your

5    investments from a broad range of investment

6    alternatives?

7    A    Yes.

8    Q    You understand that you were responsible for

9    the investment decisions you made relating to your plan

10   investments?

11   A    Yes.

12   Q    And you understand that the plan's fiduciaries

13   were not responsible for any losses resulting from your

14   investment instructions?

15             MR. ROBERTS:  Object to form.

16   A    I'm unsure.

17   Q    Let me step back.  Did you have any losses

18   resulting from your investment instructions?

19   A    Not that I know of.

20   Q    Because your account gained from the time that

21   you began participating until you withdrew your funds,

22   correct?

23             MR. ROBERTS:  Object to form.

24   A    Yes.

25   Q    You just believe it didn't gain enough?

Page 69

1      A     Correct.

2      Q     Do you see this reference to DOL regulation

3   section 2550.404a-5?

4      A     Yes.

5      Q     Okay.  You understand that's the fee

6   disclosure that we were just looking at a moment ago?

7      A     Yes.

8      Q     And you understand that that information was

9   provided to you?

10      A     Yes.

11      Q     I just want to revisit quickly your current

12   retirement savings in your current employer's 401K plan.

13   So I think you said earlier you're not sure what

14   investments you're in, is that correct?

15      A     Correct.

16      Q     Do you have any understanding whether you're

17   invested in mutual funds?

18      A     I'm unsure.

19      Q     Unsure?

20      A     Unsure.

21      Q     Okay.  Do you know whether the funds you're

22   invested in are actively managed or passively managed?

23      A     I do not know.

24      Q     Okay.  And you don't know whether they're

25   target-date funds?

Page 70

1      A      I do not know.

2      Q      Do you know what fees are charged by the

3   investments you're currently invested in?

4      A      No.

5      Q      Do you agree that that would all be important

6   information to know about your investments?

7      A      Yes.

8      Q      Have you ever invested in any cryptocurrency?

9      A      I have not.

10      Q      I'm going to introduce Exhibit 6.  Do you

11   recognize this document?

12      A      I do.

13           (Exhibit 6 is marked for identification)

14      Q      Do you recall -- did you review Quanta's

15   requests for production when you first received them?

16      A      I believe so.

17      Q      And did you collect all the documents

18   responsive to these requests?

19      A      Can you repeat that?

20      Q      Did you collect all of the documents

21   responsive to these requests?

22      A      I collected what I had.

23      Q      Where did you search to collect documents?

24      A      My personal files.

25      Q      Are those electronic, hard copy?

Page 71

1      A      Both electronic and hard copy.

2      Q      And sitting here today, are there any other

3  documents responsive to these requests you can think of

4  that have not been produced?

5      A      Not that I have.

6      Q      I know we've covered a couple throughout the

7  day today, but anything other than the Dyson account

8  statement or the Dycom stock statements and your current

9  401K account statements?

10     A      Yep.  No, I don't have anything else.

11     Q      Can you turn to page six of this document to

12 request for production number one?  So under the

13 response, the second to last sentence here says plaintiff

14 no longer has access to her plan account or any plan

15 related documents she might have received during the

16 class period.  Do you see that?

17     A      Where are you at again?  I apologize.

18     Q      Sorry.  It's in the response to request for

19 production number one, and it's the second to last

20 sentence.

21     A      I'm still lost.  I apologize.

22     Q      No, no worries.  You can see the highlighting

23 on the version that I have.

24     A      Oh, okay.  Got it.  Thank you.  Okay.  Yes, I

25 do see that.

Page 72

1        Q      Okay.  Is that statement accurate?

2        A      Yes.

3        Q      Did you ever receive any hard copy plan

4   documents?

5        A      I don't believe so.

6        Q      So the only access you had was through your

7   plan account?

8        A      Yes.

9        Q      Or perhaps email?

10        A      Yes.

11        Q      And any plan documents that you had in your

12   email were produced to us?

13        A      Correct.

14        Q      Request for production number two.  Request

15   any document reflecting your participation in any

16   retirement vehicle or investment other than the plan,

17   such as employer response or plans, etcetera.  I think

18   this is the RFP, essentially what we've been talking

19   about today.  Requesting information on other retirement

20   plans.  Other than the your current 401K plan and the

21   Dycom stock, aren't there any other documents you can

22   think of that would be responsive to this request?

23        A      Nothing else.

24        Q      Then request for production number three.

25   Similarly, request all documents that relate to any

Page 73

1    retirement or other benefit plans that are available to

2    you through your current employer or that were available

3    to you from any other employer other than the plan.  Do

4    you have any documents relating to your current 401K plan

5    that would be responsive to that request?

6         A    I believe so.

7         Q    Okay.  And we can follow up after we're off

8    the record today here.  Can you turn to page twelve of

9    this document?  So this request seeks all documents used,

10   reviewed, or relied upon in preparing the complaint,

11   including, but not limited to those that support, refute,

12   or concern any allegation in the complaint.  I just want

13   to direct you to the last sentence in your response to

14   this request.  It says, plaintiff reserves the right to

15   supplement or amend her objections and response to this

16   request as appropriate during the course of this

17   litigation.  Sitting here today, do you have anything to

18   supplement in response to request number ten?

19        A    I don't.

20        Q    Okay, I'm going to introduce Exhibit 7.  Do

21   you recognize this document?

22        A    I do.

23             (Exhibit 7 is marked for identification)

24        Q    And I will just represent for the record that

25   this version of this document does not have your

Page 74

1    signature.  I realized I printed out the wrong version.

2    I think we received this version one day and then a

3    separate version with your signature the following day.

4        A    Okay.

5        Q    So just, you know, for the record, we have

6    assigned version from you.  It's just not this one.  But

7    so, understanding that this is not the signed version,

8    did you review this document before you signed it?

9        A    Yes.

10       Q    And you understand that the statements made in

11   response to these interrogatories are made under oath the

12   same as here today or before a judge?

13       A    Yes.

14       Q    And you agree with the content in these

15   responses?

16       A    Yes.

17       Q    Sitting here today, you still agree with the

18   content of these responses, or is there anything that you

19   think should be updated?

20       A    No updates.

21       Q    Can you turn to page seven of this document?

22   The last sentence in your response to interrogatory

23   number one, you wrote; plaintiff informed Adam Laliberte,

24   her spouse, who is a former employee of Quanta, and

25   participant in the plan, of the claims of the case and

Page 75

1    her involvement in the action.  So I don't want you to

2    tell me anything about sort of the specifics that you

3    discussed with your husband about the plan.  But how long

4    was your husband a participant in the plan himself?

5           A     I don't recall.

6           Q     Do you recall when he was employed with

7    Quanta?

8           A     Around the same time frame as I was.  2018,

9    may have been 2017.

10          Q     Until 2020?

11          A     I believe he was there until 2022.

12          Q     And do you recall if you participated in the

13   plan that whole time or just a portion of the time?

14          A     I have no idea.

15          Q     Do you recall what investments he selected

16   when he was a participant in the plan?

17          A     I do not know any information of his 401k.

18          Q     Interrogatory number two.  At the bottom of

19   this page, it says, to identify all instances and each

20   person or entity who communicated with you orally or in

21   writing regarding the plan, including the planned

22   investment options, fees, or expensive -- expenses.  And

23   on the following page, the last sentence and response you

24   wrote, plaintiff has no information responsive to this

25   interrogatory.  Do you see that?

Page 76

1          A      That's correct.

2          Q      So is it your testimony that there are no

3    communications that you never spoke to anybody about the

4    plan other than your husband and your attorneys?

5          A      That's correct.

6          Q      You didn't speak to anybody at Quanta?

7          A      No.

8          Q      Nobody in HR?

9          A      No.

10         Q      Nobody at Fidelity?

11         A      No.

12         Q      What about your line manager?

13         A      Nope.

14         Q      Nobody from HR ever reached out with

15    information about the plan?

16         A      Not that I know of, no.

17         Q      Interrogatory number three on page eight,

18    states, identify any communication or information you

19    relied upon in connection with your participation in the

20    plan or that otherwise influenced your decision to

21    participate in the plan and or your investment decisions

22    under the plan.  And then turning to the next page, the

23    last sentence response is, plaintiff has no information

24    responsive to this interrogatory.  Do you see that?

25         A      Yes.

Page 77

1      Q      So is it your testimony that there are no

2  communications that influenced your decision to

3  participate in the plan?

4      A      That is correct.

5      Q      And it was just the fact that you got a pay

6  increase in or around 2020 and began participating at

7  that time?

8      A      Correct.

9      Q      And there was no other factor that influenced

10  that decision?

11      A      No.

12      Q      Interrogatory number four on page nine asks

13  you to describe in detail how you stayed apprised of the

14  performance of your investments in the plan and or the

15  fees you may have paid related to the plan, including the

16  sources of information upon which you relied and

17  individuals with whom you spoke since January 1st, 2016.

18  And the last sentence of your response says, plaintiff

19  reviewed her pay stubs, plan account statements, and any

20  plan notices she might have received.  Do you see that?

21      A      Yes.

22      Q      What information did you look for when you

23  were reviewing your pay stubs?

24      A      Just to see how much was taken out for the

25  plan.

                                                    Page 78

1        Q      Okay, so just to see what your contributions
2   were?
3        A      Correct.
4        Q      And what were you looking for when you
5   reviewed your plan statements?
6        A      Basically the gains that it had.
7        Q      And that's just the gains for that quarter, is
8   that correct?
9        A      Correct.
10       Q      And do you recall any specific plan notices
11  that you reviewed?
12       A      Not specifically.
13       Q      How did you receive plan notices, generally?
14  Via email?
15       A      Via email.
16       Q      And they were available on the plan website?
17       A      Yes.
18       Q      But you never reviewed any of them?
19       A      No.
20       Q      On page ten, interrogatory number six says, if
21  you contend that defendants or any of their officers or
22  agents have made any admissions or declarations against
23  interest concerning the subject matter of this action,
24  identify each person that allegedly made such statement
25  and describe in detail each alleged omission or

Page 79

1    declaration.

2        And your response on page twelve, the last sentence

3    of your response starts with, plaintiff reserves the

4    right to supplement or amend her objection in response to

5    this interrogatory as appropriate during the course of

6    this litigation.  Sitting here today, can you identify

7    any admission or declaration against interest concerning

8    the subject matter of your lawsuit made by any

9    representative of Quanta?

10       A    No.

11            MR. MCKENNA:  Okay, we've been going for

12       close to an hour.  This might be a good point for a

13       ten minute break.

14            THE REPORTER:  We're going off the record

15       at 10:55 a m.

16                (Recess taken)

17            THE REPORTER:  We are back on the record

18       at 11:05 am.

19            CONTINUED DIRECT EXAMINATION

20    BY MR. MCKENNA:

21       Q    I just want to circle back quickly and confirm

22    that I had the name of the stock you're invested in.

23    Right?  Is it Dycom?

24       A    Dycom.

25       Q    D-Y-C-O-M.

Page 80

1       A       Correct.

2       Q       What type of company is Dycom?

3       A       It's a communications infrastructure.

4       Q       Do you know where they're based out of?

5       A       I want to say Washington state.

6       Q       And do they have a relationship with your

7    current employer?

8       A       Yes, they're our parent company.

9       Q       Okay, so that's how that stock was available

10   to you?

11      A       Correct.

12      Q       Was it sort of a -- was it an employee

13   incentive program or was it just made available and you

14   could choose to purchase some if you wanted to?

15      A       It's just made available.

16      Q       Okay, how was it made available to you?

17      A       To be honest, I don't remember.

18      Q       Do you remember, was it an email or was there

19   an announcement?

20      A       I believe it was an email from our HR group.

21      Q       And do you know, is Dycom a publicly traded

22   company?

23      A       I'm not for sure.

24      Q       I think we talked about this earlier, but when

25   you decided to invest in Dycom stock, it was just based

Page 81

1    on historical stock performance.

2          A     Historical and current.

3          Q     Did you look at any sort of financial

4    forecasts for the company itself?

5          A     I did not.

6          Q     Did you look at any, the stock performance of

7    any of Dycom's competitors?

8          A     I did not.

9          Q     I'm going to switch gears a little bit here.

10   When did you decide that you wanted to sue Quanta over

11   the plan?

12         A     Speaking more of like a particular timeframe?

13         Q     Yes.

14         A     A year?  I would say 2021, 2022.  Whenever I

15   was reached out to initially by legal counsel.

16         Q     So you said whenever you were reached out to

17   by legal counsel.  So did they reach out to you or did

18   you search and seek them out?

19         A     I was reached out to.

20         Q     Do you know how they got your information?

21         A     I do not.

22         Q     And who did you speak to about the lawsuit

23   when they reached out to you?  Do you remember the name?

24         A     I do not.

25         Q     Do you remember where they -- somebody at

```
                                                    Page 82

 1    Miller Shah?

 2         A     I believe so.

 3         Q     So not anybody at Capozzi Adler?

 4         A     Pardon?

 5         Q     Are you familiar with Capozzi Adler?

 6         A     I'm not.

 7         Q     Okay.  They're in a lawsuit involved with

 8    representing the plaintiffs in this case.

 9         A     I'm not.

10         Q     So prior to speaking to the representative

11    from Miller Shah, you had no desire to bring a class

12    action lawsuit against Quanta?

13         A     I did not.

14         Q     And without sort of, you know, without getting

15    into the details that you discussed with the Miller Shah

16    attorney, can you just give me an overview of why you

17    decided to sue Quanta?

18         A     After discussing it with the attorney, I

19    figured that it would be in not only my best interest,

20    but the plan's interest for everyone.  It seemed like

21    there was some needs that were needed to be met.

22         Q     And what needs needed to be met?

23         A     As far as maybe some legal compensation.

24         Q     For who?

25         A     For everyone that was involved with investing
```

Page 83

1    with Quanta.

2         Q    So that's everybody who participated in the

3    plan?

4         A    Correct.

5         Q    And what leads you to believe that there's

6    legal compensation needed for those individuals?

7         A    Just for the simple fact of the misinvestment,

8    mismanagement.  It would be due to everyone that was

9    involved.

10         Q    And that's just based on the fact that the

11    Freedom Funds didn't return as much as you thought they

12    should have returned?

13         A    Correct.

14         Q    And you're not familiar with any of the other

15    investments being challenged in this lawsuit, correct?

16         A    Correct.

17         Q    You have no basis to say whether or not

18    anybody else was harmed by those investments?

19              MR. ROBERTS:  Object to form.

20         A    I'm not sure.

21         Q    You're not sure if anybody else was harmed or

22    you're not sure if you can say?

23         A    Can you repeat the question, please?

24         Q    Yes.  So do you have any basis to conclude

25    that any other participant was harmed by the plan's

Page 84

```
 1    offering of the American Beacon fund or the DFA fund?
 2         A     Not specifically, no.
 3         Q     And do you believe that every participant who
 4    invested in the Freedom Funds was harmed?
 5         A     To my knowledge.
 6         Q     Would you agree that it's possible that some
 7    participants might have benefited from the Freedom Funds?
 8                    MR. ROBERTS:  Object the form.
 9         A     It's possible.
10         Q     Depending on when they invested and how much
11    they invested?
12         A     It's a possibility.  I don't have knowledge to
13    that information.
14         Q     And we already discussed this.  But you didn't
15    have any losses to your account associated with the
16    Freedom Funds, correct?
17                    MR. ROBERTS:  Object to form.
18         A     I don't know.
19         Q     So I think earlier you agreed that you didn't
20    have losses because your account gained over time.
21         A     It did gain, but I'm not sure if it gained as
22    much as it should have or if it lost some.
23         Q     So I think earlier today you testified that
24    you didn't have any losses from the Freedom Funds.  So
25    are you changing that testimony now?
```

Page 85

1        A      It didn't have any losses, to my knowledge.

2        Q      So after you spoke to the attorney at Miller

3    Shah, what steps did you take before you decided to join

4    the lawsuit?

5        A      I really tried to give it some consideration

6    and thought, as far as, you know, this was something that

7    needed legal attention, or if it was something and that

8    was kind of, maybe erroneously, would be an erroneous

9    filing.  But after consideration, I felt that it would be

10   in my best interest to be a part of this.

11       Q      Did you seek out any information about the

12   lawsuit other than that conversation?

13       A      I did not.

14       Q      Do you do any research into the Miller Shah

15   law firm or the attorney you spoke to?

16       A      I did look into the law firm site.

17       Q      Did you do any research into the investments

18   that are being challenged?

19       A      No.

20       Q      So you just gave it some consideration and

21   decided to go ahead with the law suit?

22       A      Correct.

23       Q      Did you consult with any other attorney other

24   than Miller Shah?

25       A      No.

Page 86

```
 1        Q     Had you heard about this lawsuit before you
 2   spoke to Miller Shah?
 3        A     No.
 4        Q     Have you spoken to any other potential class
 5   member about this lawsuit?
 6        A     No.
 7        Q     Have you reviewed any of your current
 8   investments based on the information alleged in your
 9   complaint?
10        A     No.
11        Q     So you haven't undertaken to assess whether
12   your current investments are appropriate based on the
13   allegations in your complaint?
14        A     Not at this time.
15        Q     And before you spoke with your attorneys, you
16   didn't believe that you had been harmed by investing in
17   the Quanta plan, right?
18        A     I had no idea, no.
19        Q     When you were a participant in the Quanta
20   plan, did you have any concerns with how it was managed?
21        A     No.
22        Q     Do you have a fee agreement with your
23   attorneys?
24        A     I'm not sure.  I may.
25        Q     Do you know how your lawyers are being paid?
```

Page 87

1      A      Pardon?

2      Q      Do you know how your lawyers are being paid?

3      A      Can you restate that question in a different

4   way?

5      Q      Sure.  Are you paying any money out of pocket

6   for your attorneys?

7      A      No.

8      Q      Do you understand that if you were to prevail

9   in this case, they would be entitled to a certain

10  percentage of money recovered?

11     A      Yes.

12     Q      Do you know what percentage they want?

13     A      I don't recall.

14     Q      Would you object if they sought to recover 33%

15  of any recovery?

16     A      No.

17     Q      Why not?

18     A      Just, I guess, for the fact that I'm not

19  paying anything up front.

20     Q      And so in your view, 33% is reasonable?

21     A      It seems fair.

22     Q      Did you make any attempt to negotiate fees

23  with your attorneys, how much they might seek to recover?

24     A      I did not.

25     Q      Why not?

Page 88

```
 1        A     I didn't have a reason to.
 2        Q     Do you understand that whatever fee they
 3   recover is money that doesn't go to the other
 4   participants?
 5        A     I'm aware.
 6        Q     And you didn't try to find any other attorney
 7   who might represent the class for less?
 8        A     No.
 9        Q     So I think earlier we talked about the
10   complaint.  Have you read any of the other filings in the
11   lawsuit?
12        A     I believe so.
13        Q     Do you remember which ones?
14        A     I don't.
15        Q     Do you think you've read all of them?  Some of
16   them?
17        A     I believe that I've read everything that's
18   been filed.
19        Q     Do you know if you've read it before it was
20   filed or after it was filed?
21        A     I believe I read everything prior to each
22   filing.
23        Q     We touched on this briefly earlier, but if you
24   read the expert reports submitted on your behalf?
25        A     I don't recall.
```

Page 89

1      Q      Do you recognize the name Adam Werner?

2      A      I do nothing.

3      Q      Do you recognize the name Donald Stone?

4      A      No.

5      Q      Richard Marin?

6      A      No.

7      Q      Do you know how much money you're seeking from

8   Quanta in this lawsuit?

9      A      I do not.

10     Q      How would you determine how much money to seek

11  from Quanta?

12     A      I think that would be a discussion between my

13  attorneys and myself, as well as the other plan

14  participants.

15     Q      All of the other plan participants?

16     A      Correct.

17     Q      And you haven't had that conversation?

18     A      No.

19     Q      You understand that this is a class action

20  lawsuit?

21     A      I understand.

22     Q      Just in your own words, what does that mean to

23  you?  It's a class action.

24     A      It says multiple people that are involved in

25  one case.

Page 90

1       Q      Do you know how many people?

2       A      No.  Specifically with my attorney.  There's

3   one other person.  I do not know how many others with

4   different attorneys.

5       Q      And so that one other person is the other

6   named plaintiff?

7       A      Correct.

8       Q      And do you know how many potential class

9   members there are?

10      A      I do not.

11      Q      And you're seeking to serve as a class

12  representative?, correct?

13      A      Correct.

14      Q      In your own words, what does that mean to you

15  to be a class representative?

16      A      Just to provide a good face for the whole

17  plan.

18      Q      What do you mean by a good face?

19      A      Someone who's able to speak on everyone's

20  behalf.

21      Q      And who do you speak with on behalf of the

22  other participants?

23      A      I'm sorry, can you repeat that?

24      Q      Sure.  So, I think you said provide a good

25  face to speak on behalf of the other participants.  Who

Page 91

1   would you be speaking to?

2       A    If anything went further, such as going to

3   trial.

4       Q    If this case goes to trial, do you expect to

5   testify in court?

6       A    I would expect to, yes.

7       Q    And you understand that will be in the

8   southern district of Texas?

9       A    Yes.

10      Q    You understand that a trial in this case might

11  take upwards of two weeks?

12      A    Yes.

13      Q    What do you think qualifies you to be a class

14  representative?

15      A    Well, I've been heavily involved in the case

16  since the beginning.  I've provided documents, and I'm

17  sitting here today doing a deposition.

18      Q    You understand it's an important

19  responsibility to act as a class representative?

20      A    I do.

21      Q    And you understand that you're not just

22  representing your interests, but the interests of the

23  class?

24      A    Absolutely.

25      Q    What does that mean to you?  To represent the

Page 92

```
 1    interests of the class?
 2         A    Just to try to work to get what's fair for
 3    everyone that's involved.
 4         Q    And who decides what's fair for everybody
 5    involved?
 6         A    I believe that would be up to the judge.
 7         Q    I think you said before you don't know how
 8    many participants make up the class.  Could you give an
 9    estimate?  Do you think it's less than 10,000?  More than
10    10,000?
11         A    I can't even give you a rough estimate.  I
12    have no idea.
13         Q    Do you know what time period the class covers?
14         A    I do not.
15         Q    Do you expect to receive any compensation for
16    serving as a class representative?
17         A    No, it's not expected.
18         Q    But do you think you will?
19         A    I'm not sure.  I think it really just depends
20    on what the division district has set for that area.
21         Q    Do you know the other named plaintiff in this
22    lawsuit?
23         A    The top of my head, I do not.
24         Q    Okay, so you've never met her?
25         A    I think it's Marie.  I've never met her, no.
```

Page 93

1      Q      Okay.  Ever spoken to her on the phone?

2      A      No.

3      Q      Do you have any personal knowledge about her

4    investments?

5      A      No.

6      Q      Do you have any personal knowledge about the

7    investments of any other participant in the plan?

8      A      I do not.

9      Q      Do you know anything about how other

10   participants might value risk?

11     A      No.

12     Q      Have you taken any steps to try to learn more

13   about the preferences of the other participants?

14     A      No.

15     Q      So at the end of the day, what changes are you

16   looking to make through your lawsuit.

17     A      For Quanta specifically.  Just to be more

18   aware of how they're investing and be more diligent about

19   what they're investing in and to make sure to monitor

20   everything.

21     Q      Can you give me any examples of specific

22   changes you'd like to see implemented?

23     A      I can't specifically.

24     Q      And do you have any understanding of what

25   Quanta did wrong that you allege with respect to

Page 94

1    monitoring?

2         A     No, not specifically.

3         Q     Are you looking to have investment options

4    removed from the plan?

5         A     No.

6         Q     Are you looking to have investment options

7    added to the plan?

8         A     I'm not sure.

9         Q     Are you looking to have any committee members

10   removed from the committee?

11        A     Not at this time.

12        Q     So sitting here today, can you identify sort

13   of any specific actions that you believe Quanta should

14   implement or the committee should implement?

15        A     I can't give any specifics.

16        Q     And you can't identify anything specifically

17   that they did wrong either?

18        A     No.

19        Q     Are you familiar with QPA or qualified plan

20   advisors?

21        A     I'm not.

22        Q     Do you understand that the plan had an

23   investment advisor who helped the committee monitor

24   investments and make decisions?

25        A     I do not know that.

Page 95

1      Q     Do you know -- does your lawsuit accuse the

2   investment advisor of doing anything wrong or

3   inappropriate?

4      A     I'm not sure.

5      Q     Do you have any personal opinion about whether

6   or not the investment advisor was appropriately advising

7   the committee?

8      A     No.

9      Q     If the court decides that the case can't

10  proceed, cannot proceed as a class action, do you intend

11  to pursue an individual lawsuit?

12     A     Possibly.

13     Q     Why?

14     A     Just because I feel like I'm owed compensation

15  at this point.

16     Q     What do you feel like your owed?

17     A     As far as a number?

18     Q     Mm hmm.

19     A     I don't have that off the top of my head.

20     Q     How would you go about figuring out what that

21  number is?

22     A     Probably discussing that with an attorney.

23     Q     I think we've talked a couple of times now

24  that your account gained, but you believe it should have

25  gained more, is that right?

Page 96

1        A       Correct.

2        Q       And so what you would seek in an individual

3    lawsuit would be essentially the difference between what

4    you gained and what you should have gained in a different

5    investment option?

6        A       Yes.

7        Q       But you don't know what that investment option

8    is?

9        A       No.

10       Q       And you don't even know if there is an

11   investment option that returns more than the Freedom Fund

12   during the time period that you were invested in the

13   plan?

14       A       Correct.

15       Q       Do you know how Quanta selected investments

16   for the plan?

17       A       I do not.

18       Q       And so you don't know how they monitor those

19   investments either, right?

20       A       I do not.

21       Q       Would it surprise you to learn that the

22   committee met on a quarterly basis to review the plan's

23   investments?

24       A       That would not surprise me.

25       Q       But you don't think that those quarterly

Page 97

1    meetings were sufficient?

2        A    I'm not aware of any of their policies or

3    procedures.  I'm not sure.

4        Q    But your lawsuit's criticizing those policies

5    and procedures, right?

6        A    I would say yes.

7        Q    But you don't know what they are?

8        A    I do not know what they are.

9        Q    Earlier, we briefly talked about -- 404(c) in

10   the plan SPD.  That was -- I'll refer you back to the

11   exhibit, Exhibit 5.  This one.  Sorry, this one.  And it

12   was the Bates number 70 on that one.  So, looking back at

13   that first paragraph under investments again, you

14   understand that you had the ability to choose your

15   investments from a broad range of investment alternatives

16   in the plan?

17       A    Correct.

18       Q    And nobody forced you to select the Freedom

19   Funds, right?

20       A    That's correct.

21       Q    And you could have changed that investment at

22   any other time?  At any time?

23       A    Correct.

24       Q    You could have selected a different fund

25   offered in the plan that you thought performed better?

Page 98

1      A      I could have.

2      Q      And it was your decision not to?

3      A      Correct.

4      Q      And nobody from Quanta ever told you which

5    investments to select, correct?

6      A      No.

7      Q      And other participants in the plan had the

8    same choices?

9      A      I would assume so.

10     Q      And so since you are making the choice where

11   to invest your money, you understand that you have

12   responsibility for the outcomes?

13     A      Correct.

14     Q      And you understand that if you wanted to seek

15   higher returns, you could have chosen a riskier

16   investment option that might have yielded higher returns?

17     A      Yes.

18     Q      And you chose not to?

19     A      That's correct.

20     Q      And you could also have chosen an investment

21   option that was cheaper than the Freedom Funds.

22     A      I would assume.  I'm not sure.  Like I said

23   earlier, I'd trust Quanta to make those decisions for me.

24     Q      But Quanta didn't make the decision where to

25   invest your funds, correct?

Page 99

```
 1        A     I selected the option to let them handle where
 2   the investments went.
 3        Q     So do you know, was it an option to let Quanta
 4   handle it, or was it an option to invest in the default
 5   investment?
 6        A     To be honest, I'm not sure, but I trusted that
 7   selection.
 8        Q     And so if it was an option to invest in the
 9   default investment, do you still think that that was
10   Quanta's decision to invest your money there?
11        A     I'm unsure.
12        Q     But at the end of the day, you could have
13   invested in any of the funds that were available in the
14   plan?
15        A     I could have.
16        Q     Including many of the funds that your lawsuit
17   doesn't challenge?
18        A     Correct.
19        Q     And earlier, we looked at the 404(a)(5)
20   disclosure or the participant fee disclosure, and you
21   said that you did not review that information while you
22   were a participant in the plan, correct?
23        A     Correct.
24        Q     But you understand that information was
25   provided to you and available to you?
```

Page 100

1          A      Correct.

2          Q      Do you believe that information, the

3    information included in the fee disclosure was important

4    to know as an investor?

5          A      Yes, I would say so, but no, in a sense of I

6    do not have knowledge as to what those charts mean.

7          Q      But you understand that the fee disclosure

8    included website and phone numbers that you could have

9    reached out to speak with Fidelity representatives to

10   gain more information or ask for clarification?

11         A      Yes.

12         Q      And you did not do so?

13         A      No.

14         Q      And you never changed your investments while

15   you were in the plan, correct?

16         A      I did not.

17         Q      What about your current 401K plan?  Have you

18   ever changed your investments there?

19         A      I haven't.

20         Q      Sorry.  Was that have not?

21         A      I have not.

22         Q      Okay, thank you.  Sorry.

23                MR. MCKENNA:  All right, why don't we take

24         a quick break?  I may be done, but I just want to go

25         back through my outline and see if there's anything

Page 101

1      else.  I might have a few more questions.

2                  MR. ROBERTS:  Sounds good.

3                  THE REPORTER:  We're off to record at

4      11:35 am.

5                      (Recess taken)

6                  THE REPORTER:  We're back on the record at

7      11:42 am.

8                  MR. MCKENNA:  So I don't have any further

9      questions.  I just wanted to briefly discuss on the

10     record, the documents.  So I understand that there

11     are, you know, maybe a handful of documents that

12     you'll be producing related to your investment in

13     Dycom stock, your current 401K plan, account

14     statements, and documents relating to that plan.

15                 You know, to the extent that there is

16     information in those documents that's sort of

17     relevant to the questions that I've been asked

18     asking today, I am going to hold the deposition open

19     just so that we can follow up on maybe a couple of

20     specific lines of questioning.  Given the limited

21     scope of that, I assume we could probably do it

22     remotely and candidly there may be nothing, but I'm

23     just going to hold the deposition open for the time

24     being until we have a chance to review those

25     documents and see if there's anything else we want

Page 102

1          to revisit.

2                    MR. ROBERTS:  Okay.

3                    MR. MCKENNA:  I don't have any further

4          questions.

5                    MR. ROBERTS:  All right.  Well, thank you

6          very much for your time today.

7                    THE WITNESS:  Thank you.

8                    THE REPORTER:  Would you like to order the

9          original transcript or video at this time?

10                    MR. MCKENNA:  Yes, we'll take, we'll take

11          a transcript for now.  We'll hold off on the video.

12                    THE REPORTER:  Mr. Roberts would you like

13          a copy?

14                    MR. ROBERTS:  Mm hmm.

15                    THE REPORTER:  Is Ms. Cambell listening?

16                    MR. MCKENNA:  Yes.  She's in house

17          counsel.

18                    MS. CAMBELL:  Yes, I'm listening.

19                    THE REPORTER:  Sorry, what did you say?

20                    MR. MCKENNA:  If you send us the

21          transcript, she'll get it through us.  Yeah.

22                    THE REPORTER:  This adjourns today's

23          proceeding.  We're going off the record at 11:44

24          a.m.

25                    (Off the record at 11:44 am)

Page 103

1　　　　(Witness reserves the right to read)

2　　　　　JURAT/ERRATA FOR MARY LALIBERTE

3　　PAGE / LINE　　　　　CHANGE　　　　　　REASON

4　　_____

5　　_____

6　　_____

7　　_____

8　　_____

9　　_____

10　_____

11　_____

12　_____

13　_____

14　_____

15　_____

16　_____

17　_____

18　_____

19　_____

20　_____

21　_____

22　_____

23　_____

24　_____

25　_____

　　Job No. CS6863203

Page 104

1    I, MARY LALIBERTE, have read the foregoing deposition and

2     hereby affix my signature that same is true and correct,

3                     except as noted above.

4

5                          _____

6                          MARY LALIBERTE

7    THE STATE OF _____ )

8    COUNTY OF _____ )

9        Before me, _____, on this day

10   personally appeared MARY LALIBERTE, known to me (or

11   proved to me under oath or through  _____)

12   (description of identity card or other document) to be

13   the person whose name is subscribed to the foregoing

14   instrument and acknowledged to me that they executed the

15   same for the purposes and consideration therein

16   expressed.

17       Given under my hand and seal of office this

18       _____ day of _____, _____.

19

20                          _____

21                          NOTARY PUBLIC IN AND FOR

22                          THE STATE OF _____

23                           MY COMMISSION EXPIRES:

24                          _____

25      Job No. CS6863203

CERTIFICATE OF DIGITAL REPORTER


I, CHRISTOPHER TISA, a Digital Reporter and Notary public within the State of FLORIDA, do hereby certify:


That on August 27th, 2024, I digitally reported the proceedings had and the evidence given, together with the objections of counsel thereto, and that said testimony was accurately captured with annotations by me during the proceeding, taken at said time and place.


I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.


IN WITNESS THEREOF, I have hereunto set my hand the 28th day of August 2024.


_____
Christopher Tisa
Notary Commission Florida/HH 308731
Commission Expires: Oct. 22nd, 2026

CERTIFICATE OF TRANSCRIPTIONIST

I, MARIO BARREDO, a Legal Transcriptionist do hereby
certify:

    That the foregoing is a complete and true
transcription of the original digital audio recording
of the testimony and proceedings captured in the
above-entitled matter.  As the transcriptionist, I
have reviewed and transcribed the entirety of the
original digital audio recording of the proceeding to
ensure a verbatim record to the best of my ability.

    I further certify that I am neither attorney
for nor a relative or employee of any of the parties
to the action; further, that I am not a relative or
employee of any attorney employed by the parties
hereto, nor financially or otherwise interested in the
outcome of this matter.


    IN WITNESS THEREOF, I have hereunto set my hand
this 10th day of September, 2024.



    _Mario Barredo_____

    Mario Barredo

Page 107

1    jcroberts@millereshah.com

2                          September 12, 2024

3    RE: Laliberte, Mary v. Quanta

4    DEPOSITION OF: Mary Laliberte 6863203

5        The above-referenced witness transcript is

6    available for read and sign.

7        Within the applicable timeframe, the witness

8    should read the testimony to verify its accuracy. If

9    there are any changes, the witness should note those

10   on the attached Errata Sheet.

11       The witness should sign and notarize the

12   attached Errata pages and return to Veritext at

13   errata-tx@veritext.com.

14       According to applicable rules or agreements, if

15   the witness fails to do so within the time allotted,

16   a certified copy of the transcript may be used as if

17   signed.

18                          Yours,

19                          Veritext Legal Solutions

20

21

22

23

24

25

[& - 6]

**&**

**&**  2:11

**0**

**03290**  1:5

**1**

**1**  3:13 12:11,17
**1,284.56**  36:25
  39:9
**1,284.56.**  36:24
**10**  44:24
**10,000**  92:9,10
**10/03/2022**
  35:25
**10/3/2022**  36:4
**100**  13:5
**103**  3:5
**105**  3:6
**106**  3:7
**10:00**  45:4
**10:33**  65:24
**10:34**  66:2
**10:55**  79:15
**10th**  106:20
**1111**  2:11
**11:05**  79:18
**11:35**  101:4
**11:42**  101:7
**12**  3:13 107:2
**165**  1:21
**18**  41:23
**1845**  2:5
**19**  35:13
**19.9**  34:16,19

**19103**  2:6
**1974**  28:3,19
**1st**  19:2 77:17

**2**

**2**  3:14 26:14,15
  26:18 34:10,15
  40:20
**2,843**  27:6 29:6
  31:6 32:19
  37:6 38:15,19
**20**  17:24
**20004**  2:12
**2016**  77:17
**2017**  75:9
**2018**  12:19
  15:7 43:1 75:8
**2019**  61:3
**202-739-5412**
  2:12
**2020**  15:7 19:2
  26:24 27:14
  34:10,16 36:12
  43:4,6,10
  75:10 77:6
**2021**  81:14
**2022**  75:11
  81:14
**2023**  20:15
  21:10 58:15
**2024**  1:18 4:5
  105:6,17
  106:20 107:2
**2026**  1:24
  40:22 105:21

**2028**  41:22
**2037**  34:9
**2039**  39:15
**2055**  53:2
**2055k**  35:22
**22nd**  1:24
  105:21
**24**  20:2
**2550.404a**  69:3
**26**  3:14
**2727**  2:16
**27th**  1:18 4:4
  105:6
**28th**  105:17

**3**

**3**  3:14 13:5,6
  33:8,10
**308731**  1:23
  105:21
**30th**  36:12
**31st**  12:19
**32506**  10:11
**32561**  1:21
**33**  3:14 87:14
  87:20
**35**  10:7

**4**

**4**  3:3,15 60:19
  60:22
**4.5**  13:7
**401**  1:7,11
  15:25 16:12
  67:13

**401k**  13:4 14:7
  14:13 16:7
  18:21 20:11
  21:9,23 22:6,9
  22:22 24:12,13
  24:16,21 26:8
  28:12 29:24
  32:22 33:1,4
  37:2 45:11,14
  55:25 56:11,22
  57:20 58:3,11
  60:24 66:7
  69:12 71:9
  72:20 73:4
  75:17 100:17
  101:13
**404**  60:13 97:9
  99:19
**473.43.**  36:16
**4:22**  1:5

**5**

**5**  3:15 44:24
  60:13 65:10,11
  66:6 69:3
  97:11 99:19
**50**  13:5 44:21
**577**  61:19
**581**  62:23
**582**  63:10
**584**  63:19
**5th**  26:24

**6**

**6**  3:16 13:6
  70:10,13

| | | | |
|---|---|---|---|
| **60** 3:15 | **acceptable** | **action** 1:7 | **advises** 41:3 |
| **631.24.** 36:13 | 13:10,11 27:6 | 62:12 75:1 | **advising** 95:6 |
| **64** 66:17 | **access** 65:5 | 78:23 82:12 | **advisor** 94:23 |
| **65** 3:15 | 71:14 72:6 | 89:19,23 95:10 | 95:2,6 |
| **6863203** 107:4 | **accessed** 60:6 | 105:13 106:14 | **advisors** 94:20 |
| **6903** 10:10 | **accessing** 62:24 | **actions** 48:24 | **affect** 8:1,4 |
| **7** | **account** 16:16 | 94:13 | 48:24 |
| **7** 3:16 73:20,23 | 16:19,20,23,24 | **active** 52:22 | **affirmative** |
| **70** 3:16 67:16 | 17:18,24 21:24 | 54:8 | 61:22 62:17 |
| 97:12 | 22:2,15 25:1,4 | **actively** 52:19 | **affix** 104:2 |
| **713-985-6488** | 31:8 33:13,16 | 69:22 | **agents** 78:22 |
| 2:17 | 33:23 34:10,12 | **activity** 36:18 | **ago** 5:24 30:22 |
| **73** 3:16 | 34:18 35:20 | **actual** 52:14 | 31:18 52:9 |
| **77008** 2:16 | 36:17 37:9 | 59:6 67:2 | 57:17 69:6 |
| **8** | 39:20 40:4,6,9 | **actually** 5:2 | **agree** 4:16 32:9 |
| **806** 2:5 | 49:21 53:1,14 | 25:13 | 32:11 67:9 |
| **866-540-5505** | 59:25 62:2,24 | **adam** 74:23 | 70:5 74:14,17 |
| 2:6 | 62:25 63:2,3,8 | 89:1 | 84:6 |
| **9** | 67:25 68:20 | **added** 94:7 | **agreed** 28:8 |
| **9:00** 1:19 4:2,4 | 71:7,9,14 72:7 | **additional** 64:6 | 84:19 |
| **9:51** 45:1 | 77:19 84:15,20 | 64:9 | **agreement** 3:14 |
| **9th** 61:3 | 95:24 101:13 | **address** 10:8 | 27:5,9,16 28:8 |
| **a** | **accuracy** 107:8 | **adjourns** | 31:2 32:14 |
| **a.m.** 65:24 66:2 | **accurate** 72:1 | 102:22 | 40:21,24,25 |
| 102:24 | **accurately** | **adler** 82:3,5 | 41:4,6 42:2,3,5 |
| **ability** 7:23 8:1 | 105:9 | **administration** | 42:6,9,13 |
| 8:5 67:24 | **accuse** 95:1 | 4:16 | 66:24 67:1 |
| 97:14 106:11 | **acknowledged** | **admission** 79:7 | 86:22 |
| **able** 67:6 90:19 | 31:1 104:14 | **admissions** | **agreements** |
| **above** 104:3 | **acknowledges** | 78:22 | 107:14 |
| 106:8 107:5 | 27:7 30:8 42:1 | **advice** 24:3,21 | **agrees** 27:7 |
| **absent** 4:14 | **acknowledg...** | 42:7 | 40:25 42:1 |
| **absolutely** | 41:25 | **advised** 41:10 | **ahead** 35:19 |
| 91:24 | **act** 28:3,19 | 42:4 | 85:21 |
| | 91:19 | | |

**allegation**
73:12
**allegations**
86:13
**allege** 93:25
**alleged** 32:18
78:25 86:8
**allegedly** 78:24
**alleging** 48:13
**allotted** 107:15
**allow** 63:13
**allowed** 4:18
**alternative**
21:1 61:19
**alternatives**
68:6 97:15
**amend** 73:15
79:4
**american** 46:19
84:1
**amount** 31:11
31:24 32:4,7
57:4
**annotations**
105:9
**announcement**
80:19
**answer** 6:12,22
7:17,18 17:3
17:13,14 23:24
26:5
**answers** 5:21
6:24
**anybody** 8:14
9:20,23 14:7

49:7 76:3,6
82:3 83:18,21
**anymore** 58:20
**apologize** 36:2
71:17,21
**appearances**
2:1
**appeared**
104:10
**appears** 62:4
64:14
**applicable** 64:2
107:7,14
**apprised** 77:13
**appropriate**
42:8 45:22
55:5 73:16
79:5 86:12
**appropriately**
45:12 47:9
95:6
**approximately**
11:8 18:10,19
20:2 27:13
31:18 33:3
**area** 92:20
**areas** 47:14
**arising** 28:9,16
**arrested** 10:23
**asked** 50:18
101:17
**asking** 5:20,25
6:8 23:14
101:18

**asks** 77:12
**aspect** 28:16
**asserting** 5:19
**asserts** 16:2
**assess** 86:11
**assessment**
53:23
**asset** 53:25
54:2
**assets** 26:3
67:25
**assigned** 74:6
**assist** 37:22
**associated**
64:12 84:15
**associates**
19:22 20:12
21:5,9 23:3,11
24:5,8,12,21
25:17,18,21
**assume** 6:13
16:13 98:9,22
101:21
**assumption**
16:14
**attached**
107:10,12
**attempt** 87:22
**attend** 11:9
**attended** 12:6
**attending**
13:21
**attention** 85:7
**attorney** 5:4
7:16 8:9,17

9:16 41:4,5,14
42:5,7 82:16
82:18 85:2,15
85:23 88:6
90:2 95:22
106:12,15
**attorneys** 8:18
9:19,23 29:3
29:13 49:12
50:6 76:4
86:15,23 87:6
87:23 89:13
90:4
**audio** 4:9 106:6
106:10
**august** 1:18 4:4
105:6,17
**available** 18:25
33:20 37:16
38:7,18 39:1
44:15 56:4
60:3 61:9,14
63:4 64:7 73:1
73:2 78:16
80:9,13,15,16
99:13,25 107:6
**avenue** 2:11
**avenues** 50:10
**aware** 31:9
39:12 60:1
88:5 93:18
97:2

**b**

**b** 3:12 5:7,11
**back** 25:12
  40:20 45:3,7
  58:2 66:1
  68:17 79:17,21
  97:10,12
  100:25 101:6
**background**
  11:4,5
**bad** 6:9 47:7
**balance** 59:25
**bankruptcy**
  10:25
**barredo** 106:3
  106:24
**base** 16:25
  39:15
**based** 16:14
  17:5,7,21,22
  21:15,22,24
  24:25 29:12
  30:1 35:2
  37:13 38:23
  39:6 49:3 57:3
  57:4 64:5 67:4
  80:4,25 83:10
  86:8,12
**basic** 11:20
**basically** 27:22
  30:15 34:2
  45:10 67:20
  78:6
**basis** 17:17
  32:21 34:25

51:5 55:3,17
63:16 83:17,24
96:22
**bates** 34:2,8,9
  40:22 41:23
  61:18 62:22
  66:16 67:15
  97:12
**battery** 65:12
**beach** 1:20
**beacon** 46:19
  84:1
**began** 68:21
  77:6
**beginning**
  35:13 91:16
**behalf** 1:7 2:3,9
  4:7 88:24
  90:20,21,25
**belief** 29:14,15
  30:1 39:6
**believe** 13:10
  13:25 17:18,20
  21:14 22:8
  23:4 24:24
  29:8,16 30:17
  33:19 37:1
  40:2,10,15
  41:9 42:17
  43:19 66:8
  68:25 70:16
  72:5 73:6
  75:11 80:20
  82:2 83:5 84:3
  86:16 88:12,17

88:21 92:6
94:13 95:24
100:2
**believed** 23:15
  44:10
**benchmark**
  64:2,2
**benchmarks**
  64:7,9
**beneficial**
  62:21
**benefit** 13:9,10
  73:1
**benefited** 84:7
**benefits** 13:23
  14:2 27:3,7,8
  49:1,17 50:14
  66:22
**best** 6:1,20 16:8
  20:17 62:19
  82:19 85:10
  106:11
**better** 11:3
  30:2 45:17,19
  45:23 48:5
  52:24 67:7
  97:25
**bit** 5:25 11:2
  45:7 81:9
**blankenship**
  5:11
**blood** 105:13
**board** 1:10
  20:23

**bockius** 2:11
  5:4
**booklet** 66:19
  66:20
**bottom** 34:4
  61:2 75:18
**boyles** 18:5,5
  18:17,18,20,20
**break** 7:9,10,14
  44:24 79:13
  100:24
**breaks** 7:7,8
**brief** 66:23
**briefly** 5:2 11:4
  40:20 88:23
  97:9 101:9
**bring** 82:11
**broad** 64:5
  68:5 97:15
**broadly** 9:22
**build** 17:4
  32:24
**bullet** 12:25
  13:2 63:1
**butcher** 25:13

**c**

**c** 2:4 4:1 19:14
  56:19 79:25
  97:9
**cable** 14:21
**call** 39:21,23
  62:7
**called** 34:1
  49:23 66:19,20

calls  41:17
cambell  102:15
  102:18
campbell  2:15
  15:13
candidly
  101:22
cap  46:20 47:1
capozzi  82:3,5
captured  105:9
  106:7
capturing  4:8
card  104:12
career  11:14
carefully  42:1,9
carolina  20:6
carolyn  2:15
  15:13
case  1:4 9:23
  16:9 28:22,23
  29:17 52:3
  74:25 82:8
  87:9 89:25
  91:4,10,15
  95:9
certain  87:9
certificate  3:6,7
  105:1 106:1
certifications
  12:1
certified
  107:16
certify  105:4,12
  106:4,12

challenge  99:17
challenged
  83:15 85:18
challenging
  46:2,4,8,17,23
  47:4
chance  101:24
change  14:22
  25:5,20 38:13
  62:12 66:25
  103:3
changed  15:3,4
  40:13 43:10
  50:5 97:21
  100:14,18
changes  39:20
  44:4 93:15,22
  107:9
changing  84:25
charged  70:2
chart  63:24
  64:6,11
charts  100:6
cheaper  98:21
check  63:2
checked  63:8
child  18:12
children  18:13
choice  63:12
  98:10
choices  43:18
  98:8
choose  56:25
  68:4 80:14
  97:14

choosing  54:17
chose  18:16
  56:1 62:15
  98:18
chosen  98:15
  98:20
christopher
  1:23 4:6 105:3
  105:20
circle  79:21
cities  20:5
civil  4:18 22:11
claim  30:7,10
  30:18,24,25
  31:3 41:2,19
claims  5:19
  28:9,15 30:21
  41:2,15 74:25
clarification
  100:10
clarified  25:14
class  1:5,7 54:2
  71:16 82:11
  86:4 88:7
  89:19,23 90:8
  90:11,15 91:13
  91:19,23 92:1
  92:8,13,16
  95:10
classes  11:16
  11:20
clear  6:19
clients  20:6
cliff  52:11,13

close  79:12
collect  70:17,20
  70:23
collected  70:22
college  11:6,9
  11:15
come  44:8
  54:10 57:23
  60:8
commission
  1:23,24 104:23
  105:21,21
committee  1:11
  15:5,24 48:14
  50:19 94:9,10
  94:14,23 95:7
  96:22
communicated
  75:20
communication
  76:18
communicati...
  76:3 77:2 80:3
companies
  13:12,14 19:18
  23:1
company  13:4
  13:7 27:6
  28:17 41:3
  42:4 56:14
  57:4,10,12
  80:2,8,22 81:4
compared
  21:22

**[compensation - couple]**

compensation
  82:23 83:6
  92:15 95:14
competitors
  81:7
complain  49:6
complaint  1:7
  51:12 52:14,16
  73:10,12 86:9
  86:13 88:10
complete  5:20
  106:5
computer  4:10
  65:12
concern  73:12
concerning
  42:5 78:23
  79:7
concerns  50:8
  86:20
conclude  83:24
concluding
  17:17
conclusion  17:1
  25:4,20 38:14
conditions  42:3
  42:12
confirm  22:17
  55:12 79:21
confirmations
  63:4
connect  22:14
connection
  76:19

cons  56:6
consider  13:9
  53:8,22,25
  56:1
consideration
  27:9 30:8 56:3
  85:5,9,20
  104:15
considered
  58:19,21
considering
  57:24
consistent
  13:17
consists  24:8
constitutes
  41:1
consult  41:3,5
  41:13 42:5
  85:23
consulted
  41:14
contacted
  40:14
contains  66:21
contend  17:25
  45:13 78:21
content  74:14
  74:18
continued
  79:19
contrary  40:25
contribute  43:8
contributed
  13:6

contributes
  13:6
contributing
  17:21,22
contribution
  13:5 35:25
  36:4
contributions
  36:7,11 78:1
control  67:25
conversation
  6:21 29:2
  85:12 89:17
coordinator
  14:16,19
copies  33:18
copy  12:12
  26:15 70:25
  71:1 72:3
  102:13 107:16
corr  68:1
correct  8:11
  9:3,8 13:19
  14:16,17 16:21
  16:22 18:3
  20:10 21:19
  22:1,18,19
  25:2 28:9 29:7
  30:3,18,22,23
  31:3,12,13
  32:16 37:3,6,8
  37:11 39:5,8
  39:11 40:4,19
  41:12 43:1,2,5
  43:16 44:13

46:6 47:18,19
  48:17 49:5,15
  49:24 50:2,7
  55:6,10,16,21
  57:19 62:16
  64:16 66:9,10
  68:3,22 69:1
  69:14,15 72:13
  76:1,5 77:4,8
  78:3,8,9 80:1
  80:11 83:4,13
  83:15,16 84:16
  85:22 89:16
  90:7,12,13
  96:1,14 97:17
  97:20,23 98:3
  98:5,13,19,25
  99:18,22,23
  100:1,15 104:2
correctly  24:24
corresponden...
  63:3
cost  51:3
costs  51:10
counsel  4:15
  23:20 37:21
  40:14,16 81:15
  81:17 102:17
  105:8
county  104:8
couple  7:12
  19:17 47:10
  51:20,24 59:1
  59:19,20 71:6
  95:23 101:19

**course** 73:16
79:5
**court** 1:1 6:17
7:2 91:5 95:9
**courtroom** 6:6
**cover** 29:25
**covered** 6:3
20:8 54:4
55:11 71:6
**covers** 92:13
**covid** 35:13
**coworkers** 10:4
**create** 63:13
**criticizing** 97:4
**cryptocurrency**
70:8
**cs6863203** 1:25
103:25 104:25
**current** 10:4,8
25:16 26:8
53:18 55:25
56:11 57:16
58:2 67:12
69:11,12 71:8
72:20 73:2,4
80:7 81:2 86:7
86:12 100:17
101:13
**currently** 1:12
4:12 19:10,21
19:22 22:6
70:3
**customer** 39:21
39:23

**cv** 1:5

**d**

**d** 3:1 4:1 30:5
56:19 79:25
**damage** 38:14
**damages** 32:18
38:15,19
**date** 1:18 26:12
26:20 36:7
69:25
**dated** 26:24
61:2
**day** 6:8 7:7,16
14:11 20:3,3,4
20:4 71:7 74:2
74:3 93:15
99:12 104:9,18
105:17 106:20
**dc** 2:12
**december**
20:15 21:10
58:15
**decide** 11:13
81:10
**decided** 80:25
82:17 85:3,21
**decides** 47:16
92:4 95:9
**decision** 61:22
76:20 77:2,10
98:2,24 99:10
**decisions** 55:23
62:7 67:22
68:9 76:21
94:24 98:23

**declaration**
79:1,7
**declarations**
78:22
**declared** 10:25
**deemed** 42:8
**def** 3:16,16
**default** 21:1
61:19 99:4,9
**defaulted** 61:23
62:2
**defendants**
1:13 2:9 5:5
78:21
**deferral** 36:10
39:11
**deficient** 16:3,7
**definitely** 44:1
**degree** 11:8
**delivered** 14:1
**department**
49:17
**depending**
84:10
**depends** 92:19
**deponent** 1:17
**deposed** 5:13
**deposition** 4:5
5:18 8:7,21
9:20 52:7
91:17 101:18
101:23 104:1
107:4
**derek** 15:11

**describe** 11:4
77:13 78:25
**description**
3:13,15 66:7
66:14,21,23
104:12
**desire** 82:11
**detail** 77:13
78:25
**details** 29:2
82:15
**determine**
89:10
**dfa** 46:25 84:1
**difference**
52:18 96:3
**different** 11:14
15:4 19:17
45:24 47:14
54:16,17 56:5
87:3 90:4 96:4
97:24
**differently**
24:12 57:23
**digital** 3:6,23
4:6 105:1,3
106:6,10
**digitally** 105:6
**digits** 34:6
**diligent** 93:18
**direct** 3:3 4:24
45:5 66:3
73:13 79:19
**directly** 50:19

**directs** 7:17
**disclosed** 64:21
  64:24
**disclosure** 3:15
  60:14,17,24
  61:6,6,8 69:6
  99:20,20 100:3
  100:7
**disclosures**
  60:11
**discovered**
  23:14
**discovery**
  22:12
**discrepancy**
  67:2
**discuss** 13:23
  14:6 49:15,20
  101:9
**discussed** 9:20
  9:22 10:1 29:3
  49:3,11 75:3
  82:15 84:14
**discussing**
  30:22 82:18
  95:22
**discussion**
  89:12
**dispute** 61:13
  63:16
**district** 1:1,1
  91:8 92:20
**diversified**
  63:13

**division** 1:2
  92:20
**document** 7:12
  7:13 12:15
  26:16,19 31:19
  33:8 60:20
  65:13 66:11,24
  67:1,6,10
  70:11 71:11
  72:15 73:9,21
  73:25 74:8,21
  104:12
**document's**
  67:21
**documents**
  8:20,23 9:5,6
  9:11,13,17
  34:3 58:7
  70:17,20,23
  71:3,15 72:4
  72:11,21,25
  73:4,9 91:16
  101:10,11,14
  101:16,25
**doing** 18:7
  47:24 91:17
  95:2
**dol** 69:2
**donald** 89:3
**dot** 28:18,18,18
**double** 39:10
**doubled** 37:10
  37:17,17 38:8
  39:2

**doubt** 65:15
  66:9
**driver's** 4:14
**due** 83:8
**duly** 4:21
**duties** 14:18,22
  18:6 19:25
  67:22
**duty** 22:11
**dycom** 56:15
  56:17 58:8,11
  71:8 72:21
  79:23,24 80:2
  80:21,25
  101:13
**dycom's** 81:7
**dying** 65:12
**dyson** 71:7

**e**

**e** 3:1,12 4:1,1
  5:7,8,11 19:14
  19:15
**earlier** 20:8
  37:1 49:3,12
  49:21 53:1
  55:11 69:13
  80:24 84:19,23
  88:9,23 97:9
  98:23 99:19
**ease** 14:10
**ecological**
  14:21
**economics**
  11:18

**education** 11:3
  11:23 65:5
**educational**
  11:5
**effective** 19:2
**eight** 76:17
**either** 94:17
  96:19
**election** 62:18
**elections** 35:25
  36:4 43:24
**electronic** 4:9
  70:25 71:1
**electronically**
  44:1
**eligible** 42:15
**email** 33:17,25
  72:9,12 78:14
  78:15 80:18,20
**employed**
  10:14,16 14:8
  15:6 75:6
  106:15
**employee** 13:6
  27:6,7 28:2,19
  30:8,10 40:25
  41:2,3,13,25
  42:1,2,4,6,7
  74:24 80:12
  106:13,15
**employees** 27:9
  28:16 42:4
**employer** 17:22
  36:14 56:21
  72:17 73:2,3

80:7
**employer's**
  25:16 56:22
  69:12
**employment**
  11:3 19:5
  28:16,17
**engaged** 37:21
**engineering**
  19:8,10,22
  20:12 21:5,9
  23:3,11 24:5,8
  24:12,21 25:17
  25:18,21
**ensure** 106:11
**entire** 15:3 31:7
**entirely** 20:18
**entirety** 106:9
**entitled** 49:2
  87:9 106:8
**entity** 75:20
**equipment** 4:9
**erisa** 27:24
  28:5,9
**errata** 3:5
  103:2 107:10
  107:12,13
**erroneous** 85:8
**erroneously**
  85:8
**esq** 2:4,10,15
**essentially**
  72:18 96:3
**esther** 10:10

**estimate** 92:9
  92:11
**etcetera** 72:17
**events** 5:23
  7:23 8:2
**everybody** 83:2
  92:4
**everyday** 6:21
**everyone's**
  90:19
**evidence** 105:7
**exactly** 31:14
**examination**
  3:3 4:24 45:5
  66:3 79:19
**examples** 93:21
**exceed** 32:19
**exceeded** 37:6
  38:14,15,19
**exceeds** 31:7
**except** 104:3
**exchange** 29:5
**executed** 42:6
  42:10 104:14
**executing** 41:4
  41:6
**execution** 27:9
**exercise** 67:25
**exhibit** 3:13,14
  3:14,15,15,16
  3:16 12:11,17
  26:14,15,18
  33:6,8,10
  40:20 60:19,22
  65:10,11 66:6

70:10,13 73:20
  73:23 97:11,11
**exhibits** 9:1,2,4
**expect** 91:4,6
  92:15
**expected** 32:22
  92:17
**expenses** 75:22
**expensive**
  50:25 51:6
  75:22
**experienced**
  25:20
**expert** 37:25
  88:24
**experts** 37:22
  38:4,6,12
**expires** 1:24
  104:23 105:21
**expressed**
  104:16
**expressly** 41:25
**extend** 66:25
**extent** 30:7
  101:15

|      f       |

**f** 19:14
**face** 90:16,18
  90:25
**fact** 28:22
  32:22 38:23
  55:1 77:5 83:7
  83:10 87:18
**factor** 77:9

**factors** 54:11
  54:17
**fails** 107:15
**fair** 40:16
  87:21 92:2,4
**falls** 28:23 29:9
  30:20
**familiar** 15:5
  20:25 46:19,25
  60:10 82:5
  83:14 94:19
**far** 29:24 45:21
  47:9 59:5 65:1
  65:3 82:23
  85:6 95:17
**features** 66:23
**federal** 22:10
**fee** 60:10,16
  69:5 86:22
  88:2 99:20
  100:3,7
**feel** 14:5 16:11
  25:24 44:9
  45:15,25 46:9
  47:8,12,22
  49:1,10,19
  50:22 57:25
  60:9 95:14,16
**feeling** 17:11
  35:7 49:4
  55:18
**fees** 54:5 64:12
  64:23 70:2
  75:22 77:15
  87:22

fell 41:15
felt 17:22 43:15
  45:17 49:25
  50:3 85:9
fiber 14:21
fidelity 35:22
  46:8,10,12,13
  47:6,15,18,23
  48:2 49:13,23
  50:1,16 53:2
  55:7,12 76:10
  100:9
fiduciaries
  68:12
fiduciary 24:8
field 12:21
figure 23:18
  54:24
figured 62:19
  62:20 82:19
figuring 95:20
file 23:16 31:17
  45:11
filed 10:18,19
  10:21 14:20
  22:9 31:19
  41:16 48:13
  51:21 88:18,20
  88:20
files 70:24
filing 15:23
  85:9 88:22
filings 8:24,25
  9:2 88:10

final 4:17
finance 11:16
financial 12:6
  29:20,22,23
  31:22 56:8
  65:5 81:3
financially
  106:16
find 88:6
fine 7:7
finish 6:23,23
  11:13
firm 19:8,10
  85:15,16
firms 19:9,12
  22:23
first 4:21 13:5
  27:1 30:5,6
  31:19 42:15
  60:23 61:20
  70:15 97:13
fishel 19:13
  22:23
five 28:1
fixed 63:25
fl 1:21
florida 1:23 4:8
  4:13 10:11
  12:21 105:4,21
foggy 5:25
follow 73:7
  101:19
following 74:3
  75:23

follows 4:22
forced 97:18
forecasts 81:4
foregoing
  104:1,13 106:5
forgetting
  25:16
form 4:11 17:2
  17:12 18:2
  23:5,23 24:18
  25:6 26:4
  28:10 31:4
  32:2 35:18
  37:7,12,19
  38:10,16,20
  40:18 41:17,20
  43:25 44:12
  48:16 51:7
  55:9,19 68:15
  68:23 83:19
  84:8,17
former 10:4
  74:24
fort 1:21
four 77:12
fourth 66:18
frame 75:8
freedom 35:22
  46:8,10,14
  47:6,16 48:2
  48:15 49:7,13
  50:1 53:2
  54:23 55:7,12
  61:24 62:3,11
  64:9 83:11

84:4,7,16,24
  96:11 97:18
  98:21
fresh 52:2
front 6:5 87:19
full 5:6,20
fully 20:9 42:2
  42:12
fund 35:22
  46:20,23 47:1
  47:4 50:8
  52:19,19 53:2
  53:5 64:4 84:1
  84:1 96:11
  97:24
funds 26:12,12
  45:24 46:8,10
  46:14 47:6,14
  47:16 48:2,15
  49:7,13 50:1
  54:23 55:8,12
  61:24 62:3,11
  64:9 68:21
  69:17,21,25
  83:11 84:4,7
  84:16,24 97:19
  98:21,25 99:13
  99:16
further 45:5
  66:3 91:2
  101:8 102:3
  105:12 106:12
  106:14

[g - husband]

| g | | h | hereunder 30:9 |
|---|---|---|---|

**g** 4:1
**gain** 32:23
  40:11 68:25
  84:21 100:10
**gained** 16:20
  16:24 57:25
  68:20 84:20,21
  95:24,25 96:4
  96:4
**gaining** 47:13
**gains** 40:6
  45:18 78:6,7
**game** 40:16
**gears** 81:9
**generally** 78:13
**generous** 13:9
**getting** 44:11
  49:1 82:14
**give** 5:25 10:8
  17:8 33:15
  45:8 55:14
  82:16 85:5
  92:8,11 93:21
  94:15
**given** 101:20
  104:17 105:7
**go** 5:15 35:18
  65:18,21 85:21
  88:3 95:20
  100:24
**goes** 91:4
**going** 5:18 6:8
  6:13,22 22:15
  30:16 33:6

34:1 40:20,21
41:22 44:21,25
45:3 61:18
62:20,22 63:10
65:10,23 66:1
66:16 67:15
70:10 73:20
79:11,14 81:9
91:2 101:18,23
102:23
**gonna** 5:15
  12:11 26:14
  58:5
**good** 4:3 44:23
  57:2 79:12
  90:16,18,24
  101:2
**gotten** 39:7
**govern** 67:1
**grew** 34:18
**grindstaff** 15:9
**ground** 5:15
**group** 80:20
**grow** 17:18,23
  18:1
**grown** 17:20
  21:12
**growth** 17:25
  21:19 24:25
  25:3,3,15,18,19
  26:2
**guess** 43:23
  87:18

**h** 3:12 5:12
  19:14,15
**halfway** 63:23
**hand** 4:19 34:5
  104:17 105:16
  106:19
**handful** 101:11
**handle** 20:23
  99:1,4
**handled** 43:20
**happened** 5:24
  62:1
**happy** 34:21
**hard** 33:18
  70:25 71:1
  72:3
**harmed** 83:18
  83:21,25 84:4
  86:16
**havoc** 33:7
**head** 7:4,4
  92:23 95:19
**header** 36:3
  39:16
**hear** 6:10
**heard** 60:13
  86:1
**heavily** 91:15
**help** 5:16 63:14
**helped** 94:23
**helpful** 67:10
**helping** 62:24
**hereto** 106:16

**hereunto**
  105:16 106:19
**hh** 1:23 105:21
**high** 11:5 55:14
**higher** 98:15,16
**highlighting**
  71:22
**hired** 12:21
  13:8,20
**historical** 53:19
  53:21 57:15,16
  57:19 58:3
  81:1,2
**history** 11:3
  19:6
**hmm** 23:13
  32:15 95:18
  102:14
**hold** 101:18,23
  102:11
**holding** 58:18
**home** 18:16
**honest** 33:2
  80:17 99:6
**hour** 7:8 8:13
  79:12
**house** 102:16
**houston** 1:2
  2:16
**how'd** 56:20
**hr** 42:17,19
  76:8,14 80:20
**husband** 10:14
  75:3,4 76:4

[hypothetical - investment]                                    Page 12

| | | | |
|---|---|---|---|
| **hypothetical** 41:17 | **included** 100:3 100:8 | **informed** 67:21 74:23 | 73:20 |

**i**

**idea** 75:14 86:18 92:12
**identification** 12:17 26:18 33:10 60:22 65:11 70:13 73:23
**identified** 4:13 38:12
**identify** 35:3 48:18,21 75:19 76:18 78:24 79:6 94:12,16
**identity** 104:12
**imagine** 61:11
**impact** 7:23
**implement** 94:14,14
**implemented** 93:22
**important** 70:5 91:18 100:3
**improperly** 48:14
**imprudently** 39:4
**inappropriate** 55:13 95:3
**incentive** 80:13
**inception** 36:7
**include** 27:24

**includes** 12:25
**including** 28:18 73:11 75:21 77:15 99:16
**income** 28:3,19
**increase** 43:11 43:14 77:6
**index** 64:5
**individual** 36:10 63:14 95:11 96:2
**individually** 1:5
**individuals** 16:3 77:17 83:6
**influenced** 76:20 77:2,9
**information** 3:15 22:12 29:12 56:5 57:10 59:23,25 60:2,5,24 61:12 63:2 64:15 65:2,8 69:8 70:6 72:19 75:17,24 76:15,18,23 77:16,22 81:20 84:13 85:11 86:8 99:21,24 100:2,3,10 101:16

**informs** 17:9 29:15
**infrastructure** 80:3
**initial** 59:22
**initially** 81:15
**instances** 75:19
**instructions** 68:14,18
**instrument** 104:14
**intend** 95:10
**interest** 16:8 78:23 79:7 82:19,20 85:10
**interested** 105:14 106:16
**interests** 91:22 91:22 92:1
**internal** 34:4
**international** 46:25
**interpret** 66:25
**interrogatories** 74:11
**interrogatory** 74:22 75:18,25 76:17,24 77:12 78:20 79:5
**introduce** 12:11 26:14 33:6 60:19 65:10 70:10

**introduced** 5:1
**invest** 47:16 53:5 57:24 61:23 62:20 80:25 98:11,25 99:4,8,10
**invested** 20:20 21:5 22:18,22 24:24 26:1,12 33:4 35:21 62:10 69:17,22 70:3,8 79:22 84:4,10,11 96:12 99:13
**investing** 47:23 82:25 86:16 93:18,19
**investment** 11:21 12:7 21:1,4,20 22:18 35:3 37:16 38:7,13 38:18 39:1 43:17,24 44:19 47:7 51:3,6,10 54:18,22 55:4 55:13,23 56:6 58:8 60:3 61:19,22 62:7 63:11,13,24 64:1,4,6,7,13 64:20 67:21 68:5,9,14,18 72:16 75:22

[investment - lawsuit]                                                    Page 13

76:21 94:3,6
94:23 95:2,6
96:5,7,11
97:15,21 98:16
98:20 99:5,9
101:12
**investments**
20:16,19 21:8
21:12 26:8
39:11 44:5,15
44:18 45:11,11
45:21 46:1,5
46:16 47:9,11
50:24 53:23
55:2 56:1
57:18 58:3,12
58:25 59:3,6
63:20 67:17
68:5,10 69:14
70:3,6 75:15
77:14 83:15,18
85:17 86:8,12
93:4,7 94:24
96:15,19,23
97:13,15 98:5
99:2 100:14,18
**investor** 53:9
100:4
**investors** 54:16
**involuntary**
40:23 41:1
**involve** 11:20
**involved** 29:17
82:7,25 83:9
89:24 91:15

92:3,5
**involvement**
75:1
**issue** 14:13
**issues** 49:16
**it'll** 7:4

**j**

**j** 2:10
**january** 77:17
**jcroberts** 2:7
107:1
**jensen** 15:11
**job** 1:25 12:3
13:16,17 14:18
14:22 18:6
19:23,25
103:25 104:25
**john** 2:4 22:14
**join** 85:3
**joined** 18:4
36:11 42:23
43:1
**judge** 6:6 7:20
74:12 92:6
**july** 12:18
**jump** 6:22
44:22
**june** 27:14
36:12
**jurat** 3:5 103:2

**k**

**k** 1:7,11 5:11
**keep** 25:16

**kept** 45:17,19
**kim** 15:15
**kind** 25:24
27:23 85:8
**kip** 15:17
**know** 5:1,23
6:3,20 7:9,11
13:14 20:19
21:4,8,12,17,21
22:18 26:7,11
26:11 35:9
38:6 44:17
46:16,22 47:3
47:24 48:1,10
48:15 51:9
62:25 65:1,3
67:17,20 68:19
69:21,23,24
70:1,2,6 71:6
74:5 75:17
76:16 80:4,21
81:20 82:14
84:18 85:6
86:25 87:2,12
88:19 89:7
90:1,3,8 92:7
92:13,21 93:9
94:25 95:1
96:7,10,15,18
97:7,8 99:3
100:4 101:11
101:15
**knowing** 40:23
41:1 42:7

**knowledge**
21:14 53:7
57:25 62:20
64:22,25 84:5
84:12 85:1
93:3,6 100:6
**knowledgeable**
53:8
**known** 104:10
**kosher** 50:4

**l**

**l** 5:7,7,11 19:14
19:15
**laliberte** 1:4,17
3:2,5 4:5,20
5:1,7 74:23
103:2 104:1,6
104:10 107:3,4
**language** 66:22
**law** 85:15,16,21
**lawsuit** 5:5,19
9:7 10:18,19
10:21 14:13
15:23 16:2
23:16 29:8
30:17,20,24
31:12,15,17,21
32:5,19 41:15
41:16 46:22
48:13 49:6
51:9,12,21
52:22 79:8
81:22 82:7,12
83:15 85:4,12
86:1,5 88:11

89:8,20 92:22
93:16 95:1,11
96:3 99:16
**lawsuit's** 45:8
46:2,7 47:3
97:4
**lawyers** 86:25
87:2
**leads** 83:5
**learn** 42:15
93:12 96:21
**leave** 18:11
**leaving** 19:6,7
**left** 7:12 18:17
19:2 63:11
**legal** 23:20
24:3,20 40:14
40:16 81:15,17
82:23 83:6
85:7 106:3
107:19
**letter** 3:13
12:12,24 14:2
**letting** 67:20
**level** 5:16
**lewis** 2:11 5:4
**license** 4:14
**limitation**
28:18
**limited** 73:11
101:20
**line** 19:9 36:8
44:22 76:12
103:3

**lines** 7:2 28:1
101:20
**link** 62:6
**list** 63:24
**listed** 64:5
**listening**
102:15,18
**litigation** 22:3
34:3 37:22
73:17 79:6
**little** 5:25 11:2
45:7 81:9
**llp** 2:5,11
**local** 4:18
**located** 4:12
**location** 1:20
**login** 59:22
**logistically**
43:23
**long** 8:12 18:9
18:17 32:25
75:3
**longer** 71:14
**look** 28:1 34:4
44:14 53:21
54:4,7,10 56:5
57:6,9,18 58:2
58:3 61:9 66:6
77:22 81:3,6
85:16
**looked** 47:13
49:21 53:1
57:2,8 99:19
**looking** 7:11
31:10,21,22,24

36:2 39:15
53:14,15,19
69:6 78:4
93:16 94:3,6,9
97:12
**looks** 27:22
**loop** 2:16
**lose** 16:12
**loss** 16:11
**losses** 68:13,17
84:15,20,24
85:1
**lost** 16:20 17:1
17:17 71:21
84:22
**lot** 6:9 50:23
**loud** 63:21
66:17

| m |
|---|

**m** 2:15 5:7
56:19 79:15,25
**made** 43:17,24
56:25 57:7
62:12 63:4
68:9 74:10,11
78:22,24 79:8
80:13,15,16
**maiden** 5:11
**major** 11:11
**majority** 51:15
**make** 5:16 6:15
6:18 7:16
39:20 44:4
52:2 54:19
55:23 61:22

62:17 87:22
92:8 93:16,19
94:24 98:23,24
**makes** 57:5
**making** 45:21
67:21 98:10
**manage** 20:2
23:12 62:24
**managed** 23:4
23:7,15 25:21
39:4 47:8
52:19,19 69:22
69:22 86:20
**management**
52:22 54:7
**manager** 19:24
20:1 64:4
76:12
**managing**
15:25
**marie** 1:4 92:25
**marin** 89:5
**mario** 106:3,24
**marked** 12:17
26:18 33:10
60:22 65:11
70:13 73:23
**market** 35:9,16
35:20 37:16
39:2 64:5
**marriage**
105:13
**married** 10:12
**mary** 1:4,17
3:2,5 4:5,20

5:7 103:2
104:1,6,10
107:3,4
**match** 13:5,12
36:14
**matches** 13:7
**material** 56:2
**materials** 55:23
**mathew** 2:10
**mathew.mck...**
2:13
**matter** 37:22
78:23 79:8
105:14 106:8
106:17
**matthew** 5:3
**mckenna** 2:10
3:3 4:25 5:3
25:12 44:21
45:6 65:20
66:4 79:11,20
100:23 101:8
102:3,10,16,20
**mcknight** 1:5
**mean** 27:21
30:12 45:19
46:11,14 47:11
61:21 67:19
89:22 90:14,18
91:25 100:6
**means** 29:20
31:23 43:8,11
43:15
**meant** 29:17
43:10 66:24

67:6
**measured** 64:4
**medication**
7:22
**meet** 63:14
**meeting** 8:9,10
8:12 20:6
**meetings** 97:1
**member** 86:5
**members** 15:6
15:24 20:2,23
90:9 94:9
**message** 39:16
**met** 82:21,22
92:24,25 96:22
**mics** 33:7
**middle** 36:1
**miller** 2:5 82:1
82:11,15 85:2
85:14,24 86:2
**millereshah.c...**
2:7 107:1
**minute** 79:13
**minutes** 44:21
44:24
**mis** 45:15
**misinvested**
28:22
**misinvestment**
28:12 83:7
**mismanaged**
23:17,19,22
26:1 38:25
45:15

**mismanagem...**
26:3 83:8
**misstates** 26:4
55:19
**misunderstood**
59:4
**mm** 23:13
32:15 95:18
102:14
**modules** 65:5
**moment** 30:22
57:17 69:6
**monetary** 30:9
49:15
**money** 16:12
16:21,24 17:1
17:17,21 18:1
20:19 32:23
37:17 38:24
39:3,7 47:16
57:4 87:5,10
88:3 89:7,10
98:11 99:10
**monies** 16:11
**monitor** 16:8
45:11 48:1
93:19 94:23
96:18
**monitored**
45:15 47:22
**monitoring**
16:4,7 45:14
48:14 94:1
**months** 51:20
51:24 52:9

59:1
**morgan** 2:11
5:4
**morganlewis....**
2:13
**morning** 4:3
5:1
**mother** 18:16
**multiple** 89:24
**mutual** 64:4
69:17

**n**

**n** 3:1 4:1 5:11
5:11
**name** 4:6 5:6
5:11 15:9
25:16 79:22
81:23 89:1,3
104:13
**named** 10:1
90:6 92:21
**names** 1:12
5:10 19:11,19
**necessarily**
46:12
**need** 6:19 7:9
27:17 44:9
49:19 50:22
60:9
**needed** 41:9
49:25 62:12
65:2 82:21,22
83:6 85:7
**needs** 7:20
63:14 82:21,22

negotiate   87:22
neither   106:12
never   49:25
   61:16 64:15
   65:7 66:11
   76:3 78:18
   92:24,25
   100:14
new   22:12
nick   15:9
nine   77:12
no.1-20   1:12
nodding   7:4
non   8:18 30:10
   30:17,24
nope   15:16
   76:13
normal   6:21
north   2:16 20:6
notarize   107:11
notary   1:23 4:6
   104:21 105:3
   105:21
note   107:9
noted   104:3
notes   9:13
   52:11,13
notice   61:20
   64:5
notices   77:20
   78:10,13
number   34:2,8
   34:9 39:15,22
   39:24 41:23
   49:22 61:18

62:6,23 66:16
67:15 71:12,19
72:14,24 73:18
74:23 75:18
76:17 77:12
78:20 95:17,21
97:12
numbers   21:22
   21:23 34:2
   57:8,9,11
   100:8
nw   2:11

**o**

o   4:1 56:19
   79:25
oath   4:16 6:4
   74:11 104:11
object   17:2,12
   18:2 23:5,23
   24:18 25:6
   26:4 32:2
   35:18 37:7,12
   37:19 38:10,16
   38:20 40:18
   41:17,20 44:12
   48:16 51:7
   55:9,19 68:15
   68:23 83:19
   84:8,17 87:14
objection   79:4
objections   4:15
   7:17,18 73:15
   105:8
objective   28:10
   31:4

obviously   5:17
oct   1:24 105:21
offer   3:13
   12:12,24,25
   14:2
offered   14:15
   20:16 26:8
   42:17 46:5
   54:22 97:25
offering   13:13
   13:15 46:13
   84:1
offers   13:16,18
   63:12
office   12:22
   104:17
officers   78:21
offset   30:9 31:2
   32:7
offsets   31:11
oh   22:13 71:24
okay   4:3 5:15
   6:2,14,25 7:1,6
   7:15,21 13:23
   14:15 17:11
   19:11 22:10
   24:1 26:14
   30:11 32:13
   34:8 36:6 37:5
   40:15 45:13
   48:13 55:3
   58:11,18 59:7
   65:10 66:5
   69:5,21,24
   71:24,24 72:1

73:7,20 74:4
78:1 79:11
80:9,16 82:7
92:24 93:1
100:22 102:2
old   10:6
omission   78:25
once   7:8 43:14
   59:11
ones   38:2 88:13
online   43:25
open   101:18,23
operated   24:16
opine   38:6
opinion   17:7,9
   21:16 32:12,13
   35:2 37:14
   47:20 49:4
   52:24 55:17
   95:5
optic   14:21
option   20:24
   21:1 43:19,21
   54:18,25 55:13
   57:2 61:23
   62:19 64:1,2,6
   64:7 96:5,7,11
   98:16,21 99:1
   99:3,4,8
options   22:18
   47:12 50:25
   54:22 55:4
   56:6 60:3
   63:11,13,25
   64:13 75:22

94:3,6

**orally** 75:20

**order** 102:8

**orientation** 13:21

**original** 102:9 106:6,10

**originally** 22:9

**outcome** 105:14 106:17

**outcomes** 98:12

**outline** 100:25

**outperformed** 44:18

**outside** 49:6 56:11

**overlapped** 35:13

**oversee** 20:3,4

**overview** 67:5 82:16

**owed** 31:12 95:14,16

**owing** 30:10 31:2

**own** 23:21 45:8 89:22 90:14

**p**

**p** 4:1 5:12

**pa** 2:6

**page** 3:13 26:19 27:1,15 30:4,4 34:5 35:21,24 36:1 39:15 60:23

63:10,11 71:11 73:8 74:21 75:19,23 76:17 76:22 77:12 78:20 79:2 103:3

**pages** 64:12 107:12

**paid** 29:24 77:15 86:25 87:2

**pandemic** 35:13

**paper** 43:24

**paragraph** 27:1,16,20,21 30:5,22 40:22 41:11,23 61:20 62:5 63:20 67:16,18 97:13

**paragraphs** 66:18

**paralegal** 11:12 18:8

**pardon** 82:4 87:1

**parent** 80:8

**part** 85:10

**participant** 16:17 32:25 44:5 50:9 53:6 53:13 58:24 67:10 74:25 75:4,16 83:25 84:3 86:19

93:7 99:20,22

**participants** 67:6 84:7 88:4 89:14,15 90:22 90:25 92:8 93:10,13 98:7

**participate** 18:21 20:11 42:16 43:15 76:21 77:3

**participated** 75:12 83:2

**participating** 20:14 43:3,7 68:21 77:6

**participation** 16:25 72:15 76:19

**particular** 48:19,20,21 52:4 81:12

**parties** 41:3 105:13 106:13 106:15

**parts** 51:16

**party** 16:9 29:16

**passage** 7:25

**passive** 52:22 54:8

**passively** 52:19 69:22

**past** 7:23 8:1

**path** 11:14

**pay** 27:6 30:16 43:11,14 77:5 77:19,23

**paying** 87:5,19

**payment** 27:10 29:6 31:7,11 31:25 32:5,7 37:6

**payments** 30:8 31:1

**penalty** 6:4

**pending** 7:11

**pennsylvania** 2:11

**pensacola** 1:20 1:21 4:13 10:10 11:10,24 12:21

**people** 49:17 89:24 90:1

**percentage** 87:10,12

**perfectly** 7:7

**performance** 44:14 50:1,9 53:15,17,19,20 53:21 57:12,12 57:14,15,19 58:3 64:3,12 64:20 77:14 81:1,6

**performed** 21:9 21:18 97:25

**period** 34:15 35:10,12,15

[period - prepare]                                                    Page 18

38:8 71:16
92:13 96:12
**perjury**  6:4
**permit**  14:16
14:18 19:24,25
**permits**  14:20
14:21
**permitting**
20:5
**person**  14:1
15:2 75:20
78:24 90:3,5
104:13
**personal**  17:7,9
21:16 29:14,15
32:12,13 34:13
35:2 37:14
38:15 39:6,10
70:24 93:3,6
95:5
**personally**
16:12 48:25
104:10
**persons**  1:6
**philadelphia**
2:6
**phone**  43:25
62:6 93:1
100:8
**pickens**  1:21
**place**  105:10
**placed**  47:14
**places**  45:25
**placing**  14:21

**plaintiff**  3:16
3:16 10:2
71:13 73:14
74:23 75:24
76:23 77:18
79:3 90:6
92:21
**plaintiffs**  1:8
2:3 82:8
**plan**  1:7,11
3:15 13:3,4
14:7,11,13
15:25 16:7,12
16:16,19,23
17:24 18:21,23
18:25 20:11,14
20:16 21:6,9
21:24 22:2,15
22:22 23:4,4,7
23:11 24:5,12
24:13,16,21
25:1,4,19,19,21
26:2,3,9 28:12
31:8 32:24
33:1,4,13,16,21
36:11,22 37:1
37:2 39:4 40:3
40:9 42:16
43:3,18 44:2,6
44:15,18 46:5
46:14 47:7
49:21 50:10,25
51:6 53:1,6,13
53:14 54:22
55:4,13,25

56:11,22 58:11
58:25,25 59:2
59:21 60:3,25
61:9 62:24,25
63:12 64:13
65:4 66:7,8,13
66:20,22,24
67:1,3,5,10,13
67:25 68:9
69:12 71:14,14
72:3,7,11,16,20
73:3,4 74:25
75:3,4,13,16,21
76:4,15,20,21
76:22 77:3,14
77:15,19,20,25
78:5,10,13,16
81:11 83:3
86:17,20 89:13
89:15 90:17
93:7 94:4,7,19
94:22 96:13,16
97:10,16,25
98:7 99:14,22
100:15,17
101:13,14
**plan's**  59:16,24
60:10 63:24
64:20,23 68:12
82:20 83:25
96:22
**planned**  75:21
**planning**  12:9
56:9 65:5

**plans**  24:8
57:18 72:17,20
73:1
**please**  4:19 5:5
10:9 25:10
27:4 32:3 34:9
63:2,22 83:23
**pllc**  18:5
**pocket**  87:5
**point**  13:2
25:25 44:23
79:12 95:15
**points**  12:25
**policies**  97:2,4
**portfolio**  63:14
**portion**  75:13
**position**  14:15
20:9
**positive**  5:3
**positively**  4:13
**possibility**
84:12
**possible**  5:17
6:9,19 84:6,9
**possibly**  32:24
95:12
**potential**  86:4
90:8
**predict**  6:21
**preferences**
93:13
**prep**  8:9
**prepare**  8:7,20
52:6

[prepared - question] Page 19

prepared 52:14
preparing
  73:10
present 8:14
presentation
  12:11
preserve 7:19
pretty 63:9
prevail 87:8
previous 13:16
principal 66:23
principles
  11:21
printed 74:1
prior 41:4,5
  82:10 88:21
probably 7:8
  58:9 59:19
  95:22 101:21
probe 23:22
probst 15:19
procedure 4:18
  22:11
procedures
  97:3,5
proceed 4:23
  95:10,10
proceeding 4:9
  102:23 105:10
  106:10
proceedings
  3:23 8:24
  105:7 106:7
process 16:4
  24:8

produce 9:17
produced 3:24
  9:6 22:2 34:3
  71:4 72:12
producing
  101:12
production
  70:15 71:12,19
  72:14,24
professional
  12:1
program 80:13
promptly 63:3
proper 48:8,11
pros 56:6
proved 104:11
provide 5:20
  90:16,24
provided 9:5
  9:16 27:8
  57:10 65:1,16
  66:9 67:22
  69:9 91:16
  99:25
provides 62:5
provisions
  40:24 66:25
  67:3
prudently 23:4
  23:7,11,15
  25:21
public 4:6
  104:21 105:4
publications
  55:22

publicly 56:4
  80:21
pulled 58:22
purchase 56:25
  57:7 58:14
  80:14
purchased
  56:21 58:1,19
purchasing
  58:19,19
purpose 59:20
purposes 4:17
  34:4 104:15
pursue 95:11
put 32:23 45:24
  46:9 50:18

**q**

qdia 20:25 21:5
qpa 94:19
qualified 21:1
  61:19 94:19
qualifies 28:11
  28:13 91:13
quanta 1:7,10
  1:10,11 2:15
  5:4 12:12
  13:20,24 14:6
  14:7,12,16,23
  15:3,6,24 18:4
  18:18 19:2,6,7
  21:20,23 24:13
  24:16 25:4,5
  25:19 26:1
  27:23 28:8
  32:25 33:4

34:5 38:24
39:16 41:12
42:24 43:1
45:10,14 46:12
46:13 47:20
48:1,14,19,22
50:9,14 54:24
58:24 60:24
65:1 66:7
74:24 75:7
76:6 79:9
81:10 82:12,17
83:1 86:17,19
89:8,11 93:17
93:25 94:13
96:15 98:4,23
98:24 99:3
107:3
quanta's 36:14
  48:24 70:14
  99:10
quarter 17:25
  34:10,15,19
  59:11 78:7
quarter's 53:18
quarterly 59:7
  59:13 96:22,25
question 6:10
  6:12,12,22
  7:11,18 17:14
  17:15 23:9
  25:9,11,13,14
  25:15 59:4
  83:23 87:3

**questioning**
44:23 101:20
**questions** 5:18
6:9,24 7:12
39:21 101:1,9
101:17 102:4
**quick** 44:23
65:19,22
100:24
**quickly** 69:11
79:21

**r**

**r** 4:1 5:7,7
**raise** 4:19
**range** 68:5
97:15
**rate** 34:13 38:8
49:14 50:24
55:14 63:25
**reach** 81:17
**reached** 42:17
42:19,21 50:11
50:13,16,18
76:14 81:15,16
81:19,23 100:9
**read** 13:2 25:12
27:1,16,17
30:6 37:25
39:19 40:22
41:23 42:1,9
51:12,17,19,21
61:16,20 62:23
63:19 66:11,17
67:16 88:10,15
88:17,19,21,24

103:1 104:1
107:6,8
**reading** 32:14
**real** 65:19,22
**realized** 74:1
**really** 53:12
85:5 92:19
**reason** 14:5
40:2 49:10
61:13 65:15
66:9 88:1
103:3
**reasonable**
40:10 44:11
49:13 51:3
87:20
**recall** 7:23 8:1
8:23 9:4 12:18
13:20 15:1,2
19:11 27:12
33:3 38:2
42:19,21 43:17
43:23 51:16
52:1 60:16,18
61:5,7,11
70:14 75:5,6
75:12,15 78:10
87:13 88:25
**receive** 27:10
29:18 33:15,18
43:11 72:3
78:13 92:15
**received** 13:18
27:12 29:5
30:9 31:1,7,25

32:6 33:24
40:4,9 58:7
61:5 70:15
71:15 74:2
77:20
**receiving** 12:18
60:16
**recently** 52:10
52:11
**recess** 45:2
65:25 79:16
101:5
**recognize**
12:15 15:9
26:16 33:8
60:19 65:13
70:11 73:21
89:1,3
**recollection**
5:24 6:1 20:17
**record** 4:2,4,8
5:2,6 7:19 20:9
22:14 27:18
44:25 45:4
65:18,21,23
66:2,5 73:8,24
74:5 79:14,17
101:3,6,10
102:23,25
106:11
**recorded** 3:23
**recording** 3:23
4:10 6:18
106:6,10

**recover** 31:14
31:21,22,25
32:5 87:14,23
88:3
**recovered**
87:10
**recovery** 87:15
**refer** 14:11
34:1 97:10
**reference** 14:10
69:2
**referenced**
107:5
**reflected** 16:20
**reflecting**
72:15
**refute** 73:11
**regarding**
28:14 56:5
75:21
**reggie** 15:19
**regulation** 69:2
**relate** 72:25
**related** 71:15
77:15 101:12
105:12
**relating** 28:15
68:9 73:4
101:14
**relationship**
54:14 80:6
**relative** 106:13
106:14
**releasable** 30:7
30:10,18,25

release 27:22
28:8,24 29:5
29:10
released 30:16
30:21 41:2,15
41:19
relevant 22:12
101:17
relied 73:10
76:19 77:16
rely 55:22
remember 6:1
19:19 33:2
43:21 53:3
80:17,18 81:23
81:25 88:13
remote 4:16
20:9
remotely
101:22
removed 94:4
94:10
repeat 6:11
17:15 23:9
25:9 32:3
70:19 83:23
90:23
rephrase 6:12
report 14:25
reported 1:23
105:6
reporter 3:6
4:3,7,23 6:17
7:3 12:14
25:14 44:25

45:3 65:23
66:1 79:14,17
101:3,6 102:8
102:12,15,19
102:22 105:1,3
reports 37:25
88:24
represent
73:24 88:7
91:25
representative
79:9 82:10
90:12,15 91:14
91:19 92:16
representatives
1:5 38:24
45:10 100:9
representing
5:4 82:8 91:22
request 58:9
71:12,18 72:14
72:14,22,24,25
73:5,9,14,16,18
requested 22:5
requesting
72:19
requests 70:15
70:18,21 71:3
required 3:15
60:23
requires 64:5
reread 30:13
research 58:1
85:14,17

reserves 73:14
79:3 103:1
resort 1:20
respect 24:4
93:25
response 71:13
71:18 72:17
73:13,15,18
74:11,22 75:23
76:23 77:18
79:2,3,4
responses 3:16
3:16 7:3 22:12
74:15,18
responsibility
91:19 98:12
responsible
15:25 68:8,13
responsive
58:10 70:18,21
71:3 72:22
73:5 75:24
76:24
restate 87:3
resulting 68:13
68:18
retirement 3:14
12:9 13:3,4
18:23,25 22:20
22:25 28:2,19
32:24 33:12
56:8,12 69:12
72:16,19 73:1
return 34:13,21
37:2,5,18 38:9

44:11 49:14
50:24 55:14
63:20 64:1
83:11 107:12
returned 35:4,4
83:12
returning
49:13
returns 54:14
96:11 98:15,16
review 8:20
16:16 52:6
58:25 59:2,10
60:5 63:3 64:8
67:10 70:14
74:8 96:22
99:21 101:24
reviewed 51:23
52:1 59:6,7
64:15 65:7
67:12 73:10
77:19 78:5,11
78:18 86:7
106:9
reviewing 40:3
77:23
revisit 69:11
102:1
rfp 3:16 72:18
rfp's 58:10
richard 89:5
riddle 15:15
right 4:19
14:20 19:3
21:18 26:24

29:6 32:1 34:5
37:23 42:4
43:4 46:5
62:13 73:14
79:4,23 86:17
95:25 96:19
97:5,19 100:23
102:5 103:1
**rights** 41:1
66:22
**risk** 53:22
54:14,20 93:10
**riskier** 98:15
**road** 1:21
**roberts** 2:4
12:13 17:2,12
18:2 23:5,23
24:18 25:6,17
26:4 28:10
31:4 32:2
35:18 37:7,12
37:19 38:10,16
38:20 40:18
41:20 44:12
48:16 51:7
55:9,19 65:18
65:21 68:15,23
83:19 84:8,17
101:2 102:2,5
102:12,14
**rog** 3:16
**rough** 92:11
**roughly** 8:13
31:20

**route** 62:21
**rule** 7:20
**rules** 4:18 5:16
22:11 107:14
**runs** 5:17
**rupp** 15:17

**s**

**s** 3:12 5:11
19:14,15
**salary** 36:10
39:10
**saved** 33:25
**savings** 1:7,11
3:14 13:3,4
14:7 22:20,25
33:12 56:12
58:12 60:25
66:8 69:12
**saw** 40:6
**saying** 30:15
34:25 59:5
**says** 28:2 31:11
34:5,13,16
36:20 39:16
51:9 52:22
60:23 63:2,12
71:13 73:14
75:19 77:18
78:20 89:24
**scheduling**
20:7
**school** 11:5
**scope** 28:24
29:9 30:21
41:15 101:21

**seal** 104:17
**search** 70:23
81:18
**sec** 33:15
**second** 8:17
13:2 18:12
27:15 63:1
71:13,19
**secretary** 18:7
**section** 36:3
62:5,23 69:3
**security** 28:3
28:19 64:3
**see** 12:25 26:20
27:25 28:2,19
34:5,12,15
35:21,24 36:6
36:7,17 39:16
47:13 60:23
61:2 62:8,14
63:2,5,12 69:2
71:16,22,25
75:25 76:24
77:20,24 78:1
93:22 100:25
101:25
**seek** 81:18
85:11 87:23
89:10 96:2
98:14
**seeking** 24:3,20
31:14 32:4,8
89:7 90:11
**seeks** 73:9

**seemed** 13:12
82:20
**seems** 34:24,25
87:21
**seen** 21:22
**select** 97:18
98:5
**selected** 20:24
43:19 54:25
75:15 96:15
97:24 99:1
**selection** 99:7
**seminar** 12:7,9
**send** 102:20
**sense** 6:15 11:4
54:19 100:5
**sentence** 30:6
30:11,25 31:10
32:6 39:19
71:13,20 73:13
74:22 75:23
76:23 77:18
79:2
**separate** 56:23
56:24 74:3
**separated**
10:17
**september** 61:3
106:20 107:2
**serve** 90:11
**service** 39:21
39:23
**services** 1:7,10
1:10,11 2:15
14:6 39:17

60:24 66:7

**serving** 92:16

**set** 59:22 92:20
105:16 106:19

**seven** 27:16,21
30:22 74:21

**several** 5:24
64:12

**severance** 3:14
27:3,7,8 28:8
31:2,6,11,25
32:5,7,14 37:6
40:21

**shah** 2:5 82:1
82:11,15 85:3
85:14,24 86:2

**shaking** 7:4

**shared** 29:13

**she'll** 102:21

**sheet** 107:10

**shortly** 42:23

**show** 16:23

**showed** 17:24
53:2

**shown** 21:19

**shows** 35:21
36:7 64:12

**side** 63:11

**sign** 107:6,11

**signature** 26:20
26:22 74:1,3
104:2

**signed** 74:7,8
107:17

**significance**
42:3,13

**signing** 28:7

**similar** 25:3,19
61:6

**similarly** 1:6
24:16 72:25

**simple** 32:22
83:7

**site** 85:16

**sitting** 26:7
48:18 71:2
73:17 74:17
79:6 91:17
94:12

**situated** 1:6

**six** 34:6 71:11
78:20

**skimmed** 52:16
52:17

**small** 46:20
47:1

**smoothly** 5:17

**software** 4:10

**solutions**
107:19

**somebody**
13:24 49:23
50:13 81:25

**sooner** 7:9

**sorry** 17:2,18
21:2 25:12
26:15 29:21
35:18 36:3
41:13 56:16

68:2 71:18
90:23 97:11
100:20,22
102:19

**sort** 5:16,25
6:17,20 11:20
12:3 14:10
17:16 31:22
43:23 59:10
60:16 67:5
75:2 80:12
81:3 82:14
94:12 101:16

**sought** 87:14

**sound** 3:23
19:3 67:21

**sounds** 101:2

**sources** 77:16

**southern** 1:1
91:8

**spd** 66:21,23
67:2,5,12
97:10

**speak** 49:23,25
55:7 62:7 76:6
81:22 90:19,21
90:25 100:9

**speaking** 9:22
81:12 82:10
91:1

**specialized**
4:10

**specific** 35:3
78:10 93:21
94:13 101:20

**specifically** 9:4
45:13 46:3
47:25 51:16
78:12 84:2
90:2 93:17,23
94:2,16

**specifics** 17:8
75:2 94:15

**speculation**
25:24

**spell** 5:6 56:18

**spelled** 5:7

**spoke** 49:12
50:6 76:3
77:17 85:2,15
86:2,15

**spoken** 38:4
86:4 93:1

**spouse** 9:19,24
74:24

**spurred** 52:4

**stamp** 34:3

**stamped** 40:22

**stand** 33:7

**standard** 64:3

**start** 20:14

**started** 18:7,7
18:18

**starting** 66:6
66:18

**starts** 13:3 79:3

**state** 4:7 5:5
11:10,24 20:6
28:14 80:5
104:7,22 105:4

| | | | |
|---|---|---|---|
| stated 63:25 | 101:13 | sums 30:9 31:2 | talk 6:20 11:2 |
| statement 3:14 | stock's 57:12 | supplement | talked 80:24 |
| 17:24 33:12,13 | stocks 58:8 | 73:15,18 79:4 | 88:9 95:23 |
| 34:10 39:21 | stone 89:3 | support 73:11 | 97:9 |
| 40:10 63:17 | street 2:5 10:10 | sure 5:16 10:17 | talking 14:12 |
| 71:8 72:1 | strictly 54:25 | 16:15 20:18 | 29:9 50:23 |
| 78:24 | stubs 77:19,23 | 22:16 23:10 | 57:17 72:18 |
| statements | studies 11:12 | 25:9,11 30:14 | target 26:12 |
| 16:17,19,23 | style 53:25 54:7 | 31:18 32:4 | 69:25 |
| 21:25 22:3,15 | subcontracting | 33:2 45:21 | tasks 20:3,4 |
| 25:1 33:16,23 | 19:9,17 22:23 | 48:8 51:1 52:2 | taxes 27:6 29:6 |
| 40:4 49:22 | subject 27:5 | 54:12 65:20 | team 19:13 |
| 53:2,14 59:5,8 | 78:23 79:8 | 69:13 80:23 | 20:2 22:22 |
| 59:14 62:25 | submitted | 83:20,21,22 | tell 48:4 75:2 |
| 63:4,8 71:8,9 | 88:24 | 84:21 86:24 | telling 29:1,1 |
| 74:10 77:19 | subpart 27:17 | 87:5 90:24 | 62:11 |
| 78:5 101:14 | 27:21 28:1 | 92:19 93:19 | ten 40:22 73:18 |
| states 27:25 | 30:5 | 94:8 95:4 97:3 | 78:20 79:13 |
| 76:18 | subscribed | 98:22 99:6 | term 20:25 |
| stay 18:16 | 104:13 | surprise 96:21 | 60:13 |
| stayed 77:13 | sue 23:8 24:17 | 96:24 | termination |
| stenography | 81:10 82:17 | switch 81:9 | 28:17 |
| 4:11 | sufficient 97:1 | sworn 4:22 | terms 27:5 31:2 |
| step 68:17 | sufficiently | | 42:3,12 |
| stephen 15:21 | 64:20,24 | **t** | testified 4:22 |
| stepping 45:7 | suing 46:12,13 | t 3:12 5:8 | 84:23 |
| steps 23:21 | 47:18 | take 7:8,13 | testify 8:5 91:5 |
| 24:2 48:1,8,11 | suit 27:23 | 11:15 23:21 | testifying 6:5 |
| 85:3 93:12 | 85:21 | 24:2 54:20 | testimony 3:2 |
| stock 35:9 | suite 2:5 | 62:12 85:3 | 26:5 55:20 |
| 56:13,14,20 | suits 27:24 | 91:11 100:23 | 76:2 77:1 |
| 57:1,14 58:1 | summary 3:15 | 102:10,10 | 84:25 105:8 |
| 58:12,14 71:8 | 34:12 52:14 | taken 7:22 45:2 | 106:7 107:8 |
| 72:21 79:22 | 66:7,13,20,21 | 65:25 77:24 | texas 1:1 91:8 |
| 80:9,25 81:1,6 | 67:5 | 79:16 93:12 | |
| | | 101:5 105:10 | |

| | | | |
|---|---|---|---|
| **thank**  5:9 12:13 | **thinking**  35:7 | **title**  19:23 | **transcriptionist** |
| 12:14 22:17 | 59:5 | **titled**  66:6 | 3:7,24 106:1,3 |
| 71:24 100:22 | **third**  62:5 | **today**  5:17 8:2 | 106:8 |
| 102:5,7 | 66:18 | 8:8,21 9:14,17 | **treat**  57:23 |
| **thereof**  105:16 | **thought**  24:20 | 26:7 29:9 | **trial**  91:3,4,10 |
| 106:19 | 49:12 55:15 | 48:18 52:7 | **tried**  85:5 |
| **thereto**  105:8 | 83:11 85:6 | 71:2,7 72:19 | **trigger**  58:22 |
| **thing**  50:5 | 97:25 | 73:8,17 74:12 | **true**  104:2 |
| **things**  6:18 | **three**  12:25 | 74:17 79:6 | 106:5 |
| 24:15 | 30:4 31:18,20 | 84:23 91:17 | **trust**  20:23 |
| **think**  7:25 8:4 | 72:24 76:17 | 94:12 101:18 | 66:24 67:1 |
| 20:8 21:13,17 | **time**  1:19 4:15 | 102:6 | 98:23 |
| 22:15 23:3,20 | 7:10,25 12:2 | **today's**  4:9 | **trusted**  38:23 |
| 25:25 26:2 | 13:8,13 14:23 | 9:20 102:22 | 41:12 50:22 |
| 28:11,13,21,21 | 15:3,6 16:24 | **together**  105:7 | 54:24 99:6 |
| 28:23 30:20 | 31:16 33:7 | **told**  40:16 | **trustees**  1:10 |
| 32:16,18 37:2 | 36:11,15,23 | 41:14 98:4 | **truthfully**  8:5 |
| 37:5,9 38:14 | 37:18 38:7 | **took**  48:1 | **try**  6:22,24 7:8 |
| 38:19 39:3,13 | 40:7,9,12 | **top**  92:23 95:19 | 88:6 92:2 |
| 44:2,22 47:10 | 42:13 43:9 | **total**  12:24 | 93:12 |
| 49:3,11,21 | 44:5,10 50:3 | **touch**  50:19 | **trying**  17:16,19 |
| 50:23,24 53:1 | 68:20 75:8,13 | **touched**  88:23 | **turn**  26:19 |
| 54:4 55:11,12 | 75:13 77:7 | **towns**  20:5 | 27:15 30:4 |
| 57:17 58:5,7,8 | 84:20 86:14 | **track**  45:17,20 | 34:9 35:24 |
| 58:9 59:4,6,22 | 92:13 94:11 | **tracking**  34:4 | 40:21 41:22 |
| 63:1 69:13 | 96:12 97:22,22 | **traded**  80:21 | 61:18 62:22 |
| 71:3 72:17,22 | 101:23 102:6,9 | **training**  12:3,4 | 63:10,19 66:16 |
| 74:2,19 80:24 | 105:10 107:15 | **transcribed** | 67:15 71:11 |
| 84:19,23 88:9 | **timeframe**  39:3 | 106:9 | 73:8 74:21 |
| 88:15 89:12 | 81:12 107:7 | **transcript**  3:24 | **turned**  24:15 |
| 90:24 91:13 | **times**  15:4 | 4:17 6:18,19 | **turning**  76:22 |
| 92:7,9,18,19,25 | 47:10 59:19 | 102:9,11,21 | **twelve**  73:8 |
| 95:23 96:25 | 95:23 | 107:5,16 | 79:2 |
| 99:9 | **tisa**  1:23 4:6 | **transcription** | **two**  11:8 18:10 |
| | 105:3,20 | 106:6 | 18:13,19 27:1 |

72:14 75:18
91:11
**tx**  2:16 107:13
**type**  80:2
**types**  20:4

**u**

**under**  6:4,4
   12:24 22:10
   27:24 28:9
   31:1 34:12
   35:20,25 61:19
   62:24 63:11,20
   66:22 67:16
   71:12 74:11
   76:22 97:13
   104:11,17
**underneath**
   36:6,17 64:1
**underscore**
   34:6
**understand**
   5:21 6:4 14:12
   15:23 16:1,2
   17:16,19 22:5
   22:10 27:20
   28:5,7 30:11
   31:6 34:9,18
   35:12,15 37:21
   39:9 46:1,4,7
   47:15 50:10
   52:18 54:16
   56:4 59:24
   60:2 61:8,21
   62:1 64:11
   65:4 66:13

67:4,7,18,24
68:4,8,12 69:5
69:8 74:10
87:8 88:2
89:19,21 91:7
91:10,18,21
94:22 97:14
98:11,14 99:24
100:7 101:10
**understandable**
66:21
**understanding**
   16:6 24:7,11
   36:25 37:15
   51:2 52:21
   54:13,21 55:1
   64:18 69:16
   74:7 93:24
**understands**
   42:2
**understood**
   6:13 42:12
**undertaken**
   86:11
**undetermined**
   25:7,8
**unit**  10:10
**united**  1:1
**unknown**  1:12
**unsure**  23:6,10
   24:19 30:19
   31:5,16,21
   38:17 44:3
   54:1,3 68:16
   69:18,19,20

99:11
**update**  22:11
**updated**  74:19
**updates**  74:20
**upwards**  91:11
**url**  63:22
**use**  56:2
**used**  4:17 73:9
   107:16
**using**  4:9
**utility**  19:10

**v**

**v**  1:9 107:3
**value**  31:7
   35:20 37:9
   46:20 47:1
   54:17 93:10
**variable**  63:20
**various**  60:3
**vehicle**  72:16
**verbal**  7:3
**verbatim**  4:8
   106:11
**verify**  107:8
**veritext**  4:7
   107:12,19
**veritext.com.**
   107:13
**version**  52:12
   52:13 71:23
   73:25 74:1,2,3
   74:6,7
**versus**  52:22
   54:8

**video**  102:9,11
**view**  64:19
   87:20
**visit**  59:16 64:8
**visits**  59:21
**vocational**  12:4
**volatile**  35:15
**voluntarily**
   42:6

**w**

**wait**  43:6
**waiver**  40:23
   41:1
**walk**  19:5
**walnut**  2:5
**want**  7:3 11:2
   22:15,17 54:20
   55:12 62:10
   63:21 69:11
   73:12 75:1
   79:21 80:5
   87:12 100:24
   101:25
**wanted**  52:2
   61:9 80:14
   81:10 98:14
   101:9
**washington**
   2:12 80:5
**way**  4:14 14:20
   29:19,22 47:6
   51:5 66:25
   87:4 105:14
**we've**  50:23
   58:7 71:6

72:18 79:11 95:23

**website** 33:21 44:2 59:16,21 59:24 60:6 61:9 62:6 64:8 65:4 78:16 100:8

**weeks** 91:11

**went** 66:5 91:2 99:2

**werner** 89:1

**west** 2:16

**wheelhouse** 53:12

**wide** 55:1

**wilhelm** 15:21

**withdraw** 36:22

**withdrawal** 59:23

**withdrawals** 36:20

**withdrew** 36:25 39:10 68:21

**withstanding** 40:24

**witness** 4:12,15 4:21 102:7 103:1 105:16 106:19 107:5,7 107:9,11,15

**words** 45:8 89:22 90:14

**work** 18:4,8,13 19:9,16,21,22 49:18 92:2

**worked** 18:5 19:7,8,13

**worries** 71:22

**wrap** 7:13

**wreaks** 33:7

**writing** 75:21

**wrong** 45:14 47:21 74:1 93:25 94:17 95:2

**wrote** 74:23 75:24

| x |
|---|
| **x** 3:1,12 |

| y |
|---|

**y** 5:7 56:19 79:25

**yeah** 17:16 35:8 63:22 102:21

**year** 57:5 81:14

**years** 5:24 11:8 18:10,19 31:18 31:20

**yep** 57:21 71:10

**yielded** 98:16

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.