# Exhibit  G

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

---------------------------------------------------x

MARY LALIBERTE, et al.,

Plaintiffs,

vs. Case No. 4:22-cv-03290 (AHB)

QUANTA SERICES, INC., et al.,

Defendants.

---------------------------------------------------x

REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF
ADAM WERNER
Monday, September 9, 2024

Stenographically Reported By: Lynne Ledanois
License No. 6811
Job No. 6866036

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

---------------------------------------------------x

MARY LALIBERTE, et al.,

Plaintiffs,

vs. Case No. 4:22-cv-03290 (AHB)

QUANTA SERVICES, INC., et al.,

Defendants.

---------------------------------------------------x

Videotaped deposition of ADAM WERNER, taken in Pismo Beach, California, commencing at 9:02 a.m., on Monday, September 9, 2024 before LYNNE M. LEDANOIS, Certified Shorthand Reporter No. 6811, Certified Court Reporter.

* * *

REMOTE APPEARANCES

Counsel for the Plaintiffs:

MILLER SHAH LLP
BY: KOLIN TANG
Attorney at Law
1845 Walnut Street
Suite 806
Philadelphia, Pennsylvania 19103
ktong@millershah.com

Counsel for the Defendants:

MORGAN, LEWIS & BOCKIUS LLP
BY: JEREMY BLUMENFELD
BY: SAMUEL BLOCK
KERI ENGELMAN
MARIA DeCASTRO
Attorneys at Law
2222 Market Street
Philadelphia, Pennsylvania 19103
jeremy.blumenfeld@morganlewis.com

Also Present: Brandon Miller, Videographer
Carolyn Campbell, In-House Counsel Quanta

INDEX OF EXAMINATION

Examination by: Page

Mr. Blumenfeld 8

I N D E X O F E X H I B I T S

| Deposition | Description | Identified |
|---|---|---|
| Exhibit 1 | Expert Report of Dr. Adam Werner, 8/1/24 | 21 |
| Exhibit 2 | Quanta Complaint | 42 |
| Exhibit 3 | Excel Spreadsheet, DFA Fund - Quarterly Balances 4Q 2019 through 2Q 2024 | 94 |
| Exhibit 4 | Excel Spreadsheet, Werner Report Backup | 112 |
| Exhibit 5 | Document: EPIC Plan Investment Review, Quanta October 1 - December 31, 2017 QUANTA_002559 | 129 |
| Exhibit 6 | Fiduciary Investment Analysis Quanta Services, Inc., 401(k) Savings Plan as of March 31, 2021 QUANTA_005002 | 140 |
| Exhibit 7 | Fiduciary Investment Analysis Quanta Services, Inc., 401(k) Savings Plan as of June 20, 2021 QUANTA_005134 | 142 |

///

Monday, September 9, 2024

9:02 a.m.

-----------------------------------------------------

THE VIDEOGRAPHER: Good morning. We're going on the record at 9:02 a.m. Pacific Daylight Time on September 9th, 2024.

Please note that this deposition is being conducted virtually.

Quality of the recording depends on the quality of camera and internet connections of participants. What is seen from the witness and heard on screen is what will be recorded.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit Number 1 of the video-recorded deposition of Dr. Adam Werner taken by counsel for defendants in the matter of Mary Laliberte, et al., versus Quanta Services Incorporated, et al., filed in the United States District Court for the Southern District of Texas. Case number 4:22-cv-03290 (AHB).

This deposition is being conducted remotely using virtual technology.

My name is Brandon Miller, representing

Veritext Legal Solutions and I'm the videographer. The court reporter is Lynne Ledanois from the firm Veritext Legal Solutions.

I'm not related to any party in this action, nor am I financially interested in the outcome.

If there are any objections to proceeding, please state them at the time of your appearance.

Counsel and all present, including remotely, will now state their appearances and affiliations for the record beginning with the noticing attorney and the witness will be sworn in. Thank you.

MR. BLUMENFELD: Good morning, everyone. This is Jeremy Blumenfeld from Morgan Lewis on behalf of the defendants.

We also have Sam Block, Keri Engelman and Maria DeCastro on behalf of the defendants and Carolyn Campbell on behalf of Quanta.

MR. TANG: Kolin Tang of Miller Shah here on behalf of plaintiffs and Dr. Werner.

ADAM WERNER, Ph.D.,

having been duly sworn, testified as follows:

EXAMINATION

BY MR. BLUMENFELD:

Q Good morning, Dr. Werner. My name is Jeremy Blumenfeld. We met a couple of minutes ago. I'm one of the lawyers for the Quanta Service defendants in connection with the ERISA class action.

Do you understand that?

A I do.

Q Great. You've been deposed before?

A I have.

Q Approximately how many times?

A North of 50.

Q You know the drill. You know the rules. The most important rule is you're under oath as if you were testifying life in front of the judge or jury. Do you understand that?

A I do.

Q Great. If there comes a point in time during the course of the session today that you want to take a break, just let me know, we'll find a good place do that. Okay?

A Yes.

Q And if you don't hear my question or my question is unclear to you, please let me know that and I'll try and clarify it or repeat it.

Especially with technology that we're using today, if you don't hear something because I cut out or the video cuts out or what have you, we'll just repeat the question and go from there. Sound good?

A Yes.

Q Great. Have you ever been deposed before in any ERISA cases?

A Yes.

Q How many?

A One, to the best of my knowledge.

Q Is that the Genworth case?

A Correct.

Q Your report in that case was also about damages?

A To the best of my recollection, yes.

Q How long ago was that?

A As I sit here, I don't recall. I'm happy to look at my vitae. I believe that's Exhibit 1 to -- I don't know that my report will be Exhibit 1 to this deposition, but it's Exhibit 1 to my report. I can use that to refresh my memory.

Q You don't remember as you sit here today without looking at your report and your vitae whether it was a year ago or five years ago or ten years ago?

A So do you want me to answer each one of those sequentially?
Q Sure.
A So it was not ten years ago. It was not five years ago. It probably was within the last year.
I mean, if you want me to give vague answers like, oh, I was deposed within the last three years, so that encompasses my probability of me not remembering with 100 percent accuracy, I'm happy to do that.
Q Okay. I think what you said is you know it's within the last three years, but -- and maybe within the last year, but you're not 100 percent on that; is that correct?
A That's correct.
Q Have you ever prepared any papers on anything associated with ERISA?
A I don't understand --
THE WITNESS: Sorry, go ahead.
MR. TANG: Object to form. Go ahead.
THE WITNESS: I don't understand the question.
BY MR. BLUMENFELD:
Q You are a professor?
A I was.

Q When you were a professor, did you publish any papers?

A I've published papers, I don't believe I published any papers while I was a professor. I think technically I was a lecturer.

Q Have you published any papers that have anything to do with ERISA?

A Not to my knowledge.

Q Okay. Have you given any presentations that have anything to do with ERISA?

A Not that I recall.

MR. TANG: Just a form objection. Go ahead, Dr. Werner.

BY MR. BLUMENFELD:

Q Dr. Werner, before you joined, I was explaining to the court reporter that we have an expert on our end also whose name is Dr. Wermers, which is similar to yours, and so that's some of the confusion you might hear.

If I do that during the course of the session today, I apologize. I am a human being like everybody else, but I just wanted to explain that to you.

MR. TANG: Thank you, Jeremy.

MR. BLUMENFELD: Sure.

Q Are you also employed by SEDA, S-E-D-A?
A I don't think I'm technically employed by them. I am a 1099, so -- but, I mean, if you want to consider that under the umbrella of employment, I guess the answer is yes.
Q How long have you been working for SEDA and receiving 1099s?
A To give you the most accurate answer, I would need to look at my vitae.
Q Can you give me an approximation?
A I believe more than a year, less than two years.
Q Do you know how many people are employed by SEDA in a similar relationship to the one that you have with SEDA?
A I do not.
Q Do you know how many people are W2 employees of SEDA?
A I do not.
Q Do you have any approximation as to how many people consider themselves in some form or another to be employed by SEDA?
A No.
Q Do you know if there's anybody else who works for SEDA in a similar capacity to what you do?

A Can you repeat the question, please?
MR. BLUMENFELD: Lynne, can you read that back?
THE REPORTER: Sure.
(Requested testimony read by the reporter.)
THE WITNESS: When you say "similar capacity," what do you mean?
BY MR. BLUMENFELD:
Q Who serves as an expert?
A Do I know anyone -- have I ever met anyone at SEDA who serves as an expert, I believe the answer to that is yes.
Q That's fine, and I appreciate that.
I wasn't asking if you met them. I was asking if you know if there are other people who serve as experts who are associated with SEDA?
A If I've met them, I guess to me that's the same as knowing that they are an expert. This is not rocket science.
Q How many people have you met?
A I don't know as I sit here today.
Q Can you give me an estimate?
A I have no idea.
Q You don't know how many people you've met who are associated with SEDA as some sort of expert?

A That's correct.

Q And so as you sit here today, you can't say whether you've met five people who are associated with SEDA as an expert or 50 people who are associated with SEDA as an expert or 500 people or 5,000?

A I've met at least five. I doubt I've met 50. Definitely not 500 and definitely not 5,000. I'm just trying to be as precise as possible here.

If you want me to give vague answers, it's not going to behoove me to kind of speculate about, oh, I know it's not 5,000. I mean, I can do that if you prefer, but this will obviously take a lot longer.

Q I just want you to provide the truthful information and I will follow up to the extent that I think either my question wasn't quite clear or you didn't understand it or you didn't give an answer that I was expecting.

Do you remember the names of the people that you met who consider themselves to be associated with SEDA as an expert?

MR. TANG: Object to form.

THE WITNESS: So now we're talking about people I met as opposed to people I'm aware are

experts; is that correct?

BY MR. BLUMENFELD:

Q It is.

A I believe Peter Selman, Damiano -- I'm not going to remember their last names. I know someone named Damiano. There is another expert, his first name is Sergio. Those are all three managing partners of the firm.

I am aware that Richard Marin -- I believe it's Richard Marin -- is an expert -- it's Richard Mann, I'm sorry.

Off the top of my head, those are the names that I recall. I mean, I know there's more. I have met more; I just don't recall their names. I'm not very good with names, unfortunately.

Q Did anybody help you in connection with the preparation of this report that you submitted in this case?

A They did.

Q Did other people from SEDA help you in the preparation of your report in this case?

A What do you mean by "from SEDA"?

Q Anybody who's associated with SEDA in any capacity.

A As either a W2 or 1099 employee?

Q Or it could be -- have some other relationship with SEDA that I am not aware of.

A Alexander Huang, that's spelled -- the last name is H as in Harry, A-U-N-G (sic).

Q Anybody else?

A I'm sorry, I believe there's one other gentlemen in Italy who helped provide Alex with some data that I have not -- but I have not spoken with him. I don't recall his name as I sit here.

Q You referred to this person as Alex. Is that the name than he goes by?

A Which person are we talking about now?

Q You said that there was an individual by the name of Alex -- I thought the last name was Huang?

A That's correct.

Q Does that person go by the name Alex?

A I believe so.

Q Did you explain a moment ago that that person was coordinating with somebody in Italy whose name you don't know in helping you prepare this report?

A That's correct.

Q Okay. So my question I think that I started out with was: What did Alex do to help you

prepare this report?

A Can you go back in the deposition and see where you asked me that question? I don't recall that being asked. I want to make sure I'm giving the most precise answers as possible.

Q I'm asking it now, so you can just answer it now.

A I'm sorry, could you reask the question?

Q What did Alex do in assisting you to prepare this report?

A He helped draft the report and he helped with the calculations and putting together the exhibits.

Q Anybody else?

A I believe that's all.

Q The individual that is in Italy whose name you don't recall, what did he or she do to help you prepare this report?

A I believe they downloaded data for Alex and myself, but Alex dealt directly with them.

Q Did that person do anything besides download the data and provide that to Alex and indirectly to yourself?

A For the purpose of my report?

Q Correct.

A No.

Q Anybody else help you in the preparation of your report aside from Alex and the person in Italy?

A As I sit here, it's possible that Dylan McCabe -- I can spell that for you if you like -- may have assisted briefly. But as I sit here, I don't know for sure.

Q Who prepared the first draft of your report?

A Both Alex and I did.

Q And what was the process?

A We drafted the report.

Q Were you sitting next to each other?

A No.

Q How did the draft of the report get exchanged between you and Alex?

A I believe via email, but it may -- I'm trying to remember. I don't remember the name of the sharing program on Microsoft.

It might just be Microsoft share, but I don't -- actually as I sit here, I don't recall having actually done that. So my guess is strictly through email.

Q Do you recall if Alex sent you the first

draft of the report or if you sent him the first draft of the report?

A I don't recall as I sit here.

Q Do you know a person named Svetla Tzenova?

A I've heard that name before. I believe I've met her once, but that is speculation on my part. I'm not sure about that.

Q Do you remember anything about her other than you've heard her name before?

A I believe she had a Ph.D. and she formally worked at NERA.

Q You understand that she's associated with SEDA now?

A I do. So to the extent that you asked me about people who do work similar to me at SEDA, she would be included.

Q Do you know, does SEDA have a 401(k) plan?

A I do not know that.

Q Do you participate in any 401(k) plans?

A When you say "participate," what do you mean?

Q Are you a participant in?

A I don't know how to answer that. I'm part of CalPERS. I don't know if you put that under the 401(k) umbrella or not.

Q Do you know if CalPERS is a 401(k) plan or something else?
A I do not as I sit here today.
Q Do you participate in any other retirement plans aside from the CalPERS plan?
A I don't believe so.
Q And CalPERS, the plan that you participate in that you were referring to, is a defined contribution retirement plan?
A I believe so.
Q One where you select investment options from among the choices that CalPERS makes available?
A As I sit here, I don't recall. I joined about ten years ago, I don't remember -- I don't remember what the process was or whether or not I was given investment options.
Q Do you still have an account in the CalPERS retirement plan?
A I do.
Q Does it have investments in it?
A I don't understand the question.
Q Does your account in the CalPERS retirement plan have investments in it?
A What do you mean "investments in it"?
Q Do you hold any investments within your

account within the CalPERS retirement plan?

A I don't know how to answer that question.

Q Okay. Do you know approximately the balance in your retirement plan with CalPERS?

A I do not.

Q You have no idea?

A That's correct.

Q Okay. Do you still contribute to that retirement plan?

A I do not.

Q When did you stop contributing to that retirement plan?

A When I stopped working at Cal Poly.

Q Dr. Werner, if you look in the marked exhibits folder for Veritext, you should see hopefully a copy of your report.

(Whereupon, Exhibit 1 was marked for identification.)

THE WITNESS: Let me refresh it.

BY MR. BLUMENFELD:

Q Take your time.

A Exhibit 1?

Q Correct.

A I've opened it.

Q If you have a paper copy of your report in

front of you, you can certainly feel free to use that if that's easier for you, but the official copy will be the one that's marked as an exhibit. Understood?

A Yes. Just so you know, I don't have a paper copy in front of me.

Q Do you have any other documents in front of you?

A I have my son's medical insurance card.

Q Anything related to this case?

A No.

Q Am I correct that Exhibit 1 is a copy of your expert report in this case?

A It appears to be.

Q You submitted it on August 1st of 2024 of this year?

A That's correct.

Q Do you remember when you were first retained in connection with this case?

A I do not.

Q Can you approximate?

A Within the last two years.

Q And you cannot give me any better estimate than that?

A No.

Q Do you recall when you started working on your report in this case?
A I do not.
Q And you can't approximate that either?
A Within calendar year 2024.
Q As you sit here today, sir, do you know if plaintiffs in this case have any other experts?
A I believe they do.
Q Do you know who they are?
A Again, I believe one of them is named Richard Mann. But I can refresh my memory by looking at the firm's website. I will do that at the break, but I believe that's his name.
Q Are you aware of any other experts aside from the individual you identified as Mr. Mann? I think it's Marin by the way.
A It is Marin, thank you.
Q Sure. Any others?
A No.
Q Have you seen Mr. Marin's report in this case?
A I have not.
Q Have you seen any other expert reports in this case aside from the one from Mr. Marin?
A I'm sorry. So I haven't seen Mr. Marin's

report and I haven't seen any other reports.

I don't know if there are other reports or whether Mr. Marin has submitted a report or is still waiting to submit a report.

Q Got it.

Are you aware of the fact that defendants have submitted an expert report in this case?

A I may have been made aware of that the other day, but I don't specifically know that that is the case. I believe someone made reference to it.

Q Who made reference to it?

A One of the attorneys at Miller Shah.

MR. TANG: I want to caution you you're getting into communications between you and my colleagues.

THE WITNESS: Understood.

MR. TANG: Thank you, Doctor.

BY MR. BLUMENFELD:

Q Dr. Werner, did you see a copy of an expert report from any of the defendants' experts?

A I have not.

Q Am I right, sir, that you were retained by plaintiffs to provide an estimate of losses suffered by the Quanta plan under certain assumptions?

A Well, I mean, we might as well just read it

from my report because that will give us the most accurate answer.

So I was asked by Miller Shah "to apply a common damages methodology and provide an estimate of losses for the Quanta Services Incorporated 401(k) savings plan (the 'Plan') attributable to Class members who participated in the Plan at any time on or after September 26th, 2016. Specifically, I was asked to provide an estimate of losses suffered by the Plan under the following assumptions."

And you mentioned that I was asked to do that under a set of assumptions. I don't -- I believe that answers your question. I don't believe I need to, at least at this point, read the assumptions that I was asked to assume.

But I'm happy to if you would like me to.

Q No, that's okay. I have the report in front of me, too, so I can read it as well.

I may ask you specific questions during the course of our time today, but you don't need to read the whole report or all of Paragraph 1.

The assumptions that you include, A, B, C and D to your report, those are the only assumptions that you made; correct?

A I believe that's correct.
Q When you submitted your report on August 1st of 2024, did you know whether the plaintiffs had any other experts?
A I did.
Q And what did you know at that point in time?
A That they had at least one other expert.
Q Did you know who that expert was?
A I did.
Q You knew it was Mr. Marin?
A That's correct.
Q Did you know what Mr. Marin's opinions were?
A To the extent that they informed the assumption that I made, I believe so. But I've not seen his report, I have not spoken with him.
Q In other words, you think your supposition, maybe I'll call it, was that the assumptions you were asked to make are things that Mr. Marin was offering opinions about?
A That's correct.
Q Did you do anything to test the validity of any of the assumptions that you described in Paragraph 1 of your report?

A When you say "test the validity," what do you mean?

Q Did you do anything to see whether those assumptions, in fact, were correct or not correct?

A I am a little confused. So when you say "correct or not correct," so he's providing an opinion. My guess is the court will decide whether or not that -- those opinions are valid. Is that what you mean by "correct"?

Q I'm asking about assumptions you made, so let's skip to -- or be more specific and we'll talk about Assumption 1A in your report, which was that "The retention of the Fidelity Freedom Funds Target-Day Suite," which you called the Fidelity Freedom TDFs, "in the Plan was imprudent as of 4Q2016."

Do you see that?

A I do.

Q Did you do anything to see whether that was correct or not correct?

A No.

Q Did you do anything to see whether that was reasonable or not reasonable?

MR. TANG: Object to form.

THE WITNESS: No.

BY MR. BLUMENFELD:

Q What about the rest of the assumptions that are in Paragraph 1A, B, C and D, did you do anything to test or evaluate whether they were correct or not?

A Again, I am a little uncomfortable with your use of the word "correct." But I didn't do anything to validate those assumptions.

Q And you did not do anything to evaluate whether they were reasonable assumptions or not; correct?

MR. TANG: Object to form.

THE WITNESS: I did not -- I was not asked to determine whether they were reasonable or unreasonable.

BY MR. BLUMENFELD:

Q That's fine.

But did you?

A I did exactly what I was asked to do, as I explained in reading Paragraph 1 to Exhibit 1 of this deposition.

Q Okay. Did you do anything to test whether it was reasonable to conclude that the Fidelity target-date funds should have been replaced with the American Funds' target-date funds as of Q12017?

A Can you repeat the question, please?
Q Sure. Let's be specific about it.
I'm looking at your assumption in Paragraph 1A. You say that part of what you were asked to assume was that the plan's fiduciaries should have replaced the Freedom -- Fidelity Freedom TDFs with the American Funds' TDF R6 suite as of Q12017; correct?
A That's correct.
Q Okay. Did you do anything to assess whether that was reasonable or not?
A Excuse me. I did not.
Q In Paragraph 1B, there are other assumptions that you describe there regarding the American Beacon Small Cap Value Fund and the Janus Henderson Small Cap Value N fund; correct?
A That's correct.
Q Did you do anything to assess whether any of the assumptions that are in Paragraph 1B of your report were reasonable or not?
A I did not.
Q Okay. What about Paragraph 1C, same question?
A I did not.
Q What about Paragraph 1D?

A Can you repeat the question --
Q Sure.
A -- in full with regards to 1D?
Q Paragraph 1D of your report says that you were asked to assume, quote, "That the terminal date for all loss calculations for purposes of this Expert Report should be June 30, 2024 or Q2 2024." Correct?
A Hold on one second.
Right. So my understanding, and I'm looking now at Footnote 1 to my report -- or Footnote I to Exhibit 1 of this deposition, June 30th, 2024 reflects the last quarter end for which data was available at the time of submitting this expert report.
I reserve the right to update the calculation to losses beyond June 30th, 2024 based on subsequently available data should I be asked by counsel or the court and to include a calculation of prejudgment interest.
So I don't know whether or not that -- are you asking me is that a reasonable assumption to make? I guess I don't understand the question.
Q So the question was whether the text in your Assumption 1D which says that you were asked to

assume that the terminal date for all loss calculations for purposes of your expert report should be June 30, 2024 or Q22024; correct?

A That was read correctly, yes.

Q That's the assumption that plaintiff's counsel asked you to make?

A I don't know. To the extent that we did not have data beyond that, I believe that's correct.

Q Okay. And did you do anything to assess whether that was a reasonable assumption to make or not?

A I did not.

Q Okay. If you turn, sir, to Exhibit 2 of your expert report, which I believe is internal Page 18 of your report. Let me know when you have that.

A I'm there.

Q This Exhibit 2 to your report, which is Deposition Exhibit 1, is the list of the documents and other information you considered in preparing your report; correct?

A That's correct.

Q Okay. You don't list any expert reports on the materials that you considered, Exhibit 2 to your Deposition Exhibit 1; correct?

A That's correct.

Q And that's because you did not consider any other expert reports in forming the opinions that are reflected in your expert report; correct?

A I don't know how to answer that question.

Q Did you consider any other expert reports in forming the opinions that are reflected in your report?

A I don't -- did I consider them? To the extent that I was asked to make certain assumptions that may have been informed by someone else's expert report, I don't know how to answer that question.

Q Okay. Do you think that any other expert reports should be listed on your expert report, Exhibit 2, "Documents and Other Information Considered"?

A As I sit here today, I don't believe so.

Q I'm sorry, say that again.

A As I sit here today, I don't believe so.

Q Okay. Am I correct, Dr. Werner, that you don't consider yourself to be offering an opinion on any issues of liability in connection with this case?

A That's correct.

Q And am I correct that you're not offering

an opinion about whether the Fidelity Freedom Funds were reasonable investments for the plan?

A That's correct.

Q You're also not offering an opinion about whether the Fidelity Freedom Funds were reasonable investments for any other plan?

A I don't believe so.

Q Did you analyze whether the Fidelity Freedom Funds were reasonable or appropriate investments for the plan in 2016?

A What do you mean by "analyze"?

Q Did you undertake any steps to analyze whether the Fidelity Freedom Funds were reasonable and appropriate investments for the plan in 2016?

A So in asking you to define "analyze," you used "analyze" in your definition. So I'm not any clearer as to what you're asking.

Q Did you undertake any steps that you would consider to be analyzing whether the Fidelity Freedom Funds were reasonable and appropriate investments for the plan in 2016?

A No.

Q Okay. What about in 2017?

A No.

Q What about 2018?

A No.

Q 2019?

A No.

Q 2020?

A No.

Q 2021?

A No.

Q 2022?

A No.

Q 2023?

A No.

Q 2024?

A No.

THE WITNESS: We've been going for about a half an hour here, is now a good time to take a break?

MR. BLUMENFELD: If you would like, we can certainly do that, sure.

How much time would you need, Dr. Werner?

THE WITNESS: Five minutes.

THE VIDEOGRAPHER: Off the record. This marks the end of Media Number 1. Going off the record at 9:40 a.m. Pacific.

(Recess taken.)

THE VIDEOGRAPHER: We're back on the

record at 9:47 a.m. Pacific. This marks the beginning of Media Number 2 in the deposition of Dr. Adam Werner.

Please proceed, counsel.

MR. BLUMENFELD: Thank you.

Q Dr. Werner, you understand that we are back on the record?

A I do.

Q And you understand that you're still under oath?

A I do.

Q You have the same obligation to tell the truth as if you were testifying in front of a judge and/or a jury?

A I do.

Q Great.

Before the break, I was asking you about some of the things that I think you're not offering opinions about in your report. I want to continue with that.

In preparing your report, did you analyze whether the Fidelity Freedom Funds were reasonable or appropriate investments for any other plans in 2016?

A I don't believe so.

Q Okay. What about 2017?
A I don't believe so.
Q 2018?
A I don't believe so.
Q 2019?
A I don't believe so.
Q 2020?
A I don't believe so.
Q 2021?
A I don't believe so.
Q 2022?
A You know, at this point, I've forgotten what the original question was. Can you reread it and stick in 2022 as the date?
Q Did you analyze whether the Fidelity Freedom Funds were reasonable or appropriate investments for any other plans in 2022?
A I don't believe so.
Q What about 2023 or 2024?
MR. TANG: Object to form.
THE WITNESS: I don't believe so.
BY MR. BLUMENFELD:
Q Did you undertake any analysis of whether the American Funds' target-date fund were reasonable or appropriate investments in 2016 to 2024?

A I don't believe so.

Q Did you analyze the risks, fees, investment holdings, investment strategy, glide path or any other characteristics of the Fidelity Freedom Funds?

A Can you reread the question, please?

Q I'll ask it slightly differently.

Did you analyze the risk, fees, investment holdings, investment strategy or glide path of the Fidelity Freedom Funds?

A I don't believe so.

Q What about the American Funds, did you analyze the risk, fees, investment holdings, investment strategy or glide path of the American Funds?

A I'm sorry, I'm confused now because there's so many things in this one question and yet when we went through the dates, we went through each date.

Why don't you ask me each factor and I'll be able to give a more accurate answer to make sure I'm not missing anything?

Q Do you want me to go back and ask you the same question about the Fidelity Freedom Funds or about the American Funds?

A Both.

Q Did you analyze the risk of the Fidelity Freedom Funds?
A When you say "risk," what do you mean?
Q Any measure of risk.
A Any measure of risk? I'm sorry --
Q Yes.
A How do you define "risk"?
Q How would you define risk?
A Depends on the context.
Q Okay. In any context, did you analyze the risk of the Fidelity Freedom Funds?
A In any context? I don't believe so.
Q What about the fees of the Fidelity Freedom Funds?
A I do not believe so.
Q What about the investment holdings of the Fidelity Freedom Funds?
A I don't believe so.
Q What about the investment strategy of the Fidelity Freedom Funds?
A I don't believe so.
Q What about the glide path of the Fidelity Freedom Funds?
A I don't believe so.
Q Do you know what a glide path is?

A I believe so.
Q Tell me what your understanding is.
A It's the time span of -- "time span" might be wrong, but it's basically how a fund is -- distributes its funds through the end of its -- well, through the end of time.
Q Did you evaluate the risk of the American Funds?
A I don't believe so.
Q Did you evaluate the fees of the American Funds?
A I don't believe so.
Q Did you evaluate the investment holdings of the American Funds?
A I don't believe so.
Q Did you evaluate the investment strategy of the American Funds?
A I don't believe so.
Q And did you evaluate the glide path of the American Funds?
A I don't believe so.
Q Did you evaluate the risk of any other target-date funds?
A I don't believe so.
Q Did you evaluate the fees of any other

target-date funds?

A I don't believe so.

Q Did you evaluate the investments holdings of any other investment funds?

A I don't believe so.

Q Did you evaluate the investment strategy of any other target-date funds?

A I don't believe so.

Q Did you evaluate the glide path of any other target-date funds?

A I don't believe so.

Q Do you have an understanding, sir, of the difference between active management and passive management?

A Do I have an understanding?

Q Yes.

A Yes.

Q Did you evaluate whether the Freedom Funds were actively managed or passively managed?

A I did not.

Q Did you evaluate whether the American Funds were actively managed or passively managed?

A I did not.

Q Did you evaluate whether any other target-date funds were actively managed or passively

managed?

A I did not.

MR. BLUMENFELD: Sam, could we upload the complaint?

Q Dr. Werner, you have to be patient, it takes a couple of minutes to get uploaded, then downloaded, so --

A Okay.

MR. BLOCK: It should be there now.

MR. BLUMENFELD: Thank you.

THE WITNESS: Do I have to go back? So I have my report open, do I have to close it?

BY MR. BLUMENFELD:

Q You might be able to download a copy of your report.

A Let me try doing that, maybe that will be easier.

Okay. I've opened the complaint.

Q Do you also have your report handy?

A Hold on. I should be -- yes, I can tab back and forth.

Q Wonderful. The report is a document, not surprising to you perhaps, that we're going back and forth on several times.

So you have the complaint; correct?

A I do. Just as a point of clarification, did I miss Exhibits 2 and 3 or are we just jumping around?

MR. BLOCK: I premarked 2 and it did not update, so I'll change that during a break.

(Whereupon, Exhibit 2 was marked for identification.)

THE WITNESS: I'm okay with it, just curious.

BY MR. BLUMENFELD:

Q And the complaint is one of the documents that you say in your report you considered as you were forming your opinions in this case; correct?

A That's correct.

Q And so you read the complaint before you prepared your report?

A Correct.

Q Could you turn to Paragraph 25 of the complaint.

A Okay. I'm there.

Q The third sentence of that paragraph says, "Among its target-date offerings, Fidelity offers the riskier and more costly Freedom Funds (the 'Active suite') and the less risky and less costly Freedom Index funds (the 'Index suite')."

Do you see that?

A I do.
Q Before seeing the complaint in this case, were you aware that Fidelity offered different target-date funds?
A As a general matter, I believe so.
Q Not just different target-date funds but different suites of target-date funds like the Active suite and Index suite that are described in Paragraph 25?
A Correct.
Q Did you evaluate whether the Active suite -- first, do you understand which is the subject of plaintiff's complaint in this lawsuit?
A Well, I mean, why don't we go to the beginning of the complaint.
Can you repeat the question?
Q Let me ask the question again to make sure I get it right and you hear me correctly, Dr. Werner.
Do you have an understanding as to which target-date funds plaintiffs are complaining about in their lawsuit?
A I believe the target-date funds that I analyzed.
Q Okay. And do you see how they are

described in the complaint?

A I'm happy to read through the complaint and tell you how they are described if you give me some time.

Q Well, the complaint here, first of all, defines --

A I'm sorry, do you want me to try to answer the question or are you going to explain something to me? Are you no longer asking that question?

Q Why don't you answer the question that I am about to ask you.

A Okay.

Q The complaint in Paragraph 25 describes the Active suite and the Index suite; correct?

A Correct.

Q Okay. Do you have an understanding as to which one of those is the subject of plaintiff's complaint in this lawsuit?

A As I sit here today, I don't recall.

Q You don't know whether the funds that you're offering opinions about were the Active suite or the Index suite or something different?

A Okay. Let's -- let me read through the complaint because I've not looked at this for a little while. So it will refresh my memory and I'll be able

to give you an accurate answer to that question.
So reading from Paragraph 24 of the complaint, "All TDFs are inherently and actively managed, because managers make changes to the allocations to stocks, bonds, and cash over time."
Let me keep reading.
Q Sure.
A I believe that's my answer.
Q Dr. Werner, my question was: Do you know which target-date funds the plaintiffs were complaining about in the complaint?
A Yes.
Q Which?
A The ones that I analyzed.
Q And where do you see that in the complaint?
A Hold on.
I'm sorry. I gave you the answer to the question. And now what do you want me to look at the complaint for?
Q Do you know whether plaintiffs are complaining about the Active suite or the Index suite or something else?
A I believe it's -- to the best of my recollection, it's the Active suite. But I remember

seeing mention of the index funds well. But I believe to the best of my recollection it's the active funds.

Q Okay. And you quoted before some language from Paragraph 24 of the complaint. And the language you quoted was the middle of that paragraph which says, "All TDFs are inherently actively managed, because managers make changes to the allocations to stocks, bonds, and cash over time." Correct?

A Correct.

Q Am I right that you were reading that before, you're not offering that as your opinion in connection with this case?

A That's not my -- I mean, I don't agree or disagree. I mean, I understand the statement. Do I agree or disagree with it? I agree with it.

Q Did you offer that opinion in your report?

A I did not.

Q Okay. Did you analyze that?

A "Analyze" meaning what?

Q Did you do anything to analyze whether it was correct or not correct?

A That all funds are actively managed by definition?

Q Yes.

A I don't understand the question.

Q What about the question don't you understand?

A I don't understand the question. I mean, what analysis are you referring to? Under what definition of analysis?

Q Any definition of analysis.

A Just thinking, is that considered an analysis?

Q Sure.

A So I read that statement, I thought about it, it seemed reasonable. If that falls under the umbrella of analysis, then I suppose I did perform an analysis as you've defined it.

Q And that's an analysis that you did when you were preparing your report?

A What I was -- was that -- again, this is under your definition of analysis where thinking is considered an analysis, did I consider that when I was preparing my report, yes. Did I consider it as I sit here today reading that sentence, yes.

Q You don't include anything about that in your report, though; correct?

A I don't believe so. But that's not the question you asked me.

Q It's the question I'm asking you now.
A So are we going to focus on my report or are you going to ask me questions about analyses or thoughts that I have?
Q Dr. Werner, my job is to ask you questions today. Your job is to answer them and to do so truthfully.
A Okay. Well, to the extent that you're asking very vague questions, it's difficult to answer some of them.
So if you tell me that analysis includes things like thinking, we're going to get into a philosophical conversation about what the definition of "analysis" is.
And, I mean, I'm sitting here, I'm thinking about this deposition, does that mean I'm analyzing the deposition as you've defined analysis?
Q Can you turn to Paragraph 41 of the complaint.
A I'm sorry, what paragraph?
Q Paragraph 41.
A I'm there.
Q The first sentence says, "Even a minor increase in a fund's expense ratio can considerably reduce long-term retirement savings."

Do you see that?

A I do.

Q Did you include any sort of analysis of that in your report?

A Strictly within my report but not thinking about -- I mean, I understand this statement. Sticking with the report, I don't believe so.

Q Okay. The second sentence says, "The fees charged by the Active suite are many multiples higher than the Index suite's industry-leading low fees."

Do you see that?

A I do.

Q Okay. Did you include anything in your report analyzing that?

A I don't believe so.

Q The next sentence says, "While the Institutional Premium share class for each target year of the Index suite charges a mere 8 basis points, (0.08 percent), the K share class of the Active suite - which the Plan offers - has expense ratios ranging from 42 basis points (0.42 percent) to 65 basis points (0.65 percent)."

Do you see that?

A I do.

Q Okay. And did you do anything in your report to analyze any of the information contained in the allegations in that sentence of Paragraph 41?

A I don't believe so.

Q Okay. There's also a chart in Paragraph 41 that has ticker symbols of the Fidelity Freedom Funds that the complaint is alleging the plan offers; correct?

A That's my understanding.

Q And it also has separate ticker symbols for the Index suite?

A I'm sorry, where are you looking?

Q The same chart, Paragraph 41.

A What was the question?

Q The question I was just asking is whether the chart in Paragraph 41 also includes ticker symbols for the Index suite?

A As I sit here today, I don't know.

Q Do you see the chart that says "Cost Comparison"?

A I do.

Q Okay. Do you see the leftmost column is entitled "Freedom Suite"?

A I do.

Q And then the next column over is "Ticker";

right?

A Right.

Q And the next column over is "Expense Ratio"?

A Correct.

Q The next column over is the "Freedom Index Suite"?

A Correct.

Q And then the next column over is the "Ticker"?

A Correct.

Q So you understand that that column is showing the ticker symbol for the Freedom Index suite; correct?

A That's my understanding.

Q Okay. And the second column from the left is showing the Fidelity Freedom Funds that were in the plan and ticker symbols that plaintiffs were complaining about?

A I believe that is correct.

Q Could you turn to Paragraph 29 of the complaint.

A Okay. I'm there.

Q Have you had a chance to read that?

A I have.

Q The first sentence of Paragraph 29 says that "The Active suite and the Index suite are sponsored by the same investment management company and share a management team." Correct?
A That's correct.
Q Okay. And in preparing your report, did you do any analysis of whether that was true or not?
A I did not. I have no reason to think it's not correct. But I did not independently verify.
Q And Footnote 3 to Paragraph 29 identifies the name of the people who the complaint alleges were managing both the Active suite and the Index suite?
A That's correct.
Q The second sentence in Paragraph 29 says, quote, "But while the Active suite invests predominantly in actively managed Fidelity mutual funds, the Index suite places no assets under active management and instead invests in Fidelity funds that simply track market indices." Correct?
A You read that correctly.
Q Did you do anything in your report to analyze whether that sentence of Paragraph 29 is true?
A Within my report, no.

Q Did you do something aside from your report to evaluate whether that was true or not?
A Well, now we're talking is this thinking include -- does that fall under the umbrella of evaluating or are we separating evaluating from analyzing?
Q Did you think about this sentence in Paragraph 29?
A Have I thought about it, yes, I've thought about it.
Q Do you consider what you did to be evaluating whether the Active suite invests predominantly in actively managed Fidelity mutual funds?
A I'm sorry, can you repeat the question?
Q Let me try and be more clear about it.
Did you evaluate whether the Active suite invests predominantly in actively managed Fidelity mutual funds?
A Where thinking is under the rubric of evaluation, I have thought about it, but I haven't included any opinions about that in my report.
Q Okay. When you thought about it, what did you understand to be the percentage of investments in the Active suite that were actively managed

Fidelity mutual funds?

A I'm sorry, can you repeat the question?

MR. BLUMENFELD: Lynne, can you read that question back?

(Requested testimony read by the reporter.)

THE WITNESS: I did not think about that.

BY MR. BLUMENFELD:

Q Do you know how much the Active suite invests in actively managed Fidelity mutual funds?

A As I sit here today, no. It's possible. But again, the key word being "possible."

If I'm looking at Footnote 4, it says, "Per Morningstar, the Active suite's underlying holdings are 88.8 percent actively managed, by asset weight."

But that's nothing I thought about or that -- and in no way did that inform my opinion --

Q You did not --

A -- that I express here in my report.

Q I'm sorry, I didn't mean to talk over you. Say what you said again.

A I don't recall what I said.

Q Okay.

A It is that -- my understanding of that is not reflected in my report and has not affected any

opinions that I provided in my report.

Q Okay. And the next sentence says that the Index suite -- the next part of the sentence says, "the Index suite places no assets under active management."

Do you know whether that's true or not?

A I don't know one way or the other whether that's true.

Q And you did not evaluate that issue in preparing your report?

A In preparing my report, no.

Q And you did not evaluate that issue at any point since preparing your report?

A Again, I don't want to get into semantics here. If we're talking about -- if thinking is under the umbrella or the rubric of evaluating, as I sit here today and I'm reading this, I suppose by definition I'm thinking about it. So I don't quite know how to answer that question.

Again, this deposition is about my report. These sentences -- or the questions you're asking me have not informed my opinion or impacted the opinions I've presented in my report.

Q As you sit here today, you don't know if the Index suite places no assets under active

management or not?

A As I sit here today, I do not.

Q Dr. Werner, I think I might have covered this in an earlier question, but I'm not entirely sure.

Did you look at the performance of the Index suite?

A Did I look at the performance of the Index suite?

I don't believe so. Not that I recall.

Q You did not do any analysis comparing the performance of the Active suite to the Index suite?

A I did not, in preparing my report.

Q Did you do that at any other time?

A I mean, to the extent, again, that we're talking about it now and thinking -- you've decided that evaluating or analyzed something includes thinking about it.

To the extent I'm reading it, my brain is thinking about it. So I suppose I'm evaluating it now.

But it doesn't inform my opinions about my report, which is really what this deposition is about to the best of my understanding.

Q And having thought about it now in the

course of this deposition, do you have an understanding as to whether the Active suite or the Index suite has performed better?

A That has no bearing -- have I thought about it? I've thought about it. It doesn't affect my opinion in any way, shape or form.

Q Do you have an understanding of which one has performed better?

A In general?

Q Yes.

A Again, it hasn't impacted -- my understanding or non-understanding of that doesn't affect my opinion with regards to anything I've written in my report.

Q I understand that you're saying that. My question was a little bit different, though.

Do you have an understanding as to whether which has performed better, the Active suite or the Index suite?

MR. TANG: Object to form.

THE WITNESS: Right. What do you mean by "better"?

BY MR. BLUMENFELD:

Q Better performance.

A Right. What do you mean? There are two

components of performance, right, return and risk. I suppose also cost. So what do you mean?

Q You identified I think three factors that you say impact whether something is better than another, risk, cost and performance?

A Well, those would be things that I would take under consideration if I was trying to evaluate a fund.

Performance as you mentioned it, but again, this has nothing to do with my report.

Q I'm just asking you questions --

A To the extent that this -- this is outside the scope of my report.

Q And so you don't have an opinion as you sit here today as to whether the Active suite or the Index suite was better; correct?

A Again, how do you define "better"?

Q You identified three ways, risk, cost and performance?

A Those are three components that could go into the definition of better, but I'm asking for your definition of better.

Q Have you evaluated the Active suite versus the Index suite on any of those?

A Evaluate means thinking about it? Again,

for the purposes of preparing my report, no.

Q Okay.

A Why don't we stick with that? Since this is a deposition about my report, I'll stick to answering questions about my report.

Q So that's not the way this works, Dr. Werner. I get to ask you questions and you have to answer them. One of the materials you said you relied upon --

MR. TANG: You're asking questions outside his report. You're repeatedly quizzing him on the complaint. What is the purpose of this?

MR. BLUMENFELD: Asking him about the complaint you're saying is inappropriate, Kolin?

MR. TANG: You're repeatedly asking him about items that are not related to his report. You're asking him to form opinions about the complaint --

MR. BLUMENFELD: I'm not asking him to form opinions about things. He's been perfectly fine telling me all of the times that he doesn't have an opinion about things or didn't analyze certain things and that's fine.

But I'm entitled to an answer to my question.

Q So, Dr. Werner?
A What?
Q Did you evaluate whether the Active suite or the Index suite was better when it comes to risk, cost or performance?
A For the purposes of preparing my report, I did not.
Q Did you in any other context?
A For the purposes of preparing my report, I did not.
Q I understand that. That's not the question that I asked.
A Well, again, see, you and I are going back and forth about context, analysis, evaluate. You've given an extremely broad definition of evaluate and analysis to include the process of thinking.
So, again, have I thought about it, I'm thinking about it right now. But with regards to my report, it's not something that affects my opinion in the report that I provided for this case, which is, to my understanding, what this deposition is about.
Q Have you looked --
A I understand that you can ask questions and that's -- but to the extent you're asking about things

that are outside of the scope of my report, I don't -- to the best of my understanding, I don't have to answer them.

Q That's not true, Dr. Werner. I'm allowed to ask you questions and you are obligated to answer them.

A I'm obligated to answer to the best of my ability.

Q Correct.

A Right? So -- okay. I'm sorry, go ahead. You know what, let's take a break. Now is a good time for a break.

Q How much time would you like, Dr. Werner?

A Let's do ten minutes.

THE VIDEOGRAPHER: Okay. Going off the record. This marks the end of Media Number 2. Going off the record at 10:31 a.m. Pacific.

(Recess taken.)

THE VIDEOGRAPHER: We're back on the record at 10:41 a.m. Pacific. And this marks the beginning of Media Number 3 in the deposition of Dr. Adam Werner.

Please proceed, counsel.

MR. BLUMENFELD: Thank you.

Q Dr. Werner, do you understand that we are

back on the record?

A I do.

Q And you understand you're still under oath?

A That's my understanding.

Q And you have the same obligation to tell the truth as if you were testifying live in front of a judge or a jury?

A That's my understanding of what under oath means.

Q Okay. Dr. Werner, did you do any comparison of the performance of the Freedom Funds against the Freedom Index Funds?

A For the purposes of preparing my report, I did not.

Q Okay. Aside from for purposes of preparing your report, did you do that?

A I don't know how to answer that question.

Q Did you look at the performance of the Fidelity Freedom Funds, what the complaint calls the Active suite, and compare that to the performance of the Freedom Index Funds, what the complaint calls the Index suite?

A Again, for the purpose of preparing my report, I did not.

Q Okay. Aside from that, have you ever done that?

A I don't know how to answer that question.

Q How about this, prior to --

A I don't know how to answer that question.

You've been asking all sorts of vague questions that are not sort of based around my report. You're saying thinking is analyzing, all sorts of things fall under the umbrella of analyzing.

We're here to talk about this report. And so when you tell me thinking is analyzing and you ask me about right now, I'm thinking about it.

Q Okay.

A That's your definition, not my definition. I'm trying to give the most accurate answers that I can and so that you're giving me some like let's look at everything. Let's look at the entire world and say is this possible. How does that affect your opinion?

My fan is on, does that affect your opinion? Well, am I thinking about the fan being on, yes, I'm thinking about the fan being on.

Does that have anything to do with my report, no. But am I thinking about it, yes, I'm thinking about it, yes. Is that analyzing it?

Well, I guess I've analyzed the fan.

Q Dr. Werner, before today, did you do any analysis of the performance of the Fidelity Freedom Funds that the complaint calls the Active suite versus the Fidelity Index Freedom Funds, which the complaint calls the Index suite?

A I did not.

Q Okay. Before today, did you do any analysis comparing the performance of what the complaint calls the Active suite against Vanguard target-date funds?

A I did not.

Q Okay. You know the complaint identifies several alternative target-date fund suites that the plan should have offered instead of the Fidelity Freedom Funds?

A I don't know that one way or the other as I sit here today.

Q You don't remember what the complaint says about that?

A I don't recall as I sit here today.

Q Do you have the complaint in front of you still?

A I do. No, I don't. Hold on.

Q During the break, Dr. Werner, I believe we

removed the complaint that had the Exhibit 4 sticker and added one that had the Exhibit 2 sticker.

A Okay.

Q Turn to Paragraph 47, if you would.

A Oh, Paragraph 47. Sorry. Okay.

Q Do you see that Paragraph 47 identifies target-date funds from American Funds, J.P. Morgan, T. Rowe Price and Vanguard?

A I believe that's correct.

Q Prior to today, did you do any analysis comparing the performance of the Freedom Funds with what the complaint calls the Active suite against the Vanguard target-date funds?

A For the purposes of preparing my report, it did not impact this analysis or this chart did not impact my opinions.

Q I know you didn't do an analysis in your report comparing the returns of the Fidelity Freedom Funds against the Vanguard target-date funds or the J.P. Morgan target-date funds or the T. Rowe target-date funds; correct?

A I'm sorry, you lost me. What did you say?

Q Dr. Werner, in your report you don't do any analysis comparing the performance of the Fidelity Freedom Funds against the J.P. Morgan

target-date funds; correct?

A Within my report, that's correct.

Q Okay. In your report, you don't do any analysis comparing the performance of the Fidelity Freedom Funds against the T. Rowe target-date funds; correct?

A I believe that's correct.

Q In your report you don't do any analysis comparing the performance of the Fidelity Freedom Funds against the Vanguard target-date funds; is that correct?

A I believe that's correct.

Q In your report you don't calculate any losses or damages associated with the performance of the Fidelity Freedom Funds relative to the J.P. Morgan target-date funds?

A Relative to the J.P. Morgan target-date funds, I believe that's correct.

Q In your report you don't do any analysis calculating any losses or damages comparing the performance of the Fidelity Freedom Funds against the T. Rowe price target-date funds; correct?

A I believe that's correct.

Q You also in your report do not do any analysis comparing the performance of the Fidelity

Freedom Funds against the Vanguard target-date funds for purposes of calculating any losses or damages?

A I believe that's correct.

Q Now, aside from what is contained in your report, did you do any calculation of losses or damages by comparing the performance of the Fidelity Freedom Funds against the J.P. Morgan target-date funds?

A I'm sorry, did you ask me about the American Funds and the Fidelity Freedom Funds? I just want to make sure that we're on the same page.

I'm sorry, what was your question?

Q My question, sir, was whether, aside from what's contained in your report, you did any calculation of losses or damages associated with the Fidelity Freedom Funds in the plan relative to the J.P. Morgan target-date funds?

A I assume by calculation you mean a mathematical calculation? Outside of the realm of me -- again, if you want to say calculation includes thinking, I can look at this and say, I can compare these two returns and I can calculate the difference.

Again, it did not impact -- I can do that. It did not impact my report. So I don't know.

Is that -- when you say "calculate," do

you mean what normal people call calculating or do you include, again, this sort of broad definition where thinking is included in things like analysis? I don't know if thinking is included in calculating or not.

Q Okay, Dr. Werner. Let's use what you understand most people think of as calculating.

A Okay.

Q Okay. Now can you answer my question?

A If you reask it, I can.

Q Aside from what's in your report, did you do any calculation of losses or damages associated with the Freedom Funds in the plan as compared to the J.P. Morgan target-date funds?

A I did not.

Q Now, aside from what's in your report, did you do any calculation of damages or losses comparing the Fidelity Freedom Funds in the plan to the T. Rowe target price funds?

A I did not.

Q Aside from what's in your report, did you do any calculation of losses or damages comparing the performance of the Vanguard target-date funds to the Fidelity Freedom Funds that were in the plan?

A I did not.

Q We're looking at Paragraph 47 of the complaint; correct?
A I believe so.
Q That has returns as of Q22016 all the way through five-year returns Q22016; correct?
A I'm sorry, where are you looking? I'm not seeing that.
Q Are you looking at Paragraph 47?
A I am.
Q Okay. So if you look at what is PDF Page 23.
A PDF Page 23.
Q Just the start of the charts.
A Okay.
Q You see it says "Three-Year Annualized Returns as of 2Q2016"?
A I do.
Q And then it has "Five-Year Annualized returns as of Q22016"?
A Yes, that's what I see.
Q The time period that you analyzed in your report is after this time period; correct?
A What do you mean "after this time period"?
Q After Q2 of 2016.
A After Q22016, let's go to my report.

Looking at Exhibit 3, I believe that's correct. I should say that's Exhibit 3 to Exhibit 1 of this deposition, just for clarification.

Q Dr. Werner, you're referring to Exhibit 3 to your report?

A Exhibit 3 to Exhibit 1 of this deposition, correct.

Q Got it. Thank you.

Is there a reason that you did not calculate any potential losses or damages by comparing the performance of the Fidelity Freedom Funds to the J.P. Morgan, T. Rowe Price or Vanguard target-date funds or Fidelity Index target-date funds?

A Can you repeat the question, please?

Q Is there a reason that you did not calculate any losses or damages by comparing the performance of the Fidelity Freedom Funds to the J.P. Morgan, T. Rowe Price, Vanguard or Fidelity Freedom Index target-date funds?

A That was not something I was asked to do, so it's outside the scope of my report.

Q In your report, Dr. Werner, you don't offer any opinion about the fiduciary process that was utilized by the Quanta plan fiduciaries in this

case; correct?

A That was outside the scope of my report.

Q Okay. Do you consider yourself to be an expert in connection with the fiduciary process used by plan fiduciaries when selecting and monitoring investment options?

A I don't believe that's something I've been retained to do in this case.

Q Putting aside this case, do you consider yourself to be an expert in that?

A In the common parlance of expert, so not within your -- what you might consider an expert, let's just go with the average person considers an expert, I don't believe so.

Q You also offer some opinions on the American Beacon Small Cap Value Fund; correct?

A I believe that is correct.

Q Okay. In connection with your report, did you analyze the risk, fees, investment holdings or investment strategy of the American Beacon Small Cap Value Fund?

A That was not something I was asked to do.

Q So you did not?

A I've only done what I was asked to do. Yes, by tautology, your statement is correct.

Q Did you analyze whether the American Beacon Small Cap Value Fund was a reasonable or appropriate investment option in 2019 or 2020?

A That was not something I was asked to do for this report.

Q Is it something you think you would be qualified to do as an expert?

A Could you reread the question, please?

(Requested testimony read by the reporter.)

THE WITNESS: Now you're asking me is that something I'm qualified to do?

BY MR. BLUMENFELD:

Q Correct.

A That's not anything I've ever given any thought to.

Q As you sit here today at least, you don't consider yourself to be an expert in doing that sort of work?

A I believe that is correct.

But I'm sorry, there's so many questions here, can you reread the original question, then I'll think about it in terms of whether or not I believe I'm qualified to do that.

(Requested testimony read by the reporter.)

THE WITNESS: That's not something I was

asked to do for this report. Am I qualified to do it, I don't know. Again, qualified by who?

BY MR. BLUMENFELD:

Q Do you consider yourself qualified to do that?

A That's not anything anyone has asked me to do.

Q Okay. Can you answer my question?

A Do I -- so why don't you just ask me the question, am I qualified to do what?

Q Do you consider yourself qualified to analyze whether the American Beacon Small Cap Value Fund was a reasonable or appropriate investment option in 2019 or 2020?

A So beyond -- I mean, I don't know how to answer that. I have a Ph.D. in finance, I've taught finance.

Qualified according to who? According to me? I don't know how to answer that question.

Q I said qualified according to you.

A I don't know how to answer that question. That's not anything I've ever thought about prior to you asking about it.

Q As you sit here today at least, you don't qualify yourself qualified to offer opinions on

whether the American Beacon Small Cap Value Fund was a reasonable or appropriate investment option in 2019 or 2020?

MR. TANG: Misstates prior testimony.

THE WITNESS: I defer to my previous answer. I don't believe that's what I said.

BY MR. BLUMENFELD:

Q Tell me what you did say because I thought you did.

THE WITNESS: Could you reread my previous answer, please?

(Requested testimony read by the reporter.)

THE WITNESS: I still don't know how to answer that question.

BY MR. BLUMENFELD:

Q And to be clear, I'm saying: Do you consider yourself to be qualified?

MR. TANG: Asked and answered.

THE WITNESS: What does that mean? Do I consider myself to be qualified? I don't understand that. Qualified with regards to who?

BY MR. BLUMENFELD:

Q Do you consider yourself qualified to offer expert opinion on damages and losses in this case?

A I do.

Q Do you consider yourself qualified to be able to offer opinions on whether the American Beacon Small Cap Value Fund was a reasonable or appropriate investment option for the Quanta plan in 2019 or 2020?

A So that's not anything I've ever thought about prior to you asking me that question. So I don't know how to answer it.

Q You also offer opinions in your report on the Janus Henderson Small Cap Value Fund; correct?

A That's correct.

Q Did you analyze the risks, fees, investment holdings, investment strategy of the Janus Henderson Small Cap Value Fund?

A That was not something I was asked to do for the purposes of submitting my report.

Q You offer in your report opinions on the DFA International Small Cap Value Fund; correct?

A Correct.

Q Did you analyze the risks, fees, investment holdings or investment strategy of the DFA International Small Cap Value Fund?

A That was not something I was asked to do in submitting this report.

Q So you did not?

A That was not something I was asked to do for the purposes of submitting my report.

Q And you only did the things that you were asked to do?

A Well, let's go back to what my assignment was.

So going back to Paragraph 1 of Exhibit 1 to this deposition, "I was asked by Miller Shah, counsel for the Plaintiffs in the above-captioned litigation against Quanta Services Incorporated ('Quanta' or 'Defendant') to apply a common damages methodology and provide an estimate of losses of the Quanta Services Incorporated 401(k) Savings Plan (the 'Plan') attributable to Class members who participated in the Plan at any time on or after September 26th, 2016."

Q Did you analyze the risks, fees, investment holdings or investment strategy of the DFA International Small Cap Value Fund?

A That was not something I was asked to do for purposes of providing my report in this case.

Q I'm not asking what you were asked to do. I'm asking whether you did it or not.

Whether it was asked of you or not, did

you do it?

A I completed my assignment as I stated it to you. But I mean, I can reread Paragraph 1. That was my assignment. That's what I did.

Q So things that aren't in your list of what you were assigned to do, you did not do?

A If I was not asked to do something, I did not do it.

Q And the only thing you were asked to do is contained in Paragraph I?

A I believe that's correct as of this date, yes.

Q You offer in your report opinions on the Schwab Fundamental International Small Cap Equity Index Fund; correct?

A I believe that's correct.

Q Okay. Did you analyze the risks, fees, investment holdings or investment strategy of the Schwab Fundamental International Small Cap Equity Index Fund?

A That was not something I was asked to do.

Q Because you weren't asked to do it, you did not do it?

A By definition, I believe that's correct.

Q Have you ever served as an investment

consultant to any ERISA plans?
A No.
Q Have you ever served as a fiduciary for any ERISA plans?
A No.
Q Have you ever served as an investment consultant for any non-ERISA plans?
A I don't believe so.
Q Have you ever served as a fiduciary for any non-ERISA plans?
A No.
Q In Paragraph 1 of your report, you say that you were asked to apply a common damages methodology?
A Correct.
Q What do you mean by that?
A A damage methodology common to all plaintiffs.
Q How do you know that the damages methodology you applied is a common one to all plaintiffs?
A There is no other reason for me to --
Q Maybe I misunderstood.
Did you finish your answer, Dr. Werner?
A Go ahead, I'm sorry, I guess I don't

understand what you're asking.

Q When you say "common damages methodology," you're referring to common as among all of the participants in the Quanta plan?

A A methodology that could be used to calculate damages for all people in the plan, yes.

Q You're not referring to a damages methodology that is common among plaintiffs in ERISA litigation class actions?

A I don't -- I've not -- that's not something I've thought about as I sit here today.

Q You don't know whether your damages methodology is used by anybody else in any other cases?

A I mean, I used a -- I haven't looked at it in awhile. I used a similar methodology, to the best of my recollection, in the Genworth matter.

I've seen other reports from other experts in other cases that have applied similar methodologies to the ones I've used here.

Q What other cases?

A As I sit here today, I cannot recall.

Q You cannot identify any of the other cases where somebody else has used a methodology that's similar to what you used in this case?

A Correct.

Q And just to be clear, when you said in Paragraph 1 that you were asked to apply a common damages methodology, you were referring to common as among all the participants in the Quanta plan, not common that this is the way others would calculate damages in a similar circumstance?

A I don't think that's what I said.

Q Okay. Correct me then.

A I defer to my previous answer. It's just -- I mean, I don't want to say this is a common sentence that I submitted on my -- many of my reports, but I'm not sure what the misunderstanding about this is.

Q Well, you say in Paragraph 1 that you were asked to apply a common damages methodology; correct?

A That's correct.

Q I'm trying to understand what you meant by that. How about that, tell me what you mean by that.

A I don't know why I'm having problems with this, but I just -- it's the way I would normally use it. It's a methodology that can be used.

Q And you said it's similar to the methodology you used in the Genworth case; correct?

A That's correct, and as I also stated, similar to the methodology I've seen used in other cases.

Q Right. But you can't identify any other cases where that similar methodology has been used aside from by you?

A That's correct.

Q Are there portions of your opinion in your report where you believe you've exercised judgment?

A Well, I mean, yes, I developed the model -- looking at Footnote 4 to my report, it points to some places where I actually make -- where I make use of judgment.

So I guess the answer to your question is yes.

Q Aside from Footnote 4?

A Well, that wasn't my only answer, was it?

Q You said you developed the model?

A Right.

Q And --

A But that's not contained in Footnote 4.

Q And developing the model you believe required you to exercise judgment?

A Yes.

Q Anyplace else?

A As I sit here today, I don't know. I can't think of anything else.

Is that true? I don't know that that's true.

So I developed the model, I had to make some assumptions about funds with regards to the assumptions I made with regards to Footnote 4. Is there anything else?

I chose not to include the prejudgment interest in my calculation.

(Reporter clarification.)

THE WITNESS: I would guess that's a judgment call.

I don't recall whether or not that was something I was told to do or determined on my own. So I would have to think more about that.

BY MR. BLUMENFELD:

Q Am I correct, Dr. Werner, you don't remember as you sit here today whether you decided not to include prejudgment interest in your calculation or whether you were told to do that by plaintiff's counsel?

A That's correct. I believe I was told to by plaintiff's counsel, but I don't know as I sit here today.

Q Okay. You could have included prejudgment interest in your calculations if you wanted to and you were given the direction to do so?

A Hold on one second. So I'm sorry, could you reask your question?

Q You could have included prejudgment interest in your calculations; correct?

A Is it possible? It's possible I could have done that, yes.

Q You did not and you don't remember whether you did not because you decided not to or because plaintiffs counsel told you not to; correct?

A As I sit here today, I don't recall.

Q Okay. Either way, it was a choice either by you or plaintiff's counsel that led to you not including prejudgment interest in your report?

A That's correct.

Q Could you turn to Paragraph 2 of your report?

A Okay.

Q In Paragraph 2 of your report, you say, "I understand that as an expert witness in this proceeding, my duty in providing my Report is to the Court and that this duty overrides any obligation to the parties who have engaged me, from whom I have

received instructions or compensation. I confirm that I have complied with this duty."

Did I read that correctly?

A That's correct.

Q And you believe that that is true?

A I do.

Q Okay. What do you understand your duty to the court is?

A My duty is to provide a report.

Q That's it?

A In my understanding of the word "duty," yes. I understand I have to tell the truth. I don't know if that's included under your definition of duty.

So my understanding of duty is that my duty is provide an independent report to the court.

Q As far as you're concerned, the obligation that you believe you have under Paragraph 2 as you describe it is to provide an independent report to the court?

A To provide a report.

Q It does not have to be independent?

A Look, I mean, I don't know why this is some kind of controversial statement. If you want to include things like -- I mean, let's go up to my -- the beginning of my report.

"I declare and state under penalty of perjury that the following is true and correct to the best of my knowledge, information and belief. If called to testify, I could and would testify competently to the following facts."

Is that included under duty? I don't know. But if you want to include that as part of duty, I believe that's also my duty.

Q You wrote Paragraph 2; correct?

A I did.

Q Okay. What I'm trying to understand, sir, is what you meant when you wrote Paragraph 2?

A I just meant the common use term of the word "duty."

Q Which is to provide a report?

A Well, I mean, since we're getting -- I mean, I also again -- yes, it's to provide a report but in doing so, right, I have -- I declare and state under penalty of perjury that the following is true and correct to the best of my knowledge, information and belief.

Is that a duty? I don't know. It's what I've done, so I don't know -- I mean, do I consider that part of the duty? I don't know how to answer that question. That's not anything that anyone's

ever asked me before.

Q Okay.

A In the over 50 depositions I've given.

Q You include this paragraph -- do you include this paragraph in all of your reports?

A Which paragraph?

Q Paragraph 2 that I have been asking you about and you've been answering about.

A So not the declaration at the beginning, I believe that is true.

Q And do you believe that part of your duty as reflected in Paragraph 2 is to be -- to have a duty of candor to the court?

A Candor -- well, I think that falls under true and correct.

Q Okay. And you believe that your report in this case complies with whatever duty you believe you have?

A I believe that's correct.

Q Do you believe that your duty of candor -- excuse me, let me restate that question.

Do you believe that the duty reflected in Paragraph 2 also includes a duty to include all of the assumptions that you make in connection with your report?

A I believe that's correct.

Q Do you believe that the duty you have in Paragraph 2 also includes a duty not to hide things in your report or the supporting materials?

A What do you mean by "hide things"?

Q The common understanding of the word "hide."

A Why don't you tell me what the common understanding of hide is. Like hide and go seek? You define hide for me and then I'll answer the question. I don't know what the common definition --

Q How would you define hide?

A I don't know how to define it. In what context? You're using the term, so explain to me what you mean.

Q Okay. Do you understand, sir, that you have a duty, as reflected in Paragraph 2, not to obfuscate information from the court?

A What do you mean by "obfuscate information from the court"?

Q You don't know what that means?

A No, your question, I don't understand what you mean by your question.

Q Okay. That's fine.

Do you understand that your duty as

reflected in Paragraph 2 includes a duty not to misrepresent things in your report?

A What do you mean by "misrepresent"?

Q You're not sure what the word "misrepresent" means?

A I don't know what you mean by the term "misrepresent."

Q Okay. Do you have an understanding of what the term "misrepresent" means?

A I believe I do.

Q Using your understanding of what the term "misrepresent" means, do you believe that the duty you described in your report, Paragraph 2, includes a duty not to misrepresent things?

A Again, that's -- that's not anything I've ever been asked before in over 50 depositions. I mean, do I have a duty to do that, I guess so. I don't know.

I mean, why don't you tell me what you mean by misrepresent and then I'll try to answer your question.

Q That's okay. I think your answers are pretty clear.

I have a question for you about Exhibits 3 through 8 in your report.

A Okay.

Q Can you turn to Exhibit 3 to start?

A Yes, I'm there.

Q Okay. This is a PDF copy of a spreadsheet; correct?

A That's correct.

Q And you provided the spreadsheet in connection with the backup materials that you provided to us?

A I believe that's correct.

Q The spreadsheet itself was a live spreadsheet that you provided; in other words, it has the numbers in it and it calculates things based on those numbers; correct?

A So you mean the Excel spreadsheet?

Q Yes.

A Correct.

Q And it's the Excel spreadsheet itself that you used to calculate the losses that you describe in your report and then you printed a more legible version of that as a PDF to include as Exhibits 3 through 8 of your report; correct?

A We can argue about legible, but I believe that's correct.

Q Okay. And the way that the actual

spreadsheets operate that you provided to us as the backup materials, you could change some of the inputs and it would change the outputs that it was -- it would change the damages or losses if you change the inputs; correct?

A That's correct.

Q Exhibit 3 in particular, did you personally type this information in?

A I did not.

Q Who did?

A I believe -- I mean, I don't know -- alexander Huang would have been in charge of that. I don't know if he actually went in and typed in each one of these numbers.

My guess is that's what happened. But I don't know as I sit here today.

Q Okay. You're not sure if he did it or if somebody else did it and gave it to him?

A I'm pretty sure he did it.

Q Okay. Did you do any comparison of the information that is in Exhibit 3 compared to the underlying documents?

A I did not.

Q Let's switch to Exhibit 4, which is the next page of your report.

A Okay.
Q Is this information that you personally typed in to Exhibit 4?
A It is not. That's going to be -- I'm sorry, I'll stick with that. I did not.
Q Okay. Did you do anything to validate whether the information contained in Exhibit 4 was correct or not correct?
A I did not. When I'm answering that, I mean I personally did not do that.
Q Right. Somebody on your team might have done that?
A Correct.
Q Do you know if somebody on your team did it?
A I don't know as I sit here today. I would be surprised if they did not.
Q Can we go back to the assumptions that are in Paragraph 1, A, B and C.
A Okay.
Q So if the assumptions that are derived in A, B and C turn out not to be correct, then the analysis of claimed losses would also have to change; correct?
A So I'm sorry, could you reread the question,

please?

(Requested testimony read by the reporter.)

THE WITNESS: What do you mean by "correct"? Correct according to who, the court? Who am I -- who are you referring to?

BY MR. BLUMENFELD:

Q Well, let's start with the court.

If the court says that the assumptions that are contained in Paragraph 1A of your report are not correct, then the conclusions that you reached based on those assumptions would have to be changed; correct?

A I believe that's correct.

Q The same with the assumptions that are listed in 1B?

A I believe that's correct.

Q And the same with the assumptions that are in 1C?

A I believe that's correct.

Q And if plaintiffs came to you and said, we want you to change the assumptions, then the conclusions that you reached in your report also would have to change; correct?

A I believe that's correct.

Q Did you also assume that aside from the

changes that are listed in A, B and C of Paragraph 1 that the plan otherwise would be managed in exactly the same way it was and would still have exactly the same investments that it otherwise had?

A Can you reread that question, please?

(Requested testimony read by the reporter.)

MR. TANG: Object to form.

THE WITNESS: What do you mean by "changed"?

BY MR. BLUMENFELD:

Q Well, in Paragraph 1A, you describe changing from the Fidelity Freedom Funds target-date suites to the American Funds; correct?

A I'm sorry, can you reread that question?

Q Let me restate it.

In Paragraph 1A of your report, you say you were asked to assume that the plan fiduciary should have replaced the Fidelity Freedom target-date suite with the American Funds; correct?

A Okay. You mean -- that's correct.

Q And in Paragraph 1B, you say you were asked to assume that the fiduciaries should have replaced the American Beacon Fund with the Janus Henderson Small Cap Value End Fund?

A That's correct.

Q In Paragraph 1C, you say that you were asked to assume that the DFA fund was replaced with the Schwab Fundamental International Small Cap Equity Index?

A The DFA International small cap value, yes, that's correct, or Value 1.

Q Aside from those three changes, you assumed that the plan otherwise was going to be operated in exactly the way it was; correct?

A That's actually an interesting question. That is not something I really thought about.

I believe what you said is correct, but I need to think about it more to give you a precise answer.

Q At least for purposes of your report, the only changes that you assumed would be made to the plan were those in 1A, B and C?

A I believe that is correct.

Q Okay.

MR. BLUMENFELD: Sam, fair warning, can you upload the Beacon and DFA Excel spreadsheet?

(Whereupon, Exhibit 3 was marked for identification.)

BY MR. BLUMENFELD:

Q While he's doing that, Dr. Werner, I have

a question for you about Paragraph 17 of your report.

A Okay.

Q Do you have that in front of you?

A I do.

Q In Paragraph 17, you say that "Assuming that Quanta should have replaced the Fidelity Freedom TDFs with the American Fund TDFs as of Q12017, the American Beacon Fund with the Janus Henderson Small Cap Value N as of Q12020, and the DFA Fund with the Schwab Fundamental International Small Cap Equity Index as of Q12020, the Plan's aggregate losses amount to $20,139,166 as of June 30, 2024." Correct?

A Excluding prejudgment interest, correct, yes.

Q Then you add, "excluding prejudgment interest."

You calculate those losses to the dollar; right?

A What do you mean?

Q The precise calculation, it's not -- you're not saying that the losses are $20 million or $25 million or $19 million, you're saying $20,139,166?

A Excluding prejudgment interest, correct.
Q Now, you calculate losses with respect to the Fidelity Freedom TDFs of $20,139,166 itself; correct?
A That's correct.
Q For the American Beacon and DFA funds, you actually calculate negative losses; correct?
A I believe that is correct.
Q Well, why don't we see if that's ready to download now. It should be there.
A Okay. Let's see.
Okay. I'm there.
Q Do you have it open?
A I do.
Q Can you turn to the "Beacon Losses" tab in your backup materials?
A Okay. I'm there.
Q Okay. Now, first, you don't include any of these sorts of materials in your actual report like you do with respect to the Fidelity Freedom Funds; correct?
A I'm sorry, I don't understand the question.
Q With respect to the Fidelity Freedom Funds, you include Exhibits 3 through 8 which show some of the calculations; right?

A Correct.

Q But you don't do that with respect to the American Beacon and DFA funds?

A That's correct.

Q Okay. Now, if I'm understanding correctly -- and we'll walk through this in a little bit more detail -- but you calculate losses of negative $3,147,203 with respect to the American Beacon fund as of June 30th, 2024; correct?

A Excluding prejudgment interest, correct.

Q Right. And you don't, when you then total up the changes in Paragraph 17, account for that negative $3,147,203; correct?

A I'm sorry, what was your question?

Q In Paragraph 17 of your report --

A Right.

Q -- you ignore the negative $3,147,203 from your calculations of the total?

A Do I net out? I guess I don't know how to answer the question.

Damages according to this are zero, so that's what the damages were. If you tell me -- if there is a different theory of liability and someone tells me that we need to look at net damages or I need to do a different calculation, then I might

revisit this.

But my understanding is that that is a legal question, not an economic one.

Q Were you asked to make an assumption about that?

A I don't know as I sit here today.

Q You don't include an assumption about that in your list of assumptions; correct?

A I don't believe so.

Q In Paragraph 17, one of the things you're specifically assuming is that Quantum would have replaced the American Beacon fund with the Janus Henderson small cap value N?

A That's correct.

Q And had the plan done that, the plan would have been worse off to the tune of $3,147,203?

A The fund would have been worse off -- I don't believe that's correct.

Q If the plan had replaced the American Beacon fund with the Janus fund as of January 1 of 2020, as you were asked to assume, the plan would have 3 million fewer dollars in it; correct?

A I don't believe that -- I don't believe that's correct.

Q Tell me what's wrong about that.

A I believe it would have -- it would have 3 million -- approximately $3 million more in the fund, not less. Maybe I'm just doing the math wrong. Maybe I'm misunderstanding.

Q Let's be clear about this, Dr. Werner. Do you want to write it down so you can figure it out?

A Well, I just -- I don't think what you said is correct.

Q I understand, that's fine. I want to make sure we get it right.

But you calculate negative damages; correct?

A Correct.

Q Negative $3,147,203?

A Right. So a negative damage would be a benefit.

Q Okay.

A At least theoretically.

Q Let me ask the question this way: When you say a benefit, you mean that the plan is better off in the American Beacon fund that it actually had than it would have been in the alternative Janus fund that you were asked to assume?

A I see what you're saying, yes.

Q Okay. And so had the plan made the change

that you were asked to assume it was going to make, the plan would have 3,147,203 fewer dollars as of June 30, 2024 than it actually has?

A That's correct.

Q But you don't account for that in Paragraph 17?

A Again, I think that is a legal question, not an economic one.

Q You don't have an opinion one way or the other as to whether the $3,147,203 should be accounted for or not?

A I believe that your statement is correct.

Q Okay. As an economics matter, though, you would agree with me that had the plan made the change that you were asked to assume it would make, the plan would have 3,147,203 fewer dollars than it actually has?

A As an economic matter, that's correct.

Q Okay. Can we go to the spreadsheet, the worksheet that's entitled "DFA Losses."

A Okay.

Q And at least on my copy of that, Dr. Werner, those are in green as opposed to the Beacon ones that are in blue. Is that the same for yours?

A It is.

Q Okay. And you also calculate negative damages with respect to the DFA fund. This time the number is negative $834,969; correct?

A That's correct.

Q Meaning had the plan made the change that plaintiffs asked you to assume it should have made, the plan would be worse off to the tune of $834,969?

A That's correct.

Q You don't account for that in Paragraph 17 of your report either?

A Again, I believe that's a legal issue.

Q That's fine.

A I'm not a lawyer.

Q Let's go back to the American Beacon fund.

Dr. Werner, I apologize, I lost track of time a little bit. I know we took some breaks early on. I don't know if it's been about an hour or if you would like to take a break now or keep going, it's up to you.

A You know, why don't we take a ten-minute break; is that okay?

Q That's fine by me?

A Thank you for offering that.

Q Okay.

A Or reminding me.

THE VIDEOGRAPHER: Stand by. This marks the end of Media Number 3. Going off the record at 11:41 a.m. Pacific.

(Recess taken.)

THE VIDEOGRAPHER: We are back on the record at 11:52 a.m. Pacific. And this marks the beginning of Media Number 4 in the deposition of Dr. Adam Werner.

Please proceed, counsel.

MR. BLUMENFELD: Am I still sharing my screen?

THE VIDEOGRAPHER: Yes, you are.

THE WITNESS: It appears so. I see the spreadsheet.

MR. BLUMENFELD: Great. Is that being recorded on the video, Brandon?

THE VIDEOGRAPHER: Yes, it is. I -- yes, it's both. It's the witness in a smaller view screen.

MR. BLUMENFELD: Perfect. Thank you very much. And thank you, Dr. Werner.

THE WITNESS: Sure.

BY MR. BLUMENFELD:

Q Do you understand we're back on the record

and you're still under oath?

A I do.

Q You have the same obligation to tell the truth as if you were testifying live in front of a judge or jury?

A I do.

Q This is your backup spreadsheet for the Beacon and DFA funds; correct, Exhibit 3?

A Correct, or at least it appears to be. I have no reason to think it's not.

Q And the tab that we're focused on now is entitled "Beacon Losses."

Do you see that?

A I do.

Q And that's the tab that runs through all of the calculations that yield the -- your conclusion that the plan would have been better off in the American Beacon fund that was in the plan as compared to the Janus Henderson fund by $3,147,203; correct?

A Economically, that's correct.

Q Can we go to the "Beacon Balances" tab first. And there is a bunch of numbers here. These are numbers that were input by somebody on your team; correct?

A Correct.
Q My understanding from your report is that they got the information from the quarterly investment reviews?
A Why don't we pull up my report. Oh, I'm sorry, yes, I believe that's correct.
Q Okay. Did you personally look at any of the quarterly investment reviews?
A I did not.
Q Okay. Just while we're on the subject, on Page 18 of your report --
A Hold on. Yes. Page 18.
Q It continues to the top of Page 19.
A Okay.
Q Did you look at any of these documents in preparing your report?
A I did look at the complaint. Did I look -- I don't -- as I sit here, I don't recall.
Q Okay. You did not look at the quarterly investment reviews, but you might have looked at some other documents?
A Correct.
Q And you're just not sure?
A Correct.
Q It also says that you relied on

Morningstar Direct data?

A That's correct.

Q Is that data that you personally pulled?

A I did not personally pull that data.

Q Okay. Do you know who did?

A It's either Alex -- Alexander Huang or someone in Italy.

Q Got it. Thank you.

Switching gears back to Exhibit 3 to your deposition, which is the backup materials for the American Beacon and DFA fund.

The way the spreadsheet works, if you change the quarterly balance numbers, that would change the result in the "Beacon Losses" tab; correct?

A I believe that's correct.

Q Okay. And am I right that you calculated losses assuming that the change from the American Beacon fund to the replacement fund occurred on January 1 of 2020?

A On January 1 of 2020. I believe that's correct. Let me just look at my report. Hold on.

Q Sure.

A Yes, I believe that's correct.

Q The same with the DFA fund; correct?

A Correct.

Q Okay. Getting back to Deposition Exhibit 3, your backup materials on the American Beacon and DFA funds, if you go to the "Beacon Losses" tab.

A Okay.

Q As of March 31 of 2020, you calculated losses of $942,080; correct?

A Correct.

Q Meaning as of that date, the plan would have been better off in the Janus fund as compared to the American Beacon fund by $942,080?

A Correct.

Q And then the next quarter that number goes down to $225,257; correct?

A Correct.

Q I guess that means that during that three-month time period, the American Beacon fund did better than the Janus Henderson fund?

A That would be my assumption.

Q Okay. And then the next quarter after that by September 30th, the damages start to go negative, meaning the plan was better off in the American Beacon fund than it would have been in the Janus fund that you were asked to assume as a

replacement; correct?

A That's correct. Hold on one second. I'm just looking at my copy of the spreadsheet that you're looking at. I just wanted to...

Okay. Go ahead. I'm sorry.

Q That's okay.

Dr. Werner, just so I'm clear, when you said you were going to look at your copy, you're looking at the copy you downloaded from our Exhibit Share?

A That's correct.

Q Okay. If I'm understanding this correctly, when you calculate damages of $942,080 as of March 31 of 2020, what that really means is if the plan had stopped investing in the American Beacon fund as of, I'll call it, April 1st of 2020, then you would have calculated losses of $942,080; correct?

A That's correct.

Q The reason that the losses then fluctuate is because the plan continued to be invested in the American Beacon fund and so you can continue to run the analysis?

A Correct.

Q Okay. And if the plan had replaced the

American Beacon fund with some other fund as of June 30 of 2020, your opinion in this case would be that the losses were $225,257 plus prejudgment interest; correct?

A Could you repeat that question?

Q I'll try.

If the plan had replaced the American Beacon fund with some other fund as of June 30 of 2020, then you would have calculated losses associated with the failure to offer the Janus fund instead of the American Beacon fund of $225,257?

A Okay. So I think where I'm getting confused is that at the beginning of your statement, you don't mention the Janus Henderson fund as the replacement fund. I think you just say a general replacement fund?

Q Correct.

A So I am a little confused by the question.

Q Let me ask it this way: If -- let's stick to that first quarter.

If on April 1 of 2020, the American Beacon fund was removed from the plan, the plan would have suffered losses, under your methodology, of $942,080; correct?

A Correct.

Q Those would be the losses associated with the American Beacon fund?
A Correct, relative to the Janus Henderson Small Cap Value Fund.
Q And if the plan had offered the XYZ fund instead of the American Beacon fund as of April 1 of 2020, you could evaluate the performance of the XYZ fund compared to the Janus fund or anything else, but those would be losses associated with the XYZ fund, not associated with the American Beacon fund?
A Could you restate your question?
Q Sure.
Once the American Beacon fund is removed from the plan, there wouldn't be any more losses associated with the American Beacon after that; correct?
A That's correct.
Q Okay.
A I believe that's correct.
Q Okay. Let's go to the DFA fund, "DFA Balances" tab on Exhibit 3.
Do you see that in front of you?
A I do.
Q And this works the same way as you did

with respect to the American Beacon fund; correct?
A That's correct.
Q And these are the balances in the DFA fund quarter by quarter?
A Correct.
Q If we go -- this always messes me up because I had trouble finding all the tabs, but if you go to the "DFA Losses" tab of your worksheet.
A Okay.
Q Are you there?
A You're there.
Q As of June 30 of 2024, you calculated negative losses of $834,969; correct?
A Correct.
Q And similarly, as with respect to the American Beacon fund, as of March 31 of 2020 at least, you calculate damages of $118,517; correct?
A Correct.
Q And so if the plan had removed the DFA fund as of April 1 of 2020, then the damages associated with the DFA fund would have been $118,517; correct?
A As of that date, that's correct.
Q If whatever was replacing the DFA fund did better or worse than the Schwab fund, there would be

damages or no damages but those wouldn't be damages associated with the DFA fund; correct?

A I believe that is correct. See that seems to be -- I mean, economically, I believe that's correct. Legally, I don't know. So I don't know how liability works in that type of situation.

Q That's fine, the lawyers can have arguments about it. But as an economics matter, what I said is correct?

A I believe economically what you said is correct.

Q And maybe one way you could show that economically is to go to the DFA balances and change the numbers to reflect that the balances in the DFA funds went to zero after March 31 of 2020; correct?

A I believe that's correct.

MR. BLUMENFELD: Why don't we close this one first. How do I stop sharing?

Sam, could you upload as Exhibit 4 the backup materials regarding the Freedom Funds?

THE VIDEOGRAPHER: I believe at the bottom, counsel, it says stop sharing.

MR. BLUMENFELD: That's what I would have thought, too, but mine just says share.

THE VIDEOGRAPHER: Or above in the green

bar.

MR. BLUMENFELD: Dr. Werner, Exhibit 4 should be there, too.

(Whereupon, Exhibit 4 was marked for identification.)

BY MR. BLUMENFELD:

Q I'm going to share my screen again, be patient with me. Did that work again?

A Yes, I believe so.

Q Okay. These are your calculations that are reflected in Exhibits 3 through 8 of your report; correct?

A That's correct.

Q And Deposition Exhibit 4 is the actual calculations, the printout is what you included in the report as a PDF?

A That's correct.

Q Exhibit 3 shows the balances in the Fidelity Freedom target-date funds; correct?

A That's correct.

Q Exhibit 4 shows quarterly returns for the Fidelity Freedom Funds target-date funds?

A That's correct.

Q What is Exhibit 5?

A It's a calculation of quarterly cash flow.

Q What does that mean?
A So it would be the net inflows or outflows within each fund adjusting for the return over that period.
Q This is a formula that's calculated, it's not underlying data that was either provided to you or collected by you?
A That's correct.
Q Exhibit 6 is the performance of the American Funds target-date funds?
A Correct.
Q Okay. This is data that was collected by you; correct?
A Right. This was from Morningstar.
Q Exhibit 7 reflects calculations that you and your team made?
A Correct.
Q And Exhibit 8 is a calculation of the losses that you calculate; correct?
A That's correct.
Q And Exhibit 8 is the difference between the assets that the plan would have in the American Funds as compared to the assets that the plan actually had in the Fidelity Freedom target-date funds?

A I believe that is correct.

Q Okay. Exhibit 3, just so I'm clear for the record, this is Exhibit 3 to Exhibit 4 to your deposition, is the assets in the Fidelity Freedom target-date funds on a quarterly basis; correct?

A Correct.

Q And the methodology here is the same methodology you used for the American Beacon and DFA funds, it's just here you have a suite of funds, not just a single fund, then you aggregated it; correct?

A We're looking at Exhibit 3; right?

Q Yes.

A I believe that's correct.

Q Before we dig in further on this, Dr. Werner, I want you to assume that the Fidelity Freedom Funds that were in the plan paid revenue sharing and the American --

MR. TANG: Objection.

THE WITNESS: When you say "paid revenue sharing," what do you mean?

BY MR. BLUMENFELD:

Q Do you understand what revenue sharing is?

A A sharing of revenue. But in this context, I'm not sure what you're --

Q Sorry, I did not mean to cut you off. Go

ahead, Dr. Werner.

A No, no, no, you're fine.

Q Do you have an understanding as to what revenue sharing is in the context of mutual funds?

A Beyond the idea that the revenue would be shared, I mean, are you talking about cash outflows? I'm not quite sure what you mean.

Q Okay. That's fine. You can say you're not familiar with the concept of revenue sharing in the circumstance of mutual funds, that's fine.

A All right. But that's -- I know it's okay to say that. That's not what I'm saying. I'm trying to understand what you mean by revenue sharing.

Q Have you ever heard of mutual funds engaging in a practice called revenue sharing?

A I don't believe so.

Q Okay. Revenue sharing as I'm describing it is where the mutual fund company, here Fidelity, is willing to share some revenue back with the plan, the Quanta plan, to cover administrative expenses that the plan has to pay or to give back to plan participants.

Do you understand what I'm saying to you now?

A I believe so.

Q Okay. And so if the plan received revenue sharing from the Fidelity Freedom Funds but did not receive revenue sharing from the American Funds target-date funds, you would have to account for that in your calculations; correct?

A If that were the case, yes, I would need to account for that in my calculations.

Q Okay. You did not account for that in your calculations; correct?

A Well, I think that's why we add in the net cash flow. So the calculations from -- sorry, I'm trying to -- so the calculations from Exhibit 5.

Q But the calculations in Exhibit 5 are new monies that people are moving in or out of the investment options of the participants; correct?

A Right, I have no -- but I mean as you've defined revenue sharing, that sounds like that would be included.

Q Do you know if that's included?

A I do not.

Q Okay. And if I told you that the plan received 20 basis points in revenue sharing on the Fidelity Freedom Funds, do you factor in 20 basis points in your calculations anywhere?

A I believe that's part of the return

calculation. But I could be wrong.

Q Did you investigate that?

A I did not.

Q And if the revenue sharing wasn't included in the returns but was separate money that went back to the plan, you would not be accounting for it in your calculations; correct?

A And to the extent it's not in those cash outflows or those net cash flows?

Q Correct.

A I believe that would be correct.

Q Okay. Dr. Werner, if the plan had decided to replace the Fidelity Freedom Funds with the Vanguard target-date funds on January 1 of 2017, would you agree with me that there would be no losses associated with the Fidelity Freedom Funds in that circumstance?

A So in your hypothetical, what is happening?

Q The Fidelity Freedom Funds --

A Right.

Q -- are replaced with the Vanguard target-date funds on January 1 of 2017.

A Okay. So that's your hypothetical, then what?

Q In that circumstance, your calculations

would show no damages associated with the Fidelity Freedom Funds?

MR. TANG: Calls for a legal conclusion.

THE WITNESS: I don't -- I don't quite understand your hypothetical. I need -- I just don't understand your hypothetical.

BY MR. BLUMENFELD:

Q Okay. Let me try and be clear.

You are asked to assume and calculate losses associated with the Freedom Funds compared to the American Funds target-date funds; correct?

A Correct.

Q And your starting date for your calculations was January 1 of 2017?

A I believe that's correct.

Q And so what I was asking you is: If as of January 1 of 2017 the Fidelity Freedom Funds were no longer in the plan, because they were replaced with the Vanguard target-date funds, then there wouldn't be any losses associated with the Fidelity Freedom Funds under your methodology?

A Again, I believe it's an incomplete hypothetical. I don't understand the question.

Q Let me ask the question this way: What do you calculate the losses to be as of January 1 of

2017?

A Let's go to -- for the income fund? Which income fund are you talking about?

Q All of them. So -- by the way, Dr. Werner, can you see my screen on Exhibit 8?

A Hold on. Yes, I can.

Q Okay.

A I'm sorry, what was your question?

Q As of January 1 of 2016, you would calculate no losses associated with the Fidelity Freedom Funds?

MR. TANG: Objection, form.

THE WITNESS: That's not actually anything I've thought about. So as of January 1st, 2016 -- I'm sorry, 2017?

BY MR. BLUMENFELD:

Q Yes.

A Sorry, I'm just looking at my report here.

Q Sure.

A I think I understand. Can you ask your hypothetical one more time -- actually, at this point it's not a hypothetical. So what is the question?

Q As of January 1 of 2017, you calculate no losses associated with the Fidelity Freedom Funds; correct?

A I believe that's correct.

Q And to be sure, we could mathematically say, let's sum up the losses that you calculate in each of the different vintages; right? Because it's a live spreadsheet, we can do that work?

A Correct.

Q So never want to do a spreadsheet calculation on camera and live.

But if you do that as of December 31 of 2016 at least, you get zero; correct?

A That's correct.

Q Okay. And you're comfortable with the formula that I utilized to calculate that; right?

A I am.

Q Okay. If the plan did not have the Fidelity Freedom Funds after December 31 of 2016, then there would be no losses associated with the Fidelity Freedom Funds?

A That's -- so you're asking me to assume that there were no Fidelity Freedom Funds as of January 1st, 2017?

Q Right.

A Under that assumption, I need to think more about that, I don't -- that sounds like that there's probably some legal -- that that's -- that probably

has to do with the law in addition to being an economic matter.

Another way of putting it, it's not an economic matter, it's not strictly an economic matter. I think that there's probably some theory of liability that I am not aware of as I sit here today.

Q As an economics matter, you would agree that the damages would be zero?

A It appears to be, yes, that's an economic -- that's what you calculated here, that's what your zero, zero, zero -- your summation across Line 7 of the spreadsheet.

Q Well, let's be clear, I'm doing the same methodology on Line 7 that you did to calculate the total as of June 30th, 2024; correct?

A That's correct.

Q Okay. And so let's copy this formula to the next quarter.

As of March 31 of 2017, you calculate -- you calculate, using your methodology, that the damages would have been negative $714,717.39; correct?

A That's correct.

Q And so if after that date the Fidelity

Freedom Funds were no longer in the plan, your damages methodology would show negative $714,717.39?

A Again, so I believe it's an incomplete hypothetical. I don't -- so you want me to assume, again, that the funds are not available as of what date?

Q The day after the calculations, so here as of April 1 of 2017.

A Okay. The Freedom Funds are not available?

Q Correct.

A I don't know exactly how damages would work in that scenario.

Q Okay. You don't have an economics opinion on the subject?

A Oh, again, I don't think it's strictly a question of economics.

Q You're the one who came up with this spreadsheet; correct?

A That's correct.

Q And you calculate, using your methodology, that as of March 31 of 2017, the damages would be negative $714,717.39?

A That's correct.

Q If we copy that same formula again to the next quarter -- and I'll put commas in it so it's a

little bit easier to see -- as of the next quarter, as of June 30, 2017, the damages would be negative $2,036,579.01; correct?

A Under your hypothetical, and given the other caveats I've said, I believe that would be correct.

Q Just to be clear, this is not a hypothetical, if you were asked what were the losses as of March -- excuse me, June 30th, 2017, you would have said negative $2,036,579.01?

A Well, there is a couple of things there. I would say economically that that is true. But in your -- what you're asking me, though, is to assume that this fund no longer exists or it's -- so again, that is an assumption you asked me to make.

Again, I have not thought enough about it to say that that's exactly -- from both a combined legal and economic perspective, that those would be damages.

Q Okay.

A As a simple calculation, your calculation is correct.

Q Okay. And my calculation would be correct as of June 30, 2017 regardless of whether the Fidelity Freedom Funds remained in the plan after that date; correct? In other words --

A I don't know how to answer that.

Q If you're asked to calculate what the losses were to the plan as of June 30 of 2017, you would give this answer, right, negative $2,036,579.01?

A As an economic matter, I believe that's correct.

Q As of -- Dr. Werner, are you checking on the formula again?

A Yes, I mean, I would give the same answer I just gave about the previous cell we were looking at.

Q If you were asked to calculate the losses as of September 30th of 2017, you would say negative $2,256,824.62?

A Again, as an economic matter, I believe that's correct.

Q Okay.

A I mean, your calculation is correct.

Q Let's switch gears and look at Exhibit 4 to Exhibit 4, which is the returns on the Fidelity Freedom Funds that you use in your calculations.

A Okay.

Q Did I describe what those numbers are supposed to reflect correctly?

A I'm sorry, I was switching back and forth

between my spreadsheet and your spreadsheet.

What was your description of this?

Q Exhibit 4 to Exhibit 4 is the quarterly returns of the Fidelity Freedom Funds?

A That's correct.

Q Okay. Do you know where these numbers came from?

A I believe if you look at the bottom of Exhibit 4, they came from the documents cited in the notes.

Q These are documents you hadn't seen before today; correct?

A Which documents?

Q The documents you cite in the notes?

A That's correct. I mean, I may have, but as I sit here today, I don't recall.

Q I'll show it to you if we need to, but if you look in your report, Paragraph 9 --

A Slow down.

Q Yes. I apologize.

A I don't have all of these things in front of me.

Q That's fine, let's go back to your report.

On Paragraph 9?

A Yes.

Q Do you have that in front of you?
A I do.
Q In Paragraph 10, you say that you obtained quarterly return data for each of the Fidelity Freedom TDF Vintages from the same set of documents from which you obtained quarterly balances; correct?
A That's correct.
Q When you look at the PDF of Exhibit 4 as you produced it attached to your report, the returns --
A I'm sorry, no. So you want me to look at -- am I looking at my report right now or am I looking at the spreadsheet?
Q Go to your report first, please.
A Okay.
I'm there. I've read Paragraph 9.
Q And you read Paragraph 10?
A Not in its entirety.
Okay. I've now read both of those paragraphs.
Q Now, if you go to Exhibit 4 to your report.
A Exhibit 4 to my report, okay.
Q The actual PDF.
A Right.

Q You see all of the return percentages?
A I do.
Q They are all to two decimal places; correct?
A Well, no.
Q Are you looking at the Excel file or are you looking at the PDF?
A Oh, I'm sorry. So now we're looking -- I'm not looking at the exhibit that you're sharing with me that's taking up the entire page. You want me to look at the PDF. So basically look at my report and then go to Exhibit 4 in the PDF format; is that what you're asking me to do?
Q That's what I said, yes.
A I may argue with you -- I'm not going to argue with you. I'm not sure that's what you said, but okay. So now I'm in Exhibit 4 -- okay. Go ahead, what is the question?
Q All of the percentage returns there are listed to two decimal places?
A That's correct.
Q Okay. Now, if you switch gears to the backup. It is Exhibit 4 to your deposition.
A Okay. Exhibit 4 to my deposition, okay. I'm there.

Q The Excel file tab "Exhibit 4"?
A Correct.
Q That's the one that I am sharing on my screen.
A Right.
Q You see that the returns show up as being to two decimal places but when you click on them, it's actually to about five or six decimal places?
A That's correct.
Q Do you have any idea where that information came from?
A The information -- again, I would refer you to the notes in this exhibit.
Q Okay.
A Or at the bottom of this Excel page.
Q Excuse me.
MR. BLUMENFELD: Sam, let's mark the Q42017 QIR.
MR. BLOCK: I'll let you know when it's up.
MR. BLUMENFELD: Thank you.
THE WITNESS: How much longer are we going to go? I mean if you have no idea, then I would say maybe we want to take a lunch break now.
MR. BLUMENFELD: Why don't we finish these

questions and then we can take a lunch break.

THE WITNESS: I'm starting to get lightheaded. I would really like to take the lunch break now if we're going on for a while.

MR. BLUMENFELD: Okay. How much time do you need, Dr. Werner?

THE WITNESS: How about a half an hour?

(Whereupon, Exhibit 5 was marked for identification.)

THE VIDEOGRAPHER: Going off the record. This marks the end of Media Number 4. Going off the record at 12:38 p.m. Pacific.

(Recess taken.)

THE VIDEOGRAPHER: We're back on the record at 1:13 p.m. Pacific. This marks the beginning of Media Number 5 in the deposition of Dr. Adam Werner.

0

Please proceed, counsel.

MR. BLUMENFELD: Thank you.

Q Dr. Werner, you understand you're still under oath?

A I do.

Q And you understand you have the same obligation to tell the truth as if you were testifying live in front of a judge or jury?

A I do.
Q Did you get a chance to eat something during the break?
A I did. Thank you.
(Discussion off the record.)
BY MR. BLUMENFELD:
Q Dr. Werner, did you talk to anybody about your testimony during the lunch break?
A Did I talk to anyone about my testimony? I talked with Alexander Huang. I talked briefly with counsel.
Q What was the conversation with Mr. Huang?
A That I was surprised that this was going so long.
Q Anything else?
A That was it.
Q Could you go back to Paragraph 10 of your report, Dr. Werner.
A Okay.
Q Let me know when you have that in front of you.
A I'm there.
Q Okay. You say in the first sentence of Paragraph 10 that you "obtained the quarterly return data for each of the Fidelity Freedom TDF Vintages

from the same set of documents from which I obtained quarterly balances." Correct?

A That's correct.

Q Okay. And you said earlier you did not personally do that, but somebody on your team got the returns data; correct?

A That's correct.

Q Okay. Now, I think, Dr. Werner, that Paragraph 10, that sentence is untrue. I don't think you got the returns data that you used in your calculations from the material that were provided in this case that you list as your documents considered.

And what I was trying to get at before the break was that you have too many decimal places in your calculations.

A Okay.

Q So let's go to Exhibit 5 to your deposition.

A Is that something that we already -- is that new or is that --

Q It was introduced at the very last minute before you asked for a lunch break.

A Okay. Hold on.

Okay.

Q Do you have that document?
A I do.
Q Okay. This is the quarterly investment review for the plan for the time period ending December 31, 2017.
Do you see that?
A I do.
Q Okay. If you page to Page 37 of 114 of the PDF.
A Page 37?
Q Yes.
A Okay.
Q You see on here, among other things, the target-date 2020 Fidelity Freedom 2020 K Fund.
Do you see that?
A I do.
Q Okay. And the ticker symbol for that fund is listed right next to that; correct?
A Correct.
Q What is that ticker?
A If I'm reading this correctly, F as in Frank, S as in Sam, N as in Nancy, O as in orange, X as in xylophone.
Q And if you look at the assets that are listed there, it's $71,251,182; correct?

A That's correct.
Q Okay. Now, bear with me, if you go to your spreadsheet.
A Okay.
Q Exhibit 4.
A Exhibit 4.
Q We're in the backup materials.
A Right.
Q It's Exhibit 3 within Exhibit 4.
A Okay.
Q Do you have that?
A I do.
Q Okay. And you can look and see the same 2020 fund as of December 31, 2017 has assets of $71,251,182; correct?
A I can see that, yes.
Q That matches what's in the QIR, the quarterly --
A I'm sorry, are we looking at the spreadsheet or are we looking at the PDF of my report?
Q Spreadsheet.
A So, yes, there's more decimal places and I'm actually -- I'm happy to issue a corrected report. But obviously this -- I shouldn't say obviously because I guess it's not obvious. This data came from

Morningstar, was then checked against these exhibits.

So that's why there's the discrepancy between the number of digits in my exhibits versus the number of digits in the Excel exhibits I turned over. So what was the term you used? It wasn't dishonest -- untruthful. Untruthful.

It was an oversight. I'm more than happy to submit a corrected version.

I can tell you, though, that each one of these numbers from -- that was taken from Morningstar were checked against the exhibit in question. And so if that's what we've been spending this time doing, I apologize that I've wasted a half an hour of your time because I was somewhat inarticulate.

Q Well, so let's go back to Paragraph 10 in the text of your report.

A Yes.

Q That first sentence is not correct?

A I believe that that needs to be fixed, yes.

Q Okay.

A I defer to my counsel. Do you want me to submit an entirely new report instead of exhibits?

Q That's something that you'll discuss with your counsel. All I'm doing is asking the questions

based on the data and the report that you provided.

So Exhibit 3, which is part of your backup spreadsheet --

A I'm sorry, Exhibit 3 to what?

Q Exhibit 3 deposition, Exhibit 4. Let's go to the live Excel spreadsheet.

A Are you sharing it with us or no?

Q Do you want me to share my screen again?

A I don't need you to do it, I just need a more accurate description of exactly what I'm supposed to be looking at.

Q Let's do that to make sure that it's accurate.

A Okay. I have the spreadsheet in front of me now.

Q Okay. The spreadsheet, which is Exhibit 4 to your deposition, has an Exhibit 3 tab to it; yes?

A Correct, yes.

Q That Exhibit 3 tab has the assets in the plan in the Fidelity Freedom target-date funds; correct?

A It has the balances.

Q The balances in the Fidelity Freedom target-date funds?

A Correct.

Q And the title of that is "Exhibit 3, Fidelity Freedom TDFs - Quarterly Balances (in Dollars)"; yes?

A That's correct.

Q Switching to the next tab, which is Exhibit 4 to Exhibit 4, this is the backup worksheet returns data.

This is supposed to represent the Fidelity Freedom target-date funds quarterly returns each quarter; correct?

A Correct.

Q Dr. Werner, when you said that the data in Exhibit 4 was checked against the quarterly investment reviews, did you do that or did somebody else do that?

A I did not do that. Someone else did. I don't know how many other people did that. My guess is at least two.

Q Are you sure that anybody did it?

A I'm positive. Which is -- we'll leave it at that.

Q Did you have something you wanted to say, Dr. Werner?

A I'm trying to look at the footnote here. Oh, yes. So maybe I should have highlighted this

more.

I'm looking at Footnote 3 to my report, which is Exhibit 1 to this deposition. "The differences between the Morningstar Direct quarterly return data and the quarterly return data obtained from Quanta's documents is de minimis. The average difference was less than a single basis point across the Fidelity Freedom TDFs during the quarters where both data series were available."

So hopefully that also gives you a little more clarification about whether or not this data was checked.

Q Who wrote that footnote?

A It was -- I believe it was written by Alex Huang at my direction under my supervision.

Q Let's go back to Exhibit 8 to Exhibit 4, which is the spreadsheet.

A Okay.

Q This is the live backup spreadsheet showing your work that led to the numbers that are reflected in your report; correct?

A I believe that's correct.

Q Okay. I want to go down to March 31 of 2021 and June 30 of 2021.

Are you following where I'm looking?

A I am.
Q Okay. And you will see that I copied the same total losses formula down for these two rows; correct?
A That's what did you, correct.
Q And you are comfortable that the formulas worked the way they are supposed to and are written the way --
A Well, I suppose I can do it on my exhibits as well if there's any doubt.
Okay.
Q Can you confirm that my numbers are correct?
A Right. You just left out all the numbers that are positive. Oh, there's one negative number you haven't included, at least one. But by all means, go ahead.
Q Sure.
As of March 31st of 2021, your damages methodology yields negative damages of 4.233 -- excuse me. Let me restate that.
As of March 31st of 2021, your damages methodology yields damages of negative $4,233,995.89; correct?
A As an economic matter, I believe that that

calculation is correct.

Q Okay. And then as of June 30th, 2021, your calculation methodology yields damages of negative $7,062,855.17?

A As an economic calculation, that does sum -- represent the sum of Line 25 or I guess what's labeled Row 19.

Q Okay. Meaning that as of those two dates, the plan was better off in the Fidelity Freedom Funds than the American Funds by $4.2 million as of March 31st of 2021 and by $7 million as of June 30th, 2021; correct?

A No, I don't know that for sure. I mean, I've just been -- I've just done this today. I would need to think about it more with regards to the exact answer to your question before I stated that definitively.

Q You calculate damages as of June 30 of 2024 of $20,139,166; correct?

A That's correct.

Q And you used the same formula that I used?

A Let's see. Well, I don't think that's actually accurate.

Q Well, the cell is P39; correct?

A That's correct.

Q Okay. And cell P39 says you sum up C37 to P37?

A That's correct.

Q Okay. And what I did is sum up all of the cells, C to P, for different rows because it's a different time period?

A That's correct.

Q Okay. But otherwise, it's the same exact calculation that you did?

A I believe mathematically that's correct.

MR. BLUMENFELD: Sam, can we do the -- I'm trying to stop sharing.

Q Am I still sharing my screen, Dr. Werner?

A No, I don't believe so.

MR. BLUMENFELD: Sam, can we do the Q12021 QIR?

THE WITNESS: Is this Exhibit 6 or 5?

MR. BLUMENFELD: This will be 6.

THE WITNESS: Okay, I haven't received it yet.

MR. BLOCK: It's not up yet, but it's uploading.

THE WITNESS: That probably explains it.

MR. BLOCK: It should be available now.

(Whereupon, Exhibit 6 was marked for

identification.)

THE WITNESS: Okay. I see it now.

MR. BLUMENFELD: Great.

THE WITNESS: I've got it open.

BY MR. BLUMENFELD:

Q Could you turn to Page 19 of 40?

A Nineteen of 40? The asset allocation?

Q Yes.

A Okay.

Q Specifically look for the Fidelity Freedom 2020 K fund.

A Okay.

Q It's $75,692,121; correct?

A That's what it says, yes.

Q And if we go back to your worksheet, the actual Excel spreadsheet which is Exhibit 4 to your deposition.

A Okay.

Q Let me know when you're there.

A Okay. I'm there.

Q Okay. Can you go to the tab that is marked Exhibit 3?

A I can.

Q Have you done that?

A Yes, I'm there.

Q If you look at the 2020 fund as of March 31 of 2021, do you see that same number in your calculations, $75,692,121; correct?

A Correct.

Q And if I could indulge you to go back to Exhibit 6.

A Okay.

Q Give me a second, sorry. We can be done with that exhibit.

MR. BLUMENFELD: Sam, could we upload the next QIR?

MR. BLOCK: It should be up now.

(Whereupon, Exhibit 7 was marked for identification.)

BY MR. BLUMENFELD:

Q Can you turn to Page 19 of 40.

A Okay. I'm there.

Q And for the Fidelity Freedom Funds, you see that they are not listed; correct?

A They don't appear to be.

Q Dr. Werner, did you know before today that the Fidelity Freedom Funds had been removed from the plan between March of 2021 and June of 2021?

A Are you stipulating that that happened?

Q Did you know?

A I still don't know.

Q I'm telling you it happened. Did you know that it happened?

A Not that -- I'll take you at your word. I don't believe that I knew that.

MR. BLUMENFELD: Okay. Let's take a break for about five minutes. I might be just about done.

THE VIDEOGRAPHER: Okay. Stand by, everyone.

MR. BLUMENFELD: Sorry.

THE VIDEOGRAPHER: Go off the record, counsel?

MR. BLUMENFELD: Yes, please, but then stay on for just one more minute.

THE VIDEOGRAPHER: Thank you.

This marks the end of Media Number 5. Going off the record at 1:39 p.m. Pacific.

(Recess taken.)

THE VIDEOGRAPHER: We're back on the record at 1:53 p.m. Pacific. This marks the beginning of Media Number 6 in the deposition of Dr. Adam Werner. 0

Please proceed, counsel.

MR. BLUMENFELD: Thank you very much for your time, Dr. Werner. I don't have any further

questions.

THE VIDEOGRAPHER: Is there anything else from counsel or the court reporter before I conclude the record?

THE REPORTER: Jeremy, you have a standing order. Kolin, what do you need?

MR. TANG: Let's get a rough, please.

THE VIDEOGRAPHER: I'm going to conclude.

This concludes today's deposition of Dr. Adam Werner. Total number of media used is six.

Going off the record at 1:54 p.m. Pacific Daylight Time.

(Proceedings concluded at 1:54 p.m.)

I, LYNNE M. LEDANOIS, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [] was [x] wasn't requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: September 10, 2024

LYNNE MARIE LEDANOIS

CSR No. 6811

NAME OF CASE: Mary Laliberte vs Quanta

DATE OF DEPOSITION: 9/9/24

NAME OF WITNESS: Adam Werner

Reason codes:

1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page ____ Line ____ Reason____

From ___________________ to_________________

Page ____ Line ____ Reason____

From ___________________ to_________________

Page ____ Line ____ Reason____

From ___________________ to_________________

Page ____ Line ____ Reason____

From ___________________ to_________________

Page ____ Line ____ Reason____

From ___________________ to_________________

Page ____ Line ____ Reason____

From ___________________ to_________________

Page ____ Line ____ Reason____

From ___________________ to_________________

_______________________

Signature of Deponent

**&**

**&** 3:13

**0**

**0** 6:5 35:1 129:15 143:20
**0.08** 49:20
**0.42** 49:22
**0.65** 49:23
**002559** 5:14
**005002** 5:19
**005134** 5:24
**03290** 1:7 2:7 6:22

**1**

**1** 5:3,13 6:16 9:18,19,20 21:17,22 22:12 25:22 26:25 28:20,20 30:11 30:12 31:19,25 34:22 70:2,6 76:8,8 77:3 78:12 80:3,14 91:19 93:1 94:6 98:20 105:20,21 108:21 109:6 110:20 117:14 117:22 118:14 118:17,25 119:9,23 122:8 137:3 146:5
**10** 126:3,17 130:17,24 131:9 134:16 145:20
**100** 10:9,13
**1099** 12:3 15:25
**1099s** 12:7
**10:31** 61:17
**10:41** 61:20
**112** 5:9
**114** 132:8
**118,517** 110:17 110:22
**11:41** 102:4
**11:52** 102:7
**129** 5:11
**12:38** 129:12
**140** 5:15
**142** 5:20
**17** 95:1,6 97:12 97:15 98:10 100:6 101:10
**18** 31:15 104:11,12
**1845** 3:7
**19** 95:24 104:13 139:7 141:6 142:16
**19103** 3:9,20
**1:13** 129:15
**1:39** 143:17
**1:53** 143:20
**1:54** 144:11,13
**1a** 27:12 28:3 29:4 92:9 93:11,16 94:17
**1b** 29:13,19 92:15 93:21
**1c** 29:22 92:18 94:1
**1d** 29:25 30:3,4 30:25
**1st** 22:15 26:3 107:16 119:14 120:21

**2**

**2** 5:5 31:13,18 31:24 32:15 35:2 42:2,3,5 61:16 65:2 83:18,21 84:17 85:9,12 86:7 86:12,23 87:3 87:17 88:1,13 146:5
**2,036,579.01** 123:3,9 124:5
**2,256,824.62** 124:14
**20** 5:22 95:23 116:22,23
**20,139,166** 95:13,25 96:3 139:19
**2016** 25:8 33:10,14,21 35:24 36:25 69:24 76:17 119:9,14 120:10,16
**2017** 5:13 33:23 36:1 117:14,22 118:14,17 119:1,15,23 120:21 121:20 122:8,21 123:2 123:8,23 124:3 124:13 132:5 133:14
**2018** 33:25 36:3
**2019** 5:7 34:2 36:5 72:3 73:14 74:3 75:6
**2020** 34:4 36:7 72:3 73:14 74:3 75:6 98:21 105:20 105:21 106:7 107:14,16 108:2,9,21 109:7 110:16 110:20 111:15 132:14,14 133:14 141:11 142:1
**2021** 5:18,23 34:6 36:9 137:24,24 138:19,22 139:2,11,12 142:2,23,23

**2022** 34:8 36:11,14,17
**2023** 34:10 36:19
**2024** 1:16 2:16 5:8 6:1,6 22:15 23:5 26:3 30:7 30:7,13,17 31:3 34:12 36:19,25 95:14 97:9 100:3 110:12 121:16 139:19 145:20
**21** 5:3
**2222** 3:19
**225,257** 106:15 108:3,11
**23** 69:11,12
**24** 45:2 46:4
**25** 42:17 43:9 44:13 95:24 139:6
**26th** 25:8 76:17
**29** 51:21 52:1 52:10,15,23 53:8
**2q** 5:8
**2q2016** 69:16

**3**

**3** 5:6 42:2 52:10 61:21 70:1,2,4,6 88:24 89:2,21 90:7,21 94:22 96:24 98:22 99:2,2 102:3 103:8 105:9 106:3 109:22 112:11,18 114:2,3,11 133:9 135:2,4 135:5,17,19 136:1 137:2 141:22 146:6
**3,147,203** 97:8 97:13,17 98:16 99:14 100:2,10 100:16 103:19
**30** 30:7 31:3 95:14 100:3 108:2,8 110:12 123:2,23 124:3 137:24 139:18
**30th** 30:13,17 97:9 106:22 121:16 123:8 124:13 139:2 139:12
**31** 5:13,17 106:7 107:14 110:16 111:15 120:9,16 121:20 122:21 132:5 133:14 137:23 142:2
**31st** 138:19,22 139:11
**37** 132:8,10

**4**

**4** 5:9 54:12 65:1 81:11,16 81:21 82:7 90:24 91:3,7 102:8 111:19 112:2,4,14,21 114:3 124:19 124:20 125:3,3 125:9 126:8,21 126:23 127:12 127:17,23,24 128:1 129:11 133:5,6,9 135:5,16 136:6 136:6,13 137:16 141:16
**4,233,995.89** 138:24
**4.2** 139:10
**4.233** 138:20
**40** 141:6,7 142:16
**401** 5:16,21 19:17,19,25 20:1 25:6 76:14
**41** 48:18,21 50:3,6,13,16
**42** 5:5 49:22
**47** 65:4,5,6 69:1,8
**4:22** 1:7 2:7 6:22
**4q** 5:7
**4q2016** 27:16

**5**

**5** 5:11 112:24 116:12,13 129:8,16 131:18 140:17 143:16
**5,000** 14:6,8,12
**50** 8:12 14:4,8 86:3 88:16
**500** 14:5,8

**6**

**6** 5:15 113:9 140:17,18,25 142:6 143:21
**65** 49:23
**6811** 1:24 2:18 145:25
**6866036** 1:25
**6954** 145:24

**7**

**7** 5:20 113:15 121:12,15 139:11 142:13
**7,062,855.17** 139:4
**71,251,182** 132:25 133:15
**714,717.39** 121:22 122:2 122:22
**75,692,121** 141:13 142:3

**8**

**8** 4:4 49:19 88:25 89:22 96:24 112:11 113:18,21 119:5 137:16
**8/1/24** 5:4
**806** 3:8
**834,969** 101:4,8 110:13
**88.8** 54:14

**9**

**9** 1:16 2:16 6:1 125:18,24 126:16
**9/9/24** 146:2
**94** 5:6
**942,080** 106:8 106:12 107:13 107:17 108:24
**9:02** 2:16 6:2,5
**9:40** 34:23
**9:47** 35:1
**9th** 6:6

**a**

**a.m.** 2:16 6:2,5 34:23 35:1 61:17,20 102:4 102:7
**ability** 61:8
**able** 37:20 41:14 44:25 75:3
**above** 76:10 111:25
**account** 20:17 20:22 21:1 97:12 100:5 101:10 116:4,7 116:8
**accounted** 100:11
**accounting** 117:6
**accuracy** 10:9
**accurate** 12:8 25:2 37:20 45:1 63:16 135:10,13 139:23
**action** 7:5 8:6 145:15,16
**actions** 79:9
**active** 40:13 42:23 43:8,11 44:14,21 45:22 45:25 46:2 49:9,21 52:2 52:12,16,18 53:12,17,25 54:8,13 55:4 55:25 56:12 57:2,18 58:15 58:23 60:3 62:21 64:4,10 65:12
**actively** 40:19 40:22,25 45:3 46:6,23 52:17 53:13,18,25 54:9,14
**actual** 89:25 96:19 112:14 126:24 141:16
**actually** 18:22 18:23 81:12 90:13 94:10 96:7 99:21 100:3,17 113:24 119:13 119:21 128:8 133:23 139:23
**adam** 1:15 2:14 5:3 6:17 7:23 35:3 61:22 102:9 129:17 143:22 144:10 146:3
**add** 95:17 116:10
**added** 65:2
**addition** 121:1
**adjusting** 113:3
**administrative** 115:20
**affect** 57:5,13 63:19,20
**affected** 54:25
**affects** 60:19
**affiliations** 7:11
**aggregate** 95:13
**aggregated** 114:10
**ago** 8:3 9:16,24 9:24,25 10:4,5 16:19 20:14
**agree** 6:14 46:14,16,16 100:14 117:15 121:8
**ahb** 1:7 2:7 6:22
**ahead** 10:19,20 11:13 61:10 78:25 107:5 115:1 127:17 138:17
**al** 1:4,7 2:4,7 6:19,20
**alex** 16:7,10,14 16:17,25 17:9 17:19,20,22 18:3,11,17,25 105:6 137:14
**alexander** 16:3 90:12 105:6 130:10
**allegations** 50:3
**alleges** 52:11
**alleging** 50:7
**allocation** 141:7
**allocations** 45:5 46:8

**allowed** 61:4
**alternative** 64:14 99:22
**american** 28:25 29:7,15 36:24 37:12,14,24 39:7,10,14,17 39:20 40:21 65:7 67:9 71:16,20 72:1 73:12 74:1 75:3 93:13,19 93:23 95:8,9 96:6 97:3,8 98:12,19 99:21 101:15 103:18 105:11,18 106:3,12,18,24 107:15,22 108:1,7,11,21 109:2,6,10,14 109:16 110:1 110:16 113:10 113:22 114:8 114:17 116:3 118:11 139:10
**amount** 95:13
**analyses** 48:3
**analysis** 5:15 5:20 36:23 47:5,6,7,9,13 47:14,15,18,19 48:11,14,17 49:3 52:7 56:11 60:14,16 64:3,9 65:10 65:15,17,24 66:4,8,19,25 68:3 91:23 107:23
**analyze** 33:8,11 33:12,15,16 35:21 36:15 37:2,8,13 38:1 38:10 46:19,20 46:21 50:2 52:23 59:22 71:19 72:1 73:12 75:13,21 76:18 77:17
**analyzed** 43:24 45:14 56:17 64:1 69:21
**analyzing** 33:19 48:17 49:15 53:6 63:8,10,12,25
**annualized** 69:15,18
**answer** 10:1 12:5,8 13:11 14:18 17:6 19:23 21:2 25:2 32:5,12 37:20 44:7,10 45:1,8,18 48:6 48:9 55:19 59:8,24 61:3,5 61:7 62:18 63:3,5 68:9 73:8,16,19,21 74:6,11,14 75:9 78:24 80:10 81:14,17 85:24 87:10 88:20 94:14 97:20 124:1,4 124:10 139:16
**answered** 74:18
**answering** 59:4 86:8 91:9
**answers** 10:7 14:10 17:5 25:14 63:16 88:22
**anybody** 12:24 15:16,23 16:5 17:14 18:2 79:13 130:7 136:19
**anyone's** 85:25
**anyplace** 81:25
**apologize** 11:21 101:16 125:20 134:13
**appear** 142:20
**appearance** 7:8
**appearances** 3:1 7:10
**appears** 22:14 102:14 103:9 121:10
**applied** 78:20 79:19
**apply** 25:3 76:12 78:13 80:3,15
**appreciate** 13:13
**appropriate** 33:9,14,20 35:23 36:16,25 72:3 73:13 74:2 75:5
**approximate** 22:21 23:4
**approximately** 8:11 21:3 99:2
**approximation** 12:10,20
**april** 107:16 108:21 109:6 110:20 122:8
**argue** 89:23 127:15,16
**arguments** 111:8
**aside** 18:3 20:5 23:14,24 53:1 62:16 63:1 67:4,13 68:11 68:16,21 71:9 81:6,16 92:25 94:7
**asked** 17:3,4 19:14 25:3,9 25:12,16 26:20 28:13,19 29:5 30:5,18,25

31:6 32:10 47:25 60:12 70:21 71:22,24 72:4 73:1,6 74:18 75:16,24 76:2,5,9,21,23 76:25 77:7,9 77:21,22 78:13 80:3,15 86:1 88:16 93:17,22 94:2 98:4,21 99:23 100:1,15 101:7 106:25 118:9 123:7,14 124:2,12 131:23
**asking** 13:14,15 17:6 27:10 30:22 33:15,17 35:17 44:9 48:1,9 50:15 55:21 58:11,21 59:10,13,15,17 59:19 60:25 63:6 72:10 73:23 75:8 76:23,24 79:1 86:7 118:16 120:19 123:12 127:13 134:25
**assess** 29:10,18 31:9
**asset** 54:14 141:7
**assets** 52:18 55:4,25 113:22 113:23 114:4 132:24 133:14 135:19
**assigned** 77:6
**assignment** 76:6 77:2,4
**assisted** 18:7
**assisting** 17:9
**associated** 10:17 13:16,25 14:4,5,22 15:23 19:12 66:14 67:15 68:12 108:10 109:1,9,10,16 110:21 111:2 117:16 118:1 118:10,20 119:10,24 120:17
**assume** 25:16 29:5 30:5 31:1 67:18 92:25 93:17,22 94:2 98:21 99:23 100:1,15 101:7 106:25 114:15 118:9 120:19 122:4 123:12
**assumed** 94:8 94:16
**assuming** 95:6 98:11 105:18
**assumption** 26:16 27:12 29:3 30:22,25 31:5,10 98:4,7 106:20 120:23 123:14
**assumptions** 24:24 25:11,13 25:16,23,24 26:20,24 27:4 27:10 28:2,8 28:10 29:14,19 32:10 82:6,7 86:24 91:18,21 92:8,11,14,17 92:21 98:8
**attached** 126:9
**attorney** 3:6 7:12 145:16
**attorneys** 3:18 24:12
**attributable** 25:6 76:15
**audio** 6:13
**august** 22:15 26:3
**available** 20:12 30:14,18 122:5 122:9 137:9 140:24
**average** 71:13 137:6
**aware** 14:25 15:9 16:2 23:14 24:6,8 43:3 121:6
**awhile** 79:16

**b**

**b** 5:1 25:23 28:3 91:19,22 93:1 94:17
**back** 13:3 17:2 34:25 35:7 37:22 41:11,20 41:23 54:4 60:13 61:19 62:1 76:6,8 91:18 101:15 102:6,25 105:9 106:2 115:19 115:21 117:5 124:25 125:23 129:14 130:17 134:16 137:16 141:15 142:5 143:19
**backup** 5:10 89:8 90:2 96:16 103:7 105:10 106:3 111:20 127:23 133:7 135:2 136:6 137:19
**balance** 21:4 105:13
**balances** 5:7 103:22 109:22 110:3 111:13 111:14 112:18 126:6 131:2

135:22,23
136:2
**bar**  112:1
**based**  30:17
63:7 89:13
92:11 135:1
**basically**  39:4
127:11
**basis**  49:19,22
49:23 114:5
116:22,23
137:7
**beach**  2:15
**beacon**  29:15
71:16,20 72:2
73:12 74:1
75:4 93:23
94:21 95:9
96:6,15 97:3,9
98:12,20 99:21
100:24 101:15
103:8,12,18,22
105:11,14,19
106:4,4,12,18
106:24 107:16
107:22 108:1,8
108:11,21
109:2,6,10,14
109:16 110:1
110:16 114:8
**bear**  133:2
**bearing**  57:4
**beginning**  7:11
35:2 43:15
61:21 84:25

86:9 102:8
108:13 129:16
143:21
**behalf**  7:16,18
7:19,21
**behoove**  14:11
**belief**  85:3,21
**believe**  9:18
11:3 12:11
13:11 15:4,9
16:6,18 17:15
17:19 18:18
19:5,10 20:6
20:10 23:8,10
23:13 24:10
25:14,14 26:1
26:16 31:8,14
32:17,19 33:7
35:25 36:2,4,6
36:8,10,18,21
37:1,11 38:12
38:15,18,21,24
39:1,9,12,15,18
39:21,24 40:2
40:5,8,11 43:5
43:23 45:8,24
46:1 47:24
49:7,16 50:4
51:20 56:10
64:25 65:9
66:7,12,18,23
67:3 69:3 70:1
71:7,14,17
72:19,23 74:6
77:11,16,24

78:8 81:9,22
82:23 84:5,17
85:8 86:10,11
86:16,17,19,20
86:22 87:1,2
88:10,12 89:10
89:23 90:11
92:13,16,19,24
94:12,18 96:8
98:9,18,23,23
99:1 100:12
101:12 104:6
105:16,21,24
109:20 111:3,4
111:10,16,21
112:9 114:1,13
115:16,25
116:25 117:11
118:15,22
120:1 122:3
123:5 124:6,15
125:8 134:20
137:14,22
138:25 140:10
140:14 143:5
**benefit**  99:16
99:20
**best**  9:10,15
45:24 46:2
56:24 61:2,7
79:16 85:3,20
**better**  22:23
57:3,8,18,22,24
58:4,16,17,21
58:22 60:4

99:20 103:17
106:11,19,23
110:25 139:9
**beyond**  30:17
31:8 73:15
115:5
**bit**  57:16 97:7
101:17 123:1
**block**  3:15 7:17
41:9 42:3
128:19 140:21
140:24 142:12
**blue**  100:24
**blumenfeld**
3:14 4:4 7:14
7:15 8:1,3
10:23 11:14,25
13:2,8 15:2
21:20 24:18
28:1,16 34:17
35:5 36:22
41:3,10,13
42:9 54:3,7
57:23 59:13,19
61:24 72:12
73:3 74:7,15
74:22 82:17
92:6 93:10
94:20,24
102:11,16,21
102:24 111:17
111:23 112:2,6
114:21 118:7
119:16 128:17
128:21,25

129:5,19 130:6
140:11,15,18
141:3,5 142:10
142:15 143:6
143:10,13,24
**bockius** 3:13
**bonds** 45:5
46:8
**bottom** 111:22
125:8 128:15
**brain** 56:19
**brandon** 3:24
6:25 102:17
**break** 8:20
23:12 34:16
35:17 42:4
61:11,12 64:25
101:19,22
128:24 129:1,4
130:3,8 131:15
131:23 143:6
**breaks** 101:17
**briefly** 18:7
130:10
**broad** 60:15
68:2
**bunch** 103:23

**c**

**c** 25:23 28:3
91:19,22 93:1
94:17 140:5
**c37** 140:1
**cal** 21:13
**calculate** 66:13
67:22,25 70:10

70:17 79:6
80:6 89:19
95:19 96:2,7
97:7 99:11
101:2 107:13
110:17 113:19
118:9,25
119:10,23
120:3,13
121:15,20,21
122:20 124:2
124:12 139:18
**calculated**
105:17 106:7
107:17 108:9
110:12 113:5
121:11
**calculates**
89:13
**calculating**
66:20 67:2
68:1,4,7
**calculation**
30:17,19 67:5
67:15,18,19,20
68:12,17,22
82:10,21 95:22
97:25 112:25
113:18 117:1
120:8 123:20
123:20,22
124:18 139:1,3
139:5 140:9
**calculations**
17:12 30:6

31:2 83:2,7
96:25 97:18
103:16 112:10
112:15 113:15
116:5,7,9,11,12
116:13,24
117:7,25
118:14 122:7
124:21 131:11
131:16 142:3
**calendar** 23:5
**california** 2:15
145:2
**call** 26:19 68:1
82:13 107:16
**called** 27:14
85:4 115:15
**calls** 62:20,22
64:4,6,10
65:12 118:3
**calpers** 19:24
20:1,5,7,12,18
20:22 21:1,4
**camera** 6:10
120:8
**campbell** 3:25
7:19
**candor** 86:13
86:14,20
**cap** 29:15,16
71:16,20 72:2
73:12 74:1
75:4,11,15,19
75:23 76:20
77:14,19 93:24

94:3,5 95:10
95:12 98:13
109:4
**capacity** 12:25
13:7 15:24
**captioned**
76:10
**card** 22:9
**carolyn** 3:25
7:19
**case** 1:6 2:6
6:22 9:11,13
15:18,21 22:10
22:13,19 23:2
23:7,21,24
24:7,10 32:23
42:12 43:2
46:13 60:20
71:1,8,9 74:25
76:22 79:25
80:25 86:17
108:2 116:6
131:12 145:12
146:1
**cases** 9:7 79:14
79:19,21,23
81:3,5
**cash** 45:5 46:8
112:25 115:6
116:11 117:8,9
**caution** 24:13
**caveats** 123:5
**cell** 124:11
139:24 140:1

**cells** 140:5
**certain** 24:24 32:10 59:23
**certainly** 22:1 34:18
**certified** 2:17 2:18 145:1
**certify** 145:3,14
**chance** 51:24 130:2
**change** 42:4 90:2,3,4,5 91:24 92:21,23 99:25 100:15 101:6 105:13 105:14,18 111:13
**changed** 92:12 93:9
**changes** 45:4 46:7 93:1 94:7 94:16 97:12
**changing** 93:12
**characteristics** 37:4
**charge** 90:12
**charged** 49:9
**charges** 49:19
**chart** 50:5,13 50:16,19 65:15
**charts** 69:13
**checked** 134:1 134:11 136:13 137:12
**checking** 124:8
**choice** 83:14
**choices** 20:12
**chose** 82:9
**circumstance** 80:7 115:10 117:17,25
**cite** 125:14
**cited** 125:9
**claimed** 91:23
**clarification** 42:1 70:3 82:11 137:11
**clarify** 8:25 146:5
**class** 8:5 25:7 49:18,20 76:15 79:9
**clear** 14:17 53:16 74:16 80:2 88:23 99:5 107:7 114:2 118:8 121:14 123:6
**clearer** 33:17
**click** 128:7
**close** 41:12 111:17
**codes** 146:4
**colleagues** 24:15
**collected** 113:7 113:12
**column** 50:22 50:25 51:3,6,9 51:12,16
**combined** 123:16
**comes** 8:18 60:4
**comfortable** 120:12 138:6
**commas** 122:25
**commencing** 2:15
**common** 25:4 71:11 76:12 78:13,17,20 79:2,3,8 80:3,4 80:6,11,15 85:13 87:6,8 87:11
**communicati...** 24:14
**company** 52:3 115:18
**compare** 62:21 67:21
**compared** 68:13 90:21 103:19 106:11 109:8 113:23 118:10
**comparing** 56:11 64:9 65:11,18,24 66:4,9,20,25 67:6 68:18,22 70:11,17
**comparison** 50:20 62:12 90:20
**compensation** 84:1
**competently** 85:5
**complaining** 43:21 45:11,22 51:19
**complaint** 5:5 41:4,18,25 42:10,14,18 43:2,13,15 44:1,2,5,13,18 44:24 45:3,11 45:16,20 46:4 48:19 50:7 51:22 52:11 59:12,14,18 62:20,22 64:4 64:6,10,13,19 64:22 65:1,12 69:2 104:17
**completed** 77:2
**completion** 145:12
**complied** 84:2
**complies** 86:17
**components** 58:1,20
**concept** 115:9
**concerned** 84:16

**conclude** 28:23 144:3,8
**concluded** 144:13
**concludes** 144:9
**conclusion** 103:17 118:3
**conclusions** 92:10,22
**conducted** 6:8 6:23
**confirm** 84:1 138:12
**conform** 146:5
**confused** 27:5 37:16 108:12 108:18
**confusion** 11:19
**connection** 8:5 15:16 22:19 32:22 46:13 71:4,18 86:24 89:8
**connections** 6:10
**consider** 12:4 12:21 14:21 32:2,6,9,21 33:19 47:19,20 53:11 71:3,9 71:12 72:17 73:4,11 74:17 74:20,23 75:2 85:23
**considerably** 48:24
**consideration** 58:7
**considered** 31:20,24 32:16 42:11 47:8,19 131:13
**considers** 71:13
**consultant** 78:1 78:7
**contained** 50:2 67:4,14 77:10 81:21 91:7 92:9
**context** 38:9,10 38:12 60:8,14 87:14 114:23 115:4
**continue** 6:13 35:19 107:22
**continued** 107:21
**continues** 104:13
**contribute** 21:8
**contributing** 21:11
**contribution** 20:9
**controversial** 84:23
**conversation** 48:13 130:12
**coordinating** 16:20
**copied** 138:2
**copy** 21:16,25 22:2,6,12 24:19 41:14 89:4 100:22 107:3,8,9 121:18 122:24
**correct** 9:12 10:14,15 14:1 15:1 16:16,23 17:25 21:7,23 22:12,17 25:25 26:1,12,22 27:4,4,6,6,9,20 27:20 28:5,7 28:11 29:8,9 29:16,17 30:8 31:3,8,21,22,25 32:1,4,20,24,25 33:3 41:25 42:12,13,16 43:10 44:14,15 46:9,10,22,22 47:23 50:8 51:5,8,11,14,20 52:4,5,9,14,20 58:16 61:9 65:9,21 66:1,2 66:6,7,11,12,18 66:22,23 67:3 69:2,5,22 70:2 70:7 71:1,16 71:17,25 72:13 72:19 75:11,12 75:19,20 77:11 77:15,16,24 78:15 80:1,9 80:16,17,25 81:1,7 82:18 82:23 83:7,12 83:17 84:4 85:2,9,20 86:15,19 87:1 89:5,6,10,14,17 89:22,24 90:5 90:6 91:8,8,13 91:22,24 92:4 92:4,10,12,13 92:16,19,23,24 93:13,19,20,25 94:6,9,12,18 95:14,15 96:1 96:4,5,7,8,21 97:1,4,9,10,13 98:8,14,18,22 98:24 99:8,12 99:13 100:4,12 100:18 101:4,5 101:9 103:8,9 103:20,21,25 104:1,6,22,24 105:2,15,16,22 105:24,25 106:1,8,9,13,15 106:16 107:1,2 107:11,18,19 107:24 108:4 108:17,24,25

109:3,17,18,20
110:1,2,5,13,14
110:17,18,22
110:23 111:2,3
111:5,9,11,15
111:16 112:12
112:13,17,19
112:20,23
113:8,11,13,17
113:19,20
114:1,5,6,10,13
116:5,9,15
117:7,10,11
118:11,12,15
119:25 120:1,6
120:10,11
121:16,17,23
121:24 122:10
122:18,19,23
123:3,5,21,22
123:25 124:7
124:16,18
125:5,12,15
126:6,7 127:4
127:21 128:2,9
131:2,3,6,7
132:18,19,25
133:1,15
134:19 135:18
135:21,25
136:4,10,11
137:21,22
138:4,5,13,24
139:1,12,19,20
139:24,25

140:3,7,10
141:13 142:3,4
142:19 146:6
**corrected**
133:23 134:8
**correctly** 31:4
43:18 52:21
84:3 97:6
107:13 124:24
132:21
**cost** 50:19 58:2
58:5,18 60:5
**costly** 42:22,23
**counsel** 3:3,12
3:25 6:18 7:9
30:19 31:6
35:4 61:23
76:10 82:22,24
83:12,15
102:10 111:22
129:18 130:11
134:22,25
143:12,23
144:3
**couple** 8:3 41:6
123:10
**course** 8:19
11:20 25:21
57:1
**court** 1:1 2:1
2:18 6:21 7:2
11:16 27:7
30:19 83:24
84:8,15,19
86:13 87:18,20

92:4,7,8 144:3
**cover** 115:20
**covered** 56:3
**csr** 145:25
**curious** 42:8
**cut** 9:2 114:25
**cuts** 9:3
**cv** 1:7 2:7 6:22

**d**

**d** 4:1 5:1 12:1
25:24 28:3
**damage** 78:17
99:15
**damages** 9:14
25:4 66:14,20
67:2,6,15
68:12,17,22
70:10,17 74:24
76:12 78:13,19
79:2,6,7,12
80:4,7,15 90:4
97:21,22,24
99:11 101:3
106:22 107:13
110:17,20
111:1,1,1
118:1 121:9,22
122:2,11,21
123:2,18
138:19,20,22
138:23 139:3
139:18
**damiano** 15:4,6
**data** 16:8 17:19
17:22 30:14,18

31:8 105:1,3,4
113:6,12 126:4
130:25 131:6
131:10 133:25
135:1 136:7,12
137:5,5,9,11
**date** 28:24,25
30:5 31:1
36:14,24 37:18
39:23 40:1,7
40:10,25 42:21
43:4,6,7,21,23
45:10 64:11,14
65:7,13,19,20
65:21 66:1,5
66:10,16,17,22
67:1,7,17
68:14,23 70:13
70:13,20 77:11
93:12,19
106:10 110:23
112:19,22
113:10,24
114:5 116:4
117:14,22
118:11,13,19
121:25 122:6
123:25 132:14
135:20,24
136:9 145:17
146:2
**dated** 145:20
**dates** 37:18
139:8

**day** 24:9 27:14
122:7
**daylight** 6:5
144:12
**de** 137:6
**dealt** 17:20
**decastro** 3:17
7:18
**december** 5:13
120:9,16 132:5
133:14
**decide** 27:7
**decided** 56:16
82:19 83:11
117:12
**decimal** 127:3
127:20 128:7,8
131:15 133:22
**declaration**
86:9
**declare** 85:1,18
**defendant**
76:12
**defendants** 1:9
2:9 3:12 6:18
7:16,18 8:5
24:6,20
**defer** 74:5
80:10 134:22
**define** 33:15
38:7,8 58:17
87:10,12,13
**defined** 20:8
47:14 48:17
116:17

**defines** 44:6
**definitely** 14:8
14:8
**definition**
33:16 46:24
47:6,7,18
48:13 55:18
58:21,22 60:15
63:15,15 68:2
77:24 84:13
87:11
**definitively**
139:17
**depends** 6:9
38:9
**deponent**
146:25
**deposed** 8:9 9:6
10:7
**deposition** 1:14
2:14 5:2 6:7,17
6:23 9:20 17:2
28:21 30:12
31:19,25 35:2
48:16,17 55:20
56:23 57:1
59:4 60:21
61:21 70:3,6
76:9 102:8
105:10 106:2
112:14 114:4
127:23,24
129:16 131:19
135:5,17 137:3
141:17 143:21

144:9 145:11
146:2
**depositions**
86:3 88:16
**derived** 91:21
**describe** 29:14
84:18 89:19
93:11 124:23
**described**
26:24 43:8
44:1,3 88:13
**describes** 44:13
**describing**
115:17
**description** 5:2
125:2 135:10
**detail** 97:7
**determine**
28:14
**determined**
82:15
**developed**
81:10,18 82:5
**developing**
81:22
**dfa** 5:6 75:19
75:23 76:20
94:2,5,21
95:11 96:6
97:3 100:20
101:3 103:8
105:11,25
106:4 109:21
109:21 110:3,8
110:19,21,24

111:2,13,14
114:8
**difference**
40:13 67:22
113:21 137:7
**differences**
137:4
**different** 43:3,6
43:7 44:22
57:16 97:23,25
120:4 140:5,6
**differently** 37:7
**difficult** 48:9
**dig** 114:14
**digits** 134:3,4
**direct** 105:1
137:4
**direction** 83:3
137:15 145:8
**directly** 17:20
**disagree** 46:15
46:16
**discrepancy**
134:2
**discuss** 134:24
**discussion**
130:5
**dishonest** 134:6
**distributes**
39:5
**district** 1:1,2
2:1,2 6:21,21
**doctor** 24:17
**document** 5:11
41:22 132:1

**documents** 22:7 31:19 32:15 42:10 90:22 104:15 104:21 125:9 125:11,13,14 126:5 131:1,12 137:6
**doing** 41:16 72:17 85:18 94:25 99:3 121:14 134:13 134:25
**dollar** 95:19
**dollars** 98:22 100:2,16 136:3
**doubt** 14:7 138:10
**download** 17:22 41:14 96:10
**downloaded** 17:19 41:7 107:9
**dr** 5:3 6:17 7:21 8:2 11:13 11:15,17 21:14 24:19 32:20 34:19 35:3,6 41:5 43:19 45:9 48:5 56:3 59:7 60:1 61:4 61:13,22,25 62:11 64:2,25 65:23 68:6 70:4,23 78:24 82:18 94:25 99:5 100:23 101:16 102:9 102:22 107:7 112:2 114:15 115:1 117:12 119:5 124:8 129:6,17,20 130:7,18 131:8 136:12,23 140:13 142:21 143:22,25 144:10
**draft** 17:11 18:9,16 19:1,2
**drafted** 18:13
**drill** 8:13
**duly** 7:24
**duty** 83:23,24 84:2,7,9,11,13 84:14,15 85:6 85:8,8,14,22,24 86:11,13,17,20 86:22,23 87:2 87:3,17,25 88:1,12,14,17
**dylan** 18:5

**e**

**e** 4:1,1 5:1,1 12:1
**earlier** 56:4 131:4
**early** 101:17
**easier** 22:2 41:17 123:1
**eat** 130:2
**economic** 98:3 100:8,18 121:2 121:4,4,10 123:17 124:6 124:15 138:25 139:5
**economically** 103:21 111:4 111:10,13 123:11
**economics** 100:13 111:8 121:8 122:13 122:16
**either** 14:17 15:25 23:4 83:14,14 101:11 105:6 113:6
**else's** 32:11
**email** 18:18,24
**employed** 12:1 12:2,13,22
**employee** 15:25 145:15
**employees** 12:18
**employment** 12:4
**encompasses** 10:8
**engaged** 83:25
**engaging** 115:15
**engelman** 3:16 7:17
**entire** 63:18 127:10
**entirely** 56:4 134:23
**entirety** 126:18
**entitled** 50:23 59:24 100:20 103:12
**epic** 5:11
**equity** 77:14,19 94:4 95:12
**erisa** 8:5 9:7 10:17 11:7,10 78:1,4,7,10 79:8
**errors** 146:6
**especially** 9:1
**estimate** 13:22 22:23 24:23 25:4,9 76:13
**et** 1:4,7 2:4,7 6:19,20
**evaluate** 28:4,9 39:7,10,13,16 39:19,22,25 40:3,6,9,18,21 40:24 43:11 53:2,17 55:9 55:12 58:7,25 60:3,14,15

109:7
**evaluated**
58:23
**evaluating** 53:5
53:5,12 55:16
56:17,20
**evaluation**
53:21
**everybody**
11:22
**exact** 139:15
140:8
**exactly** 28:19
93:2,3 94:9
122:11 123:16
135:10
**examination**
4:3 7:25
**excel** 5:6,9
89:15,18 94:21
127:6 128:1,15
134:4 135:6
141:16
**exchanged**
18:17
**excluding**
95:15,17 96:1
97:10
**excuse** 29:12
86:21 123:8
128:16 138:21
**exercise** 81:23
**exercised** 81:9
**exhibit** 5:3,5,6
5:9,11,15,20

9:18,19,20
21:17,22 22:3
22:12 28:20
30:12 31:13,18
31:19,24,25
32:15 42:5
65:1,2 70:1,2,2
70:4,6,6 76:8
89:2 90:7,21
90:24 91:3,7
94:22 103:8
105:9 106:3
107:9 109:22
111:19 112:2,4
112:14,18,21
112:24 113:9
113:15,18,21
114:2,3,3,11
116:12,13
119:5 124:19
124:20 125:3,3
125:9 126:8,21
126:23 127:9
127:12,17,23
127:24 128:1
128:13 129:8
131:18 133:5,6
133:9,9 134:11
135:2,4,5,5,16
135:17,19
136:1,6,6,13
137:3,16,16
140:17,25
141:16,22
142:6,9,13

**exhibits** 17:13
21:15 42:2
88:24 89:21
96:24 112:11
134:1,3,4,23
138:9
**exists** 123:13
**expecting**
14:19
**expense** 48:24
49:21 51:3
**expenses**
115:20
**expert** 5:3
11:17 13:9,11
13:18,25 14:4
14:5,22 15:6
15:10 22:13
23:23 24:7,20
26:8,9 30:7,15
31:2,14,23
32:3,4,6,11,13
32:14 71:4,10
71:11,12,14
72:7,17 74:24
83:22
**experts** 13:16
15:1 23:7,14
24:20 26:4
79:18
**explain** 11:22
16:19 44:8
87:14
**explained**
28:20

**explaining**
11:16
**explains** 140:23
**express** 54:19
**extent** 14:16
19:14 26:15
31:7 32:10
48:8 56:15,19
58:12 60:25
117:8
**extremely**
60:15

**f**

**f** 4:1 5:1 132:21
**fact** 24:6 27:4
**factor** 37:19
116:23
**factors** 58:3
**facts** 85:5
146:5
**failure** 108:10
**fair** 94:20
**fall** 53:4 63:9
**falls** 47:12
86:14
**familiar** 115:9
**fan** 63:20,21,22
64:1
**far** 84:16
**federal** 145:11
**feel** 22:1
**fees** 37:2,8,13
38:13 39:10,25
49:8,11 71:19
75:13,21 76:18

77:17
**fewer** 98:22 100:2,16
**fidelity** 27:13 27:14 28:23 29:6 33:1,5,8 33:13,19 35:22 36:15 37:4,10 37:23 38:1,11 38:13,17,20,22 42:21 43:3 50:6 51:17 52:17,19 53:13 53:18 54:1,9 62:20 64:3,5 64:15 65:18,25 66:4,9,15,21,25 67:6,10,16 68:18,24 70:11 70:13,18,19 93:12,18 95:7 96:3,20,23 112:19,22 113:24 114:4 114:15 115:18 116:2,23 117:13,16,19 118:1,17,20 119:10,24 120:16,18,20 121:25 123:24 124:20 125:4 126:4 130:25 132:14 135:20 135:23 136:2,8 137:8 139:9 141:10 142:18 142:22
**fiduciaries** 29:5 70:25 71:5 93:22
**fiduciary** 5:15 5:20 70:24 71:4 78:3,9 93:17
**figure** 99:6
**file** 127:6 128:1
**filed** 6:20
**finance** 73:16 73:17
**financially** 7:5 145:14
**find** 8:20
**finding** 110:7
**fine** 13:13 28:17 59:21,23 87:24 99:9 101:13,23 111:7 115:2,8 115:10 125:23
**finish** 78:24 128:25
**firm** 7:2 15:8
**firm's** 23:12
**first** 15:6 18:9 18:25 19:1 22:18 43:12 44:5 48:23 52:1 96:18 103:23 108:20 111:18 126:14 130:23 134:19
**five** 9:24 10:5 14:3,7 34:20 69:5,18 128:8 143:7
**fixed** 134:20
**flow** 112:25 116:11
**flows** 117:9
**fluctuate** 107:20
**focus** 48:2
**focused** 103:11
**folder** 21:15
**follow** 14:16
**following** 25:10 85:2,5,19 137:25
**follows** 7:24
**footnote** 30:11 30:12 52:10 54:12 81:11,16 81:21 82:7 136:24 137:2 137:13
**foregoing** 145:4,8,10
**forgotten** 36:12
**form** 10:20 11:12 12:21 14:23 27:24 28:12 36:20 57:6,20 59:17 59:20 93:7 119:12
**formally** 19:10
**format** 127:12
**forming** 32:3,7 42:12
**formula** 113:5 120:13 121:18 122:24 124:9 138:3 139:21
**formulas** 138:6
**forth** 41:21,24 60:14 124:25 145:5
**frank** 132:22
**free** 22:1
**freedom** 27:13 27:15 29:6,6 33:1,5,9,13,20 35:22 36:16 37:4,10,23 38:2,11,14,17 38:20,23 40:18 42:22,24 50:7 50:23 51:6,13 51:17 62:12,13 62:20,22 64:3 64:5,16 65:11 65:18,25 66:5 66:9,15,21 67:1,7,10,16 68:13,18,24 70:11,18,20 93:12,18 95:8 96:3,20,23 111:20 112:19

112:22 113:24 114:4,16 116:2 116:23 117:13 117:16,19 118:2,10,17,20 119:11,24 120:16,18,20 122:1,9 123:24 124:21 125:4 126:5 130:25 132:14 135:20 135:23 136:2,9 137:8 139:9 141:10 142:18 142:22
**front** 8:15 22:1 22:6,7 25:19 35:13 62:7 64:22 95:4 103:4 109:23 125:21 126:1 129:25 130:20 135:14
**full** 30:3
**fund** 5:6 29:15 29:16 36:24 39:4 58:8 64:14 71:16,21 72:2 73:13 74:1 75:4,11 75:15,19,23 76:20 77:15,20 93:23,24 94:2 95:8,9,11 97:9 98:12,17,20,20 99:3,21,23 101:3,15 103:18,19 105:11,19,19 105:25 106:11 106:12,18,19 106:24,25 107:16,22 108:1,1,8,8,10 108:11,14,15 108:16,22 109:2,4,5,6,8,8 109:10,11,14 109:21 110:1,3 110:16,20,21 110:24,25 111:2 113:3 114:10 115:18 119:2,3 123:13 132:14,17 133:14 141:11 142:1
**fund's** 48:24
**fundamental** 77:14,19 94:3 95:11
**funds** 27:13 28:24,25,25 29:7 33:1,5,9 33:13,20 35:22 36:16,24 37:5 37:10,12,15,23 37:24 38:2,11 38:14,17,20,23 39:5,8,11,14,17 39:20,23 40:1 40:4,7,10,18,22 40:25 42:22,24 43:4,6,7,21,23 44:20 45:10 46:1,2,23 50:7 51:17 52:18,19 53:14,19 54:1 54:9 62:12,13 62:20,22 64:4 64:5,11,16 65:7,7,11,13,19 65:19,20,21,25 66:1,5,5,10,10 66:15,16,18,21 66:22 67:1,1,7 67:8,10,10,16 67:17 68:13,14 68:18,19,23,24 70:12,13,14,18 70:20 82:6 93:12,13,19 96:6,21,24 97:3 103:8 106:4 111:15 111:20 112:19 112:22,22 113:10,10,23 113:25 114:5,9 114:9,16 115:4 115:10,14 116:2,3,4,23 117:13,14,16 117:19,22 118:2,10,11,11 118:17,19,21 119:11,24 120:16,18,20 122:1,5,9 123:24 124:21 125:4 135:20 135:24 136:9 139:10,10 142:18,22
**further** 114:14 143:25 145:10 145:14

**g**

**g** 16:4
**gears** 105:9 124:19 127:22
**general** 43:5 57:9 108:15
**gentlemen** 16:7
**genworth** 9:11 79:17 80:25
**getting** 24:14 85:16 106:2 108:12
**give** 10:6 12:8 12:10 13:22 14:10,18 22:23 25:1 37:20 44:3 45:1 63:16 94:13 115:21 124:4 124:10 142:8
**given** 11:9 20:16 60:15 72:14 83:3

86:3 123:4
145:9
**gives** 137:10
**giving** 17:4
63:17
**glide** 37:3,9,14
38:22,25 39:19
40:9
**go** 6:14 9:4
10:19,20 11:12
16:17 17:2
37:22 41:11
43:14 58:20
61:10 69:25
71:13 76:6
78:25 84:24
87:9 91:18
100:19 101:15
103:22 106:4
106:22 107:5
109:21 110:6,8
111:13 114:25
119:2 125:23
126:14,21
127:12,17
128:23 130:17
131:18 133:2
134:16 135:5
137:16,23
138:17 141:15
141:21 142:5
143:11
**goes** 16:11
106:14

**going** 6:5 14:11
15:5 34:14,22
41:23 44:8
48:2,3,12
60:13 61:15,17
76:8 91:4 94:8
100:1 101:19
102:3 107:8
112:7 127:15
128:22 129:4
129:10,11
130:13 143:17
144:8,11
**good** 6:4 7:14
8:2,20 9:4
15:15 34:15
61:11
**great** 8:9,18 9:6
35:16 102:16
141:3
**green** 100:23
111:25
**guess** 12:5
13:17 18:23
27:7 30:23
64:1 78:25
81:14 82:12
88:17 90:15
97:19 106:17
133:25 136:17
139:6

**h**

**h** 5:1 16:4
**half** 34:15
129:7 134:13

**handy** 41:19
**happened**
90:15 142:24
143:2,3
**happening**
117:18
**happy** 9:17
10:10 25:17
44:2 133:23
134:7
**harry** 16:4
**head** 15:12
**hear** 8:23 9:2
11:19 43:18
**heard** 6:12 19:5
19:9 115:14
**help** 15:16,20
16:25 17:17
18:2
**helped** 16:7
17:11,11
**helping** 16:21
**henderson**
29:16 75:11,15
93:24 95:10
98:13 103:19
106:19 108:14
109:3
**hide** 87:3,5,7,9
87:9,10,12
**higher** 49:10
**highlighted**
136:25
**hold** 20:25 30:9
41:20 45:17

64:24 83:4
104:12 105:22
107:2 119:6
131:24
**holdings** 37:3,9
37:13 38:16
39:13 40:3
54:14 71:19
75:14,22 76:19
77:18
**hopefully** 21:16
137:10
**hour** 34:15
101:18 129:7
134:14
**house** 3:25
**huang** 16:3,15
90:12 105:6
130:10,12
137:15
**human** 11:21
**hypothetical**
117:18,23
118:5,6,23
119:21,22
122:4 123:4,7

**i**

**idea** 13:23 21:6
115:5 128:10
128:23
**identification**
21:18 42:6
94:23 112:5
129:9 141:1
142:14

**identified** 5:2
23:15 58:3,18
**identifies** 52:10
64:13 65:6
**identify** 79:23
81:4
**ignore** 97:17
**impact** 58:4
65:15,16 67:23
67:24
**impacted** 55:22
57:11
**important** 8:14
**imprudent**
27:15
**inappropriate**
59:14
**inarticulate**
134:15
**include** 25:23
30:19 47:22
49:3,14 53:4
60:16 68:2
82:9,20 84:24
85:7 86:4,5,23
89:21 96:18,24
98:7
**included** 19:16
53:22 68:3,4
83:1,6 84:13
85:6 112:15
116:18,19
117:4 138:16
**includes** 48:11
50:16 56:17

67:20 86:23
87:3 88:1,13
**including** 7:9
83:16
**income** 119:2,3
**incomplete**
118:22 122:3
**incorporated**
6:20 25:5
76:11,14
**increase** 48:24
**independent**
84:15,18,21
**independently**
52:9
**index** 42:24,24
43:8 44:14,22
45:22 46:1
49:10,19 50:11
50:17 51:6,13
52:2,12,18
55:3,4,25 56:7
56:8,12 57:3
57:19 58:16,24
60:4 62:13,22
62:23 64:5,6
70:13,20 77:15
77:20 94:4
95:12
**indices** 52:20
**indirectly**
17:23
**individual**
16:13 17:16
23:15

**indulge** 142:5
**industry** 49:10
**inflows** 113:2
**inform** 54:17
56:22
**information**
14:16 31:20
32:15 50:2
85:3,20 87:18
87:19 90:8,21
91:2,7 104:3
128:11,12
**informed** 26:15
32:11 55:22
**inherently** 45:3
46:6
**input** 103:24
**inputs** 90:3,5
**institutional**
49:18
**instructions**
84:1
**insurance** 22:9
**interest** 30:20
82:10,20 83:2
83:7,16 95:15
95:18 96:1
97:10 108:4
**interested** 7:5
145:15
**interesting**
94:10
**internal** 31:14
**international**
75:19,23 76:20

77:14,19 94:3
94:5 95:11
**internet** 6:10
**introduced**
131:22
**invested** 107:21
**investigate**
117:2
**investing**
107:15
**investment**
5:12,15,20
20:11,16 37:3
37:3,8,9,13,14
38:16,19 39:13
39:16 40:4,6
52:3 71:6,19
71:20 72:3
73:13 74:2
75:5,14,14,22
75:22 76:19,19
77:18,18,25
78:6 104:4,8
104:20 116:15
132:3 136:14
**investments**
20:20,23,24,25
33:2,6,10,14,21
35:23 36:17,25
40:3 53:24
93:4
**invests** 52:16
52:19 53:12,18
54:9

**issue** 55:9,12 101:12 133:23
**issues** 32:22
**italy** 16:7,20 17:16 18:4 105:7
**items** 59:16

**j**

**j.p.** 65:7,20,25 66:16,17 67:7 67:17 68:14 70:12,19
**january** 98:20 105:20,21 117:14,22 118:14,17,25 119:9,14,23 120:21
**janus** 29:15 75:11,15 93:23 95:9 98:12,20 99:22 103:19 106:11,19,25 108:10,14 109:3,8
**jeremy** 3:14 7:15 8:3 11:24 144:5
**jeremy.blum...** 3:21
**job** 1:25 48:5,6
**joined** 11:15 20:13
**judge** 8:15 35:13 62:8 103:5 129:25
**judgment** 81:9 81:13,23 82:13
**jumping** 42:2
**june** 5:22 30:7 30:13,17 31:3 95:14 97:9 100:3 108:2,8 110:12 121:16 123:2,8,23 124:3 137:24 139:2,12,18 142:23
**jury** 8:16 35:14 62:8 103:5 129:25

**k**

**k** 5:16,21 19:17 19:19,25 20:1 25:6 49:20 76:14 132:14 141:11
**keep** 45:6 101:19
**keri** 3:16 7:17
**key** 54:11
**kind** 14:11 84:23
**knew** 26:11 143:5
**know** 8:13,13 8:20,24 9:19 10:11 12:13,17 12:24 13:10,15 13:21,24 14:12 15:5,13 16:21 18:8 19:4,17 19:18,23,24 20:1 21:2,3 22:5 23:6,9 24:2,9 26:3,6,9 26:13 30:21 31:7,15 32:5 32:12 36:12 38:25 44:20 45:9,21 50:18 54:8 55:6,7,19 55:24 61:11 62:18 63:3,5 64:13,17 65:17 67:24 68:4 73:2,15,19,21 74:13 75:9 78:19 79:12 80:21 82:1,3 82:24 84:12,22 85:7,22,23,24 87:11,13,21 88:6,18 90:11 90:13,16 91:14 91:16 97:19 98:6 101:17,18 101:21 105:5 111:5,5 115:11 116:19 122:11 124:1 125:6 128:19 130:20 136:17 139:13 141:19 142:21 142:25 143:1,2
**knowing** 13:18
**knowledge** 9:10 11:8 85:3 85:20
**kolin** 3:5 7:20 59:14 144:6
**ktong** 3:10

**l**

**labeled** 139:6
**laliberte** 1:4 2:4 6:19 146:1
**language** 46:3 46:5
**law** 3:6,18 121:1
**lawsuit** 43:13 43:22 44:18
**lawyer** 101:14
**lawyers** 8:4 111:7
**leading** 49:10
**leave** 136:20
**lecturer** 11:5
**led** 83:15 137:20
**ledanois** 1:23 2:17 7:2 145:1 145:24
**left** 51:16 138:14
**leftmost** 50:22
**legal** 7:1,3 98:3 100:7 101:12 118:3 120:25 123:17

**legally** 111:5
**legible** 89:20,23
**lewis** 3:13 7:15
**liability** 32:22 97:23 111:6 121:6
**license** 1:24
**life** 8:15
**lightheaded** 129:3
**line** 121:12,15 139:6 146:7,9 146:11,13,15 146:17,19
**list** 31:19,23 77:5 98:8 131:12
**listed** 32:14 92:15 93:1 127:20 132:18 132:25 142:19
**litigation** 76:11 79:9
**little** 27:5 28:6 44:24 57:16 97:6 101:17 108:18 123:1 137:10
**live** 62:7 89:11 103:4 120:5,8 129:25 135:6 137:19
**llp** 3:4,13
**long** 9:16 12:6 48:25 130:14
**longer** 14:14 44:9 118:18 122:1 123:13 128:22
**look** 9:18 12:9 21:14 45:19 56:6,8 62:19 63:17,18 67:21 69:10 84:22 97:24 104:7,15 104:17,17,19 105:22 107:8 124:19 125:8 125:18 126:8 126:11 127:10 127:11 132:24 133:13 136:24 141:10 142:1
**looked** 44:24 60:23 79:15 104:20
**looking** 9:23 23:11 29:3 30:11 50:12 54:12 69:1,6,8 70:1 81:11 107:3,4,9 114:11 119:18 124:11 126:12 126:12 127:6,7 127:8,9 133:19 133:20 135:11 137:2,25
**loss** 30:6 31:1
**losses** 24:23 25:5,10 30:17 66:14,20 67:2 67:5,15 68:12 68:17,22 70:10 70:17 74:24 76:13 89:19 90:4 91:23 95:13,19,23 96:2,7,15 97:7 100:20 103:12 105:14,18 106:5,8 107:17 107:20 108:3,9 108:23 109:1,9 109:15 110:8 110:13 113:19 117:16 118:10 118:20,25 119:10,24 120:3,17 123:7 124:3,12 138:3
**lost** 65:22 101:16
**lot** 14:13
**low** 49:10
**lunch** 128:24 129:1,3 130:8 131:23
**lynne** 1:23 2:17 7:2 13:2 54:3 145:1,24

**m**

**m** 2:17 4:1 145:1
**machine** 145:7
**made** 24:8,10 24:11 25:25 26:16 27:10 82:7 94:16 99:25 100:14 101:6,7 113:16 145:6
**make** 17:4 26:20 30:23 31:6,10 32:10 37:20 43:17 45:4 46:7 67:11 81:12,12 82:5 86:24 98:4 99:9 100:1,15 123:14 135:12
**makes** 20:12
**managed** 40:19 40:19,22,22,25 41:1 45:4 46:7 46:23 52:17 53:13,18,25 54:9,14 93:2
**management** 40:13,14 52:3 52:4,19 55:5 56:1
**managers** 45:4 46:7

**managing** 15:7
52:12
**mann** 15:11
23:11,15
**march** 5:17
106:7 107:14
110:16 111:15
121:20 122:21
123:8 137:23
138:19,22
139:11 142:2
142:23
**maria** 3:17
7:18
**marie** 145:24
**marin** 15:9,10
23:16,17,24
24:3 26:11,21
**marin's** 23:20
23:25 26:13
**mark** 128:17
**marked** 21:14
21:17 22:3
42:5 94:22
112:4 129:8
140:25 141:22
142:13
**market** 3:19
52:20
**marks** 34:22
35:1 61:16,20
102:2,7 129:11
129:15 143:16
143:20

**mary** 1:4 2:4
6:18 146:1
**matches** 133:17
**material**
131:11
**materials** 31:24
59:8 87:4 89:8
90:2 96:16,19
105:10 106:3
111:20 133:7
**math** 99:3
**mathematical**
67:19
**mathematically**
120:2 140:10
**matter** 6:18
43:5 79:17
100:13,18
111:8 121:2,4
121:5,8 124:6
124:15 138:25
**mccabe** 18:6
**mean** 10:6 12:3
13:7 14:12
15:13,22 19:21
20:24 24:25
27:2,9 33:11
38:3 43:14
46:14,15 47:4
48:15,16 49:6
54:20 56:15
57:21,25 58:2
67:18 68:1
69:23 73:15
74:19 77:3

78:16 79:15
80:11,19 81:10
84:22,24 85:16
85:16,23 87:5
87:15,19,23
88:3,6,17,19,20
89:15 90:11
91:9 92:3 93:8
93:20 95:21
99:20 111:4
113:1 114:20
114:25 115:6,7
115:13 116:16
124:10,18
125:15 128:23
139:13
**meaning** 46:20
101:6 106:10
106:23 139:8
**means** 58:25
62:10 87:21
88:5,9,12
106:17 107:14
138:16
**meant** 80:18
85:12,13
**measure** 38:4,5
**media** 6:16
34:22 35:2
61:16,21 102:3
102:8 129:11
129:16 143:16
143:21 144:10
**medical** 22:9

**members** 25:7
76:15
**memory** 9:21
23:11 44:25
**mention** 46:1
108:14
**mentioned**
25:12 58:9
**mere** 49:19
**messes** 110:6
**met** 8:3 13:10
13:14,17,20,24
14:3,7,7,21,25
15:14 19:6
**methodologies**
79:20
**methodology**
25:4 76:13
78:14,17,20
79:2,5,8,13,16
79:24 80:4,15
80:23,25 81:2
81:5 108:23
114:7,8 118:21
121:15,21
122:2,20
138:20,23
139:3
**microsoft**
18:20,21
**middle** 46:5
**miller** 3:4,24
6:25 7:20
24:12 25:3
76:9

**millershah.com** 3:10
**million** 95:23 95:24,24 98:22 99:2,2 139:10 139:11
**mine** 111:24
**minimis** 137:6
**minor** 48:23
**minute** 101:21 131:22 143:14
**minutes** 8:3 34:20 41:6 61:14 143:7
**misrepresent** 88:2,3,5,7,9,12 88:14,20
**missing** 37:21
**misstates** 74:4
**misunderstan...** 80:13 99:4
**misunderstood** 78:23
**model** 81:10,18 81:22 82:5
**moment** 16:19
**monday** 1:16 2:16 6:1
**money** 117:5
**monies** 116:14
**monitoring** 71:5
**month** 106:18
**morgan** 3:13 7:15 65:7,20 65:25 66:16,17 67:7,17 68:14 70:12,19
**morganlewis....** 3:21
**morning** 6:4 7:14 8:2
**morningstar** 54:13 105:1 113:14 134:1 134:11 137:4
**moving** 116:14
**multiples** 49:9
**mutual** 52:17 53:13,19 54:1 54:9 115:4,10 115:14,18

**n**

**n** 4:1,1,1 5:1 16:4 29:16 95:10 98:13 132:22
**name** 6:25 8:2 11:17 15:7 16:4,9,11,14,14 16:17,21 17:16 18:19 19:5,9 23:13 52:11 145:18 146:1,3
**named** 15:6 19:4 23:10
**names** 14:20 15:5,13,14,15
**nancy** 132:22
**need** 12:9 25:15 25:21 34:19 94:13 97:24,25 116:6 118:5 120:23 125:17 129:6 135:9,9 139:15 144:6
**needs** 134:20
**negative** 96:7 97:8,13,17 99:11,14,15 101:2,4 106:23 110:13 121:22 122:2,22 123:2 123:9 124:4,13 138:15,20,23 139:4
**neither** 145:14
**nera** 19:11
**net** 97:19,24 113:2 116:10 117:9
**never** 120:7
**new** 116:13 131:21 134:23
**nineteen** 141:7
**non** 57:12 78:7 78:10
**normal** 68:1
**normally** 80:22
**north** 8:12
**note** 6:7
**notes** 125:10,14 128:13
**noticing** 7:12
**number** 6:16 6:22 34:22 35:2 61:16,21 101:4 102:3,8 106:14 129:11 129:16 134:3,4 138:15 142:2 143:16,21 144:10
**numbers** 89:13 89:14 90:14 103:23,24 105:13 111:14 124:23 125:6 134:10 137:20 138:12,14

**o**

**o** 4:1,1 5:1 132:22
**oath** 8:14 35:10 62:4,9 103:1 129:21
**obfuscate** 87:18,19
**object** 10:20 14:23 27:24 28:12 36:20 57:20 93:7
**objection** 11:12 114:18 119:12
**objections** 7:7
**obligated** 61:5 61:7

**obligation** 35:12 62:6 83:24 84:16 103:3 129:24
**obtained** 126:3 126:6 130:24 131:1 137:5
**obvious** 133:25
**obviously** 14:13 133:24 133:24
**occurred** 105:19
**october** 5:13
**offer** 46:17 70:24 71:15 73:25 74:24 75:3,10,18 77:13 108:10
**offered** 43:3 64:15 109:5
**offering** 26:21 32:21,25 33:4 35:18 44:21 46:12 101:24
**offerings** 42:21
**offers** 42:21 49:21 50:8
**official** 22:2
**oh** 10:7 14:12 65:5 104:5 122:15 127:8 136:25 138:15
**okay** 8:21 10:11 11:9 16:24 21:3,8 25:18 28:22 29:10,22 31:9 31:13,23 32:13 32:20 33:23 36:1 38:10 41:8,18 42:7 42:19 43:25 44:12,16,23 46:3,19 48:8 49:8,14 50:1,5 50:22 51:16,23 52:6 53:23 54:23 55:2 59:2 61:10,15 62:11,16 63:1 63:14 64:8,13 65:3,5 66:3 68:6,8,9 69:10 69:14 71:3,18 73:8 77:17 80:9 83:1,14 83:20 84:7 85:11 86:2,16 87:16,24 88:8 88:22 89:1,4 89:25 90:17,20 91:1,6,20 93:20 94:19 95:3 96:11,12 96:17,18 97:5 99:17,25 100:13,19,21 101:2,22,25 104:7,10,14,19 105:5,17 106:2 106:6,21 107:5 107:6,12,25 108:12 109:19 109:21 110:9 112:10 113:12 114:2 115:8,11 115:17 116:1,8 116:21 117:12 117:23 118:8 119:7 120:12 120:15 121:18 122:9,13 123:19,22 124:17,22 125:6 126:15 126:19,23 127:17,17,22 127:24,24 128:14 129:5 130:19,23 131:4,8,17,24 131:25 132:3,8 132:12,17 133:2,4,10,13 134:21 135:14 135:16 137:18 137:23 138:2 138:11 139:2,8 140:1,4,8,19 141:2,9,12,18 141:20,21 142:7,17 143:6 143:8
**once** 19:6 109:14
**ones** 45:14 79:20 100:24
**open** 41:12 96:13 141:4
**opened** 21:24 41:18
**operate** 90:1
**operated** 94:9
**opinion** 27:7 32:21 33:1,4 46:12,17 54:17 55:22 57:6,13 58:14 59:22 60:19 63:19,21 70:24 74:24 81:8 100:9 108:2 122:13
**opinions** 26:13 26:21 27:8 32:3,7 35:19 42:12 44:21 53:22 55:1,23 56:22 59:17,20 65:16 71:15 73:25 75:3,10 75:18 77:13
**opposed** 14:25 100:23
**option** 72:3 73:14 74:2 75:5
**options** 20:11 20:16 71:6

116:15
**orange** 132:22
**order** 144:6
**original** 36:13 72:21 145:11
**outcome** 7:6
**outflows** 113:2 115:6 117:9
**outputs** 90:3
**outside** 58:12 59:10 61:1 67:19 70:22 71:2
**overrides** 83:24
**oversight** 134:7
**own** 82:15

**p**

**p** 140:5
**p.m.** 129:12,15 143:17,20 144:11,13
**p37** 140:2
**p39** 139:24 140:1
**pacific** 6:5 34:23 35:1 61:17,20 102:4 102:7 129:12 129:15 143:17 143:20 144:11
**page** 4:3 31:15 67:11 69:11,12 90:25 104:11 104:12,13 127:10 128:15 132:8,8,10 141:6 142:16 146:7,9,11,13 146:15,17,19
**paid** 114:16,19
**paper** 21:25 22:5
**papers** 10:16 11:2,3,4,6
**paragraph** 25:22 26:25 28:3,20 29:4 29:13,19,22,25 30:4 42:17,20 43:9 44:13 45:2 46:4,5 48:18,20,21 50:3,6,13,16 51:21 52:1,10 52:15,23 53:8 65:4,5,6 69:1,8 76:8 77:3,10 78:12 80:3,14 83:18,21 84:17 85:9,12 86:4,5 86:6,7,12,23 87:3,17 88:1 88:13 91:19 92:9 93:1,11 93:16,21 94:1 95:1,6 97:12 97:15 98:10 100:6 101:10 125:18,24 126:3,16,17 130:17,24 131:9 134:16
**paragraphs** 126:20
**parlance** 71:11
**part** 19:6,23 29:4 55:3 85:7 85:24 86:11 116:25 135:2
**participant** 19:22
**participants** 6:11 79:4 80:5 115:22 116:15
**participate** 19:19,20 20:4 20:7
**participated** 25:7 76:16
**particular** 90:7
**parties** 6:14 83:25
**partners** 15:7
**party** 7:4 145:16
**passive** 40:13
**passively** 40:19 40:22,25
**path** 37:3,9,14 38:22,25 39:19 40:9
**patient** 41:5 112:8
**pay** 115:21
**pdf** 69:10,12 89:4,21 112:16 126:8,24 127:7 127:11,12 132:9 133:20
**penalty** 85:1,19
**pennsylvania** 3:9,20
**people** 12:13,17 12:21 13:15,20 13:24 14:3,4,5 14:20,25,25 15:20 19:15 52:11 68:1,7 79:6 116:14 136:17
**percent** 10:9,13 49:20,22,23 54:14
**percentage** 53:24 127:19
**percentages** 127:1
**perfect** 102:21
**perfectly** 59:20
**perform** 47:13
**performance** 56:6,8,12 57:24 58:1,5,9 58:19 60:5 62:12,19,21 64:3,9 65:11 65:24 66:4,9 66:14,21,25 67:6 68:23

70:11,18 109:7 113:9
**performed** 57:3 57:8,18
**period** 69:21,22 69:23 106:18 113:4 132:4 140:6
**perjury** 85:2,19
**person** 16:10 16:12,17,20 17:21 18:3 19:4 71:13
**personally** 90:8 91:2,10 104:7 105:3,4 131:5
**perspective** 123:17
**pertains** 145:10
**peter** 15:4
**ph.d.** 7:23 19:10 73:16
**philadelphia** 3:9,20
**philosophical** 48:13
**pismo** 2:15
**place** 6:14 8:21 145:5
**places** 52:18 55:4,25 81:12 127:3,20 128:7 128:8 131:15 133:22
**plaintiff's** 31:5 43:13 44:17 82:22,24 83:15
**plaintiffs** 1:5 2:5 3:3 7:21 23:7 24:23 26:4 43:21 45:10,21 51:18 76:10 78:18,21 79:8 83:12 92:20 101:7
**plan** 5:11,17,22 19:17 20:1,5,7 20:9,18,23 21:1,4,9,12 24:24 25:6,6,7 25:10 27:15 33:2,6,10,14,21 49:21 50:8 51:18 64:15 67:16 68:13,18 68:24 70:25 71:5 75:5 76:14,15,16 79:4,6 80:5 93:2,17 94:8 94:17 98:15,15 98:19,21 99:20 99:25 100:2,14 100:16 101:6,8 103:17,18 106:10,23 107:15,21,25 108:7,22,22 109:5,15 110:19 113:22 113:23 114:16 115:19,20,21 115:21 116:1 116:21 117:6 117:12 118:18 120:15 122:1 123:24 124:3 132:4 135:20 139:9 142:23
**plan's** 29:5 95:12
**plans** 19:19 20:5 35:23 36:17 78:1,4,7 78:10
**please** 6:7 7:8 8:24 13:1 29:1 35:4 37:6 61:23 70:15 72:8 74:11 92:1 93:5 102:10 126:14 129:18 143:13 143:23 144:7
**plus** 108:3
**point** 8:18 25:15 26:6 36:12 42:1 55:13 119:21 137:7
**points** 49:20,22 49:23 81:11 116:22,24
**poly** 21:13
**portions** 81:8
**positive** 136:20 138:15
**possible** 14:9 17:5 18:5 54:10,11 63:19 83:8,8
**potential** 70:10
**practice** 115:15
**precise** 14:9 17:5 94:13 95:22
**predominantly** 52:17 53:13,18
**prefer** 14:13
**prejudgment** 30:20 82:9,20 83:1,6,16 95:15,17 96:1 97:10 108:3
**premarked** 42:3
**premium** 49:18
**preparation** 15:17,21 18:2
**prepare** 16:21 17:1,10,18
**prepared** 10:16 18:9 42:15
**preparing** 31:20 35:21 47:16,20 52:6 55:10,11,13 56:13 59:1

60:6,9 62:14
62:17,24 65:14
104:16
**present**  3:24
7:9
**presentations**
11:9
**presented**
55:23
**pretty**  88:23
90:19
**previous**  74:5
74:10 80:10
124:11
**price**  65:8
66:22 68:19
70:12,19
**printed**  89:20
**printout**
112:15
**prior**  63:4
65:10 73:22
74:4 75:8
**probability**
10:8
**probably**  10:5
120:25,25
121:5 140:23
**problems**  80:21
**proceed**  35:4
61:23 102:10
129:18 143:23
**proceeding**  7:7
83:23

**proceedings**
144:13 145:4,6
145:12
**process**  18:12
20:15 60:16
70:24 71:4
**produced**
126:9
**professor**  10:24
11:1,4
**program**  18:20
**provide**  14:15
16:7 17:22
24:23 25:4,9
76:13 84:9,15
84:18,20 85:15
85:17
**provided**  55:1
60:20 89:7,9
89:12 90:1
113:6 131:11
135:1
**providing**  27:6
76:22 83:23
**publish**  11:1
**published**  11:3
11:4,6
**pull**  104:5
105:4
**pulled**  105:3
**purpose**  17:24
59:12 62:24
**purposes**  30:6
31:2 59:1 60:6
60:9 62:14,16

65:14 67:2
75:17 76:3,22
94:15
**put**  19:24
122:25
**putting**  17:12
71:9 121:3

**q**

**q12017**  28:25
29:8 95:9
**q12020**  95:10
95:12
**q12021**  140:15
**q2**  30:7 69:24
**q22016**  69:4,5
69:19,25
**q22024**  31:3
**q42017**  128:18
**qir**  128:18
133:17 140:16
142:11
**qualified**  72:7
72:11,23 73:1
73:2,4,10,11,18
73:20,25 74:17
74:20,21,23
75:2
**qualify**  73:25
**quality**  6:9,10
**quanta**  1:7 2:7
3:25 5:5,12,14
5:16,19,21,24
6:19 7:19 8:4
24:24 25:5
70:25 75:5

76:11,12,14
79:4 80:5 95:7
115:20 146:1
**quanta's**  137:6
**quantum**  98:11
**quarter**  30:13
106:14,21
108:20 110:4,4
121:19 122:25
123:1 136:10
**quarterly**  5:7
104:3,8,19
105:13 112:21
112:25 114:5
125:3 126:4,6
130:24 131:2
132:3 133:18
136:2,9,13
137:4,5
**quarters**  137:8
**question**  8:23
8:24 9:4 10:22
13:1 14:17
16:24 17:3,8
20:21 21:2
25:14 29:1,23
30:1,23,24
32:5,12 36:13
37:6,17,23
43:16,17 44:8
44:9,10 45:1,9
45:19 47:1,2,4
47:25 48:1
50:14,15 53:15
54:2,4 55:19

56:4 57:16
59:25 60:12
62:18 63:3,5
67:12,13 68:9
70:15 72:8,21
73:8,10,19,21
74:14 75:8
81:14 83:5
85:25 86:21
87:10,22,23
88:21,24 91:25
93:5,14 94:10
95:1 96:22
97:14,20 98:3
99:19 100:7
108:5,18
109:12 118:23
118:24 119:8
119:22 122:16
127:18 134:12
139:16
**questions** 25:20
48:3,5,9 55:21
58:11 59:5,7
59:10 60:24
61:5 63:7
72:20 129:1
134:25 144:1
**quite** 14:17
55:18 115:7
118:4
**quizzing** 59:11
**quote** 30:5
52:16

**quoted** 46:3,5

**r**

**r6** 29:7
**ranging** 49:22
**ratio** 48:24
51:4
**ratios** 49:22
**reached** 92:11
92:22
**read** 13:2,5
24:25 25:15,19
25:22 31:4
42:14 44:2,23
47:11 51:24
52:21 54:3,5
72:9,24 74:12
84:3 92:2 93:6
126:16,17,19
**reading** 28:20
45:2,6 46:11
47:21 55:17
56:19 132:21
**ready** 96:9
**really** 56:23
94:11 107:14
129:3
**realm** 67:19
**reask** 17:8
68:10 83:5
**reason** 52:8
70:9,16 78:22
103:10 107:20
146:4,7,9,11,13
146:15,17,19

**reasonable**
27:23,23 28:10
28:14,23 29:11
29:20 30:22
31:10 33:2,5,9
33:13,20 35:22
36:16,24 47:12
72:2 73:13
74:2 75:4
**recall** 9:17
11:11 15:13,14
16:9 17:3,17
18:22,25 19:3
20:13 23:1
44:19 54:22
56:10 64:21
79:22 82:14
83:13 104:18
125:16
**receive** 116:3
**received** 84:1
116:1,22
140:19
**receiving** 12:7
**recess** 34:24
61:18 102:5
129:13 143:18
**recollection**
9:15 45:25
46:2 79:17
**record** 6:5,15
7:11 34:21,23
35:1,7 61:16
61:17,20 62:1
102:3,7,25

114:3 129:10
129:12,15
130:5 143:11
143:17,20
144:4,11 145:6
145:9 146:5
**recorded** 6:12
6:17 102:17
**recording** 6:9
6:13
**reduce** 48:25
**refer** 128:12
**reference** 24:10
24:11
**referred** 16:10
**referring** 20:8
47:5 70:4 79:3
79:7 80:4 92:5
**reflect** 111:14
124:24
**reflected** 32:4,7
54:25 86:12,22
87:17 88:1
112:11 137:21
**reflects** 30:13
113:15
**refresh** 9:21
21:19 23:11
44:25
**regarding**
29:14 111:20
**regardless**
123:23
**regards** 30:3
57:13 60:18

74:21 82:6,7
139:15
**related** 7:4
22:10 59:16
**relationship**
12:14 16:2
**relative** 66:15
66:17 67:16
109:3 145:15
**relied** 59:9
104:25
**remained**
123:24
**remember** 9:22
14:20 15:5
18:19,19 19:8
20:14,15 22:18
45:25 64:19
82:19 83:10
**remembering**
10:9
**reminding**
102:1
**remote** 1:14 3:1
**remotely** 6:24
7:10
**removed** 65:1
108:22 109:14
110:19 142:22
**repeat** 8:25 9:3
13:1 29:1 30:1
43:16 53:15
54:2 70:15
108:5

**repeatedly**
59:11,15
**replace** 117:13
**replaced** 28:24
29:6 93:18,23
94:2 95:7
98:12,19
107:25 108:7
117:21 118:18
**replacement**
105:19 107:1
108:14,15
**replacing**
110:24
**report** 5:3,10
9:13,19,20,23
15:17,21 16:22
17:1,10,11,18
17:24 18:3,10
18:13,16 19:1
19:2 21:16,25
22:13 23:2,20
24:1,3,4,7,20
25:1,18,22,24
26:2,17,25
27:12 29:20
30:4,7,11,15
31:2,14,15,18
31:21 32:4,8
32:12,14 35:19
35:21 41:12,15
41:19,22 42:11
42:15 46:17
47:16,20,23
48:2 49:4,5,7

49:15 50:2
52:6,22,25
53:2,22 54:19
54:25 55:1,10
55:11,13,20,23
56:13,23 57:14
58:10,13 59:1
59:4,5,11,16
60:6,9,19,20
61:1 62:14,17
62:25 63:8,11
63:24 65:14,18
65:23 66:2,3,8
66:13,19,24
67:5,14,24
68:11,16,21
69:22,25 70:5
70:22,23 71:2
71:18 72:5
73:1 75:10,17
75:18,25 76:3
76:22 77:13
78:12 81:9,11
83:16,19,21,23
84:9,15,18,20
84:25 85:15,17
86:16,25 87:4
88:2,13,25
89:20,22 90:25
92:9,22 93:16
94:15 95:2
96:19 97:15
101:11 104:2,5
104:11,16
105:22 112:12

112:16 119:18
125:18,23
126:9,12,14,22
126:23 127:11
130:18 133:20
133:23 134:17
134:23 135:1
137:2,21
**reported** 1:23
**reporter** 2:17
2:18 7:2 11:16
13:4,5 54:5
72:9,24 74:12
82:11 92:2
93:6 144:3,5
145:2
**reports** 23:23
24:1,2 31:23
32:3,6,14
79:18 80:12
86:5
**represent**
136:8 139:6
**representing**
6:25
**requested** 13:5
54:5 72:9,24
74:12 92:2
93:6 145:13
**required** 81:23
**reread** 36:13
37:6 72:8,21
74:10 77:3
91:25 93:5,14

**reserve** 30:16
**respect** 96:2,20 96:23 97:2,8 101:3 110:1,15
**rest** 28:2
**restate** 86:21 93:15 109:12 138:21
**result** 105:14
**retained** 22:19 24:22 71:8
**retention** 27:13
**retirement** 20:4 20:9,18,23 21:1,4,9,12 48:25
**return** 58:1 113:3 116:25 126:4 127:1 130:24 137:5,5
**returns** 65:18 67:22 69:4,5 69:16,19 112:21 117:5 124:20 125:4 126:10 127:19 128:6 131:6,10 136:7,9
**revenue** 114:16 114:19,22,23 115:4,5,9,13,15 115:17,19 116:1,3,17,22 117:4
**review** 5:12 132:4 145:12
**reviews** 104:4,8 104:20 136:14
**revisit** 98:1
**richard** 15:9,10 15:10 23:11
**right** 24:22 30:10,16 43:18 46:11 51:1,2 57:21,25 58:1 60:18 61:10 63:13 81:4,19 85:18 91:11 95:20 96:25 97:11,16 99:10 99:15 105:17 113:14 114:11 115:11 116:16 117:20 120:4 120:13,22 124:4 126:12 126:25 128:5 132:18 133:8 138:14
**risk** 37:8,13 38:1,3,4,5,7,8 38:11 39:7,22 58:1,5,18 60:4 71:19
**riskier** 42:22
**risks** 37:2 75:13,21 76:18 77:17
**risky** 42:23
**rocket** 13:19
**rough** 144:7
**row** 139:7
**rowe** 65:8,20 66:5,22 68:19 70:12,19
**rows** 138:3 140:5
**rubric** 53:20 55:16
**rule** 8:14
**rules** 8:13
**run** 107:22
**runs** 103:15

**s**

**s** 5:1 12:1 132:22
**sam** 7:17 41:3 94:20 111:19 128:17 132:22 140:11,15 142:10
**samuel** 3:15
**savings** 5:17,22 25:6 48:25 76:14
**saying** 57:15 59:14 63:8 74:16 95:23,24 99:24 115:12 115:23
**says** 30:4,25 42:20 46:6 48:23 49:8,17 50:19 52:1,15 54:12 55:2,3 64:19 69:15 92:8 104:25 111:22,24 140:1 141:14
**scenario** 122:12
**schwab** 77:14 77:19 94:3 95:11 110:25
**science** 13:19
**scope** 58:13 61:1 70:22 71:2
**screen** 6:12 102:12,20 112:7 119:5 128:4 135:8 140:13
**second** 30:9 49:8 51:16 52:15 83:4 107:2 142:8
**seda** 12:1,6,14 12:15,18,22,25 13:11,16,25 14:4,5,22 15:20,22,23 16:2 19:13,15 19:17
**see** 17:2 21:15 24:19 27:3,17 27:19,22 42:25 43:25 45:15

49:1,12,24 50:19,22 60:13 65:6 69:15,20 96:9,11 99:24 102:14 103:13 109:23 111:3 119:5 123:1 127:1 128:6 132:6,13,15 133:13,16 138:2 139:22 141:2 142:2,19
**seeing** 43:2 46:1 69:7
**seek** 87:9
**seemed** 47:12
**seems** 111:3
**seen** 6:11 23:20 23:23,25 24:1 26:17 79:18 81:2 125:11
**select** 20:11
**selecting** 71:5
**selman** 15:4
**semantics** 55:14
**sent** 18:25 19:1
**sentence** 42:20 47:21 48:23 49:8,17 50:3 52:1,15,23 53:7 55:2,3 80:11 130:23 131:9 134:19
**sentences** 55:21
**separate** 50:10 117:5
**separating** 53:5
**september** 1:16 2:16 6:1,6 25:8 76:17 106:22 124:13 145:20
**sequentially** 10:2
**sergio** 15:7
**serices** 1:7
**series** 137:9
**serve** 13:16
**served** 77:25 78:3,6,9
**serves** 13:9,11
**service** 8:4
**services** 2:7 5:16,21 6:19 25:5 76:11,14
**session** 8:19 11:21
**set** 25:13 126:5 131:1 145:5
**several** 41:24 64:14
**shah** 3:4 7:20 24:12 25:3 76:9
**shape** 57:6
**share** 18:21 49:18,20 52:4 107:10 111:24 112:7 115:19
135:8
**shared** 115:6
**sharing** 18:20 102:11 111:18 111:22 114:17 114:20,22,23 115:4,9,13,15 115:17 116:2,3 116:17,22 117:4 127:9 128:3 135:7 140:12,13
**shorthand** 2:17 145:2,7
**show** 96:24 111:12 118:1 122:2 125:17 128:6
**showing** 51:13 51:17 137:20
**shows** 112:18 112:21
**sic** 16:4
**signature** 145:24 146:25
**similar** 11:18 12:14,25 13:6 19:15 79:16,19 79:25 80:7,24 81:2,5
**similarly** 110:15
**simple** 123:20
**simply** 52:20
**single** 114:10 137:7
**sir** 23:6 24:22 31:13 40:12 67:13 85:11 87:16
**sit** 9:17,22 13:21 14:2 16:9 18:5,7,22 19:3 20:3,13 23:6 32:17,19 44:19 47:20 50:18 54:10 55:16,24 56:2 58:15 64:18,21 72:16 73:24 79:11,22 82:1 82:19,24 83:13 90:16 91:16 98:6 104:18 121:6 125:16
**sitting** 18:14 48:15
**situation** 111:6
**six** 128:8 144:10
**skip** 27:11
**slightly** 37:7
**slow** 125:19
**small** 29:15,16 71:16,20 72:2 73:12 74:1 75:4,11,15,19 75:23 76:20 77:14,19 93:24

94:3,5 95:10
95:12 98:13
109:4
**smaller** 102:19
**solutions** 7:1,3
**somebody**
16:20 79:24
90:18 91:11,14
103:24 131:5
136:14
**somewhat**
134:14
**son's** 22:9
**sorry** 10:19
15:11 16:6
17:8 23:25
32:18 37:16
38:5 44:7
45:18 48:20
50:12 53:15
54:2,20 61:10
65:5,22 67:9
67:12 69:6
72:20 78:25
83:4 91:4,25
93:14 96:22
97:14 104:6
107:5 114:25
116:11 119:8
119:15,18
124:25 126:11
127:8 133:19
135:4 142:8
143:10

**sort** 13:25 49:3
63:7 68:2
72:17
**sorts** 63:6,9
96:19
**sound** 9:4
**sounds** 116:17
120:24
**southern** 1:2
2:2 6:21
**span** 39:3,3
**specific** 25:20
27:11 29:2
**specifically**
24:9 25:9
98:11 141:10
**speculate** 14:11
**speculation**
19:6
**spell** 18:6
**spelled** 16:3
**spending**
134:12
**spoken** 16:8
26:17
**sponsored** 52:3
**spreadsheet**
5:6,9 89:5,7,11
89:12,15,18
94:21 100:19
102:15 103:7
105:12 107:3
120:5,7 121:13
122:18 125:1,1
126:13 133:3

133:19,21
135:3,6,14,16
137:17,19
141:16
**spreadsheets**
90:1
**stand** 102:2
143:8
**standing** 144:5
**start** 69:13
89:2 92:7
106:22
**started** 16:25
23:1
**starting** 118:13
129:2
**state** 7:8,10
85:1,18 145:2
**stated** 77:2
81:1 139:16
**statement**
46:15 47:11
49:6 71:25
84:23 100:12
108:13
**states** 1:1 2:1
6:20
**stay** 143:14
**stenographic...**
1:23
**steps** 33:12,18
**stick** 36:14 59:3
59:4 91:5
108:19

**sticker** 65:1,2
**sticking** 49:7
**stipulating**
142:24
**stocks** 45:5
46:8
**stop** 21:11
111:18,22
140:12
**stopped** 21:13
107:15
**strategy** 37:3,9
37:14 38:19
39:16 40:6
71:20 75:14,22
76:19 77:18
**street** 3:7,19
**strictly** 18:23
49:5 121:4
122:15
**subject** 43:13
44:17 104:10
122:14
**submit** 24:4
134:8,23
**submitted**
15:17 22:15
24:3,7 26:2
80:12
**submitting**
30:14 75:17,25
76:3
**subscribed**
145:18

**subsequently** 30:18
**suffered** 24:23 25:10 108:23
**suite** 3:8 27:14 29:7 42:23,24 43:8,8,12 44:14,14,21,22 45:22,23,25 49:9,19,21 50:11,17,23 51:7,14 52:2,2 52:12,13,16,18 53:12,17,25 54:8 55:3,4,25 56:7,9,12,12 57:2,3,18,19 58:15,16,23,24 60:3,4 62:21 62:23 64:4,6 64:10 65:12 93:19 114:9
**suite's** 49:10 54:13
**suites** 43:7 64:14 93:13
**sum** 120:3 139:5,6 140:1 140:4
**summation** 121:12
**supervision** 137:15
**supporting** 87:4
**suppose** 47:13 55:17 56:20 58:2 138:9
**supposed** 124:24 135:10 136:8 138:7
**supposition** 26:19
**sure** 10:3 11:25 13:4 17:4 18:8 19:7 23:18 29:2 30:2 34:18 37:20 43:17 45:7 47:10 56:5 67:11 80:13 88:4 90:17,19 99:10 102:23 104:23 105:23 109:13 114:24 115:7 119:19 120:2 127:16 135:12 136:19 138:18 139:13
**surprised** 91:17 130:13
**surprising** 41:23
**svetla** 19:4
**switch** 90:24 124:19 127:22
**switching** 105:9 124:25 136:5
**sworn** 7:12,24
**symbol** 51:13 132:17
**symbols** 50:6 50:10,17 51:18

**t**

**t** 4:1 5:1 65:8 65:20 66:5,22 68:19 70:12,19
**tab** 41:20 96:15 103:11,15,22 105:14 106:5 109:22 110:8 128:1 135:17 135:19 136:5 141:21
**tabs** 110:7
**take** 6:14 8:20 14:13 21:21 34:15 58:7 61:11 101:19 101:21 128:24 129:1,3 143:4 143:6
**taken** 2:15 6:17 34:24 61:18 102:5 129:13 134:10 143:18 145:4
**takes** 41:6
**talk** 27:11 54:20 63:11 130:7,9
**talked** 130:10 130:10
**talking** 14:24 16:12 53:3 55:15 56:16 115:6 119:3
**tang** 3:5 7:20 7:20 10:20 11:12,24 14:23 24:13,17 27:24 28:12 36:20 57:20 59:10,15 74:4,18 93:7 114:18 118:3 119:12 144:7
**target** 27:14 28:24,25 36:24 39:23 40:1,7 40:10,25 42:21 43:4,6,7,21,23 45:10 49:18 64:11,14 65:7 65:13,19,20,21 66:1,5,10,16,17 66:22 67:1,7 67:17 68:14,19 68:23 70:13,13 70:20 93:12,19 112:19,22 113:10,24 114:5 116:4 117:14,22 118:11,19 132:14 135:20 135:24 136:9
**taught** 73:16

**tautology** 71:25
**tdf** 29:7 126:5 130:25
**tdfs** 27:15 29:7 45:3 46:6 95:8 95:8 96:3 136:2 137:8
**team** 52:4 91:11,14 103:25 113:16 131:5
**technically** 11:5 12:2
**technology** 6:24 9:1
**tell** 35:12 39:2 44:3 48:11 62:6 63:12 74:8 80:19 84:12 87:8 88:19 97:22 98:25 103:3 129:24 134:9
**telling** 59:21 143:2
**tells** 97:24
**ten** 9:24 10:4 20:14 61:14 101:21
**term** 48:25 85:13 87:14 88:6,9,11 134:5
**terminal** 30:5 31:1
**terms** 72:22
**test** 26:23 27:1 28:4,22
**testified** 7:24
**testify** 85:4,4
**testifying** 8:15 35:13 62:7 103:4 129:25
**testimony** 13:5 54:5 72:9,24 74:4,12 92:2 93:6 130:8,9 145:9
**texas** 1:2 2:2 6:21
**text** 30:24 134:17
**thank** 7:13 11:24 23:17 24:17 35:5 41:10 61:24 70:8 101:24 102:21,22 105:8 128:21 129:19 130:4 143:15,24
**theoretically** 99:18
**theory** 97:23 121:5
**thing** 77:9
**things** 26:20 35:18 37:17 48:12 58:6 59:20,22,23 60:25 63:9 68:3 76:4 77:5 84:24 87:3,5 88:2,14 89:13 98:10 123:10 125:21 132:13
**think** 10:11 11:4 12:2 14:17 16:24 23:16 26:18 32:13 35:18 52:8 53:7 54:6 56:3 58:3 68:7 72:6,22 80:8 82:2,16 86:14 88:22 94:13 99:7 100:7 103:10 108:12 108:15 116:10 119:20 120:23 121:5 122:15 131:8,10 139:15,22
**thinking** 47:8 47:18 48:12,16 49:5 53:3,20 55:15,18 56:16 56:18,20 58:25 60:16,18 63:8 63:12,13,21,22 63:24,25 67:21 68:3,4
**third** 42:20
**thought** 16:14 47:11 53:9,9 53:21,23 54:16 56:25 57:4,5 60:17 72:15 73:22 74:8 75:7 79:11 94:11 111:24 119:14 123:15
**thoughts** 48:4
**three** 10:8,12 15:7 58:3,18 58:20 69:15 94:7 106:18
**ticker** 50:6,10 50:16,25 51:10 51:13,18 132:17,20
**time** 6:6 7:8 8:18 21:21 25:8,21 26:7 30:14 34:15,19 39:3,3,6 44:4 45:5 46:8 56:14 61:11,13 69:21,22,23 76:16 101:3,17 106:18 119:21 129:5 132:4 134:13,14 140:6 143:25 144:12 145:5
**times** 8:11 41:24 59:21
**title** 136:1
**today** 8:19 9:1 9:22 11:21

13:21 14:2 20:3 23:6 25:21 32:17,19 44:19 47:21 48:6 50:18 54:10 55:17,24 56:2 58:15 64:2,8,18,21 65:10 72:16 73:24 79:11,22 82:1,19,25 83:13 90:16 91:16 98:6 121:7 125:12 125:16 139:14 142:21
**today's** 144:9
**together** 17:12
**told** 82:15,21 82:23 83:12 116:21
**took** 101:17
**top** 15:12 104:13
**total** 97:11,18 121:16 138:3 144:10
**track** 52:20 101:16
**transcribed** 145:8
**transcript** 145:9,11,13
**transcription** 146:6
**trouble** 110:7
**true** 52:7,24 53:2 55:6,8 61:4 82:3,4 84:5 85:2,19 86:10,15 123:11 145:9
**truth** 35:13 62:7 84:12 103:4 129:24
**truthful** 14:15
**truthfully** 48:7
**try** 8:25 41:16 44:7 53:16 88:20 108:6 118:8
**trying** 14:9 18:19 58:7 63:16 80:18 85:11 115:12 116:12 131:14 136:24 140:12
**tune** 98:16 101:8
**turn** 31:13 42:17 48:18 51:21 65:4 83:18 89:2 91:22 96:15 141:6 142:16
**turned** 134:4
**two** 12:11 22:22 57:25 67:22 127:3,20 128:7 136:18
138:3 139:8
**type** 90:8 111:6
**typed** 90:13 91:3
**tzenova** 19:4

**u**

**u** 16:4
**umbrella** 12:4 19:25 47:13 53:4 55:16 63:9
**unclear** 8:24
**uncomfortable** 28:6
**under** 8:14 12:4 19:24 24:24 25:10,13 35:9 47:5,12 47:18 52:18 53:4,20 55:4 55:15,25 58:7 62:3,9 63:9 84:13,17 85:1 85:6,18 86:14 103:1 108:23 118:21 120:23 123:4 129:21 137:15 145:8
**underlying** 54:13 90:22 113:6
**understand** 8:7 8:16 10:18,21 14:18 19:12 20:21 30:23
35:6,9 43:12 46:15 47:1,3,4 49:6 51:12 53:24 57:15 60:11,24 61:25 62:3 68:7 74:20 79:1 80:18 83:22 84:7,12 85:11 87:16,22,25 96:22 99:9 102:25 114:22 115:13,23 118:5,6,23 119:20 129:20 129:23
**understanding** 30:10 39:2 40:12,15 43:20 44:16 50:9 51:15 54:24 56:24 57:2,7 57:12,12,17 60:21 61:2 62:5,9 84:11 84:14 87:6,9 88:8,11 97:5 98:2 104:2 107:12 115:3
**understood** 22:4 24:16
**undertake** 33:12,18 36:23
**unfortunately** 15:15

**unit** 6:16
**united** 1:1 2:1
  6:20
**unreasonable**
  28:15
**untrue** 131:9
**untruthful**
  134:6,6
**update** 30:16
  42:4
**upload** 41:3
  94:21 111:19
  142:10
**uploaded** 41:6
**uploading**
  140:22
**use** 9:21 22:1
  28:7 68:6
  80:22 81:12
  85:13 124:21
**used** 33:16 71:4
  79:5,13,15,16
  79:20,24,25
  80:23,25 81:2
  81:5 89:19
  114:8 131:10
  134:5 139:21
  139:21 144:10
**using** 6:24 9:1
  87:14 88:11
  121:21 122:20
  145:7
**utilized** 70:25
  120:13

**v**

**vague** 10:6
  14:10 48:9
  63:6
**valid** 27:8
**validate** 28:8
  91:6
**validity** 26:23
  27:1
**value** 29:15,16
  71:16,21 72:2
  73:12 74:1
  75:4,11,15,19
  75:23 76:20
  93:24 94:5,6
  95:10 98:13
  109:4
**vanguard**
  64:10 65:8,13
  65:19 66:10
  67:1 68:23
  70:12,19
  117:14,21
  118:19
**verify** 52:9
**veritext** 7:1,3
  21:15
**version** 89:21
  134:8
**versus** 6:19
  58:23 64:5
  134:3
**video** 6:13,17
  9:3 102:17

**videographer**
  3:24 6:4 7:1
  34:21,25 61:15
  61:19 102:2,6
  102:13,18
  111:21,25
  129:10,14
  143:8,11,15,19
  144:2,8
**videotaped**
  1:14 2:14
**view** 102:19
**vintages** 120:4
  126:5 130:25
**virtual** 1:14
  6:24
**virtually** 6:8
**vitae** 9:18,23
  12:9
**vs** 1:6 2:6 146:1

**w**

**w2** 12:17 15:25
**waiting** 24:4
**walk** 97:6
**walnut** 3:7
**want** 8:19 10:1
  10:6 12:3
  14:10,15 17:4
  24:13 35:19
  37:22 44:7
  45:19 55:14
  67:10,20 80:11
  84:23 85:7
  92:21 99:6,9
  114:15 120:7

  122:4 126:11
  127:10 128:24
  134:22 135:8
  137:23
**wanted** 11:22
  83:2 107:4
  136:22
**warning** 94:20
**wasted** 134:13
**way** 23:16
  54:17 55:7
  57:6 59:6
  64:17 69:4
  80:6,22 83:14
  89:25 93:3
  94:9 99:19
  100:9 105:12
  108:19 109:25
  111:12 118:24
  119:4 121:3
  138:7,8
**ways** 58:18
**we've** 34:14
  134:12
**website** 23:12
**weight** 54:15
**went** 37:18,18
  90:13 111:15
  117:5
**wermers** 11:17
**werner** 1:15
  2:14 5:4,9 6:17
  7:21,23 8:2
  11:13,15 21:14
  24:19 32:20

34:19 35:3,6 41:5 43:19 45:9 48:5 56:3 59:7 60:1 61:4 61:13,22,25 62:11 64:2,25 65:23 68:6 70:4,23 78:24 82:18 94:25 99:5 100:23 101:16 102:9 102:22 107:7 112:2 114:15 115:1 117:12 119:5 124:8 129:6,17,20 130:7,18 131:8 136:12,23 140:13 142:21 143:22,25 144:10 146:3
**whereof** 145:17
**willing** 115:19
**witness** 6:11 7:12 10:19,21 13:6 14:24 21:19 24:16 27:25 28:13 34:14,20 36:21 41:11 42:7 54:6 57:21 72:10,25 74:5 74:10,13,19 82:12 83:22 92:3 93:8 102:14,19,23 114:19 118:4 119:13 128:22 129:2,7 140:17 140:19,23 141:2,4 145:17 146:3
**wonderful** 41:22
**word** 28:7 54:11 84:11 85:13 87:6 88:4 143:4
**words** 26:18 89:12 123:25
**work** 19:15 72:18 112:8 120:5 122:11 137:20
**worked** 19:11 138:7
**working** 12:6 21:13 23:1
**works** 12:25 59:6 105:12 109:25 111:6
**worksheet** 100:20 110:8 136:6 141:15
**world** 63:18
**worse** 98:16,17 101:8 110:25
**write** 99:6
**written** 57:14 137:14 138:7
**wrong** 39:4 98:25 99:3 117:1
**wrote** 85:9,12 137:13

**x**

**x** 1:3,10 2:3,10 4:1,1 5:1,1 132:22 145:13
**xylophone** 132:23
**xyz** 109:5,8,10

**y**

**year** 9:24 10:5 10:13 12:11 22:16 23:5 49:19 69:5,15 69:18
**years** 9:24,25 10:4,5,8,12 12:12 20:14 22:22
**yield** 103:16
**yields** 138:20 138:23 139:3

**z**

**zero** 97:21 111:15 120:10 121:9,12,12,12
**zoom** 1:14

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.