# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **MARY LALIBERTE and MARIE MCKNIGHT, individually and as representatives of a class of similarly situated persons, on behalf of the QUANTA SERVICES, INC. 401(K) SAVINGS PLAN,** | § § § § § § § § | |
| | | **Case No: 4:22-cv-03290 (AHB)** |
| **Plaintiffs,** | § § | **Oral Argument Requested** |
| **v.** | § § | |
| **QUANTA SERVICES, INC.,** | § § | |
| **Defendant.** | § § | |

---

## DEFENDANT'S MOTION TO EXCLUDE PROPOSED EXPERT TESTIMONY OF RICHARD MARIN AND MEMORANDUM OF LAW IN SUPPORT

---

Defendant Quanta Services, Inc. ("Quanta" or "Defendant"), by and through the undersigned counsel, submits this motion and accompanying memorandum of law to exclude the proposed expert testimony of Richard Marin (1) that Quanta should have placed the actively managed Fidelity Freedom Funds TDFs[1] in the Quanta Services, Inc. 401(k) Savings Plan ("Plan") on watch list and removed them from the Plan effective January 1, 2017, and (2) that a prudent fiduciary would have offered the American Funds TDFs instead of the Freedom Funds.

---

[1] "TDFs" is short for "target date funds."

## I.      INTRODUCTION

Plaintiffs' Complaint alleges that Quanta breached its fiduciary duties under the Employee Retirement Income Security Act of 1974 ("ERISA") by offering the actively managed Freedom Funds in the Plan because they: (a) were more expensive than the passively managed Fidelity Freedom Index TDFs,[2] (b) were riskier than the Freedom Index TDFs, (c) were comprised of underlying funds that performed poorly or had an insufficient track record, (d) took "levels of risk that rendered [them] unsuitable for the average retirement investor," (e) engaged in "active asset allocation" and had a "chaotic glide path[]," (f) lost investor confidence, and (g) had three- and five-year performance that was worse than four other TDFs in the first and second quarter of 2016. Compl. ¶¶ 29-48. Plaintiffs say the Freedom Funds were "objectively imprudent" investments because of these alleged problems. Order, Dkt. 53 at 2 (quoting Dkt. 40 at 5-7).

To support their claims, Plaintiffs now proffer the testimony of Richard Marin as a purported expert witness. But Marin did not address the bases for Plaintiffs' allegations in the Complaint. That is, Marin did not evaluate: whether the Freedom Funds were riskier or more expensive than the Freedom Index TDFs; the glide path or whether the Freedom Funds took on levels of risk that rendered them unsuitable for retirement investors; the performance of any of the underlying funds in the Freedom Funds; or whether other investors lost confidence in the Freedom Funds or withdrew their money from the Freedom Funds. Ex. A (Marin Dep. Tr.) at 187:6-206:15.

Nevertheless, Marin opines that (1) based on the terms of the Plan's Investment Policy Statement ("IPS"), Quanta should have placed the Freedom Funds on a watch list and then removed the Freedom Funds from the Plan effective January 1, 2017 ("Removal Opinions"), and

---

[2] The Complaint refers to the Freedom Funds as the "Active Suite" and the Freedom Index TDFs as the "Index Suite." Compl. ¶ 25.

(2) a prudent fiduciary would have offered the American Funds TDFs as of January 1, 2017 instead of the Freedom Funds ("Replacement Opinions"). Ex. B (Marin Report) ¶¶ 24(a)-(c), 66-67.

Marin's Removal Opinions are improper because (1) they are not tied to the allegations in Plaintiffs' Complaint, (2) Marin is not qualified to offer opinions based on the IPS, and (3) Marin ignores the actual terms of the IPS. In fact, the IPS identifies *nine* criteria that Quanta "may consider" when evaluating whether a fund should be placed on a watch list and then considered for removal. Marin's Report only mentions three of them. Yet he admitted at deposition that he considered the other six criteria but disregarded them *because they did not support his conclusions*.

Marin's Replacement Opinions likewise should be excluded, but for different reasons. Marin compares the "Freedom Funds" to eleven other TDFs in the market and concludes that the American Funds TDFs were the best alternative. But Marin's Replacement Opinions are based on an investment selection methodology that *no other* plans (out of tens of thousands) use and that he admits has never been tested, scientifically or otherwise. Marin also did not evaluate whether the American Funds TDFs he proffers as a replacement suffered from all of the same criticisms (e.g., risk, glidepath, fees, etc.) that are alleged in the Complaint about the Freedom Funds, and Marin's Replacement Opinions are based on a comparison to a more expensive version of the Freedom Funds that was *never* in the Plan. Worse yet, Marin's Replacement Opinions are based on hindsight because he relies on the fees for all of the TDFs *in 2024* to select the best TDF for the Plan *in 2017*. Ex. A at 170:6-11. As Marin testified, using hindsight, even a little bit, "ruins the whole analysis," because "you can't cherry pick information in the future and include it in an analysis and have it be valid on a contemporaneous basis." *Id*. at 147:1-10. Yet that is exactly what Marin did here.

For these, and the reasons explained below, the Court should exclude Marin's testimony.

## II.    APPLICABLE LEGAL STANDARDS

To be admissible under Federal Rule of Evidence 702, expert testimony must be "both relevant and reliable." *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993)). "Reliability is determined by assessing 'whether the reasoning or methodology underlying the testimony is scientifically valid.'" *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (quoting *Daubert*, 509 U.S. at 592-93). "Relevance depends upon 'whether that reasoning or methodology properly can be applied to the facts in issue.'" *Id*. Evaluating these factors "requires more than a glance at the expert's credentials; the court must also ensure that the expert has reliably applied the methods in question." *Valencia*, 600 F.3d at 424. "Overall, the trial court must strive to ensure that the expert, 'whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Id*. (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)).

The proponent of the expert testimony bears the burden of demonstrating the admissibility of the opinions and testimony offered by the proposed expert "by a preponderance of the evidence." *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). The district court serves a critical "gatekeeping role to determine the admissibility of expert testimony" under these standards. *Valencia*, 600 F.3d at 424. These principles apply equally where, as here, the matter is set to be tried to a judge rather than a jury. *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832-33 (3d Cir. 2020) ("Rule 702 applies whether the trier of fact is a judge or a jury" and the fact that a case is being tried to a judge does not give the court "discretion to abandon the gatekeeping function or [to] perform the function inadequately") (citing *Kumho Tire*, 526 U.S. at 158-59 (Scalia, J., concurring)); *Grand Isle Shipyards, Inc. v. Black Elk Offshore*

4

*Operations, LLC*, 2021 WL 533706, at *3 (E.D. La. Feb. 21, 2021) ("[A]lthough district courts retain latitude to determine how to apply the *Daubert* requirements in a bench trial, a court may not sidestep Rule 702 altogether and decline to perform any assessment of expert testimony before trial.").

III.    **ARGUMENT**

    **A.    Marin's Removal Opinions Are Unreliable And Should Be Excluded.**

    In his Report, Marin does not offer an opinion about any of the facts that Plaintiffs alleged in their Complaint about the Freedom Funds that led to them being (allegedly) objectively imprudent investment options. Instead, Marin offers the opinion that the "[a]pplication of an objective investment monitoring and removal framework ***consistent with the Plan's IPS*** would have resulted in the removal and replacement" of the Freedom Funds. *E.g.*, Ex. B ¶ 66 (emphasis added). Throughout his Report, and in his deposition testimony, Marin maintained that his analysis involved simply "[a]pplying the standards articulated in the IPS" to analyze the Freedom Funds. *E.g.*, *id.* ¶ 38; *see also* Ex. A at 79:5-7 ("the information that is most relevant to deciding whether to retain or terminate a fund choice is based on what is indicated in the IPS, in my opinion"), 87:14-15 ("I did the analysis based on that guidance of the IPS."), 89:2-4 ("I'm saying that the IPS does not put these things up on its process list for them to be ignored. They need to be considered."), 124:6-7 ("I just used what was written in the IPS."), 230:17-18 ("And what is important is what is called for in the IPS"). Marin's opinion is unreliable, and should be excluded, for three independent reasons. First, Marin's opinion does not "fit" Plaintiffs' theory of the case as is required under Rule 702, as the Complaint does not allege that the Freedom Funds were imprudent because they failed the IPS's guidelines. Second, Marin is not qualified to offer an opinion concerning the interpretation or application of the Plan's IPS, which is an inherently process-based issue over

which he admittedly has no experience or expertise. Third, Marin's analysis ignores or misapplies several key tenets of the IPS.

### i.    Marin's Removal Opinions Do Not Fit Plaintiffs' Theory.

To qualify under Rule 702, expert opinion testimony must be relevant, or "fit" the case—that is, it must be "sufficiently tied to the facts of that case that it will aid the [decisionmaker] in resolving a factual dispute." *Daubert*, 509 U.S. at 591 (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)); *see also Weiser-Brown Operating Co. v. St. Paul Surplus Lines Ins. Co.*, 801 F.3d 512, 529 (5th Cir. 2015) ("'The expert testimony must be relevant, not simply in the sense that all testimony must be relevant, Fed. R. Evid. 402, but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue.'") (quoting *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003)). Marin's Removal Opinions do not meet this bar.

As this Court explained in denying Quanta's Motion to Dismiss, Plaintiffs allege that the Freedom Funds were "objectively imprudent investment options" because they were "(1) high-risk and unsuitable for Plan participants, (2) considerably more costly than other TDFs, such as the Fidelity Freedom Index Series (the 'Index Fund'), (3) not as favored by investors, and (4) inferior to other TDFs in its returns." Order, Dkt. 53 at 2 (citing Dkt. 40 at 5-7 and Compl. ¶¶ 29-48). Notably absent from the Complaint is any mention of the Plan's IPS or any factual allegations either that the terms of the IPS required removal of the Freedom Funds or that the process followed by Quanta was inconsistent with the terms of the IPS.[3]

---

[3] Plaintiffs have never sought to amend their Complaint, and the time for doing so has long since passed. Dkt. 44 at 1. Plaintiffs cannot "effectively amend the complaint to add a cause of action through [their] expert's testimony." *Equal Emp. Opportunity Comm'n v. Jackson Nat'l Life Ins. Co.*, 2023 WL 2727736, at *4 (D. Colo. Mar. 31, 2023); *see also Dane Techs., Inc. v. Gatekeeper*

Marin's Removal Opinions, by contrast, purport to be based entirely on the terms of the Plan's IPS—he opines that Quanta breached its fiduciary duties because it did not follow the IPS watch list and removal criteria. Marin does not address any of the specific criticisms Plaintiffs allege about the Freedom Funds, such as their level of risk, expense, underlying investments, investor confidence, glide path, etc. Indeed, Marin does not even mention the Freedom Index TDFs—the "Index Suite" at the center of the Complaint—in his Report.[4] Marin's Removal Opinions do not "fit" the facts of the case or Plaintiffs' theory and should be excluded for that reason alone. *E.g.*, *Cooper v. City of La Porte Police Dep't*, 608 F. App'x 195, 198-99 (5th Cir. 2015) (affirming exclusion of expert opinion that did "not examine the primary issue in the case" because it "would not assist the trier of fact"); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055 (8th Cir. 2000) ("The [Supreme] Court referred to this requirement as 'fit,' meaning that the expert testimony must not only be based on reliable science but must also 'fit' the particular facts of the case."); *Pharmanetics, Inc. v. Aventis Pharms., Inc.*, 182 F. App'x 267, 270-71 (4th Cir. 2006) (upholding district court's exclusion of an expert where "[t]he evidence was simply not 'sufficiently tied to the facts of the case'"); *McDowell v. Brown*, 392 F.3d 1283, 1298-99 (11th Cir. 2004) ("expert testimony must be 'relevant to the task at hand, . . . i.e., that it logically advances a material aspect' of the case") (quoting *Daubert*, 509 U.S. at 591).[5]

---

*Sys., Inc.*, 2015 WL 12819180, at *5 (D. Minn. Jan. 20, 2015) ("[A]n expert report cannot introduce new infringement theories without leave to amend on showing good cause.").

[4] In complete contradiction of the allegations in the Complaint, Marin testified at deposition that he agreed the Index Suite "would not be a suitable replacement for the Freedom Funds that were in the plan." Ex. A at 150:14-17.

[5] *See also Kristensen ex rel. Kristensen v. Spotnitz*, 2011 WL 4380893, at *3 (W.D. Va. Sept. 21, 2011) ("[T]he expert's theory and method must have a relevant relationship with the facts at issue in the case, described by the Supreme Court as a 'fit.'"); *Johnson v. Louisville Ladder*, 2008 WL 5122261, at *8 (S.D. Ala. Nov. 14, 2008) ("Where the opinion does not advance the question in

ii.        **Marin Is Unqualified To Offer Process-Based Opinions.**

Marin's opinion that the Freedom Funds should have been removed from the Plan boils down to a contention that Quanta misapplied the Plan's IPS. *E.g.*, Ex. B ¶ 42 ("following identification of the Freedom Funds as being in breach of the IPS performance standards in the Fourth Quarter of 2015, the Committee, employing a reasonable monitoring framework, would have, through continued scrutiny of the suite, determined to remove and replace the Freedom Funds in the Plan"). Put another way, Marin opines that Quanta breached its fiduciary duties by not following the Plan's IPS.[6] But Marin admittedly has no experience in fiduciary processes: he has never even reviewed or applied investment policy statements, and the last time he attended a fiduciary retirement committee meeting was *over twenty years ago*. *See* Ex. A at 40:25-41:2, 45:11-13. He is therefore unqualified to opine on the appropriate interpretation or application of the Plan's IPS. *See Penor v. Columbia Cnty.*, 2010 WL 916211, at *3 (D. Or. Mar. 9, 2010) (excluding opinion where expert's "qualifications are outdated"); *McCabe v. Macaulay*, 2008 WL 2980009, at *5 (N.D. Iowa Apr. 29, 2008) (finding expert unqualified because his "expert knowledge is outdated, stale and inadmissible"). Plaintiffs' process expert agrees: "[m]onitoring a retirement plan . . . is different than monitoring one's own personal investment accounts" and,

---

dispute for which the opinion is proffered, then there is no 'fit' and the opinion should be excluded.").

[6] Plaintiffs' process expert, Donald C. Stone, explains clearly that adherence to an IPS is a question of Quanta's fiduciary process. *E.g.*, Ex. C (Stone Report) ¶ 43 ("The IPS serves as the foundation for the fiduciary committee's decision-making process, providing a reliable framework for fiduciaries when carrying out their responsibilities. . . Adhering to a written IPS also helps ensure that investment decisions are made through a prudent, consistent process that aligns with the plan's investment objectives.").

because the "standard of care evolves as retirement investing products and services evolve, . . . [c]ontinuing fiduciary education should occur at lease one [*sic*] per year." Ex. C ¶¶ 31-32.[7]

Nor does Marin have any experience serving as a retirement plan consultant with responsibility for advising fiduciary retirement committees, much less drafting, interpreting, or applying an IPS. *See* Ex. A at 45:15-21.[8] In fact, the *only* other supposed "experience" Marin could identify was his review of IPSs used by two plans—but he is only familiar with those IPSs by virtue of his role as a testifying expert in those two cases. *See* Ex. A at 38:9-11 (the Quanta IPS is "not totally dissimilar to what is used at Genworth"), 49:10-19 ("I believe that's the case with Genworth, and I believe that's the case even with Prudential."); Ex. B at 42. An expert whose "exposure to the [relevant] industry is entirely in the context of providing expert services" is not qualified to offer an opinion. *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 677 (S.D.N.Y. 2013); *see also Prantil v. Arkema France S.A.*, 2022 WL 1570022, at *2 (S.D. Tex. May 18, 2022) (when evaluating the reliability of a purported expert's opinion, "relevant factors include whether the expert's theory came from litigation or independent research"); *Brown v. China Integrated Energy*, 2014 WL 12576643, at *5 (C.D. Cal. Aug. 4, 2014) ("an MBA and significant experience as an expert witness in the past is insufficient to qualify as an expert witness" where he does not have "expertise in the matters on which he will opine in this case"). Because Marin's only "relevant" experience in the last twenty years comes from his involvement as an expert for plaintiffs in two

---

[7] Notably, Plaintiffs' process expert, Stone, opines on Quanta's supposed compliance with the IPS, including with respect to the IPSs "watch list." *See generally* Ex. C. He does not opine, however, that the IPS required removal of the Freedom Funds as of January 1, 2017, or at any other time. Ex. D (Stone Dep. Tr.) at 171:3-21, 287:11-20 (testifying that he does not opine on whether the Freedom Funds should have been removed based on performance prior to January 1, 2017).

[8] Although Marin testified that he once supervised retirement consultants who reported to him while employed at Bear Stearns, he could not "recall whether or not they had defined contribution plans" and, regardless, that experience was *over fifteen years ago*. Ex. A at 29:2-4, 46:7-8.

other ERISA lawsuits, he is not qualified to offer his opinion that the Committee should have removed the Freedom Funds applying the fiduciary process outlined in the Plan's IPS.

### iii.    Marin's Analysis Ignores The Actual Terms Of The IPS, Rendering His Opinion Unreliable.

Despite asserting that he "did the analysis based on that guidance of the IPS," Marin ignores or misapplies the actual terms of the IPS. Ex. A at 87:14-15. First, the IPS identifies *nine* criteria for evaluating whether a fund should be placed on a watch list or subject to further scrutiny, but Marin only evaluated three of them in his Report (he ignored the others because they did not support his conclusions). Second, Marin arbitrarily ends his analysis after five quarters, but the IPS contemplates potentially removing a fund after six quarters (of considering all nine factors). Third, Marin uses a different peer group than the one Quanta actually utilized to monitor the Freedom Funds.

### 1.    Marin Ignores Six Of The Nine Factors In The IPS.

The Plan's IPS establishes a "watch list" process for evaluating Plan investment options. Ex. E (2015 IPS) at QUANTA_001417. The IPS identifies nine factors that the Committee "may consider" when evaluating an investment, three of which are quantitative in nature and six of which are qualitative in nature. *Id*. Marin opines that each factor in the IPS "need[s] to be considered." Ex. A at 89:2-14 ("I'm saying that the IPS does not put these things up on its process list for them to be ignored. They need to be considered."). Yet his Report ignores all six qualitative factors contemplated in the IPS watch list process. *See* Ex. B ¶¶ 31(a)-(e) (describing the methodology Marin applied to evaluate the Freedom Funds).

Worse still, Marin testified that he *did* actually consider those six qualitative factors and he chose to exclude them from his Report because they did not support his ultimate conclusion that the Freedom Funds were imprudent. Marin testified: "The ones that I viewed as in breach were

included in the report. The ones that I didn't view or I didn't have any information to indicate there was a breach were not put into that." Ex. A at 70:17-20. This sort of cherry-picked, results-oriented analysis—ignoring factors he admits were favorable to the Freedom Funds to focus solely on factors that (Marin argues) support his opinion—is inappropriate. *See Recif Res., LLC v. Juniper Cap. Advisors, L.P.*, 2020 WL 11025602, at *9 (S.D. Tex. Oct. 1, 2020) (excluding expert opinion where the expert "without explanation failed to consider substantial and especially significant information that was inconsistent with his [opinion]") (citing *Guzman v. State Farm Lloyds*, 456 F. Supp. 3d 846, 853 (S.D. Tex. 2020)); *360 Mortg. Grp., LLC v. HomeBridge Fin. Sers., Inc.*, 2016 WL 6075566, at *4 (W.D. Tex. Apr. 22, 2016) ("Experts cannot ignore relevant evidence by cherry-picking the facts which conform to a desired outcome.") (citing *Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001)).[9]

Regardless of the conclusions Marin drew from his "consideration" of the qualitative factors of the Freedom Funds (i.e., whether they supported or undermined his opinions), the mere fact that none of that analysis appears in his Report is, on its own, fatal to his opinion. "[I]f an expert does not specifically elucidate the methodology and basis he used in formulating his opinions, his opinions are unreliable and inadmissible because, under *Daubert*, an expert's qualifications, conclusions, and assurances of reliability are not enough." *Le v Exeter Fin. Corp.*, 2019 WL 1436375, at *30 (N.D. Tex. Mar. 31, 2019); *Smith v. Chrysler Grp., LLC*, 909 F.3d 744, 749 (5th Cir. 2018) (district court properly excluded testimony where the expert did "not explain his methodology for reaching his conclusion, leaving the district court to guess"); *Guile v. United*

---

[9] Marin's approach is also inconsistent with the methodology espoused by another of Plaintiffs' experts, Stone, who testified that "fiduciaries should be looking at all of these things," both qualitative and quantitative. Ex. D at 188:21-22.

*States*, 422 F.3d 221, 227 (5th Cir. 2005) ("A claim cannot stand or fall on the mere *ipse dixit* of a credentialed witness.").

### 2. Marin Uses A Shorter Time Period Than The IPS Requires.

The IPS contemplates a watch list monitoring process consisting of six quarters in total—four on "Monitor" status and two on "Alert" status—before even considering replacing the investment with alternatives:

> Once an investment option has been assigned a status of "Monitor," if it should remain with this status for up to ***four consecutive quarters***, without documented improvement in the underlying criteria, it will be advanced to a status of "Alert" no later than the fifth consecutive quarter of underperformance. ***After two consecutive quarters on "Alert" status***, the Committee shall consider alternative investment options and discuss the merits of replacing or continuing the investment. However, the Committee at its discretion may change an investment's status outside of these standards as each fund is separately evaluated. Any such change in investment status will be documented in the meeting minutes.

Ex. E at QUANTA_001417 (emphasis added). Marin, while purportedly seeking to apply the IPS watch list process, places the Freedom Funds on "Monitor" status for four quarters (Q4 2015 – Q3 2016), but only places the Freedom Funds on "Alert" status for one quarter (Q4 2016) before opining that the IPS required the Freedom Funds to be removed as of January 1, 2017. *See* Ex. B ¶ 26, Tables 1-5. Again, Marin misapplies the IPS. Even *if* Marin correctly concluded the IPS somehow required the Freedom Funds to be on "Monitor" status (he did not because he ignored six of the nine factors that "must be considered," *supra* at 10-11) as of Q4 2015, they still would not be subject to removal as of January 1, 2017, under the IPS. Moreover, the data for Q1 2017 shows that all but one vintage of the Freedom Funds outperformed their benchmark on a three-year basis and every vintage ranked in the 1st or 2nd quintile (top 20% or 40%) relative to peers.

Ex. G (Q1 2017 Investment Review) at QUANTA_002247.[10] Again, Marin is including in his Report only the data that supports his desired conclusion. *See supra* at 10-11.

When confronted with this inconsistency, Marin testified only that he believed that one quarter on "Alert" status was "sufficient to indicate removal" because "the committee has the discretion under the IPS to do that." Ex. A at 123:19-24, 126:14-19. But that ignores the plain language of the IPS, which states only that "[a]fter two consecutive quarters on 'Alert' status, the Committee shall consider alternative investment options." Ex. E at QUANTA_001417. To be sure, Marin could have opined that the IPS itself was somehow deficient under ERISA's fiduciary standards. But that claim is not alleged, and Marin does not offer that opinion (nor would he have been qualified to do so, *supra* at 8-10).[11] Instead, Marin opined that the IPS was consistent with other IPSs he has utilized, Ex. A at 37:22-38:3, and that Quanta's purported breach was in not following it. Marin's opinion, however, ignores the unambiguous words of the IPS. This is yet another reason to exclude his testimony. *See supra* at 10-11.

### 3. Marin Manufactures His Results By Using A Different Peer Group Than The Committee And Its Investment Advisor.

The Committee evaluated the Freedom Funds' performance relative to peers on a quarterly basis using Lipper peer groups.[12] *See, e.g.*, Ex. F (Q4 2016 Investment Review) at QUANTA_106698, QUANTA_106718-30. The Freedom Funds were regularly ranked favorably

---

[10] Marin testified that he relied on the benchmark performance data provided to the Committee by its investment advisor in these quarterly reports and that he presumed "that the consultant reports from Ascend[e] during the time period that I'm talking about here contained accurate information that was used to monitor these investments." Ex. A at 52:12-16.

[11] To the contrary, Plaintiffs' purported process expert testified that the IPS was "typical." Ex. D at 173:12-16.

[12] Lipper peer groups are widely used in the retirement industry to evaluate investment options, and Marin himself uses them "in connection with other work that [he's] done with respect to investment monitoring." Ex. A at 76:2-5, 106:21-107:1.

relative to peers in this analysis. For example, as of Q4 2016—the quarter whose performance Marin says should have led to the removal of the Freedom Funds—Quanta's performance reports showed that each of the Freedom Funds ranked in the top two quintiles (i.e., the top 40%) of peers, with all but two vintages ranking in the top 20%. *Id*.; Ex. A at 90:19-106:1 (walking through the peer rankings in the Q4 2016 Investment Review and agreeing that each vintage of the Freedom Funds was ranked highly relative to peers). Yet Marin simply ignores the peer group analysis that was presented to Quanta on a quarterly basis, despite testifying that he believed the data in these reports to be accurate. Instead, he creates his own "peer group" based on target date "deep dives" used by Quanta for other purposes. *See* Ex. B ¶ 31(d). Marin admitted that he did not know the purpose of the deep dives that he was relying on:

> *Q.*  And as you sit here today, you don't know how prevalent it is for plan fiduciaries to use the Lipper peer group for evaluating funds as opposed to some other deep dive peer group that plan fiduciaries might look at for further analysis?
>
> *A.*  No. I think I answered that question already. I don't know specifically. I'm not surprised that Lipper is used, but they may be using modified Lipper that are more narrowed down. I believe the industry standard is to try to use the most appropriate index available, and I believe that's what induced Ascend[e]—who by the way, was indicating underperformance for much of this period of time for these vintages on its reports. I presume it motivated them to say to the committee, at least on an annual basis, hey, you best look at this more relevant peer index, and you have better choices available to you here. That's what I read into those reports.
>
> *Q.*  That's a really good point, Mr. Marin. You didn't look at any of the deposition testimony from the consultant at Ascend[e] or QPA; correct?
> *A.*  Correct.
>
> *Q.*  And you didn't look at any of the deposition testimony from the actual committee members?
> *A.*  I have not.

> ***Q.***    So you have no idea why the target date deep dives were provided to the committee or what was discussed by the folks on the committee or by the consultants at Ascend[e] related to the target date deep dive or the performance of the Fidelity Freedom Fund[s] in the 4th quarter of 2016?
>
> ***A.***    Outside of my scope.

Ex. A at 111:9-112:15. And Marin admits that the comparison to Lipper peers would have been more favorable than the deep dive analysis. *Id*. at 110:18-22 ("So I would imagine that the Lipper—brought up Lipper universe peer comparison which is shown in these reports would show a better outcome than the deep dive, more relevant peer group index showed. That would not surprise me."). Once again, Marin is cherry-picking only the data that supported his desired conclusion and ignoring the Lipper data that was actually presented to Quanta and that does not support his conclusions. *See supra* at 10-11. Marin's Removal Opinions should be excluded.

### B.    Marin's Replacement Opinions Are Unreliable And Should Be Excluded.

Marin's Replacement Opinions are also unreliable, and should be excluded, for two independent reasons. First, Marin's methodology—which he calls his "Scorecard" —has not been tested and finds no support in the industry. Second, Marin's Scorecard is unreliable as applied, insofar as it is infected with hindsight bias and does not even evaluate the Freedom Funds that were actually in the Plan.

#### i.    Marin's Scorecard Is Not Generally Accepted In The Industry.

In evaluating the reliability of an expert's methodology, courts routinely consider four non-exclusive factors:

> (1) whether the theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community.

*Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (citing *Daubert*, 509 U.S. at 593-94).

Marin's Scorecard fails each of these four factors.

Quanta acknowledges that plan fiduciaries often consider performance and fees and a host of other qualitative and quantitative metrics when selecting a fund. However, Marin's Replacement Opinions utilize a specific Scorecard "formula" that purports to calculate the best fund with mathematical precision, but without considering glidepath, or asset allocation, or investment strategy, among many other criteria. That "Scorecard" methodology is the basis for Marin's Replacement Opinions and fails under *Arkema* and *Daubert*.

First, Marin has not identified any industry publications or peer-reviewed articles that adopt or otherwise approve of his Scorecard methodology. *See generally* Ex. B. "Where peer review and publication are absent, 'the experts must explain precisely how they went about reaching their conclusions and point to some objective source—a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like.'" *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1056 (9th Cir. 2003) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995)). Marin offers no such explanation, and points to no "objective source" for his Scorecard. This is reason enough to exclude his Replacement Opinion.

Second, and to state the obvious, if there were a magic "Scorecard" bullet for finding the best fund—or even the best target date fund—investment professionals and investors everywhere would be using it constantly. Yet Marin could not identify any other investment advisor or retirement plan fiduciary who has *ever* applied this methodology. Ex. A at 139:8-11. Marin admits that he never tested it himself, and he has no idea whether it holds any ability to select better funds. *Id*. at 211:24-25 ("I have not done that assessment, so I have no way of knowing."), 212:7-9 ("I did not—I did not do a research study that would give me strong empirical evidence as to predictive quality, so the answer is no."). Of course, the purpose of an investment selection methodology is to select a fund that is expected to perform well in the future, but Marin has no idea whether his

methodology accomplishes that goal.[13] *See Atlas Imps., Inc. v. Atain Specialty Ins. Co.*, 2020 WL 4574521, at *4 (S.D. Tex. June 10, 2020) (excluding expert opinion "because it is not supported by academic research or literature and [the expert] has not tested his theory"); *Hopper v. M/V UBC Singapore*, 2010 WL 2787806, at *7 (S.D. Tex. July 14, 2010) (excluding expert opinions that "have not been tested or otherwise subjected to peer review").

### ii.    Marin's Scorecard Is Unreliable As Applied.

Even if Marin's Scorecard were a generally accepted methodology—and it is not—it is unreliable as applied to the facts of this case for two reasons. First, Marin's Scorecard is infected with hindsight bias, an issue that he himself testified "would invalidate the exercise." Ex. A at 145:19-24. Second, Marin's Scorecard evaluates a more expensive and worse performing version of the Freedom Funds than the one offered in the Plan. *Id.* at 171:24-172:1 ("We did not include the Freedom Fidelity Funds that were in the plan in this ranking.").

### 1.    Marin's Scorecard Is Infected With Hindsight.

As Marin himself testified, investment decision-making cannot be based on hindsight.[14] Ex. A at 145:19-24 ("obviously I disagree tremendously with using hindsight bias when you're selecting alternative funds."), 146:17-19 ("that would have introduced hindsight bias, which I think is *one of the most invalidating things you can do in this sort of analysis*.") (emphasis added). He testified:

---

[13] Plaintiffs' damages expert, Dr. Adam Werner, demonstrated that the American Beacon and DFA funds in the Plan (the other Challenged Investments) *outperformed* the alternatives selected by Marin's Scorecard methodology. Ex. H (Werner Dep. Tr.) at 99:19-100:4, 100:13-18, 101:2-9.

[14] Courts routinely agree that fiduciary investment decisions cannot be judged based on hindsight. *E.g.*, *Kopp v. Klein*, 722 F.3d 327, 341 (5th Cir. 2013) ("Fiduciaries' decisions are not to be judged with the benefit of hindsight, but from the facts known to them at the time."), *vacated on other grounds*, 573 U.S. 956 (2014); *Metzler v. Graham*, 112 F.3d 207, 209 (5th Cir. 1997) ("Prudence is evaluated at the time of the investment without the benefit of hindsight.").

> *Q.*   What if you only use it [hindsight] a little bit?
> *A.*   I don't think you should use it at all, period.
>
> *Q.*   And if you use it a little bit it ruins the whole analysis?
> *A.*   Yes, it does, actually. It does indeed because you're supposed to be putting yourself into the shoes of the committee at that point in time, and they didn't have access to that information.

*Id.* at 146:20-147:7 (objections omitted).

Nevertheless, Marin admitted that his Scorecard methodology and calculations do exactly what he says is prohibited, by considering and ranking each fund's expense ratio *in 2024* to calculate the "best" fund *as of January 1, 2017*. Ex. A at 170:8-11. He testified: "for the purposes of this exercise, as we annotate it here in the report, we use the gross expense ratios *as of July 2024* because that was what was available to us." *Id.*

Of course, this information was available to Marin when he wrote his report in 2024, but it was not available to Quanta (or anyone else) in 2016 or 2017. That is the definition of hindsight. In Marin's words, it is "*one of the most invalidating things you can do in this sort of analysis*": it "ruins the whole analysis." Ex. A at 146:17-19, 147:1-12. On this, Defendant agrees with Marin. The Court should exclude his hindsight-infected Scorecard methodology.

## 2. Marin's Scorecard Uses A More Expensive Version Of The Freedom Funds Than Were In The Plan.

A further fundamental flaw in Marin's Scorecard analysis is that he does not actually analyze the Freedom Funds that were in the Plan. Marin utilizes the "Investor" share class of the Freedom Funds, which is more expensive and has lower performance than the K share class of the Freedom Funds that were in the Plan. Ex. A at 170:24-171:5 (acknowledging that his Scorecard analysis uses the "investor share class of the Fidelity Freedom Funds"). As Marin himself acknowledges, using a different share class for an investment in his analysis means that the investment "would have different numbers across the board." *Id.* at 163:17-21. Every performance

metric and fee metric in the methodology would be wrong, because it was for a different fund. As a result, Marin admits that he did not perform any analysis to evaluate how the Freedom Funds that were offered in the Plan compared to any of his potential alternative TDFs:

> *Q.*    Okay. So you didn't do an analysis to see, using your ranking methodology that you described in your report, to see whether the Fidelity Freedom Funds that were in the plan actually would have scored higher than any of the other target date funds that you were considering as potential alternatives?

> *A.*    No. That was a separate exercise. We did not include the Fidelity Freedom Funds that were in the plan in this ranking. This was a ranking of alternatives.

*Id*. at 171:18-172:1. In other words, Marin did not even evaluate whether the Freedom Funds in the Plan would have scored higher than all of the alternatives—including the American Funds TDFs—he considered. Because he does not even use the Plan's actual Freedom Funds in his Scorecard analysis, there is simply "too great an analytical gap between the underlying data and the opinions offered." *Burst v. Shell Oil Co.*, 650 F. App'x 170, 174 (5th Cir. 2016). His opinions should be excluded.[15]

## IV.    CONCLUSION

For the foregoing reasons, the Court should exclude Marin's opinions and proposed testimony.

---

[15] Marin used a similar methodology for the American Beacon and DFA funds that are also Challenged Investments in the Complaint. His opinions regarding those funds also should be excluded for the same reasons. Notably, Plaintiffs' own damages expert, Dr. Werner, calculates that the Plan suffered no losses from either of these investments, both as of the time he submitted his report in 2024 and when Plaintiffs filed this lawsuit in September 2022. Ex. H at 99:19-100:4, 100:13-18, 101:2-9; Ex. I (Werner Report Backup).

Dated: December 20, 2024          Respectfully submitted,

**MORGAN, LEWIS & BOCKIUS LLP**

/s/ *Jeremy P. Blumenfeld*
Jeremy P. Blumenfeld, *Admitted Pro Hac Vice*
Attorney-In-Charge
Pennsylvania Bar No. 85955
2222 Market Street
Philadelphia, PA  19103
Telephone: (215) 963-5000
*jeremy.blumenfeld@morganlewis.com*

David J. Levy
Texas Bar No. 12264850
S.D. Tex. No. 13725
1000 Louisiana Street, Suite 4000
Houston, TX 77002
Telephone: (713) 890-5000
*david.levy@morganlewis.com*
*Counsel for Defendant Quanta*

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that a true and correct copy of the foregoing document was served via the Court's ECF/CM e-filing system to all counsel of record on December 20, 2024.

/s/ *Jeremy P. Blumenfeld*
Jeremy P. Blumenfeld

## CERTIFICATE OF CONFERENCE

Pursuant to Local Rule 7.1.D., the undersigned counsel certifies that counsel for the parties have conferred via email concerning the foregoing Motion to Exclude Proposed Expert Testimony of Richard Marin and that Plaintiffs oppose the Motion.

/s/ *Jeremy P. Blumenfeld*
Jeremy P. Blumenfeld