# Exhibit C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| MARY LALIBERTE and MARIE MCKNIGHT, individually and as representatives of a class of similarly situated persons, on behalf of the QUANTA SERVICES, INC. 401(K) SAVINGS PLAN,<br><br>        Plaintiffs,<br><br>  v.<br><br>QUANTA SERVICES, INC.; THE BOARD OF TRUSTEES OF QUANTA SERVICES, INC.; THE QUANTA SERVICES, INC. 401(K) SAVINGS PLAN COMMITTEE; and DOES No. 1-20, Whose Names Are Currently Unknown,<br><br>        Defendant. | Case No. 4:22-cv-03290 |

**EXPERT REPORT OF DONALD C. STONE**

**August 1, 2024**

**CONFIDENTIAL**

I, Donald C. Stone, hereby submit the following expert report (the "Report") in connection with the above-captioned matter.

## I.    ENGAGEMENT

1.      I have been engaged by Counsel for Plaintiffs, Mary Laliberte and Marie McKnight, in the case of *Laliberte v. Quanta Services, Inc.*, No. 4:22-cv-03290 (S.D. Tex.) (the "Action") to offer certain expert opinions.  My opinions concern the standards of conduct applicable to plan fiduciaries in connection with the governance and monitoring of defined contribution retirement plans ("DC plans") and the investments offered through such plans, and whether the conduct of the fiduciaries of the Quanta Services, Inc. 401(k) Savings Plan (the "Plan") was consistent with these standards.

## II.    QUALIFICATIONS

2.      I have an extensive background and experience in the retirement plan industry dating back to 1984 and I have been recognized as an expert in various aspects of employee benefits, including investments, fiduciary process, plan design, fees, and vendor management. Prior to my retirement in May 2019, I was involved in virtually all aspects of the retirement plan industry, including plan administration, operations, sales, product development, investments, plan design, fiduciary process, and vendor management.  During my career, I also ran a large, diversified employee benefit trust company for a large regional bank and started my own institutional investment advisory firm that consulted for clients with total retirement assets of over $65 billion.

3.      I have personally consulted with a wide range of virtually all types of retirement plans, including defined benefit plans ("DB plans"), DC plans, and employee stock ownership plans ("ESOPs").  From 2002 until 2019, my experience focused primarily on DC plans, for which I served as an investment consultant under ERISA §3(21), 29 U.S.C. § 1002(21)(A), as well as an investment manager under ERISA § 3(38), 29 U.S.C. §1002(38).  The plans with which I worked ranged from smaller plans to some of the largest DC plans in the country with billions of dollars in assets across a wide range of industries, including technology, manufacturing, entertainment,

1

transportation, and healthcare, to name a few. Throughout my career, I have had frequent interactions with plan fiduciaries, fiduciary committees, industry professionals, investment managers, and other retirement plan service providers, through which I developed a thorough understanding of prevailing industry custom and fiduciary practices used when selecting, monitoring, or replacing investment options or service providers for DC plans. I also had the opportunity to develop fiduciary training and manuals for clients, as well as develop and implement investment policy statements ("IPS"), committee appointment and removal procedures, and other policies and procedures for fiduciary governance and plan administration.

4.      Leveraging this experience, I was one of the first professionals in the industry to raise concerns over fees in 401(k) and 403(b) plans and fiduciaries' requirements and processes for monitoring fees. For instance, in 1996, I authored the feature cover story for Pension Management entitled, "Do You Know How Much Your 401(k) Plan Really Costs?" After founding Plan Sponsor Advisors, a registered investment advisor and institutional consulting firm in 2002, for many years our firm held various seminars on a broad range of topics including fees in qualified plans, plan design, fiduciary oversight, and others. For many years, we sponsored an annual conference for plan sponsors, typically attended by approximately 100 plan sponsors, to educate sponsors on customary fiduciary practices and industry trends and legislation, and we were able to expose plan sponsors to industry experts such as Richard Thaler, Nobel laureate in economics, and Robert Reynolds, former CEO of Empower and formerly the head of Fidelity Investments' workplace solutions business, among others. I have authored numerous articles for various publications on retirement issues.

5.      I began my retirement industry career in 1984, when I was hired by San Diego Trust and Savings Bank (subsequently First Interstate Bank and, later, Wells Fargo Bank) as a trust administrator responsible for approximately 250 retirement plans. In that role, I was responsible for negotiating trust and plan documents, plan design consultations with clients, and overall relationship management. Over the next 10 years, I held a number of positions and had multiple responsibilities. Among other roles, I had responsibility over all retirement plan, investment

2

management and trust sales, and was a member of several task forces to create a family of mutual funds, risk-based asset allocation funds, and 401(k) product offerings for both small and large plan sponsors.

6.     From 1996 to 1999, I was Senior Vice President at Key Bank, which had a $50 billion retirement plan business.  I was responsible for all facets of the business.  I oversaw the reorganization of back-office operations, such as the movement to mainframe operations for better data security, and changes to key performance indicators for call center operations for a better client experience.  I also served on the Trust Company Board.  As a Board member, I was involved in all major decisions affecting the trust company, including investment offerings and pricing and determinations on strategy for the various business lines, for example, whether to maintain our master trust business.

7.     From February 1999 through July 2000, I consulted with financial services companies including Intuit, Manulife, and Charles Schwab, ePlan Services, and PayCycle.  For Intuit, I provided recommendations on their exploration of entering the 401(k) business through their existing payroll business, helped develop business models, and conducted due diligence of a third-party administration firm.  For Manulife and Charles Schwab, I conducted market research to support their businesses.  For ePlan Services, I served on their Advisory Board and provided strategic consulting about their business segment.  For PayCycle, I provided strategic consulting involving their payroll application and retirement plans.

8.     From August 2000 until December 2001, I held the position of Senior Vice President at Ilona Financial, a United States holding company of Irish Life, and I was the Chief Operating Officer of its financial planning and advice subsidiary.

9.     In June 2002, I founded Plan Sponsor Advisors, LLC ("PSA"), a registered investment advisor and retirement plan consulting firm.  As the President and Managing Partner, I managed the firm's institutional investment and retirement advisory business.  During my tenure, PSA advised on over $65 billion in retirement assets in either an ongoing consulting role or on a project basis.  I served as an ERISA § 3(21) investment consultant to retirement plans (both large

and small), primarily DC plans. I performed or oversaw various consulting projects for retirement plan clients, including fee reviews, fiduciary reviews, operational compliance reviews and corrections, and committee fiduciary training, and I served as either an expert witness or expert consultant in various ERISA litigation cases. Over a number of years, PSA was recognized by PlanSponsor magazine as one of the leading advisory firms in the country. In 2012, the firm won the 401(k) Leadership Award sponsored by Morningstar and ASPPA. I was a frequent speaker at various conferences sponsored by Institutional Investor, Plan Sponsor Council of America, ASPPA, J.P. Morgan, and others.

10.    In June 2014, my partner and I sold PSA to Pavilion Advisory Group and I continued to work there. At the time of my retirement in May 2019, I was Executive Director of the firm, responsible for managing clients, developing a delegated investment process for DC plans where appropriate, conducting due diligence on various managed account providers, and negotiating fees and fee structures for clients with a broad range of service providers. Many of my DC clients had plan assets in excess of $1 billion. I served in both an ERISA § 3(21) and § 3(38) capacity to DC plans and DB plans. In particular, I was responsible for managing some of the firm's largest, most complex clients.

11.    Since 2021, I have provided consulting services related to the retirement plan industry, including serving as an expert witness in ERISA litigation involving investments, managed accounts, target date funds, record keeping and fiduciary practices.

12.    I have been asked to provide my knowledge and experience to the United States Government regarding issues impacting the retirement plan industry. In 2004, I testified before the United States Department of Labor's Advisory Council on Employee Welfare and Pension Benefits Plans ("ERISA Advisory Council") concerning fees in 401(k) plans. In 2009, I provided testimony to the ERISA Advisory Council related to stable value funds offered in DC plans. In 2006, I was interviewed by the United States Government Accountability Office ("GAO") in preparation of the GAO's report to Congressman George Miller's Workforce and Labor Committee on fee disclosures in 401(k) plans.

13.     During my career, I have written and spoken extensively on a broad range of topics impacting the retirement plan industry.  I chaired the National ABA 401(k) Conference, lectured at the Midwest Trust School on retirement plan trends, was a member of the Profit Sharing/401(k) Council of America ("PSCA") and the Worldwide Employee Benefits Network.  I was the managing partner of one of the founding firms of the Defined Contribution Institutional Investment Association ("DCIIA"), where I served on the Executive Committee for four years.  DCIIA is the premier not-for-profit organization in the country dedicated to enhancing retirement security for America's workforce.  DCIIA members include major record keepers, trust companies, investment managers, consultants and law firms with ERISA practices.  I have written articles for the American Society of Pension Professionals & Actuaries ("ASPPA"), PSCA, Financial Executive, Pensions & Investments, and Pension Management, among other publications.  I have been frequently quoted in publications such as Bloomberg, the Wall Street Journal, Treasury & Risk, Workforce Management, and Pensions & Investments.  Additionally, my firm (PSA) was hired and I led the consulting effort to create a fiduciary process manual for a global manufacturing firm as part of their settlement of ERISA litigation.

14.     I held the Accredited Investment Fiduciary designation from the Center for Fiduciary Studies, and previously held Series 7, 24, and 66 securities licenses.  I received my B.A. degree from University of South Carolina, and my M.S. degree from San Diego State University. I completed post-graduate studies at Case Western Reserve University and attended the AIMSE Investment Institute at the Wharton School of Business.

15.     My *curriculum vitae* and a partial list of the publications I have authored in the last 10 years is attached as **Appendix A**.  In the past four years, I have testified as an expert witness by deposition in *Wachala v. Astellas US LLC*, No. 20-3882 in the U.S. District Court for the Northern District of Illinois, *Harmon v. Shell Oil Company*, No. 3:20-cv-00021 in the U.S. District Court for the Southern District of Texas, *Mills v. Molina Healthcare, Inc.*, No. 2:22-01813 in the Central District of California, *Snyder v. UnitedHealth Group, Inc.*, No. 21-1049 in the District of Minnesota, *Waldner v. Natixis Investment Managers, LP*, No. 21-10273 in the District of

Massachusetts, *Williams v. Centerra*, No. 1:20-04220 in the District of South Carolina, and *Ahmed v. Liberty Mutual Group, Inc*., No. 2:20-30056 in the District of Massachusetts. I testified at trial in *Mills v. Molina*.

### III.     COMPENSATION AND PREPARATION OF EXPERT REPORT

16.     I am being compensated at a rate of $800 per hour for my work in connection with this engagement. My compensation is not contingent upon my opinions or the outcome of the Action. My review of the Action is ongoing and I reserve the right to amend, revise, or supplement the Report should additional information come to light.

17.     A list of materials that I relied upon in forming my opinions regarding the Action is set forth in **Appendix B**.

### IV.     BACKGROUND ON RETIREMENT PLAN INDUSTRY

18.     Over the last four decades, the predominant type of retirement benefits plan offered by employers to their employees has shifted from DB plans to DC plans.[1] These plans enable employees to direct a portion of their income into a dedicated retirement account, which is held in a single retirement savings plan.[2] Some employers contribute to these accounts as well, matching contributions made by their employees.[3] Employees can then direct the investment of these contributions among the range of investment options selected by fiduciaries to be made available through the plan. The Internal Revenue Code's Section 401(k) applies to DC plans offered by private, for-profit companies.

---

[1] A Visual Depiction of the Shift from Defined Benefit (DB) to Defined Contribution (DC) Pension Plans in the Private Sector, CONGRESSIONAL RESEARCH SERVICE (Dec. 27, 2021), pp. 1–2, available at: https://crsreports.congress.gov/product/pdf/IF/IF12007.

[2] *See id.*

[3] *See id.*

19.     Target date funds ("TDF(s)") have become a common choice for investors who have a DC plan.  These funds pool money from investors and invest in various asset classes.[4] TDFs also adjust their investment strategy over time, shifting from higher-risk stocks and other investments to more conservative options as the investor approaches retirement.[5]  As the investor approaches their target retirement age, the TDF will rebalance its asset allocation in the portfolio automatically over time to become more conservative, thereby gradually shifting from a higher allocation to equities to a lower allocation to equities.[6]  The manner in which the asset allocation is adjusted over the investment horizon is known as the glidepath.

20.     Since TDFs automatically transition their asset allocation to more conservative investments as the investor nears retirement, they have become a popular option among investors who prefer a single investment vehicle for their retirement savings without having to frequently manage their investments.  TDFs are a "set it and forget it" type of option that can be ideal for investors who want a single diversified and low-maintenance investment vehicle to save for retirement.  They have become accepted as a prevailing type of investment designated as a Qualified Default Investment Alternative ("QDIA"), which is "a default investment option chosen by a plan fiduciary for participants who fail to make an election regarding investment of their account balances."[7]  According to a joint study conducted by the Investment Company Institute ("ICI") and the Employee Benefit Research Institute ("EBRI"), by the end of 2022, 68% of all participants in 401(k) plans in their database held TDFs and 38% of all 401(k) assets were in

---

[4] *See* Target Date Retirement Funds, U.S. SEC. & EXCHANGE COMM'N, Investor.gov (May 7, 2010), available at: https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins/target.

[5] *See id.*

[6] *See id.*

[7] *See* Target Date Retirement Funds – Tips for ERISA Plan Fiduciaries, U.S. DEP'T OF LABOR, EMPLOYEE BENEFITS SECURITY ADMINISTRATION (Feb. 2013), at 1.

TDFs.[8]  This highlights the popularity of TDFs, while also emphasizing the critical role of prudent fiduciary oversight in the selection and monitoring of these funds.

21.    A DC plan's QDIA is the most important investment option provided to plan participants.  This is because plan participants who do not make an affirmative investment election will be defaulted into the QDIA.  The plan's QDIA, and in particular when TDFs are selected as the QDIA, may be exclusively relied upon by plan participants to meet their retirement needs. When plan participants initially invest in a TDF, it is common that those participants overwhelmingly remain invested in the TDF throughout the span of their participation in the DC plan.

22.    The term "target date" refers to the anticipated retirement date of the investor.[9]  For example, a TDF with a target date of 2025 is intended for investors who plan to retire around that year.  These funds are typically created by investment management companies and are available in a series of "vintages" that range from 2020 to 2065.  When TDFs were first offered in the marketplace, the vintages ranged in earlier retirement dates given the expected retirement dates of investors at that time (*e.g.*, 2005)  Well before 2015, TDF providers overwhelmingly offered TDFs in five-year vintages rather than ten-year vintages because five-year intervals were determined to best meet the investment needs of investors rather than longer ten-year intervals.

23.    TDFs commonly use a "to" or "through" retirement glidepath approach.[10]  A "to" retirement glidepath refers to a TDF that reaches its most conservative asset allocation at the

---

[8] Sarah Holden, Steven Bass, and Craig Copeland, 401(k) Plan Asset Allocation, Account Balances, and Loan Activity in 2022, EMPLOYEE BENEFITS RESEARCH INSTITUTE (Apr. 30, 2024), available at: https://www.ebri.org/docs/default-source/pbriefs/ebri_ib_606_k-xsec-30apr24.pdf?sfvrsn=1f43072f_1.

[9] *See* Target Date Retirement Funds, U.S. SEC. & EXCHANGE COMM'N, Investor.gov (May 7, 2010), available at: https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins/target.

[10] *See* Save the Date: Target Date Funds Explained, FINRA (Apr. 21, 2022), available at: https://www.finra.org/investors/insights/save-date-target-date-funds-explained.

anticipated retirement date.[11]  In contrast, a "through" retirement glidepaths refers to a TDF that reaches its most conservative asset allocation after the anticipated retirement date.[12]  The distinction between the type of glidepath would not cause a plan fiduciary to exclude TDFs offering a certain type of glidepath from consideration for a DC plan.  Both types of TDFs would be considered at the outset for inclusion in a DC plan.

## V.    ERISA'S FIDUCIARY DUTIES

24.    ERISA fiduciaries are subject to duties specified in 29 U.S.C. §1104.  The ERISA fiduciary duties are to act:

> (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan;

> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

> (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

> (D) in accordance with the documents and instruments governing the plan . . . .

29 U.S.C. §1104(a)(1)(A)–(D).

25.    In my experience as a fiduciary to large DC plans, I have observed the prevailing practices that prudent fiduciaries typically follow.  These practices help ensure that fiduciaries make wise decisions and lead to better outcomes for plan participants.  When I use the term "prudent," I am referring to the standards of care, skill, prudence, and diligence that have been established for fiduciaries of DC plans over the course of my career in the retirement plan industry. I am not offering a legal opinion on whether any particular conduct violates ERISA or other laws or regulations.

---

[11] *See id.*

[12] *See id.*

## VI.    APPLICABLE STANDARDS OF CONDUCT

### A.  Investment Committees

26.    To ensure that a DC plan is prudently managed, many plan sponsors establish a fiduciary committee that is authorized to carry out matters of plan management and administration, including the selection of investments and service providers.[13] This delegation typically is done in writing through a charter or resolution from the company's board of directors or trustees; all parties involved in the plan's administration should have clearly defined roles and responsibilities that are documented in writing.[14] When a plan sponsor establishes a fiduciary committee, it retains oversight responsibilities with respect to the committee's fiduciary decision-making.

27.    The committee should consist of knowledgeable and dedicated individuals who oversee the general administration of the plan, including its investments, expenses, and service providers.  It is customary for appointing fiduciaries to screen candidates for service on a fiduciary committee to ensure the persons selected to serve have an understanding of their role as a discretionary fiduciary and the standard of care with respect to their monitoring responsibilities, including as it relates to investment monitoring, and time to effectively carry out their responsibilities.  It is also critical for committee members to receive fiduciary training before serving and on an ongoing basis to ensure that they are well-informed of their obligations and equipped with the requisite knowledge to perform their duties effectively.

28.    The responsibilities of such a committee are customarily set forth in plan documents, such as a committee charter, and may include, among other things: (i) establishing, interpreting, and following an investment policy statement ("IPS") for the plan; (ii) selecting investment options for the plan, including a QDIA; (iii) monitoring the performance of each of the

---

[13] *See* Robert E. Jamison, Share the Love; Establish an Investment Committee (2007).  The Department of Labor has recognized that establishing an investment committee is a prevailing practice with respect to DC plan management.  *See* Meeting Your Fiduciary Responsibilities, U.S. DEP'T OF LABOR, EMPLOYEE BENEFITS SECURITY ADMINISTRATION (Sept. 2021), p. 2.

[14] *See* Prudent Practices for Investment Stewards, F I360 (2020), Practice 1.2–1.3.

investment options; (iv) appointing service providers for the plan, including investment advisors; and (v) monitoring the performance of plan service providers.

29.     Investment committees typically meet on a quarterly basis and keep records of actions taken by a committee, including deliberate inaction, and the rationale for such actions.[15] A committee's records are typically kept by way of meeting minutes and materials provided for consideration at meetings.[16]   At each meeting, fiduciary committees should review the prior meeting's minutes with particular attention to the actions taken at past meetings and the committee's reasons for taking such actions.[17]   Committee meeting minutes should specifically reflect any materials presented and any action taken regarding the plan investments.[18]   It is critical for an investment committee to document not only the actions taken or intentionally not taken, but the underlying rationale for any actions taken with respect to the plan's investments.[19]

30.     The Department of Labor stresses the importance of fiduciaries documenting not just their decisions and actions on behalf of the plan but also "the basis for those decisions."[20] Meeting minutes serve as the formal record of the decision-making process for fiduciary committees and should contain details of the topics discussed, materials considered, decisions made, rationale behind those decisions, and any actions to be taken.[21]   The fiduciary committee

---

[15] *See* Bradley Bartells, How to Properly Document 2024 Plan Meetings, PLANADVISER (Jan. 18, 2024), available at: https://www.planadviser.com/properly-document-2024-plan-meetings/.

[16] *See* Prudent Practices for Investment Stewards, FI360 (2020), Practice 1.2.

[17] *See* Guide to Committee Meeting Minutes, PENSIONMARK (last visited July 19, 2024), available at:         https://cdn.ymaws.com/dciia.org/resource/resmgr/resource_library/Guide-to-Committee-Meeting-M.pdf.

[18] *See id.*

[19] *See id.*

[20] U.S. Dept. of Labor, Meeting your Fiduciary Responsibilities (2021) at p. 2, available at https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf; Dept. Of Labor, *Meeting your Fiduciary Responsibilities,* p. 2, (2021) https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

[21] *See* Vanguard, *Best Practices for Plan Fiduciaries* (2013), p. 11 ("Document all committee actions and decisions.").

approves and finalizes the minutes, typically before or during the next scheduled meeting, and any actions taken should be reviewed and documented at subsequent meetings.

### B. Fiduciary Training

31.     Monitoring a retirement plan, which involves the supervision of service providers and investments on behalf of an entire population of plan participants, is different than monitoring one's own personal investment accounts.  Accordingly, individuals with limited knowledge of retirement plan administration must obtain training concerning fiduciary decision-making standards and, as relevant here, investment selection and monitoring practices in order to effectively serve as a retirement plan fiduciary.[22]  The information included in fiduciary training should be specific enough to inform fiduciaries of the particular means and methods by which they are expected to monitor plan investments.

32.     Fiduciaries should receive onboarding training prior to beginning service on a fiduciary committee, as well as continuing education and training, to ensure fiduciaries are equipped to carry out their responsibilities.  Onboarding training should include review of all plan governance documents, investment and fee guidance, and records of any prior decision-making of plan fiduciaries.  The standard of care evolves as retirement investing products and services evolve.  Accordingly, continuing education should involve refresher information as well as information regarding current developments.  Continuing fiduciary education should occur at least one per year.[23]

---

[22] Several providers offer educational programs to meet this need for fiduciary training. *See, e.g.*, Multnomah Group, Fiduciary Training Program (last visited July 19, 2024), available at: https://www.multnomahgroup.com/fiduciary-training-program; Aon, Aon Fiduciary Academy (last visited July 19, 2024), available at: https://www.aon.com/en/capabilities/pensions-and-retirement/online-fiduciary-training.  Indeed, some providers offer specific fiduciary training on the selection and monitoring of target date funds.  *See* Multnomah Group, Fiduciary Training Program (last visited July 19, 2024), available at: https://www.multnomahgroup.com/fiduciary-training-program.

[23] *See* Noah Zuss, How to Teach Fiduciary Responsibilities to Plan Committees, PLANSPONSOR (Feb. 1, 2024), available at: https://www.plansponsor.com/how-to-teach-fiduciary-responsibility-to-plan-committees/.

### C. Fiduciary Investment Monitoring

33.     In defined contribution plans, like the Plan, the value of a participant's accounts is derived from the participant's contributions, the employer's contribution, and the participant's share of earnings, losses, and any appreciation or depreciation of the funds invested, net of applicable administrative expenses.[24]    Accordingly, it is critical that fiduciaries employ an objective and consistent process to select and monitor investments in a DC plan to ensure such investments are suitable for the plan.

34.     On at least a quarterly basis, fiduciaries should review and analyze the impact of economic developments on the plan, the performance of each plan investment across all relevant metrics, and the qualitative and quantitative factors relevant to the fiduciary's decision to retain or replace any investments on a watch list.[25]    Fiduciaries also remain vigilant for any qualitative changes that may warrant further investigation, such as manager turnover or a change in investment strategy.[26] If an investment option fails to meet the plan's standards for several consecutive quarters, it should be closely scrutinized.   This review should also include discussion of significant news bearing on the retirement plan industry generally and the plan's investments specifically.[27] Consistent underperformance over longer periods is usually grounds for removal.

35.     An appropriate quantitative analysis typically involves comparing the fund's historical investment returns to that of other comparable investments as well as to applicable market indices or other relevant benchmarks using various metrics.[28] The analysis should evaluate

---

[24] *See* Quanta Services, Inc. 401(k) Savings Plan, Form 5500 (2022), Notes to Financial Statements, p. 8; *see also* QUANTA_104039, at -075.

[25] *See* Bradley Bartells, How to Properly Document 2024 Plan Meetings, PLANADVISER (Jan. 18, 2024), available at: https://www.planadviser.com/properly-document-2024-plan-meetings/.

[26] *See* Prudent Practices for Investment Stewards, FI360 (2020), p. 86.

[27] *See id.*; *see also* Bradley Bartells, How to Properly Document 2024 Plan Meetings, PLANADVISER (Jan. 18, 2024), available at: https://www.planadviser.com/properly-document-2024-plan-meetings/.

[28] *See* Prudent Practices for Investment Stewards, FI360 (2020), p. 86, Practice 4.1.

both absolute and risk-adjusted performance results and compare fund expenses to available alternatives pursuing the same or a similar investment objective.

36.     Prudent plan fiduciaries perform qualitative analyses that consider multiple factors, including the experience and expertise of the fund's portfolio managers in managing the specific asset class, the degree of concentration in the fund's assets, and the identification and mitigation of potential conflicts of interest.  The fiduciaries should also evaluate each investment manager's consistency with their investment approach.  When selecting an investment option, the responsible fiduciary should make a well-reasoned decision that the manager can generate a long-term investment return that, net of fees, is comparable to its benchmark or peers.

37.     Prudent fiduciaries typically require a minimum performance history before adding an investment option to a retirement plan.  In my experience, fiduciaries commonly seek a manager who has at least five years of experience managing the fund or a comparable investment vehicle with the same investment approach and objective, such as the mutual fund version of a CIT. Having a long enough performance history is crucial to evaluating the manager's ability to deliver long-term investment outcomes that equal or surpass its benchmark and peers.  A track record that demonstrates some success in managing the strategy provides fiduciaries with confidence in the manager's ability to achieve excellent long-term performance results.

38.     Fiduciaries must establish procedures for scrutiny and action with respect to investments that fail to meet established performance expectations and other evaluative criteria.[29] When an investment repeatedly fails to meet established criteria, fiduciaries must undertake a thorough investigation of the investment in order to ascertain the reasons for its failure of such criteria and make a specific and documented determination about whether the investment should be retained.[30]  Fiduciaries often implement "watch list" procedures in order to carry out this

---

[29] *See id.*

[30] *See id.*

function.[31]  Any inconsistencies among decisions made with regard to investments that are placed on a "watch list" or otherwise fail evaluative criteria should be specifically documented to reflect the reasoning applied.[32]

39.    Responsible plan fiduciaries should apply the same principles when assessing TDFs.  They should have a clear understanding of how TDFs operate and establish an unbiased process for comparing and selecting TDFs for the plan.  The fiduciaries gather and evaluate essential information about the available options, such as historical returns and risk-adjusted returns, fees, expenses, and differences in their respective glidepaths, asset classes, and underlying investments.  Evaluating the underlying funds used by a TDF alone is a necessary component of TDF monitoring, but it is not alone sufficient to perform a thorough quantitative evaluation of that provider.

40.    TDFs provide an additional consideration that prudent fiduciaries consider: "to" versus "through."  Generally speaking, a TDF is either designed to get a participant "to" retirement or it is designed to get a participant "through" retirement, in other words until the end of their life. Regardless of the classification of the glidepath, prudent fiduciaries conduct a diligent evaluation of both types of TDFs to determine the appropriate TDF solution to be offered to their participants based on available information.

41.    These principles are especially important in the context of a plan's QDIA, since it is an automatic election for participants who do not or are not capable of exercising their own discretion.  Thus, it is necessary to ensure an investment designated as QDIA is prudent for a diverse set of participants across an appropriate range of risk tolerances.

### D. Investment Policy Statements

42.    Plan fiduciaries have the responsibility to develop criteria for selecting, monitoring, and removing investments in a plan lineup and customarily carry out this responsibility through

---

[31] *See id.*

[32] *See id.*

the establishment of written guidelines, such as an IPS. An IPS establishes a framework for selecting new plan investments, monitoring existing plan investments, and removing plan investments, when necessary, by setting forth clear processes and objective criteria to be used in performing these tasks. Although an IPS is not strictly required under ERISA, the DOL encourages plan fiduciaries to establish an IPS for the plan, and it has stated that maintenance of an IPS is consistent with a plan sponsor's fiduciary obligations.[33] Indeed, most investment advisors provide assistance with preparation of an IPS as part of their services.[34]

43.     The IPS serves as the foundation for the fiduciary committee's decision-making process, providing a reliable framework for fiduciaries when carrying out their responsibilities.[35] It is critical that the plan committee, investment advisor, and any discretionary investment manager diligently adhere to the IPS, as it is a governing document as defined by ERISA. Adhering to a written IPS also helps ensure that investment decisions are made through a prudent, consistent process that aligns with the plan's investment objectives.[36] Particularly when there are changes in committee membership, without a written IPS to follow, fiduciaries are more prone to making impromptu investment decisions based on irregular and imprudent factors.[37]

44.     An IPS should provide clear guidance for fiduciaries in carrying out their investment monitoring responsibilities, such that the process can be carried out in an objective and

---

[33] *See* 29 CFR § 2509.2016-01 ("The maintenance by an employee benefit plan of a statement of investment policy designed to further the purposes of the plan and its funding policy is consistent with the fiduciary obligations set forth in ERISA section 404(a)(1)(A) and (B)"); *see also* Fred Reish and Joan Neri, An IPS 'Sets' the Standard, PLANSPONSOR (2019), available at: https://www.faegredrinker.com/-/media/files/insights_db/publications/2019/10/56_paso19_columns_p1ok1_reprint.pdf?la=en&hash=68361A41F0CDCF5DDF55F975684ADF1EB7E4F5FE.

[34] *See* Reish and Neri, An IPS 'Sets' the Standard, PLANSPONSOR (2019).

[35] DOL Interpretive Bulletin 2016-01.

[36] *See* Prudent Practices for Investment Stewards, FI360 (2020), Practice 2.6.

[37] *See id.*

repeatable manner.[38]  Indeed, an IPS should be written with sufficient detail and clarity that a competent third party could implement the investment strategy.[39]  To do so, an IPS will typically set forth specific criteria and metrics for the selection and retention of investments, procedures for removing investments, and the roles of each party involved in the investment monitoring process.[40]  In addition, an IPS will provide specific guidance regarding the selection and monitoring of TDFs, if selected for a plan.[41]  To operationalize the criteria and metrics set forth in an IPS, the document should include clear and objective standards for compliance with the chosen criteria.[42]  Although the form of an IPS can vary, these are the basis components of any sufficient IPS.[43]

45.    Where fiduciaries have adopted an IPS, they are required to closely familiarize themselves with the document's terms, ensure it is strictly followed, and revise it as necessary to establish appropriate investment standards for the particular plan.[44]  Moreover, although an IPS may ultimately provide discretion to plan fiduciaries such that they may determine a deviation from the IPS is necessary, any such deviations should be documented in an amendment to the IPS or meeting minutes.

### E.  Relying on Advisors

46.    Even with regular training, fiduciary committee members may lack the necessary expertise and understanding to develop a plan, select and oversee investment options, and evaluate the suitability of plan expenses.  As such, it is customary for investment committees to engage

---

[38] *See* Rebecca Moore, Steps for Creating an Effective IPS, PLANSPONSOR (Feb. 4, 2020), available at: https://www.plansponsor.com/in-depth/steps-creating-effective-ips/.

[39] *See* Prudent Practices for Investment Stewards, FI360 (2020), Practice 2.6.

[40] *See id.*

[41] *See* Reish and Neri, An IPS 'Sets' the Standard, PLANSPONSOR (2019).

[42] *See* Moore, Steps for Creating an Effective IPS, PLANSPONSOR (Feb. 4, 2020).

[43] *See id.*; *see also* Reish and Neri, An IPS 'Sets' the Standard, PLANSPONSOR (2019).

[44] *See* Moore, Steps for Creating an Effective IPS, PLANSPONSOR (Feb. 4, 2020).  In fact, once adopted, an IPS becomes a plan document.  *See* Reish and Neri, An IPS 'Sets' the Standard, PLANSPONSOR (2019).

investment advisors for DC plans.  Investment advisors provide services including the creation and maintenance of plan investment policies, research and recommendations regarding investment managers, evaluation of plan investments, provision of information and data regarding the performance of plan investments, and monitoring plan expenses.

47.    Investments advisors may be hired in a discretionary or non-discretionary capacity. Non-discretionary investment advisors—often known as ERISA § 3(21)[45] investment advisors— are responsible for providing advice and recommendations to fiduciaries, who retain ultimate discretion for actions with regard to plan investments.  Discretionary investment advisors—often known as ERISA § 3(38) investment managers—exercise discretionary authority to direct the selection, retention, or removal of investments in a plan.[46]  In instances where fiduciaries engage a non-discretionary investment advisor to make recommendations regarding the selection and monitoring of plan investments, the fiduciaries must independently and critically review and analyze the recommendations they receive from the investment advisor.

48.    Investment advisors are required to register with the SEC, which includes the filing of a Form ADV.[47]  Form ADV submissions provide information about an investment advisor's business, ownership, clients, employees, business practices, affiliations, and disciplinary events.[48]

---

[45] 29 U.S.C. §1002(21)(A)(ii) states that a person is a fiduciary when "he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so."

[46] The Plan Document itself recognizes this distinction, providing "[t]he Administrator, as named fiduciary for the Plan, may appoint one or more investment managers (as defined under Section 3(38) of ERISA) who may have such duties, up to and including any authority to determine what shall be the Permissible Investments for the Plan at any given time, what restrictions will exist upon those and how unallocated accounts under the Plan and contributions described in Section 8.02(b)(2) of the Plan shall be invested, as the Administrator in its sole discretion shall determine in its appointment and agreement with such investment manager(s).  Such agreement(s) may limit, to the extent permissible under ERIS, the Administrator's authority and responsibility for the Plan's Permissible Investments so delegated to the investment manager(s)."  QUANTA_104039, at -077.

[47] *See* Form ADV, U.S. Sec. & Exchange Comm'n, Investor.gov (last visited July 19, 2024), available at: https://www.investor.gov/introduction-investing/investing-basics/glossary/form-adv.

[48] *See id.*

Fiduciaries should review the complete Form ADV submissions made by their hired investment advisors.

49.     Hiring a service provider is a primary function for fiduciaries of a large defined contribution retirement plan.  Critical considerations when hiring a service provider include the experience of a service provider with retirement plans of similar size and complexity, the service provider's capability and quality of services offered, and the manner and means in which the service provider will carry out its responsibilities on behalf of the plan.[49]  Retirement plan service providers should possess the requisite expertise, certification, and adherence to regulatory protocols.

50.     Prudent fiduciaries who seek to hire a third party to provide fiduciary services to the plan typically use a request for proposal ("RFP") process to solicit competitive bids.  The RFP process is considered the most reliable way to identify the most qualified service provider at a reasonable cost.  It enables plan sponsors to assess multiple candidates objectively based on various criteria, which highlights the key differences among them.[50]  The RFP process aims to align the service provider's strengths with the plan's goals and requirements.[51]  Moreover, the competitive search offers assurance that the fees charged to the plan are reasonable for the services rendered.  The RFP process also ensures that the selection process is properly documented.[52]

51.     To avoid any ambiguity, it is important to have a written agreement that outlines the scope of authority and the services that will be provided by a service provider when they are hired by a plan.

---

[49] *See* Meeting Your Fiduciary Responsibilities, U.S. DEP'T OF LABOR, EMPLOYEE BENEFITS SECURITY ADMINISTRATION (Sept. 2021), p. 5.

[50] *See* "Delegation of Duty", Plan Sponsor, January 2013; "OCIO RFPS: Are you asking these key questions", Strategic Investment Group, 2014.

[51] "Delegation of Duty", Plan Sponsor, January 2013; "OCIO RFPS: Are you asking these key questions" (noting how with "success" of the delegated fiduciary be "define[d]").

[52] *See* "Tips for the Selection and Monitoring of Service Providers for your Employee Benefit Plan," available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/tips-for-selecting-and-monitoring-service-providers.pdf.

52.    Fiduciaries should establish and follow a formal process to periodically review the performance of all plan service providers.[53]    Such review should be conducted no less than annually.[54]

53.    Ultimately, hiring an investment professional does not release fiduciary committee members from their responsibilities.    Even with an investment fiduciary in place, the committee has a duty to oversee their actions, ensuring that they act solely in the best interests of plan participants, within the limits of their delegated authority, and in accordance with the plan's IPS and other governing documents.[55]    Fiduciaries should establish and follow a consistent monitoring process.    Monitoring investment fiduciaries is crucial, and it involves remaining informed of all investment decisions, comprehending all recommendations, assessing the fairness of all fees charged by plan service providers, and continuing to evaluate the prudence of all plan investment options.

**F.    Investigating and Eliminating Conflicts of Interest of Plan Fiduciary Service Providers**

54.    The fiduciary committee has a key obligation under ERISA to thoroughly investigate and comprehend any potential conflicts of interest that arise with the plan's fiduciary service providers.    If the committee has reason to suspect that a co-fiduciary is acting in their own self-interest or for any purpose that is not in the best interests of plan participants, they must act swiftly to understand and either remove or substantially decrease any conflict.

55.    Whenever a fiduciary makes recommendations or investment decisions that provide a direct or indirect benefit to itself or its affiliated service provider, conflicts of interest may arise.    Two typical scenarios where this can happen are when the fiduciary offers its proprietary investment products to the plan or when the fiduciary receives compensation directly

---

[53] *See* Prudent Practices for Investment Stewards, FI360 (2020), Practice 1.5.

[54] *See* Bradley Bartells, How to Properly Document 2024 Plan Meetings, PLANADVISER (Jan. 18, 2024), available at: https://www.planadviser.com/properly-document-2024-plan-meetings/.

[55] "When did the easy solution get so complex? Defining and deciphering investment outsourcing" at 6, Steven F. Charlton, C.F.A., New England Pension and Consultants, September 2012.

or indirectly from the investment products it recommends or selects for the plan. A provider's judgment can be compromised by conflicts of interest, which can impair their ability to remain impartial. Therefore, plan fiduciaries cannot rely on the investment advice and decisions of a conflicted provider.

56.    Plan fiduciaries may be able to identify some conflicts of interest by examining the service provider's Form ADV. At the very least, fiduciaries should thoroughly examine the Form ADV Part 2 and discuss any identified conflicts with the provider. While this approach may not uncover all conflicts of interest, it can often reveal material conflicts.

### G. Monitoring Appointed Fiduciaries

57.    Specifically, an individual with discretion to appoint an ERISA fiduciary has a fiduciary duty to prudently select, retain, and monitor those who they appoint. In this respect, the DOL has stated that "[a]t reasonable intervals the performance of trustees and other fiduciaries should be reviewed by the appointing fiduciary in such manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan."[56] Fiduciaries must document their adherence to this standard.

## VII.    FACTUAL BACKGROUND

### A. Quanta and the Plan

58.    Quanta Services, Inc. ("Quanta") is a public Delaware corporation, headquartered in Houston, Texas, that provides infrastructure solutions for the electric and gas utility, renewable energy, communications, pipeline, and energy industries in the United States and certain international markets.[57]

---

[56] 29 C.F.R. §2509.75-8, FR-17.

[57] *See* Quanta Services, Inc., Form 10-K (2023), Part I, Item 1.

59.     The Plan is a defined contribution retirement plan established by Quanta on January 1, 1999.[58] Eligible employees of Quanta and its participating affiliated companies were permitted to participate in the Plan.[59]

### B.  The Committee and the IPS

60.     Quanta appointed an administrative committee (the "Committee") with responsibility for selecting and monitoring the investments in the Plan.[60] The Committee generally met quarterly during the relevant time period.[61]

61.     The Committee did not adopt a formal charter during the relevant period.  During the relevant period, the Committee adopted an IPS, which provided standards for selecting and monitoring the Plan's investments.  The Committee formally adopted an IPS on October 19, 2015[62] ("2015 IPS") and adopted updates to the IPS on June 9, 2020 ("2020 IPS")[63] and March 9, 2023 ("2023 IPS").[64]  The stated purpose of the IPS "is to provide the Plan and its fiduciaries with guidelines which will establish the Plan's investment objectives and the process for promoting those objectives."[65]  In addition, the IPS "sets forth the process the Committee shall apply to select

---

[58] *See* QUANTA_001914 (2022 Form 5500), at -981; *see also* QUANTA_000937, at -946.

[59] *See, e.g.*, QUANTA_000937, at -938.

[60] Quanta, the Plan's administrator, had authority to make this appointment under the Plan's governing document.  *See* QUANTA_104039, at -104 ("The Administrator may, by written instrument, allocate and delegate its fiduciary responsibilities in accordance with ERISA Section 405, including allocation of such responsibilities to an administrative committee formed to administer the Plan.").

[61] The Committee's meeting minutes reflect the dates on which the Committee met.

[62] *See* QUANTA_001404.

[63] *See* QUANTA_000909.

[64] *See* QUANTA_046513.

[65] *See* QUANTA_001404, at -406.

and monitor the investment options available under the Plan to enable participants to meet the goals of the Plan."[66]  The IPS expressly incorporates the principles of Modern Portfolio Theory.[67]

62.     The Plan's IPS detailed additional specific responsibilities for the Committee, including: (i) defining the Plan's investment objectives; (ii) preparing and maintaining the IPS; (iii) determining guidelines for selecting investment options; (iv) establishing procedures for continued monitoring of investment options; (v) establishing criteria used to determine when to retain, add, or eliminate investment options; and (vi) amending the Plan's investment policy as necessary to meet the Plan's overall objectives.[68]

63.     The 2015 IPS provided "[t]he Committee shall create and maintain written records of all decisions relating to the choice and ongoing monitoring of the investment options under the Plan.  Minutes shall be taken of all meetings, noting time and place, attendees, matters discussed, and decisions reached.  The minutes shall document investigation, facts, and the reasoning that went into the making of such decisions.  Relevant documents or materials used by the Committee in its decision-making process shall be included in or annexed to such minutes."[69]  The language providing that "[t]he minutes shall document investigation, facts, and the reasoning that went into the making of such decisions" and "[r]elevant documents or materials used by the Committee in its decision-making processes shall be included in or annexed to such minutes" was removed from the 2020 IPS and 2023 IPS.[70]

---

[66] *See id.*

[67] *See* QUANTA_001404, at -411.  Similarly, the IPS affirms "[p]assively managed investments, which typically track an established index, are generally the least expensive way of achieving the unique risk and return characteristics of a given asset class" and "[a]ctively managed investments generally charge higher investment expenses for the goal of offering either better performance or lower risk, or combination thereof, than a given market index."  *Id.*  Fiduciaries are expected to have a sufficient understanding of Modern Portfolio Theory and other principles of investing.  *See* Prudent Practices for Investment Stewards, Fı360 (2020), p. 44.

[68] *See* QUANTA_001404, at -408.

[69] *See* QUANTA_001404, at -410.

[70] *See* QUANTA_000909, at -914; QUANTA_046513, at -518.

64.     Among the criteria established by the IPS for all investments is a "[l]ong-term competitive rate of return on investments, net of expenses."[71]  In addition, the IPS established criteria for the selection of investment options, including a number of quantitative and qualitative factors.[72]  The quantitative factors for investment selection include favorable "Long Term Performance, Volatility and Risk as Measured by Alpha, Beta, R-Squared, Sharpe ratio and Standard Deviation Statistics," "Competitive and Consistent Performance Measured Against an Appropriate Benchmark," and "Manager Performance Measured Against the Relative Peer Group."[73]  The qualitative factors for investment selection include "Fund Reputation and Management" and "Assets Under Management."[74]

65.     The IPS establishes additional performance evaluation criteria to be used in the ongoing monitoring of investment options, while again emphasizing "comparisons to appropriate market indexes and peer group comparisons."[75]  For this part, the IPS provides, "when a fund fails to achieve its stated objectives, the reasons for failure will be evaluated, and the Committee shall determine whether the option shall remain, be frozen, or be replaced."[76]  In addition, the IPS provides that "[m]aterial changes in the investment option's organization, investment philosophy, personnel or any legal or regulatory proceedings will also be monitored."[77]  The 2015 IPS references an Appendix B, in which "[a]ll performance evaluation categories and criteria are

---

[71] *See* QUANTA_001404, at -412.

[72] *See* QUANTA_001404, at -414.  All subsequent IPS versions, both adopted and unratified drafts, deemed these quantitative and qualitative factors relevant to investment monitoring in addition to selection.  *See* QUANTA_112842, at -852; QUANTA_116202, at -211; QUANTA_000909, at -918; QUANTA_046513, at -522.

[73] *Id.* The IPS provides that long-term performance will be defined as at least three years and includes a list of benchmarks to be used for comparison to the Plan's investment options for purposes of the relevant quantitative criterion.

[74] *See* QUANTA_001404, at -415.

[75] *See* QUANTA_001404, at -416.

[76] *Id.*

[77] *Id.*

24

outlined," however, I understand that Appendix B was not produced in connection with the Action and Committee members were not able to testify definitively to its existence or contents.[78]

66.     Since 2015, the IPS has provided for a "watch list" process pursuant to which an investment may be placed on a "Monitor" or "Alert" status for reasons including the failure of a number of specified criteria.[79]  These criteria include an investment's performance or risk-adjusted return (*i.e.*, Alpha) falling below its peer group median, a negative information ratio, a significant change in the management or assets under management ("AUM") of the investment, and other significant changes with respect to a fund.[80]  Placement of an investment on the "watch list" would require the Committee to conduct "a thorough review and analysis of the investment option" to determine the appropriate course of action with respect to the investment.[81]  The 2015 IPS provided that once an investment has been assigned a status of "Monitor," it should remain with this status for no more than four consecutive quarters before being advanced to "Alert" status and, after no more than two more quarters without improvement, the Committee shall consider alternative investments.[82]  Any change in an investment's status is required to be documented in the Committee's meeting minutes.[83]

67.     In 2017 and 2019, the Committee considered revisions to the IPS, although the revisions were not adopted at those times.[84]  In both 2017 and 2019, the revisions under consideration included the deletion of the language providing the IPS "sets forth the process the Committee shall apply to select and monitor the investment options available under the Plan to enable participants to meet the goals of the Plan" and the proposed revisions replaced of such

---

[78] *See id.*

[79] *See* QUANTA_001404, at -417.

[80] *See id.*

[81] *See id.*

[82] *See id.*

[83] *See id.*

[84] *See* QUANTA_112693 (redline version); QUANTA_116224 (redline version).

language with permissive language suggesting the fiduciaries "are not bound by the literal terms" of the IPS.[85]   The proposed revisions in both 2017 and 2019 also included more permissive language concerning the Committee's obligations with respect to meeting minutes and the deletion of references to Modern Portfolio Theory.[86]   In addition, certain changes were proposed to the investment review criteria.[87]   Regarding investment termination, language was proposed to be inserted that provided "if [a plan] investment has consistently failed to adhere to one or more of the stated criteria listed in the IPS, it is reasonable to presume a lack of adherence going forward. Failure to remedy the circumstances of unsatisfactory performance within a reasonable time, is a basis for termination."[88]   The proposed revisions in 2017 and 2019 also included a scoring system for Plan investments; while the 2017 revisions featured one scoring system to be applied to all investments, the 2019 revisions included separate scoring systems for actively managed, passively managed, and TDF investments, respectively.[89]   The proposed revisions in 2017 provided that if an investment option remained on "Watch" for five consecutive quarters with no documented signs of improvement, "the Committee may consider alternative investment options and discuss the merits of replacing or continuing the investment."[90]

68.    The 2020 IPS incorporated many of the revisions proposed in the 2017 and 2019 revisions to the IPS, including the more permissive language regarding following the IPS itself and minuting obligations, the deletion of references to Modern Portfolio Theory, and scoring systems.[91]   It bears noting that the scoring systems incorporated in the 2020 IPS differed from the

---

[85] *See* QUANTA_112693, at -695; QUANTA_116224, at -227.

[86] *See* QUANTA_112693, at -699, -700; QUANTA_116224, at -234, -236.

[87] *See* QUANTA_116224, at -242 through -249.

[88] *See* QUANTA_116224, at -252.

[89] *See* QUANTA_112693, at -705, -711; QUANTA_116224, at -259 through -263.

[90] *See* QUANTA_112693, at -706.

[91] *See* QUANTA_000909, at -909 through -930.

scoring systems set forth in the 2017 and 2019 revisions to the IPS.[92]  The 2020 IPS also set forth an "Investment Review Escalation Process," similar to the "watch list" in previous versions of the IPS.[93]  Pursuant to this "Investment Review Escalation Process," actively and passively managed investments that obtain scores of 65 or more are given a "Pass" rating and TDFs that obtain a score of 50 or more are given a "Pass" rating.[94]  Investments that do not obtain a "Pass" rating are placed on "Watch" status for the quarter and subject to further review.[95]  In a redline version of the 2020 IPS, a reviewer denoted "CC3" commented that the status for an investment that does not exceed the minimum passing score should be called "Watch" as opposed to "Fail" "as it does not seem appropriate to allow a 'Fail' option to remain in the Plan for 7 quarters."[96]

69.     The 2022 IPS included several incremental changes to the 2020 IPS.  With regard to the "Investment Review Escalation Process," the 2022 IPS provided that the Committee "shall consider alternative investment options and discuss the merits of replacing or continuing the investment option" with regard to "any investment option remaining on 'Review' status for five or more consecutive quarters with no documented sign of improvement[.]"[97]  Under the 2022 IPS, an investment was eligible for "Review" status upon its second consecutive quarter of failing the monitoring criteria of the IPS.[98]

---

[92] *See* QUANTA_000909, at -927 through -930.

[93] *See* QUANTA_000909, at -922.

[94] *See id.*

[95] *See id.*  Although the IPS provides that "[t]he Committee may seek and shall be entitled to rely on the advice and recommendations of a third-party Investment Adviser in determining the final watch status of the investment options[,]" this does not relieve the Committee of its ultimate responsibility to make independent retention determinations regarding the Plan's investments.  *See id.*

[96] *See* PCIA005322, at -335.  Based on the initials associated with the various commenters on the IPS, it appears this comment was made by Committee member (and Quanta in-house attorney) Carolyn Campbell.

[97] *See* QUANTA_120538, at -551.

[98] *See id.*

### C. The Plan's Investment Advisor

70.     The Committee engaged an investment advisor to assist it with Plan management and administration.  By 2015, the Committee engaged Ascende Wealth Advisers, Inc. ("Ascende") as a non-discretionary investment advisor.[99]   In mid-2017, Ascende was acquired by EPIC Holdings, Inc. ("EPIC"), the parent holding company of several insurance and financial services businesses.[100]   In 2018, the Committee engaged Prime Capital Investment Advisors, LLC ("PCIA"), doing business as Qualified Plan Advisors ("QPA"), as a non-discretionary investment advisor.[101]   QPA was essentially a successor to Ascende (and EPIC), as the client service team responsible for providing investment advisory services to the Plan did not change during the relevant time period.[102]

71.     Ascende' s Form ADV prepared in 2017 indicates, at that time, Ascend advised 65 clients with total assets under advisement of $3,624,360,507 across those clients.[103]   Accordingly, the average assets of Ascende's clients were less than $56 million.  For the 2017 plan year, the Plan had total assets of over $700 million, over ten times larger than Ascende's average client.[104] Mr. Eagar, the Ascende's (later QPA's) lead consultant for its relationship with the Plan testified that the Plan was Ascende's largest client.[105]

72.     Quanta engaged Ascende in 2015 to provide the following services for the Plan:
(a) Review and evaluate the Plan Committee structure, recommend changes and, if necessary, draft or amend the committee charter, for final review and approval by Plan Sponsor;

(b) Identify deficiencies in the [IPS] for final review and approval by Plan Sponsor;

---

[99] *See* QUANTA_011500.

[100] *See* QUANTA_110365.

[101] *See* QUANTA_124130.

[102] Eagar Dep., at 50:1-6.

[103] Ascende Wealth Advisors, Form ADV (2017), Item 5 Information About Your Advisory Business – Regulatory Assets Under Management.

[104] *See* QUANTA_001527, at -604.

[105] Eagar Dep., at 164:8–10.

(c) Advise Plan Sponsor or Plan Committee about mutual funds, separate accounts, common collective trust funds and other investment categories which are consistent with the investment categories allowable under the Plan and the IPS; and

(d) Meet with representatives of the Plan Sponsor or Plan Committee, at intervals not less than quarterly, to discuss and report findings related to:

      (I) Current market and economic conditions;

      (II) Plan portfolio performance;

      (III) Individual investment performance compared to established benchmarks, peer groups and various quantitative and qualitative investment measures as established in the IPS;

      (IV) Possible changes to the Plan's investment alternatives; and

      (V) Provide other agreed upon services as specified on Schedule A, attached hereto and incorporated by reference.

(e) Annual review of investment management fees and any underlying expense reimbursements to Plan service providers.

(f) Notwithstanding the above services, Adviser will not provide opinions or advise the fiduciaries to the Plan on the prudence of employer securities, physical real estate, derivatives, artwork or collectibles within the Plan.[106]

These were the basic services for which Ascende was engaged on behalf of the Plan throughout the duration of its service as investment advisor. Ascende represented in its agreement with Quanta that it would act as an investment advisor to the Plan as defined by ERISA § 3(21), a non-discretionary advisory role[107] and disclaimed liability for any losses suffered by the Plan as a result of Ascende's recommendations.[108]

---

[106] *See* QUANTA_011500, at -503.

[107] *See* QUANTA_011500, at -504.

[108] *See* QUANTA_011500, at -505.

73.     After QPA's acquisition of Ascende, QPA provided substantially similar services to the Plan.[109]  QPA's agreement with the Plan specifically described its "Investment Selection" and "Investment Monitoring" services by reference to the selection criteria in the IPS.[110]  Notably, QPA's agreement provided that if an investment failed to meet "the relevant criteria, QPA will advise [Quanta] and place that investment on a watch list for further discussion and direction from [Quanta]" and if the investment "fails to meet the criteria for a period of four consecutive calendar quarters (or such other period as may be specified in the IPS), QPA will engage with [Quanta] to provide due diligence sufficient for [Quanta] to identify an appropriate replacement or other action."[111]  QPA's agreement also specifically provided that it would provide "periodic market reporting and retirement plan industry updates via e-mail as frequently as QPA and [Quanta] agree" and "ERISA education and training for Plan Trustees/committee members and their designees, at a frequency agreed upon by [Quanta] and QPA."[112]

74.     The Committee had no formal process for monitoring Ascende's and QPA's performance as investment advisor.[113]  At no time during the relevant period did the Committee undertake a request for proposal ("RFP") process or otherwise solicit alternative proposals or bids for the Plan's investment advisory services.[114]

---

[109] Campbell Dep., at 52:16–53:13.

[110] *See* QUANTA_124130, at -130 through -131.

[111] *See* QUANTA_124130, at -131.

[112] *See* QUANTA_124130, at -132.

[113] Rupp Dep., at 72:10–25.

[114] *See id.*

### D. The Plan's Investments

75.     At all relevant times, the Plan has offered a lineup of investment options through which participants in the Plan could direct the investment of the assets in their accounts.[115]  These investments include mutual funds and collective investment trusts.[116]  Mutual funds are publicly traded investment vehicles comprised of various investment securities, such as stocks and bonds.[117]  Collective investment trusts ("CIT(s)") are legal trusts administered by a bank or trust company utilized as pooled retirement investment vehicles.  Like mutual funds, collective investment trusts are comprised of various investment securities.  Unlike mutual funds, however, CITs are not subject to regulation by the United States Securities and Exchange Commission but rather are under the purview of the Office of the Comptroller of the Currency.[118]

76.     Among other investment options, during the relevant period, the Plan investment lineup included a suite of TDFs sponsored by Fidelity Management & Research Company ("FMR") known as the Fidelity Freedom Funds ("Freedom Funds").[119]  TDFs are an investment vehicle designed to automatically rebalance an investor's portfolio over time in an attempt to optimize risk and returns for a predetermined retirement data (*i.e.*, the target date).[120]  This rebalancing or shift in allocation is known as the TDFs' "glide path."[121]  The Freedom Funds were designated as the Plan's QDIA.[122]

---

[115] *See, e.g.*, QUANTA_001914 (2022 Form 5500), at -992.

[116] *See id.*

[117] *See* Investopedia, Adam Hayes, *et al.*, What Is a Mutual Fund? (June 14, 2024), available at: https://www.investopedia.com/terms/m/mutualfund.asp.

[118] *See* Nuveen, Collective Investment Trusts (last visited July 19, 2024), available at: https://www.nuveen.com/en-us/investments/retirement/collective-investment-trust.

[119] *See, e.g.*, QUANTA_000474, at -507; *see also* QUANTA_000937, at -947.

[120] *See* QUANTA_106738; *see also* Target Date Retirement Funds – Tips for ERISA Plan Fiduciaries, U.S. DEP'T OF LABOR, EMPLOYEE BENEFITS SECURITY ADMINISTRATION (Feb. 2013), at 1.

[121] *See* Target Date Retirement Funds – Tips for ERISA Plan Fiduciaries, U.S. DEP'T OF LABOR, EMPLOYEE BENEFITS SECURITY ADMINISTRATION (Feb. 2013), at 1.

[122] *See* QUANTA_000937, at -956; QUANTA_001404, at -418.

77.     In addition to the Freedom Funds, the Plan investment lineup included single-strategy investment vehicles, including money market funds, mutual funds, and CITs.[123]  These included the American Beacon Small Cap Value Fund ("American Beacon Fund") and the DFA International Small Cap Value Fund ("DFA Fund").[124]

78.     During the relevant period, Plan assets were held in trust by Fidelity Management Trust Company, an affiliate of FMR, through which investments and asset allocations were performed.[125]

### E.  The Committee's Fiduciary Training

79.     Qualified Plan Advisors ("QPA") presented standalone fiduciary training to the Committee in 2021 and 2022.[126]  Before 2021, the only fiduciary training the Committee received was by way of a brief portion of its financial advisor's quarterly presentation, which spanned only a few slides and primarily reported on litigation pending against other fiduciaries.

## VIII.  OPINIONS

### A.  The Committee Failed to Establish and Apply a Reasonable Process to Monitor the Challenged Investments

#### 1.  The Committee's Fiduciary Governance Procedures were Insufficient

80.     As discussed in the sections that follow, the Committee's fiduciary governance procedures were unreasonable insofar as they did not facilitate the application of a consistent, objective, and independent investment monitoring process.  At the most basic level, the Committee operated without a charter or equivalent governance document that provided specific guidance concerning the Committee's monitoring role and guidelines for its interactions with other parties with responsibilities relative to the Plan's investments.  In addition, the Committee failed to

---

[123] QUANTA_001422 (2016 Form 5500), at -526.

[124] *See id.*

[125] *See* QUANTA_001914 (2022 Form 5500), at -981.

[126] *See* QUANTA_004975; QUANTA_118778.

appropriately document its decision-making in a manner sufficient to enable the application of consistent standards over time and inform new and incumbent Committee members of the reasoning underlying the Committee's determinations with respect to the Plan's investments. Moreover, Committee members demonstrated insufficient understanding of their monitoring responsibilities and did not receive adequate training. These basic fiduciary governance failures resulted in an inconsistent monitoring process that failed to identify issues with Plan investments necessitating investigation and action.

### i.    The Committee Operated without a Charter or Other Sufficient Guidance Regarding its Responsibilities

81.    Throughout the entire relevant period, the Committee operated without a charter or other formal governance document outlining the Committee's responsibilities, the roles of respective Committee members, the Committee's voting procedures, requirements for Committee action, and guidance concerning Committee records, among other subjects typically discussed in an investment committee charter.[127]  While an IPS may contain some of the same guidance as would ordinarily be set forth in a charter, it is critical that, in such an instance, investment committee members understand the force and effect of such provisions. The record here, however, makes clear that the Committee was not operating with such an understanding. For example, Ms. Campbell, a Committee Member and Quanta's Deputy General Counsel, testified that she believed the IPS governed the Committee's conduct, and that the IPS effectively served as a charter.[128]  Yet, Ms. Campbell also testified that the Committee did not view the IPS as a binding document.[129] Another Committee member, Mr. Rupp, was under a mistaken impression that the Committee had adopted a charter when it plainly had not.[130]

---

[127] Eagar Dep., at 40:11–21.

[128] Campbell Dep., at 71:8–22.

[129] Campbell Dep., at 238:10–239:4.

[130] Rupp Dep., at 53:16–21.

82.     The Committee lacked any clear structure or guidelines for its decision making in carrying out its fiduciary monitoring responsibilities.[131]  Mr. Eagar testified that there was no voting process required for a change in monitor status of an investment in the Plan.[132]  He further testified that "all of the present committee members weigh[ed] in input but there was not a document that formulated the discussion or that noted that."[133]  Mr. Grindstaff corroborated that there were no tasks or processes for which the Committee required the taking of a formal vote.[134] Committee members testified that they typically reached decisions by consensus after discussion among the Committee and its advisor.[135]  However, the Committee lacked any process contemplating a scenario where the Committee was unable to reach a consensus.[136]  This decision-making structure (or lack thereof) is problematic, as it leaves uneducated and disengaged fiduciaries susceptible to unduly relying on their advisor.  Unsurprisingly, Committee members were unable to identify any instance in which the Committee did not adopt the recommendations of the investment advisor.[137]

83.     Although the Committee nominally appointed a Chairperson, Committee members had inconsistent understandings of the role of the Chairman.  Indeed, while acknowledging that there is no written guidance as to the roles of Committee members, Mr. Rupp testified that the Committee's Chairperson had a "leadership role in certain aspects of engaging with the plan sponsors and the advisors and steering aspects of the [C]ommittee."[138]  Mr. Jensen, the Chairperson of the Committee during a portion of the relevant period, however, testified that there

---

[131] Eagar Dep., at 85:19–86:9.

[132] Eagar Dep., at 85:19–86:9.

[133] Eagar Dep., at 85:19–86:9.

[134] Grindstaff Dep., at 34:2–6

[135] Grindstaff Dep., at 32:24–33:24; Rupp Dep., at 45:12–42:2.

[136] Grindstaff Dep., at 94:15–22.

[137] Campbell Dep., at 148:19–149:3; Eagar Dep., at 86:10–17; Grindstaff Dep., at 32:8–13; Jensen Dep., at 83:4–18; Riddle Dep., at 92:2–12.

[138] Rupp Dep., at 28:14–20.

was "no formal process by which [the Committee] established a chair, but from [his] role within the Company and the actions, [he] would say that [he] was likely looked at as being the default Chair of the Committee."[139] Ms. Riddle's understanding of Mr. Jensen's role deviated even further from her colleagues', as she testified that Mr. Jensen's title was effectively an honorary one that carried with it no responsibilities distinct from those held by all other Committee members.[140] Still, Mr. Jensen testified, while he may have driven some of the Committee's actions, "there were no reporting lines."[141]

### ii.    The Committee's Meeting Minutes were Cursory and Failed to Support Objective and Consistent Decision-Making

84.    As already discussed, it is necessary for fiduciaries to document the processes they use in selecting and monitoring investments, and the reasoning supporting decisions made with respect to plan investments, both to act and to stay action, particularly those with substantial AUM or which make up a large portion of the Plan's assets, such as a QDIA.  Documentation of fiduciary decision-making is critical to demonstrate the existence of a prudent process to monitor investments and to ensure that committee members have a point of reference to be able to replicate the process for assessing the prudence of plan investments on an ongoing basis.

85.    Although the Committee maintained meeting minutes, drafted by the Plan's investment advisor, the minutes were cursory and failed to underpin a consistent and objective process.  This was a manifest failure of their purpose.  Indeed, the 2015 IPS contained a clear directive that meeting minutes should capture the "investigation, facts, and the reasoning" that went into the decision-making process of the Committee. [142]  Mr. Eagar similarly testified that the minutes were intended to reflect "what was being reviewed, what was being considered, and

---

[139] Jensen Dep., at 19:24–20:5.

[140] Riddle Dep, at 119:6–20.

[141] Jensen Dep., at 20:15–20.

[142] QUANTA_001404, at -410.

information that was discussed."[143]  The actual meeting minutes are woefully inadequate, and do not reflect the decision-making process of the Committee at the time of the meeting.  It bears noting that subsequent revisions to the IPS included more permissive language regarding meeting minutes in a deliberate effort to provide greater flexibility and be much less specific in terms of what needed to be recorded under the terms of the IPS.[144]  Since the format and usual substance of meeting minutes did not change over the relevant period, this also implicitly recognizes that meeting minutes were previously inconsistent with the stricter minuting requirements of the 2015 IPS, which remained in effect until 2020.[145]

86.     A glaring example of the deficiency of the meeting minutes centers around the Committee's removal of the Freedom Funds from "Monitor" Status in February 2016.  As of the Fourth Quarter 2015 meeting, the Freedom Funds had been on Monitor Status for four consecutive quarters.[146]  The Quarterly Investment Review presented at the meeting also detailed that the Freedom Funds were underperforming their benchmarks for three- and five-year periods.[147]  In accordance with the criteria of the 2015 IPS, if an investment on "Monitor" status for four consecutive quarters shows no signs of improvement in the underlying criteria, it is to be advanced to "Alert" status, absent a documented decision by the committee to change an investment's status.[148]

87.     The minutes of the Fourth Quarter 2015 Committee meeting held on February 15, 2016, reflect that a number of investments were "discussed in depth to determine monitor status."[149]  The minutes report:

---

[143] Eagar Dep., at 165:13–25.

[144] Eagar Dep., at 119:10–23.

[145] Eagar Dep., at 106:2–10.

[146] QUANTA_100812 (4th Quarter 2015 Investment Review), at -842.

[147] QUANTA_100812, at -839.

[148] QUANTA_001404, at -417.

[149] QUANTA_104297, at -298.

AWAI and the Committee discussed various aspects of the target date suite involving management, glide path, asset allocation, fees and underlying fund composition. The AWAI team also indicated that there were not significant changes to the fund suite during 2015. As a result, AWAI and the Committee agreed to move the funds from Monitor to No Alert status.[150]

88.     Committee members and the investment advisor who attended the Fourth Quarter 2015 meeting were unable to identify why the Freedom Funds were removed from "Monitor" status, even when looking at the meeting minutes and the corresponding Quarterly Investment Review for the Fourth Quarter of 2015[151]   Given that the Freedom Funds continued to underperform their benchmarks and that the advisor and the Committee noted that no significant changes to the fund suite occurred during 2015, it is entirely unclear as to how the Committee arrived at its decision to remove the Freedom Funds from "Monitor" status at this time.

89.     As previously discussed, a draft version of the IPS from 2017 contains redlines which reflect that the "Written Records" section was revised to allow the Committee to be less detailed in how it documented meetings.[152]   Notwithstanding any suggestion that the minuting requirements under the 2015 IPS and subsequent revisions were substantively similar or that ERISA allows for different levels of detail in investment committee minutes, it is inconsistent with prevailing standards for investment committee minutes to omit the rationale for retaining plan investments that fail adopted monitoring criteria (particularly with respect to a plan's QDIA).

90.     Committee members consistently testified that they had the opportunity to review and make changes to meeting minutes before they were approved by the Committee and that the minutes were an accurate reflection of what was discussed during the meetings.[153]   However, when asked to elaborate on specific Committee decisions or occurrences during the relevant period,

---

[150] QUANTA_104297, at -299.

[151] Jensen Dep., at 180:23–186:19; Eagar Dep., at 203:14–208:23; Grindstaff Dep., at 64:3–11.

[152] Eagar Dep., at 109:25–112:17

[153] Eagar Dep., at 79:19–81:13; Grindstaff Dep., at 23:5–15.

Committee members and the advisor were largely unable to provide any recollection, instead falling back on their mantra: that the meeting minutes "are not a transcript."[154]

### iii. Committee Members Lacked Sufficient Knowledge and Training Regarding Their Investment Monitoring Responsibilities

91.     Investment committee members should receive formal fiduciary training both at the time they are ratified as new committee members and periodically throughout their committee service.  As part of the onboarding process, new committee members should review records of previous actions and decisions with respect to plan management and administration to understand their role and responsibilities, as well as the decision-making of fiduciaries with respect to the plan's then-existing investment lineup and service arrangements.  This review should include detailed examination of the committee's processes and rationale.  In addition, new investment committee members who have not previously acted as fiduciaries for a retirement plan should be provided training regarding their fiduciary role and specific responsibilities and methods with respect to investment monitoring.  It is important that fiduciary training be conducted regularly to reinforce key concepts, terminology, and industry developments.  The training should go beyond basic duties and jargon and updates on recent retirement plan litigation but should instead provide continuing education to the fiduciaries on the Plan's structure, the roles of third-party service providers, and monitoring responsibilities.

92.     The record demonstrates that any fiduciary training that did occur was informal and cursory at best.  The Plan's investment advisor testified that there was no formal process in place for how new Committee members were to be onboarded and that there was no formal process for the type of fiduciary training that new Committee members would receive.[155]  For example:

---

[154] Eagar Dep., at 79:6–18; Campbell Dep., at 85:7–86:12; Rupp Dep., at 54:23–55:9; Jensen Dep., at 96:18–97:17; Grindstaff Dep., at 53:24–55:4.

[155] Eagar Dep., at 150:14–25.

- Mr. Jensen, the *de facto* Chairperson of the Committee, testified to receiving fiduciary training upon joining the Committee, but described this training as one of many informal discussions that occurred at every meeting regarding the Committee's operations and fiduciary responsibilities.[156]

- Ms. Campbell did not recall attending a one-on-one onboarding session and recalled only an informal discussion among members of the Committee upon joining in 2016.[157]

- Mr. Grindstaff could not identify a specific instance of formal fiduciary training being provided and could only testify to "committee discussions regarding fiduciary responsibility."[158]

- Ms. Riddle confirmed that any training she received was conducted within Committee meetings, and that she did not receive any separate training beyond the informal discussions that occurred in the meetings upon joining the Committee.[159]

93.    Other than brief updates in quarterly investment review materials provided by the Plan's investment advisor, no formal fiduciary education materials were presented to the Committee prior to May 24, 2021.[160]  Mr. Eagar testified that the fiduciary education presented to the Committee on this date was the product of a presentation he prepared to present at a HR Benefits Bootcamp conference.[161]  This presentation reviewed, at a high level that should be familiar to any current member of an investment committee, the general roles and responsibilities of retirement plan fiduciaries and service providers, basic plan documents, and common litigation

---

[156] Jensen Dep., at 24:14–25:11.

[157] Campbell Dep., at 41:10–14

[158] Grindstaff Dep., at 19:7–21.

[159] Riddle Dep., at 38:17–23.

[160] *See* QUANTA_004975.

[161] Eagar Dep., at 156:18–159:12.

claims.[162]  The presentation contains no specific information regarding investment monitoring responsibilities, evaluative methods, or considerations for determining investment suitability.[163] In fact, despite litigation risks representing the most substantial subject covered in the presentation, there is no mention of pending litigation involving the Freedom Funds, of which numerous cases were filed by this time.[164]  It is clear that this training was not tailored to the needs of the Committee or circumstances of the Plan, and offered no instruction regarding investment selection and monitoring practices.   Approximately one year later, on June 16, 2022, virtually the same information was presented to the Committee.[165]

94.    Without sufficient fiduciary education, those responsible for selecting and monitoring investments lack the essential knowledge needed to implement a consistent and prudent fiduciary process and, crucially, to recognize and remedy an erratic process or a deficiency of investment data.  As a result, all decisions regarding Plan investments and fees—including the choice to retain several contested investments in this case and the irregular application of evaluation standards underpinning those decisions, discussed in greater detail in Sections VIII.A.3.i–iii —were significantly influenced by the lack of training on specific investment monitoring considerations and the relevant standard of care.

95.    Committee members clearly would have benefitted from further or better training, as they lacked an understanding of which individuals and service providers had a fiduciary responsibility to the Plan.   In particular, Ms. Riddle, Vice President of Human Resources, demonstrated a glaring lack of knowledge regarding basic investment concepts.[166]  Ms. Riddle attempted to justify her lack of knowledge with her role performing the administrative functions

---

[162] *See* QUANTA_004975, at -978 through -983, -984 through -987, -988 through -993.

[163] *See id.*

[164] *See id.*

[165] *See* QUANTA_118778.

[166] Riddle Dep., at 83:23–25 (testifying that she was not familiar with risk-adjusted returns or information rations beyond their inclusion as metrics in the IPS).

of the Plan.[167]  But a fiduciary's specialization with regard to administration does not absolve them of responsibility to be educated about the basic investment concepts critical to ensuring the continued prudence of the Plan's investments, particularly when they are a full voting member with regard to the Plan's investments, and critically when conflict exists between the prevailing investment guidance and the standards applied by the advisor in furnishing investment retention and replacement advice (see Sections VIII.A.3.i–iii below).

### 2. The Committee Unduly Relied on its Investment Advisor to Carry out Investment Monitoring

96.   Quanta elected to engage Ascende and QPA as a non-discretionary investment advisor.   Considering this arrangement, it retained the responsibility to exercise oversight concerning the investment advisor's recommendations and reach independent determinations concerning the Plan's investments.  If Quanta wished to fully delegate investment monitoring responsibility to its consultant, it could have chosen to do so.  Indeed, Ascende and QPA offered both non-discretionary investment advisory services consistent with ERISA § 3(21) as well as discretionary investment management services consistent with ERISA § 3(38).[168]  Mr. Eagar himself worked with clients that engaged Ascende and QPA as a discretionary investment manager under ERISA § 3(38).[169]   However, since Quanta engaged Ascende and QPA in a non-discretionary capacity, it retained residual responsibility to act independently with respect to the Plan's investments.

97.   Notwithstanding this chosen arrangement, the Committee relied solely on the Plan's investment advisor to identify investments that became non-compliant with the Plan's IPS or might otherwise be unsuitable for the Plan.  This undue reliance was inadequate.  Ascende was not selected as the Plan's investment advisor pursuant to an objective process or evaluated at all

---

[167] Riddle Dep., at 32:23–33:19 ("I think that side of things is why I was brought there.  Definitely not my investment acumen, but—but the side of it that was—that was representing them fully").

[168] Eagar Dep., at 58:12–21.

[169] Eagar Dep., at 59:20–60:8.

throughout its engagement.  As a result, the Committee failed to recognize that the procedures and recommendations implemented by Ascende on behalf of the Plan were consistent with Ascende's small client base of retirement plans, most of which were dwarfed in size by the Plan.  Similarly, because there was no review of the Plan's investment advisory services at the time Ascende was acquired by QPA, the Committee took little stock that the level of advice provided to the Plan did not evolve even after QPA acquired Ascende (other than a few additional metrics and new format for the quarterly investment review materials provided to the Committee).[170]  All this resulted in the Committee's failure to recognize that investments in the Plan were routinely failing the evaluative criteria established in the IPS and otherwise required specific consideration regarding their ongoing suitability for the Plan.

### i.    The Committee Relied Solely on Its Advisors to Identify IPS Non-Compliance

98.    It is typical for an investment committee to work with an advisor to identify instances where certain investments are not complying with IPS criteria during regular intervals. As part of a prudent process, however, an engaged committee, when presented with information and recommendations from an advisor, will typically assess the available data to independently determine whether or not to adopt the recommendations of its advisor, and will document this deliberative process.

99.    The Committee relied virtually entirely on its investment advisors to monitor the investments in the Plan, from curating the specific metrics, statistics and time horizons presented in their reports to selecting the benchmarks against which the performance of Plan investments was reported.  In effect, the Committee deferred the responsibility for selecting and retaining investments in the Plan to its investment advisor.

---

[170] Rupp Dep., at 67:2–69:19 (Mr. Rupp testifying that the service team responsible for the Plan did not change after Ascende's acquisition by QPA and the only specific service enhancements he recalled were additional metrics provided in the quarterly investment review materials).

100.    The Committee took no action outside of the Committee meetings that they held with the advisor to ensure Plan investment options were satisfying the requirements of the IPS.[171]

101.    My review of the record shows that there was not a single instance where the Committee acted independently of any recommendation made by Ascende.[172]  In my experience, the Committee relied on Ascende, which was a non-discretionary fiduciary under ERISA section 3(21)(A)(ii), an advice-giving role, to a degree that departs from minimum fiduciary standards and custom.

### ii.    The Committee Failed to Recognize that Its Advisors were not Identifying IPS Non-Compliance

102.    As Mr. Eagar himself testified, failure of any one of the evaluative criteria set forth in the IPS could have been sufficient to place an investment on "Monitor" or "Alert" status.[173]

103.    In my experience, a reasonable fiduciary standing in the shoes of the Committee would take due care to evaluate the performance of the Plan's investment options consistent with the IPS criteria.  I have not seen evidence in the record showing the Committee and/or any Committee member actually conducted any meaningful performance evaluation with respect to the IPS (beyond receiving the investment consultant quarterly reports).

104.    Plan investments frequently ran afoul of the standards adopted in the IPS for assigning "Monitor" and "Alert" status but escaped mention or scrutiny because the binary pass or fail hegemony of the scoring system was the sole monitoring approach undertaken by the Committee.  For example, the Committee's indifference to the IPS "Investment Watch List Process" and deference to the scoring system permitted the DFA Fund's below peer median three-year Alpha and negative three-year Information Ratio to go undetected in Q3 2018,[174] the

---

[171] Rupp Dep., at 40:23–41:12; Campbell Dep., at 152:23–154:10; Grindstaff Dep., at 36:3–7; Riddle Dep., at 53:19–54:19; Eagar Dep., at 170:14–171:11.

[172] Eagar Dep., at 86:10–17; Campbell Dep., at 148:19–149:9.

[173] Eagar Dep., at 90:12–20.

[174] QUANTA_002950, at -988, 068, 069.

American Beacon Fund's below peer median five-year Alpha and negative five-year Information Ratio to go unnoticed in Q3 2019,[175] and the Freedom Funds' negative Information Ratios over both three- and five-year periods to be ignored in Q4 2015.[176]  None of the foregoing examples instigated discussion of the merits of the investment, nor resulted in any of the funds being placed on "Monitor" or "Alert" status.[177]

105.   Conducting a monitoring process that followed the IPS guidance, a reasonable fiduciary in my view would have, in these instances, applied the IPS and engaged in an evaluation to determine whether replacement was appropriate, and the reasoning for any resulting decision, whether in favor of or opposed to termination, would be documented.

106.   Given the Committee's blind reliance on the advice of its advisors, it is perhaps unsurprising (but at odds with the guidance of the IPS), that it did not recognize that Ascende failed to flag any of the above or other breaches of the watch list criteria.

107.   As they pertain to the Plan's TDF, these failures are all the more concerning since the Freedom Funds were selected for the Plan's investment lineup prior to Quanta's engagement of Ascende and Ascende did not inquire into the rationale for including the Freedom Funds in the Plan's investment lineup when they were engaged.[178]

108.   The Committee's nonchalance and disengagement led to a failure to recognize when Plan investments failed to meet the IPS criteria adopted by the Committee, to the detriment of Plan participants.

        **iii.**     **Ascende (and later the QPA team) Primarily Served Smaller Retirement Plans and Provided Insufficient Information for the Committee to Appropriately Monitor the Plan's Investments**

---

[175] QUANTA_003725, at -754.

[176] QUANTA_100812, at -859–871.

[177] *See* QUANTA_002946; QUANTA_003722; QUANTA_104297, at -299.

[178] Eagar Dep., at 70:7–71:25.

109.    At all times during the relevant period, the Plan was the largest plan that Ascende serviced in terms of AUM and Ascende's average client was far smaller.[179]  Indeed, in 2017, when the Plan's assets were greater than $700 million, the average assets of Ascende's clients were less than $56 million.[180]  In fact, Mr. Eagar could only recall five of Ascende's or QPA's clients other than Quanta with more than $500 million in AUM during the relevant period.[181]

110.    It was only after Ascende was acquired by EPIC, and gradually gained access to more sophisticated reporting systems, that it began providing more detailed metrics and analysis to the Committee.  It is clear, however, that the additional information presented to the Committee was: (1) not the product of any tested and accepted means for evaluating the performance of investment options; (2) not consistent with the criteria in the IPS; and (3) not clearly communicated to the Committee.

111.    For example, upon the transition to QPA, the advisor team also transitioned to a new reporting system with additional capabilities with respect to monitoring and scoring.[182]  QPA at that time, elected to create a new scoring system based on the reporting capabilities of the new software, selecting criteria it felt would be "a good representation of how [QPA] could best quantitatively analyze a Target Date suite."[183]  Mr. Eagar testified that, prior to creating the scoring criteria for the 2019 IPS, QPA did not have any real-world experience using the criteria with clients.[184]  QPA never informed the Committee that it had effectively operationalized scoring

---

[179] Eagar Dep., at 138:1–16.

[180] *See* QUANTA_001527, at -604; *see also* Ascende Wealth Advisors, Form ADV (2017), Item 5 Information About Your Advisory Business – Regulatory Assets Under Management.

[181] Eagar Dep., at 175:20–176:13.

[182] Eagar Dep., at 142:9–23.

[183] Eagar Dep., at 145:2–148:10.

[184] Eagar Dep., at 151:3–16.

criteria that were untried, inconsistent with the IPS, and not formally adopted by the Committee.[185] The omission of such information is stark given, as discussed in greater detail below, neither Ascende nor QPA ever provided the Committee with information reflecting noted public concerns with the Freedom Funds, including substantial withdrawals of retirement plan assets and a demonstrable loss of faith by investors.[186]

112.    Based on my experience, Ascende/QPA's conduct was highly atypical and resulted in a fundamental ignorance among the Committee of glaring non-compliance with the Plan's IPS.

### iv.    The Committee Never Formally Evaluated the Plan's Investment Advisory Services

113.    During the relevant period, Ascende (and later QPA) served as non-discretionary fiduciaries with the Committee retaining ultimate responsibility for the selection and monitoring of Plan investments.  It is well understood in the industry that, under ERISA, a fiduciary with discretion to appoint other fiduciaries has a residual duty to monitor its appointees.  The Department of Labor has stated that "[a]t reasonable intervals the performance of trustees and other fiduciaries should be reviewed by the appointing fiduciary in such manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan."[187]  It is typical for plan sponsors and fiduciaries to monitor delegated fiduciaries such as advisors through a formal process and document the process for doing so.

114.    Service provider evaluation should occur with reasonable frequency, comprehensively review service levels, and consider whether alternative providers may have capabilities that better match with the needs of a plan or its participants.  The Committee's process (or lack thereof) to monitor Ascende and QPA, as well as independently act upon its

---

[185] Eagar Dep., at 151:18–153:6.

[186] Eagar Dep., at 179:4–23; Rupp Dep., at 150:14–17.

[187] 29 C.F.R. §2509.75-8, FR-17.

recommendations, fell short of the degree of scrupulous review required of appointing fiduciaries. Based upon my review of the record, Committee members repeatedly offered testimony confirming that there was no semblance of a formal process to monitor the investment consultant[188] beyond receiving quarterly investment review materials from Ascende and QPA and receiving the advice they provided at meetings.[189]  While this provides some perspective about the services provided to the Plan by its investment advisor, it does not speak whatsoever to additional services and capabilities that the Plan's incumbent advisor or other providers offer.  Moreover, since Ascende's and QPA's investment review materials reflected a list of evaluative metrics and information that was not tailored to the circumstances of the Plan or its IPS, objective review of the investment advisor's services was all the more important.

115.    Considering the investment advisor's crucial role with respect to selecting and monitoring the Plan's investments—particularly because the Committee relied solely on the advisor's recommendations—the Committee' complete failure to monitor its advisor was highly atypical of the conduct of reasonable fiduciaries, based on my experience.  In my experience, an investment committee typically acts to ensure the plan is getting the benefit of the bargain in receiving all of the contracted services from the investment consultant.  Based on the record I have reviewed, the Committee did not establish or apply a process to ensure that occurred here.

### 3.  The Evaluative Criteria in Plan's Investment Policy Statement and the Advisor's Scoring System were Internally Inconsistent and Failed to Establish Appropriate Investment Monitoring Standards

#### i.  The Scoring System Implemented After 2017 Conflicted with the Monitoring Standards Established by the IPS

116.    Inconsistencies between the ratified 2015 IPS and the scoring system introduced in the 2017 quarterly investment review materials compounded the disconnect regarding the operative IPS between the Committee and the Plan's investment consultant.  Indeed, many of the

---

[188] Riddle Dep., at 92:2–12; Rupp Dep., at 70:10–71:2

[189] Riddle Dep., at 92:19–93:5; Grindstaff Dep., at 34:7–16; Rupp Dep., at 70:3–8.

conflicts were sufficiently incompatible such that investments could regularly fail standards established in one set of monitoring criteria while passing in the other, rendering it virtually impossible to conduct appropriate, consistent investment monitoring with one party (the Committee) required to follow the IPS and the other (the advisor) adhering to the scoring system.

117.    Specific inconsistencies between the IPS and advisor monitoring system include the following:[190]

- The IPS dictates that investment "performance will be measured by comparing rates of return to appropriate market indexes and peer groups for the most recent quarter, YTD, 1-year and 3-year periods;" the scoring system evaluates performance against market indexes for three- and *five-year* periods and against peers for one-, three- and *five-year* periods.[191]  In addition to incorporating an assessment of fund performance for a longer timeframe than the IPS contemplated, the scoring system also includes no category and assigns no points for the shorter-term metrics identified in the IPS (quarter and year-to-date).[192]

- The IPS "Investment Watch List Processes" identify performance below the peer median over three, five, or *ten* years as a criterion to consider in placing an investment on "Monitor" or "Alert" status, despite ten year returns not appearing anywhere in the scoring system.[193]

- In those same "Investment Watch List Processes", the IPS sets the threshold for poor consistency of performance as whether a fund's Information Ratio is

---

[190] All references to the IPS are to the 2015 version, and all references to the scoring system are to the monitoring methodology that was included in the quarterly investment reviews presented to the Committee beginning in the Third Quarter of 2017.

[191] *See* QUANTA_001404, at -416; QUANTA_002430, at -454.

[192] *See* QUANTA_001404, at -417; QUANTA_002430, at -454.

[193] *See id.*

*negative*, but the scoring system requires a fund's Information Ratio to rank in the top 50% of peers, without regard for the sign of the datapoint. Moreover, while the IPS calls for analysis of the Information Ratio over three-, five-, and ten-year periods, the scoring system only evaluates ***three-year*** Information Ratios.[194]

- The scoring system requires an investment manager to have at least a three-year tenure to receive a passing score for that component, but the IPS cautions that ***any change*** in investment manager could be sufficient reason to assign a fund "Monitor" or "Alert" status.[195]

- Both the IPS and the scoring system contemplate a $75 million threshold for an investment's AUM, but while the IPS notes the potential for concern (and "Monitor" or "Alert" status) due to a "significant decrease" in AUM, the scoring system contains no mechanism to penalize a fund for incurring substantial capital flight.[196]

- Similarly, both the IPS and the scoring system require an investment's expense ratio to rank in the top half of peer funds, but the IPS notes the potential for concern due to a "significant increase" in expense, the scoring system is agnostic to any such change.[197]

- While a deviation from the investment manager's stated style and/or strategy is contemplated as a potential watch list criteria in the IPS, it is omitted entirely from the scoring system.[198]

---

[194] *See id.*

[195] *See id.*

[196] *See id.*

[197] *See id.*

[198] *See id.*

- The scoring system assigns points to investments for their standing according to the Sharpe Ratio and R-squared metrics, neither of which is named in the IPS watch list standards.[199]

118.    Undue reliance on a scoring system that is inconsistent with the provisions of an adopted IPS inhibits an investment committee's ability to perform monitoring consistent with the IPS.

### ii.    The Scoring System Implemented After 2017 Established Arbitrary Monitoring Standards

119.    Independent of the inconsistencies between the scoring system introduced in 2017 and the Committee's guiding policy document, the system suffered from several flaws relating to the arbitrary nature in which its component metrics and score weightings were chosen.  In addition to being untethered to any of the guidance contained in the IPS, the scoring criteria, and the emphasis placed on each, appear internally inconsistent and, critically, are unsupported by any documented justification or rationale.

- The scoring system evaluates peer ranked returns over one-, three- and five-year periods, but omits the one-year timeframe from any assessment of returns compared to the benchmark.[200]

- In terms of total weighting, the benchmark comparisons contribute just 15% of an investment's total score, while peer ranked returns contribute 30%, effectively deeming peer-relative performance twice as important as market-relative performance.[201]

- While the threshold for earning a passing score in the peer-relative performance categories over three- and five-year periods is ranking in the top 50% of peers,

---

[199] *See id.*

[200] *See* QUANTA_002430, at -454.

[201] *See id.*

a fund's one-year return only has to rank in the top 65% of peers to earn the same number of points (10) as the three- and five-year categories.[202]

- The AUM threshold of $75 million is not only completely arbitrary, it lacks the nuance to account for different assets classes and appears to have been set without consideration for the assets in individual funds the Plan. Notwithstanding the fact that a TDF suite with just $76 million in assets would be inappropriate for investment in the Plan despite earning a passing grade in the AUM component of the scoring system, several single-strategy funds in the Plan had sufficient assets as of Q3 2017 (the first quarter in which the scoring system appears) to render the $75 million threshold meaningless. In the case of a fund with $76 million, passing the scoring system criteria, this would be inappropriate for investment in a number of asset classes where the Plan's assets would represent a disproportionately large fraction, such as the $46.2 million Fidelity 500 Index Fund, the $58.1 million Dodge & Cox Stock Fund, or the $80.2 million American Funds Growth Fund of America.

Each criterion in the scoring system is Pass/Fail.[203] An investment that meets the standard for a particular criterion gets all the points available in that category; an investment that falls short gets zero. Accordingly, an investment that ranks the best among its peers will receive the same number of points in that category as one that ranks in the 49th percentile; there is no sliding scale for the assigning of points based on degrees of under- or outperformance.[204]

---

[202] *See id.*

[203] *See id.*

[204] Eagar Deposition, at 147:5–24.

### iii. Changes to the Scoring System in 2019 Produced a Materially Different Set of Investment Monitoring Standards

120.     The scoring system, which was incorporated in the draft 2017 IPS that the advisor treated as operative, but which was never formally adopted, was updated in several material respects in a 2019 draft of the IPS that was formally ratified in 2020.  I have seen no documented justification or rationale for these changes, which I enumerate below, that produced an entirely new scoring system for TDFs and a fundamentally altered mix of criteria for single-strategy funds.

- I have referenced above Mr. Eagar's testimony that the new TDF scoring system introduced in 2019 had not been formally operationalized or tested and were not adopted by the Committee,[205] despite the criteria of the updated methodology first appearing in the quarterly investment review materials in Q3 2019.[206]  The new TDF scoring system honed in on five components: three- and five-year Sharpe Ratio, three- and five-year max drawdown, and net expense ratio.[207, 208]  As TDFs were not assigned a distinct evaluative matrix prior to these updates, and were accordingly assessed pursuant to the general scoring system like all other investments, the 2019 update calls into question the utility

---

[205] Eagar Dep., at 151:3–16; 151:18–153:6.

[206] *See* QUANTA_003725, at -757.

[207] It is not clear to me based on explanations of the scoring system contained in any iteration of the IPS or quarterly investment review how the comparative peer group is defined for purposes of evaluating whether a Plan fund's expense ratio falls below the peer median.  Given the absence of language in any of these materials suggesting the peer groups are limited to just the lowest cost share class or institutional share class of each fund in the asset class, it is likely that the peer group used to calculate the expense ratio score for each Plan investment contains every share class of every fund classified within that category.  Accordingly, it would be difficult for any Plan investment in an institutional or equivalent share class to fail this criterion when it is compared to the retail and other more expensive share classes of similar funds.  For example, the American Funds Growth Fund of America, the R6 share class of which was offered in the Plan lineup during the relevant period, is offered in twenty other share classes, with expense ratios ranging from 0.30% to 1.44%.  A fund in the same asset class with a 0.32% expense ratio would, despite being more expensive than the institutional level share class of the Growth Fund of America, still rank as less expensive than 19 other share classes of the same fund.

[208] *See* QUANTA_116202, at -222.

and applicability of the old system to TDFs, such was the dramatic departure in criteria. The 2019 TDF scoring system placed a 60% weight on a TDF's risk-adjusted returns as viewed through the lens of the Sharpe Ratio and scrutinized the metric over both three- and five-year periods; this component previously carried a 10% weight in an investment's overall score, and was analyzed over just a three-year timeframe.[209] Similarly, the importance of the expense ratio was elevated from 10% in the prior scoring system to 30% in the 2019 TDF matrix. Max drawdown represented a brand new criterion, never contemplated in the previous iteration of the system. Gone from the earlier scoring system were an assessment of returns, compared to peers and benchmarks, Alpha, R-squared, Information Ratio, manager tenure, and assets under management, casting doubt on the prior TDF evaluation and retention decisions made by the Committee pursuant to a scoring system containing so many criteria that were apparently suddenly deemed unnecessary or unhelpful by the Plan advisor.

- Concerning the evolution of the scoring system, the threshold to earn a passing score in the one-year peer ranked performance category was lowered from the top 65% to the top 75%, while its weighting in the overall score was reduced from 10% to 5%.[210]

- The weighting for an investment's three- and five-year return relative to the benchmark was raised from 7.5% each to 10% each.[211]

- The three-year time horizon over which each of the Alpha, Sharpe Ratio, R-squared and Information Ratio statistics was evaluated in the earlier scoring system was changed to a five-year window in the 2019 update.[212]

---

[209] *See* QUANTA_002430, at -454; QUANTA_116202, at -222.

[210] *See id.*

[211] *See id.*

[212] *See id.*

The AUM threshold in the scoring system was raised from $75 million to $100 million, despite the "Investment Watch List Process" section of the 2019 and 2020 IPSs retaining $75 million as the minimum criteria.[213]

121.    These changes to the scoring system, for which there is no documented rationale or other evidence suggesting the Committee considered the appropriateness of such changes for the Plan within the context of the IPS, further impeded the application of a consistent investment monitoring process.

### 4. The Committee Failed to Consistently Apply the Investment Policy Statement and Scoring System

#### i.    The Committee Adopted the Scoring System as a Means of Identifying Investment Non-Compliance and Decided to Ignore the Scores

122.    Despite the Committee's eventual adoption of an investment scoring system in the IPS, it failed to actually monitor the Plan's investments according to the scoring system, leading to a lack of specific guidance concerning the evaluative criteria to be applied in monitoring the Plan's investments, and no consistent or objective process.

123.    From the beginning of the relevant period until the Third Quarter of 2017, when the Plan's investment advisor began providing advice consistent with an unratified draft version of the IPS,[214] Ascende's investment review reports to the Committee included a laundry list of financial metrics.[215]  The reports during this period did not utilize a scoring system or weighting of metrics to assess or enforce IPS compliance.[216]

124.    Beginning with its report reviewing the Third Quarter of 2017, Ascende began providing an "Investment Policy Monitoring Report" that indicated compliance with a monitoring

---

[213]  *See* QUANTA_002430, at -454; QUANTA_3725, at -742; QUANTA_116202, at -214; QUANTA_000909, at -921.

[214]  Campbell Dep., at 115:15–116:21.

[215]  *See* QUANTA_002291, at -317 through -319.

[216]  *See id.*

methodology based on a weighted scoring system.[217]  Pursuant to this scoring system, investments received "Pass" or "Watch" status based on whether they received more than 65 points out of 100, and received "Review" status if they remained on "Watch" status for more than four quarters.[218]  Yet, even after the scoring system was effectively implemented, the Committee never actually received the scores assigned to investments pursuant to the IPS scoring system.  Instead, from the Third Quarter of 2017 through the Second Quarter of 2019, the Committee simply received an indication of "Pass," "Watch," or "Review" status, but not the numerical score an investment received.[219]  In other words, the Committee did not receive information indicating whether an investment received a barely passing score or the maximum total points.[220]

125.    Even more concerning, beginning with QPA's investment review report in the Third Quarter of 2019, the Committee instructed QPA to stop providing any indication of the results of the scoring system altogether.[221]  This coincided with the circulation of another unratified draft version of the IPS,[222] which included changes to the existing scoring system and introduced a separate scoring system for TDFs.

---

[217] *See* QUANTA_002430, at -454.

[218] *See id.*

[219] *See* QUANTA_002430, at -457 through -462; QUANTA_003585, at -605 through -610.

[220] *See id.*

[221] *See* QUANTA_003725, at -746 through -758.

[222] Campbell Dep., at 115:15–116:21.

126.    The timeline of the Committee's receipt of the components and conclusions of the scoring system is set forth below.



ii.    **Unbeknownst to the Committee, QPA's Advice was Keyed to Unratified Versions of the IPS**

127.    Deposition testimony confirms the Committee understood that, in order for an investment policy to become operative, it would have had to have first been approved by the Committee.[223]    Committee members consistently testified that they believed that, until the adoption of the 2020 IPS, the 2015 iteration was the only operational IPS during the Class Period.[224]

128.    In complete contradiction to the testimony of the Committee, the Plan's advisor testified that, despite the 2017 draft of the IPS not being formally adopted, it was operational "in practice and review" and that it "was the process in which the Committee funds were being

---

[223] Jensen Dep., at 78:10-17; Grindstaff Dep., at 46:9–15

[224] Campbell Dep., at 116:18-21; Riddle Dep., at 67:5–13.

discussed."[225]  Mr. Eagar also confirmed that he understood that the 2019 draft IPS was operational until the formal adoption of the 2020 IPS.[226]

129.    This disconnect between the Committee and advisor is highly atypical of the fiduciary processes I've encountered.  The 2017 and 2019 draft IPS each depart drastically from the 2015 IPS in terms of quantitative performance monitoring criteria and include new scoring systems never approved by the Committee, as discussed above.[227]  This disconnect meant that the Plan's advisor was monitoring the Plan's investments under a fundamentally different set of criteria from the Committee, and that its recommendations would have been made in accordance with guidance inconsistent with the operative IPS.  This conduct, in my opinion, falls well below the minimum fiduciary standards applicable to Plan fiduciaries.

### iii.    The Committee Failed to Reasonably Monitor Qualitative or Non-Performance Criteria Consistent with the IPS

130.    The IPS identified a number of qualitative and non-performance criteria that should be considered in determining the compliance of investments with the IPS and identifying the need to place an investment on "watch" and undertake further investigation.[228]  Among these criteria are "a significant decrease in the investment option's assets," extraordinary events, and other factors concerning an investment manger's ability to consistently execute its strategy.[229] Throughout the relevant period, the Committee regularly failed to consider information addressing these criteria with respect to the Plan's investments, including the Freedom Funds.

131.    Despite widespread reporting regarding concerns with the Freedom Funds, Ascende and QPA never brought such reporting to the Committee's attention.  For example, on March 5, 2018, Reuters published a Special Report entitled "Fidelity puts 6 million savers on risk

---

[225] Eagar Dep., at 114:10–16.

[226] Eagar Dep., at 152:22–153:2.

[227] *Compare* QUANTA_001404 with QUANTA_112693 and QUANTA_116224.

[228] *See, e.g.*, QUANTA_001404, at -415, -417.

[229] *Id.*

path to retirement" addressing issues with the Freedom Funds.[230]  Mr. Eagar testified that he was not aware of the Special Report, although he may have been aware of some of the underlying concerns with the Freedom Funds.[231]  The Special Report indicated that Fidelity had seen nearly $16 billion in net withdrawals over the preceding four years and linked such withdrawals with increased risk in Fidelity's TDFs following a strategy overhaul that took effect in 2014.[232]  The Special Report identified that the managers of Fidelity's TDFs had employed riskier investments than other TDF managers and cited commentary from the president of a TDF research firm calling the equity concentration of the Freedom Funds a "time bomb."[233]  Indeed, this followed subpar performance by the Freedom Funds against Fidelity's internal benchmark over one-, three-, five-, and 10-year time horizons for a decade.[234]  The Special Report also pointed to a host of specific examples of retirement plan sponsors withdrawing from the Freedom Funds.[235]  The Committee never reviewed or discussed these concerns, much less deliberated their impact on the Freedom Funds' standing in the Plan, whether as a result of the Plan's investment advisor bringing this reporting to the Committee's attention or the Committee independently identifying significant negative reporting concerning the Plan's most important investments.

132.    In addition, despite the IPS' specific inclusion of net capital outflows (*i.e.*, "a significant decrease in the investment option's assets" not attributable to depreciation) among reasons that an investment may be placed on "watch" and considered for replacement in the Plan, the Committee failed to consider the substantial capital exodus that occurred from the Freedom

---

[230] *See* Tim McLaughlin and Renee Dudley, Special Report: Fidelity puts 6 million savers on risky path to retirement (Mar. 5, 2018), available at: https://www.reuters.com/article/business/special-report-fidelity-puts-6-million-savers-on-risky-path-to-retirement-idUSKBN1GH1SI/.

[231] Eagar Dep., at 191:19–13; *see also* McLaughlin and Dudley, Special Report: Fidelity puts 6 million savers on risky path to retirement (Mar. 5, 2018).

[232] *See* McLaughlin and Dudley, Special Report: Fidelity puts 6 million savers on risky path to retirement (Mar. 5, 2018).

[233] *Id.*

[234] *See id.*

[235] *See id.*

Funds during the relevant period.  Indeed, Mr. Eagar himself acknowledged that capital outflows from Plan investments should be a factor considered in investment monitoring, including with respect to TDFs.[236]  Fidelity's TDFs had experienced $16 billion in net capital outflows from 2014 to 2018 and, from 2008 to 2018, the Freedom Funds' market share had decreased over 50%, from 43% market share to 21% market share.[237]  This was all occurring as the TDF marketplace grew substantially and the Freedom Funds' peers experienced net capital inflows.[238]  Nonetheless, the Committee did not discuss the Freedom Funds' substantial asset shedding during the relevant period.[239]  Moreover, the Committee did not receive, nor did it seek out, sufficient information concerning the net asset flows to the Freedom Funds.[240]

133.    Under prevailing standards and the Plan's own IPS, a reasonable investment monitoring process would have included discussion and documentation of these substantial concerns with Plan investments, particularly with the Plan's largest investment option.

### iv.    The Committee Failed to Reasonably Monitor the Plan's QDIA

134.    As discussed above, the Committee did not monitor the Freedom Funds in accordance with the criteria established under the IPS or take any sufficient affirmative steps to investigate whether it was reasonable to continue offering the Freedom Funds as the Plan's QDIA. The Committee applied no heightened scrutiny or established any separate, more rigorous procedures to monitor the Plan's QDIA.  Indeed, there is little evidence that the Committee

---

[236] Eagar Dep., at 190:12–19.

[237] See McLaughlin and Dudley, Special Report: Fidelity puts 6 million savers on risky path to retirement (Mar. 5, 2018).

[238] See id.

[239] See Eagar Dep., at 189:10–23.

[240] While the Committee received information concerning the Freedom Funds assets under management, this information would need to be compared across periods (and at a more granular level) to indicate net flows to the Committee.  See QUANTA_106738, at -742.  No attempt to do so is reflected in the Committee's minutes, meeting materials, or otherwise.

considered the appropriateness of the Freedom Funds in light of the demographics of Plan participants, analyzed whether the Freedom Funds' strategy remained appropriate for the Plan, or inquired into whether custom TDFs or an off-the-shelf alternative presented a more suitable option for Plan participants, as the Department of Labor's QDIA guidance provides.

135.    Indeed, the Committee failed to recognize and appropriately scrutinize the persistent failure of the Freedom Funds to outperform its benchmark.[241]  Appendix A to the 2015 IPS identifies the S&P Target Date Indices as the appropriate benchmark for evaluating TDF performance.[242]  For at least the six quarters bracketing the start of the Class Period, from Q4 2015 through Q1 2017 (and possibly further back prior to the Class Period, but I understand no quarterly investment reviews from before Q4 2015 were produced to Plaintiffs), the majority of Freedom Fund vintages failed to generate returns that exceeded the corresponding S&P Target Date Index on a five-year basis, while for all but Q1 2017, the Freedom Funds similarly failed that standard on a three-year basis.[243]

---

[241] At the start of the Class Period, the IPS listed performance compared to an appropriate benchmark as an investment selection criterion to be thoroughly examined, but omitted it as a monitoring criterion.  This incongruence was fixed in the subsequent 2017 draft.  I have seen no explanation in the record I have reviewed for why the IPS selection standards so substantially departed from the monitoring measurements prior to the 2017 update.

[242] *See* QUANTA_001404, at -421.

[243] *See* QUANTA_100812, at -839; QUANTA_120726, at -754; QUANTA_120799, at -827; QUANTA_120867, at -895; QUANTA_120935, at -963; QUANTA_002219, at -247.

**TABLE 1**

|  | Q4 2015 | | Q1 2016 | | Q2 2016 | |
|---|---|---|---|---|---|---|
|  | 3 Year Performance Relative to Benchmark | 5 Year Performance Relative to Benchmark | 3 Year Performance Relative to Benchmark | 5 Year Performance Relative to Benchmark | 3 Year Performance Relative to Benchmark | 5 Year Performance Relative to Benchmark |
| Fidelity Freedom Income | Underperform | Underperform | Underperform | Underperform | Underperform | Underperform |
| Fidelity Freedom 2005 | Outperform | Underperform | Underperform | Underperform | Underperform | Underperform |
| Fidelity Freedom 2010 | Outperform | Underperform | Underperform | Underperform | Underperform | Underperform |
| Fidelity Freedom 2015 | Underperform | Underperform | Underperform | Underperform | Underperform | Underperform |
| Fidelity Freedom 2020 | Underperform | Underperform | Underperform | Underperform | Underperform | Underperform |
| Fidelity Freedom 2025 | Underperform | Underperform | Underperform | Underperform | Underperform | Underperform |
| Fidelity Freedom 2030 | Underperform | Underperform | Underperform | Underperform | Underperform | Underperform |
| Fidelity Freedom 2035 | Underperform | Underperform | Underperform | Underperform | Underperform | Underperform |
| Fidelity Freedom 2040 | Underperform | Underperform | Underperform | Underperform | Underperform | Underperform |
| Fidelity Freedom 2045 | Underperform | Underperform | Underperform | Underperform | Underperform | Underperform |
| Fidelity Freedom 2050 | Underperform | Underperform | Underperform | Underperform | Underperform | Underperform |
| Fidelity Freedom 2055 | Underperform | Outperform | Underperform | Underperform | Underperform | Underperform |
| Fidelity Freedom 2060 | Outperform | Outperform | Underperform | Underperform | Outperform | Outperform |

|  | Q3 2016 | | Q4 2016 | | Q1 2017 | |
|---|---|---|---|---|---|---|
|  | 3 Year Performance Relative to Benchmark | 5 Year Performance Relative to Benchmark | 3 Year Performance Relative to Benchmark | 5 Year Performance Relative to Benchmark | 3 Year Performance Relative to Benchmark | 5 Year Performance Relative to Benchmark |
| Fidelity Freedom Income | Underperform | Underperform | Underperform | Underperform | Underperform | Underperform |
| Fidelity Freedom 2005 | Outperform | Outperform | Underperform | Outperform | Outperform | Outperform |
| Fidelity Freedom 2010 | Outperform | Outperform | Underperform | Outperform | Outperform | Outperform |
| Fidelity Freedom 2015 | Underperform | Underperform | Underperform | Underperform | Outperform | Outperform |
| Fidelity Freedom 2020 | Underperform | Underperform | Underperform | Underperform | Outperform | Underperform |
| Fidelity Freedom 2025 | Underperform | Underperform | Underperform | Underperform | Outperform | Underperform |
| Fidelity Freedom 2030 | Outperform | Underperform | Underperform | Underperform | Outperform | Underperform |
| Fidelity Freedom 2035 | Underperform | Underperform | Underperform | Underperform | Outperform | Outperform |
| Fidelity Freedom 2040 | Underperform | Underperform | Underperform | Underperform | Outperform | Underperform |
| Fidelity Freedom 2045 | Underperform | Underperform | Underperform | Underperform | Outperform | Underperform |
| Fidelity Freedom 2050 | Underperform | Underperform | Underperform | Underperform | Outperform | Underperform |
| Fidelity Freedom 2055 | Underperform | Underperform | Underperform | Underperform | Outperform | Underperform |
| Fidelity Freedom 2060 | Underperform | Underperform | Outperform | Outperform | No Data | No Data |

136.    The minutes of the Committee meetings for each quarter from Q4 2015 through Q1 2017 contain no mention[244] of any of the above underperformance, despite the IPS' explicit

---

[244]    *See*  QUANTA_104297;  QUANTA_114144;  QUANTA_109620;  QUANTA_110280; QUANTA_002215.

acknowledgement that "competitive and consistent performance measured against an appropriate benchmark"[245] was desirable.

137.    Beyond the quarterly investment review presentations the Committee received from the Plan's investment advisor, the only information it reviewed concerning the Freedom Funds was a high-level annual summary of a few select TDFs.  Indeed, on February 15, 2016, Ascende provided the Committee with a presentation titled "Fidelity Freedom Funds Target Date Deep Dive" ("TDF Deep Dive"), which Mr. Eagar testified was a form document presented to all of its clients on an annual basis.[246]  The documents I reviewed reflect that Ascende presented the Committee with TDF Deep Dives on a yearly basis from 2014 to 2024, with the exception of 2017.[247]  Committee members did not recall requesting additional information or taking any action as a result of reviewing the Target Date Deep Dives.[248]  The TDF Deep Dives provided general investment information and performance comparisons to other TDFs on the market.[249]  These documents were not prepared at the request of the Committee or tailored to the Quanta Plan but were instead distributed to each of Ascende's clients.[250]

---

[245] See QUANTA_001404, at -414.

[246] Eagar Dep., at 200:25–201:9.

[247] See QUANTA_104283 (referencing a 2014 TDF Deep Dive); QUANTA_104297, at -299 (referencing a 2015 TDF Deep Dive); QUANTA_106738 (2016 TDF Deep Dive); QUANTA_003295 (2018 Deep Dive); QUANTA_004058 (2019 Deep Dive); QUANTA_004861 (2020 Deep Dive); See QUANTA_005405, at -408 (referencing a 2021 TDF Deep Dive); QUANTA_005448 (2022 Deep Dive); QUANTA_006169 (2023 Deep Dive); QUANTA_129075 (2024 Deep Dive).

[248] Riddle Dep., at 123:3–10.

[249] Eagar Dep., at 182:1–3, 186:1–10.

[250] Eagar Dep., at 200:25–201:9

138.    It is unclear if and how the Committee actually considered the data presented in the TDF Deep Dives.[251]  In fact, the minutes the Second Quarter 2017 Committee meeting note that the Committee had received a question from a Plan participant regarding the cost  and performance differences between the target date offerings of Fidelity and Vanguard, and that the Committee elected not to look into the topic further as they has recently reviewed a TDF Deep Dive from the advisor.[252]

139.    None of the meeting minutes or the TDF Deep Dives I reviewed discuss in any level of detail the underperformance of the Freedom Funds relative to their benchmarks or peer group universe.  When the Committee ultimately voted to replace the Freedom Funds with the FIAM Blend TDFs, the minutes reflect it did so at the suggestion of the advisor in order to lower fees; there is no evidence that the Committee considered any available non-Fidelity alternatives in making this change.[253]

140.    The TDF Deep Dives, which were form documents and did not contain any detailed analysis or consideration of the suitability of the Freedom Funds for the Plan, were not sufficient for the Committee to evaluate the ongoing prudence of retaining the Freedom Funds as QDIA. This holds all the more since the Committee failed to monitor the Freedom Funds consistent with the IPS.

### B.  Quanta did not Establish or Apply a Reasonable Process to Appoint Qualified Committee Members and Monitor the Committee's Performance

141.    As discussed in Section VI.A, when a plan sponsor establishes a fiduciary committee, it retains oversight responsibilities with respect to the committee's fiduciary decision-

---

[251] Riddle Dep., at 121:13–19 ("Q: Do you recall if the switch from the Fidelity Freedom Funds to the Blended Funds was ultimately the result of a target date deep dive? Mr. Block: Object to form. A: Honestly, I don't – I don't remember.")

[252] *See* QUANTA_002287.

[253] *See* QUANTA_004626, at -627 through -628.

making.  This structural accountability provides an important backstop against a breakdown of fiduciary process.  My review of the record shows a complete failure by Quanta to apply a reasonable process to appoint qualified Committee members and to monitor the performance of the Committee.

142.    Ms. Campbell, who served as Quanta's Deputy General Counsel, did not identify any regular reporting to the Board of Directors or subcommittee thereof regarding the action of the Committee beyond routine reporting from Kim Riddle regarding "the benefits that [Quanta] offer to employees, utilization of the benefits, cost of the benefits, you know, the Plan Committee appointments as necessary."[254]  Likewise, the Plan's investment advisor could not identify an instance where the advisor or any committee members presented to the Board or a subcommittee regarding the Committee's work.[255]

143.    Testimony from the advisor and Committee members also confirms a complete lack of process for appointing qualified Committee members.[256]  Committee members uniformly reported joining the Committee following an informal request, with no real interview process to determine whether they possessed the requisite knowledge or background to meaningfully contribute to the Committee's work.[257]

144.    As a result, some Committee members lacked the requisite knowledge required to effectively contribute to the Committee's monitoring responsibilities.  For example, Kim Riddle was unfamiliar with such basic concepts as risk adjusted returns and information ratios.[258]  Although some Committee members had professional roles that related to Quanta's corporate financial functions, few had prior experience as fiduciaries or had previously received fiduciary

---

[254] Campbell Dep., at 225:3–227:9.

[255] Eagar Dep., at 143:18–145:7

[256] Eagar Dep., at 150:14–25.

[257] Riddle Dep., at 32:23–33:19; Campbell Dep., at 33:2–7; Grindstaff Dep. at 17:17–18:3

[258] Riddle Dep., at 83:23–25.

training.[259]  As discussed earlier in my Report, the functions and duties of a corporate officer or executive with investment responsibilities are not the same a fiduciary of a DC plan under ERISA. At least one Committee member, Mr. Rupp, misunderstood that the responsibilities of fiduciary under ERISA are not the same as those of a securities broker.[260]

145.    Committee members were not provided onboarding training despite most Committee members having no prior experience serving in fiduciary investment roles and several having only limited investment experience whatsoever.[261]  In fact, as Mr. Eagar testified, there was no formal process whatsoever to onboard new Committee members.[262]  The lack of onboarding training and ineffective periodic fiduciary training left the Committee without a sufficient understanding of basic fiduciary investment concepts, unable to consistently and objectively implement the IPS, and unaware of their responsibility to act independently from the Plan's investment non-discretionary investment advisor.

146.    The record reflects virtually no efforts by Quanta or its Board to review the performance of the Committee through formal reporting, as would be consistent with applicable standards and the governance structure of the Plan.  Neither the Committee nor QPA regularly presented to the Quanta's Board on the Plan's investments or the Committee's process to monitor them.[263]  If Quanta and its Board had effectively exercised its authority to appoint Committee members and monitor them consistent with prevailing practices, the process deficiencies identified in this Report would have been readily apparent.

147.    In my opinion, Quanta's failure to establish a process for selecting qualified Committee members, in tandem with its failure to provide any meaningful oversight of the

---

[259] *See, e.g.*, Jensen Dep., at 24:9–13; Campbell Dep., at 26:8–17.

[260] Rupp Dep., at 23:22–25:9.

[261] *See, e.g.*, Campbell Dep., at 33:2–7.

[262] Eagar Dep., at 150:14–25.

[263] Eagar Dep., at 143:18–144:7, 144:25–145:7.

Committee's operations, fell far short of the minimum standard of care for plan sponsors and fiduciaries.

## IX.   CONCLUSIONS

148.   The Committee failed to establish and apply reasonable processes to monitor the Challenged Investments.

149.   Quanta did not establish or apply a reasonable process to appoint qualified Committee members and monitor the Committee's performance.


Executed this 31st day of July 2024 in Palm Beach Gardens, Florida.

_____

Donald C. Stone

## Appendix B - Materials Considered

A Visual Depiction of the Shift from Defined Benefit (DB) to Defined Contribution (DC) Pension Plans in the Private Sector, Congressional Research Service (Dec. 27, 2021), pp. 1–2, available at: https://crsreports.congress.gov/product/pdf/IF/IF12007

Aon, Aon Fiduciary Academy (last visited July 19, 2024), available at: https://www.aon.com/en/capabilities/pensions-and-retirement/online-fiduciary-training

Bradley Bartells, How to Properly Document 2024 Plan Meetings, planadviser (Jan. 18, 2024), available at: https://www.planadviser.com/properly-document-2024-plan-meetings/

"Delegation of Duty", Plan Sponsor, January 2013

Form ADV, U.S. Sec. & Exchange Comm'n, Investor.gov (last visited July 19, 2024), available at: https://www.investor.gov/introduction-investing/investing-basics/glossary/form-adv

Fred Reish and Joan Neri, An IPS 'Sets' the Standard, Plansponsor (2019), available at: https://www.faegredrinker.com/-/media/files/insights_db/publications/2019/10/56_paso19_columns_p1ok1_reprint.pdf?la=en&hash=68361A41F0CDCF5DDF55F975684ADF1EB7E4F5FE

Guide to Committee Meeting Minutes, Pensionmark (last visited July 19, 2024), available at: https://cdn.ymaws.com/dciia.org/resource/resmgr/resource_library/Guide-to-Committee-Meeting-M.pdf

Investopedia, Adam Hayes, et al., What Is a Mutual Fund? (June 14, 2024), available at: https://www.investopedia.com/terms/m/mutualfund.asp

Meeting Your Fiduciary Responsibilities, U.S. Dep't of Labor, Employee Benefits Security Administration (Sept. 2021)

Meeting Your Fiduciary Responsibilities, U.S. Dep't of Labor, Employee Benefits Security Administration (Sept. 2021)

Multnomah Group, Fiduciary Training Program (last visited July 19, 2024), available at: https://www.multnomahgroup.com/fiduciary-training-program

Noah Zuss, How to Teach Fiduciary Responsibilities to Plan Committees, Plansponsor (Feb. 1, 2024), available at: https://www.plansponsor.com/how-to-teach-fiduciary-responsibility-to-plan-committees/

Nuveen, Collective Investment Trusts (last visited July 19, 2024), available at: https://www.nuveen.com/en-us/investments/retirement/collective-investment-trust

"OCIO RFPS: Are you asking these key questions", Strategic Investment Group, 2014

Rebecca Moore, Steps for Creating an Effective IPS, Plansponsor (Feb. 4, 2020), available at: https://www.plansponsor.com/in-depth/steps-creating-effective-ips/

Robert E. Jamison, Share the Love; Establish an Investment Committee (2007).

Sarah Holden, Steven Bass, and Craig Copeland, 401(k) Plan Asset Allocation, Account Balances, and Loan Activity in 2022, Employee Benefits Research Institute (Apr. 30, 2024), available at: https://www.ebri.org/docs/default-source/pbriefs/ebri_ib_606_k-xsec-30apr24.pdf?sfvrsn=1f43072f_1

Save the Date: Target Date Funds Explained, FINRA (Apr. 21, 2022), available at: https://www.finra.org/investors/insights/save-date-target-date-funds-explained

Target Date Retirement Funds – Tips for ERISA Plan Fiduciaries, U.S. Dep't of Labor, Employee Benefits Security Administration (Feb. 2013)

Target Date Retirement Funds, U.S. Sec. & Exchange Comm'n, Investor.gov (May 7, 2010), available at: https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins/target.

Tim McLaughlin and Renee Dudley, Special Report: Fidelity puts 6 million savers on risky path to retirement (Mar. 5, 2018), available at: https://www.reuters.com/article/business/special-report-fidelity-puts-6-million-savers-on-risky-path-to-retirement-idUSKBN1GH1SI/

"Tips for the Selection and Monitoring of Service Providers for your Employee Benefit Plan," available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/tips-for-selecting-and-monitoring-service-providers.pdf

Vanguard, Best Practices for Plan Fiduciaries (2013)

"When did the easy solution get so complex? Defining and deciphering investment outsourcing" Steven F. Charlton, C.F.A., New England Pension and Consultants, September 2012.

29 C.F.R. §2509.75-8, FR-17

29 CFR § 2509.2016-01

29 U.S.C. §1002(21)(A)(ii)

DOL Interpretive Bulletin 2016-01

Prudent Practices for Investment Stewards, Fi360 (2020)

**Litigation Documents**

PCIA000287 (1st Quarter 2024 Meeting Minutes)
PCIA005322 (2020 Redlined IPS)
Quanta Services, Inc. 401(k) Savings Plan, Form 5500 (2022), Notes to Financial Statements, Quanta Services, Inc., Form 10-K (2023), Part I, Item 1.
QUANTA_000474 (2003 Trust Agreement)
QUANTA_000909 (2020 Investment Policy Statement)
QUANTA_000937 (2015 Summary Plan Description)
QUANTA_001404 (2015 Investment Policy Statement)
QUANTA_001422 (2016 Form 5500)
QUANTA_001527 (2017 Form 5500)
QUANTA_001914 (2022 Form 5500)
QUANTA_002215 (4th Quarter 2016 & 1st Quarter 2017 Meeting Minutes)
QUANTA_002219 (1st Quarter 2017 Investment Review)
QUANTA_002287 (2nd Quarter 2017 Meeting Minutes)
QUANTA_002291 (2nd Quarter 2017 Investment Review)
QUANTA_002427 (3rd Quarter 2017 Meeting Minutes)
QUANTA_002430 (3rd Quarter 2017 Investment Review)
QUANTA_002555 (4th Quarter 2017 Meeting Minutes)
QUANTA_002559 (4th Quarter 2017 Investment Review)
QUANTA_002674 (1st Quarter 2018 Investment Review)
QUANTA_002806 (1st Quarter 2018 & 2nd Quarter 2018 Meeting Minutes)
QUANTA_002810 (2nd Quarter 2018 Investment Review)
QUANTA_002946 (3rd Quarter 2018 Meeting Minutes)
QUANTA_002950 (3rd Quarter 2018 Investment Review)
QUANTA_003080 (4th Quarter 2018 Meeting Minutes)
QUANTA_003084 (4th Quarter 2018 Investment Review)
QUANTA_003295 (2018 Target Date Deep Dive)
QUANTA_003363 (1st Quarter 2019 Meeting Minutes)
QUANTA_003367 (1st Quarter 2019 Investment Review)
QUANTA_003581 (2nd Quarter 2019 Meeting Minutes)
QUANTA_003585 (2nd Quarter 2019 Investment Review)
QUANTA_003722 (3rd Quarter 2019 Meeting Minutes)
QUANTA_003725 (3rd Quarter 2019 Investment Review)
QUANTA_003956 (4th Quarter 2019 Meeting Minutes)
QUANTA_003960 (4th Quarter 2019 Investment Review)
QUANTA_004058 (2019 Target Date Deep Dive)
QUANTA_004149 (1st Quarter 2020 Meeting Minutes)
QUANTA_004153 (1st Quarter 2020 Investment Review)
QUANTA_004416 (2nd Quarter 2020 Meeting Minutes)
QUANTA_004420 (2nd Quarter 2020 Investment Review)
QUANTA_004626 (3rd Quarter 2020 Meeting Minutes)
QUANTA_004631 (3rd Quarter 2020 Investment Review)
QUANTA_004822 (4th Quarter 2020 Meeting Minutes)
QUANTA_004827 (4th Quarter 2020 Investment Review)

QUANTA_004861 (2020 Target Date Deep Dive)
QUANTA_004975 (2021 Retirement Plan Fiduciary Education)
QUANTA_004998 (1st Quarter 2021 Meeting Minutes)
QUANTA_005002 (1st Quarter 2021 Investment Review)
QUANTA_005130 (2nd Quarter 2021 Meeting Minutes)
QUANTA_005134 (2nd Quarter 2021 Investment Review)
QUANTA_005275 (3rd Quarter 2021 Meeting Minutes)
QUANTA_005279 (3rd Quarter 2021 Investment Review)
QUANTA_005408 (4th Quarter 2021 Meeting Minutes)
QUANTA_005409 (4th Quarter 2021 Investment Review)
QUANTA_005448 (2022 Target Date Deep Dive)
QUANTA_005566 (1st Quarter 2022 Meeting Minutes)
QUANTA_005592 (1st Quarter 2022 Investment Review)
QUANTA_005738 (2nd Quarter 2022 Meeting Minutes)
QUANTA_005743 (2nd Quarter 2022 Investment Review)
QUANTA_005955 (3rd Quarter 2022 Meeting Minutes)
QUANTA_005960 (3rd Quarter 2022 Investment Review)
QUANTA_006119 (4th Quarter 2022 Meeting Minutes)
QUANTA_006125 (4th Quarter 2022 Investment Review)
QUANTA_006169 (2023 Target Date Deep Dive)
QUANTA_006292 (1st Quarter 2023 Meeting Minutes)
QUANTA_006297 (1st Quarter 2023 Investment Review)
QUANTA_006447 (2nd Quarter 2023 Meeting Minutes)
QUANTA_006452 (2nd Quarter 2023 Investment Review)
QUANTA_006606 (3rd Quarter 2023 Investment Review)
QUANTA_011500 (2015 Advisory Services Agreement)
QUANTA_046513 (2022 Investment Policy Statement)
QUANTA_100812 (4th Quarter 2015 Investment Review)
QUANTA_104039 (2014 Fidelity Basic Plan Document No. 17)
QUANTA_104283 (4th Quarter 2014 Meeting Minutes)
QUANTA_104287 (1st Quarter 2015 Meeting Minutes)
QUANTA_104295 (2015 Oct 19 Meeting Minutes)
QUANTA_104297 (4th Quarter 2015 Meeting Minutes)
QUANTA_104300 (2015 Sep 24 Meeting Minutes)
QUANTA_106738 (2016 Target Date Deep Dive)
QUANTA_109620 (2nd Quarter 2016 Meeting Minutes)
QUANTA_110280 (3rd Quarter 2016 Meeting Minutes)
QUANTA_110365 (2017 Notice of Adviser Change of Control)
QUANTA_112693 (2017 Redlined IPS)
QUANTA_112842 (2017 Draft IPS)
QUANTA_114144 (1st Quarter 2016 Meeting Minutes)
QUANTA_116202 (2019 Draft IPS)
QUANTA_116224 (2019 Redlined IPS)
QUANTA_118778 (2022 Retirement Plan Fiduciary Education)
QUANTA_120538 (2022 Redlined IPS)
QUANTA_120726 (1st Quarter 2016 Investment Review)

QUANTA_120799 (2nd Quarter 2016 Investment Review)
QUANTA_120867 (3rd Quarter 2016 Investment Review)
QUANTA_120935 (4th Quarter 2016 Investment Review)
QUANTA_124130 (2018 QPA Service Agreement)
QUANTA_128821 (1st Quarter 2024 Investment Review)
QUANTA_129016 (4th Quarter 2023 Investment Review)
QUANTA_129075 (2024 Target Date Deep Dive)
QUANTA_129093 (4th Quarter 2023 Meeting Minutes)
QUANTA_129099 (3rd Quarter 2023 Meeting Minutes)

**Depositions**

Deposition of Carolyn Campbell
Deposition of Derrick Jensen
Deposition of Kim Riddle
Deposition of Kip Rupp
Deposition of Nick Grindstaff
Deposition of Rich Eagar