# Exhibit D

Page 1

1

2      UNITED STATES DISTRICT COURT

3      SOUTHERN DISTRICT OF TEXAS

4      Case No.: 4:22-cv-03290 (AHB)

5      ------------------------------------x

6      MARY LALIBERTE, et al.,

7                              Plaintiffs,

8              -against-

9      QUANTA SERVICES, INC., et al.,

10                             Defendants.

11     ------------------------------------x

12                             November 1, 2024

                               3:03 p.m.

13                             Central European Time

14

15

16          Remote Virtual Zoom Deposition of

17     DONALD C. STONE  taken by Defendants, pursuant

       to Notice, with the Witness located in Costa

18     Bravo, Spain, before William Visconti, a

       Shorthand Reporter and Notary Public within and

19     for the State of New York.

20

21

22

23

24

25

Page 2

```
 1
 2      A P P E A R A N C E S:
             MILLER SHAH, LLP
 3           Attorneys for Plaintiffs
                   1845 Walnut Street, Suite 806
 4                 Philadelphia, PA 19103
 5           BY:    JOHN C. ROBERTS  ESQ.
                    jcroberts@millershah.com
 6
 7
             MORGAN LEWIS & BOCKIUS LL[
 8           Attorneys for Defendants
                   One Federal Street
 9                 Boston, MA 02110
10           BY:    KERI L. ENGELMAN, ESQ.
                    keri.engelman@morganlewis.com
11                  MARIA DE CASTRO, ESQ.
                    maria.decastro@morganlewis.com
12
13
14
        ALSO PRESENT:
15
             HOWARD BRODSKY, Videographer
16           CAROLYN CAMPBELL, In-house Quanta Services
17
18
19
20
21
22
23
24
25
```

Page 3

1

2           IT IS HEREBY STIPULATED AND AGREED

3      by and between the attorneys for the

4      respective parties herein that filing and

5      sealing be and the same are hereby waived.

6           IT IS FURTHER STIPULATED AND AGREED

7      that all objections, except as to the form

8      of the question, shall be reserved to the

9      time of the trial.

10          IT IS FURTHER STIPULATED AND AGREED

11     that the within deposition may be signed

12     and sworn to before any officer authorized

13     to administer an oath with the same force and

14     effect as if signed and sworn to before the

15     Court.

16

17

18

19

20

21

22

23

24

25

Page 4

1

2                    THE VIDEOGRAPHER:    Good morning.

3        Here begins the video recorded virtual

4        remote testimony of Donald C. Stone

5        appearing from his location in Costa Bravo,

6        Spain.  This deposition is taken by the

7        Defendants in the matter of Mary Laliberte,

8        et al. Plaintiffs versus Quanta Services

9        Inc., et al, Defendants.  The case number

10       4:22-CV-03290 (AHB) in the United States

11       District Court Southern District of Texas.

12                    Today is Friday, November 1st, 2024.

13       The time is approximately 3:03 p.m. central

14       European standard time.  My name is Howard

15       Brodsky and I'm the legal video specialist

16       today with Veritext Legal Solutions with

17       offices located in Philadelphia,

18       Pennsylvania.  The court reporter is

19       William Visconti in association with

20       Veritext.

21                    Counsel have stipulated that the

22       court reporter shall enter all appearances

23       for this proceeding into the stenographic

24       court record and further stipulate and

25       agree that the court reporter may take the

Page 5

```
 1
 2              deponents oath remotely.
 3                      Will you court reporter please swear
 4              in the witness.
 5
 6                      D O N A L D   C.   S T O N E,
 7              having been first duly sworn by the Notary Public,
 8              was examined and testified as follows:
 9                      MR. ROBERTS:  I'm ordering a copy of
10              the transcript.
11      EXAMINATION CONDUCTED BY MS. ENGELMAN:
12              Q.     Good afternoon, Mr. Stone.  How
13      are you today?
14              A.     I'm fine.  How about yourself?
15              Q.     Good, thank you.  My name is Keri
16      Engelman and I represent Quanta Services in
17      this matter.  And you understand today that
18      you're here to be deposed about the expert
19      report that you submitted in this matter.
20              A.     Correct.
21              Q.     We have heard on the record that
22      you are currently in Spain; is that correct?
23              A.     That is correct.
24              Q.     How long have you been in Spain?
25              A.     Six months.  We spend about 6
```

```
 1                    DONALD C. STONE
 2      months in here and six months in Florida.
 3              Q.    I understand that you have been
 4      deposed before; is that correct?
 5              A.    That's correct.
 6              Q.    I won't spend a lot of time going
 7      through some preliminaries since you have been
 8      deposed, but I just want to be go through a
 9      couple of basics.
10                    First of all, if you need a break
11      today, please let me know.  I'm happy to take
12      one, my only sort of instruction around that
13      would be if there is a question pending that
14      you answer the question and then we could take
15      that break.  That being said, we are in kind of
16      a good rhythm of taking a break every hour or
17      hour and a half to stretch our legs.  So that
18      should be fine.
19                    If you do not understand a
20      question, of course ask me to clarify.  If you
21      do answer the question I'm going to assume that
22      you understood it.  Is that fair?
23              A.    That's fair.
24              Q.    You understand that you just took
25      an oath and that means that you have an
```

                    DONALD C. STONE
1
2    obligation to the court to tell the truth just
3    as if you were before the judge in court.  Do
4    you understand that?
5              A.    I do.
6              Q.    Is there any reason today that you
7    would not be able to testify truthfully?
8              A.    No.
9              Q.    What did you do, Mr. Stone, to
10    prepare for today's deposition?
11             A.    Just in the last day or two or
12    since the beginning when I got involved in the
13    case?
14             Q.    I would like to take it step by
15    step.  But to the extent that you prepared for
16    today's deposition since being aware that you
17    would come in to be deposed, what do you do to
18    prepare for today?
19             A.    So I read through my report, of
20    course.  I read through some of the depositions
21    again.  I read the investment policy statement
22    again.  I looked at a few of the quarterly
23    reports, investment reports again.  Probably a
24    few other documents as well that have been
25    supplied by counsel.

1                   DONALD C. STONE

2           Q.      When you say deposition

3    transcripts, do you mean the entirety of the

4    transcripts?

5           A.      Well, I didn't look through the

6    entirety of all the transcripts again at this

7    point.  But I did look up Laurie Latham in

8    particular, I reread that one.

9           Q.      You read Laurie Latham's

10   deposition transcript?

11          A.      I read her rebuttal report.

12          Q.      When talking about deposition

13   transcripts, do you remember which deponents

14   the transcripts of which you read in preparation

15   for today's deposition?

16          A.      There were a bunch of names,

17   that's for sure.  There were several of the

18   committee members that I looked at.  I didn't

19   read all of those transcripts in preparation in

20   the last couple of days.  I looked at them

21   earlier.  I think there were three committee

22   members that I looked at.  One was the

23   associate legal counsel, one was the head of

24   the committee or at least presumed head of the

25   committee and the other would have been the

Page 9

```
 1              DONALD C. STONE
 2    head of HR.
 3         Q.    Other than your counsel, did you
 4    speak to anyone in preparation for today's
 5    deposition?
 6         A.    No, I did not.
 7         Q.    Did you speak with counsel in
 8    preparation for today's deposition?
 9         A.    I did.
10         Q.    Who did you speak with?
11         A.    John Roberts and a couple of his
12    associates yesterday for probably three, four
13    hours.
14         Q.    Other than that conversation with
15    John and some associates yesterday, did you
16    speak with counsel in preparation for today's
17    deposition?
18         A.    That was -- well, I think two days
19    ago I spoke with him briefly and yesterday and
20    that was the part that I would count as
21    preparation for today.
22         Q.    You mentioned that you re-reviewed
23    Laurie Latham's report; is that right?
24         A.    Correct.
25         Q.    Did you review Laurie Latham's
```

Page 10

1                    DONALD C. STONE
2       report when she served it in this matter or
3       shortly thereafter or did you just review it
4       within this past week?
5                A.    I think just in this past week.
6                Q.    When were you provided the report?
7                A.    It has been some time ago.  I
8       don't remember the exact date.
9                Q.    So you were provided it some time
10      ago and you read it this week for the first
11      time; is that right?
12               A.    I think that is correct, yes.
13               Q.    Have you read any other expert
14      reports that have been submitted in this
15      matter?
16               A.    I have and it has been a little
17      while since I have looked at those.
18               Q.    Do you know if those were
19      Plaintiffs' experts or Defendants' experts?
20               A.    Those would have been Defendants.
21               Q.    Are you aware if Plaintiffs have
22      submitted any other expert reports other than
23      your own in this matter?
24               A.    I am.
25               Q.    Do you know which experts or which

Page 11

                    DONALD C. STONE

1

2    reports?

3          A.    I did not read those.  Since they

4    weren't part of my opinion I did not read them.

5          Q.    Do you know who the experts are?

6          A.    I don't remember the names off the

7    top of my head.  And I don't know them through

8    my industry contacts.

9          Q.    You said you recall reading

10   another of Defendants' expert reports other

11   than Laurie Latham; is that correct?

12         A.    Yes.

13         Q.    Do you know when you read that?

14         A.    No, I don't.

15         Q.    Do you have any documents with you

16   today in person, Mr. Stone?

17         A.    I have a freshly printed out copy

18   of my report, that's it.

19         Q.    Sounds good.  So when were you

20   retained in this case?

21         A.    I believe I want to say it was

22   either May or June of this year, I believe.

23   It's possible I was retained earlier, but we

24   didn't get around to looking at documents or

25   anything, so I don't have that -- I'd have to

```
 1                   DONALD C. STONE
 2    look up when the agreement was signed.  I don't
 3    have that off the top of my head.
 4          Q.    That's okay.  Do you recall --
 5          A.    Can I -- I'm sorry interrupt you.
 6    I have a really obnoxious fly that keeps
 7    landing on my computer.  Can we go off the
 8    record for two minutes and I'm gong to take of
 9    this.
10                   MS. ENGELMAN:   Sure.  Let's go off
11              the record for 5 to make sure that you take
12              care of it.
13                   THE VIDEOGRAPHER:   Counsel, the
14              time is 3:12 p.m. and we are off the
15              record.
16              (Recess Taken.)
17                   THE VIDEOGRAPHER:   The time is 3:14
18              p.m. and we are on the record.
19    BY MS. ENGELMAN:
20          Q.    Mr. Stone, before the kind of fly
21    situation we were talking about when you were
22    retained in this case.  Do you recall if you
23    reviewed any documents before you were retained
24    in this case?
25          A.    I would have reviewed the
```

Page 13

```
 1                    DONALD C. STONE
 2      complaint prior to being retained.
 3              Q.      Anything else?
 4              A.      Probably that's the only document
 5      prior to being retained.
 6              Q.      Did you have any conversations
 7      with anyone in connection with prior to being
 8      retained in this case?
 9              A.      Yes, I had I think a couple of
10      conversations with counsel prior to the
11      retention.
12              Q.      With anyone else prior to the
13      retention?
14              A.      No.
15              Q.      Did anyone assist you in preparing
16      your report?
17              A.      I worked with legal counsel, but
18      other than that, no.
19              Q.      When you say legal counsel, you're
20      referring to Miller Shah?
21              A.      Yes, I am.
22              Q.      What particular attorneys are you
23      referring to?
24              A.      Well, John in particular and both
25      of his associates.
```

Page 14

1                    DONALD C. STONE

2          Q.     When you say you worked with legal

3     counsel, did you actually draft every portion

4     of your report?

5          A.     I wrote the report.  It's an

6     iterative process.  Counsel, as you probably

7     are aware, that you have conversations at the

8     beginning about kind of what the counsel's view

9     of the case is.  We go back and forth.  We talk

10    about particular salient areas where they have

11    an opinion and they are wondering if my opinion

12    kind of syncs up with theirs.  We go back and

13    forth on that.  Sometimes it does and sometimes

14    to doesn't.  Then the process begins.

15              At that point they fed me a

16    framework for the report itself and they also

17    ended up filling in, of course, at the end

18    putting all the cites and everything because

19    they have this ability.  I don't have that

20    capability here.

21          Q.     Of filling in the cites.  Okay, so

22    it is your testimony that you counsel provided

23    you with a draft of the report and you --

24          A.     We went back and forth creating

25    drafts.  They would have a, for lack of a

Page 15

1                    DONALD C. STONE
2       better work, a backbone of what they wanted to
3       do and I would populate it within some cases
4       depending on which section there was quite a
5       bit of information back and forth and they
6       would go and give me some additional
7       information.  I would review that, I would edit
8       it, I would send them an edited version back,
9       back and forth.  At the end of the day.  It is
10      my report.  I stand by the words on it.  I
11      signed it.  So I think that's the situation.
12            Q.    Other than counsel at Miller Shah,
13      did anyone else assist you in any way in the
14      creation of the report?
15            A.    No.
16            Q.    To the best of your recollection,
17      when is it that you first received a, quote/unquote,
18      framework of the draft of the report from
19      counsel?
20            A.    Probably in June.
21            Q.    Do you have any recollection of
22      how many drafts you exchanged with counsel
23      before the report was finalized?
24            A.    I don't remember the exact number.
25      All of these cases work in a very similar

Page 16

1                    DONALD C. STONE

2     fashion.  Sometimes it goes with three or four

3     drafts, sometimes it goes up to six or seven

4     drafts.  It varies and I can't give you an

5     exact number on this one.  I have to go back

6     and recreate that.

7            Q.     Sitting here today do you think it

8     was more than 3 or less than 3?

9            A.     I would guess more.

10           Q.     When you signed the report and we

11    will take a look at it, let me just pull up the

12    exact date here.  July 31st of 2024, does that

13    ring a bell?

14           A.     Yeah.

15           Q.     Do you have a recollection of when

16    you actually finalized the report with counsel?

17           A.     That would have been about that

18    time.

19           Q.     So can you approximate for me

20    about how many hours you think you spent

21    preparing the report?

22           A.     You know, I really don't know.  I

23    submit monthly invoices, but I don't actually

24    total anything up on these cases until after

25    they are done.  It's typical that it could be

Page 17

1                    DONALD C. STONE

2       cases -- it depends on case, but they could be up

3       to -- between 50 and 150 to 180 hours depending

4       and, I don't know, how many hours in this case.

5            Q.     When you say 50 to 100 hours,

6       you're talking about the preparation of the

7       report itself and not necessarily including

8       preparation for deposition or are you

9       combining?

10           A.     I'm talking about the total.

11           Q.     When you were exchanging drafts

12      with Plaintiffs' counsel, were you also having

13      conversations about those drafts via phone or

14      Teams or Zoom or what have you?

15           A.     Yes, typically via phone we would

16      have a conversation.  I don't know that it was

17      every time, but there might be an e-mail

18      exchange going on, there might be phone

19      conversations, it just depended.  But there

20      would always be some kind of communication back

21      and forth as these were being exchanged.

22           Q.     Do you have any estimation or

23      approximate of how much time you spent on the

24      phone with counsel in the iterative process of

25      preparing your report?

Page 18

1                    DONALD C. STONE
2           A.      I have no idea.  I mean it would
3    be purely a guess.  It is not something that I
4    track, so I could come up with a number but the
5    number would be as good as any fiction that is
6    out there.  I just don't know.
7           Q.      So you can't approximate whether
8    --
9           A.      I don't want to speculate on
10   something that I can't even come close on.
11          Q.      I don't want you speculate either.
12   Without speculation, can you say it was more
13   than 10 hours or less than 10 hours on the
14   phone with counsel in the process of creating
15   the report.
16          A.      Creating the report, it would have
17   been probably less than -- probably approaching
18   10  in the creation of the report, somewhere in
19   that neighborhood.  Again, that is a guess at
20   this point.
21          Q.      Okay.  So I understand that you
22   have served as an expert in prior cases; is
23   that correct?
24          A.      That's correct.
25          Q.      Approximately how many cases, I

Page 19

1                    DONALD C. STONE

2      know in your report you list the cases that you

3      served as an expert for the last four years and

4      we will cover those.

5                    Do you have an approximation of

6      how many case you have served as an expert in

7      the last 10 years?

8           A.    Let's see, the last ten years it

9      actually would be the same number.  There was a

10     period of time between say 2004 and 2007 I

11     served as an expert and then I did not serve as

12     an expert again until 2021.

13          Q.    Sorry, I missed the first date

14     that you provided there.

15          A.    2004 to 2007.

16          Q.    From 2004 to 2021 you did not

17     provide any expert --

18          A.    From 2007 to 2021.

19          Q.    Understood.  Did you provide

20     expert services prior to 2007?

21          A.    Yes, between 2004 and 2007.

22          Q.    All right, for some reason I had a

23     disconnect of the from 2004 to 2007 you

24     provided expert services?

25          A.    That's correct.

Page 20

1                   DONALD C. STONE

2           Q.      2007 to 2021 you did not and

3      resumed again in 2021?

4           A.      Correct.  I can explain that.

5           Q.      I was going to ask first how many

6      cases did you serve, if you can recall, as an

7      expert between 2004 and 2007?

8           A.      Either four or five.

9           Q.      Do you recall the issues on which

10     you opined in those cases?

11          A.      I do.

12          Q.      Can you just walk through the

13     names of the cases and the issues, if you

14     recall?

15          A.      Well, I can give you the names of

16     two of the cases.  There are a couple of them

17     which are -- I don't remember the names of the

18     cases, but they actually were the most

19     interesting of the group.  They were a bit

20     different.

21                  Two of the cases were -- one was

22     Kraft and my partner and I were working on that

23     case for the Defendants.  And then General

24     Dynamics was the other one.

25          Q.      Do you remember the issue that

Page 21

                    DONALD C. STONE

1

2      was -- that you opined in Kraft?

3              A.    It had to do with recordkeeping

4      fees and I believe in General Dynamics it had

5      to do with recordkeeping fees, but also had to

6      do with a -- with investments, because they had

7      in-house -- they had an in-house investment

8      firm that was spun off at a certain point, but

9      it was -- it had been a captive internal

10     organization, if you will, so there was some

11     issues obviously around a fiduciary aspect of

12     that.

13             Q.    So for Kraft you said that you

14     were an expert for the Defendant; is that

15     correct?

16             A.    Yes, that's correct.  You actually

17     probably will see because I was -- I wrote a

18     big chunk of the report with my partner, which

19     you will see her name on it, Jennifer, at that

20     time it would have been Jennifer Marconi I

21     believe or it could have been Flodin, F-l-o-d-i-n,

22     which would have been her married name.

23             Q.    When you say partner, what do you

24     mean by that?

25             A.    She was my business partner in a

Page 22

```
 1                  DONALD C. STONE
 2     company that I founded in 2002.
 3          Q.     Were you opining on the prudence
 4     of the fiduciary process in that case?
 5          A.     I believe, I think that is
 6     probably a fair general broad explanation of
 7     it.  I don't remember all of issues and exactly
 8     the details of it at this point.  It has been
 9     quite a while.
10          Q.     For General Dynamics were you an
11     expert for the Plaintiffs or defense, if you
12     recall?
13          A.     For the defense.
14          Q.     The same question, were you
15     opining on the prudence of fiduciary process in
16     that case?
17          A.     Yes.
18          Q.     Then are those the only two cases
19     that you can recall providing an expert report
20     between 2004 and 2007?
21          A.     No.  There were two other cases
22     and they were -- they involved smaller plans
23     than the two that we just talked about.  One
24     involved theft from a 401-K and the other one
25     involved a defense of a -- there was a lack of
```

Page 23

DONALD C. STONE

1
2      fiduciary process until I was asked to -- if
3      there was any reasonable defense in the case of
4      a profit sharing plan where somebody -- an
5      executive vice president of the firm had sued
6      saying that there was imprudence because of
7      lack of a fiduciary process and the investment
8      selection monitoring.
9              Q.     Do you recall what your opinion
10     was in that case?
11             A.     In the case of the, the last case
12     that we just talked about, yeah, basically what
13     I -- what we decided and legal counsel when
14     they approached me, this would have been toward
15     defense as well.  They said there was no
16     fiduciary process so we can't defend the case
17     on that.  Is there any other way that we can
18     defend it and the answer that I came up with
19     was how did the investments do.
20                    Basically one person chose all the
21     investments based on Money Magazine's
22     recommendations each month and she knocked it
23     out of the ballpark.  We went to the judge and
24     said no case, it would be a reasonable profit
25     sharing plan to use 60 percent S&P 500, 40

Page 24

1                        DONALD C. STONE

2        percent of the Ag on the bond side.  And if the

3        judge would accept that, which he did, then I

4        created, basically created a table showing the

5        performance.

6                        So there was no -- basically the

7        defense was there was no harm no foul.  Even

8        though there was no process, the guy who sued

9        was better off because of the selections that

10       she made.

11            Q.     So your position in that case was

12       essentially that these investments performed

13       well and as a result the defense should succeed

14       irrespective of no fiduciary process; is that

15       correct?

16            A.     Yeah, I didn't -- my report did

17       not say there was no fiduciary process.  That

18       was counsel that took that position.  My role

19       was to come up with the defense in terms of the --

20       was there a harm and the answer was there was

21       no harm.  That was my narrow role to look at

22       that.

23            Q.     And that was, just so I'm clear,

24       what is the name of that case?

25            A.     I don't remember.  It was a large --

Page 25

1                DONALD C. STONE
2    it was -- I don't remember.  I don't even
3    remember what the company did at this point.
4    It was kind of a mid-size firm in the greater
5    Chicago region.  And besides that, I just don't
6    remember anything about it at this stage.  That
7    was back in probably 2005.
8          Q.    So any other cases that you
9    remember focusing on in the 2004 to 2007 time
10   period?
11         A.    I mentioned there was one where
12   there was theft from a 401-K.
13         Q.    Anything else?
14         A.    No, those are the only ones that I
15   remember.
16         Q.    From 2007 to 2021 you did not
17   provide any expert services; is that correct?
18         A.    That's correct.  We decided that
19   after the Kraft case we decided because of the
20   nature of these cases, they kind of come and go
21   and it's very difficult to run a business
22   despite the fact that, obviously legal firms do
23   it all the time, in terms of an investment
24   consulting firm, which my firm was, it created
25   more issues than it was worth going through to

Page 26

1                    DONALD C. STONE

2      try to staff for it and have the time and so on

3      to go through that kind of process.

4                    So it was we just decided that we

5      wouldn't do any more cases and we didn't the

6      entire time that I was employed.

7          Q.      Then in 2021 as of that time you

8      were retired from the consulting service

9      business; is that correct?

10         A.      That's correct.

11         Q.      So at that time you started to

12     pick up cases, am I right?

13         A.      That's correct.  I was approached

14     about a case, I believe that would have been

15     Astellas which has since been settled and that

16     is listed in the report.  But I was approached

17     about that case in the fall of '21 to see

18     whether I would be interested in basically

19     working with the Plaintiffs in that case and I

20     think within about a month they also asked me

21     whether I would work on the Shell case.

22         Q.      When you say they, who are you

23     referring.

24         A.      This would have been Schlichter.

25         Q.      Schlichter was Plaintiffs' counsel

Page 27

1                    DONALD C. STONE
2       in the Astellas and the Harmon versus Shell Oil
3       case; is that correct?
4            A.     Yes.
5            Q.     What was the issue in Astellas?
6            A.     Astellas -- let me think for a
7       moment.  So Astellas had to do with OCIO or
8       what is sometimes referred to as 338 services
9       that were being provided by Aon as a
10      proprietary product.  That was the primary
11      issue involved in that case.
12           Q.     What is it that you opined on
13      precisely?
14           A.     Basically I was saying that that
15      was -- that their role in recommending their
16      own funds was conflicted.
17           Q.     What was the issue in the Shell
18      Oil Company case?
19           A.     Shell had several issues and that
20      is still an ongoing case at this point.  One
21      was recordkeeping fees.  The second was the
22      tier of investments of approximately 300
23      investment choices which were not monitored by
24      the investment committee.  And then the third
25      issue was fees that were being generated by

Page 28

1                    DONALD C. STONE

2      managed accounts that -- and that tied into the

3      recordkeeping fee because it had to do with the

4      total revenue that was being received by the

5      record keeper at the end of the day.

6              Q.     Did you opine on the fiduciary

7      process as it related to all three of those

8      particular issues or something else?

9              A.     No, all three.

10             Q.     But was your report limited to the

11     fiduciary process issue?

12             A.     As oppose to -- well, I didn't --

13     so I dealt with the fee issues and the

14     fiduciary process issues.  I did not opine --

15     if I remember correctly, I don't think I opined

16     on the -- I'm not sure exactly about the

17     prudence of any particular -- there were 300

18     investments that nobody was monitoring and I

19     did make some commentary about some of those

20     funds being duplicative and being the same fund

21     was in the main menu and outside of the main

22     fund it was a more expensive version.  So I may

23     have opined about that.  I don't think I was --

24     I don't think I opined about the returns of any

25     particular fund or any particular groups of

Page 29

1                    DONALD C. STONE

2       funds.

3              Q.    We could introduce the exhibit,

4       but we will probably do it later.  Do you have

5       your report in front of you, I'm looking at

6       paragraph 15, which just has a list here of the

7       cases that you set forth as providing expert

8       testimony.  I'm just running through those.

9                    I'm looking, Mr. Stone, at

10      paragraph 15 of your report, just to refresh

11      your recollection of the other cases in which

12      you listed that you provided expert testimony.

13      So we talked about Astellas.  You listed that

14      as Wachala versus Astellas.  Do you know, was

15      it actually Miller versus Astellas?  Do you

16      have a recollection of that?

17             A.    I don't have a recollection that

18      it was Miller, no.

19             Q.    So then the next case listed is

20      Mills versus Molina Healthcare; is that right?

21             A.    Yes.

22             Q.    Did you provide testimony for

23      Plaintiffs or defense?

24             A.    For Plaintiffs.

25             Q.    Do you remember who counsel was?

1                    DONALD C. STONE

2          A.     That would have been Schlichter as

3     well.

4          Q.     What was the issue in that case?

5          A.     That had to do with proprietary

6     quasi custom target day funds.

7          Q.     What is the issue that you opined

8     on?

9          A.     Well, that I felt that there was a

10    conflict between -- well, that the advisor was

11    offering their own funds as opposed to having

12    an unconflicted view to go out and search for

13    other funds for their client.  And there were,

14    even though the overall -- the issue ended up

15    turning on whether in an NFP got -- if they

16    received extra benefit because people went into

17    their own funds.  Which basically are a Wrap or

18    Blackrock funds.  And the answer is they got

19    paid the same either way as a 338.  But some of

20    their staff actually got extra compensation

21    because of the recommendation to go into those

22    proprietary funds.

23         Q.     Am I correct that you provided

24    trial testimony in that case?

25         A.     That is correct.

Page 31

1              DONALD C. STONE
2         Q.    Is that the only case in which you
3    provided trial testimony to date?
4         A.    It is.
5         Q.    Snyder versus UnitedHealth Group
6    is the next case listed.  Did you provide an
7    expert opinion for the plaintiff or the
8    defense?
9         A.    For the Plaintiffs.
10         Q.    Who was counsel on that case?
11         A.    I'm trying to remember who counsel
12    was and I could look it up, but off the top of
13    my head it is not coming to me.
14         Q.    No problem.
15         A.    It is going to be the same as
16    Natixis, if I remember correctly.  No, I'm
17    sorry UnitedHealth is different.  I'm getting
18    two law firms mixed up.  So I don't remember
19    the law firm exactly, so I'm going to beg off
20    giving you the answer there unless you want me
21    to look it up.
22         Q.    That's okay, no.  Do you recall
23    the issue in that case?
24         A.    I do.  UnitedHealth, and this is
25    an ongoing case, UnitedHealth was utilizing

Page 32

1                    DONALD C. STONE

2    Wells Fargo's target date funds and had been

3    for many years.  They were a -- they did a lot

4    of business with Wells Fargo.  And the

5    contention by Plaintiffs was that the firm,

6    UnitedHealth, was conflicted and that they did

7    not act in participants' best interest in

8    choosing and retaining and not removing the

9    Wells Fargo funds.

10          Q.     Did you provide an opinion about

11   the fiduciary process or was it just an issue

12   of conflict?

13          A.     About fiduciary process because

14   they went through an RFP process and whatever.

15   I definitely opined on the process as well as

16   the conflict of interest.

17          Q.     Did you make any conclusions about

18   the fiduciary process in that case?

19          A.     I thought the fiduciary process

20   was flawed.

21          Q.     Do you remember why?

22          A.     I'm trying to think how much of

23   this is public at this particular point and how

24   much is privileged.  So I'm having a little bit

25   of heartburn over that.

Page 33

                         DONALD C. STONE

1

2       Q.      We could move on.

3       A.      Thank you.

4       Q.      The next case is Waldner versus --

5   I don't know if I'm going to mess this up.

6       A.      Natixis.

7       Q.      Natixis.  Do you recall if you

8   provided an expert opinion for Plaintiffs or

9   defense in that case?

10      A.      For Plaintiffs.

11      Q.      Do you remember who counsel was in

12  this case?

13      A.      No.  I don't keep all of these law

14  firms in my head.

15      Q.      That's okay.

16      A.      I'm supposed to be quasi retired.

17      Q.      It seems like you have been busy.

18  So do you remember what the issue was in the

19  Waldner case?

20      A.      Yes, Natixis is a very large

21  global investment management firm.  Basically

22  Natixis is a, for lack of a better term, is in

23  parlance within the business world would be,

24  it's a roll up of investment managers.  They

25  own a number of investment management firms

Page 34

1                    DONALD C. STONE
2       that operate under the original names, if you
3       will, when they were required.
4                    Natixis put almost all, not
5       totally, almost all Natixis funds into their
6       401-K.  So the issue had to do with fiduciary
7       process of the selection, monitoring and
8       retention of some of those funds, not all of
9       them, but some of those funds.
10            Q.    Okay, again, were you providing an
11      opinion on the fiduciary process in the
12      selection, monitoring and retention of those
13      funds?
14            A.    Yes.
15            Q.    Were you deposed in this case?
16            A.    I was deposed in that case, yes.
17            Q.    And then --
18            A.    That case is still open as well.
19            Q.    Okay.  The Williams versus
20      Centerra case on the next page of your report.
21      Did you provide an opinion for the Plaintiff or
22      the defense?
23            A.    That would have been the
24      Plaintiffs.
25            Q.    Do you recall who counsel was?

Page 35

```
 1              DONALD C. STONE
 2        A.    I do.  In that case it was
 3   Schlichter.
 4        Q.    What was the issue in that case to
 5   the best of your recollection?
 6        A.    So the issue there had to do with,
 7   again, target date funds.
 8        Q.    Do you remember what the
 9   particular issue was around the target date
10   funds?
11        A.    I'm not remembering the details of
12   it at the moment.
13        Q.    Do you remember which target date
14   funds were at issue?
15        A.    I believe it was the NFP Funds
16   again, if I remember correctly.
17        Q.    NFP Funds?
18        A.    Yes, that's not the name.  The
19   funds themselves go under -- let me think a
20   second.  I believe they use Life Path which is
21   similar to Blackrock.  The names are similar to
22   what Blackrock uses for those.  I might confuse
23   those two.
24        Q.    Were you forming an opinion as to
25   the fiduciary process in retaining or selecting
```

Page 36

DONALD C. STONE

1

2          or retaining and/or monitoring those funds or

3          something different?

4                 A.      I believe so, yes.

5                 Q.      Is that case still ongoing?

6                 A.      That one has been settled.

7                 Q.      Do you remember what your

8          opinion was in that case with respect to the

9          fiduciary process of selecting or changing the

10         target date funds?

11                A.      I don't recall the details at the

12         moment.  Sometimes these things start to become

13         a little bit of a blur.

14                Q.      Understood.  So the last one is

15         the Ahmed versus Liberty Mutual Group case.

16         Did you provide expert testimony for Plaintiff

17         or defense in this case?

18                A.      For Plaintiffs.

19                Q.      Do you remember who the counsel

20         was?

21                A.      It was the same as -- let's see,

22         Liberty Mutual is the same as Natixis, I

23         believe it was the same counsel.

24                Q.      Do you remember what the issue was

25         in that case?

Page 37

1                    DONALD C. STONE

2          A.     Again, it was a target date issue

3     and I'm not remembering the details of it at

4     the moment.

5          Q.     Do you remember what target date

6     funds were at issue in that case?

7          A.     Let me think.  I should remember

8     that.  No, I'm just not remembering at the

9     moment.

10         Q.     Do you remember if you provided an

11    opinion as to the fiduciary process with

12    respect to selecting and/or retaining the

13    target date funds at issue in that case or

14    something different?

15         A.     No, I think it would be the

16    fiduciary process.

17         Q.     So in any of these cases, do you

18    have a recollection that you worked with Miller

19    Shah?

20         A.     I did not work with Miller Shah on

21    any of those cases, no.

22         Q.     So how is it that you -- do you

23    know how it is that Miller Shah came to know

24    your name and contact you?

25         A.     I believe they -- I think they

1                    DONALD C. STONE
2       found me like some of the other found me which
3       is just on the internet.  There is a lot out
4       there under my name and everything.  Things
5       that I have written over the years.  Some of
6       cases, obviously the information is out there.
7       So I think that is the way that -- I believe
8       that's the way -- in fact I'm sure that is way
9       they found me.
10              Q.    So do you have any sense of how
11      much you've earned since 2021 in connection
12      where expert services?
13              A.    Well, I don't know the exact
14      number.  I don't necessarily want to get into
15      my total compensation, but certainly from the
16      cases that we have listed here, it's well north
17      of half a million dollars.
18              Q.    Do you have any other source of
19      income other than providing expert services at
20      this time or since 2021?
21              A.    Yeah, I do.
22              Q.    I don't want to know the income
23      but what are the sources of income?
24              A.    Well, at this point social
25      security.  So mine and my wife's and I also

Page 39

                    DONALD C. STONE

1    have a number of investment accounts.  I have

2    also an IRA which is a rollover from a 401-K.

3    I have taken my required minimum distribution

4    every year.  RMD.  I have income off of bonds

5    and stocks and private equity investments as

6    well.

7         Q.    You have been retired since, is it

8    2019; is that right?

9         A.    It was actually May 19, 2019.

10        Q.    So let's --

11             MS. ENGELMAN:   Maria, can we mark

12        as Exhibit 1 Mr. Stone's report please.

13             (Exhibit 1 for identification,

14        Expert Report of Donald C. Stone.)

15        Q.    Do you have access, Mr. Stone, to

16   Exhibit Share?  Do you know how to work that?

17        A.    I do have Exhibit Share.  I'm

18   opening it as we speak.  Can I go off the hard

19   copy of my report when we talk about my report?

20        Q.    That is totally fine with me.  I

21   just want it marked for the record.

22             MS. ENGELMAN:   Let's mark it and

23        Mr. Stone and I will work off the hard copy

24        and proceed.

Page 40

1                          DONALD C. STONE
2              Q.      Mr. Stone if you turn to the back
3      end of your report which is Exhibit B,
4      materials considered.
5              A.      Yes, let me get to it.
6              Q.      The first two pages are various
7      articles, but I want to turn your attention to
8      the litigation documents.
9              A.      Okay.
10             Q.      First of all, does this report
11     contain the totality of your opinion in this
12     case?
13             A.      It does.
14             Q.      The litigation documents that are
15     listed here, are these all of the documents
16     that you relied on in forming your opinion in
17     this case?
18             A.      Yes.
19             Q.      Did you personally review every
20     single document that is listed in Exhibit B
21     here?
22             A.      I did.
23             Q.      Did you review them in their
24     totality?
25             A.      I would say virtually in their

Page 41

1                    DONALD C. STONE

2       totality.  For example, when we talk about

3       quarterly investment reports and they are 150,

4       200 pages long, I didn't review every single

5       page, every single quarter.  I think that is a

6       fair assumption.

7            Q.     Did counsel provide you documents

8       to review in order to create your opinion?

9            A.     Yes, they did.

10           Q.     Did you request certain documents

11      of counsel?

12           A.     Yes, we had conversations, I don't

13      recall specific requests that I made that they

14      didn't provide.  I know we had some back and

15      forth.  I had some questions and what have you,

16      so that may have led to certain documents being

17      included in the documents that they provided.

18      But I don't recall off the top of my head.

19                  As I said, it's a very iterative

20      process.  I had questions from the get-go and

21      that's kind of the normal way these things

22      work.

23           Q.     So I guess what I'm trying to get

24      at, the list on this page, is that all of the

25      documents that you received in connection with

Page 42

1                    DONALD C. STONE

2       this litigation or is it a subset of what you

3       received and reviewed?

4               A.    Well, first of all, the litigation

5       documents go on for several pages.  I'm just

6       making sure that we are on the same thing.

7               Q.    Yes.

8               A.    So there is four pages here that

9       are not part of what I wrote and all of that

10      good stuff.  Yes, this is to the best of my

11      recollection this is all of the documents that

12      I looked at.

13              Q.    Did you type up these three pages

14      or did counsel?

15              A.    They would have typed this up.

16              Q.    Did you review it before it was

17      submitted to make sure it accurately reflected

18      the documents that you relied on in forming

19      your opinion?

20              A.    I reviewed -- I always do a spot

21      check, okay, when there is -- when you have a

22      like a Bates number or whatever that somebody

23      put down, I spot check those.  I don't go

24      through every single document and look at it

25      again.  But I do spot checks to make sure it is

Page 43

                    DONALD C. STONE

1

2    accurate, that I have seen it, that it is

3    something that I remember and I didn't find

4    anything unboard there.

5          Q.    Do you recall if you requested

6    certain categories of documents to review in

7    connection with this case?

8          A.    You know, again, that kind of goes

9    into the blur of the conversations that we had.

10   Obviously all categories that I wanted to see I

11   did see in this case and everything.  So I saw -- I

12   mean the things that I would expect counsel to

13   provide, like IPS, quarterly investment

14   reports, those kind of normal documents I would

15   expect to see those there.

16          So I don't know -- I don't recall

17   something that it was like, okay, I haven't

18   seen this, I haven't seen that, can you provide

19   this particular document.  But that would have

20   been part of that conversation that went on on

21   an ongoing basis.

22          Q.    Understood.  At the back end of

23   this, the last page is depositions of the

24   committee members as well as the consultant,

25   Rich Eagar, do you see that?

Page 44

```
                          DONALD C. STONE
 1
 2        A.      I do.
 3        Q.      We talked earlier about your
 4   review of the transcripts in preparation for
 5   the deposition.  But in connection with
 6   preparing your report, did you personally
 7   review each of those deposition transcripts in
 8   their entirety?
 9        A.      So I looked at all of them.  I
10   can't say that I read every word -- it is fair
11   to say that I read all of them, but I sometimes
12   speed read through things where it is areas
13   that I don't think are as relevant to the issue
14   at hand.  So sometimes some of the background
15   on somebody.  I don't necessarily spend a lot
16   of time looking at every single job that each
17   person has had.  I want to get to the kind of
18   meat of the issue.
19             I don't look -- I don't spend a
20   lot of time on the parts that you and I went
21   through a few minutes ago where you say if I
22   don't understand something I ask again.  All of
23   the preliminary stuff that shows up in the
24   depositions and everything.
25             I try to go to the meat of what
```

Page 45

                    DONALD C. STONE

1
2    I'm looking for in reading through all of
3    those.
4         Q.    Are there any other areas, I mean
5    you said earlier that is not relevant to your
6    opinion.  Any there other areas other than job
7    or background that you that you would have
8    support of sped read through?
9         A.    Not that I recall, no.
10        Q.    What do you consider the meat of
11   the issue?
12        A.    I want to say how they talk about --
13   how they viewed their role on the committee.
14   How they thought about how decisions were made
15   by the committee.  How they thought about the
16   advisor.  What they thought about the fiduciary
17   training.  Kind of all of the critical issues
18   that you would expect that each one of them
19   would have been asked about and would have had
20   a slightly different take on.
21             I want to see how they thought
22   about their role in the committee.  How they
23   understood the decision-making process.  Again,
24   what their comfort level was with investments.
25   There is a -- I come up with a very long

Page 46

DONALD C. STONE

1

2  laundry list, but these are the kind of things

3  that you start immediately trying to go to to

4  understand as opposed to I went to college at

5  XYZ.

6      Q.    Would you say that you read

7  these transcripts one time through in

8  preparation for your report or more than one?

9      A.    I spent time going back on a

10 couple of them more than I did others.  But so

11 I looked at Carolyn Campbell, I went back a

12 couple times to refresh myself on certain

13 things.  I did the same thing on Jensen and

14 Riddle.  Not so much on Rupp and Grindstaff.

15     Q.    Why is that?

16     A.    Because I didn't see anything

17 that -- I didn't see information that I felt

18 like I needed to go back and look at again.

19          I guess when I was looking through

20 my report and I was looking at the rebuttal

21 report, some of the information from those

22 particular people did not come up as much.  Now

23 Rich Eagar, that is different, he came up a

24 lot.  Of course he wasn't on the committee, he

25 was the advisor.

Page 47

1                    DONALD C. STONE

2          Q.    We'll get to it, but there is a

3     fair number of transcripts or deposition cites

4     that are footnoted throughout your report; is

5     that correct?

6          A.    Correct.

7          Q.    Would you personally have chosen

8     which cites to include in your report?

9          A.    I would kind of reverse that.  It

10    was not me choosing the cite so much as the

11    reference point to quote.  Because I didn't

12    know exactly what the cite was in some cases.

13    But I had information that is a footnote and so

14    the information that is the footnote, that

15    would be what I would be focused on as opposed

16    to coming up with the legal information that

17    goes with the cite.

18         Q.    So okay, I guess maybe we are

19    talking about something -- maybe we are

20    miscommunicating here.

21              When I say citation I mean the

22    sort of information from the transcript, the

23    substantive information from the transcript.

24              Did you personally choose which

25    substantive information you wanted to include

Page 48

DONALD C. STONE

1    from the transcripts for your report?

2         A.    Yes, I mean I read through all of

3    this.  Like I said, this was -- counsel might

4    bring up a particular topic or a particular --

5    what a particular individual said and we would

6    talk about it and sometimes it might be

7    something I would say that is kind of -- that

8    doesn't resonate, I don't know that that is

9    something that I find to be a problem or

10   whatever.  Or maybe I would say okay, well that

11   sounds very relevant and everything, so let's

12   talk about that a little bit.  It's a very

13   iterative process in that regard.

14              I didn't go through a transcript

15   and pick out six different quotes I want to

16   use, for example, from Kip Rupp, okay.  I could

17   have done it that way because I read through it

18   and I did confirm all of those, but that is not

19   the way that these typically develop.

20        Q.    What do you mean you did confirm

21   all of those?

22        A.    I would go back and look up the

23   cites and make sure that they were correct.  I

24   would look at footnotes and make sure they were

Page 49

1                    DONALD C. STONE

2     correct.

3              Q.    You did do that for all the cites

4     prior to submitting your report?

5              A.    Yes.

6              Q.    Let's talk a little bit about your

7     background.  So I kind of want to start a

8     little bit in reverse order.  Prior to your

9     founding of Plan Sponsor Advisors in 2002,

10    prior to that, did you serve as a consultant in

11    any way to fiduciary committees in a 321 or 338

12    capacity?

13             A.    I was on a committee, but I was

14    the head of the trust company, so I can't say

15    that I was a 321.  I was running the trust

16    company.

17             Q.    So when you say you were on a

18    committee, you were a member of a fiduciary

19    committee for a 401-K plan for the trust?

20             A.    Yes, that's correct.  For Key

21    Bank.  Key Corp. would have been the holding

22    company.

23             Q.    Did you have a specific role on

24    the committee?

25             A.    Well, I ran the institutional

Page 50

1              DONALD C. STONE

2    trust division.

3         Q.    You just went out for me.

4         A.    Can you hear me now.

5              MS. ENGELMAN:   I'm not hearing you.

6         Can we go off the record.

7              THE VIDEOGRAPHER:   Counsel, the

8         time is 4:04 p.m. and we are off the

9         record.

10             (Recess taken.)

11             THE VIDEOGRAPHER:   The time is 4:16

12        p.m. and we are on the record.

13   BY MS. ENGELMAN:

14        Q.    Hi, Mr. Stone, sorry we had a

15   technical hiccup.  I think before we went off

16   the record you were talking about the fact that

17   you served on a 401-K fiduciary committee at

18   Key Bank; is that right?

19        A.    That is correct.

20        Q.    Did you have a particular role on

21   that committee, Mr. Stone?

22        A.    I don't recall if I -- I was not

23   the chair of that committee.  So I don't recall

24   if I had a role other than being on the

25   committee.

Page 51

1                    DONALD C. STONE

2          Q.     Do you remember how many people

3    were on that committee?

4          A.     Not exactly, but I would say there

5    were probably five or six.

6          Q.     Did that committee offer

7    investment options?

8          A.     No, we were the ones who were --

9    that committee had the role of making options

10   available for the 401-K plan for key Corp. and

11   monitoring those and changing them out as

12   necessary.  Some other -- we had some other

13   responsibilities in regard to the overall

14   institution.

15         Q.     So you were responsible as a

16   fiduciary to make selections for investment

17   options; is that right?

18         A.     Yeah, that was among the roles,

19   yes.

20         Q.     The same for monitoring those

21   investment options that were selected?

22         A.     Yes.

23         Q.     Do you recall, did you consider

24   that to be a committee operating in a prudent

25   way?

Page 52

1                    DONALD C. STONE

2          A.     Yeah, I thought it was a very

3     prudent committee.  It was a very -- it was

4     laid out well.  Everybody understood what their

5     role was.  Everybody was educated about what we

6     were supposed to be doing when we were there.

7     I thought it was a good prudent committee.

8          Q.     Was there an outside investment

9     consultant?

10         A.     No.

11         Q.     Do you know why that was the case?

12         A.     Well, keep in mind this is in the

13    mid-1990s, that would have been less prevalent.

14    And we were a rather sizable money manager and

15    so it just was not -- it was not something that

16    I think was felt that was necessary at that

17    particular time.

18         Q.     In terms of selecting investment

19    options, did that committee have any particular

20    process in place for the criteria it evaluated

21    when selecting investment options?

22         A.     I don't remember the details at

23    this point.  I mean, again, this is in the mid-1990s,

24    so a number of the options that were offered

25    were proprietary options, not all of them, but

```
 1              DONALD C. STONE
 2    a number of them were and that was very typical
 3    at that time.  I don't recall the details of
 4    the process.
 5         Q.    Do you recall any details about
 6    what criteria the committee considered when
 7    monitoring the performance of those options?
 8         A.    No, not at this point.
 9         Q.    So aside from that role at Key
10    Bank prior to PSA, did you otherwise serve on
11    any other 401-K or 403-B fiduciary committees
12    or serve as an investment consultant in a 321
13    or 338 committee?
14         A.    No.
15         Q.    Looking to 2002, you say in
16    paragraph 9 of your report that you founded
17    Plan Sponsors Advisors, which we'll call PSA.
18    Was that with the partner that you mentioned
19    earlier?
20         A.    Initially I did not have a
21    partner.  So she became part of that
22    organization officially in some time in 2004.
23         Q.    During the entirety of between
24    2002 and 2014 were you the president and
25    managing partner of PSA?
```

Page 54

                    DONALD C. STONE

1

2          A.      We changed titles a couple of

3    times.  I think I dropped the title of president at

4    some point.  At a certain point we went to

5    founding member and that kind of thing.  I

6    don't recall the details at the moment.

7          Q.      That firm provided consulting

8    services to fiduciary committees; is that

9    correct?

10         A.      That's correct.  I don't think it

11   is actually in my CV there but there was a -- I

12   also owned a second corporation that provided

13   similar services and I will explain the reason

14   behind that.

15               When I initially I had -- I picked

16   up some clients and I had them operating under

17   an entity called Third Coast Advisors.  At the

18   time that I brought my partner onboard she had

19   a separate business that was high net worth

20   individuals.  We couldn't agree on a valuation

21   between the two businesses, so we agreed to

22   carve them out separately and leave them as

23   independent as we built -- continued to build

24   Plan Sponsor Advisors.

25               So that ran in parallel the

Page 55

1              DONALD C. STONE

2      entirety time until I sold both of those

3      corporations to Pavilion in 2014.

4              Q.    So just so I'm clear, was Third

5      Coast Advisors providing the services related

6      to high net worth individuals?

7              A.    No, it was not high net worth

8      individuals.  It was to 401-K plans as a 321

9      fiduciary.

10             Q.    So can you just explain the

11     difference between the services that PSA was

12     providing and the services that Third Coast

13     Advisors was providing?  I'm not sure that I'm

14     understanding the difference.

15             A.    There was no difference in the

16     services provided.  It had to do with the

17     ownership.  So Third Coast I owned 100 percent

18     of, my partner had the high net worth business,

19     we were going to roll those into Plan Sponsor

20     Advisor but we couldn't agree upon on a

21     valuation for those businesses, so we decided

22     to carve them out, keep them separate.

23                  So mine ran in parallel, Third

24     Coast ran in parallel.  I didn't add any new

25     clients to that.  It was kind of frozen at that

Page 56

1                    DONALD C. STONE

2      point with the existing clients it had.  And it

3      ran until I sold that as well as Plan Sponsor

4      Advisors to Pavilion in 2014 and then her high

5      net business basically evaporated over time.

6           Q.    You owned 100 percent of Third

7      Coast Advisors.  Did you own a hundred percent

8      of PSA?

9           A.    I did not own hundred percent PSA

10     at that point.  There was a split that we had

11     and a complicated split, I don't want to go

12     into the legal aspect of that, but I was

13     majority owner.

14          Q.    That's fine.  So they were

15     essentially providing the same services to the

16     same clients or different clients?

17          A.    Different clients.

18          Q.    So let's start with PSA.  For both

19     Third Coast and PSA were you providing both 321

20     and 338 services?

21          A.    No, just 321.

22          Q.    Just 321 for both, okay.  During

23     the entirety of the time period between June,

24     2002 and June 2014 -- I'm sorry, between 2002

25     and 2014?

Page 57

1              DONALD C. STONE
2          A.      That's correct.
3          Q.      How many, approximately, how many
4    clients did Plan Sponsor Advisors serve?
5          A.      Probably over that timeframe,
6    around 60.
7          Q.      What about Third Coast Advisors?
8          A.      Third Coast was very small.  I
9    think I had four clients in that.
10          Q.      During the entirety of the 2002 to
11    2014 time period?
12          A.      Yes, because they were all signed
13    up in 2002 and so I didn't add anything to that
14    entity.  I just kept those clients all those
15    years.
16          Q.      Did Plan Sponsor Advisors have
17    employees or independent contractors or
18    consultants that worked there?
19          A.      We had employees.  We sometimes
20    had independent contractors who did work for us
21    as well.
22          Q.      How many employees or consultants
23    did Plan Sponsor Advisors have?
24          A.      Obviously it varied over time.  I
25    would say we were typically in the neighbor of

Page 58

DONALD C. STONE

1
2        12 employees.

3            Q.     Those employees were working as

4        321 advisors to clients of PSA?

5            A.     Not all of them.  Some of them

6        were in research.  We had one administrative it

7        person.  So there were several in the research

8        area exclusively.  There were a couple who were

9        servicing clients and also in research.  That

10       would have been 321s.

11           Q.     What about for Third Coast, were

12       there any employees or individuals --

13           A.     No, I was the sole employee.

14           Q.     For Third Coast you personally

15       served as the 321 advisor to those clients?

16           A.     Yes.

17           Q.     Do you know the names of those

18       clients?

19           A.     No, I don't remember them at this

20       point and they would be confidential.

21           Q.     For PSA did you personally serve

22       in a 321 capacity to any clients?

23           A.     I did.

24           Q.     Approximately how many clients?

25           A.     Well, I helped bring in all of

Page 59

DONALD C. STONE

1

2          those clients -- probably almost all of those

3          clients.  So I would have been in a 321

4          capacity for some period of time for probably

5          all of those.  But what typically happened is

6          that after going through the process of

7          bringing -- onboarding the clients, at a

8          certain point obviously I couldn't service them

9          all, the same thing with my partner.  So we

10         would hand them off to someone else once we

11         onboarded them and got them kind of settled in

12         to our reporting process.

13              Q.    How is it that you went about

14         bringing in clients?  What was that process?

15              A.    Well, typically I would say for

16         Plan Sponsor Advisors it was almost totally

17         referral.

18              Q.    Referral by whom?

19              A.    Almost all by ERISA counsel.  Not

20         totally, but almost all by ERISA counsel.  And

21         sometimes there would be an RFP process

22         involved that counsel would say my client is

23         going to go through an RFP process and we would

24         like you to be in the mix.

25              Q.    Do you recall for any of those RFP

Page 60

1                    DONALD C. STONE

2     processes, do you recall whether or not you

3     were submitting an RFP to be the kind of first

4     consultant to provide services to a plan or to

5     replace an existing consultant?

6          A.    It could have been either one.

7          Q.    Do you have any specific

8     recollection of whether or not you submitted an

9     RFP in connection with replacing an existing

10    consultant?

11         A.    We did, yeah.  I don't remember

12    who the existing consultant was or who the

13    client was.  I mean that was not uncommon, I

14    guess is what I'm saying.

15         Q.    With respect to the individuals

16    who worked under you or worked for PSA as a 321

17    consultant, do you feel those were prudent

18    advisors?

19         A.    Yes.

20         Q.    Did you oversee their work to

21    ensure they were fulfilling their obligation as

22    321 consultants?

23         A.    Absolutely.

24         Q.    You say in paragraph 9 that during

25    your tenure you advised on over $65 billion in

Page 61

1               DONALD C. STONE

2       retirement assets; is that right?

3            A.     That's correct.

4            Q.     Over what period are you talking

5       about there?

6            A.     That is during the 2002/2014

7       period.

8            Q.     In any given year do you know

9       approximately how many assets PSA provided

10      services for?

11           A.     That's a very difficult question.

12      Are you asking on a retainer basis?  That would

13      make this a little be easier.  We had clients

14      who were project clients in some cases.  That's

15      part of that 65 billion.  And then of course we

16      had retainer clients who we provided ongoing

17      services to and were in that 321 capacity that

18      entire time.

19           Q.     So on the project basis, those

20      were not -- those were specific projects, you

21      weren't the consistent 321 advisor to those

22      particular plans?

23           A.     We might be 321 -- depending on

24      what the project was, we might or might not be

25      a fiduciary to that particular client.

Page 62

1                      DONALD C. STONE

2                      So for ongoing retainer work when

3          we sold the business, we had a little over $23

4          billion at that point.

5              Q.      Do you know approximately how many

6          clients that covered?

7              A.      That was about 50 clients.

8              Q.      Do you know the range of the size

9          of clients that you provided 321 services to?

10         You said in your report both small and large?

11             A.      Yes.  So I would say at the time

12         that -- at the time that we sold the business

13         in 2014 the smallest client would have been

14         probably in the 5 million or so, 5, $6 million

15         range.  And that would have been one of the

16         kind, I will call them legacy clients.  One of

17         our first clients.  We had a very high

18         retention rate.

19                     I think the average client size

20         was, and this is going to be a guesstimate, I

21         did calculate it at one point.  But the average

22         client size was probably in the 4 to 500

23         million range and a number of the clients were

24         north of a billion.

25             Q.      How many clients would you say

Page 63

1                    DONALD C. STONE

2       were north of a billion?

3              A.      Probably of that 50, probably 10

4       of them.  Probably another 20, 25 would have

5       been north of a 100 million.

6              Q.      Would the asset size of the client

7       dictate the -- effect at all the quality of services that

8       you provided as a 321 consultant?

9              A.      No.  We looked to provide the same --

10      first of all, the same type of service and

11      there might be certain services that we didn't

12      provide to or would have actually -- I should

13      back up and say, would have provided as an

14      add-on service for certain clients because they

15      didn't necessarily need some of those service

16      or didn't need them all the time.

17                    In terms of the normal, you know,

18      create the IPS, arise the IPS, provide

19      investment selection, monitoring, removal,

20      basically we did the same thing for every

21      client.

22             Q.      For Third Coast Advisors, what was

23      the range of assets for those four plans, if

24      you recall?

25             A.      I don't recall exactly, but they

Page 64

1                    DONALD C. STONE

2        were small.  They would have been on the

3        smaller end.  So let's say 5 million or

4        whatever.  Because those were the first clients

5        I brought in the door when I started in 2002

6        and those were -- two of those were within the

7        first two months.  They were not the typical

8        client that we went after after that first

9        year.

10                   Q.    Between 2002 and 2014 did

11       your -- as a 321 advisor at PSA and I guess

12       Third Coast, did your reporting capabilities

13       change in terms of the sort of metrics that you

14       can provide clients on their investments?

15                   A.    I don't think the -- the basic

16       metrics did not change.  We had a pretty robust

17       reporting system early on that we invested in.

18       So the -- and the metrics -- I'll make a

19       distinction here because I think I understand

20       where you're going.

21                        The metrics that the industry

22       reports on have been around now for a good 20,

23       30 years or so.  And they are pretty much the

24       same metrics.  If you go to 50 different

25       companies you're going to get largely the same

Page 65

1              DONALD C. STONE

2      metrics.

3                   What can be different is whether

4      or not, and some companies use a scoring system

5      and some of the scoring systems could get

6      rather complicated.  Some don't use a scoring

7      system.  So there is a -- I said that is where

8      the big difference is.

9                   Everybody is going to report on

10     the returns of the fund.  They are going to

11     report on the risk adjusted returns of the

12     funds, the expense ratios, the Sharpe ratio,

13     the upside/downside capture, so on and so

14     forth.  There is a whole range of things that

15     come into being well after ERISA, but that are

16     used by everybody to try to evaluate

17     investments these days.  And that is pretty

18     standardized.

19          Q.     Is it your view that it is

20     appropriate for committees to evaluate all of

21     those metrics that are recorded in their

22     fiduciary capacity?

23          A.     You know, I guess the keyword is

24     all.  I think there are metrics that are looked

25     at by consultants that are probably not well

Page 66

1                    DONALD C. STONE

2       understood by many clients.  And you don't show

3       every metric that you could possibly look at in

4       a report.  I mean it gets to be very, very

5       cluttered.

6                    So I would say typically you look

7       at the more salient ones that are going to --

8       that are used in your report.  Some people

9       prefer the Information Ratio versus the Sharpe

10      ratio, some people the Sharpe ratio versus the

11      Information Ratio.

12                   There are other ratios, the

13      Sortino ratio that is not used very much.  But

14      it is all out there and all available on the

15      same -- there are about three investment

16      platforms that exist out there that gather all

17      of this data that everybody uses to report on.

18           Q.     So I want to break down a couple

19      of things that you said.  The metrics that you

20      think committees would not understand, what are

21      those?

22           A.     There are metrics, probably that's

23      not the right word.  They might not be familiar

24      with them.  The Sortino ratio is one that I

25      can't remember how it is calculated at the

Page 67

DONALD C. STONE

1
2        moment.  But there are a number of metrics

3        around the whole risk adjusted topic.  And

4        generally the Information Ratio and the Sharpe

5        ratio are the two that are most commonly used

6        by basically everybody in the industry that I

7        know of.  So those tell a very similar story

8        and everything.

9                   I don't think -- I guess what I'm

10       saying is, there are a lot of other things that

11       if you're a CFA you will be aware of 20

12       different ratios that aren't necessarily in

13       anybody's reporting, and if they would be, I'm

14       not sure why they would be because they don't

15       add necessarily a lot of additional value.

16            Q.    In terms of your view as to what

17       should be presented to a committee for its

18       review in terms of performance, what metrics do

19       you believe should be presented or did you

20       present to the committee in which you served as

21       a 321 advisor?

22            A.    I'm probably not going to remember

23       every single thing that we -- and we're talking

24       quantitative at the moment.  We will probably

25       get into qualitative as well.

Page 68

1                           DONALD C. STONE

2                      But the quantitative metrics, the

3           kind of things that we would report on on a

4           quarterly basis would be obviously raw

5           performance, performance against a benchmark,

6           perhaps against a couple of benchmarks

7           depending on the asset class, depending on

8           primarily the asset class and whatever we, you

9           know, whatever the investment manager used as

10          their preferred benchmark would show that.  We

11          would also use a best fit benchmark which might

12          be the same thing, might be something

13          different.

14                      We would do calculation of the

15          risk adjusted returns and we would use both

16          sharp and Information Ratio for that.  We would

17          report on actual assets in the product, in the

18          investment product.  We would report on the

19          tenure of the manager or managers.  We would

20          report typically on the upside/downside

21          capture.  It would be R squared, expense ratio

22          reports.

23                      THE COURT REPORTER:  Hold on a

24              second, he froze.

25                      THE VIDEOGRAPHER:   He froze.  Let's

Page 69

DONALD C. STONE

1
2          go off.  The time is 4:41 and we are off
3          the record.
4                    (Recess Taken.)
5                    THE VIDEOGRAPHER:   The time is 4:45
6          p.m. and we are on the record.
7                    MS. ENGELMAN:   Bill can I call on
8          you to say the last thing that you got of
9          Mr. Stone's testimony.
10                   (Requested portion of record read.)
11   BY MS. ENGELMAN:
12         Q.    Mr. Stone, you were talking about
13   the metrics that you would report on as a 321
14   advisor for clients.  Is there anything else?
15         A.    I'm sure there are a number of --
16   there are few other metrics, those are probably
17   the most salient ones that would, I think, be
18   of interest to clients or committees on a
19   quarterly basis.
20                   There would be for -- obviously
21   when we're reporting on target date funds we
22   get into some other additional things that we
23   would report on periodically if certain things
24   changed or what have you.  But you know that --
25   maybe I didn't -- one thing that I may not have

Page 70

```
 1                    DONALD C. STONE
 2    captured is we would capture comparison to
 3    peers.  I don't believe I said that one and
 4    that is a very important one.
 5                    Those are the principal ones that
 6    are coming to mind at the moment.
 7         Q.      You said with respect -- I didn't
 8    mean to interrupt you.  Were you done?
 9         A.      I was done, thank you.
10         Q.      With respect to target date funds,
11    you said there were some other metrics.  What
12    would those be?
13         A.      In target date they are obviously
14    going to look at the glide path, you're going
15    to look at any changes in the glide path over
16    time.  You're going to look at changes in the
17    asset make up of what makes up the target date
18    funds.  In other words the basic -- obviously
19    you have the glide path, quote/unquote, but
20    what makes that up in terms of the asset
21    allocation might change over time.  So that is
22    not the thing that we would report on every
23    quarter.  It is one of those things that comes
24    up as necessary.
25         Q.      Anything else with respect to
```

Page 71

DONALD C. STONE

1
2       target date funds?

3              A.      Nothing that I'm remembering off
4       the top of my head right now.

5              Q.      I think you said that you would
6       periodically provide additional information
7       about target date funds to your client.  Did I
8       hear that correctly?

9              A.      Yes, something that we did and
10      obviously was done in this case and very
11      typical in the industry is to periodically do a
12      comparison or what some people call a deep dive
13      to compare to various metrics against other
14      target date series that are out there as part
15      of the ongoing education of client committees.

16             Q.      What metrics would typically be in
17      the presentations that you would provide to
18      your clients?

19             A.      Well what you'd be looking at, and
20      this was not specific to a client, it was for
21      all clients.  You would provide information on
22      assets, the asset -- maybe on the asset flows
23      both in and out, you would provide information
24      on the comparisons of the glide path,
25      comparisons of returns, comparisons of expense

Page 72

DONALD C. STONE

1

2  ratios.  You would look at things like

3  comparison of whether there are to or through.

4  And I think most importantly you'd look at

5  their -- for this part you would look at what

6  is their equity mix at retirement date.

7  Assumed retirement date of 65.  I do would look

8  at -- you know, you just look at a number --

9  provide all of that information probably --

10  again, I'm not going to remember it all off the

11  top of my head.

12            You're basically looking to

13  provide a grounding for the committee on a

14  comparison of various products that are out

15  there which might lead to a conversation as to

16  whether a further evaluation of the existing

17  product was wanted or not.

18       Q.    How often would you provide these

19  types of reports to your clients?

20       A.    Typically annually.

21       Q.    Is there any client that you can

22  think of that offered a target date fund that

23  you did not provide this to at least annually?

24       A.    I can't think of one or a reason

25  why I wouldn't do that.

Page 73

1              DONALD C. STONE

2          Q.     What was the purpose of providing

3      these to your clients annually?

4          A.     Well, again, typically for most

5      clients the target date funds over a period of

6      time became the -- because they were typically

7      the QDIA, they would become the largest asset

8      within the plan.  So I think additional scrutiny

9      was certainly warranted.  And again, that was

10     part of the general education of the committee

11     that we would provide on an ongoing basis.

12              On a quarterly basis you wouldn't

13     provide what I just said because nothing would

14     change on a quarterly basis.  It wouldn't make

15     a lot of sense to do that.

16              Obviously if there was a selection

17     of a target date, then there would be additional

18     elements that you would look at that would be

19     specific to that particular plan in looking at

20     making -- in choosing a target date fund.  And

21     sometimes you would go back and rerun that

22     information specific to that plan on a periodic

23     basis.  Not necessarily annually, but from time

24     to time as appropriate.

25          Q.     I want to unpack just a few things

Page 74

1                    DONALD C. STONE

2     that said.  You went through the quantitative

3     criteria, generally speaking, that you would

4     provide to your client on a quarterly basis; is

5     that right?

6              A.     Yes.

7              Q.     And is it that you provided that

8     information so that the committee would review

9     and consider all of that information in making

10    its decision with respect to the investment

11    options offered in the plan?

12             A.     Yes.

13                    MR. ROBERTS:   Objection to the

14             form.

15             Q.     Is it your experience that the

16    committee in which you served as a 321

17    consultant actually considered those metrics in

18    making decisions with respect to the investment

19    options offered in the plan?

20                    MR. ROBERTS:   Objection to the form.

21             A.     Yeah, they did do that because we

22    spent a lot of time educating them about the

23    purpose of each of those and obviously some of

24    them were kind of self-explanatory.  But a

25    number of them were things that a typical

Page 75

1          DONALD C. STONE

2     person that comes on to a committee may or may

3     not be familiar with.  We would spend time as

4     part of that fiduciary education process

5     educating them about the various economic terms

6     and economic metrics and educating them about

7     the context of what was going on in the world

8     as their investments, what was going on with

9     them and what was going on in the world that

10    might be having an impact on them.

11              So the key was to get an educated

12    group that could actually be conversant.  I

13    think there is real concern in the industry in

14    terms of people throw all of these metrics out

15    and come in with fancy reports that got an

16    awful lot of night colors and everything and my

17    experience is, unless you really work hard at

18    it, half the people on these committees don't

19    have a clue as to what you're talking about.

20              So it is very, very important,

21    because they don't have the background in

22    investments, so you really need to educate

23    them, otherwise you're showing them a lot of

24    pretty charts and saying you should do this and

25    do that.  And it is difficult for them to

Page 76

```
 1                    DONALD C. STONE
 2      deliberate about that.
 3                    We spent a lot time on that
 4      education process and it's a never ending kind
 5      of process, but it is really critical to good
 6      decision-making by a committee.
 7           Q.     It is critical and you spent the
 8      time educating your committees on these various
 9      metrics that you mentioned, the quantitative
10      metrics, because it was your expectation that
11      they considered each of them?
12           A.     They did need to consider each of
13      them, absolutely, and to be able to be
14      conversant in them and ask questions about
15      them.  There would be sometimes very lively
16      conversations that would go on with these
17      clients and everything because they did take it
18      seriously.
19           Q.     With respect to the target date
20      annual reports that you provided, you mentioned
21      that you provided those to all of your clients
22      that offer target date funds; is that right?
23           A.     Yes.
24           Q.     Would you tailor those reports to
25      any specific plan?
```

Page 77

1                    DONALD C. STONE
2          A.    No, as I mentioned, there was a
3     standardized report that all of them received.
4     The only thing that was tailored to them,
5     obviously it covered -- made sure that it
6     covered the target date fund that they offered
7     and a range of other target date funds that
8     were out there.  So typically it would be the
9     same report that would go to all clients.
10                    There were things that were
11    customized to a particular client relative to
12    the target date that I alluded to that were
13    critical to the selection process.  And would
14    be important to the monitoring process if there
15    were in fact questions about whether the fund
16    that they had, the target date series they had
17    was the appropriate one.  But that is not
18    something that you would run all the time.
19          Q.    That's helpful, thank you.
20                    So you said you mentioned the
21    selection of a target date fund and some
22    metrics that would be important to that
23    process; is that right?
24          A.    Absolutely, yes.
25          Q.    So in your view what are the

Page 78

1                    DONALD C. STONE

2        important aspect of a committee's selection of

3        a target date fund?

4              A.     Well, I think what is critical in

5        the selection of a target date fund is you're

6        going to talk about the objectives that the

7        committee has, what their expectations are for

8        that target date fund.  You're going to spend

9        time talking about any particular philosophy or

10       opinions that the committee already has formed

11       and has as you go into that process to

12       understand where they are coming from.  And

13       those could sometimes bring up issues that you

14       want to address in that selection process.

15                   You're also going to look at plan

16       demographics or what some people refer to as a

17       fit analysis.  The plan demographics are

18       critical to the selection process.

19              Q.     Why is that?

20              A.     Well, because there is not one

21       target date series that is the choice for

22       everybody out there.  Plans have, as I referred

23       to a moment ago, sometimes they may have

24       different objectives or different philosophies,

25       but most critically all plans have different

```
 1                    DONALD C. STONE
 2     demographic information and the success or
 3     failure of a particular target date series
 4     really rests on those particular elements of
 5     that plan.
 6                    So what may work very well
 7     and be the right choice for plan A may not be
 8     the right choice for plan B and could in fact
 9     be imprudent.  So it is not just a, let's go
10     out and find a well known target date series or
11     whatever.  There are really critical elements
12     to look at.  I will give you an example.
13                    Things you want to look at are
14     average balances, average age of participants,
15     you want to look at the contribution rates of
16     participants, you want to look at the contribution
17     rates of the company, you want to look at are
18     there supplemental plans.  There are a handful
19     of those -- those are some of most important.
20     There are others.  I'm not going to try to list
21     every demographic element at the moment.
22                    All of those go into play because
23     what you then want to do is to make a selection
24     is to project out what is the probability of
25     this particular -- of any particular target
```

Page 80

1                          DONALD C. STONE

2      date series working for that plan.  By working,

3      I would say getting the largest percentage of

4      participants to a successful retirement.

5                     In the industry, generally

6      speaking, there is general agreement that

7      somewhere between 80, roughly 80 percent, some

8      people are a little less than that and some

9      people a little bit more than that, but let's

10     say 80 percent is probably the vast majority

11     would agree is the income percentage that

12     you're looking to replace through the plan,

13     through other assets somebody may have and

14     through social security.

15                     So what ends up happening is the

16     average participants, you're probably talking

17     about somewhere between in the neighborhood of

18     40 to 50 percent has to come from the 401-K

19     plan.  You project that out using Monte Carlo

20     simulations.

21                     I would say certainly I'm sure the

22     top 100, 150 consultants out there and maybe

23     more have this capability to project that out

24     and say, okay, this is what it is going to look

25     like in all likelihood, because you run

Page 81

1                    DONALD C. STONE

2      thousands of simulations and you have an idea

3      of whether or not it is going to get somebody

4      across the finish line.

5                    What you find sometimes is that a

6      target date series which might be well designed,

7      good named investment company but for this

8      particular plan doesn't work because people

9      aren't saving enough, people don't have average

10     balances big enough, they can't get there, they

11     are going to fail.  The whole plan will fail if

12     they choose that target date series so you

13     don't want to do that.

14                    For another plan it might be a

15     very valid and reasonable choice.  So it takes

16     a lot of -- I think it takes a lot of work to

17     in a really prudent way to make these choices.

18     And then this has developed over a period of

19     the last 50 years.  I mean we are literally 50

20     years away from ERISA coming into play.

21                    All the things that we have been

22     talking about, almost none of them existed when

23     ERISA was founded.  In fact ERISA assumed

24     everybody would be in a defined benefit plan

25     for the most part.

Page 82

1               DONALD C. STONE

2          Q.     I hear you.  I just know we just

3     celebrated the 50th anniversary.  We had some

4     parties here at our firm to commemorate that.

5          A.     That's okay, yes.

6          Q.     So a couple of follow up questions

7     there.  What you just walked through in terms

8     of the things that a committee in a prudent way

9     would consider in selecting a target date fund,

10    would those considerations come into play when

11    monitoring the prudence of a selected target

12    date fund in terms of retaining it for the

13    plan?

14         A.     Yeah, it's not something that you

15    would report on quarterly because you're not

16    going to rerun what I just described, the Monte

17    Carlo simulation, you're not going to rerun

18    that quarterly.

19               If something were under

20    consideration for -- let's say it was on a

21    watch list, I will use that is a broad general

22    term because I know in this particular case

23    they used several different terms, and if you

24    go look at 20 plans they may use a couple of

25    different terms for that.  But in general

Page 83

1                    DONALD C. STONE

2        something that needs more scrutiny, we call

3        that a watch list.  Then you might go back and

4        rerun this at that point and say is this thing

5        working the way it is supposed to.  Is there

6        something that has changed in its composition

7        that requires more scrutiny.

8                         I think you take a much deeper, I

9        will use the term deep dive, but in this case

10       it is very specific to the target date series

11       that you have to figure out what is going on

12       with it and how is it working with that plan.

13                         You're going visit with the

14       manager, you're going to spend time with them

15       and you're going to look at -- you're going to

16       spend a lot of time looking at their operational

17       processes, you're going to look at their --

18       some of the qualitative things that we haven't

19       talked about and everything.

20                         I guess the point is, you might

21       rerun that type of information at that point

22       when you've gotten to a stage where you're

23       considering making a change.  You may or may

24       not ultimately make that change, but when

25       you're on watch, then that to me is you have

Page 84

1                        DONALD C. STONE

2       heightened scrutiny.  It is not just saying,

3       watch and walking away from it.  You actually

4       need to do some additional work to look at it.

5                    I would expect a committee to be

6       saying to their consultant or their advisor, we

7       need you to go back and come back to us with

8       what is going on with this thing.  Why, you

9       know, great it's underperforming, but why is it

10      underperforming.  What is actually going on

11      under the covers that is making this happen.

12      And it may turn out that, well, you know, it's

13      a blip, it may turn out that there are reasons

14      because of changes in the firm, there may be

15      reasons that that particular approach is out of

16      favor.

17                    There certainly can be

18      explanations and then the committee has to be

19      thoughtful to consider, you know, are we still

20      comfortable whether those explanations are

21      satisfactory or perhaps we need to consider

22      making a change.  Again, just because it goes

23      on watch doesn't mean you change it, but it

24      certainly does mean that you give it additional

25      scrutiny.

Page 85

1                    DONALD C. STONE
2          Q.     So there would be circumstances in
3     your experience where there is underperformance
4     of a fund, but it is still appropriate to continue to
5     offer that fund in the planned?
6          A.     Yes, as long as you continue to do
7     the additional scrutiny while it is under watch
8     and then if the committee gets comfortable with
9     that, that's obviously a choice, that is part
10    of what they are supposed to do is make a
11    choice as to whether they think it is
12    appropriate or not.
13         Q.     You mentioned the Monte Carlo
14    simulation; is that right?
15         A.     Yes.
16         Q.     I'm not familiar with what that
17    is.  Can you explain what that is?
18         A.     Yes.  In a simple way, because I
19    haven't run these in a while, so Monte Carlo
20    simulations basically are -- and you see this
21    -- I mean for example, when you look at --
22    maybe the easiest thing to think about is, we
23    are in hurricane season and when you go out
24    there and you got a hurricane coming towards
25    Florida and they show you the cone of

Page 86

1                    DONALD C. STONE
2       uncertainty as they call it, which shows all
3       the possible routes that hurricane can take.
4       They've run thousands of simulations to create
5       that cone of uncertainty or whatever as to
6       where it is going to go.  All the inputs that
7       go in.
8                    So in the case of Monte Carlo
9       simulation for a target date fund, you're going
10      to think about all the different possible
11      permutations.  You're not going to think about
12      it, you're going to have the system run it,
13      that could happen.
14                    For example, you have immediately
15      you start having bad returns and you have bad
16      returns for five years in a row, or you
17      immediately have incredibly good returns or
18      it's level returns over the entire 35, 40 year
19      period, the career of a person.
20                    So the mathematics are running all
21      of those different kind of permutations of what
22      might -- what those returns might look like.
23      And literally -- we would typically run I think
24      at 10,000 we figured out that we had all we
25      needed.  And what happens you begin to see --

Page 87

DONALD C. STONE

1

2      then you start to kind of -- for purposes of

3      looking at the, what we were talking about,

4      about who is going to get across the finish

5      line, you look then at kind of the median of

6      all of those.  You wouldn't take the outliers,

7      whether they are positive or negative, you're

8      going to look towards the median of that.

9                  So that's probably the most

10     likely outcome that you're going to see.  And

11     how does that work if we said that a particular

12     participant -- and we will just break it down

13     as a participant.  A particular participant

14     needed $1,500,000 at retirement to meet this 80

15     percent goal including social security, does

16     this simulation do that, okay.  If it comes up

17     and says well, no, the most likely case is

18     they're going to be at 1 million 3, that is not

19     very good.  If it says they're going to be at 1

20     million 6, we are kind of happy about that.

21                  There may be three or four

22     or five target date series that are successful

23     that way for the largest number of participants.

24     So then you have to do -- then you start doing

25     additional analysis to figure out which might

Page 88

1                    DONALD C. STONE

2      be the right choice for that entity.  You're

3      going to look at how smooth the ride is.  How

4      comfortable the ups and down that go on along

5      way.

6                    I'm not how much more detail you

7      want on that.  But that's kind of how you do

8      that.  It's a mathematical simulation that

9      projects out what possible returns could be and

10     the sequence of those returns over a broad

11     number of years.

12          Q.    So I want to make sure I'm clear

13     and I don't want to get into the total minutia

14     of this.  But you're essentially suggesting

15     there is a program where you would input the

16     demographic fits or objectives of your plan for

17     which you're solving for?

18          A.    Yes.

19          Q.    And attempt to create over the

20     long-term, so for the average retiree a certain

21     level of returns and the system would look at

22     all target date funds in the market or is it a

23     subset?

24          A.    It is not looking at target date

25     funds.  It's looking at returns at that point.

Page 89

DONALD C. STONE

1

2     So what you plug in -- let's say we have

3     participant Bob, okay.  So Bob is currently

4     deferring -- I'm just using an individual --

5     but you use averages obviously.  You could run

6     it for every participant.  You could make it --

7     you can individualize it for everybody but then

8     that could get incredibly expensive.

9              So would you typically do is

10    you run it for the plan which means you look at

11    the average deferral rate, you look at average

12    contribution by the company, you look at

13    average balance and so on and so forth or you

14    look at the median or you run it for both of

15    those.

16              So let's say that the average

17    participant is contributing 6 percent and the

18    average participant has a balance of the

19    $90,000.  The average participant is, let's say

20    it's a company that has a fairly old workforce

21    that the average participant is 20 years from

22    retirement.  You plug that in and then you plug

23    those numbers in and so you have that $90,000

24    balance and you're now going to run that out

25    with that 6 percent contribution rate and

Page 90

DONALD C. STONE

1

2      you're probably going to look at other things

3      like does the plan have other escalations.

4                    So is Bob going to be or the

5      average participant, are they going to be

6      putting in 7 percent the next year and 8

7      percent the year after.  So you can build that

8      in as well.

9                    Then given those numbers, then

10     you run the simulation with returns for a mix.

11     So you can run that mix against a particular

12     asset allocation which let's say would be the

13     T. Rowe Price Funds or it could be the Fidelity

14     or it could be Van Guard, it could be whatever.

15     And you run those for each one of those against

16     their allocation because their allocation is

17     going to have, depending on how conservative --

18     you're going to run those for each allocation

19     against those average balances and the way

20     those balances are going to grow and everything

21     over time.

22                    That is how you get at the end

23     analysis that at 65 the probability is that

24     this person will have a balance of X.  This

25     average participant or median participant

Page 91

```
                           DONALD C. STONE
 1
 2      depending on how you run it.
 3             Q.      How is it -- --
 4             A.      That is very common.  It is run by
 5      all of the different advisors in consulting
 6      firms that I used to work with and interact
 7      with and over time and everything.  It is not
 8      an unusual program.  This has been around for a
 9      long time.
10             Q.      Is it something that you used as a
11      consultant?
12             A.      We used it for every single client
13      for a target date fund.  That is how the selection --
14      that was a big part of the selection process
15      because we might come up with three choices.
16      There is 42 different -- as of I think as of
17      last year there were 42 different target date
18      series, not counting any custom things that are
19      out there that are available in the marketplace.
20      Some have gone out of business over the years
21      others have come into the business in the last few
22      years, there is around 42 of them out there.
23             The only way that you're going to narrow
24      this down is to tie that from a prudence
25      perspective, is this going to make sense for our
```

Page 92

1                        DONALD C. STONE

2       client.  The real basic level is this is why you

3       want diversification in the first place and so on

4       and so forth.

5              If we go back to what the Department Of

6       Labor has said, you're supposed to have at least

7       three asset classes, well, everybody has a lot

8       more than that.  Everything is based off of

9       building on that.  So it is available to most of

10      the firms out there that I'm aware of and has been

11      for a long time.

12             Q.    So how is it that -- one piece

13      that I think I'm struggling to understand, how

14      is it that you decide as a consultant or as the

15      common industry decide which target date funds

16      to run in the program?  You said you could, for

17      example, use T. Rowe Price.  How would you

18      whittle it down from 42 to however many you're

19      going to run in the program?

20             A.    We typically -- we wouldn't run 42

21      different runs probably.  Most firms don't

22      actually track all 42 or whatever the number

23      happens to be today.  But there is a large

24      subset that they probably are watching.

25             So certainly if it is on your --

Page 93

DONALD C. STONE

1

2      if you have a buy list or a recommended list or

3      preferred list of managers, because those are

4      the ones that you have the highest conviction

5      in, you'd run it against all of those and there

6      might be five, six different managers.  But you

7      probably have run it internally against a much

8      larger subset over time to determine is this

9      somebody that we should be looking at for our

10     clients that we should be considering.

11            We would've run it against

12     probably 20 different products that were out

13     there as a part of our process.  Not for a

14     particular client, but for the firm in order to

15     be able to recommend things to our clients.

16            Q.    Okay, but if you're looking at a

17     particular client and they are looking to make

18     a target date fund selection, you mentioned a

19     preferred list.  What is that?

20            A.    So every -- I won't say every.

21     The vast majority of investment consultants

22     have a buy list or whatever they call it,

23     whether it's a buy list or preferred list or a

24     high conviction list or whatever, but it's a

25     group of -- you had your investment team

Page 94

1                    DONALD C. STONE

2       analyzing -- going out and looking at managers

3       all the time.  This is true of every asset

4       class.

5                    So you go out and you say, okay,

6       these are the five managers, there is 600 large

7       value managers, but out of that we really have

8       a high conviction because we have been to see

9       them in their office, we've seen their operational

10      processes, we've looked at their stability of

11      the organization and we've looked at their

12      returns, the construction methodology, we

13      looked at -- it goes on and on.  And we have a

14      really high conviction of this manager and this

15      manager and this manager.

16                   You typically might have five

17      different target date managers that you have a

18      high conviction and five or six large growth

19      managers or large value or whatever and in all

20      the asset classes you would do that.  That is

21      very typical.  Those would be the ones that you

22      would start with certainly on the target date.

23                   Now, if none of those, I can't

24      imagine, but if none of those worked out, you

25      could go on and look at others as well.  But

Page 95

1                      DONALD C. STONE
2        you've already whittled it down to some extent
3        because these were ones that you have -- you've
4        seen what they have done, you have a lot of
5        history on them and we have a lot of history at
6        this point for target date.
7                       And these are the ones that you --
8        somebody said through -- if your grandmother
9        said what should I buy, this is one of ones
10       that you would recommend to your grandmother
11       because you're comfortable with it for any of a
12       number of reasons which you would articulate in
13       the internal notes that you keep on fund
14       managers.
15            Q.    At your time at PSA and Pavilion,
16       I'm going assume that your testimony here
17       relates to your capacity as an investment
18       advisor at Pavilion as well, which I know that
19       we haven't talk about yet.  Is that generally
20       fair?
21            A.    That's fair, yes.
22            Q.    Can you name the target date funds
23       that you had a highest conviction rate with?
24            A.    Yeah, the highest conviction
25       managers might have changed a little bit over

                        DONALD C. STONE

1
2       time, because we're talking about a number of

3       years, but the highest -- in general the

4       highest conviction managers would have been T.

5       Rowe Price as an active manager, JP Morgan as

6       an active manager, but also as a blend manager

7       which is to say they use some passive, some

8       active.  Blackrock as a passive manager.  Van

9       Guard as a passive manager.  State Street as a

10      passive manager.  And then American Funds as an

11      active manager.

12                  Those would have been probably

13      been the recurring -- the ones that would have

14      recurred most often.

15          Q.    Did you ever have a conviction

16      rate with the Fidelity Freedom Funds to your

17      recollection?

18          A.    We used the Freedom Funds -- we

19      used Fidelity -- I don't know about the -- Fidelity has

20      several different versions.  So I don't recall

21      that the Fidelity funds -- Freedom Funds were

22      on our high conviction list.

23                  We did have some clients at some

24      point in time and I'm thinking this was

25      actually way prior to the class period that we

Page 97

                              DONALD C. STONE

1    are talking about who did use the Freedom

2    Funds, but I believe those clients moved out of

3    those, the Freedom Funds, at some point and

4    probably this would have been 2008, 2010

5    period.  But that's very hazy in my mind.  So

6    that is just a general.

7        Q.    No problem.  So just a couple of

8    other things on this simulation exercise.

9            Once you ran the exercise and you

10   whittled it down to from maybe six target date

11   funds and then a handful of those would work,

12   quote/unquote, work for your clients.  Then

13   what are the other factors that you would

14   consider as a consultant in providing advice as

15   to which to select?

16       A.    So let's say that three of the

17   funds all passed those screens that you just

18   mentioned.  As I mentioned a couple minutes

19   ago, one of the things that we look at next is,

20   okay, if all three of these get across the

21   finish line, so to speak, which one is probably

22   going to be the most comfortable ride for

23   participants.  Which is to say going to have

24   the lease volatility over that period of time.

Page 98

1                    DONALD C. STONE

2                    So one fund might be just really

3      fabulous, it knocks the lights out ultimately,

4      but the ride was like being on a roller coaster

5      all the time, that is probably not the one that

6      you are going to recommend.  You're going to

7      look for something -- if there are three of

8      them that past those screens, you're going to

9      look for something less volatile.

10                   All things being equal, one that's

11     less volatile would be one that you'd probably

12     recommend to the client as opposed to a more

13     volatile choice.

14           Q.     Any other factors that you would

15     consider at that point in time?

16           A.     Well, you're going to look at

17     things like when do people -- at that point you

18     may look at the to versus through idea which is

19     if I went to a client and they said, like most

20     clients would, well, most of our participants

21     take their money out within one year of

22     retirement.  Then it doesn't matter which one

23     you choose because the to or the through are

24     both going to be fine because people are going

25     to take their money out right after the

Page 99

1              DONALD C. STONE

2     retirement.

3              If somebody said our participants

4     they really trust us, they are likely to keep

5     their money in the plan and we would like them

6     to keep their money in the plan because we

7     think they get the fiduciary oversight, they

8     get better pricing blah, blah, blah.  Then in

9     that instance maybe one of the decision factors

10    would be of these three is one of those a

11    through choice as opposed to to.

12             So it's a conversation with the

13    committee they will all work for you, but let's

14    find something that seems to be the best

15    choice, all things being equal.  Those are --

16    there are probably some other factors, but

17    those are the big ones.

18       Q.    When you talk about volatility,

19    just help me understand.  What factors would be

20    driving volatility or what you would be looking

21    at to determine the volatility of a certain

22    fund?

23       A.    Well, keep in mind we projected

24    out the returns based on all the factors that

25    we talked about, and then when -- you're going

Page 100

1                    DONALD C. STONE
2        to have a lot of lines on a graph, if you can
3        picture it, sometimes those lines are going to
4        be smoother for some target date series then
5        for others, which means they have fewer ups and
6        downs in the market.  Maybe they do a little
7        better job of protecting on the downside when
8        the market isn't -- as a bear market or a down
9        market even if doesn't go to a full bear
10       market.
11                    Others are going to be we are
12       pedal to the metal and we are going to generate
13       great returns, but when the market goes down we
14       are just going to get hammered at least for a
15       period of time.
16                    So you're going to have that line
17       that is going to be very jagged.  It is going
18       to look more like a lightening bolt as opposed
19       to smoother line.  That is the visualization of
20       that volatility.
21            Q.    You talked about the to versus
22       through, are you referencing a glide path
23       there?
24            A.    I am.
25            Q.    And is that an important

Page 101

1              DONALD C. STONE

2     consideration when determining whether or not

3     to pick a certain target date fund?

4          A.    Well, as I mentioned, you have to

5     versus through.  I think it is only -- it is important in

6     two ways.  One is if a committee says our

7     participants keep their money in the plan so

8     they need something that is going to continue

9     to adjust over time, then a through would make

10    sense in that instance.  Most plans that is not

11    the case.  Despite the fact that a lot of

12    people would like people to keep money in the

13    plan, there are a lot of committees that would

14    like people to keep money in the plan,

15    typically they don't.  They roll it into an IRA

16    or do whatever they are going to do.

17              But the other factor that people

18    are going to look at is at retirement age, so

19    at 65, that arbitrary age we all kind of focus

20    on, what is the equity exposure at that point.

21    The range is going to be -- in the industry is

22    going to be from about 20ish percent to about

23    55, 57 percent.  Okay.  So it's a pretty good

24    range.  So that is going to be the other

25    factor.

Page 102

1              DONALD C. STONE

2                   Some committees may say, well, I

3     don't want to have that kind of volatility or potential

4     volatility with a 55 percent exposure to

5     equities at 65.  I want my participants to have

6     less than that and so of the three that you're

7     bringing to me, one of them has 55, one of them

8     has 45, and the other has 42, they probably

9     want to focus on talking about the 42 and 45

10    and in trying to decide between those two.

11         Q.    So would you look -- well, let's

12    say this differently.

13                Are all glide paths the same?

14         A.    No, glide paths can be -- they all

15    start in a pretty close proximity to each

16    other.  But after that, there is a broad range

17    of, one, where they end up ultimately.  And

18    two, there is a broad range when they decide to

19    begin to lower the equity exposure.

20                So that changes, there's a broad

21    range of choices there.  There are ones that

22    are 35, 40 years to retire and they are already

23    starting to diminish equity exposure.  There

24    are ones that wait to more like 20 years before

25    retirement before they do it.

Page 103

1              DONALD C. STONE

2              So there is a lot of variety of

3      how these are created and keep in mind the

4      asset allocations under -- that make up the

5      glide path.  We are thinking about it as

6      equity, fixed income and cash, well, it is

7      really, you know, equities could be

8      international equities, it could be emerging

9      markets, it could even be frontier markets,

10     probably not, but could be.  It's going to be

11     domestic markets, it's going to be the exposure

12     of large cap versus small cap.

13              So all of these go into when you

14     look at a glide path you're just getting the

15     first snapshot of how these are created.  And

16     it's a -- again, this is why I think it's a process.

17     Everything about ERISA is a process.  It's a

18     process to educate committees, but they need to

19     understand how these work because it might look

20     very simple on the surface that, you know, I

21     don't want a lot of equity exposure at

22     retirement and then you show them, yeah, but

23     your participants are unlikely to be

24     successful.

25              One plan I looked at a lot a while

Page 104

1                           DONALD C. STONE

2          back, to give you an example, the average

3          balance was $5200.  There is no way that those

4          folks are going to get a successful requirement.

5          Most of them aren't going to get to having the

6          balance no matter what when the average balance

7          is 5200.  They obviously need to be encouraged

8          to save a lot more.  But they also need to have

9          an equity exposure to have any chance of having

10         a reasonable balance at retirement.

11                      Now that is an extreme on one end,

12         but that's a -- actually that's a billion dollar plus

13         plan.  You can look at the other end and say

14         you got a defined benefit plan, heck, you don't

15         need to save that much.

16                      So the answers can be quite

17         different for each plan.  It's just a very

18         thoughtful process to go through.

19              Q.      That's helpful, thank you.

20                      Turning back to I want to go back

21         to we talked about the qualitative -- quantitative

22         factors that you would present to your -- to

23         the committees which you served as consultant.

24                      What about the qualitative factors

25         that would be presented to a committee for

Page 105

                              DONALD C. STONE

1        consideration of monitoring its investment

2

3        options?

4                A.      Okay.  You want me to just

5        enumerate them.

6                Q.      Yes, if you can.

7                A.      So I think I've spoken to a couple

8        of these before, but you're going to look at

9        the manager tenure, the depth of the team,

10       stability of the organization overall and you

11       can see some of these are related to each

12       other, but they are different.

13                       You're going to look at the

14       operational processes which actually means

15       looking at how does their trading desk work.

16       How good are they at trade execution which can

17       make a real difference over time.  How well do

18       they control risk internally.  How do they

19       diversify so that they don't find themselves --

20       you know, how do they track that they are not

21       getting too heavy into a particular, let's say

22       into tech or too heavy into consumer durables

23       or whatever the heck it may be.

24                       You want to look at how they put

25       this thing together.  And you want to look at

Page 106

1                    DONALD C. STONE

2      reputational risk as well.

3                    So there a number of factors that

4      come into play in that regard.  Because they

5      are qualitative they are a little bit more --

6      you're not going to -- you're not reporting on

7      hard metrics as much.  There is some of that

8      which is the how long has the manager been in

9      place, is it a single manager, is it a team.

10     So on and so forth.

11                   Some of the metrics are a little

12     bit harder to report as just a metric.

13          Q.    Understood.  So was it your

14     experience that the committees or was it your

15     expectation that the committees considered

16     these metrics each time you provided them in

17     monitoring investments offered in the plan?

18          A.    You do want them to consider them.

19     You want them to understand the qualitative why

20     it is important if there is something that

21     you're telling them about that is qualitative

22     metrics or a measure, you want to make sure

23     that they understand where does that play into

24     the equation and everything.

25                   It is one of -- quite often it is

Page 107

1                          DONALD C. STONE

2       not one thing that makes you choose a

3       particular manager or makes you decide to not

4       choose a manager or to remove a manager,

5       whatever.  It is usually a combination of

6       factors that come into play.

7                          So and you're not going to report

8       on the qualitative -- you know, there are

9       certain things maybe it will just be in the

10      book, but it is not something that you're going

11      to spend time talking about.  The manager has

12      another quarter of experience this quarter,

13      you're not going to go into that.  As long as

14      it is the same manager you're not going to

15      worry about that.

16              Q.      When you talked about the

17      quantitative metrics you mentioned, I think,

18      comparison to peer group and I think I'm

19      quoting you accurately, you said that was very

20      important.

21              A.      Yes.

22              Q.      Why is that very important?

23              A.      Well those are the -- and I think

24      that is -- I mean you're looking at two different

25      things.  You're looking at, they're related but

Page 108

1                          DONALD C. STONE
2       they are different.  You're looking at how a
3       fund is doing versus its benchmark.  You're
4       also looking how it is doing versus peers.
5                      Peers are the -- you can't invest
6       in the benchmark, but you can invest with the
7       peers.  So if you're -- you would not want to
8       choose, I don't think, somebody who is lagging
9       their peers substantially.  It is just another
10      snapshot of that -- of how well are they doing.
11      How is that performance.  It is another element
12      of that.
13                     I think in target date funds it is
14      very relevant to see how are they doing versus
15      other funds that are similar to them.
16                     Sometimes you do an analysis
17      of -- if you have a to fund, I don't think this
18      is important myself, they may say we want to
19      see what other to funds are doing and you
20      compare this against maybe five other to funds
21      as opposed to through funds.  So there are
22      different ways that you slice it.
23                     The peers is actually what real
24      managers are doing in realtime out in the real
25      world versus what your particular manager of

Page 109

DONALD C. STONE

1
2      your investment product is doing.

3            Q.    So is there specific for the

4      reporting metrics that you would provide to

5      your client, is there a specific time period of

6      performance versus benchmark and performance

7      versus peer group that you would typically

8      provide or expect to see?

9            A.    So I think this goes to -- the

10     answer is yes.  And in a vacuum you want to

11     look at as many different things as you can.

12     So quarter, year to date, one year, three year,

13     five year, 10 year if it exists.  I probably

14     wouldn't look much past that unless it was the

15     rare case where the same manager had been in

16     place for 15, 20 years.  That does exist but it

17     is not as common.

18                 But I would also -- all of this

19     needs to get tied very specifically to the

20     investment policy statement.  So the investment

21     policy statement, you have to make sure that

22     where your focus is is making sure that you're

23     compliant with the investment policy statement.

24     Not necessarily some set of metrics that you,

25     as a consultant, think people ought to be

```
 1                DONALD C. STONE
 2     looking at.
 3                    It is great that you have that,
 4     but your focus has to be on what does the
 5     investment policy say.  Because that is a --
 6     that's part of the plan documents and it is
 7     part of what the plan committee is going to use
 8     to evaluate.  So it has to tie to that
 9     investment policy statement.
10                    The investment policy statement,
11     for example, says we wouldn't focus on three
12     year, five year numbers, which would be
13     reasonable.  You may report on the 10 year, but
14     you're not going to go put something on watch,
15     for example, because the 10 year number is not
16     attractive.  Because that doesn't tie to the
17     IPS.  Now the IPS, of course, you can go out
18     and you can rewrite the IPS.  You can have a
19     conversation on that but those things are
20     reporting and the IPS really need to tie
21     together.
22                    And then a lot --
23         Q.    Okay.
24         A.    A lot of times you run into
25     problems with that because of the way people
```

Page 111

DONALD C. STONE

1

2    create the reporting system.

3         Q.    So let me just ask you this.  Is

4    it your testimony that if there is a reporting

5    metric that is provided to the committee that

6    the committee finds to be concerning and wants

7    to put an investment option on watch, because

8    of that your testimony is that they could not

9    do that if the investment policy statement

10   doesn't specifically require that?

11        A.    No, no, no.  Sorry, that is not my

12   testimony.  Keep in mind the committee has

13   flexibility to -- it's a guiding document.  The

14   IPS is a guiding document and depending on how

15   it is written, if it says you will do something

16   then I think this a clear you're going to have

17   to do that.  But quite often it says you may do

18   something.  So you have to look at the language

19   of it.

20             They can put it on watch even

21   though the IPS doesn't reference it, but I

22   think that raises an issue at that point of,

23   okay, what is going on with our IPS.  You want

24   to take a look and say, why is it important

25   that we put it on watch, but it is not covered

Page 112

1                    DONALD C. STONE

2      in the IPS.  That would seem -- it would raise

3      other questions, I think, as opposed to --

4             Q.     Got it.

5                    You mentioned earlier -- I'm going

6      to backtrack a quick second to this program

7      that simulated the target date fund and you

8      were talking about volatility in those

9      simulations.  Do you recall that?

10            A.     I do.

11            Q.     You're talking about -- when

12     you're talking about volatility, you're talking

13     about performance volatility?

14            A.     That would be performance

15     volatility, yes.

16            Q.     Is the program being run or is it

17     reflecting performance compared to a certain

18     benchmark and peer groups or one or the other?

19            A.     No.  The simulation -- you're

20     talking about the Monte Carlo.

21            Q.     Yes.

22            A.     The Monte Carlo is taking the

23     demographic information that we talked about

24     and it is then going and running that against

25     all possible combinations or at least thousands

Page 113

DONALD C. STONE

1

2       of possible combinations of return sequences

3       that could happen.  It is not worried -- it is

4       not looking at a benchmark or peer group, it is

5       looking at actual returns.

6                    So let's say, for example, it's

7       going to look at returns for bonds using -- and

8       you're going to have probably -- probably used

9       a broad index for the Barclays Ag, for example,

10      for bonds as the proxy.  It's going to look at,

11      you might use the Russell 1000 as the proxy for

12      domestic equities.  You might use something

13      else for -- you could break it down as much as

14      you want.

15                   You can put in as many inputs, if

16      you want to get down and have short-term bonds,

17      but it is actually looking at projecting against those

18      indexes what you're -- and running what you're

19      balance might be.  It is running against another fund.

20      It is not running against any particular peer group or

21      whatever.  It is running against what those

22      indexes might generate in returns going on a go

23      forward basis.

24            Q.    I see.  I got it.

25            A.    You got it, okay.  Is that okay?

Page 114

1                    DONALD C. STONE

2              Q.    Yes.  I'm okay, thank you.

3      Generally speaking, when it comes to investment

4      funds, do you agree with me that there are time

5      periods where there are fluctuations in

6      performance over time?

7              A.    Absolutely.

8                    MS. ENGELMAN:   It's 12:45 eastern,

9              can we take 20 minutes now and do a quick

10             lunch?  Does that work?  I know it is

11             probably dinnertime to you, Mr. Stone.

12             Let's go off the record

13                   THE VIDEOGRAPHER:   The time is 5:44

14             p.m. and we are off the record.

15                   (Lunch recess taken at 5:44 p.m.

16             European standard time)

17

18

19

20

21

22

23

24

25

Page 115

1                    DONALD C. STONE

2            A F T E R N O O N    S E S S I O N

3                        6:14 p.m.

4              D O N A L D    C.    S T O N E,

5            resumed, having been previously duly sworn,

6            was examined and testified further as

7            follows:

8                    THE VIDEOGRAPHER:   The time is 6:14

9            p.m. and we are on the record.

10    BY MS. ENGELMAN:

11            Q.    Hi, Mr. Stone.  We just had a

12    short lunch break here on the east coast maybe

13    dinner break for you.  Welcome back.

14                    Did you speak to your counsel

15    during the break?

16            A.    I did not.

17            Q.    I have a hypothetical for you.  So

18    we are going to switch gears a little bit.

19                    So suppose an investment fund

20    underperformed its benchmark on a three and

21    five-year basis for a single quarter.  Would

22    that in your experience require placement on

23    the watch list?

24            A.    It is usual it would be on for

25    just one quarter.  I think you have to go back

Page 116

                        DONALD C. STONE

1
2       and look at the IPS and see what it -- how it

3       would direct you, if you will.  So if something

4       was -- I don't know how you could be on a watch

5       list for a five-year period and had it happen

6       just the one quarter.  I mean the numbers are

7       not adding up for me.

8                Q.     The first quarter that there is a

9       detection of underperformance against benchmark

10      on the three year and five-year period.

11               A.     Okay.

12               Q.     Have you ever had a situation

13      where a committee placed a fund on a watch list

14      based on one quarter of underperformance,

15      irrespective of any other factor?

16               A.     I can't recall a specific instance

17      where that fact pattern existed and so I just

18      can't speak to that in terms of actual

19      experience.  As far as that is concerned.

20                      I think that would be a obviously --

21               Q.     Do you personally believe that a

22      fund should go on a watch list if there was a

23      three year and five year underperformance for a

24      single quarter?

25               A.     I think -- are you assuming --

Page 117

1                          DONALD C. STONE
2          first of all, you don't know if it is going to
3          be a single quarter, if I understand your
4          hypothetical correctly.  It is under for one
5          quarter, you don't know what the next quarter
6          is going to look like at this point, correct?
7                  Q.      Correct.
8                  A.      I think it's a conversation that
9          you have with the committee.  You certainly
10         don't ignore it.  Suddenly this thing is on
11         watch for a three year and five year -- not
12         watch.  It's underperforming for a three year
13         and five year, I think that becomes a
14         conversation with the committee and it is
15         possible it could go on watch because -- and
16         particularly, again, looking at the IPS, you
17         have to look at that and say, well, if there is
18         criteria for the IPS.
19                          There is nothing wrong with
20         putting something on watch and saying this
21         needs closer scrutiny, that is what watch
22         means.  So I don't think there is problem doing
23         that.  I think, but again, I would defer to the
24         IPS and I would have a conversation with the
25         committee and say they could make a

Page 118

1                    DONALD C. STONE
2       determination that we are not going to put it
3       on watch list, we will wait until next quarter.
4                    But I think that would be one of
5       those things that you look at and say, if it is
6       on for one quarter it's probably really likely
7       it is going to be on the next quarter too
8       particularly for three and five year numbers.
9       It is hard to see those rolling off.
10                   So I think it would be reasonable
11      to consider putting it on watch.  I don't think
12      you have to put it on watch, but it certainly
13      ought to be discussed.
14           Q.     How would your answer be impacted
15      if the underperformance on the three year, five
16      year comparison to benchmark was one basis
17      point.
18           A.     Well, again, I think you're still
19      going to have a conversation and that's a
20      conversation that you're having with the
21      committee.  It is only one basis point.  I
22      think it's a fair and honest conversation to
23      have with the committee to say, you know, it is
24      barely there, but here is where we're at.
25                   I think you can also look at --

Page 119

1                    DONALD C. STONE
2       one of the things that would happen in this
3       case in your hypothetical, I would think that
4       the advisor would go and say what number is
5       going to drop off next quarter.  Because you're
6       always adding a number and subtracting a
7       number, okay, for the three year and five year.
8                    So something is going to go off
9       and something is going to come on.  You don't
10      know what the number that is going to come on
11      at the hypothetical point that you're talking
12      about right now.  But what you do know is what
13      number is going to drop off.
14                   What the advisor would be able to
15      say is, yeah, it's one basis point now, but it
16      is probably going to be back in compliance next
17      quarter or it is going to be much worse off
18      based on the number that is dropping off.
19                   So I think you look at that.  It's
20      a conversation -- like I said, you don't have
21      to put it on watch, but I think that raises the
22      question that you want to have a conversation
23      with the committee and have the committee make
24      a decision as to whether they want to just
25      watch and wait and see or whether they want to

Page 120

1                    DONALD C. STONE

2        put it officially on watch.  They have that

3        option.

4              Q.      In your experience would the

5        committee also want to look at, not just the

6        three and five-year performance against

7        benchmark, but also look at performance against

8        the peer group?

9              A.      Absolutely.  I think at that point

10       you probably step back and, again, if I was on

11       the committee I would be saying, okay, so first

12       of all is this going to be on watch next

13       quarter and the advisor ought to be able to

14       tell you right then a there.  And then two, by

15       how much, depending on what number is dropping

16       off and is it going to have a magnitude.

17       What's the magnitude of the impact.  And then

18       let's look at the other number.

19                    It's a conversation that the

20       committee is going to have to say, okay, there

21       is issue here, let's take a look at it.  It doesn't

22       mean the house is on fire.  It may turn out to

23       be on fire, but at this point you don't know

24       that.  It is just we have an issue we ought to

25       look at, we ought to be thoughtful about it and

Page 121

1                    DONALD C. STONE

2    take a look and see what else is going on to

3    you point and look at the peer group and any

4    other metrics that seem appropriate at the

5    time.

6         Q.    So similar hypothetical for you.

7    Suppose a fund underperformed its benchmark

8    again on the three and five-year basis for five

9    quarters, irrespective of any other metric,

10   would that automatically require, in your view,

11   removal of the fund?

12        A.    Well, again, I think you go back

13   to what a particular hypothetical, what's the

14   hypothetical IPS say.  You go back to your IPS

15   and it's reasonable that you two companies or

16   two 401-K plans could have different IPSs that

17   have different metrics, that's possible.  They

18   may be -- I would hope they would be similar

19   but they wouldn't necessarily be the same.

20              The first thing is go back and

21   look at the IPS and see what it says.  See if

22   it says will or whether it says shall or

23   whether it say may.  I mean this is a process

24   and so ERISA is all about process, it is not

25   about outcomes.  So I think at that point

Page 122

```
 1                      DONALD C. STONE
 2      you're going to -- five quarters, how far under
 3      is it, you have to look at the whole thing.  I
 4      think you have to step back and look at the
 5      whole thing.  The first thing is look at the
 6      IPS and follow the IPS.  You don't look at
 7      anything else.
 8           Q.    So irrespective of an IPS, in your
 9      view, objectively, if a fund underperforms in a
10      three year and five year compared to its
11      benchmark only, irrespective to any other
12      metric, should that fund automatically be
13      removed from the plan lineup?
14                MR. ROBERTS:   Objection to the
15           form.
16           A.    The answer is, I can't give you
17      answer to that because you do look at a lot of
18      other metrics.  Certainly it would be on watch,
19      but whether you're going to remove it that
20      depends.
21           Q.    When you are evaluating or
22      monitoring the performance of a target date
23      fund and a target date fund is obviously made
24      up of many different vintages, right, correct?
25           A.    Correct.
```

Page 123

1                    DONALD C. STONE
2          Q.     And those different vintages
3     perform differently; correct?
4          A.     They do, yes.
5          Q.     So in your experience, when you
6     are helping committees to evaluate the performance,
7     for example, on a three year and five-year
8     period of target date funds, how is it that you
9     look at the target date fund as a whole in
10    order to encompass the performance of the
11    various vintages?
12         A.     Well, I think you're going to look
13    at, with the target date you're going to look
14    at potentially three different things.  You're
15    going to look at the overall target date level
16    and that would include all the vintages and
17    what the -- how that performance is.  And
18    depending on how you're reporting on it,
19    do you have a point system or not, whatever
20    mechanism you use for that.
21              Two, you're going to look
22    at each individual vintage and you're going to
23    certainly rank them as to whether they are
24    compliant or not in terms of peer group, in
25    terms of absolute performance.  And I think

Page 124

```
 1                    DONALD C. STONE
 2     that in some cases depending on what is going
 3     on on any given quarter you're not necessarily
 4     going to do this, but if you have a problem,
 5     you have an issue with a fund, then I think
 6     you're going to want to go and look at the
 7     funds that comprise each vintage and see what
 8     is happening with them.  Because one or more of
 9     those funds is probably or is definitely
10     driving that underperformance.
11                    Usually there is a couple that are
12     having the problem and you want to understand
13     is this something that is kind of something
14     that we might see from time to time or is there
15     a bigger problem.
16                    So I think you're going to look at
17     all of those as a part of that discussion which
18     you will have with the client.
19          Q.    Did you ever have a scenario where
20     you average the performance of the various
21     vintages to look at the average performance of
22     the underlying fund on a three year and
23     five-year basis?
24          A.    I've seen that done.  I think that --
25     I have some concerns about that because I think
```

Page 125

1                          DONALD C. STONE

2        it can hide issues.  I think as opposed to -- I

3        think it is done to kind of clarify things.  At

4        least that was the original idea.  We could

5        rate this fund a 6, we could rate it a 5, we

6        would rate it a 10, whatever the scoring would

7        be in that case.  And that keeps it simple in a

8        sense, but it also completely I think hides --

9        you don't really know what is going on or

10       what's driving that issue.

11                    So I'm skeptical of kind of

12       rolling that up in an average or, for example,

13       if I'm going to take an average, why wouldn't I

14       take a median and say that you could get into

15       this kind of go down a rabbit hole and I'm not

16       sure that is helpful to a committee.  Could

17       they use that, they can, if this is what they

18       choose to do.  If this is what their IPS says.

19                    Let me go back.  I think

20       committees operate differently and there is no

21       one perfect IPS and I'm not suggesting there

22       are.  I think there are elements that obviously

23       have to be in any IPS and committees can make

24       different decisions based on -- may make

25       different decisions based on similar facts in

Page 126

1                    DONALD C. STONE

2        some cases.  But, again, it comes back to it is

3        not about the outcome, it is about process with

4        ERISA.

5                Q.     Kind of along those same

6        questions with regard to evaluating the

7        performance of a target date suite.  In your

8        experience would you say that if in your

9        experience, Mr. Stone, in evaluating the

10       performance of a target date fund suite, would

11       you say that if more than 50 percent of the

12       underlying vintages were underperforming, that

13       that meant that the target date suite was

14       underperforming?  Did you reach that conclusion

15       in your experience?

16               A.     Yes.

17               Q.     Was that always the case?

18               A.     I would say, just again on that

19       hypothetical, I would say if 50 percent or more

20       are underperforming, then I think -- then

21       obviously I think there is an issue that needs

22       to be looked at with that particular target

23       date suite.

24               Q.     Could a committee look at the

25       performance and the level of performance or

Page 127

1                    DONALD C. STONE
2      level of underperformance and reach a different
3      conclusion?
4              A.    You kind of went to the heart of
5      what I said a few minutes ago.  You need to
6      evaluate it.  You can't just let it go.  You
7      need to spend the time to go an evaluate what
8      is the underperformance.  What is causing that
9      underperformance.  And then you may make a
10     decision that right now we think it is okay
11     still.  Okay.  I don't think that is possible
12     without doing the evaluation.
13                    In other words, the whole point
14     is what the -- the hypotheticals you're bringing up
15     trigger a needed response by the committee and
16     the response is not absolute, every single time
17     no matter what you have to do A and it is not
18     that you have to throw out the fund.  It's that
19     you have to evaluate it and make a
20     determination as to what the appropriate action
21     is.
22             Q.    One more hypothetical along these
23     lines and then we will move on.
24                    So say there was a target date
25     suite that underperformed its benchmark on a

Page 128

```
 1                    DONALD C. STONE
 2      three and five-year period, but that benchmark
 3      outperformed 90 percent of the other assets in
 4      it's class, would that inform how the committee
 5      evaluated the underperformance?
 6                    MR. ROBERTS:   Objection to the
 7               form.
 8               A.    Can you repeat that, please?
 9               Q.    Yes.
10                    MS. ENGELMAN:   Can you read it
11               back, Bill, because I'm not sure I can say
12               it.  If he doesn't understand it I can
13               rephrase it, but I don't know that I could
14               repeat it exactly as I said it.
15                    (Requested portion of record read.)
16               A.    What you're saying is the
17      benchmark measuring the target date fund
18      outperformed 90 percent of all of the other
19      target date funds?
20               Q.    Correct.
21               A.    So all the target date funds, 90
22      percent of them underperformed for some
23      hypothetical reason, and that's at least
24      theoretically possible.  Again, I think what
25      that would say to me, I, as a committee member,
```

Page 129

```
1                    DONALD C. STONE
2       I would say, wow, that is interesting
3       information.  So again, and that would probably
4       give me some degree of comfort in the
5       short-term in looking at this, but I would
6       still say, we need to understand why are we in
7       that 90 percent.  What are we doing or what is
8       our fund doing.  We just need to understand it
9       better.
10                     I think all of this triggers a
11      need for additional looking and scrutiny to the
12      situation.  It doesn't necessarily right off
13      top of the bat dictate an absolute answer.  It
14      dictates additional scrutiny.
15           Q.    So I was going down your
16      biography, Mr. Stone, and we went on a whole
17      detour.  So I'm going to reroute back to your
18      sort of your background.
19                     I understand doing the PSA time
20      period you served entirely as a 321 consultant
21      and then 2014, am I correct, that you sold PSA
22      to Pavilion?
23           A.    Correct, in June of 2014.
24           Q.    And you became an employee of
25      Pavilion at that time?
```

Page 130

1                    DONALD C. STONE
2          A.     That's correct.  I was an employee
3     and shareholder.
4          Q.     What was your role at Pavilion
5     from 2014 until you retired in 2019?
6          A.     I was -- my title was executive
7     director and I was responsible for a number of
8     relationships that I was -- had been -- was
9     personally working with at the time we sold the
10     company to maintain those relationships, to
11     make sure they stayed with Pavilion and to
12     ultimately transition them to other people, but
13     not in that initial three year -- the first
14     three years.
15                    Then I was also responsible for
16     being one of the spokespeople for the firm.  So
17     I did a lot of public speaking.  A lot of
18     conferences.  I did some writing.  I also
19     continued my being on the executive committee
20     of DCIIA, that's D-C-I-I-A, which you will see
21     in my CV or in the bio I should say.
22                    So I continued that role as well,
23     which was obviously promoting better outcomes
24     for participants.  But that gave visibility to
25     Pavilion.

Page 131

1          DONALD C. STONE

2               I also did due diligence on

3     managed account products and probably a couple

4     of other things along the way.  I did some

5     training of some of staff at Pavilion.

6          Q.    So did you -- in your role at

7     Pavilion, did you serve as a 338 advisor to any

8     clients?

9          A.    I did.  In 2017 I served as a --

10    began serving as a 338 for a defined benefit

11    plan of one my clients.  I want to say 1.2

12    billion or so.

13         Q.    Okay, do you remember which client

14    that is?

15         A.    Yes, it was I think in the record,

16    Packaging Corp of America.  In 2018 I became a

17    338 for the defined contribution plan as well.

18         Q.    Is that the only plan -- for

19    Packaging Corporation of America, is that the

20    only plan that you served as a 338 advisor?

21         A.    That's correct.

22         Q.    So the record is clear, what is

23    the difference between a 321 and a 338 advisor?

24         A.    So a 321 advises, provides advice

25    to clients that has no discretion.   The

Page 132

1                      DONALD C. STONE

2    ultimate decisionmaking responsibility lies

3    with the committee.  338 has discretion to act

4    on the investments within the mandate that they

5    have been given.

6                      So you could have a -- you

7    could be a 338 for one investment choice in a

8    plan, for example, or for the whole plan.  And

9    the committee still maintains some monitoring

10   responsibility of that 338, but it does shift a

11   lot of the liability for actual decisions to

12   buy fund A or fund B to the 338.

13        Q.    When did the 338 relationship,

14   your 338 relationship end with Packing

15   Corporation, is that when you left Pavilion?

16        A.    When I left Pavilion.

17        Q.    When did it start?

18        A.    So the defined benefit started in

19   2017, the defined contribution in 2018.

20        Q.    With respect to the 321

21   relationships, did you continue the relationships

22   you had from PSA into your time at Pavilion?

23        A.    I did.  And I was responsible for

24   transitioning those relationships into Pavilion

25   and helping ensure that they were happy and

Page 133

1                    DONALD C. STONE
2    would remain clients.  And then I was
3    responsible, ultimately, this would have been
4    in 2017, some time in 2017, maybe late 2017
5    early 2018, to begin transitioning those
6    relationships to other advisors within the firm
7    since I knew I was going to be retiring at -- I
8    didn't have an actual date at that point, but I
9    knew some time in the future I would be and it
10   wasn't that far off.
11            Q.    Just to take this step by step.
12   From 2014 to 2017, early 2017, how many clients
13   would you say that you were personally
14   providing 321 services for?
15            A.    Probably 15.
16            Q.    15?
17            A.    Yes.
18            Q.    Do you have an approximation of
19   the range of the plan size from small to big?
20            A.    Yes.  Probably the, probably from
21   the small end would be probably 30, 40 million.
22   With probably half of those relationships maybe
23   slightly more being just under or well over a
24   billion.
25            Q.    I missed that last part?

Page 134

1                    DONALD C. STONE
2          A.      Just under or well over a billion.
3          Q.      That is a large range.  How many
4    plans would you say were $100 million and less?
5          A.      I'm guessing at this point, but I
6    would say probably no more than three or four.
7          Q.      How many would you say were over a
8    billion?
9          A.      I said just under to over a
10   billion I think it was probably in the
11   neighborhood of 10 or so of the 15.  So there
12   is a couple that would have been in let's say
13   half a billion dollar range.
14         Q.      Did the quality of the services
15   that you provided as a 321 consultant vary
16   depending on whether it was a small client or
17   large client?
18         A.      No.  You asked me that earlier
19   today.  Even at Pavilion it was the same.  We
20   provided the same service.
21         Q.      Did you have -- for these 15
22   clients in this time period, did you have other
23   individuals working alongside you as a
24   consultant or was it just you?
25         A.      No, it was -- I had a team to help

Page 135

DONALD C. STONE

1

2    me.  For example, quarterly reports, we had at

3    that point we had probably 50 people doing

4    research in reporting.  I would have people who

5    would prepare reports for my review.  I would

6    have investment analysts who would do

7    additional information if there was a need for

8    some kind of a deep dive on a particular

9    manager or not, I would be directing someone to

10    get that information for me.  I might be

11    involved in that process as well, but I would

12    have somebody else who is kind of driving it in

13    that regard.

14                And I would usually have a, at

15    least, some other, I don't want to say junior

16    consultant, but somebody who was less

17    experienced than I was, let's just say it that

18    way, who would also go with me to meetings.  So

19    I would always have at least two people at a

20    meeting, sometimes three, depending on what the

21    topics were.

22                Q.    From 2017 on you said you started

23    to transition clients to people who were less

24    experienced; is that correct?

25                A.    Well, not necessarily people -- to

Page 136

```
1                    DONALD C. STONE
2      people who were not as close to retirement,
3      let's put it that way.
4            Q.    Did you have any role with respect
5      to those clients from 2017 on?
6            A.    It was an iterative process where
7      I was involved with some of them all the way
8      probably halfway through 2018, maybe a little
9      longer.
10           Q.    I'm going to ask a similar
11     question of PSA.  Do you feel that you
12     personally fulfilled your fiduciary duties with
13     being a 321 consultant with respect to each
14     plan that you worked with?
15           A.    Are you talking with Pavilion or
16     PSA?
17           Q.    Well, at both.
18           A.    Yes, I think I fulfilled my
19     responsibility, yes.
20           Q.    For the people -- for whom the
21     people that work under you and work with you,
22     do you have the same feeling with respect to
23     both PSA and Pavilion?
24           A.    Absolutely.  I trained a lot of
25     them, so it was a -- I trained a lot of them
```

Page 137

1                          DONALD C. STONE

2          and there was a particular way that we wanted

3          to -- if you want to think about it, it's a

4          process and we wanted to be very careful to

5          take care of our clients.  That is my personal

6          philosophy about how I approach things.

7                          So if you have a client -- you

8          have a responsibility to take care of them and

9          treat them the way that any other client would

10         be treated for that particular service that

11         you're providing.

12              Q.     With the committees with whom

13         you worked, do you feel as though they were

14         good and prudent committees?

15              A.     I do feel that.  Obviously there

16         was a range of skill sets.  There was a range

17         of size of committees, sophistication, so on

18         and so forth.  But this is where, you know, we

19         would not -- we actually refused to take on a

20         couple of assignments at some time in the past

21         I remember because I did not think they were

22         going to take it seriously and I thought it was

23         going to be a problem and I didn't want any

24         part of it.

25                          So the key is is that every single

Page 138

1                    DONALD C. STONE

2        committee we drove the process to say you have

3        to get -- we are going to provide fiduciary

4        education and somebody joins the committee,

5        there is a process that they go through.  They

6        get removed from the committee we want to make

7        sure that they actually have been removed from

8        the committee and documented in writing.  It's

9        a very clear process frankly to avoid problems,

10       but also most importantly to make sure, to the

11       extent that you possibly can, you're acting in

12       the best interest of the participants.

13              Q.    You mentioned a range skill sets.

14       What do you mean by that?

15              A.    People come on to a committee,

16       there are people you go in and the committee is

17       already in existence, the plan is already in

18       existence and you get to know people and you

19       realize -- not to pick on HR, but quite often

20       HR is not as investment savvy as the finance

21       people.  And then sometimes the finance people

22       think they are more savvy than they actually

23       are in terms of fiduciary issues or whatever.

24                    So committees from a large

25       corporation tend to have a bigger talent pool

Page 139

1                      DONALD C. STONE
2      to pick from to be on the committee.  Sometimes
3      they have already got established more robust
4      processes before we come in.  Sometimes not.
5                      And at smaller clients quite often
6      we go in and here is what we would like to do,
7      which is one of the reasons that we got hired.
8      This is what we -- the process that we want to
9      go through to get you tuned up to where you
10     need to be to make sure you're overseeing the
11     plan appropriately, to make sure that we are
12     doing the best job, you're doing the best job
13     that you can for the people in the plan.
14             Q.     Was it generally common in your
15     experience for HR folks to be part of the
16     committee?
17             A.     Yes.
18             Q.     Is that because the committee does
19     more than simply do financial analysis and
20     monitor investment performance?
21                    MR. ROBERTS:   Objection to the
22             form.
23             A.     Yes, typically -- sometimes there
24     was a separate administrative committee, so
25     that's not unusual at some large corporations.

Page 140

1                    DONALD C. STONE

2      But generally it is one committee and the -- so

3      there are issues that you deal with in terms of

4      plan design.  There are issues that you deal

5      with in terms of, did you payroll right.  Did

6      you not include -- there are a lot of issues

7      that happen with these plans and everything and

8      so all of those issues would typically come to

9      a committee at least to report out what is

10     being done.

11                    In some cases those administrative

12     issues would be handled outside the investment

13     committee room, but they would report back in

14     as to what the follow up was.  There was a lot

15     of issues in terms of revenue sharing, in terms

16     of how we are going to account for, we have a

17     para account which is an account that could be

18     set up to pay expenses of the plan and to

19     actually reimburse companies for people who are

20     working, spending most of their time working on

21     issues around the plan and there are

22     complicated rules around that.

23                    So there is a lot of things that

24     an administrative person does versus an HR

25     person.  Certainly the whole plan design issue

Page 141

1               DONALD C. STONE

2     is a big issue for that side of the house.

3          Q.     Generally speaking at Pavilion,

4     are you aware of any consultants who worked

5     there who you do not think fulfilled their

6     obligations as a 321 consultant or otherwise

7     worked with imprudent or disengaged committees?

8          A.     I can't speak to whether -- to

9     what the committees were like for somebody that

10    I never met.  So I can't really speak to that.

11               I would say the staff, all of the

12    consultants at Pavilion, I think I met all of

13    them because we had multiple offices, but all

14    the ones that I knew I think were serious and

15    dedicated about the work they did.  And we had

16    a common process about how we went about --

17    what we presented to clients and how that --

18    how those decisions got made at to what to show

19    them.

20               To go back to what we talked

21    about earlier today.  The process for picking a

22    target date fund would have been the same if it

23    was me, if it was a colleague of mine who came

24    over from PSA or if it was somebody who had

25    been at Pavilion for ten years before we sold

Page 142

```
1                    DONALD C. STONE
2      the firm to Pavilion.
3           Q.    Got it, okay.  And that would be
4      the same for not just selecting a target date
5      fund, but retaining a target date fund or
6      monitoring a target date fund?
7           A.    That's correct.  All of that would
8      be the same and in fact the research person who
9      was primarily responsible for spearheading the
10     target date efforts and to track them and to
11     investigate all the products that were out
12     there was one of my staff from PSA that came
13     over.
14          Q.    And she did all of that work for
15     Pavilion?
16          A.    He did.
17          Q.    He did, sorry.  When you sold the
18     business from PSA to Pavilion, did the
19     reporting capabilities change?  We talked
20     earlier about reporting capabilities and how
21     those can change over time.  Did that happen?
22          A.    So the defined contribution
23     reporting essentially stayed the same.
24          Q.    Okay.
25          A.    The defined benefit reporting was
```

Page 143

1                      DONALD C. STONE

2       enhanced because Pavilion had been primarily

3       focused on endowments, foundations and defined

4       benefit plans and one of the reasons why they

5       wanted to acquire our firm is because of their

6       expertise in defined contribution was more

7       limited.  So we had more resources, I will say,

8       but the systems that we used, the actual

9       reporting systems that we used I don't believe

10      changed at all.

11           Q.    You talked earlier, sort generally

12      speaking in the industry how reporting systems

13      can change.  Do you recall that testimony?

14           A.    Are you talking about scoring

15      systems or are you talking about reporting --

16      like there are three or so major reporting

17      systems that everybody basically goes out and

18      buys.  I'm not sure what you're saying.

19           Q.    What are those reporting systems?

20           A.    One of them was produced by

21      Morning Star.  One of them is produce by

22      Markoff Systems and the third is -- the third -- I'm

23      not remembering the name right at the moment.

24                 Quite often it is not unusual for

25      a shop to have two of those in-house and use

Page 144

1                    DONALD C. STONE

2     them in different ways.

3          Q.     Those reporting systems may have

4     different metrics embedded into them and spit

5     out different metrics in different formats?

6          A.     They all have the same metrics

7     available.  You can select which metrics you

8     want to see.  If you're printing out something,

9     you can go in and customize those pages to

10    include only the -- you can suppress some data

11    and include other data, depending on what as a

12    firm you decided what you want to show a

13    client.  All the metrics are available on all

14    of these systems.

15                    Generally speaking, if you go

16    and look at -- I looked at probably the vast

17    majority -- I've looked at all major firms out

18    there for sure, they are all pretty much

19    reporting the same stuff.  It may look maybe

20    formatted a little differently, but there is

21    nobody out there who is, that I know of, who is

22    not reporting or peer groups.  There is a

23    nobody out there who's not reporting absolute

24    performance.  There is nobody out there that's

25    not doing risk adjusted performance and so on

Page 145

1                    DONALD C. STONE
2       and so forth.  So everybody is providing that
3       same data pretty much.
4              Q.    So you did mention scoring systems
5       earlier.  How many of your clients at PSA or
6       Pavilion utilized a score system of some sort?
7              A.    I don't think we used a scoring
8       system at the client level at all.  In fact I
9       know we didn't.  We never did that.  A lot of
10      our -- okay, some of our colleagues did and
11      some of our colleagues didn't, but we never did
12      use that.
13             Q.    Do you have an opinion about
14      whether or not just as a general matter a
15      scoring system is appropriate or inappropriate
16      in evaluating investment options?
17             A.    I guess I will ask you what do you
18      mean by appropriate or inappropriate in the
19      context of what we are talking about here?
20             Q.    Do you think it's a prudent way to
21      monitor investment options as a general matter
22      or an imprudent way as a general matter?
23             A.    I don't think it is necessarily
24      imprudent.  I'm not a huge fan of scoring
25      systems, but I don't think by definition they

Page 146

                         DONALD C. STONE
1
2      are imprudent, no.
3             Q.      Mr. Stone, in your report you
4      make several references to the relevant time
5      period.  What time period are you speaking
6      about?
7             A.      Can you show me a particular
8      place in my report where that -- I'm not going
9      to do a memory test tonight.
10            Q.      Sure.  Give me a second.
11     Paragraph 60 as an example.
12            A.      6-0?
13            Q.      Yes.
14            A.      Let me get to that.  I'm on 60.
15     You want me to read through that?
16            Q.      In the second sentence you say,
17     "The committee generally met quarterly during
18     the relevant time period."
19                    What is the relevant time period
20     that you're referring to there?
21            A.      Well, I would be referring to the
22     class period is I guess what I'm saying.
23            Q.      Okay.  What is the class period?
24            A.      I believe it began in the end of
25     2014 and runs to the present.

Page 147

1                    DONALD C. STONE

2          Q.     You believe it began in 2014?

3          A.     I think at the end of 2014 is when

4     it began.

5          Q.     So if we turn to the conclusions

6     in your report which are on page 66 paragraph

7     148.

8          A.     66 paragraph 148.  Okay, I'm

9     there.

10         Q.     It says, "The conclusion is the

11    committee failed to established and apply a

12    reasonable process to monitor the challenged

13    investments."  Do you see that?

14         A.     I do.

15         Q.     So what are the challenged

16    investments that you're referring to there?

17         A.     I think we are referring to the

18    Freedom Funds.

19         Q.     Anything else?

20         A.     I think that's the focus.

21         Q.     So when you say the committee

22    failed to establish and apply a reasonable

23    process, do you have a time period associated

24    with that?

25         A.     It is over the entire period that

```
 1                    DONALD C. STONE
 2      is covered within my report which talks --
 3      which focuses obviously starting in 2014 and
 4      goes into probably 2020 at least.
 5           Q.    Do you have a sense of when the
 6      class period runs through?
 7           A.    Well, the class period as I
 8      understand it, that we are still in the class
 9      period.
10           Q.    You said your report ran from 2014
11      to 2020; is that correct?
12           A.    2020 is about where it I stopped
13      commenting on things, yes.
14                 MS. ENGELMAN:   Can we go off the
15            record, I'm having issues with him freezing
16            and I don't know if it's just me.
17                 THE VIDEOGRAPHER:   The time is 7
18            p.m. and we are off the record.
19                 (Recess Taken.)
20                 THE VIDEOGRAPHER:   The time is 7:05
21            and we are on the record.
22                 MS. ENGELMAN:   Bill, would you mind
23            reading back the last thing that you have.
24                 (Requested portion of record read.)
25      BY MS. ENGELMAN:
```

Page 149

1                    DONALD C. STONE

2          Q.     Why is it that you stopped

3    commenting around 2020?

4          A.     Basically the period that I was

5    focused on has to do with the behavior that

6    took place in 2015, 2016, 2017, 2018, 2019.

7    2020 they put in a new IPS and I think there

8    was, also at that point there was some

9    additional training that was being offered from

10   a fiduciary perspective.

11              So I didn't think there's was a

12   lot else to comment on that point.  In talking

13   with counsel that was the period they wanted to

14   focus on I guess is the best way to put that.

15         Q.     So is it your opinion that -- did

16   you review all of the materials relating from

17   2020 forward or you didn't review the materials

18   at all?

19         A.     No, I did.  I reviewed all the

20   documents that I said I reviewed.  I looked at

21   all of them.  If you notice there is nothing in

22   my report that goes into that further period.

23         Q.     So when we look at the litigation

24   documents that are cited in Appendix B, that

25   goes through 2024, the first quarter of 2024

Page 150

                    DONALD C. STONE

1    and you reviewed all the materials through
2    2024; is that correct?
3            A.    What was the last document in
4    2024?
5            Q.    It looks like you reviewed the
6    meeting -- everything up to Q1, 2024.
7            A.    That sounds right, yes.
8            Q.    Do you know when in 2020 your
9    recorder of what month your opinion essentially
10   stopped?
11           A.    I'd have to look at my report to
12   figure that out at this point.
13           Q.    Sitting here today without looking
14   at your report you don't know when in 2020 you
15   stopped defining?
16           A.    No, I can't tell you what month,
17   no
18           Q.    But it was some time in 2020?
19           A.    That's the last thing that I
20   actually wrote about, yes.
21           Q.    Is it your opinion then from 2020
22   to 2024 that the process was prudent?
23           A.    I did not reach a judgment as to
24   whether it was prudent or not during that
25

Page 151

1                     DONALD C. STONE

2     period.

3              Q.    So when we say -- when we look

4     at your conclusions on paragraph 148 when it

5     says, "The committee failed to establish and

6     apply reasonable processes to monitor the

7     challenged investments."  You're talking about

8     a period that is from 2014 to some time in

9     2020; is that correct?

10             A.    Yes, that be would correct.

11             Q.    So from 2020 on it is not your

12    conclusion that the committee failed to establish

13    a reasonable process to monitor the challenged

14    investments; is that correct?

15             A.    Well, again, I have no comment on

16    it.  There is commentary in my report.

17             Q.    What I'm trying to understand is

18    if you independently made a determination as to

19    the reasonableness of the process during that

20    time period or whether counsel told you that

21    you should not focus on that time period?

22             A.    Counsel did not tell me not to

23    focus on it, but we did not focus on that time

24    period.

25             Q.    Who is we in that sentence?

Page 152

1                    DONALD C. STONE
2            A.     Well, I didn't spend my time
3      looking at documentation on that.  So I think
4      it has to do with when the -- the Freedom Funds
5      changed over was what, 2019, so that's a
6      significant change.  When they got out of the
7      Freedom Funds and got into the other fidelity
8      funds that is where my opinion ends.
9            Q.     You think that happened in 2019,
10     is that your testimony?
11           A.     I think they switched, again, I
12     don't want this to be a memory test, we could
13     look at my report.  I think they switched out
14     of the Freedom Funds in 2019.  I don't remember
15     what month.
16           Q.     So focusing I guess on the -- do
17     you know what month your review in 2014
18     started?
19           A.     I looked at all of 2014, because I
20     looked at -- actually I looked at all of 2014.
21     I was looking at meeting minutes so I would
22     call it the entire year of 2014.
23           Q.     So from January 1st, 2014 to some
24     time in 2020 was the focus of your review?
25           A.     That's what my report covers, yes.

Page 153

1                  DONALD C. STONE

2          Q.     When you say that the committee

3    failed to establish an apply a reasonable

4    process to monitor the challenged investments,

5    is there anything specific in 2014 that was

6    unreasonable in your view?

7          A.     Well, I think one of the things is

8    we don't know how the Freedom Funds got into

9    the mix in the first place.  They were selected

10   prior to -- I believe prior to Ascende being

11   the advisor, if I remember correctly.  So when

12   you look at the minutes, again, the minutes to

13   me and the IPS is from 2015.  So -- I don't

14   think it was -- I don't recall an IPS prior to

15   that.  So the IPS was 2015 I guess is the

16   relevant document.

17         Q.     So I appreciate that.  My question

18   is a little different which is, can you identify

19   anything specific into 2014 that the committee

20   did that was unreasonable with respect to

21   monitoring the Freedom Funds?

22         A.     I don't think they had a process

23   in place to monitor them that tied to the IPS.

24   What the advisor was providing, I don't know

25   that it tied to an IPS.

Page 154

1                    DONALD C. STONE

2          Q.     In 2015 is there anything specific

3     other than what you just mentioned that you

4     identified as unreasonable with respect to

5     monitoring the Freedom Funds?

6          A.     Well, again, I think in 2015 the

7     funds should have been -- they were on -- they

8     were on watch and they were on watch -- one of

9     interesting things, they weren't on watch for

10    underperformance and yet the funds were

11    underperforming.  And that ties into the IPS.

12    But what they were actually on watch for, at

13    least the way they came off of watch later on,

14    they are were on watch because of the lack of a

15    three year performance number at all for some

16    of the underlying funds.

17              I think that raises a question

18    about how they got selected in the first place.

19    If you don't have a track record you can look

20    at how do you make a selection in that

21    particular instance.  That's the first thing.

22              The second thing is, if they

23    actually are underperforming overall, each

24    underlying fund, why wasn't it on watch for

25    that purpose at that particular time.

Page 155

```
 1                    DONALD C. STONE
 2          Q.      Mr. Stone, are you offering an
 3    opinion on the committee's selection of the
 4    Freedom Funds?
 5          A.      No, that is prior to the class
 6    period.  So I don't have an opinion on that.  I
 7    think -- I have questions in my mind about it.
 8    I have no idea how it got in there.  I guess
 9    I'm saying Ascende doesn't seem to have asked
10    how it got in there as well and didn't seem to
11    do any due diligence, from what I see in the
12    record on how they got in there as well.
13                  Again, it is prior to the class
14    period, so that's kind of not an issue.  I'm
15    not volunteering any opinion.
16          Q.      So it has nothing to do with your
17    report; is that right?
18          A.      I think --
19                  MR. ROBERTS:   Objection to the
20          form.
21          A.      I think the selection process -- I
22    have questions -- it carries forward.  Okay so
23    in the period when they were chosen in a sense
24    is not relevant because it is before the class
25    period.  But the same behavior, unless it is
```

Page 156

```
 1                   DONALD C. STONE
 2    corrected, carries forward into the class
 3    period in which case nobody looked at why they
 4    got selected.  Nobody went back and why did we
 5    select these things, why are they here.
 6                   There was is an opportunity to do
 7    that when they were on watch for not having
 8    three year numbers in some of the funds.  That
 9    would have been an opportunity for the
10    committee and advisor to suggest that they go
11    and take a deeper look and understand how did
12    they choose these and are there -- do we want
13    to consider other alternatives.
14         Q.    Was is it your opinion that when
15    Ascende became the advisor in 2015 it should
16    have evaluated whether or not the Freedom Funds
17    were an appropriate investment option?
18         A.    I would think they would have done
19    that for all the investment options that were
20    in the plan.  That would be a normal part of
21    the process.
22         Q.    Is it your opinion if at any time
23    that Ascende became the investment advisor
24    there was any underperformance as compared to
25    benchmark or peer groups, that that fund would
```

Page 157

                        DONALD C. STONE
1
2    be removed at that time?

3          A.    Again, I can go back and look and
4    say what does the IPS say and the answer I'm
5    going to give is the same one I gave awhile
6    back which is, it doesn't instantaneously mean
7    that you're going to remove it.  It means it
8    needs to be reviewed and you need to understand
9    more of the reasons for the underperformance.
10   And there may be a reason that you would keep
11   it and there may be a reason why you would
12   remove it.

13         Q.    Got it.

14               Moving forward, I want to make
15   sure it is clear that your opinion is that anything
16   prior to the class period is irrelevant, correct?

17               MR. ROBERTS:    Objection to the
18          form, misstates testimony.

19         A.    What I said was is that the
20   behavior carries forward and is current during
21   the class period because they didn't change
22   anything.  They had an opportunity to look at
23   it and see whether it was appropriate or not,
24   but they didn't do that.

25               So obviously I could have an

Page 158

                      DONALD C. STONE

1

2      opinion about 2009, that wouldn't make any

3      difference either.  That is irrelevant.  But

4      what is relevant is that if a behavior carries

5      forward into the class period, it is relevant

6      to that case.  And that behavior did carry

7      forward because nothing changed.  They didn't

8      do a look at that and determine whether or not

9      it was still an appropriate choice to have in

10     the plan.

11          Q.     In 2016 did you identify any

12     particular deficiencies or parts of the process

13     that were unreasonable in 2016?

14          A.     Well there is things in my report

15     and -- I don't -- well I could go through the

16     report, there are comments about 2016.  But I

17     have to look through the report.  I'm not going

18     off my memory to try to remember specific dates

19     or things in 2016.  If you want to show me

20     something in my report I'm happy to comment on

21     it.

22          Q.     Well get through it.  I'm

23     wondering sitting here today whether or not you

24     have an opinion on whether or not you know

25     there was something in 2016 that you deemed to

Page 159

```
                    DONALD C. STONE
 1
 2      be unreasonable in the process?
 3            A.     I think the -- again, without
 4      looking at my report, which is what I would ask
 5      to do, but having said that, the behavior in
 6      2016, nothing changed, okay, in terms of trying
 7      to comply with the IPS.  There were a couple of
 8      funds that I believe -- I think it was 2016,
 9      but again I would like to look at my report to
10      confirm it, where the way it was reported by
11      Ascende is different than the way the IPS
12      reads.  The two didn't sync up.
13                   The committee didn't pick up on
14      this, they were getting reporting that was
15      showing compliance in one way when the IPS
16      called for compliance in a different way.  And
17      that happened a couple of different times over
18      different time periods.
19            Q.     The same question for 2017, just
20      do you have any sitting here today do you have
21      any opinion as to whether there was something
22      inspect in 2017 that was unreasonable with
23      respect to monitoring the Freedom Funds?
24            A.     There is certainly -- in 2017 is
25      when there was a draft of the IPS that was -- a
```

Page 160

1                    DONALD C. STONE

2      new IPS was drafted, but it was not adopted.

3      But Eagar, I guess that's his last name, Eagar,

4      specifically said that the reporting that they

5      provided to the committee was based on that

6      2017 IPS which was never adopted.  So the

7      committee was getting information that really --

8      they weren't able to -- they weren't getting

9      the appropriate information as to compliance

10     on -- I don't know how many different funds

11     were affected, but definitely some were

12     affected in that regard.  And they didn't ask

13     about it.  And I think they were kind of

14     getting, just assuming that the investment

15     advisor was tying about back to the IPS or not,

16     but they weren't.  And they didn't ask about it

17     and that's their responsibility.

18             Q.    Other than what you just

19     mentioned, anything in 2017 that you deemed to

20     be unreasonable with respect to monitoring the

21     Freedom Funds?

22             A.    Again, I would want to look at my

23     report.  I don't want to try to go off my

24     memory particularly it is getting late here.

25     I'm happy to go look at any page that you like

Page 161

1                    DONALD C. STONE

2      and comment on it.

3          Q.     We will do that, I want to get

4      through these questions.

5                    2018, anything that you can recall

6      that you identified specifically for that

7      reason that was unreasonable in terms of

8      Quanta's process for evaluating the Freedom

9      Funds?

10         A.     Well I don't think anything change

11     in 2018, so I guess the same thing would apply

12     in 2018 in terms of the performance reporting

13     being based on an IPS that had not been

14     adopted.  So that is problem.  Nobody asked

15     anything else about it.  There may have been

16     other things, but again, I would refer to my

17     report.

18         Q.     What about 2019?

19         A.     Another draft IPS which was

20     ultimately adopted in 2020.  And actually one

21     thing that I would want to comment on going

22     back over this period that you were just asking

23     about, as a part of this in the noncompliance,

24     there were three different systems over that,

25     call it 4 1/2 year period.  Three different

Page 162

1                        DONALD C. STONE

2     scoring systems that were being used by

3     Ascende and its successors that don't tie to an

4     IPS.  Don't tie to the IPS that Quanta had

5     specifically.

6                    So they had three different ways

7     they were getting reporting.  So they were not

8     getting the information they needed and they

9     were making decisions based on information that

10    in some cases was not accurate as to how they

11    would expect to see compliance.  So some things

12    may have been showing as compliant when they

13    weren't and vice versa and what have you,

14    because they weren't operating off the existing

15    IPS.  And it kept changing the system that they

16    operated off of.

17                    And at one point and this one I

18    don't understand at all.  I believe this was in

19    2019, basically the committee said stop showing

20    us these scores on each of the funds.  They

21    just wanted to see whether it was pass or fail.

22    Then one of the committee members, I think it

23    was Campbell said that she didn't want to see

24    the word fail.  She wanted to use a different

25    word.

Page 163

1                        DONALD C. STONE

2                   But bottom line they didn't -- so

3       there was additional information, I would think

4       any committee would want to know what the score

5       was.   If you're using a scorecard, even it's

6       the wrong one in this case, if you're getting

7       reporting on it, you'd want to know what the

8       score was because, to your point earlier, what

9       if you're just one basis point off, well that

10      is a different circumstance than if you're a

11      hundred basis points off.  They didn't want the

12      score.  So the score got dropped on that.  I

13      have no idea why that happened.  I don't find

14      that to be a good system to be followed.

15          Q.    Mr. Stone, isn't it exactly the

16      opposite, that if you don't get the score but

17      you just look at the underlying criteria, you're

18      actually looking at the level of performance as

19      opposed to what the scores tells you?

20                  MR. ROBERTS:   Objection to the

21            form.

22          A.    So it depends on what they

23      received.  But, yes, if you get the underlying

24      information, that's great.  But if the -- but

25      the score is what is driving whether or not it

Page 164

1                    DONALD C. STONE

2       was compliant or not.  That's where the

3       disconnect is on that.  You can have the

4       information and the information could be saying

5       whatever about the fund which could be good,

6       not good, whatever, but the -- what made it

7       compliant or not was the score that it got.

8       They didn't want to see the score.  You can

9       have a fund that was actually okay, but if it

10      had a bad score then it would be showing as not

11      okay.

12                    So I think the process is --

13           Q.    Okay.  Do you take issue with the

14      fact that the committee wanted to evaluate the

15      underlying quantitative metrics independently

16      on their own as opposed to looking at a score

17      irrespective of the IPS just as general matter?

18      Do you take issue with that?

19           A.    I don't have an issue with them

20      wanting to look at the information, the underlying

21      information about each of the funds.  That is

22      not an issue.  But I would expect them to look

23      at it in relationship to the IPS.  To not have

24      the IPS as part of that conversation I think is

25      a problem.

Page 165

1                  DONALD C. STONE
2           Q.      We will come back to that later.
3      I want to focus on 2020.  Do you have any
4      specific issues with the process that the
5      committee undertook with respect to evaluating
6      the Freedom Funds?
7           A.      Again, I would say I would like to
8      look at my report and --
9           Q.      Sir, you can look at your report
10     any time you like.
11          A.      I'm sorry?
12          Q.      You can look at your report any
13     time you like.
14          A.      I understand that.  If I'm having
15     to search for where something is, it could take
16     some time to find some of those things as
17     opposed to you have some very specific things
18     in mind and I think it will serve the purpose
19     of everybody better if you'd direct me where
20     you'd like me to look and comment.  I'm happy
21     to do that.
22          Q.      I understand, I will.  I'm just
23     trying to understand based on your knowledge
24     sitting here today whether or not you know
25     there is anything in 2020 specific.

Page 166

1                    DONALD C. STONE

2                    You mentioned in 2020 a new IPS

3        was adopted, isn't that correct?

4            A.      That's correct.

5            Q.      Do you have any recollection of

6        whether or not that IPS had any sort of scoring

7        system attached to it?

8            A.      I believe it did, but again, I

9        would like to look at my report.

10           Q.      If it did, did you look to see

11       whether or not the committee from 2020 forward

12       received information that was consistent with

13       the scoring system in the 2020 IPS?

14           A.      No, I don't think so.

15           Q.      Why not?

16           A.      Well, again, at that point the

17       Freedom Funds were not in the mix.

18           Q.      Okay.  So it is your opinion that

19       as of 2020 the Freedom Funds were not in the

20       mix and therefore you did not need to review

21       the committee's fiduciary process from 2020

22       forward?

23                   MR. ROBERTS:   Objection to the

24               form, misstates testimony.

25           A.      I was not asked to review from

Page 167

1                    DONALD C. STONE

2      that point forward for to '24 to have an

3      opinion about that because the funds that were

4      at issue were not in the plan.

5              Q.    If the funds were in the plan past

6      2020, would there be a reason that you wouldn't

7      look to see if the scoring system matched with

8      the criteria that the fiduciary committee was

9      evaluating?

10             A.    No.

11             Q.    So you would agree that you should

12     have done that if the Freedom Funds were still

13     in the plan as of 2020?

14             A.    Yes.

15             Q.    Do you know if there are any other

16     challenged investments in this case?

17             A.    The only ones that I'm aware of

18     were the Freedom Funds at this point.

19             Q.    So Mr. Stone, do you have an

20     opinion, based on your review of the materials

21     in your report, that there should have been

22     action with respect to the Freedom Funds by the

23     committee?

24             A.    Yes.  I think that as of the end

25     of -- as of the fourth quarter 2015 they would

Page 168

1                    DONALD C. STONE

2       have been on -- they could have been a watch

3       for four quarters at least at that point.  In

4       fact I think that would have been a fifth

5       quarter at that point.  I think, again, there

6       should have been a process where the committee

7       took a very hard look at whether those funds

8       should have been removed or should have stayed

9       in the plan and there should have been

10      documentation either way on what conclusion

11      they reached and why.

12              Q.    Do you have an opinion that they

13      should have removed the Freedom Funds as of a

14      certain date?

15              A.    Again, I think they needed to do

16      the analysis to determine -- so my remit here

17      was to talk about fiduciary process.  I didn't

18      do a deep dive and your question is assuming

19      that I went out and did independent analysis of

20      the Freedom Funds during that particular period

21      and ran all the analytics and everything and I

22      did not do that.  I was not asked to do that.

23              Q.    I understand --

24              A.    So it goes back again to the point

25      I was -- my role as an expert is to talk about

Page 169

1                    DONALD C. STONE

2    fiduciary process, not necessarily to provide

3    in-depth information about any particular

4    investment at that time.

5            Q.    But you mentioned the fourth

6    quarter of 2015, you made a specific very

7    specific reference to that and underperformance.

8    So what I'm asking you is, do you have an

9    opinion as to the fiduciary process, whether or

10   not the process should have -- my question is,

11   you mentioned fourth quarter of 2015?

12           A.    Yes.

13           Q.    So what is the issue with the

14   fourth quarter of 2015 that you were referring

15   to?

16           A.    The number of quarters that the

17   fund could have potentially been on watch for

18   underperformance.

19           Q.    So is it your opinion that it

20   should have been on watch or that it could have

21   potentially been on watch?

22           A.    I think it should have been on

23   watch and I think the committee should have

24   determined that, but they did not put it on

25   watch or performance.  In fact they -- it gets

Page 170

1                    DONALD C. STONE

2       worse, because they took it off of watch, it

3       had been on watch for the fact that some of

4       funds, underlying funds did not have a three

5       year history.  And when those funds got a three

6       year history, irrespective of the fact that the

7       funds were underperforming relative to the

8       benchmark, they took it off of watch at that

9       point which I think is -- sends a very strange

10      signal and is something that I can't recall

11      seeing in my past and everything that you would

12      take a fund, even if it is on watch for a

13      different reason, at the time that you start --

14      you want to remove it from being on watch in

15      this case for some of the underlying funds not

16      having a performance history.

17                    I cannot recall seeing a fund come

18      off of watch that in fact has a long period of

19      underperformance at that point.  I think that

20      just speaks to me that they weren't looking at

21      the underperformance at all and it could get

22      kind of crazy if the next quarter they decide

23      to look at it and say oh, this underperformance

24      is really a problem we need to put it on watch

25      again.  I think that process is -- that's a bit

Page 171

1                    DONALD C. STONE

2      of a mess.

3            Q.    So we will get to some of those

4      details.  I'm just trying to hone in on whether

5      or not you have an opinion that the committee

6      should have removed the Freedom Funds from the

7      plan lineup at a certain period of time?

8            A.    I think they should have done -- I

9      keep coming back to this.  I haven't done -- I

10     don't have all of that analytic data in front

11     of me.  I know the number of quarters that it

12     was underperforming and I know by how much

13     because that is in the report here.  But what I

14     don't have, I don't have the information to

15     make the determination that you're asking me to

16     just blithely say it should have been removed.

17                  What I can say, it should have

18     been subject to substantially more analytical

19     analysis which might have resulted in it being

20     removed, but I can't say at this point because

21     the work wasn't done.

22                  MS. ENGELMAN:  So let's pull up the

23          IPS, the 2015 IPS Maria.

24                  (Exhibit 2 for identification, 2015

25          IPS.)

Page 172

1                    DONALD C. STONE

2          A.    I assume it is still loading.

3          Q.    It usually takes a minute.  I'll

4    get to that in a second.  I'm going to turn

5    your attention to --

6                    MR. ROBERTS:   It looks like it is

7             up now.

8          Q.    One question for you, Mr. Stone.

9    You mentioned some draft IPSs.  Is it your view

10   that those were operative or inoperative?

11         A.    They were not operative in my view

12   and I think a couple of committee members

13   specifically said they, in their deposition,

14   they did not think it was operative.  And I

15   would say it was not operative because it was

16   never signed.

17         Q.    You make some references to the

18   draft IPSs in your report.  Why is it did you

19   do so if they are not operative in your view?

20         A.    Because I think they were used by

21   the advisor to generate their reporting.

22         Q.    Do you see it Mr. Stone?

23         A.    The IPS?

24         Q.    Yes.

25         A.    I have it open.

Page 173

1              DONALD C. STONE

2         Q.    This is the 2015 IPS; correct?

3         A.    Yes.

4         Q.    And in your view this was in

5    operation until the 2020 version went into

6    effect; is that right?

7         A.    That would be correct.

8         Q.    And you had an opportunity to

9    review this IPS as part of drafting your

10   report?

11        A.    I did.

12        Q.    Generally speaking, is it a pretty

13   typical IPS in your experience?

14        A.    For the most part, yeah, I would

15   say, yeah, they all vary a little bit, but for

16   the most part it is fairly typical, yes.

17        Q.    Is there anything that you can

18   identify that is not typical, in your experience?

19        A.    No, I was just thinking about

20   that.  I don't mean to say there is something

21   atypical.  I think the -- as we go through it,

22   I can't think of anything that is a major

23   problem or issue with the 2015 IPS, no.

24        Q.    So you opine -- let's just take a

25   step back here.  If we turn to page 2 of the

Page 174

1                    DONALD C. STONE

2    IPS.

3              A.     Okay.

4              Q.     That last paragraph where it says

5    "The purpose of the IPS is to provide the plan

6    and fiduciaries with guidelines which will

7    establish the plan's investment objectives and

8    the process for promoting these objectives."

9    Do you see that?

10             A.     I do.

11             Q.     I think you testified earlier that

12   you agree that the IPS is a guideline for the

13   committee?

14             A.     Yes, I think I testified that in

15   general it's a guidepost that the committee

16   uses to have a consistent process.  But there

17   are parts of it that are obligatory and parts

18   that are not obligatory and subject to the

19   discretion of the committee members.

20                    Again, this gets back to the

21   language that we talked about earlier.  If it

22   says will, then I think they have to follow it.

23   That is what will means.  If it says may, then

24   that obviously applies discretion on the part

25   of the committee.

Page 175

1                    DONALD C. STONE
2          Q.    So if you can turn to page 12 of
3     the IPS.  Are you there?
4          A.    The Bates number seems to be right
5     on top of it, so I'm just -- tell me what it
6     says at the top of the page and I will be sure
7     that I'm on the right one.
8          Q.    I'm looking at "Investment
9     Objectives Criteria for Review and Review
10    Processes".
11         A.    Okay, that is what I'm on.
12         Q.    "Performance Evaluation Criteria."
13    Are you with me?
14         A.    I am.
15         Q.    The second sentence says, "To
16    address this the committee will monitor the
17    plan's investment performance on at least an
18    annual basis and evaluate each of the
19    investment opportunities pursuant to the
20    guidelines detailed herein."  Do you see that?
21         A.    I do.
22         Q.    Do you agree with me that the
23    committee monitored the plan's investment
24    options more than on an annual basis?
25         A.    Yes.

Page 176

1                    DONALD C. STONE

2          Q.    Then it says, "Performance

3    evaluation will include, but not be limited to,

4    comparisons to appropriate benchmark, indexes

5    and peer group comparisons."  Do you see that?

6          A.    I do.

7          Q.    Do you agree with me that the

8    committee evaluated performance and the IPS

9    mandated that performance be evaluated not just

10   on benchmark, but on peer group comparisons and

11   other factors?

12         A.    Yes.

13         Q.    Do you see the next sentence where

14   it says, "Performance will be measured by

15   comparing rates of return to appropriate market

16   indexes and peer groups for the most recent

17   quarter, year to date, one year and three year

18   periods and longer periods where available."

19   Do you see that?

20         A.    But that is not the next sentence,

21   that was the next -- that was another paragraph

22   down.

23              MS. ENGELMAN:   It is saying my

24         internet connection is unstable, can we

25         take five.

Page 177

```
 1                    DONALD C. STONE
 2                    THE VIDEOGRAPHER:   The time is 7:47
 3           and we are off the record.
 4                    (Recess taken.)
 5                    THE VIDEOGRAPHER:   The time is 8:01
 6           and we are on the record.
 7                    MS. ENGELMAN:   Bill, can you tell
 8           me the last thing that you got.
 9                    (Requested portion of record read.)
10      BY MS. ENGELMAN:
11           Q.    You see it in the IPS, is that
12      correct, on the page?
13           A.    I do.
14           Q.    So then we look at -- if we go to
15      the next page, Mr. Stone, is the investment
16      watch list page.
17           A.    I'm there.
18           Q.    The first sentence says, "The
19      committee may place an investment option on
20      monitor alert status and conduct a thorough
21      review analysis of the investment options."  Do
22      you see that?
23           A.    I do.
24           Q.    Do you agree that the committee
25      has discretion as to whether or not to place an
```

Page 178

```
 1                    DONALD C. STONE
 2    investment option on monitor alert status?
 3         A.      That's their job is to evaluate
 4    that.
 5         Q.      Then is --
 6         A.      But here is where the IPS gets a
 7    little funky.  If you go back to the previous
 8    page.  In the second paragraph it says, "When a
 9    fund fails to achieve its stated objective, the
10    reasons for the failure will be evaluated and
11    the committee shall determine whether the
12    option shall remain, be frozen or replaced."
13              So that doesn't quite sync up with
14    the other page.  That gets back to kind of what
15    I've been saying all along which is they
16    actually need to go and determine the reasons
17    for the failure needs to be evaluated.
18              That is not quite the same as
19    saying you don't have to do anything with it,
20    as I think you were alluding to on the
21    subsequent page.
22         Q.      What does the stated objectives
23    mean to you?
24         A.      The stated objectives of the fund?
25         Q.      Correct.
```

Page 179

1                         DONALD C. STONE

2          A.      Not of the committee or whatever?

3          Q.      Well, it says "When a fund fails

4    to achieve its stated objectives."  That is the

5    sentence that you just quoted; is that correct?

6          A.      Yes.

7          Q.      Do you know what the stated

8    objectives of the target date funds are, the

9    Fidelity Freedom target date funds are?

10         A.      Well I don't know that it's

11   necessarily the stated objectives of what, in

12   this case, what Fidelity would say, but I think

13   it probably refers to the stated objectives

14   that the committee has for the plan.

15                 So that goes back to where

16   does it rank, its having a competitive return

17   and blah, blah, blah, blah, okay.

18         Q.      That's not what this sentence

19   says.  This sentence says, "When a fund fails

20   to achieve its stated objectives."

21         A.      Well, its stated objectives may --

22   I read that to refer to its, for example, its

23   performance relative to the IPS standards.

24         Q.      Is that what that says there?

25         A.      That's what I'm reading it to

Page 180

1                    DONALD C. STONE
2    mean, okay.
3           Q.    But you agree with me it says when
4    a fund fails to achieve its stated objectives,
5    correct?
6           A.    Correct, you're having a different
7    definition of what its stated objectives are.
8    We are disagreeing about that.
9           Q.    So we have a grammatical
10    disagreement about how to read a sentence?
11                MR. ROBERTS:   Objection to the
12                form.
13           A.    I'm say it is not very clear
14    because you think it refers to what Fidelity
15    says about the fund and I'm saying I think this
16    is all in language within the IPS itself.  I
17    don't think -- if they had referred to what the
18    investment manager's stated objective is, that
19    would have been probably a different
20    conversation.  But I'm reading -- I guess that
21    is what we get with indefinite pronouns like
22    its.
23                     I read it as being a reference
24    back to the IPS and the objectives that the
25    committee has for the funds in the plan and not

Page 181

```
1                    DONALD C. STONE
2       anything that Fidelity may have as an
3       objective.
4            Q.    Would you agree with me that
5       the objectives of a target date funds are to
6       meet the needs of retirement for individuals
7       invested in the target date fund?
8            A.    Yes, I mean there is nothing --
9       it's a rather anodyne statement.  You can't
10      argue with that.
11           Q.    If we turn back to the watch list
12      page, Mr. Stone.
13           A.    Yes.
14           Q.    The second sentence says, 'The
15      committee may consider the following criteria
16      when placing a fund on monitor or alert status?
17      Do you agree with that?
18           A.    Again, this goes back to why we
19      went to the previous page.  I'm not sure this
20      language syncs up with what the previous page
21      says.
22           Q.    Okay, just to be clear, what is it
23      exactly -- what exactly in this previous page
24      do you think does not sync up with that page?
25           A.    So it says, "Thus, when a fund
```

Page 182

```
 1                    DONALD C. STONE

 2    fails to achieve its stated objectives, the

 3    reasons for the failure will be evaluated and

 4    the committee shall determine whether the

 5    options shall remain, be frozen or replaced."

 6              That contradicts what it says on

 7    the subsequent page which is the committee may

 8    do any of these following things.

 9              So I don't think those two sync

10    up.  I don't think the IPS is written very

11    tightly in that regard.  Those two shouldn't be

12    out of alignment with each other.

13        Q.    Do you agree with me that the

14    sentence that says "When a fund fails to

15    achieve its it stated objectives the reasons

16    for failure will be evaluated."?

17        A.    Yes.

18        Q.    Strike that.

19              If you move to the second, the

20    page that I was on in the investment watch list

21    criteria page.

22        A.    Okay.

23        Q.    You see the list of options or

24    list of criteria that the committee may

25    consider, do you see that?
```

Page 183

1                    DONALD C. STONE

2            A.     Yes.

3            Q.     Do you see anywhere in here where

4     it says that a consideration is the three and

5     five-year performance against benchmark?

6                   (Witness reviewing document.)

7            A.     I think that is another strange

8     thing about it.  It is talking about -- so this

9     is where -- this is another thing that is in my

10    report.  The IPS does not mention performance

11    at all in these particular criteria, which is

12    extremely strange that in a watch list criteria

13    you would not mention performance versus a

14    benchmark.

15           Q.     You're incorrect that it doesn't

16    mention performance at all.  The first three

17    bullets are performance criteria; correct?

18           A.     It talks about against a peer

19    group, which is fine, okay.  Risk adjusted

20    return and they talk about the Information

21    Ratio.  All of which is fine.  Okay, I'm just

22    saying I've never seen an IPS that doesn't go

23    and have as potential monitoring -- potential

24    watch issues the performance of the fund

25    against the benchmark.  I've never seen that in

Page 184

1                    DONALD C. STONE
2       my 40 years.
3             Q.     So you agree with me that it is
4       not listed here in this criteria?
5             A.     It is not listed, no.  And it was
6       later on added in I think the draft of the 2017
7       IPS which was not adopted, but I think they
8       realized they left it out.
9             Q.     Do you know whether it is included
10      in the 2020 IPS?
11            A.     Not off the top of my head.  I
12      have to look at it.
13            Q.     When you were preparing your
14      report, did you look to make that determination?
15            A.     I looked at the '15, I look at the
16      '17, I look at '19, which was eventually adopted
17      and I looked at the signed 2020 as well.  But
18      I'm not going to remember everything off the
19      top of my head at this particular point.
20            Q.     My question is, do you remember
21      looking particularly for the issue of whether
22      or not the inclusion of the benchmark was
23      included in 2020 adopted IPS?
24            A.     I think I looked for whether it
25      was included in later versions of the IPS.  I'm

Page 185

```
 1                    DONALD C. STONE
 2      sure I did.
 3              Q.      When we go back to the earlier
 4      page 12 which is the performance evaluation
 5      criteria, is it your view that the plan objectives
 6      were for the Freedom Funds to outperform its
 7      benchmark on the three and five-year period?
 8      Does it state that somewhere in the IPS?
 9              A.      Where are you looking?
10              Q.      You were focused on this second
11      sentence.  In the second paragraph in the
12      performance evaluation criteria when it says,
13      "When a fund fails to achieve its stated
14      objectives" and your testimony is that that
15      relates to the plan's objectives for a fund; is
16      that correct?
17              A.      Correct.
18              Q.      Is it your belief that the plan's
19      objectives for the Freedom Funds were for it to
20      outperform its benchmark on a three and
21      five-year basis?
22              A.      No, I don't think it said that.
23              Q.      Okay.  If we turn back to the
24      investment watch list process.
25              A.      Okay.
```

Page 186

1                    DONALD C. STONE
2          Q.      The bottom paragraph it says,
3    "Once an investment option has been assigned a
4    status of monitor, it should remain with the
5    status for up to four consecutive quarters.
6    Without documented approving on the underlying
7    criteria, it will be advanced to a status of
8    alert no later than the fifth consecutive
9    quarter of underperformance."  Do you see that?
10         A.      I do.
11         Q.      Do you agree if there is an
12   improvement of the underlying criteria, the IPS
13   does not mandate an advancement to alert status
14   in the fifth consecutive quarter?
15         A.      Let me read that again.
16                 (Witness reviewing document.)
17         A.      So I think what that is saying
18   is -- what I read it as saying is that if it
19   doesn't improve, then it is going to go to the
20   alert status no later than the fifth consecutive
21   quarter which to me would also say it could go
22   to an alert status earlier.  And I'm not sure
23   that it -- it doesn't really speak to the issue
24   of not having gone on the watch list at that
25   point or in the monitor.

Page 187

1                    DONALD C. STONE

2          Q.      But you agree with me if there is

3     improvement, the IPS does not mandate it be

4     advanced alert status; correct?

5          A.      That would be correct.

6          Q.      The second to last sentence says,

7     "The committee at its discretion may change an

8     investment status outside of these standards as

9     each fund is separately evaluated."  Do you see

10    that?

11         A.      I do.

12         Q.      Is that pretty typical for the IPS

13    to allow discretion of that nature?

14         A.      Well, again, as long as it is

15    consistent with other parts of the IPS, yes.

16         Q.      You can put that document down for

17    now.

18                 I want to turn back to your

19    report.  Give me a second to find the paragraph.

20    So paragraph 34 of your report, Mr. Stone, if

21    you could turn to that, please?

22         A.      Okay, I'm on that page.

23         Q.      So you state in paragraph 34,

24    "On at least a quarterly basis, fiduciaries

25    should review and analyze the impact of

Page 188

```
 1                      DONALD C. STONE
 2      economic developments on the plan, the
 3      performance of each plan investment across all
 4      relevant metrics, and the qualitative and
 5      quantitative factors relevant to the
 6      fiduciary's decision to retain or replace any
 7      investments on a watch list."  Do you see that?
 8              A.      I do.
 9              Q.      So it's your testimony that not a
10      single metric is informative necessarily of a
11      fiduciary's decision, but they must consider
12      all of the qualitative and quantitative
13      factors?
14              A.      Well, I think that is misreading
15      what I wrote there.  Obviously what we are
16      saying -- what I'm saying, the fiduciaries want
17      to look at all of it.  But that doesn't speak
18      to whether one of them should be called out and
19      one of them might be enough to trigger taking a
20      look at everything.
21                      It says that the fiduciaries
22      should be looking at all of these things.  This
23      is, you know, to retain or replace something on
24      the watch list.  It says you should look at all
25      of them, which is correct, okay.
```

Page 189

                         DONALD C. STONE

1

2          Q.      Okay, got it.  So the last

3     sentence it says, "Consistent underperformance

4     over longer periods is usually grounds for

5     removal."  Do you see that?

6          A.      I do.

7          Q.      What do you mean by consistent

8     underperformance?

9          A.      This is a generalized statement

10    which could be somewhat different from one plan

11    versus another, depending on what their IPS

12    says.  But generally speaking, consistent

13    underperformance means over an extended period

14    of time to be defined by, again, each committee

15    may define it slightly differently.

16              I will tell you that generally in

17    the industry more often than not it is

18    somewhere between four and six quarters,

19    although that is not a hard rule, because it's

20    this is a -- because it is a -- it's not a

21    cookie cutter decision as to how you do this.

22    You're looking at all factors.

23              You brought up before, you're one

24    basis point under.  Well, that's a very

25    different fact pattern than if you're a hundred

Page 190

1                    DONALD C. STONE
2       basis points under.  So you're not going to
3       necessarily make the same decision based on
4       that.
5                    So consistent underperformance
6       means over an extended period of time.  Let's
7       say somewhere between four and six quarters
8       typically in the industry.  I think that will
9       generally be agreed upon.  And that's usually
10      grounds for removal.  Again "usually" key word
11      there.  There are circumstances when that might
12      not be the case.  There are circumstances where
13      it definitely would be the case.  So committees
14      have to use their judgment.  It's not a check
15      the box approach.
16              Q.    When you're talking about
17      underperformance there, are you talking about
18      as compared to a specific metric?
19              A.    I'm talking about underperformance
20      may be compared to -- it could be across any of
21      those metrics if it is underperforming.
22              Q.    Let's turn to page 35 of your
23      report.
24              A.    Okay.
25              Q.    You have given an opinion,

Page 191

```
                        DONALD C. STONE
 1
 2      Mr. Stone, that the committee meeting minutes
 3      by this committee were, I'm using your words,
 4      "woefully inadequate and cursory."  Is that
 5      correct?
 6              A.      Correct.
 7              Q.      Did you review in full the
 8      entirety of the meeting minutes between 2014
 9      and 2024?
10              A.      I think I reviewed all of those,
11      yes.
12              Q.      Is it your opinion that every
13      single one of those meeting minutes is woefully
14      inadequate and cursory?
15              A.      No, that is not my opinion.  I
16      didn't single out -- any particular one my
17      might be fine.  This is a general observation.
18              Q.      I'm trying to understand how you
19      reached the conclusion that there is a general
20      observation if all of them are not cursory and
21      woefully inadequate, how many are?
22              A.      You can't have -- you doesn't
23      necessary have to be every single one as
24      woefully inadequate.  Some of those meeting
25      minutes are rather brief and they seem
```

Page 192

```
 1                    DONALD C. STONE
 2      perfectly fine.
 3                    Part of the issue here is the
 4      minutes were taken by the advisor, they weren't
 5      taken by someone on the committee.  So that is
 6      not unusual.  I'm not faulting that per se.
 7                    What the committee meetings are is
 8      they're the voice of the advisor filtering what
 9      the committee talked about or said as opposed
10      to -- so there are some of the substantive
11      decisions that are not -- it is not clear how
12      they made some of those decisions.  So when I
13      say this is a general comment, you don't have
14      to have every one be wrong for it to be an
15      issue in general.  That's not -- that was not
16      my claim that every single minute was wrong and
17      should have been redone or whatever.
18                    I think there is a generalized
19      problem that they seem to be -- it's not clear
20      when read through them exactly what the
21      rationalization is for some of the decisions
22      that are made.  They are pretty anodyne.  They
23      are pretty vanilla.  They don't really give me
24      a sense of how did this decision get made.
25      What were the issues that were concerned.
```

Page 193

DONALD C. STONE

1

2      Q.     As a 321 consultant, did you ever

3   take the minutes for any of the committees with

4   which you worked?

5      A.     I did.  And as I said, that is not

6   unusual in the industry.  It is not -- it doesn't always

7   happen that way, but it is certainly not unusual.

8      Q.     How many clients with which you

9   worked did you take the minutes approximately?

10     A.     Probably a third, maybe it might

11   have been slightly more than a third.  At least

12   a third.

13     Q.     Do you have an understanding in

14   this case that the committee members reviewed

15   and commented on the minutes and revised them

16   as appropriate?

17     A.     I do.  I do recognize that, yes.

18     Q.     You testified earlier that some of

19   the committee minutes were brief but otherwise

20   fine.  Do you remember that testimony?

21     A.     Yeah, I said that just a minute

22   ago, yes.

23     Q.     What does that mean?

24     A.     So it depends on -- that was just

25   an offhand comment.  But it depends on if there

Page 194

1                    DONALD C. STONE

2      were any significant issues to be discussed and

3      whatever, if there weren't and it was a short

4      meeting or if it was an administrative meeting

5      that didn't deal with the investments, that may

6      have been fine.  I'm not referring to a

7      particular set of minutes in this particular

8      case.

9                    What I'm saying, when there were

10     investment decisions that needed to be made, it

11     wasn't always clear what the rationale was and

12     it wasn't very clear what other discussions may

13     have gone on and whether there were any

14     concerns by any of the committee members that

15     weren't captured.

16          Q.     For each of those minutes which

17     you identified a problem, did you include those

18     in your report?

19          A.     I didn't single out particular

20     series of minutes, no.

21          Q.     Why not?

22          A.     It never crossed my mind.  In

23     general the minutes were taken the same way

24     each time.  So in general I felt they were

25     deficient for the reasons that I gave.

Page 195

1                    DONALD C. STONE
2          Q.      Well, you testified earlier they
3    were only deficient in so far as the -- you
4    didn't believe the rationale was adequately
5    captured, correct?
6          A.      That happens in a lot of cases
7    when something is being monitored.  There is
8    always something going on.  In most of the
9    minutes there is something going on.
10         Q.      Do you have an approximation of
11   how many -- first of all, do you know how many
12   minutes you reviewed?
13         A.      I don't have the exact number, no.
14   There was a lot of minutes, but I don't remember the
15   exact number.
16         Q.      I'm going to represent to you that
17   according to your report in the litigation
18   documents you reviewed 37 minutes.
19         A.      Okay.
20         Q.      Do you have any sense of how many
21   of those 37 you took issue with?
22         A.      No.
23         Q.      So do you agree with me that you
24   provided one example in your report of a
25   deficient meeting minute?

```
 1              DONALD C. STONE
 2         A.    I'd have to look at that, but that
 3    sounds correct.
 4         Q.    Do you have any -- did you decide
 5    which example would be included in your report?
 6         A.    It was part of the conversation
 7    that I had with counsel.  I don't know exactly
 8    whether I brought it up, they brought it up, I
 9    don't know.
10         Q.    So it's your testimony it could
11    have been counsel deciding which example would
12    be in your report?
13         A.    No, they didn't decide which
14    example.  You're misspeaking what I said.  It
15    is my report at the end of the day.  I either
16    agreed with it or I didn't.  I don't know how a
17    particular conversation went that would have
18    taken place weeks ago at this point.  That's
19    not realistic.
20         Q.    But you don't know if you took
21    issue with half of the minutes, a third of the
22    minutes, two of the minutes, you don't know?
23         A.    Now we could go through them all
24    right now and I will tell you as we go.  We'll
25    will go through all 37.  We could do that.
```

Page 197

1                    DONALD C. STONE

2          Q.      You testified that you reviewed

3     every single one of the minutes in preparation

4     for your report.  Your report contains one

5     example of a so-called deficient meeting and

6     I'm asking what other meeting minutes are

7     deficient in your view.  You reviewed them.

8          A.      Okay, but I don't remember which

9     particular quarter here, there or the other.

10    If we looked through them I could give you that

11    answer.

12         Q.      If the majority of the meeting

13    minutes are deficient, why didn't you include

14    more examples of those deficiencies?

15         A.      I didn't include every single

16    example of everything in the report.  I can't

17    recall ever seeing one of these reports where

18    every single possible thing is capture because

19    it is way too long.

20                 If the bottom line is I didn't, I

21    think as a general process as I read through

22    the reports and, again, in a lot of cases it

23    just strikes me there is stuff that is missing.

24    When I read through it there are things that

25    simply aren't there.

Page 198

```
 1                    DONALD C. STONE
 2          Q.    Can you identify any of those
 3     things today?
 4          A.     If I read through the minutes I
 5     can.
 6          Q.    Did you read through the minutes
 7     in advance of your deposition today?
 8          A.     I did not read through them in the
 9     last -- I read through some of them yesterday,
10     but I didn't read through them this morning.
11          Q.    So based on your review yesterday,
12     do have any recollection of other things that
13     are missing from the minutes that you did not
14     include in your report?
15          A.    As I read through the minutes,
16     what comes across is it's very -- it's, as I
17     said before, it's anodyne, it doesn't tell me
18     the rationale behind a lot of decisionmaking.
19          Q.    What decision, you look at them
20     yesterday, what ones?
21               MR. ROBERTS:   Are you asking about
22          a particular document or are you asking in
23          the aggregate of 37?  If you want to show
24          him a document you can do that.
25               MS. ENGELMAN:   I'm asking what he
```

Page 199

1                    DONALD C. STONE

2           remembers from his review of the minutes

3           yesterday.

4           A.      At this hour in the evening,

5     frankly I don't remember any specific minute,

6     period.  I can look through them and I'm happy

7     to do that.  For me to say I have a memory, I

8     remember the meeting minutes from June of 2017,

9     no, I'm not going to say that, that wouldn't be

10    accurate.

11          Q.      Is it your opinion that the

12    meeting minutes from 2020 forward were

13    compliant with the IPS?

14          A.      I think it is the same issue that

15    goes forward.  Okay.

16          Q.      You note in your report that the

17    IPS was amended to reflect what needed to be

18    included in the minutes.  Do you recall that?

19          A.      I do.

20          Q.      Do you take issue with that

21    decision?  Is that uncommon in the industry to

22    make a change to the IPS in terms of what needs

23    to be reflected in the minutes?

24          A.      You asked two different questions.

25    That's a compound question.  It is not uncommon

Page 200

1                      DONALD C. STONE

2      for an IPS to be modified over time.  In fact

3      it is fairly common.

4              Q.    Okay, let's turn to paragraph 86

5      of your report.

6              A.    86, okay.

7              Q.    So you say here, "This is a

8      glaring example of deficiency of the meeting

9      minutes."  Right?  And this is the fact that

10     the Freedom Funds were on monitor status in

11     February, 2016?

12             A.    Correct.

13             Q.    Do you see that?

14             A.    Yes.

15             Q.    You say here "As of the fourth

16     quarter 2015 meeting, the Freedom Funds had

17     been on monitor status for four consecutive

18     quarters."  Do you see that?

19             A.    Yes.

20             Q.    Then you say, "The quarterly

21     investment review presented at the meeting also

22     detailed that the Freedom Funds were

23     underperforming their benchmarks for a three and

24     five-year period."  Do you see that?

25             A.    I do.

Page 201

1                    DONALD C. STONE

2          Q.     Then it says, "In accordance with

3    the criteria of the 2015 IPS, if an investment

4    on monitor status for four consecutive quarters

5    shows no signs of improvement in the underlying

6    criteria, it is to be advanced to alert status

7    absent a documented decision by the committee

8    to change an investment status."  Do you see

9    that?

10         A.     I do.

11         Q.     We looked at the 2015 IPS earlier

12   and you agreed with me that the performance

13   against benchmark for the three and five-year

14   period is not included as a monitoring criteria

15   in the 2015 IPS; correct?

16         A.     Correct.

17         Q.     Then it says, "The minutes of the

18   fourth quarter 2015 committee meeting held on

19   February 15th, 2015 reflected a number of

20   investments were discussed in-depth to

21   determine monitor status."  Then it goes on to

22   say what the minutes reported.  Right?

23         A.     Yes.

24         Q.     I'm going to the middle of the

25   paragraph, paragraph 88.  "Given that the

Page 202

1                    DONALD C. STONE
2      Freedom Funds continue to underperform their
3      benchmark and that the advisor and the
4      committee noted that no significant changes to
5      the suite had occurred during 2015, it is
6      entirely unclear how the committee arrived at
7      its decision to remove the Freedom Funds from
8      monitor status at this time."  Do you see that?
9              A.    I do.
10             Q.    I believe you testified earlier
11     that the reason that you're aware that the
12     reason that the Freedom Funds were on monitor
13     status as of this time was the lack of
14     performance data for some of underlying funds;
15     is that right?
16             A.    That was the reason that they
17     gave, yes.
18             Q.    Were you aware of that at the time
19     that you wrote this report?
20             A.    Yes.
21             Q.    So when you say that given the
22     Freedom Funds continued to underperform their
23     benchmark and that the advisor committee noted
24     no significant changes to the fund suite
25     occurred in 2015, were you aware at that point

Page 203

```
                      DONALD C. STONE
 1
 2      that you wrote the report that the Freedom
 3      Funds were not on monitor status for
 4      performance?
 5              A.      They should have been.
 6              Q.      But they weren't; is that correct?
 7              A.      Well, and that's a flaw by the
 8      committee, that they were not on watch status
 9      at that point.  That was -- and to take them
10      off monitor in general.
11                      When you go on monitor, to come
12      off monitor says that all the issues are
13      resolved.  That is typically the way that you
14      think of that.  When they came off monitor all
15      the issues weren't resolved.  They still had
16      significant underperformance issues despite the
17      fact that the IPS left that language out.
18                      So my point is, I think the
19      committee, regardless of whether -- because the
20      committee has the flexibility to put it on
21      monitor for any reason they want, and it's
22      incomprehensible to me that they come and take
23      it off of monitor when it is still underperforming.
24                      They could have gone and said,
25      okay, we are taking it off of watch for the
```

Page 204

1                    DONALD C. STONE

2      three year number, but at the same time it would

3      have made sense they we are going to keep it on

4      watch because it is still underperforming.  We

5      are looking at it in a different lens at this

6      point.

7                    I think the committee -- I don't

8      know if they just weren't paying attention or

9      exactly what happened that they would take

10      something off monitor when it's underperforming.

11      Regardless whether it is specifically a bullet

12      point in that 2015 IPS or not.

13          Q.    So I guess that's my question.

14      What is the basis for your opinion that it

15      should have been on monitor as of -- for the

16      poor performance, what is basis of your

17      opinion?

18          A.    Because I think the committee has

19      a duty of loyalty to the plan to look after the

20      best interest of the participants.  And I don't

21      think they were making a good judgment in that

22      affect.  Okay.  It is incomprehensible to me.

23          Q.    Do you know what the

24      underperformance was at this time period

25      relative to benchmark?

Page 205

1                    DONALD C. STONE

2          A.     There is a list that gives the

3     underperformance fund vintage by vintage.  I

4     don't have it right in front of me.  I looked at it

5     earlier today, but I don't have it in front of

6     me at the moment.  It varied from being just

7     slightly underperforming to being fairly

8     substantially underperforming.  So it varied

9     depending on the vintage.

10         Q.     So was this underperformance

11    compared to index or compared to benchmark or

12    compare to something else?

13         A.     I believe that was compared to the

14    index.

15         Q.     Do you know how the target date

16    funds were comparing as to peer group during

17    the time period?

18         A.     They were showing up a little

19    differently.  You're talking about the liber

20    list?

21         Q.     I'm asking you if you know.

22         A.     The peer group performance looked

23    better than against the benchmark.

24         Q.     So is it plausible that the

25    committee looked at the peer group performance

Page 206

1                    DONALD C. STONE
2       and decided that it didn't need to be on monitor
3       status because the performance against peer
4       group?
5            A.    But they didn't say that.  This
6       goes back to the minutes not talking about the
7       rationale employed.
8            Q.    Do you have any sense of whether
9       or not the performance improved during the time
10      they were stated on monitor until the time they
11      went off monitor?
12           A.    I think it varied depending on the
13      vantage.
14           Q.    Do you know one way or another?
15           A.    And depending on the quarter.
16      There was some improvement during I think part
17      of that period of time, but by the same token
18      they were still underperforming.  So they never
19      got above the waterline.
20           Q.    You talk about in your report that
21      the Freedom Funds were the plan QDIA; is that
22      correct?
23           A.    Yes.
24           Q.    And that there should be some sort
25      of heightened scrutiny around the plan's QDIA;

Page 207

1                    DONALD C. STONE

2       is that correct

3                A.      Correct.

4                Q.      What do you mean by heightened

5       scrutiny?

6                A.      Well, by heightened scrutiny I

7       mean, usually QDIA holds a large percentage, if

8       not the majority percentage, of all the assets

9       in the plan.  So I think that the -- so just by

10      share looking at raw numbers and number of

11      participants typically involved as well that --

12      this is not a minor thing.  It is not like it's

13      a fund that is held -- some kind of select fund

14      that is held by three individuals who happen to

15      be in a C suite.  It's a very different thing.

16                       They are people who quite often

17      have been defaulted, they tend to be

18      unsophisticated people, they tend to be

19      unengaged, their money is going into a suite of

20      funds that they don't actually know much about

21      and they are relying upon the plan fiduciaries

22      to look after their interest.  So I think that

23      is why I say a heightened level of scrutiny is

24      reasonable.

25                Q.      My question was a little

Page 208

```
 1                    DONALD C. STONE
 2      different.  What is the heightened level of
 3      scrutiny?  What does that entail?
 4             A.      The heightened level of scrutiny,
 5      it looks at it more carefully to be sensitive
 6      to the fact that you don't go and -- in this
 7      case you don't go and remove it because it
 8      doesn't happen to show up in the 2015 IPS to
 9      look against benchmark.  You don't remove it
10      from a watch list because it is still
11      underperforming.  You try to understand what's
12      driving that underperformance and I don't see
13      that anywhere they spent time doing that.
14             Q.      Did you always do that in your
15      role as a 321 investment advisor?
16             A.      Of course.
17             Q.      Mr. Stone, you opine in your
18      report that the committee failed to review the
19      services provided by Ascende and QPA; is that
20      correct?
21             A.      That's correct.
22             Q.      Is it your opinion that the
23      committee was under obligation to do an RFP for
24      services by another investment consultant?
25             A.      I don't think it was necessarily,
```

Page 209

1                    DONALD C. STONE

2      although that would be the better way to go.

3      An RFP per se, like I said, I think that would

4      be the preferred way to go, but they weren't

5      under a, quote, obligation to do just an RFP.

6      They could have done an RFI, they could have

7      had a -- they could have hired somebody to a

8      benchmarking study of advisors.  An RFP would

9      certainly be the preferred way because you get

10     so much more information, much richer.

11                    The Department of Labor

12     specifically does call out -- they don't call

13     out an RFP, of course, but they do call out

14     that you have to have a process for reviewing

15     your service providers.  And that would

16     certainly include your investment advisor.

17          Q.     But you agree that the Department

18     of Labor doesn't require any specific manner in

19     which to review your investment advisor; is

20     that correct?

21          A.     The Department of Labor doesn't

22     require almost any of the things that we have

23     been talking about, including an IPS, a

24     charter, they don't require having a committee

25     of multiple people.  You could have an

Page 210

                    DONALD C. STONE

1    individual, it is not a good process, but you

2    could do that.

3           Most of the things -- they don't

4    require looking at peer groups.  They don't

5    require looking at risk adjusted returns.  None

6    of this is anywhere in ERISA because it is 50

7    years old and this has been an accretive

8    process of what has been standard practice in

9    the industry over a period literally of decades.

10          So none of this stuff is -- and

11   the Department of Labor, I think, doesn't want

12   to get involved in some of the level of detail

13   in everything.  I'm not sure the skill set is

14   there.

15          Q.    When you were a 321 investment

16   advisor from 2002 to 2019, did you recommend to

17   your clients that they conduct an RFP or a RFI

18   for other investment consultants?

19          A.    I had many of them go exactly

20   through that.  I never said don't do that at

21   all.

22          Q.    Did every single one of them do

23   that annually?

24          A.    First of all, you wouldn't do it

Page 211

1                    DONALD C. STONE
2       annually.   You wouldn't do an RFP annually.
3       But not every single one of them, as I recall,
4       actually did it.  But those were conversations
5       that we had as part of the fiduciary training
6       that your service providers, and that would
7       have included us sitting in the room, you ought
8       to be out periodically going through a formal
9       process to determine if you have the
10      appropriate choice.
11              Q.    So tell me what specific steps you
12      made sure they were going through -- every
13      single one of your clients was going through a
14      formal process to determine --
15              A.    As I said some of them --
16              Q.    Let me finish my question.  -- to
17      determine whether or not to continue to have
18      their services provided by the PSA or Pavilion?
19              A.    As I said a minute ago, not all of
20      them chose to go through that.  As a 321 I
21      could make recommendations, I couldn't go and
22      act for them.  So not everyone of them went
23      through a formal process.  Many of them did.
24              Q.    How many did?
25              A.    I don't know exactly the number,

Page 212

```
 1                    DONALD C. STONE
 2      but it certainly would have been well over half
 3      of our clients.
 4            Q.      For the other half you testified
 5      earlier that you believe all the committees
 6      that which you worked with were prudent engaged
 7      in good committees.  Does your answer change
 8      given that they didn't go out and do a formal
 9      RFP and RFI?
10                    MR. ROBERTS:    Objection to form.
11            A.      The thing to realize is, I don't
12      even know if they did an RFP separate.
13      Sometimes they don't tell you what they're
14      doing.  They don't include you in that process.
15      If they do an RFI they don't include you
16      necessarily.  So there would be ones that I
17      don't know what they did.  I'm not included in
18      some of those conversations or wasn't, I should
19      say, included in some of those conversations
20      depending on how the committee decided it
21      wanted to act.
22            Q.      But sitting here today you're
23      aware of some of the committees in which you
24      worked where you don't know whether or not they
25      underwent any formal process for evaluating the
```

Page 213

DONALD C. STONE

1
2      services that you were providing?  You have no
3      idea one way of the other?
4              A.     I don't know what process they
5      went through.  I won't say they didn't go
6      through a process, but I don't know what
7      process they went through because typically the
8      existing advisor is not included in that process
9      unless it's a full blown RFP.
10             Q.     If you don't know what process
11     they went through, how do you know they went
12     through a process at all?
13             A.     This is really a gotcha game and
14     it is really rather childish at this hour of
15     the day.
16                    My clients went through rigorous
17     training on what they should do.  At the end of
18     day they needed to take the action to go
19     through a process to evaluate us.  Sometimes
20     they went through a process of evaluating us
21     that we found out about after the fact.
22                    Sometimes they went through a
23     process that it was quite formal with an RFP
24     which we knew about upfront.  Sometimes they
25     did it through talking to their peers.  There

Page 214

1                    DONALD C. STONE

2     were multiple ways they decided to go about

3     that.  I did not have access to all of that

4     data.

5               So I can't, for example, respond

6     to their level of prudency on that particular

7     element because I wasn't involvement in that

8     process and I was there to provide advice not

9     to dictate what they did.

10          Q.    Let's turn to training.  You talk

11    about training for individuals who were

12    onboarded on to the committee during the

13    relevant period.  Do you recall that line?

14          A.    I do.

15          Q.    Do you know whether any

16    committee members were onboarded during the

17    relevant time period in that case?

18          A.    They talk about an informal

19    process of onboarding that seems to come back

20    to the conversation of being included in the

21    quarterly investment reviews where there was

22    some degree of fiduciary information provided.

23    And there were I think a couple of years where

24    there was a one-pager that I saw that bullet

25    pointed various fiduciary things that people

Page 215

                              DONALD C. STONE
1
2      should be aware of which I would not consider
3      anywhere near adequate fiduciary training nor
4      would anyone else that I know of consider that.
5                    So I don't think -- I think a
6      couple of the numbers specifically refer to the
7      fact that they did not get specific onboarding
8      training.
9           Q.    My question was a little
10     different.  Do you know whether or not any
11     committee members were onboarded during the
12     relevant period in this case?
13          A.    I thought I answered that.  I said
14     some of them said they received -- that their
15     onboarding was getting quarterly information as
16     they were in the meetings.
17          Q.    You're misunderstanding my
18     question.  I'm talking about the timeframe.  Do
19     you know whether or not anyone was actually
20     onboarded during the relevant time period in
21     this case?
22          A.    You mean a new person entered the
23     committee?
24          Q.    Yes.
25          A.    Okay, I didn't understand that.

Page 216

1                         DONALD C. STONE
2                  I'm trying to think who went --
3        there was a -- there was a change over of a
4        couple of members of the committee, I don't
5        remember the exact date, but the 2015 IPS I
6        believe was signed by a couple of people that
7        were not on the committee later.
8            Q.    So you testified or paragraph 93
9        of your report, I will direct you there.
10           A.    Okay, I'm there.
11           Q.    You say, "Other than brief updates
12       in quarterly investment review materials
13       provided by the plan's investment advisor, no
14       formal fiduciary education materials were
15       presented to the committee prior to May 24th,
16       2021."  Do you see that?
17           A.    I do.
18           Q.    What do you consider to be formal
19       fiduciary education?
20           A.    Well, I think it's a very -- it's --
21       probably a good example would be what was
22       actually presented on May 24, 2021.  It is like
23       a 22-page document that walked through a number
24       of issues.  It's a question of how much you
25       want to include.

Page 217

1                       DONALD C. STONE

2                       But the reality was that it talked

3       about a lot of different aspects, what it means

4       to be a fiduciary, how you monitor the

5       investments.  It talked about appointment to

6       the committee.  It talked about all the

7       different processes that you look at and how

8       you should also think about being a fiduciary.

9       So it was a pretty detailed document.

10                      I don't think it was -- I probably

11      would tweak it a little bit if I were doing it

12      myself, but that is neither here nor there I

13      suppose.

14                      I think it was a pretty rich and

15      robust document overall as compared to what we

16      saw prior to that period when for I think two

17      years there it was a one-page bullet pointed

18      document that I have no idea how much was --

19      what was spoken to from that and how that was

20      presented.  And otherwise it was just different

21      updates during quarterly meetings which there

22      is nothing wrong with updates during quarterly

23      meetings, but it is not sufficient.

24           Q.    So when you're talking about a

25      one-pager, are you talking about the fiduciary

Page 218

```
 1              DONALD C. STONE
 2      essentials document, do you know?
 3              A.    That sounds correct.
 4              Q.    Do you know when that was
 5      presented to the committee?
 6              A.    It was presented on two different
 7      occasions as I recall and I don't remember the
 8      exact dates.
 9              Q.    Was it prior to 2021?
10              A.    Yes, it was.
11              Q.    Your position is that is just not
12      a formal training in your view?
13              A.    I think it's -- a one page bullet
14      point is not formal training in any sense of
15      the word in my mind.  I think it is -- it's a
16      complicated issue and people need help in
17      understanding what they're supposed to do and
18      it's certainly not an onboarding of anybody.
19                    No, I don't think it is formal
20      training at all.  It didn't get into a lot of
21      different issues that I would have gone into.
22      And I don't know how much was spoken.
23                    I want to add, even with the
24      bullet points, I don't know what was spoken to
25      those bullet points or not spoken to them in
```

Page 219

1                    DONALD C. STONE

2       terms of the amount of relevant detail that

3       would have been provided in terms of talking

4       about fiduciary responsibility, investment

5       monitoring and selection, you know, acting in

6       the interest of the participants as opposed to

7       the interest of the company or yourself,

8       conflicts of interest.  These are pretty meaty

9       topics that require more than a single bullet

10      point on a sheet of paper.

11           Q.    Understood.  You don't have any

12      knowledge sitting here one way or another what

13      was actually delivered in the fiduciary

14      essentials presentation to the committee,

15      you're just going off what is included in the

16      one-pager?

17           A.    That is the piece of paper that

18      apparently was given to them.

19           Q.    You don't have any knowledge or

20      testimony or record of any sort regarding what

21      was actually delivered, it could have been much

22      meatier than what the one-pager suggests?

23                 MR. ROBERTS:   Objection.

24           A.    I have no idea what was delivered.

25      I cannot imagine that you can deliver -- based

Page 220

1                    DONALD C. STONE

2      on those bullet points, it certainly would not

3      have been sufficient regardless of what was

4      delivered in person.  No, I don't know what was

5      delivered verbally, let's say, to those bullet

6      points.

7             Q.     Do you have a recollection that

8      the bullet points did cover at least at a high

9      level investment monitoring?

10            A.     They did.

11            Q.     So you mentioned earlier,

12     Mr. Stone, that the DOL does not require a

13     charter; is that correct?

14            A.     They don't require a lot of things

15     in explicit terms, no.

16            Q.     You agree with me that ERISA does

17     not require a charter of any kind?

18            A.     I missed the last part of that.

19            Q.     Do you agree that ERISA doesn't

20     require a charter of any kind?

21            A.     A what?

22            Q.     A charter of any kind.

23            A.     What did you say before that?

24            Q.     ERISA does not require.

25            A.     That's what I missed, sorry.  No

Page 221

DONALD C. STONE

1
2      ERISA is not -- is not that explicit about a
3      lot of things as I said a minute ago.  It
4      doesn't require a committee.
5              Q.    Did every single one of the
6      clients with which you worked at both PSA and
7      Pavilion have a charter in place?
8              A.    They did.  I wouldn't allow them
9      not to.
10             Q.    When you say charter, do you mean
11     charter or other equivalent document?  I think
12     you use that in your report.
13             A.    It could be an equivalent
14     document.  Again, it depends on what it says in
15     the equivalent document.  The IPS typically
16     reiterates some pieces of it, but there is a
17     lot of things that an IPS would not include and
18     the IPSs in this case do not include that would
19     be essential to have in a charter.  It could be
20     covered in the plan document.  Sometimes that
21     happens.  And that's fine.  My preference would
22     be for a charter, but you don't have to have a
23     charter as long as the information is conveyed
24     that needs to be conveyed.
25             Q.    So let's go back to the 2015 IPS.

Page 222

DONALD C. STONE

1

2        A.      Let me bring that up.

3        Q.      Can you identify what is missing

4   from the IPS that you would like to see in a

5   charter document?

6        A.      Well there are several things that

7   are -- that jump out right from the get-go.  So

8   I don't know that IPS is going to help because

9   it doesn't have anything in there about this.

10  So a charter first of all should clearly

11  delegate authority to either an individual or

12  to a committee and by that it is going to be

13  clear who the authority is that it's coming

14  from.  It could be the board, it could be from

15  the CEO, it could be handled several different

16  ways.  It is going to also detail what

17  authority that committee has.  It is not just a

18  matter of you can monitor the investments and

19  this, that and the other.

20            Part of it is what authority don't

21  you have.  Where does your committee get

22  circumscribed.  In some cases a committee can

23  make decisions about certain things and that is

24  very clear.  Again, that is the purpose of a

25  charter.  It is very clear that this is something that

Page 223

1                    DONALD C. STONE

2       we can make a decision about.  Here is

3       something that over here if it happens we need

4       to go and raise it to -- elevate it to another

5       level.

6                    So that's not covered in the

7       investment policy statement.

8            Q.    I don't want to interrupt you

9       there, but if you're done with that particular

10      thought I would like to jump in with a question

11      whenever you done with that particular thought.

12           A.    The point is, I think there is a

13      number of areas that are not covered in the IPS

14      that a charter should cover that makes the

15      authority very, very clear.  And I think that

16      is a very important point.

17           Q.    So I want to turn your attention

18      to paragraph 28 of your report.

19           A.    Paragraph 28?

20           Q.    We are going to look at paragraph

21      28 of your report and look at the 2015 IPS.

22           A.    All right, I have paragraph 28.

23           Q.    You say, "The responsibilities of

24      such a committee are customarily set forth in

25      plan documents such as a committee charter and

Page 224

1                    DONALD C. STONE
2        may include, among other things, 'establishing,
3        interpreting and following investment policy
4        statement'."  Do you see that?
5              A.    I do.
6              Q.    Let's turn to page 4 of the IPS.
7              A.    Okay.
8              Q.    Do you see here that it sets forth
9        the roles and responsibilities of the 401-K
10       committee.  And it sets forth exactly what the
11       401-K committee is going to do and that
12       includes preparing and maintaining the IPS?
13             A.    Yes, I see that.
14             Q.    And then you see here in bullet
15       point two you say, "Selecting investment
16       options for the plan including the QPA."
17             A.    Yes.
18             Q.    Do you see here where it says,
19       "Determine guidelines for selecting investment
20       options and then provide sufficient asset
21       classes with different and distinct risk return
22       profiles so each participant may prudently
23       diversify his or her accounts."  Do you see
24       that?
25             A.    Hold on, I got my pages turned up

Page 225

1                    DONALD C. STONE
2      here.  Where are you again now?
3              Q.    I'm on page 4 of the IPS, bullets
4      number 3 and 4.
5              A.    Determine guideline and provide
6      sufficient asset classes, okay.
7              Q.    Do you see subsection 3 on page 28
8      of your report says "Monitoring the performance
9      of each of investment options"?
10             A.    Yes.
11             Q.    Then do you see two bullets down
12     it says here "Establish procedures for continuing
13     monitoring and evaluating the investment
14     options."?
15             A.    Yes.
16             Q.    Then do you see bullet point four
17     where it says, "Appointing service providers
18     for the plan including investment advisors?
19             A.    Yes.
20             Q.    Do you see the last sentence of
21     this page it says "The committee also has the
22     authority to obtain the services of any third
23     providers as it deems necessary."?
24             A.    Yes.
25             Q.    Mr. Stone, you also state in your

Page 226

1                    DONALD C. STONE

2        report at what I'll say that you seem to have

3        taken issue with the fact that the committee

4        operated by consensus voting; is that correct?

5              A.    Yeah, it is not -- I think it can

6        be confusing.  It's not that you can't do

7        consensus voting, but sometimes in the not

8        clear and particularly in this record it is not

9        clear if they actually took a vote or what the

10       results of the vote were in some cases.  And

11       what happens to somebody if you don't have a

12       consensus.

13              That to me strikes me as a

14       particularly potentially dangerous area to get

15       into that you can't reach a consensus.  So it

16       is not -- I'm not saying that you can't use

17       consensus voting, but I'm raising that I don't

18       think it is the best approach to -- it is not

19       the approach that makes sense to me to use

20       given the fact that you might not have

21       consensus, given the fact that in this

22       particular case -- again, it is not clear that

23       they took a vote on many of these cases.  It

24       just seems to -- something happened and it is

25       not -- we took a vote, here is what we vote to

Page 227

1                  DONALD C. STONE

2    do, even if it was by consensus.

3         Q.    Well is it required by ERISA, the

4    DOL or anyone else that committee members take

5    a vote on every decision?

6         A.    Again, almost nothing that we're

7    talking about is, quote/unquote, required.

8               This comes back to the prudent

9    practice and what is the common and accepted

10   practice in the industry today or during the

11   time period that we are talking about.  What

12   are the things that make -- what would make

13   this a group process.  That is what I'm talking

14   about.

15              And no, I'm not going to say

16   they got to list of all of these 42 different

17   things you should be doing because none of

18   these existed -- most of them didn't exist at

19   the time that ERISA was passed.  So the

20   Department of Labor hadn't come out with a list

21   like that.

22        Q.    So is it your testimony that the

23   only prudent way to operate a committee is to

24   have an formal vote on every decision?

25              MR. ROBERTS:   Objection to the

Page 228

DONALD C. STONE

1

2          form.

3          A.      I don't think you have to have a,

4   quote, formal vote on every decision.  But I

5   think that that is a practice that is generally

6   accepted in the industry as a prudent way to

7   operate because it does demonstrate that

8   decisions were made and how they were made and

9   who made them.

10          Q.      Okay, did you identify any

11   particular circumstances here where you

12   couldn't determine whether or not a decision

13   was made?

14          A.      I don't see any record of votes in

15   most of these cases.

16          Q.      That wasn't my question.

17          A.      I can't determine that if there

18   was no vote.  I can't determine what they

19   decided.

20          Q.      If the committee talked about an

21   issue and together made a decision without a

22   formal yes/no vote, but came together and made

23   a decision and then the meeting minutes reflect

24   that the committee made a certain decision, is

25   that an unreasonable process in your view?

Page 229

1                    DONALD C. STONE
2          A.     How could say they made a decision
3     if we don't know what they made a decision
4     about.
5          Q.     I'm representing to you that the
6     meeting minutes state that the committee as a
7     whole made a decision.
8          A.     Okay, if they say that the
9     committee made a decision, that is -- I don't
10    think -- certainly it is not a way that I would
11    prefer.  It is not an imprudent thing in and of
12    itself, no.
13         Q.     Would it be your -- is it your
14    testimony that the meeting minutes should
15    reflect the individual votes of every committee
16    member?
17         A.     No, it doesn't necessarily have to
18    reflect the individual members' votes.  It
19    could simply be the committee voted and
20    everyone was in agreement or a majority agreed
21    to remove this fund from watch or put it on
22    watch or what have you.  That would be, I
23    think, sufficient.
24         Q.     So I want to make sure that the
25    record is clear.

Page 230

DONALD C. STONE

1

2          Your testimony is not that a vote
3     is required by each committee member in order
4     to reach a decision.  Your testimony is that
5     the record needs to reflect that a decision was
6     made, whether by consensus or otherwise?
7          A.     It needs to reflect that a
8     decision was made and I think the clarification
9     would be the best way to do that is through an
10    actual vote.
11         Q.     But it is not the only way; isn't
12    that correct?
13         A.     It is not the only way.
14              MR. ROBERTS:   Keri, we have been
15         going for over an hour, would now be a good
16         time to take a break?
17              MS. ENGELMAN:   Yes, let's take ten
18         minutes.
19              THE VIDEOGRAPHER:   The time is 9:09
20         and we are off the record.
21              (Recess Taken.)
22              THE VIDEOGRAPHER:   The time is 9:26
23         and we are on the record.
24    BY MS. ENGELMAN:
25         A.     Can I interject something before

Page 231

1                    DONALD C. STONE

2      you ask me a question?

3           Q.      Sure.

4           A.      So I want to -- I had a chance to

5      over this break to go through and look at a

6      couple of the times that you asked me about

7      earlier.  And I misspoke earlier talking about,

8      for example, the changeover was, because that

9      was in my head the changeover was to the new

10     FIA funds of Fidelity.  That was actually 2022.

11                 So the timeframe that I should

12     have been working with was 2016.  It began in

13     2016 through 2022 when they changed over to the

14     FIAM version of the Fidelity funds.  That would

15     be consistent with what is in my report and I

16     reference part of that on page 40, for example.

17          Q.      So is it your testimony that your

18     report does not go out beyond 2020; is that

19     correct?

20          A.      No, it goes through to the change

21     over to FIAM in 2022.

22          Q.      Sorry, I meant 2022.

23          A.      Yes.

24          Q.      It doesn't go beyond 2022; is that

25     right?

Page 232

                                DONALD C. STONE

1

2          A.      That's correct.

3          Q.      It is your testimony that the

4    change from the Freedom Funds to the FIAM funds

5    happened in 2022?

6          A.      Yes.

7          Q.      What is the basis of your change

8    in testimony regarding the 2016 time period?

9          A.      I went back and looked through the

10   report.

11         Q.      Did you speak with counsel during

12   this break?

13         A.      I did not speak with him, no.

14         Q.      If you turn to page 97 of your

15   report.

16         A.      Page 97?

17         Q.      I'm sorry, paragraph 97.

18         A.      I was going to say, page 97, I'm

19   going to run out of pages.  Paragraph 97 page

20   41, okay.

21         Q.      You say that, "The committee

22   relies solely on the plan's investment advisor

23   to identify investments that became

24   noncompliant with the plan's IPS that might

25   otherwise be unsuitable for the plan."  Do you

Page 233

1                   DONALD C. STONE
2       see that?
3               A.      I do.
4               Q.      In that paragraph are you
5       referring to specific instances that investments
6       became noncompliant with the IPS or otherwise
7       became unsuitable for the plan?
8               A.      There were a couple of instances
9       that were referenced and it's a question of
10      finding the pages and everything where -- this
11      is on page 43.  If you look at 104 we start
12      getting into that in terms of what -- this was
13      where the whole thing where the -- Ascende was
14      using or QPA was using a version their scoring
15      system that was not in sync with the IPS and so
16      I think the committee did not -- they didn't
17      look on their own and they didn't get any other
18      information and they were I think not getting
19      good information, consistent information as to
20      what should have been or would have been on
21      watch and not on watch.
22              Q.      So when you talk about that
23      paragraph, you're referring to the three
24      instances that you identify in I think
25      paragraph 104 of the report?

Page 234

```
 1                    DONALD C. STONE
 2          A.     Page 104 --
 3          Q.     Paragraph 104?
 4          A.     Paragraph 104, you're right.  And
 5   so the American Beacon Fund and DFA Fund and
 6   then the Freedom Funds as well.  So those are
 7   the three that I call out in that particular
 8   instance, yes.
 9          Q.     Did you identify, in preparing
10   your report, any other instances that you did
11   not include in your report?
12          A.     None are coming to mind at the
13   moment.
14          Q.     When you're talking about the QPA
15   or Ascende at the time was using a scoring
16   system, that in your view was inconsistent with
17   the 2015 IPS; is that correct?
18          A.     Correct.
19          Q.     Is it your understanding that the
20   scoring system was implemented sometime around
21   2017; is that correct?
22          A.     So, yeah, there were three
23   iterations of scoring systems.  One was in
24   place during the 2015 IPS and the next one was
25   2017 and then there was another change in 2019.
```

Page 235

1                    DONALD C. STONE

2                What happened is, QPA was changing

3        their systems to -- I think they upgraded or

4        they changed the -- it sounds like they changed

5        some of the software they were using.  So they

6        started using a different reporting standard

7        than had been used in the past.  I think this

8        pretty much left -- unfortunately left the

9        committee unaware of -- they didn't go back and

10       say what about under this scoring system would

11       this thing have been compliant before or not.

12       You'd have to go through and look at every fund

13       over multiple periods of time, which I did not

14       do.

15                Theoretically you can go back and

16       say maybe these were compliant under this

17       system but they weren't under that system.  But

18       the changeover in the systems was I think a

19       significant concern.

20            Q.    Is it your understanding that

21       there was a scoring system prior to 2017 in the

22       IPS?

23            A.    I believe there -- I'm trying to

24       see -- I have to go back and look through my

25       report, but I recall there was one standard --

Page 236

1                    DONALD C. STONE

2     I don't know that they -- there was one

3     standard that was being used in 2015 and then

4     switched over to the pass/fail and then they

5     went to this other point count system

6     ultimately and that's when they got them to

7     delay the score.  So that's three in my mind.

8          Q.     I want the record to be clear

9     here.  If you need to consult your report

10    please do so.  But if you look at the 2015 IPS

11    there is no scoring system.

12         A.     I guess the question is not the

13    IPS, but what is being reported by QPA or

14    Ascende in terms of how they came up with

15    whether something was potentially on watch or

16    not.

17                So not necessarily the scoring

18    system in the 2015 IPS, because I don't think

19    that was there, but I'm not sure that they --

20    you know, I guess that, to -- well, the 2015

21    maybe that is where it is.  They didn't have

22    Appendix B or there was something about an

23    Appendix B missing and that is probably where

24    the scoring was.

25         Q.     Let's turn to page 47 of your

Page 237

1                           DONALD C. STONE
2       report.
3               A.      47?
4               Q.      The bottom of page 47.
5               A.      Okay.
6               Q.      It says "The scoring system
7       implemented after 2017 conflicted with the
8       monitoring standards established in the IPS."
9                       Do you see that?
10              A.      No, where are you reading?
11              Q.      Does that refresh your
12      recollection that your opinion is that the
13      scoring system was implemented in 2017?
14              A.      Where were you reading?
15              Q.      The bottom of page 47.
16              A.      Okay.  The scoring system
17      implemented -- you're talking about 3-I?
18              Q.      Yes.
19              A.      Okay, yes, the inconsistencies --
20      yes.
21              Q.      So to make the record clear.  Is
22      your recollection refreshed that the scoring
23      system was implemented in 2017 and not prior to
24      that.  So when we turn back to paragraph 97 of
25      your report and the examples, the scoring

Page 238

1                    DONALD C. STONE
2       system that you're talking about was the ones
3       in place in 2017 and after that time period; is
4       that correct?
5              A.    That's correct.  But we don't know
6       what attachment B was to the 2015 IPS.
7              Q.    Do you have any knowledge of
8       testimony otherwise that says there was a
9       scoring system in Appendix B?
10             A.    No, I just know there is an
11      Appendix B that is referenced in the scoring --
12      excuse me in the -- in there.  We don't know
13      what it says.  But I reference there were a
14      number of analytics that they were referencing
15      in the document.
16             Q.    Did you review the quarterly
17      investment reports prior to 2017?
18             A.    Yes, I looked at investment
19      reports prior to 2017, yes.
20             Q.    Did those reflect a scoring system
21      of any kind?
22             A.    I don't recall and I'm not looking
23      at one in front of me.  Even if they had an
24      internal scoring system, it wouldn't
25      necessarily be reflected in that report.

Page 239

1                    DONALD C. STONE

2          Q.    Do you have any knowledge about

3    whether or not there was an internal scoring

4    system?

5          A.    I don't know what was in the

6    appendix.  I don't know what I don't know

7    there.  I'm just raising that as a question.

8          Q.    Let's turn back to page --

9    paragraph 104 of your report, page 43.

10         A.    Okay, I'm there.

11         Q.    So you say, "Plan investments

12   frequently ran afoul of the standards adopted

13   in the IPS for assigning monitor and alert

14   status, but escaped mention or scrutiny because

15   the binary pass or fail hegemony of the scoring

16   system was the sole monitoring approach

17   undertaken by the committee."  Do you see that?

18         A.    I do.

19         Q.    And that pass/fail system was

20   implemented in 2017 to your knowledge?

21         A.    I think so, yes.

22         Q.    Then you testified earlier that

23   these are the examples that you could come up

24   with where there was an inconsistency between

25   the scoring system and the 2015 IPS; is that

Page 240

                                    DONALD C. STONE
1
2      right?
3              A.      That's correct.
4              Q.      If we look at the 2015 IPS.
5              A.      Okay, I have it up
6              Q.      You say, "The deference to the
7      scoring system permitted the DFA Funds below
8      peer median three-year Alpha and negative
9      three-year Alpha Information Ratio to go
10     undetected --
11             A.      Where are you?  What paragraph are
12     you?
13             Q.      I'm still on paragraph 104.
14             A.      Okay.
15             Q.      It says "The committee's
16     indifference to the IPS investment watch list
17     process and deference to the scoring system
18     permitted the DFA Fund below peer median
19     three-year Alpha and negative three-year Alpha
20     information to go undetected in Q3, 2018."  Do
21     you see that?
22             A.      Yes.
23             Q.      So let's turn to in the IPS, the
24     2015 IPS.  Let's turn to the investment watch
25     list process page.

Page 241

1                    DONALD C. STONE

2          A.      Remind me again which page that

3     is.

4          Q.      Page 13.

5          A.      I'm there.

6          Q.      You're there, okay.  Can you point

7     me to where in this document it says that a

8     below peer median three-year Alpha and negative

9     three-year Alpha Information Ratio requires a

10    monitor status?

11         A.      The second bullet point I think

12    speaks to I think what you're asking about

13    which is the peer group median risk adjusted

14    return is in the second bullet point.

15         Q.      You agree with me that is one

16    consideration that the committee may consider?

17         A.      Yes.

18         Q.      But does not have to consider?

19         A.      It says may consider in the IPS.

20         Q.      Then if we look at --

21                 MS. ENGELMAN:   Maria, can we pull

22            up I believe it is the Q4, 2018 minutes.

23                 (Exhibit 3 for identification, Q4,

24            2018 meeting minutes.)

25         A.      Okay, let me open that.

Page 242

1                     DONALD C. STONE

2          Q.    So this is the quarter after the

3    quarter that you referred in your report where

4    you said this information was undetected; is

5    that right?

6          A.    Yes.

7          Q.    Do you see here where it says "The

8    DAF was place on monitor status as of Q4, 2018."?

9          A.    Which page are you on?

10         Q.    I'm on page, I guess this is page 3.

11         A.    The DAF International Small/Mid

12   Cap Value.

13               (Witness reviewing document.)

14         A.    Okay.

15         Q.    So you agree that the committee

16   detected performance issues with this fund in

17   Q4 2018?

18         A.    Q4 they did, they are talking

19   about short-term decline.

20         Q.    Did you reference that document

21   prior to forming your opinion?

22         A.    I read this document, yes.

23         Q.    You didn't include it in your

24   report?

25         A.    I don't know if there is a bullet

Page 243

1                    DONALD C. STONE

2      point or if there is a footnote on it, I don't

3      think there is, but I don't recall that at this

4      point.

5            Q.    Do you recall whether or not the

6      American Beacon Funds were ever placed on

7      monitor status?

8            A.    I do not recall if they were

9      placed on monitor status.  They don't appear to

10     have been placed on monitor status during this

11     quarter?

12           Q.    Right, okay.  Stick with paragraph

13     104, the second to last sentence you say, "The

14     Freedom Funds' negative information ratios over

15     both three and five-year period were ignored in

16     Q4, 2015."  Do you see that?

17           A.    I do.

18           Q.    So again, you testified earlier

19     that when you're talking about the scoring

20     system in these paragraphs you're talking about

21     the one that was implemented in 2017?

22           A.    Well, this is referring back to

23     2015.

24           Q.    Okay.  But you testified earlier

25     that the inconsistency with the IPS that you

Page 244

1                           DONALD C. STONE

2       were speaking about in this paragraph relates

3       to the 2017 scoring system.  Do you recall that

4       testimony?

5              A.    I do, but I think that misspoke

6       the fact that I also had an example from an

7       earlier period.

8              Q.    Okay, tell me -- point me to where

9       in the 2015 IPS it requires a monitoring status

10      for a negative Information Ratio on a three and

11      five-year period?

12             A.    Again I don't think it has that

13      specifically to a -- it is one of the monitoring factors

14      that you can look at and the committee did not

15      seem to address it.

16             Q.    When you came back from the break

17      you clarified that the relevant period was from

18      2016 forward.  Do you recall that?

19             A.    I do.

20             Q.    Do you know what month in 2016?

21             A.    That would have been the beginning

22      of 2016, so that would have included the Q4

23      report that was in February or so.

24             Q.    February of 2016?

25             A.    Correct.

Page 245

                         DONALD C. STONE
1
2           Q.     So you believe the relevant time
3       period cover January, 2016 forward?
4           A.     It covers the period of that --
5       yes, from January of 2016 forward.
6           Q.     So can you explain to me why
7       you're providing an example in 2015?
8           A.     Because it wasn't reported on
9       until 2016.  The committee would not have had
10      the information until 2016 and that's the time
11      when it would have been triggered.
12          Q.      So if we turn to paragraph 117 of
13      your report.
14          A.     Okay.
15          Q.     So if you turn to page 47, I want
16      to go back to this.  We are under a bullet 3-1?
17          A.     Hold on?
18          Q.     We looked at it earlier.
19          A.     Okay.
20          Q.     So we are talking about the
21      scoring system implemented after 2017
22      conflicted with the monitoring standards
23      established by the IPS.  That is the bullet
24      under which this section is created; correct?
25          A.     Yes, 3-I.

Page 246

1                    DONALD C. STONE
2          Q.     Can we agree that the information
3     in this section relates only to the time period
4     of 2017 forward?
5          A.     I don't know why we are would do
6     that.
7          Q.     Is that not what it says?
8          A.     So that's what the -- I understand
9     what you're saying.  It's a grammatical issue
10    about where it is placed in here as opposed to
11    a substantive issue.
12         Q.     It's not a grammatical issue.  The
13    heading is "The scoring implemented after 2017
14    conflicted with the monitoring standards
15    established by the IPS."
16                My question is, the paragraphs
17    that follow under that heading, will you agree
18    with me these relate to the time period of 2017
19    forward when the scoring system was
20    implemented?  That is not grammatical, that is
21    your text.
22         A.     I understand what you're saying.
23    Okay.
24         Q.     So you agree?
25         A.     I agree that's what the heading

Page 247

1                    DONALD C. STONE

2      says, yes.

3              Q.      That wasn't my question.   Do you

4      agree that the paragraphs that follow until we

5      get to the second subbullet on page 50 relate

6      only to the time period after 2017 when the

7      scoring system was implemented, which I will

8      represent to you is Q3 2017, if you don't know

9      that?

10             A.      Okay.

11             Q.      So the first bullet point, it says

12     "The IPS dictates that performance will be

13     measured by comparing rates of return to

14     appropriate market indexes and peer groups for

15     me recent quarter, year to date, one year and

16     three-year period."  Do you see that?

17             A.      I do see that.

18             Q.      You saying that is what the 2015

19     IPS requires; is that correct?

20             A.      That would be the 2015, yes.

21             Q.      Then you say, "The scoring system

22     evaluates performance against benchmark indexes

23     for three year and five-year period and again

24     peers for one, three and five-year periods."

25     Do you see that?

Page 248

1                    DONALD C. STONE

2          A.     I do.

3          Q.     And you have highlighted and

4     bolded -- I'm sorry italicized and bolded the

5     five-year period.  Do you see that?

6          A.     I do.

7          Q.     So your point here is that these

8     scoring systems evaluated five-year performance

9     against benchmark and peer groups, but the IPS

10    did not call for five-year performance against

11    benchmark and peer groups; is that correct?

12         A.     Correct.

13         Q.     Then you say, "In addition to

14    incorporating an assessment of funds

15    performance for a longer timeframe than the

16    IPS".  So again, you're criticizing the

17    committee for looking at a longer time period

18    than the IPS contemplated; is that correct?

19         A.     Yes, I'm just saying it is

20    inconsistent, yes.

21         Q.     Is it your opinion that it is

22    inappropriate for the committee to evaluate

23    five-year performance against benchmark and

24    peer groups?

25         A.     No, I'm saying it is inconsistent

Page 249

1                        DONALD C. STONE

2        with the two don't tie together.  And that is

3        one of the things that I'm saying is there are

4        places where these two don't tie together and I

5        think that could present confusing information

6        to the committee.

7                        There is nothing wrong with a

8        five-year number per se, but that is not a part

9        of the IPS.  So if you go and get a scoring

10       based on a five-year number, you might come up

11       with a different answer then what the IPS would

12       necessarily dictate.

13            Q.    Okay.  So let's look at the IPS.

14       Go back to the 2015 IPS.  And what you're

15       referring to is on page 12 of the IPS.  Do you

16       see that?

17            A.    Let me get to page 12.  Okay, yes

18       performance evaluation, right.

19            Q.    So the middle of the page it says,

20       where I think you got your quote from.

21       "Performance hopefully measured by comparing

22       rates of return to the appropriate market

23       indexes and peer groups for the most recent

24       quarter, year to date, one-year and three-year

25       period and longer periods where available."  Do

Page 250

1                    DONALD C. STONE
2        you see that?
3               A.    I do.
4               Q.    And that would include five-year
5        period?
6               A.    Yes, it would.
7               Q.    So that is not inconsistent with
8        the IPS at all, is it?
9               A.    No, it would seem to be
10        consistent.
11               Q.    Why did you state in your report
12        that it was inconsistent with the IPS?
13               A.    I probably misread it.
14               Q.    Okay.
15                    Would you agree with me that the
16        quarter data would be captured by the one year
17        data?
18               A.    No, the quarter data is data -- I
19        mean it would be subsumed under it, but
20        reporting on the quarter is a separate
21        reporting element.
22               Q.    But it would be subsumed in the
23        one year data, correct?
24               A.    But you wouldn't know what part of
25        it was, that's why you call it out separately.

Page 251

1                    DONALD C. STONE

2          Q.      Aside from the scoring system, do

3     you know one way or the other whether or not

4     the committee was receiving in the quarterly

5     reports all of this information?

6          A.      They were getting quite a bit of

7     information in the quarterly reports.

8          Q.      So did you review, aside from the

9     scoring system, did you review all of the

10    metrics that the committee was receiving in the

11    quarterly reports?

12         A.      I did look at the metrics they

13    were receiving, yes.

14         Q.      Did you form an opinion as to

15    whether or not all of the metrics they were

16    receiving were inconsistent with the IPS?

17         A.      The metrics seemed fine.

18         Q.      If we go to the second bullet it

19    says, "The IPS investment watch list process

20    identified performance below the peer median

21    over three, five or ten years as a criterion to

22    consider in placing an investment on monitor or

23    alert status despite the ten-year returns not

24    appearing anywhere in the scoring system."  Do

25    you see that?

Page 252

1                    DONALD C. STONE
2          A.     I do.
3          Q.     Was the ten-year returns provided
4    in the quarterly investment reports outside the
5    scoring system?
6          A.     I have to look at the quarterly
7    report to confirm that.  They probably were,
8    but I have to look at the report to confirm it.
9          Q.     So if we turn to the next page.
10   It says, "The scoring system requires an
11   investment manager to have at least a
12   three-year tenure to receive a passing score
13   for that component, but IPS cautions that any
14   change to an investment manager could be
15   sufficient reason to assign a fund to monitor
16   or alert status."  Do you see that?
17         A.     I do.
18         Q.     So wouldn't a three-year tenure
19   encompass any change to an investment manager?
20         A.     To get a passing score you have to
21   have -- let me read it.
22                (Witness reviewing document.)
23         A.     I'm trying to understand what
24   you're asking me.
25         Q.     So you say, "The IPS cautions that

Page 253

1                    DONALD C. STONE

2      any change to an investment manager could be

3      sufficient reason to assign a fund to monitor

4      or alert status."  Right?

5               A.      Correct.

6               Q.      And the scoring system requires

7      that a manager have at least a three-year tenure;

8      is that right?

9               A.      Yes, it does.

10              Q.      If there is a change --

11              A.      That is not the same as any

12     change.  That could be -- again, the language

13     is not clear.  That could be something else.

14              Q.      What is it in your view?  How are

15     these inconsistent?

16              A.      You could have had a team of

17     people and one of them left, that wouldn't

18     change the fact that you still have a

19     three-year tenure.  But it could be if that was

20     a person -- that that person left might be a

21     reason that you'd want to consider monitor or

22     alert status.

23              Q.      Do you know whether or not the

24     committee was receiving information about

25     whether or not there was any change to the

1                    DONALD C. STONE

2      investment manager in the QIRs?

3              A.     They were receiving that.

4              Q.     So that is not inconsistent with

5      the IPS; correct?

6              A.     No.

7              Q.     I want to turn your attention to

8      some of qualitative criteria.  Turn to paragraph 131

9      of your report.

10             A.     Let me get there.

11             Q.     Here you're talking about a March,

12     2018 report, a special report regarding the

13     Fidelity Freedom Funds.

14             A.     Yes, the Reuters report.

15             Q.     This Reuters report dealt with

16     withdrawals from the Fidelity Freedom Funds

17     over the preceding four years; is that right?

18             A.     Correct.

19             Q.     Is it your -- did you review that

20     report in connection with preparing your

21     report?

22             A.     Yes.

23             Q.     Are you aware that -- am I correct

24     that that report was dealing with essentially

25     an overhaul of the Fidelity Freedom Funds that

Page 255

                         DONALD C. STONE

1

2    happened if 2014 that resulted in some riskier

3    investments; is that correct?

4         A.    Well, it was -- they changed their

5    glide path and probably some of the underlying

6    funds in 2014, so between 2014 and 2018 there

7    was a substantial runoff of assets by people

8    who got concerned about what the risk might be.

9    There was an increase in equity depending on

10   vintage between 1 and 20 percent and there were

11   a few other, I think there are probably a few

12   other tweaks that I don't remember off the top

13   of me head.

14             In any event, Fidelity was

15   undergoing substantial run off of assets that I

16   think about 15 billion during that period of

17   time.  And other target dates series were

18   gaining assets.  So it was actually a rather

19   fraught period at Fidelity, they were losing

20   market share overall.

21        Q.    You say in here towards the

22   bottom of this paragraph, "The committee never

23   reviewed or discussed these concerns much less

24   deliberated their impact on the Freedom Funds

25   standing in the plan whether as a result of the

Page 256

1                      DONALD C. STONE
2        plan's investment advisor bringing this report
3        to the committee's attention or to the
4        committee independently identifying significant
5        negative reporting concerning the plan's most
6        important investments."  Do you see that?
7             A.    I do.
8             Q.    So did you review all of the
9        minutes to determine whether or not the
10       committee had ever discussed this report or
11       otherwise discussed the underlying overhaul of
12       the Fidelity Freedom Funds.
13            A.    I did not see anything specific to
14       the special report.
15            Q.    What about the overhaul of the
16       Fidelity Freedom Funds?
17            A.    I don't recall at the moment.  I
18       wouldn't be surprised if they did have some
19       conversation around that.
20            Q.    Why wouldn't you be surprised
21       about that?
22            A.    Well, I would expect -- I would
23       hope they would.  I just wouldn't be surprised.
24       It's a big event at the time.
25            Q.    Why is it that you believe that

```
 1                    DONALD C. STONE
 2      the special report should have been considered
 3      if in fact the actual -- if the committee was
 4      actually monitoring the overhaul itself and the
 5      impact on the plan?
 6           A.    Well, I would like -- again, I'm
 7      saying it ought to be in there, but I'm not
 8      looking at the particular minutes.  I don't
 9      recall which minutes might have them in there.
10      I would have to look at that.
11                MS. ENGELMAN:   Maria, can you pull
12           up Q1 2015 committee meeting minutes
13           please.
14                (Exhibit 4 for identification, Q1
15           2015 committee meeting minutes.)
16           A.    That was a Q4 '18?
17           Q.    It should be Q1, 2015.
18           A.    Q1, 2015, I got that.  Okay.
19           Q.    Do you see here where it says that
20      "The Fidelity Freedom Funds were on monitor
21      status in part due to the underlying -- the
22      performance history of the underlying fund but
23      also --
24           A.    Where are you in this?
25           Q.    Page 4.
```

Page 258

1                      DONALD C. STONE
2              A.      Page 4, okay.  Fidelity Freedom
3      Funds, okay.
4                      (Witness reviewing document.)
5              A.      So that's an addition to reason
6      for monitoring added for that quarter.
7              Q.      So do you agree that they were on
8      monitor status and the committee was monitoring
9      the enhanced guide path that changed in the
10     latter part of 2013 which increased overall
11     equity exposure between 10 percent and 20
12     percent across the various vintages?
13             A.      But they waited nearly two years
14     to do that.
15             Q.      Well, I'm showing one set of
16     minutes here.  I'm asking if you agree that
17     during this time period they were monitoring
18     that?
19             A.      They were monitoring the glide
20     path change at this point, yes.
21             Q.      Do you have any reason to believe
22     sitting here they weren't monitoring during
23     other time periods?
24             A.      I don't recall seeing it on watch
25     for other time periods and they said -- so it

Page 259

1                  DONALD C. STONE

2      was added at this point due to do the enhanced

3      glide path and maybe because it just want into

4      effect -- I don't know if it shows up in prior

5      minutes or not.

6           Q.    If you were a -- let me ask you

7      this.  Are you suggesting in this report that

8      the 2018 special report should have resulted in

9      any particular action with respect to the

10     Freedom Funds?

11          A.    Again, I would go back to what I

12     said before.  I would think that it would first

13     lead to an in-depth analysis as to what was

14     going on with them.  It would not simply be

15     business as usual.

16                I think that would be to me the

17     kind of thing that would raise the issue that

18     to put them back on watch if they weren't on

19     watch and to do a deep analysis of, in this

20     case, going back to find out how much assets

21     they were losing, what the impact of that was,

22     what the -- why the concern about the putting

23     6 million participants at risk is kind of a hot

24     headline to say the least.

25                I would think that they would

Page 260

1                    DONALD C. STONE
2       want to go do a deeper analysis and that would
3       show up in let's say the next quarter's
4       reports.
5              Q.     But other than that, any
6       particular outcome that you were opining should
7       have resulted as a result of --
8              A.     It depends on what they found when
9       they did that as to whether they would replace
10      them or not.
11             Q.     Turn to paragraph 135 of your
12      report.
13             A.     Okay.
14             Q.     Actually, you know what, we are
15      going to go somewhere else first and then to
16      that.
17                    So Mr. Stone, you're familiar with
18      the target date deep dives that were presented
19      to the committee?
20             A.     Yes.
21             Q.     It's your opinion they were
22      presented annually from 2014 to 2024 other than
23      2017 that is in paragraph 137 of your report?
24             A.     Correct.
25             Q.     You say that the committee did not

Page 261

1                      DONALD C. STONE

2       ask for those deep dives in your report.  Do

3       you see that?

4              A.      Where are you?

5              Q.      On paragraph 137 toward the end

6       of the paragraph you say "Committee members did

7       not recall requesting additional information or

8       taking any action as a result of the target

9       date deep dives."

10             A.      Yeah, that was the Riddle

11      deposition.

12             Q.      Then the last sentence says,

13      "These documents were not prepared at the

14      request of the committee or tailored to the

15      Quanta plan, but instead were distributed to

16      each of Ascende's clients." Do you see that?

17             A.      Yes.

18             Q.      You were relying on Mr. Eagar's

19      testimony that the committee did not request

20      these deep dives?

21             A.      Correct.

22             Q.      Why does it matter whether or not

23      the committee requested the deep dives or not

24      if they saw them and considered them?

25             A.      Well, I think it has had do with

Page 262

DONALD C. STONE

1

2          their being kind of what they're asking for

3          that they are in charge, they are the ones

4          making the decision as opposed to something

5          just being fed to them which was a document

6          that was sent to every client.  I think there

7          is a difference.

8                    There is obviously a difference if

9          the committee says, you know, we would really

10         like to see a deeper dive of the Fidelity

11         Freedom Funds relative to a broad array of

12         other target date funds.  That's a very

13         different fact pattern than if Ascende just

14         simply says, we've created this, we thought

15         we'd go over this and we thought you'd find

16         this interesting.

17              Q.    If the committee is receiving the

18         information and considering the information in

19         its analysis, why does it matter who requested

20         it in the first place?

21              A.    Because it's a motivational issue.

22         They didn't seem to have any interest in

23         finding out how others were doing.  That was

24         the point.

25              Q.    You testified earlier that you

Page 263

1                    DONALD C. STONE

2       provided similar reports to your clients; is

3       that correct?

4              A.     We did.

5              Q.     Did every committee which you

6       worked with ask for that information or did you

7       just provide it?

8              A.     One of them -- there is a myriad

9       number of things that we provide as part of our

10      service.

11             Q.     You testified that you didn't

12      tailor those specific documents to the specific

13      plans; is that correct?

14             A.     No, like I had said, this was just

15      an add-on that we provided.  But the point

16      would be that if a client asked for specific

17      information, that's different than if we just simply

18      send them information or in this case if QPA

19      sends them information.

20             Q.     Did you draw a conclusion that the

21      committees with which you were working were

22      operating imprudently if they hadn't asked for

23      this type of information?

24             A.     That isn't what I said.  It's a

25      different circumstance in terms of, if you ask

Page 264

1                      DONALD C. STONE

2        for something you're showing more, obviously,

3        more interest in being proactive about things.

4        And all I'm saying in this particular case is

5        the committee did not proactively ask for this

6        information.  Not everybody that I worked with

7        asked for it either.  Some did, some didn't.

8        But I'm just saying that is a different fact

9        pattern.

10                      MS. ENGELMAN:   Can you pull up

11              minutes, Maria, please.

12                      (Exhibit 5 for identification, Q1

13              2016 Meeting Minutes.)

14              A.     Which meeting minutes is that?

15              Q.     It should be the latest document

16        in Exhibit Share, Q1 2016.

17              A.     Which document?

18              Q.     Q1.

19              A.     Q1, 2016, I got it.

20              Q.     If you turn to the bottom of the

21        page.

22              A.     Which page?

23              Q.     Target date fund and it says, "As

24        the meeting concluded, AWAI" which is Ascende

25        at that point in time "and the committee

Page 265

```
 1                    DONALD C. STONE
 2      discussed an overview of the Fidelity Freedom
 3      Funds.  The committee expressed interest in
 4      conducting a due diligence project to review
 5      the Freedom Funds versus some industry
 6      competitors."
 7                    Does that refresh your
 8      recollection that the committee actually
 9      requested these types of analysis?
10            A.    It sounds like they did request
11      some additional information.
12                    MS. ENGELMAN:   Maria, can you pull
13            up 2016 deep dives.
14                    (Exhibit 6 for identification, 2016
15            Deep Dives.)
16            Q.    Mr. Stone, I point your attention
17      paragraph 39 of your report.
18            A.    39, okay.
19            Q.    Here you talk about what
20      responsible plan fiduciaries should do when
21      assessing target date funds.  Do you see that?
22            A.    Yes.
23            Q.    And in the middle of the paragraph
24      you say, "The fiduciaries gather and evaluate
25      essential information about the available
```

Page 266

DONALD C. STONE

1

2      options such as historical returns and risk

3      adjusted returns, fees, expenses, and

4      differences in their glide path, asset classes

5      and underlying investments."  Do you see that?

6              A.    Yes.

7              Q.    So if you pull up the target date

8      funds that should be in Exhibit Share which are

9      the 2016 deep dives.

10             A.    Yes.

11             Q.    And I represent to you that was

12     presented at the Q4 2016 meeting.  If you turn

13     to page 5 of that document.  Do you agree that

14     that shows the various asset classes?

15             A.    This is the glide path.

16             Q.    The glide path, okay.

17             A.    Not the various asset classes.

18             Q.    Okay, sorry I'm looking at the

19     wrong thing.

20                   Do you see it shows the various

21     glide paths of various target date funds?

22             A.    Maybe I'm looking at the wrong

23     one.  I'm looking at Freedom Funds glide path

24     on page 5.

25             Q.    Okay, hold on one second.

Page 267

1                    DONALD C. STONE

2          A.      You're looking at the glide path

3    comparison all?

4          Q.      I'm looking at equity fund split

5    of target date funds on page 5 of the Freedom

6    Funds.  Do you see that?

7          A.      Yes.  "The Freedom Funds, The

8    International Equity Exposure, US Equity

9    Exposure, Bond Exposure."

10         Q.      If we go to page 6, it looks at

11   the glide path of the Fidelity Freedom Funds as

12   compared to all the comparators in this report?

13         A.      Yes.

14         Q.      And then the next page looks at

15   glide path to only and the page after that

16   looks at glide path comparison through only.

17         A.      Correct.

18         Q.      The next page looks at the

19   composition percentage breakdown of the various

20   vintages of the Fidelity Freedom Funds.

21         A.      Yes, it's a high level asset

22   allocation, yes.

23         Q.      Then if we look at the next page,

24   it looks at the Freedom Funds returns on three

25   years.

Page 268

1                    DONALD C. STONE

2          A.      Correct.

3          Q.      Then if we look at next page it

4    looks at one-year returns compared to the

5    various comparators.

6          A.      Correct.

7          Q.      Then if we look at the next page

8    it looks at three-year returns compared to the

9    various comparators.

10         A.      Yes, it does.

11         Q.      Then the next page looks at the

12   five-year returns compared to the various

13   comparators.

14         A.      Yes, it does.

15         Q.      Then the next page looks at the

16   growth of the Fidelity Freedom Funds, certain

17   vintages.

18         A.      Yes.

19         Q.      The next couple of pages looks

20   like that and then we get to page 16 and does

21   this look at the risk adjusted returns?

22         A.      Let me get to that.

23         Q.      On a three year and five-year

24   basis compared to the comparators?

25         A.      Yes.

Page 269

1                    DONALD C. STONE

2          Q.     So does page 17 and so does page

3     18.

4          A.     Okay.

5          Q.     And page 19 looks at the

6     allocation of the underlying funds for the

7     various vintages.

8          A.     Yes.

9          Q.     And page 20 looks at the

10    three-year comparison compared to best

11    benchmark.

12         A.     Yes.

13         Q.     And the next page looks at

14    five-year comparison compared to best

15    benchmark.

16         A.     Correct.

17         Q.     And the next page looks to be --

18    the next couple of pages looks at expense

19    ratios.

20         A.     Yes, it looks at returns.

21         Q.     You're correct.

22                It has a summary of returns

23    compared to benchmark and annualized and net

24    expense ratios.  So it's a summary of the

25    various vintages?

Page 270

1              DONALD C. STONE

2        A.     These is all the various sub funds

3    within the vintage, yes.

4        Q.     Would you agree with me that this

5    deep dive is consistent with type of information

6    that you would expect the committee to have in

7    conjunction with paragraph 39 of your report?

8        A.     I think it is good information for

9    them to have, absolutely.

10       Q.     So if we look at --

11              MS. ENGELMAN:   Maria, can you pull

12          up fourth quarter 2016.  I'm not sure, I

13          think it is Exhibit 5, Mr. Stone.

14       A.     You want me to go to Exhibit 5.

15       Q.     Hold on a second.  Let me make

16   sure this is right.   Fourth quarter -- it

17   should be the May 10, 2017 meeting minutes

18   Maria..

19              (Exhibit 7 for identification, May 10,

20          2017 meeting minutes.)

21       Q.     While you wait for that to come

22   up.  So in paragraph 138 you opine in the first

23   sentence, "It's unclear if and how the

24   committee actually considered the data

25   presented in the TDF deep dives."  Do you see

Page 271

1                    DONALD C. STONE

2    that?

3           A.     Yes.

4           Q.     If you look at these meeting

5    minutes and you go to the end of them -- do you

6    have them in front of you?

7           A.     No they haven't come up.

8           Q.     May 1st, 2017.

9           A.     Okay, now let me open it, okay.

10          Q.     At the bottom of the page, the

11    bottom of the document.

12          A.     Okay.

13          Q.     It says, "The committee reviewed a

14    target date fund comparison which analyzed the

15    current Fidelity Freedom Funds versus leading

16    industry competitors.  Discussion covered the

17    glide path construction and philosophy,

18    terminal allocation point of the glide path

19    fees and diversification.  The committee

20    considered like styled active managers, index

21    managers as well as blended managers using

22    active and passive underlying investments in

23    their target date strategies.  Upon their

24    review the committee remained pleased with the

25    Fidelity Freedom Funds.  It did not note

Page 272

1              DONALD C. STONE

2    sufficient reasoning to change target date

3    providers at the time."  Do you see that?

4         A.     I do.

5         Q.     So do you agree with me that in

6    these meeting minutes it is clear that the

7    committee considered the data present in this

8    target date deep dive?

9         A.     They considered the information

10   in the target date deep dive, but it is kind of

11   a -- it actually doesn't get to the issue of

12   whether these particular funds are appropriate

13   for their participants.  And this is the kind

14   of thing that we talked about earlier about the

15   minutes, you read this and I have no idea

16   whether they know or have any idea whether

17   these target date series does or does not work

18   for the participants.

19              It is just a laundry of list of

20   fees, glide path, diversification, which is all

21   stuff that you have to look at but that doesn't

22   answer that question at all.  It doesn't seem

23   to go what a participant -- are participants

24   generating the kind of wealth they need which

25   would be what I would hope to see in addition

Page 273

```
 1                    DONALD C. STONE
 2      to the information that is here.  It is just
 3      not there.
 4           Q.    So what you would expect to
 5      see is information about how the Fidelity
 6      Freedom Funds are generating wealth for the
 7      plan participants?
 8           A.    How it is working for the
 9      participants.  In other words, this could have
10      been for any of the 5,000 different plans out
11      there.  This is what I'm saying, it could be
12      rather anodyne.  This doesn't tell me, is this
13      the appropriate choice for their plan and if
14      so, why do they think it is the right choice
15      for their plan.
16                 They are just saying it's --
17      that they looked at the fees, they looked at
18      diversification, they looked at the allocation,
19      the construction, all of which is good stuff.
20      All of which they should definitely be doing.
21      But nowhere does it tell me that they have tied
22      that to their own plan and how that works.
23           Q.    So it doesn't tell you in the
24      minutes they tied it to their own plans, but
25      the minutes reflect that they reached a
```

Page 274

```
                         DONALD C. STONE
 1
 2      conclusion after looking at all of the
 3      available information that it was sufficient
 4      for their plan; is that correct?
 5              A.      Well, no, that is not quite what I
 6      said.  It tells me they probably didn't consider
 7      whether it works for their participants.  That
 8      is what I take away from that.
 9                      It tells me they looked at all of
10      this information, they looked at a lot of data
11      and a lot of analytics, which is good, but the
12      point of looking at all of that information is
13      to tie it back and realize is this working for
14      our plan.  It this working for our participants.
15      That's not here and that's, I don't think that
16      is ever in any of these things that I've seen.
17                      That is -- people are -- they're
18      ticking all the boxes as opposed to kind of
19      actually -- they are kind of missing what the
20      punch line is here which is, is the plan
21      working well for our participants and that
22      answer is not here.
23              Q.      And that answer can change
24      depending on the plan and the plan's objectives;
25      is that right?
```

Page 275

1                    DONALD C. STONE

2          A.      It could, it could depend on the

3    plan's objectives, it could depend on the

4    plan's demographics.  But like said, in this

5    case they are looking at all the stuff that

6    everybody gets excited about, which is all the

7    nice color charts and graphs and everything,

8    but what do you do with that information.  All

9    of that stuff is for a purpose and that purpose

10   is to help you determine is this appropriate

11   for our plan.  Is this working for our

12   participants.  Are they getting to where they

13   want.

14          If the objective of the plan,

15   which one of the objectives is to have people

16   be able to save the appropriate amount of money

17   for retirement.  This doesn't answer that

18   question.  This just tells me they looked at a

19   bunch analytics.

20          Q.      Okay.  Going back to the meeting

21   minutes.  Did you review any of the materials

22   that were appended to or attached to the

23   meeting minutes?

24          A.      I did.  I don't recall exactly

25   what I looked at at the moment, but yes, I did.

Page 276

1                    DONALD C. STONE

2            Q.      Do you consider the materials

3    presented at the meeting such as the quarterly

4    investment reports to be part of the meeting

5    minutes record?

6            A.      Yes.

7            Q.      Let's go paragraph 135 of your

8    report.

9            A.      Okay, 135.

10           Q.      So you say here that "The

11   committee failed to recognize and appropriately

12   scrutinize the persistent failure of the Freedom

13   Funds to outperform its benchmark."  Do you see

14   that?

15           A.      I do.

16           Q.      It says, "Appendix A to the 2015

17   IPS identifies S&P target date indexes as the

18   appropriate benchmark for evaluating TDF

19   performance."  Do you see that?

20           A.      I do.

21           Q.      Then it goes on about, "There is

22   quarters bracketing the start of the class

23   period from Q4 2015 through Q1 2017, the

24   majority of the Freedom Funds vintages failed

25   to generate returns that exceeded the

Page 277

                    DONALD C. STONE
1
2       corresponding S&P target date index on a
3       five-year basis while all but Q1 2017 the
4       Freedom Funds similarly failed that standard on
5       a three-year basis."  Do you see that?
6               A.      I do.
7               Q.      So then you go to the next page,
8       there is a table one in your report.
9               A.      There is, yes.
10              Q.      Did you prepare that table?
11              A.      No, I asked counsel to prepare
12      that report.
13              Q.      Did you check to make sure it was
14      accurate in terms of the underperform versus
15      outperform on three year and five-year
16      performance relative to benchmark?
17              A.      I went and spot checked it.  I
18      didn't check every single vintage against every
19      single period.
20              Q.      How did you spot check it?  What
21      materials did you consult?
22              A.      Go back to Morning Star and I also
23      get -- there was a couple of others too, I
24      think.
25              Q.      We already talked about the fact

Page 278

DONALD C. STONE

1
2      that the IPS asks for -- looks at performance

3      on a comparison to benchmark but also

4      comparison to peer group; is that correct?

5              A.      Correct.

6              Q.      You didn't include comparison to

7      peer group here, why is that?

8              A.      Because it is -- I think this

9      demonstrates one element of underperformance.

10     There is probably an infinite number of things

11     that you could do on those things.  So this is

12     one example.  It is not a matter of

13     intentionally -- well, it was intentionally

14     leaving it out, but it was not because it

15     somehow or another told a different story.

16             Q.      What was end of that, I didn't

17     catch it?

18             A.      I said it was not left out because

19     it told a different story.  I think this tells the story

20     as I wanted to tell it.  It underperformed its

21     benchmark, period.  I thought that was enough

22     for purposes of what I was trying to say here.

23             Q.      So what is it that you're trying

24     to say here?

25             A.      That they consistently

Page 279

1                    DONALD C. STONE
2       underperformed their benchmark over a three
3       year and five-year period through the timeframe
4       that we are looking at here which is Q4 of 2015
5       into where they actually started to outperform
6       which is Q1 2017.
7            Q.    So did you look at performance
8       compared to benchmark after Q1 2017 of the
9       Fidelity Freedom Funds?
10           A.    I had look at some of it, yes, and
11      the performance was better.
12           Q.    Do you know over what time period
13      the performance was better?
14           A.    I can't say off the top of my head
15      right now, no.
16           Q.    Is it not -- is it common for
17      investment funds to have fluctuating performance
18      during different time periods?
19           A.    It is and we talked about that,
20      but we also talked about that that doesn't mean
21      that you don't take a very deep look at
22      underperformance and determine whether or not
23      it is still an appropriate choice for you.
24                 Because we don't know -- we are
25      ex post here, we know that the funds performed

Page 280

                              DONALD C. STONE
1
2    better, but that's great.  After the fact is
3    great.  At the time that they were looking at
4    this we have underperform, underperform,
5    underperform pretty much across the board for
6    an extended period which goes back to the
7    conversation I know we had several times which
8    is why weren't they taking a much deeper look
9    at this at that particular time not knowing
10   what the future would hold.  Okay, nobody knows
11   that.
12           Q.     In this table here you don't state
13   the level of underperformance compared to
14   benchmark, do you?
15           A.     Not in this table, no.
16           Q.     But you agree with me that that is
17   an important factor that the committee needs to
18   consider when evaluating whether something is
19   actually underperforming or not?
20           A.     It was underperforming.  The
21   question is the percentage underperforming is
22   certainly something that you could take a look
23   at and I would expect they would take a look at
24   that.
25           Q.     And they would also take a look at

Page 281

DONALD C. STONE

1              whether or not the performance was improving

2              during tis time period?

3

4              A.    You would take a look at all of

5              this, yes.

6                    MS. ENGELMAN:    Can we take a ten

7              minute break and hopefully come back and

8              wrap up.

9                    MR. ROBERTS:    Okay.

10                   THE VIDEOGRAPHER:    The time is

11             10:40 and we are off the record.

12                   (Recess taken.)

13                   THE VIDEOGRAPHER:    The time is

14             10:50 and we are on the record.

15             BY MS. ENGELMAN:

16             Q.    Mr. Stone, do you recall or do you

17             know GlassBridge Enterprises was a client of

18             Pavilion?

19             A.    I'm sorry, who was?

20             Q.    GlassBridge Enterprises?

21             A.    Glass, G-l-a-s-s?

22             Q.    Yes.

23             A.    I've never heard of them.

24                   MS. ENGELMAN:    Maria, can we pull

25             up the 5500 for GlassBridge, the 2017.

Page 282

1            DONALD C. STONE
2            (Exhibit 8 for identification,
3       GlassBridge 2017 Form 5500.)
4       A.    I'm opening it now.
5       Q.    Can you go to Schedule C which is
6  on page 6 of the document?
7       A.    Okay.
8       Q.    First, actually let me start at
9  the top of the document.  This is a 5500 for
10  the GlassBridge Retirement Investment Plan, do
11  you see that?
12      A.    Yes, I do.
13      Q.    It is the period January, 2017 to
14  December 31st, 2017, do you see that?
15      A.    I do.
16      Q.    If we go to page 6 of the
17  document.
18      A.    Yes.
19      Q.    It says Pavilion Advisory Group
20  and under there it says relationship,
21  investment advisory.
22      A.    Yes, so on the following page
23  after that what you see is Jeffrey Slocum &
24  Associates which was a firm that we bought
25  based out of Minneapolis.  So that is why I

Page 283

1                   DONALD C. STONE
2      didn't recognize that name because that was a
3      Slocum client and 2017 sounds like the time
4      that we actually close that deal and taken them
5      over as a client.
6           Q.    So when you took them over as a
7      client, did some of their investment advisors
8      come over to Pavilion as well?
9           A.    Yes, most of them did.
10          Q.    Did you interact with those folks?
11          A.    I did interact with them.  Mostly --
12     occasionally I saw a few of them, but I never
13     went to the Minneapolis office, so I didn't
14     meet all the people that worked there.
15          Q.    Were you an executive director of
16     Pavilion at this time?
17          A.    I was.
18          Q.    So you feel that the investment
19     advisors who were serving in the 321 capacity
20     were fulfilling their fiduciary obligation?
21     Any reason not to believe that?
22          A.    I'm sorry, repeat that I
23     couldn't --
24          Q.    Do you believe that the 321
25     investment advisors that were employed by

Page 284

1                    DONALD C. STONE
2        Pavilion at this time were fulfilling their
3        fiduciary obligation?
4              A.     The ones that I knew were
5        certainly.  I can't speak to people that I
6        didn't know and I think I kind of carved that
7        out earlier.  But to the extent that I knew
8        people, I was absolutely certain they were
9        doing the correct thing.
10                   I didn't have a -- I mean some
11       of these -- I don't know who -- I don't know
12       who was responsible for this relationship.  So
13       while I would like to think they certainly were
14       doing exactly what they should be doing, I
15       don't know what they were doing because I
16       wasn't -- I don't even know it we integrated
17       them into our reporting system at this
18       particular time, because you have part of the
19       fee went to Jeffrey Slocum & Associates, so
20       that would have been probably just earlier in
21       the year and then the rest of it would have
22       been Pavilion later in the year.  So I would
23       guess that we may not have even switched over
24       the reporting system at that point.
25             Q.     So would it have been your

Page 285

1                         DONALD C. STONE
2       expectation that when Pavilion essentially, I
3       guess, acquired this business, that it ensured
4       that the individuals who were working on the
5       clients that were now Pavilion were fulfilling
6       their fiduciary obligations?
7               A.      Yes, I would expect that they
8       would do that.  How that was validated, I'm not
9       sure.
10              Q.      If we turn Schedule H of this
11      document which I will tell you the PDF number
12      in a second.
13              A.      I'm there.
14              Q.      You see here as of December 31,
15      2017 this plan offers the Fidelity Freedom
16      Funds K Class?
17              A.      I'm on Schedule H.  Isn't H the
18      one that you want to be in?
19              Q.      Page 41 of the document, Schedule
20      H line 4-I.
21              A.      4-I, okay.  I'm missing it
22      somewhere.  I'm not sure where you're looking.
23              Q.      On page 41 of 43.
24              A.      41 of 43.  Okay way down there.
25      Hold on.  Almost there.  Okay, I'm on page 41

Page 286

1                          DONALD C. STONE

2       of 43.

3                    Q.      Do you see where it says the

4       Fidelity Freedom Funds and the various vintages

5       K Class was offered in this plan?

6                    A.      I do.

7                    Q.      As of December 31st, 2017?

8                    A.      Yes.

9                    Q.      Do you see that?

10                   A.      Yes.

11                   Q.      Do you agree with me that the

12      Pavilion advisors would have had the same

13      performance information that you identified in

14      table 1 paragraph 135 of your report?

15                   A.      I would assume so, yes.

16                   Q.      You agree with me that this plan

17      committee did not elect to remove the Fidelity

18      Freedom Funds as of that time period?

19                   A.      As of that time, that is correct.

20                   Q.      You have no reason to believe that

21      Pavilion as a 321 advisor was acting imprudently or

22      not fulfilling its fiduciary obligations?

23                   A.      I would not think that the firm

24      was acting imprudently.  I don't know who the

25      advisor was.  As I said, this was as we were

Page 287

1                    DONALD C. STONE

2     transitioning people over.  I can't speak to

3     what they did or do not do.  But I would assume

4     because the firm had a sterling reputation and

5     everything, that they were doing what they

6     should be doing.  And I also don't know

7     demographics of this plan, so I don't know how

8     that would have fit in this particular case

9     because I didn't recognize the firm's name at

10    all.

11         Q.    So would you agree with me

12    based on the information in table 1 of your

13    report, that that information does not

14    necessitate a removal of the Fidelity Freedom

15    Funds from a plan?

16         A.    I said what it necessitated was

17    taking additional action to understand the

18    reasons for the underperformance.  That might

19    or not have led to the removal of the funds

20    depending on what was discovered.

21         Q.    You agree with me that at least

22    this plan did not discover anything that

23    warranted removal as of December 31st, 2017?

24              MR. ROBERTS:  Objection.

25         A.    I can't speak to what they knew

Page 288

1                    DONALD C. STONE
2        or didn't know, because I don't know these
3        people.  So I'm not going to put myself in
4        their place.  They chose to keep the funds as
5        of this point, that's the only information that
6        I know of at this stage.
7                         MS. ENGELMAN:   Maria, can we look
8               at 2019 GlassBridge.
9                         (Exhibit 9 for identification,
10              GlassBridge 2019 Form 5500.)
11              A.    Okay, I'm bringing it up.
12              Q.    So this is for the year -- let me
13       know when you have it.
14              A.    Okay, I'm on the first page.
15              Q.    This is for year January, 2019 to
16       December 31st, 2019.  Do you see that?
17              A.    Yes.
18              Q.    If you go to page 3 of the PDF it
19       shows that Pavilion Advisory Group is the
20       investment advisor?
21              A.    On page 3?
22              Q.    Sorry, it's page 6.  Page 6 of the
23       PDF.  Schedule C.
24              A.    Yes, Pavilion Advisory Group, yes.
25              Q.    If we go back down to Schedule H

Page 289

1                      DONALD C. STONE
2      which is page 37 of 38 all the way toward the
3      end.
4              A.      37 of 38.  Okay, I'm on this.
5              Q.      You see as of this time period
6      this plan is still offering the Fidelity Freedom
7      Funds Class K.  Do you see that?
8              A.      Yes, I do.
9              Q.      Those are the same funds that are
10     offered in this plan; is that right?
11             A.      That's correct.
12             Q.      Through May of 2019 you were an
13     executive director at Pavilion; is that right?
14             A.      Yes, actually it had switched over
15     to Mercer.
16             Q.      What time period?
17             A.      Well Mercer acquired Pavilion on
18     November 30th, 2018.
19             Q.      Got it.  But you were still there
20     in an executive director role until May of 2019
21     I thought you said?
22             A.      No, I had no client relationship,
23     I had no responsibilities and I was living in
24     Spain, but I was still on the payroll, yes.
25             Q.      During this time period, this 2019

Page 290

```
 1                    DONALD C. STONE
 2     time period where this plan is still offering
 3     the Fidelity Freedom Funds, that is after the
 4     March, 2018 special report that you highlighted
 5     in your expert report; is that correct?
 6              A.    That's correct.
 7              Q.    Mr. Stone I would like to --
 8              MS. ENGELMAN:   Maria, can we look
 9         at the 2016 Holland & Knight.
10              (Exhibit 10 for identification,
11         Holland & Knight 2016 Form 5500.)
12              Q.    Mr. Stone, were you an investment
13     advisor for Holland & Knight?
14              A.    I was not.
15              Q.    Do you know if Pavilion was?
16              A.    That sounds familiar.
17              Q.    Do you know who the investment
18     consultant, the 321 investment consultant was
19     for Holland & Knight?
20              A.    I do not.
21              Q.    Do you have any reason to believe
22     sitting here today that the investment consultant
23     from Pavilion working on the Holland & Knight plan
24     did not fulfill the fiduciary obligation of a
25     321 advisor?
```

Page 291

```
1                    DONALD C. STONE
2               MR. ROBERTS:   Objection.
3          A.    I don't have any reason to think
4     that, no.
5          Q.    Do you have any reason to think
6     that the Holland & Knight committee was acting
7     imprudently in any way?
8          A.    I don't know anything about that,
9     so I can't speak to them.
10         Q.    Do you have the 2016 Holland &
11    Knight 5500 in your Exhibit Share?
12         A.    Let me see if it is loaded.  Yes,
13    it is there.  Let me open it.
14         Q.    So this is for the period
15    January 1st, 2016 to December 31st, 2016.  Do
16    you see that?
17         A.    Yes.
18         Q.    If we look at page 36 of the PDF.
19         A.    36 of the PDF, okay.
20         Q.    Schedule C.
21         A.    Yes, okay.  I'm on page 36 of
22    Schedule C.
23         Q.    Do you see there that the Pavilion
24    Advisory Group is the Holland & Knight plan's
25    investment advisor?
```

Page 292

1                    DONALD C. STONE
2            A.    I don't.  On 36 that is not --
3       hold on.  Yes, okay, the previous page, I see
4       it.
5            Q.    Then if we go to page 88 of 89.
6            A.    I'm there.
7            Q.    Do you see that this plan offered
8       the Fidelity Freedom Funds K target date funds
9       with is the same funds that were offered in
10      this plan?
11           A.    I do.
12                 MS. ENGELMAN:   Can we go to 2017,
13            Maria.
14                 (Exhibit 11 for identification,
15            Holland & Knight 2017 Form 5500.)
16           A.    I'm loading it.  Okay, I think it
17      is open.
18           Q.    So this is the 5500 for the
19      Holland & Knight Profit Sharing Plan and Trust.
20      This is for the January 1st, 2017 to
21      December 31st, 2017 time period.  Do you see
22      that?
23           A.    I do.
24           Q.    Then if we go to, again, to page
25      36 of my PDF where it shows that Pavilion

Page 293

DONALD C. STONE

1    Advisory Group is the investment advisor.
2
3         A.    Give me a moment.  Okay, yes, one
4    of several consultants apparently.
5         Q.    Then if we go to Schedule H --
6         A.    If I could just stop you there for
7    a moment.  I have an a question.
8         Q.    Sure.
9         A.    So I mean there is four different
10   consultants listed here, no five.  Five -- six
11   different consultants listed here and so I'm
12   not sure what Pavilion's role was here as the
13   investment advisor.  They were getting only
14   $15,000, so that is not a typical advisory fee.
15   So I'm not sure if they just take -- they had
16   the relationship before.  I'm not sure what the
17   role was for Pavilion at that particular time.
18              I wanted to make a note of that
19   because somebody else -- there a couple of
20   somebody else's that were making considerably
21   more money as consultants on this plan at this
22   particular time.  And there is enough advisors,
23   strategic advisors on this plan at the same
24   time.
25         Q.    If we go to Schedule H.

Page 294

```
 1                  DONALD C. STONE
 2        A.     Okay, I'm on Schedule H.
 3        Q.     It is my page 81 of 83.
 4        A.     81 of 83.  Okay.
 5        Q.     Do you see here that the Fidelity
 6   Freedom Fund K Funds were offered in this plan?
 7        A.     I do.
 8        Q.     And that Pavilion would have had
 9   access to the same performance information in
10   table one of your report?
11        A.     Yes, but I'm not sure who was the --
12   who was actually driving the ship in this
13   particular case because there are like five
14   consultants and at least two investment
15   advisors as they're broken out on Schedule C.
16             I don't know that -- I don't know
17   what they were providing.  But for $15,000 they
18   were not providing quarterly reporting.  So I
19   think it was one of the other -- I'm not saying
20   these guys didn't have the K Funds and all of
21   that, I get it.  I don't think Pavilion has
22   probably much of anything to say on whatever
23   was going on with that plan in this particular
24   year because it looks like other people were
25   providing advice to the plan.
```

Page 295

1                   DONALD C. STONE

2          Q.     Do you know one way or the other

3    sitting here today what role Pavilion played?

4          A.     No, but for $15,000, they weren't

5    the investment advisor.  I could tell you that.

6          Q.     Mr. Stone, you testified earlier

7    that you were the 338 investment advisor to

8    Packaging Corporation of America; is that

9    correct?

10         A.     That's correct.

11         Q.     What was the timeline that you

12   were the 338 advisor?

13         A.     We are talking about the 401-K or

14   the define benefit?

15         Q.     The 401-K.

16         A.     401-K would have begun sometime

17   during 2018 and I'm going to -- I'm not sure of

18   the exact timeframe.  It was probably during

19   the second quarter that they began to convert

20   over and I actually handed that relationship

21   off to one of my colleagues at the point that

22   they finalized the decision and signed the

23   agreement to have us being a 338.

24         Q.     Prior to that were you personally

25   the 321 advisor?

Page 296

1                    DONALD C. STONE
2          A.      321, yes.
3          Q.      So during what time period were
4     you the 321 advisor?
5          A.      So I had worked with Packaging
6     Corporation of America beginning in 2005, if I
7     remember correctly, but I don't think we took
8     over the main plan until 2007.  I did a couple
9     of projects for them back in like 2005, 2006.
10    And I think that -- and worked with a subsidiary
11    and took over the main 401-K plan as advisor I
12    think in 2007.
13         Q.      Do you recall what target date
14    funds the Packaging Corporation of America
15    offered?
16         A.      I do not.
17         Q.      Would it refresh your recollection
18    if they offered the State Street Fund?
19         A.      That sounds like that could be
20    correct, yes.  That sounds correct.
21         Q.      Do you recall if they were the
22    plan QDIA?
23         A.      I believe they were.
24         Q.      Does that mean that you would have
25    provided heightened scrutiny, as you used that

Page 297

1                    DONALD C. STONE
2      term, with respect to the State Street Fund?
3             A.     Yes.
4             Q.     Would you have recommended their
5      removal -- in a 321 capacity would you have
6      recommended the committee remove those funds if
7      you deemed them to be imprudent?
8             A.     Of course.
9             Q.     As a 338 advisor it would have
10     been your fiduciary obligation to remove those
11     funds if they were imprudent in your view?
12            A.     Correct.
13            Q.     Do you have a recollection of when
14     the plan offered the State Street target date
15     funds?
16            A.     I believe they offered them for a
17     number of years, but I can't speak to when they
18     went into the plan and I'm not sure what
19     happened after Pavilion became the 338 and I
20     handed the relationship off to one of my
21     colleagues as part of my kind of exit strategy.
22                   So I don't recall if any --
23     because that was actually at the time, as you
24     said, it was after we had signed the agreement
25     and we were in the process of evaluating

Page 298

                    DONALD C. STONE
1
2       whether any fund changes were going to be made
3       by us as a 338.  But I was not involved
4       ultimately in whatever changes did or did not
5       take place.
6              Q.    Sorry, just remind me, when was
7       the time period when you handed off the
8       relationship?
9              A.    I believe it was the second
10      quarter of 2018.  I'm not a hundred percent
11      sure, but that is pretty close.
12             Q.    Do you recall what the benchmark
13      was for the State Street funds?
14             A.    I do not off the top of my head,
15      no.
16             Q.    Would it refresh your recollection
17      that the State Street Fund offered or have the
18      chosen benchmark as the S&P 500?
19             A.    It would be the S&P target date
20      index fund, right?
21             Q.    Correct.
22             A.    Not the S&P 500.
23             Q.    The target date Intex fund;
24      correct.
25             A.    That is a typical index that's

Page 299

1                    DONALD C. STONE
2      used pretty much across the board.
3                    MS. ENGELMAN:  Maria, can we pull up
4            the next document.
5                    (Exhibit 12 for identification,
6            Document titled State Street Fund versus
7            S&P.)
8            Q.     Let me know when you have it,
9      Mr. Stone.
10           A.     What is the document?
11           Q.     This document is one that we put
12     together and I will explain it to you.
13           A.     The last thing I'm showing is
14     still the Holland & Knight.  Okay State Street
15     Fund versus S&P PDF.
16           Q.     We went and looked at the
17     performance of the State Street Fund as
18     compared to the benchmark over the time period
19     that you served in both a 321 capacity and also
20     a 338 capacity.  Although I know post 2018,
21     second quarter 2018 that is not necessarily the
22     case.
23                  I understand that you don't have
24     the underlying metric, but assuming this
25     analysis is correct, will you agree with me

Page 300

1                DONALD C. STONE

2       that starting in Q3 2016 the State Street funds

3       are underperforming the index on a three year

4       and five-year basis?

5              A.      Q3 in 2016, right?

6              Q.      Correct.

7              A.      Okay, so there were a couple of

8       vintages that appear not to have been, but

9       there are several that -- most of them were

10      underperforming at that particular time, yes.

11             Q.      The same is true for Q4 2016?

12             A.      That would be correct.

13             Q.      The same is true for Q1 2017?

14             A.      I have to go to the next page.

15      Three year basis, yes.

16             Q.      And on a five-year basis as well?

17             A.      Yes.

18             Q.      For Q2 2017 would you agree they

19      are underperforming the benchmark on a three

20      year and five-year basis?

21             A.      I would.

22             Q.      And for Q3 2017, would you agree

23      the State Street funds are underperforming the

24      benchmark on a three year and five-year basis?

25             A.      I would.  These are index funds,

Page 301

1                      DONALD C. STONE

2       so you would expect them to be underperforming

3       by definition.

4               Q.     For Q4 2017?

5               A.     Again, most of them are

6       underperforming at that particular point.

7               Q.     Q1 2018?

8               A.     Okay, most of them are

9       underperforming at that point.  And again, my

10      point still stands which is they are index

11      funds so you would expect them to be

12      underperforming this benchmark.

13              Q.     For Q2 2018 the same?

14              A.     Same thing.

15              Q.     And Q3 2018 same thing?

16              A.     Yes.

17              Q.     And during this time period, so

18      that is, I'm going to count, nine quarters of

19      underperformance on the three year and

20      five-year basis as compared to index.  Do you

21      agree with me?

22              A.     As compared to the S&P target date

23      index, that's correct.  These are passively

24      managed funds.  Again, it is not exactly a

25      surprise that they're underperforming a little

Page 302

1                      DONALD C. STONE

2    bit.

3            Q.    But you agree with me these funds

4    were not removed from the plan?

5            A.    They are going to be evaluated

6    differently as a passive fund.  They are going

7    to be evaluated differently.  No, they weren't

8    removed from the fund.  But I'm saying the

9    evaluation would also be different as well.

10           Q.    Tell me about that.  Why would the

11   evaluation be different for a passive fund?

12           A.    They are passive, they are not

13   actively managed.  All they are doing is

14   tracking a benchmark and the only difference

15   here is the benchmark.  The S&P target date

16   index and I don't have that information in

17   front of me, but I'm making a good educated

18   guess, is the allocation in the target date

19   index that they are being measure against, the

20   allocations could be slightly different than

21   the actual State Street target date allocations

22   themselves.

23                  Also State Street might have

24   been using a different -- the funds that they

25   were using, the asset allocation itself might

Page 303

1                    DONALD C. STONE

2      have included or not included all the different

3      asset categories that are in the S&P target

4      date series.

5                    In addition to that, you have

6      transaction costs in the State Street.  So you

7      have several things that create a little bit of

8      noise in the data when you look at that because

9      they are passive funds.  All they are doing is

10     mimicking an index and they did a very good job

11     of mimicking that index.

12                   When we did the analysis, we would

13     go back and look at, you know, what are they

14     doing anything that says they are not tracking

15     their index.  If that they are -- that they are

16     not doing what they should be doing.  And the

17     funds were inexpensive so I think the

18     evaluation is, not to say that you wouldn't

19     have the conversation with the committee about

20     these versus this benchmark, I think you would.

21     But it is very different than how the way that

22     you evaluate actively managed funds.  Totally

23     different.

24            Q.     Do you have a specific

25     recollection of having conversations with the

Page 304

1                    DONALD C. STONE

2      committee in a 321 capacity regarding this

3      performance?

4           A.    I don't recall specific

5      conversations I would have had years ago with

6      this -- in regard to any quarterly performance

7      or whatever with this particular client.  No, I

8      don't remember that.

9           Q.    In a 338 capacity do you recall

10     specifically you tracking down sort of

11     understanding what the noise was and

12     understanding what was driving this

13     underperformance?

14          A.    This would have been up to my

15     colleague who replaced me.  He was heavily

16     involved in the evaluation process as to

17     whether they were going to continue with the

18     State Street target date funds or not and I

19     have no idea what the outcome of that was.

20          Q.    You were a 338 advisor prior to

21     Q2 2018; correct?

22          A.    In '17 I was a 338 for the defined

23     benefit.  In 2018 I was briefly the 338 for the

24     401-K because I handed it off during -- as we

25     got the agreement signed.  So I would have --

Page 305

1                    DONALD C. STONE
2       technically it was probably a 30-day period
3       that I was actually the 338 since we were
4       handing it off.
5            Q.    Your partner, you don't know what
6       happened -- you don't know what analysis they
7       did exactly?
8            A.    First of all, it wouldn't have
9       just been him.  It would have been an entire
10      staff of people that would have been looking at
11      whether or not State Street was in our high
12      conviction list.  If State Street was in our
13      high conviction list, if they were in our high
14      conviction list, we are probably would have
15      kept it.
16                 It's a passive choice.  It is
17      generally -- it has been very good doing what
18      it does.  And the allocation of the State
19      Street target date funds is -- for example,
20      passive funds can be a little tricky.  State
21      Street, their target date funds look a little
22      bit different than Blackrock which looks a
23      little different than Vanguards.  They are all
24      passive, they all track index, but they are
25      tracking in some case the same index and in

Page 306

1                    DONALD C. STONE

2      some case different indexes.

3                      And they also may be making

4      other decision under the covers.  For example,

5      Vanguard does not go and invest in small and

6      mid cap international funds because they said

7      it dries up transaction costs.  Well, State

8      Street does as far as I know and I'm pretty

9      sure Blackrock does as well.

10                     There is some noise in those

11     numbers and I don't think -- you can not

12     reasonably compare a passive index fund to an

13     actively managed portfolio in target date or

14     for that matter any other category and say

15     well, gee, the index fund is underperforming.

16                     If it is doing what it is supposed

17     to be doing which is tracking its index, then

18     it is doing exactly what it is supposed to be

19     doing and you don't need to do anything else.

20                     MS. ENGELMAN:   If I could have five

21           minutes, I likely can wrap up, I just need

22           to look at my notes.

23                     THE VIDEOGRAPHER:   The time is

24           11:26 and we are off the record.

25                     (Recess taken.)

Page 307

```
 1                  DONALD C. STONE
 2                  THE VIDEOGRAPHER:   The time is
 3            11:41 and we are on the record.
 4      BY MS. ENGELMAN:
 5            Q.    Mr. Stone, just a couple of other
 6      things and then we will wrap up.
 7                  Are you aware that Packaging
 8      Corporation of America and the investment
 9      committee of the Packaging Corporation of
10      America was sued in connection with the choices
11      of the fiduciary committee?
12            A.    No, I was not the aware of that.
13      Can you tell me what date that was?
14            Q.    I can.  The complaint was filed in
15      June of 2022.
16            A.    Okay.
17                  MS. ENGELMAN:   Maria, can we pull
18            up the Amended Complaint, please.
19                  (Exhibit 12 for identification,
20            Amended Complaint filed in June of 2022.)
21            Q.    Do you have that, Mr. Stone?  Let
22      me know when you do?
23            A.    No, it hasn't loaded yet.  Oh
24      okay, it just came across.
25            Q.    So this was filed in -- this is
```

Page 308

1                    DONALD C. STONE
2        the Amended Complaint.  This was filed in June
3        of 2022.  I think the class period goes back to
4        at least 2016.  So that is the time period when
5        you were serving as the 321 consultant; is that
6        right?
7              A.    That would be correct.
8              Q.    We don't have to review the whole
9        thing, but I will represent to you that it
10       challenges breach of fiduciary duty claims
11       based on the recordkeeping fees that were paid
12       to the record keeper, the managed account
13       services as well as the prudence of three
14       different investment options.
15             A.    Okay.
16             Q.    So the investment options are,
17       they are listed throughout the complaint, but
18       if you go to page, I guess paragraph 151 there
19       it is a chart and the Invesco Diversified
20       Dividend  Fund, The Metropolitan West Total
21       Return Bond Fund and the Victory-Integrity
22       Small Cap Value Fund.
23             A.    Okay.
24             Q.    Do you have any thoughts on
25       whether or not these three investment options

Page 309

1                      DONALD C. STONE

2       were actually prudent options available to plan

3       participants?

4            A.    I have not look at those

5       investment options in a long time, so I really

6       have no thought one way or the other at this

7       particular point.

8            Q.    Do you have any thoughts about

9       whether or not the recordkeeping fees paid to

10      the record keeper by this plan may have been

11      too high?

12           A.    I would very surprised.  Again, I

13      haven't looked at the specifics of the complaint,

14      but we negotiated lower fees for every single

15      client that we ever had except one over -- as

16      PSA, so over that 12-year period, only one

17      client were we not able to reduce fees for.

18                 That was something that we

19      spent a lot of time doing.  So I would be very

20      surprised, but I don't know, like I said, I

21      don't know anything about the complaint.

22           Q.    You weren't involved and you

23      weren't deposes in this matter or otherwise

24      involved in any way?

25           A.    I have not been contacted by

Page 310

1                    DONALD C. STONE

2      anybody.

3              Q.     But you understand that on the

4      date of this complaint essentially you're

5      advice to the committee was at issue in this

6      lawsuit?

7              A.     Yeah, I understand that, yes.

8                    MS. ENGELMAN:    I don't have any

9             further questions for Mr. Stone.

10                    MR. ROBERTS:    Nothing from me

11            either.  Thank you, Mr. Stone.

12                    THE WITNESS:    Okay.

13                    (CONTINUED ON NEXT PAGE.)

14

15

16

17

18

19

20

21

22

23

24

25

Page 311

1                    DONALD C. STONE

2               THE VIDEOGRAPHER:    If there are no

3      other stipulations I will conclude the

4      video recorded for this proceeding.

5               So here ends media unit number 6,

6      this concludes the video recorded virtual

7      remote deposition of Donald C. Stone taken

8      by the Defendants on Friday, November 1st,

9      2024.  The time is 11:47 p.m. central

10     European time and we are going off the

11     record.

12               (TIME NOTED:  11:47 P.M. CENTRAL

13     EUROPEAN TIME.)

14

15                          _____

16                          DONALD C. STONE

17

18     Subscribed and sworn to before me

19     this _____ day of _____, 2024

20

21     _____

22

23

24

25

Page 312

1                          ERRATA SHEET

                    VERITEXT LEGAL SOLUTIONS

2                    330 OLD COUNTRY ROAD

                    MINEOLA, NEW YORK 11501

3                              516-608-2400

4       NAME OF CASE:

        DATE OF DEPOSITION:

5       NAME OF DEPONENT:

6       PAGE    LINE(S)      CHANGE              REASON

7       ____|_____|_____|_____

8       ____|_____|_____|_____

9       ____|_____|_____|_____

10      ____|_____|_____|_____

11      ____|_____|_____|_____

12      ____|_____|_____|_____

13      ____|_____|_____|_____

14      ____|_____|_____|_____

15      ____|_____|_____|_____

16      ____|_____|_____|_____

17      ____|_____|_____|_____

18      ____|_____|_____|_____

19      ____|_____|_____|_____

20      ____|_____|_____|_____

21      ____|_____|_____|_____

22      ____|_____|_____|_____

23      SUBSCRIBED AND SWORN TO BEFORE ME

        THIS___DAY OF _____, 20__.

24

        _____    _____

25      (NOTARY PUBLIC)              MY COMMISSION EXPIRES:

Page 313

```
 1              C E R T I F I C A T E

 2     STATE OF NEW YORK      )

 3                           : ss.

 4     COUNTY OF NEW YORK  )

 5         I, WILLIAM VISCONTI, a Shorthand Reporter and

 6     Notary Public within and for the State of New York,

 7     do hereby certify:

 8         That prior to being examined, the witness named in

 9     the foregoing deposition was duly sworn to testify the truth,

10     the whole truth, and nothing but the truth;

11         That said deposition was taken down by me in

12     shorthand at the time and place therein named and

13     thereafter reduced by me to typewritten form and that the

14     same is a true, correct, and complete transcript of said

15     proceedings.

16         Before completion of the deposition, review of the

17     transcript [ X ] was [   ] was not requested.  If requested,

18     any changes made by the deponent (and provided to the

19     reporter) during the period allowed are appended hereto.

20         I further certify that I am not interested in the

21     outcome of the action.

22         Witness my hand this 11th day of 2024.

23

24         _____

25                   WILLIAM VISCONTI
```

Page 314

                    E X H I B I T S

DESCRIPTION                                    PAGE

Exhibit 1 for identification,    39
Expert Report of Donald C.
Stone.

Exhibit 2 for identification,    171
2015 IPS.

Exhibit 3 for identification,    241
Q4, 2018 meeting minutes.

Exhibit 4 for identification,    257
Q1 2015 committee meeting
minutes.

Exhibit 5 for identification,    264
Q1 2016 Meeting Minutes.

Exhibit 6 for identification,    265
2016 Deep Dives.

Exhibit 7 for identification,    270
May 10, 2017 meeting minutes.

Exhibit 8 for identification,    282
GlassBridge 2017 Form 5500.

Exhibit 9 for identification,    288
GlassBridge 2019 Form 5500.

Exhibit 10 for identification,   290
Holland & Knight 2016 Form 5500

Page 315

1

2                    E X H I B I T S

3    DESCRIPTION                          PAGE.)

4    Exhibit 11 for identification,   292

5    Holland & Knight 2017 Form

6    5500.

7    Exhibit 12 for identification,   299

8    document titled State Street

9    Fund versus S&P.

10   Exhibit 12 for identification,   307

11   Amended Complaint filed in June

12   of 2022.

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 316

1    John Roberts, Esquire

2    jcroberts@millershah.com

3                        November 11, 2024

4    RE:    Laliberte, Mary Et Al v. Quanta Services Inc Et Al

5          11/1/2024, Donald C. Stone (#6983699)

6          The above-referenced transcript is available for

7    review.

8          Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12         The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-midatlantic@veritext.com.

16    Return completed errata within 30 days from

17   receipt of testimony.

18     If the witness fails to do so within the time

19   allotted, the transcript may be used as if signed.

20

21

22                   Yours,

23                   Veritext Legal Solutions

24

25

Page 317

1   Laliberte, Mary Et Al v. Quanta Services Inc Et Al

2   Donald C. Stone (#6983699)

3                    ACKNOWLEDGEMENT OF DEPONENT

4       I, Donald C. Stone, do hereby declare that I

5   have read the foregoing transcript, I have made any

6   corrections, additions, or changes I deemed necessary as

7   noted above to be appended hereto, and that the same is

8   a true, correct and complete transcript of the testimony

9   given by me.

10

11  _____    _____

12  Donald C. Stone                          Date

13  *If notary is required

14                        SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                        _____ DAY OF _____, 20____.

16

17

18                        _____

19                        NOTARY PUBLIC

20

21

22

23

24

25

**[& - 2015]** Page 1

| & | | | |
|---|---|---|---|
| **&** 2:7 282:23 284:19 290:9 290:11,13,19 290:23 291:6 291:10,24 292:15,19 299:14 314:25 315:5 | **104** 233:11,25 234:2,3,4 239:9 240:13 243:13 **10:40** 281:11 **10:50** 281:14 **11** 292:14 315:4 316:3 **11/1/2024** 316:5 | 255:16 **15,000** 293:14 294:17 295:4 **150** 17:3 41:3 80:22 **151** 308:18 **15th** 201:19 **16** 268:20 **17** 184:16 269:2 304:22 | 56:24 57:10,13 64:5,10 210:17 **2002/2014** 61:6 **2004** 19:10,15 19:16,21,23 20:7 22:20 25:9 53:22 **2005** 25:7 296:6,9 |

**0**

**02110** 2:9
**03290** 1:4 4:10

**1**

**1** 1:12 39:13,14 87:18,19 255:10 286:14 287:12 314:4
**1,500,000** 87:14
**1.2** 131:11
**1/2** 161:25
**10** 18:13,13,18 19:7 63:3 109:13 110:13 110:15 125:6 134:11 258:11 270:17,19 290:10 314:19 314:24
**10,000** 86:24
**100** 17:5 55:17 56:6 63:5 80:22 134:4
**1000** 113:11

**11501** 312:2
**117** 245:12
**11:26** 306:24
**11:41** 307:3
**11:47** 311:9,12
**11th** 313:22
**12** 58:2 175:2 185:4 249:15 249:17 299:5 307:19 309:16 315:7,10
**12:45** 114:8
**13** 241:4
**131** 254:8
**135** 260:11 276:7,9 286:14
**137** 260:23 261:5
**138** 270:22
**148** 147:7,8 151:4
**15** 29:6,10 109:16 133:15 133:16 134:11 134:21 184:15

**171** 314:7
**18** 257:16 269:3
**180** 17:3
**1845** 2:3
**19** 39:10 184:16 269:5
**19103** 2:4
**1990s** 52:13,23
**1st** 4:12 152:23 271:8 291:15 292:20 311:8

**2**

**2** 171:24 173:25 314:7
**20** 63:4 64:22 67:11 82:24 89:21 93:12 102:24 109:16 114:9 255:10 258:11 269:9 312:23 317:15
**200** 41:4
**2002** 22:2 49:9 53:15,24 56:24

**2006** 296:9
**2007** 19:10,15 19:18,20,21,23 20:2,7 22:20 25:9,16 296:8 296:12
**2008** 97:5
**2009** 158:2
**2010** 97:5
**2013** 258:10
**2014** 53:24 55:3 56:4,24 56:25 57:11 62:13 64:10 129:21,23 130:5 133:12 146:25 147:2,3 148:3,10 151:8 152:17,19,20 152:22,23 153:5,19 191:8 255:2,6,6 260:22
**2015** 149:6 153:13,15 154:2,6 156:15

**[2015 - 299]**

167:25 169:6
169:11,14
171:23,24
173:2,23
200:16 201:3
201:11,15,18
201:19 202:5
202:25 204:12
208:8 216:5
221:25 223:21
234:17,24
236:3,10,18,20
238:6 239:25
240:4,24
243:16,23
244:9 245:7
247:18,20
249:14 257:12
257:15,17,18
276:16,23
279:4 314:8,12
**2016**  149:6
158:11,13,16
158:19,25
159:6,8 200:11
231:12,13
232:8 244:18
244:20,22,24
245:3,5,9,10
264:13,16,19
265:13,14
266:9,12
270:12 290:9
290:11 291:10
291:15,15

300:2,5,11
308:4 314:15
314:17,25
**2017**  131:9
132:19 133:4,4
133:4,12,12
135:22 136:5
149:6 159:19
159:22,24
160:6,19 184:6
199:8 234:21
234:25 235:21
237:7,13,23
238:3,17,19
239:20 243:21
244:3 245:21
246:4,13,18
247:6,8 260:23
270:17,20
271:8 276:23
277:3 279:6,8
281:25 282:3
282:13,14
283:3 285:15
286:7 287:23
292:12,15,20
292:21 300:13
300:18,22
301:4 314:19
314:21 315:5
**2018**  131:16
132:19 133:5
136:8 149:6
161:5,11,12
240:20 241:22

241:24 242:8
242:17 254:12
255:6 259:8
289:18 290:4
295:17 298:10
299:20,21
301:7,13,15
304:21,23
314:10
**2019**  39:9,10
130:5 149:6
152:5,9,14
161:18 162:19
210:17 234:25
288:8,10,15,16
289:12,20,25
314:23
**2020**  148:4,11
148:12 149:3,7
149:17 150:9
150:15,19,22
151:9,11
152:24 161:20
165:3,25 166:2
166:11,13,19
166:21 167:6
167:13 173:5
184:10,17,23
199:12 231:18
**2021**  19:12,16
19:18 20:2,3
25:16 26:7
38:11,20
216:16,22
218:9

**2022**  231:10,13
231:21,22,24
232:5 307:15
307:20 308:3
315:12
**2024**  1:12 4:12
16:12 149:25
149:25 150:3,5
150:7,23 191:9
260:22 311:9
311:19 313:22
316:3
**20567**  313:23
**20ish**  101:22
**21**  26:17
**22**  216:23
**23**  62:3
**24**  167:2
216:22
**241**  314:9
**24th**  216:15
**25**  63:4
**257**  314:11
**264**  314:14
**265**  314:16
**270**  314:18
**28**  223:18,19,21
223:22 225:7
**282**  314:20
**288**  314:22
**290**  314:24
**292**  315:4
**299**  315:7

| 3 |
|---|

**3** 16:8,8 87:18
225:4,7 237:17
241:23 242:10
245:25 288:18
288:21 314:9
**3-1** 245:16
**30** 64:23
133:21 305:2
316:16
**300** 27:22
28:17
**307** 315:10
**30th** 289:18
**31** 285:14
**31st** 16:12
282:14 286:7
287:23 288:16
291:15 292:21
**321** 49:11,15
53:12 55:8
56:19,21,22
58:4,15,22
59:3 60:16,22
61:17,21,23
62:9 63:8
64:11 67:21
69:13 74:16
129:20 131:23
131:24 132:20
133:14 134:15
136:13 141:6
193:2 208:15
210:16 211:20
283:19,24

286:21 290:18
290:25 295:25
296:2,4 297:5
299:19 304:2
308:5
**321s** 58:10
**330** 312:2
**338** 27:8 30:19
49:11 53:13
56:20 131:7,10
131:17,20,23
132:3,7,10,12
132:13,14
295:7,12,23
297:9,19 298:3
299:20 304:9
304:20,22,23
305:3
**34** 187:20,23
**35** 86:18
102:22 190:22
**36** 291:18,19,21
292:2,25
**37** 195:18,21
196:25 198:23
289:2,4
**38** 289:2,4
**39** 265:17,18
270:7 314:4
**3:03** 1:12 4:13
**3:12** 12:14

| 4 |
|---|

**4** 62:22 161:25
224:6 225:3,4
257:14,25

258:2 285:20
285:21 314:11
**40** 23:25 80:18
86:18 102:22
133:21 184:2
231:16
**401** 22:24
25:12 34:6
39:3 49:19
50:17 51:10
53:11 55:8
80:18 121:16
224:9,11
295:13,15,16
296:11 304:24
**403** 53:11
**41** 232:20
285:19,23,24
285:25
**42** 91:16,17,22
92:18,20,22
102:8,9 227:16
**43** 233:11
239:9 285:23
285:24 286:2
**45** 102:8,9
**47** 236:25
237:3,4,15
245:15
**4:04** 50:8
**4:22** 1:4 4:10
**4:41** 69:2

| 5 |
|---|

**5** 12:11 62:14
62:14 64:3
125:5 264:12
266:13,24
267:5 270:13
270:14 314:14
**5,000** 273:10
**50** 17:3,5 62:7
63:3 64:24
80:18 81:19,19
126:11,19
135:3 210:7
247:5
**500** 23:25
62:22 298:18
298:22
**50th** 82:3
**516-608-2400**
312:3
**5200** 104:3,7
**55** 101:23
102:4,7
**5500** 281:25
282:3,9 288:10
290:11 291:11
292:15,18
314:21,23,25
315:6
**57** 101:23

| 6 |
|---|

**6** 5:25 62:14
87:20 89:17,25
125:5 259:23
265:14 267:10

**[6 - add]**

282:6,16
288:22,22
311:5 314:16
**6-0** 146:12
**60** 23:25 57:6
146:11,14
**600** 94:6
**65** 60:25 61:15
72:7 90:23
101:19 102:5
**66** 147:6,8
**6983699** 316:5
317:2

**7**

**7** 90:6 148:17
270:19 314:18

**8**

**8** 90:6 282:2
314:20
**80** 80:7,7,10
87:14
**806** 2:3
**81** 294:3,4
**83** 294:3,4
**86** 200:4,6
**88** 201:25
292:5
**89** 292:5

**9**

**9** 53:16 60:24
288:9 314:22
**90** 128:3,18,21
129:7

**90,000** 89:19,23
**93** 216:8
**97** 232:14,16,17
232:18,19
237:24

**a**

**ability** 14:19
**able** 7:7 76:13
93:15 119:14
120:13 160:8
275:16 309:17
**above** 206:19
316:6 317:7
**absent** 201:7
**absolute**
123:25 127:16
129:13 144:23
**absolutely**
60:23 76:13
77:24 114:7
120:9 136:24
270:9 284:8
**accept** 24:3
**accepted** 227:9
228:6
**access** 39:16
214:3 294:9
**accordance**
201:2
**account** 131:3
140:16,17,17
308:12
**accounts** 28:2
39:2 224:23

**accretive** 210:8
**accuracy** 316:9
**accurate** 43:2
162:10 199:10
277:14
**accurately**
42:17 107:19
**achieve** 178:9
179:4,20 180:4
182:2,15
185:13
**acknowledge...**
317:3
**acknowledg...**
316:12
**acquire** 143:5
**acquired** 285:3
289:17
**act** 32:7 132:3
211:22 212:21
**acting** 138:11
219:5 286:21
286:24 291:6
**action** 127:20
167:22 213:18
259:9 261:8
287:17 313:21
**active** 96:5,6,8
96:11 271:20
271:22
**actively** 302:13
303:22 306:13
**actual** 68:17
113:5 116:18
132:11 133:8

143:8 230:10
257:3 302:21
**actually** 14:3
16:16,23 19:9
20:18 21:16
29:15 30:20
39:10 54:11
63:12 74:17
75:12 84:3,10
92:22 96:25
104:12 105:14
108:23 113:17
137:19 138:7
138:22 140:19
150:21 152:20
154:12,23
161:20 163:18
164:9 178:16
207:20 211:4
215:19 216:22
219:13,21
226:9 231:10
255:18 257:4
260:14 265:8
270:24 272:11
274:19 279:5
280:19 282:8
283:4 289:14
294:12 295:20
297:23 305:3
309:2
**add** 55:24
57:13 63:14
67:15 218:23
263:15

**added** 184:6 258:6 259:2

**adding** 116:7 119:6

**addition** 248:13 258:5 272:25 303:5

**additional** 15:6 67:15 69:22 71:6 73:8,17 84:4,24 85:7 87:25 129:11 129:14 135:7 149:9 163:3 261:7 265:11 287:17

**additions** 317:6

**address** 78:14 175:16 244:15

**adequate** 215:3

**adequately** 195:4

**adjust** 101:9

**adjusted** 65:11 67:3 68:15 144:25 183:19 210:6 241:13 266:3 268:21

**administer** 3:13

**administrative** 58:6 139:24 140:11,24 194:4

**adopted** 160:2 160:6 161:14 161:20 166:3 184:7,16,23 239:12

**advance** 198:7

**advanced** 186:7 187:4 201:6

**advancement** 186:13

**advice** 97:15 131:24 214:8 294:25 310:5

**advised** 60:25

**advises** 131:24

**advisor** 30:10 45:16 46:25 55:20 58:15 61:21 64:11 67:21 69:14 84:6 95:18 119:4,14 120:13 131:7 131:20,23 153:11,24 156:10,15,23 160:15 172:21 192:4,8 202:3 202:23 208:15 209:16,19 210:17 213:8 216:13 232:22 256:2 286:21 286:25 288:20

290:13,25 291:25 293:2 293:13 295:5,7 295:12,25 296:4,11 297:9 304:20

**advisors** 49:9 53:17 54:17,24 55:5,13 56:4,7 57:4,7,16,23 58:4 59:16 60:18 63:22 91:5 133:6 209:8 225:18 283:7,19,25 286:12 293:22 293:23 294:15

**advisory** 282:19,21 288:19,24 291:24 293:2 293:14

**affect** 204:22

**affected** 160:11 160:12

**afoul** 239:12

**afternoon** 5:12

**ag** 24:2 113:9

**age** 79:14 101:18,19

**aggregate** 198:23

**ago** 9:19 10:7 10:10 44:21 78:23 97:20

127:5 193:22 196:18 211:19 221:3 304:5

**agree** 4:25 54:20 55:20 80:11 114:4 167:11 174:12 175:22 176:7 177:24 180:3 181:4,17 182:13 184:3 186:11 187:2 195:23 209:17 220:16,19 241:15 242:15 246:2,17,24,25 247:4 250:15 258:7,16 266:13 270:4 272:5 280:16 286:11,16 287:11,21 299:25 300:18 300:22 301:21 302:3

**agreed** 3:2,6,10 54:21 190:9 196:16 201:12 229:20

**agreement** 12:2 80:6 229:20 295:23 297:24 304:25

**ahb** 1:4 4:10

| | | | |
|---|---|---|---|
| **ahmed** 36:15 | **alternatives** | **anniversary** | **appearances** |
| **al** 1:6,9 4:8,9 | 156:13 | 82:3 | 4:22 |
| 316:4,4 317:1 | **amended** | **annual** 76:20 | **appearing** 4:5 |
| 317:1 | 199:17 307:18 | 175:18,24 | 251:24 |
| **alert** 177:20 | 307:20 308:2 | **annualized** | **appended** |
| 178:2 181:16 | 315:11 | 269:23 | 275:22 313:19 |
| 186:8,13,20,22 | **america** 131:16 | **annually** 72:20 | 317:7 |
| 187:4 201:6 | 131:19 295:8 | 72:23 73:3,23 | **appendix** |
| 239:13 251:23 | 296:6,14 307:8 | 210:24 211:2,2 | 149:24 236:22 |
| 252:16 253:4 | 307:10 | 260:22 | 236:23 238:9 |
| 253:22 | **american** 96:10 | **anodyne** 181:9 | 238:11 239:6 |
| **alignment** | 234:5 243:6 | 192:22 198:17 | 276:16 |
| 182:12 | **amount** 219:2 | 273:12 | **applicable** |
| **allocation** | 275:16 | **answer** 6:14,21 | 316:8 |
| 70:21 90:12,16 | **analysis** 78:17 | 23:18 24:20 | **applies** 174:24 |
| 90:16,18 | 87:25 90:23 | 30:18 31:20 | **apply** 147:11 |
| 267:22 269:6 | 108:16 139:19 | 109:10 118:14 | 147:22 151:6 |
| 271:18 273:18 | 168:16,19 | 122:16,17 | 153:3 161:11 |
| 302:18,25 | 171:19 177:21 | 129:13 157:4 | **appointing** |
| 305:18 | 259:13,19 | 197:11 212:7 | 225:17 |
| **allocations** | 260:2 262:19 | 249:11 272:22 | **appointment** |
| 103:4 302:20 | 265:9 299:25 | 274:22,23 | 217:5 |
| 302:21 | 303:12 305:6 | 275:17 | **appreciate** |
| **allotted** 316:19 | **analysts** 135:6 | **answered** | 153:17 |
| **allow** 187:13 | **analytic** 171:10 | 215:13 | **approach** |
| 221:8 | **analytical** | **answers** 104:16 | 84:15 137:6 |
| **allowed** 313:19 | 171:18 | **anybody** | 190:15 226:18 |
| **alluded** 77:12 | **analytics** | 218:18 310:2 | 226:19 239:16 |
| **alluding** 178:20 | 168:21 238:14 | **anybody's** | **approached** |
| **alongside** | 274:11 275:19 | 67:13 | 23:14 26:13,16 |
| 134:23 | **analyze** 187:25 | **aon** 27:9 | **approaching** |
| **alpha** 240:8,9 | **analyzed** | **apparently** | 18:17 |
| 240:19,19 | 271:14 | 219:18 293:4 | **appropriate** |
| 241:8,9 | **analyzing** 94:2 | **appear** 243:9 | 65:20 73:24 |
| | | 300:8 | 77:17 85:4,12 |

121:4 127:20
145:15,18
156:17 157:23
158:9 160:9
176:4,15
193:16 211:10
247:14 249:22
272:12 273:13
275:10,16
276:18 279:23
**appropriately**
139:11 276:11
**approving**
186:6
**approximate**
16:19 17:23
18:7
**approximately**
4:13 18:25
27:22 57:3
58:24 61:9
62:5 193:9
**approximation**
19:5 133:18
195:10
**arbitrary**
101:19
**area** 58:8
226:14
**areas** 14:10
44:12 45:4,6
223:13
**argue** 181:10
**array** 262:11

**arrived** 202:6
**articles** 40:7
**articulate**
95:12
**ascende** 153:10
155:9 156:15
156:23 159:11
162:3 208:19
233:13 234:15
236:14 262:13
264:24
**ascende's**
261:16
**aside** 53:9
251:2,8
**asked** 23:2
26:20 45:19
134:18 155:9
161:14 166:25
168:22 199:24
231:6 263:16
263:22 264:7
277:11
**asking** 61:12
161:22 169:8
171:15 197:6
198:21,22,25
205:21 241:12
252:24 258:16
262:2
**asks** 278:2
**aspect** 21:11
56:12 78:2
**aspects** 217:3

**assessing**
265:21
**assessment**
248:14
**asset** 63:6 68:7
68:8 70:17,20
71:22,22 73:7
90:12 92:7
94:3,20 103:4
224:20 225:6
266:4,14,17
267:21 302:25
303:3
**assets** 61:2,9
63:23 68:17
71:22 80:13
128:3 207:8
255:7,15,18
259:20
**assign** 252:15
253:3
**assigned** 186:3
**assigning**
239:13
**assignments**
137:20
**assist** 13:15
15:13
**associate** 8:23
**associated**
147:23
**associates** 9:12
9:15 13:25
282:24 284:19

**association**
4:19
**assume** 6:21
95:16 172:2
286:15 287:3
**assumed** 72:7
81:23
**assuming**
116:25 160:14
168:18 299:24
**assumption**
41:6
**astellas** 26:15
27:2,5,6,7
29:13,14,15
**attached** 166:7
275:22 316:11
**attachment**
238:6
**attempt** 88:19
**attention** 40:7
172:5 204:8
223:17 254:7
256:3 265:16
**attorney**
316:13
**attorneys** 2:3,8
3:3 13:22
**attractive**
110:16
**atypical** 173:21
**authority**
222:11,13,17
222:20 223:15
225:22

**authorized**
3:12
**automatically**
121:10 122:12
**available** 51:10
66:14 91:19
92:9 144:7,13
176:18 249:25
265:25 274:3
309:2 316:6
**average** 62:19
62:21 79:14,14
80:16 81:9
88:20 89:11,11
89:13,16,18,19
89:21 90:5,19
90:25 104:2,6
124:20,21
125:12,13
**averages** 89:5
**avoid** 138:9
**awai** 264:24
**aware** 7:16
10:21 14:7
67:11 92:10
141:4 167:17
202:11,18,25
212:23 215:2
254:23 307:7
307:12
**awful** 75:16
**awhile** 157:5

**b**

**b** 40:3,20 53:11
79:8 132:12
149:24 236:22
236:23 238:6,9
238:11 314:2
315:2
**back** 14:9,12
14:24 15:5,8,9
16:5 17:20
25:7 40:2
41:14 43:22
46:9,11,18
48:23 63:13
73:21 83:3
84:7,7 92:5
104:2,20,20
115:13,25
119:16 120:10
121:12,14,20
122:4 125:19
126:2 128:11
129:17 140:13
141:20 148:23
156:4 157:3,6
160:15 161:22
165:2 168:24
171:9 173:25
174:20 178:7
178:14 179:15
180:24 181:11
181:18 185:3
185:23 187:18
206:6 214:19
221:25 227:8

232:9 235:9,15
235:24 237:24
239:8 243:22
244:16 245:16
249:14 259:11
259:18,20
274:13 275:20
277:22 280:6
281:7 288:25
296:9 303:13
308:3
**backbone** 15:2
**background**
44:14 45:7
49:7 75:21
129:18
**backtrack**
112:6
**bad** 86:15,15
164:10
**balance** 89:13
89:18,24 90:24
104:3,6,6,10
113:19
**balances** 79:14
81:10 90:19,20
**ballpark** 23:23
**bank** 49:21
50:18 53:10
**barclays** 113:9
**barely** 118:24
**based** 23:21
92:8 99:24
116:14 119:18
125:24,25

160:5 161:13
162:9 165:23
167:20 190:3
198:11 219:25
249:10 282:25
287:12 308:11
**basic** 64:15
70:18 92:2
**basically** 23:12
23:20 24:4,6
26:18 27:14
30:17 33:21
56:5 63:20
67:6 72:12
85:20 143:17
149:4 162:19
**basics** 6:9
**basis** 43:21
61:12,19 68:4
69:19 73:11,12
73:14,23 74:4
113:23 115:21
118:16,21
119:15 121:8
124:23 163:9
163:11 175:18
175:24 185:21
187:24 189:24
190:2 204:14
204:16 232:7
268:24 277:3,5
300:4,15,16,20
300:24 301:20
**bat** 129:13

**bates** 42:22
175:4
**beacon** 234:5
243:6
**bear** 100:8,9
**beg** 31:19
**began** 131:10
146:24 147:2,4
231:12 295:19
**beginning** 7:12
14:8 244:21
296:6
**begins** 4:3
14:14
**begun** 295:16
**behavior** 149:5
155:25 157:20
158:4,6 159:5
**belief** 185:18
**believe** 11:21
11:22 21:4,21
22:5 26:14
35:15,20 36:4
36:23 37:25
38:7 67:19
70:3 97:3
116:21 143:9
146:24 147:2
153:10 159:8
162:18 166:8
195:4 202:10
205:13 212:5
216:6 235:23
241:22 245:2
256:25 258:21

283:21,24
286:20 290:21
296:23 297:16
298:9
**bell** 16:13
**benchmark**
68:5,10,11
108:3,6 109:6
112:18 113:4
115:20 116:9
118:16 120:7
121:7 122:11
127:25 128:2
128:17 156:25
170:8 176:4,10
183:5,14,25
184:22 185:7
185:20 201:13
202:3,23
204:25 205:11
205:23 208:9
247:22 248:9
248:11,23
269:11,15,23
276:13,18
277:16 278:3
278:21 279:2,8
280:14 298:12
298:18 299:18
300:19,24
301:12 302:14
302:15 303:20
**benchmarking**
209:8

**benchmarks**
68:6 200:23
**benefit** 30:16
81:24 104:14
131:10 132:18
142:25 143:4
295:14 304:23
**best** 15:16 32:7
35:5 42:10
68:11 99:14
138:12 139:12
139:12 149:14
204:20 226:18
230:9 269:10
269:14
**better** 15:2
24:9 33:22
99:8 100:7
129:9 130:23
165:19 205:23
209:2 279:11
279:13 280:2
**beyond** 231:18
231:24
**big** 21:18 65:8
81:10 91:14
99:17 133:19
141:2 256:24
**bigger** 124:15
138:25
**bill** 69:7 128:11
148:22 177:7
**billion** 60:25
61:15 62:4,24
63:2 104:12

**benchmarks** 131:12 133:24
134:2,8,10,13
255:16
**binary** 239:15
**bio** 130:21
**biography**
129:16
**bit** 15:5 20:19
32:24 36:13
48:13 49:6,8
80:9 95:25
106:5,12
115:18 170:25
173:15 217:11
251:6 302:2
303:7 305:22
**blackrock**
30:18 35:21,22
96:8 305:22
306:9
**blah** 99:8,8,8
179:17,17,17
179:17
**blend** 96:6
**blended** 271:21
**blip** 84:13
**blithely** 171:16
**blown** 213:9
**blur** 36:13 43:9
**board** 222:14
280:5 299:2
**bob** 89:3,3 90:4
**bockius** 2:7
**bolded** 248:4,4

**bolt** 100:18
**bond** 24:2
  267:9 308:21
**bonds** 39:5
  113:7,10,16
**book** 107:10
**boston** 2:9
**bottom** 163:2
  186:2 197:20
  237:4,15
  255:22 264:20
  271:10,11
**bought** 282:24
**box** 190:15
**boxes** 274:18
**bracketing**
  276:22
**bravo** 1:18 4:5
**breach** 308:10
**break** 6:10,15
  6:16 66:18
  87:12 113:13
  115:12,13,15
  230:16 231:5
  232:12 244:16
  281:7
**breakdown**
  267:19
**brief** 191:25
  193:19 216:11
**briefly** 9:19
  304:23
**bring** 48:5
  58:25 78:13
  222:2

**bringing** 59:7
  59:14 102:7
  127:14 256:2
  288:11
**broad** 22:6
  82:21 88:10
  102:16,18,20
  113:9 262:11
**brodsky** 2:15
  4:15
**broken** 294:15
**brought** 54:18
  64:5 189:23
  196:8,8
**build** 54:23
  90:7
**building** 92:9
**built** 54:23
**bullet** 204:11
  214:24 217:17
  218:13,24,25
  219:9 220:2,5
  220:8 224:14
  225:16 241:11
  241:14 242:25
  245:16,23
  247:11 251:18
**bullets** 183:17
  225:3,11
**bunch** 8:16
  275:19
**business** 21:25
  25:21 26:9
  32:4 33:23
  54:19 55:18

  56:5 62:3,12
  91:20,21
  142:18 259:15
  285:3
**businesses**
  54:21 55:21
**busy** 33:17
**buy** 93:2,22,23
  95:9 132:12
**buys** 143:18

**c**

**c** 1:17 2:2,5 4:4
  5:6 6:1 7:1 8:1
  9:1 10:1 11:1
  12:1 13:1 14:1
  15:1 16:1 17:1
  18:1 19:1 20:1
  21:1 22:1 23:1
  24:1 25:1 26:1
  27:1 28:1 29:1
  30:1 31:1 32:1
  33:1 34:1 35:1
  36:1 37:1 38:1
  39:1,15 40:1
  41:1 42:1 43:1
  44:1 45:1 46:1
  47:1 48:1 49:1
  50:1 51:1 52:1
  53:1 54:1 55:1
  56:1 57:1 58:1
  59:1 60:1 61:1
  62:1 63:1 64:1
  65:1 66:1 67:1
  68:1 69:1 70:1
  71:1 72:1 73:1

  74:1 75:1 76:1
  77:1 78:1 79:1
  80:1 81:1 82:1
  83:1 84:1 85:1
  86:1 87:1 88:1
  89:1 90:1 91:1
  92:1 93:1 94:1
  95:1 96:1 97:1
  98:1 99:1
  100:1 101:1
  102:1 103:1
  104:1 105:1
  106:1 107:1
  108:1 109:1
  110:1 111:1
  112:1 113:1
  114:1 115:1,4
  116:1 117:1
  118:1 119:1
  120:1 121:1
  122:1 123:1
  124:1 125:1
  126:1 127:1
  128:1 129:1
  130:1,20 131:1
  132:1 133:1
  134:1 135:1
  136:1 137:1
  138:1 139:1
  140:1 141:1
  142:1 143:1
  144:1 145:1
  146:1 147:1
  148:1 149:1
  150:1 151:1

| | | | |
|---|---|---|---|
| 152:1 153:1 | 222:1 223:1 | 291:22 292:1 | **capabilities** |
| 154:1 155:1 | 224:1 225:1 | 293:1 294:1,15 | 64:12 142:19 |
| 156:1 157:1 | 226:1 227:1 | 295:1 296:1 | 142:20 |
| 158:1 159:1 | 228:1 229:1 | 297:1 298:1 | **capability** |
| 160:1 161:1 | 230:1 231:1 | 299:1 300:1 | 14:20 80:23 |
| 162:1 163:1 | 232:1 233:1 | 301:1 302:1 | **capacity** 49:12 |
| 164:1 165:1 | 234:1 235:1 | 303:1 304:1 | 58:22 59:4 |
| 166:1 167:1 | 236:1 237:1 | 305:1 306:1 | 61:17 65:22 |
| 168:1 169:1 | 238:1 239:1 | 307:1 308:1 | 95:17 283:19 |
| 170:1 171:1 | 240:1 241:1 | 309:1 310:1 | 297:5 299:19 |
| 172:1 173:1 | 242:1 243:1 | 311:1,7,16 | 299:20 304:2,9 |
| 174:1 175:1 | 244:1 245:1 | 313:1,1 314:5 | **captive** 21:9 |
| 176:1 177:1 | 246:1 247:1 | 316:5 317:2,4 | **capture** 65:13 |
| 178:1 179:1 | 248:1 249:1 | 317:12 | 68:21 70:2 |
| 180:1 181:1 | 250:1 251:1 | **calculate** 62:21 | 197:18 |
| 182:1 183:1 | 252:1 253:1 | **calculated** | **captured** 70:2 |
| 184:1 185:1 | 254:1 255:1 | 66:25 | 194:15 195:5 |
| 186:1 187:1 | 256:1 257:1 | **calculation** | 250:16 |
| 188:1 189:1 | 258:1 259:1 | 68:14 | **care** 12:12 |
| 190:1 191:1 | 260:1 261:1 | **call** 53:17 | 137:5,8 |
| 192:1 193:1 | 262:1 263:1 | 62:16 69:7 | **career** 86:19 |
| 194:1 195:1 | 264:1 265:1 | 71:12 83:2 | **careful** 137:4 |
| 196:1 197:1 | 266:1 267:1 | 86:2 93:22 | **carefully** 208:5 |
| 198:1 199:1 | 268:1 269:1 | 152:22 161:25 | **carlo** 80:19 |
| 200:1 201:1 | 270:1 271:1 | 209:12,12,13 | 82:17 85:13,19 |
| 202:1 203:1 | 272:1 273:1 | 234:7 248:10 | 86:8 112:20,22 |
| 204:1 205:1 | 274:1 275:1 | 250:25 | **carolyn** 2:16 |
| 206:1 207:1,15 | 276:1 277:1 | **called** 54:17 | 46:11 |
| 208:1 209:1 | 278:1 279:1 | 159:16 188:18 | **carries** 155:22 |
| 210:1 211:1 | 280:1 281:1 | 197:5 | 156:2 157:20 |
| 212:1 213:1 | 282:1,5 283:1 | **campbell** 2:16 | 158:4 |
| 214:1 215:1 | 284:1 285:1 | 46:11 162:23 | **carry** 158:6 |
| 216:1 217:1 | 286:1 287:1 | **cap** 103:12,12 | **carve** 54:22 |
| 218:1 219:1 | 288:1,23 289:1 | 242:12 306:6 | 55:22 |
| 220:1 221:1 | 290:1 291:1,20 | 308:22 | |

**[carved - chart]**                                                  Page 12

| | | | |
|---|---|---|---|
| **carved** 284:6 | 263:18 264:4 | **ceo** 222:15 | 73:14 83:23,24 |
| **case** 1:4 4:9 | 275:5 287:8 | **certain** 21:8 | 84:22,23 |
| 7:13 11:20 | 294:13 299:22 | 41:10,16 43:6 | 142:19,21 |
| 12:22,24 13:8 | 305:25 306:2 | 46:12 54:4 | 143:13 152:6 |
| 14:9 17:2,4 | 312:4 | 59:8 63:11,14 | 157:21 161:10 |
| 19:6 20:23 | **cases** 15:3,25 | 69:23 88:20 | 187:7 199:22 |
| 22:4,16 23:3 | 16:24 17:2 | 99:21 101:3 | 201:8 212:7 |
| 23:10,11,11,16 | 18:22,25 19:2 | 107:9 112:17 | 216:3 231:20 |
| 23:24 24:11,24 | 20:6,10,13,16 | 168:14 171:7 | 232:4,7 234:25 |
| 25:19 26:14,17 | 20:18,21 22:18 | 222:23 228:24 | 252:14,19 |
| 26:19,21 27:3 | 22:21 25:8,20 | 268:16 284:8 | 253:2,10,12,18 |
| 27:11,18,20 | 26:5,12 29:7 | **certainly** 38:15 | 253:25 258:20 |
| 29:19 30:4,24 | 29:11 37:17,21 | 73:9 80:21 | 272:2 274:23 |
| 31:2,6,10,23,25 | 38:6,16 47:12 | 84:17,24 92:25 | 312:6 |
| 32:18 33:4,9 | 61:14 124:2 | 94:22 117:9 | **changed** 54:2 |
| 33:12,19 34:15 | 126:2 140:11 | 118:12 122:18 | 69:24 83:6 |
| 34:16,18,20 | 162:10 195:6 | 123:23 140:25 | 95:25 143:10 |
| 35:2,4 36:5,8 | 197:22 222:22 | 159:24 193:7 | 152:5 158:7 |
| 36:15,17,25 | 226:10,23 | 209:9,16 212:2 | 159:6 231:13 |
| 37:6,13 40:12 | 228:15 | 218:18 220:2 | 235:4,4 255:4 |
| 40:17 43:7,11 | **cash** 103:6 | 229:10 280:22 | 258:9 |
| 52:11 71:10 | **castro** 2:11 | 284:5,13 | **changeover** |
| 82:22 83:9 | **catch** 278:17 | **certify** 313:7,20 | 231:8,9 235:18 |
| 86:8 87:17 | **categories** 43:6 | **cfa** 67:11 | **changes** 70:15 |
| 101:11 109:15 | 43:10 303:3 | **chair** 50:23 | 70:16 84:14 |
| 119:3 125:7 | **category** | **challenged** | 102:20 202:4 |
| 126:17 156:3 | 306:14 | 147:12,15 | 202:24 298:2,4 |
| 158:6 163:6 | **causing** 127:8 | 151:7,13 153:4 | 313:18 316:10 |
| 167:16 170:15 | **cautions** | 167:16 | 317:6 |
| 179:12 190:12 | 252:13,25 | **challenges** | **changing** 36:9 |
| 190:13 193:14 | **celebrated** 82:3 | 308:10 | 51:11 162:15 |
| 194:8 208:7 | **centerra** 34:20 | **chance** 104:9 | 235:2 |
| 214:17 215:12 | **central** 1:13 | 231:4 | **charge** 262:3 |
| 215:21 221:18 | 4:13 311:9,12 | **change** 64:13 | **chart** 308:19 |
| 226:22 259:20 | | 64:16 70:21 | |

**[charter - coast]**

**charter** 209:24
220:13,17,20
220:22 221:7
221:10,11,19
221:22,23
222:5,10,25
223:14,25
**charts** 75:24
275:7
**check** 42:21,23
190:14 277:13
277:18,20
**checked** 277:17
**checks** 42:25
**chicago** 25:5
**childish** 213:14
**choice** 78:21
79:7,8 81:15
85:9,11 88:2
98:13 99:11,15
132:7 158:9
211:10 273:13
273:14 279:23
305:16
**choices** 27:23
81:17 91:15
102:21 307:10
**choose** 47:24
81:12 98:23
107:2,4 108:8
125:18 156:12
**choosing** 32:8
47:10 73:20
**chose** 23:20
211:20 288:4

**chosen** 47:7
155:23 298:18
**chunk** 21:18
**circumscribed**
222:22
**circumstance**
163:10 263:25
**circumstances**
85:2 190:11,12
228:11
**citation** 47:21
**cite** 47:10,12,17
**cited** 149:24
**cites** 14:18,21
47:3,8 48:24
49:3
**claim** 192:16
**claims** 308:10
**clarification**
230:8
**clarified**
244:17
**clarify** 6:20
125:3
**class** 68:7,8
94:4 96:25
128:4 146:22
146:23 148:6,7
148:8 155:5,13
155:24 156:2
157:16,21
158:5 276:22
285:16 286:5
289:7 308:3

**classes** 92:7
94:20 224:21
225:6 266:4,14
266:17
**clear** 24:23
55:4 88:12
111:16 131:22
138:9 157:15
180:13 181:22
192:11,19
194:11,12
222:13,24,25
223:15 226:8,9
226:22 229:25
236:8 237:21
253:13 272:6
**clearly** 222:10
**client** 30:13
59:22 60:13
61:25 62:13,19
62:22 63:6,21
64:8 71:7,15
71:20 72:21
74:4 77:11
91:12 92:2
93:14,17 98:12
98:19 109:5
124:18 131:13
134:16,17
137:7,9 144:13
145:8 262:6
263:16 281:17
283:3,5,7
289:22 304:7
309:15,17

**clients** 54:16
55:25 56:2,16
56:16,17 57:4
57:9,14 58:4,9
58:15,18,22,24
59:2,3,7,14
61:13,14,16
62:6,7,9,16,17
62:23,25 63:14
64:4,14 66:2
69:14,18 71:18
71:21 72:19
73:3,5 76:17
76:21 77:9
93:10,15 96:23
97:3,13 98:20
131:8,11,25
133:2,12
134:22 135:23
136:5 137:5
139:5 141:17
145:5 193:8
210:18 211:13
212:3 213:16
221:6 261:16
263:2 285:5
**close** 18:10
102:15 136:2
283:4 298:11
**closer** 117:21
**clue** 75:19
**cluttered** 66:5
**coast** 54:17
55:5,12,17,24
56:7,19 57:7,8

58:11,14 63:22
64:12 115:12
**coaster**  98:4
**colleague**
141:23 304:15
**colleagues**
145:10,11
295:21 297:21
**college**  46:4
**color**  275:7
**colors**  75:16
**combination**
107:5
**combinations**
112:25 113:2
**combining**  17:9
**come**  7:17 18:4
18:10 24:19
25:20 45:25
46:22 65:15
75:15 80:18
82:10 84:7
91:15,21 106:4
107:6 119:9,10
138:15 139:4
140:8 165:2
170:17 203:11
203:22 214:19
227:20 239:23
249:10 270:21
271:7 281:7
283:8
**comes**  70:23
75:2 87:16
114:3 126:2

198:16 227:8
**comfort**  45:24
129:4
**comfortable**
84:20 85:8
88:4 95:11
97:23
**coming**  31:13
47:16 70:6
78:12 81:20
85:24 171:9
222:13 234:12
**commemorate**
82:4
**comment**
149:12 151:15
158:20 161:2
161:21 165:20
192:13 193:25
**commentary**
28:19 151:16
**commented**
193:15
**commenting**
148:13 149:3
**comments**
158:16
**commission**
312:25
**committee**  8:18
8:21,24,25
27:24 43:24
45:13,15,22
46:24 49:13,18
49:19,24 50:17

50:21,23,25
51:3,6,9,24
52:3,7,19 53:6
53:13 67:17,20
72:13 73:10
74:8,16 75:2
76:6 78:7,10
82:8 84:5,18
85:8 99:13
101:6 104:25
110:7 111:5,6
111:12 116:13
117:9,14,25
118:21,23
119:23,23
120:5,11,20
125:16 126:24
127:15 128:4
128:25 130:19
132:3,9 138:2
138:4,6,8,15,16
139:2,16,18,24
140:2,9,13
146:17 147:11
147:21 151:5
151:12 153:2
153:19 156:10
159:13 160:5,7
162:19,22
163:4 164:14
165:5 166:11
167:8,23 168:6
169:23 171:5
172:12 174:13
174:15,19,25

175:16,23
176:8 177:19
177:24 178:11
179:2,14
180:25 181:15
182:4,7,24
187:7 189:14
191:2,3 192:5
192:7,9 193:14
193:19 194:14
201:7,18 202:4
202:6,23 203:8
203:19,20
204:7,18
205:25 208:18
208:23 209:24
212:20 214:12
214:16 215:11
215:23 216:4,7
216:15 217:6
218:5 219:14
221:4 222:12
222:17,21,22
223:24,25
224:10,11
225:21 226:3
227:4,23
228:20,24
229:6,9,15,19
230:3 232:21
233:16 235:9
239:17 241:16
242:15 244:14
245:9 248:17
248:22 249:6

251:4,10
253:24 255:22
256:4,10 257:3
257:12,15
258:8 260:19
260:25 261:6
261:14,19,23
262:9,17 263:5
264:5,25 265:3
265:8 270:6,24
271:13,19,24
272:7 276:11
280:17 286:17
291:6 297:6
303:19 304:2
307:9,11 310:5
314:12
**committee's**
78:2 155:3
166:21 240:15
256:3
**committees**
49:11 53:11
54:8 65:20
66:20 69:18
71:15 75:18
76:8 101:13
102:2 103:18
104:23 106:14
106:15 123:6
125:20,23
137:12,14,17
138:24 141:7,9
190:13 193:3
212:5,7,23

263:21
**common**  91:4
92:15 109:17
139:14 141:16
200:3 227:9
279:16
**commonly**  67:5
**communication**
17:20
**companies**
64:25 65:4
121:15 140:19
**company**  22:2
25:3 27:18
49:14,16,22
79:17 81:7
89:12,20
130:10 219:7
**comparators**
267:12 268:5,9
268:13,24
**compare**  71:13
108:20 205:12
306:12
**compared**
112:17 122:10
156:24 190:18
190:20 205:11
205:11,13
217:15 267:12
268:4,8,12,24
269:10,14,23
279:8 280:13
299:18 301:20
301:22

**comparing**
176:15 205:16
247:13 249:21
**comparison**
70:2 71:12
72:3,14 107:18
118:16 267:3
267:16 269:10
269:14 271:14
278:3,4,6
**comparisons**
71:24,25,25
176:4,5,10
**compensation**
30:20 38:15
**competitive**
179:16
**competitors**
265:6 271:16
**complaint**  13:2
307:14,18,20
308:2,17
309:13,21
310:4 315:11
**complete**
313:14 317:8
**completed**
316:16
**completely**
125:8
**completion**
313:16
**compliance**
119:16 159:15
159:16 160:9

162:11
**compliant**
109:23 123:24
162:12 164:2,7
199:13 235:11
235:16
**complicated**
56:11 65:6
140:22 218:16
**comply**  159:7
**component**
252:13
**composition**
83:6 267:19
**compound**
199:25
**comprise**  124:7
**computer**  12:7
**concern**  75:13
235:19 259:22
**concerned**
116:19 192:25
255:8
**concerning**
111:6 256:5
**concerns**
124:25 194:14
255:23
**conclude**  311:3
**concluded**
264:24
**concludes**
311:6
**conclusion**
126:14 127:3

147:10 151:12
168:10 191:19
263:20 274:2
**conclusions**
32:17 147:5
151:4
**conduct**   177:20
210:18
**conducted**   5:11
**conducting**
265:4
**cone**  85:25 86:5
**conferences**
130:18
**confidential**
58:20
**confirm**   48:19
48:21 159:10
252:7,8
**conflict**   30:10
32:12,16
**conflicted**
27:16 32:6
237:7 245:22
246:14
**conflicts**   219:8
**confuse**   35:22
**confusing**
226:6 249:5
**conjunction**
270:7
**connection**
13:7 38:11
41:25 43:7
44:5 60:9

176:24 254:20
307:10
**consecutive**
186:5,8,14,20
200:17 201:4
**consensus**
226:4,7,12,15
226:17,21
227:2 230:6
**conservative**
90:17
**consider**   45:10
51:23 74:9
76:12 82:9
84:19,21 97:15
98:15 106:18
118:11 156:13
181:15 182:25
188:11 215:2,4
216:18 241:16
241:18,19
251:22 253:21
274:6 276:2
280:18
**considerably**
293:20
**consideration**
82:20 101:2
105:2 183:4
241:16
**considerations**
82:10
**considered**
40:4 53:6
74:17 76:11

106:15 257:2
261:24 270:24
271:20 272:7,9
**considering**
83:23 93:10
262:18
**consistent**
61:21 166:12
174:16 187:15
189:3,7,12
190:5 231:15
233:19 250:10
270:5
**consistently**
278:25
**construction**
94:12 271:17
273:19
**consult**   236:9
277:21
**consultant**
43:24 49:10
52:9 53:12
60:4,5,10,12,17
63:8 74:17
84:6 91:11
92:14 97:15
104:23 109:25
129:20 134:15
134:24 135:16
136:13 141:6
193:2 208:24
290:18,18,22
308:5

**consultants**
57:18,22 60:22
65:25 80:22
93:21 141:4,12
210:19 293:4
293:10,11,21
294:14
**consulting**
25:24 26:8
54:7 91:5
**consumer**
105:22
**contact**  37:24
**contacted**
309:25
**contacts**   11:8
**contain**   40:11
**contains**   197:4
**contemplated**
248:18
**contention**  32:5
**context**   75:7
145:19
**continue**   85:4,6
101:8 132:21
202:2 211:17
304:17
**continued**
54:23 130:19
130:22 202:22
310:13
**continuing**
225:12
**contractors**
57:17,20

**contradicts**
  182:6
**contributing**
  89:17
**contribution**
  79:15,16 89:12
  89:25 131:17
  132:19 142:22
  143:6
**control** 105:18
**conversant**
  75:12 76:14
**conversation**
  9:14 17:16
  43:20 72:15
  99:12 110:19
  117:8,14,24
  118:19,20,22
  119:20,22
  120:19 164:24
  180:20 196:6
  196:17 214:20
  256:19 280:7
  303:19
**conversations**
  13:6,10 14:7
  17:13,19 41:12
  43:9 76:16
  211:4 212:18
  212:19 303:25
  304:5
**convert** 295:19
**conveyed**
  221:23,24

**conviction** 93:4
  93:24 94:8,14
  94:18 95:23,24
  96:4,15,22
  305:12,13,14
**cookie** 189:21
**copies** 316:14
**copy** 5:9 11:17
  39:20,24
**corp** 49:21
  51:10 131:16
**corporation**
  54:12 131:19
  132:15 138:25
  295:8 296:6,14
  307:8,9
**corporations**
  55:3 139:25
**correct** 5:20,22
  5:23 6:4,5 9:24
  10:12 11:11
  18:23,24 19:25
  20:4 21:15,16
  24:15 25:17,18
  26:9,10,13
  27:3 30:23,25
  47:5,6 48:24
  49:2,20 50:19
  54:9,10 57:2
  61:3 117:6,7
  122:24,25
  123:3 128:20
  129:21,23
  130:2 131:21
  135:24 142:7

  148:11 150:3
  151:9,10,14
  157:16 166:3,4
  173:2,7 177:12
  178:25 179:5
  180:5,6 183:17
  185:16,17
  187:4,5 188:25
  191:5,6 195:5
  196:3 200:12
  201:15,16
  203:6 206:22
  207:2,3 208:20
  208:21 209:20
  218:3 220:13
  226:4 230:12
  231:19 232:2
  234:17,18,21
  238:4,5 240:3
  244:25 245:24
  247:19 248:11
  248:12,18
  250:23 253:5
  254:5,18,23
  255:3 260:24
  261:21 263:3
  263:13 267:17
  268:2,6 269:16
  269:21 274:4
  278:4,5 284:9
  286:19 289:11
  290:5,6 295:9
  295:10 296:20
  296:20 297:12
  298:21,24

  299:25 300:6
  300:12 301:23
  304:21 308:7
  313:14 317:8
**corrected** 156:2
**corrections**
  317:6
**correctly** 28:15
  31:16 35:16
  71:8 117:4
  153:11 296:7
**corresponding**
  277:2
**costa** 1:17 4:5
**costs** 303:6
  306:7
**counsel** 4:21
  7:25 8:23 9:3,7
  9:16 12:13
  13:10,17,19
  14:3,6,22
  15:12,19,22
  16:16 17:12,24
  18:14 23:13
  24:18 26:25
  29:25 31:10,11
  33:11 34:25
  36:19,23 41:7
  41:11 42:14
  43:12 48:4
  50:7 59:19,20
  59:22 115:14
  149:13 151:20
  151:22 196:7
  196:11 232:11

277:11 316:14
**counsel's** 14:8
**count** 9:20
 236:5 301:18
**counting** 91:18
**country** 312:2
**county** 313:4
**couple** 6:9 8:20
 9:11 13:9
 20:16 46:10,12
 54:2 58:8
 66:18 68:6
 82:6,24 97:8
 97:19 105:7
 124:11 131:3
 134:12 137:20
 159:7,17
 172:12 214:23
 215:6 216:4,6
 231:6 233:8
 268:19 269:18
 277:23 293:19
 296:8 300:7
 307:5
**course** 6:20
 7:20 14:17
 46:24 61:15
 110:17 208:16
 209:13 297:8
**court** 1:2 3:15
 4:11,18,22,24
 4:25 5:3 7:2,3
 68:23
**cover** 19:4
 220:8 223:14

245:3
**covered** 62:6
 77:5,6 111:25
 148:2 221:20
 223:6,13
 271:16
**covers** 84:11
 152:25 245:4
 306:4
**crazy** 170:22
**create** 41:8
 63:18 86:4
 88:19 111:2
 303:7
**created** 24:4,4
 25:24 103:3,15
 245:24 262:14
**creating** 14:24
 18:14,16
**creation** 15:14
 18:18
**criteria** 52:20
 53:6 74:3
 117:18 163:17
 167:8 175:9,12
 181:15 182:21
 182:24 183:11
 183:12,17
 184:4 185:5,12
 186:7,12 201:3
 201:6,14 254:8
**criterion**
 251:21
**critical** 45:17
 76:5,7 77:13

78:4,18 79:11
**critically** 78:25
**criticizing**
 248:16
**crossed** 194:22
**cs** 316:15
**current** 157:20
 271:15
**currently** 5:22
 89:3
**cursory** 191:4
 191:14,20
**custom** 30:6
 91:18
**customarily**
 223:24
**customize**
 144:9
**customized**
 77:11
**cutter** 189:21
**cv** 1:4 4:10
 54:11 130:21

**d**

**d** 5:6,6 21:21
 115:4,4 130:20
**daf** 242:8,11
**dangerous**
 226:14
**data** 66:17
 144:10,11
 145:3 171:10
 202:14 214:4
 250:16,17,18
 250:18,23

270:24 272:7
 274:10 303:8
**date** 10:8 16:12
 19:13 31:3
 32:2 35:7,9,13
 36:10 37:2,5
 37:13 69:21
 70:10,13,17
 71:2,7,14 72:6
 72:7,22 73:5
 73:17,20 76:19
 76:22 77:6,7
 77:12,16,21
 78:3,5,8,21
 79:3,10 80:2
 81:6,12 82:9
 82:12 83:10
 86:9 87:22
 88:22,24 91:13
 91:17 92:15
 93:18 94:17,22
 95:6,22 97:11
 100:4 101:3
 108:13 109:12
 112:7 122:22
 122:23 123:8,9
 123:13,15
 126:7,10,13,23
 127:24 128:17
 128:19,21
 133:8 141:22
 142:4,5,6,10
 168:14 176:17
 179:8,9 181:5
 181:7 205:15

216:5 247:15
249:24 260:18
261:9 262:12
264:23 265:21
266:7,21 267:5
271:14,23
272:2,8,10,17
276:17 277:2
292:8 296:13
297:14 298:19
298:23 301:22
302:15,18,21
303:4 304:18
305:19,21
306:13 307:13
310:4 312:4
317:12
**dates**  158:18
218:8 255:17
**day**  7:11 15:9
28:5 30:6
196:15 213:15
213:18 305:2
311:19 312:23
313:22 317:15
**days**  8:20 9:18
65:17 316:16
**dciia**  130:20
**de**  2:11
**deal**  140:3,4
194:5 283:4
**dealing**  254:24
**dealt**  28:13
254:15

**decades**  210:10
**december**
282:14 285:14
286:7 287:23
288:16 291:15
292:21
**decide**  92:14,15
102:10,18
107:3 170:22
196:4,13
**decided**  23:13
25:18,19 26:4
55:21 144:12
206:2 212:20
214:2 228:19
**deciding**
196:11
**decision**  45:23
74:10 76:6
99:9 119:24
127:10 188:6
188:11 189:21
190:3 192:24
198:19 199:21
201:7 202:7
223:2 227:5,24
228:4,12,21,23
228:24 229:2,3
229:7,9 230:4
230:5,8 262:4
295:22 306:4
**decisionmaki...**
132:2 198:18
**decisions**  45:14
74:18 125:24

125:25 132:11
141:18 162:9
192:11,12,21
194:10 222:23
228:8
**declare**  317:4
**decline**  242:19
**dedicated**
141:15
**deemed**  158:25
160:19 297:7
317:6
**deems**  225:23
**deep**  71:12 83:9
135:8 168:18
259:19 260:18
261:2,9,20,23
265:13,15
266:9 270:5,25
272:8,10
279:21 314:17
**deeper**  83:8
156:11 260:2
262:10 280:8
**defaulted**
207:17
**defend**  23:16
23:18
**defendant**
21:14
**defendants**
1:10,17 2:8 4:7
4:9 10:19,20
11:10 20:23
311:8

**defense**  22:11
22:13,25 23:3
23:15 24:7,13
24:19 29:23
31:8 33:9
34:22 36:17
**defer**  117:23
**deference**
240:6,17
**deferral**  89:11
**deferring**  89:4
**deficiencies**
158:12 197:14
**deficiency**
200:8
**deficient**
194:25 195:3
195:25 197:5,7
197:13
**define**  189:15
295:14
**defined**  81:24
104:14 131:10
131:17 132:18
132:19 142:22
142:25 143:3,6
189:14 304:22
**defining**  150:16
**definitely**  32:15
124:9 160:11
190:13 273:20
**definition**
145:25 180:7
301:3

**degree** 129:4
  214:22
**delay** 236:7
**delegate** 222:11
**deliberate** 76:2
**deliberated**
  255:24
**deliver** 219:25
**delivered**
  219:13,21,24
  220:4,5
**demographic**
  79:2,21 88:16
  112:23
**demographics**
  78:16,17 275:4
  287:7
**demonstrate**
  228:7
**demonstrates**
  278:9
**department**
  92:5 209:11,17
  209:21 210:12
  227:20
**depend** 275:2,3
**depended**
  17:19
**depending** 15:4
  17:3 61:23
  68:7,7 90:17
  91:2 111:14
  120:15 123:18
  124:2 134:16
  135:20 144:11

  189:11 205:9
  206:12,15
  212:20 255:9
  274:24 287:20
**depends** 17:2
  122:20 163:22
  193:24,25
  221:14 260:8
**deponent** 312:5
  313:18 316:13
  317:3
**deponents** 5:2
  8:13
**deposed** 5:18
  6:4,8 7:17
  34:15,16
**deposes** 309:23
**deposing**
  316:13
**deposition** 1:16
  3:11 4:6 7:10
  7:16 8:2,10,12
  8:15 9:5,8,17
  17:8 44:5,7
  47:3 172:13
  198:7 261:11
  311:7 312:4
  313:9,11,16
**depositions**
  7:20 43:23
  44:24
**depth** 105:9
  169:3 201:20
  259:13

**described**
  82:16
**description**
  314:3 315:3
**design** 140:4,25
**designed** 81:6
**desk** 105:15
**despite** 25:22
  101:11 203:16
  251:23
**detail** 88:6
  210:13 219:2
  222:16
**detailed** 175:20
  200:22 217:9
**details** 22:8
  35:11 36:11
  37:3 52:22
  53:3,5 54:6
  171:4
**detected**
  242:16
**detection** 116:9
**determination**
  118:2 127:20
  151:18 171:15
  184:14
**determine** 93:8
  99:21 158:8
  168:16 178:11
  178:16 182:4
  201:21 211:9
  211:14,17
  224:19 225:5
  228:12,17,18

  256:9 275:10
  279:22
**determined**
  169:24
**determining**
  101:2
**detour** 129:17
**develop** 48:20
**developed**
  81:18
**developments**
  188:2
**dfa** 234:5 240:7
  240:18
**dictate** 63:7
  129:13 214:9
  249:12
**dictates** 129:14
  247:12
**difference**
  55:11,14,15
  65:8 105:17
  131:23 158:3
  262:7,8 302:14
**differences**
  266:4
**different** 20:20
  31:17 36:3
  37:14 45:20
  46:23 48:16
  56:16,17 64:24
  65:3 67:12
  68:13 78:24,24
  78:25 82:23,25
  86:10,21 91:5

[different - documents]                                    Page 21

| | | | |
|---|---|---|---|
| 91:16,17 92:21 | **differently** | **discussed** | 314:17 |
| 93:6,12 94:17 | 102:12 123:3 | 118:13 194:2 | **dividend** |
| 96:20 104:17 | 125:20 144:20 | 201:20 255:23 | 308:20 |
| 105:12 107:24 | 189:15 205:19 | 256:10,11 | **division** 50:2 |
| 108:2,22 | 302:6,7 | 265:2 | **document** 13:4 |
| 109:11 121:16 | **difficult** 25:21 | **discussion** | 40:20 42:24 |
| 121:17 122:24 | 61:11 75:25 | 124:17 271:16 | 43:19 111:13 |
| 123:2,14 | **diligence** 131:2 | **discussions** | 111:14 150:4 |
| 125:24,25 | 155:11 265:4 | 194:12 | 153:16 183:6 |
| 127:2 144:2,4 | **diminish** | **disengaged** | 186:16 187:16 |
| 144:5,5 153:18 | 102:23 | 141:7 | 198:22,24 |
| 159:11,16,17 | **dinner** 115:13 | **distinct** 224:21 | 216:23 217:9 |
| 159:18 160:10 | **dinnertime** | **distinction** | 217:15,18 |
| 161:24,25 | 114:11 | 64:19 | 218:2 221:11 |
| 162:6,24 | **direct** 116:3 | **distributed** | 221:14,15,20 |
| 163:10 170:13 | 165:19 216:9 | 261:15 | 222:5 238:15 |
| 180:6,19 | **directing** 135:9 | **distribution** | 241:7 242:13 |
| 189:10,25 | **director** 130:7 | 39:4 | 242:20,22 |
| 199:24 204:5 | 283:15 289:13 | **district** 1:2,3 | 252:22 258:4 |
| 207:15 208:2 | 289:20 | 4:11,11 | 262:5 264:15 |
| 215:10 217:3,7 | **disagreeing** | **dive** 71:12 83:9 | 264:17 266:13 |
| 217:20 218:6 | 180:8 | 135:8 168:18 | 271:11 282:6,9 |
| 218:21 222:15 | **disagreement** | 262:10 270:5 | 282:17 285:11 |
| 224:21 227:16 | 180:10 | 272:8,10 | 285:19 299:4,6 |
| 235:6 249:11 | **disconnect** | **diversification** | 299:10,11 |
| 262:13 263:17 | 19:23 164:3 | 92:3 271:19 | 315:8 |
| 263:25 264:8 | **discover** | 272:20 273:18 | **documentation** |
| 273:10 278:15 | 287:22 | **diversified** | 152:3 168:10 |
| 278:19 279:18 | **discovered** | 308:19 | **documented** |
| 293:9,11 302:9 | 287:20 | **diversify** | 138:8 186:6 |
| 302:11,20,24 | **discretion** | 105:19 224:23 | 201:7 |
| 303:2,21,23 | 131:25 132:3 | **dives** 260:18 | **documents** |
| 305:22,23 | 174:19,24 | 261:2,9,20,23 | 7:24 11:15,24 |
| 306:2 308:14 | 177:25 187:7 | 265:13,15 | 12:23 40:8,14 |
| | 187:13 | 266:9 270:25 | 40:15 41:7,10 |

| | | | |
|---|---|---|---|
| 41:16,17,25 | 19:1 20:1 21:1 | 114:1 115:1 | 184:1 185:1 |
| 42:5,11,18 | 22:1 23:1 24:1 | 116:1 117:1 | 186:1 187:1 |
| 43:6,14 110:6 | 25:1 26:1 27:1 | 118:1 119:1 | 188:1 189:1 |
| 149:20,24 | 28:1 29:1 30:1 | 120:1 121:1 | 190:1 191:1 |
| 195:18 223:25 | 31:1 32:1 33:1 | 122:1 123:1 | 192:1 193:1 |
| 261:13 263:12 | 34:1 35:1 36:1 | 124:1 125:1 | 194:1 195:1 |
| **doing**   52:6 | 37:1 38:1 39:1 | 126:1 127:1 | 196:1 197:1 |
| 87:24 108:3,4 | 39:15 40:1 | 128:1 129:1 | 198:1 199:1 |
| 108:10,14,19 | 41:1 42:1 43:1 | 130:1 131:1 | 200:1 201:1 |
| 108:24 109:2 | 44:1 45:1 46:1 | 132:1 133:1 | 202:1 203:1 |
| 117:22 127:12 | 47:1 48:1 49:1 | 134:1 135:1 | 204:1 205:1 |
| 129:7,8,19 | 50:1 51:1 52:1 | 136:1 137:1 | 206:1 207:1 |
| 135:3 139:12 | 53:1 54:1 55:1 | 138:1 139:1 | 208:1 209:1 |
| 139:12 144:25 | 56:1 57:1 58:1 | 140:1 141:1 | 210:1 211:1 |
| 208:13 212:14 | 59:1 60:1 61:1 | 142:1 143:1 | 212:1 213:1 |
| 217:11 227:17 | 62:1 63:1 64:1 | 144:1 145:1 | 214:1 215:1 |
| 262:23 273:20 | 65:1 66:1 67:1 | 146:1 147:1 | 216:1 217:1 |
| 284:9,14,14,15 | 68:1 69:1 70:1 | 148:1 149:1 | 218:1 219:1 |
| 287:5,6 302:13 | 71:1 72:1 73:1 | 150:1 151:1 | 220:1 221:1 |
| 303:9,14,16,16 | 74:1 75:1 76:1 | 152:1 153:1 | 222:1 223:1 |
| 305:17 306:16 | 77:1 78:1 79:1 | 154:1 155:1 | 224:1 225:1 |
| 306:17,18,19 | 80:1 81:1 82:1 | 156:1 157:1 | 226:1 227:1 |
| 309:19 | 83:1 84:1 85:1 | 158:1 159:1 | 228:1 229:1 |
| **dol**   220:12 | 86:1 87:1 88:1 | 160:1 161:1 | 230:1 231:1 |
| 227:4 | 89:1 90:1 91:1 | 162:1 163:1 | 232:1 233:1 |
| **dollar**   104:12 | 92:1 93:1 94:1 | 164:1 165:1 | 234:1 235:1 |
| 134:13 | 95:1 96:1 97:1 | 166:1 167:1 | 236:1 237:1 |
| **dollars**   38:17 | 98:1 99:1 | 168:1 169:1 | 238:1 239:1 |
| **domestic** | 100:1 101:1 | 170:1 171:1 | 240:1 241:1 |
| 103:11 113:12 | 102:1 103:1 | 172:1 173:1 | 242:1 243:1 |
| **donald**   1:17 4:4 | 104:1 105:1 | 174:1 175:1 | 244:1 245:1 |
| 6:1 7:1 8:1 9:1 | 106:1 107:1 | 176:1 177:1 | 246:1 247:1 |
| 10:1 11:1 12:1 | 108:1 109:1 | 178:1 179:1 | 248:1 249:1 |
| 13:1 14:1 15:1 | 110:1 111:1 | 180:1 181:1 | 250:1 251:1 |
| 16:1 17:1 18:1 | 112:1 113:1 | 182:1 183:1 | 252:1 253:1 |

**[donald - elements]**                                        Page 23

254:1 255:1
256:1 257:1
258:1 259:1
260:1 261:1
262:1 263:1
264:1 265:1
266:1 267:1
268:1 269:1
270:1 271:1
272:1 273:1
274:1 275:1
276:1 277:1
278:1 279:1
280:1 281:1
282:1 283:1
284:1 285:1
286:1 287:1
288:1 289:1
290:1 291:1
292:1 293:1
294:1 295:1
296:1 297:1
298:1 299:1
300:1 301:1
302:1 303:1
304:1 305:1
306:1 307:1
308:1 309:1
310:1 311:1,7
311:16 314:5
316:5 317:2,4
317:12
**door**  64:5
**downs**  100:6

**downside**  65:13
68:20 100:7
**draft**  14:3,23
15:18 159:25
161:19 172:9
172:18 184:6
**drafted**  160:2
**drafting**  173:9
**drafts**  14:25
15:22 16:3,4
17:11,13
**draw**  263:20
**dries**  306:7
**driving**  99:20
124:10 125:10
135:12 163:25
208:12 294:12
304:12
**drop**  119:5,13
**dropped**  54:3
163:12
**dropping**
119:18 120:15
**drove**  138:2
**due**  131:2
155:11 257:21
259:2 265:4
**duly**  5:7 115:5
313:9
**duplicative**
28:20
**durables**
105:22
**duties**  136:12

**duty**  204:19
308:10
**dynamics**
20:24 21:4
22:10

**e**

**e**  2:2,2 5:6
17:17 115:2,2
115:4 313:1,1
314:2 315:2
**eagar**  43:25
46:23 160:3,3
**eagar's**  261:18
**earlier**  8:21
11:23 44:3
45:5 53:19
112:5 134:18
141:21 142:20
143:11 145:5
163:8 174:11
174:21 185:3
186:22 193:18
195:2 201:11
202:10 205:5
212:5 220:11
231:7,7 239:22
243:18,24
244:7 245:18
262:25 272:14
284:7,20 295:6
**early**  64:17
133:5,12
**earned**  38:11
**easier**  61:13

**easiest**  85:22
**east**  115:12
**eastern**  114:8
**economic**  75:5
75:6 188:2
**edit**  15:7
**edited**  15:8
**educate**  75:22
103:18
**educated**  52:5
75:11 302:17
**educating**
74:22 75:5,6
76:8
**education**
71:15 73:10
75:4 76:4
138:4 216:14
216:19
**effect**  3:14 63:7
173:6 259:4
**efforts**  142:10
**either**  11:22
18:11 20:8
30:19 60:6
158:3 168:10
196:15 222:11
264:7 310:11
**elect**  286:17
**element**  79:21
108:11 214:7
250:21 278:9
**elements**  73:18
79:4,11 125:22

| | | | |
|---|---|---|---|
| **elevate** 223:4 | 265:12 270:11 | **equities** 102:5 | 151:12 153:3 |
| **else's** 293:20 | 281:6,15,24 | 103:7,8 113:12 | 174:7 225:12 |
| **embedded** | 288:7 290:8 | **equity** 39:6 | **established** |
| 144:4 | 292:12 299:3 | 72:6 101:20 | 139:3 147:11 |
| **emerging** 103:8 | 306:20 307:4 | 102:19,23 | 237:8 245:23 |
| **employed** 26:6 | 307:17 310:8 | 103:6,21 104:9 | 246:15 |
| 206:7 283:25 | **enhanced** | 255:9 258:11 | **establishing** |
| **employee** 58:13 | 143:2 258:9 | 267:4,8,8 | 224:2 |
| 129:24 130:2 | 259:2 | **equivalent** | **estimation** |
| **employees** | **ensure** 60:21 | 221:11,13,15 | 17:22 |
| 57:17,19,22 | 132:25 | **erisa** 59:19,20 | **et** 1:6,9 4:8,9 |
| 58:2,3,12 | **ensured** 285:3 | 65:15 81:20,23 | 316:4,4 317:1 |
| **encompass** | **entail** 208:3 | 81:23 103:17 | 317:1 |
| 123:10 252:19 | **enter** 4:22 | 121:24 126:4 | **european** 1:13 |
| **encouraged** | **entered** 215:22 | 210:7 220:16 | 4:14 114:16 |
| 104:7 | **enterprises** | 220:19,24 | 311:10,13 |
| **ended** 14:17 | 281:17,20 | 221:2 227:3,19 | **evaluate** 65:16 |
| 30:14 | **entire** 26:6 | **errata** 312:1 | 65:20 110:8 |
| **endowments** | 61:18 86:18 | 316:11,13,16 | 123:6 127:6,7 |
| 143:3 | 147:25 152:22 | **escalations** | 127:19 164:14 |
| **ends** 80:15 | 305:9 | 90:3 | 175:18 178:3 |
| 152:8 311:5 | **entirely** 129:20 | **escaped** 239:14 | 213:19 248:22 |
| **engaged** 212:6 | 202:6 | **esq** 2:5,10,11 | 265:24 303:22 |
| **engelman** 2:10 | **entirety** 8:3,6 | **esquire** 316:1 | **evaluated** |
| 5:11,16 12:10 | 44:8 53:23 | **essential** | 52:20 128:5 |
| 12:19 39:12,23 | 55:2 56:23 | 221:19 265:25 | 156:16 176:8,9 |
| 50:5,13 69:7 | 57:10 191:8 | **essentially** | 178:10,17 |
| 69:11 114:8 | **entity** 54:17 | 24:12 56:15 | 182:3,16 187:9 |
| 115:10 128:10 | 57:14 88:2 | 88:14 142:23 | 248:8 302:5,7 |
| 148:14,22,25 | **enumerate** | 150:10 254:24 | **evaluates** |
| 171:22 176:23 | 105:5 | 285:2 310:4 | 247:22 |
| 177:7,10 | **equal** 98:10 | **essentials** 218:2 | **evaluating** |
| 198:25 230:17 | 99:15 | 219:14 | 122:21 126:6,9 |
| 230:24 241:21 | **equation** | **establish** | 145:16 161:8 |
| 257:11 264:10 | 106:24 | 147:22 151:5 | 165:5 167:9 |

212:25 213:20
225:13 276:18
280:18 297:25
**evaluation**
72:16 127:12
175:12 176:3
185:4,12
249:18 302:9
302:11 303:18
304:16
**evaporated**
56:5
**evening** 199:4
**event** 255:14
256:24
**eventually**
184:16
**everybody** 52:4
52:5 65:9,16
66:17 67:6
78:22 81:24
89:7 92:7
143:17 145:2
165:19 264:6
275:6
**ex** 279:25
**exact** 10:8
15:24 16:5,12
38:13 195:13
195:15 216:5
218:8 295:18
**exactly** 22:7
28:16 31:19
47:12 51:4
63:25 128:14

163:15 181:23
181:23 192:20
196:7 204:9
210:20 211:25
224:10 275:24
284:14 301:24
305:7 306:18
**examination**
5:11
**examined** 5:8
115:6 313:8
**example** 41:2
48:17 79:12
85:21 86:14
92:17 104:2
110:11,15
113:6,9 123:7
125:12 132:8
135:2 146:11
179:22 195:24
196:5,11,14
197:5,16 200:8
214:5 216:21
231:8,16 244:6
245:7 278:12
305:19 306:4
**examples**
197:14 237:25
239:23
**exceeded**
276:25
**except** 3:7
309:15
**exchange** 17:18

**exchanged**
15:22 17:21
**exchanging**
17:11
**excited** 275:6
**exclusively**
58:8
**excuse** 238:12
**execution**
105:16
**executive** 23:5
130:6,19
283:15 289:13
289:20
**exercise** 97:9
97:10
**exhibit** 29:3
39:13,14,17,18
40:3,20 171:24
241:23 257:14
264:12,16
265:14 266:8
270:13,14,19
282:2 288:9
290:10 291:11
292:14 299:5
307:19 314:4,7
314:9,11,14,16
314:18,20,22
314:24 315:4,7
315:10
**exist** 66:16
109:16 227:18
**existed** 81:22
116:17 227:18

**existence**
138:17,18
**existing** 56:2
60:5,9,12
72:16 162:14
213:8
**exists** 109:13
**exit** 297:21
**expect** 43:12,15
45:18 84:5
109:8 162:11
164:22 256:22
270:6 273:4
280:23 285:7
301:2,11
**expectation**
76:10 106:15
285:2
**expectations**
78:7
**expense** 65:12
68:21 71:25
269:18,24
**expenses**
140:18 266:3
**expensive**
28:22 89:8
**experience**
74:15 75:17
85:3 106:14
107:12 115:22
116:19 120:4
123:5 126:8,9
126:15 139:15
173:13,18

experienced
135:17,24
expert  5:18
10:13,22 11:10
18:22 19:3,6
19:11,12,17,20
19:24 20:7
21:14 22:11,19
25:17 29:7,12
31:7 33:8
36:16 38:12,19
39:15 168:25
290:5 314:5
expertise  143:6
experts  10:19
10:19,25 11:5
expires  312:25
explain  20:4
54:13 55:10
85:17 245:6
299:12
explanation
22:6
explanations
84:18,20
explanatory
74:24
explicit  220:15
221:2
exposure
101:20 102:4
102:19,23
103:11,21
104:9 258:11
267:8,9,9

expressed
265:3
extended
189:13 190:6
280:6
extent  7:15
95:2 138:11
284:7
extra  30:16,20
extreme  104:11
extremely
183:12

f

f  21:21 115:2
313:1
fabulous  98:3
fact  25:22 38:8
50:16 77:15
79:8 81:23
101:11 116:17
142:8 145:8
164:14 168:4
169:25 170:3,6
170:18 189:25
200:2,9 203:17
208:6 213:21
215:7 226:3,20
226:21 244:6
253:18 257:3
262:13 264:8
277:25 280:2
factor  101:17
101:25 116:15
280:17

factors  97:14
98:14 99:9,16
99:19,24
104:22,24
106:3 107:6
176:11 188:5
188:13 189:22
244:13
facts  125:25
fail  81:11,11
162:21,24
236:4 239:15
239:19
failed  147:11
147:22 151:5
151:12 153:3
208:18 276:11
276:24 277:4
fails  178:9
179:3,19 180:4
182:2,14
185:13 316:18
failure  79:3
178:10,17
182:3,16
276:12
fair  6:22,23
22:6 41:6
44:10 47:3
95:20,21
118:22
fairly  89:20
173:16 200:3
205:7

fall  26:17
familiar  66:23
75:3 85:16
260:17 290:16
fan  145:24
fancy  75:15
far  116:19
122:2 133:10
195:3 306:8
fargo  32:4,9
fargo's  32:2
fashion  16:2
faulting  192:6
favor  84:16
february
200:11 201:19
244:23,24
fed  14:15 262:5
federal  2:8
fee  28:3,13
284:19 293:14
feel  60:17
136:11 137:13
137:15 283:18
feeling  136:22
fees  21:4,5
27:21,25 266:3
271:19 272:20
273:17 308:11
309:9,14,17
felt  30:9 46:17
52:16 194:24
fewer  100:5
fia  231:10

**fiam** 231:14,21
232:4
**fiction** 18:5
**fidelity** 90:13
96:16,19,19,21
152:7 179:9,12
180:14 181:2
231:10,14
254:13,16,25
255:14,19
256:12,16
257:20 258:2
262:10 265:2
267:11,20
268:16 271:15
271:25 273:5
279:9 285:15
286:4,17
287:14 289:6
290:3 292:8
294:5
**fiduciaries**
174:6 187:24
188:16,21
207:21 265:20
265:24
**fiduciary** 21:11
22:4,15 23:2,7
23:16 24:14,17
28:6,11,14
32:11,13,18,19
34:6,11 35:25
36:9 37:11,16
45:16 49:11,18
50:17 51:16

53:11 54:8
55:9 61:25
65:22 75:4
99:7 136:12
138:3,23
149:10 166:21
167:8 168:17
169:2,9 211:5
214:22,25
215:3 216:14
216:19 217:4,8
217:25 219:4
219:13 283:20
284:3 285:6
286:22 290:24
297:10 307:11
308:10
**fiduciary's**
188:6,11
**fifth** 168:4
186:8,14,20
**figure** 83:11
87:25 150:13
**figured** 86:24
**filed** 307:14,20
307:25 308:2
315:11
**filing** 3:4
**filling** 14:17,21
**filtering** 192:8
**finalized** 15:23
16:16 295:22
**finance** 138:20
138:21

**financial**
139:19
**find** 43:3 48:10
79:10 81:5
99:14 105:19
163:13 165:16
187:19 259:20
262:15
**finding** 233:10
262:23
**finds** 111:6
**fine** 5:14 6:18
39:21 56:14
98:24 183:19
183:21 191:17
192:2 193:20
194:6 221:21
251:17
**finish** 81:4 87:4
97:22 211:16
**fire** 120:22,23
**firm** 21:8 23:5
25:4,24,24
31:19 32:5
33:21 54:7
82:4 84:14
93:14 130:16
133:6 142:2
143:5 144:12
282:24 286:23
287:4
**firm's** 287:9
**firms** 25:22
31:18 33:14,25
91:6 92:10,21

144:17
**first** 5:7 6:10
10:10 15:17
19:13 20:5
40:6,10 42:4
60:3 62:17
63:10 64:4,7,8
92:3 103:15
116:8 117:2
120:11 121:20
122:5 130:13
149:25 153:9
154:18,21
177:18 183:16
195:11 210:25
222:10 247:11
259:12 260:15
262:20 270:22
282:8 288:14
305:8
**fit** 68:11 78:17
287:8
**fits** 88:16
**five** 20:8 51:5
86:16 87:22
93:6 94:6,16
94:18 108:20
109:13 110:12
115:21 116:5
116:10,23
117:11,13
118:8,15 119:7
120:6 121:8,8
122:2,10 123:7
124:23 128:2

176:25 183:5
185:7,21
200:24 201:13
243:15 244:11
247:23,24
248:5,8,10,23
249:8,10 250:4
251:21 268:12
268:23 269:14
277:3,15 279:3
293:10,10
294:13 300:4
300:16,20,24
301:20 306:20
**fixed** 103:6
**flaw** 203:7
**flawed** 32:20
**flexibility**
111:13 203:20
**flodin** 21:21
**florida** 6:2
85:25
**flows** 71:22
**fluctuating**
279:17
**fluctuations**
114:5
**fly** 12:6,20
**focus** 101:19
102:9 109:22
110:4,11
147:20 149:14
151:21,23,23
152:24 165:3

**focused** 47:15
143:3 149:5
185:10
**focuses** 148:3
**focusing** 25:9
152:16
**folks** 104:4
139:15 283:10
**follow** 82:6
122:6 140:14
174:22 246:17
247:4
**followed**
163:14
**following**
181:15 182:8
224:3 282:22
**follows** 5:8
115:7
**footnote** 47:13
47:14 243:2
**footnoted** 47:4
**footnotes** 48:25
**force** 3:13
**foregoing**
313:9 317:5
**form** 3:7 74:14
74:20 122:15
128:7 139:22
155:20 157:18
163:21 166:24
180:12 212:10
228:2 251:14
282:3 288:10
290:11 292:15

313:13 314:21
314:23,25
315:5
**formal** 211:8
211:14,23
212:8,25
213:23 216:14
216:18 218:12
218:14,19
227:24 228:4
228:22
**formats** 144:5
**formatted**
144:20
**formed** 78:10
**forming** 35:24
40:16 42:18
242:21
**forth** 14:9,13
14:24 15:5,9
17:21 29:7
41:15 65:14
89:13 92:4
106:10 137:18
145:2 223:24
224:8,10
**forward** 113:23
149:17 155:22
156:2 157:14
157:20 158:5,7
166:11,22
167:2 199:12
199:15 244:18
245:3,5 246:4
246:19

**foul** 24:7
**found** 38:2,2,9
213:21 260:8
**foundations**
143:3
**founded** 22:2
53:16 81:23
**founding** 49:9
54:5
**four** 9:12 16:2
19:3 20:8 42:8
57:9 63:23
87:21 134:6
168:3 186:5
189:18 190:7
200:17 201:4
225:16 254:17
293:9
**fourth** 167:25
169:5,11,14
200:15 201:18
270:12,16
**framework**
14:16 15:18
**frankly** 138:9
199:5
**fraught** 255:19
**freedom** 96:16
96:18,21 97:2
97:4 147:18
152:4,7,14
153:8,21 154:5
155:4 156:16
159:23 160:21
161:8 165:6

166:17,19
167:12,18,22
168:13,20
171:6 179:9
185:6,19
200:10,16,22
202:2,7,12,22
203:2 206:21
232:4 234:6
243:14 254:13
254:16,25
255:24 256:12
256:16 257:20
258:2 259:10
262:11 265:2,5
266:23 267:5,7
267:11,20,24
268:16 271:15
271:25 273:6
276:12,24
277:4 279:9
285:15 286:4
286:18 287:14
289:6 290:3
292:8 294:6
**freezing** 148:15
**frequently**
239:12
**freshly** 11:17
**friday** 4:12
311:8
**front** 29:5
171:10 205:4,5
238:23 271:6
302:17

**frontier** 103:9
**froze** 68:24,25
**frozen** 55:25
178:12 182:5
**fulfill** 290:24
**fulfilled** 136:12
136:18 141:5
**fulfilling** 60:21
283:20 284:2
285:5 286:22
**full** 100:9 191:7
213:9
**fund** 28:20,22
28:25 65:10
72:22 73:20
77:6,15,21
78:3,5,8 82:9
82:12 85:4,5
86:9 91:13
93:18 95:13
98:2 99:22
101:3 108:3,17
112:7 113:19
115:19 116:13
116:22 121:7
121:11 122:9
122:12,23,23
123:9 124:5,22
125:5 126:10
127:18 128:17
129:8 132:12
132:12 141:22
142:5,5,6
154:24 156:25
164:5,9 169:17

170:12,17
178:9,24 179:3
179:19 180:4
180:15 181:7
181:16,25
182:14 183:24
185:13,15
187:9 202:24
205:3 207:13
207:13 229:21
234:5,5 235:12
240:18 242:16
252:15 253:3
257:22 264:23
267:4 271:14
294:6 296:18
297:2 298:2,17
298:20,23
299:6,15,17
302:6,8,11
306:12,15
308:20,21,22
315:9
**funds** 27:16
28:20 29:2
30:6,11,13,17
30:18,22 32:2
32:9 34:5,8,9
34:13 35:7,10
35:14,15,17,19
36:2,10 37:6
37:13 65:12
69:21 70:10,18
71:2,7 73:5
76:22 77:7

88:22,25 90:13
92:15 95:22
96:10,16,18,21
96:21 97:3,4
97:12,18
108:13,15,19
108:20,21
114:4 123:8
124:7,9 128:19
128:21 147:18
152:4,7,8,14
153:8,21 154:5
154:7,10,16
155:4 156:8,16
159:8,23
160:10,21
161:9 162:20
164:21 165:6
166:17,19
167:3,5,12,18
167:22 168:7
168:13,20
170:4,4,5,7,15
171:6 179:8,9
180:25 181:5
185:6,19
200:10,16,22
202:2,7,12,14
202:22 203:3
205:16 206:21
207:20 231:10
231:14 232:4,4
234:6 240:7
243:6,14
248:14 254:13

254:16,25
255:6,24
256:12,16
257:20 258:3
259:10 262:11
262:12 265:3,5
265:21 266:8
266:21,23
267:5,6,7,11,20
267:24 268:16
269:6 270:2
271:15,25
272:12 273:6
276:13,24
277:4 279:9,17
279:25 285:16
286:4,18
287:15,19
288:4 289:7,9
290:3 292:8,8
292:9 294:6,20
296:14 297:6
297:11,15
298:13 300:2
300:23,25
301:11,24
302:3,24 303:9
303:17,22
304:18 305:19
305:20,21
306:6
**funky**   178:7
**further**   3:6,10
4:24 72:16
115:6 149:22

310:9 313:20
**future**   133:9
280:10

**g**

**g** 281:21
**gaining**   255:18
**game**   213:13
**gather**   66:16
265:24
**gears**   115:18
**gee**   306:15
**general**   20:23
21:4 22:6,10
73:10 80:6
82:21,25 96:3
97:7 145:14,21
145:22 164:17
174:15 191:17
191:19 192:13
192:15 194:23
194:24 197:21
203:10
**generalized**
189:9 192:18
**generally**   67:4
74:3 80:5
95:19 114:3
139:14 140:2
141:3 143:11
144:15 146:17
173:12 189:12
189:16 190:9
228:5 305:17
**generate**
100:12 113:22

172:21 276:25
**generated**
27:25
**generating**
272:24 273:6
**getting**   31:17
80:3 103:14
105:21 159:14
160:7,8,14,24
162:7,8 163:6
215:15 233:12
233:18 251:6
275:12 293:13
**give**   15:6 16:4
20:15 79:12
84:24 104:2
122:16 129:4
146:10 157:5
187:19 192:23
197:10 293:3
**given**   61:8 90:9
124:3 132:5
190:25 201:25
202:21 212:8
219:18 226:20
226:21 317:9
**gives**   205:2
**giving**   31:20
**glaring**   200:8
**glass**   281:21
**glassbridge**
281:17,20,25
282:3,10 288:8
288:10 314:21
314:23

**glide**   70:14,15
70:19 71:24
100:22 102:13
102:14 103:5
103:14 255:5
258:19 259:3
266:4,15,16,21
266:23 267:2
267:11,15,16
271:17,18
272:20
**global**   33:21
**go**   6:8 12:7,10
14:9,12 15:6
16:5 25:20
26:3 30:12,21
35:19 39:19
41:20 42:5,23
44:25 46:3,18
48:15,23 50:6
56:11 59:23
64:24 69:2
73:21 76:16
77:9 78:11
79:9,22 82:24
83:3 84:7
85:23 86:6,7
88:4 92:5 94:5
94:25 100:9
103:13 104:18
104:20 107:13
110:14,17
113:22 114:12
115:25 116:22
117:15 119:4,8

121:12,14,20
124:6 125:15
125:19 127:6,7
135:18 138:5
138:16 139:6,9
141:20 144:9
144:15 148:14
156:10 157:3
158:15 160:23
160:25 173:21
177:14 178:7
178:16 183:22
185:3 186:19
186:21 196:23
196:24,25
203:11 208:6,7
209:2,4 210:20
211:20,21
212:8 213:5,18
214:2 221:25
222:7 223:4
231:5,18,24
235:9,12,15,24
240:9,20
245:16 249:9
249:14 251:18
259:11 260:2
260:15 262:15
267:10 270:14
271:5 272:23
276:7 277:7,22
282:5,16
288:18,25
292:5,12,24
293:5,25

300:14 303:13
306:5 308:18
**goal** 87:15
**goes** 16:2,3
43:8 47:17
84:22 94:13
100:13 109:9
143:17 148:4
149:22,25
168:24 179:15
181:18 199:15
201:21 206:6
231:20 276:21
280:6 308:3
**going** 6:6,21
17:18 20:5
25:25 31:15,19
33:5 46:9
55:19 59:6,23
62:20 64:20,25
65:9,10 66:7
67:22 70:14,14
70:16 72:10
75:7,8,9 78:6,8
78:15 79:20
80:24 81:3,11
82:16,17 83:11
83:13,14,15,15
83:17 84:8,10
86:6,9,11,12
87:4,8,10,18,19
88:3 89:24
90:2,4,5,17,18
90:20 91:23,25
92:19 94:2

95:16 97:23,24
98:6,6,8,16,24
98:24 99:25
100:3,11,12,14
100:16,17,17
101:8,16,18,21
101:22,24
103:10,11
104:4,5 105:8
105:13 106:6
107:7,10,13,14
110:7,14
111:16,23
112:5,24 113:7
113:8,10,22
115:18 117:2,6
118:2,7,19
119:5,8,9,10,13
119:16,17
120:12,16,20
121:2 122:2,19
123:12,13,15
123:21,22
124:2,4,6,16
125:9,13
129:15,17
133:7 136:10
137:22,23
138:3 140:16
146:8 157:5,7
158:17 161:21
172:4 184:18
186:19 190:2
195:8,9,16
199:9 201:24

204:3 207:19
211:8,12,13
219:15 222:8
222:12,16
223:20 224:11
227:15 230:15
232:18,19
259:14,20
260:15 275:20
288:3 294:23
295:17 298:2
301:18 302:5,6
304:17 311:10
**gong** 12:8
**good** 4:2 5:12
5:15 6:16
11:19 18:5
42:10 52:7
64:22 76:5
81:7 86:17
87:19 101:23
105:16 137:14
163:14 164:5,6
204:21 210:2
212:7 216:21
230:15 233:19
270:8 273:19
274:11 302:17
303:10 305:17
**gotcha** 213:13
**gotten** 83:22
**grammatical**
180:9 246:9,12
246:20

**grandmother**
  95:8,10
**graph** 100:2
**graphs** 275:7
**great** 84:9
  100:13 110:3
  163:24 280:2,3
**greater** 25:4
**grindstaff**
  46:14
**grounding**
  72:13
**grounds** 189:4
  190:10
**group** 20:19
  31:5 36:15
  75:12 93:25
  107:18 109:7
  113:4,20 120:8
  121:3 123:24
  176:5,10
  183:19 205:16
  205:22,25
  206:4 227:13
  241:13 278:4,7
  282:19 288:19
  288:24 291:24
  293:2
**groups** 28:25
  112:18 144:22
  156:25 176:16
  210:5 247:14
  248:9,11,24
  249:23

**grow** 90:20
**growth** 94:18
  268:16
**guard** 90:14
  96:9
**guess** 16:9 18:3
  18:19 41:23
  46:19 47:18
  60:14 64:11
  65:23 67:9
  83:20 145:17
  146:22 149:14
  152:16 153:15
  155:8 160:3
  161:11 180:20
  204:13 236:12
  236:20 242:10
  284:23 285:3
  302:18 308:18
**guessing** 134:5
**guesstimate**
  62:20
**guide** 258:9
**guideline**
  174:12 225:5
**guidelines**
  174:6 175:20
  224:19
**guidepost**
  174:15
**guiding** 111:13
  111:14
**guy** 24:8
**guys** 294:20

**h**

**h** 285:10,17,17
  285:20 288:25
  293:5,25 294:2
  314:2 315:2
**half** 6:17 38:17
  75:18 133:22
  134:13 196:21
  212:2,4
**halfway** 136:8
**hammered**
  100:14
**hand** 44:14
  59:10 313:22
**handed** 295:20
  297:20 298:7
  304:24
**handful** 79:18
  97:12
**handing** 305:4
**handled** 140:12
  222:15
**happen** 84:11
  86:13 113:3
  116:5 119:2
  140:7 142:21
  193:7 207:14
  208:8
**happened** 59:5
  152:9 159:17
  163:13 204:9
  226:24 232:5
  235:2 255:2
  297:19 305:6

**happening**
  80:15 124:8
**happens** 86:25
  92:23 195:6
  221:21 223:3
  226:11
**happy** 6:11
  87:20 132:25
  158:20 160:25
  165:20 199:6
**hard** 39:19,24
  75:17 106:7
  118:9 168:7
  189:19
**harder** 106:12
**harm** 24:7,20
  24:21
**harmon** 27:2
**hazy** 97:6
**head** 8:23,24
  9:2 11:7 12:3
  31:13 33:14
  41:18 49:14
  71:4 72:11
  184:11,19
  231:9 255:13
  279:14 298:14
**heading** 246:13
  246:17,25
**headline**
  259:24
**healthcare**
  29:20
**hear** 50:4 71:8
  82:2

| | | | i |
|---|---|---|---|

**heard** 5:21
281:23
**hearing** 50:5
**heart** 127:4
**heartburn**
32:25
**heavily** 304:15
**heavy** 105:21
105:22
**heck** 104:14
105:23
**hegemony**
239:15
**heightened**
84:2 206:25
207:4,6,23
208:2,4 296:25
**held** 201:18
207:13,14
**help** 99:19
134:25 218:16
222:8 275:10
**helped** 58:25
**helpful** 77:19
104:19 125:16
**helping** 123:6
132:25
**hereto** 313:19
317:7
**hi** 50:14 115:11
**hiccup** 50:15
**hide** 125:2
**hides** 125:8
**high** 54:19 55:6
55:7,18 56:4

62:17 93:24
94:8,14,18
96:22 220:8
267:21 305:11
305:13,13
309:11
**highest** 93:4
95:23,24 96:3
96:4
**highlighted**
248:3 290:4
**hired** 139:7
209:7
**historical** 266:2
**history** 95:5,5
170:5,6,16
257:22
**hold** 68:23
224:25 245:17
266:25 270:15
280:10 285:25
292:3
**holding** 49:21
**holds** 207:7
**hole** 125:15
**holland** 290:9
290:11,13,19
290:23 291:6
291:10,24
292:15,19
299:14 314:25
315:5
**hone** 171:4
**honest** 118:22

**hope** 121:18
256:23 272:25
**hopefully**
249:21 281:7
**hot** 259:23
**hour** 6:16,17
199:4 213:14
230:15
**hours** 9:13
16:20 17:3,4,5
18:13,13
**house** 2:16 21:7
21:7 120:22
141:2 143:25
**howard** 2:15
4:14
**hr** 9:2 138:19
138:20 139:15
140:24
**huge** 145:24
**hundred** 56:7,9
163:11 189:25
298:10
**hurricane**
85:23,24 86:3
**hypothetical**
115:17 117:4
119:3,11 121:6
121:13,14
126:19 127:22
128:23
**hypotheticals**
127:14

**idea** 18:2 81:2
98:18 125:4
155:8 163:13
213:3 217:18
219:24 272:15
272:16 304:19
**identification**
39:14 171:24
241:23 257:14
264:12 265:14
270:19 282:2
288:9 290:10
292:14 299:5
307:19 314:4,7
314:9,11,14,16
314:18,20,22
314:24 315:4,7
315:10
**identified**
154:4 161:6
194:17 251:20
286:13
**identifies**
276:17
**identify** 153:18
158:11 173:18
198:2 222:3
228:10 232:23
233:24 234:9
**identifying**
256:4
**ignore** 117:10
**ignored** 243:15

imagine 94:24
219:25
immediately
46:3 86:14,17
impact 75:10
120:17 187:25
255:24 257:5
259:21
impacted
118:14
implemented
234:20 237:7
237:13,17,23
239:20 243:21
245:21 246:13
246:20 247:7
important 70:4
75:20 77:14,22
78:2 79:19
100:25 101:5
106:20 107:20
107:22 108:18
111:24 223:16
256:6 280:17
importantly
72:4 138:10
improve
186:19
improved
206:9
improvement
186:12 187:3
201:5 206:16
improving
281:2

imprudence
23:6
imprudent
79:9 141:7
145:22,24
146:2 229:11
297:7,11
imprudently
263:22 286:21
286:24 291:7
inadequate
191:4,14,21,24
inappropriate
145:15,18
248:22
include 47:8,25
123:16 140:6
144:10,11
176:3 194:17
197:13,15
198:14 209:16
212:14,15
216:25 221:17
221:18 224:2
234:11 242:23
250:4 278:6
included 41:17
184:9,23,25
196:5 199:18
201:14 211:7
212:17,19
213:8 214:20
219:15 244:22
303:2,2

includes 224:12
including 17:7
87:15 209:23
224:16 225:18
inclusion
184:22
income 38:19
38:22,23 39:5
80:11 103:6
incomprehen...
203:22 204:22
inconsistencies
237:19
inconsistency
239:24 243:25
inconsistent
234:16 248:20
248:25 250:7
250:12 251:16
253:15 254:4
incorporating
248:14
incorrect
183:15
increase 255:9
increased
258:10
incredibly
86:17 89:8
indefinite
180:21
independent
54:23 57:17,20
168:19

independently
151:18 164:15
256:4
index 113:9
205:11,14
271:20 277:2
298:20,25
300:3,25
301:10,20,23
302:16,19
303:10,11,15
305:24,25
306:12,15,17
indexes 113:18
113:22 176:4
176:16 247:14
247:22 249:23
276:17 306:2
indifference
240:16
individual 48:6
89:4 123:22
210:2 222:11
229:15,18
individualize
89:7
individuals
54:20 55:6,8
58:12 60:15
134:23 181:6
207:14 214:11
285:4
industry 11:8
64:21 67:6
71:11 75:13

80:5 92:15
101:21 143:12
189:17 190:8
193:6 199:21
210:10 227:10
228:6 265:5
271:16
**inexpensive**
303:17
**infinite**  278:10
**inform**  128:4
**informal**
214:18
**information**
15:5,7 38:6
46:17,21 47:13
47:14,16,22,23
47:25 66:9,11
67:4 68:16
71:6,21,23
72:9 73:22
74:8,9 79:2
83:21 112:23
129:3 135:7,10
160:7,9 162:8
162:9 163:3,24
164:4,4,20,21
166:12 169:3
171:14 183:20
209:10 214:22
215:15 221:23
233:18,19,19
240:9,20 241:9
242:4 243:14
244:10 245:10

246:2 249:5
251:5,7 253:24
261:7 262:18
262:18 263:6
263:17,18,19
263:23 264:6
265:11,25
270:5,8 272:9
273:2,5 274:3
274:10,12
275:8 286:13
287:12,13
288:5 294:9
302:16
**informative**
188:10
**initial**  130:13
**initially**  53:20
54:15
**inoperative**
172:10
**input**  88:15
**inputs**  86:6
113:15
**inspect**  159:22
**instance**  99:9
101:10 116:16
154:21 234:8
**instances**  233:5
233:8,24
234:10
**instantaneous...**
157:6
**institution**
51:14

**institutional**
49:25
**instruction**
6:12
**integrated**
284:16
**integrity**
308:21
**intentionally**
278:13,13
**interact**  91:6
283:10,11
**interest**  32:7,16
69:18 138:12
204:20 207:22
219:6,7,8
262:22 264:3
265:3
**interested**
26:18 313:20
**interesting**
20:19 129:2
154:9 262:16
**interject**
230:25
**internal**  21:9
95:13 238:24
239:3
**internally**  93:7
105:18
**international**
103:8 242:11
267:8 306:6
**internet**  38:3
176:24

**interpreting**
224:3
**interrupt**  12:5
70:8 223:8
**intex**  298:23
**introduce**  29:3
**invesco**  308:19
**invest**  108:5,6
306:5
**invested**  64:17
181:7
**investigate**
142:11
**investment**
7:21,23 21:7
23:7 25:23
27:23,24 33:21
33:24,25 39:2
41:3 43:13
51:7,16,21
52:8,18,21
53:12 63:19
66:15 68:9,18
74:10,18 81:7
93:21,25 95:17
105:2 109:2,20
109:20,23
110:5,9,10
111:7,9 114:3
115:19 132:7
135:6 138:20
139:20 140:12
145:16,21
156:17,19,23
160:14 169:4

| | | | |
|---|---|---|---|
| 174:7 175:8,17 | 24:12 27:22 | 153:25 154:11 | 239:13,25 |
| 175:19,23 | 28:18 39:6 | 157:4 159:7,11 | 240:4,16,23,24 |
| 177:15,19,21 | 45:24 64:14 | 159:15,25 | 241:19 243:25 |
| 178:2 180:18 | 65:17 75:8,22 | 160:2,6,15 | 244:9 245:23 |
| 182:20 185:24 | 106:17 132:4 | 161:13,19 | 246:15 247:12 |
| 186:3 187:8 | 147:13,16 | 162:4,4,15 | 247:19 248:9 |
| 188:3 194:10 | 151:7,14 153:4 | 164:17,23,24 | 248:16,18 |
| 200:21 201:3,8 | 167:16 188:7 | 166:2,6,13 | 249:9,11,13,14 |
| 208:15,24 | 194:5 201:20 | 171:23,23,25 | 249:15 250:8 |
| 209:16,19 | 217:5 222:18 | 172:23 173:2,9 | 250:12 251:16 |
| 210:16,19 | 232:23 233:5 | 173:13,23 | 251:19 252:13 |
| 214:21 216:12 | 239:11 255:3 | 174:2,5,12 | 252:25 254:5 |
| 216:13 219:4 | 256:6 266:5 | 175:3 176:8 | 276:17 278:2 |
| 220:9 223:7 | 271:22 | 177:11 178:6 | 314:8 |
| 224:3,15,19 | **invoices**  16:23 | 179:23 180:16 | **ipss**  121:16 |
| 225:9,13,18 | **involved**  7:12 | 180:24 182:10 | 172:9,18 |
| 232:22 238:17 | 22:22,24,25 | 183:10,22 | 221:18 |
| 238:18 240:16 | 27:11 59:22 | 184:7,10,23,25 | **ira**  39:3 101:15 |
| 240:24 251:19 | 135:11 136:7 | 185:8 186:12 | **irrelevant** |
| 251:22 252:4 | 207:11 210:13 | 187:3,12,15 | 157:16 158:3 |
| 252:11,14,19 | 298:3 304:16 | 189:11 199:13 | **irrespective** |
| 253:2 254:2 | 309:22,24 | 199:17,22 | 24:14 116:15 |
| 256:2 276:4 | **involvement** | 200:2 201:3,11 | 121:9 122:8,11 |
| 279:17 282:10 | 214:7 | 201:15 203:17 | 164:17 170:6 |
| 282:21 283:7 | **ips**  43:13 63:18 | 204:12 208:8 | **issue**  20:25 |
| 283:18,25 | 63:18 110:17 | 209:23 216:5 | 27:5,11,17,25 |
| 288:20 290:12 | 110:17,18,20 | 221:15,17,25 | 28:11 30:4,7 |
| 290:17,18,22 | 111:14,21,23 | 222:4,8 223:13 | 30:14 31:23 |
| 291:25 293:2 | 112:2 116:2 | 223:21 224:6 | 32:11 33:18 |
| 293:13 294:14 | 117:16,18,24 | 224:12 225:3 | 34:6 35:4,6,9 |
| 295:5,7 307:8 | 121:14,14,21 | 232:24 233:6 | 35:14 36:24 |
| 308:14,16,25 | 122:6,6,8 | 233:15 234:17 | 37:2,6,13 |
| 309:5 | 125:18,21,23 | 234:24 235:22 | 44:13,18 45:11 |
| **investments** | 149:7 153:13 | 236:10,13,18 | 111:22 120:21 |
| 21:6 23:19,21 | 153:14,15,23 | 237:8 238:6 | 120:24 124:5 |

**[issue - knight]**                                                    Page 37

| | **j** | **junior** 135:15 | **keyword** 65:23 |

125:10 126:21
140:25 141:2
155:14 164:13
164:18,19,22
167:4 169:13
173:23 184:21
186:23 192:3
192:15 195:21
196:21 199:14
199:20 218:16
226:3 228:21
246:9,11,12
259:17 262:21
272:11 310:5
**issues** 20:9,13
21:11 22:7
25:25 27:19
28:8,13,14
45:17 78:13
125:2 138:23
140:3,4,6,8,12
140:15,21
148:15 165:4
183:24 192:25
194:2 203:12
203:15,16
216:24 218:21
242:16
**italicized** 248:4
**iterations**
234:23
**iterative** 14:6
17:24 41:19
48:14 136:6

**j**

**jagged** 100:17
**january** 152:23
245:3,5 282:13
288:15 291:15
292:20
**jcroberts** 2:5
316:2
**jeffrey** 282:23
284:19
**jennifer** 21:19
21:20
**jensen** 46:13
**job** 44:16 45:6
100:7 139:12
139:12 178:3
303:10
**john** 2:5 9:11
9:15 13:24
316:1
**joins** 138:4
**jp** 96:5
**judge** 7:3 23:23
24:3
**judgment**
150:24 190:14
204:21
**july** 16:12
**jump** 222:7
223:10
**june** 11:22
15:20 56:23,24
129:23 199:8
307:15,20
308:2 315:11

**junior** 135:15

**k**

**k** 22:24 25:12
34:6 39:3
49:19 50:17
51:10 53:11
55:8 80:18
121:16 224:9
224:11 285:16
286:5 289:7
292:8 294:6,20
295:13,15,16
296:11 304:24
**keep** 33:13
52:12 55:22
95:13 99:4,6
99:23 101:7,12
101:14 103:3
111:12 157:10
171:9 204:3
288:4
**keeper** 28:5
308:12 309:10
**keeps** 12:6
125:7
**kept** 57:14
162:15 305:15
**keri** 2:10 5:15
230:14
**keri.engelman**
2:10
**key** 49:20,21
50:18 51:10
53:9 75:11
137:25 190:10

**keyword** 65:23
**kind** 6:15 12:20
14:8,12 17:20
25:4,20 26:3
41:21 43:8,14
44:17 45:17
46:2 47:9 48:8
49:7 54:5
55:25 59:11
60:3 62:16
68:3 74:24
76:4 86:21
87:2,5,20 88:7
101:19 102:3
124:13 125:3
125:11,15
126:5 127:4
135:8,12
155:14 160:13
170:22 178:14
207:13 220:17
220:20,22
238:21 259:17
259:23 262:2
272:10,13,24
274:18,19
284:6 297:21
**kip** 48:17
**knew** 133:7,9
141:14 213:24
284:4,7 287:25
**knight** 290:9,11
290:13,19,23
291:6,11,24
292:15,19

299:14 314:25
315:5
**knocked** 23:22
**knocks** 98:3
**know** 6:11
10:18,25 11:5
11:7,13 16:22
16:22 17:4,16
18:6 19:2
29:14 33:5
37:23,23 38:13
38:22 39:17
41:14 43:8,16
47:12 48:9
52:11 58:17
61:8 62:5,8
63:17 65:23
67:7 68:9
69:24 72:8
82:2,22 84:9
84:12,19 95:18
96:19 103:7,20
105:20 107:8
114:10 116:4
117:2,5 118:23
119:10,12
120:23 125:9
128:13 137:18
138:18 144:21
145:9 148:16
150:9,15
152:17 153:8
153:24 158:24
160:10 163:4,7
165:24 167:15

171:11,12
179:7,10 184:9
188:23 195:11
196:7,9,16,20
196:22 204:8
204:23 205:15
205:21 206:14
207:20 211:25
212:12,17,24
213:4,6,10,11
214:15 215:4
215:10,19
218:2,4,22,24
219:5 220:4
222:8 229:3
236:2,20 238:5
238:10,12
239:5,6,6
242:25 244:20
246:5 247:8
250:24 251:3
253:23 259:4
260:14 262:9
272:16 279:12
279:24,25
280:7 281:17
284:6,11,11,15
284:16 286:24
287:6,7 288:2
288:2,6,13
290:15,17
291:8 294:16
294:16 295:2
299:8,20
303:13 305:5,6

306:8 307:22
309:20,21
**knowing** 280:9
**knowledge**
165:23 219:12
219:19 238:7
239:2,20
**known** 79:10
**knows** 280:10
**kraft** 20:22
21:2,13 25:19

**l**

**l** 2:10 5:6 21:21
115:4 281:21
**labor** 92:6
209:11,18,21
210:12 227:20
**lack** 14:25
22:25 23:7
33:22 154:14
202:13
**lagging** 108:8
**laid** 52:4
**laliberte** 1:6
4:7 316:4
317:1
**landing** 12:7
**language**
111:18 174:21
180:16 181:20
203:17 253:12
**large** 24:25
33:20 62:10
92:23 94:6,18
94:19 103:12

134:3,17
138:24 139:25
207:7
**largely** 64:25
**larger** 93:8
**largest** 73:7
80:3 87:23
**late** 133:4
160:24
**latest** 264:15
**latham** 8:7
11:11
**latham's** 8:9
9:23,25
**laundry** 46:2
272:19
**laurie** 8:7,9
9:23,25 11:11
**law** 31:18,19
33:13
**lawsuit** 310:6
**lead** 72:15
259:13
**leading** 271:15
**lease** 97:25
**leave** 54:22
**leaving** 278:14
**led** 41:16
287:19
**left** 132:15,16
184:8 203:17
235:8,8 253:17
253:20 278:18
**legacy** 62:16

**[legal - look]**

**legal** 4:15,16
8:23 13:17,19
14:2 23:13
25:22 47:16
56:12 312:1
316:23
**legs** 6:17
**lens** 204:5
**level** 45:24
86:18 88:21
92:2 123:15
126:25 127:2
145:8 163:18
207:23 208:2,4
210:13 214:6
220:9 223:5
267:21 280:13
**lewis** 2:7
**liability** 132:11
**liber** 205:19
**liberty** 36:15
36:22
**lies** 132:2
**life** 35:20
**lightening**
100:18
**lights** 98:3
**likelihood**
80:25
**likely** 87:10,17
99:4 118:6
306:21
**limited** 28:10
143:7 176:3

**line** 81:4 87:5
97:22 100:16
100:19 163:2
197:20 214:13
274:20 285:20
312:6
**lines** 100:2,3
127:23
**lineup** 122:13
171:7
**list** 19:2 29:6
41:24 46:2
79:20 82:21
83:3 93:2,2,3
93:19,22,23,23
93:24 96:22
115:23 116:5
116:13,22
118:3 177:16
181:11 182:20
182:23,24
183:12 185:24
186:24 188:7
188:24 205:2
205:20 208:10
227:16,20
240:16,25
251:19 272:19
305:12,13,14
**listed** 26:16
29:12,13,19
31:6 38:16
40:15,20 184:4
184:5 293:10
293:11 308:17

**literally** 81:19
86:23 210:10
**litigation** 40:8
40:14 42:2,4
149:23 195:17
**little** 10:16
32:24 36:13
48:13 49:6,8
61:13 62:3
80:8,9 95:25
100:6 106:5,11
115:18 136:8
144:20 153:18
173:15 178:7
205:18 207:25
215:9 217:11
301:25 303:7
305:20,21,23
**lively** 76:15
**living** 289:23
**llp** 2:2
**loaded** 291:12
307:23
**loading** 172:2
292:16
**located** 1:17
4:17
**location** 4:5
**long** 5:24 41:4
45:25 85:6
88:20 91:9
92:11 106:8
107:13 170:18
187:14 197:19
221:23 309:5

**longer** 136:9
176:18 189:4
248:15,17
249:25
**look** 8:5,7 12:2
16:11 24:21
31:12,21 42:24
44:19 46:18
48:23,25 66:3
66:6 70:14,15
70:16 72:2,4,5
72:7,8 73:18
78:15 79:12,13
79:15,16,17
80:24 82:24
83:15,17 84:4
85:21 86:22
87:5,8 88:3,21
89:10,11,12,14
90:2 94:25
97:20 98:7,9
98:16,18
100:18 101:18
102:11 103:14
103:19 104:13
105:8,13,24,25
109:11,14
111:18,24
113:7,10 116:2
117:6,17 118:5
118:25 119:19
120:5,7,18,21
120:25 121:2,3
121:21 122:3,4
122:5,6,17

**[look - made]**                                        Page 40

| | | | |
|---|---|---|---|
| 123:9,12,13,15 | 281:4 288:7 | 107:25 108:2,4 | 92:7 95:4,5 |
| 123:21 124:6 | 290:8 291:18 | 110:2 113:4,5 | 100:2 101:11 |
| 124:16,21 | 303:8,13 | 113:17 117:16 | 101:13 103:2 |
| 126:24 144:16 | 305:21 306:22 | 129:5,11 | 103:21,25 |
| 144:19 149:23 | 309:4 | 150:14 152:3 | 104:8 110:22 |
| 150:12 151:3 | **looked** 7:22 | 152:21 159:4 | 110:24 122:17 |
| 152:13 153:12 | 8:18,20,22 | 163:18 164:16 | 130:17,17 |
| 154:19 156:11 | 10:17 42:12 | 170:20 175:8 | 132:11 136:24 |
| 157:3,22 158:8 | 44:9 46:11 | 184:21 185:9 | 136:25 140:6 |
| 158:17 159:9 | 63:9 65:24 | 188:22 189:22 | 140:14,23 |
| 160:22,25 | 94:10,11,13 | 204:5 207:10 | 145:9 149:12 |
| 163:17 164:20 | 103:25 126:22 | 210:5,6 238:22 | 195:6,14 |
| 164:22 165:8,9 | 144:16,17 | 248:17 257:8 | 197:22 198:18 |
| 165:12,20 | 149:20 152:19 | 266:18,22,23 | 217:3 218:20 |
| 166:9,10 167:7 | 152:20,20 | 267:2,4 274:2 | 220:14 221:3 |
| 168:7 170:23 | 156:3 184:15 | 274:12 275:5 | 221:17 274:10 |
| 177:14 184:12 | 184:17,24 | 279:4 280:3 | 274:11 309:19 |
| 184:14,15,16 | 197:10 201:11 | 285:22 305:10 | **lower** 102:19 |
| 188:17,20,24 | 205:4,22,25 | **looks** 150:6 | 309:14 |
| 196:2 198:19 | 232:9 238:18 | 172:6 208:5 | **loyalty** 204:19 |
| 199:6 204:19 | 245:18 273:17 | 267:10,14,16 | **lunch** 114:10 |
| 207:22 208:9 | 273:17,18 | 267:18,24 | 114:15 115:12 |
| 217:7 223:20 | 274:9,10 | 268:4,8,11,15 | |
| 223:21 231:5 | 275:18,25 | 268:19 269:5,9 | **m** |
| 233:11,17 | 299:16 309:13 | 269:13,17,18 | **ma** 2:9 |
| 235:12,24 | **looking** 11:24 | 269:20 278:2 | **made** 24:10 |
| 236:10 240:4 | 29:5,9 44:16 | 294:24 305:22 | 41:13 45:14 |
| 241:20 244:14 | 45:2 46:19,20 | **losing** 255:19 | 77:5 122:23 |
| 249:13 251:12 | 53:15 71:19 | 259:21 | 141:18 151:18 |
| 252:6,8 257:10 | 72:12 73:19 | **lot** 6:6 32:3 | 164:6 169:6 |
| 267:23 268:3,7 | 80:12 83:16 | 38:3 44:15,20 | 192:12,22,24 |
| 268:21 270:10 | 87:3 88:24,25 | 46:24 67:10,15 | 194:10 204:3 |
| 271:4 272:21 | 93:9,16,17 | 73:15 74:22 | 211:12 228:8,8 |
| 279:7,10,21 | 94:2 99:20 | 75:16,23 76:3 | 228:9,13,21,22 |
| 280:8,22,23,25 | 105:15 107:24 | 81:16,16 83:16 | 228:24 229:2,3 |
| | | | 229:7,9 230:6 |

230:8 298:2
313:18 317:5
**magazine's**
23:21
**magnitude**
120:16,17
**mail** 17:17
**main** 28:21,21
296:8,11
**maintain**
130:10
**maintaining**
224:12
**maintains**
132:9
**major** 143:16
144:17 173:22
**majority** 56:13
80:10 93:21
144:17 197:12
207:8 229:20
276:24
**make** 12:11
28:19 32:17
42:17,25 48:24
48:25 51:16
61:13 64:18
70:17 73:14
79:23 81:17
83:24 85:10
88:12 89:6
91:25 93:17
101:9 103:4
105:17 106:22
109:21 117:25

119:23 125:23
125:24 127:9
127:19 130:11
138:6,10
139:10,11
146:4 154:20
157:14 158:2
171:15 172:17
184:14 190:3
199:22 211:21
222:23 223:2
227:12,12
229:24 237:21
270:15 277:13
293:18
**makes** 70:17,20
107:2,3 223:14
226:19
**making** 42:6
45:23 51:9
73:20 74:9,18
76:6 83:23
84:11,22
109:22 162:9
204:21 262:4
293:20 302:17
306:3
**managed** 28:2
131:3 301:24
302:13 303:22
306:13 308:12
**management**
33:21,25
**manager** 52:14
68:9,19 83:14

94:14,15,15
96:5,6,6,8,9,10
96:11 105:9
106:8,9 107:3
107:4,4,11,14
108:25 109:15
135:9 252:11
252:14,19
253:2,7 254:2
**manager's**
180:18
**managers**
33:24 68:19
93:3,6 94:2,6,7
94:17,19 95:14
95:25 96:4
108:24 271:20
271:21,21
**managing**
53:25
**mandate** 132:4
186:13 187:3
**mandated**
176:9
**manner** 209:18
**march** 254:11
290:4
**marconi** 21:20
**maria** 2:11
39:12 171:23
241:21 257:11
264:11 265:12
270:11,18
281:24 288:7
290:8 292:13

299:3 307:17
**maria.decastro**
2:11
**mark** 39:12,23
**marked** 39:22
**market** 88:22
100:6,8,8,9,10
100:13 176:15
247:14 249:22
255:20
**marketplace**
91:19
**markets** 103:9
103:9,11
**markoff** 143:22
**married** 21:22
**mary** 1:6 4:7
316:4 317:1
**matched** 167:7
**materials** 40:4
149:16,17
150:2 167:20
216:12,14
275:21 276:2
277:21
**mathematical**
88:8
**mathematics**
86:20
**matter** 4:7 5:17
5:19 10:2,15
10:23 98:22
104:6 127:17
145:14,21,22
164:17 222:18

261:22 262:19
278:12 306:14
309:23
**mean** 8:3 18:2
21:24 43:12
45:4 47:21
48:3,21 52:23
60:13 66:4
70:8 81:19
84:23,24 85:21
107:24 116:6
120:22 121:23
138:14 145:18
157:6 173:20
178:23 180:2
181:8 189:7
193:23 207:4,7
215:22 221:10
250:19 279:20
284:10 293:9
296:24
**means** 6:25
89:10 100:5
105:14 117:22
157:7 174:23
189:13 190:6
217:3
**meant** 126:13
231:22
**measure**
106:22 302:19
**measured**
176:14 247:13
249:21

**measuring**
128:17
**meat** 44:18,25
45:10
**meatier** 219:22
**meaty** 219:8
**mechanism**
123:20
**media** 311:5
**median** 87:5,8
89:14 90:25
125:14 240:8
240:18 241:8
241:13 251:20
**meet** 87:14
181:6 283:14
**meeting** 135:20
150:7 152:21
191:2,8,13,24
194:4,4 195:25
197:5,6,12
199:8,12 200:8
200:16,21
201:18 228:23
229:6,14
241:24 257:12
257:15 264:13
264:14,24
266:12 270:17
270:20 271:4
272:6 275:20
275:23 276:3,4
314:10,12,15
314:19

**meetings**
135:18 192:7
215:16 217:21
217:23
**member** 49:18
54:5 128:25
229:16 230:3
**members** 8:18
8:22 43:24
162:22 172:12
174:19 193:14
194:14 214:16
215:11 216:4
227:4 229:18
261:6
**memory** 146:9
152:12 158:18
160:24 199:7
**mention** 145:4
183:10,13,16
239:14
**mentioned** 9:22
25:11 53:18
76:9,20 77:2
77:20 85:13
93:18 97:19,19
101:4 107:17
112:5 138:13
154:3 160:19
166:2 169:5,11
172:9 220:11
**menu** 28:21
**mercer** 289:15
289:17

**mess** 33:5
171:2
**met** 141:10,12
146:17
**metal** 100:12
**methodology**
94:12
**metric** 66:3
106:12 111:5
121:9 122:12
188:10 190:18
299:24
**metrics** 64:13
64:16,18,21,24
65:2,21,24
66:19,22 67:2
67:18 68:2
69:13,16 70:11
71:13,16 74:17
75:6,14 76:9
76:10 77:22
106:7,11,16,22
107:17 109:4
109:24 121:4
121:17 122:18
144:4,5,6,7,13
164:15 188:4
190:21 251:10
251:12,15,17
**metropolitan**
308:20
**mid** 25:4 52:13
52:23 242:11
306:6

**midatlantic**
316:15
**middle** 201:24
249:19 265:23
**miller** 2:2
13:20 15:12
29:15,18 37:18
37:20,23
**millershah.com**
2:5 316:2
**million** 38:17
62:14,14,23
63:5 64:3
87:18,20
133:21 134:4
259:23
**mills** 29:20
**mimicking**
303:10,11
**mind** 52:12
70:6 97:6
99:23 103:3
111:12 148:22
155:7 165:18
194:22 218:15
234:12 236:7
**mine** 38:25
55:23 141:23
**mineola** 312:2
**minimum** 39:4
**minneapolis**
282:25 283:13
**minor** 207:12
**minute** 172:3
192:16 193:21

195:25 199:5
211:19 221:3
281:7
**minutes** 12:8
44:21 97:19
114:9 127:5
152:21 153:12
153:12 191:2,8
191:13,25
192:4 193:3,9
193:15,19
194:7,16,20,23
195:9,12,14,18
196:21,22,22
197:3,6,13
198:4,6,13,15
199:2,8,12,18
199:23 200:9
201:17,22
206:6 228:23
229:6,14
230:18 241:22
241:24 256:9
257:8,9,12,15
258:16 259:5
264:11,13,14
270:17,20
271:5 272:6,15
273:24,25
275:21,23
276:5 306:21
314:10,13,15
314:19
**minutia** 88:13

**miscommuni...**
47:20
**misread** 250:13
**misreading**
188:14
**missed** 19:13
133:25 220:18
220:25
**missing** 197:23
198:13 222:3
236:23 274:19
285:21
**misspeaking**
196:14
**misspoke** 231:7
244:5
**misstates**
157:18 166:24
**misunderstan...**
215:17
**mix** 59:24 72:6
90:10,11 153:9
166:17,20
**mixed** 31:18
**modified** 200:2
**molina** 29:20
**moment** 27:7
35:12 36:12
37:4,9 54:6
67:2,24 70:6
78:23 79:21
143:23 205:6
234:13 256:17
275:25 293:3,7

**money** 23:21
52:14 98:21,25
99:5,6 101:7
101:12,14
207:19 275:16
293:21
**monitor** 139:20
145:21 147:12
151:6,13 153:4
153:23 175:16
177:20 178:2
181:16 186:4
186:25 200:10
200:17 201:4
201:21 202:8
202:12 203:3
203:10,11,12
203:14,21,23
204:10,15
206:2,10,11
217:4 222:18
239:13 241:10
242:8 243:7,9
243:10 251:22
252:15 253:3
253:21 257:20
258:8
**monitored**
27:23 175:23
195:7
**monitoring**
23:8 28:18
34:7,12 36:2
51:11,20 53:7
63:19 77:14

**[monitoring - new]**                                    Page 44

82:11 105:2
106:17 122:22
132:9 142:6
153:21 154:5
159:23 160:20
183:23 201:14
219:5 220:9
225:8,13 237:8
239:16 244:9
244:13 245:22
246:14 257:4
258:6,8,17,19
258:22
**monte**   80:19
82:16 85:13,19
86:8 112:20,22
**month**   23:22
26:20 150:10
150:17 152:15
152:17 244:20
**monthly**   16:23
**months**   5:25
6:2,2 64:7
**morgan**   2:7
96:5
**morganlewis....**
2:10,11
**morning**   4:2
143:21 198:10
277:22
**motivational**
262:21
**move**   33:2
127:23 182:19

**moved**   97:3
**moving**   157:14
**multiple**
141:13 209:25
214:2 235:13
**mutual**   36:15
36:22
**myriad**   263:8

**n**

**n**   2:2 5:6,6
21:21 115:2,2
115:2,4,4
**name**   4:14 5:15
21:19,22 24:24
35:18 37:24
38:4 95:22
143:23 160:3
283:2 287:9
312:4,5
**named**   81:7
313:8,12
**names**   8:16
11:6 20:13,15
20:17 34:2
35:21 58:17
**narrow**   24:21
91:23
**natixis**   31:16
33:6,7,20,22
34:4,5 36:22
**nature**   25:20
187:13
**near**   215:3
**nearly**   258:13

**necessarily**
17:7 38:14
44:15 63:15
67:12,15 73:23
109:24 121:19
124:3 129:12
135:25 145:23
169:2 179:11
188:10 190:3
208:25 212:16
229:17 236:17
238:25 249:12
299:21
**necessary**
51:12 52:16
70:24 191:23
225:23 317:6
**necessitate**
287:14
**necessitated**
287:16
**need**   6:10 63:15
63:16 75:22
76:12 84:4,7
84:21 101:8
103:18 104:7,8
104:15 110:20
127:5,7 129:6
129:8,11 135:7
139:10 157:8
166:20 170:24
178:16 206:2
218:16 223:3
236:9 272:24
306:19,21

**needed**   46:18
86:25 87:14
127:15 162:8
168:15 194:10
199:17 213:18
**needs**   83:2
109:19 117:21
126:21 157:8
178:17 181:6
199:22 221:24
230:5,7 280:17
**negative**   87:7
240:8,19 241:8
243:14 244:10
256:5
**negotiated**
309:14
**neighbor**   57:25
**neighborhood**
18:19 80:17
134:11
**neither**   217:12
**net**   54:19 55:6
55:7,18 56:5
269:23
**never**   76:4
141:10 145:9
145:11 160:6
172:16 183:22
183:25 194:22
206:18 210:21
255:22 281:23
283:12
**new**   1:19 55:24
149:7 160:2

166:2 215:22
231:9 312:2
313:2,4,6
**nfp**  30:15 35:15
35:17
**nice**  275:7
**night**  75:16
**nine**  301:18
**noise**  303:8
304:11 306:10
**noncompliance**
161:23
**noncompliant**
232:24 233:6
**normal**  41:21
43:14 63:17
156:20
**north**  38:16
62:24 63:2,5
**notary**  1:18 5:7
312:25 313:6
317:13,19
**note**  199:16
271:25 293:18
316:10
**noted**  202:4,23
311:12 317:7
**notes**  95:13
306:22
**notice**  1:17
149:21
**november**  1:12
4:12 289:18
311:8 316:3

**number**  4:9
15:24 16:5
18:4,5 19:9
33:25 38:14
39:2 42:22
47:3 52:24
53:2 62:23
67:2 69:15
72:8 74:25
87:23 88:11
92:22 95:12
96:2 106:3
110:15 119:4,6
119:7,10,13,18
120:15,18
130:7 154:15
169:16 171:11
175:4 195:13
195:15 201:19
204:2 207:10
211:25 216:23
223:13 225:4
238:14 249:8
249:10 263:9
278:10 285:11
297:17 311:5
**numbers**  89:23
90:9 110:12
116:6 118:8
156:8 207:10
215:6 306:11

**o**

**o**  5:6,6 21:21
115:2,2,2,4,4

**oath**  3:13 5:2
6:25
**objection**  74:13
74:20 122:14
128:6 139:21
155:19 157:17
163:20 166:23
180:11 212:10
219:23 227:25
287:24 291:2
**objections**  3:7
**objective**  178:9
180:18 181:3
275:14
**objectively**
122:9
**objectives**  78:6
78:24 88:16
174:7,8 175:9
178:22,24
179:4,8,11,13
179:20,21
180:4,7,24
181:5 182:2,15
185:5,14,15,19
274:24 275:3
275:15
**obligation**  7:2
60:21 208:23
209:5 283:20
284:3 290:24
297:10
**obligations**
141:6 285:6
286:22

**obligatory**
174:17,18
**obnoxious**  12:6
**observation**
191:17,20
**obtain**  225:22
**obviously**
21:11 25:22
38:6 43:10
57:24 59:8
68:4 69:20
70:13,18 71:10
73:16 74:23
77:5 85:9 89:5
104:7 116:20
122:23 125:22
126:21 130:23
137:15 148:3
157:25 174:24
188:15 262:8
264:2
**occasionally**
283:12
**occasions**  218:7
**occurred**  202:5
202:25
**ocio**  27:7
**offer**  51:6
76:22 85:5
**offered**  52:24
72:22 74:11,19
77:6 106:17
149:9 286:5
289:10 292:7,9
294:6 296:15

**[offered - opinion]**                                                                Page 46

296:18 297:14
297:16 298:17
**offering** 30:11
155:2 289:6
290:2
**offers** 285:15
**offhand** 193:25
**office** 94:9
283:13
**officer** 3:12
**offices** 4:17
141:13
**officially** 53:22
120:2
**oh** 170:23
307:23
**oil** 27:2,18
**okay** 12:4
14:21 18:21
31:22 33:15
34:10,19 40:9
42:21 43:17
47:18 48:11,17
56:22 80:24
82:5 87:16
89:3 93:16
94:5 97:21
101:23 105:4
110:23 111:23
113:25,25
114:2 116:11
119:7 120:11
120:20 127:10
127:11 131:13
142:3,24

145:10 146:23
147:8 155:22
159:6 164:9,11
164:13 166:18
174:3 175:11
179:17 180:2
181:22 182:22
183:19,21
185:23,25
187:22 188:25
189:2 190:24
195:19 197:8
199:15 200:4,6
203:25 204:22
215:25 216:10
224:7 225:6
228:10 229:8
232:20 237:5
237:16,19
239:10 240:5
240:14 241:6
241:25 242:14
243:12,24
244:8 245:14
245:19 246:23
247:10 249:13
249:17 250:14
257:18 258:2,3
260:13 265:18
266:16,18,25
269:4 271:9,9
271:12 275:20
276:9 280:10
281:9 282:7
285:21,24,25

288:11,14
289:4 291:19
291:21 292:3
292:16 293:3
294:2,4 299:14
300:7 301:8
307:16,24
308:15,23
310:12
**old** 89:20 210:8
312:2
**onboard** 54:18
**onboarded**
59:11 214:12
214:16 215:11
215:20
**onboarding**
59:7 214:19
215:7,15
218:18
**once** 59:10
97:10 186:3
**ones** 25:14 51:8
66:7 69:17
70:5 93:4
94:21 95:3,7,9
96:13 99:17
102:21,24
141:14 167:17
198:20 212:16
238:2 262:3
284:4
**ongoing** 27:20
31:25 36:5
43:21 61:16

62:2 71:15
73:11
**open** 34:18
172:25 241:25
271:9 291:13
292:17
**opening** 39:19
282:4
**operate** 34:2
125:20 227:23
228:7
**operated**
162:16 226:4
**operating**
51:24 54:16
162:14 263:22
**operation**
173:5
**operational**
83:16 94:9
105:14
**operative**
172:10,11,14
172:15,19
**opine** 28:6,14
173:24 208:17
270:22
**opined** 20:10
21:2 27:12
28:15,23,24
30:7 32:15
**opining** 22:3,15
260:6
**opinion** 11:4
14:11,11 23:9

[opinion - page]                                                    Page 47

| | | | |
|---|---|---|---|
| 31:7 32:10 | 219:6 246:10 | 304:19 313:21 | **ownership** |
| 33:8 34:11,21 | 262:4 274:18 | **outcomes** | 55:17 |
| 35:24 36:8 | **opposite** | 121:25 130:23 | **p** |
| 37:11 40:11,16 | 163:16 | **outliers**  87:6 | **p**  2:2,2 |
| 41:8 42:19 | **option**  111:7 | **outperform** | **p.m.**  1:12 4:13 |
| 45:6 145:13 | 120:3 156:17 | 185:6,20 | 12:14,18 50:8 |
| 149:15 150:10 | 177:19 178:2 | 276:13 277:15 | 50:12 69:6 |
| 150:22 152:8 | 178:12 186:3 | 279:5 | 114:14,15 |
| 155:3,6,15 | **options**  51:7,9 | **outperformed** | 115:3,9 148:18 |
| 156:14,22 | 51:17,21 52:19 | 128:3,18 | 311:9,12 |
| 157:15 158:2 | 52:21,24,25 | **outside**  28:21 | **pa**  2:4 |
| 158:24 159:21 | 53:7 74:11,19 | 52:8 140:12 | **packaging** |
| 166:18 167:3 | 105:3 145:16 | 187:8 252:4 | 131:16,19 |
| 167:20 168:12 | 145:21 156:19 | **overall**  30:14 | 295:8 296:5,14 |
| 169:9,19 171:5 | 175:24 177:21 | 51:13 105:10 | 307:7,9 |
| 190:25 191:12 | 182:5,23 | 123:15 154:23 | **packing**  132:14 |
| 191:15 199:11 | 224:16,20 | 217:15 255:20 | **page**  34:20 |
| 204:14,17 | 225:9,14 266:2 | 258:10 | 41:5,24 43:23 |
| 208:22 237:12 | 308:14,16,25 | **overhaul** | 147:6 160:25 |
| 242:21 248:21 | 309:2,5 | 254:25 256:11 | 173:25 175:2,6 |
| 251:14 260:21 | **order**  41:8 49:8 | 256:15 257:4 | 177:12,15,16 |
| **opinions**  78:10 | 93:14 123:10 | **oversee**  60:20 | 178:8,14,21 |
| **opportunities** | 230:3 | **overseeing** | 181:12,19,20 |
| 175:19 | **ordering**  5:9 | 139:10 | 181:23,24 |
| **opportunity** | **organization** | **oversight**  99:7 | 182:7,20,21 |
| 156:6,9 157:22 | 21:10 53:22 | **overview**  265:2 | 185:4 187:22 |
| 173:8 | 94:11 105:10 | **own**  10:23 | 190:22 216:23 |
| **oppose**  28:12 | **original**  34:2 | 27:16 30:11,17 | 217:17 218:13 |
| **opposed**  30:11 | 125:4 | 33:25 56:7,9 | 224:6 225:3,7 |
| 46:4 47:15 | **ought**  109:25 | 164:16 233:17 | 225:21 231:16 |
| 98:12 99:11 | 118:13 120:13 | 273:22,24 | 232:14,16,18 |
| 100:18 108:21 | 120:24,25 | **owned**  54:12 | 232:19 233:11 |
| 112:3 125:2 | 211:7 257:7 | 55:17 56:6 | 234:2 236:25 |
| 163:19 164:16 | **outcome**  87:10 | **owner**  56:13 | 237:4,15 239:8 |
| 165:17 192:9 | 126:3 260:6 | | 239:9 240:25 |

**[page - particular]**                                          Page 48

| | | | |
|---|---|---|---|
| 241:2,4 242:9 | **paper** 219:10 | 53:21 61:15 | 274:14,21 |
| 242:10,10 | 219:17 | 71:14 72:5 | 275:12 309:3 |
| 245:15 247:5 | **para** 140:17 | 73:10 75:4 | **particular** 8:8 |
| 249:15,17,19 | **paragraph** | 81:25 85:9 | 13:22,24 14:10 |
| 252:9 257:25 | 29:6,10 53:16 | 91:14 93:13 | 28:8,17,25,25 |
| 258:2 264:21 | 60:24 146:11 | 110:6,7 124:17 | 32:23 35:9 |
| 264:22 266:13 | 147:6,8 151:4 | 133:25 137:24 | 43:19 46:22 |
| 266:24 267:5 | 174:4 176:21 | 139:15 156:20 | 48:5,5,6 50:20 |
| 267:10,14,15 | 178:8 185:11 | 161:23 164:24 | 52:17,19 61:22 |
| 267:18,23 | 186:2 187:19 | 173:9,14,16 | 61:25 73:19 |
| 268:3,7,11,15 | 187:20,23 | 174:24 192:3 | 77:11 78:9 |
| 268:20 269:2,2 | 200:4 201:25 | 196:6 206:16 | 79:3,4,25,25 |
| 269:5,9,13,17 | 201:25 216:8 | 211:5 220:18 | 81:8 82:22 |
| 271:10 277:7 | 223:18,19,20 | 222:20 231:16 | 84:15 87:11,13 |
| 282:6,16,22 | 223:22 232:17 | 249:8 250:24 | 90:11 93:14,17 |
| 285:19,23,25 | 232:19 233:4 | 257:21 258:10 | 105:21 107:3 |
| 288:14,18,21 | 233:23,25 | 263:9 276:4 | 108:25 113:20 |
| 288:22,22 | 234:3,4 237:24 | 284:18 297:21 | 121:13 126:22 |
| 289:2 291:18 | 239:9 240:11 | **participant** | 135:8 137:2,10 |
| 291:21 292:3,5 | 240:13 243:12 | 87:12,13,13 | 146:7 154:21 |
| 292:24 294:3 | 244:2 245:12 | 89:3,6,17,18,19 | 154:25 158:12 |
| 300:14 308:18 | 254:8 255:22 | 89:21 90:5,25 | 168:20 169:3 |
| 310:13 312:6 | 260:11,23 | 90:25 224:22 | 183:11 184:19 |
| 314:3 315:3 | 261:5,6 265:17 | 272:23 | 191:16 194:7,7 |
| **pager** 214:24 | 265:23 270:7 | **participants** | 194:19 196:17 |
| 217:25 219:16 | 270:22 276:7 | 32:7 79:14,16 | 197:9 198:22 |
| 219:22 | 286:14 308:18 | 80:4,16 87:23 | 214:6 223:9,11 |
| **pages** 40:6 41:4 | **paragraphs** | 97:24 98:20 | 226:22 228:11 |
| 42:5,8,13 | 243:20 246:16 | 99:3 101:7 | 234:7 257:8 |
| 144:9 224:25 | 247:4 | 102:5 103:23 | 259:9 260:6 |
| 232:19 233:10 | **parallel** 54:25 | 130:24 138:12 | 264:4 272:12 |
| 268:19 269:18 | 55:23,24 | 204:20 207:11 | 280:9 284:18 |
| **paid** 30:19 | **parlance** 33:23 | 219:6 259:23 | 287:8 293:17 |
| 308:11 309:9 | **part** 9:20 11:4 | 272:13,18,23 | 293:22 294:13 |
| | 42:9 43:20 | 273:7,9 274:7 | 294:23 300:10 |

301:6 304:7
309:7
**particularly**
117:16 118:8
160:24 184:21
226:8,14
**parties** 3:4 82:4
**partner** 20:22
21:18,23,25
53:18,21,25
54:18 55:18
59:9 305:5
**parts** 44:20
158:12 174:17
174:17 187:15
**pass** 162:21
236:4 239:15
239:19
**passed** 97:18
227:19
**passing** 252:12
252:20
**passive** 96:7,8
96:9,10 271:22
302:6,11,12
303:9 305:16
305:20,24
306:12
**passively**
301:23
**past** 10:4,5
98:8 109:14
137:20 167:5
170:11 235:7

**path** 35:20
70:14,15,19
71:24 100:22
103:5,14 255:5
258:9,20 259:3
266:4,15,16,23
267:2,11,15,16
271:17,18
272:20
**paths** 102:13
102:14 266:21
**pattern** 116:17
189:25 262:13
264:9
**pavilion** 55:3
56:4 95:15,18
129:22,25
130:4,11,25
131:5,7 132:15
132:16,22,24
134:19 136:15
136:23 141:3
141:12,25
142:2,15,18
143:2 145:6
211:18 221:7
281:18 282:19
283:8,16 284:2
284:22 285:2,5
286:12,21
288:19,24
289:13,17
290:15,23
291:23 292:25
293:17 294:8

294:21 295:3
297:19
**pavilion's**
293:12
**pay** 140:18
**paying** 204:8
**payroll** 140:5
289:24
**pdf** 285:11
288:18,23
291:18,19
292:25 299:15
**pedal** 100:12
**peer** 107:18
109:7 112:18
113:4,20 120:8
121:3 123:24
144:22 156:25
176:5,10,16
183:18 205:16
205:22,25
206:3 210:5
240:8,18 241:8
241:13 247:14
248:9,11,24
249:23 251:20
278:4,7
**peers** 70:3
108:4,5,7,9,23
213:25 247:24
**pending** 6:13
**pennsylvania**
4:18
**people** 30:16
46:22 51:2

66:8,10 71:12
75:14,18 78:16
80:8,9 81:8,9
98:17,24
101:12,12,14
101:17 109:25
110:25 130:12
135:3,4,19,23
135:25 136:2
136:20,21
138:15,16,18
138:21,21
139:13 140:19
207:16,18
209:25 214:25
216:6 218:16
253:17 255:7
274:17 275:15
283:14 284:5,8
287:2 288:3
294:24 305:10
**percent** 23:25
24:2 55:17
56:6,7,9 80:7
80:10,18 87:15
89:17,25 90:6
90:7 101:22,23
102:4 126:11
126:19 128:3
128:18,22
129:7 255:10
258:11,12
298:10
**percentage**
80:3,11 207:7

| | | | |
|---|---|---|---|
| 207:8 267:19 | 278:2 279:7,11 | 215:20 217:16 | **permutations** |
| 280:21 | 279:13,17 | 227:11 232:8 | 86:11,21 |
| **perfect** 125:21 | 281:2 286:13 | 238:3 243:15 | **persistent** |
| **perfectly** 192:2 | 294:9 299:17 | 244:7,11,17 | 276:12 |
| **perform** 123:3 | 304:3,6 | 245:3,4 246:3 | **person** 11:16 |
| **performance** | **performed** | 246:18 247:6 | 23:20 44:17 |
| 24:5 53:7 | 24:12 279:25 | 247:16,23 | 58:7 75:2 |
| 67:18 68:5,5 | **period** 19:10 | 248:5,17 | 86:19 90:24 |
| 108:11 109:6,6 | 25:10 56:23 | 249:25 250:5 | 140:24,25 |
| 112:13,14,17 | 57:11 59:4 | 255:16,19 | 142:8 215:22 |
| 114:6 120:6,7 | 61:4,7 73:5 | 258:17 276:23 | 220:4 253:20 |
| 122:22 123:6 | 81:18 86:19 | 277:19 278:21 | 253:20 |
| 123:10,17,25 | 96:25 97:6,25 | 279:3,12 280:6 | **personal** 137:5 |
| 124:20,21 | 100:15 109:5 | 281:3 282:13 | **personally** |
| 126:7,10,25,25 | 116:5,10 123:8 | 286:18 289:5 | 40:19 44:6 |
| 139:20 144:24 | 128:2 129:20 | 289:16,25 | 47:7,24 58:14 |
| 144:25 154:15 | 134:22 146:5,5 | 290:2 291:14 | 58:21 116:21 |
| 161:12 163:18 | 146:18,19,22 | 292:21 296:3 | 130:9 133:13 |
| 169:25 170:16 | 146:23 147:23 | 298:7 299:18 | 136:12 295:24 |
| 175:12,17 | 147:25 148:6,7 | 301:17 305:2 | **perspective** |
| 176:2,8,9,14 | 148:9 149:4,13 | 308:3,4 309:16 | 91:25 149:10 |
| 179:23 183:5 | 149:22 151:2,8 | 313:19 | **philadelphia** |
| 183:10,13,16 | 151:20,21,24 | **periodic** 73:22 | 2:4 4:17 |
| 183:17,24 | 155:6,14,23,25 | **periodically** | **philosophies** |
| 185:4,12 188:3 | 156:3 157:16 | 69:23 71:6,11 | 78:24 |
| 201:12 202:14 | 157:21 158:5 | 211:8 | **philosophy** |
| 203:4 204:16 | 161:22,25 | **periods** 114:5 | 78:9 137:6 |
| 205:22,25 | 168:20 170:18 | 159:18 176:18 | 271:17 |
| 206:3,9 225:8 | 171:7 185:7 | 176:18 189:4 | **phone** 17:13,15 |
| 242:16 247:12 | 189:13 190:6 | 235:13 247:24 | 17:18,24 18:14 |
| 247:22 248:8 | 199:6 200:24 | 249:25 258:23 | **pick** 26:12 |
| 248:10,15,23 | 201:14 204:24 | 258:25 279:18 | 48:16 101:3 |
| 249:18,21 | 205:17 206:17 | **permitted** | 138:19 139:2 |
| 251:20 257:22 | 210:10 214:13 | 240:7,18 | 159:13 |
| 276:19 277:16 | 214:17 215:12 | | |

picked  54:15
picking  141:21
picture  100:3
piece  92:12
    219:17
pieces  221:16
place  52:20
    92:3 106:9
    109:16 146:8
    149:6 153:9,23
    154:18 177:19
    177:25 196:18
    221:7 234:24
    238:3 242:8
    262:20 288:4
    298:5 313:12
placed  116:13
    243:6,9,10
    246:10
placement
    115:22
places  249:4
placing  181:16
    251:22
plaintiff  31:7
    34:21 36:16
plaintiffs  1:7
    2:3 4:8 10:19
    10:21 17:12
    22:11 26:19,25
    29:23,24 31:9
    32:5 33:8,10
    34:24 36:18
plan  23:4,25
    49:9,19 51:10

53:17 54:24
55:19 56:3
57:4,16,23
59:16 60:4
73:8,19,22
74:11,19 76:25
78:15,17 79:5
79:7,8 80:2,12
80:19 81:8,11
81:14,24 82:13
83:12 88:16
89:10 90:3
99:5,6 101:7
101:13,14
103:25 104:13
104:14,17
106:17 110:6,7
122:13 131:11
131:17,18,20
132:8,8 133:19
136:14 138:17
139:11,13
140:4,18,21,25
156:20 158:10
167:4,5,13
168:9 171:7
174:5 179:14
180:25 185:5
188:2,3 189:10
204:19 206:21
207:9,21
221:20 223:25
224:16 225:18
232:25 233:7
239:11 255:25

257:5 261:15
265:20 273:7
273:13,15,22
274:4,14,20,24
275:11,14
282:10 285:15
286:5,16 287:7
287:15,22
289:6,10 290:2
290:23 292:7
292:10,19
293:21,23
294:6,23,25
296:8,11,22
297:14,18
302:4 309:2,10
plan's  174:7
    175:17,23
    185:15,18
    206:25 216:13
    232:22,24
    256:2,5 274:24
    275:3,4 291:24
planned  85:5
plans  22:22
    55:8 61:22
    63:23 78:22,25
    79:18 82:24
    101:10 121:16
    134:4 140:7
    143:4 263:13
    273:10,24
platforms
    66:16

plausible
    205:24
play  79:22
    81:20 82:10
    106:4,23 107:6
played  295:3
please  5:3 6:11
    39:13 128:8
    187:21 236:10
    257:13 264:11
    307:18
pleased  271:24
plug  89:2,22,22
plus  104:12
point  8:7 14:15
    18:20 21:8
    22:8 25:3
    27:20 32:23
    38:24 47:11
    52:23 53:8
    54:4,4 56:2,10
    58:20 59:8
    62:4,21 83:4
    83:20,21 88:25
    95:6 96:24
    97:4 98:15,17
    101:20 111:22
    117:6 118:17
    118:21 119:11
    119:15 120:9
    120:23 121:3
    121:25 123:19
    127:13 133:8
    134:5 135:3
    149:8,12

**[point - printing]**

150:13 162:17
163:8,9 166:16
167:2,18 168:3
168:5,24 170:9
170:19 171:20
184:19 186:25
189:24 196:18
202:25 203:9
203:18 204:6
204:12 218:14
219:10 223:12
223:16 224:15
225:16 236:5
241:6,11,14
243:2,4 244:8
247:11 248:7
258:20 259:2
262:24 263:15
264:25 265:16
271:18 274:12
284:24 288:5
295:21 301:6,9
301:10 309:7
**pointed**  214:25
217:17
**points**  163:11
190:2 218:24
218:25 220:2,6
220:8
**policy**  7:21
109:20,21,23
110:5,9,10
111:9 223:7
224:3

**pool**  138:25
**poor**  204:16
**populate**  15:3
**portfolio**
306:13
**portion**  14:3
69:10 128:15
148:24 177:9
**position**  24:11
24:18 218:11
**positive**  87:7
**possible**  11:23
86:3,10 88:9
112:25 113:2
117:15 121:17
127:11 128:24
197:18
**possibly**  66:3
138:11
**post**  279:25
299:20
**potential**  102:3
183:23,23
**potentially**
123:14 169:17
169:21 226:14
236:15
**practice**  210:9
227:9,10 228:5
**preceding**
254:17
**precisely**  27:13
**prefer**  66:9
229:11

**preference**
221:21
**preferred**
68:10 93:3,19
93:23 209:4,9
**preliminaries**
6:7
**preliminary**
44:23
**preparation**
8:14,19 9:4,8
9:16,21 17:6,8
44:4 46:8
197:3
**prepare**  7:10
7:18 135:5
277:10,11
**prepared**  7:15
261:13
**preparing**
13:15 16:21
17:25 44:6
184:13 224:12
234:9 254:20
**present**  2:14
67:20 104:22
146:25 249:5
272:7
**presentation**
219:14
**presentations**
71:17
**presented**
67:17,19
104:25 141:17

**200:21 216:15**
216:22 217:20
218:5,6 260:18
260:22 266:12
270:25 276:3
**president**  23:5
53:24 54:3
**presumed**  8:24
**pretty**  64:16,23
65:17 75:24
101:23 102:15
144:18 145:3
173:12 187:12
192:22,23
217:9,14 219:8
235:8 280:5
298:11 299:2
306:8
**prevalent**
52:13
**previous**  178:7
181:19,20,23
292:3
**previously**
115:5
**price**  90:13
92:17 96:5
**pricing**  99:8
**primarily**  68:8
142:9 143:2
**primary**  27:10
**principal**  70:5
**printed**  11:17
**printing**  144:8

**[prior - program]**

**prior** 13:2,5,7
13:10,12 18:22
19:20 49:4,8
49:10 53:10
96:25 153:10
153:10,14
155:5,13
157:16 216:15
217:16 218:9
235:21 237:23
238:17,19
242:21 259:4
295:24 304:20
313:8
**private** 39:6
**privileged**
32:24
**proactive** 264:3
**proactively**
264:5
**probability**
79:24 90:23
**probably** 7:23
9:12 13:4 14:6
15:20 18:17,17
21:17 22:6
25:7 29:4 51:5
57:5 59:2,4
62:14,22 63:3
63:3,4 65:25
66:22 67:22,24
69:16 72:9
80:10,16 87:9
90:2 92:21,24
93:7,12 96:12

97:5,22 98:5
98:11 99:16
102:8 103:10
109:13 113:8,8
114:11 118:6
119:16 120:10
124:9 129:3
131:3 133:15
133:20,20,21
133:22 134:6
134:10 135:3
136:8 144:16
148:4 179:13
180:19 193:10
216:21 217:10
236:23 250:13
252:7 255:5,11
274:6 278:10
284:20 294:22
295:18 305:2
305:14
**problem** 31:14
48:10 97:8
117:22 124:4
124:12,15
137:23 161:14
164:25 170:24
173:23 192:19
194:17
**problems**
110:25 138:9
**procedures**
225:12
**proceed** 39:25

**proceeding**
4:23 311:4
**proceedings**
313:15
**process** 14:6,14
17:24 18:14
22:4,15 23:2,7
23:16 24:8,14
24:17 26:3
28:7,11,14
32:11,13,14,15
32:18,19 34:7
34:11 35:25
36:9 37:11,16
41:20 45:23
48:14 52:20
53:4 59:6,12
59:14,21,23
75:4 76:4,5
77:13,14,23
78:11,14,18
91:14 93:13
103:16,17,18
104:18 121:23
121:24 126:3
135:11 136:6
137:4 138:2,5
138:9 139:8
141:16,21
147:12,23
150:23 151:13
151:19 153:4
153:22 155:21
156:21 158:12
159:2 161:8

164:12 165:4
166:21 168:6
168:17 169:2,9
169:10 170:25
174:8,16
185:24 197:21
209:14 210:2,9
211:9,14,23
212:14,25
213:4,6,7,8,10
213:12,19,20
213:23 214:8
214:19 227:13
228:25 240:17
240:25 251:19
297:25 304:16
**processes** 60:2
83:17 94:10
105:14 139:4
151:6 175:10
217:7
**produce** 143:21
**produced**
143:20
**product** 27:10
68:17,18 72:17
109:2
**products** 72:14
93:12 131:3
142:11
**profiles** 224:22
**profit** 23:4,24
292:19
**program** 88:15
91:8 92:16,19

**[program - q1]**    Page 54

112:6,16

**project**  61:14
61:19,24 79:24
80:19,23 265:4

**projected**
99:23

**projecting**
113:17

**projects**  61:20
88:9 296:9

**promoting**
130:23 174:8

**pronouns**
180:21

**proprietary**
27:10 30:5,22
52:25

**protecting**
100:7

**provide**  19:17
19:19 25:17
29:22 31:6
32:10 34:21
36:16 41:7,14
43:13,18 60:4
63:9,12,18
64:14 71:6,17
71:21,23 72:9
72:13,18,23
73:11,13 74:4
109:4,8 138:3
169:2 174:5
214:8 224:20
225:5 263:7,9

**provided**  10:6
10:9 14:22
19:14,24 27:9
29:12 30:23
31:3 33:8
37:10 41:17
54:7,12 55:16
61:9,16 62:9
63:8,13 74:7
76:20,21
106:16 111:5
134:15,20
160:5 195:24
208:19 211:18
214:22 216:13
219:3 252:3
263:2,15
296:25 313:18

**providers**
209:15 211:6
225:17,23
272:3

**provides**
131:24

**providing**
22:19 29:7
34:10 38:19
55:5,12,13
56:15,19 73:2
97:15 133:14
137:11 145:2
153:24 213:2
245:7 294:17
294:18,25

**proximity**
102:15

**proxy**  113:10
113:11

**prudence**  22:3
22:15 28:17
82:11 91:24
308:13

**prudency**
214:6

**prudent**  51:24
52:3,7 60:17
81:17 82:8
137:14 145:20
150:23,25
212:6 227:8,23
228:6 309:2

**prudently**
224:22

**psa**  53:10,17,25
55:11 56:8,9
56:18,19 58:4
58:21 60:16
61:9 64:11
95:15 129:19
129:21 132:22
136:11,16,23
141:24 142:12
142:18 145:5
211:18 221:6
309:16

**public**  1:18 5:7
32:23 130:17
312:25 313:6
317:19

**pull**  16:11
171:22 241:21
257:11 264:10
265:12 266:7
270:11 281:24
299:3 307:17

**punch**  274:20

**purely**  18:3

**purpose**  73:2
74:23 154:25
165:18 174:5
222:24 275:9,9

**purposes**  87:2
278:22

**pursuant**  1:17
175:19

**put**  34:4 42:23
105:24 110:14
111:7,20,25
113:15 118:2
118:12 119:21
120:2 136:3
149:7,14
169:24 170:24
187:16 203:20
229:21 259:18
288:3 299:11

**putting**  14:18
90:6 117:20
118:11 259:22

| q |
|---|

**q1**  150:7
257:12,14,17
257:18 264:12
264:16,18,19

**[q1 - ran]**

276:23 277:3
279:6,8 300:13
301:7 314:12
314:15
**q2** 300:18
301:13 304:21
**q3** 240:20
247:8 300:2,5
300:22 301:15
**q4** 241:22,23
242:8,17,18
243:16 244:22
257:16 266:12
276:23 279:4
300:11 301:4
314:10
**qdia** 73:7
206:21,25
207:7 296:22
**qirs** 254:2
**qpa** 208:19
224:16 233:14
234:14 235:2
236:13 263:18
**qualitative**
67:25 83:18
104:21,24
106:5,19,21
107:8 188:4,12
254:8
**quality** 63:7
134:14
**quanta** 1:9
2:16 4:8 5:16
162:4 261:15

316:4 317:1
**quanta's** 161:8
**quantitative**
67:24 68:2
74:2 76:9
104:21 107:17
164:15 188:5
188:12
**quarter** 41:5
70:23 107:12
107:12 109:12
115:21,25
116:6,8,14,24
117:3,5,5
118:3,6,7
119:5,17
120:13 124:3
149:25 167:25
168:5 169:6,11
169:14 170:22
176:17 186:9
186:14,21
197:9 200:16
201:18 206:15
242:2,3 243:11
247:15 249:24
250:16,18,20
258:6 270:12
270:16 295:19
298:10 299:21
**quarter's** 260:3
**quarterly** 7:22
41:3 43:13
68:4 69:19
73:12,14 74:4

82:15,18 135:2
146:17 187:24
200:20 214:21
215:15 216:12
217:21,22
238:16 251:4,7
251:11 252:4,6
276:3 294:18
304:6
**quarters** 121:9
122:2 168:3
169:16 171:11
186:5 189:18
190:7 200:18
201:4 276:22
301:18
**quasi** 30:6
33:16
**question** 3:8
6:13,14,20,21
22:14 61:11
119:22 136:11
153:17 154:17
159:19 168:18
169:10 172:8
184:20 199:25
204:13 207:25
211:16 215:9
215:18 216:24
223:10 228:16
231:2 233:9
236:12 239:7
246:16 247:3
272:22 275:18
280:21 293:7

**questions** 41:15
41:20 76:14
77:15 82:6
112:3 126:6
155:7,22 161:4
199:24 310:9
**quick** 112:6
114:9
**quite** 15:4 22:9
104:16 106:25
111:17 138:19
139:5 143:24
178:13,18
207:16 213:23
251:6 274:5
**quote** 15:17
47:11 70:19
97:13 209:5
227:7 228:4
249:20
**quoted** 179:5
**quotes** 48:16
**quoting** 107:19

**r**

**r** 2:2 68:21
115:2 313:1
**rabbit** 125:15
**raise** 112:2
223:4 259:17
**raises** 111:22
119:21 154:17
**raising** 226:17
239:7
**ran** 49:25
54:25 55:23,24

56:3 97:10
148:10 168:21
239:12
**range** 62:8,15
62:23 63:23
65:14 77:7
101:21,24
102:16,18,21
133:19 134:3
134:13 137:16
137:16 138:13
**rank** 123:23
179:16
**rare** 109:15
**rate** 62:18
89:11,25 95:23
96:16 125:5,5
125:6
**rates** 79:15,17
176:15 247:13
249:22
**rather** 52:14
65:6 181:9
191:25 213:14
255:18 273:12
**ratio** 65:12
66:9,10,10,11
66:13,24 67:4
67:5 68:16,21
183:21 240:9
241:9 244:10
**rationale**
194:11 195:4
198:18 206:7

**rationalization**
192:21
**ratios** 65:12
66:12 67:12
72:2 243:14
269:19,24
**raw** 68:4
207:10
**reach** 126:14
127:2 150:24
226:15 230:4
**reached** 168:11
191:19 273:25
**read** 7:19,20,21
8:9,11,14,19
10:10,13 11:3
11:4,13 44:10
44:11,12 45:8
46:6 48:3,18
69:10 128:10
128:15 146:15
148:24 177:9
179:22 180:10
180:23 186:15
186:18 192:20
197:21,24
198:4,6,8,9,10
198:15 242:22
252:21 272:15
316:9 317:5
**reading** 11:9
45:2 148:23
179:25 180:20
237:10,14

**reads** 159:12
**real** 75:13 92:2
105:17 108:23
108:24
**realistic** 196:19
**reality** 217:2
**realize** 138:19
212:11 274:13
**realized** 184:8
**really** 12:6
16:22 75:17,22
76:5 79:4,11
81:17 94:7,14
98:2 99:4
103:7 110:20
118:6 125:9
141:10 160:7
170:24 186:23
192:23 213:13
213:14 262:9
309:5
**realtime** 108:24
**reason** 7:6
19:22 54:13
72:24 128:23
157:10,11
161:7 167:6
170:13 202:11
202:12,16
203:21 252:15
253:3,21 258:5
258:21 283:21
286:20 290:21
291:3,5 312:6
316:11

**reasonable**
23:3,24 81:15
104:10 110:13
118:10 121:15
147:12,22
151:6,13 153:3
207:24
**reasonableness**
151:19
**reasonably**
306:12
**reasoning**
272:2
**reasons** 84:13
84:15 95:12
139:7 143:4
157:9 178:10
178:16 182:3
182:15 194:25
287:18
**rebuttal** 8:11
46:20
**recall** 11:9 12:4
12:22 20:6,9
20:14 22:12,19
23:9 31:22
33:7 34:25
36:11 41:13,18
43:5,16 45:9
50:22,23 51:23
53:3,5 54:6
59:25 60:2
63:24,25 96:20
112:9 116:16
143:13 153:14

161:5 170:10
170:17 197:17
199:18 211:3
214:13 218:7
235:25 238:22
243:3,5,8
244:3,18
256:17 257:9
258:24 261:7
275:24 281:16
296:13,21
297:22 298:12
304:4,9
**receipt** 316:17
**receive** 252:12
**received** 15:17
28:4 30:16
41:25 42:3
77:3 163:23
166:12 215:14
**receiving** 251:4
251:10,13,16
253:24 254:3
262:17
**recent** 176:16
247:15 249:23
**recess** 12:16
50:10 69:4
114:15 148:19
177:4 230:21
281:12 306:25
**recognize**
193:17 276:11
283:2 287:9

**recollection**
15:16,21 16:15
29:11,16,17
35:5 37:18
42:11 60:8
96:17 166:5
198:12 220:7
237:12,22
265:8 296:17
297:13 298:16
303:25
**recommend**
93:15 95:10
98:6,12 210:17
**recommendat...**
30:21
**recommendat...**
23:22 211:21
**recommended**
93:2 297:4,6
**recommending**
27:15
**record** 4:24
5:21 12:8,11
12:15,18 28:5
39:22 50:6,9
50:12,16 69:3
69:6,10 114:12
114:14 115:9
128:15 131:15
131:22 148:15
148:18,21,24
154:19 155:12
177:3,6,9
219:20 226:8

228:14 229:25
230:5,20,23
236:8 237:21
276:5 281:11
281:14 306:24
307:3 308:12
309:10 311:11
**recorded** 4:3
65:21 311:4,6
**recorder**
150:10
**recordkeeping**
21:3,5 27:21
28:3 308:11
309:9
**recreate** 16:6
**recurred** 96:14
**recurring**
96:13
**redone** 192:17
**reduce** 309:17
**reduced** 313:13
**refer** 78:16
161:16 179:22
215:6
**reference** 47:11
111:21 169:7
180:23 231:16
238:13 242:20
**referenced**
233:9 238:11
316:6
**references**
146:4 172:17

**referencing**
100:22 238:14
**referral** 59:17
59:18
**referred** 27:8
78:22 180:17
242:3
**referring** 13:20
13:23 26:23
146:20,21
147:16,17
169:14 194:6
233:5,23
243:22 249:15
**refers** 179:13
180:14
**reflect** 199:17
228:23 229:15
229:18 230:5,7
238:20 273:25
**reflected** 42:17
199:23 201:19
238:25
**reflecting**
112:17
**refresh** 29:10
46:12 237:11
265:7 296:17
298:16
**refreshed**
237:22
**refused** 137:19
**regard** 48:14
51:13 106:4
126:6 135:13

[regard - report]                                                Page 58

160:12 182:11
304:6
**regarding**
219:20 232:8
254:12 304:2
**regardless**
203:19 204:11
220:3
**region** 25:5
**reimburse**
140:19
**reiterates**
221:16
**relate** 246:18
247:5
**related** 28:7
55:5 105:11
107:25
**relates** 95:17
185:15 244:2
246:3
**relating** 149:16
**relationship**
132:13,14
164:23 282:20
284:12 289:22
293:16 295:20
297:20 298:8
**relationships**
130:8,10
132:21,21,24
133:6,22
**relative** 77:11
170:7 179:23
204:25 262:11

277:16
**relevant** 44:13
45:5 48:12
108:14 146:4
146:18,19
153:16 155:24
158:4,5 188:4
188:5 214:13
214:17 215:12
215:20 219:2
244:17 245:2
**relied** 40:16
42:18
**relies** 232:22
**relying** 207:21
261:18
**remain** 133:2
178:12 182:5
186:4
**remained**
271:24
**remember** 8:13
10:8 11:6
15:24 20:17,25
22:7 24:25
25:2,3,6,9,15
28:15 29:25
31:11,16,18
32:21 33:11,18
35:8,13,16
36:7,19,24
37:5,7,10 43:3
51:2 52:22
58:19 60:11
66:25 67:22

72:10 131:13
137:21 152:14
153:11 158:18
184:18,20
193:20 195:14
197:8 199:5,8
216:5 218:7
255:12 296:7
304:8
**remembering**
35:11 37:3,8
71:3 143:23
**remembers**
199:2
**remind** 241:2
298:6
**remit** 168:16
**remote** 1:16 4:4
311:7
**remotely** 5:2
**removal** 63:19
121:11 189:5
190:10 287:14
287:19,23
297:5
**remove** 107:4
122:19 157:7
157:12 170:14
202:7 208:7,9
229:21 286:17
297:6,10
**removed**
122:13 138:6,7
157:2 168:8,13
171:6,16,20

302:4,8
**removing** 32:8
**repeat** 128:8,14
283:22
**rephrase**
128:13
**replace** 60:5
80:12 188:6,23
260:9
**replaced**
178:12 182:5
304:15
**replacing** 60:9
**report** 5:19
7:19 8:11 9:23
10:2,6 11:18
13:16 14:4,5
14:16,23 15:10
15:14,18,23
16:10,16,21
17:7,25 18:15
18:16,18 19:2
21:18 22:19
24:16 26:16
28:10 29:5,10
34:20 39:13,15
39:20,20 40:3
40:10 44:6
46:8,20,21
47:4,8 48:2
49:4 53:16
62:10 65:9,11
66:4,8,17 68:3
68:17,18,20
69:13,23 70:22

| | | | |
|---|---|---|---|
| 77:3,9 82:15 | 244:23 245:13 | 250:21 256:5 | **requests**  41:13 |
| 106:12 107:7 | 250:11 252:7,8 | 284:17,24 | **require**  111:10 |
| 110:13 140:9 | 254:9,12,12,14 | 294:18 | 115:22 121:10 |
| 140:13 146:3,8 | 254:15,20,21 | **reports**  7:23,23 | 209:18,22,24 |
| 147:6 148:2,10 | 254:24 256:2 | 10:14,22 11:2 | 210:5,6 219:9 |
| 149:22 150:12 | 256:10,14 | 11:10 41:3 | 220:12,14,17 |
| 150:15 151:16 | 257:2 259:7,8 | 43:14 64:22 | 220:20,24 |
| 152:13,25 | 260:12,23 | 68:22 72:19 | 221:4 |
| 155:17 158:14 | 261:2 265:17 | 75:15 76:20,24 | **required**  34:3 |
| 158:16,17,20 | 267:12 270:7 | 135:2,5 197:17 | 39:4 227:3,7 |
| 159:4,9 160:23 | 276:8 277:8,12 | 197:22 238:17 | 230:3 317:13 |
| 161:17 165:8,9 | 286:14 287:13 | 238:19 251:5,7 | **requirement** |
| 165:12 166:9 | 290:4,5 294:10 | 251:11 252:4 | 104:4 |
| 167:21 171:13 | 314:5 | 260:4 263:2 | **requires**  83:7 |
| 172:18 173:10 | **reported** | 276:4 | 241:9 244:9 |
| 183:10 184:14 | 159:10 201:22 | **represent**  5:16 | 247:19 252:10 |
| 187:19,20 | 236:13 245:8 | 195:16 247:8 | 253:6 |
| 190:23 194:18 | **reporter**  1:18 | 266:11 308:9 | **reread**  8:8 |
| 195:17,24 | 4:18,22,25 5:3 | **representing** | **reroute**  129:17 |
| 196:5,12,15 | 68:23 313:5,19 | 229:5 | **rerun**  73:21 |
| 197:4,4,16 | **reporting** | **reputation** | 82:16,17 83:4 |
| 198:14 199:16 | 59:12 64:12,17 | 287:4 | 83:21 |
| 200:5 202:19 | 67:13 69:21 | **reputational** | **research**  58:6,7 |
| 203:2 206:20 | 106:6 109:4 | 106:2 | 58:9 135:4 |
| 208:18 216:9 | 110:20 111:2,4 | **request**  41:10 | 142:8 |
| 221:12 223:18 | 123:18 135:4 | 261:14,19 | **reserved**  3:8 |
| 223:21 225:8 | 142:19,20,23 | 265:10 | **resolved** |
| 226:2 231:15 | 142:25 143:9 | **requested**  43:5 | 203:13,15 |
| 231:18 232:10 | 143:12,15,16 | 69:10 128:15 | **resonate**  48:9 |
| 232:15 233:25 | 143:19 144:3 | 148:24 177:9 | **resources** |
| 234:10,11 | 144:19,22,23 | 261:23 262:19 | 143:7 |
| 235:25 236:9 | 159:14 160:4 | 265:9 313:17 | **respect**  36:8 |
| 237:2,25 | 161:12 162:7 | 313:17 | 37:12 60:15 |
| 238:25 239:9 | 163:7 172:21 | **requesting** | 70:7,10,25 |
| 242:3,24 | 235:6 250:20 | 261:7 | 74:10,18 76:19 |

132:20 136:4
136:13,22
153:20 154:4
159:23 160:20
165:5 167:22
259:9 297:2
**respective** 3:4
**respond** 214:5
**response**
  127:15,16
**responsibilities**
  51:13 223:23
  224:9 289:23
**responsibility**
  132:2,10
  136:19 137:8
  160:17 219:4
**responsible**
  51:15 130:7,15
  132:23 133:3
  142:9 265:20
  284:12
**rest** 284:21
**rests** 79:4
**result** 24:13
  255:25 260:7
  261:8
**resulted** 171:19
  255:2 259:8
  260:7
**results** 226:10
**resumed** 20:3
  115:5
**retain** 188:6,23

**retained** 11:20
  11:23 12:22,23
  13:2,5,8
**retainer** 61:12
  61:16 62:2
**retaining** 32:8
  35:25 36:2
  37:12 82:12
  142:5
**retention** 13:11
  13:13 34:8,12
  62:18
**retire** 102:22
**retired** 26:8
  33:16 39:8
  130:5
**retiree** 88:20
**retirement** 61:2
  72:6,7 80:4
  87:14 89:22
  98:22 99:2
  101:18 102:25
  103:22 104:10
  136:2 181:6
  275:17 282:10
**retiring** 133:7
**return** 113:2
  176:15 179:16
  183:20 224:21
  241:14 247:13
  249:22 308:21
  316:13,16
**returns** 28:24
  65:10,11 68:15
  71:25 86:15,16

86:17,18,22
88:9,10,21,25
90:10 94:12
99:24 100:13
113:5,7,22
210:6 251:23
252:3 266:2,3
267:24 268:4,8
268:12,21
269:20,22
276:25
**reuters** 254:14
  254:15
**revenue** 28:4
  140:15
**reverse** 47:9
  49:8
**review** 9:25
  10:3 15:7
  40:19,23 41:4
  41:8 42:16
  43:6 44:4,7
  67:18 74:8
  135:5 149:16
  149:17 152:17
  152:24 166:20
  166:25 167:20
  173:9 175:9,9
  177:21 187:25
  191:7 198:11
  199:2 200:21
  208:18 209:19
  216:12 238:16
  251:8,9 254:19
  256:8 265:4

271:24 275:21
308:8 313:16
316:7
**reviewed** 9:22
  12:23,25 42:3
  42:20 149:19
  149:20 150:2,6
  157:8 191:10
  193:14 195:12
  195:18 197:2,7
  255:23 271:13
**reviewing**
  183:6 186:16
  209:14 242:13
  252:22 258:4
**reviews** 214:21
**revised** 193:15
**rewrite** 110:18
**rfi** 209:6
  210:18 212:9
  212:15
**rfp** 32:14 59:21
  59:23,25 60:3
  60:9 208:23
  209:3,5,8,13
  210:18 211:2
  212:9,12 213:9
  213:23
**rhythm** 6:16
**rich** 43:25
  46:23 217:14
**richer** 209:10
**riddle** 46:14
  261:10

**[ride - saying]**

**ride** 88:3 97:23
98:4
**right** 9:23
10:11 19:22
26:12 29:20
39:9 50:18
51:17 61:2
66:23 71:4
74:5 76:22
77:23 79:7,8
85:14 88:2
98:25 119:12
120:14 122:24
127:10 129:12
140:5 143:23
150:8 155:17
173:6 175:4,7
196:24 200:9
201:22 202:15
205:4 222:7
223:22 231:25
234:4 240:2
242:5 243:12
249:18 253:4,8
254:17 270:16
273:14 274:25
279:15 289:10
289:13 298:20
300:5 308:6
**rigorous**
213:16
**ring** 16:13
**risk** 65:11 67:3
68:15 105:18
106:2 144:25

183:19 210:6
224:21 241:13
255:8 259:23
266:2 268:21
**riskier** 255:2
**rmd** 39:5
**road** 312:2
**roberts** 2:5 5:9
9:11 74:13,20
122:14 128:6
139:21 155:19
157:17 163:20
166:23 172:6
180:11 198:21
212:10 219:23
227:25 230:14
281:9 287:24
291:2 310:10
316:1
**robust** 64:16
139:3 217:15
**role** 24:18,21
27:15 45:13,22
49:23 50:20,24
51:9 52:5 53:9
130:4,22 131:6
136:4 168:25
208:15 289:20
293:12,17
295:3
**roles** 51:18
224:9
**roll** 33:24
55:19 101:15

**roller** 98:4
**rolling** 118:9
125:12
**rollover** 39:3
**room** 140:13
211:7
**roughly** 80:7
**routes** 86:3
**row** 86:16
**rowe** 90:13
92:17 96:5
**rule** 189:19
**rules** 140:22
**run** 25:21
77:18 80:25
85:19 86:4,12
86:23 89:5,10
89:14,24 90:10
90:11,15,18
91:2,4 92:16
92:19,20 93:5
93:7,11 110:24
112:16 232:19
255:15
**running** 29:8
49:15 86:20
112:24 113:18
113:19,20,21
**runoff** 255:7
**runs** 92:21
146:25 148:6
**rupp** 46:14
48:17
**russell** 113:11

**s**

**s** 2:2 5:6 115:2
115:2,2,4
281:21,21
312:6 314:2
315:2
**s&p** 23:25
276:17 277:2
298:18,19,22
299:7,15
301:22 302:15
303:3 315:9
**salient** 14:10
66:7 69:17
**satisfactory**
84:21
**save** 104:8,15
275:16
**saving** 81:9
**savvy** 138:20
138:22
**saw** 43:11
214:24 217:16
261:24 283:12
**saying** 23:6
27:14 60:14
67:10 75:24
84:2,6 117:20
120:11 128:16
143:18 146:22
155:9 164:4
176:23 178:15
178:19 180:15
183:22 186:17
186:18 188:16

| | | | |
|---|---|---|---|
| 188:16 194:9 | 261:12 262:9 | 237:6,13,16,22 | 181:14 182:19 |
| 226:16 246:9 | 262:14 264:23 | 237:25 238:9 | 185:10,11 |
| 246:22 247:18 | 271:13 276:16 | 238:11,20,24 | 187:6,19 |
| 248:19,25 | 282:19,20 | 239:3,15,25 | 241:11,14 |
| 249:3 257:7 | 286:3 303:14 | 240:7,17 | 243:13 247:5 |
| 264:4,8 273:11 | **scenario** | 243:19 244:3 | 251:18 266:25 |
| 273:16 294:19 | 124:19 | 245:21 246:13 | 270:15 285:12 |
| 302:8 | **schedule**  282:5 | 246:19 247:7 | 295:19 298:9 |
| **says**  87:17,19 | 285:10,17,19 | 247:21 248:8 | 299:21 |
| 101:6 110:11 | 288:23,25 | 249:9 251:2,9 | **section**  15:4 |
| 111:15,17 | 291:20,22 | 251:24 252:5 | 245:24 246:3 |
| 121:21,22,22 | 293:5,25 294:2 | 252:10 253:6 | **security**  38:25 |
| 125:18 147:10 | 294:15 | **screens**  97:18 | 80:14 87:15 |
| 151:5 174:4,22 | **schlichter** | 98:8 | **see**  19:8 21:17 |
| 174:23 175:6 | 26:24,25 30:2 | **scrutinize** | 21:19 26:17 |
| 175:15 176:2 | 35:3 | 276:12 | 36:21 43:10,11 |
| 176:14 177:18 | **score**  145:6 | **scrutiny**  73:8 | 43:15,25 45:21 |
| 178:8 179:3,19 | 163:4,8,12,12 | 83:2,7 84:2,25 | 46:16,17 85:20 |
| 179:19,24 | 163:16,25 | 85:7 117:21 | 86:25 87:10 |
| 180:3,15 | 164:7,8,10,16 | 129:11,14 | 94:8 105:11 |
| 181:14,21,25 | 236:7 252:12 | 206:25 207:5,6 | 108:14,19 |
| 182:6,14 183:4 | 252:20 | 207:23 208:3,4 | 109:8 113:24 |
| 185:12 186:2 | **scorecard** | 239:14 296:25 | 116:2 118:9 |
| 187:6 188:21 | 163:5 | **se**  192:6 209:3 | 119:25 121:2 |
| 188:24 189:3 | **scores**  162:20 | 249:8 | 121:21,21 |
| 189:12 201:2 | 163:19 | **sealing**  3:5 | 124:7,14 |
| 201:17 203:12 | **scoring**  65:4,5 | **search**  30:12 | 130:20 144:8 |
| 221:14 224:18 | 65:6 125:6 | 165:15 | 147:13 155:11 |
| 225:8,12,17,21 | 143:14 145:4,7 | **season**  85:23 | 157:23 162:11 |
| 237:6 238:8,13 | 145:15,24 | **second**  27:21 | 162:21,23 |
| 240:15 241:7 | 162:2 166:6,13 | 35:20 54:12 | 164:8 166:10 |
| 241:19 242:7 | 167:7 233:14 | 68:24 112:6 | 167:7 172:22 |
| 246:7 247:2,11 | 234:15,20,23 | 146:10,16 | 174:9 175:20 |
| 249:19 251:19 | 235:10,21 | 154:22 172:4 | 176:5,13,19 |
| 252:10 257:19 | 236:11,17,24 | 175:15 178:8 | 177:11,22 |

| | | | |
|---|---|---|---|
| 182:23,25 | 258:24 | **self** 74:24 | **series** 71:14 |
| 183:3 186:9 | **seem** 112:2 | **send** 15:8 | 77:16 78:21 |
| 187:9 188:7 | 121:4 155:9,10 | 263:18 | 79:3,10 80:2 |
| 189:5 200:13 | 191:25 192:19 | **sends** 170:9 | 81:6,12 83:10 |
| 200:18,24 | 226:2 244:15 | 263:19 | 87:22 91:18 |
| 201:8 202:8 | 250:9 262:22 | **sense** 38:10 | 100:4 194:20 |
| 208:12 216:16 | 272:22 | 73:15 91:25 | 255:17 272:17 |
| 222:4 224:4,8 | **seemed** 251:17 | 101:10 125:8 | 303:4 |
| 224:13,14,18 | **seems** 33:17 | 148:5 155:23 | **serious** 141:14 |
| 224:23 225:7 | 99:14 175:4 | 192:24 195:20 | **seriously** 76:18 |
| 225:11,16,20 | 214:19 226:24 | 204:3 206:8 | 137:22 |
| 228:14 233:2 | **seen** 43:2,18,18 | 218:14 226:19 | **serve** 19:11 |
| 235:24 237:9 | 94:9 95:4 | **sensitive** 208:5 | 20:6 49:10 |
| 239:17 240:21 | 124:24 183:22 | **sent** 262:6 | 53:10,12 57:4 |
| 242:7 243:16 | 183:25 274:16 | 316:14 | 58:21 131:7 |
| 247:16,17,25 | **select** 97:16 | **sentence** | 165:18 |
| 248:5 249:16 | 144:7 156:5 | 146:16 151:25 | **served** 10:2 |
| 250:2 251:25 | 207:13 | 175:15 176:13 | 18:22 19:3,6 |
| 252:16 256:6 | **selected** 51:21 | 176:20 177:18 | 19:11 50:17 |
| 256:13 257:19 | 82:11 153:9 | 179:5,18,19 | 58:15 67:20 |
| 261:3,16 | 154:18 156:4 | 180:10 181:14 | 74:16 104:23 |
| 262:10 265:21 | **selecting** 35:25 | 182:14 185:11 | 129:20 131:9 |
| 266:5,20 267:6 | 36:9 37:12 | 187:6 189:3 | 131:20 299:19 |
| 270:25 272:3 | 52:18,21 82:9 | 225:20 243:13 | **service** 26:8 |
| 272:25 273:5 | 142:4 224:15 | 261:12 270:23 | 59:8 63:10,14 |
| 276:13,19 | 224:19 | **separate** 54:19 | 63:15 134:20 |
| 277:5 282:11 | **selection** 23:8 | 55:22 139:24 | 137:10 209:15 |
| 282:14,23 | 34:7,12 63:19 | 212:12 250:20 | 211:6 225:17 |
| 285:14 286:3,9 | 73:16 77:13,21 | **separately** | 263:10 |
| 288:16 289:5,7 | 78:2,5,14,18 | 54:22 187:9 | **services** 1:9 |
| 291:12,16,23 | 79:23 91:13,14 | 250:25 | 2:16 4:8 5:16 |
| 292:3,7,21 | 93:18 154:20 | **sequence** 88:10 | 19:20,24 25:17 |
| 294:5 | 155:3,21 219:5 | **sequences** | 27:8 38:12,19 |
| **seeing** 170:11 | **selections** 24:9 | 113:2 | 54:8,13 55:5 |
| 170:17 197:17 | 51:16 | | 55:11,12,16 |

**[services - six]**                                                                Page 64

56:15,20 60:4
61:10,17 62:9
63:7,11 133:14
134:14 208:19
208:24 211:18
213:2 225:22
308:13 316:4
317:1
**servicing** 58:9
**serving** 131:10
283:19 308:5
**set** 29:7 109:24
140:18 194:7
210:14 223:24
258:15
**sets** 137:16
138:13 224:8
224:10
**settled** 26:15
36:6 59:11
**seven** 16:3
**several** 8:17
27:19 42:5
58:7 82:23
96:20 146:4
222:6,15 280:7
293:4 300:9
303:7
**shah** 2:2 13:20
15:12 37:19,20
37:23
**share** 39:17,18
207:10 255:20
264:16 266:8
291:11

**shareholder**
130:3
**sharing** 23:4,25
140:15 292:19
**sharp** 68:16
**sharpe** 65:12
66:9,10 67:4
**sheet** 219:10
312:1 316:11
**shell** 26:21 27:2
27:17,19
**shift** 132:10
**ship** 294:12
**shop** 143:25
**short** 113:16
115:12 129:5
194:3 242:19
**shorthand** 1:18
313:5,12
**shortly** 10:3
**show** 66:2
68:10 85:25
103:22 141:18
144:12 146:7
158:19 198:23
208:8 260:3
**showing** 24:4
75:23 159:15
162:12,19
164:10 205:18
258:15 264:2
299:13
**shows** 44:23
86:2 201:5
259:4 266:14

266:20 288:19
292:25
**side** 24:2 141:2
**sign** 316:12
**signal** 170:10
**signature**
313:23
**signed** 3:11,14
12:2 15:11
16:10 57:12
172:16 184:17
216:6 295:22
297:24 304:25
316:19
**significant**
152:6 194:2
202:4,24
203:16 235:19
256:4
**signs** 201:5
**similar** 15:25
35:21,21 54:13
67:7 108:15
121:6,18
125:25 136:10
263:2
**similarly** 277:4
**simple** 85:18
103:20 125:7
**simply** 139:19
197:25 229:19
259:14 262:14
263:17
**simulated**
112:7

**simulation**
82:17 85:14
86:9 87:16
88:8 90:10
97:9 112:19
**simulations**
80:20 81:2
85:20 86:4
112:9
**single** 40:20
41:4,5 42:24
44:16 67:23
91:12 106:9
115:21 116:24
117:3 127:16
137:25 188:10
191:13,16,23
192:16 194:19
197:3,15,18
210:23 211:3
211:13 219:9
221:5 277:18
277:19 309:14
**sir** 165:9
**sitting** 16:7
150:14 158:23
159:20 165:24
211:7 212:22
219:12 258:22
290:22 295:3
**situation** 12:21
15:11 116:12
129:12
**six** 5:25 6:2
16:3 48:16

**[six - speculate]**                                                    Page 65

| | | | |
|---|---|---|---|
| 51:5 93:6<br>94:18 97:11<br>189:18 190:7<br>293:10<br>**sizable** 52:14<br>**size** 25:4 62:8<br>62:19,22 63:6<br>133:19 137:17<br>**skeptical**<br>125:11<br>**skill** 137:16<br>138:13 210:14<br>**slice** 108:22<br>**slightly** 45:20<br>133:23 189:15<br>193:11 205:7<br>302:20<br>**slocum** 282:23<br>283:3 284:19<br>**small** 57:8<br>62:10 64:2<br>103:12 133:19<br>133:21 134:16<br>242:11 306:5<br>308:22<br>**smaller** 22:22<br>64:3 139:5<br>**smallest** 62:13<br>**smooth** 88:3<br>**smoother** 100:4<br>100:19<br>**snapshot**<br>103:15 108:10<br>**snyder** 31:5 | **social** 38:24<br>80:14 87:15<br>**software** 235:5<br>**sold** 55:2 56:3<br>62:3,12 129:21<br>130:9 141:25<br>142:17<br>**sole** 58:13<br>239:16<br>**solely** 232:22<br>**solutions** 4:16<br>312:1 316:23<br>**solving** 88:17<br>**somebody** 23:4<br>42:22 44:15<br>80:13 81:3<br>93:9 95:8 99:3<br>108:8 135:12<br>135:16 138:4<br>141:9,24 209:7<br>226:11 293:19<br>293:20<br>**somewhat**<br>189:10<br>**sophistication**<br>137:17<br>**sorry** 12:5<br>19:13 31:17<br>50:14 56:24<br>111:11 142:17<br>165:11 220:25<br>231:22 232:17<br>248:4 266:18<br>281:19 283:22<br>288:22 298:6 | **sort** 6:12 47:22<br>64:13 129:18<br>143:11 145:6<br>166:6 206:24<br>219:20 304:10<br>**sortino** 66:13<br>66:24<br>**sounds** 11:19<br>48:12 150:8<br>196:3 218:3<br>235:4 265:10<br>283:3 290:16<br>296:19,20<br>**source** 38:18<br>**sources** 38:23<br>**southern** 1:3<br>4:11<br>**spain** 1:18 4:6<br>5:22,24 289:24<br>**speak** 9:4,7,10<br>9:16 39:19<br>97:22 115:14<br>116:18 141:8<br>141:10 186:23<br>188:17 232:11<br>232:13 284:5<br>287:2,25 291:9<br>297:17<br>**speaking** 74:3<br>80:6 114:3<br>130:17 141:3<br>143:12 144:15<br>146:5 173:12<br>189:12 244:2 | **speaks** 170:20<br>241:12<br>**spearheading**<br>142:9<br>**special** 254:12<br>256:14 257:2<br>259:8 290:4<br>**specialist** 4:15<br>**specific** 41:13<br>49:23 60:7<br>61:20 71:20<br>73:19,22 76:25<br>83:10 109:3,5<br>116:16 153:5<br>153:19 154:2<br>158:18 165:4<br>165:17,25<br>169:6,7 190:18<br>199:5 209:18<br>211:11 215:7<br>233:5 256:13<br>263:12,12,16<br>303:24 304:4<br>**specifically**<br>109:19 111:10<br>160:4 161:6<br>162:5 172:13<br>204:11 209:12<br>215:6 244:13<br>304:10<br>**specifics**<br>309:13<br>**speculate** 18:9<br>18:11 |

[speculation - stone]                                                      Page 66

| | | | |
|---|---|---|---|
| **speculation** | **ss** 313:3 | **starting** 102:23 | 202:8,13 203:3 |
| 18:12 | **stability** 94:10 | 148:3 300:2 | 203:8 206:3 |
| **sped** 45:8 | 105:10 | **state** 1:19 96:9 | 239:14 241:10 |
| **speed** 44:12 | **staff** 26:2 30:20 | 185:8 187:23 | 242:8 243:7,9 |
| **spend** 5:25 6:6 | 131:5 141:11 | 225:25 229:6 | 243:10 244:9 |
| 44:15,19 75:3 | 142:12 305:10 | 250:11 280:12 | 251:23 252:16 |
| 78:8 83:14,16 | **stage** 25:6 | 296:18 297:2 | 253:4,22 |
| 107:11 127:7 | 83:22 288:6 | 297:14 298:13 | 257:21 258:8 |
| 152:2 | **stand** 15:10 | 298:17 299:6 | **stayed** 130:11 |
| **spending** | **standard** 4:14 | 299:14,17 | 142:23 168:8 |
| 140:20 | 114:16 210:9 | 300:2,23 | **stenographic** |
| **spent** 16:20 | 235:6,25 236:3 | 302:21,23 | 4:23 |
| 17:23 46:9 | 277:4 | 303:6 304:18 | **step** 7:14,15 |
| 74:22 76:3,7 | **standardized** | 305:11,12,18 | 120:10 122:4 |
| 208:13 309:19 | 65:18 77:3 | 305:20 306:7 | 133:11,11 |
| **spit** 144:4 | **standards** | 313:2,6 315:8 | 173:25 |
| **split** 56:10,11 | 179:23 187:8 | **stated** 178:9,22 | **steps** 211:11 |
| 267:4 | 237:8 239:12 | 178:24 179:4,7 | **sterling** 287:4 |
| **spoke** 9:19 | 245:22 246:14 | 179:11,13,20 | **stick** 243:12 |
| **spoken** 105:7 | **standing** | 179:21 180:4,7 | **stipulate** 4:24 |
| 217:19 218:22 | 255:25 | 180:18 182:2 | **stipulated** 3:2,6 |
| 218:24,25 | **stands** 301:10 | 182:15 185:13 | 3:10 4:21 |
| **spokespeople** | **star** 143:21 | 206:10 | **stipulations** |
| 130:16 | 277:22 | **statement** 7:21 | 311:3 |
| **sponsor** 49:9 | **start** 36:12 | 109:20,21,23 | **stocks** 39:6 |
| 54:24 55:19 | 46:3 49:7 | 110:9,10 111:9 | **stone** 1:17 4:4 |
| 56:3 57:4,16 | 56:18 86:15 | 181:9 189:9 | 5:12 6:1 7:1,9 |
| 57:23 59:16 | 87:2,24 94:22 | 223:7 224:4 | 8:1 9:1 10:1 |
| **sponsors** 53:17 | 102:15 132:17 | **states** 1:2 4:10 | 11:1,16 12:1 |
| **spot** 42:20,23 | 170:13 233:11 | **status** 177:20 | 12:20 13:1 |
| 42:25 277:17 | 276:22 282:8 | 178:2 181:16 | 14:1 15:1 16:1 |
| 277:20 | **started** 26:11 | 186:4,5,7,13,20 | 17:1 18:1 19:1 |
| **spun** 21:8 | 64:5 132:18 | 186:22 187:4,8 | 20:1 21:1 22:1 |
| **squared** 68:21 | 135:22 152:18 | 200:10,17 | 23:1 24:1 25:1 |
| | 235:6 279:5 | 201:4,6,8,21 | 26:1 27:1 28:1 |

| | | | |
|---|---|---|---|
| 29:1,9 30:1 | 115:11 116:1 | 184:1 185:1 | 254:1 255:1 |
| 31:1 32:1 33:1 | 117:1 118:1 | 186:1 187:1,20 | 256:1 257:1 |
| 34:1 35:1 36:1 | 119:1 120:1 | 188:1 189:1 | 258:1 259:1 |
| 37:1 38:1 39:1 | 121:1 122:1 | 190:1 191:1,2 | 260:1,17 261:1 |
| 39:15,16,24 | 123:1 124:1 | 192:1 193:1 | 262:1 263:1 |
| 40:1,2 41:1 | 125:1 126:1,9 | 194:1 195:1 | 264:1 265:1,16 |
| 42:1 43:1 44:1 | 127:1 128:1 | 196:1 197:1 | 266:1 267:1 |
| 45:1 46:1 47:1 | 129:1,16 130:1 | 198:1 199:1 | 268:1 269:1 |
| 48:1 49:1 50:1 | 131:1 132:1 | 200:1 201:1 | 270:1,13 271:1 |
| 50:14,21 51:1 | 133:1 134:1 | 202:1 203:1 | 272:1 273:1 |
| 52:1 53:1 54:1 | 135:1 136:1 | 204:1 205:1 | 274:1 275:1 |
| 55:1 56:1 57:1 | 137:1 138:1 | 206:1 207:1 | 276:1 277:1 |
| 58:1 59:1 60:1 | 139:1 140:1 | 208:1,17 209:1 | 278:1 279:1 |
| 61:1 62:1 63:1 | 141:1 142:1 | 210:1 211:1 | 280:1 281:1,16 |
| 64:1 65:1 66:1 | 143:1 144:1 | 212:1 213:1 | 282:1 283:1 |
| 67:1 68:1 69:1 | 145:1 146:1,3 | 214:1 215:1 | 284:1 285:1 |
| 69:12 70:1 | 147:1 148:1 | 216:1 217:1 | 286:1 287:1 |
| 71:1 72:1 73:1 | 149:1 150:1 | 218:1 219:1 | 288:1 289:1 |
| 74:1 75:1 76:1 | 151:1 152:1 | 220:1,12 221:1 | 290:1,7,12 |
| 77:1 78:1 79:1 | 153:1 154:1 | 222:1 223:1 | 291:1 292:1 |
| 80:1 81:1 82:1 | 155:1,2 156:1 | 224:1 225:1,25 | 293:1 294:1 |
| 83:1 84:1 85:1 | 157:1 158:1 | 226:1 227:1 | 295:1,6 296:1 |
| 86:1 87:1 88:1 | 159:1 160:1 | 228:1 229:1 | 297:1 298:1 |
| 89:1 90:1 91:1 | 161:1 162:1 | 230:1 231:1 | 299:1,9 300:1 |
| 92:1 93:1 94:1 | 163:1,15 164:1 | 232:1 233:1 | 301:1 302:1 |
| 95:1 96:1 97:1 | 165:1 166:1 | 234:1 235:1 | 303:1 304:1 |
| 98:1 99:1 | 167:1,19 168:1 | 236:1 237:1 | 305:1 306:1 |
| 100:1 101:1 | 169:1 170:1 | 238:1 239:1 | 307:1,5,21 |
| 102:1 103:1 | 171:1 172:1,8 | 240:1 241:1 | 308:1 309:1 |
| 104:1 105:1 | 172:22 173:1 | 242:1 243:1 | 310:1,9,11 |
| 106:1 107:1 | 174:1 175:1 | 244:1 245:1 | 311:1,7,16 |
| 108:1 109:1 | 176:1 177:1,15 | 246:1 247:1 | 314:6 316:5 |
| 110:1 111:1 | 178:1 179:1 | 248:1 249:1 | 317:2,4,12 |
| 112:1 113:1 | 180:1 181:1,12 | 250:1 251:1 | **stone's**  39:13 |
| 114:1,11 115:1 | 182:1 183:1 | 252:1 253:1 | 69:9 |

**[stop - sure]**

stop 162:19
293:6
stopped 148:12
149:2 150:11
150:16
story 67:7
278:15,19,19
strange 170:9
183:7,12
strategic
293:23
strategies
271:23
strategy 297:21
street 2:3,8
96:9 296:18
297:2,14
298:13,17
299:6,14,17
300:2,23
302:21,23
303:6 304:18
305:11,12,19
305:21 306:8
315:8
stretch 6:17
strike 182:18
strikes 197:23
226:13
struggling
92:13
study 209:8
stuff 42:10
44:23 144:19
197:23 210:11

272:21 273:19
275:5,9
styled 271:20
sub 270:2
subbullet 247:5
subject 171:18
174:18
submit 16:23
submitted 5:19
10:14,22 42:17
60:8
submitting
49:4 60:3
subscribed
311:18 312:23
317:14
subsection
225:7
subsequent
178:21 182:7
subset 42:2
88:23 92:24
93:8
subsidiary
296:10
substantial
255:7,15
substantially
108:9 171:18
205:8
substantive
47:23,25
192:10 246:11
subsumed
250:19,22

subtracting
119:6
succeed 24:13
success 79:2
successful 80:4
87:22 103:24
104:4
successors
162:3
suddenly
117:10
sued 23:5 24:8
307:10
sufficient
217:23 220:3
224:20 225:6
229:23 252:15
253:3 272:2
274:3
suggest 156:10
suggesting
88:14 125:21
259:7
suggests 219:22
suite 2:3 126:7
126:10,13,23
127:25 202:5
202:24 207:15
207:19
summary
269:22,24
supplemental
79:18
supplied 7:25

support 45:8
suppose 115:19
121:7 217:13
supposed 33:16
52:6 83:5
85:10 92:6
218:17 306:16
306:18
suppress
144:10
sure 8:17 12:10
12:11 28:16
38:8 42:6,17
42:25 48:24,25
55:13 67:14
69:15 77:5
80:21 88:12
106:22 109:21
109:22 125:16
128:11 130:11
138:7,10
139:10,11
143:18 144:18
146:10 157:15
175:6 181:19
185:2 186:22
210:14 211:12
229:24 231:3
236:19 270:12
270:16 277:13
285:9,22 293:8
293:12,15,16
294:11 295:17
297:18 298:11
306:9

**surface** 103:20
**surprise** 301:25
**surprised**
  256:18,20,23
  309:12,20
**swear** 5:3
**switch** 115:18
**switched**
  152:11,13
  236:4 284:23
  289:14
**sworn** 3:12,14
  5:7 115:5
  311:18 312:23
  313:9 317:14
**sync** 159:12
  178:13 181:24
  182:9 233:15
**syncs** 14:12
  181:20
**system** 64:17
  65:4,7 86:12
  88:21 111:2
  123:19 145:6,8
  145:15 162:15
  163:14 166:7
  166:13 167:7
  233:15 234:16
  234:20 235:10
  235:17,17,21
  236:5,11,18
  237:6,13,16,23
  238:2,9,20,24
  239:4,16,19,25
  240:7,17

243:20 244:3
245:21 246:19
247:7,21 251:2
251:9,24 252:5
252:10 253:6
284:17,24
**systems** 65:5
  143:8,9,12,15
  143:17,19,22
  144:3,14 145:4
  145:25 161:24
  162:2 234:23
  235:3,18 248:8

**t**

**t** 5:6 90:13
  92:17 96:4
  115:2,4 313:1
  313:1 314:2
  315:2
**table** 24:4
  277:8,10
  280:12,15
  286:14 287:12
  294:10
**tailor** 76:24
  263:12
**tailored** 77:4
  261:14
**take** 4:25 6:11
  6:14 7:14 12:8
  12:11 16:11
  45:20 76:17
  83:8 86:3 87:6
  98:21,25
  111:24 114:9

120:21 121:2
125:13,14
133:11 137:5,8
137:19,22
156:11 164:13
164:18 165:15
170:12 173:24
176:25 193:3,9
199:20 203:9
203:22 204:9
213:18 227:4
230:16,17
274:8 279:21
280:22,23,25
281:4,6 293:15
298:5
**taken** 1:17 4:6
  12:16 39:4
  50:10 69:4
  114:15 148:19
  177:4 192:4,5
  194:23 196:18
  226:3 230:21
  281:12 283:4
  306:25 311:7
  313:11
**takes** 81:15,16
  172:3
**talent** 138:25
**talk** 14:9 39:20
  41:2 45:12
  48:7,13 49:6
  78:6 95:19
  99:18 168:17
  168:25 183:20

206:20 214:10
214:18 233:22
265:19
**talked** 22:23
  23:12 29:13
  44:3 83:19
  99:25 100:21
  104:21 107:16
  112:23 141:20
  142:19 143:11
  174:21 192:9
  217:2,5,6
  228:20 272:14
  277:25 279:19
  279:20
**talking** 8:12
  12:21 17:6,10
  47:19 50:16
  61:4 67:23
  69:12 75:19
  78:9 80:16
  81:22 87:3
  96:2 97:2
  102:9 107:11
  112:8,11,12,12
  112:20 119:11
  136:15 143:14
  143:15 145:19
  149:12 151:7
  183:8 190:16
  190:17,19
  205:19 206:6
  209:23 213:25
  215:18 217:24
  217:25 219:3

227:7,11,13
231:7 234:14
237:17 238:2
242:18 243:19
243:20 245:20
254:11 295:13
**talks** 148:2
183:18
**target** 30:6
32:2 35:7,9,13
36:10 37:2,5
37:13 69:21
70:10,13,17
71:2,7,14
72:22 73:5,17
73:20 76:19,22
77:6,7,12,16,21
78:3,5,8,21
79:3,10,25
81:6,12 82:9
82:11 83:10
86:9 87:22
88:22,24 91:13
91:17 92:15
93:18 94:17,22
95:6,22 97:11
100:4 101:3
108:13 112:7
122:22,23
123:8,9,13,15
126:7,10,13,22
127:24 128:17
128:19,21
141:22 142:4,5
142:6,10 179:8

179:9 181:5,7
205:15 255:17
260:18 261:8
262:12 264:23
265:21 266:7
266:21 267:5
271:14,23
272:2,8,10,17
276:17 277:2
292:8 296:13
297:14 298:19
298:23 301:22
302:15,18,21
303:3 304:18
305:19,21
306:13
**tdf** 270:25
276:18
**team** 93:25
105:9 106:9
134:25 253:16
**teams** 17:14
**tech** 105:22
**technical** 50:15
**technically**
305:2
**tell** 7:2 67:7
120:14 150:17
151:22 175:5
177:7 189:16
196:24 198:17
211:11 212:13
244:8 273:12
273:21,23
278:20 285:11

295:5 302:10
307:13
**telling** 106:21
**tells** 163:19
274:6,9 275:18
278:19
**ten** 19:8 141:25
230:17 251:21
251:23 252:3
281:6
**tend** 138:25
207:17,18
**tenure** 60:25
68:19 105:9
252:12,18
253:7,19
**term** 33:22
82:22 83:9
88:20 113:16
129:5 242:19
297:2
**terminal**
271:18
**terms** 24:19
25:23 52:18
63:17 64:13
67:16,18 70:20
75:5,14 82:7
82:12,23,25
116:18 123:24
123:25 138:23
140:3,5,15,15
159:6 161:7,12
199:22 219:2,3
220:15 233:12

236:14 263:25
277:14
**test** 146:9
152:12
**testified** 5:8
115:6 174:11
174:14 193:18
195:2 197:2
202:10 212:4
216:8 239:22
243:18,24
262:25 263:11
295:6
**testify** 7:7
313:9
**testimony** 4:4
14:22 29:8,12
29:22 30:24
31:3 36:16
69:9 95:16
111:4,8,12
143:13 152:10
157:18 166:24
185:14 188:9
193:20 196:10
219:20 227:22
229:14 230:2,4
231:17 232:3,8
238:8 244:4
261:19 316:9
316:17 317:8
**texas** 1:3 4:11
**text** 246:21
**thank** 5:15 33:3
70:9 77:19

**[thank - think]**                                                    Page 71

| | | | |
|---|---|---|---|
| 104:19 114:2 | 73:25 74:25 | 35:19 37:7,15 | 131:15 134:10 |
| 310:11 | 77:10 79:13 | 37:25 38:7 | 136:18 137:3 |
| **theft**   22:24 | 81:21 82:8 | 41:5 44:13 | 137:21 138:22 |
| 25:12 | 83:18 90:2 | 50:15 52:16 | 141:5,12,14 |
| **theirs**   14:12 | 91:18 93:15 | 54:3,10 57:9 | 145:7,20,23,25 |
| **theoretically** | 97:9,20 98:10 | 62:19 64:15,19 | 147:3,17,20 |
| 128:24 235:15 | 98:17 99:15 | 65:24 66:20 | 149:7,11 152:3 |
| **thing**   42:6 | 107:9,25 | 67:9 69:17 | 152:9,11,13 |
| 46:13 54:5 | 109:11 110:19 | 71:5 72:4,22 | 153:7,14,22 |
| 59:9 63:20 | 118:5 119:2 | 72:24 73:8 | 154:6,17 155:7 |
| 67:23 68:12 | 123:14 125:3 | 75:13 78:4 | 155:18,21 |
| 69:8,25 70:22 | 131:4 137:6 | 81:16 83:8 | 156:18 159:3,8 |
| 77:4 83:4 84:8 | 140:23 148:13 | 85:11,22 86:10 | 160:13 161:10 |
| 85:22 105:25 | 153:7 154:9 | 86:11,23 91:16 | 162:22 163:3 |
| 107:2 117:10 | 156:5 158:14 | 92:13 99:7 | 164:12,24 |
| 121:20 122:3,5 | 158:19 161:16 | 101:5 103:16 | 165:18 166:14 |
| 122:5 148:23 | 162:11 165:16 | 105:7 107:17 | 167:24 168:4,5 |
| 150:20 154:21 | 165:17 182:8 | 107:18,23 | 168:15 169:22 |
| 154:22 161:11 | 188:22 197:24 | 108:8,13,17 | 169:23 170:9 |
| 161:21 177:8 | 198:3,12 | 109:9,25 | 170:19,25 |
| 183:8,9 197:18 | 209:22 210:4 | 111:16,22 | 171:8 172:12 |
| 207:12,15 | 214:25 220:14 | 112:3 115:25 | 172:14,20 |
| 212:11 229:11 | 221:3,17 222:6 | 116:20,25 | 173:21,22 |
| 233:13 235:11 | 222:23 224:2 | 117:8,13,22,23 | 174:11,14,22 |
| 259:17 266:19 | 227:12,17 | 118:4,10,11,18 | 178:20 179:12 |
| 272:14 284:9 | 249:3 263:9 | 118:22,25 | 180:14,15,17 |
| 299:13 301:14 | 264:3 274:16 | 119:3,19,21 | 181:24 182:9 |
| 301:15 308:9 | 278:10,11 | 120:9 121:12 | 182:10 183:7 |
| **things**   36:12 | 303:7 307:6 | 121:25 122:4 | 184:6,7,24 |
| 38:4 41:21 | **think**   8:21 9:18 | 123:12,25 | 185:22 186:17 |
| 43:12 44:12 | 10:5,12 13:9 | 124:5,16,24,25 | 188:14 190:8 |
| 46:2,13 65:14 | 15:11 16:7,20 | 125:2,3,8,19,22 | 191:10 192:18 |
| 66:19 67:10 | 22:5 26:20 | 126:20,21 | 197:21 199:14 |
| 68:3 69:22,23 | 27:6 28:15,23 | 127:10,11 | 203:14,18 |
| 70:23 72:2 | 28:24 32:22 | 128:24 129:10 | 204:7,18,21 |

206:12,16
207:9,22
208:25 209:3
210:12 214:23
215:5,5 216:2
216:20 217:8
217:10,14,16
218:13,15,19
221:11 223:12
223:15 226:5
226:18 228:3,5
229:10,23
230:8 233:16
233:18,24
235:3,7,18
236:18 239:21
241:11,12
243:3 244:5,12
249:5,20
255:11,16
259:12,16,25
261:25 262:6
270:8,13
273:14 274:15
277:24 278:8
278:19 284:6
284:13 286:23
291:3,5 292:16
294:19,21
296:7,10,12
303:17,20
306:11 308:3
**thinking**  96:24
103:5 173:19

**third**  27:24
54:17 55:4,12
55:17,23 56:6
56:19 57:7,8
58:11,14 63:22
64:12 143:22
143:22 193:10
193:11,12
196:21 225:22
**thorough**
177:20
**thought**  32:19
45:14,15,16,21
52:2,7 137:22
215:13 223:10
223:11 262:14
262:15 278:21
289:21 309:6
**thoughtful**
84:19 104:18
120:25
**thoughts**
308:24 309:8
**thousands**  81:2
86:4 112:25
**three**  8:21 9:12
16:2 28:7,9
42:13 66:15
87:21 91:15
92:7 97:17,21
98:7 99:10
102:6 109:12
110:11 115:20
116:10,23
117:11,12

118:8,15 119:7
120:6 121:8
122:10 123:7
123:14 124:22
128:2 130:13
130:14 134:6
135:20 143:16
154:15 156:8
161:24,25
162:6 170:4,5
176:17 183:4
183:16 185:7
185:20 200:23
201:13 204:2
207:14 233:23
234:7,22 236:7
240:8,9,19,19
241:8,9 243:15
244:10 247:16
247:23,24
249:24 251:21
252:12,18
253:7,19
267:24 268:8
268:23 269:10
277:5,15 279:2
300:3,15,19,24
301:19 308:13
308:25
**throw**  75:14
127:18
**ticking**  274:18
**tie**  91:24 110:8
110:16,20
162:3,4 249:2

249:4 274:13
**tied**  28:2
109:19 153:23
153:25 273:21
273:24
**tier**  27:22
**ties**  154:11
**tightly**  182:11
**time**  1:13 3:9
4:13,14 6:6
10:7,9,11
12:14,17 16:18
17:17,23 19:10
21:20 25:9,23
26:2,6,7,11
38:20 44:16,20
46:7,9 50:8,11
52:17 53:3,22
54:18 55:2
56:5,23 57:11
57:24 59:4
61:18 62:11,12
63:16 69:2,5
70:16,21 73:6
73:23,24 74:22
75:3 76:3,8
77:18 78:9
83:14,16 90:21
91:7,9 92:11
93:8 94:3
95:15 96:2,24
97:25 98:5,15
100:15 101:9
105:17 106:16
107:11 109:5

[time - transcript]                                      Page 73

| | | | |
|---|---|---|---|
| 114:4,6,13,16 | 258:23,25 | 11:16 16:7 | **total** 16:24 |
| 115:8 121:5 | 264:25 272:3 | 92:23 134:19 | 17:10 28:4 |
| 124:14,14 | 279:12,18 | 141:21 150:14 | 38:15 88:13 |
| 127:7,16 | 280:3,9 281:3 | 158:23 159:20 | 308:20 |
| 129:19,25 | 281:10,13 | 165:24 198:3,7 | **totality** 40:11 |
| 130:9 132:22 | 283:3,16 284:2 | 205:5 212:22 | 40:24 41:2 |
| 133:4,9 134:22 | 284:18 286:18 | 227:10 290:22 | **totally** 34:5 |
| 137:20 140:20 | 286:19 289:5 | 295:3 | 39:21 59:16,20 |
| 142:21 146:4,5 | 289:16,25 | **today's** 7:10,16 | 303:22 |
| 146:18,19 | 290:2 292:21 | 8:15 9:4,8,16 | **toward** 23:14 |
| 147:23 148:17 | 293:17,22,24 | **together** | 261:5 289:2 |
| 148:20 150:19 | 296:3 297:23 | 105:25 110:21 | **towards** 85:24 |
| 151:8,20,21,23 | 298:7 299:18 | 228:21,22 | 87:8 255:21 |
| 152:2,24 | 300:10 301:17 | 249:2,4 299:12 | **track** 18:4 |
| 154:25 156:22 | 306:23 307:2 | **token** 206:17 | 92:22 105:20 |
| 157:2 159:18 | 308:4 309:5,19 | **told** 151:20 | 142:10 154:19 |
| 165:10,13,16 | 311:9,10,12,13 | 278:15,19 | 305:24 |
| 169:4 170:13 | 313:12 316:18 | **tonight** 146:9 | **tracking** |
| 171:7 177:2,5 | **timeframe** 57:5 | **took** 6:24 24:18 | 302:14 303:14 |
| 189:14 190:6 | 215:18 231:11 | 149:6 168:7 | 304:10 305:25 |
| 194:24 200:2 | 248:15 279:3 | 170:2,8 195:21 | 306:17 |
| 202:8,13,18 | 295:18 316:8 | 196:20 226:9 | **trade** 105:16 |
| 204:2,24 | **timeline** 295:11 | 226:23,25 | **trading** 105:15 |
| 205:17 206:9 | **times** 46:12 | 283:6 296:7,11 | **trained** 136:24 |
| 206:10,17 | 54:3 110:24 | **top** 11:7 12:3 | 136:25 |
| 208:13 214:17 | 159:17 231:6 | 31:12 41:18 | **training** 45:17 |
| 215:20 227:11 | 280:7 | 71:4 72:11 | 131:5 149:9 |
| 227:19 230:16 | **tis** 281:3 | 80:22 129:13 | 211:5 213:17 |
| 230:19,22 | **title** 54:3 130:6 | 175:5,6 184:11 | 214:10,11 |
| 232:8 234:15 | **titled** 299:6 | 184:19 255:12 | 215:3,8 218:12 |
| 235:13 238:3 | 315:8 | 279:14 282:9 | 218:14,20 |
| 245:2,10 246:3 | **titles** 54:2 | 298:14 | **transaction** |
| 246:18 247:6 | **today** 4:12,16 | **topic** 48:5 67:3 | 303:6 306:7 |
| 248:17 255:17 | 5:13,17 6:11 | **topics** 135:21 | **transcript** 5:10 |
| 256:24 258:17 | 7:6,18 9:21 | 219:9 | 8:10 47:22,23 |

[transcript - under]                                        Page 74

48:15 313:14
313:17 316:6
316:19 317:5,8
**transcripts**  8:3
8:4,6,13,14,19
44:4,7 46:7
47:3 48:2
**transition**
130:12 135:23
**transitioning**
132:24 133:5
287:2
**treat**  137:9
**treated**  137:10
**trial**  3:9 30:24
31:3
**tricky**  305:20
**trigger**  127:15
188:19
**triggered**
245:11
**triggers**  129:10
**true**  94:3
300:11,13
313:14 317:8
**trust**  49:14,15
49:19 50:2
99:4 292:19
**truth**  7:2 313:9
313:10,10
**truthfully**  7:7
**try**  26:2 44:25
65:16 79:20
158:18 160:23
208:11

**trying**  31:11
32:22 41:23
46:3 102:10
151:17 159:6
165:23 171:4
191:18 216:2
235:23 252:23
278:22,23
**tuned**  139:9
**turn**  40:2,7
84:12,13
120:22 147:5
172:4 173:25
175:2 181:11
185:23 187:18
187:21 190:22
200:4 214:10
223:17 224:6
232:14 236:25
237:24 239:8
240:23,24
245:12,15
252:9 254:7,8
260:11 264:20
266:12 285:10
**turned**  224:25
**turning**  30:15
104:20
**tweak**  217:11
**tweaks**  255:12
**two**  7:11 9:18
12:8 20:16,21
22:18,21,23
31:18 35:23
40:6 54:21

64:6,7 67:5
101:6 102:10
102:18 107:24
120:14 121:15
121:16 123:21
135:19 143:25
159:12 182:9
182:11 196:22
199:24 217:16
218:6 224:15
225:11 249:2,4
258:13 294:14
**tying**  160:15
**type**  42:13
63:10 83:21
263:23 270:5
**typed**  42:15
**types**  72:19
265:9
**typewritten**
313:13
**typical**  16:25
53:2 64:7
71:11 74:25
94:21 173:13
173:16,18
187:12 293:14
298:25
**typically**  17:15
48:20 57:25
59:5,15 66:6
68:20 71:16
72:20 73:4,6
77:8 86:23
89:9 92:20

94:16 101:15
109:7 139:23
140:8 190:8
203:13 207:11
213:7 221:15

| **u** |
|---|

**ultimate**  132:2
**ultimately**
83:24 98:3
102:17 130:12
133:3 161:20
236:6 298:4
**unaware**  235:9
**unboard**  43:4
**uncertainty**
86:2,5
**unclear**  202:6
270:23
**uncommon**
60:13 199:21
199:25
**unconflicted**
30:12
**under**  34:2
35:19 38:4
54:16 60:16
82:19 84:11
85:7 103:4
117:4 122:2
133:23 134:2,9
136:21 189:24
190:2 208:23
209:5 235:10
235:16,17
245:16,24

**[under - use]**                                                    Page 75

246:17 250:19
282:20 306:4
**undergoing**
255:15
**underlying**
124:22 126:12
154:16,24
163:17,23
164:15,20
170:4,15 186:6
186:12 201:5
202:14 255:5
256:11 257:21
257:22 266:5
269:6 271:22
299:24
**underperform**
202:2,22
277:14 280:4,4
280:5
**underperfor...**
85:3 116:9,14
116:23 118:15
124:10 127:2,8
127:9 128:5
154:10 156:24
157:9 169:7,18
170:19,21,23
186:9 189:3,8
189:13 190:5
190:17,19
203:16 204:24
205:3,10
208:12 278:9
279:22 280:13

287:18 301:19
304:13
**underperfor...**
115:20 121:7
127:25 128:22
278:20 279:2
**underperfor...**
84:9,10 117:12
126:12,14,20
154:11,23
170:7 171:12
190:21 200:23
203:23 204:4
204:10 205:7,8
206:18 208:11
280:19,20,21
300:3,10,19,23
301:2,6,9,12,25
306:15
**underperforms**
122:9
**understand**
5:17 6:3,19,24
7:4 18:21
44:22 46:4
64:19 66:20
78:12 92:13
99:19 103:19
106:19,23
117:3 124:12
128:12 129:6,8
129:19 148:8
151:17 156:11
157:8 162:18
165:14,22,23

168:23 191:18
208:11 215:25
246:8,22
252:23 287:17
299:23 310:3,7
**understanding**
55:14 193:13
218:17 234:19
235:20 304:11
304:12
**understood**
6:22 19:19
36:14 43:22
45:23 52:4
66:2 106:13
219:11
**undertaken**
239:17
**undertook**
165:5
**underwent**
212:25
**undetected**
240:10,20
242:4
**unengaged**
207:19
**unfortunately**
235:8
**unit**   311:5
**united**   1:2 4:10
**unitedhealth**
31:5,17,24,25
32:6

**unpack**   73:25
**unquote**   15:17
70:19 97:13
227:7
**unreasonable**
153:6,20 154:4
158:13 159:2
159:22 160:20
161:7 228:25
**unsophisticat...**
207:18
**unstable**
176:24
**unsuitable**
232:25 233:7
**unusual**   91:8
139:25 143:24
192:6 193:6,7
**updates**   216:11
217:21,22
**upfront**   213:24
**upgraded**
235:3
**ups**   88:4 100:5
**upside**   65:13
68:20
**use**   23:25 35:20
48:17 65:4,6
68:11,15 82:21
82:24 83:9
89:5 92:17
96:7 97:2
110:7 113:11
113:12 123:20
125:17 143:25

145:12 162:24
190:14 221:12
226:16,19
**used** 65:16 66:8
66:13 67:5
68:9 82:23
91:6,10,12
96:18,19 113:8
143:8,9 145:7
162:2 172:20
235:7 236:3
296:25 299:2
316:19
**uses** 35:22
66:17 174:16
**using** 80:19
89:4 113:7
163:5 191:3
233:14,14
234:15 235:5,6
271:21 302:24
302:25
**usual** 115:24
259:15
**usually** 107:5
124:11 135:14
172:3 189:4
190:9,10 207:7
**utilized** 145:6
**utilizing** 31:25

**v**

**v** 316:4 317:1
**vacuum** 109:10
**valid** 81:15

**validated** 285:8
**valuation** 54:20
55:21
**value** 67:15
94:7,19 242:12
308:22
**van** 90:14 96:8
**vanguard**
306:5
**vanguards**
305:23
**vanilla** 192:23
**vantage** 206:13
**varied** 57:24
205:6,8 206:12
**varies** 16:4
**variety** 103:2
**various** 40:6
71:13 72:14
75:5 76:8
123:11 124:20
214:25 258:12
266:14,17,20
266:21 267:19
268:5,9,12
269:7,25 270:2
286:4
**vary** 134:15
173:15
**vast** 80:10
93:21 144:16
**verbally** 220:5
**verify** 316:9
**veritext** 4:16,20
312:1 316:14

316:23
**veritext.com.**
316:15
**versa** 162:13
**version** 15:8
28:22 173:5
231:14 233:14
**versions** 96:20
184:25
**versus** 4:8 27:2
29:14,15,20
31:5 33:4
34:19 36:15
66:9,10 98:18
100:21 101:5
103:12 108:3,4
108:14,25
109:6,7 140:24
183:13 189:11
265:5 271:15
277:14 299:6
299:15 303:20
315:9
**vice** 23:5
162:13
**victory** 308:21
**video** 4:3,15
311:4,6
**videographer**
2:15 4:2 12:13
12:17 50:7,11
68:25 69:5
114:13 115:8
148:17,20
177:2,5 230:19

230:22 281:10
281:13 306:23
307:2 311:2
**view** 14:8 30:12
65:19 67:16
77:25 121:10
122:9 153:6
172:9,11,19
173:4 185:5
197:7 218:12
228:25 234:16
253:14 297:11
**viewed** 45:13
**vintage** 123:22
124:7 205:3,3
205:9 255:10
270:3 277:18
**vintages** 122:24
123:2,11,16
124:21 126:12
258:12 267:20
268:17 269:7
269:25 276:24
286:4 300:8
**virtual** 1:16 4:3
311:6
**virtually** 40:25
**visconti** 1:18
4:19 313:5,25
**visibility**
130:24
**visit** 83:13
**visualization**
100:19

| | | | |
|---|---|---|---|
| **voice** 192:8 | 38:14,22 39:22 | 253:21 254:7 | 181:11 182:20 |
| **volatile** 98:9,11 | 40:7 44:17 | 259:3 260:2 | 183:12,24 |
| 98:13 | 45:12,21 48:16 | 270:14 275:13 | 185:24 186:24 |
| **volatility** 97:25 | 49:7 56:11 | 285:18 | 188:7,24 203:8 |
| 99:18,20,21 | 66:18 73:25 | **wanted** 15:2 | 203:25 204:4 |
| 100:20 102:3,4 | 78:14 79:13,15 | 43:10 47:25 | 208:10 229:21 |
| 112:8,12,13,15 | 79:16,17,23 | 72:17 137:2,4 | 229:22 233:21 |
| **volunteering** | 81:13 88:7,12 | 143:5 149:13 | 233:21 236:15 |
| 155:15 | 88:13 92:3 | 162:21,24 | 240:16,24 |
| **vote** 226:9,10 | 102:3,5,9 | 164:14 212:21 | 251:19 258:24 |
| 226:23,25,25 | 103:21 104:20 | 278:20 293:18 | 259:18,19 |
| 227:5,24 228:4 | 105:4,24,25 | **wanting** 164:20 | **watching** 92:24 |
| 228:18,22 | 106:18,19,22 | **wants** 111:6 | **waterline** |
| 230:2,10 | 108:7,18 | **warranted** 73:9 | 206:19 |
| **voted** 229:19 | 109:10 111:23 | 287:23 | **way** 15:13 |
| **votes** 228:14 | 113:14,16 | **watch** 82:21 | 23:17 30:19 |
| 229:15,18 | 119:22,24,25 | 83:3,25 84:3 | 38:7,8,8 41:21 |
| **voting** 226:4,7 | 120:5 124:6,12 | 84:23 85:7 | 48:18,20 49:11 |
| 226:17 | 131:11 135:15 | 110:14 111:7 | 51:25 81:17 |
| | 137:3,23 138:6 | 111:20,25 | 82:8 83:5 |
| **w** | 139:8 144:8,12 | 115:23 116:4 | 85:18 87:23 |
| | 146:15 152:12 | 116:13,22 | 88:5 90:19 |
| **wachala** 29:14 | 156:12 157:14 | 117:11,12,15 | 91:23 96:25 |
| **wait** 102:24 | 158:19 160:22 | 117:20,21 | 104:3 110:25 |
| 118:3 119:25 | 160:23 161:3 | 118:3,11,12 | 131:4 135:18 |
| 270:21 | 161:21 162:23 | 119:21,25 | 136:3,7 137:2 |
| **waited** 258:13 | 163:4,7,11 | 120:2,12 | 137:9 145:20 |
| **waived** 3:5 | 164:8 165:3 | 122:18 154:8,8 | 145:22 149:14 |
| **waldner** 33:4 | 170:14 187:18 | 154:9,12,13,14 | 154:13 159:10 |
| 33:19 | 188:16 198:23 | 154:24 156:7 | 159:11,15,16 |
| **walk** 20:12 | 203:21 210:12 | 168:2 169:17 | 168:10 193:7 |
| **walked** 82:7 | 216:25 218:23 | 169:20,21,23 | 194:23 197:19 |
| 216:23 | 223:8,17 | 169:25 170:2,3 | 203:13 206:14 |
| **walking** 84:3 | 229:24 231:4 | 170:8,12,14,18 | 209:2,4,9 |
| **walnut** 2:3 | 236:8 245:15 | 170:24 177:16 | 213:3 219:12 |
| **want** 6:8 11:21 | | | |
| 18:9,11 31:20 | | | |

227:23 228:6
229:10 230:9
230:11,13
251:3 285:24
289:2 291:7
295:2 303:21
309:6,24
**ways** 101:6
108:22 144:2
162:6 214:2
222:16
**we've** 94:9,10
94:11 262:14
**wealth** 272:24
273:6
**week** 10:4,5,10
**weeks** 196:18
**welcome**
115:13
**wells** 32:2,4,9
**went** 14:24
23:23 30:16
32:14 43:20
44:20 46:4,11
50:3,15 54:4
59:13 64:8
74:2 98:19
127:4 129:16
141:16 156:4
168:19 173:5
181:19 196:17
206:11 211:22
213:5,7,11,11
213:16,20,22
216:2 232:9

236:5 277:17
283:13 284:19
297:18 299:16
**west** 308:20
**whittle** 92:18
**whittled** 95:2
97:11
**wife's** 38:25
**william** 1:18
4:19 313:5,25
**williams** 34:19
**withdrawals**
254:16
**witness** 1:17
5:4 183:6
186:16 242:13
252:22 258:4
310:12 313:8
313:22 316:8
316:10,12,18
**woefully** 191:4
191:13,21,24
**wondering**
14:11 158:23
**word** 44:10
66:23 162:24
162:25 190:10
218:15
**words** 15:10
70:18 127:13
191:3 273:9
**work** 15:2,25
26:21 37:20
39:17,24 41:22
57:20 60:20

62:2 75:17
79:6 81:8,16
84:4 87:11
91:6 97:12,13
99:13 103:19
105:15 114:10
136:21,21
141:15 142:14
171:21 272:17
**worked** 13:17
14:2 37:18
57:18 60:16,16
94:24 136:14
137:13 141:4,7
193:4,9 212:6
212:24 221:6
263:6 264:6
283:14 296:5
296:10
**workforce**
89:20
**working** 20:22
26:19 58:3
80:2,2 83:5,12
130:9 134:23
140:20,20
231:12 263:21
273:8 274:13
274:14,21
275:11 285:4
290:23
**works** 273:22
274:7
**world** 33:23
75:7,9 108:25

**worried** 113:3
**worry** 107:15
**worse** 119:17
170:2
**worth** 25:25
54:19 55:6,7
55:18
**would've** 93:11
**wow** 129:2
**wrap** 30:17
281:8 306:21
307:6
**writing** 130:18
138:8
**written** 38:5
111:15 182:10
**wrong** 117:19
163:6 192:14
192:16 217:22
249:7 266:19
266:22
**wrote** 14:5
21:17 42:9
150:21 188:15
202:19 203:2

| x |
|---|

**x** 1:5,11 90:24
313:17 314:2
315:2
**xyz** 46:5

| y |
|---|

**yeah** 16:14
23:12 24:16
38:21 51:18

**[yeah - zoom]**                                          Page 79

52:2 60:11
74:21 82:14
95:24 103:22
119:15 173:14
173:15 193:21
226:5 234:22
261:10 310:7
**year**   11:22 39:5
61:8 64:9
86:18 90:6,7
91:17 98:21
109:12,12,12
109:13,13
110:12,12,13
110:15 115:21
116:5,10,10,23
116:23 117:11
117:11,12,13
118:8,15,16
119:7,7 120:6
121:8 122:10
122:10 123:7,7
124:22,23
128:2 130:13
152:22 154:15
156:8 161:25
170:5,6 176:17
176:17,17
183:5 185:7,21
200:24 201:13
204:2 240:8,9
240:19,19
241:8,9 243:15
244:11 247:15
247:15,16,23

247:23,24
248:5,8,10,23
249:8,10,24,24
249:24 250:4
250:16,23
251:23 252:3
252:12,18
253:7,19 268:4
268:8,12,23,23
269:10,14
277:3,5,15,15
279:3,3 284:21
284:22 288:12
288:15 294:24
300:3,4,15,16
300:20,20,24
300:24 301:19
301:20 309:16
**years**   19:3,7,8
32:3 38:5
57:15 64:23
81:19,20 86:16
88:11 89:21
91:20,22 96:3
102:22,24
109:16 130:14
141:25 184:2
210:8 214:23
217:17 251:21
254:17 258:13
267:25 297:17
304:5
**yesterday**   9:12
9:15,19 198:9
198:11,20

199:3
**york**   1:19 312:2
313:2,4,6

**z**

**zoom**   1:16
17:14

Federal Rules of Civil Procedure

Rule 30

(e)  Review  By  the  Witness;  Changes.

(1)  Review;  Statement  of  Changes.  On  request  by  the
deponent  or  a  party  before  the  deposition  is
completed,  the  deponent  must  be  allowed  30  days
after  being  notified  by  the  officer  that  the
transcript  or  recording  is  available  in  which:

(A)  to  review  the  transcript  or  recording;  and

(B)  if  there  are  changes  in  form  or  substance,  to
sign  a  statement  listing  the  changes  and  the
reasons  for  making  them.

(2)  Changes  Indicated  in  the  Officer's  Certificate.
The  officer  must  note  in  the  certificate  prescribed
by  Rule  30(f)(1)  whether  a  review  was  requested
and,  if  so,  must  attach  any  changes  the  deponent
makes  during  the  30-day  period.

DISCLAIMER:  THE  FOREGOING  FEDERAL  PROCEDURE  RULES
ARE  PROVIDED  FOR  INFORMATIONAL  PURPOSES  ONLY.
THE  ABOVE  RULES  ARE  CURRENT  AS  OF  APRIL  1,
2019.  PLEASE  REFER  TO  THE  APPLICABLE  FEDERAL  RULES
OF  CIVIL  PROCEDURE  FOR  UP-TO-DATE  INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.