UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| **MARY LALIBERTE and MARIE MCKNIGHT, individually and as representatives of a class of similarly situated persons, on behalf of the QUANTA SERVICES, INC. 401(K) SAVINGS PLAN,** §§§§§§§ | |
| § | **Case No: 4:22-cv-03290 (AHB)** |
| **Plaintiffs,** § | **Oral Argument Requested** |
| § | |
| **v.** § | |
| § | |
| **QUANTA SERVICES, INC.,** § | |
| § | |
| **Defendant.** § | |

**DEFENDANT'S MOTION TO EXCLUDE PROPOSED EXPERT TESTIMONY OF DONALD C. STONE AND MEMORANDUM OF LAW IN SUPPORT**

Defendant Quanta Services, Inc. ("Quanta" or "Defendant"), by and through the undersigned counsel, submits this motion and accompanying memorandum of law to exclude the proposed expert testimony of Donald C. Stone ("Stone") that Quanta failed to establish and apply reasonable fiduciary processes to monitor the Fidelity Freedom Funds TDFs[1] in the Quanta Services, Inc. 401(k) Savings Plan ("Plan").

---

[1] "TDFs" is short for "target date funds."

1

I.      INTRODUCTION

Plaintiffs allege that Quanta breached its fiduciary duties under ERISA by offering the Freedom Funds as an investment option in the Plan, and that a prudent fiduciary would have removed the Freedom Funds from the Plan as of Q1 2017. *See* Dkt. 53 at 2; Ex. A (Werner Report) ¶ 1. Plaintiffs further challenge Quanta's inclusion of the American Beacon Small Cap Value Fund ("American Beacon Fund") and the DFA International Small Cap Value Fund ("DFA Fund") in the Plan and contend that a prudent fiduciary would have removed each of those investments from the Plan as of Q1 2020. *Id*. Plaintiffs proffered Stone as a proposed expert to opine on the Quanta fiduciaries' "conduct." *See* Ex. B (Expert Report of Donald C. Stone, August 1, 2024, hereinafter "Stone Report" or "Report"). However, Stone does not offer any opinion concerning Quanta's process with respect to the American Beacon Fund or DFA Fund—in fact, Stone was unaware at deposition that Plaintiffs were challenging any investments other than the Freedom Funds. Ex. C (Stone Dep. Tr.) at 167:15-18.

Ostensibly in support of Plaintiffs' claims, Stone offers the opinion that Quanta employed a flawed fiduciary process for monitoring Plan investments between the start of the putative class period, September 26, 2016, and the date the Freedom Funds were undisputedly removed from the Plan, April 16, 2021. *E.g.*, *id*. at 148:12-13, 150:22-151:1. However, no harm accrued to the Plan during that period. To the contrary, Plaintiffs' damages expert opined that, as of April 16, 2021, the Plan was *better off* due to its offering of the Freedom Funds than it would have been had it offered Plaintiffs' purported reasonable alternative—the American Funds TDFs—between Q1 2017 and April 16, 2021. Ex. D (Werner Dep. Tr.) at 138:18-139:7. Stone's opinion concerning Quanta's fiduciary process is, therefore, irrelevant to Plaintiffs' theory of harm—the claimed damages in this matter accrued after April 16, 2021, but Stone offers no opinion concerning the

2

fiduciary process during that time period. Nor does Stone offer any opinion concerning Quanta's decision to remove the Freedom Funds effective April 16, 2021, or to offer the FIAM Blend Funds as investment options as of that date.

Moreover, Stone does not identify any specific fiduciary missteps by Quanta during the period Plaintiffs have placed at issue, September 26, 2016, until Q1 2017 (i.e., January 1, 2017). In his Report, Stone identifies only a *single* instance where the Freedom Funds allegedly failed to comply with the Plan's Investment Policy Statement ("IPS"). Ex. B ¶ 104; Ex. C at 234:3-13. But the sole example he identifies occurred in Q4 2015, nearly a year before the start of the putative class period. Otherwise, Stone merely points to the Freedom Funds' performance relative to their benchmark between Q4 2015 and Q1 2017 and opines that Quanta should have applied "heightened scrutiny" to the Freedom Funds based on that sole metric. Ex. B ¶¶ 135-36; Ex. C at 83:8-84:25. In doing so, Stone ignores the watch list procedures contained in the Plan's IPS, which identify nine criteria to be considered (none of which are performance relative to benchmark). Ex. E (2015 IPS) at QUANTA_001417. Stone's approach is thus inconsistent with *his own stated methodology* as he testified that it is essential for fiduciaries to tie their investment monitoring process to the Plan's IPS and that the 2015 IPS was "typical" for the industry. Ex. C at 85:2-12, 109:18-20, 173:12-16.

Worse still, Stone does not even apply the sort of "heightened scrutiny" analysis to the Freedom Funds that he opines Quanta should have employed. Thus, he cannot—and, to his credit, refuses to—offer the opinion that Quanta should have removed Freedom Funds as of Q1 2017. Instead, he merely offers the opinion that Quanta may or may not have decided to remove the Freedom Funds based on the outcome of the "heightened scrutiny" analysis that he has not

performed. *Id*. at 171:3-21, 287:11-20. That opinion does not support Plaintiffs' theory of the case and is unhelpful to the Court.

## II.   APPLICABLE LEGAL STANDARDS

To be admissible under Federal Rule of Evidence 702, expert testimony must be "both relevant and reliable." *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993)). "Reliability is determined by assessing 'whether the reasoning or methodology underlying the testimony is scientifically valid.'" *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (quoting *Daubert*, 509 U.S. at 592-93). "Relevance depends upon 'whether that reasoning or methodology properly can be applied to the facts in issue.'" *Id*. Evaluating these factors "requires more than a glance at the expert's credentials; the court must also ensure that the expert has reliably applied the methods in question." *Valencia*, 600 F.3d at 424. "Overall, the trial court must strive to ensure that the expert, 'whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Id*. (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

The proponent of the expert testimony bears the burden of demonstrating the admissibility of the opinions and testimony offered by the proposed expert "by a preponderance of the evidence." *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). The district court serves a critical "gatekeeping role to determine the admissibility of expert testimony" under these standards. *Valencia*, 600 F.3d at 424. These principles apply equally where, as here, the matter is set to be tried to a judge rather than a jury. *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832-33 (3d Cir. 2020) ("Rule 702 applies whether the trier of fact is a judge or a jury" and the fact a case is being tried to a judge does not give the court "discretion to abandon

the gatekeeping function or [to] perform the function inadequately") (citing *Kumho Tire*, 526 U.S. at 158-59 (Scalia, J., concurring)); *Grand Isle Shipyards, Inc. v. Black Elk Offshore Ops., LLC*, 2021 WL 533706, at *3 (E.D. La. Feb. 21, 2021) ("[A]lthough district courts retain latitude to determine how to apply the *Daubert* requirements in a bench trial, a court may not sidestep Rule 702 altogether and decline to perform any assessment of expert testimony before trial.").

### III.    ARGUMENT

#### A.    Stone's Opinion Does Not Fit Plaintiffs' Theory.

To qualify under Rule 702, expert opinion testimony must be relevant, or "fit" the case—that is, it must be "sufficiently tied to the facts of that case that it will aid the [decision-maker] in resolving a factual dispute." *Daubert*, 509 U.S. at 591 (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)); *see also Weiser-Brown Operating Co. v. St. Paul Surplus Lines Ins. Co.*, 801 F.3d 512, 529 (5th Cir. 2015) ("The expert testimony must be relevant, not simply in the sense that all testimony must be relevant, Fed.R.Evid. 402, but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue.") (quoting *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003)). Stone's opinion does not fit Plaintiffs' theory of the case because: (1) his opinion is temporally limited to a time period during which there is no dispute that no harm accrued to the Plan; (2) he does not identify any specific shortcomings in Quanta's fiduciary process during the approximately twelve-week time period Plaintiffs have put at issue in this case: between September 26, 2016 (the start of putative class period) and January 1, 2017 (the date on which Plaintiffs allege the Freedom Funds should have been removed from the Plan); and (3) he does not opine that the Freedom Funds should have been removed from the Plan and has not bothered to perform the type of analysis he advocates would answer the question of whether they should have been removed.

5

### i. Stone's Opinion Is Limited To A Time Period During Which, Undisputedly, No Harm Accrued To the Plan.

Stone testified at deposition that his opinion only concerns the portion of the putative class period during which the Freedom Funds were offered in the Plan.[2] *E.g.*, Ex. C at 152:6-8 ("When they got out of the Freedom Funds and got into the other Fidelity funds that is where my opinion ends."). However, Stone did not actually know when the Freedom Funds were removed from the Plan and could not put a firm end date on his opinion, interchangeably testifying that his analysis ran until 2020 or, perhaps, 2022.[3] *E.g.*, *id.* at 148:12-13 ("2020 is about where [] I stopped commenting on things, yes."), 149:2-14 ("the period that I was focused on has to do with the behavior that took place in 2015, 2016, 2017, 2018, 2019. . . In talking with counsel that was the period they wanted to focus on I guess is the best way to put that."), 150:22-151:1 ("I did not reach a judgment as to whether [Quanta's process] was prudent or not during that period [from 2020 to 2024]."). Although Stone himself is unaware of the date the Freedom Funds were removed from the Plan, it is undisputed that they were removed April 16, 2021, and that the FIAM Blend TDFs were offered as of that date. Ex. F (Letter Agreement re FIAM Blend Funds) at QUANTA_001015.

---

[2] Additionally, Stone testified that his opinion only concerns the Freedom Funds. Ex. C at 147:15-20 (defining "challenged investments" as the Freedom Funds and explaining that they were "the focus" of his report), 167:15-18 ("The only [challenged investments] that I'm aware of were the Freedom Funds at this point."). Indeed, Stone's "focus" on the Freedom Funds is evident from the face of his report, which uses the term "Freedom Funds" 42 times, while only using the terms "DFA" and "American Beacon" just three times each. *See generally* Ex. B. Accordingly, Stone's opinion is irrelevant as to Plaintiffs' claims concerning the DFA Fund and American Beacon Fund. Regardless, as with the Freedom Funds, Plaintiffs' damages expert opined that the Plan suffered no harm with respect to those funds too.

[3] Stone's lack of knowledge about the facts of the case and the scope of his Report further highlights the unreliability of his opinion. *See, e.g.*, *Natour v. United States*, 2024 WL 3687120, at *4 (S.D. Tex. Aug. 5, 2024) (excluding expert opinion where expert did "not know anything about the underlying data").

Thus, taking him at his word, Stone's opinions concerning Quanta's fiduciary process apply to the period ending no later than April 16, 2021.

This temporal limitation on Stone's opinion is borne out by reference to his Report, which offers no discussion of the reasonableness of the Plan's IPS revisions in 2020 or 2022, no discussion of Quanta's process for deciding to remove the Freedom Funds, no discussion of Quanta's process for selecting the FIAM Blend TDFs, or any other discussion of Quanta's fiduciary processes after about 2020. *See generally* Ex. B. This limitation is critical, and undermines the overall relevance of Stone's opinion, because there is no dispute that the Plan suffered no harm by offering the Freedom Funds through April 16, 2021. According to Plaintiffs' own damages expert, Dr. Adam Werner, at the time the Freedom Funds were removed from the Plan they had *outperformed* Plaintiffs' purported prudent alternative TDFs. Ex. D at 138:18-139:7 (agreeing that as of March 31, 2021, his damages model yielded *negative* damages of over $4 million and as of June 30, 2021, his damages model yielded *negative* damages of over $7 million); Ex. G (Werner Report Backup); *see also* Quanta's Motion for Summary Judgment at Dkt. 88. Because Stone admits that he offers no opinion concerning the fiduciary processes employed by Quanta after the Freedom Fund's removal on April 16, 2021, that means his opinion is irrelevant to Plaintiffs' theory of the case and should be excluded for that lone reason.[4] *E.g.*, *McDowell v. Brown*, 392 F.3d 1283, 1298-99 (11th Cir. 2004) ("expert testimony must be 'relevant to the task at hand, . . . i.e., that it logically advances a material aspect' of the case") (quoting *Daubert*, 509

---

[4] To prevail on their claim for breach of fiduciary duty under ERISA, Plaintiffs must establish a breach of process and a *prima facie* case of loss to the Plan. *McDonald v. Provident Indem. Life Ins. Co.*, 60 F.3d 234, 237 (5th Cir. 1995). Plaintiffs submit Stone's opinion as evidence purportedly to support their claim for breach of process. However, since Stone's opinion is temporally misaligned with Plaintiffs' theory of loss, it does not support their claim and therefore does not "fit" their theory of the case.

U.S. at 591); *Johnson v. Louisville Ladder*, 2008 WL 5122261, at *8 (S.D. Ala. Nov. 14, 2008) ("Where the opinion does not advance the question in dispute for which the opinion is proffered, then there is no 'fit' and the opinion should be excluded.").

Ultimately, Stone's opinion is nothing more than a distraction—he nitpicks Quanta's fiduciary process during a period of time in which Plaintiffs do not even contend any harm accrued to the Plan.

### ii. Stone Does Not Identify Any Specific Shortcoming In Quanta's Fiduciary Process As It Pertains To The Freedom Funds Before 2017.

Another of Plaintiffs' experts, Richard Marin, opines that Quanta should have removed the Freedom Funds from the Plan as of Q1 2017 based on his purported application of the Plan's IPS watch list methodology. *See* Dkt. 90 (Motion to Exclude Marin) at 2-3, 5-15. Putting aside the reliability of that opinion, Stone does not identify *any* purported issue with Quanta's fiduciary process with respect to the Freedom Funds between the start of the putative class period, September 26, 2016, and Q1 2017. In his Report, Stone identifies a single instance in which the Freedom Funds allegedly failed to comply with the Plan's IPS: "the Committee's indifference to the IPS 'Investment Watch List Process' and deference to the scoring system permitted . . . the Freedom Funds' negative Information Ratios over both three- and five-year periods to be ignored in Q4 2015." Ex. B ¶ 104; Ex. C at 234:3-13 (confirming that he did not identify any other instances of IPS non-compliance other than those identified in paragraph 104 of his Report). Stone is wrong, but regardless, Q4 2015 was nearly a year prior to the start of the putative class period, and fiduciary liability cannot be premised on alleged missteps outside of the statute of limitations. *E.g.*, *Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015) (claim for breach of fiduciary duty is only timely "so long as the alleged breach [] occurred within six years of suit").

8

In fact, the bulk of Stone's criticisms of Quanta's process for monitoring the Freedom Funds stem from purported inconsistencies between the terms of the 2015 IPS and the information that was provided by the Plan's investment consultant following draft revisions to the IPS *in Q3 2017*—nearly two quarters (and counting) **after** Plaintiffs say the Freedom Funds should have been removed from the Plan. Ex. B ¶¶ 116-29; Ex. C at 247:3-10 (agreeing that his opinions concerning purported inconsistencies in Quanta's monitoring process "relate only to the time period after 2017 when the scoring system was implemented"). But even if Quanta's monitoring process did deviate from its IPS starting in Q3 2017 (it did not), that is irrelevant to the question of whether Quanta employed a flawed fiduciary process *leading up to Q1 2017*, which is the only date Plaintiffs maintain the Freedom Funds should have been removed.

And *none* of Plaintiffs' experts have offered any opinion concerning whether the Freedom Funds were prudent investment options at *any point after Q1 2017. E.g.*, Ex. L (Marin Dep. Tr.) at 219:12-18 (agreeing that he "didn't look at anything starting essentially Q1 of 2017 or thereafter"). Thus, Stone's opinion, which focuses on Quanta's fiduciary process during approximately 2017-2021, is completely untethered from Plaintiffs' theory of the case and, therefore, irrelevant. *See DuBois v. The Bd. of Cty. Comm'rs of Mayes Cty.*, 2016 WL 907971, at *2 (N.D. Okla. Mar. 9, 2016) (excluding expert opinion that was "temporally defective in a manner that renders that opinion irrelevant" because it concerned a time period after the alleged injury).

The only other criticism Stone levies specific to the Freedom Funds is an assertion that the Freedom Funds' performance trailed their benchmark from Q4 2015 through Q1 2017. Ex. B ¶¶ 135-36. Stone assumes this single metric was not considered by the Committee based on the observation that the Committee meeting minutes for those quarters do not explicitly mention the

9

Freedom Funds' performance relative to benchmark.[5] *Id*. ¶ 136. But the very data Stone relies on is pulled directly from the quarterly investment reports that were provided to the Committee at those meetings, and which the Committee testified it reviewed and considered. *Id*. ¶ 135 n.243 and Table 1. Stone's criticism thus elevates form over substance—he criticizes the meeting minutes for not explicitly referencing the Freedom Funds' performance relative to benchmark while ignoring robust testimony from the Committee members who confirmed that, prior to every meeting, they reviewed the quarterly investment reports in depth, including the very performance data Stone relies on in his report. For example, Carolyn Campbell, a Committee member since 2016, explained her process as follows:

> *Q.* And then, did you have, throughout your tenure on the Committee, a regular practice preparing for committee meetings?
> *A.* Yes. I would review – I would get the materials in advance, review the agenda, the minutes, the investment performance, presentation deck, the Plan statistics deck.
>
> I would print out either the entire set of documents or parts and pieces of various documents. I reviewed every – every deck that was included, occasionally there was a handout during the meeting.

---

[5] Contrary to Stone's opinion, during the Q1 2016 Committee meeting, "the Committee expressed interest in conducting a due diligence project to review the Freedom Funds versus some industry competitors." Ex. H (Q1 2016 Minutes) at QUANTA_114146. Quanta's investment advisor prepared an analysis that was introduced during the Q3 2016 Committee meeting but, due to time constraints, held in abeyance until the following meeting. Ex. I (Q3 2016 Minutes) at QUANTA_110282. During the Q4 2016 Committee meeting, Quanta "reviewed a target date fund comparison which analyzed the current Fidelity Freedom Funds versus leading industry competitors" and "covered the glide path construction and philosophy, terminal allocation point of the glide path, fees, and diversification." Ex. J (Q4 2016 Minutes) at QUANTA_002217-18. Based on that analysis, the Committee concluded that it "remained pleased with the Fidelity Freedom Funds and did not note sufficient reasoning to change target date fund providers at this time." *Id*. Thus, the meeting minutes clearly demonstrate that Quanta was monitoring the Freedom Funds during this time period and, in fact, requested *additional information* to ensure they remained reasonable investment options for the Plan. Stone ignores all of this discussion and blithely asserts that because the phrase "performance relative to benchmark" does not appear in the meeting minutes, Quanta must not have been paying attention to it.

> If there was anything like that it was typically something that was very short and something that was being supplemental to the more comprehensive material that had already been circulated.
>
> But I spent hours reviewing the materials so that I could come in and have my comments sort of highlighted or circled for myself to bring to the Committee and see if there were things that we wanted to address as a group, or get an explanation from our investment advisor, or just have a discussion about it.
>
> *Q.* Okay. As part of that preparation, would you review the performance of the investments in the Plan lineup?
>
> *A.* Yes. I would review the menu of options, Plan options. ***I would review investment performance results. We looked at multiple time periods. We looked at multiple metrics, a number of quantitative metrics.***
>
> We considered a lot of factors. We considered performance against overall market returns. ***We considered performance against benchmarks***, indexes.
>
> We considered quantitative risk analysis ratios, if you will, risk-adjusted returns, absolute returns. We oftentimes got additional information that would supplement that quantitative information and it was sort of a wholistic approach.
>
> We – we used a lot of judgment and discretion to have a fulsome approach.

Ex. K (Campbell Dep. Tr.) at 63:7-65:5 (emphasis added). Stone's opinion completely ignores that undisputed testimony—as well as similar testimony from the other Committee members—in favor of an overly simplistic (and misleading) approach wherein if something is not explicitly noted in the meeting minutes, he simply assumes it did not happen. This speculative approach—particularly where belied by record evidence, as here—is an inappropriate and unreliable expert opinion. *See Daubert*, 509 U.S. at 590 ("the word 'knowledge' connotes more than subjective belief or unsupported speculation"); *Kovaly v. Wal-Mart Stores Tex., LLC*, 157 F. Supp. 3d 666, 673 (S.D. Tex. 2016) (excluding expert opinion as "irrelevant and speculative" where "Plaintiff has not pointed to reliable bases for [the] expert opinion"); *Young v. Brand Scaffold Servs., LLC*, 2009 WL 4674053, at *4 (E.D. Tex. Mar. 16, 2009) (excluding expert testimony that is "speculative and conjectural at best, lacking any support in the record and belied by" record evidence).

Moreover, the 2015 IPS identifies nine different criteria—both quantitative and qualitative—for the Committee to consider in evaluating whether to place an investment option on the watch list. *Id*. Included among those criteria is performance relative to peers. *Id*. Stone testified that the Freedom Funds' "peer group performance looked better than against the benchmark" but, despite that admission, inexplicably excludes any consideration of performance relative to peers from his Report. Ex. C at 205:22-23. This sort of cherry-picked approach—considering a single isolated performance factor while ignoring other relevant factors (at least one of which he admits undermines his opinion)—is plainly inappropriate and renders Stone's opinion unreliable. *See Recif Res., LLC v. Juniper Cap. Advisors, L.P.*, 2020 WL 11025602, at *9 (S.D. Tex. Oct. 1, 2020) (excluding expert opinion where the expert "without explanation failed to consider substantial and especially significant information that was inconsistent with his [opinion]") (citing *Guzman v. State Farm Lloyds*, 456 F. Supp. 3d 846, 853 (S.D. Tex. 2020)).

Nor is Stone's approach consistent with *his own stated methodology*. Stone testified that the 2015 IPS was "fairly typical," that a prudent fiduciary monitoring process "needs to get tied very specifically to the investment policy statement," and agreed that "there would be circumstances in [his] experience where there is underperformance of a fund, but it is still appropriate to continue to offer that fund." Ex. C at 85:2-12, 109:18-20, 173:12-16. Despite that testimony, Stone's opinion ignores the tenets of the 2015 IPS insofar as he neglects to consider ***any of the nine*** quantitative and qualitative criteria actually identified for watch list purposes.

      **iii.**      **Stone Does Not Opine That The Freedom Funds Should Have Been Removed From The Plan.**

The entire premise of Plaintiffs' case is the theory that the Freedom Funds should have been removed from the Plan as of Q1 2017, and that the Committee's allegedly imprudent fiduciary monitoring process resulted in the Freedom Funds not being removed at that time. *See, e.g.*, Compl.

¶¶ 24-48; Dkt. 53 at 2; Ex. A ¶ 1. But Stone himself does not offer that opinion. Rather, Stone only goes so far as to say that the Freedom Funds should have been subject to more "scrutiny" as of Q1 2017:

> *Q.* So we will get to some of those details. I'm just trying to hone in on whether or not you have an opinion that the Committee should have removed the Freedom Funds from the Plan lineup at a certain period of time?
>
> *A.* I think they should have done – I keep coming back to this. I haven't done – I don't have all of that analytic data in front of me. I know the number of quarters that it was underperforming and I know by how much because that is in the report here. But what I don't have, I don't have the information to make the determination that you're asking me to just blithely say it should have been removed.
>
> What I can say, it should have been subject to substantially more analytical analysis which might have resulted in it being removed, but I can't say at this point because the work wasn't done.

Ex. C at 171:3-21.

> *Q.* So would you agree with me based on the information in table 1 of your report, that that information does not necessitate a removal of the Fidelity Freedom Funds from a Plan?
>
> *A.* I said what it necessitated was taking additional action to understand the reasons for the underperformance. That might or not have led to the removal of the funds depending on what was discovered.

*Id*. at 287:11-20. According to Stone, once an investment option is identified as underperforming (against a single metric) or subject to watch list procedures, a fiduciary committee should apply "heightened scrutiny." But Stone did not conduct the type of "heightened scrutiny" analysis he believes the Committee should have applied to the Freedom Funds.[6] Nothing was stopping Stone from doing so—indeed, he testified that he routinely applied the process he espouses for his own clients during his tenure as an investment consultant. *Id*. at 83:8-84:25. And Stone further admitted that he had access to all the information related to Quanta's fiduciary process that he needed to

---

[6] Nor did any of Plaintiffs' other experts, for that matter.

13

form his opinion. *Id.* at 42:8-43:21; Ex. B at App'x B. Stone proclaims (without any basis) that the Committee did not "do the work" necessary to reach a conclusion as to the prudence of the Freedom Funds, but neither did he. This sort of equivocal opinion—that the Freedom Funds may or may not have been subject to removal depending on the outcome of some analysis that Stone himself never carried out—is unhelpful to the Court. *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 245 (5th Cir. 2002) ("A perfectly equivocal opinion [that] does not make any fact more or less probable and is irrelevant under the Federal Rules of Evidence."); *Sandifer v. Hoyt Archery, Inc.*, 907 F.3d 802, 809 (5th Cir. 2018) (similar); *Munoz v. Orr*, 200 F.3d 291, 301-02 (5th Cir. 2000) (affirming exclusion of expert opinion where expert "admitted to failing to consider other variables" and admitted to not performing a certain type of analysis); *Stevens v. Ford Motor Co.*, 2022 WL 19978265, at *10 (S.D. Tex. Sept. 29, 2022) (excluding expert opinion that identified relevant data and a process for evaluating that data but did not actually perform the analysis, because the expert "does not provide necessary analysis or calculations, rendering his methodology 'incomplete'").

      **B.**    **Stone's Remaining Broad Criticisms Of Quanta's Fiduciary Process Are Meritless *Ipse Dixit*.**

Stone asserts three broad criticisms of Quanta's fiduciary processes between the start of the class period and, approximately, 2021: (1) Quanta's fiduciary committee operated without a committee charter, Ex. B ¶¶ 81-83; (2) Quanta's fiduciary committee's meeting minutes were "cursory," *id*. ¶¶ 84-90; and (3) Quanta's fiduciary committee members received inadequate fiduciary training, *id*. ¶¶ 91-95. Each of these criticisms is based solely on Stone's experience as an investment advisor to other fiduciary committees. But "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is

reliably applied to the facts." Fed. R. Evid. 702 advisory committee's note to 2000 amendments. Stone falls far short of this standard.

***Committee Charter.*** Stone opines that "the Committee operated without a charter or other formal governance document." Ex. B ¶ 81. However, Stone admits that neither ERISA nor the Department of Labor requires fiduciary committees to have a charter and that the information contained in a charter may instead be detailed in an "equivalent document." Ex. C at 220:11-221:14. Here, the 2015 IPS includes a section titled "Roles and Responsibilities of the Various Parties" that details the Committee's responsibilities. Ex. E at QUANTA_001408. Stone's Report completely ignores that fact, and he does not even consider the delegation of authority contained in the IPS. Moreover, although he testified in deposition that there were "several things" missing from the IPS, he could not identify any specific item that was missing other than the delegation of authority—which is, in fact, contained in the 2015 IPS. Ex. C at 222:3-223:7, 224:6-225:24. Instead of evaluating the delegation of authority in the IPS, Stone cites deposition testimony from various Committee members out of context to argue that the Committee members lacked an "understanding" of their roles. Ex. B ¶¶ 81-83. But even if that were true (it is not), Stone does not explain anywhere in his Report how this supposed lack of understanding manifested in any procedural misstep with respect to the Committee's monitoring of the Freedom Funds—much less during the limited window of time Plaintiffs have put at issue in this case. Nor could he. For example, Stone takes issue with the fact the Committee "reached decisions by consensus after discussion among the Committee and its advisor" rather than employing a formal "voting process." *Id*. ¶ 82. But Stone does not identify any specific instance where the lack of a formal vote led to an issue with the Freedom Funds. And in the end, Stone conceded at deposition that he is "not saying that you can't use consensus voting." Ex. C at 226:13-227:2.

15

*Meeting Minutes.* Stone argues that the Committee's meeting minutes "were cursory and failed to underpin a consistent and objective process." Ex. B ¶ 85. But in support of that opinion, Stone points to a *single* set of Committee meeting minutes from prior to the start of the putative class period, out of the 37 Committee meeting minutes that he purportedly reviewed in offering his opinion. *Id.* ¶¶ 86-88 (criticizing the Q4 2015 meeting minutes from a Committee meeting that occurred on February 15, 2016), App'x B (identifying materials considered in rendering his opinion). Stone does not identify *any* meeting minutes during the relevant time period that are supposedly deficient, much less explain the manner in which they are deficient or how such purported deficiency impacted the Committee's fiduciary process. *See* Ex. B ¶¶ 84-90. Nor could he even identify how many minutes were purportedly deficient other than the single example he cites from before the putative class period. Ex. C at 195:16-22. To the contrary, Stone testified that "some" of the meeting minutes "seem perfectly fine." *Id.* at 191:24-192:2. Absent any further detail, Stone provides absolutely no basis to support his opinion concerning the meeting minutes.

*Fiduciary Training.* Stone opines that the fiduciary training received by the Committee prior to 2021 was inadequate because it was "informal and cursory at best." Ex. B ¶ 92. But Stone admitted that on at least two occasions prior to 2021, the Committee was provided with a "one-pager" titled "fiduciary essentials." Ex. C at 217:24-218:10. Stone further admitted that he "ha[s] no idea what was delivered" verbally to the Committee in connection with the fiduciary essentials one-pagers. *Id.* at 219:24-220:6. In other words, Stone has no basis to opine that the information shared by the investment advisor was insufficient. Moreover, and again, Stone does not take the necessary step to connect this purported shortcoming to the Committee's process for monitoring the Freedom Funds. Instead, he simply asserts that "all decisions regarding Plan investments and fees . . . were significantly influenced by the lack of training on specific investment monitoring

16

considerations and the relevant standard of care." Ex. B ¶ 94. This sort of speculative and conclusory expert opinion is inadmissible. *E.g.*, *In re Complaint of C.F. Bean L.L.C.*, 841 F.3d 365, 370-71 (5th Cir. 2016) ("A district court does not abuse its discretion by excluding this kind of conclusory opinion."); *Williams v. Hyster-Yale Grp.*, 2024 WL 1144889, at *7 (S.D. Tex. Feb. 9, 2024) ("conclusory assertions do not pass muster under *Daubert*"); *Floyd v. Hefner*, 556 F. Supp. 2d 617, 641 (S.D. Tex. 2008) (excluding expert opinion that is "speculative and conclusory").

Ultimately, these opinions do not relate to the time period at issue in this case—September 26, 2016 to January 1, 2017. And they should be excluded as impermissible *ipse dixit*. "Even when an expert is extrapolating from personal experience as a practitioner rather than from reviewing research undertaken by others, 'nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.'" *LeBlanc ex rel. Est. of LeBlanc v. Chevron USA, Inc.*, 396 F. App'x 94, 100 (5th Cir. 2010) (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)); *see also Mama Jo's Inc. v. Sparta Ins. Co.*, 823 F. App'x 868, 876 (11th Cir. 2020) ("To be sure, experience, standing alone, is not a sufficient foundation rendering reliable any conceivable opinion the expert may express.").

## IV. CONCLUSION

For the foregoing reasons, the Court should exclude Stone's opinions and proposed testimony.

Dated: December 20, 2024

Respectfully submitted,

**MORGAN, LEWIS & BOCKIUS LLP**

/s/ *Jeremy P. Blumenfeld*
Jeremy P. Blumenfeld, *Admitted Pro Hac Vice*
Attorney-In-Charge
Pennsylvania Bar No. 85955
2222 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-5000
*jeremy.blumenfeld@morganlewis.com*

David J. Levy
Texas Bar No. 12264850
S.D. Tex. No. 13725
1000 Louisiana Street, Suite 4000
Houston, TX 77002
Telephone: (713) 890-5000
*david.levy@morganlewis.com*
*Counsel for Defendant Quanta*

**CERTIFICATE OF SERVICE**

The undersigned counsel certifies that a true and correct copy of the foregoing document was served via the Court's ECF/CM e-filing system to all counsel of record on December 20, 2024.

/s/ *Jeremy P. Blumenfeld*
Jeremy P. Blumenfeld

**CERTIFICATE OF CONFERENCE**

Pursuant to Local Rule 7.1.D., the undersigned counsel certifies that counsel for the parties have conferred via email concerning the foregoing Motion to Exclude Proposed Expert Testimony of Donald C. Stone and that Plaintiffs oppose the Motion.

/s/ *Jeremy P. Blumenfeld*
Jeremy P. Blumenfeld