# Exhibit C

Page 1

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF TEXAS

4    Case No.: 4:22-cv-03290 (AHB)

5    ------------------------------------x

6    MARY LALIBERTE, et al.,

7                            Plaintiffs,

8            -against-

9    QUANTA SERVICES, INC., et al.,

10                           Defendants.

11   ------------------------------------x

12                           November 1, 2024
                             3:03 p.m.

13                           Central European Time

14

15

16       Remote Virtual Zoom Deposition of

17   DONALD C. STONE  taken by Defendants, pursuant
     to Notice, with the Witness located in Costa

18   Bravo, Spain, before William Visconti, a
     Shorthand Reporter and Notary Public within and

19   for the State of New York.

20

21

22

23

24

25

```
                                            Page 2

 1
 2      A P P E A R A N C E S:
            MILLER SHAH, LLP
 3          Attorneys for Plaintiffs
                    1845 Walnut Street, Suite 806
 4                  Philadelphia, PA 19103
 5          BY:    JOHN C. ROBERTS  ESQ.
                    jcroberts@millershah.com
 6
 7
            MORGAN LEWIS & BOCKIUS LL[
 8          Attorneys for Defendants
                    One Federal Street
 9                  Boston, MA 02110
10          BY:    KERI L. ENGELMAN, ESQ.
                    keri.engelman@morganlewis.com
11                  MARIA DE CASTRO, ESQ.
                    maria.decastro@morganlewis.com
12
13
14
        ALSO PRESENT:
15
            HOWARD BRODSKY, Videographer
16          CAROLYN CAMPBELL, In-house Quanta Services
17
18
19
20
21
22
23
24
25
```

Page 3

1

2          IT IS HEREBY STIPULATED AND AGREED

3     by and between the attorneys for the

4     respective parties herein that filing and

5     sealing be and the same are hereby waived.

6          IT IS FURTHER STIPULATED AND AGREED

7     that all objections, except as to the form

8     of the question, shall be reserved to the

9     time of the trial.

10          IT IS FURTHER STIPULATED AND AGREED

11     that the within deposition may be signed

12     and sworn to before any officer authorized

13     to administer an oath with the same force and

14     effect as if signed and sworn to before the

15     Court.

16

17

18

19

20

21

22

23

24

25

Page 4

1

2              THE VIDEOGRAPHER:   Good morning.

3       Here begins the video recorded virtual

4       remote testimony of Donald C. Stone

5       appearing from his location in Costa Bravo,

6       Spain.   This deposition is taken by the

7       Defendants in the matter of Mary Laliberte,

8       et al. Plaintiffs versus Quanta Services

9       Inc., et al, Defendants.   The case number

10      4:22-CV-03290 (AHB) in the United States

11      District Court Southern District of Texas.

12              Today is Friday, November 1st, 2024.

13      The time is approximately 3:03 p.m. central

14      European standard time.   My name is Howard

15      Brodsky and I'm the legal video specialist

16      today with Veritext Legal Solutions with

17      offices located in Philadelphia,

18      Pennsylvania.   The court reporter is

19      William Visconti in association with

20      Veritext.

21              Counsel have stipulated that the

22      court reporter shall enter all appearances

23      for this proceeding into the stenographic

24      court record and further stipulate and

25      agree that the court reporter may take the

Page 5

```
 1
 2          deponents oath remotely.
 3                  Will you court reporter please swear
 4          in the witness.
 5
 6                  D O N A L D   C.   S T O N E,
 7          having been first duly sworn by the Notary Public,
 8          was examined and testified as follows:
 9                  MR. ROBERTS:  I'm ordering a copy of
10          the transcript.
11  EXAMINATION CONDUCTED BY MS. ENGELMAN:
12          Q.    Good afternoon, Mr. Stone.  How
13  are you today?
14          A.    I'm fine.  How about yourself?
15          Q.    Good, thank you.  My name is Keri
16  Engelman and I represent Quanta Services in
17  this matter.  And you understand today that
18  you're here to be deposed about the expert
19  report that you submitted in this matter.
20          A.    Correct.
21          Q.    We have heard on the record that
22  you are currently in Spain; is that correct?
23          A.    That is correct.
24          Q.    How long have you been in Spain?
25          A.    Six months.  We spend about 6
```

Page 6

1                    DONALD C. STONE

2      months in here and six months in Florida.

3            Q.    I understand that you have been

4      deposed before; is that correct?

5            A.    That's correct.

6            Q.    I won't spend a lot of time going

7      through some preliminaries since you have been

8      deposed, but I just want to be go through a

9      couple of basics.

10                  First of all, if you need a break

11     today, please let me know.  I'm happy to take

12     one, my only sort of instruction around that

13     would be if there is a question pending that

14     you answer the question and then we could take

15     that break.  That being said, we are in kind of

16     a good rhythm of taking a break every hour or

17     hour and a half to stretch our legs.  So that

18     should be fine.

19                  If you do not understand a

20     question, of course ask me to clarify.  If you

21     do answer the question I'm going to assume that

22     you understood it.  Is that fair?

23           A.    That's fair.

24           Q.    You understand that you just took

25     an oath and that means that you have an

Page 7

1                    DONALD C. STONE
2       obligation to the court to tell the truth just
3       as if you were before the judge in court.  Do
4       you understand that?
5              A.     I do.
6              Q.     Is there any reason today that you
7       would not be able to testify truthfully?
8              A.     No.
9              Q.     What did you do, Mr. Stone, to
10      prepare for today's deposition?
11             A.     Just in the last day or two or
12      since the beginning when I got involved in the
13      case?
14             Q.     I would like to take it step by
15      step.  But to the extent that you prepared for
16      today's deposition since being aware that you
17      would come in to be deposed, what do you do to
18      prepare for today?
19             A.     So I read through my report, of
20      course.  I read through some of the depositions
21      again.  I read the investment policy statement
22      again.  I looked at a few of the quarterly
23      reports, investment reports again.  Probably a
24      few other documents as well that have been
25      supplied by counsel.

1           DONALD C. STONE

2           Q.    When you say deposition

3    transcripts, do you mean the entirety of the

4    transcripts?

5           A.    Well, I didn't look through the

6    entirety of all the transcripts again at this

7    point.  But I did look up Laurie Latham in

8    particular, I reread that one.

9           Q.    You read Laurie Latham's

10   deposition transcript?

11          A.    I read her rebuttal report.

12          Q.    When talking about deposition

13   transcripts, do you remember which deponents

14   the transcripts of which you read in preparation

15   for today's deposition?

16          A.    There were a bunch of names,

17   that's for sure.  There were several of the

18   committee members that I looked at.  I didn't

19   read all of those transcripts in preparation in

20   the last couple of days.  I looked at them

21   earlier.  I think there were three committee

22   members that I looked at.  One was the

23   associate legal counsel, one was the head of

24   the committee or at least presumed head of the

25   committee and the other would have been the

Page 9

1                    DONALD C. STONE

2    head of HR.

3           Q.     Other than your counsel, did you

4    speak to anyone in preparation for today's

5    deposition?

6           A.     No, I did not.

7           Q.     Did you speak with counsel in

8    preparation for today's deposition?

9           A.     I did.

10          Q.     Who did you speak with?

11          A.     John Roberts and a couple of his

12   associates yesterday for probably three, four

13   hours.

14          Q.     Other than that conversation with

15   John and some associates yesterday, did you

16   speak with counsel in preparation for today's

17   deposition?

18          A.     That was -- well, I think two days

19   ago I spoke with him briefly and yesterday and

20   that was the part that I would count as

21   preparation for today.

22          Q.     You mentioned that you re-reviewed

23   Laurie Latham's report; is that right?

24          A.     Correct.

25          Q.     Did you review Laurie Latham's

1              DONALD C. STONE

2    report when she served it in this matter or

3    shortly thereafter or did you just review it

4    within this past week?

5              A.    I think just in this past week.

6              Q.    When were you provided the report?

7              A.    It has been some time ago.  I

8    don't remember the exact date.

9              Q.    So you were provided it some time

10   ago and you read it this week for the first

11   time; is that right?

12             A.    I think that is correct, yes.

13             Q.    Have you read any other expert

14   reports that have been submitted in this

15   matter?

16             A.    I have and it has been a little

17   while since I have looked at those.

18             Q.    Do you know if those were

19   Plaintiffs' experts or Defendants' experts?

20             A.    Those would have been Defendants.

21             Q.    Are you aware if Plaintiffs have

22   submitted any other expert reports other than

23   your own in this matter?

24             A.    I am.

25             Q.    Do you know which experts or which

Page 11

                    DONALD C. STONE

1

2    reports?

3         A.    I did not read those.  Since they

4    weren't part of my opinion I did not read them.

5         Q.    Do you know who the experts are?

6         A.    I don't remember the names off the

7    top of my head.  And I don't know them through

8    my industry contacts.

9         Q.    You said you recall reading

10   another of Defendants' expert reports other

11   than Laurie Latham; is that correct?

12        A.    Yes.

13        Q.    Do you know when you read that?

14        A.    No, I don't.

15        Q.    Do you have any documents with you

16   today in person, Mr. Stone?

17        A.    I have a freshly printed out copy

18   of my report, that's it.

19        Q.    Sounds good.  So when were you

20   retained in this case?

21        A.    I believe I want to say it was

22   either May or June of this year, I believe.

23   It's possible I was retained earlier, but we

24   didn't get around to looking at documents or

25   anything, so I don't have that -- I'd have to

Page 12

1                     DONALD C. STONE

2      look up when the agreement was signed.  I don't

3      have that off the top of my head.

4            Q.     That's okay.  Do you recall --

5            A.     Can I -- I'm sorry interrupt you.

6      I have a really obnoxious fly that keeps

7      landing on my computer.  Can we go off the

8      record for two minutes and I'm gong to take of

9      this.

10                   MS. ENGELMAN:   Sure.  Let's go off

11              the record for 5 to make sure that you take

12              care of it.

13                   THE VIDEOGRAPHER:   Counsel, the

14              time is 3:12 p.m. and we are off the

15              record.

16                   (Recess Taken.)

17                   THE VIDEOGRAPHER:   The time is 3:14

18              p.m. and we are on the record.

19      BY MS. ENGELMAN:

20            Q.     Mr. Stone, before the kind of fly

21      situation we were talking about when you were

22      retained in this case.  Do you recall if you

23      reviewed any documents before you were retained

24      in this case?

25            A.     I would have reviewed the

Page 13

```
1                    DONALD C. STONE
2       complaint prior to being retained.
3              Q.     Anything else?
4              A.     Probably that's the only document
5       prior to being retained.
6              Q.     Did you have any conversations
7       with anyone in connection with prior to being
8       retained in this case?
9              A.     Yes, I had I think a couple of
10      conversations with counsel prior to the
11      retention.
12             Q.     With anyone else prior to the
13      retention?
14             A.     No.
15             Q.     Did anyone assist you in preparing
16      your report?
17             A.     I worked with legal counsel, but
18      other than that, no.
19             Q.     When you say legal counsel, you're
20      referring to Miller Shah?
21             A.     Yes, I am.
22             Q.     What particular attorneys are you
23      referring to?
24             A.     Well, John in particular and both
25      of his associates.
```

Page 14

1              DONALD C. STONE

2         Q.    When you say you worked with legal

3    counsel, did you actually draft every portion

4    of your report?

5         A.    I wrote the report.  It's an

6    iterative process.  Counsel, as you probably

7    are aware, that you have conversations at the

8    beginning about kind of what the counsel's view

9    of the case is.  We go back and forth.  We talk

10   about particular salient areas where they have

11   an opinion and they are wondering if my opinion

12   kind of syncs up with theirs.  We go back and

13   forth on that.  Sometimes it does and sometimes

14   to doesn't.  Then the process begins.

15              At that point they fed me a

16   framework for the report itself and they also

17   ended up filling in, of course, at the end

18   putting all the cites and everything because

19   they have this ability.  I don't have that

20   capability here.

21         Q.    Of filling in the cites.  Okay, so

22   it is your testimony that you counsel provided

23   you with a draft of the report and you --

24         A.    We went back and forth creating

25   drafts.  They would have a, for lack of a

Page 15

```
 1                    DONALD C. STONE
 2     better work, a backbone of what they wanted to
 3     do and I would populate it within some cases
 4     depending on which section there was quite a
 5     bit of information back and forth and they
 6     would go and give me some additional
 7     information.  I would review that, I would edit
 8     it, I would send them an edited version back,
 9     back and forth.  At the end of the day.  It is
10     my report.  I stand by the words on it.  I
11     signed it.  So I think that's the situation.
12           Q.     Other than counsel at Miller Shah,
13     did anyone else assist you in any way in the
14     creation of the report?
15           A.     No.
16           Q.     To the best of your recollection,
17     when is it that you first received a, quote/unquote,
18     framework of the draft of the report from
19     counsel?
20           A.     Probably in June.
21           Q.     Do you have any recollection of
22     how many drafts you exchanged with counsel
23     before the report was finalized?
24           A.     I don't remember the exact number.
25     All of these cases work in a very similar
```

Page 16

1                    DONALD C. STONE

2        fashion.  Sometimes it goes with three or four

3        drafts, sometimes it goes up to six or seven

4        drafts.  It varies and I can't give you an

5        exact number on this one.  I have to go back

6        and recreate that.

7               Q.     Sitting here today do you think it

8        was more than 3 or less than 3?

9               A.     I would guess more.

10              Q.     When you signed the report and we

11       will take a look at it, let me just pull up the

12       exact date here.  July 31st of 2024, does that

13       ring a bell?

14              A.     Yeah.

15              Q.     Do you have a recollection of when

16       you actually finalized the report with counsel?

17              A.     That would have been about that

18       time.

19              Q.     So can you approximate for me

20       about how many hours you think you spent

21       preparing the report?

22              A.     You know, I really don't know.  I

23       submit monthly invoices, but I don't actually

24       total anything up on these cases until after

25       they are done.  It's typical that it could be

Page 17

DONALD C. STONE

1
2      cases -- it depends on case, but they could be up

3      to -- between 50 and 150 to 180 hours depending

4      and, I don't know, how many hours in this case.

5              Q.      When you say 50 to 100 hours,

6      you're talking about the preparation of the

7      report itself and not necessarily including

8      preparation for deposition or are you

9      combining?

10             A.      I'm talking about the total.

11             Q.      When you were exchanging drafts

12     with Plaintiffs' counsel, were you also having

13     conversations about those drafts via phone or

14     Teams or Zoom or what have you?

15             A.      Yes, typically via phone we would

16     have a conversation.  I don't know that it was

17     every time, but there might be an e-mail

18     exchange going on, there might be phone

19     conversations, it just depended.  But there

20     would always be some kind of communication back

21     and forth as these were being exchanged.

22             Q.      Do you have any estimation or

23     approximate of how much time you spent on the

24     phone with counsel in the iterative process of

25     preparing your report?

Page 18

1              DONALD C. STONE

2         A.      I have no idea.  I mean it would

3     be purely a guess.  It is not something that I

4     track, so I could come up with a number but the

5     number would be as good as any fiction that is

6     out there.  I just don't know.

7         Q.      So you can't approximate whether

8     --

9         A.      I don't want to speculate on

10    something that I can't even come close on.

11        Q.      I don't want you speculate either.

12    Without speculation, can you say it was more

13    than 10 hours or less than 10 hours on the

14    phone with counsel in the process of creating

15    the report.

16        A.      Creating the report, it would have

17    been probably less than -- probably approaching

18    10  in the creation of the report, somewhere in

19    that neighborhood.  Again, that is a guess at

20    this point.

21        Q.      Okay.  So I understand that you

22    have served as an expert in prior cases; is

23    that correct?

24        A.      That's correct.

25        Q.      Approximately how many cases, I

Page 19

                        DONALD C. STONE
1
2       know in your report you list the cases that you
3       served as an expert for the last four years and
4       we will cover those.
5                       Do you have an approximation of
6       how many case you have served as an expert in
7       the last 10 years?
8                A.     Let's see, the last ten years it
9       actually would be the same number.  There was a
10      period of time between say 2004 and 2007 I
11      served as an expert and then I did not serve as
12      an expert again until 2021.
13               Q.     Sorry, I missed the first date
14      that you provided there.
15               A.     2004 to 2007.
16               Q.     From 2004 to 2021 you did not
17      provide any expert --
18               A.     From 2007 to 2021.
19               Q.     Understood.  Did you provide
20      expert services prior to 2007?
21               A.     Yes, between 2004 and 2007.
22               Q.     All right, for some reason I had a
23      disconnect of the from 2004 to 2007 you
24      provided expert services?
25               A.     That's correct.

Page 20

1                    DONALD C. STONE

2          Q.     2007 to 2021 you did not and

3     resumed again in 2021?

4          A.     Correct.  I can explain that.

5          Q.     I was going to ask first how many

6     cases did you serve, if you can recall, as an

7     expert between 2004 and 2007?

8          A.     Either four or five.

9          Q.     Do you recall the issues on which

10    you opined in those cases?

11         A.     I do.

12         Q.     Can you just walk through the

13    names of the cases and the issues, if you

14    recall?

15         A.     Well, I can give you the names of

16    two of the cases.  There are a couple of them

17    which are -- I don't remember the names of the

18    cases, but they actually were the most

19    interesting of the group.  They were a bit

20    different.

21                Two of the cases were -- one was

22    Kraft and my partner and I were working on that

23    case for the Defendants.  And then General

24    Dynamics was the other one.

25         Q.     Do you remember the issue that

Page 21

DONALD C. STONE

```
 1                       DONALD C. STONE
 2     was -- that you opined in Kraft?
 3            A.     It had to do with recordkeeping
 4     fees and I believe in General Dynamics it had
 5     to do with recordkeeping fees, but also had to
 6     do with a -- with investments, because they had
 7     in-house -- they had an in-house investment
 8     firm that was spun off at a certain point, but
 9     it was -- it had been a captive internal
10     organization, if you will, so there was some
11     issues obviously around a fiduciary aspect of
12     that.
13            Q.     So for Kraft you said that you
14     were an expert for the Defendant; is that
15     correct?
16            A.     Yes, that's correct.  You actually
17     probably will see because I was -- I wrote a
18     big chunk of the report with my partner, which
19     you will see her name on it, Jennifer, at that
20     time it would have been Jennifer Marconi I
21     believe or it could have been Flodin, F-l-o-d-i-n,
22     which would have been her married name.
23            Q.     When you say partner, what do you
24     mean by that?
25            A.     She was my business partner in a
```

Page 22

```
1                 DONALD C. STONE
2      company that I founded in 2002.
3              Q.    Were you opining on the prudence
4      of the fiduciary process in that case?
5              A.    I believe, I think that is
6      probably a fair general broad explanation of
7      it.  I don't remember all of issues and exactly
8      the details of it at this point.  It has been
9      quite a while.
10             Q.    For General Dynamics were you an
11     expert for the Plaintiffs or defense, if you
12     recall?
13             A.    For the defense.
14             Q.    The same question, were you
15     opining on the prudence of fiduciary process in
16     that case?
17             A.    Yes.
18             Q.    Then are those the only two cases
19     that you can recall providing an expert report
20     between 2004 and 2007?
21             A.    No.  There were two other cases
22     and they were -- they involved smaller plans
23     than the two that we just talked about.  One
24     involved theft from a 401-K and the other one
25     involved a defense of a -- there was a lack of
```

Page 23

1                      DONALD C. STONE

2       fiduciary process until I was asked to -- if

3       there was any reasonable defense in the case of

4       a profit sharing plan where somebody -- an

5       executive vice president of the firm had sued

6       saying that there was imprudence because of

7       lack of a fiduciary process and the investment

8       selection monitoring.

9              Q.    Do you recall what your opinion

10      was in that case?

11             A.    In the case of the, the last case

12      that we just talked about, yeah, basically what

13      I -- what we decided and legal counsel when

14      they approached me, this would have been toward

15      defense as well.  They said there was no

16      fiduciary process so we can't defend the case

17      on that.  Is there any other way that we can

18      defend it and the answer that I came up with

19      was how did the investments do.

20                   Basically one person chose all the

21      investments based on Money Magazine's

22      recommendations each month and she knocked it

23      out of the ballpark.  We went to the judge and

24      said no case, it would be a reasonable profit

25      sharing plan to use 60 percent S&P 500, 40

Page 24

                    DONALD C. STONE

1

2       percent of the Ag on the bond side.  And if the

3       judge would accept that, which he did, then I

4       created, basically created a table showing the

5       performance.

6                    So there was no -- basically the

7       defense was there was no harm no foul.  Even

8       though there was no process, the guy who sued

9       was better off because of the selections that

10      she made.

11          Q.    So your position in that case was

12      essentially that these investments performed

13      well and as a result the defense should succeed

14      irrespective of no fiduciary process; is that

15      correct?

16          A.    Yeah, I didn't -- my report did

17      not say there was no fiduciary process.  That

18      was counsel that took that position.  My role

19      was to come up with the defense in terms of the --

20      was there a harm and the answer was there was

21      no harm.  That was my narrow role to look at

22      that.

23          Q.    And that was, just so I'm clear,

24      what is the name of that case?

25          A.    I don't remember.  It was a large --

Page 25

1                      DONALD C. STONE

2       it was -- I don't remember.  I don't even

3       remember what the company did at this point.

4       It was kind of a mid-size firm in the greater

5       Chicago region.  And besides that, I just don't

6       remember anything about it at this stage.  That

7       was back in probably 2005.

8               Q.    So any other cases that you

9       remember focusing on in the 2004 to 2007 time

10      period?

11              A.    I mentioned there was one where

12      there was theft from a 401-K.

13              Q.    Anything else?

14              A.    No, those are the only ones that I

15      remember.

16              Q.    From 2007 to 2021 you did not

17      provide any expert services; is that correct?

18              A.    That's correct.  We decided that

19      after the Kraft case we decided because of the

20      nature of these cases, they kind of come and go

21      and it's very difficult to run a business

22      despite the fact that, obviously legal firms do

23      it all the time, in terms of an investment

24      consulting firm, which my firm was, it created

25      more issues than it was worth going through to

Page 26

1                    DONALD C. STONE

2       try to staff for it and have the time and so on

3       to go through that kind of process.

4                    So it was we just decided that we

5       wouldn't do any more cases and we didn't the

6       entire time that I was employed.

7            Q.      Then in 2021 as of that time you

8       were retired from the consulting service

9       business; is that correct?

10           A.      That's correct.

11           Q.      So at that time you started to

12      pick up cases, am I right?

13           A.      That's correct.  I was approached

14      about a case, I believe that would have been

15      Astellas which has since been settled and that

16      is listed in the report.  But I was approached

17      about that case in the fall of '21 to see

18      whether I would be interested in basically

19      working with the Plaintiffs in that case and I

20      think within about a month they also asked me

21      whether I would work on the Shell case.

22           Q.      When you say they, who are you

23      referring.

24           A.      This would have been Schlichter.

25           Q.      Schlichter was Plaintiffs' counsel

Page 27

DONALD C. STONE

1

2      in the Astellas and the Harmon versus Shell Oil

3      case; is that correct?

4              A.      Yes.

5              Q.      What was the issue in Astellas?

6              A.      Astellas -- let me think for a

7      moment.  So Astellas had to do with OCIO or

8      what is sometimes referred to as 338 services

9      that were being provided by Aon as a

10     proprietary product.  That was the primary

11     issue involved in that case.

12             Q.      What is it that you opined on

13     precisely?

14             A.      Basically I was saying that that

15     was -- that their role in recommending their

16     own funds was conflicted.

17             Q.      What was the issue in the Shell

18     Oil Company case?

19             A.      Shell had several issues and that

20     is still an ongoing case at this point.  One

21     was recordkeeping fees.  The second was the

22     tier of investments of approximately 300

23     investment choices which were not monitored by

24     the investment committee.  And then the third

25     issue was fees that were being generated by

Page 28

1              DONALD C. STONE

2       managed accounts that -- and that tied into the

3       recordkeeping fee because it had to do with the

4       total revenue that was being received by the

5       record keeper at the end of the day.

6              Q.    Did you opine on the fiduciary

7       process as it related to all three of those

8       particular issues or something else?

9              A.    No, all three.

10             Q.    But was your report limited to the

11      fiduciary process issue?

12             A.    As oppose to -- well, I didn't --

13      so I dealt with the fee issues and the

14      fiduciary process issues.  I did not opine --

15      if I remember correctly, I don't think I opined

16      on the -- I'm not sure exactly about the

17      prudence of any particular -- there were 300

18      investments that nobody was monitoring and I

19      did make some commentary about some of those

20      funds being duplicative and being the same fund

21      was in the main menu and outside of the main

22      fund it was a more expensive version.  So I may

23      have opined about that.  I don't think I was --

24      I don't think I opined about the returns of any

25      particular fund or any particular groups of

Page 29

1              DONALD C. STONE

2    funds.

3         Q.    We could introduce the exhibit,

4    but we will probably do it later.  Do you have

5    your report in front of you, I'm looking at

6    paragraph 15, which just has a list here of the

7    cases that you set forth as providing expert

8    testimony.  I'm just running through those.

9              I'm looking, Mr. Stone, at

10   paragraph 15 of your report, just to refresh

11   your recollection of the other cases in which

12   you listed that you provided expert testimony.

13   So we talked about Astellas.  You listed that

14   as Wachala versus Astellas.  Do you know, was

15   it actually Miller versus Astellas?  Do you

16   have a recollection of that?

17        A.    I don't have a recollection that

18   it was Miller, no.

19        Q.    So then the next case listed is

20   Mills versus Molina Healthcare; is that right?

21        A.    Yes.

22        Q.    Did you provide testimony for

23   Plaintiffs or defense?

24        A.    For Plaintiffs.

25        Q.    Do you remember who counsel was?

Page 30

1                    DONALD C. STONE

2          A.     That would have been Schlichter as

3     well.

4          Q.     What was the issue in that case?

5          A.     That had to do with proprietary

6     quasi custom target day funds.

7          Q.     What is the issue that you opined

8     on?

9          A.     Well, that I felt that there was a

10    conflict between -- well, that the advisor was

11    offering their own funds as opposed to having

12    an unconflicted view to go out and search for

13    other funds for their client.  And there were,

14    even though the overall -- the issue ended up

15    turning on whether in an NFP got -- if they

16    received extra benefit because people went into

17    their own funds.  Which basically are a Wrap or

18    Blackrock funds.  And the answer is they got

19    paid the same either way as a 338.  But some of

20    their staff actually got extra compensation

21    because of the recommendation to go into those

22    proprietary funds.

23         Q.     Am I correct that you provided

24    trial testimony in that case?

25         A.     That is correct.

Page 31

1                    DONALD C. STONE
2           Q.      Is that the only case in which you
3      provided trial testimony to date?
4           A.      It is.
5           Q.      Snyder versus UnitedHealth Group
6      is the next case listed.  Did you provide an
7      expert opinion for the plaintiff or the
8      defense?
9           A.      For the Plaintiffs.
10          Q.      Who was counsel on that case?
11          A.      I'm trying to remember who counsel
12     was and I could look it up, but off the top of
13     my head it is not coming to me.
14          Q.      No problem.
15          A.      It is going to be the same as
16     Natixis, if I remember correctly.  No, I'm
17     sorry UnitedHealth is different.  I'm getting
18     two law firms mixed up.  So I don't remember
19     the law firm exactly, so I'm going to beg off
20     giving you the answer there unless you want me
21     to look it up.
22          Q.      That's okay, no.  Do you recall
23     the issue in that case?
24          A.      I do.  UnitedHealth, and this is
25     an ongoing case, UnitedHealth was utilizing

Page 32

1              DONALD C. STONE

2     Wells Fargo's target date funds and had been

3     for many years.  They were a -- they did a lot

4     of business with Wells Fargo.  And the

5     contention by Plaintiffs was that the firm,

6     UnitedHealth, was conflicted and that they did

7     not act in participants' best interest in

8     choosing and retaining and not removing the

9     Wells Fargo funds.

10          Q.    Did you provide an opinion about

11    the fiduciary process or was it just an issue

12    of conflict?

13          A.    About fiduciary process because

14    they went through an RFP process and whatever.

15    I definitely opined on the process as well as

16    the conflict of interest.

17          Q.    Did you make any conclusions about

18    the fiduciary process in that case?

19          A.    I thought the fiduciary process

20    was flawed.

21          Q.    Do you remember why?

22          A.    I'm trying to think how much of

23    this is public at this particular point and how

24    much is privileged.  So I'm having a little bit

25    of heartburn over that.

Page 33

1                   DONALD C. STONE

2          Q.      We could move on.

3          A.      Thank you.

4          Q.      The next case is Waldner versus --

5     I don't know if I'm going to mess this up.

6          A.      Natixis.

7          Q.      Natixis.  Do you recall if you

8     provided an expert opinion for Plaintiffs or

9     defense in that case?

10         A.      For Plaintiffs.

11         Q.      Do you remember who counsel was in

12    this case?

13         A.      No.  I don't keep all of these law

14    firms in my head.

15         Q.      That's okay.

16         A.      I'm supposed to be quasi retired.

17         Q.      It seems like you have been busy.

18    So do you remember what the issue was in the

19    Waldner case?

20         A.      Yes, Natixis is a very large

21    global investment management firm.  Basically

22    Natixis is a, for lack of a better term, is in

23    parlance within the business world would be,

24    it's a roll up of investment managers.  They

25    own a number of investment management firms

Page 34

```
 1                      DONALD C. STONE
 2        that operate under the original names, if you
 3        will, when they were required.
 4                       Natixis put almost all, not
 5        totally, almost all Natixis funds into their
 6        401-K.  So the issue had to do with fiduciary
 7        process of the selection, monitoring and
 8        retention of some of those funds, not all of
 9        them, but some of those funds.
10             Q.      Okay, again, were you providing an
11        opinion on the fiduciary process in the
12        selection, monitoring and retention of those
13        funds?
14             A.      Yes.
15             Q.      Were you deposed in this case?
16             A.      I was deposed in that case, yes.
17             Q.      And then --
18             A.      That case is still open as well.
19             Q.      Okay.  The Williams versus
20        Centerra case on the next page of your report.
21        Did you provide an opinion for the Plaintiff or
22        the defense?
23             A.      That would have been the
24        Plaintiffs.
25             Q.      Do you recall who counsel was?
```

Page 35

```
 1                DONALD C. STONE
 2         A.    I do.  In that case it was
 3    Schlichter.
 4         Q.    What was the issue in that case to
 5    the best of your recollection?
 6         A.    So the issue there had to do with,
 7    again, target date funds.
 8         Q.    Do you remember what the
 9    particular issue was around the target date
10    funds?
11         A.    I'm not remembering the details of
12    it at the moment.
13         Q.    Do you remember which target date
14    funds were at issue?
15         A.    I believe it was the NFP Funds
16    again, if I remember correctly.
17         Q.    NFP Funds?
18         A.    Yes, that's not the name.  The
19    funds themselves go under -- let me think a
20    second.  I believe they use Life Path which is
21    similar to Blackrock.  The names are similar to
22    what Blackrock uses for those.  I might confuse
23    those two.
24         Q.    Were you forming an opinion as to
25    the fiduciary process in retaining or selecting
```

Page 36

1                    DONALD C. STONE

2       or retaining and/or monitoring those funds or

3       something different?

4              A.      I believe so, yes.

5              Q.      Is that case still ongoing?

6              A.      That one has been settled.

7              Q.      Do you remember what your

8       opinion was in that case with respect to the

9       fiduciary process of selecting or changing the

10      target date funds?

11             A.      I don't recall the details at the

12      moment.  Sometimes these things start to become

13      a little bit of a blur.

14             Q.      Understood.  So the last one is

15      the Ahmed versus Liberty Mutual Group case.

16      Did you provide expert testimony for Plaintiff

17      or defense in this case?

18             A.      For Plaintiffs.

19             Q.      Do you remember who the counsel

20      was?

21             A.      It was the same as -- let's see,

22      Liberty Mutual is the same as Natixis, I

23      believe it was the same counsel.

24             Q.      Do you remember what the issue was

25      in that case?

Page 37

```
 1                  DONALD C. STONE
 2          A.      Again, it was a target date issue
 3     and I'm not remembering the details of it at
 4     the moment.
 5          Q.      Do you remember what target date
 6     funds were at issue in that case?
 7          A.      Let me think.  I should remember
 8     that.  No, I'm just not remembering at the
 9     moment.
10          Q.      Do you remember if you provided an
11     opinion as to the fiduciary process with
12     respect to selecting and/or retaining the
13     target date funds at issue in that case or
14     something different?
15          A.      No, I think it would be the
16     fiduciary process.
17          Q.      So in any of these cases, do you
18     have a recollection that you worked with Miller
19     Shah?
20          A.      I did not work with Miller Shah on
21     any of those cases, no.
22          Q.      So how is it that you -- do you
23     know how it is that Miller Shah came to know
24     your name and contact you?
25          A.      I believe they -- I think they
```

1                    DONALD C. STONE
2       found me like some of the other found me which
3       is just on the internet.  There is a lot out
4       there under my name and everything.  Things
5       that I have written over the years.  Some of
6       cases, obviously the information is out there.
7       So I think that is the way that -- I believe
8       that's the way -- in fact I'm sure that is way
9       they found me.
10            Q.     So do you have any sense of how
11      much you've earned since 2021 in connection
12      where expert services?
13            A.     Well, I don't know the exact
14      number.  I don't necessarily want to get into
15      my total compensation, but certainly from the
16      cases that we have listed here, it's well north
17      of half a million dollars.
18            Q.     Do you have any other source of
19      income other than providing expert services at
20      this time or since 2021?
21            A.     Yeah, I do.
22            Q.     I don't want to know the income
23      but what are the sources of income?
24            A.     Well, at this point social
25      security.  So mine and my wife's and I also

```
 1                DONALD C. STONE
 2    have a number of investment accounts.  I have
 3    also an IRA which is a rollover from a 401-K.
 4    I have taken my required minimum distribution
 5    every year.  RMD.  I have income off of bonds
 6    and stocks and private equity investments as
 7    well.
 8           Q.    You have been retired since, is it
 9    2019; is that right?
10           A.    It was actually May 19, 2019.
11           Q.    So let's --
12           MS. ENGELMAN:    Maria, can we mark
13       as Exhibit 1 Mr. Stone's report please.
14           (Exhibit 1 for identification,
15       Expert Report of Donald C. Stone.)
16           Q.    Do you have access, Mr. Stone, to
17    Exhibit Share?  Do you know how to work that?
18           A.    I do have Exhibit Share.  I'm
19    opening it as we speak.  Can I go off the hard
20    copy of my report when we talk about my report?
21           Q.    That is totally fine with me.  I
22    just want it marked for the record.
23           MS. ENGELMAN:    Let's mark it and
24       Mr. Stone and I will work off the hard copy
25       and proceed.
```

Page 40

1                    DONALD C. STONE

2           Q.      Mr. Stone if you turn to the back

3      end of your report which is Exhibit B,

4      materials considered.

5           A.      Yes, let me get to it.

6           Q.      The first two pages are various

7      articles, but I want to turn your attention to

8      the litigation documents.

9           A.      Okay.

10          Q.      First of all, does this report

11     contain the totality of your opinion in this

12     case?

13          A.      It does.

14          Q.      The litigation documents that are

15     listed here, are these all of the documents

16     that you relied on in forming your opinion in

17     this case?

18          A.      Yes.

19          Q.      Did you personally review every

20     single document that is listed in Exhibit B

21     here?

22          A.      I did.

23          Q.      Did you review them in their

24     totality?

25          A.      I would say virtually in their

Page 41

1                    DONALD C. STONE

2       totality.  For example, when we talk about

3       quarterly investment reports and they are 150,

4       200 pages long, I didn't review every single

5       page, every single quarter.  I think that is a

6       fair assumption.

7              Q.    Did counsel provide you documents

8       to review in order to create your opinion?

9              A.    Yes, they did.

10             Q.    Did you request certain documents

11      of counsel?

12             A.    Yes, we had conversations, I don't

13      recall specific requests that I made that they

14      didn't provide.  I know we had some back and

15      forth.  I had some questions and what have you,

16      so that may have led to certain documents being

17      included in the documents that they provided.

18      But I don't recall off the top of my head.

19                    As I said, it's a very iterative

20      process.  I had questions from the get-go and

21      that's kind of the normal way these things

22      work.

23             Q.    So I guess what I'm trying to get

24      at, the list on this page, is that all of the

25      documents that you received in connection with

Page 42

                    DONALD C. STONE

1
2     this litigation or is it a subset of what you
3     received and reviewed?
4          A.     Well, first of all, the litigation
5     documents go on for several pages.  I'm just
6     making sure that we are on the same thing.
7          Q.     Yes.
8          A.     So there is four pages here that
9     are not part of what I wrote and all of that
10    good stuff.  Yes, this is to the best of my
11    recollection this is all of the documents that
12    I looked at.
13         Q.     Did you type up these three pages
14    or did counsel?
15         A.     They would have typed this up.
16         Q.     Did you review it before it was
17    submitted to make sure it accurately reflected
18    the documents that you relied on in forming
19    your opinion?
20         A.     I reviewed -- I always do a spot
21    check, okay, when there is -- when you have a
22    like a Bates number or whatever that somebody
23    put down, I spot check those.  I don't go
24    through every single document and look at it
25    again.  But I do spot checks to make sure it is

Page 43

DONALD C. STONE

1
2      accurate, that I have seen it, that it is
3      something that I remember and I didn't find
4      anything unboard there.
5            Q.    Do you recall if you requested
6      certain categories of documents to review in
7      connection with this case?
8            A.    You know, again, that kind of goes
9      into the blur of the conversations that we had.
10     Obviously all categories that I wanted to see I
11     did see in this case and everything.  So I saw -- I
12     mean the things that I would expect counsel to
13     provide, like IPS, quarterly investment
14     reports, those kind of normal documents I would
15     expect to see those there.
16            So I don't know -- I don't recall
17     something that it was like, okay, I haven't
18     seen this, I haven't seen that, can you provide
19     this particular document.  But that would have
20     been part of that conversation that went on on
21     an ongoing basis.
22            Q.    Understood.  At the back end of
23     this, the last page is depositions of the
24     committee members as well as the consultant,
25     Rich Eagar, do you see that?

Page 44

1                     DONALD C. STONE

2          A.      I do.

3          Q.      We talked earlier about your

4    review of the transcripts in preparation for

5    the deposition.  But in connection with

6    preparing your report, did you personally

7    review each of those deposition transcripts in

8    their entirety?

9          A.      So I looked at all of them.  I

10   can't say that I read every word -- it is fair

11   to say that I read all of them, but I sometimes

12   speed read through things where it is areas

13   that I don't think are as relevant to the issue

14   at hand.  So sometimes some of the background

15   on somebody.  I don't necessarily spend a lot

16   of time looking at every single job that each

17   person has had.  I want to get to the kind of

18   meat of the issue.

19              I don't look -- I don't spend a

20   lot of time on the parts that you and I went

21   through a few minutes ago where you say if I

22   don't understand something I ask again.  All of

23   the preliminary stuff that shows up in the

24   depositions and everything.

25              I try to go to the meat of what

Page 45

                         DONALD C. STONE

1    I'm looking for in reading through all of

2    those.

3         Q.    Are there any other areas, I mean

4    you said earlier that is not relevant to your

5    opinion.  Any there other areas other than job

6    or background that you that you would have

7    support of sped read through?

8         A.    Not that I recall, no.

9         Q.    What do you consider the meat of

10   the issue?

11        A.    I want to say how they talk about --

12   how they viewed their role on the committee.

13   How they thought about how decisions were made

14   by the committee.  How they thought about the

15   advisor.  What they thought about the fiduciary

16   training.  Kind of all of the critical issues

17   that you would expect that each one of them

18   would have been asked about and would have had

19   a slightly different take on.

20              I want to see how they thought

21   about their role in the committee.  How they

22   understood the decision-making process.  Again,

23   what their comfort level was with investments.

24   There is a -- I come up with a very long

*Note: The line numbers above are 1-25 as shown in the document.*

Page 46

1                    DONALD C. STONE

2      laundry list, but these are the kind of things

3      that you start immediately trying to go to to

4      understand as opposed to I went to college at

5      XYZ.

6             Q.     Would you say that you read

7      these transcripts one time through in

8      preparation for your report or more than one?

9             A.     I spent time going back on a

10     couple of them more than I did others.  But so

11     I looked at Carolyn Campbell, I went back a

12     couple times to refresh myself on certain

13     things.  I did the same thing on Jensen and

14     Riddle.  Not so much on Rupp and Grindstaff.

15            Q.     Why is that?

16            A.     Because I didn't see anything

17     that -- I didn't see information that I felt

18     like I needed to go back and look at again.

19                   I guess when I was looking through

20     my report and I was looking at the rebuttal

21     report, some of the information from those

22     particular people did not come up as much.  Now

23     Rich Eagar, that is different, he came up a

24     lot.  Of course he wasn't on the committee, he

25     was the advisor.

Page 47

1                     DONALD C. STONE

2          Q.     We'll get to it, but there is a

3     fair number of transcripts or deposition cites

4     that are footnoted throughout your report; is

5     that correct?

6          A.     Correct.

7          Q.     Would you personally have chosen

8     which cites to include in your report?

9          A.     I would kind of reverse that.  It

10    was not me choosing the cite so much as the

11    reference point to quote.  Because I didn't

12    know exactly what the cite was in some cases.

13    But I had information that is a footnote and so

14    the information that is the footnote, that

15    would be what I would be focused on as opposed

16    to coming up with the legal information that

17    goes with the cite.

18         Q.     So okay, I guess maybe we are

19    talking about something -- maybe we are

20    miscommunicating here.

21              When I say citation I mean the

22    sort of information from the transcript, the

23    substantive information from the transcript.

24              Did you personally choose which

25    substantive information you wanted to include

Page 48

1                    DONALD C. STONE

2      from the transcripts for your report?

3           A.     Yes, I mean I read through all of

4      this.   Like I said, this was -- counsel might

5      bring up a particular topic or a particular --

6      what a particular individual said and we would

7      talk about it and sometimes it might be

8      something I would say that is kind of -- that

9      doesn't resonate, I don't know that that is

10     something that I find to be a problem or

11     whatever.   Or maybe I would say okay, well that

12     sounds very relevant and everything, so let's

13     talk about that a little bit.   It's a very

14     iterative process in that regard.

15                    I didn't go through a transcript

16     and pick out six different quotes I want to

17     use, for example, from Kip Rupp, okay.   I could

18     have done it that way because I read through it

19     and I did confirm all of those, but that is not

20     the way that these typically develop.

21           Q.     What do you mean you did confirm

22     all of those?

23           A.     I would go back and look up the

24     cites and make sure that they were correct.   I

25     would look at footnotes and make sure they were

Page 49

1                    DONALD C. STONE

2     correct.

3          Q.    You did do that for all the cites

4     prior to submitting your report?

5          A.    Yes.

6          Q.    Let's talk a little bit about your

7     background.  So I kind of want to start a

8     little bit in reverse order.  Prior to your

9     founding of Plan Sponsor Advisors in 2002,

10    prior to that, did you serve as a consultant in

11    any way to fiduciary committees in a 321 or 338

12    capacity?

13         A.    I was on a committee, but I was

14    the head of the trust company, so I can't say

15    that I was a 321.  I was running the trust

16    company.

17         Q.    So when you say you were on a

18    committee, you were a member of a fiduciary

19    committee for a 401-K plan for the trust?

20         A.    Yes, that's correct.  For Key

21    Bank.  Key Corp. would have been the holding

22    company.

23         Q.    Did you have a specific role on

24    the committee?

25         A.    Well, I ran the institutional

Page 50

1                    DONALD C. STONE

2      trust division.

3             Q.     You just went out for me.

4             A.     Can you hear me now.

5                    MS. ENGELMAN:   I'm not hearing you.

6             Can we go off the record.

7                    THE VIDEOGRAPHER:   Counsel, the

8             time is 4:04 p.m. and we are off the

9             record.

10                   (Recess taken.)

11                   THE VIDEOGRAPHER:   The time is 4:16

12            p.m. and we are on the record.

13      BY MS. ENGELMAN:

14            Q.     Hi, Mr. Stone, sorry we had a

15      technical hiccup.  I think before we went off

16      the record you were talking about the fact that

17      you served on a 401-K fiduciary committee at

18      Key Bank; is that right?

19            A.     That is correct.

20            Q.     Did you have a particular role on

21      that committee, Mr. Stone?

22            A.     I don't recall if I -- I was not

23      the chair of that committee.  So I don't recall

24      if I had a role other than being on the

25      committee.

Page 51

1                    DONALD C. STONE

2         Q.    Do you remember how many people

3    were on that committee?

4         A.    Not exactly, but I would say there

5    were probably five or six.

6         Q.    Did that committee offer

7    investment options?

8         A.    No, we were the ones who were --

9    that committee had the role of making options

10   available for the 401-K plan for key Corp. and

11   monitoring those and changing them out as

12   necessary.  Some other -- we had some other

13   responsibilities in regard to the overall

14   institution.

15        Q.    So you were responsible as a

16   fiduciary to make selections for investment

17   options; is that right?

18        A.    Yeah, that was among the roles,

19   yes.

20        Q.    The same for monitoring those

21   investment options that were selected?

22        A.    Yes.

23        Q.    Do you recall, did you consider

24   that to be a committee operating in a prudent

25   way?

Page 52

1                    DONALD C. STONE

2          A.     Yeah, I thought it was a very

3     prudent committee.  It was a very -- it was

4     laid out well.  Everybody understood what their

5     role was.  Everybody was educated about what we

6     were supposed to be doing when we were there.

7     I thought it was a good prudent committee.

8          Q.     Was there an outside investment

9     consultant?

10         A.     No.

11         Q.     Do you know why that was the case?

12         A.     Well, keep in mind this is in the

13    mid-1990s, that would have been less prevalent.

14    And we were a rather sizable money manager and

15    so it just was not -- it was not something that

16    I think was felt that was necessary at that

17    particular time.

18         Q.     In terms of selecting investment

19    options, did that committee have any particular

20    process in place for the criteria it evaluated

21    when selecting investment options?

22         A.     I don't remember the details at

23    this point.  I mean, again, this is in the mid-1990s,

24    so a number of the options that were offered

25    were proprietary options, not all of them, but

1                    DONALD C. STONE

2       a number of them were and that was very typical

3       at that time.  I don't recall the details of

4       the process.

5               Q.    Do you recall any details about

6       what criteria the committee considered when

7       monitoring the performance of those options?

8               A.    No, not at this point.

9               Q.    So aside from that role at Key

10      Bank prior to PSA, did you otherwise serve on

11      any other 401-K or 403-B fiduciary committees

12      or serve as an investment consultant in a 321

13      or 338 committee?

14              A.    No.

15              Q.    Looking to 2002, you say in

16      paragraph 9 of your report that you founded

17      Plan Sponsors Advisors, which we'll call PSA.

18      Was that with the partner that you mentioned

19      earlier?

20              A.    Initially I did not have a

21      partner.  So she became part of that

22      organization officially in some time in 2004.

23              Q.    During the entirety of between

24      2002 and 2014 were you the president and

25      managing partner of PSA?

Page 54

1                          DONALD C. STONE

2              A.      We changed titles a couple of

3      times.  I think I dropped the title of president at

4      some point.  At a certain point we went to

5      founding member and that kind of thing.  I

6      don't recall the details at the moment.

7              Q.      That firm provided consulting

8      services to fiduciary committees; is that

9      correct?

10             A.      That's correct.  I don't think it

11     is actually in my CV there but there was a -- I

12     also owned a second corporation that provided

13     similar services and I will explain the reason

14     behind that.

15                     When I initially I had -- I picked

16     up some clients and I had them operating under

17     an entity called Third Coast Advisors.  At the

18     time that I brought my partner onboard she had

19     a separate business that was high net worth

20     individuals.  We couldn't agree on a valuation

21     between the two businesses, so we agreed to

22     carve them out separately and leave them as

23     independent as we built -- continued to build

24     Plan Sponsor Advisors.

25                     So that ran in parallel the

Page 55

1                        DONALD C. STONE

2       entirety time until I sold both of those

3       corporations to Pavilion in 2014.

4              Q.    So just so I'm clear, was Third

5       Coast Advisors providing the services related

6       to high net worth individuals?

7              A.    No, it was not high net worth

8       individuals.  It was to 401-K plans as a 321

9       fiduciary.

10             Q.    So can you just explain the

11      difference between the services that PSA was

12      providing and the services that Third Coast

13      Advisors was providing?  I'm not sure that I'm

14      understanding the difference.

15             A.    There was no difference in the

16      services provided.  It had to do with the

17      ownership.  So Third Coast I owned 100 percent

18      of, my partner had the high net worth business,

19      we were going to roll those into Plan Sponsor

20      Advisor but we couldn't agree upon on a

21      valuation for those businesses, so we decided

22      to carve them out, keep them separate.

23                   So mine ran in parallel, Third

24      Coast ran in parallel.  I didn't add any new

25      clients to that.  It was kind of frozen at that

Page 56

1                    DONALD C. STONE

2       point with the existing clients it had.  And it

3       ran until I sold that as well as Plan Sponsor

4       Advisors to Pavilion in 2014 and then her high

5       net business basically evaporated over time.

6            Q.    You owned 100 percent of Third

7       Coast Advisors.  Did you own a hundred percent

8       of PSA?

9            A.    I did not own hundred percent PSA

10      at that point.  There was a split that we had

11      and a complicated split, I don't want to go

12      into the legal aspect of that, but I was

13      majority owner.

14           Q.    That's fine.  So they were

15      essentially providing the same services to the

16      same clients or different clients?

17           A.    Different clients.

18           Q.    So let's start with PSA.  For both

19      Third Coast and PSA were you providing both 321

20      and 338 services?

21           A.    No, just 321.

22           Q.    Just 321 for both, okay.  During

23      the entirety of the time period between June,

24      2002 and June 2014 -- I'm sorry, between 2002

25      and 2014?

Page 57

1              DONALD C. STONE

2        A.      That's correct.

3        Q.      How many, approximately, how many

4   clients did Plan Sponsor Advisors serve?

5        A.      Probably over that timeframe,

6   around 60.

7        Q.      What about Third Coast Advisors?

8        A.      Third Coast was very small.  I

9   think I had four clients in that.

10       Q.      During the entirety of the 2002 to

11  2014 time period?

12       A.      Yes, because they were all signed

13  up in 2002 and so I didn't add anything to that

14  entity.  I just kept those clients all those

15  years.

16       Q.      Did Plan Sponsor Advisors have

17  employees or independent contractors or

18  consultants that worked there?

19       A.      We had employees.  We sometimes

20  had independent contractors who did work for us

21  as well.

22       Q.      How many employees or consultants

23  did Plan Sponsor Advisors have?

24       A.      Obviously it varied over time.  I

25  would say we were typically in the neighbor of

Page 58

1                DONALD C. STONE

2       12 employees.

3              Q.    Those employees were working as

4       321 advisors to clients of PSA?

5              A.    Not all of them.  Some of them

6       were in research.  We had one administrative it

7       person.  So there were several in the research

8       area exclusively.  There were a couple who were

9       servicing clients and also in research.  That

10      would have been 321s.

11             Q.    What about for Third Coast, were

12      there any employees or individuals --

13             A.    No, I was the sole employee.

14             Q.    For Third Coast you personally

15      served as the 321 advisor to those clients?

16             A.    Yes.

17             Q.    Do you know the names of those

18      clients?

19             A.    No, I don't remember them at this

20      point and they would be confidential.

21             Q.    For PSA did you personally serve

22      in a 321 capacity to any clients?

23             A.    I did.

24             Q.    Approximately how many clients?

25             A.    Well, I helped bring in all of

Page 59

1                    DONALD C. STONE

2       those clients -- probably almost all of those

3       clients.  So I would have been in a 321

4       capacity for some period of time for probably

5       all of those.  But what typically happened is

6       that after going through the process of

7       bringing -- onboarding the clients, at a

8       certain point obviously I couldn't service them

9       all, the same thing with my partner.  So we

10      would hand them off to someone else once we

11      onboarded them and got them kind of settled in

12      to our reporting process.

13           Q.    How is it that you went about

14      bringing in clients?  What was that process?

15           A.    Well, typically I would say for

16      Plan Sponsor Advisors it was almost totally

17      referral.

18           Q.    Referral by whom?

19           A.    Almost all by ERISA counsel.  Not

20      totally, but almost all by ERISA counsel.  And

21      sometimes there would be an RFP process

22      involved that counsel would say my client is

23      going to go through an RFP process and we would

24      like you to be in the mix.

25           Q.    Do you recall for any of those RFP

Page 60

```
 1                      DONALD C. STONE
 2      processes, do you recall whether or not you
 3      were submitting an RFP to be the kind of first
 4      consultant to provide services to a plan or to
 5      replace an existing consultant?
 6              A.      It could have been either one.
 7              Q.      Do you have any specific
 8      recollection of whether or not you submitted an
 9      RFP in connection with replacing an existing
10      consultant?
11              A.      We did, yeah.  I don't remember
12      who the existing consultant was or who the
13      client was.  I mean that was not uncommon, I
14      guess is what I'm saying.
15              Q.      With respect to the individuals
16      who worked under you or worked for PSA as a 321
17      consultant, do you feel those were prudent
18      advisors?
19              A.      Yes.
20              Q.      Did you oversee their work to
21      ensure they were fulfilling their obligation as
22      321 consultants?
23              A.      Absolutely.
24              Q.      You say in paragraph 9 that during
25      your tenure you advised on over $65 billion in
```

Page 61

1                       DONALD C. STONE

2          retirement assets; is that right?

3                  A.      That's correct.

4                  Q.      Over what period are you talking

5          about there?

6                  A.      That is during the 2002/2014

7          period.

8                  Q.      In any given year do you know

9          approximately how many assets PSA provided

10         services for?

11                 A.      That's a very difficult question.

12         Are you asking on a retainer basis?  That would

13         make this a little be easier.  We had clients

14         who were project clients in some cases.  That's

15         part of that 65 billion.  And then of course we

16         had retainer clients who we provided ongoing

17         services to and were in that 321 capacity that

18         entire time.

19                 Q.      So on the project basis, those

20         were not -- those were specific projects, you

21         weren't the consistent 321 advisor to those

22         particular plans?

23                 A.      We might be 321 -- depending on

24         what the project was, we might or might not be

25         a fiduciary to that particular client.

Page 62

1                DONALD C. STONE

2                So for ongoing retainer work when

3        we sold the business, we had a little over $23

4        billion at that point.

5            Q.    Do you know approximately how many

6        clients that covered?

7            A.    That was about 50 clients.

8            Q.    Do you know the range of the size

9        of clients that you provided 321 services to?

10       You said in your report both small and large?

11           A.    Yes.  So I would say at the time

12       that -- at the time that we sold the business

13       in 2014 the smallest client would have been

14       probably in the 5 million or so, 5, $6 million

15       range.  And that would have been one of the

16       kind, I will call them legacy clients.  One of

17       our first clients.  We had a very high

18       retention rate.

19                I think the average client size

20       was, and this is going to be a guesstimate, I

21       did calculate it at one point.  But the average

22       client size was probably in the 4 to 500

23       million range and a number of the clients were

24       north of a billion.

25           Q.    How many clients would you say

Page 63

```
1                    DONALD C. STONE
2        were north of a billion?
3              A.     Probably of that 50, probably 10
4        of them.  Probably another 20, 25 would have
5        been north of a 100 million.
6              Q.     Would the asset size of the client
7        dictate the -- effect at all the quality of services that
8        you provided as a 321 consultant?
9              A.     No.  We looked to provide the same --
10       first of all, the same type of service and
11       there might be certain services that we didn't
12       provide to or would have actually -- I should
13       back up and say, would have provided as an
14       add-on service for certain clients because they
15       didn't necessarily need some of those service
16       or didn't need them all the time.
17                    In terms of the normal, you know,
18       create the IPS, arise the IPS, provide
19       investment selection, monitoring, removal,
20       basically we did the same thing for every
21       client.
22             Q.     For Third Coast Advisors, what was
23       the range of assets for those four plans, if
24       you recall?
25             A.     I don't recall exactly, but they
```

Page 64

1                    DONALD C. STONE

2     were small.  They would have been on the

3     smaller end.  So let's say 5 million or

4     whatever.  Because those were the first clients

5     I brought in the door when I started in 2002

6     and those were -- two of those were within the

7     first two months.  They were not the typical

8     client that we went after after that first

9     year.

10             Q.    Between 2002 and 2014 did

11    your -- as a 321 advisor at PSA and I guess

12    Third Coast, did your reporting capabilities

13    change in terms of the sort of metrics that you

14    can provide clients on their investments?

15             A.    I don't think the -- the basic

16    metrics did not change.  We had a pretty robust

17    reporting system early on that we invested in.

18    So the -- and the metrics -- I'll make a

19    distinction here because I think I understand

20    where you're going.

21                    The metrics that the industry

22    reports on have been around now for a good 20,

23    30 years or so.  And they are pretty much the

24    same metrics.  If you go to 50 different

25    companies you're going to get largely the same

Page 65

DONALD C. STONE

1              DONALD C. STONE

2    metrics.

3                   What can be different is whether

4    or not, and some companies use a scoring system

5    and some of the scoring systems could get

6    rather complicated.  Some don't use a scoring

7    system.  So there is a -- I said that is where

8    the big difference is.

9                   Everybody is going to report on

10   the returns of the fund.  They are going to

11   report on the risk adjusted returns of the

12   funds, the expense ratios, the Sharpe ratio,

13   the upside/downside capture, so on and so

14   forth.  There is a whole range of things that

15   come into being well after ERISA, but that are

16   used by everybody to try to evaluate

17   investments these days.  And that is pretty

18   standardized.

19        Q.    Is it your view that it is

20   appropriate for committees to evaluate all of

21   those metrics that are recorded in their

22   fiduciary capacity?

23        A.    You know, I guess the keyword is

24   all.  I think there are metrics that are looked

25   at by consultants that are probably not well

Page 66

1                    DONALD C. STONE

2       understood by many clients.  And you don't show

3       every metric that you could possibly look at in

4       a report.  I mean it gets to be very, very

5       cluttered.

6                    So I would say typically you look

7       at the more salient ones that are going to --

8       that are used in your report.  Some people

9       prefer the Information Ratio versus the Sharpe

10      ratio, some people the Sharpe ratio versus the

11      Information Ratio.

12                   There are other ratios, the

13      Sortino ratio that is not used very much.  But

14      it is all out there and all available on the

15      same -- there are about three investment

16      platforms that exist out there that gather all

17      of this data that everybody uses to report on.

18           Q.    So I want to break down a couple

19      of things that you said.  The metrics that you

20      think committees would not understand, what are

21      those?

22           A.    There are metrics, probably that's

23      not the right word.  They might not be familiar

24      with them.  The Sortino ratio is one that I

25      can't remember how it is calculated at the

Page 67

DONALD C. STONE

1

2    moment.  But there are a number of metrics

3    around the whole risk adjusted topic.  And

4    generally the Information Ratio and the Sharpe

5    ratio are the two that are most commonly used

6    by basically everybody in the industry that I

7    know of.  So those tell a very similar story

8    and everything.

9              I don't think -- I guess what I'm

10   saying is, there are a lot of other things that

11   if you're a CFA you will be aware of 20

12   different ratios that aren't necessarily in

13   anybody's reporting, and if they would be, I'm

14   not sure why they would be because they don't

15   add necessarily a lot of additional value.

16        Q.    In terms of your view as to what

17   should be presented to a committee for its

18   review in terms of performance, what metrics do

19   you believe should be presented or did you

20   present to the committee in which you served as

21   a 321 advisor?

22        A.    I'm probably not going to remember

23   every single thing that we -- and we're talking

24   quantitative at the moment.  We will probably

25   get into qualitative as well.

Page 68

1                        DONALD C. STONE

2                But the quantitative metrics, the

3       kind of things that we would report on on a

4       quarterly basis would be obviously raw

5       performance, performance against a benchmark,

6       perhaps against a couple of benchmarks

7       depending on the asset class, depending on

8       primarily the asset class and whatever we, you

9       know, whatever the investment manager used as

10      their preferred benchmark would show that.  We

11      would also use a best fit benchmark which might

12      be the same thing, might be something

13      different.

14                We would do calculation of the

15      risk adjusted returns and we would use both

16      sharp and Information Ratio for that.  We would

17      report on actual assets in the product, in the

18      investment product.  We would report on the

19      tenure of the manager or managers.  We would

20      report typically on the upside/downside

21      capture.  It would be R squared, expense ratio

22      reports.

23                THE COURT REPORTER:  Hold on a

24          second, he froze.

25                THE VIDEOGRAPHER:   He froze.  Let's

Page 69

DONALD C. STONE

1
2          go off.   The time is 4:41 and we are off
3          the record.
4                    (Recess Taken.)
5                    THE VIDEOGRAPHER:    The time is 4:45
6          p.m. and we are on the record.
7                    MS. ENGELMAN:    Bill can I call on
8          you to say the last thing that you got of
9          Mr. Stone's testimony.
10                    (Requested portion of record read.)
11   BY MS. ENGELMAN:
12          Q.    Mr. Stone, you were talking about
13   the metrics that you would report on as a 321
14   advisor for clients.  Is there anything else?
15          A.    I'm sure there are a number of --
16   there are few other metrics, those are probably
17   the most salient ones that would, I think, be
18   of interest to clients or committees on a
19   quarterly basis.
20                    There would be for -- obviously
21   when we're reporting on target date funds we
22   get into some other additional things that we
23   would report on periodically if certain things
24   changed or what have you.  But you know that --
25   maybe I didn't -- one thing that I may not have

Page 70

1               DONALD C. STONE

2      captured is we would capture comparison to

3      peers.  I don't believe I said that one and

4      that is a very important one.

5                   Those are the principal ones that

6      are coming to mind at the moment.

7           Q.     You said with respect -- I didn't

8      mean to interrupt you.  Were you done?

9           A.     I was done, thank you.

10          Q.     With respect to target date funds,

11     you said there were some other metrics.  What

12     would those be?

13          A.     In target date they are obviously

14     going to look at the glide path, you're going

15     to look at any changes in the glide path over

16     time.  You're going to look at changes in the

17     asset make up of what makes up the target date

18     funds.  In other words the basic -- obviously

19     you have the glide path, quote/unquote, but

20     what makes that up in terms of the asset

21     allocation might change over time.  So that is

22     not the thing that we would report on every

23     quarter.  It is one of those things that comes

24     up as necessary.

25          Q.     Anything else with respect to

Page 71

DONALD C. STONE

1

2    target date funds?

3         A.    Nothing that I'm remembering off

4    the top of my head right now.

5         Q.    I think you said that you would

6    periodically provide additional information

7    about target date funds to your client.  Did I

8    hear that correctly?

9         A.    Yes, something that we did and

10   obviously was done in this case and very

11   typical in the industry is to periodically do a

12   comparison or what some people call a deep dive

13   to compare to various metrics against other

14   target date series that are out there as part

15   of the ongoing education of client committees.

16        Q.    What metrics would typically be in

17   the presentations that you would provide to

18   your clients?

19        A.    Well what you'd be looking at, and

20   this was not specific to a client, it was for

21   all clients.  You would provide information on

22   assets, the asset -- maybe on the asset flows

23   both in and out, you would provide information

24   on the comparisons of the glide path,

25   comparisons of returns, comparisons of expense

Page 72

DONALD C. STONE

1
2       ratios.  You would look at things like
3       comparison of whether there are to or through.
4       And I think most importantly you'd look at
5       their -- for this part you would look at what
6       is their equity mix at retirement date.
7       Assumed retirement date of 65.  I do would look
8       at -- you know, you just look at a number --
9       provide all of that information probably --
10      again, I'm not going to remember it all off the
11      top of my head.
12                   You're basically looking to
13      provide a grounding for the committee on a
14      comparison of various products that are out
15      there which might lead to a conversation as to
16      whether a further evaluation of the existing
17      product was wanted or not.
18              Q.    How often would you provide these
19      types of reports to your clients?
20              A.    Typically annually.
21              Q.    Is there any client that you can
22      think of that offered a target date fund that
23      you did not provide this to at least annually?
24              A.    I can't think of one or a reason
25      why I wouldn't do that.

Page 73

1           DONALD C. STONE

2           Q.      What was the purpose of providing

3     these to your clients annually?

4           A.      Well, again, typically for most

5     clients the target date funds over a period of

6     time became the -- because they were typically

7     the QDIA, they would become the largest asset

8     within the plan.  So I think additional scrutiny

9     was certainly warranted.  And again, that was

10    part of the general education of the committee

11    that we would provide on an ongoing basis.

12              On a quarterly basis you wouldn't

13    provide what I just said because nothing would

14    change on a quarterly basis.  It wouldn't make

15    a lot of sense to do that.

16              Obviously if there was a selection

17    of a target date, then there would be additional

18    elements that you would look at that would be

19    specific to that particular plan in looking at

20    making -- in choosing a target date fund.  And

21    sometimes you would go back and rerun that

22    information specific to that plan on a periodic

23    basis.  Not necessarily annually, but from time

24    to time as appropriate.

25          Q.      I want to unpack just a few things

Page 74

```
                              DONALD C. STONE
 1
 2     that said.  You went through the quantitative
 3     criteria, generally speaking, that you would
 4     provide to your client on a quarterly basis; is
 5     that right?
 6                A.    Yes.
 7                Q.    And is it that you provided that
 8     information so that the committee would review
 9     and consider all of that information in making
10     its decision with respect to the investment
11     options offered in the plan?
12                A.    Yes.
13                     MR. ROBERTS:   Objection to the
14                form.
15                Q.    Is it your experience that the
16     committee in which you served as a 321
17     consultant actually considered those metrics in
18     making decisions with respect to the investment
19     options offered in the plan?
20                     MR. ROBERTS:   Objection to the form.
21                A.    Yeah, they did do that because we
22     spent a lot of time educating them about the
23     purpose of each of those and obviously some of
24     them were kind of self-explanatory.  But a
25     number of them were things that a typical
```

Page 75

DONALD C. STONE

1

2      person that comes on to a committee may or may

3      not be familiar with.  We would spend time as

4      part of that fiduciary education process

5      educating them about the various economic terms

6      and economic metrics and educating them about

7      the context of what was going on in the world

8      as their investments, what was going on with

9      them and what was going on in the world that

10     might be having an impact on them.

11             So the key was to get an educated

12     group that could actually be conversant.  I

13     think there is real concern in the industry in

14     terms of people throw all of these metrics out

15     and come in with fancy reports that got an

16     awful lot of night colors and everything and my

17     experience is, unless you really work hard at

18     it, half the people on these committees don't

19     have a clue as to what you're talking about.

20             So it is very, very important,

21     because they don't have the background in

22     investments, so you really need to educate

23     them, otherwise you're showing them a lot of

24     pretty charts and saying you should do this and

25     do that.  And it is difficult for them to

Page 76

1                   DONALD C. STONE

2       deliberate about that.

3                   We spent a lot time on that

4       education process and it's a never ending kind

5       of process, but it is really critical to good

6       decision-making by a committee.

7            Q.    It is critical and you spent the

8       time educating your committees on these various

9       metrics that you mentioned, the quantitative

10      metrics, because it was your expectation that

11      they considered each of them?

12           A.    They did need to consider each of

13      them, absolutely, and to be able to be

14      conversant in them and ask questions about

15      them.  There would be sometimes very lively

16      conversations that would go on with these

17      clients and everything because they did take it

18      seriously.

19           Q.    With respect to the target date

20      annual reports that you provided, you mentioned

21      that you provided those to all of your clients

22      that offer target date funds; is that right?

23           A.    Yes.

24           Q.    Would you tailor those reports to

25      any specific plan?

Page 77

1                    DONALD C. STONE

2          A.     No, as I mentioned, there was a

3     standardized report that all of them received.

4     The only thing that was tailored to them,

5     obviously it covered -- made sure that it

6     covered the target date fund that they offered

7     and a range of other target date funds that

8     were out there.  So typically it would be the

9     same report that would go to all clients.

10                      There were things that were

11    customized to a particular client relative to

12    the target date that I alluded to that were

13    critical to the selection process.  And would

14    be important to the monitoring process if there

15    were in fact questions about whether the fund

16    that they had, the target date series they had

17    was the appropriate one.  But that is not

18    something that you would run all the time.

19          Q.     That's helpful, thank you.

20                      So you said you mentioned the

21    selection of a target date fund and some

22    metrics that would be important to that

23    process; is that right?

24          A.     Absolutely, yes.

25          Q.     So in your view what are the

Page 78

1                     DONALD C. STONE

2       important aspect of a committee's selection of

3       a target date fund?

4            A.     Well, I think what is critical in

5       the selection of a target date fund is you're

6       going to talk about the objectives that the

7       committee has, what their expectations are for

8       that target date fund.  You're going to spend

9       time talking about any particular philosophy or

10      opinions that the committee already has formed

11      and has as you go into that process to

12      understand where they are coming from.  And

13      those could sometimes bring up issues that you

14      want to address in that selection process.

15                   You're also going to look at plan

16      demographics or what some people refer to as a

17      fit analysis.  The plan demographics are

18      critical to the selection process.

19           Q.     Why is that?

20           A.     Well, because there is not one

21      target date series that is the choice for

22      everybody out there.  Plans have, as I referred

23      to a moment ago, sometimes they may have

24      different objectives or different philosophies,

25      but most critically all plans have different

Page 79

1                    DONALD C. STONE
2    demographic information and the success or
3    failure of a particular target date series
4    really rests on those particular elements of
5    that plan.
6                    So what may work very well
7    and be the right choice for plan A may not be
8    the right choice for plan B and could in fact
9    be imprudent.  So it is not just a, let's go
10   out and find a well known target date series or
11   whatever.  There are really critical elements
12   to look at.  I will give you an example.
13                    Things you want to look at are
14   average balances, average age of participants,
15   you want to look at the contribution rates of
16   participants, you want to look at the contribution
17   rates of the company, you want to look at are
18   there supplemental plans.  There are a handful
19   of those -- those are some of most important.
20   There are others.  I'm not going to try to list
21   every demographic element at the moment.
22                    All of those go into play because
23   what you then want to do is to make a selection
24   is to project out what is the probability of
25   this particular -- of any particular target

Page 80

                    DONALD C. STONE

1

2    date series working for that plan.  By working,

3    I would say getting the largest percentage of

4    participants to a successful retirement.

5                    In the industry, generally

6    speaking, there is general agreement that

7    somewhere between 80, roughly 80 percent, some

8    people are a little less than that and some

9    people a little bit more than that, but let's

10   say 80 percent is probably the vast majority

11   would agree is the income percentage that

12   you're looking to replace through the plan,

13   through other assets somebody may have and

14   through social security.

15                    So what ends up happening is the

16   average participants, you're probably talking

17   about somewhere between in the neighborhood of

18   40 to 50 percent has to come from the 401-K

19   plan.  You project that out using Monte Carlo

20   simulations.

21                    I would say certainly I'm sure the

22   top 100, 150 consultants out there and maybe

23   more have this capability to project that out

24   and say, okay, this is what it is going to look

25   like in all likelihood, because you run

Page 81

1                    DONALD C. STONE

2      thousands of simulations and you have an idea

3      of whether or not it is going to get somebody

4      across the finish line.

5                    What you find sometimes is that a

6      target date series which might be well designed,

7      good named investment company but for this

8      particular plan doesn't work because people

9      aren't saving enough, people don't have average

10     balances big enough, they can't get there, they

11     are going to fail.  The whole plan will fail if

12     they choose that target date series so you

13     don't want to do that.

14                    For another plan it might be a

15     very valid and reasonable choice.  So it takes

16     a lot of -- I think it takes a lot of work to

17     in a really prudent way to make these choices.

18     And then this has developed over a period of

19     the last 50 years.  I mean we are literally 50

20     years away from ERISA coming into play.

21                    All the things that we have been

22     talking about, almost none of them existed when

23     ERISA was founded.  In fact ERISA assumed

24     everybody would be in a defined benefit plan

25     for the most part.

Page 82

1                    DONALD C. STONE

2          Q.     I hear you.  I just know we just

3     celebrated the 50th anniversary.  We had some

4     parties here at our firm to commemorate that.

5          A.     That's okay, yes.

6          Q.     So a couple of follow up questions

7     there.  What you just walked through in terms

8     of the things that a committee in a prudent way

9     would consider in selecting a target date fund,

10    would those considerations come into play when

11    monitoring the prudence of a selected target

12    date fund in terms of retaining it for the

13    plan?

14         A.     Yeah, it's not something that you

15    would report on quarterly because you're not

16    going to rerun what I just described, the Monte

17    Carlo simulation, you're not going to rerun

18    that quarterly.

19               If something were under

20    consideration for -- let's say it was on a

21    watch list, I will use that is a broad general

22    term because I know in this particular case

23    they used several different terms, and if you

24    go look at 20 plans they may use a couple of

25    different terms for that.  But in general

Page 83

1                    DONALD C. STONE

2       something that needs more scrutiny, we call

3       that a watch list.  Then you might go back and

4       rerun this at that point and say is this thing

5       working the way it is supposed to.  Is there

6       something that has changed in its composition

7       that requires more scrutiny.

8                    I think you take a much deeper, I

9       will use the term deep dive, but in this case

10      it is very specific to the target date series

11      that you have to figure out what is going on

12      with it and how is it working with that plan.

13                   You're going visit with the

14      manager, you're going to spend time with them

15      and you're going to look at -- you're going to

16      spend a lot of time looking at their operational

17      processes, you're going to look at their --

18      some of the qualitative things that we haven't

19      talked about and everything.

20                   I guess the point is, you might

21      rerun that type of information at that point

22      when you've gotten to a stage where you're

23      considering making a change.  You may or may

24      not ultimately make that change, but when

25      you're on watch, then that to me is you have

Page 84

```
 1                    DONALD C. STONE
 2    heightened scrutiny.  It is not just saying,
 3    watch and walking away from it.  You actually
 4    need to do some additional work to look at it.
 5              I would expect a committee to be
 6    saying to their consultant or their advisor, we
 7    need you to go back and come back to us with
 8    what is going on with this thing.  Why, you
 9    know, great it's underperforming, but why is it
10    underperforming.  What is actually going on
11    under the covers that is making this happen.
12    And it may turn out that, well, you know, it's
13    a blip, it may turn out that there are reasons
14    because of changes in the firm, there may be
15    reasons that that particular approach is out of
16    favor.
17              There certainly can be
18    explanations and then the committee has to be
19    thoughtful to consider, you know, are we still
20    comfortable whether those explanations are
21    satisfactory or perhaps we need to consider
22    making a change.  Again, just because it goes
23    on watch doesn't mean you change it, but it
24    certainly does mean that you give it additional
25    scrutiny.
```

```
 1                    DONALD C. STONE
 2           Q.     So there would be circumstances in
 3      your experience where there is underperformance
 4      of a fund, but it is still appropriate to continue to
 5      offer that fund in the planned?
 6           A.     Yes, as long as you continue to do
 7      the additional scrutiny while it is under watch
 8      and then if the committee gets comfortable with
 9      that, that's obviously a choice, that is part
10      of what they are supposed to do is make a
11      choice as to whether they think it is
12      appropriate or not.
13           Q.     You mentioned the Monte Carlo
14      simulation; is that right?
15           A.     Yes.
16           Q.     I'm not familiar with what that
17      is.  Can you explain what that is?
18           A.     Yes.  In a simple way, because I
19      haven't run these in a while, so Monte Carlo
20      simulations basically are -- and you see this
21      -- I mean for example, when you look at --
22      maybe the easiest thing to think about is, we
23      are in hurricane season and when you go out
24      there and you got a hurricane coming towards
25      Florida and they show you the cone of
```

Page 86

1                    DONALD C. STONE

2       uncertainty as they call it, which shows all

3       the possible routes that hurricane can take.

4       They've run thousands of simulations to create

5       that cone of uncertainty or whatever as to

6       where it is going to go.  All the inputs that

7       go in.

8                         So in the case of Monte Carlo

9       simulation for a target date fund, you're going

10      to think about all the different possible

11      permutations.  You're not going to think about

12      it, you're going to have the system run it,

13      that could happen.

14                        For example, you have immediately

15      you start having bad returns and you have bad

16      returns for five years in a row, or you

17      immediately have incredibly good returns or

18      it's level returns over the entire 35, 40 year

19      period, the career of a person.

20                        So the mathematics are running all

21      of those different kind of permutations of what

22      might -- what those returns might look like.

23      And literally -- we would typically run I think

24      at 10,000 we figured out that we had all we

25      needed.  And what happens you begin to see --

Page 87

DONALD C. STONE

1

2    then you start to kind of -- for purposes of

3    looking at the, what we were talking about,

4    about who is going to get across the finish

5    line, you look then at kind of the median of

6    all of those.  You wouldn't take the outliers,

7    whether they are positive or negative, you're

8    going to look towards the median of that.

9            So that's probably the most

10   likely outcome that you're going to see.  And

11   how does that work if we said that a particular

12   participant -- and we will just break it down

13   as a participant.  A particular participant

14   needed $1,500,000 at retirement to meet this 80

15   percent goal including social security, does

16   this simulation do that, okay.  If it comes up

17   and says well, no, the most likely case is

18   they're going to be at 1 million 3, that is not

19   very good.  If it says they're going to be at 1

20   million 6, we are kind of happy about that.

21            There may be three or four

22   or five target date series that are successful

23   that way for the largest number of participants.

24   So then you have to do -- then you start doing

25   additional analysis to figure out which might

Page 88

1                          DONALD C. STONE
2       be the right choice for that entity.  You're
3       going to look at how smooth the ride is.  How
4       comfortable the ups and down that go on along
5       way.
6                     I'm not how much more detail you
7       want on that.  But that's kind of how you do
8       that.  It's a mathematical simulation that
9       projects out what possible returns could be and
10      the sequence of those returns over a broad
11      number of years.
12          Q.     So I want to make sure I'm clear
13      and I don't want to get into the total minutia
14      of this.  But you're essentially suggesting
15      there is a program where you would input the
16      demographic fits or objectives of your plan for
17      which you're solving for?
18          A.     Yes.
19          Q.     And attempt to create over the
20      long-term, so for the average retiree a certain
21      level of returns and the system would look at
22      all target date funds in the market or is it a
23      subset?
24          A.     It is not looking at target date
25      funds.  It's looking at returns at that point.

Page 89

DONALD C. STONE

1
2      So what you plug in -- let's say we have
3      participant Bob, okay.  So Bob is currently
4      deferring -- I'm just using an individual --
5      but you use averages obviously.  You could run
6      it for every participant.  You could make it --
7      you can individualize it for everybody but then
8      that could get incredibly expensive.
9                So would you typically do is
10     you run it for the plan which means you look at
11     the average deferral rate, you look at average
12     contribution by the company, you look at
13     average balance and so on and so forth or you
14     look at the median or you run it for both of
15     those.
16                So let's say that the average
17     participant is contributing 6 percent and the
18     average participant has a balance of the
19     $90,000.  The average participant is, let's say
20     it's a company that has a fairly old workforce
21     that the average participant is 20 years from
22     retirement.  You plug that in and then you plug
23     those numbers in and so you have that $90,000
24     balance and you're now going to run that out
25     with that 6 percent contribution rate and

Page 90

                           DONALD C. STONE

1

2          you're probably going to look at other things

3          like does the plan have other escalations.

4                    So is Bob going to be or the

5          average participant, are they going to be

6          putting in 7 percent the next year and 8

7          percent the year after.  So you can build that

8          in as well.

9                    Then given those numbers, then

10         you run the simulation with returns for a mix.

11         So you can run that mix against a particular

12         asset allocation which let's say would be the

13         T. Rowe Price Funds or it could be the Fidelity

14         or it could be Van Guard, it could be whatever.

15         And you run those for each one of those against

16         their allocation because their allocation is

17         going to have, depending on how conservative --

18         you're going to run those for each allocation

19         against those average balances and the way

20         those balances are going to grow and everything

21         over time.

22                   That is how you get at the end

23         analysis that at 65 the probability is that

24         this person will have a balance of X.  This

25         average participant or median participant

Page 91

                         DONALD C. STONE

1

2      depending on how you run it.

3              Q.    How is it -- --

4              A.    That is very common.  It is run by

5      all of the different advisors in consulting

6      firms that I used to work with and interact

7      with and over time and everything.  It is not

8      an unusual program.  This has been around for a

9      long time.

10             Q.    Is it something that you used as a

11     consultant?

12             A.    We used it for every single client

13     for a target date fund.  That is how the selection --

14     that was a big part of the selection process

15     because we might come up with three choices.

16     There is 42 different -- as of I think as of

17     last year there were 42 different target date

18     series, not counting any custom things that are

19     out there that are available in the marketplace.

20     Some have gone out of business over the years

21     others have come into the business in the last few

22     years, there is around 42 of them out there.

23             The only way that you're going to narrow

24     this down is to tie that from a prudence

25     perspective, is this going to make sense for our

Page 92

1                    DONALD C. STONE
2       client.  The real basic level is this is why you
3       want diversification in the first place and so on
4       and so forth.
5            If we go back to what the Department Of
6       Labor has said, you're supposed to have at least
7       three asset classes, well, everybody has a lot
8       more than that.  Everything is based off of
9       building on that.  So it is available to most of
10      the firms out there that I'm aware of and has been
11      for a long time.
12            Q.    So how is it that -- one piece
13      that I think I'm struggling to understand, how
14      is it that you decide as a consultant or as the
15      common industry decide which target date funds
16      to run in the program?  You said you could, for
17      example, use T. Rowe Price.  How would you
18      whittle it down from 42 to however many you're
19      going to run in the program?
20            A.    We typically -- we wouldn't run 42
21      different runs probably.  Most firms don't
22      actually track all 42 or whatever the number
23      happens to be today.  But there is a large
24      subset that they probably are watching.
25            So certainly if it is on your --

Page 93

                      DONALD C. STONE

1

2    if you have a buy list or a recommended list or

3    preferred list of managers, because those are

4    the ones that you have the highest conviction

5    in, you'd run it against all of those and there

6    might be five, six different managers.  But you

7    probably have run it internally against a much

8    larger subset over time to determine is this

9    somebody that we should be looking at for our

10   clients that we should be considering.

11            We would've run it against

12   probably 20 different products that were out

13   there as a part of our process.  Not for a

14   particular client, but for the firm in order to

15   be able to recommend things to our clients.

16        Q.    Okay, but if you're looking at a

17   particular client and they are looking to make

18   a target date fund selection, you mentioned a

19   preferred list.  What is that?

20        A.    So every -- I won't say every.

21   The vast majority of investment consultants

22   have a buy list or whatever they call it,

23   whether it's a buy list or preferred list or a

24   high conviction list or whatever, but it's a

25   group of -- you had your investment team

Page 94

1                    DONALD C. STONE

2       analyzing -- going out and looking at managers

3       all the time.  This is true of every asset

4       class.

5                    So you go out and you say, okay,

6       these are the five managers, there is 600 large

7       value managers, but out of that we really have

8       a high conviction because we have been to see

9       them in their office, we've seen their operational

10      processes, we've looked at their stability of

11      the organization and we've looked at their

12      returns, the construction methodology, we

13      looked at -- it goes on and on.  And we have a

14      really high conviction of this manager and this

15      manager and this manager.

16                   You typically might have five

17      different target date managers that you have a

18      high conviction and five or six large growth

19      managers or large value or whatever and in all

20      the asset classes you would do that.  That is

21      very typical.  Those would be the ones that you

22      would start with certainly on the target date.

23                   Now, if none of those, I can't

24      imagine, but if none of those worked out, you

25      could go on and look at others as well.  But

Page 95

DONALD C. STONE

1
2      you've already whittled it down to some extent
3      because these were ones that you have -- you've
4      seen what they have done, you have a lot of
5      history on them and we have a lot of history at
6      this point for target date.
7                    And these are the ones that you --
8      somebody said through -- if your grandmother
9      said what should I buy, this is one of ones
10     that you would recommend to your grandmother
11     because you're comfortable with it for any of a
12     number of reasons which you would articulate in
13     the internal notes that you keep on fund
14     managers.
15          Q.    At your time at PSA and Pavilion,
16     I'm going assume that your testimony here
17     relates to your capacity as an investment
18     advisor at Pavilion as well, which I know that
19     we haven't talk about yet.  Is that generally
20     fair?
21          A.    That's fair, yes.
22          Q.    Can you name the target date funds
23     that you had a highest conviction rate with?
24          A.    Yeah, the highest conviction
25     managers might have changed a little bit over

```
                         DONALD C. STONE
```

1      DONALD C. STONE

2      time, because we're talking about a number of

3      years, but the highest -- in general the

4      highest conviction managers would have been T.

5      Rowe Price as an active manager, JP Morgan as

6      an active manager, but also as a blend manager

7      which is to say they use some passive, some

8      active.  Blackrock as a passive manager.  Van

9      Guard as a passive manager.  State Street as a

10     passive manager.  And then American Funds as an

11     active manager.

12              Those would have been probably

13     been the recurring -- the ones that would have

14     recurred most often.

15          Q.    Did you ever have a conviction

16     rate with the Fidelity Freedom Funds to your

17     recollection?

18          A.    We used the Freedom Funds -- we

19     used Fidelity -- I don't know about the -- Fidelity has

20     several different versions.  So I don't recall

21     that the Fidelity funds -- Freedom Funds were

22     on our high conviction list.

23              We did have some clients at some

24     point in time and I'm thinking this was

25     actually way prior to the class period that we

Page 97

DONALD C. STONE

1

2    are talking about who did use the Freedom

3    Funds, but I believe those clients moved out of

4    those, the Freedom Funds, at some point and

5    probably this would have been 2008, 2010

6    period.  But that's very hazy in my mind.  So

7    that is just a general.

8         Q.    No problem.  So just a couple of

9    other things on this simulation exercise.

10             Once you ran the exercise and you

11   whittled it down to from maybe six target date

12   funds and then a handful of those would work,

13   quote/unquote, work for your clients.  Then

14   what are the other factors that you would

15   consider as a consultant in providing advice as

16   to which to select?

17        A.    So let's say that three of the

18   funds all passed those screens that you just

19   mentioned.  As I mentioned a couple minutes

20   ago, one of the things that we look at next is,

21   okay, if all three of these get across the

22   finish line, so to speak, which one is probably

23   going to be the most comfortable ride for

24   participants.  Which is to say going to have

25   the lease volatility over that period of time.

Page 98

1                    DONALD C. STONE

2                    So one fund might be just really

3         fabulous, it knocks the lights out ultimately,

4         but the ride was like being on a roller coaster

5         all the time, that is probably not the one that

6         you are going to recommend.  You're going to

7         look for something -- if there are three of

8         them that past those screens, you're going to

9         look for something less volatile.

10                   All things being equal, one that's

11        less volatile would be one that you'd probably

12        recommend to the client as opposed to a more

13        volatile choice.

14             Q.    Any other factors that you would

15        consider at that point in time?

16             A.    Well, you're going to look at

17        things like when do people -- at that point you

18        may look at the to versus through idea which is

19        if I went to a client and they said, like most

20        clients would, well, most of our participants

21        take their money out within one year of

22        retirement.  Then it doesn't matter which one

23        you choose because the to or the through are

24        both going to be fine because people are going

25        to take their money out right after the

Page 99

1                    DONALD C. STONE

2      retirement.

3                    If somebody said our participants

4      they really trust us, they are likely to keep

5      their money in the plan and we would like them

6      to keep their money in the plan because we

7      think they get the fiduciary oversight, they

8      get better pricing blah, blah, blah.  Then in

9      that instance maybe one of the decision factors

10     would be of these three is one of those a

11     through choice as opposed to to.

12                   So it's a conversation with the

13     committee they will all work for you, but let's

14     find something that seems to be the best

15     choice, all things being equal.  Those are --

16     there are probably some other factors, but

17     those are the big ones.

18          Q.     When you talk about volatility,

19     just help me understand.  What factors would be

20     driving volatility or what you would be looking

21     at to determine the volatility of a certain

22     fund?

23          A.     Well, keep in mind we projected

24     out the returns based on all the factors that

25     we talked about, and then when -- you're going

Page 100

1                    DONALD C. STONE

2    to have a lot of lines on a graph, if you can

3    picture it, sometimes those lines are going to

4    be smoother for some target date series then

5    for others, which means they have fewer ups and

6    downs in the market.  Maybe they do a little

7    better job of protecting on the downside when

8    the market isn't -- as a bear market or a down

9    market even if doesn't go to a full bear

10   market.

11                    Others are going to be we are

12   pedal to the metal and we are going to generate

13   great returns, but when the market goes down we

14   are just going to get hammered at least for a

15   period of time.

16                    So you're going to have that line

17   that is going to be very jagged.  It is going

18   to look more like a lightening bolt as opposed

19   to smoother line.  That is the visualization of

20   that volatility.

21           Q.    You talked about the to versus

22   through, are you referencing a glide path

23   there?

24           A.    I am.

25           Q.    And is that an important

Page 101

1                       DONALD C. STONE

2          consideration when determining whether or not

3          to pick a certain target date fund?

4               A.    Well, as I mentioned, you have to

5          versus through.  I think it is only -- it is important in

6          two ways.  One is if a committee says our

7          participants keep their money in the plan so

8          they need something that is going to continue

9          to adjust over time, then a through would make

10         sense in that instance.  Most plans that is not

11         the case.  Despite the fact that a lot of

12         people would like people to keep money in the

13         plan, there are a lot of committees that would

14         like people to keep money in the plan,

15         typically they don't.  They roll it into an IRA

16         or do whatever they are going to do.

17                     But the other factor that people

18         are going to look at is at retirement age, so

19         at 65, that arbitrary age we all kind of focus

20         on, what is the equity exposure at that point.

21         The range is going to be -- in the industry is

22         going to be from about 20ish percent to about

23         55, 57 percent.  Okay.  So it's a pretty good

24         range.  So that is going to be the other

25         factor.

Page 102

```
 1                    DONALD C. STONE

 2                    Some committees may say, well, I

 3         don't want to have that kind of volatility or potential

 4         volatility with a 55 percent exposure to

 5         equities at 65.  I want my participants to have

 6         less than that and so of the three that you're

 7         bringing to me, one of them has 55, one of them

 8         has 45, and the other has 42, they probably

 9         want to focus on talking about the 42 and 45

10         and in trying to decide between those two.

11              Q.    So would you look -- well, let's

12         say this differently.

13                    Are all glide paths the same?

14              A.    No, glide paths can be -- they all

15         start in a pretty close proximity to each

16         other.  But after that, there is a broad range

17         of, one, where they end up ultimately.  And

18         two, there is a broad range when they decide to

19         begin to lower the equity exposure.

20                    So that changes, there's a broad

21         range of choices there.  There are ones that

22         are 35, 40 years to retire and they are already

23         starting to diminish equity exposure.  There

24         are ones that wait to more like 20 years before

25         retirement before they do it.
```

Page 103

1              DONALD C. STONE

2                   So there is a lot of variety of

3         how these are created and keep in mind the

4         asset allocations under -- that make up the

5         glide path.  We are thinking about it as

6         equity, fixed income and cash, well, it is

7         really, you know, equities could be

8         international equities, it could be emerging

9         markets, it could even be frontier markets,

10        probably not, but could be.  It's going to be

11        domestic markets, it's going to be the exposure

12        of large cap versus small cap.

13                  So all of these go into when you

14        look at a glide path you're just getting the

15        first snapshot of how these are created.  And

16        it's a -- again, this is why I think it's a process.

17        Everything about ERISA is a process.  It's a

18        process to educate committees, but they need to

19        understand how these work because it might look

20        very simple on the surface that, you know, I

21        don't want a lot of equity exposure at

22        retirement and then you show them, yeah, but

23        your participants are unlikely to be

24        successful.

25                  One plan I looked at a lot a while

Page 104

1                    DONALD C. STONE

2       back, to give you an example, the average

3       balance was $5200.  There is no way that those

4       folks are going to get a successful requirement.

5       Most of them aren't going to get to having the

6       balance no matter what when the average balance

7       is 5200.  They obviously need to be encouraged

8       to save a lot more.  But they also need to have

9       an equity exposure to have any chance of having

10      a reasonable balance at retirement.

11                    Now that is an extreme on one end,

12      but that's a -- actually that's a billion dollar plus

13      plan.  You can look at the other end and say

14      you got a defined benefit plan, heck, you don't

15      need to save that much.

16                    So the answers can be quite

17      different for each plan.  It's just a very

18      thoughtful process to go through.

19           Q.     That's helpful, thank you.

20                    Turning back to I want to go back

21      to we talked about the qualitative -- quantitative

22      factors that you would present to your -- to

23      the committees which you served as consultant.

24                    What about the qualitative factors

25      that would be presented to a committee for

Page 105

```
 1                      DONALD C. STONE
 2      consideration of monitoring its investment
 3      options?
 4              A.      Okay.  You want me to just
 5      enumerate them.
 6              Q.      Yes, if you can.
 7              A.      So I think I've spoken to a couple
 8      of these before, but you're going to look at
 9      the manager tenure, the depth of the team,
10      stability of the organization overall and you
11      can see some of these are related to each
12      other, but they are different.
13                      You're going to look at the
14      operational processes which actually means
15      looking at how does their trading desk work.
16      How good are they at trade execution which can
17      make a real difference over time.  How well do
18      they control risk internally.  How do they
19      diversify so that they don't find themselves --
20      you know, how do they track that they are not
21      getting too heavy into a particular, let's say
22      into tech or too heavy into consumer durables
23      or whatever the heck it may be.
24                      You want to look at how they put
25      this thing together.  And you want to look at
```

Page 106

                    DONALD C. STONE

1          reputational risk as well.

3                    So there a number of factors that

4          come into play in that regard.  Because they

5          are qualitative they are a little bit more --

6          you're not going to -- you're not reporting on

7          hard metrics as much.  There is some of that

8          which is the how long has the manager been in

9          place, is it a single manager, is it a team.

10         So on and so forth.

11                   Some of the metrics are a little

12         bit harder to report as just a metric.

13         Q.    Understood.  So was it your

14         experience that the committees or was it your

15         expectation that the committees considered

16         these metrics each time you provided them in

17         monitoring investments offered in the plan?

18         A.    You do want them to consider them.

19         You want them to understand the qualitative why

20         it is important if there is something that

21         you're telling them about that is qualitative

22         metrics or a measure, you want to make sure

23         that they understand where does that play into

24         the equation and everything.

25                   It is one of -- quite often it is

```
 1                    DONALD C. STONE
 2      not one thing that makes you choose a
 3      particular manager or makes you decide to not
 4      choose a manager or to remove a manager,
 5      whatever.  It is usually a combination of
 6      factors that come into play.
 7                    So and you're not going to report
 8      on the qualitative -- you know, there are
 9      certain things maybe it will just be in the
10      book, but it is not something that you're going
11      to spend time talking about.  The manager has
12      another quarter of experience this quarter,
13      you're not going to go into that.  As long as
14      it is the same manager you're not going to
15      worry about that.
16           Q.    When you talked about the
17      quantitative metrics you mentioned, I think,
18      comparison to peer group and I think I'm
19      quoting you accurately, you said that was very
20      important.
21           A.    Yes.
22           Q.    Why is that very important?
23           A.    Well those are the -- and I think
24      that is -- I mean you're looking at two different
25      things.  You're looking at, they're related but
```

Page 108

1                      DONALD C. STONE
2    they are different.  You're looking at how a
3    fund is doing versus its benchmark.  You're
4    also looking how it is doing versus peers.
5                      Peers are the -- you can't invest
6    in the benchmark, but you can invest with the
7    peers.  So if you're -- you would not want to
8    choose, I don't think, somebody who is lagging
9    their peers substantially.  It is just another
10   snapshot of that -- of how well are they doing.
11   How is that performance.  It is another element
12   of that.
13                      I think in target date funds it is
14   very relevant to see how are they doing versus
15   other funds that are similar to them.
16                      Sometimes you do an analysis
17   of -- if you have a to fund, I don't think this
18   is important myself, they may say we want to
19   see what other to funds are doing and you
20   compare this against maybe five other to funds
21   as opposed to through funds.  So there are
22   different ways that you slice it.
23                      The peers is actually what real
24   managers are doing in realtime out in the real
25   world versus what your particular manager of

Page 109

1                  DONALD C. STONE
2      your investment product is doing.
3             Q.    So is there specific for the
4      reporting metrics that you would provide to
5      your client, is there a specific time period of
6      performance versus benchmark and performance
7      versus peer group that you would typically
8      provide or expect to see?
9             A.    So I think this goes to -- the
10     answer is yes.  And in a vacuum you want to
11     look at as many different things as you can.
12     So quarter, year to date, one year, three year,
13     five year, 10 year if it exists.  I probably
14     wouldn't look much past that unless it was the
15     rare case where the same manager had been in
16     place for 15, 20 years.  That does exist but it
17     is not as common.
18                  But I would also -- all of this
19     needs to get tied very specifically to the
20     investment policy statement.  So the investment
21     policy statement, you have to make sure that
22     where your focus is is making sure that you're
23     compliant with the investment policy statement.
24     Not necessarily some set of metrics that you,
25     as a consultant, think people ought to be

Page 110

1              DONALD C. STONE
2       looking at.
3                    It is great that you have that,
4       but your focus has to be on what does the
5       investment policy say.  Because that is a --
6       that's part of the plan documents and it is
7       part of what the plan committee is going to use
8       to evaluate.  So it has to tie to that
9       investment policy statement.
10                    The investment policy statement,
11       for example, says we wouldn't focus on three
12       year, five year numbers, which would be
13       reasonable.  You may report on the 10 year, but
14       you're not going to go put something on watch,
15       for example, because the 10 year number is not
16       attractive.  Because that doesn't tie to the
17       IPS.  Now the IPS, of course, you can go out
18       and you can rewrite the IPS.  You can have a
19       conversation on that but those things are
20       reporting and the IPS really need to tie
21       together.
22                    And then a lot --
23            Q.    Okay.
24            A.    A lot of times you run into
25       problems with that because of the way people

Page 111

                    DONALD C. STONE
1
2      create the reporting system.
3              Q.     So let me just ask you this.  Is
4      it your testimony that if there is a reporting
5      metric that is provided to the committee that
6      the committee finds to be concerning and wants
7      to put an investment option on watch, because
8      of that your testimony is that they could not
9      do that if the investment policy statement
10     doesn't specifically require that?
11             A.     No, no, no.  Sorry, that is not my
12     testimony.  Keep in mind the committee has
13     flexibility to -- it's a guiding document.  The
14     IPS is a guiding document and depending on how
15     it is written, if it says you will do something
16     then I think this a clear you're going to have
17     to do that.  But quite often it says you may do
18     something.  So you have to look at the language
19     of it.
20                    They can put it on watch even
21     though the IPS doesn't reference it, but I
22     think that raises an issue at that point of,
23     okay, what is going on with our IPS.  You want
24     to take a look and say, why is it important
25     that we put it on watch, but it is not covered

```
 1                   DONALD C. STONE
 2      in the IPS.  That would seem -- it would raise
 3      other questions, I think, as opposed to --
 4           Q.     Got it.
 5                  You mentioned earlier -- I'm going
 6      to backtrack a quick second to this program
 7      that simulated the target date fund and you
 8      were talking about volatility in those
 9      simulations.  Do you recall that?
10           A.     I do.
11           Q.     You're talking about -- when
12      you're talking about volatility, you're talking
13      about performance volatility?
14           A.     That would be performance
15      volatility, yes.
16           Q.     Is the program being run or is it
17      reflecting performance compared to a certain
18      benchmark and peer groups or one or the other?
19           A.     No.  The simulation -- you're
20      talking about the Monte Carlo.
21           Q.     Yes.
22           A.     The Monte Carlo is taking the
23      demographic information that we talked about
24      and it is then going and running that against
25      all possible combinations or at least thousands
```

Page 113

1                           DONALD C. STONE

2        of possible combinations of return sequences

3        that could happen.  It is not worried -- it is

4        not looking at a benchmark or peer group, it is

5        looking at actual returns.

6                    So let's say, for example, it's

7        going to look at returns for bonds using -- and

8        you're going to have probably -- probably used

9        a broad index for the Barclays Ag, for example,

10        for bonds as the proxy.  It's going to look at,

11        you might use the Russell 1000 as the proxy for

12        domestic equities.  You might use something

13        else for -- you could break it down as much as

14        you want.

15                    You can put in as many inputs, if

16        you want to get down and have short-term bonds,

17        but it is actually looking at projecting against those

18        indexes what you're -- and running what you're

19        balance might be.  It is running against another fund.

20        It is not running against any particular peer group or

21        whatever.  It is running against what those

22        indexes might generate in returns going on a go

23        forward basis.

24                    Q.    I see.  I got it.

25                    A.    You got it, okay.  Is that okay?

```
                                          Page 114

 1                  DONALD C. STONE

 2          Q.    Yes.  I'm okay, thank you.

 3    Generally speaking, when it comes to investment

 4    funds, do you agree with me that there are time

 5    periods where there are fluctuations in

 6    performance over time?

 7              A.    Absolutely.

 8                  MS. ENGELMAN:   It's 12:45 eastern,

 9              can we take 20 minutes now and do a quick

10              lunch?  Does that work?  I know it is

11              probably dinnertime to you, Mr. Stone.

12              Let's go off the record

13                  THE VIDEOGRAPHER:   The time is 5:44

14              p.m. and we are off the record.

15                  (Lunch recess taken at 5:44 p.m.

16              European standard time)

17

18

19

20

21

22

23

24

25
```

Page 115

```
 1                      DONALD C. STONE
 2             A F T E R N O O N   S E S S I O N
 3                        6:14 p.m.
 4               D O N A L D   C.   S T O N E,
 5         resumed, having been previously duly sworn,
 6         was examined and testified further as
 7         follows:
 8                    THE VIDEOGRAPHER:  The time is 6:14
 9         p.m. and we are on the record.
10    BY MS. ENGELMAN:
11             Q.    Hi, Mr. Stone.  We just had a
12    short lunch break here on the east coast maybe
13    dinner break for you.  Welcome back.
14                    Did you speak to your counsel
15    during the break?
16             A.    I did not.
17             Q.    I have a hypothetical for you.  So
18    we are going to switch gears a little bit.
19                    So suppose an investment fund
20    underperformed its benchmark on a three and
21    five-year basis for a single quarter.  Would
22    that in your experience require placement on
23    the watch list?
24             A.    It is usual it would be on for
25    just one quarter.  I think you have to go back
```

Page 116

1                    DONALD C. STONE

2       and look at the IPS and see what it -- how it

3       would direct you, if you will.  So if something

4       was -- I don't know how you could be on a watch

5       list for a five-year period and had it happen

6       just the one quarter.  I mean the numbers are

7       not adding up for me.

8              Q.    The first quarter that there is a

9       detection of underperformance against benchmark

10      on the three year and five-year period.

11             A.    Okay.

12             Q.    Have you ever had a situation

13      where a committee placed a fund on a watch list

14      based on one quarter of underperformance,

15      irrespective of any other factor?

16             A.    I can't recall a specific instance

17      where that fact pattern existed and so I just

18      can't speak to that in terms of actual

19      experience.  As far as that is concerned.

20                   I think that would be a obviously --

21             Q.    Do you personally believe that a

22      fund should go on a watch list if there was a

23      three year and five year underperformance for a

24      single quarter?

25             A.    I think -- are you assuming --

Page 117

1                    DONALD C. STONE

2       first of all, you don't know if it is going to

3       be a single quarter, if I understand your

4       hypothetical correctly.  It is under for one

5       quarter, you don't know what the next quarter

6       is going to look like at this point, correct?

7            Q.    Correct.

8            A.    I think it's a conversation that

9       you have with the committee.  You certainly

10      don't ignore it.  Suddenly this thing is on

11      watch for a three year and five year -- not

12      watch.  It's underperforming for a three year

13      and five year, I think that becomes a

14      conversation with the committee and it is

15      possible it could go on watch because -- and

16      particularly, again, looking at the IPS, you

17      have to look at that and say, well, if there is

18      criteria for the IPS.

19                      There is nothing wrong with

20      putting something on watch and saying this

21      needs closer scrutiny, that is what watch

22      means.  So I don't think there is problem doing

23      that.  I think, but again, I would defer to the

24      IPS and I would have a conversation with the

25      committee and say they could make a

Page 118

```
1                      DONALD C. STONE
2        determination that we are not going to put it
3        on watch list, we will wait until next quarter.
4                      But I think that would be one of
5        those things that you look at and say, if it is
6        on for one quarter it's probably really likely
7        it is going to be on the next quarter too
8        particularly for three and five year numbers.
9        It is hard to see those rolling off.
10                     So I think it would be reasonable
11       to consider putting it on watch.  I don't think
12       you have to put it on watch, but it certainly
13       ought to be discussed.
14            Q.    How would your answer be impacted
15       if the underperformance on the three year, five
16       year comparison to benchmark was one basis
17       point.
18            A.    Well, again, I think you're still
19       going to have a conversation and that's a
20       conversation that you're having with the
21       committee.  It is only one basis point.  I
22       think it's a fair and honest conversation to
23       have with the committee to say, you know, it is
24       barely there, but here is where we're at.
25                     I think you can also look at --
```

Page 119

DONALD C. STONE

1

2      one of the things that would happen in this

3      case in your hypothetical, I would think that

4      the advisor would go and say what number is

5      going to drop off next quarter.  Because you're

6      always adding a number and subtracting a

7      number, okay, for the three year and five year.

8              So something is going to go off

9      and something is going to come on.  You don't

10     know what the number that is going to come on

11     at the hypothetical point that you're talking

12     about right now.  But what you do know is what

13     number is going to drop off.

14              What the advisor would be able to

15     say is, yeah, it's one basis point now, but it

16     is probably going to be back in compliance next

17     quarter or it is going to be much worse off

18     based on the number that is dropping off.

19              So I think you look at that.  It's

20     a conversation -- like I said, you don't have

21     to put it on watch, but I think that raises the

22     question that you want to have a conversation

23     with the committee and have the committee make

24     a decision as to whether they want to just

25     watch and wait and see or whether they want to

Page 120

1                    DONALD C. STONE

2      put it officially on watch.  They have that

3      option.

4           Q.     In your experience would the

5      committee also want to look at, not just the

6      three and five-year performance against

7      benchmark, but also look at performance against

8      the peer group?

9           A.     Absolutely.  I think at that point

10     you probably step back and, again, if I was on

11     the committee I would be saying, okay, so first

12     of all is this going to be on watch next

13     quarter and the advisor ought to be able to

14     tell you right then a there.  And then two, by

15     how much, depending on what number is dropping

16     off and is it going to have a magnitude.

17     What's the magnitude of the impact.  And then

18     let's look at the other number.

19                    It's a conversation that the

20     committee is going to have to say, okay, there

21     is issue here, let's take a look at it.  It doesn't

22     mean the house is on fire.  It may turn out to

23     be on fire, but at this point you don't know

24     that.  It is just we have an issue we ought to

25     look at, we ought to be thoughtful about it and

                                              Page 121

 1                    DONALD C. STONE

 2      take a look and see what else is going on to

 3      you point and look at the peer group and any

 4      other metrics that seem appropriate at the

 5      time.

 6            Q.    So similar hypothetical for you.

 7      Suppose a fund underperformed its benchmark

 8      again on the three and five-year basis for five

 9      quarters, irrespective of any other metric,

10      would that automatically require, in your view,

11      removal of the fund?

12            A.    Well, again, I think you go back

13      to what a particular hypothetical, what's the

14      hypothetical IPS say.  You go back to your IPS

15      and it's reasonable that you two companies or

16      two 401-K plans could have different IPSs that

17      have different metrics, that's possible.  They

18      may be -- I would hope they would be similar

19      but they wouldn't necessarily be the same.

20                  The first thing is go back and

21      look at the IPS and see what it says.  See if

22      it says will or whether it says shall or

23      whether it say may.  I mean this is a process

24      and so ERISA is all about process, it is not

25      about outcomes.  So I think at that point

Page 122

1                    DONALD C. STONE

2      you're going to -- five quarters, how far under

3      is it, you have to look at the whole thing.  I

4      think you have to step back and look at the

5      whole thing.  The first thing is look at the

6      IPS and follow the IPS.  You don't look at

7      anything else.

8            Q.    So irrespective of an IPS, in your

9      view, objectively, if a fund underperforms in a

10     three year and five year compared to its

11     benchmark only, irrespective to any other

12     metric, should that fund automatically be

13     removed from the plan lineup?

14                 MR. ROBERTS:   Objection to the

15            form.

16            A.    The answer is, I can't give you

17     answer to that because you do look at a lot of

18     other metrics.  Certainly it would be on watch,

19     but whether you're going to remove it that

20     depends.

21            Q.    When you are evaluating or

22     monitoring the performance of a target date

23     fund and a target date fund is obviously made

24     up of many different vintages, right, correct?

25            A.    Correct.

Page 123

1                    DONALD C. STONE

2          Q.    And those different vintages

3     perform differently; correct?

4          A.    They do, yes.

5          Q.    So in your experience, when you

6     are helping committees to evaluate the performance,

7     for example, on a three year and five-year

8     period of target date funds, how is it that you

9     look at the target date fund as a whole in

10    order to encompass the performance of the

11    various vintages?

12         A.    Well, I think you're going to look

13    at, with the target date you're going to look

14    at potentially three different things.  You're

15    going to look at the overall target date level

16    and that would include all the vintages and

17    what the -- how that performance is.  And

18    depending on how you're reporting on it,

19    do you have a point system or not, whatever

20    mechanism you use for that.

21                Two, you're going to look

22    at each individual vintage and you're going to

23    certainly rank them as to whether they are

24    compliant or not in terms of peer group, in

25    terms of absolute performance.  And I think

Page 124

                    DONALD C. STONE

 1

 2    that in some cases depending on what is going

 3    on on any given quarter you're not necessarily

 4    going to do this, but if you have a problem,

 5    you have an issue with a fund, then I think

 6    you're going to want to go and look at the

 7    funds that comprise each vintage and see what

 8    is happening with them.  Because one or more of

 9    those funds is probably or is definitely

10    driving that underperformance.

11            Usually there is a couple that are

12    having the problem and you want to understand

13    is this something that is kind of something

14    that we might see from time to time or is there

15    a bigger problem.

16            So I think you're going to look at

17    all of those as a part of that discussion which

18    you will have with the client.

19        Q.    Did you ever have a scenario where

20    you average the performance of the various

21    vintages to look at the average performance of

22    the underlying fund on a three year and

23    five-year basis?

24        A.    I've seen that done.  I think that --

25    I have some concerns about that because I think

Page 125

1                      DONALD C. STONE
2      it can hide issues.  I think as opposed to -- I
3      think it is done to kind of clarify things.  At
4      least that was the original idea.  We could
5      rate this fund a 6, we could rate it a 5, we
6      would rate it a 10, whatever the scoring would
7      be in that case.  And that keeps it simple in a
8      sense, but it also completely I think hides --
9      you don't really know what is going on or
10     what's driving that issue.
11                      So I'm skeptical of kind of
12     rolling that up in an average or, for example,
13     if I'm going to take an average, why wouldn't I
14     take a median and say that you could get into
15     this kind of go down a rabbit hole and I'm not
16     sure that is helpful to a committee.  Could
17     they use that, they can, if this is what they
18     choose to do.  If this is what their IPS says.
19                      Let me go back.  I think
20     committees operate differently and there is no
21     one perfect IPS and I'm not suggesting there
22     are.  I think there are elements that obviously
23     have to be in any IPS and committees can make
24     different decisions based on -- may make
25     different decisions based on similar facts in

Page 126

1                    DONALD C. STONE

2       some cases.  But, again, it comes back to it is

3       not about the outcome, it is about process with

4       ERISA.

5                Q.    Kind of along those same

6       questions with regard to evaluating the

7       performance of a target date suite.  In your

8       experience would you say that if in your

9       experience, Mr. Stone, in evaluating the

10      performance of a target date fund suite, would

11      you say that if more than 50 percent of the

12      underlying vintages were underperforming, that

13      that meant that the target date suite was

14      underperforming?  Did you reach that conclusion

15      in your experience?

16               A.    Yes.

17               Q.    Was that always the case?

18               A.    I would say, just again on that

19      hypothetical, I would say if 50 percent or more

20      are underperforming, then I think -- then

21      obviously I think there is an issue that needs

22      to be looked at with that particular target

23      date suite.

24               Q.    Could a committee look at the

25      performance and the level of performance or

Page 127

1                    DONALD C. STONE
2        level of underperformance and reach a different
3        conclusion?
4              A.      You kind of went to the heart of
5        what I said a few minutes ago.  You need to
6        evaluate it.  You can't just let it go.  You
7        need to spend the time to go an evaluate what
8        is the underperformance.  What is causing that
9        underperformance.  And then you may make a
10       decision that right now we think it is okay
11       still.  Okay.  I don't think that is possible
12       without doing the evaluation.
13                    In other words, the whole point
14       is what the -- the hypotheticals you're bringing up
15       trigger a needed response by the committee and
16       the response is not absolute, every single time
17       no matter what you have to do A and it is not
18       that you have to throw out the fund.  It's that
19       you have to evaluate it and make a
20       determination as to what the appropriate action
21       is.
22              Q.      One more hypothetical along these
23       lines and then we will move on.
24                    So say there was a target date
25       suite that underperformed its benchmark on a

Page 128

```
 1                    DONALD C. STONE
 2      three and five-year period, but that benchmark
 3      outperformed 90 percent of the other assets in
 4      it's class, would that inform how the committee
 5      evaluated the underperformance?
 6                    MR. ROBERTS:   Objection to the
 7              form.
 8              A.    Can you repeat that, please?
 9              Q.    Yes.
10                    MS. ENGELMAN:   Can you read it
11              back, Bill, because I'm not sure I can say
12              it.  If he doesn't understand it I can
13              rephrase it, but I don't know that I could
14              repeat it exactly as I said it.
15                    (Requested portion of record read.)
16              A.    What you're saying is the
17      benchmark measuring the target date fund
18      outperformed 90 percent of all of the other
19      target date funds?
20              Q.    Correct.
21              A.    So all the target date funds, 90
22      percent of them underperformed for some
23      hypothetical reason, and that's at least
24      theoretically possible.  Again, I think what
25      that would say to me, I, as a committee member,
```

Page 129

1                    DONALD C. STONE

2      I would say, wow, that is interesting

3      information.  So again, and that would probably

4      give me some degree of comfort in the

5      short-term in looking at this, but I would

6      still say, we need to understand why are we in

7      that 90 percent.  What are we doing or what is

8      our fund doing.  We just need to understand it

9      better.

10                    I think all of this triggers a

11     need for additional looking and scrutiny to the

12     situation.  It doesn't necessarily right off

13     top of the bat dictate an absolute answer.  It

14     dictates additional scrutiny.

15          Q.    So I was going down your

16     biography, Mr. Stone, and we went on a whole

17     detour.  So I'm going to reroute back to your

18     sort of your background.

19                    I understand doing the PSA time

20     period you served entirely as a 321 consultant

21     and then 2014, am I correct, that you sold PSA

22     to Pavilion?

23          A.    Correct, in June of 2014.

24          Q.    And you became an employee of

25     Pavilion at that time?

1                    DONALD C. STONE

2           A.      That's correct.  I was an employee

3     and shareholder.

4           Q.      What was your role at Pavilion

5     from 2014 until you retired in 2019?

6           A.      I was -- my title was executive

7     director and I was responsible for a number of

8     relationships that I was -- had been -- was

9     personally working with at the time we sold the

10    company to maintain those relationships, to

11    make sure they stayed with Pavilion and to

12    ultimately transition them to other people, but

13    not in that initial three year -- the first

14    three years.

15                  Then I was also responsible for

16    being one of the spokespeople for the firm.  So

17    I did a lot of public speaking.  A lot of

18    conferences.  I did some writing.  I also

19    continued my being on the executive committee

20    of DCIIA, that's D-C-I-I-A, which you will see

21    in my CV or in the bio I should say.

22                  So I continued that role as well,

23    which was obviously promoting better outcomes

24    for participants.  But that gave visibility to

25    Pavilion.

Page 131

1              DONALD C. STONE

2              I also did due diligence on

3      managed account products and probably a couple

4      of other things along the way.  I did some

5      training of some of staff at Pavilion.

6              Q.    So did you -- in your role at

7      Pavilion, did you serve as a 338 advisor to any

8      clients?

9              A.    I did.  In 2017 I served as a --

10     began serving as a 338 for a defined benefit

11     plan of one my clients.  I want to say 1.2

12     billion or so.

13             Q.    Okay, do you remember which client

14     that is?

15             A.    Yes, it was I think in the record,

16     Packaging Corp of America.  In 2018 I became a

17     338 for the defined contribution plan as well.

18             Q.    Is that the only plan -- for

19     Packaging Corporation of America, is that the

20     only plan that you served as a 338 advisor?

21             A.    That's correct.

22             Q.    So the record is clear, what is

23     the difference between a 321 and a 338 advisor?

24             A.    So a 321 advises, provides advice

25     to clients that has no discretion.   The

Page 132

1                    DONALD C. STONE

2       ultimate decisionmaking responsibility lies

3       with the committee.  338 has discretion to act

4       on the investments within the mandate that they

5       have been given.

6                    So you could have a -- you

7       could be a 338 for one investment choice in a

8       plan, for example, or for the whole plan.  And

9       the committee still maintains some monitoring

10      responsibility of that 338, but it does shift a

11      lot of the liability for actual decisions to

12      buy fund A or fund B to the 338.

13           Q.    When did the 338 relationship,

14      your 338 relationship end with Packing

15      Corporation, is that when you left Pavilion?

16           A.    When I left Pavilion.

17           Q.    When did it start?

18           A.    So the defined benefit started in

19      2017, the defined contribution in 2018.

20           Q.    With respect to the 321

21      relationships, did you continue the relationships

22      you had from PSA into your time at Pavilion?

23           A.    I did.  And I was responsible for

24      transitioning those relationships into Pavilion

25      and helping ensure that they were happy and

```
 1                    DONALD C. STONE
 2    would remain clients.  And then I was
 3    responsible, ultimately, this would have been
 4    in 2017, some time in 2017, maybe late 2017
 5    early 2018, to begin transitioning those
 6    relationships to other advisors within the firm
 7    since I knew I was going to be retiring at -- I
 8    didn't have an actual date at that point, but I
 9    knew some time in the future I would be and it
10    wasn't that far off.
11            Q.    Just to take this step by step.
12    From 2014 to 2017, early 2017, how many clients
13    would you say that you were personally
14    providing 321 services for?
15            A.    Probably 15.
16            Q.    15?
17            A.    Yes.
18            Q.    Do you have an approximation of
19    the range of the plan size from small to big?
20            A.    Yes.  Probably the, probably from
21    the small end would be probably 30, 40 million.
22    With probably half of those relationships maybe
23    slightly more being just under or well over a
24    billion.
25            Q.    I missed that last part?
```

Page 134

1                    DONALD C. STONE

2            A.      Just under or well over a billion.

3            Q.      That is a large range.  How many

4    plans would you say were $100 million and less?

5            A.      I'm guessing at this point, but I

6    would say probably no more than three or four.

7            Q.      How many would you say were over a

8    billion?

9            A.      I said just under to over a

10   billion I think it was probably in the

11   neighborhood of 10 or so of the 15.  So there

12   is a couple that would have been in let's say

13   half a billion dollar range.

14           Q.      Did the quality of the services

15   that you provided as a 321 consultant vary

16   depending on whether it was a small client or

17   large client?

18           A.      No.  You asked me that earlier

19   today.  Even at Pavilion it was the same.  We

20   provided the same service.

21           Q.      Did you have -- for these 15

22   clients in this time period, did you have other

23   individuals working alongside you as a

24   consultant or was it just you?

25           A.      No, it was -- I had a team to help

Page 135

                        DONALD C. STONE
1
2       me.  For example, quarterly reports, we had at
3       that point we had probably 50 people doing
4       research in reporting.  I would have people who
5       would prepare reports for my review.  I would
6       have investment analysts who would do
7       additional information if there was a need for
8       some kind of a deep dive on a particular
9       manager or not, I would be directing someone to
10      get that information for me.  I might be
11      involved in that process as well, but I would
12      have somebody else who is kind of driving it in
13      that regard.
14                  And I would usually have a, at
15      least, some other, I don't want to say junior
16      consultant, but somebody who was less
17      experienced than I was, let's just say it that
18      way, who would also go with me to meetings.  So
19      I would always have at least two people at a
20      meeting, sometimes three, depending on what the
21      topics were.
22              Q.    From 2017 on you said you started
23      to transition clients to people who were less
24      experienced; is that correct?
25              A.    Well, not necessarily people -- to

Page 136

```
                              DONALD C. STONE
 1
 2    people who were not as close to retirement,
 3    let's put it that way.
 4            Q.    Did you have any role with respect
 5    to those clients from 2017 on?
 6            A.    It was an iterative process where
 7    I was involved with some of them all the way
 8    probably halfway through 2018, maybe a little
 9    longer.
10            Q.    I'm going to ask a similar
11    question of PSA.  Do you feel that you
12    personally fulfilled your fiduciary duties with
13    being a 321 consultant with respect to each
14    plan that you worked with?
15            A.    Are you talking with Pavilion or
16    PSA?
17            Q.    Well, at both.
18            A.    Yes, I think I fulfilled my
19    responsibility, yes.
20            Q.    For the people -- for whom the
21    people that work under you and work with you,
22    do you have the same feeling with respect to
23    both PSA and Pavilion?
24            A.    Absolutely.  I trained a lot of
25    them, so it was a -- I trained a lot of them
```

Page 137

1                    DONALD C. STONE
2        and there was a particular way that we wanted
3        to -- if you want to think about it, it's a
4        process and we wanted to be very careful to
5        take care of our clients.  That is my personal
6        philosophy about how I approach things.
7                    So if you have a client -- you
8        have a responsibility to take care of them and
9        treat them the way that any other client would
10       be treated for that particular service that
11       you're providing.
12            Q.    With the committees with whom
13       you worked, do you feel as though they were
14       good and prudent committees?
15            A.    I do feel that.  Obviously there
16       was a range of skill sets.  There was a range
17       of size of committees, sophistication, so on
18       and so forth.  But this is where, you know, we
19       would not -- we actually refused to take on a
20       couple of assignments at some time in the past
21       I remember because I did not think they were
22       going to take it seriously and I thought it was
23       going to be a problem and I didn't want any
24       part of it.
25                    So the key is is that every single

Page 138

DONALD C. STONE

1
2       committee we drove the process to say you have
3       to get -- we are going to provide fiduciary
4       education and somebody joins the committee,
5       there is a process that they go through.  They
6       get removed from the committee we want to make
7       sure that they actually have been removed from
8       the committee and documented in writing.  It's
9       a very clear process frankly to avoid problems,
10      but also most importantly to make sure, to the
11      extent that you possibly can, you're acting in
12      the best interest of the participants.
13              Q.    You mentioned a range skill sets.
14      What do you mean by that?
15              A.    People come on to a committee,
16      there are people you go in and the committee is
17      already in existence, the plan is already in
18      existence and you get to know people and you
19      realize -- not to pick on HR, but quite often
20      HR is not as investment savvy as the finance
21      people.  And then sometimes the finance people
22      think they are more savvy than they actually
23      are in terms of fiduciary issues or whatever.
24                    So committees from a large
25      corporation tend to have a bigger talent pool

```
 1                  DONALD C. STONE
 2     to pick from to be on the committee.  Sometimes
 3     they have already got established more robust
 4     processes before we come in.  Sometimes not.
 5                      And at smaller clients quite often
 6     we go in and here is what we would like to do,
 7     which is one of the reasons that we got hired.
 8     This is what we -- the process that we want to
 9     go through to get you tuned up to where you
10     need to be to make sure you're overseeing the
11     plan appropriately, to make sure that we are
12     doing the best job, you're doing the best job
13     that you can for the people in the plan.
14          Q.    Was it generally common in your
15     experience for HR folks to be part of the
16     committee?
17          A.    Yes.
18          Q.    Is that because the committee does
19     more than simply do financial analysis and
20     monitor investment performance?
21                  MR. ROBERTS:   Objection to the
22          form.
23          A.    Yes, typically -- sometimes there
24     was a separate administrative committee, so
25     that's not unusual at some large corporations.
```

Page 140

1                    DONALD C. STONE

2        But generally it is one committee and the -- so

3        there are issues that you deal with in terms of

4        plan design.  There are issues that you deal

5        with in terms of, did you payroll right.  Did

6        you not include -- there are a lot of issues

7        that happen with these plans and everything and

8        so all of those issues would typically come to

9        a committee at least to report out what is

10       being done.

11                    In some cases those administrative

12       issues would be handled outside the investment

13       committee room, but they would report back in

14       as to what the follow up was.  There was a lot

15       of issues in terms of revenue sharing, in terms

16       of how we are going to account for, we have a

17       para account which is an account that could be

18       set up to pay expenses of the plan and to

19       actually reimburse companies for people who are

20       working, spending most of their time working on

21       issues around the plan and there are

22       complicated rules around that.

23                    So there is a lot of things that

24       an administrative person does versus an HR

25       person.  Certainly the whole plan design issue

Page 141

1                    DONALD C. STONE
2      is a big issue for that side of the house.
3           Q.     Generally speaking at Pavilion,
4      are you aware of any consultants who worked
5      there who you do not think fulfilled their
6      obligations as a 321 consultant or otherwise
7      worked with imprudent or disengaged committees?
8           A.     I can't speak to whether -- to
9      what the committees were like for somebody that
10     I never met.  So I can't really speak to that.
11                 I would say the staff, all of the
12     consultants at Pavilion, I think I met all of
13     them because we had multiple offices, but all
14     the ones that I knew I think were serious and
15     dedicated about the work they did.  And we had
16     a common process about how we went about --
17     what we presented to clients and how that --
18     how those decisions got made at to what to show
19     them.
20                 To go back to what we talked
21     about earlier today.  The process for picking a
22     target date fund would have been the same if it
23     was me, if it was a colleague of mine who came
24     over from PSA or if it was somebody who had
25     been at Pavilion for ten years before we sold

Page 142

1                    DONALD C. STONE
2       the firm to Pavilion.
3            Q.    Got it, okay.  And that would be
4       the same for not just selecting a target date
5       fund, but retaining a target date fund or
6       monitoring a target date fund?
7            A.    That's correct.  All of that would
8       be the same and in fact the research person who
9       was primarily responsible for spearheading the
10      target date efforts and to track them and to
11      investigate all the products that were out
12      there was one of my staff from PSA that came
13      over.
14           Q.    And she did all of that work for
15      Pavilion?
16           A.    He did.
17           Q.    He did, sorry.  When you sold the
18      business from PSA to Pavilion, did the
19      reporting capabilities change?  We talked
20      earlier about reporting capabilities and how
21      those can change over time.  Did that happen?
22           A.    So the defined contribution
23      reporting essentially stayed the same.
24           Q.    Okay.
25           A.    The defined benefit reporting was

Page 143

```
                                DONALD C. STONE
 1
 2      enhanced because Pavilion had been primarily

 3      focused on endowments, foundations and defined

 4      benefit plans and one of the reasons why they

 5      wanted to acquire our firm is because of their

 6      expertise in defined contribution was more

 7      limited.  So we had more resources, I will say,

 8      but the systems that we used, the actual

 9      reporting systems that we used I don't believe

10      changed at all.

11              Q.    You talked earlier, sort generally

12      speaking in the industry how reporting systems

13      can change.  Do you recall that testimony?

14              A.    Are you talking about scoring

15      systems or are you talking about reporting --

16      like there are three or so major reporting

17      systems that everybody basically goes out and

18      buys.  I'm not sure what you're saying.

19              Q.    What are those reporting systems?

20              A.    One of them was produced by

21      Morning Star.  One of them is produce by

22      Markoff Systems and the third is -- the third -- I'm

23      not remembering the name right at the moment.

24                    Quite often it is not unusual for

25      a shop to have two of those in-house and use
```

Page 144

DONALD C. STONE

1

2     them in different ways.

3          Q.     Those reporting systems may have

4     different metrics embedded into them and spit

5     out different metrics in different formats?

6          A.     They all have the same metrics

7     available.  You can select which metrics you

8     want to see.  If you're printing out something,

9     you can go in and customize those pages to

10    include only the -- you can suppress some data

11    and include other data, depending on what as a

12    firm you decided what you want to show a

13    client.  All the metrics are available on all

14    of these systems.

15              Generally speaking, if you go

16    and look at -- I looked at probably the vast

17    majority -- I've looked at all major firms out

18    there for sure, they are all pretty much

19    reporting the same stuff.  It may look maybe

20    formatted a little differently, but there is

21    nobody out there who is, that I know of, who is

22    not reporting or peer groups.  There is a

23    nobody out there who's not reporting absolute

24    performance.  There is nobody out there that's

25    not doing risk adjusted performance and so on

Page 145

1                    DONALD C. STONE
2      and so forth.  So everybody is providing that
3      same data pretty much.
4           Q.    So you did mention scoring systems
5      earlier.  How many of your clients at PSA or
6      Pavilion utilized a score system of some sort?
7           A.    I don't think we used a scoring
8      system at the client level at all.  In fact I
9      know we didn't.  We never did that.  A lot of
10     our -- okay, some of our colleagues did and
11     some of our colleagues didn't, but we never did
12     use that.
13          Q.    Do you have an opinion about
14     whether or not just as a general matter a
15     scoring system is appropriate or inappropriate
16     in evaluating investment options?
17          A.    I guess I will ask you what do you
18     mean by appropriate or inappropriate in the
19     context of what we are talking about here?
20          Q.    Do you think it's a prudent way to
21     monitor investment options as a general matter
22     or an imprudent way as a general matter?
23          A.    I don't think it is necessarily
24     imprudent.  I'm not a huge fan of scoring
25     systems, but I don't think by definition they

                     DONALD C. STONE

1

2    are imprudent, no.

3         Q.      Mr. Stone, in your report you

4    make several references to the relevant time

5    period.  What time period are you speaking

6    about?

7         A.      Can you show me a particular

8    place in my report where that -- I'm not going

9    to do a memory test tonight.

10        Q.      Sure.  Give me a second.

11   Paragraph 60 as an example.

12        A.      6-0?

13        Q.      Yes.

14        A.      Let me get to that.  I'm on 60.

15   You want me to read through that?

16        Q.      In the second sentence you say,

17   "The committee generally met quarterly during

18   the relevant time period."

19                What is the relevant time period

20   that you're referring to there?

21        A.      Well, I would be referring to the

22   class period is I guess what I'm saying.

23        Q.      Okay.  What is the class period?

24        A.      I believe it began in the end of

25   2014 and runs to the present.

Page 147

1                          DONALD C. STONE

2          Q.      You believe it began in 2014?

3          A.      I think at the end of 2014 is when

4     it began.

5          Q.      So if we turn to the conclusions

6     in your report which are on page 66 paragraph

7     148.

8          A.      66 paragraph 148.  Okay, I'm

9     there.

10         Q.      It says, "The conclusion is the

11    committee failed to established and apply a

12    reasonable process to monitor the challenged

13    investments."  Do you see that?

14         A.      I do.

15         Q.      So what are the challenged

16    investments that you're referring to there?

17         A.      I think we are referring to the

18    Freedom Funds.

19         Q.      Anything else?

20         A.      I think that's the focus.

21         Q.      So when you say the committee

22    failed to establish and apply a reasonable

23    process, do you have a time period associated

24    with that?

25         A.      It is over the entire period that

Page 148

```
 1                    DONALD C. STONE
 2      is covered within my report which talks --
 3      which focuses obviously starting in 2014 and
 4      goes into probably 2020 at least.
 5              Q.      Do you have a sense of when the
 6      class period runs through?
 7              A.      Well, the class period as I
 8      understand it, that we are still in the class
 9      period.
10              Q.      You said your report ran from 2014
11      to 2020; is that correct?
12              A.      2020 is about where it I stopped
13      commenting on things, yes.
14                   MS. ENGELMAN:   Can we go off the
15              record, I'm having issues with him freezing
16              and I don't know if it's just me.
17                   THE VIDEOGRAPHER:   The time is 7
18              p.m. and we are off the record.
19                   (Recess Taken.)
20                   THE VIDEOGRAPHER:   The time is 7:05
21              and we are on the record.
22                   MS. ENGELMAN:   Bill, would you mind
23              reading back the last thing that you have.
24                   (Requested portion of record read.)
25      BY MS. ENGELMAN:
```

Page 149

1                    DONALD C. STONE

2          Q.     Why is it that you stopped

3    commenting around 2020?

4          A.     Basically the period that I was

5    focused on has to do with the behavior that

6    took place in 2015, 2016, 2017, 2018, 2019.

7    2020 they put in a new IPS and I think there

8    was, also at that point there was some

9    additional training that was being offered from

10   a fiduciary perspective.

11              So I didn't think there's was a

12   lot else to comment on that point.  In talking

13   with counsel that was the period they wanted to

14   focus on I guess is the best way to put that.

15         Q.     So is it your opinion that -- did

16   you review all of the materials relating from

17   2020 forward or you didn't review the materials

18   at all?

19         A.     No, I did.  I reviewed all the

20   documents that I said I reviewed.  I looked at

21   all of them.  If you notice there is nothing in

22   my report that goes into that further period.

23         Q.     So when we look at the litigation

24   documents that are cited in Appendix B, that

25   goes through 2024, the first quarter of 2024

Page 150

```
 1                     DONALD C. STONE
 2      and you reviewed all the materials through
 3      2024; is that correct?
 4              A.     What was the last document in
 5      2024?
 6              Q.     It looks like you reviewed the
 7      meeting -- everything up to Q1, 2024.
 8              A.     That sounds right, yes.
 9              Q.     Do you know when in 2020 your
10      recorder of what month your opinion essentially
11      stopped?
12              A.     I'd have to look at my report to
13      figure that out at this point.
14              Q.     Sitting here today without looking
15      at your report you don't know when in 2020 you
16      stopped defining?
17              A.     No, I can't tell you what month,
18      no
19              Q.     But it was some time in 2020?
20              A.     That's the last thing that I
21      actually wrote about, yes.
22              Q.     Is it your opinion then from 2020
23      to 2024 that the process was prudent?
24              A.     I did not reach a judgment as to
25      whether it was prudent or not during that
```

Page 151

1                          DONALD C. STONE

2      period.

3               Q.      So when we say -- when we look

4      at your conclusions on paragraph 148 when it

5      says, "The committee failed to establish and

6      apply reasonable processes to monitor the

7      challenged investments."  You're talking about

8      a period that is from 2014 to some time in

9      2020; is that correct?

10              A.      Yes, that be would correct.

11              Q.      So from 2020 on it is not your

12     conclusion that the committee failed to establish

13     a reasonable process to monitor the challenged

14     investments; is that correct?

15              A.      Well, again, I have no comment on

16     it.  There is commentary in my report.

17              Q.      What I'm trying to understand is

18     if you independently made a determination as to

19     the reasonableness of the process during that

20     time period or whether counsel told you that

21     you should not focus on that time period?

22              A.      Counsel did not tell me not to

23     focus on it, but we did not focus on that time

24     period.

25              Q.      Who is we in that sentence?

Page 152

1                    DONALD C. STONE

2          A.     Well, I didn't spend my time

3    looking at documentation on that.  So I think

4    it has to do with when the -- the Freedom Funds

5    changed over was what, 2019, so that's a

6    significant change.  When they got out of the

7    Freedom Funds and got into the other fidelity

8    funds that is where my opinion ends.

9          Q.     You think that happened in 2019,

10   is that your testimony?

11         A.     I think they switched, again, I

12   don't want this to be a memory test, we could

13   look at my report.  I think they switched out

14   of the Freedom Funds in 2019.  I don't remember

15   what month.

16         Q.     So focusing I guess on the -- do

17   you know what month your review in 2014

18   started?

19         A.     I looked at all of 2014, because I

20   looked at -- actually I looked at all of 2014.

21   I was looking at meeting minutes so I would

22   call it the entire year of 2014.

23         Q.     So from January 1st, 2014 to some

24   time in 2020 was the focus of your review?

25         A.     That's what my report covers, yes.

Page 153

1              DONALD C. STONE

2         Q.    When you say that the committee

3    failed to establish an apply a reasonable

4    process to monitor the challenged investments,

5    is there anything specific in 2014 that was

6    unreasonable in your view?

7         A.    Well, I think one of the things is

8    we don't know how the Freedom Funds got into

9    the mix in the first place.  They were selected

10   prior to -- I believe prior to Ascende being

11   the advisor, if I remember correctly.  So when

12   you look at the minutes, again, the minutes to

13   me and the IPS is from 2015.  So -- I don't

14   think it was -- I don't recall an IPS prior to

15   that.  So the IPS was 2015 I guess is the

16   relevant document.

17        Q.    So I appreciate that.  My question

18   is a little different which is, can you identify

19   anything specific into 2014 that the committee

20   did that was unreasonable with respect to

21   monitoring the Freedom Funds?

22        A.    I don't think they had a process

23   in place to monitor them that tied to the IPS.

24   What the advisor was providing, I don't know

25   that it tied to an IPS.

Page 154

1                    DONALD C. STONE

2          Q.      In 2015 is there anything specific

3    other than what you just mentioned that you

4    identified as unreasonable with respect to

5    monitoring the Freedom Funds?

6          A.      Well, again, I think in 2015 the

7    funds should have been -- they were on -- they

8    were on watch and they were on watch -- one of

9    interesting things, they weren't on watch for

10   underperformance and yet the funds were

11   underperforming.  And that ties into the IPS.

12   But what they were actually on watch for, at

13   least the way they came off of watch later on,

14   they are were on watch because of the lack of a

15   three year performance number at all for some

16   of the underlying funds.

17                 I think that raises a question

18   about how they got selected in the first place.

19   If you don't have a track record you can look

20   at how do you make a selection in that

21   particular instance.  That's the first thing.

22                 The second thing is, if they

23   actually are underperforming overall, each

24   underlying fund, why wasn't it on watch for

25   that purpose at that particular time.

Page 155

1            DONALD C. STONE
2            Q.    Mr. Stone, are you offering an
3     opinion on the committee's selection of the
4     Freedom Funds?
5            A.    No, that is prior to the class
6     period.  So I don't have an opinion on that.  I
7     think -- I have questions in my mind about it.
8     I have no idea how it got in there.  I guess
9     I'm saying Ascende doesn't seem to have asked
10    how it got in there as well and didn't seem to
11    do any due diligence, from what I see in the
12    record on how they got in there as well.
13                 Again, it is prior to the class
14    period, so that's kind of not an issue.  I'm
15    not volunteering any opinion.
16           Q.    So it has nothing to do with your
17    report; is that right?
18           A.    I think --
19                 MR. ROBERTS:   Objection to the
20           form.
21           A.    I think the selection process -- I
22    have questions -- it carries forward.  Okay so
23    in the period when they were chosen in a sense
24    is not relevant because it is before the class
25    period.  But the same behavior, unless it is

Page 156

1                    DONALD C. STONE

2      corrected, carries forward into the class

3      period in which case nobody looked at why they

4      got selected.  Nobody went back and why did we

5      select these things, why are they here.

6                    There was is an opportunity to do

7      that when they were on watch for not having

8      three year numbers in some of the funds.  That

9      would have been an opportunity for the

10     committee and advisor to suggest that they go

11     and take a deeper look and understand how did

12     they choose these and are there -- do we want

13     to consider other alternatives.

14          Q.     Was is it your opinion that when

15     Ascende became the advisor in 2015 it should

16     have evaluated whether or not the Freedom Funds

17     were an appropriate investment option?

18          A.     I would think they would have done

19     that for all the investment options that were

20     in the plan.  That would be a normal part of

21     the process.

22          Q.     Is it your opinion if at any time

23     that Ascende became the investment advisor

24     there was any underperformance as compared to

25     benchmark or peer groups, that that fund would

Page 157

1                    DONALD C. STONE
2       be removed at that time?
3              A.    Again, I can go back and look and
4       say what does the IPS say and the answer I'm
5       going to give is the same one I gave awhile
6       back which is, it doesn't instantaneously mean
7       that you're going to remove it.  It means it
8       needs to be reviewed and you need to understand
9       more of the reasons for the underperformance.
10      And there may be a reason that you would keep
11      it and there may be a reason why you would
12      remove it.
13             Q.    Got it.
14                   Moving forward, I want to make
15      sure it is clear that your opinion is that anything
16      prior to the class period is irrelevant, correct?
17                   MR. ROBERTS:   Objection to the
18             form, misstates testimony.
19             A.    What I said was is that the
20      behavior carries forward and is current during
21      the class period because they didn't change
22      anything.  They had an opportunity to look at
23      it and see whether it was appropriate or not,
24      but they didn't do that.
25                   So obviously I could have an

Page 158

                              DONALD C. STONE

1

2    opinion about 2009, that wouldn't make any

3    difference either.  That is irrelevant.  But

4    what is relevant is that if a behavior carries

5    forward into the class period, it is relevant

6    to that case.  And that behavior did carry

7    forward because nothing changed.  They didn't

8    do a look at that and determine whether or not

9    it was still an appropriate choice to have in

10   the plan.

11        Q.    In 2016 did you identify any

12   particular deficiencies or parts of the process

13   that were unreasonable in 2016?

14        A.    Well there is things in my report

15   and -- I don't -- well I could go through the

16   report, there are comments about 2016.  But I

17   have to look through the report.  I'm not going

18   off my memory to try to remember specific dates

19   or things in 2016.  If you want to show me

20   something in my report I'm happy to comment on

21   it.

22        Q.    Well get through it.  I'm

23   wondering sitting here today whether or not you

24   have an opinion on whether or not you know

25   there was something in 2016 that you deemed to

Page 159

1                    DONALD C. STONE
2     be unreasonable in the process?
3          A.    I think the -- again, without
4     looking at my report, which is what I would ask
5     to do, but having said that, the behavior in
6     2016, nothing changed, okay, in terms of trying
7     to comply with the IPS.  There were a couple of
8     funds that I believe -- I think it was 2016,
9     but again I would like to look at my report to
10    confirm it, where the way it was reported by
11    Ascende is different than the way the IPS
12    reads.  The two didn't sync up.
13               The committee didn't pick up on
14    this, they were getting reporting that was
15    showing compliance in one way when the IPS
16    called for compliance in a different way.  And
17    that happened a couple of different times over
18    different time periods.
19         Q.    The same question for 2017, just
20    do you have any sitting here today do you have
21    any opinion as to whether there was something
22    inspect in 2017 that was unreasonable with
23    respect to monitoring the Freedom Funds?
24         A.    There is certainly -- in 2017 is
25    when there was a draft of the IPS that was -- a

Page 160

1                    DONALD C. STONE

2      new IPS was drafted, but it was not adopted.

3      But Eagar, I guess that's his last name, Eagar,

4      specifically said that the reporting that they

5      provided to the committee was based on that

6      2017 IPS which was never adopted.  So the

7      committee was getting information that really --

8      they weren't able to -- they weren't getting

9      the appropriate information as to compliance

10     on -- I don't know how many different funds

11     were affected, but definitely some were

12     affected in that regard.  And they didn't ask

13     about it.  And I think they were kind of

14     getting, just assuming that the investment

15     advisor was tying about back to the IPS or not,

16     but they weren't.  And they didn't ask about it

17     and that's their responsibility.

18          Q.    Other than what you just

19     mentioned, anything in 2017 that you deemed to

20     be unreasonable with respect to monitoring the

21     Freedom Funds?

22          A.    Again, I would want to look at my

23     report.  I don't want to try to go off my

24     memory particularly it is getting late here.

25     I'm happy to go look at any page that you like

Page 161

1                    DONALD C. STONE

2    and comment on it.

3         Q.    We will do that, I want to get

4    through these questions.

5                    2018, anything that you can recall

6    that you identified specifically for that

7    reason that was unreasonable in terms of

8    Quanta's process for evaluating the Freedom

9    Funds?

10        A.    Well I don't think anything change

11   in 2018, so I guess the same thing would apply

12   in 2018 in terms of the performance reporting

13   being based on an IPS that had not been

14   adopted.  So that is problem.  Nobody asked

15   anything else about it.  There may have been

16   other things, but again, I would refer to my

17   report.

18        Q.    What about 2019?

19        A.    Another draft IPS which was

20   ultimately adopted in 2020.  And actually one

21   thing that I would want to comment on going

22   back over this period that you were just asking

23   about, as a part of this in the noncompliance,

24   there were three different systems over that,

25   call it 4 1/2 year period.  Three different

Page 162

1                    DONALD C. STONE

2      scoring systems that were being used by

3      Ascende and its successors that don't tie to an

4      IPS.  Don't tie to the IPS that Quanta had

5      specifically.

6                    So they had three different ways

7      they were getting reporting.  So they were not

8      getting the information they needed and they

9      were making decisions based on information that

10     in some cases was not accurate as to how they

11     would expect to see compliance.  So some things

12     may have been showing as compliant when they

13     weren't and vice versa and what have you,

14     because they weren't operating off the existing

15     IPS.  And it kept changing the system that they

16     operated off of.

17                    And at one point and this one I

18     don't understand at all.  I believe this was in

19     2019, basically the committee said stop showing

20     us these scores on each of the funds.  They

21     just wanted to see whether it was pass or fail.

22     Then one of the committee members, I think it

23     was Campbell said that she didn't want to see

24     the word fail.  She wanted to use a different

25     word.

Page 163

1                    DONALD C. STONE

2                    But bottom line they didn't -- so

3        there was additional information, I would think

4        any committee would want to know what the score

5        was.   If you're using a scorecard, even it's

6        the wrong one in this case, if you're getting

7        reporting on it, you'd want to know what the

8        score was because, to your point earlier, what

9        if you're just one basis point off, well that

10       is a different circumstance than if you're a

11       hundred basis points off.   They didn't want the

12       score.   So the score got dropped on that.   I

13       have no idea why that happened.   I don't find

14       that to be a good system to be followed.

15            Q.    Mr. Stone, isn't it exactly the

16       opposite, that if you don't get the score but

17       you just look at the underlying criteria, you're

18       actually looking at the level of performance as

19       opposed to what the scores tells you?

20                    MR. ROBERTS:   Objection to the

21            form.

22            A.    So it depends on what they

23       received.   But, yes, if you get the underlying

24       information, that's great.   But if the -- but

25       the score is what is driving whether or not it

Page 164

1                    DONALD C. STONE

2      was compliant or not.  That's where the

3      disconnect is on that.  You can have the

4      information and the information could be saying

5      whatever about the fund which could be good,

6      not good, whatever, but the -- what made it

7      compliant or not was the score that it got.

8      They didn't want to see the score.  You can

9      have a fund that was actually okay, but if it

10     had a bad score then it would be showing as not

11     okay.

12                    So I think the process is --

13              Q.    Okay.  Do you take issue with the

14     fact that the committee wanted to evaluate the

15     underlying quantitative metrics independently

16     on their own as opposed to looking at a score

17     irrespective of the IPS just as general matter?

18     Do you take issue with that?

19              A.    I don't have an issue with them

20     wanting to look at the information, the underlying

21     information about each of the funds.  That is

22     not an issue.  But I would expect them to look

23     at it in relationship to the IPS.  To not have

24     the IPS as part of that conversation I think is

25     a problem.

Page 165

1               DONALD C. STONE
2          Q.    We will come back to that later.
3     I want to focus on 2020.  Do you have any
4     specific issues with the process that the
5     committee undertook with respect to evaluating
6     the Freedom Funds?
7          A.    Again, I would say I would like to
8     look at my report and --
9          Q.    Sir, you can look at your report
10    any time you like.
11         A.    I'm sorry?
12         Q.    You can look at your report any
13    time you like.
14         A.    I understand that.  If I'm having
15    to search for where something is, it could take
16    some time to find some of those things as
17    opposed to you have some very specific things
18    in mind and I think it will serve the purpose
19    of everybody better if you'd direct me where
20    you'd like me to look and comment.  I'm happy
21    to do that.
22         Q.    I understand, I will.  I'm just
23    trying to understand based on your knowledge
24    sitting here today whether or not you know
25    there is anything in 2020 specific.

                                        Page 166

1                    DONALD C. STONE
2                    You mentioned in 2020 a new IPS
3        was adopted, isn't that correct?
4            A.      That's correct.
5            Q.      Do you have any recollection of
6        whether or not that IPS had any sort of scoring
7        system attached to it?
8            A.      I believe it did, but again, I
9        would like to look at my report.
10           Q.      If it did, did you look to see
11       whether or not the committee from 2020 forward
12       received information that was consistent with
13       the scoring system in the 2020 IPS?
14           A.      No, I don't think so.
15           Q.      Why not?
16           A.      Well, again, at that point the
17       Freedom Funds were not in the mix.
18           Q.      Okay.  So it is your opinion that
19       as of 2020 the Freedom Funds were not in the
20       mix and therefore you did not need to review
21       the committee's fiduciary process from 2020
22       forward?
23                   MR. ROBERTS:   Objection to the
24               form, misstates testimony.
25           A.      I was not asked to review from

Page 167

1              DONALD C. STONE

2     that point forward for to '24 to have an

3     opinion about that because the funds that were

4     at issue were not in the plan.

5              Q.    If the funds were in the plan past

6     2020, would there be a reason that you wouldn't

7     look to see if the scoring system matched with

8     the criteria that the fiduciary committee was

9     evaluating?

10             A.    No.

11             Q.    So you would agree that you should

12    have done that if the Freedom Funds were still

13    in the plan as of 2020?

14             A.    Yes.

15             Q.    Do you know if there are any other

16    challenged investments in this case?

17             A.    The only ones that I'm aware of

18    were the Freedom Funds at this point.

19             Q.    So Mr. Stone, do you have an

20    opinion, based on your review of the materials

21    in your report, that there should have been

22    action with respect to the Freedom Funds by the

23    committee?

24             A.    Yes.  I think that as of the end

25    of -- as of the fourth quarter 2015 they would

Page 168

1                    DONALD C. STONE

2        have been on -- they could have been a watch

3        for four quarters at least at that point.  In

4        fact I think that would have been a fifth

5        quarter at that point.  I think, again, there

6        should have been a process where the committee

7        took a very hard look at whether those funds

8        should have been removed or should have stayed

9        in the plan and there should have been

10       documentation either way on what conclusion

11       they reached and why.

12            Q.    Do you have an opinion that they

13       should have removed the Freedom Funds as of a

14       certain date?

15            A.    Again, I think they needed to do

16       the analysis to determine -- so my remit here

17       was to talk about fiduciary process.  I didn't

18       do a deep dive and your question is assuming

19       that I went out and did independent analysis of

20       the Freedom Funds during that particular period

21       and ran all the analytics and everything and I

22       did not do that.  I was not asked to do that.

23            Q.    I understand --

24            A.    So it goes back again to the point

25       I was -- my role as an expert is to talk about

Page 169

1                    DONALD C. STONE

2       fiduciary process, not necessarily to provide

3       in-depth information about any particular

4       investment at that time.

5              Q.     But you mentioned the fourth

6       quarter of 2015, you made a specific very

7       specific reference to that and underperformance.

8       So what I'm asking you is, do you have an

9       opinion as to the fiduciary process, whether or

10      not the process should have -- my question is,

11      you mentioned fourth quarter of 2015?

12             A.     Yes.

13             Q.     So what is the issue with the

14      fourth quarter of 2015 that you were referring

15      to?

16             A.     The number of quarters that the

17      fund could have potentially been on watch for

18      underperformance.

19             Q.     So is it your opinion that it

20      should have been on watch or that it could have

21      potentially been on watch?

22             A.     I think it should have been on

23      watch and I think the committee should have

24      determined that, but they did not put it on

25      watch or performance.  In fact they -- it gets

Page 170

1                    DONALD C. STONE

2       worse, because they took it off of watch, it

3       had been on watch for the fact that some of

4       funds, underlying funds did not have a three

5       year history.  And when those funds got a three

6       year history, irrespective of the fact that the

7       funds were underperforming relative to the

8       benchmark, they took it off of watch at that

9       point which I think is -- sends a very strange

10      signal and is something that I can't recall

11      seeing in my past and everything that you would

12      take a fund, even if it is on watch for a

13      different reason, at the time that you start --

14      you want to remove it from being on watch in

15      this case for some of the underlying funds not

16      having a performance history.

17                    I cannot recall seeing a fund come

18      off of watch that in fact has a long period of

19      underperformance at that point.  I think that

20      just speaks to me that they weren't looking at

21      the underperformance at all and it could get

22      kind of crazy if the next quarter they decide

23      to look at it and say oh, this underperformance

24      is really a problem we need to put it on watch

25      again.  I think that process is -- that's a bit

Page 171

```
              1        DONALD C. STONE
     2   of a mess.
     3        Q.    So we will get to some of those
     4   details.  I'm just trying to hone in on whether
     5   or not you have an opinion that the committee
     6   should have removed the Freedom Funds from the
     7   plan lineup at a certain period of time?
     8        A.    I think they should have done -- I
     9   keep coming back to this.  I haven't done -- I
    10   don't have all of that analytic data in front
    11   of me.  I know the number of quarters that it
    12   was underperforming and I know by how much
    13   because that is in the report here.  But what I
    14   don't have, I don't have the information to
    15   make the determination that you're asking me to
    16   just blithely say it should have been removed.
    17            What I can say, it should have
    18   been subject to substantially more analytical
    19   analysis which might have resulted in it being
    20   removed, but I can't say at this point because
    21   the work wasn't done.
    22            MS. ENGELMAN:  So let's pull up the
    23        IPS, the 2015 IPS Maria.
    24            (Exhibit 2 for identification, 2015
    25        IPS.)
```

Page 172

```
1              DONALD C. STONE
2        A.    I assume it is still loading.
3        Q.    It usually takes a minute.  I'll
4   get to that in a second.  I'm going to turn
5   your attention to --
6              MR. ROBERTS:   It looks like it is
7        up now.
8        Q.    One question for you, Mr. Stone.
9   You mentioned some draft IPSs.  Is it your view
10  that those were operative or inoperative?
11       A.    They were not operative in my view
12  and I think a couple of committee members
13  specifically said they, in their deposition,
14  they did not think it was operative.  And I
15  would say it was not operative because it was
16  never signed.
17       Q.    You make some references to the
18  draft IPSs in your report.  Why is it did you
19  do so if they are not operative in your view?
20       A.    Because I think they were used by
21  the advisor to generate their reporting.
22       Q.    Do you see it Mr. Stone?
23       A.    The IPS?
24       Q.    Yes.
25       A.    I have it open.
```

Page 173

1                  DONALD C. STONE
2          Q.     This is the 2015 IPS; correct?
3          A.     Yes.
4          Q.     And in your view this was in
5     operation until the 2020 version went into
6     effect; is that right?
7          A.     That would be correct.
8          Q.     And you had an opportunity to
9     review this IPS as part of drafting your
10    report?
11         A.     I did.
12         Q.     Generally speaking, is it a pretty
13    typical IPS in your experience?
14         A.     For the most part, yeah, I would
15    say, yeah, they all vary a little bit, but for
16    the most part it is fairly typical, yes.
17         Q.     Is there anything that you can
18    identify that is not typical, in your experience?
19         A.     No, I was just thinking about
20    that.  I don't mean to say there is something
21    atypical.  I think the -- as we go through it,
22    I can't think of anything that is a major
23    problem or issue with the 2015 IPS, no.
24         Q.     So you opine -- let's just take a
25    step back here.  If we turn to page 2 of the

Page 174

1                     DONALD C. STONE

2      IPS.

3              A.      Okay.

4              Q.      That last paragraph where it says

5      "The purpose of the IPS is to provide the plan

6      and fiduciaries with guidelines which will

7      establish the plan's investment objectives and

8      the process for promoting these objectives."

9      Do you see that?

10             A.      I do.

11             Q.      I think you testified earlier that

12     you agree that the IPS is a guideline for the

13     committee?

14             A.      Yes, I think I testified that in

15     general it's a guidepost that the committee

16     uses to have a consistent process.  But there

17     are parts of it that are obligatory and parts

18     that are not obligatory and subject to the

19     discretion of the committee members.

20                     Again, this gets back to the

21     language that we talked about earlier.  If it

22     says will, then I think they have to follow it.

23     That is what will means.   If it says may, then

24     that obviously applies discretion on the part

25     of the committee.

Page 175

1                    DONALD C. STONE
2          Q.    So if you can turn to page 12 of
3     the IPS.  Are you there?
4          A.    The Bates number seems to be right
5     on top of it, so I'm just -- tell me what it
6     says at the top of the page and I will be sure
7     that I'm on the right one.
8          Q.    I'm looking at "Investment
9     Objectives Criteria for Review and Review
10    Processes".
11         A.    Okay, that is what I'm on.
12         Q.    "Performance Evaluation Criteria."
13    Are you with me?
14         A.    I am.
15         Q.    The second sentence says, "To
16    address this the committee will monitor the
17    plan's investment performance on at least an
18    annual basis and evaluate each of the
19    investment opportunities pursuant to the
20    guidelines detailed herein."  Do you see that?
21         A.    I do.
22         Q.    Do you agree with me that the
23    committee monitored the plan's investment
24    options more than on an annual basis?
25         A.    Yes.

Page 176

1              DONALD C. STONE

2        Q.    Then it says, "Performance

3    evaluation will include, but not be limited to,

4    comparisons to appropriate benchmark, indexes

5    and peer group comparisons."  Do you see that?

6        A.    I do.

7        Q.    Do you agree with me that the

8    committee evaluated performance and the IPS

9    mandated that performance be evaluated not just

10   on benchmark, but on peer group comparisons and

11   other factors?

12       A.    Yes.

13       Q.    Do you see the next sentence where

14   it says, "Performance will be measured by

15   comparing rates of return to appropriate market

16   indexes and peer groups for the most recent

17   quarter, year to date, one year and three year

18   periods and longer periods where available."

19   Do you see that?

20       A.    But that is not the next sentence,

21   that was the next -- that was another paragraph

22   down.

23            MS. ENGELMAN:   It is saying my

24         internet connection is unstable, can we

25         take five.

Page 177

1                    DONALD C. STONE

2                    THE VIDEOGRAPHER:   The time is 7:47

3           and we are off the record.

4                    (Recess taken.)

5                    THE VIDEOGRAPHER:   The time is 8:01

6           and we are on the record.

7                    MS. ENGELMAN:   Bill, can you tell

8           me the last thing that you got.

9                    (Requested portion of record read.)

10      BY MS. ENGELMAN:

11           Q.   You see it in the IPS, is that

12      correct, on the page?

13           A.   I do.

14           Q.   So then we look at -- if we go to

15      the next page, Mr. Stone, is the investment

16      watch list page.

17           A.   I'm there.

18           Q.   The first sentence says, "The

19      committee may place an investment option on

20      monitor alert status and conduct a thorough

21      review analysis of the investment options."  Do

22      you see that?

23           A.   I do.

24           Q.   Do you agree that the committee

25      has discretion as to whether or not to place an

Page 178

```
 1              DONALD C. STONE
 2    investment option on monitor alert status?
 3         A.     That's their job is to evaluate
 4    that.
 5         Q.     Then is --
 6         A.     But here is where the IPS gets a
 7    little funky.  If you go back to the previous
 8    page.  In the second paragraph it says, "When a
 9    fund fails to achieve its stated objective, the
10    reasons for the failure will be evaluated and
11    the committee shall determine whether the
12    option shall remain, be frozen or replaced."
13              So that doesn't quite sync up with
14    the other page.  That gets back to kind of what
15    I've been saying all along which is they
16    actually need to go and determine the reasons
17    for the failure needs to be evaluated.
18              That is not quite the same as
19    saying you don't have to do anything with it,
20    as I think you were alluding to on the
21    subsequent page.
22         Q.     What does the stated objectives
23    mean to you?
24         A.     The stated objectives of the fund?
25         Q.     Correct.
```

Page 179

1                        DONALD C. STONE

2          A.       Not of the committee or whatever?

3          Q.       Well, it says "When a fund fails

4     to achieve its stated objectives."  That is the

5     sentence that you just quoted; is that correct?

6          A.       Yes.

7          Q.       Do you know what the stated

8     objectives of the target date funds are, the

9     Fidelity Freedom target date funds are?

10          A.       Well I don't know that it's

11     necessarily the stated objectives of what, in

12     this case, what Fidelity would say, but I think

13     it probably refers to the stated objectives

14     that the committee has for the plan.

15                   So that goes back to where

16     does it rank, its having a competitive return

17     and blah, blah, blah, blah, okay.

18          Q.       That's not what this sentence

19     says.  This sentence says, "When a fund fails

20     to achieve its stated objectives."

21          A.       Well, its stated objectives may --

22     I read that to refer to its, for example, its

23     performance relative to the IPS standards.

24          Q.       Is that what that says there?

25          A.       That's what I'm reading it to

Page 180

```
1                       DONALD C. STONE
2       mean, okay.
3              Q.     But you agree with me it says when
4       a fund fails to achieve its stated objectives,
5       correct?
6              A.     Correct, you're having a different
7       definition of what its stated objectives are.
8       We are disagreeing about that.
9              Q.     So we have a grammatical
10      disagreement about how to read a sentence?
11                    MR. ROBERTS:   Objection to the
12             form.
13             A.     I'm say it is not very clear
14      because you think it refers to what Fidelity
15      says about the fund and I'm saying I think this
16      is all in language within the IPS itself.  I
17      don't think -- if they had referred to what the
18      investment manager's stated objective is, that
19      would have been probably a different
20      conversation.  But I'm reading -- I guess that
21      is what we get with indefinite pronouns like
22      its.
23                    I read it as being a reference
24      back to the IPS and the objectives that the
25      committee has for the funds in the plan and not
```

Page 181

                    DONALD C. STONE
1
2       anything that Fidelity may have as an
3       objective.
4              Q.     Would you agree with me that
5       the objectives of a target date funds are to
6       meet the needs of retirement for individuals
7       invested in the target date fund?
8              A.     Yes, I mean there is nothing --
9       it's a rather anodyne statement.  You can't
10      argue with that.
11             Q.     If we turn back to the watch list
12      page, Mr. Stone.
13             A.     Yes.
14             Q.     The second sentence says, 'The
15      committee may consider the following criteria
16      when placing a fund on monitor or alert status?
17      Do you agree with that?
18             A.     Again, this goes back to why we
19      went to the previous page.  I'm not sure this
20      language syncs up with what the previous page
21      says.
22             Q.     Okay, just to be clear, what is it
23      exactly -- what exactly in this previous page
24      do you think does not sync up with that page?
25             A.     So it says, "Thus, when a fund

Page 182

1                    DONALD C. STONE

2        fails to achieve its stated objectives, the

3        reasons for the failure will be evaluated and

4        the committee shall determine whether the

5        options shall remain, be frozen or replaced."

6                    That contradicts what it says on

7        the subsequent page which is the committee may

8        do any of these following things.

9                    So I don't think those two sync

10       up.  I don't think the IPS is written very

11       tightly in that regard.  Those two shouldn't be

12       out of alignment with each other.

13            Q.    Do you agree with me that the

14       sentence that says "When a fund fails to

15       achieve its it stated objectives the reasons

16       for failure will be evaluated."?

17            A.    Yes.

18            Q.    Strike that.

19                    If you move to the second, the

20       page that I was on in the investment watch list

21       criteria page.

22            A.    Okay.

23            Q.    You see the list of options or

24       list of criteria that the committee may

25       consider, do you see that?

Page 183

                      DONALD C. STONE

1

2         A.      Yes.

3         Q.      Do you see anywhere in here where

4    it says that a consideration is the three and

5    five-year performance against benchmark?

6                 (Witness reviewing document.)

7         A.      I think that is another strange

8    thing about it.  It is talking about -- so this

9    is where -- this is another thing that is in my

10   report.  The IPS does not mention performance

11   at all in these particular criteria, which is

12   extremely strange that in a watch list criteria

13   you would not mention performance versus a

14   benchmark.

15        Q.      You're incorrect that it doesn't

16   mention performance at all.  The first three

17   bullets are performance criteria; correct?

18        A.      It talks about against a peer

19   group, which is fine, okay.  Risk adjusted

20   return and they talk about the Information

21   Ratio.  All of which is fine.  Okay, I'm just

22   saying I've never seen an IPS that doesn't go

23   and have as potential monitoring -- potential

24   watch issues the performance of the fund

25   against the benchmark.  I've never seen that in

Page 184

                    DONALD C. STONE

1

2    my 40 years.

3         Q.    So you agree with me that it is

4    not listed here in this criteria?

5         A.    It is not listed, no.  And it was

6    later on added in I think the draft of the 2017

7    IPS which was not adopted, but I think they

8    realized they left it out.

9         Q.    Do you know whether it is included

10   in the 2020 IPS?

11        A.    Not off the top of my head.  I

12   have to look at it.

13        Q.    When you were preparing your

14   report, did you look to make that determination?

15        A.    I looked at the '15, I look at the

16   '17, I look at '19, which was eventually adopted

17   and I looked at the signed 2020 as well.  But

18   I'm not going to remember everything off the

19   top of my head at this particular point.

20        Q.    My question is, do you remember

21   looking particularly for the issue of whether

22   or not the inclusion of the benchmark was

23   included in 2020 adopted IPS?

24        A.    I think I looked for whether it

25   was included in later versions of the IPS.  I'm

Page 185

1                DONALD C. STONE

2    sure I did.

3         Q.    When we go back to the earlier

4    page 12 which is the performance evaluation

5    criteria, is it your view that the plan objectives

6    were for the Freedom Funds to outperform its

7    benchmark on the three and five-year period?

8    Does it state that somewhere in the IPS?

9         A.    Where are you looking?

10        Q.    You were focused on this second

11   sentence.  In the second paragraph in the

12   performance evaluation criteria when it says,

13   "When a fund fails to achieve its stated

14   objectives" and your testimony is that that

15   relates to the plan's objectives for a fund; is

16   that correct?

17        A.    Correct.

18        Q.    Is it your belief that the plan's

19   objectives for the Freedom Funds were for it to

20   outperform its benchmark on a three and

21   five-year basis?

22        A.    No, I don't think it said that.

23        Q.    Okay.  If we turn back to the

24   investment watch list process.

25        A.    Okay.

Page 186

1                    DONALD C. STONE

2              Q.     The bottom paragraph it says,

3      "Once an investment option has been assigned a

4      status of monitor, it should remain with the

5      status for up to four consecutive quarters.

6      Without documented approving on the underlying

7      criteria, it will be advanced to a status of

8      alert no later than the fifth consecutive

9      quarter of underperformance."  Do you see that?

10             A.     I do.

11             Q.     Do you agree if there is an

12     improvement of the underlying criteria, the IPS

13     does not mandate an advancement to alert status

14     in the fifth consecutive quarter?

15             A.     Let me read that again.

16             (Witness reviewing document.)

17             A.     So I think what that is saying

18     is -- what I read it as saying is that if it

19     doesn't improve, then it is going to go to the

20     alert status no later than the fifth consecutive

21     quarter which to me would also say it could go

22     to an alert status earlier.  And I'm not sure

23     that it -- it doesn't really speak to the issue

24     of not having gone on the watch list at that

25     point or in the monitor.

1                     DONALD C. STONE

2          Q.     But you agree with me if there is

3     improvement, the IPS does not mandate it be

4     advanced alert status; correct?

5          A.     That would be correct.

6          Q.     The second to last sentence says,

7     "The committee at its discretion may change an

8     investment status outside of these standards as

9     each fund is separately evaluated."  Do you see

10    that?

11         A.     I do.

12         Q.     Is that pretty typical for the IPS

13    to allow discretion of that nature?

14         A.     Well, again, as long as it is

15    consistent with other parts of the IPS, yes.

16         Q.     You can put that document down for

17    now.

18                I want to turn back to your

19    report.  Give me a second to find the paragraph.

20    So paragraph 34 of your report, Mr. Stone, if

21    you could turn to that, please?

22         A.     Okay, I'm on that page.

23         Q.     So you state in paragraph 34,

24    "On at least a quarterly basis, fiduciaries

25    should review and analyze the impact of

Page 188

1                    DONALD C. STONE

2       economic developments on the plan, the

3       performance of each plan investment across all

4       relevant metrics, and the qualitative and

5       quantitative factors relevant to the

6       fiduciary's decision to retain or replace any

7       investments on a watch list."  Do you see that?

8              A.    I do.

9              Q.    So it's your testimony that not a

10      single metric is informative necessarily of a

11      fiduciary's decision, but they must consider

12      all of the qualitative and quantitative

13      factors?

14             A.    Well, I think that is misreading

15      what I wrote there.  Obviously what we are

16      saying -- what I'm saying, the fiduciaries want

17      to look at all of it.  But that doesn't speak

18      to whether one of them should be called out and

19      one of them might be enough to trigger taking a

20      look at everything.

21                   It says that the fiduciaries

22      should be looking at all of these things.  This

23      is, you know, to retain or replace something on

24      the watch list.  It says you should look at all

25      of them, which is correct, okay.

Page 189

```
 1              DONALD C. STONE
 2        Q.    Okay, got it.  So the last
 3   sentence it says, "Consistent underperformance
 4   over longer periods is usually grounds for
 5   removal."  Do you see that?
 6        A.    I do.
 7        Q.    What do you mean by consistent
 8   underperformance?
 9        A.    This is a generalized statement
10   which could be somewhat different from one plan
11   versus another, depending on what their IPS
12   says.  But generally speaking, consistent
13   underperformance means over an extended period
14   of time to be defined by, again, each committee
15   may define it slightly differently.
16              I will tell you that generally in
17   the industry more often than not it is
18   somewhere between four and six quarters,
19   although that is not a hard rule, because it's
20   this is a -- because it is a -- it's not a
21   cookie cutter decision as to how you do this.
22   You're looking at all factors.
23              You brought up before, you're one
24   basis point under.  Well, that's a very
25   different fact pattern than if you're a hundred
```

Page 190

1                  DONALD C. STONE

2       basis points under.  So you're not going to

3       necessarily make the same decision based on

4       that.

5                  So consistent underperformance

6       means over an extended period of time.  Let's

7       say somewhere between four and six quarters

8       typically in the industry.  I think that will

9       generally be agreed upon.  And that's usually

10      grounds for removal.  Again "usually" key word

11      there.  There are circumstances when that might

12      not be the case.  There are circumstances where

13      it definitely would be the case.  So committees

14      have to use their judgment.  It's not a check

15      the box approach.

16           Q.    When you're talking about

17      underperformance there, are you talking about

18      as compared to a specific metric?

19           A.    I'm talking about underperformance

20      may be compared to -- it could be across any of

21      those metrics if it is underperforming.

22           Q.    Let's turn to page 35 of your

23      report.

24           A.    Okay.

25           Q.    You have given an opinion,

Page 191

DONALD C. STONE

1          Mr. Stone, that the committee meeting minutes

2          by this committee were, I'm using your words,

3          "woefully inadequate and cursory."  Is that

4          correct?

5                 A.     Correct.

6          Q.     Did you review in full the

7          entirety of the meeting minutes between 2014

8          and 2024?

9                 A.     I think I reviewed all of those,

10         yes.

11         Q.     Is it your opinion that every

12         single one of those meeting minutes is woefully

13         inadequate and cursory?

14                A.     No, that is not my opinion.  I

15         didn't single out -- any particular one my

16         might be fine.  This is a general observation.

17         Q.     I'm trying to understand how you

18         reached the conclusion that there is a general

19         observation if all of them are not cursory and

20         woefully inadequate, how many are?

21                A.     You can't have -- you doesn't

22         necessary have to be every single one as

23         woefully inadequate.  Some of those meeting

24         minutes are rather brief and they seem

Page 192

1                    DONALD C. STONE

2       perfectly fine.

3                    Part of the issue here is the

4       minutes were taken by the advisor, they weren't

5       taken by someone on the committee.  So that is

6       not unusual.  I'm not faulting that per se.

7                    What the committee meetings are is

8       they're the voice of the advisor filtering what

9       the committee talked about or said as opposed

10      to -- so there are some of the substantive

11      decisions that are not -- it is not clear how

12      they made some of those decisions.  So when I

13      say this is a general comment, you don't have

14      to have every one be wrong for it to be an

15      issue in general.  That's not -- that was not

16      my claim that every single minute was wrong and

17      should have been redone or whatever.

18                    I think there is a generalized

19      problem that they seem to be -- it's not clear

20      when read through them exactly what the

21      rationalization is for some of the decisions

22      that are made.  They are pretty anodyne.  They

23      are pretty vanilla.  They don't really give me

24      a sense of how did this decision get made.

25      What were the issues that were concerned.

Page 193

DONALD C. STONE

1

2          Q.     As a 321 consultant, did you ever

3   take the minutes for any of the committees with

4   which you worked?

5          A.     I did.  And as I said, that is not

6   unusual in the industry.  It is not -- it doesn't always

7   happen that way, but it is certainly not unusual.

8          Q.     How many clients with which you

9   worked did you take the minutes approximately?

10         A.     Probably a third, maybe it might

11   have been slightly more than a third.  At least

12   a third.

13         Q.     Do you have an understanding in

14   this case that the committee members reviewed

15   and commented on the minutes and revised them

16   as appropriate?

17         A.     I do.  I do recognize that, yes.

18         Q.     You testified earlier that some of

19   the committee minutes were brief but otherwise

20   fine.  Do you remember that testimony?

21         A.     Yeah, I said that just a minute

22   ago, yes.

23         Q.     What does that mean?

24         A.     So it depends on -- that was just

25   an offhand comment.  But it depends on if there

Page 194

1                    DONALD C. STONE

2       were any significant issues to be discussed and

3       whatever, if there weren't and it was a short

4       meeting or if it was an administrative meeting

5       that didn't deal with the investments, that may

6       have been fine.  I'm not referring to a

7       particular set of minutes in this particular

8       case.

9                    What I'm saying, when there were

10      investment decisions that needed to be made, it

11      wasn't always clear what the rationale was and

12      it wasn't very clear what other discussions may

13      have gone on and whether there were any

14      concerns by any of the committee members that

15      weren't captured.

16           Q.     For each of those minutes which

17      you identified a problem, did you include those

18      in your report?

19           A.     I didn't single out particular

20      series of minutes, no.

21           Q.     Why not?

22           A.     It never crossed my mind.  In

23      general the minutes were taken the same way

24      each time.  So in general I felt they were

25      deficient for the reasons that I gave.

Page 195

```
 1                    DONALD C. STONE
 2          Q.      Well, you testified earlier they
 3     were only deficient in so far as the -- you
 4     didn't believe the rationale was adequately
 5     captured, correct?
 6          A.      That happens in a lot of cases
 7     when something is being monitored.  There is
 8     always something going on.  In most of the
 9     minutes there is something going on.
10          Q.      Do you have an approximation of
11     how many -- first of all, do you know how many
12     minutes you reviewed?
13          A.      I don't have the exact number, no.
14     There was a lot of minutes, but I don't remember the
15     exact number.
16          Q.      I'm going to represent to you that
17     according to your report in the litigation
18     documents you reviewed 37 minutes.
19          A.      Okay.
20          Q.      Do you have any sense of how many
21     of those 37 you took issue with?
22          A.      No.
23          Q.      So do you agree with me that you
24     provided one example in your report of a
25     deficient meeting minute?
```

Page 196

1                    DONALD C. STONE

2          A.     I'd have to look at that, but that

3     sounds correct.

4          Q.     Do you have any -- did you decide

5     which example would be included in your report?

6          A.     It was part of the conversation

7     that I had with counsel.  I don't know exactly

8     whether I brought it up, they brought it up, I

9     don't know.

10         Q.     So it's your testimony it could

11    have been counsel deciding which example would

12    be in your report?

13         A.     No, they didn't decide which

14    example.  You're misspeaking what I said.  It

15    is my report at the end of the day.  I either

16    agreed with it or I didn't.  I don't know how a

17    particular conversation went that would have

18    taken place weeks ago at this point.  That's

19    not realistic.

20         Q.     But you don't know if you took

21    issue with half of the minutes, a third of the

22    minutes, two of the minutes, you don't know?

23         A.     Now we could go through them all

24    right now and I will tell you as we go.  We'll

25    will go through all 37.  We could do that.

Page 197

1                           DONALD C. STONE

2                Q.      You testified that you reviewed

3       every single one of the minutes in preparation

4       for your report.  Your report contains one

5       example of a so-called deficient meeting and

6       I'm asking what other meeting minutes are

7       deficient in your view.  You reviewed them.

8                A.      Okay, but I don't remember which

9       particular quarter here, there or the other.

10      If we looked through them I could give you that

11      answer.

12               Q.      If the majority of the meeting

13      minutes are deficient, why didn't you include

14      more examples of those deficiencies?

15               A.      I didn't include every single

16      example of everything in the report.  I can't

17      recall ever seeing one of these reports where

18      every single possible thing is capture because

19      it is way too long.

20                        If the bottom line is I didn't, I

21      think as a general process as I read through

22      the reports and, again, in a lot of cases it

23      just strikes me there is stuff that is missing.

24      When I read through it there are things that

25      simply aren't there.

Page 198

1                    DONALD C. STONE

2          Q.     Can you identify any of those

3    things today?

4          A.     If I read through the minutes I

5    can.

6          Q.     Did you read through the minutes

7    in advance of your deposition today?

8          A.     I did not read through them in the

9    last -- I read through some of them yesterday,

10   but I didn't read through them this morning.

11         Q.     So based on your review yesterday,

12   do have any recollection of other things that

13   are missing from the minutes that you did not

14   include in your report?

15         A.     As I read through the minutes,

16   what comes across is it's very -- it's, as I

17   said before, it's anodyne, it doesn't tell me

18   the rationale behind a lot of decisionmaking.

19         Q.     What decision, you look at them

20   yesterday, what ones?

21              MR. ROBERTS:   Are you asking about

22         a particular document or are you asking in

23         the aggregate of 37?  If you want to show

24         him a document you can do that.

25              MS. ENGELMAN:   I'm asking what he

Page 199

1                    DONALD C. STONE
2           remembers from his review of the minutes
3           yesterday.
4           A.     At this hour in the evening,
5    frankly I don't remember any specific minute,
6    period.  I can look through them and I'm happy
7    to do that.  For me to say I have a memory, I
8    remember the meeting minutes from June of 2017,
9    no, I'm not going to say that, that wouldn't be
10   accurate.
11          Q.     Is it your opinion that the
12   meeting minutes from 2020 forward were
13   compliant with the IPS?
14          A.     I think it is the same issue that
15   goes forward.  Okay.
16          Q.     You note in your report that the
17   IPS was amended to reflect what needed to be
18   included in the minutes.  Do you recall that?
19          A.     I do.
20          Q.     Do you take issue with that
21   decision?  Is that uncommon in the industry to
22   make a change to the IPS in terms of what needs
23   to be reflected in the minutes?
24          A.     You asked two different questions.
25   That's a compound question.  It is not uncommon

Page 200

1                      DONALD C. STONE

2      for an IPS to be modified over time.  In fact

3      it is fairly common.

4            Q.    Okay, let's turn to paragraph 86

5      of your report.

6            A.    86, okay.

7            Q.    So you say here, "This is a

8      glaring example of deficiency of the meeting

9      minutes."  Right?  And this is the fact that

10     the Freedom Funds were on monitor status in

11     February, 2016?

12           A.    Correct.

13           Q.    Do you see that?

14           A.    Yes.

15           Q.    You say here "As of the fourth

16     quarter 2015 meeting, the Freedom Funds had

17     been on monitor status for four consecutive

18     quarters."  Do you see that?

19           A.    Yes.

20           Q.    Then you say, "The quarterly

21     investment review presented at the meeting also

22     detailed that the Freedom Funds were

23     underperforming their benchmarks for a three and

24     five-year period."  Do you see that?

25           A.    I do.

Page 201

1                    DONALD C. STONE

2          Q.      Then it says, "In accordance with

3     the criteria of the 2015 IPS, if an investment

4     on monitor status for four consecutive quarters

5     shows no signs of improvement in the underlying

6     criteria, it is to be advanced to alert status

7     absent a documented decision by the committee

8     to change an investment status."  Do you see

9     that?

10         A.      I do.

11         Q.      We looked at the 2015 IPS earlier

12    and you agreed with me that the performance

13    against benchmark for the three and five-year

14    period is not included as a monitoring criteria

15    in the 2015 IPS; correct?

16         A.      Correct.

17         Q.      Then it says, "The minutes of the

18    fourth quarter 2015 committee meeting held on

19    February 15th, 2015 reflected a number of

20    investments were discussed in-depth to

21    determine monitor status."  Then it goes on to

22    say what the minutes reported.  Right?

23         A.      Yes.

24         Q.      I'm going to the middle of the

25    paragraph, paragraph 88.  "Given that the

Page 202

```
 1                    DONALD C. STONE
 2      Freedom Funds continue to underperform their
 3      benchmark and that the advisor and the
 4      committee noted that no significant changes to
 5      the suite had occurred during 2015, it is
 6      entirely unclear how the committee arrived at
 7      its decision to remove the Freedom Funds from
 8      monitor status at this time."  Do you see that?
 9           A.     I do.
10           Q.     I believe you testified earlier
11      that the reason that you're aware that the
12      reason that the Freedom Funds were on monitor
13      status as of this time was the lack of
14      performance data for some of underlying funds;
15      is that right?
16           A.     That was the reason that they
17      gave, yes.
18           Q.     Were you aware of that at the time
19      that you wrote this report?
20           A.     Yes.
21           Q.     So when you say that given the
22      Freedom Funds continued to underperform their
23      benchmark and that the advisor committee noted
24      no significant changes to the fund suite
25      occurred in 2015, were you aware at that point
```

Page 203

1                    DONALD C. STONE

2      that you wrote the report that the Freedom

3      Funds were not on monitor status for

4      performance?

5             A.      They should have been.

6             Q.      But they weren't; is that correct?

7             A.      Well, and that's a flaw by the

8      committee, that they were not on watch status

9      at that point.  That was -- and to take them

10     off monitor in general.

11                   When you go on monitor, to come

12     off monitor says that all the issues are

13     resolved.  That is typically the way that you

14     think of that.  When they came off monitor all

15     the issues weren't resolved.  They still had

16     significant underperformance issues despite the

17     fact that the IPS left that language out.

18                   So my point is, I think the

19     committee, regardless of whether -- because the

20     committee has the flexibility to put it on

21     monitor for any reason they want, and it's

22     incomprehensible to me that they come and take

23     it off of monitor when it is still underperforming.

24                   They could have gone and said,

25     okay, we are taking it off of watch for the

1                    DONALD C. STONE

2    three year number, but at the same time it would

3    have made sense they we are going to keep it on

4    watch because it is still underperforming.  We

5    are looking at it in a different lens at this

6    point.

7                    I think the committee -- I don't

8    know if they just weren't paying attention or

9    exactly what happened that they would take

10   something off monitor when it's underperforming.

11   Regardless whether it is specifically a bullet

12   point in that 2015 IPS or not.

13        Q.    So I guess that's my question.

14   What is the basis for your opinion that it

15   should have been on monitor as of -- for the

16   poor performance, what is basis of your

17   opinion?

18        A.    Because I think the committee has

19   a duty of loyalty to the plan to look after the

20   best interest of the participants.  And I don't

21   think they were making a good judgment in that

22   affect.  Okay.  It is incomprehensible to me.

23        Q.    Do you know what the

24   underperformance was at this time period

25   relative to benchmark?

1                    DONALD C. STONE
2          A.     There is a list that gives the
3     underperformance fund vintage by vintage.  I
4     don't have it right in front of me.  I looked at it
5     earlier today, but I don't have it in front of
6     me at the moment.  It varied from being just
7     slightly underperforming to being fairly
8     substantially underperforming.  So it varied
9     depending on the vintage.
10         Q.     So was this underperformance
11    compared to index or compared to benchmark or
12    compare to something else?
13         A.     I believe that was compared to the
14    index.
15         Q.     Do you know how the target date
16    funds were comparing as to peer group during
17    the time period?
18         A.     They were showing up a little
19    differently.  You're talking about the liber
20    list?
21         Q.     I'm asking you if you know.
22         A.     The peer group performance looked
23    better than against the benchmark.
24         Q.     So is it plausible that the
25    committee looked at the peer group performance

Page 206

1                   DONALD C. STONE

2       and decided that it didn't need to be on monitor

3       status because the performance against peer

4       group?

5             A.      But they didn't say that.  This

6       goes back to the minutes not talking about the

7       rationale employed.

8             Q.      Do you have any sense of whether

9       or not the performance improved during the time

10      they were stated on monitor until the time they

11      went off monitor?

12            A.      I think it varied depending on the

13      vantage.

14            Q.      Do you know one way or another?

15            A.      And depending on the quarter.

16      There was some improvement during I think part

17      of that period of time, but by the same token

18      they were still underperforming.  So they never

19      got above the waterline.

20            Q.      You talk about in your report that

21      the Freedom Funds were the plan QDIA; is that

22      correct?

23            A.      Yes.

24            Q.      And that there should be some sort

25      of heightened scrutiny around the plan's QDIA;

Page 207

DONALD C. STONE

1

2    is that correct

3        A.    Correct.

4        Q.    What do you mean by heightened

5    scrutiny?

6        A.    Well, by heightened scrutiny I

7    mean, usually QDIA holds a large percentage, if

8    not the majority percentage, of all the assets

9    in the plan.  So I think that the -- so just by

10   share looking at raw numbers and number of

11   participants typically involved as well that --

12   this is not a minor thing.  It is not like it's

13   a fund that is held -- some kind of select fund

14   that is held by three individuals who happen to

15   be in a C suite.  It's a very different thing.

16            They are people who quite often

17   have been defaulted, they tend to be

18   unsophisticated people, they tend to be

19   unengaged, their money is going into a suite of

20   funds that they don't actually know much about

21   and they are relying upon the plan fiduciaries

22   to look after their interest.  So I think that

23   is why I say a heightened level of scrutiny is

24   reasonable.

25        Q.    My question was a little

Page 208

1                    DONALD C. STONE

2       different.  What is the heightened level of

3       scrutiny?  What does that entail?

4            A.     The heightened level of scrutiny,

5       it looks at it more carefully to be sensitive

6       to the fact that you don't go and -- in this

7       case you don't go and remove it because it

8       doesn't happen to show up in the 2015 IPS to

9       look against benchmark.  You don't remove it

10      from a watch list because it is still

11      underperforming.  You try to understand what's

12      driving that underperformance and I don't see

13      that anywhere they spent time doing that.

14           Q.     Did you always do that in your

15      role as a 321 investment advisor?

16           A.     Of course.

17           Q.     Mr. Stone, you opine in your

18      report that the committee failed to review the

19      services provided by Ascende and QPA; is that

20      correct?

21           A.     That's correct.

22           Q.     Is it your opinion that the

23      committee was under obligation to do an RFP for

24      services by another investment consultant?

25           A.     I don't think it was necessarily,

Page 209

DONALD C. STONE

1
2      although that would be the better way to go.
3      An RFP per se, like I said, I think that would
4      be the preferred way to go, but they weren't
5      under a, quote, obligation to do just an RFP.
6      They could have done an RFI, they could have
7      had a -- they could have hired somebody to a
8      benchmarking study of advisors.  An RFP would
9      certainly be the preferred way because you get
10     so much more information, much richer.
11                    The Department of Labor
12     specifically does call out -- they don't call
13     out an RFP, of course, but they do call out
14     that you have to have a process for reviewing
15     your service providers.  And that would
16     certainly include your investment advisor.
17            Q.     But you agree that the Department
18     of Labor doesn't require any specific manner in
19     which to review your investment advisor; is
20     that correct?
21            A.     The Department of Labor doesn't
22     require almost any of the things that we have
23     been talking about, including an IPS, a
24     charter, they don't require having a committee
25     of multiple people.  You could have an

Page 210

1                          DONALD C. STONE

2          individual, it is not a good process, but you

3          could do that.

4                          Most of the things -- they don't

5          require looking at peer groups.  They don't

6          require looking at risk adjusted returns.  None

7          of this is anywhere in ERISA because it is 50

8          years old and this has been an accretive

9          process of what has been standard practice in

10         the industry over a period literally of decades.

11                         So none of this stuff is -- and

12         the Department of Labor, I think, doesn't want

13         to get involved in some of the level of detail

14         in everything.  I'm not sure the skill set is

15         there.

16              Q.    When you were a 321 investment

17         advisor from 2002 to 2019, did you recommend to

18         your clients that they conduct an RFP or a RFI

19         for other investment consultants?

20              A.    I had many of them go exactly

21         through that.  I never said don't do that at

22         all.

23              Q.    Did every single one of them do

24         that annually?

25              A.    First of all, you wouldn't do it

Page 211

DONALD C. STONE

1

2       annually.    You wouldn't do an RFP annually.

3       But not every single one of them, as I recall,

4       actually did it.    But those were conversations

5       that we had as part of the fiduciary training

6       that your service providers, and that would

7       have included us sitting in the room, you ought

8       to be out periodically going through a formal

9       process to determine if you have the

10      appropriate choice.

11          Q.    So tell me what specific steps you

12      made sure they were going through -- every

13      single one of your clients was going through a

14      formal process to determine --

15          A.    As I said some of them --

16          Q.    Let me finish my question.    -- to

17      determine whether or not to continue to have

18      their services provided by the PSA or Pavilion?

19          A.    As I said a minute ago, not all of

20      them chose to go through that.    As a 321 I

21      could make recommendations, I couldn't go and

22      act for them.    So not everyone of them went

23      through a formal process.    Many of them did.

24          Q.    How many did?

25          A.    I don't know exactly the number,

Page 212

1                    DONALD C. STONE
2       but it certainly would have been well over half
3       of our clients.
4            Q.    For the other half you testified
5       earlier that you believe all the committees
6       that which you worked with were prudent engaged
7       in good committees.  Does your answer change
8       given that they didn't go out and do a formal
9       RFP and RFI?
10                   MR. ROBERTS:   Objection to form.
11           A.    The thing to realize is, I don't
12      even know if they did an RFP separate.
13      Sometimes they don't tell you what they're
14      doing.  They don't include you in that process.
15      If they do an RFI they don't include you
16      necessarily.  So there would be ones that I
17      don't know what they did.  I'm not included in
18      some of those conversations or wasn't, I should
19      say, included in some of those conversations
20      depending on how the committee decided it
21      wanted to act.
22           Q.    But sitting here today you're
23      aware of some of the committees in which you
24      worked where you don't know whether or not they
25      underwent any formal process for evaluating the

Page 213

1                    DONALD C. STONE

2     services that you were providing?  You have no

3     idea one way of the other?

4          A.     I don't know what process they

5     went through.  I won't say they didn't go

6     through a process, but I don't know what

7     process they went through because typically the

8     existing advisor is not included in that process

9     unless it's a full blown RFP.

10         Q.     If you don't know what process

11    they went through, how do you know they went

12    through a process at all?

13         A.     This is really a gotcha game and

14    it is really rather childish at this hour of

15    the day.

16              My clients went through rigorous

17    training on what they should do.  At the end of

18    day they needed to take the action to go

19    through a process to evaluate us.  Sometimes

20    they went through a process of evaluating us

21    that we found out about after the fact.

22              Sometimes they went through a

23    process that it was quite formal with an RFP

24    which we knew about upfront.  Sometimes they

25    did it through talking to their peers.  There

Page 214

1                    DONALD C. STONE

2       were multiple ways they decided to go about

3       that.  I did not have access to all of that

4       data.

5                    So I can't, for example, respond

6       to their level of prudency on that particular

7       element because I wasn't involvement in that

8       process and I was there to provide advice not

9       to dictate what they did.

10           Q.     Let's turn to training.  You talk

11      about training for individuals who were

12      onboarded on to the committee during the

13      relevant period.  Do you recall that line?

14           A.     I do.

15           Q.     Do you know whether any

16      committee members were onboarded during the

17      relevant time period in that case?

18           A.     They talk about an informal

19      process of onboarding that seems to come back

20      to the conversation of being included in the

21      quarterly investment reviews where there was

22      some degree of fiduciary information provided.

23      And there were I think a couple of years where

24      there was a one-pager that I saw that bullet

25      pointed various fiduciary things that people

Page 215

1                    DONALD C. STONE

2      should be aware of which I would not consider

3      anywhere near adequate fiduciary training nor

4      would anyone else that I know of consider that.

5                    So I don't think -- I think a

6      couple of the numbers specifically refer to the

7      fact that they did not get specific onboarding

8      training.

9            Q.     My question was a little

10     different.  Do you know whether or not any

11     committee members were onboarded during the

12     relevant period in this case?

13           A.     I thought I answered that.  I said

14     some of them said they received -- that their

15     onboarding was getting quarterly information as

16     they were in the meetings.

17           Q.     You're misunderstanding my

18     question.  I'm talking about the timeframe.  Do

19     you know whether or not anyone was actually

20     onboarded during the relevant time period in

21     this case?

22           A.     You mean a new person entered the

23     committee?

24           Q.     Yes.

25           A.     Okay, I didn't understand that.

Page 216

1                          DONALD C. STONE
2                    I'm trying to think who went --
3          there was a -- there was a change over of a
4          couple of members of the committee, I don't
5          remember the exact date, but the 2015 IPS I
6          believe was signed by a couple of people that
7          were not on the committee later.
8               Q.    So you testified or paragraph 93
9          of your report, I will direct you there.
10              A.    Okay, I'm there.
11              Q.    You say, "Other than brief updates
12         in quarterly investment review materials
13         provided by the plan's investment advisor, no
14         formal fiduciary education materials were
15         presented to the committee prior to May 24th,
16         2021."  Do you see that?
17              A.    I do.
18              Q.    What do you consider to be formal
19         fiduciary education?
20              A.    Well, I think it's a very -- it's --
21         probably a good example would be what was
22         actually presented on May 24, 2021.  It is like
23         a 22-page document that walked through a number
24         of issues.  It's a question of how much you
25         want to include.

Page 217

1                    DONALD C. STONE

2                    But the reality was that it talked

3          about a lot of different aspects, what it means

4          to be a fiduciary, how you monitor the

5          investments.  It talked about appointment to

6          the committee.  It talked about all the

7          different processes that you look at and how

8          you should also think about being a fiduciary.

9          So it was a pretty detailed document.

10                   I don't think it was -- I probably

11         would tweak it a little bit if I were doing it

12         myself, but that is neither here nor there I

13         suppose.

14                   I think it was a pretty rich and

15         robust document overall as compared to what we

16         saw prior to that period when for I think two

17         years there it was a one-page bullet pointed

18         document that I have no idea how much was --

19         what was spoken to from that and how that was

20         presented.  And otherwise it was just different

21         updates during quarterly meetings which there

22         is nothing wrong with updates during quarterly

23         meetings, but it is not sufficient.

24              Q.   So when you're talking about a

25         one-pager, are you talking about the fiduciary

Page 218

1                    DONALD C. STONE
2    essentials document, do you know?
3          A.    That sounds correct.
4          Q.    Do you know when that was
5    presented to the committee?
6          A.    It was presented on two different
7    occasions as I recall and I don't remember the
8    exact dates.
9          Q.    Was it prior to 2021?
10         A.    Yes, it was.
11         Q.    Your position is that is just not
12   a formal training in your view?
13         A.    I think it's -- a one page bullet
14   point is not formal training in any sense of
15   the word in my mind.  I think it is -- it's a
16   complicated issue and people need help in
17   understanding what they're supposed to do and
18   it's certainly not an onboarding of anybody.
19              No, I don't think it is formal
20   training at all.  It didn't get into a lot of
21   different issues that I would have gone into.
22   And I don't know how much was spoken.
23              I want to add, even with the
24   bullet points, I don't know what was spoken to
25   those bullet points or not spoken to them in

Page 219

1                    DONALD C. STONE
2      terms of the amount of relevant detail that
3      would have been provided in terms of talking
4      about fiduciary responsibility, investment
5      monitoring and selection, you know, acting in
6      the interest of the participants as opposed to
7      the interest of the company or yourself,
8      conflicts of interest.  These are pretty meaty
9      topics that require more than a single bullet
10     point on a sheet of paper.
11          Q.     Understood.  You don't have any
12     knowledge sitting here one way or another what
13     was actually delivered in the fiduciary
14     essentials presentation to the committee,
15     you're just going off what is included in the
16     one-pager?
17          A.     That is the piece of paper that
18     apparently was given to them.
19          Q.     You don't have any knowledge or
20     testimony or record of any sort regarding what
21     was actually delivered, it could have been much
22     meatier than what the one-pager suggests?
23                 MR. ROBERTS:    Objection.
24          A.     I have no idea what was delivered.
25     I cannot imagine that you can deliver -- based

Page 220

```
                              DONALD C. STONE
 1
 2     on those bullet points, it certainly would not
 3     have been sufficient regardless of what was
 4     delivered in person.  No, I don't know what was
 5     delivered verbally, let's say, to those bullet
 6     points.
 7            Q.     Do you have a recollection that
 8     the bullet points did cover at least at a high
 9     level investment monitoring?
10            A.     They did.
11            Q.     So you mentioned earlier,
12     Mr. Stone, that the DOL does not require a
13     charter; is that correct?
14            A.     They don't require a lot of things
15     in explicit terms, no.
16            Q.     You agree with me that ERISA does
17     not require a charter of any kind?
18            A.     I missed the last part of that.
19            Q.     Do you agree that ERISA doesn't
20     require a charter of any kind?
21            A.     A what?
22            Q.     A charter of any kind.
23            A.     What did you say before that?
24            Q.     ERISA does not require.
25            A.     That's what I missed, sorry.  No
```

Page 221

1                    DONALD C. STONE
2     ERISA is not -- is not that explicit about a
3     lot of things as I said a minute ago.  It
4     doesn't require a committee.
5          Q.    Did every single one of the
6     clients with which you worked at both PSA and
7     Pavilion have a charter in place?
8          A.    They did.  I wouldn't allow them
9     not to.
10          Q.    When you say charter, do you mean
11     charter or other equivalent document?  I think
12     you use that in your report.
13          A.    It could be an equivalent
14     document.  Again, it depends on what it says in
15     the equivalent document.  The IPS typically
16     reiterates some pieces of it, but there is a
17     lot of things that an IPS would not include and
18     the IPSs in this case do not include that would
19     be essential to have in a charter.  It could be
20     covered in the plan document.  Sometimes that
21     happens.  And that's fine.  My preference would
22     be for a charter, but you don't have to have a
23     charter as long as the information is conveyed
24     that needs to be conveyed.
25          Q.    So let's go back to the 2015 IPS.

Page 222

DONALD C. STONE

2    A.    Let me bring that up.

3    Q.    Can you identify what is missing

4    from the IPS that you would like to see in a

5    charter document?

6    A.    Well there are several things that

7    are -- that jump out right from the get-go.  So

8    I don't know that IPS is going to help because

9    it doesn't have anything in there about this.

10   So a charter first of all should clearly

11   delegate authority to either an individual or

12   to a committee and by that it is going to be

13   clear who the authority is that it's coming

14   from.  It could be the board, it could be from

15   the CEO, it could be handled several different

16   ways.  It is going to also detail what

17   authority that committee has.  It is not just a

18   matter of you can monitor the investments and

19   this, that and the other.

20        Part of it is what authority don't

21   you have.  Where does your committee get

22   circumscribed.  In some cases a committee can

23   make decisions about certain things and that is

24   very clear.  Again, that is the purpose of a

25   charter.  It is very clear that this is something that

Page 223

1                    DONALD C. STONE
2      we can make a decision about.  Here is
3      something that over here if it happens we need
4      to go and raise it to -- elevate it to another
5      level.
6                    So that's not covered in the
7      investment policy statement.
8           Q.     I don't want to interrupt you
9      there, but if you're done with that particular
10     thought I would like to jump in with a question
11     whenever you done with that particular thought.
12          A.     The point is, I think there is a
13     number of areas that are not covered in the IPS
14     that a charter should cover that makes the
15     authority very, very clear.  And I think that
16     is a very important point.
17          Q.     So I want to turn your attention
18     to paragraph 28 of your report.
19          A.     Paragraph 28?
20          Q.     We are going to look at paragraph
21     28 of your report and look at the 2015 IPS.
22          A.     All right, I have paragraph 28.
23          Q.     You say, "The responsibilities of
24     such a committee are customarily set forth in
25     plan documents such as a committee charter and

Page 224

1                          DONALD C. STONE
2        may include, among other things, 'establishing,
3        interpreting and following investment policy
4        statement'."  Do you see that?
5                A.     I do.
6                Q.     Let's turn to page 4 of the IPS.
7                A.     Okay.
8                Q.     Do you see here that it sets forth
9        the roles and responsibilities of the 401-K
10       committee.  And it sets forth exactly what the
11       401-K committee is going to do and that
12       includes preparing and maintaining the IPS?
13               A.     Yes, I see that.
14               Q.     And then you see here in bullet
15       point two you say, "Selecting investment
16       options for the plan including the QPA."
17               A.     Yes.
18               Q.     Do you see here where it says,
19       "Determine guidelines for selecting investment
20       options and then provide sufficient asset
21       classes with different and distinct risk return
22       profiles so each participant may prudently
23       diversify his or her accounts."  Do you see
24       that?
25               A.     Hold on, I got my pages turned up

Page 225

1                  DONALD C. STONE
2       here.  Where are you again now?
3                Q.    I'm on page 4 of the IPS, bullets
4       number 3 and 4.
5                A.    Determine guideline and provide
6       sufficient asset classes, okay.
7                Q.    Do you see subsection 3 on page 28
8       of your report says "Monitoring the performance
9       of each of investment options"?
10               A.    Yes.
11               Q.    Then do you see two bullets down
12      it says here "Establish procedures for continuing
13      monitoring and evaluating the investment
14      options."?
15               A.    Yes.
16               Q.    Then do you see bullet point four
17      where it says, "Appointing service providers
18      for the plan including investment advisors?
19               A.    Yes.
20               Q.    Do you see the last sentence of
21      this page it says "The committee also has the
22      authority to obtain the services of any third
23      providers as it deems necessary."?
24               A.    Yes.
25               Q.    Mr. Stone, you also state in your

Page 226

1                          DONALD C. STONE

2       report at what I'll say that you seem to have

3       taken issue with the fact that the committee

4       operated by consensus voting; is that correct?

5              A.      Yeah, it is not -- I think it can

6       be confusing.  It's not that you can't do

7       consensus voting, but sometimes in the not

8       clear and particularly in this record it is not

9       clear if they actually took a vote or what the

10      results of the vote were in some cases.  And

11      what happens to somebody if you don't have a

12      consensus.

13              That to me strikes me as a

14      particularly potentially dangerous area to get

15      into that you can't reach a consensus.  So it

16      is not -- I'm not saying that you can't use

17      consensus voting, but I'm raising that I don't

18      think it is the best approach to -- it is not

19      the approach that makes sense to me to use

20      given the fact that you might not have

21      consensus, given the fact that in this

22      particular case -- again, it is not clear that

23      they took a vote on many of these cases.  It

24      just seems to -- something happened and it is

25      not -- we took a vote, here is what we vote to

Page 227

```
 1                      DONALD C. STONE
 2     do, even if it was by consensus.
 3              Q.    Well is it required by ERISA, the
 4     DOL or anyone else that committee members take
 5     a vote on every decision?
 6              A.    Again, almost nothing that we're
 7     talking about is, quote/unquote, required.
 8                    This comes back to the prudent
 9     practice and what is the common and accepted
10     practice in the industry today or during the
11     time period that we are talking about.  What
12     are the things that make -- what would make
13     this a group process.  That is what I'm talking
14     about.
15                    And no, I'm not going to say
16     they got to list of all of these 42 different
17     things you should be doing because none of
18     these existed -- most of them didn't exist at
19     the time that ERISA was passed.  So the
20     Department of Labor hadn't come out with a list
21     like that.
22              Q.    So is it your testimony that the
23     only prudent way to operate a committee is to
24     have an formal vote on every decision?
25                    MR. ROBERTS:   Objection to the
```

Page 228

                           DONALD C. STONE

 1
 2          form.
 3          A.      I don't think you have to have a,
 4     quote, formal vote on every decision.  But I
 5     think that that is a practice that is generally
 6     accepted in the industry as a prudent way to
 7     operate because it does demonstrate that
 8     decisions were made and how they were made and
 9     who made them.
10          Q.      Okay, did you identify any
11     particular circumstances here where you
12     couldn't determine whether or not a decision
13     was made?
14          A.      I don't see any record of votes in
15     most of these cases.
16          Q.      That wasn't my question.
17          A.      I can't determine that if there
18     was no vote.  I can't determine what they
19     decided.
20          Q.      If the committee talked about an
21     issue and together made a decision without a
22     formal yes/no vote, but came together and made
23     a decision and then the meeting minutes reflect
24     that the committee made a certain decision, is
25     that an unreasonable process in your view?

Page 229

1                    DONALD C. STONE

2          A.    How could say they made a decision

3     if we don't know what they made a decision

4     about.

5          Q.    I'm representing to you that the

6     meeting minutes state that the committee as a

7     whole made a decision.

8          A.    Okay, if they say that the

9     committee made a decision, that is -- I don't

10    think -- certainly it is not a way that I would

11    prefer.  It is not an imprudent thing in and of

12    itself, no.

13         Q.    Would it be your -- is it your

14    testimony that the meeting minutes should

15    reflect the individual votes of every committee

16    member?

17         A.    No, it doesn't necessarily have to

18    reflect the individual members' votes.  It

19    could simply be the committee voted and

20    everyone was in agreement or a majority agreed

21    to remove this fund from watch or put it on

22    watch or what have you.  That would be, I

23    think, sufficient.

24         Q.    So I want to make sure that the

25    record is clear.

Page 230

                        DONALD C. STONE

1

2              Your testimony is not that a vote

3    is required by each committee member in order

4    to reach a decision.  Your testimony is that

5    the record needs to reflect that a decision was

6    made, whether by consensus or otherwise?

7         A.    It needs to reflect that a

8    decision was made and I think the clarification

9    would be the best way to do that is through an

10   actual vote.

11        Q.    But it is not the only way; isn't

12   that correct?

13        A.    It is not the only way.

14              MR. ROBERTS:   Keri, we have been

15         going for over an hour, would now be a good

16         time to take a break?

17              MS. ENGELMAN:   Yes, let's take ten

18         minutes.

19              THE VIDEOGRAPHER:   The time is 9:09

20         and we are off the record.

21              (Recess Taken.)

22              THE VIDEOGRAPHER:   The time is 9:26

23         and we are on the record.

24   BY MS. ENGELMAN:

25        A.    Can I interject something before

Page 231

1                    DONALD C. STONE

2       you ask me a question?

3              Q.    Sure.

4              A.    So I want to -- I had a chance to

5       over this break to go through and look at a

6       couple of the times that you asked me about

7       earlier.  And I misspoke earlier talking about,

8       for example, the changeover was, because that

9       was in my head the changeover was to the new

10      FIA funds of Fidelity.  That was actually 2022.

11                    So the timeframe that I should

12      have been working with was 2016.  It began in

13      2016 through 2022 when they changed over to the

14      FIAM version of the Fidelity funds.  That would

15      be consistent with what is in my report and I

16      reference part of that on page 40, for example.

17             Q.    So is it your testimony that your

18      report does not go out beyond 2020; is that

19      correct?

20             A.    No, it goes through to the change

21      over to FIAM in 2022.

22             Q.    Sorry, I meant 2022.

23             A.    Yes.

24             Q.    It doesn't go beyond 2022; is that

25      right?

Page 232

```
 1                     DONALD C. STONE
 2           A.      That's correct.
 3           Q.      It is your testimony that the
 4      change from the Freedom Funds to the FIAM funds
 5      happened in 2022?
 6           A.      Yes.
 7           Q.      What is the basis of your change
 8      in testimony regarding the 2016 time period?
 9           A.      I went back and looked through the
10      report.
11           Q.      Did you speak with counsel during
12      this break?
13           A.      I did not speak with him, no.
14           Q.      If you turn to page 97 of your
15      report.
16           A.      Page 97?
17           Q.      I'm sorry, paragraph 97.
18           A.      I was going to say, page 97, I'm
19      going to run out of pages.  Paragraph 97 page
20      41, okay.
21           Q.      You say that, "The committee
22      relies solely on the plan's investment advisor
23      to identify investments that became
24      noncompliant with the plan's IPS that might
25      otherwise be unsuitable for the plan."  Do you
```

Page 233

                    DONALD C. STONE

1

2        see that?

3               A.     I do.

4               Q.     In that paragraph are you

5        referring to specific instances that investments

6        became noncompliant with the IPS or otherwise

7        became unsuitable for the plan?

8               A.     There were a couple of instances

9        that were referenced and it's a question of

10       finding the pages and everything where -- this

11       is on page 43.  If you look at 104 we start

12       getting into that in terms of what -- this was

13       where the whole thing where the -- Ascende was

14       using or QPA was using a version their scoring

15       system that was not in sync with the IPS and so

16       I think the committee did not -- they didn't

17       look on their own and they didn't get any other

18       information and they were I think not getting

19       good information, consistent information as to

20       what should have been or would have been on

21       watch and not on watch.

22              Q.     So when you talk about that

23       paragraph, you're referring to the three

24       instances that you identify in I think

25       paragraph 104 of the report?

1              DONALD C. STONE

2         A.    Page 104 --

3         Q.    Paragraph 104?

4         A.    Paragraph 104, you're right.  And

5    so the American Beacon Fund and DFA Fund and

6    then the Freedom Funds as well.  So those are

7    the three that I call out in that particular

8    instance, yes.

9         Q.    Did you identify, in preparing

10   your report, any other instances that you did

11   not include in your report?

12        A.    None are coming to mind at the

13   moment.

14        Q.    When you're talking about the QPA

15   or Ascende at the time was using a scoring

16   system, that in your view was inconsistent with

17   the 2015 IPS; is that correct?

18        A.    Correct.

19        Q.    Is it your understanding that the

20   scoring system was implemented sometime around

21   2017; is that correct?

22        A.    So, yeah, there were three

23   iterations of scoring systems.  One was in

24   place during the 2015 IPS and the next one was

25   2017 and then there was another change in 2019.

Page 235

1               DONALD C. STONE

2               What happened is, QPA was changing

3      their systems to -- I think they upgraded or

4      they changed the -- it sounds like they changed

5      some of the software they were using.  So they

6      started using a different reporting standard

7      than had been used in the past.  I think this

8      pretty much left -- unfortunately left the

9      committee unaware of -- they didn't go back and

10     say what about under this scoring system would

11     this thing have been compliant before or not.

12     You'd have to go through and look at every fund

13     over multiple periods of time, which I did not

14     do.

15               Theoretically you can go back and

16     say maybe these were compliant under this

17     system but they weren't under that system.  But

18     the changeover in the systems was I think a

19     significant concern.

20          Q.    Is it your understanding that

21     there was a scoring system prior to 2017 in the

22     IPS?

23          A.    I believe there -- I'm trying to

24     see -- I have to go back and look through my

25     report, but I recall there was one standard --

Page 236

1                    DONALD C. STONE

2       I don't know that they -- there was one

3       standard that was being used in 2015 and then

4       switched over to the pass/fail and then they

5       went to this other point count system

6       ultimately and that's when they got them to

7       delay the score.  So that's three in my mind.

8              Q.     I want the record to be clear

9       here.  If you need to consult your report

10      please do so.  But if you look at the 2015 IPS

11      there is no scoring system.

12             A.     I guess the question is not the

13      IPS, but what is being reported by QPA or

14      Ascende in terms of how they came up with

15      whether something was potentially on watch or

16      not.

17                    So not necessarily the scoring

18      system in the 2015 IPS, because I don't think

19      that was there, but I'm not sure that they --

20      you know, I guess that, to -- well, the 2015

21      maybe that is where it is.  They didn't have

22      Appendix B or there was something about an

23      Appendix B missing and that is probably where

24      the scoring was.

25             Q.     Let's turn to page 47 of your

Page 237

1                    DONALD C. STONE
2      report.
3              A.      47?
4              Q.      The bottom of page 47.
5              A.      Okay.
6              Q.      It says "The scoring system
7      implemented after 2017 conflicted with the
8      monitoring standards established in the IPS."
9                      Do you see that?
10             A.      No, where are you reading?
11             Q.      Does that refresh your
12     recollection that your opinion is that the
13     scoring system was implemented in 2017?
14             A.      Where were you reading?
15             Q.      The bottom of page 47.
16             A.      Okay.  The scoring system
17     implemented -- you're talking about 3-I?
18             Q.      Yes.
19             A.      Okay, yes, the inconsistencies --
20     yes.
21             Q.      So to make the record clear.  Is
22     your recollection refreshed that the scoring
23     system was implemented in 2017 and not prior to
24     that.  So when we turn back to paragraph 97 of
25     your report and the examples, the scoring

Page 238

                    DONALD C. STONE
1
2       system that you're talking about was the ones
3       in place in 2017 and after that time period; is
4       that correct?
5              A.     That's correct.  But we don't know
6       what attachment B was to the 2015 IPS.
7              Q.     Do you have any knowledge of
8       testimony otherwise that says there was a
9       scoring system in Appendix B?
10             A.     No, I just know there is an
11      Appendix B that is referenced in the scoring --
12      excuse me in the -- in there.  We don't know
13      what it says.  But I reference there were a
14      number of analytics that they were referencing
15      in the document.
16             Q.     Did you review the quarterly
17      investment reports prior to 2017?
18             A.     Yes, I looked at investment
19      reports prior to 2017, yes.
20             Q.     Did those reflect a scoring system
21      of any kind?
22             A.     I don't recall and I'm not looking
23      at one in front of me.  Even if they had an
24      internal scoring system, it wouldn't
25      necessarily be reflected in that report.

Page 239

1                    DONALD C. STONE

2          Q.     Do you have any knowledge about

3    whether or not there was an internal scoring

4    system?

5          A.     I don't know what was in the

6    appendix.  I don't know what I don't know

7    there.  I'm just raising that as a question.

8          Q.     Let's turn back to page --

9    paragraph 104 of your report, page 43.

10         A.     Okay, I'm there.

11         Q.     So you say, "Plan investments

12   frequently ran afoul of the standards adopted

13   in the IPS for assigning monitor and alert

14   status, but escaped mention or scrutiny because

15   the binary pass or fail hegemony of the scoring

16   system was the sole monitoring approach

17   undertaken by the committee."  Do you see that?

18         A.     I do.

19         Q.     And that pass/fail system was

20   implemented in 2017 to your knowledge?

21         A.     I think so, yes.

22         Q.     Then you testified earlier that

23   these are the examples that you could come up

24   with where there was an inconsistency between

25   the scoring system and the 2015 IPS; is that

Page 240

```
 1                      DONALD C. STONE
 2      right?
 3              A.      That's correct.
 4              Q.      If we look at the 2015 IPS.
 5              A.      Okay, I have it up
 6              Q.      You say, "The deference to the
 7      scoring system permitted the DFA Funds below
 8      peer median three-year Alpha and negative
 9      three-year Alpha Information Ratio to go
10      undetected --
11              A.      Where are you?  What paragraph are
12      you?
13              Q.      I'm still on paragraph 104.
14              A.      Okay.
15              Q.      It says "The committee's
16      indifference to the IPS investment watch list
17      process and deference to the scoring system
18      permitted the DFA Fund below peer median
19      three-year Alpha and negative three-year Alpha
20      information to go undetected in Q3, 2018."  Do
21      you see that?
22              A.      Yes.
23              Q.      So let's turn to in the IPS, the
24      2015 IPS.  Let's turn to the investment watch
25      list process page.
```

Page 241

```
1                   DONALD C. STONE
2           A.     Remind me again which page that
3    is.
4           Q.     Page 13.
5           A.     I'm there.
6           Q.     You're there, okay.  Can you point
7    me to where in this document it says that a
8    below peer median three-year Alpha and negative
9    three-year Alpha Information Ratio requires a
10   monitor status?
11          A.     The second bullet point I think
12   speaks to I think what you're asking about
13   which is the peer group median risk adjusted
14   return is in the second bullet point.
15          Q.     You agree with me that is one
16   consideration that the committee may consider?
17          A.     Yes.
18          Q.     But does not have to consider?
19          A.     It says may consider in the IPS.
20          Q.     Then if we look at --
21                 MS. ENGELMAN:   Maria, can we pull
22          up I believe it is the Q4, 2018 minutes.
23                 (Exhibit 3 for identification, Q4,
24          2018 meeting minutes.)
25          A.     Okay, let me open that.
```

Page 242

DONALD C. STONE

1

2      Q.      So this is the quarter after the

3   quarter that you referred in your report where

4   you said this information was undetected; is

5   that right?

6      A.      Yes.

7      Q.      Do you see here where it says "The

8   DAF was place on monitor status as of Q4, 2018."?

9      A.      Which page are you on?

10     Q.      I'm on page, I guess this is page 3.

11     A.      The DAF International Small/Mid

12  Cap Value.

13             (Witness reviewing document.)

14     A.      Okay.

15     Q.      So you agree that the committee

16  detected performance issues with this fund in

17  Q4 2018?

18     A.      Q4 they did, they are talking

19  about short-term decline.

20     Q.      Did you reference that document

21  prior to forming your opinion?

22     A.      I read this document, yes.

23     Q.      You didn't include it in your

24  report?

25     A.      I don't know if there is a bullet

                                        Page 243
 1                      DONALD C. STONE
 2      point or if there is a footnote on it, I don't
 3      think there is, but I don't recall that at this
 4      point.
 5              Q.      Do you recall whether or not the
 6      American Beacon Funds were ever placed on
 7      monitor status?
 8              A.      I do not recall if they were
 9      placed on monitor status.  They don't appear to
10      have been placed on monitor status during this
11      quarter?
12              Q.      Right, okay.  Stick with paragraph
13      104, the second to last sentence you say, "The
14      Freedom Funds' negative information ratios over
15      both three and five-year period were ignored in
16      Q4, 2015."  Do you see that?
17              A.      I do.
18              Q.      So again, you testified earlier
19      that when you're talking about the scoring
20      system in these paragraphs you're talking about
21      the one that was implemented in 2017?
22              A.      Well, this is referring back to
23      2015.
24              Q.      Okay.  But you testified earlier
25      that the inconsistency with the IPS that you

Page 244

1                    DONALD C. STONE
2    were speaking about in this paragraph relates
3    to the 2017 scoring system.  Do you recall that
4    testimony?
5            A.    I do, but I think that misspoke
6    the fact that I also had an example from an
7    earlier period.
8            Q.    Okay, tell me -- point me to where
9    in the 2015 IPS it requires a monitoring status
10   for a negative Information Ratio on a three and
11   five-year period?
12           A.    Again I don't think it has that
13   specifically to a -- it is one of the monitoring factors
14   that you can look at and the committee did not
15   seem to address it.
16           Q.    When you came back from the break
17   you clarified that the relevant period was from
18   2016 forward.  Do you recall that?
19           A.    I do.
20           Q.    Do you know what month in 2016?
21           A.    That would have been the beginning
22   of 2016, so that would have included the Q4
23   report that was in February or so.
24           Q.    February of 2016?
25           A.    Correct.

1                    DONALD C. STONE

2          Q.     So you believe the relevant time

3     period cover January, 2016 forward?

4          A.     It covers the period of that --

5     yes, from January of 2016 forward.

6          Q.     So can you explain to me why

7     you're providing an example in 2015?

8          A.     Because it wasn't reported on

9     until 2016.  The committee would not have had

10    the information until 2016 and that's the time

11    when it would have been triggered.

12         Q.      So if we turn to paragraph 117 of

13    your report.

14         A.     Okay.

15         Q.     So if you turn to page 47, I want

16    to go back to this.  We are under a bullet 3-1?

17         A.     Hold on?

18         Q.     We looked at it earlier.

19         A.     Okay.

20         Q.     So we are talking about the

21    scoring system implemented after 2017

22    conflicted with the monitoring standards

23    established by the IPS.  That is the bullet

24    under which this section is created; correct?

25         A.     Yes, 3-I.

Page 246

1              DONALD C. STONE

2         Q.     Can we agree that the information

3    in this section relates only to the time period

4    of 2017 forward?

5         A.     I don't know why we are would do

6    that.

7         Q.     Is that not what it says?

8         A.     So that's what the -- I understand

9    what you're saying.  It's a grammatical issue

10   about where it is placed in here as opposed to

11   a substantive issue.

12        Q.     It's not a grammatical issue.  The

13   heading is "The scoring implemented after 2017

14   conflicted with the monitoring standards

15   established by the IPS."

16              My question is, the paragraphs

17   that follow under that heading, will you agree

18   with me these relate to the time period of 2017

19   forward when the scoring system was

20   implemented?  That is not grammatical, that is

21   your text.

22        A.     I understand what you're saying.

23   Okay.

24        Q.     So you agree?

25        A.     I agree that's what the heading

Page 247

1                    DONALD C. STONE

2        says, yes.

3             Q.     That wasn't my question.  Do you

4        agree that the paragraphs that follow until we

5        get to the second subbullet on page 50 relate

6        only to the time period after 2017 when the

7        scoring system was implemented, which I will

8        represent to you is Q3 2017, if you don't know

9        that?

10            A.     Okay.

11            Q.     So the first bullet point, it says

12       "The IPS dictates that performance will be

13       measured by comparing rates of return to

14       appropriate market indexes and peer groups for

15       me recent quarter, year to date, one year and

16       three-year period."  Do you see that?

17            A.     I do see that.

18            Q.     You saying that is what the 2015

19       IPS requires; is that correct?

20            A.     That would be the 2015, yes.

21            Q.     Then you say, "The scoring system

22       evaluates performance against benchmark indexes

23       for three year and five-year period and again

24       peers for one, three and five-year periods."

25       Do you see that?

Page 248

1                    DONALD C. STONE
2          A.     I do.
3          Q.     And you have highlighted and
4    bolded -- I'm sorry italicized and bolded the
5    five-year period.  Do you see that?
6          A.     I do.
7          Q.     So your point here is that these
8    scoring systems evaluated five-year performance
9    against benchmark and peer groups, but the IPS
10   did not call for five-year performance against
11   benchmark and peer groups; is that correct?
12         A.     Correct.
13         Q.     Then you say, "In addition to
14   incorporating an assessment of funds
15   performance for a longer timeframe than the
16   IPS".  So again, you're criticizing the
17   committee for looking at a longer time period
18   than the IPS contemplated; is that correct?
19         A.     Yes, I'm just saying it is
20   inconsistent, yes.
21         Q.     Is it your opinion that it is
22   inappropriate for the committee to evaluate
23   five-year performance against benchmark and
24   peer groups?
25         A.     No, I'm saying it is inconsistent

Page 249

DONALD C. STONE

1
2          with the two don't tie together.  And that is

3          one of the things that I'm saying is there are

4          places where these two don't tie together and I

5          think that could present confusing information

6          to the committee.

7                          There is nothing wrong with a

8          five-year number per se, but that is not a part

9          of the IPS.  So if you go and get a scoring

10         based on a five-year number, you might come up

11         with a different answer then what the IPS would

12         necessarily dictate.

13              Q.    Okay.  So let's look at the IPS.

14         Go back to the 2015 IPS.  And what you're

15         referring to is on page 12 of the IPS.  Do you

16         see that?

17              A.    Let me get to page 12.  Okay, yes

18         performance evaluation, right.

19              Q.    So the middle of the page it says,

20         where I think you got your quote from.

21         "Performance hopefully measured by comparing

22         rates of return to the appropriate market

23         indexes and peer groups for the most recent

24         quarter, year to date, one-year and three-year

25         period and longer periods where available."  Do

Page 250

1                    DONALD C. STONE

2    you see that?

3              A.    I do.

4              Q.    And that would include five-year

5    period?

6              A.    Yes, it would.

7              Q.    So that is not inconsistent with

8    the IPS at all, is it?

9              A.    No, it would seem to be

10   consistent.

11             Q.    Why did you state in your report

12   that it was inconsistent with the IPS?

13             A.    I probably misread it.

14             Q.    Okay.

15                   Would you agree with me that the

16   quarter data would be captured by the one year

17   data?

18             A.    No, the quarter data is data -- I

19   mean it would be subsumed under it, but

20   reporting on the quarter is a separate

21   reporting element.

22             Q.    But it would be subsumed in the

23   one year data, correct?

24             A.    But you wouldn't know what part of

25   it was, that's why you call it out separately.

Page 251

1                     DONALD C. STONE

2          Q.     Aside from the scoring system, do

3    you know one way or the other whether or not

4    the committee was receiving in the quarterly

5    reports all of this information?

6          A.     They were getting quite a bit of

7    information in the quarterly reports.

8          Q.     So did you review, aside from the

9    scoring system, did you review all of the

10   metrics that the committee was receiving in the

11   quarterly reports?

12         A.     I did look at the metrics they

13   were receiving, yes.

14         Q.     Did you form an opinion as to

15   whether or not all of the metrics they were

16   receiving were inconsistent with the IPS?

17         A.     The metrics seemed fine.

18         Q.     If we go to the second bullet it

19   says, "The IPS investment watch list process

20   identified performance below the peer median

21   over three, five or ten years as a criterion to

22   consider in placing an investment on monitor or

23   alert status despite the ten-year returns not

24   appearing anywhere in the scoring system."  Do

25   you see that?

Page 252

1                DONALD C. STONE

2        A.    I do.

3        Q.    Was the ten-year returns provided

4    in the quarterly investment reports outside the

5    scoring system?

6        A.    I have to look at the quarterly

7    report to confirm that.  They probably were,

8    but I have to look at the report to confirm it.

9        Q.    So if we turn to the next page.

10   It says, "The scoring system requires an

11   investment manager to have at least a

12   three-year tenure to receive a passing score

13   for that component, but IPS cautions that any

14   change to an investment manager could be

15   sufficient reason to assign a fund to monitor

16   or alert status."  Do you see that?

17       A.    I do.

18       Q.    So wouldn't a three-year tenure

19   encompass any change to an investment manager?

20       A.    To get a passing score you have to

21   have -- let me read it.

22             (Witness reviewing document.)

23       A.    I'm trying to understand what

24   you're asking me.

25       Q.    So you say, "The IPS cautions that

Page 253

1                    DONALD C. STONE

2       any change to an investment manager could be

3       sufficient reason to assign a fund to monitor

4       or alert status."  Right?

5              A.      Correct.

6              Q.      And the scoring system requires

7       that a manager have at least a three-year tenure;

8       is that right?

9              A.      Yes, it does.

10             Q.      If there is a change --

11             A.      That is not the same as any

12      change.  That could be -- again, the language

13      is not clear.  That could be something else.

14             Q.      What is it in your view?  How are

15      these inconsistent?

16             A.      You could have had a team of

17      people and one of them left, that wouldn't

18      change the fact that you still have a

19      three-year tenure.  But it could be if that was

20      a person -- that that person left might be a

21      reason that you'd want to consider monitor or

22      alert status.

23             Q.      Do you know whether or not the

24      committee was receiving information about

25      whether or not there was any change to the

Page 254

1              DONALD C. STONE

2    investment manager in the QIRs?

3          A.    They were receiving that.

4          Q.    So that is not inconsistent with

5    the IPS; correct?

6          A.    No.

7          Q.    I want to turn your attention to

8    some of qualitative criteria.  Turn to paragraph 131

9    of your report.

10         A.    Let me get there.

11         Q.    Here you're talking about a March,

12   2018 report, a special report regarding the

13   Fidelity Freedom Funds.

14         A.    Yes, the Reuters report.

15         Q.    This Reuters report dealt with

16   withdrawals from the Fidelity Freedom Funds

17   over the preceding four years; is that right?

18         A.    Correct.

19         Q.    Is it your -- did you review that

20   report in connection with preparing your

21   report?

22         A.    Yes.

23         Q.    Are you aware that -- am I correct

24   that that report was dealing with essentially

25   an overhaul of the Fidelity Freedom Funds that

Page 255

1                    DONALD C. STONE

2       happened if 2014 that resulted in some riskier

3       investments; is that correct?

4            A.    Well, it was -- they changed their

5       glide path and probably some of the underlying

6       funds in 2014, so between 2014 and 2018 there

7       was a substantial runoff of assets by people

8       who got concerned about what the risk might be.

9       There was an increase in equity depending on

10      vintage between 1 and 20 percent and there were

11      a few other, I think there are probably a few

12      other tweaks that I don't remember off the top

13      of me head.

14            In any event, Fidelity was

15      undergoing substantial run off of assets that I

16      think about 15 billion during that period of

17      time.  And other target dates series were

18      gaining assets.  So it was actually a rather

19      fraught period at Fidelity, they were losing

20      market share overall.

21            Q.    You say in here towards the

22      bottom of this paragraph, "The committee never

23      reviewed or discussed these concerns much less

24      deliberated their impact on the Freedom Funds

25      standing in the plan whether as a result of the

Page 256

1                    DONALD C. STONE
2       plan's investment advisor bringing this report
3       to the committee's attention or to the
4       committee independently identifying significant
5       negative reporting concerning the plan's most
6       important investments."  Do you see that?
7            A.    I do.
8            Q.    So did you review all of the
9       minutes to determine whether or not the
10      committee had ever discussed this report or
11      otherwise discussed the underlying overhaul of
12      the Fidelity Freedom Funds.
13           A.    I did not see anything specific to
14      the special report.
15           Q.    What about the overhaul of the
16      Fidelity Freedom Funds?
17           A.    I don't recall at the moment.  I
18      wouldn't be surprised if they did have some
19      conversation around that.
20           Q.    Why wouldn't you be surprised
21      about that?
22           A.    Well, I would expect -- I would
23      hope they would.  I just wouldn't be surprised.
24      It's a big event at the time.
25           Q.    Why is it that you believe that

Page 257

```
                                DONALD C. STONE
 1
 2     the special report should have been considered
 3     if in fact the actual -- if the committee was
 4     actually monitoring the overhaul itself and the
 5     impact on the plan?
 6          A.    Well, I would like -- again, I'm
 7     saying it ought to be in there, but I'm not
 8     looking at the particular minutes.  I don't
 9     recall which minutes might have them in there.
10     I would have to look at that.
11               MS. ENGELMAN:    Maria, can you pull
12          up Q1 2015 committee meeting minutes
13          please.
14               (Exhibit 4 for identification, Q1
15          2015 committee meeting minutes.)
16          A.    That was a Q4 '18?
17          Q.    It should be Q1, 2015.
18          A.    Q1, 2015, I got that.  Okay.
19          Q.    Do you see here where it says that
20     "The Fidelity Freedom Funds were on monitor
21     status in part due to the underlying -- the
22     performance history of the underlying fund but
23     also --
24          A.    Where are you in this?
25          Q.    Page 4.
```

Page 258

1                      DONALD C. STONE

2          A.      Page 4, okay.  Fidelity Freedom

3     Funds, okay.

4                   (Witness reviewing document.)

5          A.      So that's an addition to reason

6     for monitoring added for that quarter.

7          Q.      So do you agree that they were on

8     monitor status and the committee was monitoring

9     the enhanced guide path that changed in the

10    latter part of 2013 which increased overall

11    equity exposure between 10 percent and 20

12    percent across the various vintages?

13         A.      But they waited nearly two years

14    to do that.

15         Q.      Well, I'm showing one set of

16    minutes here.  I'm asking if you agree that

17    during this time period they were monitoring

18    that?

19         A.      They were monitoring the glide

20    path change at this point, yes.

21         Q.      Do you have any reason to believe

22    sitting here they weren't monitoring during

23    other time periods?

24         A.      I don't recall seeing it on watch

25    for other time periods and they said -- so it

Page 259

1                    DONALD C. STONE

2      was added at this point due to do the enhanced

3      glide path and maybe because it just want into

4      effect -- I don't know if it shows up in prior

5      minutes or not.

6            Q.    If you were a -- let me ask you

7      this.  Are you suggesting in this report that

8      the 2018 special report should have resulted in

9      any particular action with respect to the

10     Freedom Funds?

11           A.    Again, I would go back to what I

12     said before.  I would think that it would first

13     lead to an in-depth analysis as to what was

14     going on with them.  It would not simply be

15     business as usual.

16                 I think that would be to me the

17     kind of thing that would raise the issue that

18     to put them back on watch if they weren't on

19     watch and to do a deep analysis of, in this

20     case, going back to find out how much assets

21     they were losing, what the impact of that was,

22     what the -- why the concern about the putting

23     6 million participants at risk is kind of a hot

24     headline to say the least.

25                 I would think that they would

Page 260

                    DONALD C. STONE
1
2      want to go do a deeper analysis and that would
3      show up in let's say the next quarter's
4      reports.
5             Q.      But other than that, any
6      particular outcome that you were opining should
7      have resulted as a result of --
8             A.      It depends on what they found when
9      they did that as to whether they would replace
10     them or not.
11            Q.      Turn to paragraph 135 of your
12     report.
13            A.      Okay.
14            Q.      Actually, you know what, we are
15     going to go somewhere else first and then to
16     that.
17                    So Mr. Stone, you're familiar with
18     the target date deep dives that were presented
19     to the committee?
20            A.      Yes.
21            Q.      It's your opinion they were
22     presented annually from 2014 to 2024 other than
23     2017 that is in paragraph 137 of your report?
24            A.      Correct.
25            Q.      You say that the committee did not

Page 261

                        DONALD C. STONE

1    ask for those deep dives in your report.  Do

2    you see that?

3           A.      Where are you?

4           Q.      On paragraph 137 toward the end

5    of the paragraph you say "Committee members did

6    not recall requesting additional information or

7    taking any action as a result of the target

8    date deep dives."

9           A.      Yeah, that was the Riddle

10   deposition.

11          Q.      Then the last sentence says,

12   "These documents were not prepared at the

13   request of the committee or tailored to the

14   Quanta plan, but instead were distributed to

15   each of Ascende's clients." Do you see that?

16          A.      Yes.

17          Q.      You were relying on Mr. Eagar's

18   testimony that the committee did not request

19   these deep dives?

20          A.      Correct.

21          Q.      Why does it matter whether or not

22   the committee requested the deep dives or not

23   if they saw them and considered them?

24          A.      Well, I think it has had do with

Page 262

DONALD C. STONE

1

2    their being kind of what they're asking for

3    that they are in charge, they are the ones

4    making the decision as opposed to something

5    just being fed to them which was a document

6    that was sent to every client.  I think there

7    is a difference.

8                    There is obviously a difference if

9    the committee says, you know, we would really

10   like to see a deeper dive of the Fidelity

11   Freedom Funds relative to a broad array of

12   other target date funds.  That's a very

13   different fact pattern than if Ascende just

14   simply says, we've created this, we thought

15   we'd go over this and we thought you'd find

16   this interesting.

17            Q.    If the committee is receiving the

18   information and considering the information in

19   its analysis, why does it matter who requested

20   it in the first place?

21            A.    Because it's a motivational issue.

22   They didn't seem to have any interest in

23   finding out how others were doing.  That was

24   the point.

25            Q.    You testified earlier that you

Page 263

1                     DONALD C. STONE

2       provided similar reports to your clients; is

3       that correct?

4              A.     We did.

5              Q.     Did every committee which you

6       worked with ask for that information or did you

7       just provide it?

8              A.     One of them -- there is a myriad

9       number of things that we provide as part of our

10      service.

11             Q.     You testified that you didn't

12      tailor those specific documents to the specific

13      plans; is that correct?

14             A.     No, like I had said, this was just

15      an add-on that we provided.  But the point

16      would be that if a client asked for specific

17      information, that's different than if we just simply

18      send them information or in this case if QPA

19      sends them information.

20             Q.     Did you draw a conclusion that the

21      committees with which you were working were

22      operating imprudently if they hadn't asked for

23      this type of information?

24             A.     That isn't what I said.  It's a

25      different circumstance in terms of, if you ask

Page 264

1                      DONALD C. STONE

2       for something you're showing more, obviously,

3       more interest in being proactive about things.

4       And all I'm saying in this particular case is

5       the committee did not proactively ask for this

6       information.  Not everybody that I worked with

7       asked for it either.  Some did, some didn't.

8       But I'm just saying that is a different fact

9       pattern.

10                      MS. ENGELMAN:  Can you pull up

11              minutes, Maria, please.

12                      (Exhibit 5 for identification, Q1

13              2016 Meeting Minutes.)

14              A.      Which meeting minutes is that?

15              Q.      It should be the latest document

16       in Exhibit Share, Q1 2016.

17              A.      Which document?

18              Q.      Q1.

19              A.      Q1, 2016, I got it.

20              Q.      If you turn to the bottom of the

21       page.

22              A.      Which page?

23              Q.      Target date fund and it says, "As

24       the meeting concluded, AWAI" which is Ascende

25       at that point in time "and the committee

Page 265

1                     DONALD C. STONE
2      discussed an overview of the Fidelity Freedom
3      Funds.  The committee expressed interest in
4      conducting a due diligence project to review
5      the Freedom Funds versus some industry
6      competitors."
7                     Does that refresh your
8      recollection that the committee actually
9      requested these types of analysis?
10             A.    It sounds like they did request
11     some additional information.
12                   MS. ENGELMAN:   Maria, can you pull
13             up 2016 deep dives.
14                   (Exhibit 6 for identification, 2016
15             Deep Dives.)
16             Q.    Mr. Stone, I point your attention
17     paragraph 39 of your report.
18             A.    39, okay.
19             Q.    Here you talk about what
20     responsible plan fiduciaries should do when
21     assessing target date funds.  Do you see that?
22             A.    Yes.
23             Q.    And in the middle of the paragraph
24     you say, "The fiduciaries gather and evaluate
25     essential information about the available

Page 266

1                    DONALD C. STONE
2       options such as historical returns and risk
3       adjusted returns, fees, expenses, and
4       differences in their glide path, asset classes
5       and underlying investments."  Do you see that?
6            A.    Yes.
7            Q.    So if you pull up the target date
8       funds that should be in Exhibit Share which are
9       the 2016 deep dives.
10           A.    Yes.
11           Q.    And I represent to you that was
12      presented at the Q4 2016 meeting.  If you turn
13      to page 5 of that document.  Do you agree that
14      that shows the various asset classes?
15           A.    This is the glide path.
16           Q.    The glide path, okay.
17           A.    Not the various asset classes.
18           Q.    Okay, sorry I'm looking at the
19      wrong thing.
20                 Do you see it shows the various
21      glide paths of various target date funds?
22           A.    Maybe I'm looking at the wrong
23      one.  I'm looking at Freedom Funds glide path
24      on page 5.
25           Q.    Okay, hold on one second.

Page 267

1                    DONALD C. STONE

2          A.     You're looking at the glide path

3     comparison all?

4          Q.     I'm looking at equity fund split

5     of target date funds on page 5 of the Freedom

6     Funds.  Do you see that?

7          A.     Yes.  "The Freedom Funds, The

8     International Equity Exposure, US Equity

9     Exposure, Bond Exposure."

10         Q.     If we go to page 6, it looks at

11    the glide path of the Fidelity Freedom Funds as

12    compared to all the comparators in this report?

13         A.     Yes.

14         Q.     And then the next page looks at

15    glide path to only and the page after that

16    looks at glide path comparison through only.

17         A.     Correct.

18         Q.     The next page looks at the

19    composition percentage breakdown of the various

20    vintages of the Fidelity Freedom Funds.

21         A.     Yes, it's a high level asset

22    allocation, yes.

23         Q.     Then if we look at the next page,

24    it looks at the Freedom Funds returns on three

25    years.

Page 268

1                      DONALD C. STONE

2          A.     Correct.

3          Q.     Then if we look at next page it

4    looks at one-year returns compared to the

5    various comparators.

6          A.     Correct.

7          Q.     Then if we look at the next page

8    it looks at three-year returns compared to the

9    various comparators.

10         A.     Yes, it does.

11         Q.     Then the next page looks at the

12   five-year returns compared to the various

13   comparators.

14         A.     Yes, it does.

15         Q.     Then the next page looks at the

16   growth of the Fidelity Freedom Funds, certain

17   vintages.

18         A.     Yes.

19         Q.     The next couple of pages looks

20   like that and then we get to page 16 and does

21   this look at the risk adjusted returns?

22         A.     Let me get to that.

23         Q.     On a three year and five-year

24   basis compared to the comparators?

25         A.     Yes.

Page 269

1                     DONALD C. STONE

2          Q.      So does page 17 and so does page

3     18.

4          A.      Okay.

5          Q.      And page 19 looks at the

6     allocation of the underlying funds for the

7     various vintages.

8          A.      Yes.

9          Q.      And page 20 looks at the

10    three-year comparison compared to best

11    benchmark.

12         A.      Yes.

13         Q.      And the next page looks at

14    five-year comparison compared to best

15    benchmark.

16         A.      Correct.

17         Q.      And the next page looks to be --

18    the next couple of pages looks at expense

19    ratios.

20         A.      Yes, it looks at returns.

21         Q.      You're correct.

22                 It has a summary of returns

23    compared to benchmark and annualized and net

24    expense ratios.  So it's a summary of the

25    various vintages?

Page 270

                    DONALD C. STONE

1

2          A.     These is all the various sub funds

3     within the vintage, yes.

4          Q.     Would you agree with me that this

5     deep dive is consistent with type of information

6     that you would expect the committee to have in

7     conjunction with paragraph 39 of your report?

8          A.     I think it is good information for

9     them to have, absolutely.

10         Q.     So if we look at --

11                MS. ENGELMAN:   Maria, can you pull

12             up fourth quarter 2016.  I'm not sure, I

13             think it is Exhibit 5, Mr. Stone.

14         A.     You want me to go to Exhibit 5.

15         Q.     Hold on a second.  Let me make

16    sure this is right.   Fourth quarter -- it

17    should be the May 10, 2017 meeting minutes

18    Maria..

19                (Exhibit 7 for identification, May 10,

20             2017 meeting minutes.)

21         Q.     While you wait for that to come

22    up.  So in paragraph 138 you opine in the first

23    sentence, "It's unclear if and how the

24    committee actually considered the data

25    presented in the TDF deep dives."  Do you see

Page 271

1                    DONALD C. STONE

2       that?

3              A.     Yes.

4              Q.     If you look at these meeting

5       minutes and you go to the end of them -- do you

6       have them in front of you?

7              A.     No they haven't come up.

8              Q.     May 1st, 2017.

9              A.     Okay, now let me open it, okay.

10             Q.     At the bottom of the page, the

11      bottom of the document.

12             A.     Okay.

13             Q.     It says, "The committee reviewed a

14      target date fund comparison which analyzed the

15      current Fidelity Freedom Funds versus leading

16      industry competitors.  Discussion covered the

17      glide path construction and philosophy,

18      terminal allocation point of the glide path

19      fees and diversification.  The committee

20      considered like styled active managers, index

21      managers as well as blended managers using

22      active and passive underlying investments in

23      their target date strategies.  Upon their

24      review the committee remained pleased with the

25      Fidelity Freedom Funds.  It did not note

Page 272

1                    DONALD C. STONE

2       sufficient reasoning to change target date

3       providers at the time."  Do you see that?

4              A.      I do.

5              Q.      So do you agree with me that in

6       these meeting minutes it is clear that the

7       committee considered the data present in this

8       target date deep dive?

9              A.      They considered the information

10      in the target date deep dive, but it is kind of

11      a -- it actually doesn't get to the issue of

12      whether these particular funds are appropriate

13      for their participants.  And this is the kind

14      of thing that we talked about earlier about the

15      minutes, you read this and I have no idea

16      whether they know or have any idea whether

17      these target date series does or does not work

18      for the participants.

19                     It is just a laundry of list of

20      fees, glide path, diversification, which is all

21      stuff that you have to look at but that doesn't

22      answer that question at all.  It doesn't seem

23      to go what a participant -- are participants

24      generating the kind of wealth they need which

25      would be what I would hope to see in addition

Page 273

DONALD C. STONE

1

2    to the information that is here.  It is just

3    not there.

4         Q.    So what you would expect to

5    see is information about how the Fidelity

6    Freedom Funds are generating wealth for the

7    plan participants?

8         A.    How it is working for the

9    participants.  In other words, this could have

10   been for any of the 5,000 different plans out

11   there.  This is what I'm saying, it could be

12   rather anodyne.  This doesn't tell me, is this

13   the appropriate choice for their plan and if

14   so, why do they think it is the right choice

15   for their plan.

16              They are just saying it's --

17   that they looked at the fees, they looked at

18   diversification, they looked at the allocation,

19   the construction, all of which is good stuff.

20   All of which they should definitely be doing.

21   But nowhere does it tell me that they have tied

22   that to their own plan and how that works.

23        Q.    So it doesn't tell you in the

24   minutes they tied it to their own plans, but

25   the minutes reflect that they reached a

Page 274

1                    DONALD C. STONE

2       conclusion after looking at all of the

3       available information that it was sufficient

4       for their plan; is that correct?

5              A.     Well, no, that is not quite what I

6       said.  It tells me they probably didn't consider

7       whether it works for their participants.  That

8       is what I take away from that.

9                    It tells me they looked at all of

10      this information, they looked at a lot of data

11      and a lot of analytics, which is good, but the

12      point of looking at all of that information is

13      to tie it back and realize is this working for

14      our plan.  It this working for our participants.

15      That's not here and that's, I don't think that

16      is ever in any of these things that I've seen.

17                   That is -- people are -- they're

18      ticking all the boxes as opposed to kind of

19      actually -- they are kind of missing what the

20      punch line is here which is, is the plan

21      working well for our participants and that

22      answer is not here.

23              Q.     And that answer can change

24      depending on the plan and the plan's objectives;

25      is that right?

Page 275

1                    DONALD C. STONE

2          A.     It could, it could depend on the

3    plan's objectives, it could depend on the

4    plan's demographics.  But like said, in this

5    case they are looking at all the stuff that

6    everybody gets excited about, which is all the

7    nice color charts and graphs and everything,

8    but what do you do with that information.  All

9    of that stuff is for a purpose and that purpose

10   is to help you determine is this appropriate

11   for our plan.  Is this working for our

12   participants.  Are they getting to where they

13   want.

14               If the objective of the plan,

15   which one of the objectives is to have people

16   be able to save the appropriate amount of money

17   for retirement.  This doesn't answer that

18   question.  This just tells me they looked at a

19   bunch analytics.

20          Q.     Okay.  Going back to the meeting

21   minutes.  Did you review any of the materials

22   that were appended to or attached to the

23   meeting minutes?

24          A.     I did.  I don't recall exactly

25   what I looked at at the moment, but yes, I did.

Page 276

1                DONALD C. STONE

2          Q.      Do you consider the materials

3     presented at the meeting such as the quarterly

4     investment reports to be part of the meeting

5     minutes record?

6          A.      Yes.

7          Q.      Let's go paragraph 135 of your

8     report.

9          A.      Okay, 135.

10         Q.      So you say here that "The

11    committee failed to recognize and appropriately

12    scrutinize the persistent failure of the Freedom

13    Funds to outperform its benchmark."  Do you see

14    that?

15         A.      I do.

16         Q.      It says, "Appendix A to the 2015

17    IPS identifies S&P target date indexes as the

18    appropriate benchmark for evaluating TDF

19    performance."  Do you see that?

20         A.      I do.

21         Q.      Then it goes on about, "There is

22    quarters bracketing the start of the class

23    period from Q4 2015 through Q1 2017, the

24    majority of the Freedom Funds vintages failed

25    to generate returns that exceeded the

Page 277

1                    DONALD C. STONE

2          corresponding S&P target date index on a

3          five-year basis while all but Q1 2017 the

4          Freedom Funds similarly failed that standard on

5          a three-year basis."  Do you see that?

6                A.    I do.

7                Q.    So then you go to the next page,

8          there is a table one in your report.

9                A.    There is, yes.

10                Q.    Did you prepare that table?

11                A.    No, I asked counsel to prepare

12          that report.

13                Q.    Did you check to make sure it was

14          accurate in terms of the underperform versus

15          outperform on three year and five-year

16          performance relative to benchmark?

17                A.    I went and spot checked it.  I

18          didn't check every single vintage against every

19          single period.

20                Q.    How did you spot check it?  What

21          materials did you consult?

22                A.    Go back to Morning Star and I also

23          get -- there was a couple of others too, I

24          think.

25                Q.    We already talked about the fact

Page 278

DONALD C. STONE

1

2      that the IPS asks for -- looks at performance

3      on a comparison to benchmark but also

4      comparison to peer group; is that correct?

5              A.      Correct.

6              Q.      You didn't include comparison to

7      peer group here, why is that?

8              A.      Because it is -- I think this

9      demonstrates one element of underperformance.

10     There is probably an infinite number of things

11     that you could do on those things.  So this is

12     one example.  It is not a matter of

13     intentionally -- well, it was intentionally

14     leaving it out, but it was not because it

15     somehow or another told a different story.

16             Q.      What was end of that, I didn't

17     catch it?

18             A.      I said it was not left out because

19     it told a different story.  I think this tells the story

20     as I wanted to tell it.  It underperformed its

21     benchmark, period.  I thought that was enough

22     for purposes of what I was trying to say here.

23             Q.      So what is it that you're trying

24     to say here?

25             A.      That they consistently

Page 279

1                    DONALD C. STONE

2       underperformed their benchmark over a three

3       year and five-year period through the timeframe

4       that we are looking at here which is Q4 of 2015

5       into where they actually started to outperform

6       which is Q1 2017.

7              Q.    So did you look at performance

8       compared to benchmark after Q1 2017 of the

9       Fidelity Freedom Funds?

10             A.    I had look at some of it, yes, and

11      the performance was better.

12             Q.    Do you know over what time period

13      the performance was better?

14             A.    I can't say off the top of my head

15      right now, no.

16             Q.    Is it not -- is it common for

17      investment funds to have fluctuating performance

18      during different time periods?

19             A.    It is and we talked about that,

20      but we also talked about that that doesn't mean

21      that you don't take a very deep look at

22      underperformance and determine whether or not

23      it is still an appropriate choice for you.

24                   Because we don't know -- we are

25      ex post here, we know that the funds performed

Page 280

1                    DONALD C. STONE

2     better, but that's great.  After the fact is

3     great.  At the time that they were looking at

4     this we have underperform, underperform,

5     underperform pretty much across the board for

6     an extended period which goes back to the

7     conversation I know we had several times which

8     is why weren't they taking a much deeper look

9     at this at that particular time not knowing

10    what the future would hold.  Okay, nobody knows

11    that.

12            Q.      In this table here you don't state

13    the level of underperformance compared to

14    benchmark, do you?

15            A.      Not in this table, no.

16            Q.      But you agree with me that that is

17    an important factor that the committee needs to

18    consider when evaluating whether something is

19    actually underperforming or not?

20            A.      It was underperforming.  The

21    question is the percentage underperforming is

22    certainly something that you could take a look

23    at and I would expect they would take a look at

24    that.

25            Q.      And they would also take a look at

```
                                        Page 281
 1                  DONALD C. STONE
 2     whether or not the performance was improving
 3     during tis time period?
 4          A.    You would take a look at all of
 5     this, yes.
 6               MS. ENGELMAN:   Can we take a ten
 7          minute break and hopefully come back and
 8          wrap up.
 9               MR. ROBERTS:   Okay.
10               THE VIDEOGRAPHER:   The time is
11          10:40 and we are off the record.
12               (Recess taken.)
13               THE VIDEOGRAPHER:   The time is
14          10:50 and we are on the record.
15     BY MS. ENGELMAN:
16          Q.    Mr. Stone, do you recall or do you
17     know GlassBridge Enterprises was a client of
18     Pavilion?
19          A.    I'm sorry, who was?
20          Q.    GlassBridge Enterprises?
21          A.    Glass, G-l-a-s-s?
22          Q.    Yes.
23          A.    I've never heard of them.
24               MS. ENGELMAN:   Maria, can we pull
25          up the 5500 for GlassBridge, the 2017.
```

Page 282

1                    DONALD C. STONE

2                    (Exhibit 8 for identification,

3              GlassBridge 2017 Form 5500.)

4           A.     I'm opening it now.

5           Q.     Can you go to Schedule C which is

6      on page 6 of the document?

7           A.     Okay.

8           Q.     First, actually let me start at

9      the top of the document.  This is a 5500 for

10     the GlassBridge Retirement Investment Plan, do

11     you see that?

12          A.     Yes, I do.

13          Q.     It is the period January, 2017 to

14     December 31st, 2017, do you see that?

15          A.     I do.

16          Q.     If we go to page 6 of the

17     document.

18          A.     Yes.

19          Q.     It says Pavilion Advisory Group

20     and under there it says relationship,

21     investment advisory.

22          A.     Yes, so on the following page

23     after that what you see is Jeffrey Slocum &

24     Associates which was a firm that we bought

25     based out of Minneapolis.  So that is why I

Page 283

1                         DONALD C. STONE
2       didn't recognize that name because that was a
3       Slocum client and 2017 sounds like the time
4       that we actually close that deal and taken them
5       over as a client.
6               Q.    So when you took them over as a
7       client, did some of their investment advisors
8       come over to Pavilion as well?
9               A.    Yes, most of them did.
10              Q.    Did you interact with those folks?
11              A.    I did interact with them.  Mostly --
12      occasionally I saw a few of them, but I never
13      went to the Minneapolis office, so I didn't
14      meet all the people that worked there.
15              Q.    Were you an executive director of
16      Pavilion at this time?
17              A.    I was.
18              Q.    So you feel that the investment
19      advisors who were serving in the 321 capacity
20      were fulfilling their fiduciary obligation?
21      Any reason not to believe that?
22              A.    I'm sorry, repeat that I
23      couldn't --
24              Q.    Do you believe that the 321
25      investment advisors that were employed by

Page 284

                          DONALD C. STONE
1
2        Pavilion at this time were fulfilling their
3        fiduciary obligation?
4              A.     The ones that I knew were
5        certainly.  I can't speak to people that I
6        didn't know and I think I kind of carved that
7        out earlier.  But to the extent that I knew
8        people, I was absolutely certain they were
9        doing the correct thing.
10                    I didn't have a -- I mean some
11       of these -- I don't know who -- I don't know
12       who was responsible for this relationship.  So
13       while I would like to think they certainly were
14       doing exactly what they should be doing, I
15       don't know what they were doing because I
16       wasn't -- I don't even know it we integrated
17       them into our reporting system at this
18       particular time, because you have part of the
19       fee went to Jeffrey Slocum & Associates, so
20       that would have been probably just earlier in
21       the year and then the rest of it would have
22       been Pavilion later in the year.  So I would
23       guess that we may not have even switched over
24       the reporting system at that point.
25             Q.     So would it have been your

Page 285

1                    DONALD C. STONE

2      expectation that when Pavilion essentially, I

3      guess, acquired this business, that it ensured

4      that the individuals who were working on the

5      clients that were now Pavilion were fulfilling

6      their fiduciary obligations?

7            A.    Yes, I would expect that they

8      would do that.  How that was validated, I'm not

9      sure.

10           Q.    If we turn Schedule H of this

11     document which I will tell you the PDF number

12     in a second.

13           A.    I'm there.

14           Q.    You see here as of December 31,

15     2017 this plan offers the Fidelity Freedom

16     Funds K Class?

17           A.    I'm on Schedule H.  Isn't H the

18     one that you want to be in?

19           Q.    Page 41 of the document, Schedule

20     H line 4-I.

21           A.    4-I, okay.  I'm missing it

22     somewhere.  I'm not sure where you're looking.

23           Q.    On page 41 of 43.

24           A.    41 of 43.  Okay way down there.

25     Hold on.  Almost there.  Okay, I'm on page 41

Page 286

1                    DONALD C. STONE
2       of 43.
3              Q.    Do you see where it says the
4       Fidelity Freedom Funds and the various vintages
5       K Class was offered in this plan?
6              A.    I do.
7              Q.    As of December 31st, 2017?
8              A.    Yes.
9              Q.    Do you see that?
10             A.    Yes.
11             Q.    Do you agree with me that the
12      Pavilion advisors would have had the same
13      performance information that you identified in
14      table 1 paragraph 135 of your report?
15             A.    I would assume so, yes.
16             Q.    You agree with me that this plan
17      committee did not elect to remove the Fidelity
18      Freedom Funds as of that time period?
19             A.    As of that time, that is correct.
20             Q.    You have no reason to believe that
21      Pavilion as a 321 advisor was acting imprudently or
22      not fulfilling its fiduciary obligations?
23             A.    I would not think that the firm
24      was acting imprudently.  I don't know who the
25      advisor was.  As I said, this was as we were

Page 287

DONALD C. STONE

1
2      transitioning people over.  I can't speak to
3      what they did or do not do.  But I would assume
4      because the firm had a sterling reputation and
5      everything, that they were doing what they
6      should be doing.  And I also don't know
7      demographics of this plan, so I don't know how
8      that would have fit in this particular case
9      because I didn't recognize the firm's name at
10     all.
11           Q.    So would you agree with me
12     based on the information in table 1 of your
13     report, that that information does not
14     necessitate a removal of the Fidelity Freedom
15     Funds from a plan?
16           A.    I said what it necessitated was
17     taking additional action to understand the
18     reasons for the underperformance.  That might
19     or not have led to the removal of the funds
20     depending on what was discovered.
21           Q.    You agree with me that at least
22     this plan did not discover anything that
23     warranted removal as of December 31st, 2017?
24                 MR. ROBERTS:  Objection.
25           A.    I can't speak to what they knew

Page 288

```
 1                      DONALD C. STONE
 2       or didn't know, because I don't know these
 3       people.  So I'm not going to put myself in
 4       their place.  They chose to keep the funds as
 5       of this point, that's the only information that
 6       I know of at this stage.
 7                      MS. ENGELMAN:   Maria, can we look
 8             at 2019 GlassBridge.
 9                      (Exhibit 9 for identification,
10             GlassBridge 2019 Form 5500.)
11             A.    Okay, I'm bringing it up.
12             Q.    So this is for the year -- let me
13       know when you have it.
14             A.    Okay, I'm on the first page.
15             Q.    This is for year January, 2019 to
16       December 31st, 2019.  Do you see that?
17             A.    Yes.
18             Q.    If you go to page 3 of the PDF it
19       shows that Pavilion Advisory Group is the
20       investment advisor?
21             A.    On page 3?
22             Q.    Sorry, it's page 6.  Page 6 of the
23       PDF.  Schedule C.
24             A.    Yes, Pavilion Advisory Group, yes.
25             Q.    If we go back down to Schedule H
```

Page 289

                            DONALD C. STONE
1
2      which is page 37 of 38 all the way toward the
3      end.
4              A.      37 of 38.  Okay, I'm on this.
5              Q.      You see as of this time period
6      this plan is still offering the Fidelity Freedom
7      Funds Class K.  Do you see that?
8              A.      Yes, I do.
9              Q.      Those are the same funds that are
10     offered in this plan; is that right?
11             A.      That's correct.
12             Q.      Through May of 2019 you were an
13     executive director at Pavilion; is that right?
14             A.      Yes, actually it had switched over
15     to Mercer.
16             Q.      What time period?
17             A.      Well Mercer acquired Pavilion on
18     November 30th, 2018.
19             Q.      Got it.  But you were still there
20     in an executive director role until May of 2019
21     I thought you said?
22             A.      No, I had no client relationship,
23     I had no responsibilities and I was living in
24     Spain, but I was still on the payroll, yes.
25             Q.      During this time period, this 2019

Page 290

```
1                    DONALD C. STONE
2      time period where this plan is still offering
3      the Fidelity Freedom Funds, that is after the
4      March, 2018 special report that you highlighted
5      in your expert report; is that correct?
6              A.    That's correct.
7              Q.    Mr. Stone I would like to --
8                    MS. ENGELMAN:   Maria, can we look
9              at the 2016 Holland & Knight.
10                   (Exhibit 10 for identification,
11             Holland & Knight 2016 Form 5500.)
12             Q.    Mr. Stone, were you an investment
13      advisor for Holland & Knight?
14             A.    I was not.
15             Q.    Do you know if Pavilion was?
16             A.    That sounds familiar.
17             Q.    Do you know who the investment
18      consultant, the 321 investment consultant was
19      for Holland & Knight?
20             A.    I do not.
21             Q.    Do you have any reason to believe
22      sitting here today that the investment consultant
23      from Pavilion working on the Holland & Knight plan
24      did not fulfill the fiduciary obligation of a
25      321 advisor?
```

Page 291

1                    DONALD C. STONE
2                    MR. ROBERTS:    Objection.
3           A.      I don't have any reason to think
4      that, no.
5           Q.      Do you have any reason to think
6      that the Holland & Knight committee was acting
7      imprudently in any way?
8           A.      I don't know anything about that,
9      so I can't speak to them.
10          Q.      Do you have the 2016 Holland &
11     Knight 5500 in your Exhibit Share?
12          A.      Let me see if it is loaded.  Yes,
13     it is there.  Let me open it.
14          Q.      So this is for the period
15     January 1st, 2016 to December 31st, 2016.  Do
16     you see that?
17          A.      Yes.
18          Q.      If we look at page 36 of the PDF.
19          A.      36 of the PDF, okay.
20          Q.      Schedule C.
21          A.      Yes, okay.  I'm on page 36 of
22     Schedule C.
23          Q.      Do you see there that the Pavilion
24     Advisory Group is the Holland & Knight plan's
25     investment advisor?

Page 292

```
1                    DONALD C. STONE
2           A.    I don't.  On 36 that is not --
3     hold on.  Yes, okay, the previous page, I see
4     it.
5           Q.    Then if we go to page 88 of 89.
6           A.    I'm there.
7           Q.    Do you see that this plan offered
8     the Fidelity Freedom Funds K target date funds
9     with is the same funds that were offered in
10    this plan?
11          A.    I do.
12                MS. ENGELMAN:   Can we go to 2017,
13          Maria.
14                (Exhibit 11 for identification,
15          Holland & Knight 2017 Form 5500.)
16          A.    I'm loading it.  Okay, I think it
17    is open.
18          Q.    So this is the 5500 for the
19    Holland & Knight Profit Sharing Plan and Trust.
20    This is for the January 1st, 2017 to
21    December 31st, 2017 time period.  Do you see
22    that?
23          A.    I do.
24          Q.    Then if we go to, again, to page
25    36 of my PDF where it shows that Pavilion
```

Page 293

DONALD C. STONE

1      Advisory Group is the investment advisor.

3          A.      Give me a moment.  Okay, yes, one

4      of several consultants apparently.

5          Q.      Then if we go to Schedule H --

6          A.      If I could just stop you there for

7      a moment.  I have an a question.

8          Q.      Sure.

9          A.      So I mean there is four different

10     consultants listed here, no five.  Five -- six

11     different consultants listed here and so I'm

12     not sure what Pavilion's role was here as the

13     investment advisor.  They were getting only

14     $15,000, so that is not a typical advisory fee.

15     So I'm not sure if they just take -- they had

16     the relationship before.  I'm not sure what the

17     role was for Pavilion at that particular time.

18              I wanted to make a note of that

19     because somebody else -- there a couple of

20     somebody else's that were making considerably

21     more money as consultants on this plan at this

22     particular time.  And there is enough advisors,

23     strategic advisors on this plan at the same

24     time.

25         Q.      If we go to Schedule H.

Page 294

                        DONALD C. STONE

1

2          A.      Okay, I'm on Schedule H.

3          Q.      It is my page 81 of 83.

4          A.      81 of 83.  Okay.

5          Q.      Do you see here that the Fidelity

6     Freedom Fund K Funds were offered in this plan?

7          A.      I do.

8          Q.      And that Pavilion would have had

9     access to the same performance information in

10    table one of your report?

11         A.      Yes, but I'm not sure who was the --

12    who was actually driving the ship in this

13    particular case because there are like five

14    consultants and at least two investment

15    advisors as they're broken out on Schedule C.

16              I don't know that -- I don't know

17    what they were providing.  But for $15,000 they

18    were not providing quarterly reporting.  So I

19    think it was one of the other -- I'm not saying

20    these guys didn't have the K Funds and all of

21    that, I get it.  I don't think Pavilion has

22    probably much of anything to say on whatever

23    was going on with that plan in this particular

24    year because it looks like other people were

25    providing advice to the plan.

Page 295

1                    DONALD C. STONE

2           Q.      Do you know one way or the other

3    sitting here today what role Pavilion played?

4           A.      No, but for $15,000, they weren't

5    the investment advisor.  I could tell you that.

6           Q.      Mr. Stone, you testified earlier

7    that you were the 338 investment advisor to

8    Packaging Corporation of America; is that

9    correct?

10          A.      That's correct.

11          Q.      What was the timeline that you

12   were the 338 advisor?

13          A.      We are talking about the 401-K or

14   the define benefit?

15          Q.      The 401-K.

16          A.      401-K would have begun sometime

17   during 2018 and I'm going to -- I'm not sure of

18   the exact timeframe.  It was probably during

19   the second quarter that they began to convert

20   over and I actually handed that relationship

21   off to one of my colleagues at the point that

22   they finalized the decision and signed the

23   agreement to have us being a 338.

24          Q.      Prior to that were you personally

25   the 321 advisor?

Page 296

```
 1                    DONALD C. STONE
 2          A.      321, yes.
 3          Q.      So during what time period were
 4     you the 321 advisor?
 5          A.      So I had worked with Packaging
 6     Corporation of America beginning in 2005, if I
 7     remember correctly, but I don't think we took
 8     over the main plan until 2007.  I did a couple
 9     of projects for them back in like 2005, 2006.
10     And I think that -- and worked with a subsidiary
11     and took over the main 401-K plan as advisor I
12     think in 2007.
13          Q.      Do you recall what target date
14     funds the Packaging Corporation of America
15     offered?
16          A.      I do not.
17          Q.      Would it refresh your recollection
18     if they offered the State Street Fund?
19          A.      That sounds like that could be
20     correct, yes.  That sounds correct.
21          Q.      Do you recall if they were the
22     plan QDIA?
23          A.      I believe they were.
24          Q.      Does that mean that you would have
25     provided heightened scrutiny, as you used that
```

Page 297

                    DONALD C. STONE
 1
 2      term, with respect to the State Street Fund?
 3              A.     Yes.
 4              Q.     Would you have recommended their
 5      removal -- in a 321 capacity would you have
 6      recommended the committee remove those funds if
 7      you deemed them to be imprudent?
 8              A.     Of course.
 9              Q.     As a 338 advisor it would have
10      been your fiduciary obligation to remove those
11      funds if they were imprudent in your view?
12              A.     Correct.
13              Q.     Do you have a recollection of when
14      the plan offered the State Street target date
15      funds?
16              A.     I believe they offered them for a
17      number of years, but I can't speak to when they
18      went into the plan and I'm not sure what
19      happened after Pavilion became the 338 and I
20      handed the relationship off to one of my
21      colleagues as part of my kind of exit strategy.
22                     So I don't recall if any --
23      because that was actually at the time, as you
24      said, it was after we had signed the agreement
25      and we were in the process of evaluating

Page 298

1                    DONALD C. STONE
2       whether any fund changes were going to be made
3       by us as a 338.  But I was not involved
4       ultimately in whatever changes did or did not
5       take place.
6            Q.    Sorry, just remind me, when was
7       the time period when you handed off the
8       relationship?
9            A.    I believe it was the second
10      quarter of 2018.  I'm not a hundred percent
11      sure, but that is pretty close.
12           Q.    Do you recall what the benchmark
13      was for the State Street funds?
14           A.    I do not off the top of my head,
15      no.
16           Q.    Would it refresh your recollection
17      that the State Street Fund offered or have the
18      chosen benchmark as the S&P 500?
19           A.    It would be the S&P target date
20      index fund, right?
21           Q.    Correct.
22           A.    Not the S&P 500.
23           Q.    The target date Intex fund;
24      correct.
25           A.    That is a typical index that's

                                              Page 299

 1                       DONALD C. STONE

 2      used pretty much across the board.

 3                       MS. ENGELMAN:  Maria, can we pull up

 4               the next document.

 5                       (Exhibit 12 for identification,

 6               Document titled State Street Fund versus

 7               S&P.)

 8               Q.     Let me know when you have it,

 9      Mr. Stone.

10               A.     What is the document?

11               Q.     This document is one that we put

12      together and I will explain it to you.

13               A.     The last thing I'm showing is

14      still the Holland & Knight.  Okay State Street

15      Fund versus S&P PDF.

16               Q.     We went and looked at the

17      performance of the State Street Fund as

18      compared to the benchmark over the time period

19      that you served in both a 321 capacity and also

20      a 338 capacity.  Although I know post 2018,

21      second quarter 2018 that is not necessarily the

22      case.

23                       I understand that you don't have

24      the underlying metric, but assuming this

25      analysis is correct, will you agree with me

Page 300

```
 1                    DONALD C. STONE
 2      that starting in Q3 2016 the State Street funds
 3      are underperforming the index on a three year
 4      and five-year basis?
 5              A.      Q3 in 2016, right?
 6              Q.      Correct.
 7              A.      Okay, so there were a couple of
 8      vintages that appear not to have been, but
 9      there are several that -- most of them were
10      underperforming at that particular time, yes.
11              Q.      The same is true for Q4 2016?
12              A.      That would be correct.
13              Q.      The same is true for Q1 2017?
14              A.      I have to go to the next page.
15      Three year basis, yes.
16              Q.      And on a five-year basis as well?
17              A.      Yes.
18              Q.      For Q2 2017 would you agree they
19      are underperforming the benchmark on a three
20      year and five-year basis?
21              A.      I would.
22              Q.      And for Q3 2017, would you agree
23      the State Street funds are underperforming the
24      benchmark on a three year and five-year basis?
25              A.      I would.  These are index funds,
```

Page 301

1                    DONALD C. STONE
2        so you would expect them to be underperforming
3        by definition.
4                Q.     For Q4 2017?
5                A.     Again, most of them are
6        underperforming at that particular point.
7                Q.     Q1 2018?
8                A.     Okay, most of them are
9        underperforming at that point.  And again, my
10       point still stands which is they are index
11       funds so you would expect them to be
12       underperforming this benchmark.
13               Q.     For Q2 2018 the same?
14               A.     Same thing.
15               Q.     And Q3 2018 same thing?
16               A.     Yes.
17               Q.     And during this time period, so
18       that is, I'm going to count, nine quarters of
19       underperformance on the three year and
20       five-year basis as compared to index.  Do you
21       agree with me?
22               A.     As compared to the S&P target date
23       index, that's correct.  These are passively
24       managed funds.  Again, it is not exactly a
25       surprise that they're underperforming a little

Page 302

1              DONALD C. STONE

2    bit.

3         Q.    But you agree with me these funds

4    were not removed from the plan?

5         A.    They are going to be evaluated

6    differently as a passive fund.  They are going

7    to be evaluated differently.  No, they weren't

8    removed from the fund.  But I'm saying the

9    evaluation would also be different as well.

10        Q.    Tell me about that.  Why would the

11   evaluation be different for a passive fund?

12        A.    They are passive, they are not

13   actively managed.  All they are doing is

14   tracking a benchmark and the only difference

15   here is the benchmark.  The S&P target date

16   index and I don't have that information in

17   front of me, but I'm making a good educated

18   guess, is the allocation in the target date

19   index that they are being measure against, the

20   allocations could be slightly different than

21   the actual State Street target date allocations

22   themselves.

23              Also State Street might have

24   been using a different -- the funds that they

25   were using, the asset allocation itself might

Page 303

1                    DONALD C. STONE

2       have included or not included all the different

3       asset categories that are in the S&P target

4       date series.

5                    In addition to that, you have

6       transaction costs in the State Street.  So you

7       have several things that create a little bit of

8       noise in the data when you look at that because

9       they are passive funds.  All they are doing is

10      mimicking an index and they did a very good job

11      of mimicking that index.

12                   When we did the analysis, we would

13      go back and look at, you know, what are they

14      doing anything that says they are not tracking

15      their index.  If that they are -- that they are

16      not doing what they should be doing.  And the

17      funds were inexpensive so I think the

18      evaluation is, not to say that you wouldn't

19      have the conversation with the committee about

20      these versus this benchmark, I think you would.

21      But it is very different than how the way that

22      you evaluate actively managed funds.  Totally

23      different.

24           Q.     Do you have a specific

25      recollection of having conversations with the

Page 304

DONALD C. STONE

1            DONALD C. STONE

2    committee in a 321 capacity regarding this

3    performance?

4         A.    I don't recall specific

5    conversations I would have had years ago with

6    this -- in regard to any quarterly performance

7    or whatever with this particular client.  No, I

8    don't remember that.

9         Q.    In a 338 capacity do you recall

10   specifically you tracking down sort of

11   understanding what the noise was and

12   understanding what was driving this

13   underperformance?

14        A.    This would have been up to my

15   colleague who replaced me.  He was heavily

16   involved in the evaluation process as to

17   whether they were going to continue with the

18   State Street target date funds or not and I

19   have no idea what the outcome of that was.

20        Q.    You were a 338 advisor prior to

21   Q2 2018; correct?

22        A.    In '17 I was a 338 for the defined

23   benefit.  In 2018 I was briefly the 338 for the

24   401-K because I handed it off during -- as we

25   got the agreement signed.  So I would have --

Page 305

```
                              DONALD C. STONE
 1
 2      technically it was probably a 30-day period
 3      that I was actually the 338 since we were
 4      handing it off.
 5           Q.     Your partner, you don't know what
 6      happened -- you don't know what analysis they
 7      did exactly?
 8           A.     First of all, it wouldn't have
 9      just been him.  It would have been an entire
10      staff of people that would have been looking at
11      whether or not State Street was in our high
12      conviction list.  If State Street was in our
13      high conviction list, if they were in our high
14      conviction list, we are probably would have
15      kept it.
16                 It's a passive choice.  It is
17      generally -- it has been very good doing what
18      it does.  And the allocation of the State
19      Street target date funds is -- for example,
20      passive funds can be a little tricky.  State
21      Street, their target date funds look a little
22      bit different than Blackrock which looks a
23      little different than Vanguards.  They are all
24      passive, they all track index, but they are
25      tracking in some case the same index and in
```

Page 306

1                    DONALD C. STONE

2       some case different indexes.

3                    And they also may be making

4       other decision under the covers.  For example,

5       Vanguard does not go and invest in small and

6       mid cap international funds because they said

7       it dries up transaction costs.  Well, State

8       Street does as far as I know and I'm pretty

9       sure Blackrock does as well.

10                   There is some noise in those

11      numbers and I don't think -- you can not

12      reasonably compare a passive index fund to an

13      actively managed portfolio in target date or

14      for that matter any other category and say

15      well, gee, the index fund is underperforming.

16                   If it is doing what it is supposed

17      to be doing which is tracking its index, then

18      it is doing exactly what it is supposed to be

19      doing and you don't need to do anything else.

20                   MS. ENGELMAN:   If I could have five

21           minutes, I likely can wrap up, I just need

22           to look at my notes.

23                   THE VIDEOGRAPHER:   The time is

24           11:26 and we are off the record.

25                   (Recess taken.)

```
                                            Page 307
 1              DONALD C. STONE
 2              THE VIDEOGRAPHER:   The time is
 3         11:41 and we are on the record.
 4    BY MS. ENGELMAN:
 5         Q.    Mr. Stone, just a couple of other
 6    things and then we will wrap up.
 7              Are you aware that Packaging
 8    Corporation of America and the investment
 9    committee of the Packaging Corporation of
10    America was sued in connection with the choices
11    of the fiduciary committee?
12         A.    No, I was not the aware of that.
13    Can you tell me what date that was?
14         Q.    I can.  The complaint was filed in
15    June of 2022.
16         A.    Okay.
17              MS. ENGELMAN:   Maria, can we pull
18         up the Amended Complaint, please.
19              (Exhibit 12 for identification,
20         Amended Complaint filed in June of 2022.)
21         Q.    Do you have that, Mr. Stone?  Let
22    me know when you do?
23         A.    No, it hasn't loaded yet.  Oh
24    okay, it just came across.
25         Q.    So this was filed in -- this is
```

Page 308

1                    DONALD C. STONE

2        the Amended Complaint.  This was filed in June

3        of 2022.  I think the class period goes back to

4        at least 2016.  So that is the time period when

5        you were serving as the 321 consultant; is that

6        right?

7             A.     That would be correct.

8             Q.     We don't have to review the whole

9        thing, but I will represent to you that it

10       challenges breach of fiduciary duty claims

11       based on the recordkeeping fees that were paid

12       to the record keeper, the managed account

13       services as well as the prudence of three

14       different investment options.

15            A.     Okay.

16            Q.     So the investment options are,

17       they are listed throughout the complaint, but

18       if you go to page, I guess paragraph 151 there

19       it is a chart and the Invesco Diversified

20       Dividend  Fund, The Metropolitan West Total

21       Return Bond Fund and the Victory-Integrity

22       Small Cap Value Fund.

23            A.     Okay.

24            Q.     Do you have any thoughts on

25       whether or not these three investment options

Page 309

```
 1                    DONALD C. STONE
 2       were actually prudent options available to plan
 3       participants?
 4             A.     I have not look at those
 5       investment options in a long time, so I really
 6       have no thought one way or the other at this
 7       particular point.
 8             Q.     Do you have any thoughts about
 9       whether or not the recordkeeping fees paid to
10       the record keeper by this plan may have been
11       too high?
12             A.     I would very surprised.  Again, I
13       haven't looked at the specifics of the complaint,
14       but we negotiated lower fees for every single
15       client that we ever had except one over -- as
16       PSA, so over that 12-year period, only one
17       client were we not able to reduce fees for.
18                    That was something that we
19       spent a lot of time doing.  So I would be very
20       surprised, but I don't know, like I said, I
21       don't know anything about the complaint.
22             Q.     You weren't involved and you
23       weren't deposes in this matter or otherwise
24       involved in any way?
25             A.     I have not been contacted by
```

Page 310

1                    DONALD C. STONE

2      anybody.

3              Q.     But you understand that on the

4      date of this complaint essentially you're

5      advice to the committee was at issue in this

6      lawsuit?

7              A.     Yeah, I understand that, yes.

8                    MS. ENGELMAN:    I don't have any

9             further questions for Mr. Stone.

10                   MR. ROBERTS:    Nothing from me

11            either.  Thank you, Mr. Stone.

12                   THE WITNESS:    Okay.

13                   (CONTINUED ON NEXT PAGE.)

14

15

16

17

18

19

20

21

22

23

24

25

Page 311

1                    DONALD C. STONE

2                    THE VIDEOGRAPHER:    If there are no

3          other stipulations I will conclude the

4          video recorded for this proceeding.

5                    So here ends media unit number 6,

6          this concludes the video recorded virtual

7          remote deposition of Donald C. Stone taken

8          by the Defendants on Friday, November 1st,

9          2024.  The time is 11:47 p.m. central

10         European time and we are going off the

11         record.

12                   (TIME NOTED:  11:47 P.M. CENTRAL

13         EUROPEAN TIME.)

14

15                                _____

16                                DONALD C. STONE

17

18         Subscribed and sworn to before me

19         this _____ day of _____, 2024

20

21         _____

22

23

24

25

Page 312

1                          ERRATA SHEET

                      VERITEXT LEGAL SOLUTIONS

2                      330 OLD COUNTRY ROAD

                      MINEOLA, NEW YORK 11501

3                              516-608-2400

4        NAME OF CASE:

         DATE OF DEPOSITION:

5        NAME OF DEPONENT:

6        PAGE    LINE(S)     CHANGE              REASON

7        ____|_____|_____|_____

8        ____|_____|_____|_____

9        ____|_____|_____|_____

10       ____|_____|_____|_____

11       ____|_____|_____|_____

12       ____|_____|_____|_____

13       ____|_____|_____|_____

14       ____|_____|_____|_____

15       ____|_____|_____|_____

16       ____|_____|_____|_____

17       ____|_____|_____|_____

18       ____|_____|_____|_____

19       ____|_____|_____|_____

20       ____|_____|_____|_____

21       ____|_____|_____|_____

22       ____|_____|_____|_____

23       SUBSCRIBED AND SWORN TO BEFORE ME

         THIS___DAY OF _____, 20__.

24

         _____    _____

25       (NOTARY PUBLIC)             MY COMMISSION EXPIRES:

Page 313

```
 1                    C E R T I F I C A T E

 2      STATE OF NEW YORK      )

 3                             : ss.

 4      COUNTY OF NEW YORK  )

 5          I, WILLIAM VISCONTI, a Shorthand Reporter and

 6      Notary Public within and for the State of New York,

 7      do hereby certify:

 8          That prior to being examined, the witness named in

 9      the foregoing deposition was duly sworn to testify the truth,

10      the whole truth, and nothing but the truth;

11          That said deposition was taken down by me in

12      shorthand at the time and place therein named and

13      thereafter reduced by me to typewritten form and that the

14      same is a true, correct, and complete transcript of said

15      proceedings.

16          Before completion of the deposition, review of the

17      transcript [ X ] was [    ] was not requested.  If requested,

18      any changes made by the deponent (and provided to the

19      reporter) during the period allowed are appended hereto.

20          I further certify that I am not interested in the

21      outcome of the action.

22          Witness my hand this 11th day of 2024.

23

24      _____

25                          WILLIAM VISCONTI
```

Page 314

```
 1

 2                E X H I B I T S

 3       DESCRIPTION                        PAGE

 4        Exhibit 1 for identification,     39

 5        Expert Report of Donald C.

 6        Stone.

 7        Exhibit 2 for identification,     171

 8        2015 IPS.

 9        Exhibit 3 for identification,     241

10        Q4, 2018 meeting minutes.

11        Exhibit 4 for identification,     257

12        Q1 2015 committee meeting

13        minutes.

14        Exhibit 5 for identification,     264

15        Q1 2016 Meeting Minutes.

16        Exhibit 6 for identification,     265

17        2016 Deep Dives.

18        Exhibit 7 for identification,     270

19        May 10, 2017 meeting minutes.

20        Exhibit 8 for identification,     282

21        GlassBridge 2017 Form 5500.

22        Exhibit 9 for identification,     288

23        GlassBridge 2019 Form 5500.

24        Exhibit 10 for identification,    290

25        Holland & Knight 2016 Form 5500
```

Page 315

1

2                         E X H I B I T S

3       DESCRIPTION                           PAGE.)

4       Exhibit 11 for identification,   292

5       Holland & Knight 2017 Form

6       5500.

7       Exhibit 12 for identification,   299

8       document titled State Street

9       Fund versus S&P.

10      Exhibit 12 for identification,   307

11      Amended Complaint filed in June

12      of 2022.

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 316

1    John Roberts, Esquire

2    jcroberts@millershah.com

3                          November 11, 2024

4    RE:    Laliberte, Mary Et Al v. Quanta Services Inc Et Al

5          11/1/2024, Donald C. Stone (#6983699)

6          The above-referenced transcript is available for

7    review.

8          Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12         The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-midatlantic@veritext.com.

16    Return completed errata within 30 days from

17   receipt of testimony.

18     If the witness fails to do so within the time

19   allotted, the transcript may be used as if signed.

20

21

22                  Yours,

23                  Veritext Legal Solutions

24

25

Page 317

1    Laliberte, Mary Et Al v. Quanta Services Inc Et Al

2    Donald C. Stone (#6983699)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Donald C. Stone, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11    _____    _____

12    Donald C. Stone                          Date

13    *If notary is required

14                        SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                        _____ DAY OF _____, 20____.

16

17

18                        _____

19                        NOTARY PUBLIC

20

21

22

23

24

25

**[& - 2015]**                                                                 Page 1

**&**

**&** 2:7 282:23
284:19 290:9
290:11,13,19
290:23 291:6
291:10,24
292:15,19
299:14 314:25
315:5

**0**

**02110** 2:9
**03290** 1:4 4:10

**1**

**1** 1:12 39:13,14
87:18,19
255:10 286:14
287:12 314:4
**1,500,000** 87:14
**1.2** 131:11
**1/2** 161:25
**10** 18:13,13,18
19:7 63:3
109:13 110:13
110:15 125:6
134:11 258:11
270:17,19
290:10 314:19
314:24
**10,000** 86:24
**100** 17:5 55:17
56:6 63:5
80:22 134:4
**1000** 113:11

**104** 233:11,25
234:2,3,4
239:9 240:13
243:13
**10:40** 281:11
**10:50** 281:14
**11** 292:14
315:4 316:3
**11/1/2024**
316:5
**11501** 312:2
**117** 245:12
**11:26** 306:24
**11:41** 307:3
**11:47** 311:9,12
**11th** 313:22
**12** 58:2 175:2
185:4 249:15
249:17 299:5
307:19 309:16
315:7,10
**12:45** 114:8
**13** 241:4
**131** 254:8
**135** 260:11
276:7,9 286:14
**137** 260:23
261:5
**138** 270:22
**148** 147:7,8
151:4
**15** 29:6,10
109:16 133:15
133:16 134:11
134:21 184:15

255:16
**15,000** 293:14
294:17 295:4
**150** 17:3 41:3
80:22
**151** 308:18
**15th** 201:19
**16** 268:20
**17** 184:16
269:2 304:22
**171** 314:7
**18** 257:16
269:3
**180** 17:3
**1845** 2:3
**19** 39:10
184:16 269:5
**19103** 2:4
**1990s** 52:13,23
**1st** 4:12 152:23
271:8 291:15
292:20 311:8

**2**

**2** 171:24
173:25 314:7
**20** 63:4 64:22
67:11 82:24
89:21 93:12
102:24 109:16
114:9 255:10
258:11 269:9
312:23 317:15
**200** 41:4
**2002** 22:2 49:9
53:15,24 56:24

56:24 57:10,13
64:5,10 210:17
**2002/2014** 61:6
**2004** 19:10,15
19:16,21,23
20:7 22:20
25:9 53:22
**2005** 25:7
296:6,9
**2006** 296:9
**2007** 19:10,15
19:18,20,21,23
20:2,7 22:20
25:9,16 296:8
296:12
**2008** 97:5
**2009** 158:2
**2010** 97:5
**2013** 258:10
**2014** 53:24
55:3 56:4,24
56:25 57:11
62:13 64:10
129:21,23
130:5 133:12
146:25 147:2,3
148:3,10 151:8
152:17,19,20
152:22,23
153:5,19 191:8
255:2,6,6
260:22
**2015** 149:6
153:13,15
154:2,6 156:15

**[2015 - 299]**                                                    Page 2

167:25 169:6
169:11,14
171:23,24
173:2,23
200:16 201:3
201:11,15,18
201:19 202:5
202:25 204:12
208:8 216:5
221:25 223:21
234:17,24
236:3,10,18,20
238:6 239:25
240:4,24
243:16,23
244:9 245:7
247:18,20
249:14 257:12
257:15,17,18
276:16,23
279:4 314:8,12
**2016**   149:6
158:11,13,16
158:19,25
159:6,8 200:11
231:12,13
232:8 244:18
244:20,22,24
245:3,5,9,10
264:13,16,19
265:13,14
266:9,12
270:12 290:9
290:11 291:10
291:15,15

300:2,5,11
308:4 314:15
314:17,25
**2017**   131:9
132:19 133:4,4
133:4,12,12
135:22 136:5
149:6 159:19
159:22,24
160:6,19 184:6
199:8 234:21
234:25 235:21
237:7,13,23
238:3,17,19
239:20 243:21
244:3 245:21
246:4,13,18
247:6,8 260:23
270:17,20
271:8 276:23
277:3 279:6,8
281:25 282:3
282:13,14
283:3 285:15
286:7 287:23
292:12,15,20
292:21 300:13
300:18,22
301:4 314:19
314:21 315:5
**2018**   131:16
132:19 133:5
136:8 149:6
161:5,11,12
240:20 241:22

241:24 242:8
242:17 254:12
255:6 259:8
289:18 290:4
295:17 298:10
299:20,21
301:7,13,15
304:21,23
314:10
**2019**   39:9,10
130:5 149:6
152:5,9,14
161:18 162:19
210:17 234:25
288:8,10,15,16
289:12,20,25
314:23
**2020**   148:4,11
148:12 149:3,7
149:17 150:9
150:15,19,22
151:9,11
152:24 161:20
165:3,25 166:2
166:11,13,19
166:21 167:6
167:13 173:5
184:10,17,23
199:12 231:18
**2021**   19:12,16
19:18 20:2,3
25:16 26:7
38:11,20
216:16,22
218:9

**2022**   231:10,13
231:21,22,24
232:5 307:15
307:20 308:3
315:12
**2024**   1:12 4:12
16:12 149:25
149:25 150:3,5
150:7,23 191:9
260:22 311:9
311:19 313:22
316:3
**20567**   313:23
**20ish**   101:22
**21**   26:17
**22**   216:23
**23**   62:3
**24**   167:2
216:22
**241**   314:9
**24th**   216:15
**25**   63:4
**257**   314:11
**264**   314:14
**265**   314:16
**270**   314:18
**28**   223:18,19,21
223:22 225:7
**282**   314:20
**288**   314:22
**290**   314:24
**292**   315:4
**299**   315:7

| 3 | | | 5 |
|---|---|---|---|

**3**  16:8,8 87:18
  225:4,7 237:17
  241:23 242:10
  245:25 288:18
  288:21 314:9
**3-1**  245:16
**30**  64:23
  133:21 305:2
  316:16
**300**  27:22
  28:17
**307**  315:10
**30th**  289:18
**31**  285:14
**31st**  16:12
  282:14 286:7
  287:23 288:16
  291:15 292:21
**321**  49:11,15
  53:12 55:8
  56:19,21,22
  58:4,15,22
  59:3 60:16,22
  61:17,21,23
  62:9 63:8
  64:11 67:21
  69:13 74:16
  129:20 131:23
  131:24 132:20
  133:14 134:15
  136:13 141:6
  193:2 208:15
  210:16 211:20
  283:19,24

  286:21 290:18
  290:25 295:25
  296:2,4 297:5
  299:19 304:2
  308:5
**321s**  58:10
**330**  312:2
**338**  27:8 30:19
  49:11 53:13
  56:20 131:7,10
  131:17,20,23
  132:3,7,10,12
  132:13,14
  295:7,12,23
  297:9,19 298:3
  299:20 304:9
  304:20,22,23
  305:3
**34**  187:20,23
**35**  86:18
  102:22 190:22
**36**  291:18,19,21
  292:2,25
**37**  195:18,21
  196:25 198:23
  289:2,4
**38**  289:2,4
**39**  265:17,18
  270:7 314:4
**3:03**  1:12 4:13
**3:12**  12:14

| 4 | | | |
|---|---|---|---|

**4**  62:22 161:25
  224:6 225:3,4
  257:14,25

  258:2 285:20
  285:21 314:11
**40**  23:25 80:18
  86:18 102:22
  133:21 184:2
  231:16
**401**  22:24
  25:12 34:6
  39:3 49:19
  50:17 51:10
  53:11 55:8
  80:18 121:16
  224:9,11
  295:13,15,16
  296:11 304:24
**403**  53:11
**41**  232:20
  285:19,23,24
  285:25
**42**  91:16,17,22
  92:18,20,22
  102:8,9 227:16
**43**  233:11
  239:9 285:23
  285:24 286:2
**45**  102:8,9
**47**  236:25
  237:3,4,15
  245:15
**4:04**  50:8
**4:22**  1:4 4:10
**4:41**  69:2

**5**  12:11 62:14
  62:14 64:3
  125:5 264:12
  266:13,24
  267:5 270:13
  270:14 314:14
**5,000**  273:10
**50**  17:3,5 62:7
  63:3 64:24
  80:18 81:19,19
  126:11,19
  135:3 210:7
  247:5
**500**  23:25
  62:22 298:18
  298:22
**50th**  82:3
**516-608-2400**
  312:3
**5200**  104:3,7
**55**  101:23
  102:4,7
**5500**  281:25
  282:3,9 288:10
  290:11 291:11
  292:15,18
  314:21,23,25
  315:6
**57**  101:23

| 6 | | | |
|---|---|---|---|

**6**  5:25 62:14
  87:20 89:17,25
  125:5 259:23
  265:14 267:10

**[6 - add]**

282:6,16
288:22,22
311:5 314:16
**6-0** 146:12
**60** 23:25 57:6
146:11,14
**600** 94:6
**65** 60:25 61:15
72:7 90:23
101:19 102:5
**66** 147:6,8
**6983699** 316:5
317:2

**7**

**7** 90:6 148:17
270:19 314:18

**8**

**8** 90:6 282:2
314:20
**80** 80:7,7,10
87:14
**806** 2:3
**81** 294:3,4
**83** 294:3,4
**86** 200:4,6
**88** 201:25
292:5
**89** 292:5

**9**

**9** 53:16 60:24
288:9 314:22
**90** 128:3,18,21
129:7

**90,000** 89:19,23
**93** 216:8
**97** 232:14,16,17
232:18,19
237:24

**a**

**ability** 14:19
**able** 7:7 76:13
93:15 119:14
120:13 160:8
275:16 309:17
**above** 206:19
316:6 317:7
**absent** 201:7
**absolute**
123:25 127:16
129:13 144:23
**absolutely**
60:23 76:13
77:24 114:7
120:9 136:24
270:9 284:8
**accept** 24:3
**accepted** 227:9
228:6
**access** 39:16
214:3 294:9
**accordance**
201:2
**account** 131:3
140:16,17,17
308:12
**accounts** 28:2
39:2 224:23

**accretive** 210:8
**accuracy** 316:9
**accurate** 43:2
162:10 199:10
277:14
**accurately**
42:17 107:19
**achieve** 178:9
179:4,20 180:4
182:2,15
185:13
**acknowledge...**
317:3
**acknowledg...**
316:12
**acquire** 143:5
**acquired** 285:3
289:17
**act** 32:7 132:3
211:22 212:21
**acting** 138:11
219:5 286:21
286:24 291:6
**action** 127:20
167:22 213:18
259:9 261:8
287:17 313:21
**active** 96:5,6,8
96:11 271:20
271:22
**actively** 302:13
303:22 306:13
**actual** 68:17
113:5 116:18
132:11 133:8

143:8 230:10
257:3 302:21
**actually** 14:3
16:16,23 19:9
20:18 21:16
29:15 30:20
39:10 54:11
63:12 74:17
75:12 84:3,10
92:22 96:25
104:12 105:14
108:23 113:17
137:19 138:7
138:22 140:19
150:21 152:20
154:12,23
161:20 163:18
164:9 178:16
207:20 211:4
215:19 216:22
219:13,21
226:9 231:10
255:18 257:4
260:14 265:8
270:24 272:11
274:19 279:5
280:19 282:8
283:4 289:14
294:12 295:20
297:23 305:3
309:2
**add** 55:24
57:13 63:14
67:15 218:23
263:15

[added - ahb]                                                          Page 5

**added**  184:6
  258:6 259:2
**adding**  116:7
  119:6
**addition**
  248:13 258:5
  272:25 303:5
**additional**  15:6
  67:15 69:22
  71:6 73:8,17
  84:4,24 85:7
  87:25 129:11
  129:14 135:7
  149:9 163:3
  261:7 265:11
  287:17
**additions**  317:6
**address**  78:14
  175:16 244:15
**adequate**  215:3
**adequately**
  195:4
**adjust**  101:9
**adjusted**  65:11
  67:3 68:15
  144:25 183:19
  210:6 241:13
  266:3 268:21
**administer**
  3:13
**administrative**
  58:6 139:24
  140:11,24
  194:4

**adopted**  160:2
  160:6 161:14
  161:20 166:3
  184:7,16,23
  239:12
**advance**  198:7
**advanced**
  186:7 187:4
  201:6
**advancement**
  186:13
**advice**  97:15
  131:24 214:8
  294:25 310:5
**advised**  60:25
**advises**  131:24
**advisor**  30:10
  45:16 46:25
  55:20 58:15
  61:21 64:11
  67:21 69:14
  84:6 95:18
  119:4,14
  120:13 131:7
  131:20,23
  153:11,24
  156:10,15,23
  160:15 172:21
  192:4,8 202:3
  202:23 208:15
  209:16,19
  210:17 213:8
  216:13 232:22
  256:2 286:21
  286:25 288:20

290:13,25
  291:25 293:2
  293:13 295:5,7
  295:12,25
  296:4,11 297:9
  304:20
**advisors**  49:9
  53:17 54:17,24
  55:5,13 56:4,7
  57:4,7,16,23
  58:4 59:16
  60:18 63:22
  91:5 133:6
  209:8 225:18
  283:7,19,25
  286:12 293:22
  293:23 294:15
**advisory**
  282:19,21
  288:19,24
  291:24 293:2
  293:14
**affect**  204:22
**affected**  160:11
  160:12
**afoul**  239:12
**afternoon**  5:12
**ag**  24:2 113:9
**age**  79:14
  101:18,19
**aggregate**
  198:23
**ago**  9:19 10:7
  10:10 44:21
  78:23 97:20

127:5 193:22
  196:18 211:19
  221:3 304:5
**agree**  4:25
  54:20 55:20
  80:11 114:4
  167:11 174:12
  175:22 176:7
  177:24 180:3
  181:4,17
  182:13 184:3
  186:11 187:2
  195:23 209:17
  220:16,19
  241:15 242:15
  246:2,17,24,25
  247:4 250:15
  258:7,16
  266:13 270:4
  272:5 280:16
  286:11,16
  287:11,21
  299:25 300:18
  300:22 301:21
  302:3
**agreed**  3:2,6,10
  54:21 190:9
  196:16 201:12
  229:20
**agreement**  12:2
  80:6 229:20
  295:23 297:24
  304:25
**ahb**  1:4 4:10

**[ahmed - appropriate]** Page 6

| | | | |
|---|---|---|---|
| **ahmed** 36:15 | **alternatives** | **anniversary** | **appearances** |
| **al** 1:6,9 4:8,9 | 156:13 | 82:3 | 4:22 |
| 316:4,4 317:1 | **amended** | **annual** 76:20 | **appearing** 4:5 |
| 317:1 | 199:17 307:18 | 175:18,24 | 251:24 |
| **alert** 177:20 | 307:20 308:2 | **annualized** | **appended** |
| 178:2 181:16 | 315:11 | 269:23 | 275:22 313:19 |
| 186:8,13,20,22 | **america** 131:16 | **annually** 72:20 | 317:7 |
| 187:4 201:6 | 131:19 295:8 | 72:23 73:3,23 | **appendix** |
| 239:13 251:23 | 296:6,14 307:8 | 210:24 211:2,2 | 149:24 236:22 |
| 252:16 253:4 | 307:10 | 260:22 | 236:23 238:9 |
| 253:22 | **american** 96:10 | **anodyne** 181:9 | 238:11 239:6 |
| **alignment** | 234:5 243:6 | 192:22 198:17 | 276:16 |
| 182:12 | **amount** 219:2 | 273:12 | **applicable** |
| **allocation** | 275:16 | **answer** 6:14,21 | 316:8 |
| 70:21 90:12,16 | **analysis** 78:17 | 23:18 24:20 | **applies** 174:24 |
| 90:16,18 | 87:25 90:23 | 30:18 31:20 | **apply** 147:11 |
| 267:22 269:6 | 108:16 139:19 | 109:10 118:14 | 147:22 151:6 |
| 271:18 273:18 | 168:16,19 | 122:16,17 | 153:3 161:11 |
| 302:18,25 | 171:19 177:21 | 129:13 157:4 | **appointing** |
| 305:18 | 259:13,19 | 197:11 212:7 | 225:17 |
| **allocations** | 260:2 262:19 | 249:11 272:22 | **appointment** |
| 103:4 302:20 | 265:9 299:25 | 274:22,23 | 217:5 |
| 302:21 | 303:12 305:6 | 275:17 | **appreciate** |
| **allotted** 316:19 | **analysts** 135:6 | **answered** | 153:17 |
| **allow** 187:13 | **analytic** 171:10 | 215:13 | **approach** |
| 221:8 | **analytical** | **answers** 104:16 | 84:15 137:6 |
| **allowed** 313:19 | 171:18 | **anybody** | 190:15 226:18 |
| **alluded** 77:12 | **analytics** | 218:18 310:2 | 226:19 239:16 |
| **alluding** 178:20 | 168:21 238:14 | **anybody's** | **approached** |
| **alongside** | 274:11 275:19 | 67:13 | 23:14 26:13,16 |
| 134:23 | **analyze** 187:25 | **aon** 27:9 | **approaching** |
| **alpha** 240:8,9 | **analyzed** | **apparently** | 18:17 |
| 240:19,19 | 271:14 | 219:18 293:4 | **appropriate** |
| 241:8,9 | **analyzing** 94:2 | **appear** 243:9 | 65:20 73:24 |
| | | 300:8 | 77:17 85:4,12 |

[appropriate - authority]                                          Page 7

| | | | |
|---|---|---|---|
| 121:4 127:20 | **arrived** 202:6 | **assessing** | **association** |
| 145:15,18 | **articles** 40:7 | 265:21 | 4:19 |
| 156:17 157:23 | **articulate** | **assessment** | **assume** 6:21 |
| 158:9 160:9 | 95:12 | 248:14 | 95:16 172:2 |
| 176:4,15 | **ascende** 153:10 | **asset** 63:6 68:7 | 286:15 287:3 |
| 193:16 211:10 | 155:9 156:15 | 68:8 70:17,20 | **assumed** 72:7 |
| 247:14 249:22 | 156:23 159:11 | 71:22,22 73:7 | 81:23 |
| 272:12 273:13 | 162:3 208:19 | 90:12 92:7 | **assuming** |
| 275:10,16 | 233:13 234:15 | 94:3,20 103:4 | 116:25 160:14 |
| 276:18 279:23 | 236:14 262:13 | 224:20 225:6 | 168:18 299:24 |
| **appropriately** | 264:24 | 266:4,14,17 | **assumption** |
| 139:11 276:11 | **ascende's** | 267:21 302:25 | 41:6 |
| **approving** | 261:16 | 303:3 | **astellas** 26:15 |
| 186:6 | **aside** 53:9 | **assets** 61:2,9 | 27:2,5,6,7 |
| **approximate** | 251:2,8 | 63:23 68:17 | 29:13,14,15 |
| 16:19 17:23 | **asked** 23:2 | 71:22 80:13 | **attached** 166:7 |
| 18:7 | 26:20 45:19 | 128:3 207:8 | 275:22 316:11 |
| **approximately** | 134:18 155:9 | 255:7,15,18 | **attachment** |
| 4:13 18:25 | 161:14 166:25 | 259:20 | 238:6 |
| 27:22 57:3 | 168:22 199:24 | **assign** 252:15 | **attempt** 88:19 |
| 58:24 61:9 | 231:6 263:16 | 253:3 | **attention** 40:7 |
| 62:5 193:9 | 263:22 264:7 | **assigned** 186:3 | 172:5 204:8 |
| **approximation** | 277:11 | **assigning** | 223:17 254:7 |
| 19:5 133:18 | **asking** 61:12 | 239:13 | 256:3 265:16 |
| 195:10 | 161:22 169:8 | **assignments** | **attorney** |
| **arbitrary** | 171:15 197:6 | 137:20 | 316:13 |
| 101:19 | 198:21,22,25 | **assist** 13:15 | **attorneys** 2:3,8 |
| **area** 58:8 | 205:21 241:12 | 15:13 | 3:3 13:22 |
| 226:14 | 252:24 258:16 | **associate** 8:23 | **attractive** |
| **areas** 14:10 | 262:2 | **associated** | 110:16 |
| 44:12 45:4,6 | **asks** 278:2 | 147:23 | **atypical** 173:21 |
| 223:13 | **aspect** 21:11 | **associates** 9:12 | **authority** |
| **argue** 181:10 | 56:12 78:2 | 9:15 13:25 | 222:11,13,17 |
| **array** 262:11 | **aspects** 217:3 | 282:24 284:19 | 222:20 223:15 |
| | | | 225:22 |

**authorized**
  3:12
**automatically**
  121:10 122:12
**available**  51:10
  66:14 91:19
  92:9 144:7,13
  176:18 249:25
  265:25 274:3
  309:2 316:6
**average**  62:19
  62:21 79:14,14
  80:16 81:9
  88:20 89:11,11
  89:13,16,18,19
  89:21 90:5,19
  90:25 104:2,6
  124:20,21
  125:12,13
**averages**  89:5
**avoid**  138:9
**awai**  264:24
**aware**  7:16
  10:21 14:7
  67:11 92:10
  141:4 167:17
  202:11,18,25
  212:23 215:2
  254:23 307:7
  307:12
**awful**  75:16
**awhile**  157:5

**b**

**b**  40:3,20 53:11
  79:8 132:12
  149:24 236:22
  236:23 238:6,9
  238:11 314:2
  315:2
**back**  14:9,12
  14:24 15:5,8,9
  16:5 17:20
  25:7 40:2
  41:14 43:22
  46:9,11,18
  48:23 63:13
  73:21 83:3
  84:7,7 92:5
  104:2,20,20
  115:13,25
  119:16 120:10
  121:12,14,20
  122:4 125:19
  126:2 128:11
  129:17 140:13
  141:20 148:23
  156:4 157:3,6
  160:15 161:22
  165:2 168:24
  171:9 173:25
  174:20 178:7
  178:14 179:15
  180:24 181:11
  181:18 185:3
  185:23 187:18
  206:6 214:19
  221:25 227:8

  232:9 235:9,15
  235:24 237:24
  239:8 243:22
  244:16 245:16
  249:14 259:11
  259:18,20
  274:13 275:20
  277:22 280:6
  281:7 288:25
  296:9 303:13
  308:3
**backbone**  15:2
**background**
  44:14 45:7
  49:7 75:21
  129:18
**backtrack**
  112:6
**bad**  86:15,15
  164:10
**balance**  89:13
  89:18,24 90:24
  104:3,6,6,10
  113:19
**balances**  79:14
  81:10 90:19,20
**ballpark**  23:23
**bank**  49:21
  50:18 53:10
**barclays**  113:9
**barely**  118:24
**based**  23:21
  92:8 99:24
  116:14 119:18
  125:24,25

  160:5 161:13
  162:9 165:23
  167:20 190:3
  198:11 219:25
  249:10 282:25
  287:12 308:11
**basic**  64:15
  70:18 92:2
**basically**  23:12
  23:20 24:4,6
  26:18 27:14
  30:17 33:21
  56:5 63:20
  67:6 72:12
  85:20 143:17
  149:4 162:19
**basics**  6:9
**basis**  43:21
  61:12,19 68:4
  69:19 73:11,12
  73:14,23 74:4
  113:23 115:21
  118:16,21
  119:15 121:8
  124:23 163:9
  163:11 175:18
  175:24 185:21
  187:24 189:24
  190:2 204:14
  204:16 232:7
  268:24 277:3,5
  300:4,15,16,20
  300:24 301:20
**bat**  129:13

[bates - bolded]                                           Page 9

**bates** 42:22
  175:4
**beacon** 234:5
  243:6
**bear** 100:8,9
**beg** 31:19
**began** 131:10
  146:24 147:2,4
  231:12 295:19
**beginning** 7:12
  14:8 244:21
  296:6
**begins** 4:3
  14:14
**begun** 295:16
**behavior** 149:5
  155:25 157:20
  158:4,6 159:5
**belief** 185:18
**believe** 11:21
  11:22 21:4,21
  22:5 26:14
  35:15,20 36:4
  36:23 37:25
  38:7 67:19
  70:3 97:3
  116:21 143:9
  146:24 147:2
  153:10 159:8
  162:18 166:8
  195:4 202:10
  205:13 212:5
  216:6 235:23
  241:22 245:2
  256:25 258:21

  283:21,24
  286:20 290:21
  296:23 297:16
  298:9
**bell** 16:13
**benchmark**
  68:5,10,11
  108:3,6 109:6
  112:18 113:4
  115:20 116:9
  118:16 120:7
  121:7 122:11
  127:25 128:2
  128:17 156:25
  170:8 176:4,10
  183:5,14,25
  184:22 185:7
  185:20 201:13
  202:3,23
  204:25 205:11
  205:23 208:9
  247:22 248:9
  248:11,23
  269:11,15,23
  276:13,18
  277:16 278:3
  278:21 279:2,8
  280:14 298:12
  298:18 299:18
  300:19,24
  301:12 302:14
  302:15 303:20
**benchmarking**
  209:8

**benchmarks**
  68:6 200:23
**benefit** 30:16
  81:24 104:14
  131:10 132:18
  142:25 143:4
  295:14 304:23
**best** 15:16 32:7
  35:5 42:10
  68:11 99:14
  138:12 139:12
  139:12 149:14
  204:20 226:18
  230:9 269:10
  269:14
**better** 15:2
  24:9 33:22
  99:8 100:7
  129:9 130:23
  165:19 205:23
  209:2 279:11
  279:13 280:2
**beyond** 231:18
  231:24
**big** 21:18 65:8
  81:10 91:14
  99:17 133:19
  141:2 256:24
**bigger** 124:15
  138:25
**bill** 69:7 128:11
  148:22 177:7
**billion** 60:25
  61:15 62:4,24
  63:2 104:12

  131:12 133:24
  134:2,8,10,13
  255:16
**binary** 239:15
**bio** 130:21
**biography**
  129:16
**bit** 15:5 20:19
  32:24 36:13
  48:13 49:6,8
  80:9 95:25
  106:5,12
  115:18 170:25
  173:15 217:11
  251:6 302:2
  303:7 305:22
**blackrock**
  30:18 35:21,22
  96:8 305:22
  306:9
**blah** 99:8,8,8
  179:17,17,17
  179:17
**blend** 96:6
**blended** 271:21
**blip** 84:13
**blithely** 171:16
**blown** 213:9
**blur** 36:13 43:9
**board** 222:14
  280:5 299:2
**bob** 89:3,3 90:4
**bockius** 2:7
**bolded** 248:4,4

**bolt** 100:18
**bond** 24:2
  267:9 308:21
**bonds** 39:5
  113:7,10,16
**book** 107:10
**boston** 2:9
**bottom** 163:2
  186:2 197:20
  237:4,15
  255:22 264:20
  271:10,11
**bought** 282:24
**box** 190:15
**boxes** 274:18
**bracketing**
  276:22
**bravo** 1:18 4:5
**breach** 308:10
**break** 6:10,15
  6:16 66:18
  87:12 113:13
  115:12,13,15
  230:16 231:5
  232:12 244:16
  281:7
**breakdown**
  267:19
**brief** 191:25
  193:19 216:11
**briefly** 9:19
  304:23
**bring** 48:5
  58:25 78:13
  222:2

**bringing** 59:7
  59:14 102:7
  127:14 256:2
  288:11
**broad** 22:6
  82:21 88:10
  102:16,18,20
  113:9 262:11
**brodsky** 2:15
  4:15
**broken** 294:15
**brought** 54:18
  64:5 189:23
  196:8,8
**build** 54:23
  90:7
**building** 92:9
**built** 54:23
**bullet** 204:11
  214:24 217:17
  218:13,24,25
  219:9 220:2,5
  220:8 224:14
  225:16 241:11
  241:14 242:25
  245:16,23
  247:11 251:18
**bullets** 183:17
  225:3,11
**bunch** 8:16
  275:19
**business** 21:25
  25:21 26:9
  32:4 33:23
  54:19 55:18

56:5 62:3,12
  91:20,21
  142:18 259:15
  285:3
**businesses**
  54:21 55:21
**busy** 33:17
**buy** 93:2,22,23
  95:9 132:12
**buys** 143:18

### c

**c** 1:17 2:2,5 4:4
  5:6 6:1 7:1 8:1
  9:1 10:1 11:1
  12:1 13:1 14:1
  15:1 16:1 17:1
  18:1 19:1 20:1
  21:1 22:1 23:1
  24:1 25:1 26:1
  27:1 28:1 29:1
  30:1 31:1 32:1
  33:1 34:1 35:1
  36:1 37:1 38:1
  39:1,15 40:1
  41:1 42:1 43:1
  44:1 45:1 46:1
  47:1 48:1 49:1
  50:1 51:1 52:1
  53:1 54:1 55:1
  56:1 57:1 58:1
  59:1 60:1 61:1
  62:1 63:1 64:1
  65:1 66:1 67:1
  68:1 69:1 70:1
  71:1 72:1 73:1

74:1 75:1 76:1
  77:1 78:1 79:1
  80:1 81:1 82:1
  83:1 84:1 85:1
  86:1 87:1 88:1
  89:1 90:1 91:1
  92:1 93:1 94:1
  95:1 96:1 97:1
  98:1 99:1
  100:1 101:1
  102:1 103:1
  104:1 105:1
  106:1 107:1
  108:1 109:1
  110:1 111:1
  112:1 113:1
  114:1 115:1,4
  116:1 117:1
  118:1 119:1
  120:1 121:1
  122:1 123:1
  124:1 125:1
  126:1 127:1
  128:1 129:1
  130:1,20 131:1
  132:1 133:1
  134:1 135:1
  136:1 137:1
  138:1 139:1
  140:1 141:1
  142:1 143:1
  144:1 145:1
  146:1 147:1
  148:1 149:1
  150:1 151:1

| | | | |
|---|---|---|---|
| 152:1 153:1 | 222:1 223:1 | 291:22 292:1 | **capabilities** |
| 154:1 155:1 | 224:1 225:1 | 293:1 294:1,15 | 64:12 142:19 |
| 156:1 157:1 | 226:1 227:1 | 295:1 296:1 | 142:20 |
| 158:1 159:1 | 228:1 229:1 | 297:1 298:1 | **capability** |
| 160:1 161:1 | 230:1 231:1 | 299:1 300:1 | 14:20 80:23 |
| 162:1 163:1 | 232:1 233:1 | 301:1 302:1 | **capacity** 49:12 |
| 164:1 165:1 | 234:1 235:1 | 303:1 304:1 | 58:22 59:4 |
| 166:1 167:1 | 236:1 237:1 | 305:1 306:1 | 61:17 65:22 |
| 168:1 169:1 | 238:1 239:1 | 307:1 308:1 | 95:17 283:19 |
| 170:1 171:1 | 240:1 241:1 | 309:1 310:1 | 297:5 299:19 |
| 172:1 173:1 | 242:1 243:1 | 311:1,7,16 | 299:20 304:2,9 |
| 174:1 175:1 | 244:1 245:1 | 313:1,1 314:5 | **captive** 21:9 |
| 176:1 177:1 | 246:1 247:1 | 316:5 317:2,4 | **capture** 65:13 |
| 178:1 179:1 | 248:1 249:1 | 317:12 | 68:21 70:2 |
| 180:1 181:1 | 250:1 251:1 | **calculate** 62:21 | 197:18 |
| 182:1 183:1 | 252:1 253:1 | **calculated** | **captured** 70:2 |
| 184:1 185:1 | 254:1 255:1 | 66:25 | 194:15 195:5 |
| 186:1 187:1 | 256:1 257:1 | **calculation** | 250:16 |
| 188:1 189:1 | 258:1 259:1 | 68:14 | **care** 12:12 |
| 190:1 191:1 | 260:1 261:1 | **call** 53:17 | 137:5,8 |
| 192:1 193:1 | 262:1 263:1 | 62:16 69:7 | **career** 86:19 |
| 194:1 195:1 | 264:1 265:1 | 71:12 83:2 | **careful** 137:4 |
| 196:1 197:1 | 266:1 267:1 | 86:2 93:22 | **carefully** 208:5 |
| 198:1 199:1 | 268:1 269:1 | 152:22 161:25 | **carlo** 80:19 |
| 200:1 201:1 | 270:1 271:1 | 209:12,12,13 | 82:17 85:13,19 |
| 202:1 203:1 | 272:1 273:1 | 234:7 248:10 | 86:8 112:20,22 |
| 204:1 205:1 | 274:1 275:1 | 250:25 | **carolyn** 2:16 |
| 206:1 207:1,15 | 276:1 277:1 | **called** 54:17 | 46:11 |
| 208:1 209:1 | 278:1 279:1 | 159:16 188:18 | **carries** 155:22 |
| 210:1 211:1 | 280:1 281:1 | 197:5 | 156:2 157:20 |
| 212:1 213:1 | 282:1,5 283:1 | **campbell** 2:16 | 158:4 |
| 214:1 215:1 | 284:1 285:1 | 46:11 162:23 | **carry** 158:6 |
| 216:1 217:1 | 286:1 287:1 | **cap** 103:12,12 | **carve** 54:22 |
| 218:1 219:1 | 288:1,23 289:1 | 242:12 306:6 | 55:22 |
| 220:1 221:1 | 290:1 291:1,20 | 308:22 | |

[carved - chart]                                                    Page 12

| | | | |
|---|---|---|---|
| **carved** 284:6 | 263:18 264:4 | **ceo** 222:15 | 73:14 83:23,24 |
| **case** 1:4 4:9 | 275:5 287:8 | **certain** 21:8 | 84:22,23 |
| 7:13 11:20 | 294:13 299:22 | 41:10,16 43:6 | 142:19,21 |
| 12:22,24 13:8 | 305:25 306:2 | 46:12 54:4 | 143:13 152:6 |
| 14:9 17:2,4 | 312:4 | 59:8 63:11,14 | 157:21 161:10 |
| 19:6 20:23 | **cases** 15:3,25 | 69:23 88:20 | 187:7 199:22 |
| 22:4,16 23:3 | 16:24 17:2 | 99:21 101:3 | 201:8 212:7 |
| 23:10,11,11,16 | 18:22,25 19:2 | 107:9 112:17 | 216:3 231:20 |
| 23:24 24:11,24 | 20:6,10,13,16 | 168:14 171:7 | 232:4,7 234:25 |
| 25:19 26:14,17 | 20:18,21 22:18 | 222:23 228:24 | 252:14,19 |
| 26:19,21 27:3 | 22:21 25:8,20 | 268:16 284:8 | 253:2,10,12,18 |
| 27:11,18,20 | 26:5,12 29:7 | **certainly** 38:15 | 253:25 258:20 |
| 29:19 30:4,24 | 29:11 37:17,21 | 73:9 80:21 | 272:2 274:23 |
| 31:2,6,10,23,25 | 38:6,16 47:12 | 84:17,24 92:25 | 312:6 |
| 32:18 33:4,9 | 61:14 124:2 | 94:22 117:9 | **changed** 54:2 |
| 33:12,19 34:15 | 126:2 140:11 | 118:12 122:18 | 69:24 83:6 |
| 34:16,18,20 | 162:10 195:6 | 123:23 140:25 | 95:25 143:10 |
| 35:2,4 36:5,8 | 197:22 222:22 | 159:24 193:7 | 152:5 158:7 |
| 36:15,17,25 | 226:10,23 | 209:9,16 212:2 | 159:6 231:13 |
| 37:6,13 40:12 | 228:15 | 218:18 220:2 | 235:4,4 255:4 |
| 40:17 43:7,11 | **cash** 103:6 | 229:10 280:22 | 258:9 |
| 52:11 71:10 | **castro** 2:11 | 284:5,13 | **changeover** |
| 82:22 83:9 | **catch** 278:17 | **certify** 313:7,20 | 231:8,9 235:18 |
| 86:8 87:17 | **categories** 43:6 | **cfa** 67:11 | **changes** 70:15 |
| 101:11 109:15 | 43:10 303:3 | **chair** 50:23 | 70:16 84:14 |
| 119:3 125:7 | **category** | **challenged** | 102:20 202:4 |
| 126:17 156:3 | 306:14 | 147:12,15 | 202:24 298:2,4 |
| 158:6 163:6 | **causing** 127:8 | 151:7,13 153:4 | 313:18 316:10 |
| 167:16 170:15 | **cautions** | 167:16 | 317:6 |
| 179:12 190:12 | 252:13,25 | **challenges** | **changing** 36:9 |
| 190:13 193:14 | **celebrated** 82:3 | 308:10 | 51:11 162:15 |
| 194:8 208:7 | **centerra** 34:20 | **chance** 104:9 | 235:2 |
| 214:17 215:12 | **central** 1:13 | 231:4 | **charge** 262:3 |
| 215:21 221:18 | 4:13 311:9,12 | **change** 64:13 | **chart** 308:19 |
| 226:22 259:20 | | 64:16 70:21 | |

**[charter - coast]**                                                    Page 13

**charter** 209:24
  220:13,17,20
  220:22 221:7
  221:10,11,19
  221:22,23
  222:5,10,25
  223:14,25
**charts** 75:24
  275:7
**check** 42:21,23
  190:14 277:13
  277:18,20
**checked** 277:17
**checks** 42:25
**chicago** 25:5
**childish** 213:14
**choice** 78:21
  79:7,8 81:15
  85:9,11 88:2
  98:13 99:11,15
  132:7 158:9
  211:10 273:13
  273:14 279:23
  305:16
**choices** 27:23
  81:17 91:15
  102:21 307:10
**choose** 47:24
  81:12 98:23
  107:2,4 108:8
  125:18 156:12
**choosing** 32:8
  47:10 73:20
**chose** 23:20
  211:20 288:4

**chosen** 47:7
  155:23 298:18
**chunk** 21:18
**circumscribed**
  222:22
**circumstance**
  163:10 263:25
**circumstances**
  85:2 190:11,12
  228:11
**citation** 47:21
**cite** 47:10,12,17
**cited** 149:24
**cites** 14:18,21
  47:3,8 48:24
  49:3
**claim** 192:16
**claims** 308:10
**clarification**
  230:8
**clarified**
  244:17
**clarify** 6:20
  125:3
**class** 68:7,8
  94:4 96:25
  128:4 146:22
  146:23 148:6,7
  148:8 155:5,13
  155:24 156:2
  157:16,21
  158:5 276:22
  285:16 286:5
  289:7 308:3

**classes** 92:7
  94:20 224:21
  225:6 266:4,14
  266:17
**clear** 24:23
  55:4 88:12
  111:16 131:22
  138:9 157:15
  180:13 181:22
  192:11,19
  194:11,12
  222:13,24,25
  223:15 226:8,9
  226:22 229:25
  236:8 237:21
  253:13 272:6
**clearly** 222:10
**client** 30:13
  59:22 60:13
  61:25 62:13,19
  62:22 63:6,21
  64:8 71:7,15
  71:20 72:21
  74:4 77:11
  91:12 92:2
  93:14,17 98:12
  98:19 109:5
  124:18 131:13
  134:16,17
  137:7,9 144:13
  145:8 262:6
  263:16 281:17
  283:3,5,7
  289:22 304:7
  309:15,17

**clients** 54:16
  55:25 56:2,16
  56:16,17 57:4
  57:9,14 58:4,9
  58:15,18,22,24
  59:2,3,7,14
  61:13,14,16
  62:6,7,9,16,17
  62:23,25 63:14
  64:4,14 66:2
  69:14,18 71:18
  71:21 72:19
  73:3,5 76:17
  76:21 77:9
  93:10,15 96:23
  97:3,13 98:20
  131:8,11,25
  133:2,12
  134:22 135:23
  136:5 137:5
  139:5 141:17
  145:5 193:8
  210:18 211:13
  212:3 213:16
  221:6 261:16
  263:2 285:5
**close** 18:10
  102:15 136:2
  283:4 298:11
**closer** 117:21
**clue** 75:19
**cluttered** 66:5
**coast** 54:17
  55:5,12,17,24
  56:7,19 57:7,8

**[coast - committee]** Page 14

58:11,14 63:22
64:12 115:12
**coaster** 98:4
**colleague**
141:23 304:15
**colleagues**
145:10,11
295:21 297:21
**college** 46:4
**color** 275:7
**colors** 75:16
**combination**
107:5
**combinations**
112:25 113:2
**combining** 17:9
**come** 7:17 18:4
18:10 24:19
25:20 45:25
46:22 65:15
75:15 80:18
82:10 84:7
91:15,21 106:4
107:6 119:9,10
138:15 139:4
140:8 165:2
170:17 203:11
203:22 214:19
227:20 239:23
249:10 270:21
271:7 281:7
283:8
**comes** 70:23
75:2 87:16
114:3 126:2

198:16 227:8
**comfort** 45:24
129:4
**comfortable**
84:20 85:8
88:4 95:11
97:23
**coming** 31:13
47:16 70:6
78:12 81:20
85:24 171:9
222:13 234:12
**commemorate**
82:4
**comment**
149:12 151:15
158:20 161:2
161:21 165:20
192:13 193:25
**commentary**
28:19 151:16
**commented**
193:15
**commenting**
148:13 149:3
**comments**
158:16
**commission**
312:25
**committee** 8:18
8:21,24,25
27:24 43:24
45:13,15,22
46:24 49:13,18
49:19,24 50:17

50:21,23,25
51:3,6,9,24
52:3,7,19 53:6
53:13 67:17,20
72:13 73:10
74:8,16 75:2
76:6 78:7,10
82:8 84:5,18
85:8 99:13
101:6 104:25
110:7 111:5,6
111:12 116:13
117:9,14,25
118:21,23
119:23,23
120:5,11,20
125:16 126:24
127:15 128:4
128:25 130:19
132:3,9 138:2
138:4,6,8,15,16
139:2,16,18,24
140:2,9,13
146:17 147:11
147:21 151:5
151:12 153:2
153:19 156:10
159:13 160:5,7
162:19,22
163:4 164:14
165:5 166:11
167:8,23 168:6
169:23 171:5
172:12 174:13
174:15,19,25

175:16,23
176:8 177:19
177:24 178:11
179:2,14
180:25 181:15
182:4,7,24
187:7 189:14
191:2,3 192:5
192:7,9 193:14
193:19 194:14
201:7,18 202:4
202:6,23 203:8
203:19,20
204:7,18
205:25 208:18
208:23 209:24
212:20 214:12
214:16 215:11
215:23 216:4,7
216:15 217:6
218:5 219:14
221:4 222:12
222:17,21,22
223:24,25
224:10,11
225:21 226:3
227:4,23
228:20,24
229:6,9,15,19
230:3 232:21
233:16 235:9
239:17 241:16
242:15 244:14
245:9 248:17
248:22 249:6

251:4,10
253:24 255:22
256:4,10 257:3
257:12,15
258:8 260:19
260:25 261:6
261:14,19,23
262:9,17 263:5
264:5,25 265:3
265:8 270:6,24
271:13,19,24
272:7 276:11
280:17 286:17
291:6 297:6
303:19 304:2
307:9,11 310:5
314:12
**committee's**
78:2 155:3
166:21 240:15
256:3
**committees**
49:11 53:11
54:8 65:20
66:20 69:18
71:15 75:18
76:8 101:13
102:2 103:18
104:23 106:14
106:15 123:6
125:20,23
137:12,14,17
138:24 141:7,9
190:13 193:3
212:5,7,23

263:21
**common** 91:4
92:15 109:17
139:14 141:16
200:3 227:9
279:16
**commonly** 67:5
**communication**
17:20
**companies**
64:25 65:4
121:15 140:19
**company** 22:2
25:3 27:18
49:14,16,22
79:17 81:7
89:12,20
130:10 219:7
**comparators**
267:12 268:5,9
268:13,24
**compare** 71:13
108:20 205:12
306:12
**compared**
112:17 122:10
156:24 190:18
190:20 205:11
205:11,13
217:15 267:12
268:4,8,12,24
269:10,14,23
279:8 280:13
299:18 301:20
301:22

**comparing**
176:15 205:16
247:13 249:21
**comparison**
70:2 71:12
72:3,14 107:18
118:16 267:3
267:16 269:10
269:14 271:14
278:3,4,6
**comparisons**
71:24,25,25
176:4,5,10
**compensation**
30:20 38:15
**competitive**
179:16
**competitors**
265:6 271:16
**complaint** 13:2
307:14,18,20
308:2,17
309:13,21
310:4 315:11
**complete**
313:14 317:8
**completed**
316:16
**completely**
125:8
**completion**
313:16
**compliance**
119:16 159:15
159:16 160:9

162:11
**compliant**
109:23 123:24
162:12 164:2,7
199:13 235:11
235:16
**complicated**
56:11 65:6
140:22 218:16
**comply** 159:7
**component**
252:13
**composition**
83:6 267:19
**compound**
199:25
**comprise** 124:7
**computer** 12:7
**concern** 75:13
235:19 259:22
**concerned**
116:19 192:25
255:8
**concerning**
111:6 256:5
**concerns**
124:25 194:14
255:23
**conclude** 311:3
**concluded**
264:24
**concludes**
311:6
**conclusion**
126:14 127:3

[conclusion - contractors]                                        Page 16

147:10 151:12
168:10 191:19
263:20 274:2
**conclusions**
32:17 147:5
151:4
**conduct**   177:20
210:18
**conducted**   5:11
**conducting**
265:4
**cone**   85:25 86:5
**conferences**
130:18
**confidential**
58:20
**confirm**   48:19
48:21 159:10
252:7,8
**conflict**   30:10
32:12,16
**conflicted**
27:16 32:6
237:7 245:22
246:14
**conflicts**   219:8
**confuse**   35:22
**confusing**
226:6 249:5
**conjunction**
270:7
**connection**
13:7 38:11
41:25 43:7
44:5 60:9

176:24 254:20
307:10
**consecutive**
186:5,8,14,20
200:17 201:4
**consensus**
226:4,7,12,15
226:17,21
227:2 230:6
**conservative**
90:17
**consider**   45:10
51:23 74:9
76:12 82:9
84:19,21 97:15
98:15 106:18
118:11 156:13
181:15 182:25
188:11 215:2,4
216:18 241:16
241:18,19
251:22 253:21
274:6 276:2
280:18
**considerably**
293:20
**consideration**
82:20 101:2
105:2 183:4
241:16
**considerations**
82:10
**considered**
40:4 53:6
74:17 76:11

106:15 257:2
261:24 270:24
271:20 272:7,9
**considering**
83:23 93:10
262:18
**consistent**
61:21 166:12
174:16 187:15
189:3,7,12
190:5 231:15
233:19 250:10
270:5
**consistently**
278:25
**construction**
94:12 271:17
273:19
**consult**   236:9
277:21
**consultant**
43:24 49:10
52:9 53:12
60:4,5,10,12,17
63:8 74:17
84:6 91:11
92:14 97:15
104:23 109:25
129:20 134:15
134:24 135:16
136:13 141:6
193:2 208:24
290:18,18,22
308:5

**consultants**
57:18,22 60:22
65:25 80:22
93:21 141:4,12
210:19 293:4
293:10,11,21
294:14
**consulting**
25:24 26:8
54:7 91:5
**consumer**
105:22
**contact**   37:24
**contacted**
309:25
**contacts**   11:8
**contain**   40:11
**contains**   197:4
**contemplated**
248:18
**contention**   32:5
**context**   75:7
145:19
**continue**   85:4,6
101:8 132:21
202:2 211:17
304:17
**continued**
54:23 130:19
130:22 202:22
310:13
**continuing**
225:12
**contractors**
57:17,20

[contradicts - counsel]                                          Page 17

**contradicts**
  182:6
**contributing**
  89:17
**contribution**
  79:15,16 89:12
  89:25 131:17
  132:19 142:22
  143:6
**control** 105:18
**conversant**
  75:12 76:14
**conversation**
  9:14 17:16
  43:20 72:15
  99:12 110:19
  117:8,14,24
  118:19,20,22
  119:20,22
  120:19 164:24
  180:20 196:6
  196:17 214:20
  256:19 280:7
  303:19
**conversations**
  13:6,10 14:7
  17:13,19 41:12
  43:9 76:16
  211:4 212:18
  212:19 303:25
  304:5
**convert** 295:19
**conveyed**
  221:23,24

**conviction** 93:4
  93:24 94:8,14
  94:18 95:23,24
  96:4,15,22
  305:12,13,14
**cookie** 189:21
**copies** 316:14
**copy** 5:9 11:17
  39:20,24
**corp** 49:21
  51:10 131:16
**corporation**
  54:12 131:19
  132:15 138:25
  295:8 296:6,14
  307:8,9
**corporations**
  55:3 139:25
**correct** 5:20,22
  5:23 6:4,5 9:24
  10:12 11:11
  18:23,24 19:25
  20:4 21:15,16
  24:15 25:17,18
  26:9,10,13
  27:3 30:23,25
  47:5,6 48:24
  49:2,20 50:19
  54:9,10 57:2
  61:3 117:6,7
  122:24,25
  123:3 128:20
  129:21,23
  130:2 131:21
  135:24 142:7

148:11 150:3
151:9,10,14
157:16 166:3,4
173:2,7 177:12
178:25 179:5
180:5,6 183:17
185:16,17
187:4,5 188:25
191:5,6 195:5
196:3 200:12
201:15,16
203:6 206:22
207:2,3 208:20
208:21 209:20
218:3 220:13
226:4 230:12
231:19 232:2
234:17,18,21
238:4,5 240:3
244:25 245:24
247:19 248:11
248:12,18
250:23 253:5
254:5,18,23
255:3 260:24
261:21 263:3
263:13 267:17
268:2,6 269:16
269:21 274:4
278:4,5 284:9
286:19 289:11
290:5,6 295:9
295:10 296:20
296:20 297:12
298:21,24

299:25 300:6
300:12 301:23
304:21 308:7
313:14 317:8
**corrected** 156:2
**corrections**
  317:6
**correctly** 28:15
  31:16 35:16
  71:8 117:4
  153:11 296:7
**corresponding**
  277:2
**costa** 1:17 4:5
**costs** 303:6
  306:7
**counsel** 4:21
  7:25 8:23 9:3,7
  9:16 12:13
  13:10,17,19
  14:3,6,22
  15:12,19,22
  16:16 17:12,24
  18:14 23:13
  24:18 26:25
  29:25 31:10,11
  33:11 34:25
  36:19,23 41:7
  41:11 42:14
  43:12 48:4
  50:7 59:19,20
  59:22 115:14
  149:13 151:20
  151:22 196:7
  196:11 232:11

[counsel - date]                                                    Page 18

277:11 316:14
**counsel's** 14:8
**count** 9:20
 236:5 301:18
**counting** 91:18
**country** 312:2
**county** 313:4
**couple** 6:9 8:20
 9:11 13:9
 20:16 46:10,12
 54:2 58:8
 66:18 68:6
 82:6,24 97:8
 97:19 105:7
 124:11 131:3
 134:12 137:20
 159:7,17
 172:12 214:23
 215:6 216:4,6
 231:6 233:8
 268:19 269:18
 277:23 293:19
 296:8 300:7
 307:5
**course** 6:20
 7:20 14:17
 46:24 61:15
 110:17 208:16
 209:13 297:8
**court** 1:2 3:15
 4:11,18,22,24
 4:25 5:3 7:2,3
 68:23
**cover** 19:4
 220:8 223:14

245:3
**covered** 62:6
 77:5,6 111:25
 148:2 221:20
 223:6,13
 271:16
**covers** 84:11
 152:25 245:4
 306:4
**crazy** 170:22
**create** 41:8
 63:18 86:4
 88:19 111:2
 303:7
**created** 24:4,4
 25:24 103:3,15
 245:24 262:14
**creating** 14:24
 18:14,16
**creation** 15:14
 18:18
**criteria** 52:20
 53:6 74:3
 117:18 163:17
 167:8 175:9,12
 181:15 182:21
 182:24 183:11
 183:12,17
 184:4 185:5,12
 186:7,12 201:3
 201:6,14 254:8
**criterion**
 251:21
**critical** 45:17
 76:5,7 77:13

78:4,18 79:11
**critically** 78:25
**criticizing**
 248:16
**crossed** 194:22
**cs** 316:15
**current** 157:20
 271:15
**currently** 5:22
 89:3
**cursory** 191:4
 191:14,20
**custom** 30:6
 91:18
**customarily**
 223:24
**customize**
 144:9
**customized**
 77:11
**cutter** 189:21
**cv** 1:4 4:10
 54:11 130:21

**d**

**d** 5:6,6 21:21
 115:4,4 130:20
**daf** 242:8,11
**dangerous**
 226:14
**data** 66:17
 144:10,11
 145:3 171:10
 202:14 214:4
 250:16,17,18
 250:18,23

270:24 272:7
274:10 303:8
**date** 10:8 16:12
 19:13 31:3
 32:2 35:7,9,13
 36:10 37:2,5
 37:13 69:21
 70:10,13,17
 71:2,7,14 72:6
 72:7,22 73:5
 73:17,20 76:19
 76:22 77:6,7
 77:12,16,21
 78:3,5,8,21
 79:3,10 80:2
 81:6,12 82:9
 82:12 83:10
 86:9 87:22
 88:22,24 91:13
 91:17 92:15
 93:18 94:17,22
 95:6,22 97:11
 100:4 101:3
 108:13 109:12
 112:7 122:22
 122:23 123:8,9
 123:13,15
 126:7,10,13,23
 127:24 128:17
 128:19,21
 133:8 141:22
 142:4,5,6,10
 168:14 176:17
 179:8,9 181:5
 181:7 205:15

216:5 247:15
249:24 260:18
261:9 262:12
264:23 265:21
266:7,21 267:5
271:14,23
272:2,8,10,17
276:17 277:2
292:8 296:13
297:14 298:19
298:23 301:22
302:15,18,21
303:4 304:18
305:19,21
306:13 307:13
310:4 312:4
317:12
**dates** 158:18
218:8 255:17
**day** 7:11 15:9
28:5 30:6
196:15 213:15
213:18 305:2
311:19 312:23
313:22 317:15
**days** 8:20 9:18
65:17 316:16
**dciia** 130:20
**de** 2:11
**deal** 140:3,4
194:5 283:4
**dealing** 254:24
**dealt** 28:13
254:15

**decades** 210:10
**december**
282:14 285:14
286:7 287:23
288:16 291:15
292:21
**decide** 92:14,15
102:10,18
107:3 170:22
196:4,13
**decided** 23:13
25:18,19 26:4
55:21 144:12
206:2 212:20
214:2 228:19
**deciding**
196:11
**decision** 45:23
74:10 76:6
99:9 119:24
127:10 188:6
188:11 189:21
190:3 192:24
198:19 199:21
201:7 202:7
223:2 227:5,24
228:4,12,21,23
228:24 229:2,3
229:7,9 230:4
230:5,8 262:4
295:22 306:4
**decisionmaki...**
132:2 198:18
**decisions** 45:14
74:18 125:24

125:25 132:11
141:18 162:9
192:11,12,21
194:10 222:23
228:8
**declare** 317:4
**decline** 242:19
**dedicated**
141:15
**deemed** 158:25
160:19 297:7
317:6
**deems** 225:23
**deep** 71:12 83:9
135:8 168:18
259:19 260:18
261:2,9,20,23
265:13,15
266:9 270:5,25
272:8,10
279:21 314:17
**deeper** 83:8
156:11 260:2
262:10 280:8
**defaulted**
207:17
**defend** 23:16
23:18
**defendant**
21:14
**defendants**
1:10,17 2:8 4:7
4:9 10:19,20
11:10 20:23
311:8

**defense** 22:11
22:13,25 23:3
23:15 24:7,13
24:19 29:23
31:8 33:9
34:22 36:17
**defer** 117:23
**deference**
240:6,17
**deferral** 89:11
**deferring** 89:4
**deficiencies**
158:12 197:14
**deficiency**
200:8
**deficient**
194:25 195:3
195:25 197:5,7
197:13
**define** 189:15
295:14
**defined** 81:24
104:14 131:10
131:17 132:18
132:19 142:22
142:25 143:3,6
189:14 304:22
**defining** 150:16
**definitely** 32:15
124:9 160:11
190:13 273:20
**definition**
145:25 180:7
301:3

degree 129:4
214:22
delay 236:7
delegate 222:11
deliberate 76:2
deliberated
255:24
deliver 219:25
delivered
219:13,21,24
220:4,5
demographic
79:2,21 88:16
112:23
demographics
78:16,17 275:4
287:7
demonstrate
228:7
demonstrates
278:9
department
92:5 209:11,17
209:21 210:12
227:20
depend 275:2,3
depended
17:19
depending 15:4
17:3 61:23
68:7,7 90:17
91:2 111:14
120:15 123:18
124:2 134:16
135:20 144:11

189:11 205:9
206:12,15
212:20 255:9
274:24 287:20
depends 17:2
122:20 163:22
193:24,25
221:14 260:8
deponent 312:5
313:18 316:13
317:3
deponents 5:2
8:13
deposed 5:18
6:4,8 7:17
34:15,16
deposes 309:23
deposing
316:13
deposition 1:16
3:11 4:6 7:10
7:16 8:2,10,12
8:15 9:5,8,17
17:8 44:5,7
47:3 172:13
198:7 261:11
311:7 312:4
313:9,11,16
depositions
7:20 43:23
44:24
depth 105:9
169:3 201:20
259:13

described
82:16
description
314:3 315:3
design 140:4,25
designed 81:6
desk 105:15
despite 25:22
101:11 203:16
251:23
detail 88:6
210:13 219:2
222:16
detailed 175:20
200:22 217:9
details 22:8
35:11 36:11
37:3 52:22
53:3,5 54:6
171:4
detected
242:16
detection 116:9
determination
118:2 127:20
151:18 171:15
184:14
determine 93:8
99:21 158:8
168:16 178:11
178:16 182:4
201:21 211:9
211:14,17
224:19 225:5
228:12,17,18

256:9 275:10
279:22
determined
169:24
determining
101:2
detour 129:17
develop 48:20
developed
81:18
developments
188:2
dfa 234:5 240:7
240:18
dictate 63:7
129:13 214:9
249:12
dictates 129:14
247:12
difference
55:11,14,15
65:8 105:17
131:23 158:3
262:7,8 302:14
differences
266:4
different 20:20
31:17 36:3
37:14 45:20
46:23 48:16
56:16,17 64:24
65:3 67:12
68:13 78:24,24
78:25 82:23,25
86:10,21 91:5

91:16,17 92:21
93:6,12 94:17
96:20 104:17
105:12 107:24
108:2,22
109:11 121:16
121:17 122:24
123:2,14
125:24,25
127:2 144:2,4
144:5,5 153:18
159:11,16,17
159:18 160:10
161:24,25
162:6,24
163:10 170:13
180:6,19
189:10,25
199:24 204:5
207:15 208:2
215:10 217:3,7
217:20 218:6
218:21 222:15
224:21 227:16
235:6 249:11
262:13 263:17
263:25 264:8
273:10 278:15
278:19 279:18
293:9,11 302:9
302:11,20,24
303:2,21,23
305:22,23
306:2 308:14

**differently**
102:12 123:3
125:20 144:20
189:15 205:19
302:6,7
**difficult** 25:21
61:11 75:25
**diligence** 131:2
155:11 265:4
**diminish**
102:23
**dinner** 115:13
**dinnertime**
114:11
**direct** 116:3
165:19 216:9
**directing** 135:9
**director** 130:7
283:15 289:13
289:20
**disagreeing**
180:8
**disagreement**
180:10
**disconnect**
19:23 164:3
**discover**
287:22
**discovered**
287:20
**discretion**
131:25 132:3
174:19,24
177:25 187:7
187:13

**discussed**
118:13 194:2
201:20 255:23
256:10,11
265:2
**discussion**
124:17 271:16
**discussions**
194:12
**disengaged**
141:7
**distinct** 224:21
**distinction**
64:19
**distributed**
261:15
**distribution**
39:4
**district** 1:2,3
4:11,11
**dive** 71:12 83:9
135:8 168:18
262:10 270:5
272:8,10
**diversification**
92:3 271:19
272:20 273:18
**diversified**
308:19
**diversify**
105:19 224:23
**dives** 260:18
261:2,9,20,23
265:13,15
266:9 270:25

314:17
**dividend**
308:20
**division** 50:2
**document** 13:4
40:20 42:24
43:19 111:13
111:14 150:4
153:16 183:6
186:16 187:16
198:22,24
216:23 217:9
217:15,18
218:2 221:11
221:14,15,20
222:5 238:15
241:7 242:13
242:20,22
252:22 258:4
262:5 264:15
264:17 266:13
271:11 282:6,9
282:17 285:11
285:19 299:4,6
299:10,11
315:8
**documentation**
152:3 168:10
**documented**
138:8 186:6
201:7
**documents**
7:24 11:15,24
12:23 40:8,14
40:15 41:7,10

| | | | |
|---|---|---|---|
| 41:16,17,25 | 19:1 20:1 21:1 | 114:1 115:1 | 184:1 185:1 |
| 42:5,11,18 | 22:1 23:1 24:1 | 116:1 117:1 | 186:1 187:1 |
| 43:6,14 110:6 | 25:1 26:1 27:1 | 118:1 119:1 | 188:1 189:1 |
| 149:20,24 | 28:1 29:1 30:1 | 120:1 121:1 | 190:1 191:1 |
| 195:18 223:25 | 31:1 32:1 33:1 | 122:1 123:1 | 192:1 193:1 |
| 261:13 263:12 | 34:1 35:1 36:1 | 124:1 125:1 | 194:1 195:1 |
| **doing** 52:6 | 37:1 38:1 39:1 | 126:1 127:1 | 196:1 197:1 |
| 87:24 108:3,4 | 39:15 40:1 | 128:1 129:1 | 198:1 199:1 |
| 108:10,14,19 | 41:1 42:1 43:1 | 130:1 131:1 | 200:1 201:1 |
| 108:24 109:2 | 44:1 45:1 46:1 | 132:1 133:1 | 202:1 203:1 |
| 117:22 127:12 | 47:1 48:1 49:1 | 134:1 135:1 | 204:1 205:1 |
| 129:7,8,19 | 50:1 51:1 52:1 | 136:1 137:1 | 206:1 207:1 |
| 135:3 139:12 | 53:1 54:1 55:1 | 138:1 139:1 | 208:1 209:1 |
| 139:12 144:25 | 56:1 57:1 58:1 | 140:1 141:1 | 210:1 211:1 |
| 208:13 212:14 | 59:1 60:1 61:1 | 142:1 143:1 | 212:1 213:1 |
| 217:11 227:17 | 62:1 63:1 64:1 | 144:1 145:1 | 214:1 215:1 |
| 262:23 273:20 | 65:1 66:1 67:1 | 146:1 147:1 | 216:1 217:1 |
| 284:9,14,14,15 | 68:1 69:1 70:1 | 148:1 149:1 | 218:1 219:1 |
| 287:5,6 302:13 | 71:1 72:1 73:1 | 150:1 151:1 | 220:1 221:1 |
| 303:9,14,16,16 | 74:1 75:1 76:1 | 152:1 153:1 | 222:1 223:1 |
| 305:17 306:16 | 77:1 78:1 79:1 | 154:1 155:1 | 224:1 225:1 |
| 306:17,18,19 | 80:1 81:1 82:1 | 156:1 157:1 | 226:1 227:1 |
| 309:19 | 83:1 84:1 85:1 | 158:1 159:1 | 228:1 229:1 |
| **dol** 220:12 | 86:1 87:1 88:1 | 160:1 161:1 | 230:1 231:1 |
| 227:4 | 89:1 90:1 91:1 | 162:1 163:1 | 232:1 233:1 |
| **dollar** 104:12 | 92:1 93:1 94:1 | 164:1 165:1 | 234:1 235:1 |
| 134:13 | 95:1 96:1 97:1 | 166:1 167:1 | 236:1 237:1 |
| **dollars** 38:17 | 98:1 99:1 | 168:1 169:1 | 238:1 239:1 |
| **domestic** | 100:1 101:1 | 170:1 171:1 | 240:1 241:1 |
| 103:11 113:12 | 102:1 103:1 | 172:1 173:1 | 242:1 243:1 |
| **donald** 1:17 4:4 | 104:1 105:1 | 174:1 175:1 | 244:1 245:1 |
| 6:1 7:1 8:1 9:1 | 106:1 107:1 | 176:1 177:1 | 246:1 247:1 |
| 10:1 11:1 12:1 | 108:1 109:1 | 178:1 179:1 | 248:1 249:1 |
| 13:1 14:1 15:1 | 110:1 111:1 | 180:1 181:1 | 250:1 251:1 |
| 16:1 17:1 18:1 | 112:1 113:1 | 182:1 183:1 | 252:1 253:1 |

254:1 255:1
256:1 257:1
258:1 259:1
260:1 261:1
262:1 263:1
264:1 265:1
266:1 267:1
268:1 269:1
270:1 271:1
272:1 273:1
274:1 275:1
276:1 277:1
278:1 279:1
280:1 281:1
282:1 283:1
284:1 285:1
286:1 287:1
288:1 289:1
290:1 291:1
292:1 293:1
294:1 295:1
296:1 297:1
298:1 299:1
300:1 301:1
302:1 303:1
304:1 305:1
306:1 307:1
308:1 309:1
310:1 311:1,7
311:16 314:5
316:5 317:2,4
317:12
**door** 64:5
**downs** 100:6

**downside** 65:13
68:20 100:7
**draft** 14:3,23
15:18 159:25
161:19 172:9
172:18 184:6
**drafted** 160:2
**drafting** 173:9
**drafts** 14:25
15:22 16:3,4
17:11,13
**draw** 263:20
**dries** 306:7
**driving** 99:20
124:10 125:10
135:12 163:25
208:12 294:12
304:12
**drop** 119:5,13
**dropped** 54:3
163:12
**dropping**
119:18 120:15
**drove** 138:2
**due** 131:2
155:11 257:21
259:2 265:4
**duly** 5:7 115:5
313:9
**duplicative**
28:20
**durables**
105:22
**duties** 136:12

**duty** 204:19
308:10
**dynamics**
20:24 21:4
22:10

**e**

**e** 2:2,2 5:6
17:17 115:2,2
115:4 313:1,1
314:2 315:2
**eagar** 43:25
46:23 160:3,3
**eagar's** 261:18
**earlier** 8:21
11:23 44:3
45:5 53:19
112:5 134:18
141:21 142:20
143:11 145:5
163:8 174:11
174:21 185:3
186:22 193:18
195:2 201:11
202:10 205:5
212:5 220:11
231:7,7 239:22
243:18,24
244:7 245:18
262:25 272:14
284:7,20 295:6
**early** 64:17
133:5,12
**earned** 38:11
**easier** 61:13

**easiest** 85:22
**east** 115:12
**eastern** 114:8
**economic** 75:5
75:6 188:2
**edit** 15:7
**edited** 15:8
**educate** 75:22
103:18
**educated** 52:5
75:11 302:17
**educating**
74:22 75:5,6
76:8
**education**
71:15 73:10
75:4 76:4
138:4 216:14
216:19
**effect** 3:14 63:7
173:6 259:4
**efforts** 142:10
**either** 11:22
18:11 20:8
30:19 60:6
158:3 168:10
196:15 222:11
264:7 310:11
**elect** 286:17
**element** 79:21
108:11 214:7
250:21 278:9
**elements** 73:18
79:4,11 125:22

| | | | |
|---|---|---|---|
| **elevate** 223:4 | 265:12 270:11 | **equities** 102:5 | 151:12 153:3 |
| **else's** 293:20 | 281:6,15,24 | 103:7,8 113:12 | 174:7 225:12 |
| **embedded** | 288:7 290:8 | **equity** 39:6 | **established** |
| 144:4 | 292:12 299:3 | 72:6 101:20 | 139:3 147:11 |
| **emerging** 103:8 | 306:20 307:4 | 102:19,23 | 237:8 245:23 |
| **employed** 26:6 | 307:17 310:8 | 103:6,21 104:9 | 246:15 |
| 206:7 283:25 | **enhanced** | 255:9 258:11 | **establishing** |
| **employee** 58:13 | 143:2 258:9 | 267:4,8,8 | 224:2 |
| 129:24 130:2 | 259:2 | **equivalent** | **estimation** |
| **employees** | **ensure** 60:21 | 221:11,13,15 | 17:22 |
| 57:17,19,22 | 132:25 | **erisa** 59:19,20 | **et** 1:6,9 4:8,9 |
| 58:2,3,12 | **ensured** 285:3 | 65:15 81:20,23 | 316:4,4 317:1 |
| **encompass** | **entail** 208:3 | 81:23 103:17 | 317:1 |
| 123:10 252:19 | **enter** 4:22 | 121:24 126:4 | **european** 1:13 |
| **encouraged** | **entered** 215:22 | 210:7 220:16 | 4:14 114:16 |
| 104:7 | **enterprises** | 220:19,24 | 311:10,13 |
| **ended** 14:17 | 281:17,20 | 221:2 227:3,19 | **evaluate** 65:16 |
| 30:14 | **entire** 26:6 | **errata** 312:1 | 65:20 110:8 |
| **endowments** | 61:18 86:18 | 316:11,13,16 | 123:6 127:6,7 |
| 143:3 | 147:25 152:22 | **escalations** | 127:19 164:14 |
| **ends** 80:15 | 305:9 | 90:3 | 175:18 178:3 |
| 152:8 311:5 | **entirely** 129:20 | **escaped** 239:14 | 213:19 248:22 |
| **engaged** 212:6 | 202:6 | **esq** 2:5,10,11 | 265:24 303:22 |
| **engelman** 2:10 | **entirety** 8:3,6 | **esquire** 316:1 | **evaluated** |
| 5:11,16 12:10 | 44:8 53:23 | **essential** | 52:20 128:5 |
| 12:19 39:12,23 | 55:2 56:23 | 221:19 265:25 | 156:16 176:8,9 |
| 50:5,13 69:7 | 57:10 191:8 | **essentially** | 178:10,17 |
| 69:11 114:8 | **entity** 54:17 | 24:12 56:15 | 182:3,16 187:9 |
| 115:10 128:10 | 57:14 88:2 | 88:14 142:23 | 248:8 302:5,7 |
| 148:14,22,25 | **enumerate** | 150:10 254:24 | **evaluates** |
| 171:22 176:23 | 105:5 | 285:2 310:4 | 247:22 |
| 177:7,10 | **equal** 98:10 | **essentials** 218:2 | **evaluating** |
| 198:25 230:17 | 99:15 | 219:14 | 122:21 126:6,9 |
| 230:24 241:21 | **equation** | **establish** | 145:16 161:8 |
| 257:11 264:10 | 106:24 | 147:22 151:5 | 165:5 167:9 |

212:25 213:20
225:13 276:18
280:18 297:25
**evaluation**
72:16 127:12
175:12 176:3
185:4,12
249:18 302:9
302:11 303:18
304:16
**evaporated**
56:5
**evening**  199:4
**event**  255:14
256:24
**eventually**
184:16
**everybody**  52:4
52:5 65:9,16
66:17 67:6
78:22 81:24
89:7 92:7
143:17 145:2
165:19 264:6
275:6
**ex**  279:25
**exact**  10:8
15:24 16:5,12
38:13 195:13
195:15 216:5
218:8 295:18
**exactly**  22:7
28:16 31:19
47:12 51:4
63:25 128:14

163:15 181:23
181:23 192:20
196:7 204:9
210:20 211:25
224:10 275:24
284:14 301:24
305:7 306:18
**examination**
5:11
**examined**  5:8
115:6 313:8
**example**  41:2
48:17 79:12
85:21 86:14
92:17 104:2
110:11,15
113:6,9 123:7
125:12 132:8
135:2 146:11
179:22 195:24
196:5,11,14
197:5,16 200:8
214:5 216:21
231:8,16 244:6
245:7 278:12
305:19 306:4
**examples**
197:14 237:25
239:23
**exceeded**
276:25
**except**  3:7
309:15
**exchange**  17:18

**exchanged**
15:22 17:21
**exchanging**
17:11
**excited**  275:6
**exclusively**
58:8
**excuse**  238:12
**execution**
105:16
**executive**  23:5
130:6,19
283:15 289:13
289:20
**exercise**  97:9
97:10
**exhibit**  29:3
39:13,14,17,18
40:3,20 171:24
241:23 257:14
264:12,16
265:14 266:8
270:13,14,19
282:2 288:9
290:10 291:11
292:14 299:5
307:19 314:4,7
314:9,11,14,16
314:18,20,22
314:24 315:4,7
315:10
**exist**  66:16
109:16 227:18
**existed**  81:22
116:17 227:18

**existence**
138:17,18
**existing**  56:2
60:5,9,12
72:16 162:14
213:8
**exists**  109:13
**exit**  297:21
**expect**  43:12,15
45:18 84:5
109:8 162:11
164:22 256:22
270:6 273:4
280:23 285:7
301:2,11
**expectation**
76:10 106:15
285:2
**expectations**
78:7
**expense**  65:12
68:21 71:25
269:18,24
**expenses**
140:18 266:3
**expensive**
28:22 89:8
**experience**
74:15 75:17
85:3 106:14
107:12 115:22
116:19 120:4
123:5 126:8,9
126:15 139:15
173:13,18

**experienced**
135:17,24
**expert** 5:18
10:13,22 11:10
18:22 19:3,6
19:11,12,17,20
19:24 20:7
21:14 22:11,19
25:17 29:7,12
31:7 33:8
36:16 38:12,19
39:15 168:25
290:5 314:5
**expertise** 143:6
**experts** 10:19
10:19,25 11:5
**expires** 312:25
**explain** 20:4
54:13 55:10
85:17 245:6
299:12
**explanation**
22:6
**explanations**
84:18,20
**explanatory**
74:24
**explicit** 220:15
221:2
**exposure**
101:20 102:4
102:19,23
103:11,21
104:9 258:11
267:8,9,9

**expressed**
265:3
**extended**
189:13 190:6
280:6
**extent** 7:15
95:2 138:11
284:7
**extra** 30:16,20
**extreme** 104:11
**extremely**
183:12

**f**

**f** 21:21 115:2
313:1
**fabulous** 98:3
**fact** 25:22 38:8
50:16 77:15
79:8 81:23
101:11 116:17
142:8 145:8
164:14 168:4
169:25 170:3,6
170:18 189:25
200:2,9 203:17
208:6 213:21
215:7 226:3,20
226:21 244:6
253:18 257:3
262:13 264:8
277:25 280:2
**factor** 101:17
101:25 116:15
280:17

**factors** 97:14
98:14 99:9,16
99:19,24
104:22,24
106:3 107:6
176:11 188:5
188:13 189:22
244:13
**facts** 125:25
**fail** 81:11,11
162:21,24
236:4 239:15
239:19
**failed** 147:11
147:22 151:5
151:12 153:3
208:18 276:11
276:24 277:4
**fails** 178:9
179:3,19 180:4
182:2,14
185:13 316:18
**failure** 79:3
178:10,17
182:3,16
276:12
**fair** 6:22,23
22:6 41:6
44:10 47:3
95:20,21
118:22
**fairly** 89:20
173:16 200:3
205:7

**fall** 26:17
**familiar** 66:23
75:3 85:16
260:17 290:16
**fan** 145:24
**fancy** 75:15
**far** 116:19
122:2 133:10
195:3 306:8
**fargo** 32:4,9
**fargo's** 32:2
**fashion** 16:2
**faulting** 192:6
**favor** 84:16
**february**
200:11 201:19
244:23,24
**fed** 14:15 262:5
**federal** 2:8
**fee** 28:3,13
284:19 293:14
**feel** 60:17
136:11 137:13
137:15 283:18
**feeling** 136:22
**fees** 21:4,5
27:21,25 266:3
271:19 272:20
273:17 308:11
309:9,14,17
**felt** 30:9 46:17
52:16 194:24
**fewer** 100:5
**fia** 231:10

**fiam** 231:14,21
  232:4
**fiction** 18:5
**fidelity** 90:13
  96:16,19,19,21
  152:7 179:9,12
  180:14 181:2
  231:10,14
  254:13,16,25
  255:14,19
  256:12,16
  257:20 258:2
  262:10 265:2
  267:11,20
  268:16 271:15
  271:25 273:5
  279:9 285:15
  286:4,17
  287:14 289:6
  290:3 292:8
  294:5
**fiduciaries**
  174:6 187:24
  188:16,21
  207:21 265:20
  265:24
**fiduciary** 21:11
  22:4,15 23:2,7
  23:16 24:14,17
  28:6,11,14
  32:11,13,18,19
  34:6,11 35:25
  36:9 37:11,16
  45:16 49:11,18
  50:17 51:16

53:11 54:8
  55:9 61:25
  65:22 75:4
  99:7 136:12
  138:3,23
  149:10 166:21
  167:8 168:17
  169:2,9 211:5
  214:22,25
  215:3 216:14
  216:19 217:4,8
  217:25 219:4
  219:13 283:20
  284:3 285:6
  286:22 290:24
  297:10 307:11
  308:10
**fiduciary's**
  188:6,11
**fifth** 168:4
  186:8,14,20
**figure** 83:11
  87:25 150:13
**figured** 86:24
**filed** 307:14,20
  307:25 308:2
  315:11
**filing** 3:4
**filling** 14:17,21
**filtering** 192:8
**finalized** 15:23
  16:16 295:22
**finance** 138:20
  138:21

**financial**
  139:19
**find** 43:3 48:10
  79:10 81:5
  99:14 105:19
  163:13 165:16
  187:19 259:20
  262:15
**finding** 233:10
  262:23
**finds** 111:6
**fine** 5:14 6:18
  39:21 56:14
  98:24 183:19
  183:21 191:17
  192:2 193:20
  194:6 221:21
  251:17
**finish** 81:4 87:4
  97:22 211:16
**fire** 120:22,23
**firm** 21:8 23:5
  25:4,24,24
  31:19 32:5
  33:21 54:7
  82:4 84:14
  93:14 130:16
  133:6 142:2
  143:5 144:12
  282:24 286:23
  287:4
**firm's** 287:9
**firms** 25:22
  31:18 33:14,25
  91:6 92:10,21

144:17
**first** 5:7 6:10
  10:10 15:17
  19:13 20:5
  40:6,10 42:4
  60:3 62:17
  63:10 64:4,7,8
  92:3 103:15
  116:8 117:2
  120:11 121:20
  122:5 130:13
  149:25 153:9
  154:18,21
  177:18 183:16
  195:11 210:25
  222:10 247:11
  259:12 260:15
  262:20 270:22
  282:8 288:14
  305:8
**fit** 68:11 78:17
  287:8
**fits** 88:16
**five** 20:8 51:5
  86:16 87:22
  93:6 94:6,16
  94:18 108:20
  109:13 110:12
  115:21 116:5
  116:10,23
  117:11,13
  118:8,15 119:7
  120:6 121:8,8
  122:2,10 123:7
  124:23 128:2

176:25 183:5
185:7,21
200:24 201:13
243:15 244:11
247:23,24
248:5,8,10,23
249:8,10 250:4
251:21 268:12
268:23 269:14
277:3,15 279:3
293:10,10
294:13 300:4
300:16,20,24
301:20 306:20
**fixed** 103:6
**flaw** 203:7
**flawed** 32:20
**flexibility**
111:13 203:20
**flodin** 21:21
**florida** 6:2
85:25
**flows** 71:22
**fluctuating**
279:17
**fluctuations**
114:5
**fly** 12:6,20
**focus** 101:19
102:9 109:22
110:4,11
147:20 149:14
151:21,23,23
152:24 165:3

**focused** 47:15
143:3 149:5
185:10
**focuses** 148:3
**focusing** 25:9
152:16
**folks** 104:4
139:15 283:10
**follow** 82:6
122:6 140:14
174:22 246:17
247:4
**followed**
163:14
**following**
181:15 182:8
224:3 282:22
**follows** 5:8
115:7
**footnote** 47:13
47:14 243:2
**footnoted** 47:4
**footnotes** 48:25
**force** 3:13
**foregoing**
313:9 317:5
**form** 3:7 74:14
74:20 122:15
128:7 139:22
155:20 157:18
163:21 166:24
180:12 212:10
228:2 251:14
282:3 288:10
290:11 292:15

313:13 314:21
314:23,25
315:5
**formal** 211:8
211:14,23
212:8,25
213:23 216:14
216:18 218:12
218:14,19
227:24 228:4
228:22
**formats** 144:5
**formatted**
144:20
**formed** 78:10
**forming** 35:24
40:16 42:18
242:21
**forth** 14:9,13
14:24 15:5,9
17:21 29:7
41:15 65:14
89:13 92:4
106:10 137:18
145:2 223:24
224:8,10
**forward** 113:23
149:17 155:22
156:2 157:14
157:20 158:5,7
166:11,22
167:2 199:12
199:15 244:18
245:3,5 246:4
246:19

**foul** 24:7
**found** 38:2,2,9
213:21 260:8
**foundations**
143:3
**founded** 22:2
53:16 81:23
**founding** 49:9
54:5
**four** 9:12 16:2
19:3 20:8 42:8
57:9 63:23
87:21 134:6
168:3 186:5
189:18 190:7
200:17 201:4
225:16 254:17
293:9
**fourth** 167:25
169:5,11,14
200:15 201:18
270:12,16
**framework**
14:16 15:18
**frankly** 138:9
199:5
**fraught** 255:19
**freedom** 96:16
96:18,21 97:2
97:4 147:18
152:4,7,14
153:8,21 154:5
155:4 156:16
159:23 160:21
161:8 165:6

| | | | |
|---|---|---|---|
| 166:17,19 | **frontier** 103:9 | 170:12,17 | 88:22,25 90:13 |
| 167:12,18,22 | **froze** 68:24,25 | 178:9,24 179:3 | 92:15 95:22 |
| 168:13,20 | **frozen** 55:25 | 179:19 180:4 | 96:10,16,18,21 |
| 171:6 179:9 | 178:12 182:5 | 180:15 181:7 | 96:21 97:3,4 |
| 185:6,19 | **fulfill** 290:24 | 181:16,25 | 97:12,18 |
| 200:10,16,22 | **fulfilled** 136:12 | 182:14 183:24 | 108:13,15,19 |
| 202:2,7,12,22 | 136:18 141:5 | 185:13,15 | 108:20,21 |
| 203:2 206:21 | **fulfilling** 60:21 | 187:9 202:24 | 114:4 123:8 |
| 232:4 234:6 | 283:20 284:2 | 205:3 207:13 | 124:7,9 128:19 |
| 243:14 254:13 | 285:5 286:22 | 207:13 229:21 | 128:21 147:18 |
| 254:16,25 | **full** 100:9 191:7 | 234:5,5 235:12 | 152:4,7,8,14 |
| 255:24 256:12 | 213:9 | 240:18 242:16 | 153:8,21 154:5 |
| 256:16 257:20 | **fund** 28:20,22 | 252:15 253:3 | 154:7,10,16 |
| 258:2 259:10 | 28:25 65:10 | 257:22 264:23 | 155:4 156:8,16 |
| 262:11 265:2,5 | 72:22 73:20 | 267:4 271:14 | 159:8,23 |
| 266:23 267:5,7 | 77:6,15,21 | 294:6 296:18 | 160:10,21 |
| 267:11,20,24 | 78:3,5,8 82:9 | 297:2 298:2,17 | 161:9 162:20 |
| 268:16 271:15 | 82:12 85:4,5 | 298:20,23 | 164:21 165:6 |
| 271:25 273:6 | 86:9 91:13 | 299:6,15,17 | 166:17,19 |
| 276:12,24 | 93:18 95:13 | 302:6,8,11 | 167:3,5,12,18 |
| 277:4 279:9 | 98:2 99:22 | 306:12,15 | 167:22 168:7 |
| 285:15 286:4 | 101:3 108:3,17 | 308:20,21,22 | 168:13,20 |
| 286:18 287:14 | 112:7 113:19 | 315:9 | 170:4,4,5,7,15 |
| 289:6 290:3 | 115:19 116:13 | **funds** 27:16 | 171:6 179:8,9 |
| 292:8 294:6 | 116:22 121:7 | 28:20 29:2 | 180:25 181:5 |
| **freezing** 148:15 | 121:11 122:9 | 30:6,11,13,17 | 185:6,19 |
| **frequently** | 122:12,23,23 | 30:18,22 32:2 | 200:10,16,22 |
| 239:12 | 123:9 124:5,22 | 32:9 34:5,8,9 | 202:2,7,12,14 |
| **freshly** 11:17 | 125:5 126:10 | 34:13 35:7,10 | 202:22 203:3 |
| **friday** 4:12 | 127:18 128:17 | 35:14,15,17,19 | 205:16 206:21 |
| 311:8 | 129:8 132:12 | 36:2,10 37:6 | 207:20 231:10 |
| **front** 29:5 | 132:12 141:22 | 37:13 65:12 | 231:14 232:4,4 |
| 171:10 205:4,5 | 142:5,5,6 | 69:21 70:10,18 | 234:6 240:7 |
| 238:23 271:6 | 154:24 156:25 | 71:2,7 73:5 | 243:6,14 |
| 302:17 | 164:5,9 169:17 | 76:22 77:7 | 248:14 254:13 |

254:16,25
255:6,24
256:12,16
257:20 258:3
259:10 262:11
262:12 265:3,5
265:21 266:8
266:21,23
267:5,6,7,11,20
267:24 268:16
269:6 270:2
271:15,25
272:12 273:6
276:13,24
277:4 279:9,17
279:25 285:16
286:4,18
287:15,19
288:4 289:7,9
290:3 292:8,8
292:9 294:6,20
296:14 297:6
297:11,15
298:13 300:2
300:23,25
301:11,24
302:3,24 303:9
303:17,22
304:18 305:19
305:20,21
306:6
**funky** 178:7
**further** 3:6,10
4:24 72:16
115:6 149:22

310:9 313:20
**future** 133:9
280:10

### g

**g** 281:21
**gaining** 255:18
**game** 213:13
**gather** 66:16
265:24
**gears** 115:18
**gee** 306:15
**general** 20:23
21:4 22:6,10
73:10 80:6
82:21,25 96:3
97:7 145:14,21
145:22 164:17
174:15 191:17
191:19 192:13
192:15 194:23
194:24 197:21
203:10
**generalized**
189:9 192:18
**generally** 67:4
74:3 80:5
95:19 114:3
139:14 140:2
141:3 143:11
144:15 146:17
173:12 189:12
189:16 190:9
228:5 305:17
**generate**
100:12 113:22

172:21 276:25
**generated**
27:25
**generating**
272:24 273:6
**getting** 31:17
80:3 103:14
105:21 159:14
160:7,8,14,24
162:7,8 163:6
215:15 233:12
233:18 251:6
275:12 293:13
**give** 15:6 16:4
20:15 79:12
84:24 104:2
122:16 129:4
146:10 157:5
187:19 192:23
197:10 293:3
**given** 61:8 90:9
124:3 132:5
190:25 201:25
202:21 212:8
219:18 226:20
226:21 317:9
**gives** 205:2
**giving** 31:20
**glaring** 200:8
**glass** 281:21
**glassbridge**
281:17,20,25
282:3,10 288:8
288:10 314:21
314:23

**glide** 70:14,15
70:19 71:24
100:22 102:13
102:14 103:5
103:14 255:5
258:19 259:3
266:4,15,16,21
266:23 267:2
267:11,15,16
271:17,18
272:20
**global** 33:21
**go** 6:8 12:7,10
14:9,12 15:6
16:5 25:20
26:3 30:12,21
35:19 39:19
41:20 42:5,23
44:25 46:3,18
48:15,23 50:6
56:11 59:23
64:24 69:2
73:21 76:16
77:9 78:11
79:9,22 82:24
83:3 84:7
85:23 86:6,7
88:4 92:5 94:5
94:25 100:9
103:13 104:18
104:20 107:13
110:14,17
113:22 114:12
115:25 116:22
117:15 119:4,8

| | | | |
|---|---|---|---|
| 121:12,14,20 | 300:14 303:13 | 95:16 97:23,24 | 204:3 207:19 |
| 124:6 125:15 | 306:5 308:18 | 98:6,6,8,16,24 | 211:8,12,13 |
| 125:19 127:6,7 | **goal**   87:15 | 98:24 99:25 | 219:15 222:8 |
| 135:18 138:5 | **goes**   16:2,3 | 100:3,11,12,14 | 222:12,16 |
| 138:16 139:6,9 | 43:8 47:17 | 100:16,17,17 | 223:20 224:11 |
| 141:20 144:9 | 84:22 94:13 | 101:8,16,18,21 | 227:15 230:15 |
| 144:15 148:14 | 100:13 109:9 | 101:22,24 | 232:18,19 |
| 156:10 157:3 | 143:17 148:4 | 103:10,11 | 259:14,20 |
| 158:15 160:23 | 149:22,25 | 104:4,5 105:8 | 260:15 275:20 |
| 160:25 173:21 | 168:24 179:15 | 105:13 106:6 | 288:3 294:23 |
| 177:14 178:7 | 181:18 199:15 | 107:7,10,13,14 | 295:17 298:2 |
| 178:16 183:22 | 201:21 206:6 | 110:7,14 | 301:18 302:5,6 |
| 185:3 186:19 | 231:20 276:21 | 111:16,23 | 304:17 311:10 |
| 186:21 196:23 | 280:6 308:3 | 112:5,24 113:7 | **gong**   12:8 |
| 196:24,25 | **going**   6:6,21 | 113:8,10,22 | **good**   4:2 5:12 |
| 203:11 208:6,7 | 17:18 20:5 | 115:18 117:2,6 | 5:15 6:16 |
| 209:2,4 210:20 | 25:25 31:15,19 | 118:2,7,19 | 11:19 18:5 |
| 211:20,21 | 33:5 46:9 | 119:5,8,9,10,13 | 42:10 52:7 |
| 212:8 213:5,18 | 55:19 59:6,23 | 119:16,17 | 64:22 76:5 |
| 214:2 221:25 | 62:20 64:20,25 | 120:12,16,20 | 81:7 86:17 |
| 222:7 223:4 | 65:9,10 66:7 | 121:2 122:2,19 | 87:19 101:23 |
| 231:5,18,24 | 67:22 70:14,14 | 123:12,13,15 | 105:16 137:14 |
| 235:9,12,15,24 | 70:16 72:10 | 123:21,22 | 163:14 164:5,6 |
| 240:9,20 | 75:7,8,9 78:6,8 | 124:2,4,6,16 | 204:21 210:2 |
| 245:16 249:9 | 78:15 79:20 | 125:9,13 | 212:7 216:21 |
| 249:14 251:18 | 80:24 81:3,11 | 129:15,17 | 230:15 233:19 |
| 259:11 260:2 | 82:16,17 83:11 | 133:7 136:10 | 270:8 273:19 |
| 260:15 262:15 | 83:13,14,15,15 | 137:22,23 | 274:11 302:17 |
| 267:10 270:14 | 83:17 84:8,10 | 138:3 140:16 | 303:10 305:17 |
| 271:5 272:23 | 86:6,9,11,12 | 146:8 157:5,7 | **gotcha**   213:13 |
| 276:7 277:7,22 | 87:4,8,10,18,19 | 158:17 161:21 | **gotten**   83:22 |
| 282:5,16 | 88:3 89:24 | 172:4 184:18 | **grammatical** |
| 288:18,25 | 90:2,4,5,17,18 | 186:19 190:2 | 180:9 246:9,12 |
| 292:5,12,24 | 90:20 91:23,25 | 195:8,9,16 | 246:20 |
| 293:5,25 | 92:19 94:2 | 199:9 201:24 | |

| grandmother | grow 90:20 | **h** | happening |
|---|---|---|---|
| 95:8,10 | **growth** 94:18 | | 80:15 124:8 |
| **graph** 100:2 | 268:16 | **h** 285:10,17,17 | **happens** 86:25 |
| **graphs** 275:7 | **guard** 90:14 | 285:20 288:25 | 92:23 195:6 |
| **great** 84:9 | 96:9 | 293:5,25 294:2 | 221:21 223:3 |
| 100:13 110:3 | **guess** 16:9 18:3 | 314:2 315:2 | 226:11 |
| 163:24 280:2,3 | 18:19 41:23 | **half** 6:17 38:17 | **happy** 6:11 |
| **greater** 25:4 | 46:19 47:18 | 75:18 133:22 | 87:20 132:25 |
| **grindstaff** | 60:14 64:11 | 134:13 196:21 | 158:20 160:25 |
| 46:14 | 65:23 67:9 | 212:2,4 | 165:20 199:6 |
| **grounding** | 83:20 145:17 | **halfway** 136:8 | **hard** 39:19,24 |
| 72:13 | 146:22 149:14 | **hammered** | 75:17 106:7 |
| **grounds** 189:4 | 152:16 153:15 | 100:14 | 118:9 168:7 |
| 190:10 | 155:8 160:3 | **hand** 44:14 | 189:19 |
| **group** 20:19 | 161:11 180:20 | 59:10 313:22 | **harder** 106:12 |
| 31:5 36:15 | 204:13 236:12 | **handed** 295:20 | **harm** 24:7,20 |
| 75:12 93:25 | 236:20 242:10 | 297:20 298:7 | 24:21 |
| 107:18 109:7 | 284:23 285:3 | 304:24 | **harmon** 27:2 |
| 113:4,20 120:8 | 302:18 308:18 | **handful** 79:18 | **hazy** 97:6 |
| 121:3 123:24 | **guessing** 134:5 | 97:12 | **head** 8:23,24 |
| 176:5,10 | **guesstimate** | **handing** 305:4 | 9:2 11:7 12:3 |
| 183:19 205:16 | 62:20 | **handled** 140:12 | 31:13 33:14 |
| 205:22,25 | **guide** 258:9 | 222:15 | 41:18 49:14 |
| 206:4 227:13 | **guideline** | **happen** 84:11 | 71:4 72:11 |
| 241:13 278:4,7 | 174:12 225:5 | 86:13 113:3 | 184:11,19 |
| 282:19 288:19 | **guidelines** | 116:5 119:2 | 231:9 255:13 |
| 288:24 291:24 | 174:6 175:20 | 140:7 142:21 | 279:14 298:14 |
| 293:2 | 224:19 | 193:7 207:14 | **heading** 246:13 |
| **groups** 28:25 | **guidepost** | 208:8 | 246:17,25 |
| 112:18 144:22 | 174:15 | **happened** 59:5 | **headline** |
| 156:25 176:16 | **guiding** 111:13 | 152:9 159:17 | 259:24 |
| 210:5 247:14 | 111:14 | 163:13 204:9 | **healthcare** |
| 248:9,11,24 | **guy** 24:8 | 226:24 232:5 | 29:20 |
| 249:23 | **guys** 294:20 | 235:2 255:2 | **hear** 50:4 71:8 |
| | | 297:19 305:6 | 82:2 |

[heard - ignored]

**heard** 5:21 281:23
**hearing** 50:5
**heart** 127:4
**heartburn** 32:25
**heavily** 304:15
**heavy** 105:21 105:22
**heck** 104:14 105:23
**hegemony** 239:15
**heightened** 84:2 206:25 207:4,6,23 208:2,4 296:25
**held** 201:18 207:13,14
**help** 99:19 134:25 218:16 222:8 275:10
**helped** 58:25
**helpful** 77:19 104:19 125:16
**helping** 123:6 132:25
**hereto** 313:19 317:7
**hi** 50:14 115:11
**hiccup** 50:15
**hide** 125:2
**hides** 125:8
**high** 54:19 55:6 55:7,18 56:4

62:17 93:24 94:8,14,18 96:22 220:8 267:21 305:11 305:13,13 309:11
**highest** 93:4 95:23,24 96:3 96:4
**highlighted** 248:3 290:4
**hired** 139:7 209:7
**historical** 266:2
**history** 95:5,5 170:5,6,16 257:22
**hold** 68:23 224:25 245:17 266:25 270:15 280:10 285:25 292:3
**holding** 49:21
**holds** 207:7
**hole** 125:15
**holland** 290:9 290:11,13,19 290:23 291:6 291:10,24 292:15,19 299:14 314:25 315:5
**hone** 171:4
**honest** 118:22

**hope** 121:18 256:23 272:25
**hopefully** 249:21 281:7
**hot** 259:23
**hour** 6:16,17 199:4 213:14 230:15
**hours** 9:13 16:20 17:3,4,5 18:13,13
**house** 2:16 21:7 21:7 120:22 141:2 143:25
**howard** 2:15 4:14
**hr** 9:2 138:19 138:20 139:15 140:24
**huge** 145:24
**hundred** 56:7,9 163:11 189:25 298:10
**hurricane** 85:23,24 86:3
**hypothetical** 115:17 117:4 119:3,11 121:6 121:13,14 126:19 127:22 128:23
**hypotheticals** 127:14

**i**

**idea** 18:2 81:2 98:18 125:4 155:8 163:13 213:3 217:18 219:24 272:15 272:16 304:19
**identification** 39:14 171:24 241:23 257:14 264:12 265:14 270:19 282:2 288:9 290:10 292:14 299:5 307:19 314:4,7 314:9,11,14,16 314:18,20,22 314:24 315:4,7 315:10
**identified** 154:4 161:6 194:17 251:20 286:13
**identifies** 276:17
**identify** 153:18 158:11 173:18 198:2 222:3 228:10 232:23 233:24 234:9
**identifying** 256:4
**ignore** 117:10
**ignored** 243:15

**[imagine - industry]** Page 34

**imagine** 94:24
219:25
**immediately**
46:3 86:14,17
**impact** 75:10
120:17 187:25
255:24 257:5
259:21
**impacted**
118:14
**implemented**
234:20 237:7
237:13,17,23
239:20 243:21
245:21 246:13
246:20 247:7
**important** 70:4
75:20 77:14,22
78:2 79:19
100:25 101:5
106:20 107:20
107:22 108:18
111:24 223:16
256:6 280:17
**importantly**
72:4 138:10
**improve**
186:19
**improved**
206:9
**improvement**
186:12 187:3
201:5 206:16
**improving**
281:2

**imprudence**
23:6
**imprudent**
79:9 141:7
145:22,24
146:2 229:11
297:7,11
**imprudently**
263:22 286:21
286:24 291:7
**inadequate**
191:4,14,21,24
**inappropriate**
145:15,18
248:22
**include** 47:8,25
123:16 140:6
144:10,11
176:3 194:17
197:13,15
198:14 209:16
212:14,15
216:25 221:17
221:18 224:2
234:11 242:23
250:4 278:6
**included** 41:17
184:9,23,25
196:5 199:18
201:14 211:7
212:17,19
213:8 214:20
219:15 244:22
303:2,2

**includes** 224:12
**including** 17:7
87:15 209:23
224:16 225:18
**inclusion**
184:22
**income** 38:19
38:22,23 39:5
80:11 103:6
**incomprehen...**
203:22 204:22
**inconsistencies**
237:19
**inconsistency**
239:24 243:25
**inconsistent**
234:16 248:20
248:25 250:7
250:12 251:16
253:15 254:4
**incorporating**
248:14
**incorrect**
183:15
**increase** 255:9
**increased**
258:10
**incredibly**
86:17 89:8
**indefinite**
180:21
**independent**
54:23 57:17,20
168:19

**independently**
151:18 164:15
256:4
**index** 113:9
205:11,14
271:20 277:2
298:20,25
300:3,25
301:10,20,23
302:16,19
303:10,11,15
305:24,25
306:12,15,17
**indexes** 113:18
113:22 176:4
176:16 247:14
247:22 249:23
276:17 306:2
**indifference**
240:16
**individual** 48:6
89:4 123:22
210:2 222:11
229:15,18
**individualize**
89:7
**individuals**
54:20 55:6,8
58:12 60:15
134:23 181:6
207:14 214:11
285:4
**industry** 11:8
64:21 67:6
71:11 75:13

[industry - investment]                                              Page 35

80:5 92:15
101:21 143:12
189:17 190:8
193:6 199:21
210:10 227:10
228:6 265:5
271:16
**inexpensive**
303:17
**infinite**   278:10
**inform**   128:4
**informal**
214:18
**information**
15:5,7 38:6
46:17,21 47:13
47:14,16,22,23
47:25 66:9,11
67:4 68:16
71:6,21,23
72:9 73:22
74:8,9 79:2
83:21 112:23
129:3 135:7,10
160:7,9 162:8
162:9 163:3,24
164:4,4,20,21
166:12 169:3
171:14 183:20
209:10 214:22
215:15 221:23
233:18,19,19
240:9,20 241:9
242:4 243:14
244:10 245:10

246:2 249:5
251:5,7 253:24
261:7 262:18
262:18 263:6
263:17,18,19
263:23 264:6
265:11,25
270:5,8 272:9
273:2,5 274:3
274:10,12
275:8 286:13
287:12,13
288:5 294:9
302:16
**informative**
188:10
**initial**   130:13
**initially**   53:20
54:15
**inoperative**
172:10
**input**   88:15
**inputs**   86:6
113:15
**inspect**   159:22
**instance**   99:9
101:10 116:16
154:21 234:8
**instances**   233:5
233:8,24
234:10
**instantaneous...**
157:6
**institution**
51:14

**institutional**
49:25
**instruction**
6:12
**integrated**
284:16
**integrity**
308:21
**intentionally**
278:13,13
**interact**   91:6
283:10,11
**interest**   32:7,16
69:18 138:12
204:20 207:22
219:6,7,8
262:22 264:3
265:3
**interested**
26:18 313:20
**interesting**
20:19 129:2
154:9 262:16
**interject**
230:25
**internal**   21:9
95:13 238:24
239:3
**internally**   93:7
105:18
**international**
103:8 242:11
267:8 306:6
**internet**   38:3
176:24

**interpreting**
224:3
**interrupt**   12:5
70:8 223:8
**intex**   298:23
**introduce**   29:3
**invesco**   308:19
**invest**   108:5,6
306:5
**invested**   64:17
181:7
**investigate**
142:11
**investment**
7:21,23 21:7
23:7 25:23
27:23,24 33:21
33:24,25 39:2
41:3 43:13
51:7,16,21
52:8,18,21
53:12 63:19
66:15 68:9,18
74:10,18 81:7
93:21,25 95:17
105:2 109:2,20
109:20,23
110:5,9,10
111:7,9 114:3
115:19 132:7
135:6 138:20
139:20 140:12
145:16,21
156:17,19,23
160:14 169:4

| | | | |
|---|---|---|---|
| 174:7 175:8,17 | 24:12 27:22 | 153:25 154:11 | 239:13,25 |
| 175:19,23 | 28:18 39:6 | 157:4 159:7,11 | 240:4,16,23,24 |
| 177:15,19,21 | 45:24 64:14 | 159:15,25 | 241:19 243:25 |
| 178:2 180:18 | 65:17 75:8,22 | 160:2,6,15 | 244:9 245:23 |
| 182:20 185:24 | 106:17 132:4 | 161:13,19 | 246:15 247:12 |
| 186:3 187:8 | 147:13,16 | 162:4,4,15 | 247:19 248:9 |
| 188:3 194:10 | 151:7,14 153:4 | 164:17,23,24 | 248:16,18 |
| 200:21 201:3,8 | 167:16 188:7 | 166:2,6,13 | 249:9,11,13,14 |
| 208:15,24 | 194:5 201:20 | 171:23,23,25 | 249:15 250:8 |
| 209:16,19 | 217:5 222:18 | 172:23 173:2,9 | 250:12 251:16 |
| 210:16,19 | 232:23 233:5 | 173:13,23 | 251:19 252:13 |
| 214:21 216:12 | 239:11 255:3 | 174:2,5,12 | 252:25 254:5 |
| 216:13 219:4 | 256:6 266:5 | 175:3 176:8 | 276:17 278:2 |
| 220:9 223:7 | 271:22 | 177:11 178:6 | 314:8 |
| 224:3,15,19 | **invoices**  16:23 | 179:23 180:16 | **ipss**  121:16 |
| 225:9,13,18 | **involved**  7:12 | 180:24 182:10 | 172:9,18 |
| 232:22 238:17 | 22:22,24,25 | 183:10,22 | 221:18 |
| 238:18 240:16 | 27:11 59:22 | 184:7,10,23,25 | **ira**  39:3 101:15 |
| 240:24 251:19 | 135:11 136:7 | 185:8 186:12 | **irrelevant** |
| 251:22 252:4 | 207:11 210:13 | 187:3,12,15 | 157:16 158:3 |
| 252:11,14,19 | 298:3 304:16 | 189:11 199:13 | **irrespective** |
| 253:2 254:2 | 309:22,24 | 199:17,22 | 24:14 116:15 |
| 256:2 276:4 | **involvement** | 200:2 201:3,11 | 121:9 122:8,11 |
| 279:17 282:10 | 214:7 | 201:15 203:17 | 164:17 170:6 |
| 282:21 283:7 | **ips**  43:13 63:18 | 204:12 208:8 | **issue**  20:25 |
| 283:18,25 | 63:18 110:17 | 209:23 216:5 | 27:5,11,17,25 |
| 288:20 290:12 | 110:17,18,20 | 221:15,17,25 | 28:11 30:4,7 |
| 290:17,18,22 | 111:14,21,23 | 222:4,8 223:13 | 30:14 31:23 |
| 291:25 293:2 | 112:2 116:2 | 223:21 224:6 | 32:11 33:18 |
| 293:13 294:14 | 117:16,18,24 | 224:12 225:3 | 34:6 35:4,6,9 |
| 295:5,7 307:8 | 121:14,14,21 | 232:24 233:6 | 35:14 36:24 |
| 308:14,16,25 | 122:6,6,8 | 233:15 234:17 | 37:2,6,13 |
| 309:5 | 125:18,21,23 | 234:24 235:22 | 44:13,18 45:11 |
| **investments** | 149:7 153:13 | 236:10,13,18 | 111:22 120:21 |
| 21:6 23:19,21 | 153:14,15,23 | 237:8 238:6 | 120:24 124:5 |

**[issue - knight]**

| | j | junior 135:15 | keyword 65:23 |
|---|---|---|---|

125:10 126:21
140:25 141:2
155:14 164:13
164:18,19,22
167:4 169:13
173:23 184:21
186:23 192:3
192:15 195:21
196:21 199:14
199:20 218:16
226:3 228:21
246:9,11,12
259:17 262:21
272:11 310:5
**issues** 20:9,13
21:11 22:7
25:25 27:19
28:8,13,14
45:17 78:13
125:2 138:23
140:3,4,6,8,12
140:15,21
148:15 165:4
183:24 192:25
194:2 203:12
203:15,16
216:24 218:21
242:16
**italicized** 248:4
**iterations**
234:23
**iterative** 14:6
17:24 41:19
48:14 136:6

**j**

**jagged** 100:17
**january** 152:23
245:3,5 282:13
288:15 291:15
292:20
**jcroberts** 2:5
316:2
**jeffrey** 282:23
284:19
**jennifer** 21:19
21:20
**jensen** 46:13
**job** 44:16 45:6
100:7 139:12
139:12 178:3
303:10
**john** 2:5 9:11
9:15 13:24
316:1
**joins** 138:4
**jp** 96:5
**judge** 7:3 23:23
24:3
**judgment**
150:24 190:14
204:21
**july** 16:12
**jump** 222:7
223:10
**june** 11:22
15:20 56:23,24
129:23 199:8
307:15,20
308:2 315:11

**k**

**k** 22:24 25:12
34:6 39:3
49:19 50:17
51:10 53:11
55:8 80:18
121:16 224:9
224:11 285:16
286:5 289:7
292:8 294:6,20
295:13,15,16
296:11 304:24
**keep** 33:13
52:12 55:22
95:13 99:4,6
99:23 101:7,12
101:14 103:3
111:12 157:10
171:9 204:3
288:4
**keeper** 28:5
308:12 309:10
**keeps** 12:6
125:7
**kept** 57:14
162:15 305:15
**keri** 2:10 5:15
230:14
**keri.engelman**
2:10
**key** 49:20,21
50:18 51:10
53:9 75:11
137:25 190:10

**keyword** 65:23
**kind** 6:15 12:20
14:8,12 17:20
25:4,20 26:3
41:21 43:8,14
44:17 45:17
46:2 47:9 48:8
49:7 54:5
55:25 59:11
60:3 62:16
68:3 74:24
76:4 86:21
87:2,5,20 88:7
101:19 102:3
124:13 125:3
125:11,15
126:5 127:4
135:8,12
155:14 160:13
170:22 178:14
207:13 220:17
220:20,22
238:21 259:17
259:23 262:2
272:10,13,24
274:18,19
284:6 297:21
**kip** 48:17
**knew** 133:7,9
141:14 213:24
284:4,7 287:25
**knight** 290:9,11
290:13,19,23
291:6,11,24
292:15,19

**[knight - legacy]**                                    Page 38

299:14 314:25
315:5
**knocked** 23:22
**knocks** 98:3
**know** 6:11
  10:18,25 11:5
  11:7,13 16:22
  16:22 17:4,16
  18:6 19:2
  29:14 33:5
  37:23,23 38:13
  38:22 39:17
  41:14 43:8,16
  47:12 48:9
  52:11 58:17
  61:8 62:5,8
  63:17 65:23
  67:7 68:9
  69:24 72:8
  82:2,22 84:9
  84:12,19 95:18
  96:19 103:7,20
  105:20 107:8
  114:10 116:4
  117:2,5 118:23
  119:10,12
  120:23 125:9
  128:13 137:18
  138:18 144:21
  145:9 148:16
  150:9,15
  152:17 153:8
  153:24 158:24
  160:10 163:4,7
  165:24 167:15

171:11,12
179:7,10 184:9
188:23 195:11
196:7,9,16,20
196:22 204:8
204:23 205:15
205:21 206:14
207:20 211:25
212:12,17,24
213:4,6,10,11
214:15 215:4
215:10,19
218:2,4,22,24
219:5 220:4
222:8 229:3
236:2,20 238:5
238:10,12
239:5,6,6
242:25 244:20
246:5 247:8
250:24 251:3
253:23 259:4
260:14 262:9
272:16 279:12
279:24,25
280:7 281:17
284:6,11,11,15
284:16 286:24
287:6,7 288:2
288:2,6,13
290:15,17
291:8 294:16
294:16 295:2
299:8,20
303:13 305:5,6

306:8 307:22
309:20,21
**knowing** 280:9
**knowledge**
  165:23 219:12
  219:19 238:7
  239:2,20
**known** 79:10
**knows** 280:10
**kraft** 20:22
  21:2,13 25:19

**l**

**l** 2:10 5:6 21:21
  115:4 281:21
**labor** 92:6
  209:11,18,21
  210:12 227:20
**lack** 14:25
  22:25 23:7
  33:22 154:14
  202:13
**lagging** 108:8
**laid** 52:4
**laliberte** 1:6
  4:7 316:4
  317:1
**landing** 12:7
**language**
  111:18 174:21
  180:16 181:20
  203:17 253:12
**large** 24:25
  33:20 62:10
  92:23 94:6,18
  94:19 103:12

134:3,17
138:24 139:25
207:7
**largely** 64:25
**larger** 93:8
**largest** 73:7
  80:3 87:23
**late** 133:4
  160:24
**latest** 264:15
**latham** 8:7
  11:11
**latham's** 8:9
  9:23,25
**laundry** 46:2
  272:19
**laurie** 8:7,9
  9:23,25 11:11
**law** 31:18,19
  33:13
**lawsuit** 310:6
**lead** 72:15
  259:13
**leading** 271:15
**lease** 97:25
**leave** 54:22
**leaving** 278:14
**led** 41:16
  287:19
**left** 132:15,16
  184:8 203:17
  235:8,8 253:17
  253:20 278:18
**legacy** 62:16

**[legal - look]**                                                      Page 39

| | | | |
|---|---|---|---|
| **legal**  4:15,16 | **line**  81:4 87:5 | **literally**  81:19 | **longer**  136:9 |
| 8:23 13:17,19 | 97:22 100:16 | 86:23 210:10 | 176:18 189:4 |
| 14:2 23:13 | 100:19 163:2 | **litigation**  40:8 | 248:15,17 |
| 25:22 47:16 | 197:20 214:13 | 40:14 42:2,4 | 249:25 |
| 56:12 312:1 | 274:20 285:20 | 149:23 195:17 | **look**  8:5,7 12:2 |
| 316:23 | 312:6 | **little**  10:16 | 16:11 24:21 |
| **legs**  6:17 | **lines**  100:2,3 | 32:24 36:13 | 31:12,21 42:24 |
| **lens**  204:5 | 127:23 | 48:13 49:6,8 | 44:19 46:18 |
| **level**  45:24 | **lineup**  122:13 | 61:13 62:3 | 48:23,25 66:3 |
| 86:18 88:21 | 171:7 | 80:8,9 95:25 | 66:6 70:14,15 |
| 92:2 123:15 | **list**  19:2 29:6 | 100:6 106:5,11 | 70:16 72:2,4,5 |
| 126:25 127:2 | 41:24 46:2 | 115:18 136:8 | 72:7,8 73:18 |
| 145:8 163:18 | 79:20 82:21 | 144:20 153:18 | 78:15 79:12,13 |
| 207:23 208:2,4 | 83:3 93:2,2,3 | 173:15 178:7 | 79:15,16,17 |
| 210:13 214:6 | 93:19,22,23,23 | 205:18 207:25 | 80:24 82:24 |
| 220:9 223:5 | 93:24 96:22 | 215:9 217:11 | 83:15,17 84:4 |
| 267:21 280:13 | 115:23 116:5 | 301:25 303:7 | 85:21 86:22 |
| **lewis**  2:7 | 116:13,22 | 305:20,21,23 | 87:5,8 88:3,21 |
| **liability**  132:11 | 118:3 177:16 | **lively**  76:15 | 89:10,11,12,14 |
| **liber**  205:19 | 181:11 182:20 | **living**  289:23 | 90:2 94:25 |
| **liberty**  36:15 | 182:23,24 | **llp**  2:2 | 97:20 98:7,9 |
| 36:22 | 183:12 185:24 | **loaded**  291:12 | 98:16,18 |
| **lies**  132:2 | 186:24 188:7 | 307:23 | 100:18 101:18 |
| **life**  35:20 | 188:24 205:2 | **loading**  172:2 | 102:11 103:14 |
| **lightening** | 205:20 208:10 | 292:16 | 103:19 104:13 |
| 100:18 | 227:16,20 | **located**  1:17 | 105:8,13,24,25 |
| **lights**  98:3 | 240:16,25 | 4:17 | 109:11,14 |
| **likelihood** | 251:19 272:19 | **location**  4:5 | 111:18,24 |
| 80:25 | 305:12,13,14 | **long**  5:24 41:4 | 113:7,10 116:2 |
| **likely**  87:10,17 | **listed**  26:16 | 45:25 85:6 | 117:6,17 118:5 |
| 99:4 118:6 | 29:12,13,19 | 88:20 91:9 | 118:25 119:19 |
| 306:21 | 31:6 38:16 | 92:11 106:8 | 120:5,7,18,21 |
| **limited**  28:10 | 40:15,20 184:4 | 107:13 170:18 | 120:25 121:2,3 |
| 143:7 176:3 | 184:5 293:10 | 187:14 197:19 | 121:21 122:3,4 |
| | 293:11 308:17 | 221:23 309:5 | 122:5,6,17 |

**[look - made]**                                                    Page 40

| | | | |
|---|---|---|---|
| 123:9,12,13,15 | 281:4 288:7 | 107:25 108:2,4 | 92:7 95:4,5 |
| 123:21 124:6 | 290:8 291:18 | 110:2 113:4,5 | 100:2 101:11 |
| 124:16,21 | 303:8,13 | 113:17 117:16 | 101:13 103:2 |
| 126:24 144:16 | 305:21 306:22 | 129:5,11 | 103:21,25 |
| 144:19 149:23 | 309:4 | 150:14 152:3 | 104:8 110:22 |
| 150:12 151:3 | **looked**  7:22 | 152:21 159:4 | 110:24 122:17 |
| 152:13 153:12 | 8:18,20,22 | 163:18 164:16 | 130:17,17 |
| 154:19 156:11 | 10:17 42:12 | 170:20 175:8 | 132:11 136:24 |
| 157:3,22 158:8 | 44:9 46:11 | 184:21 185:9 | 136:25 140:6 |
| 158:17 159:9 | 63:9 65:24 | 188:22 189:22 | 140:14,23 |
| 160:22,25 | 94:10,11,13 | 204:5 207:10 | 145:9 149:12 |
| 163:17 164:20 | 103:25 126:22 | 210:5,6 238:22 | 195:6,14 |
| 164:22 165:8,9 | 144:16,17 | 248:17 257:8 | 197:22 198:18 |
| 165:12,20 | 149:20 152:19 | 266:18,22,23 | 217:3 218:20 |
| 166:9,10 167:7 | 152:20,20 | 267:2,4 274:2 | 220:14 221:3 |
| 168:7 170:23 | 156:3 184:15 | 274:12 275:5 | 221:17 274:10 |
| 177:14 184:12 | 184:17,24 | 279:4 280:3 | 274:11 309:19 |
| 184:14,15,16 | 197:10 201:11 | 285:22 305:10 | **lower**  102:19 |
| 188:17,20,24 | 205:4,22,25 | **looks**  150:6 | 309:14 |
| 196:2 198:19 | 232:9 238:18 | 172:6 208:5 | **loyalty**  204:19 |
| 199:6 204:19 | 245:18 273:17 | 267:10,14,16 | **lunch**  114:10 |
| 207:22 208:9 | 273:17,18 | 267:18,24 | 114:15 115:12 |
| 217:7 223:20 | 274:9,10 | 268:4,8,11,15 | |
| 223:21 231:5 | 275:18,25 | 268:19 269:5,9 | **m** |
| 233:11,17 | 299:16 309:13 | 269:13,17,18 | **ma**  2:9 |
| 235:12,24 | **looking**  11:24 | 269:20 278:2 | **made**  24:10 |
| 236:10 240:4 | 29:5,9 44:16 | 294:24 305:22 | 41:13 45:14 |
| 241:20 244:14 | 45:2 46:19,20 | **losing**  255:19 | 77:5 122:23 |
| 249:13 251:12 | 53:15 71:19 | 259:21 | 141:18 151:18 |
| 252:6,8 257:10 | 72:12 73:19 | **lot**  6:6 32:3 | 164:6 169:6 |
| 267:23 268:3,7 | 80:12 83:16 | 38:3 44:15,20 | 192:12,22,24 |
| 268:21 270:10 | 87:3 88:24,25 | 46:24 67:10,15 | 194:10 204:3 |
| 271:4 272:21 | 93:9,16,17 | 73:15 74:22 | 211:12 228:8,8 |
| 279:7,10,21 | 94:2 99:20 | 75:16,23 76:3 | 228:9,13,21,22 |
| 280:8,22,23,25 | 105:15 107:24 | 81:16,16 83:16 | 228:24 229:2,3 |
| | | | 229:7,9 230:6 |

| | | | |
|---|---|---|---|
| 230:8 298:2 | 119:23 125:23 | 94:14,15,15 | 299:3 307:17 |
| 313:18 317:5 | 125:24 127:9 | 96:5,6,6,8,9,10 | **maria.decastro** |
| **magazine's** | 127:19 130:11 | 96:11 105:9 | 2:11 |
| 23:21 | 138:6,10 | 106:8,9 107:3 | **mark**  39:12,23 |
| **magnitude** | 139:10,11 | 107:4,4,11,14 | **marked**  39:22 |
| 120:16,17 | 146:4 154:20 | 108:25 109:15 | **market**  88:22 |
| **mail**  17:17 | 157:14 158:2 | 135:9 252:11 | 100:6,8,8,9,10 |
| **main**  28:21,21 | 171:15 172:17 | 252:14,19 | 100:13 176:15 |
| 296:8,11 | 184:14 190:3 | 253:2,7 254:2 | 247:14 249:22 |
| **maintain** | 199:22 211:21 | **manager's** | 255:20 |
| 130:10 | 222:23 223:2 | 180:18 | **marketplace** |
| **maintaining** | 227:12,12 | **managers** | 91:19 |
| 224:12 | 229:24 237:21 | 33:24 68:19 | **markets**  103:9 |
| **maintains** | 270:15 277:13 | 93:3,6 94:2,6,7 | 103:9,11 |
| 132:9 | 293:18 | 94:17,19 95:14 | **markoff**  143:22 |
| **major**  143:16 | **makes**  70:17,20 | 95:25 96:4 | **married**  21:22 |
| 144:17 173:22 | 107:2,3 223:14 | 108:24 271:20 | **mary**  1:6 4:7 |
| **majority**  56:13 | 226:19 | 271:21,21 | 316:4 317:1 |
| 80:10 93:21 | **making**  42:6 | **managing** | **matched**  167:7 |
| 144:17 197:12 | 45:23 51:9 | 53:25 | **materials**  40:4 |
| 207:8 229:20 | 73:20 74:9,18 | **mandate**  132:4 | 149:16,17 |
| 276:24 | 76:6 83:23 | 186:13 187:3 | 150:2 167:20 |
| **make**  12:11 | 84:11,22 | **mandated** | 216:12,14 |
| 28:19 32:17 | 109:22 162:9 | 176:9 | 275:21 276:2 |
| 42:17,25 48:24 | 204:21 262:4 | **manner**  209:18 | 277:21 |
| 48:25 51:16 | 293:20 302:17 | **march**  254:11 | **mathematical** |
| 61:13 64:18 | 306:3 | 290:4 | 88:8 |
| 70:17 73:14 | **managed**  28:2 | **marconi**  21:20 | **mathematics** |
| 79:23 81:17 | 131:3 301:24 | **maria**  2:11 | 86:20 |
| 83:24 85:10 | 302:13 303:22 | 39:12 171:23 | **matter**  4:7 5:17 |
| 88:12 89:6 | 306:13 308:12 | 241:21 257:11 | 5:19 10:2,15 |
| 91:25 93:17 | **management** | 264:11 265:12 | 10:23 98:22 |
| 101:9 103:4 | 33:21,25 | 270:11,18 | 104:6 127:17 |
| 105:17 106:22 | **manager**  52:14 | 281:24 288:7 | 145:14,21,22 |
| 109:21 117:25 | 68:9,19 83:14 | 290:8 292:13 | 164:17 222:18 |

**[matter - mid]**                                                        Page 42

261:22 262:19
278:12 306:14
309:23
**mean**  8:3 18:2
21:24 43:12
45:4 47:21
48:3,21 52:23
60:13 66:4
70:8 81:19
84:23,24 85:21
107:24 116:6
120:22 121:23
138:14 145:18
157:6 173:20
178:23 180:2
181:8 189:7
193:23 207:4,7
215:22 221:10
250:19 279:20
284:10 293:9
296:24
**means**  6:25
89:10 100:5
105:14 117:22
157:7 174:23
189:13 190:6
217:3
**meant**  126:13
231:22
**measure**
106:22 302:19
**measured**
176:14 247:13
249:21

**measuring**
128:17
**meat**  44:18,25
45:10
**meatier**  219:22
**meaty**  219:8
**mechanism**
123:20
**media**  311:5
**median**  87:5,8
89:14 90:25
125:14 240:8
240:18 241:8
241:13 251:20
**meet**  87:14
181:6 283:14
**meeting**  135:20
150:7 152:21
191:2,8,13,24
194:4,4 195:25
197:5,6,12
199:8,12 200:8
200:16,21
201:18 228:23
229:6,14
241:24 257:12
257:15 264:13
264:14,24
266:12 270:17
270:20 271:4
272:6 275:20
275:23 276:3,4
314:10,12,15
314:19

**meetings**
135:18 192:7
215:16 217:21
217:23
**member**  49:18
54:5 128:25
229:16 230:3
**members**  8:18
8:22 43:24
162:22 172:12
174:19 193:14
194:14 214:16
215:11 216:4
227:4 229:18
261:6
**memory**  146:9
152:12 158:18
160:24 199:7
**mention**  145:4
183:10,13,16
239:14
**mentioned**  9:22
25:11 53:18
76:9,20 77:2
77:20 85:13
93:18 97:19,19
101:4 107:17
112:5 138:13
154:3 160:19
166:2 169:5,11
172:9 220:11
**menu**  28:21
**mercer**  289:15
289:17

**mess**  33:5
171:2
**met**  141:10,12
146:17
**metal**  100:12
**methodology**
94:12
**metric**  66:3
106:12 111:5
121:9 122:12
188:10 190:18
299:24
**metrics**  64:13
64:16,18,21,24
65:2,21,24
66:19,22 67:2
67:18 68:2
69:13,16 70:11
71:13,16 74:17
75:6,14 76:9
76:10 77:22
106:7,11,16,22
107:17 109:4
109:24 121:4
121:17 122:18
144:4,5,6,7,13
164:15 188:4
190:21 251:10
251:12,15,17
**metropolitan**
308:20
**mid**  25:4 52:13
52:23 242:11
306:6

**midatlantic**
  316:15
**middle** 201:24
  249:19 265:23
**miller** 2:2
  13:20 15:12
  29:15,18 37:18
  37:20,23
**millershah.com**
  2:5 316:2
**million** 38:17
  62:14,14,23
  63:5 64:3
  87:18,20
  133:21 134:4
  259:23
**mills** 29:20
**mimicking**
  303:10,11
**mind** 52:12
  70:6 97:6
  99:23 103:3
  111:12 148:22
  155:7 165:18
  194:22 218:15
  234:12 236:7
**mine** 38:25
  55:23 141:23
**mineola** 312:2
**minimum** 39:4
**minneapolis**
  282:25 283:13
**minor** 207:12
**minute** 172:3
  192:16 193:21

195:25 199:5
  211:19 221:3
  281:7
**minutes** 12:8
  44:21 97:19
  114:9 127:5
  152:21 153:12
  153:12 191:2,8
  191:13,25
  192:4 193:3,9
  193:15,19
  194:7,16,20,23
  195:9,12,14,18
  196:21,22,22
  197:3,6,13
  198:4,6,13,15
  199:2,8,12,18
  199:23 200:9
  201:17,22
  206:6 228:23
  229:6,14
  230:18 241:22
  241:24 256:9
  257:8,9,12,15
  258:16 259:5
  264:11,13,14
  270:17,20
  271:5 272:6,15
  273:24,25
  275:21,23
  276:5 306:21
  314:10,13,15
  314:19
**minutia** 88:13

**miscommuni...**
  47:20
**misread** 250:13
**misreading**
  188:14
**missed** 19:13
  133:25 220:18
  220:25
**missing** 197:23
  198:13 222:3
  236:23 274:19
  285:21
**misspeaking**
  196:14
**misspoke** 231:7
  244:5
**misstates**
  157:18 166:24
**misunderstan...**
  215:17
**mix** 59:24 72:6
  90:10,11 153:9
  166:17,20
**mixed** 31:18
**modified** 200:2
**molina** 29:20
**moment** 27:7
  35:12 36:12
  37:4,9 54:6
  67:2,24 70:6
  78:23 79:21
  143:23 205:6
  234:13 256:17
  275:25 293:3,7

**money** 23:21
  52:14 98:21,25
  99:5,6 101:7
  101:12,14
  207:19 275:16
  293:21
**monitor** 139:20
  145:21 147:12
  151:6,13 153:4
  153:23 175:16
  177:20 178:2
  181:16 186:4
  186:25 200:10
  200:17 201:4
  201:21 202:8
  202:12 203:3
  203:10,11,12
  203:14,21,23
  204:10,15
  206:2,10,11
  217:4 222:18
  239:13 241:10
  242:8 243:7,9
  243:10 251:22
  252:15 253:3
  253:21 257:20
  258:8
**monitored**
  27:23 175:23
  195:7
**monitoring**
  23:8 28:18
  34:7,12 36:2
  51:11,20 53:7
  63:19 77:14

**[monitoring - new]**                                        Page 44

82:11 105:2
106:17 122:22
132:9 142:6
153:21 154:5
159:23 160:20
183:23 201:14
219:5 220:9
225:8,13 237:8
239:16 244:9
244:13 245:22
246:14 257:4
258:6,8,17,19
258:22
**monte** 80:19
82:16 85:13,19
86:8 112:20,22
**month** 23:22
26:20 150:10
150:17 152:15
152:17 244:20
**monthly** 16:23
**months** 5:25
6:2,2 64:7
**morgan** 2:7
96:5
**morganlewis....**
2:10,11
**morning** 4:2
143:21 198:10
277:22
**motivational**
262:21
**move** 33:2
127:23 182:19

**moved** 97:3
**moving** 157:14
**multiple**
141:13 209:25
214:2 235:13
**mutual** 36:15
36:22
**myriad** 263:8

**n**

**n** 2:2 5:6,6
21:21 115:2,2
115:2,4,4
**name** 4:14 5:15
21:19,22 24:24
35:18 37:24
38:4 95:22
143:23 160:3
283:2 287:9
312:4,5
**named** 81:7
313:8,12
**names** 8:16
11:6 20:13,15
20:17 34:2
35:21 58:17
**narrow** 24:21
91:23
**natixis** 31:16
33:6,7,20,22
34:4,5 36:22
**nature** 25:20
187:13
**near** 215:3
**nearly** 258:13

**necessarily**
17:7 38:14
44:15 63:15
67:12,15 73:23
109:24 121:19
124:3 129:12
135:25 145:23
169:2 179:11
188:10 190:3
208:25 212:16
229:17 236:17
238:25 249:12
299:21
**necessary**
51:12 52:16
70:24 191:23
225:23 317:6
**necessitate**
287:14
**necessitated**
287:16
**need** 6:10 63:15
63:16 75:22
76:12 84:4,7
84:21 101:8
103:18 104:7,8
104:15 110:20
127:5,7 129:6
129:8,11 135:7
139:10 157:8
166:20 170:24
178:16 206:2
218:16 223:3
236:9 272:24
306:19,21

**needed** 46:18
86:25 87:14
127:15 162:8
168:15 194:10
199:17 213:18
**needs** 83:2
109:19 117:21
126:21 157:8
178:17 181:6
199:22 221:24
230:5,7 280:17
**negative** 87:7
240:8,19 241:8
243:14 244:10
256:5
**negotiated**
309:14
**neighbor** 57:25
**neighborhood**
18:19 80:17
134:11
**neither** 217:12
**net** 54:19 55:6
55:7,18 56:5
269:23
**never** 76:4
141:10 145:9
145:11 160:6
172:16 183:22
183:25 194:22
206:18 210:21
255:22 281:23
283:12
**new** 1:19 55:24
149:7 160:2

| | | | |
|---|---|---|---|
| 166:2 215:22 | **number** 4:9 | **oath** 3:13 5:2 | **obligatory** |
| 231:9 312:2 | 15:24 16:5 | 6:25 | 174:17,18 |
| 313:2,4,6 | 18:4,5 19:9 | **objection** 74:13 | **obnoxious** 12:6 |
| **nfp** 30:15 35:15 | 33:25 38:14 | 74:20 122:14 | **observation** |
| 35:17 | 39:2 42:22 | 128:6 139:21 | 191:17,20 |
| **nice** 275:7 | 47:3 52:24 | 155:19 157:17 | **obtain** 225:22 |
| **night** 75:16 | 53:2 62:23 | 163:20 166:23 | **obviously** |
| **nine** 301:18 | 67:2 69:15 | 180:11 212:10 | 21:11 25:22 |
| **noise** 303:8 | 72:8 74:25 | 219:23 227:25 | 38:6 43:10 |
| 304:11 306:10 | 87:23 88:11 | 287:24 291:2 | 57:24 59:8 |
| **noncompliance** | 92:22 95:12 | **objections** 3:7 | 68:4 69:20 |
| 161:23 | 96:2 106:3 | **objective** 178:9 | 70:13,18 71:10 |
| **noncompliant** | 110:15 119:4,6 | 180:18 181:3 | 73:16 74:23 |
| 232:24 233:6 | 119:7,10,13,18 | 275:14 | 77:5 85:9 89:5 |
| **normal** 41:21 | 120:15,18 | **objectively** | 104:7 116:20 |
| 43:14 63:17 | 130:7 154:15 | 122:9 | 122:23 125:22 |
| 156:20 | 169:16 171:11 | **objectives** 78:6 | 126:21 130:23 |
| **north** 38:16 | 175:4 195:13 | 78:24 88:16 | 137:15 148:3 |
| 62:24 63:2,5 | 195:15 201:19 | 174:7,8 175:9 | 157:25 174:24 |
| **notary** 1:18 5:7 | 204:2 207:10 | 178:22,24 | 188:15 262:8 |
| 312:25 313:6 | 211:25 216:23 | 179:4,8,11,13 | 264:2 |
| 317:13,19 | 223:13 225:4 | 179:20,21 | **occasionally** |
| **note** 199:16 | 238:14 249:8 | 180:4,7,24 | 283:12 |
| 271:25 293:18 | 249:10 263:9 | 181:5 182:2,15 | **occasions** 218:7 |
| 316:10 | 278:10 285:11 | 185:5,14,15,19 | **occurred** 202:5 |
| **noted** 202:4,23 | 297:17 311:5 | 274:24 275:3 | 202:25 |
| 311:12 317:7 | **numbers** 89:23 | 275:15 | **ocio** 27:7 |
| **notes** 95:13 | 90:9 110:12 | **obligation** 7:2 | **offer** 51:6 |
| 306:22 | 116:6 118:8 | 60:21 208:23 | 76:22 85:5 |
| **notice** 1:17 | 156:8 207:10 | 209:5 283:20 | **offered** 52:24 |
| 149:21 | 215:6 306:11 | 284:3 290:24 | 72:22 74:11,19 |
| **november** 1:12 | **o** | 297:10 | 77:6 106:17 |
| 4:12 289:18 | | **obligations** | 149:9 286:5 |
| 311:8 316:3 | **o** 5:6,6 21:21 | 141:6 285:6 | 289:10 292:7,9 |
| | 115:2,2,2,4,4 | 286:22 | 294:6 296:15 |

296:18 297:14
297:16 298:17
**offering** 30:11
155:2 289:6
290:2
**offers** 285:15
**offhand** 193:25
**office** 94:9
283:13
**officer** 3:12
**offices** 4:17
141:13
**officially** 53:22
120:2
**oh** 170:23
307:23
**oil** 27:2,18
**okay** 12:4
14:21 18:21
31:22 33:15
34:10,19 40:9
42:21 43:17
47:18 48:11,17
56:22 80:24
82:5 87:16
89:3 93:16
94:5 97:21
101:23 105:4
110:23 111:23
113:25,25
114:2 116:11
119:7 120:11
120:20 127:10
127:11 131:13
142:3,24

145:10 146:23
147:8 155:22
159:6 164:9,11
164:13 166:18
174:3 175:11
179:17 180:2
181:22 182:22
183:19,21
185:23,25
187:22 188:25
189:2 190:24
195:19 197:8
199:15 200:4,6
203:25 204:22
215:25 216:10
224:7 225:6
228:10 229:8
232:20 237:5
237:16,19
239:10 240:5
240:14 241:6
241:25 242:14
243:12,24
244:8 245:14
245:19 246:23
247:10 249:13
249:17 250:14
257:18 258:2,3
260:13 265:18
266:16,18,25
269:4 271:9,9
271:12 275:20
276:9 280:10
281:9 282:7
285:21,24,25

288:11,14
289:4 291:19
291:21 292:3
292:16 293:3
294:2,4 299:14
300:7 301:8
307:16,24
308:15,23
310:12
**old** 89:20 210:8
312:2
**onboard** 54:18
**onboarded**
59:11 214:12
214:16 215:11
215:20
**onboarding**
59:7 214:19
215:7,15
218:18
**once** 59:10
97:10 186:3
**ones** 25:14 51:8
66:7 69:17
70:5 93:4
94:21 95:3,7,9
96:13 99:17
102:21,24
141:14 167:17
198:20 212:16
238:2 262:3
284:4
**ongoing** 27:20
31:25 36:5
43:21 61:16

62:2 71:15
73:11
**open** 34:18
172:25 241:25
271:9 291:13
292:17
**opening** 39:19
282:4
**operate** 34:2
125:20 227:23
228:7
**operated**
162:16 226:4
**operating**
51:24 54:16
162:14 263:22
**operation**
173:5
**operational**
83:16 94:9
105:14
**operative**
172:10,11,14
172:15,19
**opine** 28:6,14
173:24 208:17
270:22
**opined** 20:10
21:2 27:12
28:15,23,24
30:7 32:15
**opining** 22:3,15
260:6
**opinion** 11:4
14:11,11 23:9

[opinion - page]                                                    Page 47

31:7 32:10
33:8 34:11,21
35:24 36:8
37:11 40:11,16
41:8 42:19
45:6 145:13
149:15 150:10
150:22 152:8
155:3,6,15
156:14,22
157:15 158:2
158:24 159:21
166:18 167:3
167:20 168:12
169:9,19 171:5
190:25 191:12
191:15 199:11
204:14,17
208:22 237:12
242:21 248:21
251:14 260:21
**opinions** 78:10
**opportunities**
175:19
**opportunity**
156:6,9 157:22
173:8
**oppose** 28:12
**opposed** 30:11
46:4 47:15
98:12 99:11
100:18 108:21
112:3 125:2
163:19 164:16
165:17 192:9

219:6 246:10
262:4 274:18
**opposite**
163:16
**option** 111:7
120:3 156:17
177:19 178:2
178:12 186:3
**options** 51:7,9
51:17,21 52:19
52:21,24,25
53:7 74:11,19
105:3 145:16
145:21 156:19
175:24 177:21
182:5,23
224:16,20
225:9,14 266:2
308:14,16,25
309:2,5
**order** 41:8 49:8
93:14 123:10
230:3
**ordering** 5:9
**organization**
21:10 53:22
94:11 105:10
**original** 34:2
125:4
**ought** 109:25
118:13 120:13
120:24,25
211:7 257:7
**outcome** 87:10
126:3 260:6

304:19 313:21
**outcomes**
121:25 130:23
**outliers** 87:6
**outperform**
185:6,20
276:13 277:15
279:5
**outperformed**
128:3,18
**outside** 28:21
52:8 140:12
187:8 252:4
**overall** 30:14
51:13 105:10
123:15 154:23
217:15 255:20
258:10
**overhaul**
254:25 256:11
256:15 257:4
**oversee** 60:20
**overseeing**
139:10
**oversight** 99:7
**overview** 265:2
**own** 10:23
27:16 30:11,17
33:25 56:7,9
164:16 233:17
273:22,24
**owned** 54:12
55:17 56:6
**owner** 56:13

**ownership**
55:17

**p**

**p** 2:2,2
**p.m.** 1:12 4:13
12:14,18 50:8
50:12 69:6
114:14,15
115:3,9 148:18
311:9,12
**pa** 2:4
**packaging**
131:16,19
295:8 296:5,14
307:7,9
**packing** 132:14
**page** 34:20
41:5,24 43:23
147:6 160:25
173:25 175:2,6
177:12,15,16
178:8,14,21
181:12,19,20
181:23,24
182:7,20,21
185:4 187:22
190:22 216:23
217:17 218:13
224:6 225:3,7
225:21 231:16
232:14,16,18
232:19 233:11
234:2 236:25
237:4,15 239:8
239:9 240:25

241:2,4 242:9
242:10,10
245:15 247:5
249:15,17,19
252:9 257:25
258:2 264:21
264:22 266:13
266:24 267:5
267:10,14,15
267:18,23
268:3,7,11,15
268:20 269:2,2
269:5,9,13,17
271:10 277:7
282:6,16,22
285:19,23,25
288:14,18,21
288:22,22
289:2 291:18
291:21 292:3,5
292:24 294:3
300:14 308:18
310:13 312:6
314:3 315:3
**pager**  214:24
217:25 219:16
219:22
**pages**  40:6 41:4
42:5,8,13
144:9 224:25
232:19 233:10
268:19 269:18
**paid**  30:19
308:11 309:9

**paper**  219:10
219:17
**para**  140:17
**paragraph**
29:6,10 53:16
60:24 146:11
147:6,8 151:4
174:4 176:21
178:8 185:11
186:2 187:19
187:20,23
200:4 201:25
201:25 216:8
223:18,19,20
223:22 232:17
232:19 233:4
233:23,25
234:3,4 237:24
239:9 240:11
240:13 243:12
244:2 245:12
254:8 255:22
260:11,23
261:5,6 265:17
265:23 270:7
270:22 276:7
286:14 308:18
**paragraphs**
243:20 246:16
247:4
**parallel**  54:25
55:23,24
**parlance**  33:23
**part**  9:20 11:4
42:9 43:20

53:21 61:15
71:14 72:5
73:10 75:4
81:25 85:9
91:14 93:13
110:6,7 124:17
133:25 137:24
139:15 156:20
161:23 164:24
173:9,14,16
174:24 192:3
196:6 206:16
211:5 220:18
222:20 231:16
249:8 250:24
257:21 258:10
263:9 276:4
284:18 297:21
**participant**
87:12,13,13
89:3,6,17,18,19
89:21 90:5,25
90:25 224:22
272:23
**participants**
32:7 79:14,16
80:4,16 87:23
97:24 98:20
99:3 101:7
102:5 103:23
130:24 138:12
204:20 207:11
219:6 259:23
272:13,18,23
273:7,9 274:7

274:14,21
275:12 309:3
**particular**  8:8
13:22,24 14:10
28:8,17,25,25
32:23 35:9
43:19 46:22
48:5,5,6 50:20
52:17,19 61:22
61:25 73:19
77:11 78:9
79:3,4,25,25
81:8 82:22
84:15 87:11,13
90:11 93:14,17
105:21 107:3
108:25 113:20
121:13 126:22
135:8 137:2,10
146:7 154:21
154:25 158:12
168:20 169:3
183:11 184:19
191:16 194:7,7
194:19 196:17
197:9 198:22
214:6 223:9,11
226:22 228:11
234:7 257:8
259:9 260:6
264:4 272:12
280:9 284:18
287:8 293:17
293:22 294:13
294:23 300:10

301:6 304:7
309:7
**particularly**
117:16 118:8
160:24 184:21
226:8,14
**parties** 3:4 82:4
**partner** 20:22
21:18,23,25
53:18,21,25
54:18 55:18
59:9 305:5
**parts** 44:20
158:12 174:17
174:17 187:15
**pass** 162:21
236:4 239:15
239:19
**passed** 97:18
227:19
**passing** 252:12
252:20
**passive** 96:7,8
96:9,10 271:22
302:6,11,12
303:9 305:16
305:20,24
306:12
**passively**
301:23
**past** 10:4,5
98:8 109:14
137:20 167:5
170:11 235:7

**path** 35:20
70:14,15,19
71:24 100:22
103:5,14 255:5
258:9,20 259:3
266:4,15,16,23
267:2,11,15,16
271:17,18
272:20
**paths** 102:13
102:14 266:21
**pattern** 116:17
189:25 262:13
264:9
**pavilion** 55:3
56:4 95:15,18
129:22,25
130:4,11,25
131:5,7 132:15
132:16,22,24
134:19 136:15
136:23 141:3
141:12,25
142:2,15,18
143:2 145:6
211:18 221:7
281:18 282:19
283:8,16 284:2
284:22 285:2,5
286:12,21
288:19,24
289:13,17
290:15,23
291:23 292:25
293:17 294:8

294:21 295:3
297:19
**pavilion's**
293:12
**pay** 140:18
**paying** 204:8
**payroll** 140:5
289:24
**pdf** 285:11
288:18,23
291:18,19
292:25 299:15
**pedal** 100:12
**peer** 107:18
109:7 112:18
113:4,20 120:8
121:3 123:24
144:22 156:25
176:5,10,16
183:18 205:16
205:22,25
206:3 210:5
240:8,18 241:8
241:13 247:14
248:9,11,24
249:23 251:20
278:4,7
**peers** 70:3
108:4,5,7,9,23
213:25 247:24
**pending** 6:13
**pennsylvania**
4:18
**people** 30:16
46:22 51:2

66:8,10 71:12
75:14,18 78:16
80:8,9 81:8,9
98:17,24
101:12,12,14
101:17 109:25
110:25 130:12
135:3,4,19,23
135:25 136:2
136:20,21
138:15,16,18
138:21,21
139:13 140:19
207:16,18
209:25 214:25
216:6 218:16
253:17 255:7
274:17 275:15
283:14 284:5,8
287:2 288:3
294:24 305:10
**percent** 23:25
24:2 55:17
56:6,7,9 80:7
80:10,18 87:15
89:17,25 90:6
90:7 101:22,23
102:4 126:11
126:19 128:3
128:18,22
129:7 255:10
258:11,12
298:10
**percentage**
80:3,11 207:7

[percentage - pick]                                              Page 50

| | | | |
|---|---|---|---|
| 207:8 267:19 | 278:2 279:7,11 | 215:20 217:16 | **permutations** |
| 280:21 | 279:13,17 | 227:11 232:8 | 86:11,21 |
| **perfect** 125:21 | 281:2 286:13 | 238:3 243:15 | **persistent** |
| **perfectly** 192:2 | 294:9 299:17 | 244:7,11,17 | 276:12 |
| **perform** 123:3 | 304:3,6 | 245:3,4 246:3 | **person** 11:16 |
| **performance** | **performed** | 246:18 247:6 | 23:20 44:17 |
| 24:5 53:7 | 24:12 279:25 | 247:16,23 | 58:7 75:2 |
| 67:18 68:5,5 | **period** 19:10 | 248:5,17 | 86:19 90:24 |
| 108:11 109:6,6 | 25:10 56:23 | 249:25 250:5 | 140:24,25 |
| 112:13,14,17 | 57:11 59:4 | 255:16,19 | 142:8 215:22 |
| 114:6 120:6,7 | 61:4,7 73:5 | 258:17 276:23 | 220:4 253:20 |
| 122:22 123:6 | 81:18 86:19 | 277:19 278:21 | 253:20 |
| 123:10,17,25 | 96:25 97:6,25 | 279:3,12 280:6 | **personal** 137:5 |
| 124:20,21 | 100:15 109:5 | 281:3 282:13 | **personally** |
| 126:7,10,25,25 | 116:5,10 123:8 | 286:18 289:5 | 40:19 44:6 |
| 139:20 144:24 | 128:2 129:20 | 289:16,25 | 47:7,24 58:14 |
| 144:25 154:15 | 134:22 146:5,5 | 290:2 291:14 | 58:21 116:21 |
| 161:12 163:18 | 146:18,19,22 | 292:21 296:3 | 130:9 133:13 |
| 169:25 170:16 | 146:23 147:23 | 298:7 299:18 | 136:12 295:24 |
| 175:12,17 | 147:25 148:6,7 | 301:17 305:2 | **perspective** |
| 176:2,8,9,14 | 148:9 149:4,13 | 308:3,4 309:16 | 91:25 149:10 |
| 179:23 183:5 | 149:22 151:2,8 | 313:19 | **philadelphia** |
| 183:10,13,16 | 151:20,21,24 | **periodic** 73:22 | 2:4 4:17 |
| 183:17,24 | 155:6,14,23,25 | **periodically** | **philosophies** |
| 185:4,12 188:3 | 156:3 157:16 | 69:23 71:6,11 | 78:24 |
| 201:12 202:14 | 157:21 158:5 | 211:8 | **philosophy** |
| 203:4 204:16 | 161:22,25 | **periods** 114:5 | 78:9 137:6 |
| 205:22,25 | 168:20 170:18 | 159:18 176:18 | 271:17 |
| 206:3,9 225:8 | 171:7 185:7 | 176:18 189:4 | **phone** 17:13,15 |
| 242:16 247:12 | 189:13 190:6 | 235:13 247:24 | 17:18,24 18:14 |
| 247:22 248:8 | 199:6 200:24 | 249:25 258:23 | **pick** 26:12 |
| 248:10,15,23 | 201:14 204:24 | 258:25 279:18 | 48:16 101:3 |
| 249:18,21 | 205:17 206:17 | **permitted** | 138:19 139:2 |
| 251:20 257:22 | 210:10 214:13 | 240:7,18 | 159:13 |
| 276:19 277:16 | 214:17 215:12 | | |

**[picked - point]**                                        Page 51

| | | | |
|---|---|---|---|
| **picked** 54:15 | 53:17 54:24 | 257:5 261:15 | **plausible** |
| **picking** 141:21 | 55:19 56:3 | 265:20 273:7 | 205:24 |
| **picture** 100:3 | 57:4,16,23 | 273:13,15,22 | **play** 79:22 |
| **piece** 92:12 | 59:16 60:4 | 274:4,14,20,24 | 81:20 82:10 |
| 219:17 | 73:8,19,22 | 275:11,14 | 106:4,23 107:6 |
| **pieces** 221:16 | 74:11,19 76:25 | 282:10 285:15 | **played** 295:3 |
| **place** 52:20 | 78:15,17 79:5 | 286:5,16 287:7 | **please** 5:3 6:11 |
| 92:3 106:9 | 79:7,8 80:2,12 | 287:15,22 | 39:13 128:8 |
| 109:16 146:8 | 80:19 81:8,11 | 289:6,10 290:2 | 187:21 236:10 |
| 149:6 153:9,23 | 81:14,24 82:13 | 290:23 292:7 | 257:13 264:11 |
| 154:18 177:19 | 83:12 88:16 | 292:10,19 | 307:18 |
| 177:25 196:18 | 89:10 90:3 | 293:21,23 | **pleased** 271:24 |
| 221:7 234:24 | 99:5,6 101:7 | 294:6,23,25 | **plug** 89:2,22,22 |
| 238:3 242:8 | 101:13,14 | 296:8,11,22 | **plus** 104:12 |
| 262:20 288:4 | 103:25 104:13 | 297:14,18 | **point** 8:7 14:15 |
| 298:5 313:12 | 104:14,17 | 302:4 309:2,10 | 18:20 21:8 |
| **placed** 116:13 | 106:17 110:6,7 | **plan's** 174:7 | 22:8 25:3 |
| 243:6,9,10 | 122:13 131:11 | 175:17,23 | 27:20 32:23 |
| 246:10 | 131:17,18,20 | 185:15,18 | 38:24 47:11 |
| **placement** | 132:8,8 133:19 | 206:25 216:13 | 52:23 53:8 |
| 115:22 | 136:14 138:17 | 232:22,24 | 54:4,4 56:2,10 |
| **places** 249:4 | 139:11,13 | 256:2,5 274:24 | 58:20 59:8 |
| **placing** 181:16 | 140:4,18,21,25 | 275:3,4 291:24 | 62:4,21 83:4 |
| 251:22 | 156:20 158:10 | **planned** 85:5 | 83:20,21 88:25 |
| **plaintiff** 31:7 | 167:4,5,13 | **plans** 22:22 | 95:6 96:24 |
| 34:21 36:16 | 168:9 171:7 | 55:8 61:22 | 97:4 98:15,17 |
| **plaintiffs** 1:7 | 174:5 179:14 | 63:23 78:22,25 | 101:20 111:22 |
| 2:3 4:8 10:19 | 180:25 185:5 | 79:18 82:24 | 117:6 118:17 |
| 10:21 17:12 | 188:2,3 189:10 | 101:10 121:16 | 118:21 119:11 |
| 22:11 26:19,25 | 204:19 206:21 | 134:4 140:7 | 119:15 120:9 |
| 29:23,24 31:9 | 207:9,21 | 143:4 263:13 | 120:23 121:3 |
| 32:5 33:8,10 | 221:20 223:25 | 273:10,24 | 121:25 123:19 |
| 34:24 36:18 | 224:16 225:18 | **platforms** | 127:13 133:8 |
| **plan** 23:4,25 | 232:25 233:7 | 66:16 | 134:5 135:3 |
| 49:9,19 51:10 | 239:11 255:25 | | 149:8,12 |

**[point - printing]**                                                    Page 52

150:13 162:17
163:8,9 166:16
167:2,18 168:3
168:5,24 170:9
170:19 171:20
184:19 186:25
189:24 196:18
202:25 203:9
203:18 204:6
204:12 218:14
219:10 223:12
223:16 224:15
225:16 236:5
241:6,11,14
243:2,4 244:8
247:11 248:7
258:20 259:2
262:24 263:15
264:25 265:16
271:18 274:12
284:24 288:5
295:21 301:6,9
301:10 309:7
**pointed** 214:25
217:17
**points** 163:11
190:2 218:24
218:25 220:2,6
220:8
**policy** 7:21
109:20,21,23
110:5,9,10
111:9 223:7
224:3

**pool** 138:25
**poor** 204:16
**populate** 15:3
**portfolio**
306:13
**portion** 14:3
69:10 128:15
148:24 177:9
**position** 24:11
24:18 218:11
**positive** 87:7
**possible** 11:23
86:3,10 88:9
112:25 113:2
117:15 121:17
127:11 128:24
197:18
**possibly** 66:3
138:11
**post** 279:25
299:20
**potential** 102:3
183:23,23
**potentially**
123:14 169:17
169:21 226:14
236:15
**practice** 210:9
227:9,10 228:5
**preceding**
254:17
**precisely** 27:13
**prefer** 66:9
229:11

**preference**
221:21
**preferred**
68:10 93:3,19
93:23 209:4,9
**preliminaries**
6:7
**preliminary**
44:23
**preparation**
8:14,19 9:4,8
9:16,21 17:6,8
44:4 46:8
197:3
**prepare** 7:10
7:18 135:5
277:10,11
**prepared** 7:15
261:13
**preparing**
13:15 16:21
17:25 44:6
184:13 224:12
234:9 254:20
**present** 2:14
67:20 104:22
146:25 249:5
272:7
**presentation**
219:14
**presentations**
71:17
**presented**
67:17,19
104:25 141:17

**preference**
221:21
**preferred**
**president** 23:5
53:24 54:3
**presumed** 8:24
**pretty** 64:16,23
65:17 75:24
101:23 102:15
144:18 145:3
173:12 187:12
192:22,23
217:9,14 219:8
235:8 280:5
298:11 299:2
306:8
**prevalent**
52:13
**previous** 178:7
181:19,20,23
292:3
**previously**
115:5
**price** 90:13
92:17 96:5
**pricing** 99:8
**primarily** 68:8
142:9 143:2
**primary** 27:10
**principal** 70:5
**printed** 11:17
**printing** 144:8

| prior 13:2,5,7 | 97:5,22 98:5 | proceeding | 164:12 165:4 |
|---|---|---|---|
| 13:10,12 18:22 | 98:11 99:16 | 4:23 311:4 | 166:21 168:6 |
| 19:20 49:4,8 | 102:8 103:10 | proceedings | 168:17 169:2,9 |
| 49:10 53:10 | 109:13 113:8,8 | 313:15 | 169:10 170:25 |
| 96:25 153:10 | 114:11 118:6 | process 14:6,14 | 174:8,16 |
| 153:10,14 | 119:16 120:10 | 17:24 18:14 | 185:24 197:21 |
| 155:5,13 | 124:9 129:3 | 22:4,15 23:2,7 | 209:14 210:2,9 |
| 157:16 216:15 | 131:3 133:15 | 23:16 24:8,14 | 211:9,14,23 |
| 217:16 218:9 | 133:20,20,21 | 24:17 26:3 | 212:14,25 |
| 235:21 237:23 | 133:22 134:6 | 28:7,11,14 | 213:4,6,7,8,10 |
| 238:17,19 | 134:10 135:3 | 32:11,13,14,15 | 213:12,19,20 |
| 242:21 259:4 | 136:8 144:16 | 32:18,19 34:7 | 213:23 214:8 |
| 295:24 304:20 | 148:4 179:13 | 34:11 35:25 | 214:19 227:13 |
| 313:8 | 180:19 193:10 | 36:9 37:11,16 | 228:25 240:17 |
| private 39:6 | 216:21 217:10 | 41:20 45:23 | 240:25 251:19 |
| privileged | 236:23 250:13 | 48:14 52:20 | 297:25 304:16 |
| 32:24 | 252:7 255:5,11 | 53:4 59:6,12 | processes 60:2 |
| proactive 264:3 | 274:6 278:10 | 59:14,21,23 | 83:17 94:10 |
| proactively | 284:20 294:22 | 75:4 76:4,5 | 105:14 139:4 |
| 264:5 | 295:18 305:2 | 77:13,14,23 | 151:6 175:10 |
| probability | 305:14 | 78:11,14,18 | 217:7 |
| 79:24 90:23 | problem 31:14 | 91:14 93:13 | produce 143:21 |
| probably 7:23 | 48:10 97:8 | 103:16,17,18 | produced |
| 9:12 13:4 14:6 | 117:22 124:4 | 104:18 121:23 | 143:20 |
| 15:20 18:17,17 | 124:12,15 | 121:24 126:3 | product 27:10 |
| 21:17 22:6 | 137:23 161:14 | 135:11 136:6 | 68:17,18 72:17 |
| 25:7 29:4 51:5 | 164:25 170:24 | 137:4 138:2,5 | 109:2 |
| 57:5 59:2,4 | 173:23 192:19 | 138:9 139:8 | products 72:14 |
| 62:14,22 63:3 | 194:17 | 141:16,21 | 93:12 131:3 |
| 63:3,4 65:25 | problems | 147:12,23 | 142:11 |
| 66:22 67:22,24 | 110:25 138:9 | 150:23 151:13 | profiles 224:22 |
| 69:16 72:9 | procedures | 151:19 153:4 | profit 23:4,24 |
| 80:10,16 87:9 | 225:12 | 153:22 155:21 | 292:19 |
| 90:2 92:21,24 | proceed 39:25 | 156:21 158:12 | program 88:15 |
| 93:7,12 96:12 | | 159:2 161:8 | 91:8 92:16,19 |

**[program - q1]**

112:6,16

**project**  61:14
61:19,24 79:24
80:19,23 265:4

**projected**
99:23

**projecting**
113:17

**projects**  61:20
88:9 296:9

**promoting**
130:23 174:8

**pronouns**
180:21

**proprietary**
27:10 30:5,22
52:25

**protecting**
100:7

**provide**  19:17
19:19 25:17
29:22 31:6
32:10 34:21
36:16 41:7,14
43:13,18 60:4
63:9,12,18
64:14 71:6,17
71:21,23 72:9
72:13,18,23
73:11,13 74:4
109:4,8 138:3
169:2 174:5
214:8 224:20
225:5 263:7,9

**provided**  10:6
10:9 14:22
19:14,24 27:9
29:12 30:23
31:3 33:8
37:10 41:17
54:7,12 55:16
61:9,16 62:9
63:8,13 74:7
76:20,21
106:16 111:5
134:15,20
160:5 195:24
208:19 211:18
214:22 216:13
219:3 252:3
263:2,15
296:25 313:18

**providers**
209:15 211:6
225:17,23
272:3

**provides**
131:24

**providing**
22:19 29:7
34:10 38:19
55:5,12,13
56:15,19 73:2
97:15 133:14
137:11 145:2
153:24 213:2
245:7 294:17
294:18,25

**proximity**
102:15

**proxy**  113:10
113:11

**prudence**  22:3
22:15 28:17
82:11 91:24
308:13

**prudency**
214:6

**prudent**  51:24
52:3,7 60:17
81:17 82:8
137:14 145:20
150:23,25
212:6 227:8,23
228:6 309:2

**prudently**
224:22

**psa**  53:10,17,25
55:11 56:8,9
56:18,19 58:4
58:21 60:16
61:9 64:11
95:15 129:19
129:21 132:22
136:11,16,23
141:24 142:12
142:18 145:5
211:18 221:6
309:16

**public**  1:18 5:7
32:23 130:17
312:25 313:6
317:19

**pull**  16:11
171:22 241:21
257:11 264:10
265:12 266:7
270:11 281:24
299:3 307:17

**punch**  274:20

**purely**  18:3

**purpose**  73:2
74:23 154:25
165:18 174:5
222:24 275:9,9

**purposes**  87:2
278:22

**pursuant**  1:17
175:19

**put**  34:4 42:23
105:24 110:14
111:7,20,25
113:15 118:2
118:12 119:21
120:2 136:3
149:7,14
169:24 170:24
187:16 203:20
229:21 259:18
288:3 299:11

**putting**  14:18
90:6 117:20
118:11 259:22

| q |
|---|

**q1**  150:7
257:12,14,17
257:18 264:12
264:16,18,19

276:23 277:3
279:6,8 300:13
301:7 314:12
314:15
**q2** 300:18
301:13 304:21
**q3** 240:20
247:8 300:2,5
300:22 301:15
**q4** 241:22,23
242:8,17,18
243:16 244:22
257:16 266:12
276:23 279:4
300:11 301:4
314:10
**qdia** 73:7
206:21,25
207:7 296:22
**qirs** 254:2
**qpa** 208:19
224:16 233:14
234:14 235:2
236:13 263:18
**qualitative**
67:25 83:18
104:21,24
106:5,19,21
107:8 188:4,12
254:8
**quality** 63:7
134:14
**quanta** 1:9
2:16 4:8 5:16
162:4 261:15

316:4 317:1
**quanta's** 161:8
**quantitative**
67:24 68:2
74:2 76:9
104:21 107:17
164:15 188:5
188:12
**quarter** 41:5
70:23 107:12
107:12 109:12
115:21,25
116:6,8,14,24
117:3,5,5
118:3,6,7
119:5,17
120:13 124:3
149:25 167:25
168:5 169:6,11
169:14 170:22
176:17 186:9
186:14,21
197:9 200:16
201:18 206:15
242:2,3 243:11
247:15 249:24
250:16,18,20
258:6 270:12
270:16 295:19
298:10 299:21
**quarter's** 260:3
**quarterly** 7:22
41:3 43:13
68:4 69:19
73:12,14 74:4

82:15,18 135:2
146:17 187:24
200:20 214:21
215:15 216:12
217:21,22
238:16 251:4,7
251:11 252:4,6
276:3 294:18
304:6
**quarters** 121:9
122:2 168:3
169:16 171:11
186:5 189:18
190:7 200:18
201:4 276:22
301:18
**quasi** 30:6
33:16
**question** 3:8
6:13,14,20,21
22:14 61:11
119:22 136:11
153:17 154:17
159:19 168:18
169:10 172:8
184:20 199:25
204:13 207:25
211:16 215:9
215:18 216:24
223:10 228:16
231:2 233:9
236:12 239:7
246:16 247:3
272:22 275:18
280:21 293:7

**questions** 41:15
41:20 76:14
77:15 82:6
112:3 126:6
155:7,22 161:4
199:24 310:9
**quick** 112:6
114:9
**quite** 15:4 22:9
104:16 106:25
111:17 138:19
139:5 143:24
178:13,18
207:16 213:23
251:6 274:5
**quote** 15:17
47:11 70:19
97:13 209:5
227:7 228:4
249:20
**quoted** 179:5
**quotes** 48:16
**quoting** 107:19

**r**

**r** 2:2 68:21
115:2 313:1
**rabbit** 125:15
**raise** 112:2
223:4 259:17
**raises** 111:22
119:21 154:17
**raising** 226:17
239:7
**ran** 49:25
54:25 55:23,24

**[ran - recall]**

56:3 97:10
148:10 168:21
239:12
**range** 62:8,15
62:23 63:23
65:14 77:7
101:21,24
102:16,18,21
133:19 134:3
134:13 137:16
137:16 138:13
**rank** 123:23
179:16
**rare** 109:15
**rate** 62:18
89:11,25 95:23
96:16 125:5,5
125:6
**rates** 79:15,17
176:15 247:13
249:22
**rather** 52:14
65:6 181:9
191:25 213:14
255:18 273:12
**ratio** 65:12
66:9,10,10,11
66:13,24 67:4
67:5 68:16,21
183:21 240:9
241:9 244:10
**rationale**
194:11 195:4
198:18 206:7

**rationalization**
192:21
**ratios** 65:12
66:12 67:12
72:2 243:14
269:19,24
**raw** 68:4
207:10
**reach** 126:14
127:2 150:24
226:15 230:4
**reached** 168:11
191:19 273:25
**read** 7:19,20,21
8:9,11,14,19
10:10,13 11:3
11:4,13 44:10
44:11,12 45:8
46:6 48:3,18
69:10 128:10
128:15 146:15
148:24 177:9
179:22 180:10
180:23 186:15
186:18 192:20
197:21,24
198:4,6,8,9,10
198:15 242:22
252:21 272:15
316:9 317:5
**reading** 11:9
45:2 148:23
179:25 180:20
237:10,14

**reads** 159:12
**real** 75:13 92:2
105:17 108:23
108:24
**realistic** 196:19
**reality** 217:2
**realize** 138:19
212:11 274:13
**realized** 184:8
**really** 12:6
16:22 75:17,22
76:5 79:4,11
81:17 94:7,14
98:2 99:4
103:7 110:20
118:6 125:9
141:10 160:7
170:24 186:23
192:23 213:13
213:14 262:9
309:5
**realtime** 108:24
**reason** 7:6
19:22 54:13
72:24 128:23
157:10,11
161:7 167:6
170:13 202:11
202:12,16
203:21 252:15
253:3,21 258:5
258:21 283:21
286:20 290:21
291:3,5 312:6
316:11

**reasonable**
23:3,24 81:15
104:10 110:13
118:10 121:15
147:12,22
151:6,13 153:3
207:24
**reasonableness**
151:19
**reasonably**
306:12
**reasoning**
272:2
**reasons** 84:13
84:15 95:12
139:7 143:4
157:9 178:10
178:16 182:3
182:15 194:25
287:18
**rebuttal** 8:11
46:20
**recall** 11:9 12:4
12:22 20:6,9
20:14 22:12,19
23:9 31:22
33:7 34:25
36:11 41:13,18
43:5,16 45:9
50:22,23 51:23
53:3,5 54:6
59:25 60:2
63:24,25 96:20
112:9 116:16
143:13 153:14

[recall - regard]                                                                                              Page 57

161:5 170:10
170:17 197:17
199:18 211:3
214:13 218:7
235:25 238:22
243:3,5,8
244:3,18
256:17 257:9
258:24 261:7
275:24 281:16
296:13,21
297:22 298:12
304:4,9
**receipt** 316:17
**receive** 252:12
**received** 15:17
28:4 30:16
41:25 42:3
77:3 163:23
166:12 215:14
**receiving** 251:4
251:10,13,16
253:24 254:3
262:17
**recent** 176:16
247:15 249:23
**recess** 12:16
50:10 69:4
114:15 148:19
177:4 230:21
281:12 306:25
**recognize**
193:17 276:11
283:2 287:9

**recollection**
15:16,21 16:15
29:11,16,17
35:5 37:18
42:11 60:8
96:17 166:5
198:12 220:7
237:12,22
265:8 296:17
297:13 298:16
303:25
**recommend**
93:15 95:10
98:6,12 210:17
**recommendat...**
30:21
**recommendat...**
23:22 211:21
**recommended**
93:2 297:4,6
**recommending**
27:15
**record** 4:24
5:21 12:8,11
12:15,18 28:5
39:22 50:6,9
50:12,16 69:3
69:6,10 114:12
114:14 115:9
128:15 131:15
131:22 148:15
148:18,21,24
154:19 155:12
177:3,6,9
219:20 226:8

228:14 229:25
230:5,20,23
236:8 237:21
276:5 281:11
281:14 306:24
307:3 308:12
309:10 311:11
**recorded** 4:3
65:21 311:4,6
**recorder**
150:10
**recordkeeping**
21:3,5 27:21
28:3 308:11
309:9
**recreate** 16:6
**recurred** 96:14
**recurring**
96:13
**redone** 192:17
**reduce** 309:17
**reduced** 313:13
**refer** 78:16
161:16 179:22
215:6
**reference** 47:11
111:21 169:7
180:23 231:16
238:13 242:20
**referenced**
233:9 238:11
316:6
**references**
146:4 172:17

**referencing**
100:22 238:14
**referral** 59:17
59:18
**referred** 27:8
78:22 180:17
242:3
**referring** 13:20
13:23 26:23
146:20,21
147:16,17
169:14 194:6
233:5,23
243:22 249:15
**refers** 179:13
180:14
**reflect** 199:17
228:23 229:15
229:18 230:5,7
238:20 273:25
**reflected** 42:17
199:23 201:19
238:25
**reflecting**
112:17
**refresh** 29:10
46:12 237:11
265:7 296:17
298:16
**refreshed**
237:22
**refused** 137:19
**regard** 48:14
51:13 106:4
126:6 135:13

160:12 182:11
304:6
**regarding**
219:20 232:8
254:12 304:2
**regardless**
203:19 204:11
220:3
**region**  25:5
**reimburse**
140:19
**reiterates**
221:16
**relate**  246:18
247:5
**related**  28:7
55:5 105:11
107:25
**relates**  95:17
185:15 244:2
246:3
**relating**  149:16
**relationship**
132:13,14
164:23 282:20
284:12 289:22
293:16 295:20
297:20 298:8
**relationships**
130:8,10
132:21,21,24
133:6,22
**relative**  77:11
170:7 179:23
204:25 262:11

277:16
**relevant**  44:13
45:5 48:12
108:14 146:4
146:18,19
153:16 155:24
158:4,5 188:4
188:5 214:13
214:17 215:12
215:20 219:2
244:17 245:2
**relied**  40:16
42:18
**relies**  232:22
**relying**  207:21
261:18
**remain**  133:2
178:12 182:5
186:4
**remained**
271:24
**remember**  8:13
10:8 11:6
15:24 20:17,25
22:7 24:25
25:2,3,6,9,15
28:15 29:25
31:11,16,18
32:21 33:11,18
35:8,13,16
36:7,19,24
37:5,7,10 43:3
51:2 52:22
58:19 60:11
66:25 67:22

72:10 131:13
137:21 152:14
153:11 158:18
184:18,20
193:20 195:14
197:8 199:5,8
216:5 218:7
255:12 296:7
304:8
**remembering**
35:11 37:3,8
71:3 143:23
**remembers**
199:2
**remind**  241:2
298:6
**remit**  168:16
**remote**  1:16 4:4
311:7
**remotely**  5:2
**removal**  63:19
121:11 189:5
190:10 287:14
287:19,23
297:5
**remove**  107:4
122:19 157:7
157:12 170:14
202:7 208:7,9
229:21 286:17
297:6,10
**removed**
122:13 138:6,7
157:2 168:8,13
171:6,16,20

302:4,8
**removing**  32:8
**repeat**  128:8,14
283:22
**rephrase**
128:13
**replace**  60:5
80:12 188:6,23
260:9
**replaced**
178:12 182:5
304:15
**replacing**  60:9
**report**  5:19
7:19 8:11 9:23
10:2,6 11:18
13:16 14:4,5
14:16,23 15:10
15:14,18,23
16:10,16,21
17:7,25 18:15
18:16,18 19:2
21:18 22:19
24:16 26:16
28:10 29:5,10
34:20 39:13,15
39:20,20 40:3
40:10 44:6
46:8,20,21
47:4,8 48:2
49:4 53:16
62:10 65:9,11
66:4,8,17 68:3
68:17,18,20
69:13,23 70:22

| | | | |
|---|---|---|---|
| 77:3,9 82:15 | 244:23 245:13 | 250:21 256:5 | **requests** 41:13 |
| 106:12 107:7 | 250:11 252:7,8 | 284:17,24 | **require** 111:10 |
| 110:13 140:9 | 254:9,12,12,14 | 294:18 | 115:22 121:10 |
| 140:13 146:3,8 | 254:15,20,21 | **reports** 7:23,23 | 209:18,22,24 |
| 147:6 148:2,10 | 254:24 256:2 | 10:14,22 11:2 | 210:5,6 219:9 |
| 149:22 150:12 | 256:10,14 | 11:10 41:3 | 220:12,14,17 |
| 150:15 151:16 | 257:2 259:7,8 | 43:14 64:22 | 220:20,24 |
| 152:13,25 | 260:12,23 | 68:22 72:19 | 221:4 |
| 155:17 158:14 | 261:2 265:17 | 75:15 76:20,24 | **required** 34:3 |
| 158:16,17,20 | 267:12 270:7 | 135:2,5 197:17 | 39:4 227:3,7 |
| 159:4,9 160:23 | 276:8 277:8,12 | 197:22 238:17 | 230:3 317:13 |
| 161:17 165:8,9 | 286:14 287:13 | 238:19 251:5,7 | **requirement** |
| 165:12 166:9 | 290:4,5 294:10 | 251:11 252:4 | 104:4 |
| 167:21 171:13 | 314:5 | 260:4 263:2 | **requires** 83:7 |
| 172:18 173:10 | **reported** | 276:4 | 241:9 244:9 |
| 183:10 184:14 | 159:10 201:22 | **represent** 5:16 | 247:19 252:10 |
| 187:19,20 | 236:13 245:8 | 195:16 247:8 | 253:6 |
| 190:23 194:18 | **reporter** 1:18 | 266:11 308:9 | **reread** 8:8 |
| 195:17,24 | 4:18,22,25 5:3 | **representing** | **reroute** 129:17 |
| 196:5,12,15 | 68:23 313:5,19 | 229:5 | **rerun** 73:21 |
| 197:4,4,16 | **reporting** | **reputation** | 82:16,17 83:4 |
| 198:14 199:16 | 59:12 64:12,17 | 287:4 | 83:21 |
| 200:5 202:19 | 67:13 69:21 | **reputational** | **research** 58:6,7 |
| 203:2 206:20 | 106:6 109:4 | 106:2 | 58:9 135:4 |
| 208:18 216:9 | 110:20 111:2,4 | **request** 41:10 | 142:8 |
| 221:12 223:18 | 123:18 135:4 | 261:14,19 | **reserved** 3:8 |
| 223:21 225:8 | 142:19,20,23 | 265:10 | **resolved** |
| 226:2 231:15 | 142:25 143:9 | **requested** 43:5 | 203:13,15 |
| 231:18 232:10 | 143:12,15,16 | 69:10 128:15 | **resonate** 48:9 |
| 232:15 233:25 | 143:19 144:3 | 148:24 177:9 | **resources** |
| 234:10,11 | 144:19,22,23 | 261:23 262:19 | 143:7 |
| 235:25 236:9 | 159:14 160:4 | 265:9 313:17 | **respect** 36:8 |
| 237:2,25 | 161:12 162:7 | 313:17 | 37:12 60:15 |
| 238:25 239:9 | 163:7 172:21 | **requesting** | 70:7,10,25 |
| 242:3,24 | 235:6 250:20 | 261:7 | 74:10,18 76:19 |

132:20 136:4
136:13,22
153:20 154:4
159:23 160:20
165:5 167:22
259:9 297:2
**respective** 3:4
**respond** 214:5
**response**
127:15,16
**responsibilities**
51:13 223:23
224:9 289:23
**responsibility**
132:2,10
136:19 137:8
160:17 219:4
**responsible**
51:15 130:7,15
132:23 133:3
142:9 265:20
284:12
**rest** 284:21
**rests** 79:4
**result** 24:13
255:25 260:7
261:8
**resulted** 171:19
255:2 259:8
260:7
**results** 226:10
**resumed** 20:3
115:5
**retain** 188:6,23

**retained** 11:20
11:23 12:22,23
13:2,5,8
**retainer** 61:12
61:16 62:2
**retaining** 32:8
35:25 36:2
37:12 82:12
142:5
**retention** 13:11
13:13 34:8,12
62:18
**retire** 102:22
**retired** 26:8
33:16 39:8
130:5
**retiree** 88:20
**retirement** 61:2
72:6,7 80:4
87:14 89:22
98:22 99:2
101:18 102:25
103:22 104:10
136:2 181:6
275:17 282:10
**retiring** 133:7
**return** 113:2
176:15 179:16
183:20 224:21
241:14 247:13
249:22 308:21
316:13,16
**returns** 28:24
65:10,11 68:15
71:25 86:15,16

86:17,18,22
88:9,10,21,25
90:10 94:12
99:24 100:13
113:5,7,22
210:6 251:23
252:3 266:2,3
267:24 268:4,8
268:12,21
269:20,22
276:25
**reuters** 254:14
254:15
**revenue** 28:4
140:15
**reverse** 47:9
49:8
**review** 9:25
10:3 15:7
40:19,23 41:4
41:8 42:16
43:6 44:4,7
67:18 74:8
135:5 149:16
149:17 152:17
152:24 166:20
166:25 167:20
173:9 175:9,9
177:21 187:25
191:7 198:11
199:2 200:21
208:18 209:19
216:12 238:16
251:8,9 254:19
256:8 265:4

271:24 275:21
308:8 313:16
316:7
**reviewed** 9:22
12:23,25 42:3
42:20 149:19
149:20 150:2,6
157:8 191:10
193:14 195:12
195:18 197:2,7
255:23 271:13
**reviewing**
183:6 186:16
209:14 242:13
252:22 258:4
**reviews** 214:21
**revised** 193:15
**rewrite** 110:18
**rfi** 209:6
210:18 212:9
212:15
**rfp** 32:14 59:21
59:23,25 60:3
60:9 208:23
209:3,5,8,13
210:18 211:2
212:9,12 213:9
213:23
**rhythm** 6:16
**rich** 43:25
46:23 217:14
**richer** 209:10
**riddle** 46:14
261:10

**[ride - saying]**

| | | | s |
|---|---|---|---|

**ride** 88:3 97:23
  98:4
**right** 9:23
  10:11 19:22
  26:12 29:20
  39:9 50:18
  51:17 61:2
  66:23 71:4
  74:5 76:22
  77:23 79:7,8
  85:14 88:2
  98:25 119:12
  120:14 122:24
  127:10 129:12
  140:5 143:23
  150:8 155:17
  173:6 175:4,7
  196:24 200:9
  201:22 202:15
  205:4 222:7
  223:22 231:25
  234:4 240:2
  242:5 243:12
  249:18 253:4,8
  254:17 270:16
  273:14 274:25
  279:15 289:10
  289:13 298:20
  300:5 308:6
**rigorous**
  213:16
**ring** 16:13
**risk** 65:11 67:3
  68:15 105:18
  106:2 144:25

183:19 210:6
  224:21 241:13
  255:8 259:23
  266:2 268:21
**riskier** 255:2
**rmd** 39:5
**road** 312:2
**roberts** 2:5 5:9
  9:11 74:13,20
  122:14 128:6
  139:21 155:19
  157:17 163:20
  166:23 172:6
  180:11 198:21
  212:10 219:23
  227:25 230:14
  281:9 287:24
  291:2 310:10
  316:1
**robust** 64:16
  139:3 217:15
**role** 24:18,21
  27:15 45:13,22
  49:23 50:20,24
  51:9 52:5 53:9
  130:4,22 131:6
  136:4 168:25
  208:15 289:20
  293:12,17
  295:3
**roles** 51:18
  224:9
**roll** 33:24
  55:19 101:15

**roller** 98:4
**rolling** 118:9
  125:12
**rollover** 39:3
**room** 140:13
  211:7
**roughly** 80:7
**routes** 86:3
**row** 86:16
**rowe** 90:13
  92:17 96:5
**rule** 189:19
**rules** 140:22
**run** 25:21
  77:18 80:25
  85:19 86:4,12
  86:23 89:5,10
  89:14,24 90:10
  90:11,15,18
  91:2,4 92:16
  92:19,20 93:5
  93:7,11 110:24
  112:16 232:19
  255:15
**running** 29:8
  49:15 86:20
  112:24 113:18
  113:19,20,21
**runoff** 255:7
**runs** 92:21
  146:25 148:6
**rupp** 46:14
  48:17
**russell** 113:11

**s** 2:2 5:6 115:2
  115:2,2,4
  281:21,21
  312:6 314:2
  315:2
**s&p** 23:25
  276:17 277:2
  298:18,19,22
  299:7,15
  301:22 302:15
  303:3 315:9
**salient** 14:10
  66:7 69:17
**satisfactory**
  84:21
**save** 104:8,15
  275:16
**saving** 81:9
**savvy** 138:20
  138:22
**saw** 43:11
  214:24 217:16
  261:24 283:12
**saying** 23:6
  27:14 60:14
  67:10 75:24
  84:2,6 117:20
  120:11 128:16
  143:18 146:22
  155:9 164:4
  176:23 178:15
  178:19 180:15
  183:22 186:17
  186:18 188:16

| | | | |
|---|---|---|---|
| 188:16 194:9 | 261:12 262:9 | 237:6,13,16,22 | 181:14 182:19 |
| 226:16 246:9 | 262:14 264:23 | 237:25 238:9 | 185:10,11 |
| 246:22 247:18 | 271:13 276:16 | 238:11,20,24 | 187:6,19 |
| 248:19,25 | 282:19,20 | 239:3,15,25 | 241:11,14 |
| 249:3 257:7 | 286:3 303:14 | 240:7,17 | 243:13 247:5 |
| 264:4,8 273:11 | **scenario** | 243:19 244:3 | 251:18 266:25 |
| 273:16 294:19 | 124:19 | 245:21 246:13 | 270:15 285:12 |
| 302:8 | **schedule**   282:5 | 246:19 247:7 | 295:19 298:9 |
| **says**   87:17,19 | 285:10,17,19 | 247:21 248:8 | 299:21 |
| 101:6 110:11 | 288:23,25 | 249:9 251:2,9 | **section**   15:4 |
| 111:15,17 | 291:20,22 | 251:24 252:5 | 245:24 246:3 |
| 121:21,22,22 | 293:5,25 294:2 | 252:10 253:6 | **security**   38:25 |
| 125:18 147:10 | 294:15 | **screens**   97:18 | 80:14 87:15 |
| 151:5 174:4,22 | **schlichter** | 98:8 | **see**   19:8 21:17 |
| 174:23 175:6 | 26:24,25 30:2 | **scrutinize** | 21:19 26:17 |
| 175:15 176:2 | 35:3 | 276:12 | 36:21 43:10,11 |
| 176:14 177:18 | **score**   145:6 | **scrutiny**   73:8 | 43:15,25 45:21 |
| 178:8 179:3,19 | 163:4,8,12,12 | 83:2,7 84:2,25 | 46:16,17 85:20 |
| 179:19,24 | 163:16,25 | 85:7 117:21 | 86:25 87:10 |
| 180:3,15 | 164:7,8,10,16 | 129:11,14 | 94:8 105:11 |
| 181:14,21,25 | 236:7 252:12 | 206:25 207:5,6 | 108:14,19 |
| 182:6,14 183:4 | 252:20 | 207:23 208:3,4 | 109:8 113:24 |
| 185:12 186:2 | **scorecard** | 239:14 296:25 | 116:2 118:9 |
| 187:6 188:21 | 163:5 | **se**   192:6 209:3 | 119:25 121:2 |
| 188:24 189:3 | **scores**   162:20 | 249:8 | 121:21,21 |
| 189:12 201:2 | 163:19 | **sealing**   3:5 | 124:7,14 |
| 201:17 203:12 | **scoring**   65:4,5 | **search**   30:12 | 130:20 144:8 |
| 221:14 224:18 | 65:6 125:6 | 165:15 | 147:13 155:11 |
| 225:8,12,17,21 | 143:14 145:4,7 | **season**   85:23 | 157:23 162:11 |
| 237:6 238:8,13 | 145:15,24 | **second**   27:21 | 162:21,23 |
| 240:15 241:7 | 162:2 166:6,13 | 35:20 54:12 | 164:8 166:10 |
| 241:19 242:7 | 167:7 233:14 | 68:24 112:6 | 167:7 172:22 |
| 246:7 247:2,11 | 234:15,20,23 | 146:10,16 | 174:9 175:20 |
| 249:19 251:19 | 235:10,21 | 154:22 172:4 | 176:5,13,19 |
| 252:10 257:19 | 236:11,17,24 | 175:15 178:8 | 177:11,22 |

| | | | |
|---|---|---|---|
| 182:23,25 | 258:24 | **self** 74:24 | **series** 71:14 |
| 183:3 186:9 | **seem** 112:2 | **send** 15:8 | 77:16 78:21 |
| 187:9 188:7 | 121:4 155:9,10 | 263:18 | 79:3,10 80:2 |
| 189:5 200:13 | 191:25 192:19 | **sends** 170:9 | 81:6,12 83:10 |
| 200:18,24 | 226:2 244:15 | 263:19 | 87:22 91:18 |
| 201:8 202:8 | 250:9 262:22 | **sense** 38:10 | 100:4 194:20 |
| 208:12 216:16 | 272:22 | 73:15 91:25 | 255:17 272:17 |
| 222:4 224:4,8 | **seemed** 251:17 | 101:10 125:8 | 303:4 |
| 224:13,14,18 | **seems** 33:17 | 148:5 155:23 | **serious** 141:14 |
| 224:23 225:7 | 99:14 175:4 | 192:24 195:20 | **seriously** 76:18 |
| 225:11,16,20 | 214:19 226:24 | 204:3 206:8 | 137:22 |
| 228:14 233:2 | **seen** 43:2,18,18 | 218:14 226:19 | **serve** 19:11 |
| 235:24 237:9 | 94:9 95:4 | **sensitive** 208:5 | 20:6 49:10 |
| 239:17 240:21 | 124:24 183:22 | **sent** 262:6 | 53:10,12 57:4 |
| 242:7 243:16 | 183:25 274:16 | 316:14 | 58:21 131:7 |
| 247:16,17,25 | **select** 97:16 | **sentence** | 165:18 |
| 248:5 249:16 | 144:7 156:5 | 146:16 151:25 | **served** 10:2 |
| 250:2 251:25 | 207:13 | 175:15 176:13 | 18:22 19:3,6 |
| 252:16 256:6 | **selected** 51:21 | 176:20 177:18 | 19:11 50:17 |
| 256:13 257:19 | 82:11 153:9 | 179:5,18,19 | 58:15 67:20 |
| 261:3,16 | 154:18 156:4 | 180:10 181:14 | 74:16 104:23 |
| 262:10 265:21 | **selecting** 35:25 | 182:14 185:11 | 129:20 131:9 |
| 266:5,20 267:6 | 36:9 37:12 | 187:6 189:3 | 131:20 299:19 |
| 270:25 272:3 | 52:18,21 82:9 | 225:20 243:13 | **service** 26:8 |
| 272:25 273:5 | 142:4 224:15 | 261:12 270:23 | 59:8 63:10,14 |
| 276:13,19 | 224:19 | **separate** 54:19 | 63:15 134:20 |
| 277:5 282:11 | **selection** 23:8 | 55:22 139:24 | 137:10 209:15 |
| 282:14,23 | 34:7,12 63:19 | 212:12 250:20 | 211:6 225:17 |
| 285:14 286:3,9 | 73:16 77:13,21 | **separately** | 263:10 |
| 288:16 289:5,7 | 78:2,5,14,18 | 54:22 187:9 | **services** 1:9 |
| 291:12,16,23 | 79:23 91:13,14 | 250:25 | 2:16 4:8 5:16 |
| 292:3,7,21 | 93:18 154:20 | **sequence** 88:10 | 19:20,24 25:17 |
| 294:5 | 155:3,21 219:5 | **sequences** | 27:8 38:12,19 |
| **seeing** 170:11 | **selections** 24:9 | 113:2 | 54:8,13 55:5 |
| 170:17 197:17 | 51:16 | | 55:11,12,16 |

| | | | |
|---|---|---|---|
| 56:15,20 60:4 | **shareholder** | 266:20 288:19 | **simulation** |
| 61:10,17 62:9 | 130:3 | 292:25 | 82:17 85:14 |
| 63:7,11 133:14 | **sharing** 23:4,25 | **side** 24:2 141:2 | 86:9 87:16 |
| 134:14 208:19 | 140:15 292:19 | **sign** 316:12 | 88:8 90:10 |
| 208:24 211:18 | **sharp** 68:16 | **signal** 170:10 | 97:9 112:19 |
| 213:2 225:22 | **sharpe** 65:12 | **signature** | **simulations** |
| 308:13 316:4 | 66:9,10 67:4 | 313:23 | 80:20 81:2 |
| 317:1 | **sheet** 219:10 | **signed** 3:11,14 | 85:20 86:4 |
| **servicing** 58:9 | 312:1 316:11 | 12:2 15:11 | 112:9 |
| **serving** 131:10 | **shell** 26:21 27:2 | 16:10 57:12 | **single** 40:20 |
| 283:19 308:5 | 27:17,19 | 172:16 184:17 | 41:4,5 42:24 |
| **set** 29:7 109:24 | **shift** 132:10 | 216:6 295:22 | 44:16 67:23 |
| 140:18 194:7 | **ship** 294:12 | 297:24 304:25 | 91:12 106:9 |
| 210:14 223:24 | **shop** 143:25 | 316:19 | 115:21 116:24 |
| 258:15 | **short** 113:16 | **significant** | 117:3 127:16 |
| **sets** 137:16 | 115:12 129:5 | 152:6 194:2 | 137:25 188:10 |
| 138:13 224:8 | 194:3 242:19 | 202:4,24 | 191:13,16,23 |
| 224:10 | **shorthand** 1:18 | 203:16 235:19 | 192:16 194:19 |
| **settled** 26:15 | 313:5,12 | 256:4 | 197:3,15,18 |
| 36:6 59:11 | **shortly** 10:3 | **signs** 201:5 | 210:23 211:3 |
| **seven** 16:3 | **show** 66:2 | **similar** 15:25 | 211:13 219:9 |
| **several** 8:17 | 68:10 85:25 | 35:21,21 54:13 | 221:5 277:18 |
| 27:19 42:5 | 103:22 141:18 | 67:7 108:15 | 277:19 309:14 |
| 58:7 82:23 | 144:12 146:7 | 121:6,18 | **sir** 165:9 |
| 96:20 146:4 | 158:19 198:23 | 125:25 136:10 | **sitting** 16:7 |
| 222:6,15 280:7 | 208:8 260:3 | 263:2 | 150:14 158:23 |
| 293:4 300:9 | **showing** 24:4 | **similarly** 277:4 | 159:20 165:24 |
| 303:7 | 75:23 159:15 | **simple** 85:18 | 211:7 212:22 |
| **shah** 2:2 13:20 | 162:12,19 | 103:20 125:7 | 219:12 258:22 |
| 15:12 37:19,20 | 164:10 205:18 | **simply** 139:19 | 290:22 295:3 |
| 37:23 | 258:15 264:2 | 197:25 229:19 | **situation** 12:21 |
| **share** 39:17,18 | 299:13 | 259:14 262:14 | 15:11 116:12 |
| 207:10 255:20 | **shows** 44:23 | 263:17 | 129:12 |
| 264:16 266:8 | 86:2 201:5 | **simulated** | **six** 5:25 6:2 |
| 291:11 | 259:4 266:14 | 112:7 | 16:3 48:16 |

**[six - speculate]**                                             Page 65

51:5 93:6
94:18 97:11
189:18 190:7
293:10
**sizable**  52:14
**size**  25:4 62:8
62:19,22 63:6
133:19 137:17
**skeptical**
125:11
**skill**  137:16
138:13 210:14
**slice**  108:22
**slightly**  45:20
133:23 189:15
193:11 205:7
302:20
**slocum**  282:23
283:3 284:19
**small**  57:8
62:10 64:2
103:12 133:19
133:21 134:16
242:11 306:5
308:22
**smaller**  22:22
64:3 139:5
**smallest**  62:13
**smooth**  88:3
**smoother**  100:4
100:19
**snapshot**
103:15 108:10
**snyder**  31:5

**social**  38:24
80:14 87:15
**software**  235:5
**sold**  55:2 56:3
62:3,12 129:21
130:9 141:25
142:17
**sole**  58:13
239:16
**solely**  232:22
**solutions**  4:16
312:1 316:23
**solving**  88:17
**somebody**  23:4
42:22 44:15
80:13 81:3
93:9 95:8 99:3
108:8 135:12
135:16 138:4
141:9,24 209:7
226:11 293:19
293:20
**somewhat**
189:10
**sophistication**
137:17
**sorry**  12:5
19:13 31:17
50:14 56:24
111:11 142:17
165:11 220:25
231:22 232:17
248:4 266:18
281:19 283:22
288:22 298:6

**sort**  6:12 47:22
64:13 129:18
143:11 145:6
166:6 206:24
219:20 304:10
**sortino**  66:13
66:24
**sounds**  11:19
48:12 150:8
196:3 218:3
235:4 265:10
283:3 290:16
296:19,20
**source**  38:18
**sources**  38:23
**southern**  1:3
4:11
**spain**  1:18 4:6
5:22,24 289:24
**speak**  9:4,7,10
9:16 39:19
97:22 115:14
116:18 141:8
141:10 186:23
188:17 232:11
232:13 284:5
287:2,25 291:9
297:17
**speaking**  74:3
80:6 114:3
130:17 141:3
143:12 144:15
146:5 173:12
189:12 244:2

**speaks**  170:20
241:12
**spearheading**
142:9
**special**  254:12
256:14 257:2
259:8 290:4
**specialist**  4:15
**specific**  41:13
49:23 60:7
61:20 71:20
73:19,22 76:25
83:10 109:3,5
116:16 153:5
153:19 154:2
158:18 165:4
165:17,25
169:6,7 190:18
199:5 209:18
211:11 215:7
233:5 256:13
263:12,12,16
303:24 304:4
**specifically**
109:19 111:10
160:4 161:6
162:5 172:13
204:11 209:12
215:6 244:13
304:10
**specifics**
309:13
**speculate**  18:9
18:11

**speculation**
18:12
**sped** 45:8
**speed** 44:12
**spend** 5:25 6:6
44:15,19 75:3
78:8 83:14,16
107:11 127:7
152:2
**spending**
140:20
**spent** 16:20
17:23 46:9
74:22 76:3,7
208:13 309:19
**spit** 144:4
**split** 56:10,11
267:4
**spoke** 9:19
**spoken** 105:7
217:19 218:22
218:24,25
**spokespeople**
130:16
**sponsor** 49:9
54:24 55:19
56:3 57:4,16
57:23 59:16
**sponsors** 53:17
**spot** 42:20,23
42:25 277:17
277:20
**spun** 21:8
**squared** 68:21

**ss** 313:3
**stability** 94:10
105:10
**staff** 26:2 30:20
131:5 141:11
142:12 305:10
**stage** 25:6
83:22 288:6
**stand** 15:10
**standard** 4:14
114:16 210:9
235:6,25 236:3
277:4
**standardized**
65:18 77:3
**standards**
179:23 187:8
237:8 239:12
245:22 246:14
**standing**
255:25
**stands** 301:10
**star** 143:21
277:22
**start** 36:12
46:3 49:7
56:18 86:15
87:2,24 94:22
102:15 132:17
170:13 233:11
276:22 282:8
**started** 26:11
64:5 132:18
135:22 152:18
235:6 279:5

**starting** 102:23
148:3 300:2
**state** 1:19 96:9
185:8 187:23
225:25 229:6
250:11 280:12
296:18 297:2
297:14 298:13
298:17 299:6
299:14,17
300:2,23
302:21,23
303:6 304:18
305:11,12,18
305:20 306:7
313:2,6 315:8
**stated** 178:9,22
178:24 179:4,7
179:11,13,20
179:21 180:4,7
180:18 182:2
182:15 185:13
206:10
**statement** 7:21
109:20,21,23
110:9,10 111:9
181:9 189:9
223:7 224:4
**states** 1:2 4:10
**status** 177:20
178:2 181:16
186:4,5,7,13,20
186:22 187:4,8
200:10,17
201:4,6,8,21

202:8,13 203:3
203:8 206:3
239:14 241:10
242:8 243:7,9
243:10 244:9
251:23 252:16
253:4,22
257:21 258:8
**stayed** 130:11
142:23 168:8
**stenographic**
4:23
**step** 7:14,15
120:10 122:4
133:11,11
173:25
**steps** 211:11
**sterling** 287:4
**stick** 243:12
**stipulate** 4:24
**stipulated** 3:2,6
3:10 4:21
**stipulations**
311:3
**stocks** 39:6
**stone** 1:17 4:4
5:12 6:1 7:1,9
8:1 9:1 10:1
11:1,16 12:1
12:20 13:1
14:1 15:1 16:1
17:1 18:1 19:1
20:1 21:1 22:1
23:1 24:1 25:1
26:1 27:1 28:1

| | | | |
|---|---|---|---|
| 29:1,9 30:1 | 115:11 116:1 | 184:1 185:1 | 254:1 255:1 |
| 31:1 32:1 33:1 | 117:1 118:1 | 186:1 187:1,20 | 256:1 257:1 |
| 34:1 35:1 36:1 | 119:1 120:1 | 188:1 189:1 | 258:1 259:1 |
| 37:1 38:1 39:1 | 121:1 122:1 | 190:1 191:1,2 | 260:1,17 261:1 |
| 39:15,16,24 | 123:1 124:1 | 192:1 193:1 | 262:1 263:1 |
| 40:1,2 41:1 | 125:1 126:1,9 | 194:1 195:1 | 264:1 265:1,16 |
| 42:1 43:1 44:1 | 127:1 128:1 | 196:1 197:1 | 266:1 267:1 |
| 45:1 46:1 47:1 | 129:1,16 130:1 | 198:1 199:1 | 268:1 269:1 |
| 48:1 49:1 50:1 | 131:1 132:1 | 200:1 201:1 | 270:1,13 271:1 |
| 50:14,21 51:1 | 133:1 134:1 | 202:1 203:1 | 272:1 273:1 |
| 52:1 53:1 54:1 | 135:1 136:1 | 204:1 205:1 | 274:1 275:1 |
| 55:1 56:1 57:1 | 137:1 138:1 | 206:1 207:1 | 276:1 277:1 |
| 58:1 59:1 60:1 | 139:1 140:1 | 208:1,17 209:1 | 278:1 279:1 |
| 61:1 62:1 63:1 | 141:1 142:1 | 210:1 211:1 | 280:1 281:1,16 |
| 64:1 65:1 66:1 | 143:1 144:1 | 212:1 213:1 | 282:1 283:1 |
| 67:1 68:1 69:1 | 145:1 146:1,3 | 214:1 215:1 | 284:1 285:1 |
| 69:12 70:1 | 147:1 148:1 | 216:1 217:1 | 286:1 287:1 |
| 71:1 72:1 73:1 | 149:1 150:1 | 218:1 219:1 | 288:1 289:1 |
| 74:1 75:1 76:1 | 151:1 152:1 | 220:1,12 221:1 | 290:1,7,12 |
| 77:1 78:1 79:1 | 153:1 154:1 | 222:1 223:1 | 291:1 292:1 |
| 80:1 81:1 82:1 | 155:1,2 156:1 | 224:1 225:1,25 | 293:1 294:1 |
| 83:1 84:1 85:1 | 157:1 158:1 | 226:1 227:1 | 295:1,6 296:1 |
| 86:1 87:1 88:1 | 159:1 160:1 | 228:1 229:1 | 297:1 298:1 |
| 89:1 90:1 91:1 | 161:1 162:1 | 230:1 231:1 | 299:1,9 300:1 |
| 92:1 93:1 94:1 | 163:1,15 164:1 | 232:1 233:1 | 301:1 302:1 |
| 95:1 96:1 97:1 | 165:1 166:1 | 234:1 235:1 | 303:1 304:1 |
| 98:1 99:1 | 167:1,19 168:1 | 236:1 237:1 | 305:1 306:1 |
| 100:1 101:1 | 169:1 170:1 | 238:1 239:1 | 307:1,5,21 |
| 102:1 103:1 | 171:1 172:1,8 | 240:1 241:1 | 308:1 309:1 |
| 104:1 105:1 | 172:22 173:1 | 242:1 243:1 | 310:1,9,11 |
| 106:1 107:1 | 174:1 175:1 | 244:1 245:1 | 311:1,7,16 |
| 108:1 109:1 | 176:1 177:1,15 | 246:1 247:1 | 314:6 316:5 |
| 110:1 111:1 | 178:1 179:1 | 248:1 249:1 | 317:2,4,12 |
| 112:1 113:1 | 180:1 181:1,12 | 250:1 251:1 | **stone's** 39:13 |
| 114:1,11 115:1 | 182:1 183:1 | 252:1 253:1 | 69:9 |

stop 162:19
293:6
stopped 148:12
149:2 150:11
150:16
story 67:7
278:15,19,19
strange 170:9
183:7,12
strategic
293:23
strategies
271:23
strategy 297:21
street 2:3,8
96:9 296:18
297:2,14
298:13,17
299:6,14,17
300:2,23
302:21,23
303:6 304:18
305:11,12,19
305:21 306:8
315:8
stretch 6:17
strike 182:18
strikes 197:23
226:13
struggling
92:13
study 209:8
stuff 42:10
44:23 144:19
197:23 210:11

272:21 273:19
275:5,9
styled 271:20
sub 270:2
subbullet 247:5
subject 171:18
174:18
submit 16:23
submitted 5:19
10:14,22 42:17
60:8
submitting
49:4 60:3
subscribed
311:18 312:23
317:14
subsection
225:7
subsequent
178:21 182:7
subset 42:2
88:23 92:24
93:8
subsidiary
296:10
substantial
255:7,15
substantially
108:9 171:18
205:8
substantive
47:23,25
192:10 246:11
subsumed
250:19,22

subtracting
119:6
succeed 24:13
success 79:2
successful 80:4
87:22 103:24
104:4
successors
162:3
suddenly
117:10
sued 23:5 24:8
307:10
sufficient
217:23 220:3
224:20 225:6
229:23 252:15
253:3 272:2
274:3
suggest 156:10
suggesting
88:14 125:21
259:7
suggests 219:22
suite 2:3 126:7
126:10,13,23
127:25 202:5
202:24 207:15
207:19
summary
269:22,24
supplemental
79:18
supplied 7:25

support 45:8
suppose 115:19
121:7 217:13
supposed 33:16
52:6 83:5
85:10 92:6
218:17 306:16
306:18
suppress
144:10
sure 8:17 12:10
12:11 28:16
38:8 42:6,17
42:25 48:24,25
55:13 67:14
69:15 77:5
80:21 88:12
106:22 109:21
109:22 125:16
128:11 130:11
138:7,10
139:10,11
143:18 144:18
146:10 157:15
175:6 181:19
185:2 186:22
210:14 211:12
229:24 231:3
236:19 270:12
270:16 277:13
285:9,22 293:8
293:12,15,16
294:11 295:17
297:18 298:11
306:9

**surface** 103:20
**surprise** 301:25
**surprised**
  256:18,20,23
  309:12,20
**swear** 5:3
**switch** 115:18
**switched**
  152:11,13
  236:4 284:23
  289:14
**sworn** 3:12,14
  5:7 115:5
  311:18 312:23
  313:9 317:14
**sync** 159:12
  178:13 181:24
  182:9 233:15
**syncs** 14:12
  181:20
**system** 64:17
  65:4,7 86:12
  88:21 111:2
  123:19 145:6,8
  145:15 162:15
  163:14 166:7
  166:13 167:7
  233:15 234:16
  234:20 235:10
  235:17,17,21
  236:5,11,18
  237:6,13,16,23
  238:2,9,20,24
  239:4,16,19,25
  240:7,17

243:20 244:3
245:21 246:19
247:7,21 251:2
251:9,24 252:5
252:10 253:6
284:17,24
**systems** 65:5
  143:8,9,12,15
  143:17,19,22
  144:3,14 145:4
  145:25 161:24
  162:2 234:23
  235:3,18 248:8

**t**

**t** 5:6 90:13
  92:17 96:4
  115:2,4 313:1
  313:1 314:2
  315:2
**table** 24:4
  277:8,10
  280:12,15
  286:14 287:12
  294:10
**tailor** 76:24
  263:12
**tailored** 77:4
  261:14
**take** 4:25 6:11
  6:14 7:14 12:8
  12:11 16:11
  45:20 76:17
  83:8 86:3 87:6
  98:21,25
  111:24 114:9

120:21 121:2
125:13,14
133:11 137:5,8
137:19,22
156:11 164:13
164:18 165:15
170:12 173:24
176:25 193:3,9
199:20 203:9
203:22 204:9
213:18 227:4
230:16,17
274:8 279:21
280:22,23,25
281:4,6 293:15
298:5
**taken** 1:17 4:6
  12:16 39:4
  50:10 69:4
  114:15 148:19
  177:4 192:4,5
  194:23 196:18
  226:3 230:21
  281:12 283:4
  306:25 311:7
  313:11
**takes** 81:15,16
  172:3
**talent** 138:25
**talk** 14:9 39:20
  41:2 45:12
  48:7,13 49:6
  78:6 95:19
  99:18 168:17
  168:25 183:20

206:20 214:10
214:18 233:22
265:19
**talked** 22:23
  23:12 29:13
  44:3 83:19
  99:25 100:21
  104:21 107:16
  112:23 141:20
  142:19 143:11
  174:21 192:9
  217:2,5,6
  228:20 272:14
  277:25 279:19
  279:20
**talking** 8:12
  12:21 17:6,10
  47:19 50:16
  61:4 67:23
  69:12 75:19
  78:9 80:16
  81:22 87:3
  96:2 97:2
  102:9 107:11
  112:8,11,12,12
  112:20 119:11
  136:15 143:14
  143:15 145:19
  149:12 151:7
  183:8 190:16
  190:17,19
  205:19 206:6
  209:23 213:25
  215:18 217:24
  217:25 219:3

**[talking - thank]**                                                     Page 70

227:7,11,13
231:7 234:14
237:17 238:2
242:18 243:19
243:20 245:20
254:11 295:13
**talks** 148:2
183:18
**target** 30:6
32:2 35:7,9,13
36:10 37:2,5
37:13 69:21
70:10,13,17
71:2,7,14
72:22 73:5,17
73:20 76:19,22
77:6,7,12,16,21
78:3,5,8,21
79:3,10,25
81:6,12 82:9
82:11 83:10
86:9 87:22
88:22,24 91:13
91:17 92:15
93:18 94:17,22
95:6,22 97:11
100:4 101:3
108:13 112:7
122:22,23
123:8,9,13,15
126:7,10,13,22
127:24 128:17
128:19,21
141:22 142:4,5
142:6,10 179:8

179:9 181:5,7
205:15 255:17
260:18 261:8
262:12 264:23
265:21 266:7
266:21 267:5
271:14,23
272:2,8,10,17
276:17 277:2
292:8 296:13
297:14 298:19
298:23 301:22
302:15,18,21
303:3 304:18
305:19,21
306:13
**tdf** 270:25
276:18
**team** 93:25
105:9 106:9
134:25 253:16
**teams** 17:14
**tech** 105:22
**technical** 50:15
**technically**
305:2
**tell** 7:2 67:7
120:14 150:17
151:22 175:5
177:7 189:16
196:24 198:17
211:11 212:13
244:8 273:12
273:21,23
278:20 285:11

295:5 302:10
307:13
**telling** 106:21
**tells** 163:19
274:6,9 275:18
278:19
**ten** 19:8 141:25
230:17 251:21
251:23 252:3
281:6
**tend** 138:25
207:17,18
**tenure** 60:25
68:19 105:9
252:12,18
253:7,19
**term** 33:22
82:22 83:9
88:20 113:16
129:5 242:19
297:2
**terminal**
271:18
**terms** 24:19
25:23 52:18
63:17 64:13
67:16,18 70:20
75:5,14 82:7
82:12,23,25
116:18 123:24
123:25 138:23
140:3,5,15,15
159:6 161:7,12
199:22 219:2,3
220:15 233:12

236:14 263:25
277:14
**test** 146:9
152:12
**testified** 5:8
115:6 174:11
174:14 193:18
195:2 197:2
202:10 212:4
216:8 239:22
243:18,24
262:25 263:11
295:6
**testify** 7:7
313:9
**testimony** 4:4
14:22 29:8,12
29:22 30:24
31:3 36:16
69:9 95:16
111:4,8,12
143:13 152:10
157:18 166:24
185:14 188:9
193:20 196:10
219:20 227:22
229:14 230:2,4
231:17 232:3,8
238:8 244:4
261:19 316:9
316:17 317:8
**texas** 1:3 4:11
**text** 246:21
**thank** 5:15 33:3
70:9 77:19

**[thank - think]**

| | | | |
|---|---|---|---|
| 104:19 114:2 | 73:25 74:25 | 35:19 37:7,15 | 131:15 134:10 |
| 310:11 | 77:10 79:13 | 37:25 38:7 | 136:18 137:3 |
| **theft** 22:24 | 81:21 82:8 | 41:5 44:13 | 137:21 138:22 |
| 25:12 | 83:18 90:2 | 50:15 52:16 | 141:5,12,14 |
| **theirs** 14:12 | 91:18 93:15 | 54:3,10 57:9 | 145:7,20,23,25 |
| **theoretically** | 97:9,20 98:10 | 62:19 64:15,19 | 147:3,17,20 |
| 128:24 235:15 | 98:17 99:15 | 65:24 66:20 | 149:7,11 152:3 |
| **thing** 42:6 | 107:9,25 | 67:9 69:17 | 152:9,11,13 |
| 46:13 54:5 | 109:11 110:19 | 71:5 72:4,22 | 153:7,14,22 |
| 59:9 63:20 | 118:5 119:2 | 72:24 73:8 | 154:6,17 155:7 |
| 67:23 68:12 | 123:14 125:3 | 75:13 78:4 | 155:18,21 |
| 69:8,25 70:22 | 131:4 137:6 | 81:16 83:8 | 156:18 159:3,8 |
| 77:4 83:4 84:8 | 140:23 148:13 | 85:11,22 86:10 | 160:13 161:10 |
| 85:22 105:25 | 153:7 154:9 | 86:11,23 91:16 | 162:22 163:3 |
| 107:2 117:10 | 156:5 158:14 | 92:13 99:7 | 164:12,24 |
| 121:20 122:3,5 | 158:19 161:16 | 101:5 103:16 | 165:18 166:14 |
| 122:5 148:23 | 162:11 165:16 | 105:7 107:17 | 167:24 168:4,5 |
| 150:20 154:21 | 165:17 182:8 | 107:18,23 | 168:15 169:22 |
| 154:22 161:11 | 188:22 197:24 | 108:8,13,17 | 169:23 170:9 |
| 161:21 177:8 | 198:3,12 | 109:9,25 | 170:19,25 |
| 183:8,9 197:18 | 209:22 210:4 | 111:16,22 | 171:8 172:12 |
| 207:12,15 | 214:25 220:14 | 112:3 115:25 | 172:14,20 |
| 212:11 229:11 | 221:3,17 222:6 | 116:20,25 | 173:21,22 |
| 233:13 235:11 | 222:23 224:2 | 117:8,13,22,23 | 174:11,14,22 |
| 259:17 266:19 | 227:12,17 | 118:4,10,11,18 | 178:20 179:12 |
| 272:14 284:9 | 249:3 263:9 | 118:22,25 | 180:14,15,17 |
| 299:13 301:14 | 264:3 274:16 | 119:3,19,21 | 181:24 182:9 |
| 301:15 308:9 | 278:10,11 | 120:9 121:12 | 182:10 183:7 |
| **things** 36:12 | 303:7 307:6 | 121:25 122:4 | 184:6,7,24 |
| 38:4 41:21 | **think** 8:21 9:18 | 123:12,25 | 185:22 186:17 |
| 43:12 44:12 | 10:5,12 13:9 | 124:5,16,24,25 | 188:14 190:8 |
| 46:2,13 65:14 | 15:11 16:7,20 | 125:2,3,8,19,22 | 191:10 192:18 |
| 66:19 67:10 | 22:5 26:20 | 126:20,21 | 197:21 199:14 |
| 68:3 69:22,23 | 27:6 28:15,23 | 127:10,11 | 203:14,18 |
| 70:23 72:2 | 28:24 32:22 | 128:24 129:10 | 204:7,18,21 |

| | | | |
|---|---|---|---|
| 206:12,16 | **third** 27:24 | 118:8,15 119:7 | 249:4 274:13 |
| 207:9,22 | 54:17 55:4,12 | 120:6 121:8 | **tied** 28:2 |
| 208:25 209:3 | 55:17,23 56:6 | 122:10 123:7 | 109:19 153:23 |
| 210:12 214:23 | 56:19 57:7,8 | 123:14 124:22 | 153:25 273:21 |
| 215:5,5 216:2 | 58:11,14 63:22 | 128:2 130:13 | 273:24 |
| 216:20 217:8 | 64:12 143:22 | 130:14 134:6 | **tier** 27:22 |
| 217:10,14,16 | 143:22 193:10 | 135:20 143:16 | **ties** 154:11 |
| 218:13,15,19 | 193:11,12 | 154:15 156:8 | **tightly** 182:11 |
| 221:11 223:12 | 196:21 225:22 | 161:24,25 | **time** 1:13 3:9 |
| 223:15 226:5 | **thorough** | 162:6 170:4,5 | 4:13,14 6:6 |
| 226:18 228:3,5 | 177:20 | 176:17 183:4 | 10:7,9,11 |
| 229:10,23 | **thought** 32:19 | 183:16 185:7 | 12:14,17 16:18 |
| 230:8 233:16 | 45:14,15,16,21 | 185:20 200:23 | 17:17,23 19:10 |
| 233:18,24 | 52:2,7 137:22 | 201:13 204:2 | 21:20 25:9,23 |
| 235:3,7,18 | 215:13 223:10 | 207:14 233:23 | 26:2,6,7,11 |
| 236:18 239:21 | 223:11 262:14 | 234:7,22 236:7 | 38:20 44:16,20 |
| 241:11,12 | 262:15 278:21 | 240:8,9,19,19 | 46:7,9 50:8,11 |
| 243:3 244:5,12 | 289:21 309:6 | 241:8,9 243:15 | 52:17 53:3,22 |
| 249:5,20 | **thoughtful** | 244:10 247:16 | 54:18 55:2 |
| 255:11,16 | 84:19 104:18 | 247:23,24 | 56:5,23 57:11 |
| 259:12,16,25 | 120:25 | 249:24 251:21 | 57:24 59:4 |
| 261:25 262:6 | **thoughts** | 252:12,18 | 61:18 62:11,12 |
| 270:8,13 | 308:24 309:8 | 253:7,19 | 63:16 69:2,5 |
| 273:14 274:15 | **thousands** 81:2 | 267:24 268:8 | 70:16,21 73:6 |
| 277:24 278:8 | 86:4 112:25 | 268:23 269:10 | 73:23,24 74:22 |
| 278:19 284:6 | **three** 8:21 9:12 | 277:5,15 279:2 | 75:3 76:3,8 |
| 284:13 286:23 | 16:2 28:7,9 | 300:3,15,19,24 | 77:18 78:9 |
| 291:3,5 292:16 | 42:13 66:15 | 301:19 308:13 | 83:14,16 90:21 |
| 294:19,21 | 87:21 91:15 | 308:25 | 91:7,9 92:11 |
| 296:7,10,12 | 92:7 97:17,21 | **throw** 75:14 | 93:8 94:3 |
| 303:17,20 | 98:7 99:10 | 127:18 | 95:15 96:2,24 |
| 306:11 308:3 | 102:6 109:12 | **ticking** 274:18 | 97:25 98:5,15 |
| **thinking** 96:24 | 110:11 115:20 | **tie** 91:24 110:8 | 100:15 101:9 |
| 103:5 173:19 | 116:10,23 | 110:16,20 | 105:17 106:16 |
| | 117:11,12 | 162:3,4 249:2 | 107:11 109:5 |

**[time - transcript]**

| | | | |
|---|---|---|---|
| 114:4,6,13,16 | 258:23,25 | 11:16 16:7 | **total**   16:24 |
| 115:8 121:5 | 264:25 272:3 | 92:23 134:19 | 17:10 28:4 |
| 124:14,14 | 279:12,18 | 141:21 150:14 | 38:15 88:13 |
| 127:7,16 | 280:3,9 281:3 | 158:23 159:20 | 308:20 |
| 129:19,25 | 281:10,13 | 165:24 198:3,7 | **totality**   40:11 |
| 130:9 132:22 | 283:3,16 284:2 | 205:5 212:22 | 40:24 41:2 |
| 133:4,9 134:22 | 284:18 286:18 | 227:10 290:22 | **totally**   34:5 |
| 137:20 140:20 | 286:19 289:5 | 295:3 | 39:21 59:16,20 |
| 142:21 146:4,5 | 289:16,25 | **today's**   7:10,16 | 303:22 |
| 146:18,19 | 290:2 292:21 | 8:15 9:4,8,16 | **toward**   23:14 |
| 147:23 148:17 | 293:17,22,24 | **together** | 261:5 289:2 |
| 148:20 150:19 | 296:3 297:23 | 105:25 110:21 | **towards**   85:24 |
| 151:8,20,21,23 | 298:7 299:18 | 228:21,22 | 87:8 255:21 |
| 152:2,24 | 300:10 301:17 | 249:2,4 299:12 | **track**   18:4 |
| 154:25 156:22 | 306:23 307:2 | **token**   206:17 | 92:22 105:20 |
| 157:2 159:18 | 308:4 309:5,19 | **told**   151:20 | 142:10 154:19 |
| 165:10,13,16 | 311:9,10,12,13 | 278:15,19 | 305:24 |
| 169:4 170:13 | 313:12 316:18 | **tonight**   146:9 | **tracking** |
| 171:7 177:2,5 | **timeframe**   57:5 | **took**   6:24 24:18 | 302:14 303:14 |
| 189:14 190:6 | 215:18 231:11 | 149:6 168:7 | 304:10 305:25 |
| 194:24 200:2 | 248:15 279:3 | 170:2,8 195:21 | 306:17 |
| 202:8,13,18 | 295:18 316:8 | 196:20 226:9 | **trade**   105:16 |
| 204:2,24 | **timeline**   295:11 | 226:23,25 | **trading**   105:15 |
| 205:17 206:9 | **times**   46:12 | 283:6 296:7,11 | **trained**   136:24 |
| 206:10,17 | 54:3 110:24 | **top**   11:7 12:3 | 136:25 |
| 208:13 214:17 | 159:17 231:6 | 31:12 41:18 | **training**   45:17 |
| 215:20 227:11 | 280:7 | 71:4 72:11 | 131:5 149:9 |
| 227:19 230:16 | **tis**   281:3 | 80:22 129:13 | 211:5 213:17 |
| 230:19,22 | **title**   54:3 130:6 | 175:5,6 184:11 | 214:10,11 |
| 232:8 234:15 | **titled**   299:6 | 184:19 255:12 | 215:3,8 218:12 |
| 235:13 238:3 | 315:8 | 279:14 282:9 | 218:14,20 |
| 245:2,10 246:3 | **titles**   54:2 | 298:14 | **transaction** |
| 246:18 247:6 | **today**   4:12,16 | **topic**   48:5 67:3 | 303:6 306:7 |
| 248:17 255:17 | 5:13,17 6:11 | **topics**   135:21 | **transcript**   5:10 |
| 256:24 258:17 | 7:6,18 9:21 | 219:9 | 8:10 47:22,23 |

[transcript - under]                                                  Page 74

| | | | |
|---|---|---|---|
| 48:15 313:14 | **trying** 31:11 | 64:6,7 67:5 | 94:16 101:15 |
| 313:17 316:6 | 32:22 41:23 | 101:6 102:10 | 109:7 139:23 |
| 316:19 317:5,8 | 46:3 102:10 | 102:18 107:24 | 140:8 190:8 |
| **transcripts** 8:3 | 151:17 159:6 | 120:14 121:15 | 203:13 207:11 |
| 8:4,6,13,14,19 | 165:23 171:4 | 121:16 123:21 | 213:7 221:15 |
| 44:4,7 46:7 | 191:18 216:2 | 135:19 143:25 | |
| 47:3 48:2 | 235:23 252:23 | 159:12 182:9 | **u** |
| **transition** | 278:22,23 | 182:11 196:22 | **ultimate** 132:2 |
| 130:12 135:23 | **tuned** 139:9 | 199:24 217:16 | **ultimately** |
| **transitioning** | **turn** 40:2,7 | 218:6 224:15 | 83:24 98:3 |
| 132:24 133:5 | 84:12,13 | 225:11 249:2,4 | 102:17 130:12 |
| 287:2 | 120:22 147:5 | 258:13 294:14 | 133:3 161:20 |
| **treat** 137:9 | 172:4 173:25 | **tying** 160:15 | 236:6 298:4 |
| **treated** 137:10 | 175:2 181:11 | **type** 42:13 | **unaware** 235:9 |
| **trial** 3:9 30:24 | 185:23 187:18 | 63:10 83:21 | **unboard** 43:4 |
| 31:3 | 187:21 190:22 | 263:23 270:5 | **uncertainty** |
| **tricky** 305:20 | 200:4 214:10 | **typed** 42:15 | 86:2,5 |
| **trigger** 127:15 | 223:17 224:6 | **types** 72:19 | **unclear** 202:6 |
| 188:19 | 232:14 236:25 | 265:9 | 270:23 |
| **triggered** | 237:24 239:8 | **typewritten** | **uncommon** |
| 245:11 | 240:23,24 | 313:13 | 60:13 199:21 |
| **triggers** 129:10 | 245:12,15 | **typical** 16:25 | 199:25 |
| **true** 94:3 | 252:9 254:7,8 | 53:2 64:7 | **unconflicted** |
| 300:11,13 | 260:11 264:20 | 71:11 74:25 | 30:12 |
| 313:14 317:8 | 266:12 285:10 | 94:21 173:13 | **under** 34:2 |
| **trust** 49:14,15 | **turned** 224:25 | 173:16,18 | 35:19 38:4 |
| 49:19 50:2 | **turning** 30:15 | 187:12 293:14 | 54:16 60:16 |
| 99:4 292:19 | 104:20 | 298:25 | 82:19 84:11 |
| **truth** 7:2 313:9 | **tweak** 217:11 | **typically** 17:15 | 85:7 103:4 |
| 313:10,10 | **tweaks** 255:12 | 48:20 57:25 | 117:4 122:2 |
| **truthfully** 7:7 | **two** 7:11 9:18 | 59:5,15 66:6 | 133:23 134:2,9 |
| **try** 26:2 44:25 | 12:8 20:16,21 | 68:20 71:16 | 136:21 189:24 |
| 65:16 79:20 | 22:18,21,23 | 72:20 73:4,6 | 190:2 208:23 |
| 158:18 160:23 | 31:18 35:23 | 77:8 86:23 | 209:5 235:10 |
| 208:11 | 40:6 54:21 | 89:9 92:20 | 235:16,17 |
| | | | 245:16,24 |

246:17 250:19
282:20 306:4
**undergoing**
255:15
**underlying**
124:22 126:12
154:16,24
163:17,23
164:15,20
170:4,15 186:6
186:12 201:5
202:14 255:5
256:11 257:21
257:22 266:5
269:6 271:22
299:24
**underperform**
202:2,22
277:14 280:4,4
280:5
**underperfor...**
85:3 116:9,14
116:23 118:15
124:10 127:2,8
127:9 128:5
154:10 156:24
157:9 169:7,18
170:19,21,23
186:9 189:3,8
189:13 190:5
190:17,19
203:16 204:24
205:3,10
208:12 278:9
279:22 280:13

287:18 301:19
304:13
**underperfor...**
115:20 121:7
127:25 128:22
278:20 279:2
**underperfor...**
84:9,10 117:12
126:12,14,20
154:11,23
170:7 171:12
190:21 200:23
203:23 204:4
204:10 205:7,8
206:18 208:11
280:19,20,21
300:3,10,19,23
301:2,6,9,12,25
306:15
**underperforms**
122:9
**understand**
5:17 6:3,19,24
7:4 18:21
44:22 46:4
64:19 66:20
78:12 92:13
99:19 103:19
106:19,23
117:3 124:12
128:12 129:6,8
129:19 148:8
151:17 156:11
157:8 162:18
165:14,22,23

168:23 191:18
208:11 215:25
246:8,22
252:23 287:17
299:23 310:3,7
**understanding**
55:14 193:13
218:17 234:19
235:20 304:11
304:12
**understood**
6:22 19:19
36:14 43:22
45:23 52:4
66:2 106:13
219:11
**undertaken**
239:17
**undertook**
165:5
**underwent**
212:25
**undetected**
240:10,20
242:4
**unengaged**
207:19
**unfortunately**
235:8
**unit**   311:5
**united**   1:2 4:10
**unitedhealth**
31:5,17,24,25
32:6

**unpack**   73:25
**unquote**   15:17
70:19 97:13
227:7
**unreasonable**
153:6,20 154:4
158:13 159:2
159:22 160:20
161:7 228:25
**unsophisticat...**
207:18
**unstable**
176:24
**unsuitable**
232:25 233:7
**unusual**   91:8
139:25 143:24
192:6 193:6,7
**updates**   216:11
217:21,22
**upfront**   213:24
**upgraded**
235:3
**ups**   88:4 100:5
**upside**   65:13
68:20
**use**   23:25 35:20
48:17 65:4,6
68:11,15 82:21
82:24 83:9
89:5 92:17
96:7 97:2
110:7 113:11
113:12 123:20
125:17 143:25

145:12 162:24
190:14 221:12
226:16,19
**used** 65:16 66:8
66:13 67:5
68:9 82:23
91:6,10,12
96:18,19 113:8
143:8,9 145:7
162:2 172:20
235:7 236:3
296:25 299:2
316:19
**uses** 35:22
66:17 174:16
**using** 80:19
89:4 113:7
163:5 191:3
233:14,14
234:15 235:5,6
271:21 302:24
302:25
**usual** 115:24
259:15
**usually** 107:5
124:11 135:14
172:3 189:4
190:9,10 207:7
**utilized** 145:6
**utilizing** 31:25

**v**

**v** 316:4 317:1
**vacuum** 109:10
**valid** 81:15

**validated** 285:8
**valuation** 54:20
55:21
**value** 67:15
94:7,19 242:12
308:22
**van** 90:14 96:8
**vanguard**
306:5
**vanguards**
305:23
**vanilla** 192:23
**vantage** 206:13
**varied** 57:24
205:6,8 206:12
**varies** 16:4
**variety** 103:2
**various** 40:6
71:13 72:14
75:5 76:8
123:11 124:20
214:25 258:12
266:14,17,20
266:21 267:19
268:5,9,12
269:7,25 270:2
286:4
**vary** 134:15
173:15
**vast** 80:10
93:21 144:16
**verbally** 220:5
**verify** 316:9
**veritext** 4:16,20
312:1 316:14

316:23
**veritext.com.**
316:15
**versa** 162:13
**version** 15:8
28:22 173:5
231:14 233:14
**versions** 96:20
184:25
**versus** 4:8 27:2
29:14,15,20
31:5 33:4
34:19 36:15
66:9,10 98:18
100:21 101:5
103:12 108:3,4
108:14,25
109:6,7 140:24
183:13 189:11
265:5 271:15
277:14 299:6
299:15 303:20
315:9
**vice** 23:5
162:13
**victory** 308:21
**video** 4:3,15
311:4,6
**videographer**
2:15 4:2 12:13
12:17 50:7,11
68:25 69:5
114:13 115:8
148:17,20
177:2,5 230:19

230:22 281:10
281:13 306:23
307:2 311:2
**view** 14:8 30:12
65:19 67:16
77:25 121:10
122:9 153:6
172:9,11,19
173:4 185:5
197:7 218:12
228:25 234:16
253:14 297:11
**viewed** 45:13
**vintage** 123:22
124:7 205:3,3
205:9 255:10
270:3 277:18
**vintages** 122:24
123:2,11,16
124:21 126:12
258:12 267:20
268:17 269:7
269:25 276:24
286:4 300:8
**virtual** 1:16 4:3
311:6
**virtually** 40:25
**visconti** 1:18
4:19 313:5,25
**visibility**
130:24
**visit** 83:13
**visualization**
100:19

| | | | |
|---|---|---|---|
| **voice** 192:8 | 38:14,22 39:22 | 253:21 254:7 | 181:11 182:20 |
| **volatile** 98:9,11 | 40:7 44:17 | 259:3 260:2 | 183:12,24 |
| 98:13 | 45:12,21 48:16 | 270:14 275:13 | 185:24 186:24 |
| **volatility** 97:25 | 49:7 56:11 | 285:18 | 188:7,24 203:8 |
| 99:18,20,21 | 66:18 73:25 | **wanted** 15:2 | 203:25 204:4 |
| 100:20 102:3,4 | 78:14 79:13,15 | 43:10 47:25 | 208:10 229:21 |
| 112:8,12,13,15 | 79:16,17,23 | 72:17 137:2,4 | 229:22 233:21 |
| **volunteering** | 81:13 88:7,12 | 143:5 149:13 | 233:21 236:15 |
| 155:15 | 88:13 92:3 | 162:21,24 | 240:16,24 |
| **vote** 226:9,10 | 102:3,5,9 | 164:14 212:21 | 251:19 258:24 |
| 226:23,25,25 | 103:21 104:20 | 278:20 293:18 | 259:18,19 |
| 227:5,24 228:4 | 105:4,24,25 | **wanting** 164:20 | **watching** 92:24 |
| 228:18,22 | 106:18,19,22 | **wants** 111:6 | **waterline** |
| 230:2,10 | 108:7,18 | **warranted** 73:9 | 206:19 |
| **voted** 229:19 | 109:10 111:23 | 287:23 | **way** 15:13 |
| **votes** 228:14 | 113:14,16 | **watch** 82:21 | 23:17 30:19 |
| 229:15,18 | 119:22,24,25 | 83:3,25 84:3 | 38:7,8,8 41:21 |
| **voting** 226:4,7 | 120:5 124:6,12 | 84:23 85:7 | 48:18,20 49:11 |
| 226:17 | 131:11 135:15 | 110:14 111:7 | 51:25 81:17 |
| | 137:3,23 138:6 | 111:20,25 | 82:8 83:5 |
| **w** | 139:8 144:8,12 | 115:23 116:4 | 85:18 87:23 |
| | 146:15 152:12 | 116:13,22 | 88:5 90:19 |
| **wachala** 29:14 | 156:12 157:14 | 117:11,12,15 | 91:23 96:25 |
| **wait** 102:24 | 158:19 160:22 | 117:20,21 | 104:3 110:25 |
| 118:3 119:25 | 160:23 161:3 | 118:3,11,12 | 131:4 135:18 |
| 270:21 | 161:21 162:23 | 119:21,25 | 136:3,7 137:2 |
| **waited** 258:13 | 163:4,7,11 | 120:2,12 | 137:9 145:20 |
| **waived** 3:5 | 164:8 165:3 | 122:18 154:8,8 | 145:22 149:14 |
| **waldner** 33:4 | 170:14 187:18 | 154:9,12,13,14 | 154:13 159:10 |
| 33:19 | 188:16 198:23 | 154:24 156:7 | 159:11,15,16 |
| **walk** 20:12 | 203:21 210:12 | 168:2 169:17 | 168:10 193:7 |
| **walked** 82:7 | 216:25 218:23 | 169:20,21,23 | 194:23 197:19 |
| 216:23 | 223:8,17 | 169:25 170:2,3 | 203:13 206:14 |
| **walking** 84:3 | 229:24 231:4 | 170:8,12,14,18 | 209:2,4,9 |
| **walnut** 2:3 | 236:8 245:15 | 170:24 177:16 | 213:3 219:12 |
| **want** 6:8 11:21 | | | |
| 18:9,11 31:20 | | | |

**[way - yeah]**

227:23 228:6
229:10 230:9
230:11,13
251:3 285:24
289:2 291:7
295:2 303:21
309:6,24
**ways** 101:6
108:22 144:2
162:6 214:2
222:16
**we've** 94:9,10
94:11 262:14
**wealth** 272:24
273:6
**week** 10:4,5,10
**weeks** 196:18
**welcome**
115:13
**wells** 32:2,4,9
**went** 14:24
23:23 30:16
32:14 43:20
44:20 46:4,11
50:3,15 54:4
59:13 64:8
74:2 98:19
127:4 129:16
141:16 156:4
168:19 173:5
181:19 196:17
206:11 211:22
213:5,7,11,11
213:16,20,22
216:2 232:9

236:5 277:17
283:13 284:19
297:18 299:16
**west** 308:20
**whittle** 92:18
**whittled** 95:2
97:11
**wife's** 38:25
**william** 1:18
4:19 313:5,25
**williams** 34:19
**withdrawals**
254:16
**witness** 1:17
5:4 183:6
186:16 242:13
252:22 258:4
310:12 313:8
313:22 316:8
316:10,12,18
**woefully** 191:4
191:13,21,24
**wondering**
14:11 158:23
**word** 44:10
66:23 162:24
162:25 190:10
218:15
**words** 15:10
70:18 127:13
191:3 273:9
**work** 15:2,25
26:21 37:20
39:17,24 41:22
57:20 60:20

62:2 75:17
79:6 81:8,16
84:4 87:11
91:6 97:12,13
99:13 103:19
105:15 114:10
136:21,21
141:15 142:14
171:21 272:17
**worked** 13:17
14:2 37:18
57:18 60:16,16
94:24 136:14
137:13 141:4,7
193:4,9 212:6
212:24 221:6
263:6 264:6
283:14 296:5
296:10
**workforce**
89:20
**working** 20:22
26:19 58:3
80:2,2 83:5,12
130:9 134:23
140:20,20
231:12 263:21
273:8 274:13
274:14,21
275:11 285:4
290:23
**works** 273:22
274:7
**world** 33:23
75:7,9 108:25

**worried** 113:3
**worry** 107:15
**worse** 119:17
170:2
**worth** 25:25
54:19 55:6,7
55:18
**would've** 93:11
**wow** 129:2
**wrap** 30:17
281:8 306:21
307:6
**writing** 130:18
138:8
**written** 38:5
111:15 182:10
**wrong** 117:19
163:6 192:14
192:16 217:22
249:7 266:19
266:22
**wrote** 14:5
21:17 42:9
150:21 188:15
202:19 203:2

| **x** |
| --- |

**x** 1:5,11 90:24
313:17 314:2
315:2
**xyz** 46:5

| **y** |
| --- |

**yeah** 16:14
23:12 24:16
38:21 51:18

| | | |
|---|---|---|
| 52:2 60:11 | 247:23,24 | 199:3 |
| 74:21 82:14 | 248:5,8,10,23 | **york** 1:19 312:2 |
| 95:24 103:22 | 249:8,10,24,24 | 313:2,4,6 |
| 119:15 173:14 | 249:24 250:4 | **z** |
| 173:15 193:21 | 250:16,23 | **zoom** 1:16 |
| 226:5 234:22 | 251:23 252:3 | 17:14 |
| 261:10 310:7 | 252:12,18 | |
| **year** 11:22 39:5 | 253:7,19 268:4 | |
| 61:8 64:9 | 268:8,12,23,23 | |
| 86:18 90:6,7 | 269:10,14 | |
| 91:17 98:21 | 277:3,5,15,15 | |
| 109:12,12,12 | 279:3,3 284:21 | |
| 109:13,13 | 284:22 288:12 | |
| 110:12,12,13 | 288:15 294:24 | |
| 110:15 115:21 | 300:3,4,15,16 | |
| 116:5,10,10,23 | 300:20,20,24 | |
| 116:23 117:11 | 300:24 301:19 | |
| 117:11,12,13 | 301:20 309:16 | |
| 118:8,15,16 | **years** 19:3,7,8 | |
| 119:7,7 120:6 | 32:3 38:5 | |
| 121:8 122:10 | 57:15 64:23 | |
| 122:10 123:7,7 | 81:19,20 86:16 | |
| 124:22,23 | 88:11 89:21 | |
| 128:2 130:13 | 91:20,22 96:3 | |
| 152:22 154:15 | 102:22,24 | |
| 156:8 161:25 | 109:16 130:14 | |
| 170:5,6 176:17 | 141:25 184:2 | |
| 176:17,17 | 210:8 214:23 | |
| 183:5 185:7,21 | 217:17 251:21 | |
| 200:24 201:13 | 254:17 258:13 | |
| 204:2 240:8,9 | 267:25 297:17 | |
| 240:19,19 | 304:5 | |
| 241:8,9 243:15 | **yesterday** 9:12 | |
| 244:11 247:15 | 9:15,19 198:9 | |
| 247:15,16,23 | 198:11,20 | |

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.